# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY, LLC  )
                                             )
                   Plaintiff,             )
                                               )
        v.                            )    C.A. No. 04-833-KAJ
                                               )
SICOR INC. and SICOR                  )
PHARMACEUTICALS, INC.,           )
                                             )
              Defendants.         )

**AMENDED ANSWER TO FIRST AMENDED COMPLAINT,
COUNTERCLAIM AND DEMAND FOR A JURY TRIAL**

Defendants, Sicor Inc. and SICOR Pharmaceuticals, Inc. (collectively "Sicor"),

respectfully request a jury trial and hereby respond to the First Amended Complaint ("Amended

Complaint") filed by Pharmacia & Upjohn Company ("Pharmacia") as follows:

     1.     Sicor denies knowledge or information sufficient to form a belief as to the truth of

the allegations set forth in paragraph 1 of the Amended Complaint.

     2.     Sicor denies the allegations set forth in paragraph 2 of the Amended Complaint,

except admits that Sicor Inc. is incorporated in the State of Delaware and has a principal place of

business at 19 Hughes, Irvine, California 92618 and, through wholly-owned subsidiaries, is in

the business of, inter alia, making and selling generic injectable pharmaceutical products for the

human healthcare market.

     3.     Sicor denies the allegations set forth in paragraph 3 of the Amended Complaint,

except admits that SICOR Pharmaceuticals, Inc. is incorporated in the State of Delaware and has

a principal place of business at 19 Hughes, Irvine, California 92618, and is in the business of,

inter alia, making, and, through a wholly-owned subsidiary, selling generic injectable pharmaceutical products for the human healthcare market.

4.      The allegations in paragraph 4 are conclusions of law to which no response is required. To the extent a response is required, Sicor denies the allegations, except states that it does not contest the subject matter jurisdiction of this Court for purposes of this action only.

5.      The allegations in paragraph 5 are conclusions of law to which no response is required. To the extent a response is required, Sicor denies the allegations, except states that it does not contest venue in this judicial district for purposes of this action only.

6.      Sicor denies the allegations set forth in paragraph 6 of the Amended Complaint, except admits that Sicor Inc. and SICOR Pharmaceuticals, Inc. are incorporated under the laws of the State of Delaware, and that those entities, through their subsidiaries, distribute and sell products throughout the United States, including in this judicial district. Sicor further states that it does not contest personal jurisdiction over it by this Court for purposes of this action only.

7.      Sicor denies the allegations set forth in paragraph 7 of the Amended Complaint, except admits that United States Patent No. 6,107,285 (the "'285 patent") was issued on August 22, 2000 and is entitled "Injectable Ready-To-Use Solutions Containing an Antitumor Anthracycline Glycoside," and that the patent states that the assignee is Pharmacia & UpJohn Company.

8.      Sicor denies the allegations set forth in paragraph 8 of the Amended Complaint, except admits that, through its wholly-owned subsidiaries, Sicor lawfully manufactures, sells and offers to sell Idarubicin HCl, and respectfully refers the Court to the FDA-approved package insert for the ingredients thereof.

9.      Sicor denies the allegations set forth in paragraph 9 of the Amended Complaint.

## COUNT I

10.    Each of preceding paragraphs 1-9 is incorporated as if fully set forth herein.

11.    Sicor denies the allegations set forth in paragraph 11 of the Amended Complaint.

12.    Sicor denies the allegations set forth in paragraph 12 of the Amended Complaint.

13.    Sicor denies the allegations set forth in paragraph 13 of the Amended Complaint,
except admits that, through its wholly-owned subsidiaries, Sicor continues to lawfully
manufacture, sell and offer to sell Idarubicin HCl.

## COUNT II

14.    Each of the preceding paragraphs 1-13 is incorporated as if fully set forth herein

15.    Sicor denies the allegations set forth in paragraph 15 of the Amended Complaint.

16.    Sicor denies the allegations set forth in paragraph 16 of the Amended Complaint.

17.    Sicor denies the allegations set forth in paragraph 17 of the Amended Complaint.

18.    Sicor denies the allegations set forth in paragraph 18 of the Amended Complaint.

## AFFIRMATIVE DEFENSES

### First Defense

### Invalidity of the '285 Patent

19.    The '285 patent is invalid under the patent laws of the United States, including
without limitation 35 U.S.C. §§ 101, 102, 103 and 112.

### Second Defense

### Noninfringement of the '285 Patent

20.    The manufacture, sale and offer for sale of Sicor's Idarubicin HCl does not
infringe any valid and enforceable claim of the '285 patent.

3

### Third Defense

### Laches

21.    ·Under the doctrine of laches, Pharmacia is barred in whole or in part from maintaining this action and from recovering any damages or equitable relief thereunder.

### Fourth Defense

### Estoppel

22.    Under the doctrine of equitable estoppel, Pharmacia is barred in whole or in part from maintaining this action and from recovering any damages or equitable relief thereunder.

### Fifth Defense

### Unclean Hands

23.    This action is barred in whole or in part by the doctrine of unclean hands.

### Sixth Defense

### Inequitable Conduct

24.    The '285 patent is unenforceable on grounds of inequitable conduct, as described in more detail below, wherein the patentees and the assignees of the '285 patent, or their attorneys or agents, effectively withheld material references, including a 1967 reference by Sandell and a 1959 reference by Schou and Jensen, with an intent to deceive by burying such material references in a submission of 228 references submitted to the United States Patent and Trademark Office ("the Patent Office") very late in the course of prosecuting the application that matured into the '285 patent and only after learning that the Patent Office was going to allow some claims as a patent.

## COUNTERCLAIM

For its counterclaim against plaintiff Pharmacia, Sicor Inc. and SICOR Pharmaceuticals, Inc. (collectively "Sicor"), allege as follows:

### Nature of the Counterclaim

25.    Sicor asserts the following counterclaims against Pharmacia for a declaration that the '285 patent is invalid and unenforceable, and that the manufacture, sale and offer for sale of Sicor's Idarubicin HCl does not infringe any valid claim thereof.

### The Parties

26.    Sicor Inc. is a Delaware corporation having a principal place of business at 19 Hughes, Irvine, California 92618. Through its wholly-owned subsidiaries, Sicor Inc. is engaged in the business of, inter alia, making and selling generic pharmaceutical products for the human healthcare market.

27.    SICOR Pharmaceuticals, Inc. is a Delaware corporation having a principal place of business at 19 Hughes, Irvine, California 92618. SICOR Pharmaceuticals, Inc. is engaged in the business of, inter alia, making and, through a wholly-owned subsidiary, selling generic pharmaceutical products for the human healthcare market.

28.    Upon information and belief, Pharmacia is a Delaware corporation having a principal place of business at 7000 Portage Road, Kalamazoo, Michigan 49001, and is engaged in the business of researching, developing, making and selling pharmaceutical products for the human healthcare market.

**Jurisdiction and Venue**

29.     This Court has jurisdiction over the subject matter of this counterclaim under the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202, and under the laws of the United States concerning actions relating to patents, 28 U.S.C. §§ 1331 and 1338(a).

30.     Venue is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

31.     An actual justiciable case or controversy exists between Sicor and Pharmacia concerning the validity, scope and enforceability of the '285 patent and Sicor's alleged liability for alleged infringement thereof.

**Count I**

**Counterclaim for Declaratory Relief: The '285 Patent is Invalid**

32.     The '285 patent is invalid because it fails to comply with the requirements of the patent laws of the United States, including but not limited to 35 U.S.C. §§ 101, 102, 103 and 112.

33.     Pharmacia is entitled to no relief because the manufacture, sale and offer for sale of Sicor's Idarubicin HCl does not infringe any valid and enforceable claim of the '285 patent.

34.     Pharmacia is entitled to no relief because it comes to this Court with unclean hands.

35.     Pharmacia is entitled to no relief under principles of laches.

36.     Pharmacia is entitled to no relief under principles of equitable estoppel.

**Count II**

**Counterclaim for Inequitable Conduct: The '285 Patent is Unenforceable**

37.     Sicor realleges paragraphs 25 to 36 of the Counterclaim as if fully set forth herein.

6

38.     The inventors and the assignee of the '285 patent and their attorneys and agents ("the Applicants") had a duty of candor and good faith while prosecuting the application designated as Serial Number 07/827,742 (the "'742 Application"), that would mature into the '285 patent, before the Patent Office to meaningfully disclose to the Patent Office material information of which they were aware.

39.     Each individual Applicant who was aware of material information was required by Patent Office practice to submit such information to the Patent Office as part of an Information Disclosure Statement ("IDS") as early in prosecution of the '742 Application as it was known.

40.     During the period when the '742 Application was in prosecution, Patent Office practice dictated that any inventors or assignees, and their attorneys and agents, should avoid the submission of long lists of references in an IDS and that if such a long list of references was submitted the inventors or assignees, or their attorneys or agents, should highlight those references which were known to be of significance, particularly those references that might refute, or were inconsistent with, positions taken by the inventors or assignees, or their attorneys or agents, before the Patent Office.

41.     Thus, upon information and belief, the Applicants knew that they had a duty of candor and good faith and knew that they were to avoid dumping reams of information upon the Patent Office late in the course of the prosecution of the '742 Application and to not bury key references within such long lists of documents in hopes of appearing to discharge their duty of candor, but, in reality, hiding information from the Patent Office. Yet, upon information and belief, this is exactly what the Applicants did in an effort to hide important and material information and did so with an intent to deceive.

42.    During the course of the prosecution of the '742 Application -- which spanned an eight-year period from January 29, 1992, when the '742 Application was filed, through August 20, 2000, when the '285 patent issued -- the Patent Office repeatedly rejected the '742 Application upon among other grounds that the prior art taught that solutions of doxorubicin hydrochloride, one of the drugs claimed in the '285 patent, were known to be stable in the pH range of 2.3 to at least 4.0 and higher, and within the range Applicants sought to claim.

43.    The Applicants repeatedly challenged these rejections and stated that those solutions described in the prior art were not stabilized with hydrochloric acid, as Applicants sought to claim, but instead were stabilized with buffers.

44.    The Applicants repeatedly stated, including through the submission of declarations on July 12, 1996, that people skilled in the art would adjust the pH of solutions of injectable products to the level of pH 1 or 2 with an acid, but would not adjust the pH of such solutions to a level above about 2 using an acid. Instead, the Applicants stated that persons skilled in the art would have used a buffer instead of an acid to adjust the pH of a solution above about 2. For example, in a declaration dated May 27, 1991, which was resubmitted to the Patent Office as part of the '742 Application on July 12, 1996, one of the inventors stated that "[b]ased on the experience of those skilled in the art, when one was preparing the solution of [doxorubicin hydrochloride] for use in chemotherapy, any adjustment above about 2 would have been performed with a buffer and not with hydrochloric acid."

45.    In correspondence from the Patent Office dated June 23, 1998, the Patent Office informed the Applicants that some of the claims of the '742 Application would be allowed to issue as a patent. Thus, at this point, the Applicants knew that after over six years of discussions with the Patent Office they would receive a patent.

46.    Just nine days later, on July 1, 1998, the Applicants submitted a document titled the "Ninth Supplemental Information Disclosure Statement" which disclosed to the Patent Office an exceedingly long list of references -- 228 separate references -- and informed the Patent Office that this information was submitted "insofar as the [Patent Office] Examiner might consider any of the cited documents important in deciding whether to allow the ['742] application to issue as a patent . . . " The Applicants invited the Patent Office to wade though this pile of information, upon information and belief, knowing full well that at this late stage of the prosecution and after six years of dealing with the '742 Application that the Patent Office examiners would give this information little or no scrutiny.

47.    Buried within these 228 references were material references that were not highlighted to the Patent Office, including a 1967 reference by Sandell and a 1959 reference by Schou and Jensen. The Sandell and Schou and Jensen references refuted, and at the very least were inconsistent with, the position the Applicants repeatedly took with the Patent Office that persons skilled in the art would adjust a solution to a pH above about 2 with a buffer and not an acid.

48.    By burying these material references in a long list of documents dumped on the Patent Office after six years of prosecution and after learning that a patent would issue, upon information and belief, the Applicants acted with an intent to deceive and to mislead the Patent Office and ensured that their repeated statements that persons skilled in the art would not adjust a solution of doxorubicin hydrochloride to a pH above about 2 with an acid, but instead would use a buffer, would not be challenged and that the patent they long sought would issue.

9

49.    By effectively withholding material information with an intent to deceive, the Applicants engaged in inequitable conduct that renders each claim of the '285 patent unenforceable.

### JURY DEMAND

Sicor respectfully requests a trial by jury on all issues so triable.

WHEREFORE, Sicor respectfully requests the following relief:

A.    The entry of judgment on the Amended Complaint against Pharmacia, and in favor of Sicor, denying Pharmacia the relief requested in the Amended Complaint and any relief whatsoever;

B.    A declaration that the '285 patent is invalid and unenforceable;

C.    A declaration that the manufacture, sale and offer for sale of Idarubicin HCl does not infringe any valid and enforceable claim of the '285 patent;

D.    A permanent injunction enjoining Pharmacia, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the judgment, from directly or indirectly charging infringement, or instituting any action for infringement of the '285 patent against Sicor or any of its subsidiaries, affiliates, customers, distributors, licensees or suppliers;

E.    A declaration that this case is exceptional, and an award to Sicor of its reasonable attorneys' fees and costs; and

F.     Such other and further relief as the Court deems proper and just.

ASHBY & GEDDES

/s/ *John G. Day*

---

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Defendants*

*Of Counsel:*

Reid L. Ashinoff
Brian T. Moriarty
William J. Sipio
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Dated: June 1, 2005
157958.1

11

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
2003 WL 151227 (D.Del.)
**(Cite as: 2003 WL 151227 (D.Del.))**

**H**
Only the Westlaw citation is currently available.


United States District Court,
D. Delaware.
TRUEPOSITION, INC. and KSI, Inc., Plaintiffs /
Counterclaim Defendants
v.
ALLEN TELECOM, INC. Defendant / Counterclaim
Plaintiff.
No. C.A. 01-823 GMS.

Jan. 21, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

## I. INTRODUCTION

**\*1** On December 11, 2001, the plaintiffs,
TruePosition, Inc. and KSI, Inc. (collectively
"TruePosition") filed a complaint against the
defendant, Allen Telecom, Inc. ("Allen"). In the
complaint, TruePosition alleges that Allen has
infringed three of its patents, namely U.S. Patent No.
4,728,959 ("the '959 patent"), U.S. Patent No.
6,108,555 ("the '555 patent"), and U.S. Patent No.
6,119,013 ("the '013 patent"). Each of these patents
discloses a technology for locating cellular phones. In
its Answer and Counterclaims (D.I.6, 48), the
defendant asserted six affirmative defenses to the
plaintiffs' claims, as well as five counterclaims.

Presently before the court is TruePosition's Motion
to Dismiss and/or Strike the Defendant's
Counterclaims III, IV, and V, and Affirmative
Defenses III and VI (D.I.58). For the following
reasons, the court will grant in part and deny in part
the plaintiffs' motion.

## II. STANDARDS OF REVIEW

The plaintiffs move to dismiss Counterclaims III, IV,
and V pursuant to Federal Rule of Civil Procedure
12(b)(6). Dismissal is appropriate pursuant to this
Rule if the complaint fails "to state a claim upon
which relief can be granted." Fed. R. Civ. P. 12(b)(6).
In this inquiry, the court must accept as true and view
in the light most favorable to the non-movant the
well-pleaded allegations of the complaint. Doug
Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d
173, 183-84 (3d Cir.2000). The court 'need not accept
as true "unsupported conclusions and unwarranted
inferences." ' Id. (quoting City of Pittsburgh v. West
Penn Power Co., 147 F.3d 256, 263 n. 13 (3d
Cir.1998)) (quoting Schuylkill Energy Res., Inc. v.
Pennsylvania Power & Light Co., 113 F.3d 405, 417
(3d Cir.1997)). However, it is the duty of the court 'to
view the complaint as a whole and to base rulings not
upon the presence of mere words but, rather, upon the
presence of a factual situation which is or is not
justiciable.' Id. at 184 (quoting City of Pittsburgh,
147 F.3d at 263).

The plaintiffs rely upon Federal Rules of Civil
Procedure 8 and 12(f) for their motion to strike
Affirmative Defenses III and VI. Rule 8 requires a
"short and plain" statement of a claim or defense.
Fed. R. Civ. P. 8(a) and (b). It is well settled that the
Federal Rules intend a liberal pleading standard. See
Leatherman v. Tarrant County Narcotic Intelligence
& Coordination Unit, 507 U.S. 163, 168 (1993)
(holding that federal courts may not impose a more
demanding standard of pleading beyond "the liberal
system of 'notice pleading' set up by the Federal
Rules"). Indeed, Rule 8 expressly mandates that
"[e]ach averment of a pleading shall be simple,
concise, and direct." Fed. R. Civ. P. 8(e).

Rule 12(f) allows a court to strike "any insufficient
defense" from any pleading. Fed. R. Civ. P. 12(f).
Motions to strike affirmative defenses are disfavored.
Proctor & Gamble Co. v. Nabisco Brands, Inc., 697
F.Supp. 1360, 1362 (D.Del.1988). When ruling on
such a motion, the "[c]ourt must construe all facts in
favor of the nonmoving party ... and deny the motion
if the defense is sufficient under the law." Id.

## III. DISCUSSION

### A. Counterclaim III

**\*2** Counterclaim III alleges tortious interference with
a contract. The plaintiffs move to dismiss the
counterclaim pursuant to Rule 12(b)(6) on the
grounds that it fails to plead an essential element of
the alleged tort, namely, a breach of the relevant
contract.

The tort of interference with a contract requires "an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

intentional act that is a significant factor in causing the breach of the contract." [FN1] *Cantor Fitzgerald, L.P. v. Cantor, 724 A .2d 571, 584 (Del. Ch.1998).* Without a breach, there is no viable tortious interference claim. As to this point, Delaware law is well-settled. *See id.; see also Associated/Acc Int'l, LTD. v. Dupont Flooring Sys. Franchise Co.,* 2002 U.S. Dist. LEXIS 6464, at \*27- 28 (D.Del.2002); *DeBakey Corp. v. Raytheon Serv. Co.,* 2002 WL 1273317 (Del. Ch.2000); *Boyer v. Wilmington Materials,* 1997 WL 382979 (Del. Ch.1997); *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del. Ch.1987). There is no discussion in these cases as to behavior that could constitute tortious interference when no breach of contract occurs. Presumably, this is because there is no conduct that could constitute the tort of interference with a contract, unless a breach of that contract results. [FN2]

> FN1. Contrary to the defendant's paraphrasing, the court did not style this element as requiring only some kind of interference and no resultant breach. *See* Answering Brief at 9.

> FN2. Although the defendant acknowledges that "a review of the relevant case law shows that the cases are universally precipitated by a breach of contract," it maintains that "the absence of a total breach does not foreclose recovery for damages caused by improper interference." Answering Brief at 10-11. This assertion is unpersuasive as it applies to interference with a contract, particularly given Allen's conspicuous failure to cite any supporting caselaw for it. Furthermore, Allen's contention that a breach of contract is not required in such a case because "the applicable tort here is, for a reason, labeled 'tortious *interference* with contractual relations' not 'tortious *breach* of contractual relations,' " Answering Brief at 12 n. 5 (emphasis added), is astounding in its fatuity. The tort is not labeled "tortious breach of contractual relations" because a non-party to a contract generally is not bound by the contract and thus can not breach the contract. *See, e.g., Traffas v. Bridge Capital Investors II,* 1993 WL 339293 (D.Kan.1993), at \*3 ("It would be a novel holding for the court to rule that a breach of contract action can be maintained against a person who is not a party to the

contract being sued upon.... A party to a contract cannot sue a person who is not a party to that contract for breach of contract."); *Credit Gen. Ins. Co. v. Midwest Indem. Corp.,* 916 F.Supp. 766, 722 (N.D.Ill.1996) (finding "ludicrous" the defendants' contention that a non-party to a contract can breach that contract).

In this case, the contract at issue is between AT & T Wireless Services, Inc. ("AT & T") and Allen for the purchase of Allen's wireless location systems, which systems are the subject of the present patent infringement suit. In its counterclaim, Allen alleges that the plaintiffs, by filing the present suit and by publicizing it, intended to cause a breach of the AT & T contract. Answer and Counterclaims (D.I.48) ¶ ¶ 17-18. This is insufficient to state a claim of tortious interference with a contract because, as the defendant concedes, there has been no breach of the AT & T contract. [FN3] Answering Brief at 10. Therefore, Counterclaim III must be dismissed.

> FN3. The court is mindful of Allen's contention that "much of this may ... be a matter of semantics." Answering Brief at 12 n. 6. Allen argues that, because the original AT & T contract was modified subsequent to TruePosition's initiation of the present suit, it suffered a complete loss of the original anticipated contract. *Id.* Apparently, Allen wishes the court to view this "loss" as a breach. However, a mutual modification of a contract certainly is not a breach. *See, e.g., Anderson v. Golden,* 569 F.Supp. 122, 140 (S.D.Ga.1982) (distinguishing between breach and mutual modification). To the extent such a loss represents the loss of an economic expectation, the corresponding tort is interference with a prospective business opportunity. The court reiterates that Delaware law requires a breach to sustain the tort of interference with a contract.

B. Counterclaim IV

Counterclaim IV alleges tortious interference with prospective business opportunities. The elements of this tort are: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
**(Cite as: 2003 WL 151227 (D.Del.))**

Page 3

lawful manner.' *DeBonaventura v. Nationwide Mut. Ins. Co., 428 A.2d 1151, 1153 (Del.1981)* (quoting *DeBonaventura v. Nationwide Mut. Ins. Co., 419 A.2d 942, 947 (Del. Ch.1980))* (citations omitted). The plaintiffs move to dismiss the counterclaim on the grounds that the defendant cannot prove all of the required elements, namely, a prospective business opportunity, or an interference with that opportunity.

The only "prospective business opportunity" at issue in the counterclaim is the AT & T contract. As stated above, the defendant acknowledges a completed and continuing contract with AT & T. Allen's expected business opportunity, thus, appears to have been consummated before the allegedly tortious conduct of the plaintiffs. This is particularly true because "the probability of the business opportunity must be assessed at the time of the alleged interference ." *Malpiede v. Towson, 780 A.2d 1075, 1099 (Del.2001)*. In this case, the alleged interference occurred after Allen had been awarded the contract with AT & T. Answer and Counterclaims (D.I.48) ¶ 17.

**\*3** Allen maintains, however, that the plaintiffs' interference caused a modification of the expected contract terms. Following TruePosition's commencement of a patent infringement action against Allen and a press release announcing the same, Allen allegedly incurred additional legal expenses in renegotiating certain provisions of the AT & T contract, more onerous indemnification terms in the contract, and damages to its reputation. Thus, Allen contends, TruePosition's actions interfered with its expected business opportunity in that the final terms of the AT & T contract differed from the original terms. For purposes of this motion only, this is sufficient to state a claim of tortious interference with prospective business opportunities. *See McHugh v. Board of Educ., 100 F.Supp.2d 231, 247 n. 15 (D.Del.2000)* (noting that the tort requires "a valid business relationship or expectancy" and citing cases).

Assuming that these facts constitute a sufficient interference, the counterclaim may be challenged on other grounds, namely, that Allen has not shown that the plaintiffs engaged in any wrongful conduct. To sustain the tort of interference with a business opportunity, the interference must have been improper. *Bohatiuk v. Delaware Chiropractic Servs. Network, L.L.C., 1997 Del.Super. LEXIS 215, at \*8-10 (Del.Super.1997)*. The conduct at issue is the filing of a patent infringement suit and the public announcement of the suit by a press release.

Normally, lawful actions cannot form the basis of a claim of tortious interference, particularly in light of TruePosition's "privilege to compete and protect its own business interests." *Acierno v. Preit-Rubin, Inc., 199 F.R.D. 157, 164-65 (D.Del.2001)* (dismissing tortious interference with contractual relations claim because defendant corporation and real estate investment trust, in failing to affirmatively suggest to County that competitor plaintiff's property be included in a traffic impact study, committed no wrongful conduct) (citing caselaw). In this case, however, the defendant also has alleged the counterclaim of "sham litigation." In the sham litigation context, the mere initiation of a lawsuit may be wrongful if it constitutes unlawful antitrust activity. Because the court will allow the "sham litigation" counterclaim to stand, *see infra* Section I.C., the tortious interference with a prospective business opportunity claim must survive as well. It is axiomatic that if the defendant can prove that the instant lawsuit is merely a "sham" and violative of antitrust law, then the filing of the lawsuit constitutes improper conduct. Therefore, in the interest of consistency, and viewing the pleadings in the light most favorable to Allen, Counterclaim IV survives the instant motion to dismiss.

## C. Counterclaim V

TruePosition moves for the dismissal of Counterclaim V, which alleges "sham litigation," on the grounds that such a cause of action does not exist. The term "sham litigation" refers to an exception to the doctrine of antitrust immunity. Immunity to certain antitrust suits was established by the Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U .S. 127 (1961)*, and *Mine Workers v. Pennington, 381 U.S. 657 (1965)*. These cases established that "the Sherman Act does not prohibit ... persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr, 365 U.S. at 136*. The Supreme Court refused to "impute to Congress an intent to invade" the First Amendment right to petition. *Id. at 136*. Thus, the *Noerr-Pennington* doctrine protects those who petition the government from antitrust liability.

**\*4** Later caselaw extended *Noerr* antitrust immunity to "the approach of citizens ... to administrative agencies ... and to courts." *California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972)*. However, such immunity is not afforded to "sham" petitioning that is only "an attempt to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

Page 4

interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144. Litigation is a mere "sham" if it is objectively baseless and subjectively motivated to interfere with business competition by using a governmental process 'as an anticompetitive weapon.' *Professional Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49 (1993) (quoting *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991)).

The plaintiffs urge that "sham litigation" is not a cognizable cause of action. The court cannot agree. A counterclaim of sham litigation is, essentially, an assertion that antitrust law has been violated. Indeed, in litigation leading to the Court's decision in *Professional Real Estate Investors*, Columbia Pictures had sued the defendant, PRE, for copyright infringement. *Id.* at 52. The defendant counterclaimed, accusing Columbia of violations of § § 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. § § 1-2. *Id.* "In particular, PRE alleged that Columbia's copyright action was a mere sham that cloaked underlying acts of monopolization and conspiracy to restrain trade." *Id.* Although the counterclaim did not survive summary judgment on the facts of the case, the Court upheld the validity of the sham counterclaim itself. Indeed, in announcing a two-part test for its application, the Court only clarified the existence and context of the sham litigation exception. [FN4]

> FN4. Of course, as already stated, a violation of antitrust law underlies any sham exception to antitrust immunity. Although the defendant has not specifically pled a violation of the Sherman Act in Counterclaim V, the invocation of the sham litigation doctrine is sufficient to give notice of the basis of its claim. This is particularly true in the context of a Rule 12(b)(6) motion to dismiss, and in light of both the liberal pleading philosophy of the Federal Rules and the court's responsibility 'to examine the complaint to determine if the allegations provide for relief on any possible theory.' *O'Boyle v. Jiffy Lube Int'l, Inc.*, 866 F.2d 88, 93 (3d Cir.1989) (quoting C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1357, at 601-02 (1969) (footnotes omitted)).

Since *Professional Real Estate Investors*, the sham litigation exception has been invoked in varied contexts. For example, in a recent case, the Supreme Court refused to strip antitrust immunity from an

employer who filed a losing and retaliatory lawsuit where the suit was not objectively baseless. *BE & K Constr. Co. v. NLRB*, 122 S.Ct. 2390 (2002). In so doing, the Court implicitly held that the sham litigation exception applies to the National Labor Relations Act in the same way it applies to the Sherman Act. *See id.* at 2402 (Scalia, J., concurring) ("[T]he implication of our decision today is that ... we will construe the National Labor Relations Act ... in the same way we have already construed the Sherman Act: to prohibit only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process.") (emphasis in original). Other courts have applied the immunity principles of *Noerr-Pennington* to other contexts. *See, e.g., State of Missouri v. National Organization of Women*, 620 F.2d 1301, 1318-19 (8th Cir.1980) (applying *Noerr-Pennington* liability principles to state tort laws); *Video International Production, Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1084 (5th Cir.1988) (holding that *Noerr-Pennington* doctrine applies to Civil Rights Act liability); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614-15 (8th Cir.1980) (same). It follows that if the *Noerr-Pennington* immunity principles apply in these contexts, the sham litigation exception to immunity applies as well. [FN5] Other cases have explicitly or implicitly accepted the sham exception in the patent infringement context. *See, e.g., Carroll Touch, Inc. v. Electro Mechanical Sys.*, 15 F.3d 1573 (D.C.Cir.1993) (discussing sham litigation counterclaim in patent infringement context); *U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592, 597 (Fed.Cir.1995) (rejecting sham counterclaim on the facts of the case).

> FN5. Unlike the defendant, however, the court recognizes a distinction between the *Noerr-Pennington* doctrine, which shields petitioners from antitrust liability, and the sham litigation exception, which strips this immunity when the petition is meritless and anticompetitive in nature. *See, e.g.,* Answering Brief at 15 ('... the Noerr-Pennington [*i.e.*, "sham litigation"] doctrine ...').

**\*5** In sum, the court can find no justification for refusing to allow the sham exception to be litigated in the instant case. Indeed, a copyright infringement action, like that at issue in *Professional Real Estate Investors*, and a patent infringement action such as the one at issue here present such analogous contexts regarding the application of the sham litigation exception that it would strain credibility to announce

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a relevant and dispositive difference between them. Thus, Counterclaim V may remain, to succeed or fail as it may in the ensuing litigation. [FN6]

> FN6. In this vein, the court stresses that the defendant, of course, will be tasked in the ensuing litigation with proving the elements of the sham litigation exception, namely, that the present patent infringement suit is objectively baseless and subjectively motivated by an intent to interfere with competition. *See Carroll Touch,* 15 F.3d at 1583 (holding that sham litigation counterclaim could not survive summary judgment because defendant did not establish a genuine issue regarding whether the patent infringement action was baseless).

**D. Affirmative Defense III**

As its third affirmative defense, Allen alleges that TruePosition engaged in "fraud and/or inequitable conduct" in acquiring the relevant patents. The plaintiffs move to strike the defense, as well as Counterclaim I, which is predicated on the inequitable conduct defense, on the grounds that the affirmative defense does not meet the pleading requirements of Federal Rule of Civil Procedure 9(b).

Rule 9 requires that all pleadings of fraud or mistake "be stated with particularity." Fed. R. Civ. P. 9(b). [FN7] These averments, however, remain subject to the liberal pleading standard of Rule 8, which requires only a "short and plain" statement of a claim or defense. *See In re Westinghouse Sec. Litig.,* 90 F.3d 696, 703 (3d Cir.1996) (citing cases); *see generally Leatherman,* 507 U.S. at 168 (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"); 5 Charles Alan Wright & Arthur R. Miller Federal Practice and Procedure § 1281, at 520-21 (1990) (pleading with particularity under Rule 9(b) should be done consistently with the general philosophy of Rule 8); 2A James W. Moore, Moore's Federal Practice ¶ 8.13, at 8-58 (2d ed.1995) (the mandate of Rule 8 applies "even where the Rules command particularity, as in the pleading of fraud under Rule 9(b)") (footnote omitted).

> FN7. Because the court has found that Allen's pleadings satisfy the heightened pleading requirements of Rule 9(b), it need not address the defendant's argument that Rule 9(b) may not apply to allegations of

inequitable conduct.

The pleading requirements are satisfied by Allen's third affirmative defense. The defense constitutes one paragraph which names the title and publication date of at least one allegedly withheld material prior art publication. In the context of alleged inequitable conduct before the PTO during a patent prosecution, "pleadings that disclose the name of the [allegedly withheld] relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b)." *EMC Corp. v. Storage Tech. Corp.,* 921 F.Supp. 1261, 1263 (D.Del.1996). The third affirmative defense discloses at least this much, and thus suffices "to apprise the other party of what is being alleged in a manner sufficient to permit responsive pleadings" as Rule 9 requires. 5 WRIGHT & MILLER § 1296 (1990).

TruePosition objects that the named publication is relevant to only certain of their patents and, therefore, the defendant has not sufficiently pled the defense of inequitable conduct as to the other patents. The court declines, however, to weigh the relevance and materiality of the allegedly withheld prior art for purposes of this motion. It is the court's duty for purposes of this motion only to test the sufficiency of the pleading, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). Furthermore, the Third Circuit has made clear that, although "it is certainly true that allegations of 'date, place or time' ' satisfy the pleading requirements, "nothing in [Rule 9] requires them." *Seville Industrial Machinery v. Southmost Machinery,* 742 F.2d 786, 791. The affirmative defense, as pled, suffices to place the plaintiffs on notice of the misconduct with which they are charged. *Id.; see also Scripps Clinic and Research Found., et al. v. Baxter Travenol Lab., et al.,* 1988 WL 22602, at *3 (D.Del.) (defense of inequitable conduct sufficiently pled when defendant simply "allege[d] that [the plaintiff] failed to identify to the PTO relevant prior art of which it was aware").

*\*6 The motion to strike the third affirmative defense, and to dismiss Counterclaim I, which is at least partially premised on the defense of inequitable conduct, is denied.*

**E. Affirmative Defense VI**

Finally, the plaintiffs move to strike Affirmative Defense VI, abuse of process, on the grounds that it is not a defense to a patent infringement action, and that, in any event, it has not been pled properly.

The plaintiffs are correct that abuse of process is not a defense to a patent infringement action. Rather, it is a tort, *see* PROSSER, LAW OF TORTS, § 121 (4th Ed.1971), which should have been pled as a counterclaim. This mistake is not fatal, however. Federal Rule of Civil Procedure 8(c) states that "[w]hen a party has mistakenly designated ... a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Fed. R. Civ. P. 8(c). The court will view the defendant's averment of the "defense" of abuse of process as a counterclaim.

Abuse of process may be alleged in a patent infringement case as in any other. *See, e.g., Bayer AG v. Sony Elecs., Inc.,* 229 F.Supp.2d 332 (D.Del.2002). A claim of abuse of process is established when "the defendant ... prove[s] that the plaintiff had an 'ulterior purpose' and committed 'a willful act in the use of the process that is not proper in the regular conduct of the proceedings .' " *Id.* at 368 (quoting *Feinman v. Bank of Delaware,* 728 F.Supp. 1105, 1115 (D.Del.1990), *aff'd,* 909 F.2d 1475 (3d Cir.1990)). "There must be 'some definite act or threat not authorized by the process or aimed at an objective not legitimate in the use of process ... there is no liability where the [plaintiff] has done nothing more than carry out the process to its authorized conclusion .' " *Id.* (citations omitted).

The defendant has asserted that the "[p]laintiffs have abused the judicial process by bringing the present action based on the [p]atents that [p]laintiffs know are invalid, unenforceable, and/or not infringed." Answer and Counterclaims (D.I.48) at 8. There is no elaboration in the Answer and Counterclaims. The defendant's briefing, however, contends that "the same averments with regard to TruePositions tortious interference with Allen's business contracts and relations also establish a basis to proceed against TruePosition for abuse of process." Answering Brief at 17-18 n. 10.

The defendant's averments are sufficient to sustain a Rule 8, Rule 12(f), or Rule 12(b)(6) motion to strike and/or dismiss. Allen has offered a "short and plain" statement of the claim and has presented a factual context that, viewed in the light most favorable to Allen, states an abuse of process claim. Again, it is the court's duty for purposes of this motion only to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost,* 1 F.3d at 183. Despite the defendant's anemic presentation of its abuse of process claim, the facts

presented in the context of its sham litigation and tortious interference claims suffice to state a claim for relief for abuse of process as well. The plaintiffs' motion to dismiss the claim is denied.

IV. CONCLUSION

**\*7** The court concludes that the defendant's tortious interference with a contract claim can not be sustained because there has been no breach of contract. Allen's other counterclaims of tortious interference with prospective business opportunities, sham litigation, declaratory judgment, and abuse of process survive this motion to dismiss. Likewise, the defendant's third affirmative defense of fraud and/or inequitable conduct may remain.

For the foregoing reasons, IT IS HEREBY ORDERED that:
   1. TruePosition's Motion to Dismiss and/or Strike (D.I.58) is GRANTED IN PART and DENIED IN PART.
   2. Counterclaim III, alleging tortious interference with a contract, is DISMISSED.

2003 WL 151227 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.
1988 WL 22602 (D.Del.), 7 U.S.P.Q.2d 1562
(Cite as: 1988 WL 22602 (D.Del.))

Page 1

**H**

Motions, Pleadings and Filings

United States District Court, D. Delaware.
SCRIPPS CLINIC AND RESEARCH
FOUNDATION, and Rorer Group, Inc., Plaintiffs,
v.
BAXTER TRAVENOL LABORATORIES, INC.,
and Travenol Laboratories, Inc.,
Defendants.
**Civ. A. No. 87-140-CMW.**

March 9, 1988.

Gregory A. Inskip, Potter, Anderson & Corroon
Wilmington, Delaware.  of counsel: Eugene Moroz,
Kurt E. Richter, and William S. Feiler, Morgan &
Finnegan, New York City, for plaintiffs.

Allen M. Terrel, Jr., Richards, Layton & Finger
Wilmington, Delaware.  of counsel: Granger Cook,
Jr., and Dean A. Monco, Cook, Wetzel & Egan, Ltd.,
Chicago, Illinois, and Paul C. Flattery, and Robert E.
Hartenberger, Baxter Travenol Laboratories, Inc.,
Deerfield, Illinois.  for defendants.

OPINION

CALEB M. WRIGHT, Senior District Judge.

*1 This Motion to Strike arises out of a patent
infringement suit filed by the Scripps Clinic and
Research Foundation ("Scripps Clinic" or "Scripps
Group, Inc. ("Rorer") [FN1] against Baxter Travenol
Laboratories, Inc., and Travenol Laboratories, Inc.
(collectively, "Baxter").  Scripps claims that Baxter
has infringed United States Reissue Patent No. Re.
32,011 ("the '011 patent") entitled "Ultrapurification
of Factor VIII using monoclonal antibodies."
Scripps Clinic is the assignee of the patent and Rorer
is its exclusive licensee.

Factor VIII is a blood clotting factor found naturally
in the blood which has two components, Factor
VIII:C and Factor VIII:RP.  Because a deficiency in
either component can cause hemophilia, it is
desirable to obtain purified components to use in
treating hemophiliacs.

Rorer markets a purified form of Factor VIII:C

which it obtains using the process claimed in the '011
patent.  Baxter does not presently market Factor
VIII:C, but it does conduct clinical research with it
and has applied for licenses to market a pure form
both in the United States and abroad. Baxter uses two
methods to obtain purified Factor VIII:C for this
testing, one utilizing recombinant DNA technology to
create a purified form, and the other utilizing
monoclonal antibodies to separate the components in
human blood plasma.   In its patent, Scripps Clinic
claims a process similar to this second method,
claims the actual purified Factor VIII:C itself, and
claims Factor VIII:C derived by the monoclonal
antibody process.

Scripps filed its complaint on March 20, 1987.   On
May 15, 1987, Baxter filed a Motion to Dismiss or, in
the alternative, for Summary Judgment ("Baxter's
Motion" or "Motion to Dismiss").   Baxter alleged
that the complaint failed to state a claim upon which
relief could be granted because Baxter's use of Factor
VIII:C to gather data to submit to the Food and Drug
Administration ("FDA") for the purpose of obtaining
approval to market its form of Factor VIII:C is
excused under 35 U.S.C. § 271(e)(1) (Supp. III
1985).   On August 12, 1987, this Court elected to
treat Baxter's Motion as a summary judgment motion
because evidence was submitted aside from the
pleadings.   The Court then stayed Baxter's Motion
pending further discovery concerning Baxter's use of
Factor VIII:C.

On November 6, 1987, Baxter withdrew its Motion
for Summary Judgment.   Baxter then filed its
Answer and Counterclaims on November 18, 1987.
On December 8, 1987, Scripps filed this Motion to
Strike certain pleadings, including Baxter's defense
under section 271(e)(1), under Federal Rules of Civil
Procedure 9(b) and 12(f).

*I. SCRIPPS' MOTION TO STRIKE PARAGRAPHS
26 AND 27 OF BAXTER'S ANSWER*

Scripps requests that the Court strike paragraphs 26
and 27 of Baxter's answer because they are not
pleaded with sufficient particularity.   Fed.R.Civ.P.
9(b).   These paragraphs state:

*2 26. At the time SCRIPPS and/or the alleged
inventors filed the application resulting in the
issuance of the '509 patent, [the original patent,]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
1988 WL 22602 (D.Del.), 7 U.S.P.Q.2d 1562
(Cite as: 1988 WL 22602 (D.Del.))

SCRIPPS and/or the alleged inventors were aware of relevant prior art which was not identified to the Patent office at the time of filing or during the prosecution of the '509 patent. SCRIPPS and/or the alleged inventors failed to satisfy their uncompromising duty of candor to the U.S. Patent Office under the Code of Federal Regulations, 37 CFR 1.56.

27. The '509 patent was and U.S. Letters Patent No. Re. 32,011 is unenforceable because of Plaintiff SCRIPPS and/or the alleged inventors' failure to disclose the relevant prior art to the Patent Office.

Scripps alleges that these claims amount to a charge of "fraud" on the Patent and Trademark Office ("PTO"). It argues that, as such, they are subject to Rule 9(b), which states that the "circumstances" of the fraud must be pleaded with particularity.

Baxter counters by arguing that paragraphs 26 and 27 do not claim the defense "fraud", but instead claim the broader defense "inequitable conduct" which is not subject to the strict requirements of Rule 9(b). In addition, Baxter claims that it clarified its pleadings in its responses to Scripps' interrogatories. In its responses, Baxter stated that Scripps failed to file *any* prior art statement during the prosecution of the original patent but did provide 75 references with the reissue application, some of which pre-dated the filing of the original application.

A patent applicant has a duty of candor to the PTO. It breaches this duty "when material information is misrepresented or withheld, and such misrepresentation or withholding is intentional or accompanied by gross negligence or bad faith." *Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529, 1538 (Fed.Cir.1984). Such a breach can lead to charges of either fraud on the PTO or inequitable conduct.

While the terms fraud and inequitable conduct are sometimes used synonomously, they are distinct defenses covering different conduct and leading to different consequences. Fraud involves the "misrepresentation of a material fact" to the PTO, while inequitable conduct involves the omission of material fact, as well as the misrepresentation of information. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559 (1984), *cert. denied,* 474 U.S. 822 (1985). The consequences of proving these defenses are that a charge of fraud leads to patent invalidity, while a charge of inequitable conduct leads to patent unenforceability.   2 P. Rosenberg, *Patent Law Fundamentals* § 15.08, at 15-126 (2d ed.

1987). The Federal Circuit has described the defense of inequitable conduct by stating

Conduct before the PTO that may render a patent unenforceable is broader than "common law fraud" [citation omitted]. It includes failure to disclose material information, with an intent to mislead. Because the "fraud" label can be confused with other forms of conduct, this opinion avoids that label and uses "inequitable conduct" as a more accurate description of the proscribed activity, it being understood that the term encompasses affirmative acts of commission, *e.g.,* submission of false information, as well as omission, *e.g.,* failure to disclose material information.

*J.P. Stevens,* 747 F.2d at 1559. Baxter alleges that Scripps omitted prior art from its original application and that this makes the '011 patent unenforceable. Thus, Baxter alleges that Scripps engaged in inequitable conduct, not fraud.

***3** A charge of fraud on the PTO is subject to the strict pleading requirements of Rule 9(b). *See Micro Motion, Inc. v. Exac Corp.,* 112 F.R.D. 2 (N.D.Cal.1985). However, Baxter alleges inequitable conduct, not fraud, and it is unclear whether such a charge is subject to Rule 9(b).

The Court need not decide whether Rule 9(b) applies to charges of inequitable conduct because Baxter has met its burden of pleading even under the strict standard. Baxter alleges that Scripps failed to identify to the PTO relevant prior art of which it was aware. Answer ¶ ¶ 26, 27. The conclusion that the pleading is sufficient is strengthened by the fact that Baxter clarified its pleadings in response to Scripps' interrogatories. *See Essex Int'l, Inc. v. Industra Products, Inc.,* 64 F.R.D. 361 (N.D.Ind.1974) ( "as a practical matter, it is evident that considerable detailed information related to the alleged fraud has been disclosed in the response to plaintiff's interrogatories"). Baxter's claim that Scripps did not file any prior art with its original application is a sufficient description of the "circumstances" of Baxter's claim to meet Rule 9(b)'s strict requirements, even if Rule 9(b) is applicable. Thus, Scripps' Motion to Strike Paragraphs 26 and 27 must be denied.

II. *SCRIPPS' MOTION TO STRIKE PARAGRAPHS 33 AND 34 OF BAXTER'S ANSWER*

Paragraphs 33 and 34 of Baxter's answer state:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 3
1988 WL 22602 (D.Del.), 7 U.S.P.Q.2d 1562
(Cite as: 1988 WL 22602 (D.Del.))

33. BAXTER's accused Factor VIII:C product has been used solely to develop and submit information to the appropriate regulatory agencies as provided for under Federal law.

34. Under 35 USC 271(e)(1), BAXTER has not infringed any of the claims of U.S. Patent No. Re. 32,011.

Section 271(e)(1) was added to the patent laws as part of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1985 (1984). It states that "[i]t shall not be an act of infringement to make, use, or sell a patented invention ... *solely for uses reasonably related to the* development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs." (Emphasis added). This creates an exception to the general rule that anyone who "makes, uses or sells any patented invention ... infringes the patent." 35 U.S.C. § 271(a) (1982). The FDA requires a great deal of testing concerning the safety and efficacy of a drug before allowing it to be marketed. Section 271(e)(1) allows scientists to use a patented product or process to gather data and submit them to the FDA in order to obtain regulatory approval to market a drug at a later time, after the patent on the drug expires. Scripps claims that the Court should strike Baxter's section 271(e)(1) defense as insufficient under Fed.R.Civ.P. 12(f).

Scripps mounts a multipronged attack on this defense. It first claims that the defense is not viable because Baxter eliminated it when it used the defense as the basis for its Motion to Dismiss and then withdrew the Motion. It also claims that pleading the defense after withdrawing the Motion amounted to a delay tactic. This argument does not warrant the Court's striking the defense as insufficient. Baxter claims that its decision to withdraw its Motion was based on "strategy", not delay. Such a withdrawal of the Motion does not influence the viability of the defense because the issue raised has still not been adjudicated.

**\*4** Scripps next claims that the fact that Baxter distinguished this defense from "the merits" of this suit in the correspondence concerning the withdrawal of its Motion is evidence of using the Motion as a delay tactic. This argument also does not support striking the defense. It is not unusual to refer to the issues of infringement and patent invalidity as being the "merits" of a patent suit. Distinguishing a defense from these two issues does not make its interposition a delay tactic.

Scripps' next argument is based on the fact that Judge Schwarzer of the Northern District of California dismissed a similar defense raised by Genentech, Inc., based on similar facts, in another patent infringement suit brought by Scripps Clinic. *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 666 F.Supp. 1379, 1395-97 (N.D.Cal.1987). It argues that this proves that Baxter's defense is insufficient. That case, however, is not controlling in this Court. More importantly, Baxter was not a party in that case, and thus its activities were never at issue. Section 271(e)(1) excuses from infringement defendants who use a patented invention "solely for uses reasonably related to" developing information for the FDA. Baxter's defense is based on *its* use of Factor VIII:C, not Genentech's or even Scripps'. Thus, the facts pertaining to Baxter's use must be examined by this Court and *Scripps Clinic v. Genentech* does not make Baxter's defense any less viable.

Scripps' final claim is that Baxter used the data it gathered, not only to submit it to the FDA in order to gain pre-market approval, but also to submit it to regulatory agencies in foreign countries in order to obtain approval to market it there. Scripps argues that Baxter's foreign-related activities fall outside the limited exception from infringement contained in section 271(e)(1) and make Baxter's defense insufficient as a matter of law.

This question arises in the context of a Motion to Strike. The Court can grant Scripps' Motion to Strike only if it finds the defense to be "insufficient". Fed.R.Civ.P. 12(f). Thus, the Court should not grant Scripps' Motion if there are questions of fact or law remaining to be adjudicated. *See Lunsford v. United States*, 418 F.Supp. 1045, 1051 (D.S.D.1976), aff'd., 570 F.2d 221 (8th Cir.1977) (factors to be considered include whether there are factual and legal questions remaining); *see also* 5 C. Wright and A. Miller, *Federal Practice and Procedure Civil* § 1381 (motion to strike should not be granted if there are factual issues that deserve a hearing). Such questions are present here.

The scope of section 271(e)(1) presents a question of law that has no clear answer. Section 271(e)(1) was added to the patent laws in order to legislatively overrule the Federal Circuit's decision in *Roche Products, Inc. v. Bolar Pharmaceutical Co., Inc.*, 733 F.2d 858 (Fed.Cir.), cert. denied, 469 U.S. 856 (1984). H.R.Rep. No. 98-857, 98th Cong., 2d Sess. 45- 46. *reprinted in* 4 U.S. Code Cong. &

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 4
1988 WL 22602 (D.Del.), 7 U.S.P.Q.2d 1562
(Cite as: 1988 WL 22602 (D.Del.))

Admin.News 2647, 2678; *see* Flannery and Hutt, *Balancing Competition and Patent Protection in the Drug Industry: The Drug Price Competition and Patent Term Restoration Act of 1984*, 40 Food Drug Cosm.L.J. 269, 308 (1985). In *Roche Products*, the Federal Circuit held that the use of a patented ingredient of a sleeping pill to gather data for the FDA pre-market approval process was an infringement of the patent. It is clear that <u>section 271(e)(1)</u> now condones such activities related to gathering information under laws regulating the marketing of drugs. It is also clear that <u>section 271(e)(1)</u> applies only to drugs, not to medical devices. *Eli Lilly & Co. v. Medtronic, Inc.*, No. 83-5393, slip op. (E.D.Pa. Dec. 7, 1987). What is still unclear is what is meant by the phrase "solely for uses reasonably related to" gathering and submitting information and whether <u>Section 271(e)(1)</u> should apply even if the data are also given to foreign regulatory agencies. The impact of this question can best be illustrated by examining Baxter's situation.

**\*5** A subsidiary of Rorer markets Factor VIII:C made under a license of <u>the '011 patent</u>. In contrast, Baxter has not received approval to market its Factor VIII:C anywhere, but uses it in connection with a joint venture with Genetics Institute. Baxter admits that it uses the information obtained from its experimentation with Factor VIII:C for purposes other than submitting it to the FDA, but maintains that all of the experiments it conducts to obtain the information are required by FDA regulations.

Baxter admits that it seeks to market Factor VIII:C in Europe eventually. Either Baxter or Genetics Institute has filed for patent protection and regulatory approval in Europe. Baxter even submitted copies of the application it filed with the FDA to these foreign regulatory agencies. However, it claims that the data generated by the foreign agencies are also given to the FDA to aid the drug approval process in the United States. A possible result of this activity could be that Baxter or Genetics Institute could obtain approval to market Factor VIII:C in Europe, where they may also obtain a patent, as a result of testing performed in this country. Scripps objects to this potential commercial use of its patent and argues that <u>section 271(e)(1)</u> should not excuse it because Congress only excused actions relating to approval for marketing in the United States.

The question of law, then, is whether any foreign activities can be "reasonably related" to FDA drug approval. If not, then Baxter's activities would fall outside of <u>section 271(e)(1)</u> and Baxter's defense

would be insufficient. The legislative history does not provide guidance on what activities are "reasonably related" to FDA drug approval. Judge Schwarzer was faced with this issue, but he interpreted the statute to only cover activities that were "solely related" to FDA approval and did not consider what acts are "reasonably related" to it. *Scripps v. Genentech, 666 F.Supp. at 1396* ("Even if the uses to which Genentech and Cutter put the Factor VIII:C were reasonably related to meeting FDA requirements, they certainly were not solely related to that purpose."). This question must be more fully developed before the Court can decide it.

There are also questions of fact as to what data were sent to the European agencies, what data developed in Europe were given to the FDA, and what tests were required by FDA regulations. This situation must be fully developed before the Court can determine whether Baxter's activities were "solely for purposes reasonably related to" approval of Factor VIII:C by the FDA. Because this cannot be done at this stage of the proceedings, the Court must deny Scripps' Motion to Strike paragraphs 33 and 34.

### III. *Rule 11*

**\*6** Scripps, in its reply brief, alleges that Baxter violated <u>Fed.R.Civ.P. 11</u> by using its Motion to Dismiss as a delay tactic. It also claims that counsel for Baxter misrepresented certain facts in its briefs and during oral argument, such as the extent of Baxter's foreign activities and whether it or Genetics Institute controlled the tests to gather data for regulatory approval. The Court declines to impose sanctions.

<u>Rule 11</u> sanctions are warranted only if Baxter did not act reasonably under the circumstances. *Eavenson, Auchmuty & Greenwald v. Holtzman, 775 F.2d 535 (3d Cir.1985)*. <u>Rule 11</u> does not apply to counsel's alleged misrepresentations during oral argument because "<u>Rule 11</u> sanctions are improper in situations which do not involve signing a paper." *Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3d Cir.1987)*. The fact that Baxter filed and later withdrew its Motion while leaving the issue as a defense also does not warrant sanctions. Baxter claims that its move was a strategic one and that it acted reasonably. It is certainly reasonable for Baxter to believe that it could be better off asserting the defense only after full discovery. Finally, the Court finds that Baxter admitted its foreign activity rather than concealing it. Therefore, the Court holds that Baxter acted reasonably and will not impose

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 5
1988 WL 22602 (D.Del.), 7 U.S.P.Q.2d 1562
**(Cite as: 1988 WL 22602 (D.Del.))**

<u>Rule 11</u> sanctions.

An Order will issue in accordance with this Opinion.

> <u>FN1.</u> Plaintiffs will at times be referred to
> collectively as "Scripps".

1988 WL 22602 (D.Del.), 7 U.S.P.Q.2d 1562

**Motions, Pleadings and Filings <u>(Back to top)</u>**

•           <u>1:87CV00140</u>_____(Docket)
(Mar. 20, 1987)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

**Westlaw.**

Slip Copy                                                                 Page 1
2005 WL 670637 (N.D.Ill.)
**(Cite as: 2005 WL 670637 (N.D.Ill.))**

**H**

<u>**Motions, Pleadings and Filings**</u>

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
CONCEPT INNOVATION, et al., Plaintiffs and
Counter-Defendants,
v.
CFM CORPORATION, et al., Defendants, Counter-
Plaintiffs and Third-Party
Plaintiffs,
v.
Lucas PAI and Active Gene, Inc., Third Party
Defendants,
ACTIVE GENE, INC. Third-Party Counterclaimant,
v.
CFM CORPORATION and CFM U.S. Corporation,
Third-Party Counterclaim Defendants.
**No. 04 C 3345.**

March 21, 2005.

<u>Michael Peter Conway</u>, <u>Maile H. Solis</u>, Grippo &
Elden, Chicago, IL, <u>Melvin C. Garner</u>, <u>Kevin L.
Reiner</u>, Darby & Darby, New York, NY, for
Plaintiffs and Counter-Defendants and Third Party
Defendants.

<u>Michael Joseph H. Baniak</u>, <u>Charles C. Valauskas</u>,
<u>Christopher E. Haigh</u>, Baniak, Pine & Gannon,
Chicago, IL, for Defendants, Counter-Plaintiffs and
Third-Party Plaintiffs.

MEMORANDUM OPINION AND ORDER

<u>CONLON</u>, J.

**\*1** Concept Innovation, Inc. ("Concept") and Lucas
Innovation, Inc. ("Lucas") sue CFM Corporation,
CFM U.S. Corporation a/k/a and d/b/a The Vermont
Castings Majestic Products Company, and CFM
Home Products a/k/a and d/b/a The Great Outdoors
Grill Company  <u>[FN1]</u> (collectively "CFM") for
infringement of several barbeque grill design patents.
CFM counterclaims against Concept and Lucas, and
asserts various third-party claims against Lucas Pai
("Pai") and Active Gene, Inc. ("Active Gene"),
including claims to invalidate the barbeque grill

design patents and to correct inventorship under <u>35
U.S.C. § 256</u>. Concept, Lucas, Pai and Active Gene
(collectively, "the Lucas entities") move to dismiss
the counterclaims, third-party claims, <u>[FN2]</u> and
affirmative defenses.

> <u>FN1.</u> CFM Home Products disputes the
> court's entry of technical default. However,
> it has not moved to vacate the technical
> default. The issue is not properly before the
> court.

> <u>FN2.</u> The counterclaims and third-party
> claims are brought together in the same
> counts. For convenience, the court refers to
> both the counterclaims and third-party
> claims as the counterclaims.

BACKGROUND
For purposes of this motion, the court accepts all
well-pleaded allegations in the counterclaims, third-
party claims and affirmative defenses as true and
draws all reasonable inferences in CFM's favor. *See
Stachon v. United Consumers Club, Inc.,* 229 F.3d
673, 675 (7th Cir.2000). CFM imports barbeques and
barbeque accessories into the United States and
Canada for sale to retail stores and conducts business
in Illinois. CFM contacted Pai about manufacturing
barbeques for CFM in China. After negotiating with
CFM, Pai agreed to manufacture and import
barbeques into North America for CFM. Pai then
incorporated Active Gene to handle CFM's business.
CFM and Active Gene thereafter agreed to
collaborate on the development and design of the
barbeques and to share equally in any intellectual
property rights that stemmed from the development
and design of the barbeques. Active Gene agreed not
to sell the same or similar barbeques to anyone other
than CFM and not to solicit CFM's customers. CFM
agreed to use Active Gene as its exclusive agent to
manufacture the barbeques.

Pursuant to the agreement, CFM revealed
confidential information to Pai regarding barbeque
designs and characteristics, the Canadian barbeque
marketplace and its customers' needs. Pai and Active
Gene agreed to keep this information confidential and
not to use it for their own benefit or to CFM's
detriment. After entering the agreement, Pai secretly
incorporated Concept Innovation, which then filed
patent applications in its name in the United States

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 2
2005 WL 670637 (N.D.Ill.)
(Cite as: 2005 WL 670637 (N.D.Ill.))

and Canada for barbeques developed in part by CFM pursuant to the agreement. The patents issued to the Lucas entities. Although CFM or CFM and Active Gene jointly own the patents, the patents do not list the CFM employee-inventors because the Lucas entities misrepresented the identity of the inventors to the U.S. Patent and Trademark Office.

## DISCUSSION

I. Legal Standard

The Lucas entities answered the counterclaims more than seven months ago, so their motion to dismiss is considered a Fed.R.Civ.P. 12(c) motion for judgment on the pleadings. A Rule 12(c) motion is evaluated under the same standard as a Rule 12(b)(6) motion to dismiss. *Lanigan v. Village of E. Hazel Crest,* 110 F.3d 467, 470 (7th Cir.1997). A motion to dismiss tests the sufficiency of the complaint, not its merits. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In ruling on a motion to dismiss, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." *Pokuta v. Trans World Airlines, Inc.,* 191 F.3d 834, 839 (7th Cir.1999), *citing Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A motion to dismiss should not be granted "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46.

II. Count I and Affirmative Defenses 1 and 3: Patents are Invalid or Unenforceable for Misjoinder of Inventors

**\*2** In Count I and affirmative defenses 1 and 3, CFM asserts the patents are invalid or unenforceable because the Lucas entities failed to correctly identify the inventors. The Lucas entities argue Count I and affirmative defenses 1 and 3 must be dismissed because they fail to plead inequitable conduct with particularity as required under Rule 9(b). CFM responds Count I and affirmative defenses 1 and 3 are not subject to Rule 9(b)'s heightened pleading requirements. Although the court need not decide whether Rule 9(b) applies, Count I satisfies the rule's pleading requirements. Count I alleges:

> As detailed above, [the patents] should be declared invalid and/or unenforceable because, among other things, [the Lucas entities] misled the U.S. Patent and Trademark Office during prosecution of the [patents] by omitting necessary inventors that were employees of CFM, and improperly naming others as alleged inventors.

Counterclaim ¶ 23. The counterclaim contains more specific allegations incorporated by reference into Count I: Pai secretly incorporated Concept Innovation to secure the patents without CFM's knowledge, and the Lucas entities falsely asserted they owned the patents when in fact they were owned by both CFM and Active Gene. Counterclaim ¶¶ 16-21. These allegations state the who (Lucas entities), what (misrepresentation of the real owners), where (U.S. Patent and Trademark Office) and when (during patent prosecution) of the alleged inequitable conduct.

The Lucas entities also argue CFM fails to plead the "operative fact" of intent. Although Count I does not explicitly allege that the Lucas entities operated with the intent to deceive, intent can be inferred from the allegations. Count I alleges that Pai secretly incorporated Concept Innovation to obtain the patents, and that Pai and Lucas used Concept Innovation to secretly obtain the patents using CFM's confidential information, while falsely claiming to be the sole patent owners. Counterclaim ¶¶ 16-23. These allegations sufficiently infer an alleged intent to deceive.

The Lucas entities also argue Count I fails to state a claim because any improper inventorship can be corrected under 35 U.S.C. § 256. They contend that because CFM pleads in the alternative for correction of the patents, Count I must be dismissed. This argument is frivolous. On its face, 35 U.S.C. § 256 only allows for correction of a patent if the omission of a joint inventor was the result of error or mistake. *See also Merry Mfg. Co. v. Burns Tool Co.,* 335 F.2d 239 (5th Cir.1964). Count I does not allege that the Lucas entities mistakenly failed to identify all the inventors. Rather, CFM impliedly alleges the Lucas entities intentionally misled the U.S. Patent and Trademark Office as to the identity of the inventors. Thus, CFM states a claim for invalidity of the patents.

The motion to dismiss affirmative defenses 1 (invalid patent) and 3 (unenforceable patent) must also be denied. Generally, motions to strike affirmative defenses are disfavored because they potentially serve only to cause delay. *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.,* 2003 U.S. Dist. LEXIS 11487, at \*6 (N.D.Ill. July 2, 2003). Although the affirmative defenses do not contain detailed factual allegations, the Lucas entities have sufficient notice of the facts giving rise to the affirmative defenses in light of the allegations in Count I of the counterclaim. Under these

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

circumstances, striking the affirmative defenses would cause unnecessary delay and would be a waste of time. However, as plead, affirmative defenses 1 and 3 are limited in scope to the allegations set forth in Count I of the counterclaims.

### III. Count II: Violation of the Illinois Trade Secrets Act

**\*3** Count II purports to state a claim for misappropriation under the Illinois Trade Secrets Act, 765 ILCS 1065/2 ("the act"). More specifically, CFM alleges it shared its confidential information, including grill designs and industry information, with Lucas entities, and Lucas entities misappropriated CFM's confidential information to solicit CFM's customers and potential customers. Counterclaim ¶ ¶ 13, 27, 30. CFM does not allege where the alleged misappropriation occurred.

To state a claim for trade secret misappropriation under the act, CFM must allege two elements: (1) the existence of a trade secret; and (2) misappropriation of that trade secret. *RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 873 (N.D.Ill.2001). CFM alleges each of these elements. First, CFM alleges it shared confidential information such as grill designs, customer lists, and industry information with the Lucas entities. Counterclaim ¶ ¶ 13, 27 and 30. Second, CFM alleges the Lucas entities misappropriated its confidential information by soliciting its customers and potential customers for competing business. Counterclaim ¶ ¶ 29, 31-33. CFM has alleged the necessary elements to state a claim under the act.

The Lucas entities argue Count II fails to state a claim because the act is limited in reach to Illinois residents. They assert a state statute can only be applied to defendants within the state's geographic boundaries. This argument must be rejected because a state statute may be applied to non-resident defendants. *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 315-316, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) ("Mr. Hague's residence in Wisconsin does not-as Allstate seems to argue-constitutionally mandate application of Wisconsin law to the exclusion of forum law"). The act does not limit its application to Illinois residents. Thus, the territorial reach of the act is not statutorily limited to Illinois residents. *See Davis v. Suran*, 1998 U.S. Dist. LEXIS 10237, at \*7 (N.D. Ill. June 30, 1998); *Faith Freight Forwarding Corp. v. Ruiz*, 1997 U.S. Dist. LEXIS 3641, at \*24 (N.D.Ill. March 20, 1997).

The Lucas entities further argue Count II fails to state a claim for misappropriation under the act because the alleged misappropriation did not occur in Illinois. In support of their argument, the Lucas entities cite several cases where the courts applied Illinois choice-of-law rules to decide whether Illinois *or another state's law* applied to a misappropriation claim. *See Fleet Mgmt. Sys., Inc. v. Archer-Daniels-Midland Co.*, 627 F.Supp. 550, 564 (C.D.Ill.1986); *Crown Indus., Inc. v. Kawneer Co.*, 335 F.Supp. 749, 760-1 (N.D.Ill.1971); *Mergenthaler Linotype Co. v. Storch*, 66 Ill.App.3d 789, 803, 23 Ill.Dec. 352, 383 N.E.2d 1379, 1389-90 (1990). According to the Lucas entities, Count II must be dismissed because under Illinois choice-of-law rules, the law of the state where the misappropriation occurred would apply, and CFM has not alleged the misappropriation occurred in Illinois. *See Abbott Laboratories v. Chiron Corp.*, 1997 U.S. Dist. LEXIS 5596, at \*6 (N.D. Ill. April 21, 1997); *Mergenthaler*, 66 Ill.App.3d at 803, 23 Ill.Dec. 352, 383 N.E.2d at 1389 (1st Dist.1978); *Crown Industries*, 335 F.Supp. at 761.

**\*4** Although CFM's counterclaim fails to allege where the Lucas entities misappropriated CFM's confidential information, it alleges the Lucas entities committed tortious acts in Illinois. Counterclaim ¶ 10. Thus, CFM implicitly alleges that the misappropriation occurred in Illinois. Drawing all reasonable inferences in CFM's favor, it may be able to establish facts that implicate violation of Illinois trade secrets law.

### IV. Count IV: Correction of Inventorship

The Lucas entities advance numerous arguments as to why Count IV should be dismissed. First, they claim CFM lacks standing to seek correction of inventorship pursuant to 35 U.S.C. § 256 because CFM, as the employer, is not the owner of the patent rights. Count IV plainly alleges that CFM owns the patent rights. Counterclaim ¶ ¶ 12(b), 19. The court must accept these allegations as true and this argument fails.

Second, the Lucas entities argue Count IV must be dismissed for lack of standing and failure to join the CFM inventors who are necessary and indispensable parties. This argument must be rejected because CFM alleges that it owns the patent rights. CFM impliedly alleges that the employee-inventors assigned their rights to CFM. The assignment of rights in a patent divests the assignor of ownership and entitles the assignee to sue in its own right without joining the

Slip Copy                                                                                                  Page 4
2005 WL 670637 (N.D.Ill.)
**(Cite as: 2005 WL 670637 (N.D.Ill.))**

assignor. *See Proctor & Gamble Co. v. Kimberly Clark Corp.,* 684 F.Supp. 1403 (N.D.Tex.1987); *DSM Resins v. EMS-American Grilon Inc.,* 1990 U.S. Dist. LEXIS 19079 (D.S.C. Feb. 27, 1990). Thus, the motion to dismiss Count IV for lack of standing and failure to join necessary and indispensable parties must be denied.

Third, the Lucas entities argue Count IV must be dismissed because it alleges the error in inventorship was made without CFM's deceptive intent, rather than without the deceptive intent of CFM's employee-inventors. This argument is frivolous because a corporation acts only through its agents. *Jansen v. Packaging Corp. of America,* 123 F.3d 490, 496 (7th Cir.1997). CFM's alleged lack of deceptive intent may be attributed to CFM's employee-inventors. *See Kingvision Pay Per View, Ltd. v. Myths, Inc.,* 2001 U.S. Dist. LEXIS 2272, at *6-7 (N.D.Ill. March 5, 2001).

### V. Count V: Fraud

In Count V, CFM alleges that during contract negotiations and as part of the agreement itself, Pai and Active Gene repeatedly represented to CFM that they were working on CFM's behalf and would not use CFM's confidential information to their advantage or to CFM's detriment. Counterclaim ¶ 12, 28, 42-43. CFM also alleges Pai secretly incorporated a new company to obtain patents using CFM's confidential information and secured the patents without identifying CFM as an inventor. Counterclaim ¶ ¶ 16-18, 31, 43-33. The Lucas entities argue Count V should be dismissed for failure to plead fraud with particularity as required by Fed.R.Civ.P. 9(b). They argue the counterclaim fails to allege the "who, what, when, where and how" of the alleged fraud. *Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir.1999).

**\*5** Count V sufficiently alleges, either explicitly or implicitly, who made the misrepresentations (Pai and Active Gene), what the misrepresentations were (that they would not use confidential information for their own benefit), when and where the alleged misrepresentations were made (during negotiations and as part of the agreement itself) and to whom the statements were made (CFM). CFM alleges it reasonably relied on the Lucas entities' promises by divulging confidential information and paying fees. Counterclaim, ¶ ¶ 43-44. The counterclaim satisfies Rule 9(b)'s particularity requirement. *See Allied Vision Group, Inc. v. RLI Vision Corp.,* 1997 U.S. Dist. LEXIS 10805, at *17 (N.D.Ill. July 18, 1997)

(complaint satisfied Rule 9(b) by alleging a corporation committed a tort without identifying the corporate agents who performed the tortious acts); *Steadfast Ins. Co., Inc. v. Auto Marketing Network, Inc.,* 2 F.Supp.2d 1058, 1061 (N.D.Ill.1998).

The Lucas entities argue Count V fails to plead fraud because it is based on a promise of future conduct, which is not actionable. Under Illinois law, an allegation of a mere promise of future conduct, without more, is not actionable as fraud. [FN3] *Sa-Buttar Health & Med., P.C. v. TAP Pharmaceuticals, Inc.,* 2004 U.S. Dist. LEXIS 12175, at *11 (N.D.Ill. July 1, 2004); *Doherty v. Kahn,* 289 Ill.App.3d 544, 224 Ill.Dec. 602, 682 N.E.2d 163, 176 (1st Dist.1997). However, Illinois law recognizes a "scheme exception." *Allied Vision Group,* 1997 U.S. Dist. LEXIS 10805, at *12. Promissory fraud is actionable if it is part of a larger pattern of deception that reasonably induces reliance. *Steadfast,* 2 F.Supp.2d at 1060. A scheme to defraud may exist where a defendant lies repeatedly to a single promisee. *See HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672 (1993).

> FN3. CFM and the Lucas entities apply Illinois law to the fraud claim.

CFM alleges Pai and Active Gene *repeatedly* represented to CFM that they were working on CFM's behalf and would not use CFM's confidential information for their own benefit and to CFM's detriment. Counterclaim ¶ 42. CFM alleges Pai secretly formed another company for the purpose of obtaining patents with CFM's confidential information. Counterclaim ¶ ¶ 16-18. A fair reading of these allegations is that Pai and Active Gene's repeated promises not to improperly use CFM's confidential information were false when made, and were part of a scheme to fraudulently secure patents. Viewing the allegations in Count V in the light most favorable to CFM, it appears that CFM may be able to prove a set of facts to support its fraud claim entitling it to relief. The motion to dismiss Count V must therefore be denied.

### VI. Count VII: Tortious Interference with Business Relationship

In Count VII, CFM alleges the Lucas entities, without justification, pursued CFM's customers and potential customers by attempting to enter contracts with them to supply grills that would have otherwise been provided by CFM. CFM alleges it has been and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

will continue to be injured by the Lucas entities'
conduct. Counterclaim ¶ ¶ 60-63. The Lucas entities
argue these allegations fail to state a claim because
they do not allege the Lucas entities interfered with a
business relationship.

**\*6** To state a claim for tortious interference with
business expectancy under Illinois law, CFM must
allege: (1) it had a valid business relationship or
reasonable expectancy of entering into a valid
business relationship; (2) the Lucas entities had
knowledge of the relationship or expectancy; (3) the
Lucas entities' intentional and unjustifiable
interference induced or caused a breach or
termination of the relationship or expectancy; and (4)
damage to CFM resulted from the interference. *See
Voyles v. Sandia Mortgage Corp. ., 196 Ill.2d 288,
300-1, 256 Ill.Dec. 289, 751 N.E.2d 1126 (2001).*
CFM alleges each of these elements. First, CFM
alleges it had established business relationships with
customers and potential customers. Second, CFM
alleges it introduced the Lucas entities to its
customers and potential customers. Third, CFM
alleges the Lucas entities, without justification,
pursued at least two of its customers and potential
customers and attempted to enter contracts with them
to provide grills that would have otherwise been
provided by CFM. Fourth, CFM alleges it has been
and will continue to be injured by the Lucas entities'
conduct. Counterclaim ¶ ¶ 60-63.

The Lucas entities argue Count VII must be
dismissed because it does not allege they entered a
contract with any of CFM's customers or potential
customers. This argument fails because the issue is
not whether a CFM customer actually contracted with
the Lucas entities, but rather whether the Lucas
entities caused a customer or potential customer to
terminate its relationship with CFM. Although not
specifically incorporated by reference into Count VII,
the counterclaim alleges that the Lucas entities used
confidential information to procure contracts with at
least one of CFM's potential customers. Counterclaim
¶ 68. It may reasonably be inferred from the
allegations of Count VII that the Lucas entities'
tortious interference caused CFM to lose at least one
contract in favor of the Lucas entities. Consequently,
the motion to dismiss Count VII must be denied.

VII. Count IX: Unjust Enrichment

In Count IX, CFM alleges the Lucas entities have
been unjustly enriched by the retention and use of
CFM's confidential information and exclusive
ownership of the patents. Counterclaim ¶ ¶ 72-73.

The Lucas entities move to dismiss Count IX because
they are joint owners of the patents. Therefore, their
retention of the benefits derived from the patents
cannot be unjust. They cite no authority for this
argument.

To plead a claim for unjust enrichment, CFM must
allege that the Lucas entities have unjustly retained a
benefit to CFM's detriment against the fundamental
principles of justice and equity. *Firemen's Annuity &
Ben. Fund v. Municipal Employees', Officers', &
Officials' Annuity & Ben. Fund, 219 Ill.App.3d 707,
162 Ill.Dec. 189, 579 N.E.2d 1003 (1st Dist.1991).*
CFM alleges the Lucas entities have unjustly retained
the benefits of the confidential information and
exclusive ownership of the patents. Counterclaim ¶ ¶
72-73. CFM alleges the Lucas entities' improper
retention of the benefits violates CFM's rights.
Counterclaim ¶ ¶ 29, 31, 73. When read in
conjunction with the allegations incorporated by
reference into Count IX, these allegations sufficiently
state a claim for unjust enrichment under Illinois law.
[FN4]

> FN4. All parties apply Illinois law to Count
> IX.

**\*7** The Lucas entities seek dismissal of Count IX to
the extent it is based on inventorship on the ground
that this issue is preempted by federal patent law.
Federal preemption takes three basic forms: First,
Congress may explicitly preempt state law; second, a
federal scheme may occupy a given field and thus
preempt state law in that field; and third, when
compliance with both state and federal law is
impossible, the conflicting state law is preempted.
*University of Colorado v. American Cyanamid Co.,
342 F.3d 1298, 1305 (Fed.Cir.2003).* Whatever the
form, the key is whether the operation of state law
stands as an obstacle to the accomplishment and
execution of the full purposes and objectives of
Congress. *Id.* A state may not offer patent-like
protection to intellectual creations that would
otherwise remain unprotected as a matter of federal
law. *Id.*

In *University of Colorado,* the Federal Circuit held
an unjust enrichment claim was not "patent-like" at
all because an unjust-enrichment claim "springs not
from an attempt to enforce intellectual property
rights," but instead from the unlawful use of
confidential information. *Id.* at 1306. "The fact that
[defendant] improperly secured the ... patent and used
this patent to obtain incremental profits only pertains
to restitution for the unjust enrichment claim." *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6
2005 WL 670637 (N.D.Ill.)
**(Cite as: 2005 WL 670637 (N.D.Ill.))**

Similarly, in Count IX, CFM seeks to recover the alleged improper benefits retained by the Lucas entities as a result of their alleged improper use of confidential information and patents. Count IX does not undermine the purposes of the federal patent laws and therefore is not preempted by federal patent law. *Id.* at 1307.

### VIII. Count X: The Lanham Act

In Count X, CFM asserts a claim for product design trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a). More specifically, CFM alleges the Lucas entities falsely designated the origin of their grills by marketing grills substantially identical in ornamental appearance to CFM's grills. As a result, the Lucas entities allegedly benefitted from CFM's goodwill and reputation. The Lucas entities argue Count X fails to state a claim for product design trade dress infringement under the Lanham Act because it does not allege that CFM's grills acquired secondary meaning.

To establish a claim for product design trade dress infringement under the Lanham Act, CFM must show that: (1) its trade dress has acquired secondary meaning, and (2) that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 216, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), *Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 636 (7th Cir.1999). The Supreme Court made clear that in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is protectible only upon a showing of secondary meaning. *Wal-Mart Stores,* 529 U.S. at 216. Secondary meaning is acquired when "in the minds of the public, the primary significance of a product feature ... is to identify the source of the product rather than the product itself." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654 (7th Cir.1995), *citing, Qualitex Co. v. Jacobson Products Company, Inc.,* 514 U.S. 159, 115 S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995).

**\*8** Liberally construing the allegations of Count X, they do not imply that CFM's grill design acquired a secondary meaning. For instance, CFM does not allege that the grill design had a unique product feature that identified CFM as the source of the product. There is not even a conclusory allegation of secondary meaning in the counterclaim. Consequently, Count X of the counterclaim must be

dismissed without prejudice.

### IX. Count XI: Conversion

In Count XI, CFM alleges the Lucas entities converted the patents by "assert [ing] possession" of them to the exclusion of CFM. Counterclaim ¶¶ 80-82. The Lucas entities seek dismissal of Count XI for two reasons. First, they claim intellectual property cannot be converted under Illinois law. Second, they argue the conversion claim is preempted by federal patent law.

As to the first argument, it is unclear whether Illinois courts recognize a claim for conversion of intangible property. In *Bilut v. Northwestern University,* 296 Ill.App.3d 42, 230 Ill.Dec. 161, 692 N.E.2d 1327 (1st Dist.1998), the court restated the principle that an action for conversion lies only for tangible personal property. However, Illinois appellate courts have recognized an action for conversion of intangible assets in *Stathis v. Geldermann, Inc.,* 295 Ill.App.3d 844, 856, 229 Ill.Dec. 809, 692 N.E.2d 798 (1 st Dist.1998), and *Conant v. Karris,* 165 Ill.App.3d 783, 117 Ill.Dec. 406, 520 N.E.2d 757 (1st Dist.1987). In *FMC Corp. v. Capital Cities/ABC, Inc.,* 915 F.2d 300, 305 (7th Cir.1990), the court considered whether a defendant was liable for converting confidential business information. In discussing whether intangible property could be the subject of conversion, the Seventh Circuit observed: "As Prosser and Keeton have noted ... 'there is perhaps no valid and essential reason why there might not be conversion' of intangible property." *Id.* The court also noted the modern trend in state law to allow claims for conversion of intangible property, citing *Conant v. Karris,* 165 Ill.App.3d 783, 117 Ill.Dec. 406, 520 N.E.2d 757 (1st Dist.1987). *See also United States v. Grandeau,* 350 F.Supp.2d 765 (N.D.Ill.2004) ("The tort of conversion was originally limited to cases involving intangible property, but has since expanded to cases involving intangible property").

The court need not decide this issue because the conversion claim is preempted by federal patent law. As set forth above in Section VII, the relevant inquiry in deciding preemption is whether the state law claim stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *University of Colorado,* 342 F.3d at 1305. The Lucas entities cite *Methode Elecs., Inc. v. Hewlett-Packard Co.,* 2000 U.S. Dist. LEXIS 12701 (N.D.Cal. May 3, 2000), in support of their argument. *Methode* held a conversion counterclaim was preempted by federal patent law because the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fundamental premise of the claim was that the defendant should have named plaintiff as an owner of the patent. *Id.* at \*9. Similarly, in *Malik v. Lynk, Inc.*, 1999 U.S. Dist. LEXIS 14811, at \*8 (D.Kan. Aug. 18, 1999), a conversion claim was dismissed as preempted by federal patent law because the claim was based on defendant's use of plaintiff's patent, conduct that is clearly governed by patent law. *Id.* at \*12. CFM provides no contrary authority. The court is persuaded that CFM's conversion counterclaim is preempted by federal patent law because the fundamental premise of the claim is that the Lucas entities unlawfully possess the patents by virtue of their failure to name CFM's employee-inventors on the patents. The resolution of this issue is governed by patent law. Therefore, Count XI is dismissed with prejudice as preempted by federal patent law.

CONCLUSION

**\*9** The motion to dismiss is granted in part and denied in part. Count X of the counterclaims and third-party claims are dismissed without prejudice. Count XI of the counterclaims and third-party claims are dismissed with prejudice. The motion is denied in all other respects.

2005 WL 670637 (N.D.Ill.)

**Motions, Pleadings and Filings** (Back to top)

• 2004 WL 2816872 (Trial Motion, Memorandum and Affidavit) Plaintiff Concept Innovation Inc's Memorandum of Law in Support of Its Motion for Claim Construction (Oct. 15, 2004)

• 2004 WL 2816862 (Trial Motion, Memorandum and Affidavit) Reply of Defendants to Third-Party Counterclaims (Jul. 16, 2004)

• 2004 WL 2816850 (Trial Motion, Memorandum and Affidavit) Reply to Counterclaims and Answer and Counterclaims to Third-Party Claims (Jun. 28, 2004)

• 2004 WL 2816839 (Trial Pleading) Answer of Defendants, Affirmative Defenses and Counterclaims and Third-Party Complaint (Jun. 03, 2004)

• 2004 WL 2816826 (Trial Pleading) Complaint (May. 11, 2004)

• 1:04CV03345 (Docket) (May. 11, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

*126.240 (2)*
*#1*
PATENT 7-14-98

**VIA HAND DELIVERY TO GROUP ART UNIT 1211**

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**(Case No. 96,926)**

| | | |
|---|---|---|
| In re Application of: | ) | |
| | ) | |
| Gatti et al. | ) | |
| | ) | |
| Serial No.: 07/827,742 | ) | Examiner: E. Peselev |
| | ) | |
| Filed: January 29, 1992 | ) | Art Unit: 1211 _1623_ |
| | ) | |
| For:  Injectable Ready-To-Use Solutions | ) | |
|       Containing An Antitumor Anthracycline | ) | |
|       Glycoside | ) | |

**TRANSMITTAL LETTER**

RECEIVED

JUL - 2 1998

MATRIX CUSTOMER
SERVICE CENTER

Asst. Commissioner for Patents
Washington, D.C.  20231

Dear Sir:

In regard to the above identified application,

1.   We are transmitting herewith the attached:

     a)    Ninth Supplemental Information Disclosure Statement;
     b)    PTO Form 1449 and cited references;
     c)    Associate Power of Attorney;
     d)    Return postcard

2.   With respect to fees:

     a)    A check in the amount of $240.00 is enclosed.
     b)    Please charge any underpayment or credit any overpayment our Deposit Account, No.
           13-2490.

3.   GENERAL AUTHORIZATION:  Please charge any additional fees or credit overpayment to
     Deposit Account No. 13-2490.  A duplicate copy of this sheet is enclosed.

Respectfully submitted,

*Jeremy E. Noe*

Date:    1 July 1998

Jeremy E. Noe
Registration No. 40,104

McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Chicago, IL 60606
(312)913-0001

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
### (Case No. 96,926)

In re Application of:                    )
                                         )
    Gaetano Gatti et al.                 )
                                         )
Serial No. 07/827,742                    )    Examiner: E. Peselev
                                         )
Filed: January 29, 1992                  )    Art Unit: 1211
                                         )
For:   INJECTABLE READY-TO-USE        )
      SOLUTIONS CONTAINING AN       )
      ANTITUMOR ANTHRACYCLINE       )
      GLYCOSIDE                     )

Asst. Commissioner for Patents
Washington, D.C. 20231

RECEIVED

JUL _ 2 1998

MATRIX CUSTOMER
SERVICE CENTER

## ASSOCIATE POWER OF ATTORNEY

Pursuant to 37 C.F.R. § 1.34 and M.P.E.P. § 402.02, the undersigned principal attorney or agent hereby appoints the following:

        Jeremy E. Noe             Reg. No. 40,104

the mailing address and telephone number of whom is McDONNELL BOEHNEN HULBERT & BERGHOFF, 300 South Wacker Drive, Chicago, Illinois 60606, and (312) 913-0001, with full power of substitution and revocation to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith.

Date:   6/30/98         By: _____
                                Emily Miao
                                Reg. No. 35,285

**VIA HAND DELIVERY TO GROUP ART UNIT 1211**

**PATENT**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No. 96,926)

| | |
|---|---|
| In re Application of: | ) |
| | ) |
| Gatti et al. | ) |
| | ) |
| Serial No.: 07/827,742 | ) Examiner: E. Peselev |
| | ) |
| Filed: January 29, 1992 | ) Art Unit: 1211 |
| | ) |
| For:  Injectable Ready-To-Use Solutions | ) |
| Containing An Antitumor Anthracycline | ) |
| Glycoside | ) |

## NINTH SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

In order to comply with discretionary regulations 37 CFR 1.97 and 1.98, attached hereto is

Form PTO-1449 and copies[1] of the documents listed thereon and fee pursuant to 37 C.F.R. §

1.97(c) and § 1.17(p).  These documents contain information which the Examiner may consider to

be important in deciding whether to allow the present application to issue as a patent.

07/07/1998 KWASHING 00000011 07827742
01 FC:125                 240.00 OP

1.    Arcamone et al, U.S. Patent 4,039,663, issued August 2,1977

2.    Nettleton et al., U.S. Patent No. 4,039,736, August 2, 1977

3.    Israel et al., U.S. Patent No. 4,035,566, July 12, 1977

4.    Arcamone et al.,U.S. Patent 3,686,163, issued August 22, 1972

5.    Arcamone et al., U.S. 4,039,663, issued 1977

6.    Rosenkrantz, U.S. Patent 4,327,087, issued April 27, 1982

7.    Arcamone et al., Canadian Patent 1,046,508, issued January 16, 1979

8.    Pateill et al., Canadian Patent 1,041,488, issued October 31, 1978

9.    Canadian Patent Application 2,014,244

10.   Arcamone, et. al., Canadian Patent No. 1,046,507, January 16, 1979.

11.   Oppici et al., Canadian Patent No. 1,204,738, May 20, 1980

12.   Rhone-Paulene S.A, U.K. Patent 985,598, issued March 10, 1965

13.   Swedish patent no. 8602743

14.   Young et al.. The Anthracycline Antineoplastic Drugs (1981) Vol. 305(3) New England J. Med 139.

15.   Casazza, Experimental Studies on New Anthracyclines (1984) (Proc. of Int. Symposium on Adriamycin: Ogawa et al. eds.).

16.   Aubel Sadron et al., Daunorubicin and doxorubicin, anthracycline antibiotics, a physicochemcial and biological review (1984) Biochemie 66, pp. 333-352

17.   Abdella et al., A Chemical perspective on the Anthracycline Antitumor Antibiotics, Env. Health Persp. Vol. 64, pp. 3-18 (1985).

18.   Arcamone, Daunomycin and Related Antibiotics. Topics in Antibiotic Chemistry. Vol. 2 (Sammes, ed.) (1978).

19.   Brown, Adriamycin and Related Anthracycline Antibiotics, Prog. Med. Chem. 15:124 (1978).

20.   Goormagtigh et al., Anthracycline Glycoside-Membrane Interactions, Biochem. Biophys. Acta: 271-288 (1984).

21.   Skovsgaard et al., Adrimycin, An Antitumor Antibiotic : A Review with Special Reference to Daunomycin, Dan. Med. Bull 22(2):62 (1975).

22.   Bachur et al., Cellular pharmacodynamics of several anthracycline antibiotics (1976) J. Med. Chem 19(5):651.

23.   Suarato, "Antitumor Anthracyclines", The Chemistry of Antiumour Agents (1990) (Wilman, ed.)

24.   Legha; "The Anthracyclines and Mitoxantrone", Cancer Chemotherapy by Infusion 2nd edition (Lokich et.) (1990) Precept Press.

2

25.    Bouma et al., Anthracycline Antitumor agents: A review of physcicochemical, analytical and stability properties Pharm. Weekblad Sc. Ed., Vol. 8, pp. 109 (1986).

26.    Williams, Stability & Compatibility of Admixtures of Antineoplastic Drugs, Cancer Chemotherapyhy by Infusion. 2nd Edition (Lukich et.) (1990) Precept Press.

27.    Williams et al., Photoinactivation of Anthracyclines (1981) Photochemistry & Photobiology, Vol. 34, p.131.

28.    Poochikian et al., Stability of anthracycline antitumor agents in four infusion fluids (1981) Chemical Abstracts, Vol. 94.214489f.

29.    Keusters, et al., Stability of solutions of doxorubicin and epirubicin in plastic mini bags for intravesical use after storage at -20°C and thawing by microwave radiation. (1986) Pharm. Weekblad Sc.Ed. Vol. 8 p.144.

30.    Bekers et al., Effect of cyclodextrins on anthracycline stability in acidic aqueous media (1988) Pharm. Weekblad. S. Ed., Vol. 10.,207.

31.    Wood, Mary Jayne: Stability of anthracycline cytotoxic agents in solution and infusion fluids-submitted for the degree of Master of Philosophy (The University of Aston in Birmingham). October 1988.

32.    Wood et al., Stability of Doxorubicin, Daunorubicin and Epirubxcin in Plastic Syringes and Minibags (1990) J. Clin. Pharm. Therapeutics Vol. 15. p. 279-289.

33.    Crom et al., Pharmacokinetics of Anticancer Drugs in Children, Clin. Pharm. 12:pp. 168-213 (1987).

34.    Greidanus, et al., "Continuous Infusion of Low-dose Doxorubicin, Epirubicin and Mitoxantrone", Cancer Chemotherapy: A Review, (1988) Pharm. Weekblad. Sci. Ed., Vol. 10, pp. 237.

35.    Bachur et al., Daunorubicin and adriamycin metabolism in the golden syrian hamster (1973) Biochem. Med. vol. 8, pp. 352.

36.    Haneke et al., Quanititation of Daunorubicin, Doxorubicin, and their Aglycones by Ion-Pair Reversed-Phase Chromarography, J. Pharm. Sci. 70(10): 1112 (1981).

37.    Tomlinson et al., Concomitant Adsorption and Stability of Sonic Anthracycline Antibiotics (Oct. 1982) 71 (10) J. Pharm Sci. 1121.

38.    Von Hoff et al., Daunomycin: An Anthracycline Antibiotic Effective in Acute

Leukemia, Adv. Pharm. Chemo. 15:1 (1978).

39.   Cassinelli et al., La Daunomicina: Un Nuovo Antibiotico Ad Attivita Citostatica Isolamento E Proprieta (1963) Giorn. Microbial. 11:167.

40.   Arcamone, La Constitution Chimique de la Daunomycine, Path. Biol. 15(19-20): 893 (1967).

41.   Di Marco et al., Daunomycin, a New Antibiotic of the Rhodomycin Group, Nature 201: 706 (1964).

42.   Angiuli et al., Structure of Daunomycin, X-Ray Analysis of N-Br-Acetyl-Daunomycin Solvate, Nature New Biol., 234:78 (Nov. 1971).

43.   Trissel et al.; Investigational Drug Information (1978) Drug Intell. Clin. Pharm Vol. 12, pp. 404.

44.   Handbook on Injectable Drugs (Trissel) 2nd Ed. 1980, page 562.

45.   Handbook on Injectable Drugs (Trissel) 5th Edition (1988), page 222-223.

46.   AHFS Drug Information 1984, page 249-250.

47.   AHFS Drug Information 1990, page 501-503.

48.   Fischer et al., The Cancer Chemotherapy Handbook 3rd Edition (1989), page 65-69.

49.   Drug Information for the Health Care Professional USP DI 1991 – 11th Edition, page 1080-1084.

50.   Beijnen, et al., Structure Elucidation and Characterization of Daunorubicin Degradation Products (1987) Int. J. Pharm., Vol. 34, pp.. 247.

51.   Bachur, Daunomycin Metabolism in Rat Tissue Slices., J. Pharm. Exp. Ther. 175(2):331.

4

52.    Riley, et al., Review of New Drugs – 1980, U.S. Pharm. 33 (Feb.1981).

53.    Boiron et al., Daunorubicin in the Treatment of Acute Myelocytic Leukemia. The Lancet. (February 1969), p.330.

54.    Di Marco et al., Activity of Adriamycin (NSC 123127) and Daunomycin (NSC 82151) Against Mouse Mammary Carcinoma, Cancer Chemother. Rep., part 1, Vol. 56(2):153 (1972).

55.    Barthelemy-Clavey et al., Self-Association of Daunorubicin , FEBS Lett., Vol. 46(1), pp. 5 (1974).

56.    Calendi et al., On Physico-Chemical Interactions between Daunomycin and Nucleic Acids, Biochem Biophys. Acta., Vol. 103:25. (1965)

57.    Schreier, Binding of Daunomycin to Acidic Phospholipids J. Par. Sci. Tech, Vol. 43, No. 4, pp. 213 (1989)

58.    Dubost et al., Un nouvel antibiotique a proprieties cytostatiques: la rubidomycine (1963) C.R. Acad. Sci. Paris, 257, pp. 813.

59.    Maral et al., Etude Toxicologique et activite Antitumorale Experimentale de la Rubidomycine (13.057 R.P.) Path. Biol., Vol. 15, No. 19-20, pp.. 903-908 (1967).

60.    Depois et al: Un nouvel antibiotique dove d'activite antitumorale la rubidomycine (13.057 R.P.), J. Preparation et properties, Arzricial Forsch. 17:934 (1967)

61.    Brazhnikova et al., Physicochemical Properties of Antitumour Antibiotic Rubomycin produced by Act. Cocruleorubidus (1986) Antibiotki 11:763

62.    "Discovery & Development of Doxorubicin", Doxorubicin, Anticancer Antibiotics (Arcamone, eds.) (1981) Academic Press, pp.1-47.

63.    Blum et al., Adriamycin: A New Anticancer Drug with Significant Clinical Activity, Annals of Int. Med., 80:249-259 (1974).

64.    Arcamone et al., Adriamycin (14-Hydroxydaunomycin), a Novel Antitumor Antibiotic Tetrahedron Letters No. 13, p. 1007-1010.

65.    Di Marco et al., Adriamycin, a New Antibiotic, Antitumour, Activity, Cancer Chem. Reports, part 1, Vol. 53, No. 1, pg. 33 (1969).

66.    Trissel: A Handbook on Injectable Drugs 2nd edition (1980), page 196.

67.    Trissel: A Handbook on Injectable Drugs 4th edition ( 1986), page 215-217.

5

68.    Trissel: A Handbook on Injectable Drugs 5th edition (1988), page 259-264.

69.    McEvoy, AHFS Drug Information 1984, page 251-254.

70.    AHFS Drug Information 1990, page 504-507

71.    Fischer, The Cancer Chemotherapy Handbook 3rd edition (1989), page 82-87

72.    Drug Information for the Health Care Professional USP DI (1991) 11th Edition , page 1217-1222.

73.    Benvenuto et al., Stability & Compatibility of Antitumor Agents in Glass & Plastic Containers, (Dec. 1981), Am. J. Hosp. Pharm., Vol. 38, pp. 1914

74.    Walker et al., Doxorubicin Stability in Syringes and Glass Vials and Evaluation of Chemical Contamination, Can J. Hosp. Pharm. 44(2): 71(1991).

75.    Gupta et al., Investigation of the Stability of Doxorubicin Hydrochloride using Factorial Design, Drug Development & Industrial Pharmacy, (1988) Vol. 14(12) p.1657-1671.

76.    Beijnen et al., Stability of intravenous admixtures of doxorubicin and vincristine. Am. J. Hosp. Pharm., Vol. 43, pp. 3022, (Dec. 1986).

77.    Asker et al., Effect of Glutathione on Photolytic Degradation of Doxorubicin Hydrochloride, J. Par. Sci. Tech. (1988), 42(5)193.

78.    Habib et al., Photostabilization of doxorubicin Hydrochloride with Radioprotective and Photoprotective Agents: Potential Mechanism for Enhancing Chemotherapy during Radiotherapy (Nov-Dec. 1989) 43 J. Parenteral Science & Technology, Vol. 43, No. 6, pp. 254, (Nov-Dec,. 1989).

79.    Speth, et al., Clinical Pharmacokinetics of Doxorubicin, Clin. Pharm., Vol. 15, pp. 15-31, (1988)

80.    Yee et al., Adriamycin: A Brief Review (April, 1981) Am. J. Int. Ther. Clin Nut. pp. 7-12.

81.    Hoffman et al., Stability of Refrigerated and Frozen Solutions of Doxorubicin Hydrochloride (Nov. 1979), Am. J. Hosp. Pharm. Vol. 36(11) 1536-1538.

82.    Karlsen et al., Stability of cytotoxic intravenous solutions subjected to freeze-thaw treatment (1983), Chemical Abstracts, Vol. 99, No.146022, pp. 374.

83.    Gaj., et al., Compatibility of Doxorubicin Hydrochloride and Vinblastine Sulfate –.

The Stability of a Solution Stored in Cormed ®Reservoir Bags or Monoject® Plastic Syringes (May, 1984) Am. J. IV Ther. Clin. Nut., pp.8.

84.    Tavoloni et al.,  Photolytic Degradation of Adriamycin (1980) Comm. J. Pharm. Pharmacol. Vol., 32, pp. 860.

85.    Garnick et al.,  Phase 1 Trial of Long Term Continuous Adriamycin Administration, Proc. Am. Soc. Clin. Oncol., C-106: p.359,( March 1981),

86.    Lokich et al.,  Constant Infusion Schedule for Adriamycin:  A Phase I-II Clinical Trial of a 30-Day Schedule by Ambulatory Pump Delivery System, J. Clin. Oncol., Vol. 1 (1): 24 (1983).

87.    Vogelzang et al.,  Continuous Doxorubicin Infusion (CDI) Using an Implanted Lithium Battery-Powered Drug Administration Device System, Proc. Am.Soc. Clin.Uncol. C-1030: p.263, (March 1984).

88.    Legha et al.,  Reduction of Doxorubicin Cardiotoxicity by Prolonged Continuous Intravenous Infusion, Ann. Int. Med., Vol. 96, No. 2, pp. 133 (1982).

89.    Pavlik et al., Stability of Doxorubicin in Relation to Chemosensitivity Determinations: Loss of Lethality and Retention of Antiproliferative Activity (1984), Cancer Investigation 2 (6), 449-458.

90.    Dozier et al.,  Practical Considerations in the Preparation and Administration of Cancer Chemotherapy (Sept.1983) Am.J. Int. Ther. Clin. Nut., pp. 6.

91.    Kirschenbaum et al: Stability of injectable medications after reconstitution, Am. J. Hosp. Pharm.: 33:767-790 (Aug., 1976).

92.    Janssen et al.,  Doxorubicin decomposition on storage.  Effect of pH., type of buffer and liposome encapsulation, (1985) Chemical Abstracts, Vol. 102,  No. 209226k.

93.    Crommelin et al.,  Preparation and characterization of doxorubicin-containing liposomes. II. Loading capacity, long-term stability and of doxorubicin-bilayer interaction mechanism (1983) Int. J. Pharm. Vol. 17, pp. 135.

94.    Van Bommel, et al.,  Stability of Doxorubicin-Liposomes on Storage:  as an Aqueous Dispersion, Frozen or Freeze dried (1984), Int. J. Pharm., Vol. 22,     pp. 299-310.

95.    Crommelin et al.,  Preparation and characterization of doxorubicin-containing lipsomes: I. Influence of liposome charge and pH of hydration medium on loading capacity and particle size, (1983), Int. J. Pharm., Vol. 16, pp. 93-96.

96.    Gupta et al.,  "Influence of Stabilization Temperature on the Entrapment of

Adriamycin", Albumin Microspheres Drug. Dev. Int. Pharm., Vol. 13, No. 8, pp. 1471-1482, (1987)

97.    Yanagawa et al., Stability and Releasibility of Adriamycin Ointment (1983).

98.    Vilallonga et al: Interaction of Doxorubicin with Phospholipid Monolayers, J. Pharm. Sci. 67(6), pp. 773 (1978).

99.    Duarte-Karim et al., Affinity of adriamycin to phospholipids. A possible explanation for cardiac mirochonorial lesions., (1976) Biochem Biophy. Research Comm., 71(2), pp. 658.

100.   Bonadonna et al., Clinical Evaluation of Adriamycin a New Antitumor Antibiotic, Br. Med. J., (3), 503 (August 1969).

101.   Banks et al., Topical Installation of Doxorubicin Hydrochloride in the Treatment of Recurring Superficial Transitional Cell Carinoma of the Bladder, J. Ulrol., Vol. 118, pp. 757 (1977).

102.   Bertazzoli et al., Chronic toxicity of adriamycin: a new antineoplastic antibiotic (1972), Tox. Applied Pharm., Vol. 2, pp. 287-301.

103.   Wang et al., Therapeutic effect and toxicity of adriamycin in patients with neoplastic disease, (1971) Cancer, 28, pp.837.

104.   Horn et al., Intravesical chemotherapy in a controlled trial with thio-tepa versus doxorubicin hydrochloride (1981) J. Urol., 125:652.

105.   Jacobi et al., Studies on the intravesical action of topically administered G3H-doxorubicin hydrochloride in men: plasma uptake and tumor penetration (1980), J. Urol. 124:34.

106.   Jaenke, R.S.: Delayed and progressive myocardial lesions after adriamycin administration in the rabbit. (1976) Cancer Res. Vol. 36, pp. 2958-2966.

107.   Casazza et al., Tumors and dental ocular abnormalities after treatment of infant rats with adriamycin, (1977) Tumor 63:331.

108.   Barranco et al., Survival and cell kinetics effects of adriamycin on mammalian cells, (1973). Cancer Res. 33:11.

109.   Gaj et al., Evaluation of growth in Five Microorganisms in Doxorubicin and Floxuridine Media, (1984) Pharm. Manuf., pp. 50.

110.   Sturgeon and Schulman: Electronic Absorption Spectra and Protolytic Equlibria of

8

Doxorubicin: Direct Spectrophotometric Determination of Microconstants, J. Pharm. Sci. 66(7):958, (1977).

111. Dalmark et al., A Fickian Diffusion Transport Process with Features of Transport Catalysis, J. Gen Physiol. 78:349 (1981).

112. Masuike et al., Determination of Adriamycin and its Metabolities in Biological samples using high performance liquid chromatography Chemical Abstracts (1984), Vol. 101, pp. 5.

113. Barth et al., "Determination of Doxorubicin Hydrochloride.", Pharamaceutical Preparations using High Pressure Liquid Chromatography, (1977) J. of Chromatography Vol. 131, p. 375-381.

114. Arena et al., Analysis of the pharmacokinetic characteristics, pharmacological and chemotherapeutic activity of 14-hydroxy-daunomycin (adriamycin), a new drug endowed with an Antitumor activity, (1971) Drug Res. 21: 1258.

115. Watson et al., Rapid analytic method for adriamycin and metabolites in human plasma by a thin fim flourescence scanner (1976) Cancer Treat. Rep., Vol. 60, No. 11, pp. 1611.

116. Langone et al., Adriamycin and Metabolites: Separation by High Pressure Liquid Chromatography and Qunitation by Radioimmunossay, Biochem Med. 12:283 (1975).

117. Benjamin et al., Pharmacokinetics and metabolism of adriamycin in man, Clin. Pharm. Ther., 14(4) Part 1, 592.

118. Epirubicin, Drugs of the Future, Vol. 8,(5): pp. 402, (1985).

119. Cersosimo et al., Epirubicin: A Review of the Pharmacology, Clinical Activity, and Adverse Effects of an Adriamycin Analogue, J. Clin. Oncol 4(3), 425 (1986).

120. Fischer, "The Cancer Chemotherapy Handbook", 3rd Edition, (1989), page 87–89.

121. DeVroe, et. al., "A Study on the stability of three antineoplastic drugs and on their sorption by i.v. delivery systems and end-line filters, (1990), Int. J. Pharm. Vol. 65, Page 49 – 56

122. DeVries, et. al., "A Phase 1 and Pharmocokinetic Study with 21 day Continuous infusion of Epirubicin., J. Clin. Oncol., (1987), 5(9), 1445-1451.

123. Adams, et. al, "Pharmaceutical Apsects of Home Infusion Therapy for Cancer Patients, (April 1987), Pharm J., pp. 476.

9

124.  Weenen, et. al., "Pharmacokinetics of 4-Epi-doxorubicin in Man", Invesi. New Drugs, Vol. 1, (1983), pp. 59.

125.  Arcamone, et. al., "Synthesis and Antitumour Activity of 4-Demethoxydaunorubicin, 4-Demothoxy-7, 9-diepidaunorubicin, and their beta anomers", Cancer Treat Rep. 60(7):829 (1976).

126.  Turowski et al., "Visual Compatability of Idarubicin Hydrochloride with selected drugs during simulated Y-site injection", (Oct. 1991), Ans. J. Hosp. Pharm., Vol. 48, pp. 2181.

127.  Hurteloup et al., "Phase II Trial of Idarubicin (4- Demethoxydaunorubicin) in Advanced Breast Cancer, Eur. J. Cancer Clin. Oncol. 25(3)423 (1989)

128.  Kaplan et al., "Phase I Trial of 4- Demethoxydaunorubicin with single i.v. doses, Eur. J. Clin. Cancer Oncol., 18(12) 1303 (1982).

129.  Reich et al., "Carminomycin", Arptheacyclines:  Current Status and New Developments," (1980) (J. Cooke et al., eds.) Academic Press, pp. 295.

130.  Brazhnikova et al., "Physical and Chemical Characteristics and Structure of Carminomycin, a New Antitumour Antibiotic", J. Antibiot, 27(4):254 (1974)

131.  Brazhnikova et al., "Carminomycin, a New Antitumour Anthracycline" (1973) Antibiotiki 18:681.

132.  Crooke, "A Review of Carminomycin, A New Anthracycline Developed in the USSR" J. Med. 8(5):  295 (1977).

133.  Lankelma et al, "Plasma Concentrations of Carminomycin and Carminomycinol in Man, Measured in High Pressure Liquid Chromatography", Eur. J. Cancer clin. Oncol. 18(4):363 (1982)

134.  Fandrich, "Analysis of Carminomycin in Human Serum by Fluorometric High-Performance Liquid Chromatography", J. Chromatogr. 223 155 (1981).

135.  Oki, "Aclacinomycin A Anthracyclines:  Current Status and New Developments", (1980) Academic Press., pp. 323.

136.  Oki et al., "Antitumour Anthracycline Antibiotics, Aclacinomycin A and Analogues: I. Taxonomy, Production, Isolation and Physicochemical Properties", J. Antibiot 32(8):791 (1979)

137.  Oki, "New Antitumour Antibiotics, Aclacinomycins A and B", J. Antibiot, 28(10):830 (1975)

138.  Mori et al., "Physicochemical Properties and Stability of Aclacinomycin A Hydrochloride," (1980), Jpn. J. Antibiot 33:618

139.  Trissel, "Handbook on Injectable Drugs", 5th Edition, page 707

140.  Fischer, "The Cancer Chemotherapy Handbook", 3rd Edition, pages 17-19

141.  Arcamone et al., "Synthesis and Antitumour Activity of 4–Deoxydaunorubicin and 4-Deoxyadriamycin", J. Med. Chem. 19(12):1424 (1976)

142.  Fischer, "The Cancer Chemotherapy Handbook" 3rd Edition (1989), pp. 88.

143.  Salmon et al., "Antitumour Activity of Esorubicin in Human Tumour Clonogenic Assay with Comparison to Doxorubicin", J. Clin. Oncol. 2(4):282 (1984)

144.  Kovach et al., "Phase I Trial & Assay of Rubidozone (NSC 164011) in Patients with Advanced Solid Tumors", (March 1979) Cancer Research Vol. 39, pp. 823.

145.  Deprez-de Campanere et al., "Pharmacokinetic, Toxicologic, and Chemotherapeutic Properties of Detorubicin in Mice: A Comparative Study with Daunourubicin and Adriamycin", Cancer Treat. Rep., 63(5):861 (1979).

146.  Bono, "The Preclincial Development of Quelamycin and its Initial Clinical Trials.", Aruthracyclines: Current Status and New Developments, (1980) Academic Press, pp. 315.

147.  Gosalvez et al., "Quelamycin, a New Derivative of Adriamycin with Several Possible Therapeutic Advantages", Eur. J. Cancer 14:1185 (1978)

148.  Reich et al., "Marcellomycin" Anthracyclines: Current Status and New Developments", (1980) Academic Press, p. 343

149.  Nettleston et al., "New Antitumour Antibiotics: Musettamycin and Marcellomycin from Bohemic Acid Complex: (1977) 30(6) J. Antibiotics 525

150.  Israel et al., "Adriamycin Analogues: Preparation and Biological Evaulation of Some N-Perfluoroacyl Analogues of Daunorubicin, Adriamycin, and N-(trifluoroacetyl) adriamycin 14-valerate and their 9, 10-Anhydro Derivatives" J. Med. Chem. 25:187 (1982)

151.  Tong et al., "5-Iminodaunorubicin: Reduced Cardiotoxic Properties in an Antitumour Anthracycline", J. Med. Chem. 22(1): 36 (1979)

152.  Arcamone et al., "Synthesis and Antitumour Activity of new Daunorubicin and Adriamycin Analogues" (1978) Experientia 34:1255

11

153. Umezawa et al., "Tetrahydropyranyl Derivatives of Daunomycin and Adriamycin", J. Antibiot 32(10):1082 (1979)

154. Chen et al., "Possible Strategies for the Formulation of Antineoplastic Drugs" (1986) Drug. Dev. Ind. Pharm. Vol. 12(7) 1041

155. Pharmaceutics – The science of dosage form design (Aulton) (1988), pp. 242-244, 252-253, 368-369, 374-375, 380-

156. Experimental Pharmaceutical Technology, 2nd Ed.(Parrott & Saski), 1965, pp. 132-134, 149-154.

157. Pharmaceutics & Pharmacy Practice (1982) (Banker & Chalmers), pp. 238-243, 275-278.

158. Pharmaceutical Dosage Forms: Parenteral Medications: Vol. 1 (Avis et al. 1984) "Biopharmaceutics of Injectable Medication" (Motola)

159. Connors et al., "Chemical Stability of Pharmaceuticals – a Handbook for Pharmacists" (1979) Wiley, pp. 3-7, 44-63, 74-75.

160. Ozturk et al., "Dissolution of Ionizable Drugs in Buffered and Unbuffered Solutions" (1988) 5(5) Pharm. Res. 272

161. Gordon et al., "The Art and Science of Contemporary Drug Development", Prog. Drug. Res. 16:194 (1972)

162. Pharmaceutical Dosage Forms: Parenteral Medications: Vol. 1 (Avis et al., 1984), "Preformulation Research of Parenteral Medications" (Motola & Agharkar)

163. The Theory & Practice of Industrial Pharmacy (Lachman et al.), 3rd Ed. 1986, p. 191, et seq., pp. 191-194, 195-196, 459-460, 471-472, 477-478, 764-765.

164. Lin, "Kinetic Study in Formulation Investigation of New Compounds" (1968)

165. Zoglio, "Preformulation Stability Testing of Parenteral Products" (1968)

166. Knoop, "The Pharmaceutical Drug Development Process: An Overview" (1988) 22 Drug. Inf. J. 259

167. Rees, "Physico-Mechanical Pre-Formulation Studies" (1973) 112 Boll. Chim. Farm. 216

168. Monkhouse, "Dosage Forms For Clinical Trials" (1985) 11 (9 & 10) Drug. Dev. Ind. Pharm. 1729

12

169. Graffner et al., "Preformulation Studies in a Drug Development Program for Tablet Formulations", J. Pharm. Sci. 74(1) 16 (1985)

170. Davignon et al., Pharmaceutical Aspects of Antitumour Agents" (1984) Pharm. Weekbt. 119:1144

171. Pharmaceutical Dosage Forms:  Parenteral Medications:  Vol. 2 (Avis et al., 1984) "Formulation for Large Volume Parenterals" (Demorest), pp. 55-63, 68-70, 73-76, 83.

172. Pharmaceutical Dosage Forms:  Parenteral Medications:  Vol. 1(Avis et al., 1984) "Formulation for Small Volume Parenterals" (DeLuca & Boylan)

173. Schumacher (ed), Bulk Compounding Technology

174. Carlin, "Incompatibilities of Parenteral Medications" (June 1968) 25 Am. J. Hosp. Pharm. 271

175. Kalmas, et al., "Solubility Aspects in Parenteral Formulation" (May/June 1982) Ind. J. Hosp. Pharm. 94, pp. 94-96, 98, Table I.

176. Parrott, "Formulation of Parenterals"

177. Lin, "Parenteral Formulations I.  Comparisons of Accelarated Stability Data with Shelf-Life Studies", Bull. Par. Drug Assoc. 23(6):269

178. Lin, "Parenteral Formulations II.  A Stability Testing Program for Parenteral Products", Bull. Par. Drug. Assoc. 24(2):83

179. Lin, "Photochemical Considerations of Parenteral Products", Bull. Par. Drug. Assoc. 23 (4):149

180. National Coordinating Committee on Large Volume Parenterals, "Recommendations to Pharmacists for Solving Problems with Large-Volume Parenterals", Am. J. Hosp. Pharm. 33:231 (1976)

181. Zellmer, "Solving Problems with Large-Volume Parenterals, 1: Pharmacist Responsibility for Compounding Intravenous Admixtures", Am. J. Hosp. Pharm. 32:255 (1975)

182. Pharmaceutical Dosage Forms, "Parenteral Medications:  Vol 1 (Avis et al. 1984) – Parenteral Drug Administration:  Routes, Precautions, Problems & Complications" (Duma & Akers)

183. Edward, "pH:  An important Factor in the Compatibility of Additives In Intravenous Therapy" (Aug. 1967) Vol. 24 Am. J. Hosp. Pharm. 440

13

184. Document entitled "Kinetic pH Profiles", pp. 59-121, 380-385.

185. Remington's Pharmaceutical Sciences, 18th ed. 1990; ch. 17: Ionic Solutions & Electrolytic Equilibria

186. Advances in Pharmaceutical Services, Vol. 2 (Bean et al., 1967), pp. 62-75, 80-95.

187. Fynn, "Buffers-pH Control within Pharmaceutical Systems" (March-April 1980) Vol. 34 (2) J. Parenteral Drug Assoc. 139

188. Windheuser, "The Effect of Buffers on Parenteral Solutions" (Sept./Oct. 1963) Vol. 17(5) Bull Parenteral Drug Assoc.

189. Rubino, "The Effects of Cosolvents on the Action of Pharmaceutical Buffers" (1987) 41(2) J. Paren. Sci. Tech. 45

190. Kramer & Flynn, "Solubility of Organic Hydrochlorides" (Dec. 1972) Vol. 61 (12) J. Pharm. Sci. 1896

191. Tencheva et al., "New Approach of the Extrapolation Procedure in the Determination of Acid-Base Constants of Poorly Soluble Pharmaceuticals" (1979); Arzneim Forsch/Drug Res. 29 (II) #9

192. Bogardus et al., "Solubility of Doxycycline in Aqueous Solutions" (Feb. 1979) Vol. 68 (2) J. Pharm. Sci. 188

193. Miyazaki et al., "Precaution on Use of Hydrochloride Salts in Pharmaceutical Formulation" (June 1981) 70(6) J. Pharm. Sci. 594

194. Greene et al.: Stability of cicplatin in aqueous solution, Am J. Hosp. Pharm. 36:38 (1979)

195. Stjernstrom et al: Studies on the stability and compatibility of drugs in infusion fluids, Acta Pharm Spec. 15:33 (1978)

196. Ho: Prediction of Pharmaceutical Stability of Parenteral Solutions III (Feb. 1971) Vol. 5, Drug, Int. Clin. Pharm. 47

197. Stella: Chemical and Physical Bases Determining the Instability and Incompatibility of Formulated Injectable Drugs (1986) 40(4) J. Paren. Sci. Tech. 142

198. Newton: "Physicochemical Determinants of Incompatibility and Instability in Injectable Drug Solutions and Admixtures" (1978" 35 Am. J. Hosp. Pharm. 1213

199. Mendenhall: Stability of Parenterals (1984) Drugs Dev. Ind. Pharm. 10(8-9) 1297

200. Singh et al.: Effect of Solvents and Additives on the Stability of Drugs, Pharma Times 13

201. Pope: Accelerated Stability Testing for Prediction of Drug Product Stability – First of a Two-Part Article (November, 1980) D & CI 54, pp. 54, 56, 59, 60, 62, 116.

202. Pope: Accelerated Stability Testing for Prediction of Drug Product Stability – Second of a Two-Part Article (December, 1980) D & CI 48, pp. 48, 50, 55, 56, 58, 60, 62, 64-66, 110, 112-116.

203. Amirjahed: Simplified Method to Study Stability of Pharmaceutical Preparations, J. Pharm Sci. pp(6):785 (1977)

204. Vogenberg et al.: Stability Guidelines for Routinely Refrigerated Drug Products, Am. J. Hosp. Pharm. 40:101(1983)

205. Newton et al.: Estimating shelf-life of drugs in solution. Am. J. Hosp. Pharm. 44:1633 (1987)

206. Mollica et al.: Stability of Pharmaceuticals. J. Pharm. Sci. 67(4):443 (1978)

207. King et al: Statistical Prediction of Drug Stability Based on Non-Linear Parameter Extension, J. Pharm. Sci. 73(5):657

208. Herrick et al.; Monetary incentive for pharmacists to control drug costs; (July 1985) Vol. 42, Am. J. Hosp. Pharm. 1527

209. Waller: Documenting i.v. admixture product waste (Aug. 1980) Vol. 43, Am. J. Hosp. Pharm. 1914

210. Williams et al.: The Lyophilization of Pharmaceuticals: A Literature Review (1984) 38(2) J.. Paren. Sci. Tech. 48

211. Flamberg et al.: Manufacturing Considerations in the Lyophilization of Parenteral Products (1986) Pharm. Manuf.3:29-31

212. Maral et al.: Un Nouvel Antibiotique Doue D'Activite Antitumorale: La Rubidomycine (13 057 R.P.), II: Activite antitumorale experimentale Arzncimittel Forsch (1967) 17:939

213. Beijnen et al.: Aspects of the Degradation Kinetics of Doxorubicin in Aqueous Solution (1986) 32 Int. J. Pharm. 123

214. Gjelstrup et al., Almen Farmaci II (1983)

215.    Handbook on Injectible Drugs 3rd Ed. (Trissel), 1983

216.    Wang et al., "Review of Excipients and pH's for Parenteral Products Used in the United States", Journal of the Parenteral Drug Association 14(6):452 (1980)

217.    Jonkman-de Vries et al., "Pharmaceutical Development of a Parental Lyophilized Formulation of the Novel Indoloquinone Antitumor Agent EO", Cancer Chemother. Pharmacol. 34:416-422 (1994)

218.    Pharmaceutical Sciences, Mack Publishing, (1980), page 1365–1366

219.    The Pharmaceutical Codex 11th Ed., 1979, page 446–447

220.    The Pharmaceutical Codex 12th Ed. (Lund), 1994, page 201

221.    Kjeld Ilver: Almen Galenisk Farmaci - Forel≥sningsnoter, Dansk Farmaceutforenings Forlag 1971

222.    Sv. Aage Schou & V. Gaunî Jensen: Tr≥k af den glaeniske farmaci, Store Nordiske Videnskabsboghandel, 1959

223.    Almen Farmaci, Dansk Farmaceutforenings Forlag 1980

224.    Erik Sandell: Galenisk Farmaci, 2nd edition, Stockholm 1967

225.    Erik Sandell: Galenisk Farmaci, 3rd edition, Stockholm 1982

226.    User information for ADRIBLASTIN®, April 1983

227.    Alfred N. Martin et al., Physikalische Pharmazie 1975, pg. 239

228.    European Pharmacopeia, Vol. III, 1979, pg. 656: Citations - D 14

In accordance with MPEP Sections 609 and 707.05(b), it is requested that each document cited (including any cited in applicant's specification which is not repeated on the attached Form PTO-1449) be given thorough consideration and that it be cited of record in the prosecution history of the present application by initialing on Form PTO-1449. Such initialing is requested even if the

Examiner does not consider a cited document to be sufficiently pertinent to use in a rejection, or otherwise does not consider it to be prior art for any reason, or even if the Examiner does not believe that the guidelines for citation have been fully complied with.  This is requested so that each document becomes listed on the face of the patent issuing on the present application.

The present Disclosure Statement is being submitted in compliance with 37 CFR 1.56 insofar as an Examiner might consider any of the cited documents important in deciding whether to allow the application to issue as a patent, but the citation of each document is not to be construed as an admission that such document is necessarily relevant or prior art.  No representation is intended that the cited documents represent the results of a complete search, and it is anticipated that the Examiner, in the normal course of examination, will make an independent search and will determine the best prior art consistent with 37 CFR 1.104(a) and 1.106(b) and, in the course of each search, will review for relevance every document cited on the attached form even if not initialed.

Early and favorable consideration is earnestly solicited.

Respectfully submitted,

Dated: July 1, 1998

*Jeremy E. Noe*

Jeremy E. Noe
Registration No. 40,104

McDonnell Boehnen Hulbert and Berghoff.
300 South Wacker Drive, Suite 3200
Chicago, Illinois 60606
312-913-0001, Facsimile 312-913-0002

17