# EXHIBIT F



CERTIFICATE UNDER 37 CFR 1.8:  The undersigned hereby certifies that this Transmittal Letter and
the paper, as described in paragraph 1 hereinabove, are being deposited with the United States Postal
Service with sufficient postage as first class mail in an envelope addressed to:  Asst. Commissioner for
Patents, BOX AF, Washington, D.C. 20231 on this 28th day of June, 1996.

By    *Daniel A. Boehnen*

Daniel Boehnen

# IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF GAETANO GATTI, et al.          :

SERIAL NO.: 07/827,742          :          EXAMINER PESELEV

FILED:  JANUARY 29, 1992          :          GROUP ART UNIT: 1803

FOR:  INJECTABLE READY-TO-USE SOLUTIONS          :
      CONTAINING AN ANTITUMOR
      ANTHRACYCLINE GLYCOSIDE          :

**AMENDMENT UNDER 37 C.F.R. § 1.116**

**RECEIVED**

JUL 1 2 1996

GROUP 1800

ASSISTANT COMMISSIONER OF PATENTS & TRADEMARKS
BOX AF
WASHINGTON, D.C.  20231

SIR:

Responsive to the final Official Action mailed January 30, 1996, Applicants state:

## IN THE CLAIMS

Please amend independent Claims  31, 42, and 44  as follows:

31.    (Four times amended)     A physiologically acceptable solution of anthracycline

glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin

hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous

solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected

from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic

acid, and tartaric  acid, the concentration of said anthracycline glycoside being from 0.1 to

100mg/ml, wherein said solution is contained in a sealed container [and has not been

reconstituted from a lyophilizate].

1

42. (Amended)   A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefore, [wherein the solution has not been reconstituted from a lyophilizate,]  wherein said solution has a pH adjusted to 2.71 to 3.14 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

44. (Twice Amended)   A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, [wherein said solution has not been reconstituted from a lyophilizate].

Please cancel Claim 40, and add the following claims 45-47:

--45.  The anthracycline glycoside solution of Claim 31, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

46.   The container of Claim 42, wherein said doxorubicin solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

47.   The anthracycline glycoside solution of Claim 44, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids. --

2

# REMARKS

## Introduction

Claims 31, 33-38, 42, and 44 remain in this application. Prior Claim 40 has been canceled, and new claims 45-47 are submitted. Applicants had previously paid for Claims 31-42, so no new fee is required. None of these changes raise any substantial new issue, and they place the application in condition for allowance. Reconsideration of this application, as amended, is respectfully requested.

The Claims of this application were previously drafted in a way that distinguished Applicants' solutions from certain prior art products which are reconstituted from lyophilizate powder in vials by medical personnel at the time of drug administration. The comments of the Examiner in the last Office Action indicated that whether the solution was reconstituted from lyophilizate is immaterial because patentability must reflect the inherent properties of the claimed solution and the prior art. Consistent with the Examiner's comments, Claims 31, 42, and 44 are now amended (by deleting the lyophilizate limitation) to show that the important and *claimed* properties of the present invention do arise from the inherent properties of the solution, regardless of whether the solution is prepared from lyophilizates in vials.

Along those same lines, the novel property of the claimed solution relates to its capacity for long term storage stability. As explained more fully herein, this long term storage stability of the present invention permits it to be pre-packaged and sold as a ready-to-use solution product, rather than to be reconstituted from lyophilizate in vials by medical personnel in conventional manner. This novel property of the present invention was completely unrecognized by the prior art and provides the basis for satisfying a long felt need and achieving commercial success. Also

3

importantly for patentability, these aspects of the invention establish a motivation to achieve

something new and different, a factor which is necessary for a finding of obviousness under

§103, but was completely lacking from the prior art

## Double Patenting Rejection

The Examiner has rejected all of the claims on the grounds obviousness-type double

patenting over U.S. Pat. No. 4,946,831.  Applicants note that, in the Office Action mailed

11/15/93, the Examiner indicated that the terminal disclaimer, although re-submitted by

applicants, has not been found in the file.  Applicants acknowledge that they will file a new

terminal disclaimer to obviate the double patenting rejection.  Applicants request that this be

held in abeyance until agreement on patentable subject matter has been reached.

## Obviousness Rejection

The Examiner has also rejected all of the claims under 35 U.S.C. §103 as being

unpatentable over the Japanese patent no. 60-92212 in combination with Baurain et al. (U.S. Pat.

No. 4,296,105) and Arcomone et al.   Applicants respectfully request reconsideration of this

rejection and allowance of the pending claims.

Before discussing the rejection in detail, it is important to note that the entire thrust and

purpose of the present invention is to achieve technology enabling the long term storage of

doxorubicin in solution, preferably in a pharmaceutically acceptable solution.  There is no

question but that none of the prior art cited by the last Office Action are even remotely directed

toward achieving a long term storage stable solution of doxorubicin.  JP 60-92212 is directed

toward the discovery of formulations of doxorubicin salts that "are capable of being completely

4

dissolved [from reconstitute] in saline solutions within a very short span of time." *See* the first full paragraph on p. 3 of the reference. Baurain is directed to the discovery of N-leucyl-doxorubicin and its salts, as a new active ingredient. Arcomone is directed to a generalized explanation of the structural and physiochemical properties of doxorubicin, including solubility, spectroscopic characteristics, stability, and analytical methods for determining same. However, as will be detailed below, to the extent that Arcomone discussed stability, the references expressly teaches *away from the present invention*, *i.e.,* by teaching that doxorubicin has a stability in solution of only a few hours when pH is adjusted with HCL and only a few weeks when pH is adjusted to the range of 3-6 (using a something other than an acid to adjust the pH.) The bottom line is that, to the extent JP 60-92212, or Baurain, or Arcomone have any similarity to the claimed invention beyond merely dealing with doxorubicin , the similarities result from pure happenstance, and have nothing to do with the goals and objectives of the present invention.

The last Office Action implicitly acknowledges that all of the elements of the claimed invention were *not* found in a single prior art reference. That is, by virtue of rejecting the claims under Section 103, rather than Section 102, the Office Action acknowledges that the subject matter of the present invention claims is different from the prior art.

In particular, the Office Action relies upon the teaching of a single example in JP 60-92212 that discloses adjusting the pH to a level of 2.3, and the Office Action acknowledges that this pH of 2.3 is below the pH range of 2.5-5.0 that is taught and claimed in the present invention. However, the Office Action holds that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results."

As to Baurain and Arcomone, the Office Action fails to acknowledge how or why these references differ from the present invention. Apparently, however, the Office Action relies upon

5

these references only to disclose the existence of doxorubicin solutions at pH higher than 2.3. Thus, Baurain discloses a doxorubicin salt solution at pH of 4.0, and Arcomone discloses a doxorubicin salt solution at pH of 3-6. The Office Action holds that, "a person of ordinary skill in the art would have been motivated to adjust the pH of anthracyline glycoside-containing solution to higher pH such as pH 4 disclosed by Baurain et al. or higher as disclosed by Arcomone et al with other physiologically acceptable acid, as disclosed by Baurain et al., because such a person would have expected the resulting solutions to have similar stabilities."

Applicants respectfully submit that there are at least four (4) fundamental problems with the rejection in the last Office Action.

- There is no basis on this record for the motivation holding, *i.e.,* for holding that a person of ordinary skill would have been motivated to increase the pH of JP 60-92212 to the higher levels of Baurain and/or Arcomone. Rather, the only motivation for such combination arises via hindsight reliance on the teaching of the present invention.

- Assuming *arguendo* that a person of ordinary skill was motivated to combine the references in order to achieve a "similar stability" (as suggested in the Office Action), the question is similar to what? The only teaching *vis a vis* "stability" to be found anywhere in the present references is a teaching that doxorubicin solution is *not* stable as per the invention. *See* Arcomone, p.21.

- By ignoring the other differences between the claimed subject matter and the prior art, the Office Action does a disservice to the claimed invention. Assuming *arguendo* that a solution was made by following a combination of the references, the resulting combination does not fall within the pending claims.

●     Scientific test data comparing the stability of the claimed subject matter to the stability of

the solution of JP 60-92212, shows that stability of the claimed invention (pH 2.5-50) is

unexpectedly higher than the stability of the JP 60-92212 solution (pH 2.3).

For at least these reasons, Applicants respectfully request that the present rejection be

withdrawn and the claims be allowed. Once Applicants thereafter submit an appropriate terminal

disclaimer, the claims should be passed to issue.


**Lack of Motivation for Combination**

As previously noted, there is absolutely nothing in any of the cited references that refers

to a possible improvement in the long term storage stability of doxorubicin solutions. These

references are oblivious to the problem, much less the solution. More likely, the authors of these

references merely accepted the general belief (prior to the invention) that doxorubicin could not

be prepared into long term storage stable solutions, and, thus, the authors never explored nor

considered the possibility. In any event, none of the references -- alone or in combination --

provide any motivation for a person skilled in the art to pursue, adapt, modify, or combine any of

the references toward any common goal, much less the goal of achieving a long term storage

stable solution of doxorubicin hydrochloride.

To the contrary, JP 60-92212 fails to provide any teaching or suggestion that varying pH

may have any effect (either negative or positive) on the doxorubicin solution. The same is true of

Baurain. Although Arcomone discloses several examples with differing pH, the examples vary

several parameters at the same time, such that it is impossible to draw any conclusion on how to

achieve a long term storage stable solution of doxorubicin.

7

## The References Teach a *LACK* of Stability

The Office Action suggests that a person of ordinary skill would be motivated to combine the references to achieve "similar stability." It is only fair to ask, what does the Examiner mean by achieving similar stability? If the intention is achieve similar stability to the claimed invention, then Applicants respectfully submit that proves that the Examiner was relying upon hindsight reason to combine the references. If the intention was to achieve similar stability to the most stable prior art solution, then Applicants respectfully submit that references expressly taught that such resulting solution was *not* long term storage stable.

As previously noted, neither JP 60-92212 nor Baurain even mention storage stability of the solution. Rather, both of those references focus on products which are lyophilized, presumably because it was recognized that they were *not* stable. The only reference that provides any express teaching as to storage stability is the Arcomone reference, and this reference expressly teaches that the only way to achieve long term storage stability for doxorubicin is via lyophilization, because the solutions are *not* stable.

> "Adriamycin [doxorubicin] hydrochloride is stable in the solid state .... The stability of aqueous solutions of adriamycin varies with pH and the buffer concentration (Table 2 and Fig. 12) as established on the basis of spectrophotometric and chromatographic analysis."

*See* p. 21 of Arcomone. Table 2 indicates that doxorubicin in solution with HCL is stable for less than 20 hours. HCL is the only acid discussed vis a vis stability. Table 2 further indicates that doxorubicin in solution can be stable for more than a month at pH 3-6 when a phosphate buffer is used. Fig. 12 provides more specific information on the use of phosphate buffers with doxorubicin solutions; specifically, Fig. 12 indicates that a 90% stability of doxorubicin in phosphate buffered solution will expire in about 10 days. In sum, these references -- considered alone or in combination -- teach away from, not toward, the present invention.

8

## The Hypothetical Combination Is Different Than The Claimed Invention

Assuming *arguendo* that a person of ordinary skill were motivated to combine the cited references, the resulting combination would be different than the claimed subject matter. The Baurain reference differs from the pending invention in several respects, most notably in that Baurain adds L-leucine carboxyanhydride to the pH 10.2 solution. Although Baurain teaches that the pH of the solution is thereafter reduced to pH 4, the purpose and result of doing so is to convert the doxorubicin hydrochloride to N-(L-leucyl) doxorubicin. Thus, assuming a person were to combine JP 60-92212 and Baurain, the result would be a solution of N-(L-leucyl) doxorubicin at pH 4, rather than the present claimed invention. There is no basis to conclude that the resulting combination would comprise doxorubicin hydrochloride solution at the requisite doxorubicin concentration level and the requisite pH level.

Similarly, Arcomone teaches that doxorubicin solutions may be adjusted to a pH of 3-6 using a phosphate buffer solution, or to a pH of 1-2 using HCl. Arcamone presents these as alternatives, and fails to teach or suggest in any way that the acid (rather than the buffer) should be used when adjusting pH to 3-6. (Note: Arcomone teaches at Table 2 that HCL used to adjust the doxorubicin solution will achieve a stability of *less than 20 hours*. Thus, Arcamone teaches away from using HC1 to adjust pH for long term storage stability.) Assuming a person were to combine JP 60-92212 and Arcomone, the result would be solution of doxorubicin hydrochloride in which the pH was adjusted by phosphate buffer, rather than HCL as required by the pending claims. There is no basis to conclude the combination of JP 60-92212 and Arcomone would comprise doxorubicin hydrochloride solution at the requisite pH level.

9

## Scientific Evidence Establishes An Unexpected Stability Difference

It is important to recognize that the claimed subject matter is based upon using particular acids to adjust the pH of the solution to a particular pH range. Applicants have demonstrated time and again in comparative data in this application that the resulting solution exhibits surprisingly better long term storage stability than solutions having a pH outside the recited pH range or using a buffer other than the claimed acids to adjust the pH.

Lest there be any doubt on this point, Applicants are submitting herewith yet another declaration still further addressing the issue of stability. *See* Declaration of Carlo Confalonieri, filed herewith. Applicants have prepared four different solutions. The first solution involves following the procedure of example 6 of the JP 60-92212 patent except modified as to the amount of the material made. The pH of the solution was 2.3 as taught in JP 60-92212. This first solution also contained the mannitol excipient of example 6 of JP 60-92212. Two other solutions not containing the mannitol excipient of the Japanese patent were also prepared having a pH of 2.3, one having a concentration of 2mg/ml and one having 5mg/ml concentration. A fourth solution prepared in accordance with the present invention has a pH of 2.5 and a concentration of 2 mg/ml. As can be seen from the enclosed declaration of Dr. Confalonieri, the solution prepared according to the present invention, having a pH of 2.5, exhibited superior stability as compared with each of the solutions having a pH of 2.3. Indeed, the solution having the mannitol excipient taught in the Japanese patent resulted in a composition which had a worse stability than the corresponding composition not containing the excipient. *See* the results of 35°C. (Note: The one and four week stability of the 2.3 pH solution not containing the excipient was superior to the 2.3 pH solution containing the excipient at 45°C, thus demonstrating that the Japanese patent could not have been concerned with long-term storage

10

stability.) More importantly, the solution having a pH of 2.5 according to the present invention exhibited significantly better stability than each solution having a pH of 2.3 at all temperatures.

These results conclusively demonstrate that solutions having pH 2.5, adjusted by HCL, achieve unexpected and nonobvious results in storage stability *vis a vis* solutions having a pH 2.3. Perhaps more important, these results directly contradict and disprove that a doxorubicin solution having a pH of 2.3 has the same stability as a doxorubicin solution having a pH of 2.5.

The last Office Action held that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results." Accepting *arguendo* the statement in the last Office Action as to what a person of ordinary skill in the art would have expected, the evidence submitted herewith proves that expectation is incorrect. Thus, the basic assumption of the rejection in the last Office Action is incorrect. That error, without more, warrants reconsideration and reversal of the rejection.

**Secondary Evidence of NonObviousness**
**Also Provides Strong Evidence of Patentability**

The evidence presented above as to the differences, results, and motivations of the claimed invention *vis a vis* the prior art fully establishes the patentability of the present invention. Above and beyond that evidence, however, the additional available evidence as to secondary considerations of non-obviousness further confirms the patentability of the claimed invention. The examiner should keep in mind the fact that the present invention is not a paper patent but is one which has found commercial success and has solved a long felt need. If it was so obvious to adopt the technique of the present application, it certainly would have been done much earlier given the problem which has been solved.

11

In *Stratoflex, Inc. v. Aeroquip Corp.* 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed. Cir. 1983), the Federal Circuit Court of Appeals said:

> [E]vidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness. *In re Sernaker*, 702 F.2d 989, 217 USPQ 1 (Fed. Cir. 1983) citing *In re Fielder and Underwood*, 471 F.2d 640, 176 USPQ 300 (CCPA 1983), *see In re Mageli et al.*, 470 F.2d 1380, 1384, 176 USPQ 305, 307 (CCPA 1973) . . . . Indeed, *evidence of secondary considerations may often be the most probative and cogent evidence in the record.* (Emphasis in original.)

After reviewing a decision which failed to give due consideration to evidence of the secondary considerations of non-obviousness, the Federal Circuit Court of Appeals reversed, noting that such evidence is not relegated to second-class status, and whether to consider such evidence is *not* discretionary:

> That approach was error. All evidence bearing on the issue of obviousness, as with any other issue raised in the conduct of the judicial process, must be considered and evaluated *before* the required legal conclusion is reached.

*W.L. Gore & Associates, Inc. V. Garlock, Inc.*, 721 F.2d 1540, 1555, 220 USPQ 303, 314 (Fed. Cir. 1983) (emphasis in original). *See also Minnesota Min. and Mfg. V. Johnson & Johnson*, 976 F.2d 1559, 1573 (Fed. Cir. 1992) ("Objective evidence such as commercial success, failure of others, long-felt need, and unexpected results must be considered before a conclusion on obviousness is reached."); *and see Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725 (Fed. Cir. 1990).

"The rationale for giving weight to the so-called secondary considerations is that they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). As the United States Supreme Court has stated:

> These legal inferences or subtests do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of

judicial treatment than are the highly technical facts often present in patent litigation.

*Graham v. John Deere Co.*, 383 U.S. 1, 35-36, 86 S.Ct. 684, 702-03, 15 L.Ed.2d 545, (1966);

As to evidence of long felt need and/or failure of others, Judge Learned hand has stated, ". . . the length of time the art, though needing the invention, went without it" is one of the best non-technical considerations for determining whether a patented invention is unobvious. *Safety Car Heating & Lighting co. v. General Electric Co.*, 155 F.2d 937, 939 (2d. Cir. 1946). *See also Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1099 (Fed. Cir. 1985), *vacated,* 475 U.S. 809 (1986), *on remand,* 810 F.2d 1561 (Fed. Cir. 1987), *cert. den.*, 481 U.S. 1052 (1987), *later proceeding,* 836 F.2d 1329 (Fed. Cir. 1987). The evidence of long felt need and failure of others in this case is particularly enlightening in this case.

What applicants have surprisingly discovered is that the combination of pH and the pH adjusting means has allowed them to produce a storage stable solution of these anthracyclines. As the examiner is aware, anthracyclines have demonstrated significant value in the treatment of various cancerous tumors. while the anthracyclines have the benefit of tending to destroy cancerous tumors, they also have the detriment of serious side effects, including the destruction of heart muscle. These destructive capabilities are exhibited not only when the drug is injected, but also when the drug becomes ingested such as by inhalation, contact with the skin and the like. These latter exposures are significant to the health care personnel. Prior to the present invention, it was necessary for the health care personnel to dissolve the dry, lyophilized anthracyclines before administering same to the patient. This step of dissolving the lyophilized dry anthracycline created the possibility of direct exposure of the medical personnel to the anthracycline. Over time, such continued exposures could have significant adverse consequences. Thus, the present invention satisfies a long felt need.

13

Applicant has previously submitted numerous affidavits in support of commercial success and the long felt need solved by this invention. In particular, Declarations of William J. Dana, and Mary Horstman, and Debra Holton-Smith were previously filed in related case S.N. 06/878,784. For the convenience of the Examiner, copies of these declarations are enclosed and submitted now for consideration in this case.

**Conclusion**

In view of the foregoing amendment and remarks, it is respectfully submitted that this application is in condition for allowance. Early notice to this effect is respectfully requested.

Respectfully submitted,

June 28, 1996

*Daniel A. Boehnen*

Daniel A. Boehnen, Reg. No. 28,399
Emily Miao, Ph.D., Reg. No. 35,285
BANNER & ALLEGRETTI, LTD.
Suite 3000
10 South Wacker Drive
Chicago, Illinois 60606
312-715-1000

14

CERTIFICATE UNDER 37 CFR 1.8: The undersigned hereby certifies that this Transmittal Letter and the paper, as described in paragraph 1 hereinabove, are being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Asst. Commissioner for Patents, BOX AF, Washington, D.C. 20231 on this 28th day of June, 1996.

769-249-0 DIV
769-206-0 DIV

By *Daniel F Boehnen*
   Daniel Boehnen

## IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF GAETANO GATTI, et al.      :

SERIAL NO.: 07/827,742                          :          EXAMINER PESELEV

FILED:  JANUARY 29, 1992                        :          GROUP ART UNIT: 1803

FOR:  INJECTABLE READY-TO-USE SOLUTIONS         :
      CONTAINING AN ANTITUMOR
      ANTHRACYCLINE GLYCOSIDE                    :

                                                            RECEIVED
                                                            JUL 1 2 1996

### SUBMISSION OF DECLARATIONS IN SUPPORT OF
### AMENDMENT UNDER 37 C.F.R. § 1.116                       GROUP 1800

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

Applicants are filing herewith an Amendment Under 37 C.F.R. §1.116 in the above-

identified case.  The Amendment refers to and incorporates by reference several Declarations

that have been previously filed in other cases dealing with related subject matter.  In particular,

the declarations present information on long felt need, commercial success, and scientific testing

that establishes differences between the prior art and the subject matter of the present invention.

In order to establish a clear record, Applicants note that the Declarations submitted herewith

include Declarations Under Rule 1.132 of the following individuals:

1.     William J. Dana, dated June 16, 1988, and filed in case S.N. 06/878,784;

2.     Mary Horstman, dated June 2, 1988, and filed in case S.N. 06/878,784;

3.     Debra Holton-Smith, dated May 24, 1988, and filed in case S.N. 06/878,784;

4.     Carlo Confalonieri, dated 21 May 1991, and filed in case S.N. 07/503,856;

5.     Carlo Confalonieri, dated December 20, 1990, and filed in S.N. 07/503,856; and

6.     Carlo Confalonieri, dated March 10, 1987, and filed in S.N. 06/878,784, and refiled as

       Exhibit C to the Confalonieri Declaration dated Dec. 20, 1990 in S.N. 07/503,856

                                     Respectfully submitted,


June 28, 1996                        _Daniel A. Boehnen_

                                     Daniel A. Boehnen, Reg. No. 28,399
                                     Emily Miao, Ph.D., Reg. No. 35,285
                                     BANNER & ALLEGRETTI, LTD.
                                     Suite 3000
                                     10 South Wacker Drive
                                     Chicago, Illinois 60606
                                     312-715-1000

# EXHIBIT G

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
2000 WL 1481015 (D.Del.)
**(Cite as: 2000 WL 1481015 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
UNION CARBIDE CHEMS. & PLASTICS TECH.
CORP. and UNION CARBIDE CORP .,
Plaintiff, Counter-Defendant
v.
SHELL OIL CO., Shell Chemical Co., and CRI
Catalyst Co., Defendants, Counter-
Plaintiffs.
**No. 99-CV-274-SLR.**

Sept. 29, 2000.

Jeffrey B. Bove, Esquire and R. Eric Hutz, Esquire
of Connolly, Bove, Lodge & Hutz, Wilmington,
Delaware. Counsel for plaintiff, counter-defendant.
Steven J. Glassman, Esquire and Benjamin C. Hsing,
Esquire of Kaye, Scholer, Fierman, Hays & Handler,
New York, New York. Of counsel for plaintiff,
counter-defendant.

Allen M. Terrell, Jr., Esquire and Jeffrey L Moyer,
Esquire of Richards, Layton & Finger, Wilmington,
Delaware. Counsel for defendant, counter-plaintiff.
William Slusser, Esquire of Slusser & Frost,
Houston, Texas and John D. Norris, Esquire of
Howrey, Simon, Arnold & White, Houston, Texas.
Of counsel for defendant, counter-plaintiff.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

**\*1** Plaintiff Union Carbide Chemicals & Plastics
Technology Corporation filed this patent
infringement action on May 3, 1999 against
defendant Shell Oil Company, Shell Chemical
Company, and CRI Catalyst Company (collectively,
"defendant"), alleging that defendant infringes U.S.
Patent No. 4,908,343 ("the '343 patent"); U.S. Patent
No. 4,916,243 ("the '243 patent"); and U.S. Patent
No. 5,057,481 ("the '481 patent"). The '343 and '243
patents relate to particular types of catalysts and
processes for making ethylene oxide. The '481 patent
relates to compositions used in coatings applications.
Plaintiff Union Carbide Corporation joined this
litigation through an amended complaint on January

4, 2000. (D.I.75)

Defendant, in its answer to plaintiff's amended
complaint, has denied infringement of all three
patents-in-suit and filed affirmative defenses and
counterclaims alleging that all three patents are
invalid, unenforceable, and not infringed.
Specifically, defendant alleges that the '243 patent is
unenforceable because it was procured by
misrepresentations to the Patent and Trademark
Office ("PTO"). (D.I.78)

Plaintiff [FN1] is incorporated in Delaware and has
its principal place of business in Connecticut. (D.I.75,
¶ ¶ 4-5) Defendant is a Delaware corporation with its
principal place of business in Texas. (D.I. 75, ¶ ¶ 7-
9; D.I. 78 ¶ ¶ 7- 9) The court has jurisdiction over
this action under 28 U.S.C. § § 1331 and 1338.
Venue is proper in this judicial district by virtue of 28
U.S.C. § § 1391(c) and 1400(b).

> FN1. Union Carbide Chemicals & Plastics
> Technology Corporation and Union Carbide
> Corporation are hereinafter referred to
> collectively as "plaintiff."

Currently before the court is defendant's motion to
strike under Fed.R.Civ.P. 12(f) defendant's
affirmative defense, and under Fed.R.Civ.P. 12(b)(6)
to dismiss defendant's counterclaim with respect to
allegations of inequitable conduct. (D.I.84) Because
defendant's subsequent filings with this court clarify
its pleadings, plaintiff's motion is denied.

II. BACKGROUND

Plaintiff brings this motion claiming that defendant's
inequitable conduct allegation fails to meet the
particularity requirement of Fed.R.Civ.P. 9(b) [FN2]
and leaves plaintiff guessing as to the details of its
alleged wrongdoing. Plaintiff specifically complains
about the affirmative defense in paragraph thirty-
eight of defendant's answer which is repeated and
realleged as a counterclaim in paragraph fifty. (D.I.
85 at 3) Paragraph thirty-eight reads:

> FN2. Rule 9(b) provides: "In all averments
> of fraud or mistake, the circumstances
> constituting fraud or mistake shall be stated
> with particularity."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 1481015 (D.Del.)
**(Cite as: 2000 WL 1481015 (D.Del.))**

Page 2

The '243 patent is unenforceable because it was procured by misrepresentations to the PTO regarding the materiality of Union Carbide's own commercial activities to the patentability of claims pending in the prosecution of patent applications leading to the issuance of the patent and by misrepresentations regarding data submitted to the PTO to support the patentability of pending claims. During the prosecution of the '243 patent, a continuation-in-part application was filed containing claims barred under 35 U.S.C. § 102(b) as a result of Union Carbide's commercial use of the processes of these claims more than one year before their effective filing date. In a statement to the PTO, the applicants, through their attorneys, acknowledged the commercialization of the invention, but did so in a manner that obscured and misrepresented the significance of the event to the patentability of then pending claims. Additionally, during the prosecution of the '243 patent, Union Carbide, on its own initiative, conducted tests based on the teachings of cited prior art references in an effort to distinguish the claimed invention from the teachings of these references. During this testing, Union Carbide deviated from the teachings of the prior art in ways yielding results that inaccurately portrayed the claimed invention as falling outside the teachings of the prior art. Union Carbide also selectively submitted data tending to support the patentability of claims while not submitting data tending to show the contrary. All these misrepresentations were highly material to the PTO proceedings, were made with reckless or intentional disregard of the duty of candor required in proceedings before the PTO, and were made with an intent to deceive the PTO.

*2 (D.I.78, ¶ 38)

Plaintiff contends the above paragraph does not satisfy Rule 9(b) because the allegations: (1) fail to identify what Union Carbide tests are alleged to have deviated from the teachings of the prior art, (2) fail to state how any such tests purportedly deviated from the prior art to yield misleading results, (3) fail to identify what data is alleged to have been "selectively submitted" to the PTO in support of the patentability of the claims, or what "data tending to show the contrary" is alleged to have been withheld, and (4) fail to state how any such data tended to support or refute patentability.

Defendant claims that plaintiff reads the Rule 9(b) requirements too broadly. Defendant claims there is no requirement to identify particular tests and, in any event, plaintiff is aware of the tests to which

defendant refers. In its opposition to plaintiff's motion to strike, defendant contends that plaintiff submitted only two declarations that purported to duplicate examples in the prior art cited by the examiner as a basis for rejecting pending claims. Defendant attached those two declarations and claimed that the prior art references and tests they refer to in the pleadings are consistently referred to throughout the declarations. [FN3]

> FN3. The defendant is referring to two 37 C.F.R. § 132 declarations signed by: (1) the inventor, Dr. Madan Bhasin, on December 28, 1979 ("the Bhasin declaration"), and (2) Dr. Thomas Notermann on December 29, 1979 ("the Notermann declaration"). (D.I. 97 at 6)

Plaintiff argues that it submitted not two, but seven declarations during the prosecution of the '243 patent--four of which discuss testing of catalysts prepared from the teachings of the prior art. In the four declarations, eighteen catalysts were prepared based on five prior art references and twenty tests were conducted to determine whether the catalysts were synergistic. Plaintiff claims that even if defendant limited their inequitable conduct allegations to the two declarations cited in defendant's opposition brief, they would still be guessing about the specifics of the inequitable conduct allegations. In the two cited declarations, fifteen catalysts were prepared based on four prior art references and fifteen tests were conducted to determine whether those catalysts were synergistic.

## III. DISCUSSION

The purpose of Fed.R.Civ.P. 9(b) is "to place the [parties] on notice of the precise misconduct with which they are charged, and to safeguard [the parties] against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984).* The particularity requirement of Rule 9 applies to inequitable conduct charges. *See EMC Corp. v. Storage Tech. Corp., 921 F.Supp. 1261, 1263 (D.Del.1996).* Pleadings that disclose the relevant prior art and alert the patentee to the alleged fraud satisfy the requirements of Rule 9(b). *Id.* Rule 9(b) does not require that the pleadings allege the time, date, and place of the alleged misconduct. *Id.*

Here, the defendant's pleadings do appear to be "bare-boned" on their face. However, its brief submitted in opposition to the present motion

Not Reported in F.Supp.2d                                                                    Page 3
2000 WL 1481015 (D.Del.)
(Cite as: 2000 WL 1481015 (D.Del.))

sufficiently clarified its pleadings to overcome Rule 9(b)'s requirements. (D.I.97) In that brief, defendant cites two specific 37 C.F.R. § 132 declarations that were part of the '243 patent's prosecution history. In the Bhasin declaration, the inventor, through his attorney, responded to a rejection based on U.S. Patent Nos. 3,548,018; 4,038,175; 4,014,913; 4,096,164; and 4,162,262. (D.I. 97, Ex. A at 115) The examiner contended that the above references disclosed combinations of potassium and cesium in silver catalysts for ethylene oxide manufacture to provide the synergism which Bhasin claimed to be his invention. (*Id.*) To overcome the rejection, Bhasin selected examples from four of the five cited references to show the use of a silver catalyst containing both potassium and cesium which would demonstrate whether such synergism is inherently taught by the references. (*Id.* at 116) Bhasin then prepared several catalysts and conducted several tests to determine whether the catalysts were synergistic.

**\*3** When defendant pleads that plaintiff "conducted tests based on the teachings of cited prior art references in an effort to distinguish the claimed invention from the teachings of these references," defendant is, in the court's opinion, referring to the five prior art references cited above. When defendant pleads that plaintiff "deviated from the teachings of the prior art" and "selectively submitted data tending to support the patentability of claims," defendant is suggesting that Bhasin did not select representative samples from the prior art references as he proclaimed in his declaration.

The Notermann declaration explains that Notermann evaluated the catalysts prepared by Bhasin. Notermann concurred with Bhasin's opinion that the catalysts he selected were the best choices in determining whether the cited references showed a synergistic combination of silver, cesium, and potassium for the manufacturing of ethylene oxide. (D.I. 97, Ex. B at 105)

This court has allowed a party to clarify its pleadings through responses to interrogatories. *See Scripps Clinic & Research Found. v. Baxter Travenol Labs., Inc.,* 7 U.S.P.Q.2d 1562, 1564 (D.Del.1988). Likewise, the court will allow defendant to clarify its affirmative defenses and counterclaims through its opposition brief. Note, however, insufficiently pled allegations of inequitable conduct shall not be used to justify subsequent discovery into such allegations. *See EMC Corp.,* 921 F.Supp. at 1263.

Defendant's clarification has sufficiently put plaintiff

on notice of the precise misconduct with which they are charged. Defendant will still carry the burden at trial to show that plaintiff did indeed engage in that conduct.

IV. CONCLUSION

Plaintiff's motion to strike defendant's affirmative defense and to dismiss defendant's counterclaim with respect to allegations of inequitable conduct is denied. Defendant shall have thirty days to amend its answer to include the clarifications laid out in its opposition brief.

2000 WL 1481015 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
2003 WL 23515136 (D.Virgin Islands)
**(Cite as: 2003 WL 23515136 (D.Virgin Islands))**

**H**
Only the Westlaw citation is currently available.

District Court of the Virgin Islands, Division of St.
Croix.
Theresa FRORUP-ALIE, Plaintiff
v.
V.I. HOUSING FINANCE AUTHORITY (VIHA)
and DWH Business Services, Inc. (DWH),
Defendants
**No. Civ. NO. 200-0086.**

Oct. 26, 2003.
Andrew L. Capdeville, U.S. VI, for Defendants.

Natalie Nelson Tang How, Phoenix Court Business
Complex, Christiansted, St. Croix, VI, for Plaintiff.

*MEMORANDUM OPINION*

FINCH, Chief J.

**\*1** This matter comes before the Court on Defendant
Virgin Islands Housing Finance Authority (VIHFA)'s
Motion to Dismiss the Amended Complaint. For the
reasons expressed herein, Defendant's motion will be
granted in part, and denied in part.

## I. Background

Plaintiff Theresa Frorup-Alie brings this
employment discrimination action alleging that
Defendants discriminated against her on the basis of
her race (Black) and national origin (native Virgin
Islander). Plaintiff's Amended Complaint alleges:
violation of 24 V.I.C. § 451 et seq., 10 V.I.C. § 64,
and Title VII of the Civil Rights Act as amended
(Count I); retaliation (Count II); breach of
employment contract and violation of 24 V.I.C. § 76
(Count III); slander (Count IV); intentional infliction
of emotional distress (Count V); negligent infliction
of emotional distress (Count VI); and entitlement to
punitive damages (Count VII).

Defendant now moves for dismissal on all Counts (I-
-VII), pursuant to Fed.R.Civ.P. 12(b)(6) on the basis
that each count fails to state a cause of action against
Defendant VIHFA. Moreover, Defendant VIHFA
asserts the following in support of its motion:

(1) Regarding Counts I and II, Plaintiff does not

have a valid claim under 24 V.I.C. § 451 for the
following reasons: Plaintiff lacks standing because
the statute does not provide a private cause of action,
Plaintiff's claim is not ripe because a final order has
not been issued by the Virgin Islands Department of
Labor, and Plaintiff is time-barred by the statute of
limitations.

(2) Regarding Counts I and II, Plaintiff does not
have a valid claim under 10 V.I.C. § 64 on the basis
that Plaintiff lacks standing since the statute does not
provide a private cause of action.

(3) Regarding Counts I, II, and III, Plaintiff does not
have a valid claim under 24 V.I.C. § 76 because
Defendant VIHFA is exempt from the statute as a "
'public employer." '

(4) Regarding Counts I, II, and III, Plaintiff is time-
barred from bringing a retaliation claim under 10
V.I.C. § 123 by the statute of limitations.

(5) Regarding Counts I, II, and III, Plaintiff does not
have a valid claim under Title VII because Plaintiff
has not demonstrated that she has exhausted
administrative remedies and Plaintiff is time-barred
by the statute of limitations.

(6) Regarding Count IV, Plaintiff does not allege an
unprivileged publication to a third party and Plaintiff
does not specifically identify the content of the
defamatory statements nor the person(s) by whom
and to whom such statements were made.
Furthermore, the Court lacks subject matter
jurisdiction because Plaintiff has failed to comply
with the Tort Claims Act.

(7) Regarding Count V, Plaintiff cannot bring a
claim against Defendant VIHFA based on the actions
of DWH supervisors/employees Dennis Hernandez
and Jose George. Even if VIHFA could be
vicariously liable for the actions of these DWH
supervisors/employees, Plaintiff has not alleged any
facts that would constitute extreme and outrageous
conduct. Furthermore, the Court lacks subject matter
jurisdiction because Plaintiff has failed to comply
with the Tort Claims Act.

**\*2** (8) Regarding Count VI, Plaintiff cannot bring a
claim against Defendant VIHFA based on the actions
of DWH supervisors/employees Dennis Hernandez

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
2003 WL 23515136 (D.Virgin Islands)
(Cite as: 2003 WL 23515136 (D.Virgin Islands))

and Jose George. Furthermore, the Court lacks subject matter jurisdiction because Plaintiff has failed to comply with the Tort Claims Act.

(9) Regarding Count VII, Plaintiff has stipulated to dismiss this count against Defendant VIHFA.

Plaintiff opposes Defendant VIHFA's motion.

## II. Analysis
### A. Standard Governing a Rule 12(b)(6) Motion to Dismiss

In determining a Rule 12(b)(6) motion to dismiss, "the material allegations of the complaint are taken as admitted," and the Court must liberally construe the complaint in Plaintiff's favor. *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969) (citing Fed.R.Civ.P. 8(f) and *Conley v. Gibson,* 355 U.S. 41 (1957)). All reasonable inferences are drawn in favor of Plaintiff. *Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). Further, the Court must follow "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45--46; *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994). The Rule 12(b)(6) motion is viewed with disfavor and rarely granted. 5A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1357 at 321 (West 1990). [FN1]

> FN1. The Court need not rely on any documentation outside the pleadings in deciding this motion to dismiss and, therefore, declines to convert this motion into a motion pursuant to Fed.R.Civ.P. 56.

### B. Count I

*Plaintiff's Claim under 24 V.I.C. § 451 et seq.*

Defendant VIHFA has correctly asserted that Plaintiff has failed to state a cause of action under 24 V.I.C. § 451 et seq. because the statute does not provide a private cause of action. Plaintiff's Amended Complaint alleges that Defendants' actions constituted, "illegal discrimination in violation of 24 V.I.C. § 451 et seq. 10 V.I.C. § 64 and Title VII of the Civil Rights Act as amended." (Pl. Am. Compl. at ¶ 42.) Defendant VIHFA contends that there is no private right of action under Title 24. Indeed, this Court has held that there is no private right of action under 24 V.I.C. § 451 et seq., also known as

"Chapter 17" governing discrimination in employment. *See Charles, Rennie, Elmour* et al. v. HOVIC, Civ. Nos.1994/0081, 1994/0082, 1994/0104 (D.V.I. Feb. 19, 2003); *Hazell v. Executive Airlines, Inc.,* 886 F.Supp. 526, 527 (D.V.I.1995); *Williams v. Kmart Corp.,* 2001 WL 304024, at *5 (D.V.I. Mar. 13, 2001). Therefore, Plaintiff lacks standing to assert a claim under 24 V.I.C. § 451 et seq.

*Plaintiff's Claim under 10 V.I.C. § 64*

However, the Court disagrees with Defendant VIHFA's contention that Plaintiff does not have a private cause of action for discrimination under Chapter 5 of Title 10 of the Virgin Islands Civil Rights Act, 10 V.I.C. § 64 ("Chapter 5"). [FN2] A review of Virgin Islands case law indicates that this issue has been addressed many times indirectly. In *Codrington v. Virgin Islands Port Authority,* 911 F.Supp. 907, 917 (D.V.I.1996), the Court ruled that the plaintiff failed to state a claim under § 64 because Title 10 was never cited in her complaint. The complaint merely acknowledged that she filed a complaint with the Civil Rights Commission. As dictum, the Court noted:

> FN2. Although Plaintiff brings her claim under § 64, Chapter 5 encompasses 10 V.I.C. § § 61--75.

*3 [E]ven if Codrington were to attempt to amend her complaint at this late date to assure that she stated a separate cause of action under Title 10, it is not clear that the local act even creates such a right.... Nowhere in the statute is it established that an aggrieved individual may directly bring an action for violation of section 64. Not having knowledge of whether and to what extent the Civil Rights Commission is active, the Court declines to address whether its analysis and conclusion would change if the Civil Rights Commission is either non-existent or non-functional. *Codrington,* 911 F.Supp. at 917.

Likewise, in *Anderson v. Government,* Civ. No. 96-118 (D.V.I. Nov. 21, 1997), Judge Moore dismissed the plaintiff's argument that he was entitled to damages under 10 V.I.C. § § 1--11, Chapter 1 of the Virgin Islands Civil Rights Act. The Court reasoned: "Whether or not the local act creates a private cause of action, it does not entitle plaintiff to recover damages" against the government, as opposed to a private defendant. *Id.* at 13--14. The opinion then added that the plaintiff could not seek relief from the Court under 10 V.I.C. § § 61--75 (Chapter 5),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
2003 WL 23515136 (D.Virgin Islands)
(Cite as: 2003 WL 23515136 (D.Virgin Islands))

because no private right of action exists under Chapter 5.

Conversely, at least one other decision, *Allard v. Hess Oil Virgin Islands Corp.*, 43 F.Supp.2d 551 (D.V.I.1999), seems to suggest without deciding that a private claim under § 64 exists. *Id.* at 556 (holding appellant did not preserve her claim under the Virgin Islands Civil Rights Act [§ 64] for purposes of appeal).

Yet the issue of whether 10 V.I.C. § 64 provides a private cause of action was squarely decided by the Court in *Whitmore v. HEPC Sugar Bay, Inc.*, 2002 WL 31574132 (D.V.I.2002), in which the St. Thomas-St. John Division of this Court found that no private right of action exists under Chapter 5. *Whitmore* was based primarily on the conclusion that in *Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 176--81 (3d Cir.1999), "the Court of Appeals held that no private cause of action exists under chapter 5 of title 10 of the Virgin Islands Code." *Whitmore*, 2002 WL 31574132, at *3. This Court's reading of *Figueroa* leads to a different result.

*Figueroa* held that a private right of action exists under *Chapter 1* of the Civil Rights Act, 10 V.I.C. § § 1-11 ("Chapter 1"). *Figueroa*, 188 F.3d at 181. It did not, however, resolve the issue of whether a private right of action exits under Chapter 5 of the Act. *Figueroa* provides a clear discussion of the relationship between Chapters 1 and 5 of the Act:

The Virgin Islands legislature enacted the Civil Rights Act in 1950 with the intent to "prevent and prohibit discrimination in any form." The Act contains six chapters, only two of which--chapter 1 and chapter 5--are relevant to this case. Chapter 1 of the Act, 10 V .I.C. § § 1-11, substantially amended and effective in 1961, contains a statement declaring the public policy of prohibiting and punishing discrimination based on race, creed, color, or national origin. § 1. It recognizes the right to equal treatment with respect to employment and working conditions, and specifies those discriminatory acts prohibited under the chapter. § 3. In section 7, the legislature provided civil and criminal penalties for violations of the chapter, including a specific provision for punitive damages. § 7. As an aid to its interpretation, it also includes a provision requiring courts to "construe [it] liberally in furtherance of its intent as stated in section 1." § 10.

*4 In 1974, the Virgin Islands legislature enacted chapter 5 of Title 10, § § 61-75, and created the Virgin Islands Civil Rights Commission, granting

it "general jurisdiction and power" to combat discrimination. § 61. The Commission was empowered to investigate allegations of discrimination, collect information about the denial of equal protection of the law in the Virgin Islands, appraise the laws and policies of the Virgin Islands as to such discrimination, hold hearings and disseminate information regarding discrimination, and impose sanctions or provide other remedies in individual cases of discrimination. § 63. Chapter 5 also contains a list of prohibited discriminatory practices, targeting discrimination based on race, color, religion, and national origin as in chapter 1, and also discrimination based on sex [age, place of birth] and political affiliation. § 64. Chapter 5 provides a mechanism for those aggrieved by discrimination covered under the chapter to file a claim with the Commission, which will then investigate the claim and issue a cease and desist order, and such other orders that in the judgment of the Commission are consistent with enforcement of the chapter. § § 71-72. Finally, "the Commission may bring a civil action in the Territorial Court of the Virgin Islands by filing with it a complaint" setting forth the facts of the discrimination and requesting such relief as it deems necessary to enforce the Act. § 73.

*Figueroa*, 188 F.3d at 177 (footnotes omitted).

Defendant VIHFA argues that 10 V.I.C. § 64 vests only the Civil Rights Commission with the right to enforce violations of the section. Although *Figueroa* addressed Chapter 1 of the Act, its reasoning suggests that a private cause of action is also available to Plaintiff under Chapter 5. First, the statutory construction principles applied in *Figueroa* to Chapter 1 apply equally to the question of whether a private right of action exists under Chapter 5:

[T]he mere creation of an agency such as the Commission does not necessarily reflect legislative intent to exclude private enforcement of the Act ... an express indication of exclusivity of remedies is required.

*Figueroa*, 188 F.3d at 180. Accordingly, if the Virgin Islands legislature had intended to create an exclusive remedy in the Commission by enacting Chapter 5, it should have expressly said so. Yet "here, there is no implication that chapter 5 was to constitute an exclusive remedy, let alone an express statement to that effect." *Figueroa*, 188 F.3d at 180. Therefore, this Court cannot find that the additional remedies provided through the Civil Rights Commission in Chapter 5 are exclusive remedies, even for violations specific to Chapter 5. *See Wright v. City of Roanoke Redev. & Housing Auth.*, 479 U.S.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418, 424--25 (1987) (concluding that a private cause of action existed where statute and its legislative history were devoid of any indication that exclusive enforcement authority was vested in HUD), *cited in Figueroa,* 188 F.3d at 180.

**\*5** Furthermore, the reasoning in *Samuel v. Virgin Islands Telephone Corp.,* No. 75-6, 1975 WL 289 (D.V.I.1995), as *cited in Figueroa,* is applicable to this case. In *Samuel,* Judge Christian noted that the legislature did not use language in Chapter 5 implying that the Commission was to have the exclusive original right to hear and make determinations concerning civil rights matters. On that basis, he further stated:

> It is therefore certainly arguable that parties whose rights have been violated under § 64 of chapter 5 need not bring their claims in the first instance to the Commission, but may bring them directly to District Court.

*Samuel,* 1975 WL 289 at \*7 n.4. The Third Circuit stated in *Figueroa,* and this Court agrees, that Judge Christian's observation reinforces the statutory construction principles applicable to this case. *Figueroa,* 188 F.3d at 180. Therefore, Plaintiff may bring her 10 V.I.C. § 64 claim before this Court.

*Plaintiff's Claim under Title VII of the Civil Rights Act as amended*

The Court also finds that Plaintiff has stated a cause of action under Title VII. Section 42 U.S.C. § 2000e-5(f)(1) of the Civil Rights Act requires that claims brought under Title VII be filed within ninety days of the claimant's receipt of a right-to-sue letter from the EEOC. However, such issuance of a right-to-sue letter is not a jurisdictional requirement, but is rather a statutory requirement designed to give the administrative process an opportunity to proceed before a lawsuit is filed. *Tori v. Shark Information Services,* 1995 WL 764578, at \*2 (E.D.Pa.1995) (citing *Gooding v. Warner-Lambert Co.,* 744 F.2d 354 (3rd Cir.1984)); *see also Figueroa v. Buccaneer Hotel Inc.,* 188 F.3d 172, 176 (3d Cir.1999). The administrative requirement thus works as a statute of limitations rather than as a jurisdictional bar to suit. *See Figueroa,* 188 F.3d at 176.

In accordance with the above decisions, this Court finds no validity in Defendant VIHFA's assertion that Plaintiff's failure to allege receipt of a right-to-sue letter in her Amended Complaint necessitates dismissal of the Complaint. Because the administrative requirement is nonjurisdictional, Plaintiff's failure to allege receipt of a right-to-sue

letter does not deprive this Court of jurisdiction to hear the matter. In her Opposition to Defendant's Motion to Dismiss, Plaintiff alleges that she followed the appropriate administrative procedures in the filing of her claim (as set forth in 42 U.S.C. § 2000-e-5(f)(1)) [FN3] by filing her Complaint and Amended Complaint within ninety days of receipt of each Dismissal and Notice of Rights letter from the EEOC Commission. Accordingly, the Court will decline to grant Defendant VIHFA's motion and will permit Plaintiff to amend her Amended Complaint to incorporate the receipt of these Dismissal and Notice of Rights letters.

> FN3. 42 U.S.C. § 2000e-5(f)(1) provides in relevant part:
> If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice.

Plaintiff has not stated a cause of action upon which relief can be granted under 24 V.I.C. § 451 *et seq.,* but has stated cognizable claims under 10 V.I.C. § 64 and Title VII. Accordingly, Defendant VIHFA's motion shall be denied with respect to Count I.

C. Count II--Plaintiff's Retaliation Claim

**\*6** Plaintiff has validly stated a claim for retaliation under Title VII. Although Plaintiff's Amended Complaint did not specify which statute(s) her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

retaliation claim was being brought pursuant to, Plaintiff's Opposition to Defendant's Motion to Dismiss clarifies that her retaliation claim is grounded in Title VII. As discussed in Count I, the Court does not agree with Defendant that Plaintiff is barred from bringing claims under Title VII on the grounds that Plaintiff has not demonstrated that she has exhausted administrative remedies and that Plaintiff is time-barred by the statute of limitations.

The essential elements of a retaliation claim under Title VII, are that the employee engaged in a Title VII protected activity, the employer acted adversely against the employee with regard to employment, and there was a causal relationship between the employee's and employer's actions. *See, e.g., Nelson v. Upsala College,* 51 F.3d 383 (3d Cir.1995). In the instant case, Plaintiff stated in her Amended Complaint:

> Defendants further retaliated against Plaintiff for exercising her employment rights and the harassment and intimidation against Plaintiff escalated in that plaintiff received no assistance, accommodation and/or cooperation to perform her duties, was subjected to derogatory, racial remarks by her Hispanic supervisors and was ultimately terminated by Defendants.

(Pl. Am. Compl. at ¶ 45.)

It is true that Plaintiff has not specified that she exercised her employment rights by participating in an activity protected under Title VII nor that such participation *caused* Defendant VIHFA's retaliatory actions of harassment and termination. However, reading Plaintiff's Amended Complaint in the light most favorable to Plaintiff, the Court finds that it may be possible for Plaintiff to succeed on a claim for retaliation under Title VII and will therefore allow Plaintiff to bring this claim.

Accordingly, Defendant VIHFA's motion shall be denied with respect to Count II.

D. Count III--Plaintiff's Claims of Breach of Employment Contract and Violation of 24 V.I.C. § 76

The Court finds that Plaintiff has not stated a cognizable claim under the Virgin Islands Wrongful Discharge Act, 24 V.I.C. § 76. Public employers are exempt from 24 V.I.C. § 76 because they are not included in the definition of "employer" for purposes of Chapter 3 as stated in 24 V.I.C. § 62. A "public employer" is defined in 24 V.I.C. § 362(i) as "the executive branch of the Government of the United

States Virgin Islands and any agency or instrumentality thereof including, but not limited to ... the Virgin Islands Housing Authority...." Defendant VIHFA is a public employer. Therefore, Plaintiff is barred from bringing a claim under 24 V.I.C. § 76 against Defendant VIHFA.

On the other hand, the Court does not agree with Defendant VIHFA's argument that Plaintiff has failed to allege a prima facie case for breach of contract. First, Rule 8(a) of the Federal rules of Civil Procedure requires only that a complaint contain a general statement of facts from which the defendant will be able to frame a responsive pleading. *See* Fed.R.Civ.P. 8(a). It is against this liberal backdrop that the Court must apply the Rule 12(b)(6) standard. *See Rannels v. S.E. Nichols, Inc.,* 591 F.2d 242, 243 (3d Cir.1979). In the instant case, Plaintiff alleges that her employment with VIHFA began on August 12, 1991, that said employment was subcontracted to DWH on April 1, 1994, and that Defendant DWH was her immediate supervisor under the terms of the Contract of Employment. (Pl. Am. Compl. at ¶ 6.) Plaintiff sets forth various allegations of discriminatory conduct by Defendants DWH and VIHFA. Taking those material allegations as admitted, this Court cannot find that Plaintiff can prove no set of facts entitling her to relief for breach of contract. Plaintiff has sufficiently stated a claim for relief under Rule 8(a) with regard to breach of employment contract.

*7 Although Plaintiff has failed to state a cause of action upon which relief may be granted through her 24 V.I.C. § 76 claim, Plaintiff has properly stated a breach of employment contract claim. Accordingly, Defendant VIHFA's motion shall be denied with respect to Count III.

E. Count IV--Plaintiff's Claim of Slander

The Court finds merit in Defendant VIHFA's argument that Plaintiff has not met the standard of pleading required for a defamation claim. To state a claim upon which relief can be granted regarding a defamation claim, a plaintiff must give the defendant proper notice by pleading the content of the defamatory statement, who made it, to whom the statement was published, and when. *See Manns v. Leather Shop Inc.,* 960 F.Supp. 925 (D.V.I.1997). In the instant case, Plaintiff has pleaded the content of the defamatory statement by alleging that DWH (not VIHFA) accused Plaintiff of stealing money. (Pl. Am. Compl. at ¶ 32). However, Plaintiff has not even specified which employee at DWH made the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
2003 WL 23515136 (D.Virgin Islands)
**(Cite as: 2003 WL 23515136 (D.Virgin Islands))**

statement. (Pl. Am. Compl. at ¶ 32). Similarly, Plaintiff has only made a vague reference as to whom the statement was published, saying that the accusation was "circulated among other including the tenants...." (Pl. Am. Compl. at ¶ 34). Plaintiff has also failed to provide information as to *when* such defamatory statement was made.

For these reasons, Plaintiff has not plead with the particularity required for a defamation claim and has not state a claim upon which relief may be granted. Accordingly, Defendant VIHFA's motion shall be granted with respect to Count IV.

F. Count V--Plaintiff's Claim of Intentional Infliction of Emotional Distress

Defendant VIHFA next argues that Plaintiff has stated no facts in support of her claim for intentional infliction of emotional distress. The Court agrees. For a plaintiff to prevail on a claim for intentional infliction of emotional distress, the defendant must have, by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to another. "The defendant's conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society .' " *See also Manns v. Leather Shop Inc.,* 960 F.Supp. 925, 930--31 (D.V.I.1997) (*quoting Cox v. Keystone Carbon Co.,* 861 F.2d 390 (3d Cir.1988) and holding that "[a]llegations that the defendant made statements concerning the plaintiff's poor job performance and alleged misconduct simply do not rise to the level of extreme and outrageous behavior by the defendant."); *Moolenaar v. Atlas Motor Inns, Inc.,* 616 F.2d 87 (3d Cir.1980)). Moreover, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox,* 861 F.2d at 395 (citations omitted). Even conduct in which an employer engaged in a premeditated plan to force an employee to resign by making employment conditions difficult has been held not to rise to the level of extreme and outrageous conduct justifying recovery for intentional infliction of emotional distress. *Id.* (*citing Madreperla v. Williard Co.,* 606 F.Supp. 874, 880 (E.D.Pa.1985)).

**\*8** In the instant case, Plaintiff alleges that Defendants knowingly caused Plaintiff emotional distress by giving her an unacceptable workload, telling her that she would have to work overtime if she could not finish her assignments during the workday, encouraging her to resign, accusing her of stealing money, and firing her without just cause. (Pl. Am. Compl. at ¶ 14--18, 33--34, 39.) Plaintiff claims that DWH (not VIHFA) employees consistently spoke Spanish in front of Plaintiff, knowing that Plaintiff does not understand Spanish. (Pl. Am. Compl. at ¶ 11, 18.) Plaintiff further alleges that Defendant DWH President Hernandez (not VIHFA) constantly yelled and shouted at Plaintiff. (Pl. Am. Compl. at ¶ 13, 18, 27.) However, assuming those allegations to be true, as the Court must, Defendant VIHFA's conduct would not be considered extreme or outrageous.

Accordingly, the Court finds no stated cause of action for intentional infliction of emotional distress against VIHFA and will grant Defendant VIHFA's motion to dismiss Count V.

G. Count VI--Plaintiff's Claim of Negligent Infliction of Emotional Distress

The Court is not persuaded by Defendant VIHFA's argument that Plaintiff has not stated a cause of action with regard to her negligent infliction of emotional distress claim. In the Virgin Islands, there are two required elements of a claim for negligent infliction of emotional distress: (1) physical harm and (2) foreseeability. *See, e.g., Anderson v. Government of Virgin Islands,* 180 F.R.D. 284, 286 (D.V.I.1998). In the instant case, Plaintiff has cited many manifestations of physical harm as a result of Defendants' conduct. She alleges that *Defendants* (not just DWH) inflicted emotional distress that caused her insomnia, weight loss, neck and shoulder pain, shaky hands, and headaches, which often caused Plaintiff to need to go home from work early. (Pl. Am. Compl. at ¶ 18--19.) Plaintiff further alleges that said emotional distress forced her to experience labor and delivery complications, causing her to need a caesarean section. (Pl. Am. Compl. at ¶ 20.) Two weeks after returning from her maternity leave, Plaintiff claims that she experienced a work-induced depression and was placed on anti-depressant medication and ordered to stay home by her physician. (Pl. Am. Compl. at ¶ 26.)

Similarly, Plaintiff has plead foreseeability of the distress inflicted. The relevant inquiry for the foreseeability element of a negligent infliction of emotional distress claim is whether the person who caused the distress *"should have realized"* that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 23515136 (D.Virgin Islands)
**(Cite as: 2003 WL 23515136 (D.Virgin Islands))**

peril of a third person, and ... from facts known to him *should have realized* that the distress, if it were caused, might result in illness or bodily harm." *Anderson,* 180 F.R.D. at 287 (*citing* Restatement (Second) of Torts § 313). Plaintiff specifically states that *Defendants* (not just DWH) knew suggesting to Plaintiff that she find another job would cause Plaintiff emotional distress. (Pl. Am. Compl. at ¶ 17). According to Plaintiff, Defendant DWH knew accusing Plaintiff of illegal and immoral conduct would cause Plaintiff emotional distress. (Pl. Am. Compl. at ¶ 33). Plaintiff also contends that *Defendants* (again, not just DWH) knew firing Plaintiff unjustifiably would cause Plaintiff emotional distress. (Pl. Am. Compl. at ¶ 39.)

*9 Plaintiff has alleged physical harm and foreseeability. Viewing Plaintiff's Amended Complaint most favorably to Plaintiff, this Court finds that Plaintiff may be able to prove that she is entitled to relief for negligent infliction of emotional distress. Accordingly, Defendant VIHFA's motion shall be denied with respect to Count VI.

H. Count VII--Plaintiff's Claim of Entitlement to Punitive Damages

Finally, Defendant VIHFA argues that Plaintiff has stipulated to dismiss Count VII against Defendant VIHFA. Regardless, this Court has found that "punitive damages are not available against an agency of the Virgin Islands government." *Chase v. Virgin Islands Port Authority,* 3 F.Supp.2d 641, n.1 (D.V.I.1998) (citing *Codrington v. Virgin Islands Port Authority,* 33 V.I. 245 (January 17, 1996)). Accordingly, Defendant VIHFA's Motion is granted with regard to Count VII.

### III. Conclusion

The Court recognizes that Defendant VIHFA may have a viable defense under the Torts Claims Act regarding all of Plaintiff's tort-based claims. However, the relevant inquiry at this juncture is whether Plaintiff may be able to ultimately succeed on such claims against Defendant VIHFA. The Court finds that it may be possible for Plaintiff to do so. For the foregoing reasons, Defendant VIHFA's Motion to Dismiss the Amended Complaint will be granted with regard to Counts IV, V, and VII; and denied with regard to Counts I, II, III, and VI. An appropriate Order is attached.

### ORDER

THIS MATTER is before the Court on Defendant VIHFA's Motion to Dismiss the Amended Complaint, docket item # 80. Defendant asks the Court to dismiss all Counts (I--VII) of Plaintiff's Amended Complaint for failing to state a cause of action and various other defects.

Upon consideration of the matter, the Court finds that Counts IV and V must be dismissed because Plaintiff failed to plead with the required particularity and that Count VII must be dismissed because punitive damages cannot be brought against an agency of the government of the Virgin Islands, but that Plaintiff has stated a cognizable cause of action with respect to all other counts of her Amended Complaint. Accordingly, it is hereby

ORDERED that Defendant VIHFA's Motion to Dismiss the Amended Complaint is GRANTED in part, DENIED in part.

2003 WL 23515136 (D.Virgin Islands)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

Westlaw.

2005 WL 1459332                                                                          Page 1
--- F.3d ---
(Cite as: 2005 WL 1459332 (Fed.Cir.(Ill.)))

H

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Federal Circuit.
PRIMA TEK II, L.L.C. and Southpac Trust
International, Inc., as Trustee for the
Family Trust U/T/A dated 12/8/95, Plaintiffs-Cross
Appellants,
v.
POLYPAP, S.A.R.L., Philippe Charrin, and Andre
Charrin, Defendants-Appellants.
No. 04-1411, 04-1421.

June 22, 2005.

**Background:** Owner of patents for use of decorative
assemblies to hold flower arrangements sued
competitor for infringement. The United States
District Court for the Southern District of Illinois,
Michael J. Reagan, 316 F.Supp.2d 693, held patents
valid and infringed, but found no induced or
contributory infringement. Parties cross-appealed.

 **Holding:** The Court of Appeals, Dyk, Circuit Judge,
held that patents were invalid as anticipated.
 Reversed.

**[1]** Patents ☞314(5)

291k314(5) Most Cited Cases
Although patent anticipation is ultimately question of
fact, it also depends on proper claim construction,
which is legal issue. 35 U.S.C.A. § 102(b).

**[2]** Patents ☞66(1.25)
291k66(1.25) Most Cited Cases
Patents for decorative assemblies to hold flower
arrangements, consisting of floral holding material
capable of holding its own shape without pot,
covered with wrapping sheet that was crimped at top,
were anticipated by prior French patent calling for
insertion of flower stems into moss that was then
wrapped in
sheet that was tied with string; moss could hold its
own shape, and string tying inherently created
requisite crimping. 35 U.S.C.A. § 102(b).

**[3]** Patents ☞165(1)
291k165(1) Most Cited Cases
When construing patent claims, court looks first to
words of claims themselves.

**[4]** Patents ☞165(3)
291k165(3) Most Cited Cases
Words in patent claim are generally given their
ordinary and customary meaning, unless some special
definition of term is clearly stated in specification or
file history.

**[5]** Patents ☞165(3)
291k165(3) Most Cited Cases
Construing court may consult with dictionaries when
determining ordinary and customary meanings of
patent claim terms.

**[6]** Patents ☞167(1.1)
291k167(1.1) Most Cited Cases
Limitations cannot be imported into patent claims
from specification.

**[7]** Patents ☞165(4)
291k165(4) Most Cited Cases
Patent claims will not be read restrictively unless
patentee has demonstrated clear intention to limit
claim scope using words or expressions of manifest
exclusion or restriction.

**[8]** Patents ☞65
291k65 Most Cited Cases
Inherent anticipation does not require appreciation of
inherent limitation by those of skill in art before
critical date of patent in issue. 35 U.S.C.A. § 102(b).

Patents ☞328(2)
291k328(2) Most Cited Cases
5,410,856, 5,615,532. Invalid.
 Appealed from: United States District Court for the
Southern District of Illinois. Judge Michael J.
Reagan.

 Joseph P. Titterington, Dunlap, Codding & Rogers,
P.C., of Oklahoma City, Oklahoma, argued for
plaintiffs-cross appellants.

 David I. Roche, Baker & McKenzie, of Chicago,
Illinois, argued for defendants-appellants.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Before GAJARSA, Circuit Judge, PLAGER, Senior Circuit Judge, and DYK, Circuit Judge.

DYK, Circuit J.

*1 Polypap, S.A.R.L., Philippe Charrin, and Andre Charrin (collectively "Polypap") appeal from the judgment of the district court holding claim 15 of United States Patent No. 5,410,856 (the " '856 patent") and claim 9 of United States Patent No. 5,615,532 (the " '532 patent") not invalid and infringed by Polypap, and enjoining Polypap from further infringement by making, using, or selling the accused device, or instructing others in its use. *Prima Tek II, L.L.C. v. Polypap SARL,* 316 F.Supp.2d 693 (S.D.Ill.2004). Prima Tek II, L.L.C. and Southpac Trust International, Inc., as Trustee for the Family Trust U/T/A dated 12/8/95 (collectively "Prima Tek") cross-appeal the judgment of the district court holding Polypap not liable for induced or contributory infringement of the asserted claims of the patents. We reverse because we find the asserted claims of the '856 and '532 patents invalid as anticipated, and dismiss the cross-appeal as moot.

## BACKGROUND

### I

Prima Tek and Polypap are competitors in the floral products market. Polypap is a French business that sells a product in the United States called the Bouquett'O ("the accused product"). The accused product is a semicircular piece of plastic that can be formed into a disposable device for holding floral arrangements. On March 29, 1999, Prima Tek filed suit against Polypap for infringement of, *inter alia*, claim 15 of the '856 patent and claim 9 of the '532 patent. The district court granted summary judgment of non-infringement in favor of Polypap, which decision was appealed to this court. *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.,* 318 F.3d 1143, 1145 (Fed.Cir.2003). We held that the district court had used an incorrect claim construction, vacated the decision, and remanded for further proceedings. *Id.* at 1154. We specifically held that the phrase "floral holding material having an upper end, a lower end and an outer peripheral surface, the floral holding material being constructed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means" must be given its ordinary meaning, and is not limited to floral foam or soil. *Id.* at 1149, 1152.

After a bench trial, the district court held the asserted claims of the patents not invalid and infringed by

Polypap, and accordingly enjoined Polypap from making, using, or selling the accused product or instructing others in its use. The district court rejected Prima Tek's claims that Polypap was liable for induced and contributory infringement. The district court also rejected Polypap's claim that Prima Tek engaged in inequitable conduct in the prosecution of the patents. Polypap appeals and Prima Tek cross-appeals from the district court's judgment of no induced or contributory infringement.

### II

The asserted claims describe an assembly and method for displaying a floral grouping. They generally describe a floral grouping in which flower stems are inserted into floral foam, the foam wrapped in a sheet of material and tied near the top. Claim 15 of the '856 patent includes limitations for, *inter alia*, a "floral holding material," the absence of any "pot means," and a "crimped portion in the sheet of material" having "at least one overlapping fold." [FN1] Claim 9 of the '532 patent includes limitations for, *inter alia*, "providing a floral holding material," the absence of any "pot means," and "disposing banding means about the sheet of material ... causing the banding means to press a portion of the sheet of material against the outer surface of the floral holding material." [FN2]

*2 This case presents the question of whether the asserted claims are invalid as anticipated. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

In considering questions of anticipation, we are mindful that if an invalid patent is issued, competitors may be deterred from challenging it by the substantial cost of litigation. Even if a successful challenge is brought, competition may be suppressed during the pendency of the litigation. The risk of antitrust liability or litigation sanctions may deter some from seeking to secure or enforce invalid patents, but our patent system depends primarily on the Patent and Trademark Office's ("PTO's") care in screening out invalid patents during prosecution.

[1][2] Anticipation is ultimately a question of fact, but also depends on proper claim construction--a legal issue. We review the district court's claim construction without deference, and its factual determinations for clear error. *Golden Blount, Inc. v. Robert H. Peterson Co.,* 365 F.3d 1054, 1058 (Fed.Cir.2004). Here, extensive prior art exists regarding products and methods for displaying floral groupings, and the district court considered prior art

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stretching back over a century. It appears likely that the asserted claims are anticipated by the 1899 Bertels reference, but for simplicity we address only the more recent Charrin reference, which the district court found to be "substantially identical" to the much earlier Bertels reference. 316 F.Supp.2d at 707. Under the appropriate standard, the Charrin prior art reference, which was before the examiner during prosecution of the '532 patent, clearly anticipates the asserted claims of the patents in suit. The Charrin reference is a published French patent application naming Andre Charrin as the applicant and inventor. In one embodiment, flowers are inserted into a mass of wetted moss about which a cover made of waterproof material is wrapped. [FN3] The cover is tied at the top by way of a cord passing through holes in the cover, which is then tightened.

Prima Tek agrees that the Charrin reference anticipates but for three limitations: the "without any pot means" limitation, the alleged requirement that the floral holding material hold its shape, and the crimping limitation (found only in claim 15 of the '856 patent).

We first consider the meaning of the claim term "pot means" in order to determine whether the "without any pot means" limitation was satisfied by the Charrin reference. We did not construe this claim language in our prior opinion. The district court defined the "[m]aterial capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means" limitation as "any material that can function as floral holding material which supports the floral grouping without a closed bottom receptacle such as a flower pot, vase, etc." 316 F.Supp.2d at 698. Thus, the district court appears to have construed "pot means" as "a closed bottom receptacle such as a flower pot, vase, etc." The parties did not contest this construction in their briefs, but at oral argument each proposed a different construction. Polypap urged a broader construction of "a shell-like structure that supports a grouping of flowers." Prima Tek urged an even broader construction of "a container, or anything that serves like a container, to hold the floral holding material in place." The specifications do not define pot means other than to give the example of a flower pot. '856 patent, col. 3, ll. 48-49; '532, col. 3, ll. 50-51.

*3 [3][4][5] When construing claims, we look first "to the words of the claims themselves ... to define the scope of the patented invention." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir.1996). "[W]ords in a claim are generally

given their ordinary and customary meaning" unless some "special definition of the term is clearly stated in the patent specification or file history." Id. We may consult with dictionaries "in determining the ordinary and customary meanings of claim terms." Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed.Cir.2002). "Pot" is defined as a "rounded metal or earthen container of varying size used chiefly for domestic purposes." Webster's Third New International Dictionary 1774 (2002). The Charrin reference clearly satisfies the "without a pot means" limitation. It does not use a metal or earthenware container. Prima Tek's argument that the wire or string tied around the moss of the Charrin reference is a pot means is without merit.

The district court appears to have construed the term "floral holding material" to require that the material hold its predetermined shape. As required by our previous opinion, 318 F.3d at 1152, the district court construed "floral holding material" in the context of its infringement determination to mean "[h]as an upper end, a lower end and an outer peripheral surface and is constructed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means," 316 F.Supp.2d at 697-98. However, in its anticipation analysis, the district court appeared to change its claim construction to distinguish the Charrin reference from the patents by concluding that a necessary element of the term "floral holding material" is "that the material is [ ]capable of holding its predetermined shape." 316 F.Supp.2d at 706. [FN4] When this court previously construed "floral holding material," we held that the term should be given its ordinary meaning and is not limited to floral foam or soil. We did not include in that construction a requirement that the material be capable of holding its predetermined shape. 318 F.3d at 1149-52. The district court erred in adding such a limitation.

[6][7] Prima Tek attempts to defend the district court's construction by pointing to claim language requiring that the floral holding material have an upper end, a lower end, and an outer peripheral surface. This language, of course, includes virtually anything that is capable of holding flowers, and does not require that the material hold its predetermined shape. Contrary to Prima Tek's argument, the specification does not suggest otherwise. The specification reads:

The floral holding means 18 may be the type of material commonly referred to in the art as floral foam or Oasis TM or may be soil or artificial soil or other earth composition *so long as the material*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1459332                                                                                    Page 4
--- F.3d ---
(Cite as: 2005 WL 1459332 (Fed.Cir.(Ill.)))

*is capable of holding its predetermined shape and capable of receiving and supporting the floral grouping 26 without any additional pot means.*

**\*4** '856 patent, col. 3, ll. 50-56; '532 patent, col. 3, ll. 52-57 (emphasis added). This language, which appears as part of the Description of the Preferred Embodiments, merely describes the preferred embodiment, and does not define floral holding material to include an undefined limitation not found in the ordinary meaning of the claim language. We have repeatedly made clear that limitations cannot be imported from the specification into the claims. *E.g., Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed.Cir.1998)*. "[T]he claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel- Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed.Cir.2004)* (internal quotations and citation omitted). The language of the specifications here evinces no such clear intention.

[8] Finally, the district court held that the Charrin reference does not include the crimping and overlapping fold limitations of claim 15 of the '856 patent. The Charrin reference discloses the tying of a sheet of material with a string laced through holes in the sheet. The district court found that Polypap offered "no evidence that a crimped portion is formed in the sheet of material" and therefore held the crimping limitation not present in *Charrin. 316 F.Supp.2d at 707*. The appellant concedes that the Charrin reference does not include a crimping limitation, but argues that the limitation is inherent. We have previously held that "a prior art reference may anticipate when the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it." *MEHL/Biophile Int'l Corp. v. Milgraum, 192 F.3d 1362, 1365 (Fed.Cir.1999)*. Inherent anticipation does not require an appreciation of the inherent limitation by those of skill in the art before the critical date of the patents in issue. *Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373, 1377 (Fed.Cir.2003)*.

Here the undisputed evidence shows that crimping and overlapping folds are inherent to the Charrin reference. The drawings of the Charrin reference disclose a sheet of material containing a number of holes through which a string is laced. One figure shows the sheet of material tied up around a flower pot by the string such that the material has overlapping folds and is crimped. [FN5] Another figure shows the material lying flat with the string

loose and a block of moss sitting on the sheet of material. The Charrin reference itself shows that crimping is inherent. Moreover, Philippe Charrin provided testimony that when tightened, the string would create overlapping folds in the sheet of material. [FN6] Prima Tek presented no rebuttal evidence. The undisputed record shows that the crimping means was inherent in Charrin. [FN7]

Under these circumstances we conclude that claim 15 of the '856 patent and claim 9 of the '532 patent were anticipated by Charrin, and that claim 15 of the '856 patent and claim 9 of the '532 patent are invalid.

CONCLUSION
**\*5** Claim 15 of the '856 patent and claim 9 of the '532 patent are invalid as anticipated by the Charrin reference. For this reason, the judgment of the district court is reversed. The cross-appeal is dismissed as moot since there can be no contributory or induced infringement of invalid patent claims.

REVERSED
COSTS
Costs to Polypap.



FN1.
Claim 15 of the '856 patent reads in its entirety:
15. A decorative assembly comprising:
a floral grouping having a bloom end and a stem end;
a floral holding material having an upper end, a lower end and an outer peripheral surface, the floral holding material being constructed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means, the stem end of the floral grouping being disposed in the floral holding material and the floral holding material supporting the floral grouping with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a portion of the floral grouping near the bloom end thereof extending a distance upwardly beyond the upper end of the floral holding material;

a sheet of material having an upper surface, a lower surface and an outer periphery, the upper surface of the sheet of material being disposed adjacent a portion of the outer peripheral surface of the floral holding material and the sheet of material extending about a portion of the outer peripheral surface of the floral holding material, the sheet of material extending about the outer peripheral surface of the floral holding material and leaving uncovered a portion of the floral holding material near the upper end thereof uncovered whereby the floral grouping extends upwardly beyond the upper end of the floral holding material and above the sheet of material; and

means for forming a crimped portion in the sheet of material with the crimped portion cooperating to hold the sheet of material in the position extended about the floral holding material to provide a decorative covering, the crimped portion being formed in the sheet of material near the upper end of the floral holding material wherein the means for forming a crimped portion is used to form at least one overlapping fold in the sheet of material, which overlapping fold is substantially bonded via the means for forming the crimped portion and the crimped portion engaging a portion of the floral holding material for cooperating to hold the sheet of material in the position extended about the floral holding material to provide a decorative covering.

FN2. Claim 9 of the '532 patent reads in its entirety:

9. A method for providing a decorative covering comprising:

providing a floral grouping having a bloom end and a stem end;

providing a floral holding material having an upper end, a lower end and an outer peripheral surface, the floral holding material being constructed of a material capable of receiving a portion of the floral grouping and supporting the floral grouping without any pot means;

providing a sheet of material having an upper surface, a lower surface and an outer periphery;

disposing the stem end of the floral grouping in the floral holding material;

disposing the upper surface of the sheet of material near the outer peripheral surface of the floral holding material and extending the sheet of material about at least a portion of the outer peripheral surface of the floral holding material while leaving at least a portion of the upper end of the floral holding material uncovered, the upper surface of the sheet of material being disposed adjacent the outer peripheral surface of the floral holding material; and

disposing banding means about the sheet of material in a position circumferentially about the floral holding material causing the banding means to press a portion of the sheet of material against the outer surface of the floral holding material for cooperating to hold the sheet of material in the position extended about the floral holding material to provide the decorative covering.

FN3. The parties dispute the proper translation of the French word "mousse" as found in the Charrin reference. Prima Tek contends, and district court held, that the word should be translated as "moss." Polypap contends that the word should be translated as "foam." In light of our disposition, this controversy need not be addressed for we conclude that the asserted claims of the '532 and '856 patents are invalid even assuming that "mousse" is properly translated as "moss" as Prima Tek contends.

FN4. The district court wrote: "In the drawing, the [moss] is shown tied with a string or wire--an indication that the material is incapable of holding its predetermined shape, which is a necessary element of the term 'floral holding material.' " Id.

FN5. That figure appears in the Charrin reference:

FN6. Philippe Charrin testified as follows:
Q ... Do you see a string shown in figure 5?
A Yes.
....
Q When the string is tightened to pull the sheet against the floral holding material, are there overlapping folds that are formed in the sheet?

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1459332                                                    Page 6
--- F.3d ---
**(Cite as: 2005 WL 1459332 (Fed.Cir.(Ill.)))**

      A Yes, overlaps.
      (J.A. at 1153.)

      <u>FN7.</u> Expert testimony was not required, the technology being easily understood without expert testimony. *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1369 (Fed.Cir.2004).

2005 WL 1459332 (Fed.Cir.(Ill.))

**Briefs and Other Related Documents <u>(Back to top)</u>**

- 04-1421 _____ (Docket)
(Jun. 15, 2004)

- 04-1411 _____ (Docket)
(Jun. 09, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.