# EXHIBIT A

769-9949-0 DIV
769-2064-0 DIV

CERTIFICATE UNDER 37 CFR 1.8: The undersigned hereby certifies that this Transmittal Letter and the paper, as described in paragraph 1 hereinabove, are being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Asst. Commissioner for Patents, BOX AF, Washington, D.C. 20231 on this 28th day of June, 1996.

By _Daniel A. Boehnen_
Daniel Boehnen

**AMENDMENT**

## THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF GAETANO GATTI, et al.        :

SERIAL NO.: 07/827,742                            :        EXAMINER PESELEV

FILED: JANUARY 29, 1992                           :        GROUP ART UNIT: 1803

FOR:  INJECTABLE READY-TO-USE SOLUTIONS           :
      CONTAINING AN ANTITUMOR
      ANTHRACYCLINE GLYCOSIDE                     :

RECEIVED
JUL 12 1996
GROUP 1800

**AMENDMENT UNDER 37 C.F.R. § 1.116**

ASSISTANT COMMISSIONER OF PATENTS & TRADEMARKS
BOX AF
WASHINGTON, D.C. 20231

SIR:

Responsive to the final Official Action mailed January 30, 1996, Applicants state:

**IN THE CLAIMS**

Please amend independent Claims 31, 42, and 44 as follows:

31.    (Four times amended)    A physiologically acceptable solution of anthracycline

glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin

hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous

solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected

from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic

acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to

100mg/ml, wherein said solution is contained in a sealed container [and has not been

reconstituted from a lyophilizate].

1

42. (Amended)   A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefore, [wherein the solution has not been reconstituted from a lyophilizate,] wherein said solution has a pH adjusted to 2.71 to 3.14 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

44. (Twice Amended)   A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, [wherein said solution has not been reconstituted from a lyophilizate].

Please cancel Claim 40, and add the following claims 45-47:

-- 45. The anthracycline glycoside solution of Claim 71, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

46. The container of Claim 42, wherein said doxorubicin solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

47. The anthracycline glycoside solution of Claim 44, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids. --

**REMARKS**

**Introduction**

Claims 31, 33-38, 42, and 44 remain in this application.  Prior Claim 40 has been canceled, and new claims 45-47 are submitted.  Applicants had previously paid for Claims 31-42, so no new fee is required.  None of these changes raise any substantial new issue, and they place the application in condition for allowance.   Reconsideration of this application, as amended, is respectfully requested.

The Claims of this application were previously drafted in a way that distinguished Applicants' solutions from certain prior art products which are reconstituted from lyophilizate powder in vials by medical personnel at the time of drug administration.  The comments of the Examiner in the last Office Action indicated that whether the solution was reconstituted from lyophilizate is immaterial because patentability must reflect the inherent properties of the claimed solution and the prior art.  Consistent with the Examiner's comments, Claims 31, 42, and 44 are now amended (by deleting the lyophilizate limitation) to show that the important and *claimed* properties of the present invention do arise from the inherent properties of the solution, regardless of whether the solution is prepared from lyophilizates in vials.

Along those same lines, the novel property of the claimed solution relates to its capacity for long term storage stability.  As explained more fully herein, this long term storage stability of the present invention permits it to be pre-packaged and sold as a ready-to-use solution product, rather than to be reconstituted from lyophilizate in vials by medical personnel in conventional manner.  This novel property of the present invention was completely unrecognized by the prior art and provides the basis for satisfying a long felt need and achieving commercial success.  Also

importantly for patentability, these aspects of the invention establish a motivation to achieve

something new and different, a factor which is necessary for a finding of obviousness under

§103, but was completely lacking from the prior art

**Double Patenting Rejection**

The Examiner has rejected all of the claims on the grounds obviousness-type double

patenting over U.S. Pat. No. 4,946,831.  Applicants note that, in the Office Action mailed

11/15/93, the Examiner indicated that the terminal disclaimer, although re-submitted by

applicants, has not been found in the file.  Applicants acknowledge that they will file a new

terminal disclaimer to obviate the double patenting rejection.  Applicants request that this be

held in abeyance until agreement on patentable subject matter has been reached.

**Obviousness Rejection**

The Examiner has also rejected all of the claims under 35 U.S.C. §103 as being

unpatentable over the Japanese patent no. 60-92212 in combination with Baurain et al. (U.S. Pat.

No. 4,296,105) and Arcomone et al.  Applicants respectfully request reconsideration of this

rejection and allowance of the pending claims.

Before discussing the rejection in detail, it is important to note that the entire thrust and

purpose of the present invention is to achieve technology enabling the long term storage of

doxorubicin in solution, preferably in a pharmaceutically acceptable solution.  There is no

question but that none of the prior art cited by the last Office Action are even remotely directed

toward achieving a long term storage stable solution of doxorubicin.  JP 60-92212 is directed

toward the discovery of formulations of doxorubicin salts that "are capable of being completely

dissolved [from reconstitute] in saline solutions within a very short span of time." *See* the first full paragraph on p. 3 of the reference. Baurain is directed to the discovery of N-leucyl-doxorubicin and its salts, as a new active ingredient. Arcomone is directed to a generalized explanation of the structural and physiochemical properties of doxorubicin, including solubility, spectroscopic characteristics, stability, and analytical methods for determining same. However, as will be detailed below, to the extent that Arcomone discussed stability, the references expressly teaches *away from the present invention*, *i.e.,* by teaching that doxorubicin has a stability in solution of only a few hours when pH is adjusted with HCL and only a few weeks when pH is adjusted to the range of 3-6 (using a something other than an acid to adjust the pH.) The bottom line is that, to the extent JP 60-92212, or Baurain, or Arcomone have any similarity to the claimed invention beyond merely dealing with doxorubicin, the similarities result from pure happenstance, and have nothing to do with the goals and objectives of the present invention.

The last Office Action implicitly acknowledges that all of the elements of the claimed invention were *not* found in a single prior art reference. That is, by virtue of rejecting the claims under Section 103, rather than Section 102, the Office Action acknowledges that the subject matter of the present invention claims is different from the prior art.

In particular, the Office Action relies upon the teaching of a single example in JP 60-92212 that discloses adjusting the pH to a level of 2.3, and the Office Action acknowledges that this pH of 2.3 is below the pH range of 2.5-5.0 that is taught and claimed in the present invention. However, the Office Action holds that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results."

As to Baurain and Arcomone, the Office Action fails to acknowledge how or why these references differ from the present invention. Apparently, however, the Office Action relies upon

these references only to disclose the existence of doxorubicin solutions at pH higher than 2.3. Thus, Baurain discloses a doxorubicin salt solution at pH of 4.0, and Arcomone discloses a doxorubicin salt solution at pH of 3-6.  The Office Action holds that, "a person of ordinary skill in the art would have been motivated to adjust the pH of anthracyline glycoside-containing solution to higher pH such as pH 4 disclosed by Baurain et al. or higher as disclosed by Arcomone et al with other physiologically acceptable acid, as disclosed by Baurain et al., because such a person would have expected the resulting solutions to have similar stabilities."

Applicants respectfully submit that there are at least four (4) fundamental problems with the rejection in the last Office Action.

- There is no basis on this record for the motivation holding, *i.e.*, for holding that a person of ordinary skill would have been motivated to increase the pH of JP 60-92212 to the higher levels of Baurain and/or Arcomone.  Rather, the only motivation for such combination arises via hindsight reliance on the teaching of the present invention.

- Assuming *arguendo* that a person of ordinary skill was motivated to combine the references in order to achieve a "similar stability" (as suggested in the Office Action), the question is similar to what?  The only teaching *vis a vis* "stability" to be found anywhere in the present references is a teaching that doxorubicin solution is *not* stable as per the invention.  *See* Arcomone, p.21.

- By ignoring the other differences between the claimed subject matter and the prior art, the Office Action does a disservice to the claimed invention.  Assuming *arguendo* that a solution was made by following a combination of the references, the resulting combination does not fall within the pending claims.

- Scientific test data comparing the stability of the claimed subject matter to the stability of the solution of JP 60-92212, shows that stability of the claimed invention (pH 2.5-50) is unexpectedly higher than the stability of the JP 60-92212 solution (pH 2.3).

For at least these reasons, Applicants respectfully request that the present rejection be withdrawn and the claims be allowed. Once Applicants thereafter submit an appropriate terminal disclaimer, the claims should be passed to issue.

## Lack of Motivation for Combination

As previously noted, there is absolutely nothing in any of the cited references that refers to a possible improvement in the long term storage stability of doxorubicin solutions. These references are oblivious to the problem, much less the solution. More likely, the authors of these references merely accepted the general belief (prior to the invention) that doxorubicin could not be prepared into long term storage stable solutions, and, thus, the authors never explored nor considered the possibility. In any event, none of the references -- alone or in combination -- provide any motivation for a person skilled in the art to pursue, adapt, modify, or combine any of the references toward any common goal, much less the goal of achieving a long term storage stable solution of doxorubicin hydrochloride.

To the contrary, JP 60-92212 fails to provide any teaching or suggestion that varying pH may have any effect (either negative or positive) on the doxorubicin solution. The same is true of Baurain. Although Arcomone discloses several examples with differing pH, the examples vary several parameters at the same time, such that it is impossible to draw any conclusion on how to achieve a long term storage stable solution of doxorubicin.

## The References Teach a *LACK* of Stability

The Office Action suggests that a person of ordinary skill would be motivated to combine the references to achieve "similar stability." It is only fair to ask, what does the Examiner mean by achieving similar stability? If the intention is achieve similar stability to the claimed invention, then Applicants respectfully submit that proves that the Examiner was relying upon hindsight reason to combine the references. If the intention was to achieve similar stability to the most stable prior art solution, then Applicants respectfully submit that references expressly taught that such resulting solution was *not* long term storage stable.

As previously noted, neither JP 60-92212 nor Baurain even mention storage stability of the solution. Rather, both of those references focus on products which are lyophilized, presumably because it was recognized that they were *not* stable. The only reference that provides any express teaching as to storage stability is the Arcomone reference, and this reference expressly teaches that the only way to achieve long term storage stability for doxorubicin is via lyophilization, because the solutions are *not* stable.

> "Adriamycin [doxorubicin] hydrochloride is stable in the solid state . . . . The stability of aqueous solutions of adriamycin varies with pH and the buffer concentration (Table 2 and Fig. 12) as established on the basis of spectrophotometric and chromatographic analysis."

*See* p. 21 of Arcomone. Table 2 indicates that doxorubicin in solution with HCL is stable for less than 20 hours. HCL is the only acid discussed vis a vis stability. Table 2 further indicates that doxorubicin in solution can be stable for more than a month at pH 3-6 when a phosphate buffer is used. Fig. 12 provides more specific information on the use of phosphate buffers with doxorubicin solutions; specifically, Fig. 12 indicates that a 90% stability of doxorubicin in phosphate buffered solution will expire in about 10 days. In sum, these references -- considered alone or in combination -- teach away from, not toward, the present invention.

**The Hypothetical Combination Is Different Than The Claimed Invention**

Assuming *arguendo* that a person of ordinary skill were motivated to combine the cited references, the resulting combination would be different than the claimed subject matter. The Baurain reference differs from the pending invention in several respects, most notably in that Baurain adds L-leucine carboxyanhydride to the pH 10.2 solution. Although Baurain teaches that the pH of the solution is thereafter reduced to pH 4, the purpose and result of doing so is to convert the doxorubicin hydrochloride to N-(L-leucyl) doxorubicin. Thus, assuming a person were to combine JP 60-92212 and Baurain, the result would be a solution of N-(L-leucyl) doxorubicin at pH 4, rather than the present claimed invention. There is no basis to conclude that the resulting combination would comprise doxorubicin hydrochloride solution at the requisite doxorubicin concentration level and the requisite pH level.

Similarly, Arcomone teaches that doxorubicin solutions may be adjusted to a pH of 3-6 using a phosphate buffer solution, or to a pH of 1-2 using HCl. Arcamone presents these as alternatives, and fails to teach or suggest in any way that the acid (rather than the buffer) should be used when adjusting pH to 3-6. (Note: Arcomone teaches at Table 2 that HCL used to adjust the doxorubicin solution will achieve a stability of *less than 20 hours*. Thus, Arcamone teaches away from using HCl to adjust pH for long term storage stability.) Assuming a person were to combine JP 60-92212 and Arcomone, the result would be solution of doxorubicin hydrochloride in which the pH was adjusted by phosphate buffer, rather than HCL as required by the pending claims. There is no basis to conclude the combination of JP 60-92212 and Arcomone would comprise doxorubicin hydrochloride solution at the requisite pH level.

<u>Scientific Evidence Establishes An Unexpected Stability Difference</u>

It is important to recognize that the claimed subject matter is based upon using particular acids to adjust the pH of the solution to a particular pH range. Applicants have demonstrated time and again in comparative data in this application that the resulting solution exhibits surprisingly better long term storage stability than solutions having a pH outside the recited pH range or using a buffer other than the claimed acids to adjust the pH.

Lest there be any doubt on this point, Applicants are submitting herewith yet another declaration still further addressing the issue of stability. *See* Declaration of Carlo Confalonieri, filed herewith. Applicants have prepared four different solutions. The first solution involves following the procedure of example 6 of the JP 60-92212 patent except modified as to the amount of the material made. The pH of the solution was 2.3 as taught in JP 60-92212. This first solution also contained the mannitol excipient of example 6 of JP 60-92212. Two other solutions not containing the mannitol excipient of the Japanese patent were also prepared having a pH of 2.3, one having a concentration of 2mg/ml and one having 5mg/ml concentration. A fourth solution prepared in accordance with the present invention has a pH of 2.5 and a concentration of 2 mg/ml. As can be seen from the enclosed declaration of Dr. Confalonieri, the solution prepared according to the present invention, having a pH of 2.5, exhibited superior stability as compared with each of the solutions having a pH of 2.3. Indeed, the solution having the mannitol excipient taught in the Japanese patent resulted in a composition which had a worse stability than the corresponding composition not containing the excipient. *See* the results of 35°C. (Note: The one and four week stability of the 2.3 pH solution not containing the excipient was superior to the 2.3 pH solution containing the excipient at 45°C, thus demonstrating that the Japanese patent could not have been concerned with long-term storage

stability.) More importantly, the solution having a pH of 2.5 according to the present invention exhibited significantly better stability than each solution having a pH of 2.3 at all temperatures.

These results conclusively demonstrate that solutions having pH 2.5, adjusted by HCL, achieve unexpected and nonobvious results in storage stability *vis a vis* solutions having a pH 2.3. Perhaps more important, these results directly contradict and disprove that a doxorubicin solution having a pH of 2.3 has the same stability as a doxorubicin solution having a pH of 2.5.

The last Office Action held that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results." Accepting *arguendo* the statement in the last Office Action as to what a person of ordinary skill in the art would have expected, the evidence submitted herewith proves that expectation is incorrect. Thus, the basic assumption of the rejection in the last Office Action is incorrect. That error, without more, warrants reconsideration and reversal of the rejection.

**Secondary Evidence of NonObviousness**
**Also Provides Strong Evidence of Patentability**

The evidence presented above as to the differences, results, and motivations of the claimed invention *vis a vis* the prior art fully establishes the patentability of the present invention. Above and beyond that evidence, however, the additional available evidence as to secondary considerations of non-obviousness further confirms the patentability of the claimed invention. The examiner should keep in mind the fact that the present invention is not a paper patent but is one which has found commercial success and has solved a long felt need. If it was so obvious to adopt the technique of the present application, it certainly would have been done much earlier given the problem which has been solved.

In *Stratoflex, Inc. v. Aeroquip Corp.* 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed. Cir.

1983), the Federal Circuit Court of Appeals said:

> [E]vidence rising out of the so-called "secondary considerations" must always when
> present be considered en route to a determination of obviousness. *In re Sernaker*, 702
> F.2d 989, 217 USPQ 1 (Fed. Cir. 1983) citing *In re Fielder and Underwood*, 471 F.2d
> 640, 176 USPQ 300 (CCPA 1983), *see In re Mageli et al.*, 470 F.2d 1380, 1384, 176
> USPQ 305, 307 (CCPA 1973) . . . . Indeed, *evidence of secondary considerations may
> often be the most probative and cogent evidence in the record*. (Emphasis in original.)

After reviewing a decision which failed to give due consideration to evidence of the

secondary considerations of non-obviousness, the Federal Circuit Court of Appeals reversed,

noting that such evidence is not relegated to second-class status, and whether to consider such

evidence is *not* discretionary:

> That approach was error. All evidence bearing on the issue of obviousness, as
> with any other issue raised in the conduct of the judicial process, must be
> considered and evaluated *before* the required legal conclusion is reached.

*W.L. Gore & Associates, Inc. V. Garlock, Inc.*, 721 F.2d 1540, 1555, 220 USPQ 303, 314 (Fed.

Cir. 1983) (emphasis in original). *See also Minnesota Min. and Mfg. V. Johnson & Johnson*,

976 F.2d 1559, 1573 (Fed. Cir. 1992) ("Objective evidence such as commercial success, failure

of others, long-felt need, and unexpected results must be considered before a conclusion on

obviousness is reached."); *and see Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725

(Fed. Cir. 1990).

"The rationale for giving weight to the so-called secondary considerations is that they

provide objective evidence of how the patented device is viewed in the marketplace, by those

directly interested in the product." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851

F.2d 1387, 1391 (Fed. Cir. 1988). As the United States Supreme Court has stated:

> These legal inferences or subtests do focus attention on economic and
> motivational rather than technical issues and are, therefore, more susceptible of

judicial treatment than are the highly technical facts often present in patent litigation.

*Graham v. John Deere Co.*, 383 U.S. 1, 35-36, 86 S.Ct. 684, 702-03, 15 L.Ed.2d 545, (1966);

As to evidence of long felt need and/or failure of others, Judge Learned hand has stated, ". . . the length of time the art, though needing the invention, went without it" is one of the best non-technical considerations for determining whether a patented invention is unobvious. *Safety Car Heating & Lighting co. v. General Electric Co.*, 155 F.2d 937, 939 (2d. Cir. 1946). *See also Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1099 (Fed. Cir. 1985), *vacated*, 475 U.S. 809 (1986), *on remand*, 810 F.2d 1561 (Fed. Cir. 1987), *cert. den.*, 481 U.S. 1052 (1987), *later proceeding*, 836 F.2d 1329 (Fed. Cir. 1987). The evidence of long felt need and failure of others in this case is particularly enlightening in this case.

What applicants have surprisingly discovered is that the combination of pH and the pH adjusting means has allowed them to produce a storage stable solution of these anthracyclines. As the examiner is aware, anthracyclines have demonstrated significant value in the treatment of various cancerous tumors. while the anthracyclines have the benefit of tending to destroy cancerous tumors, they also have the detriment of serious side effects, including the destruction of heart muscle. These destructive capabilities are exhibited not only when the drug is injected, but also when the drug becomes ingested such as by inhalation, contact with the skin and the like. These latter exposures are significant to the health care personnel. Prior to the present invention, it was necessary for the health care personnel to dissolve the dry, lyophilized anthracyclines before administering same to the patient. This step of dissolving the lyophilized dry anthracycline created the possibility of direct exposure of the medical personnel to the anthracycline. Over time, such continued exposures could have significant adverse consequences. Thus, the present invention satisfies a long felt need.

Applicant has previously submitted numerous affidavits in support of commercial success and the long felt need solved by this invention. In particular, Declarations of William J. Dana, and Mary Horstman, and Debra Holton-Smith were previously filed in related case S.N. 06/878,784. For the convenience of the Examiner, copies of these declarations are enclosed and submitted now for consideration in this case.

## Conclusion

In view of the foregoing amendment and remarks, it is respectfully submitted that this application is in condition for allowance. Early notice to this effect is respectfully requested.

Respectfully submitted,

June 28, 1996

Daniel A. Boehnen, Reg. No. 28,399
Emily Miao, Ph.D., Reg. No. 35,285
BANNER & ALLEGRETTI, LTD.
Suite 3000
10 South Wacker Drive
Chicago, Illinois 60606
312-715-1000

14

769-249-0 DIV
769-206-0 DIV

CERTIFICATE UNDER 37 CFR 1.8: The undersigned hereby certifies that this Transmittal Letter and the paper, as described in paragraph 1 hereinabove, are being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Asst. Commissioner for Patents, BOX AF, Washington, D.C. 20231 on this 28th day of June, 1996.

By _Daniel L. Boehnen_
Daniel Boehnen

## IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF GAETANO GATTI, et al.    :

SERIAL NO.: 07/827,742    :    EXAMINER PESELEV

FILED:    JANUARY 29, 1992    :    GROUP ART UNIT: 1803

FOR:    INJECTABLE READY-TO-USE SOLUTIONS    :
CONTAINING AN ANTITUMOR
ANTHRACYCLINE GLYCOSIDE    :

RECEIVED

JUL 1 2 1996

### SUBMISSION OF DECLARATIONS IN SUPPORT OF AMENDMENT UNDER 37 C.F.R. § 1.116

GROUP 1800

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

Applicants are filing herewith an Amendment Under 37 C.F.R. §1.116 in the above-

identified case.  The Amendment refers to and incorporates by reference several Declarations

that have been previously filed in other cases dealing with related subject matter.  In particular,

the declarations present information on long felt need, commercial success, and scientific testing

that establishes differences between the prior art and the subject matter of the present invention.

In order to establish a clear record, Applicants note that the Declarations submitted herewith

include Declarations Under Rule 1.132 of the following individuals:

1.    William J. Dana, dated June 16, 1988, and filed in case S.N. 06/878,784;

2.    Mary Horstman, dated June 2, 1988, and filed in case S.N. 06/878,784;

3.    Debra Holton-Smith, dated May 24, 1988, and filed in case S.N. 06/878,784;

4.    Carlo Confalonieri, dated 21 May 1991, and filed in case S.N. 07/503,856;

5.   Carlo Confalonieri, dated December 20, 1990, and filed in S.N. 07/503,856; and

6.   Carlo Confalonieri, dated March 10, 1987, and filed in S.N. 06/878,784, and refiled as

     Exhibit C to the Confalonieri Declaration dated Dec. 20, 1990 in S.N. 07/503,856

                                   Respectfully submitted,

June 28, 1996

                                   Daniel A. Boehnen, Reg. No. 28,399
                                   Emily Miao, Ph.D., Reg. No. 35,285
                                   BANNER & ALLEGRETTI, LTD.
                                   Suite 3000
                                   10 South Wacker Drive
                                   Chicago, Illinois 60606
                                   312-715-1000

# EXHIBIT B

AMENDMENT

CERTIFICATE OF MAILING

I hereby certify that this paper and every
paper referred to therein as being enclosed
is being deposited with the U.S. Postal Ser-
vice as first class mail, postage prepaid,
in an envelope addressed to: Commissioner of
Patents & Trademarks, Washington, DC 20231,
on _May 06, 1997_ (Date of Deposit)

5/06/97   _Daniel A. Boehnen_
/Date/      Name

#41/H
6/10/97

PATENT

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
(Case No. 96,926)

In re Application of:                    )
                                         )
    Gaetano Gatti et al.             )
                                         )
Serial No.: 07/827,742                   )      Examiner: E. Peselev
                                         )
Filed: January 29, 1992                  )      Art Unit: 1211
                                         )
For:    INJECTABLE READY-TO-USE          )
        SOLUTIONS CONTAINING AN          )
        ANTITUMOR ANTHRACYCLINE          )
        GLYCOSIDE                        )

**AMENDMENT**

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

    This is in response to the Office Action mailed December 6, 1996. A Petition for an extension of time (two months) and requisite fee are attached herewith.  Please amend this application as shown below.

**IN THE CLAIMS**
    Please add the following new dependent claims as shown below.  A clean copy of the entire set of pending claims, after amendment, is attached as Appendix A.

37. (Amended) The solution of claim 31 wherein the concentration of doxorubicin is about 2 mg/ml.

38. (Amended) The solution of claim 31 wherein the concentration of doxorubicin is about 5 mg/ml.

-- 48. The solution of claim 31 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

49. The solution of claim 48 wherein the physiologically acceptable acid is hydrochloric acid.

50. The solution of claim 49 wherein the anthracycline glycoside is idarubicin hydrochloride.

51. The solution of claim 44 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

52. The solution of claim 51 wherein the physiologically acceptable acid is hydrochloric acid.

53. The solution of claim 52 wherein the anthracycline glycoside is idarubicin hydrochloride. --

## REMARKS

Reconsideration of this application, as amended, is respectfully requested.

Claims 31, 33-38, 40, 42 and 44-47 were pending in this application. New dependent claims 48-53 were added to further specify other embodiments of the invention. Claims 31, 33-38, 40, 42, and 44-53 are now pending in this application.

Support for the new dependent claims can be found in the application as originally filed. For instance, the subject matter of new claims 49 and 52 can be found on page 3, lines 23 and 24; new claims 48 and 51 can be found on page 6, lines 17 and 18; and new claims 47 and 53 can be found on page 3, line 13. Support for the amendment of claims 37 and 38 can be found on page 6, lines 14-24, in the specification. Accordingly, no new matter has been introduced into the application as a result of the above amendment.

Turning to the Office Action, claims 31, 33-38, 40 and 42 stand rejected under 35 U.S.C. 103 as being unpatentable over Janssen et al., International J. Pharmaceutics, Vol. 23 (1985), pp. 1-11 ("Janssen"). These claims also stand rejected under 35 U.S.C. 103 as being unpatentable over Kaniewska (Chem. Abstracts, Vol. 88, 1978, Abst. No. 197526x) ("Kaniewska I") or Kaniewska (Pharmacia Polska, Vol. 9, pp. 539-542) ("Kaniewska II") in combination with Janssen. Applicants respectfully traverse these rejections.

The Federal Circuit has reiterated the manner in which obviousness rejections are to be reviewed. Where claimed subject matter has been rejected as obvious in view of a combination of prior art references, "a proper analysis under § 103 requires, inter alia, consideration of two factors: (1) whether the prior art would have suggested to those of ordinary skill in the art that they should make the claimed composition or device, or carry out the claimed process; and (2) whether the prior art would also have revealed that in so making or carrying out, those of ordinary skill would have a reasonable expectation of success." In re Vaeck, 947 F.2d 488, 493, 20 U.S.P.Q.2d 1438, 1442 (Fed. Cir. 1991), cited In re Dow Chemical Co., 837 F.2d 469, 473, 5 U.S.P.Q.2d 1529, 1531 (Fed. Cir. 1988). As the Federal Circuit emphasized by succinctly summarizing: "Both the suggestion and the reasonable expectation of success must be founded in the prior art, not in the Applicants' disclosure." Id. In the present case, neither Janssen, Kanieswska I, nor Kaniewska II provide any suggestion for the combination of references. Moreover, neither Janssen, Kaniewska I nor Kaniewska II, alone or in combination with each other, teach an expectation of success for doing what the Applicants have done, i.e. achieving a storage stable solution of anthracycline glycosides in a pharmaceutically accepted solution.

3

Janssen merely relates to a doxorubicin-HCl salt dissolved in Tris or phosphate buffer or cell culture medium for determination of decomposition kinetics in the presence or absence of liposomes. While Janssen teaches that doxorubicin decomposition rates can be modulated by buffer choice and temperature, Janssen does not teach or suggest that any of the disclosed buffers are "pharmaceutically acceptable solutions" as recited in the present claims. Moreover, Janssen does not suggest that its result can be achieved irrespective of the manner of adjusting the pH, *i.e.*, irrespective of using buffer. The reader knows only that the buffer used therein achieved the results disclosed. There is nothing in Janssen that implies the need for a storage stable physiologically acceptable solution of anthracycline glycoside. There is also nothing in Janssen that suggest the same result could be obtained by pH adjustment of a physiologically acceptable aqueous solvent medium with the use of a physiologically acceptable acid. Moreover, as the Examiner had acknowledged on page 2 of the prior Office Action, Janssen does not teach or suggest a concentration of anthracycline glycoside ranging from 0.1 to 100 mg/ml in pharmaceutically acceptable solution or otherwise.

Like Janssen, Kaniewska I is mainly concerned with decomposition kinetics, and merely states that adriamycin-HCl in buffered solutions followed first order kinetics at increasing pH of the medium. While Kaniewska describes measurement of a decomposition rate constant at pH 2.6, Kaniewska does not teach or suggest any "pharmaceutically acceptable solution." Indeed, Kaniewska I is completely <u>silent</u> with respect to the chemical identity of the solution, other than the fact that it is buffered. Like Janssen, Kaniewska I fails to suggest that the results are achieved without use of a buffer, *i.e.*, irrespective of how pH is adjusted. While Kaniewska I does disclose determination of a rate constant at pH 2.6 as the Examiner noted on page 2 of the Action, this determination is not a disclosure of a pharmaceutically acceptable solution having the recited pH range as presently claimed.

Finally, Kaniewska II merely concerns decomposition kinetics of adriamycin hydrochloride in solid form and in a 2% solution of "Britton-Robinson" buffer at various pH values. As shown in the attached article by Britton and Robinson (<u>J. Chem. Soc.</u>, 458, 1456 (1931)), the Britton-Robinson buffer merely refers to an aqueous solution of sodium hydroxide, acetic acid, phosphoric acid and boric acid. Acetic acid is replaceable with phenylacetic acid and in one version, a barbituric drug substance, veronal, was also included. Britton-Robinson buffers are not considered pharmaceutically acceptable and cannot be used for pharmaceutical preparations due to the presence of physiologically unacceptable substances such as boric acid.

Accordingly, a person of ordinary skill in the art would not be motivated by Janssen's teachings concerning non-physiologically acceptable phosphate or TRIS buffer or cell growth

4

medium containing doxorubicin, or Kaniewska I's teachings concerning unknown buffered solutions for decomposition kinetic studies, or Kaniewska's adriamycin solutions in Britton-Robinson buffers for decomposition kinetic studies to make and use the presently claimed physiologically acceptable solution with any reasonable expectation of success. There is no teaching in the cited references that the results are achieved irrespective of what is used to adjust the pH level, and the teaching of the cited references was not achieved in a physiologically accepted solution. As a threshold matter, obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination. In re Geiger, 815 F.2d 686 (Fed. Cir. 1987); In re Fine, 837 F.2d 1071 (Fed. Cir. 1988). Withdrawal of the § 103 rejection based on Janssen, Kaniewska I and II, alone or in combination with each other, is in order and is respectfully requested.

These references merely illustrate that, prior to the present invention, scientists were searching for an answer to a long-term storage stable solution of anthracycline glycosides in a pharmaceutically acceptable solution. These references do not teach the solution. Rather, they confirm the long-standing need of the problem. Indeed, Janssen et al. expressly acknowledged that they had not solved the problem: "In our laboratory, work is in progress to address the problem related to the chemical stability of DXR [i.e., doxorubicin] in a systematic way." Janssen et al., p. 10.

In view of the above amendment and discussion, Applicants respectfully submit that claims 31, 33-38, 40, 42, and 44-53 are allowable and that a Notice of Allowance should be issued in this case. The Applicants urge the Examiner to contact the Applicants' undersigned representative if the Examiner believes that this would expedite prosecution of this application.

Respectfully submitted,

Dated: May 6, 1997

Daniel A. Boehnen
Registration No. 28,399

McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Chicago, Illinois 60606
Phone: (312) 913-0001
Facsimile: (312) 913-0002

5

## APPENDIX A

31.    A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution is contained in a sealed container.

33.    The solution of Claim 31 wherein said physiologically acceptable aqueous solvent is selected from the group consisting of water, ethanol, polyethylene glycol, N.N.-dimethylacetamide, and mixtures thereof.

34.    The solution of Claim 31 wherein the physiologically acceptable aqueous solvent is water.

35.    The solution of Claim 31 wherein the concentration of the doxorubicin is from 0.1 to 50 mg/ml.

36.    The solution of Claim 35 wherein the concentration of doxorubicin is from 1 to 20 mg/ml.

37.    The solution of Claim 31 wherein the concentration of doxorubicin is about 2 mg/ml.

38.    The solution of Claim 31 wherein the concentration of doxorubicin is about 5 mg/ml.

40.    The solution of Claim 31 further comprising a tonicity adjusting agent.

6

42.    A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefor,  wherein said solution has a pH adjusted to 2.5 to 5.0 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

44.    A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml.

45.    The anthracycline glycoside solution of Claim 31, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

46.    The container of Claim 42, wherein said doxorubicin solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

47.    The anthracycline glycoside solution of Claim 44, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

48.    The solution of claim 31 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

49.    The solution of claim 48 wherein the physiologically acceptable acid is hydrochloric acid.

7

50.    The solution of claim 49 wherein the anthracycline glycoside is idarubicin hydrochloride.

51.    The solution of claim 44 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

52.    The solution of claim 51 wherein the physiologically acceptable acid is hydrochloric acid.

53.    The solution of claim 52 wherein the anthracycline glycoside is idarubicin hydrochloride.

# EXHIBIT C



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
**Address: COMMISSIONER OF PATENTS AND TRADEMARKS**
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/827,742 | 01/29/92 | GATTI | G | 769-249-0-DI |

12M2/0802

OBLON, SPIVAK, MC CLELLAND, MAIER AND
NEUSTADT
FOURTH FLOOR
1755 JEFFERSON DAVIS HWY.
ARLINGTON, VA 22202

| PESELEV, EXAMINER | |
|---|---|

| ART UNIT | PAPER NUMBER |
|---|---|
| 1211 | 33 |

DATE MAILED:

### EXAMINER INTERVIEW SUMMARY RECORD

08/02/96

All participants (applicant, applicant's representative, PTO personnel):

(1) _Mr. A. Mian_  (3) _____

(2) _Mr. E. Peseler_  (4) _____

Date of interview _August 1, 1996_

Type: ☒Telephonic  ☐ Personal (copy is given to  ☐ applicant  ☐ applicant's representative).

Exhibit shown or demonstration conducted: ☐ Yes  ☐ No. If yes, brief description: _____

_____

Agreement  ☐ was reached with respect to some or all of the claims in question.  ☐ was not reached.

Claims discussed: _All the claims in the case_

Identification of prior art discussed: _none_

Description of the general nature of what was agreed to if an agreement was reached, or any other comments: _The Attorney was_
_informed that an Advisory Action will be forthcoming_
_because a Terminal Disclaimer has not been submitted._

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendments which would render the claims allowable is available, a summary thereof must be attached.)

☒1. It is not necessary for applicant to provide a separate record of the substance of the interview.

Unless the paragraph below has been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW (e.g., items 1-7 on the reverse side of this form). If a response to the last Office action has already been filed, then applicant is given one month from this interview date to provide a statement of the substance of the interview.

☐ 2. Since the examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action. Applicant is not relieved from providing a separate record of the substance of the interview unless box 1 above is also checked.

PTOL-413 (REV. 2-93)

Examiner's Signature

ORIGINAL FOR INSERTION IN RIGHT HAND FLAP OF FILE WRAPPER

Communication From Examiner

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d
2004 WL 1627170 (S.D.N.Y.), 59 Fed.R.Serv.3d 122
(Cite as: 2004 WL 1627170 (S.D.N.Y.))

Page 1

**H**

Motions, Pleadings and Filings

United States District Court,
S.D. New York.
RESQNET.COM, INC., Plaintiff,
v.
LANSA, INC., Defendant.
No. 01 Civ.3578(RWS).

July 21, 2004.
Kaplan & Gilman, Woodbridge, NJ, By: Jeffrey I.
Kaplan, for Third Party Jeffrey Kaplan, of counsel.

Arent Fox, New York, NY, By: Steven Kimelman,
for Defendant, of counsel.

Arent Fox, Washington, DC, By: James H. Hulme,
for Defendant, of counsel.

*OPINION*

SWEET, J.

**\*1** The third party witness Jeffrey I. Kaplan
("Kaplan"), who is also counsel to plaintiff
ResQNet.com, Inc. ("ResQNet"), has moved under
Rules 26 and 45, Fed.R.Civ.P., to quash the subpoena
served upon him by defendant Lansa, Inc. ("Lansa"),
or in the alternative, for a protective order. For the
reasons set forth below, the motion is granted, and
the subpoena quashed.

*Prior Proceedings*

This action was commenced on April 27, 2001.
Discovery with respect to claim construction issues
proceeded and a *Markman* hearing was held on June
12, 2002. The opinion of the court construing the
claims was rendered in September of 2002, *see
ResQNet.com v. Lansa, Inc.*, No. 01 Civ.
3578(RWS), 2002 WL 31002811 (S.D.N.Y. Sept. 5,
2002) (the "September Opinion") and the Court of
Appeals for the Federal Circuit affirmed the
September Opinion in part and reversed in part on
October 16, 2003. *See ResQNet.com v. Lansa, Inc.*,
346 F.3d 1374 (Fed.Cir.2003). Discovery resumed
and was scheduled to close on June 30, 2004.

On or about June 10, 2004, Lansa served a
deposition subpoena on Kaplan, trial counsel for
ResQNet. Lansa subsequently identified four topics
as subjects for the deposition: (1) the prosecution of
five patents alleged to be related, two of which are
the subject of this action, (2) communications with
the U.S. Patent & Trademark Office, (3) prior art, and
(4) draft patent applications. Thereafter, on June 22,
2004, Kaplan filed the instant motion. After further
briefing, the motion was marked fully submitted on
July 7, 2004.

*The Standard to Be Applied*

Lansa has asserted that Federal Circuit law, rather
than the law of this Circuit, applies with respect to
the quashing of a subpoena in a patent case.
However, on procedural issues not unique to patent
law, such as whether litigation counsel has
information such that he should be deposed, the
Federal Circuit defers to the law of the regional
circuit. *See Utah Med. Prods., Inc. v. Graphic
Control Corp.*, 350 F.3d 1376, 1381 (Fed.Cir.2003)
("The Federal Circuit applies its own law with
respect to issues of substantive patent law and certain
procedural issues pertaining to patent law, but applies
the law of the regional circuits on non-patent
issues."); *Amana Refrigeration, Inc. v. Quadlux, Inc.*,
172 F.3d 852, 856 (Fed.Cir.1999) ("Although under
our courtesy rule we are generally guided by the law
of the regional circuit to which district court appeals
normally lie, unless the issue pertains to or is unique
to patent law, we have applied our own law to both
substantive and procedural issues intimately involved
in the substance of enforcement of the patent right.")
(internal quotation marks and citations omitted).
Although the Federal Circuit has applied its own law
to discovery disputes in certain contexts, *see, e.g., In
re Spalding Sports Worldwide, Inc.*, 203 F.3d 800,
803 (Fed.Cir.2000), it has also recognized that, in
general, "[a]n order quashing a subpoena is not
unique to patent law" and should be evaluated under
the law of the regional circuit. *Truswal Sys. Corp. v.
Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1209
(Fed.Cir.1987). Lansa has not demonstrated that the
instant motion presents issues unique to patent law
and, indeed, has relied heavily on a case from this
Circuit, *Alcon Labs., Inc. v. Pharmacia Corp.*, 225
F.Supp.2d 340 (S.D.N.Y.2002). Accordingly, the law
of this Circuit will apply here.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 2
2004 WL 1627170 (S.D.N.Y.), 59 Fed.R.Serv.3d 122
(Cite as: 2004 WL 1627170 (S.D.N.Y.))

**\*2** The Federal Rules of Civil Procedure provide that parties may obtain discovery, including by oral depositions, "regarding any matter, not privileged, that is relevant to the claim or defense of any party" and that "[r]elevant information need not be admissible ." Fed.R.Civ.P. 26(b)(1). However, a district court may limit

> The frequency or extent of the use of discovery methods otherwise permitted under [the federal] rules ... if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed.R.Civ.P. 26(b)(2). "The burden of persuasion in a motion to quash a subpoena and for a protective order is borne by the movant." Jones v. Hirschfeld, 219 F.R.D. 71, 74-75 (S.D.N.Y.2003) (citing Dove v. Atl. Capital Corp., 963 F.2d 15, 19 (2d Cir.1992)).

In this Circuit, "depositions of opposing counsel are disfavored ." United States v. Yonkers Bd. of Educ., 946 F.2d 180, 185 (2d Cir.1991). The rationale behind the presumption against such discovery is that " 'even a deposition of counsel limited to relevant and nonprivileged information risks disrupting the attorney-client relationship and impeding the litigation." ' Alcon Labs., 225 F.Supp.2d at 344 (quoting Madanes v. Madanes, 199 F.R.D. 135, 151 (S.D.N.Y.2001)). Depositions of opposing counsel are not, however, categorically prohibited. "Rather, 'the request to depose a party's attorney must be weighed by balancing, generally speaking, the necessity for such discovery in the circumstances of the case against its potential to oppress the adverse party and to burden the adversary process itself." ' Madanes, 199 F.R.D. at 151 (quoting Johnston Dev. Group, Inc. v. Carpenters Local Union No. 1578, 130 F.R.D. 348, 352 (D.N.J.1990)).

In determining whether a deposition of opposing counsel is appropriate this Court is guided by dicta contained in a recent opinion of the Second Circuit Court of Appeals, In re Subpoena Issued to Dennis Friedman, 350 F.3d 65 (2d Cir.2003). [FN1] In Friedman, the Court of Appeals observed that it has never adopted the doctrine set out in Shelton v. Am.

Motors Corp., 805 F.2d 1323 (8th Cir.1986), which requires that a party "seeking to depose 'opposing trial counsel' must show that 'no other means exist to obtain the information [sought] than to depose opposing counsel." ' Friedman, 350 F.3d at 68 (quoting Shelton, 805 F .2d at 1327). Describing the Shelton rule as "rigid," id. at 67, the Second Circuit instead directed that

> FN1. As the attorney who was the subject of the subpoena consented to be deposed by the plaintiffs while the plaintiffs' appeal was still pending, the appeal was rendered moot. Friedman, 350 F.3d at 67.

**\*3** [T]he standards set forth in Rule 26 require a flexible approach to lawyer depositions whereby the judicial officer supervising discovery takes into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship. Such considerations may include the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted.... Under this approach, the fact that the proposed deponent is a lawyer does not automatically insulate him or her from a deposition nor automatically require prior resort to alternative discovery devices, but it is a circumstance to be considered.

Friedman, 350 F.3d at 72. The considerations identified by the Second Circuit in Friedman are the factors that will be applied in deciding the instant motion.

*Discussion*

Lansa seeks to depose Kaplan concerning the prosecution of the patents-in-suit because he is the only person who is listed as having prosecuted those patents for ResQNet. Specifically, Lansa seeks to determine when and under what circumstances relevant prior art become known to Kaplan, and argues that the factual information sought from Kaplan and "the role he played during the prosecution history of the patents-in-suit are directly at issue [in] this case." (Lansa Opp. Mem. at 7.)

It is not anomalous for a party to seek to depose the attorney who prosecuted the patent at issue in a litigation. See United Phosphorus, Ltd., v. Midland Fumigant, Inc., 164 F.R.D. 245, 249 (D.Kan.1995)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1627170 (S.D.N.Y.), 59 Fed.R.Serv.3d 122
(Cite as: 2004 WL 1627170 (S.D.N.Y.))

Page 3

("When a party employs counsel to represent it in a case where an attorney has played a role in the underlying facts, both the attorney and the party have every reason to expect that the attorney's deposition may be requested."). According to Lansa, attorneys that prosecute patents are routinely deposed when the patent is litigated, especially when questions of inequitable conduct arise. *See, e.g., Alcon Labs., 225 F.Supp.2d at 344-45; Environ Prods. Inc. v. Total Containment, Inc.,* 41 U.S.P.Q.2d 1302, 1306 (E.D.Pa.1996); *see also Amicus Communications L.P. v. Hewlett-Packard Co., Inc.,* No. 99 Civ. 284(HHK)(DAR), 1999 WL 33117227, at *2 (D.D.C. Dec. 3, 1999) (noting "that several courts have allowed the depositions of patent prosecution counsel"). The fact that the attorney who prosecuted the patent has been selected to serve as litigation counsel does not, in and of itself, protect that attorney from being deposed. *See, e.g., Alcon Labs., 225 F.Supp.2d at 344* ("Moreover, [the patent holder's] choice of White as trial counsel, with the knowledge that he was the lead prosecuting attorney for the patent, cannot shield his deposition."). Nonetheless, even if the depositions of attorneys who have prosecuted patents may be, as Lansa suggests, routine, Lansa has not established that Kaplan's deposition in this action is either appropriate or necessary.

*No Defense of Inequitable Conduct Has Been Asserted*

**\*4** Lansa argues that Kaplan's deposition is necessary in light of Lansa's affirmative defense of inequitable conduct. The defense of inequitable conduct, giving rise to an inquiry as to the mental impressions of counsel prosecuting the patent, *see Alcon Labs., 225 F.Supp.2d at 344,* has not been explicitly asserted in this action. However, Lansa argues that it has pled inequitable conduct because it has indicated that the patents are unenforceable due to patent misuse. Lansa further argues that it pled, as a separate affirmative defense, that it reserves the right to assert and rely upon any other affirmative defenses as they appear during discovery or as they otherwise become known.

Patent misuse and inequitable conduct are different defenses. Misuse is a defense based upon the idea that a patent properly procured has been broadened in scope impermissibly so as to be used to impose an unreasonable restraint in competition through, for example, an improper licensing or tying arrangement. *See Virginia Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 868 (Fed.Cir.1997). Misuse renders the

patent unenforceable during the period of misuse only, and may be cured so that the patent is again enforceable. *See Senza-Gel Corporation v. Seiffart,* 803 F.2d 661, 668 n. 10 (Fed.Cir.1986). Inequitable conduct, on the other hand, renders the patent unenforceable permanently, and involves concealing facts or being dishonest in the procurement of the patent. *See Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.,* 45 F.3d 1550, 1556 (Fed.Cir.1995).

Further, inequitable conduct, like fraud but unlike misuse, must be pled with particularity and is subject to the heightened pleading requirements of Fed. R. Civ. Proc. 9(b). *See Ferguson Beauregard/Logic Controls v. Mega Systems, LLC,* 350 F.3d 1327, 1344 (Fed.Cir.2003) (noting, in *dicta,* that "inequitable conduct, while a broader concept than fraud, must be pled with particularity"); *Agere Sys. Guardian Corp. v. Proxim, Inc.,* 190 F.Supp.2d 726, 733-34 (D.Del.2000) ("Although the Federal Circuit has not ruled on whether Rule 8(a) or Rule 9(b) applies to allegations of inequitable conduct, a majority of federal courts have found that allegations of inequitable conduct (*i.e.* fraud before the Patent Office) in patent cases, like other allegations of fraud, are subject to the requirements of Rule 9(b)."); *cf. Rentrop v. Spectranetics Corp.,* No. 04 Civ. 101(PKC), 2004 WL 1243608, at *1-2 (collecting cases requiring that inequitable conduct claims be pled with specificity but observing that Rule 9(b), Fed.R.Civ.P., may not apply to all allegations of inequitable conduct). Lansa has not made any allegations concerning specific prior art concealed adequate to establish an affirmative defense of inequitable conduct, nor may will an affirmative defense of inequitable conduct be inferred here from the fact that Lansa has reserved the right to assert additional, unspecified affirmative defenses.

**\*5** Lansa, therefore, is not entitled to depose Kaplan on issues that have not been pled. [FN2]

> FN2. Lansa has asserted that, even if it is deemed not to have pled inequitable conduct as an affirmative defense, it would seek to amend its answer pursuant to Fed.R.Civ.P. 15(a) to include such a defense. As Lansa has yet to seek leave for such an amendment, however, the possibility that it may do so at some later date has no bearing on the instant motion.

*Lansa Has Not Established a Sufficient Need to Depose Kaplan on Other Grounds*

Not Reported in F.Supp.2d                                    Page 4
2004 WL 1627170 (S.D.N.Y.), 59 Fed.R.Serv.3d 122
(Cite as: 2004 WL 1627170 (S.D.N.Y.))

Lansa has indicated that it wishes to depose Kaplan concerning the prosecution of five U.S. patents. However, Lansa has already deposed the inventors of the patents alleged to be relevant, and those depositions included detailed questions about the patent prosecution histories, the cited prior art, the patents in suit, and numerous related issues. The prosecution histories speak for themselves, and the relevant inquiry in terms of prior art and claim construction is how one of ordinary skill in the art would interpret and understand those prosecution histories, not what ResQNet's litigation counsel thinks about them. See *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1585 (Fed.Cir.1996). As Lansa has not specified particular subjects not already covered by the prior discovery and has not indicated why the information has not been or cannot be obtained through means other than Kaplan's testimony, it has not established the need for Kaplan's deposition with regard to the prosecution history of the various patents.

Lansa has also asserted that the purpose of Kaplan's deposition would be to elicit facts concerning the communications between Kaplan, as counsel for the patent applicants, and the U.S. Patent and Trademark Office "or other third parties." (Lansa Opp. Mem. at 4 n. 2.) Lansa has had access to the file wrapper since the beginning of this matter in April of 2001, however, and has identified no specific topic or new information as to which Kaplan's testimony is necessary.

With respect to the issue of prior art, Lansa will have the opportunity to depose an expert witness on prior art as well as ResQNet's witnesses. Any request to depose Kaplan about dates upon which prior art become known could only be directed to an inequitable conduct defense, a defense which has not been pled in this case. To the extent that Lansa is seeking information concerning prior art that is not related to inequitable conduct, it has not shown that such information could not be obtained from a variety of expert and fact witnesses, without resorting to the deposition of Kaplan. Further, any of Kaplan's conclusions regarding the effect of a particular prior art reference on the validity of ResQNet's patents would appear to be protected as attorney work-product.

Finally, it has been suggested that Lansa wishes to depose Kaplan concerning draft patent applications and amendments, petitions, and other such papers that are in the patent file. Lansa has not indicated

why Kaplan's deposition as to these topics would be useful or how it would address the privilege issues possibly associated with such draft applications. In any event, to whatever extent draft patent applications were reviewed and revised, they are properly the subject to the testimony of the inventors, all of whom have agreed to be deposed.

*Lansa Has Not Met the Friedman Standard*

\*6 As set forth above, the first factor identified by the Second Circuit in *Friedman* weighs in favor of Kaplan, as Lansa has established no specific need to depose Kaplan.

The second factor under the standard set forth in *Friedman* is the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation. See *Friedman,* 350 F.3d at 72. Kaplan's role was to prosecute the patents in the U.S. Patent and Trademark Office, and thus, Kaplan was admittedly connected to the subject matter in issue here. However, courts considering the issue of whether a patent attorney prosecuting the application and also serving as litigation counsel may be deposed have strictly limited such depositions to cases where "the prosecuting attorney's mental impressions are crucial" such as situations where an inequitable conduct or fraud claim on the Patent Office has been made. *Alcon Labs.,* 225 F.Supp.2d at 344; see also *Environ Prods.,* 41 U.S.P.Q.2d at 1306. In such cases, the defense of inequitable conduct makes the attorney's mental impressions during the patent prosecution proceedings directly at issue in the litigation. See, e.g., *Environ Products,* 41 U.S.P.Q. at 1306. In the present case, as indicated above, no inequitable conduct defense was pled, rendering Kaplan's importance as a fact witness relatively minimal.

The third factor identified in *Friedman* is the risk of encountering privilege and attorney work-product issues. See *Friedman,* 350 F.3d at 72. Lansa has specifically indicated that it is not seeking privileged information from Kaplan. Nonetheless, given the topical areas Lansa has identified for the deposition, the risk that privilege and attorney work-product issues might arise were Kaplan's deposition to go forward is not negligible. Accordingly, this factor does not weigh in favor of either Kaplan or Lansa.

The extent to which discovery has already been conducted, the fourth *Friedman* factor, weighs against Lansa because virtually all of the discovery has been conducted and completed, and the claim

Not Reported in F.Supp.2d
2004 WL 1627170 (S.D.N.Y.), 59 Fed.R.Serv.3d 122
(Cite as: 2004 WL 1627170 (S.D.N.Y.))

construction issues have already been decided.

Taken together, the various factors identified by the Second Circuit in *Friedman* counsel against permitting the deposition of Kaplan to proceed.

*Conclusion*

The motion to quash the subpoena is granted.

It is so ordered.

2004 WL 1627170 (S.D.N.Y.), 59 Fed.R.Serv.3d 122

**Motions, Pleadings and Filings (Back to top)**

•       1:01cv03578      (Docket) (Apr. 27, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
1999 WL 33117227 (D.D.C.)
**(Cite as: 1999 WL 33117227 (D.D.C.))**

C

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
AMICUS COMMUNICATIONS, L.P., Plaintiff,
v.
HEWLETT-PACKARD COMPANY, INC,
Defendant.
**No. 99-0284 HHK/DAR.**

Dec. 3, 1999.

*MEMORANDUM ORDER*

ROBINSON, Magistrate J.

**\*1** The above-captioned miscellaneous matter arises from a discovery dispute in a civil action pending in the United States District Court for the Western District of Texas. Non-party Maurice U. Cahn, co-counsel for plaintiff in the action pending in the Western District of Texas, moves to quash a subpoena *as testificandum* and *duces tecum* served upon him by defendant on the ground that "[t]he subpoena, on its face seeks attorney client privileged communications and attorney work product without any showing of propriety or need." Non-Party, Opposing Counsel's Motion to Quash the Subpoena to Maurice U. Cahn by Defendant Under Fed. R. Civ. P. 45(c)(3)(A) (Docket No. 1).

Defendant opposes non-party Cahn's motion, and moves to compel both his attendance at a deposition and the production of documents or a privilege log. Cross-Motion of Hewlett-Packard Company, Inc. to Compel Attendance at Deposition and Production of Documents and/or Privilege Log (Docket No. 4). In the memorandum in support of its motion and in opposition to non-party Cahn's motion, defendant maintains that Cahn

is a percipient witness, in some instances the sole percipient witness, to non-privileged pre-litigation facts and communications that are highly relevant to [the pending] trademark infringement action[.] On behalf of [plaintiff,] Mr. Cahn obtained the service mark registration for the mark PAVILION that is at issue in the suit. Both the Complaint and the Counterclaim in the Texas action interpose allegations that put events during the prosecution of the registration directly at issue in the

proceeding. *Both Mr. Cahn' client, ACLP, and Defendant/Counterclaimant Hewlett-Packard Company, Inc. ("H-P") identified Mr. Cahn as a witness in the Texas action prior to the time he even applied for admission* pro hac vice *in connection with that litigation.*

Memorandum of Points and Authorities (1) in Opposition to Motion by Maurice U. Cahn to Quash Subpoena and (2) in Support of Hewlett-Packard Company's Cross-Motion to Compel Attendance at Deposition and Production of Documents and/or Privilege Log ("Defendant's Memorandum") at 1. Defendant states that it seeks to depose Cahn "concerning pre-litigation facts that are neither privileged communications nor are protected work product[,]" and that "any credible claim of privilege for the documents HP seeks ... has been knowingly and repeatedly waived." Defendant's Memorandum at 1-2. [FN1]

> FN1. Defendant further explains that it "does not intend to depose Mr. Cahn in connection with his role as tertiary co-counsel in the Texas action or with respect to the events occurring in the adversarial opposition proceeding[,]" and that the deposition "will be limited to the prosecution of the trademark application and the other topics identified herein[.]" Defendant's Memorandum at 15.

Non-party Cahn has moved to strike defendant's cross-motion. *See* Motion to Strike Defendant's Cross-Motion to Compel (Docket No. 5). In his reply to defendant's opposition to his motion to quash the subpoena, non-party Cahn tacitly concedes that he obtained the service mark registration for the mark which is at issue in the Texas litigation, but maintains that "[b]ecause the language of the registration is established, regardless of the undersigned's understanding, impressions, or contentions, his testimony about the meaning of the trademark registration does not make him a necessary witness." Reply of Non-Party, Opposing Counsel to Defendant's Opposition to the Motion to Quash the Subpoena to Maurice U. Cahn by Defendant Under Fed. R. Civ. P. 45(c)(3)(A) at 3. Non-party Cahn offers no authority in support of his contention that his role as co-counsel in the Texas litigation insulates him from discovery with respect to the service mark registration proceedings. *See* Reply Memorandum of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 33117227 (D.D.C.)
(Cite as: 1999 WL 33117227 (D.D.C.))

Page 2

Hewlett-Packard Company, Inc. in Support of Cross-Motion to Compel; Memorandum in Opposition to Mr. Cahn's Motion to Strike the Cross-Motion at 1.

*DISCUSSION*

*2 Upon consideration of the motions and the memoranda in support thereof, non-party Cahn's motion to quash the subpoena will be denied, and defendant's motion to compel will be granted, for the reasons offered by defendant. More specifically, the undersigned observes that several courts have allowed the depositions of patent prosecution counsel, and have refused to uphold such counsel's blanket invocation of attorney-client privilege. *See, e.g., United Phosphorus, Ltd. v. Midland Fumigant, Inc., 164 F.R.D. 245, 249 (D.Kan.1995); Hav & Forage Indus. v. Ford New Holland, Inc., 132 F.R.D. 687, 689-90 (D.Kan.1990). [FN2]* Indeed, the *United Phosphorus* court held that a party was not precluded from taking the deposition of patent prosecution counsel simply because that counsel was chosen "notwithstanding his personal knowledge of the underlying facts[.]" That court concluded that

> FN2. The undersigned finds that Cahn's reliance upon the decision of the Eighth Circuit in *Shelton v. American Motors Co.* is misplaced, in that the court considered a claim of attorney-client privilege in a circumstances in which the lawyer whose deposition was sought had no factual, pre-litigation knowledge relevant to the pending action, and who "had nothing to do with this lawsuit except to represent her client." *See Shelton v. American Motors Co., 805 F.2d 1323, 1330 (8th Cir.1986).* In this action, it is undisputed that non-party Cahn has factual, pre-litigation knowledge.

[w]hen a party employs a counsel to represent it in a case where an attorney has played a role in the underlying facts, both the attorney and the party have every reason to expect that the attorney's deposition may be requested.
*United Phosphorus, Ltd. v. Midland Fumigant, Inc., 164 F.R.D. at 249.*

Nor can the attorney work product privilege be construed as broadly as non-party Cahn urges. "Generally, work performed by an attorney to prepare and prosecute a patent application does not fall within the parameters of the work-product protection[.]" *In re Application of Minebea Co., 143 F.R.D. 494, 499 (S.D.N.Y.1992).* Questions of patent

prosecution counsel regarding his "thought process with respect to the original patent application" have been allowed. *See, e.g., Oak Indus. v. Zenith Elec. Corp., 687 F.Supp. 369, 374- 75 (N.D.Ill.1988).* Inquiry regarding a patent prosecution attorney's communications with the Patent and Trademark Office has also been allowed. *Hav & Forage Indus. v. Ford New Holland, Inc., 132 F.R.D. at 689-90.* Non-party Cahn has not shown that the "primary motivating purpose" of the trademark registration "was to assist in the pending or impending litigation," and accordingly, the protection of the attorney work product doctrine is not available. *See In re Application of Minebea Co., 143 F.R.D. at 499.*

With respect to documents, it is settled that "to come within the umbrella of the work-product doctrine, the document must have been 'prepared in anticipation of litigation or for trial[,]' ' and that the privilege "is not 'extended to preparation for ex parte proceedings such as patent proceedings." ' *Stryker Corp. v. Intermedics Orthopedics, Inc., 145 F.R.D. 298, 302 (E.D.N.Y.1992)* (citations omitted); *see Burroughs Wellcome Co. v. Barr Labs., Inc., 143 F.R.D. 611, 617 (E.D.N.C.1992).* In *Stryker*, the court expressly rejected the proposition "that litigation is a 'possibility' in every patent application." *Stryker Corp. v. Intermedics Orthopedics, Inc., 145 F.R.D. at 302.* This Circuit has held that a litigant *3 must demonstrate that documents were created "with a specific claim supported by concrete facts which would likely lead to litigation in mind," not merely assembled in the ordinary course of business or for other nonlitigation purposes. *Linde Thompson Langworthy Kohn & Van Dyke v. Resolution Trust Corp., 5 F.3d 1508, 1515 (D.C.Cir.1993)* (citations omitted). Non-Party Cahn, by his sweeping conclusion that the subpoena seeks protected work product, has not even attempted to make such showing.

*CONCLUSION*

For the foregoing reasons, the undersigned finds that non-party Cahn has failed to demonstrate that the testimony and documents sought by defendant are protected by either the attorney-client or work product privilege. Additionally, the undersigned finds that the discovery sought by defendant from non-party Cahn is relevant, non-privileged and not obtainable from other sources. It is, therefore, this *3rd* day of December, 1999,

ORDERED that Non-Party, Opposing Counsel's Motion to Quash the Subpoena to Maurice U. Cahn

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 33117227 (D.D.C.)
(Cite as: 1999 WL 33117227 (D.D.C.))

Page 3

by Defendant Under Fed. R. Civ. P. 45(c)(3)(A) (Docket No. 1) is DENIED; and it is

FURTHER ORDERED that the Cross-Motion of Hewlett-Packard Company, Inc. to Compel Attendance at Deposition and Production of Documents and/or Privilege Log (Docket No. 4) is GRANTED, and that

(1) non-party Cahn shall produce any privilege log with respect to documents responsive to the document subpoena as to which privilege is claimed consistent with the authorities cited herein no later than December 10, 1999;

(2) non-party Cahn shall produce the documents responsive to the document subpoena not withheld in accordance with the foregoing provision no later than December 15, 1999;

(3) non-party Cahn shall appear for a deposition at time agreeable to the parties and Cahn no later than December 22, 1999; and

(4) defendant shall limit the deposition of non-party Cahn to the issues identified by defendant in the memorandum in support of its cross-motion to compel; and it is

FURTHER ORDERED that non-party Cahn's Motion to Strike Defendant's Cross-Motion to Compel (Docket No. 5) is DENIED AS MOOT.

1999 WL 33117227 (D.D.C.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
2002 WL 1268047 (D.Del.)
(Cite as: 2002 WL 1268047 (D.Del.))

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
ALLERGAN INC. and Allergan Sales, Inc.,
Plaintiffs,
v.
PHARMACIA CORPORATION, Pharmacia AB,
Pharmacia Enterprises S.A. and Pharmacia &
Upjohn Company, Defendants,
and
THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, Additional
Defendant on Counterclaim in Reply.
No. Civ.A.01-141-SLR.

May 17, 2002.

MEMORANDUM ORDER

ROBINSON, J.

*1 At Wilmington this 17th day of May, 2002, having reviewed the various pending discovery motions and the papers submitted in connection therewith;

IT IS ORDERED that:

1. Columbia's motion for a protective order precluding plaintiffs from deposing and obtaining documents from John P. White, Esquire (D .I. 77) is granted.

a. Plaintiffs have subpoenaed Columbia's lead trial counsel, Mr. White, to appear for a deposition on the issue of inventorship of U.S. Patent No. 4,599,353 ("the '353 patent"). More specifically, plaintiffs contend "that the inventor of the '353 patent, with Columbia's full knowledge and participation through its attorneys, failed to credit one or more co-inventors who collaborated in and contributed to the conception and reduction to practice of the '353 invention." (D.I. 87 at 4) Plaintiffs argue that Mr. White has relevant information based on an amendment filed by Mr. White wherein he declares that "[a]pplicant is the sole inventor of the invention described and claimed

in the subject application." (Id., Ex. 2 at 4) The amendment reflects facts as averred by the inventor in his declaration. (Id., Ex. 3)

b. As a general principle, depositions of trial counsel are limited to those circumstances where "the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." Shelton v. Am. Motors Corp., 805 F.2d 1323, 1327 (8th Cir.1987) (internal citation omitted). Cf., Environ Prods., Inc. v. Total Containment, Inc., 41 U.S.P.Q.2d 1302, 1306 (E.D.Pa.1996) ("Impressions protected by the work-product doctrine may be discovered when directly relevant to the litigation and when the need for production is compelling."); Bio-Rad Labs., Inc. v. Pharmacia, Inc., 130 F .R.D. 116, 122 (N.D.Cal.1990) ("[A]n attorney's opinion work product is discoverable where such information is directly at issue and the need for production is compelling."). Moreover, absent a prima facie showing of fraud, an allegation of inequitable conduct, in and of itself, does not vitiate the attorney-client privilege or the protections of the attorney work product doctrine. See In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 806-07 (Fed.Cir.2000).

c. The court concludes that plaintiffs have not met their burden to demonstrate a compelling need for the requested discovery. Plaintiffs apparently contend, in support of their inequitable conduct contentions, that Mr. White knew or should have known that one or more co-inventors collaborated in and contributed to the conception and reduction to practice of the patented invention and was obligated to so inform the PTO. The court suggests that until such time as plaintiffs have demonstrated the truth of the matters asserted (i.e., there were co-inventors), Mr. White's knowledge is irrelevant. Because the issue of inequitable conduct is a matter for the court to determine, and because the factual predicate to the issue of inventorship can be pursued independent of Mr. White's testimony (through the depositions of the inventor and alleged co-inventors and through access to the documents that reflect the inventive process), the court declines to permit the deposition of Mr. White at this time.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1268047 (D.Del.)
(Cite as: 2002 WL 1268047 (D.Del.))

Page 2

**\*2** 2. Defendants' motion to compel the production of documents (D.I.82) is granted to the extent explained below.

a. Defendants have moved to compel plaintiffs to produce "all documents relating to the subject matter of three opinion letters provided by their counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP ("Finnegan, Henderson"), and to permit questioning of Allergan witnesses regarding the subject matter of those opinion letters." (*Id.* at 1) By way of background, plaintiffs have chosen to rely upon the opinions written by Finnegan, Henderson in defense of the claim of willful infringement. Plaintiffs have produced the three opinion letters and drafts thereof, and "all communications between Allergan and Finnegan regarding those letters as well as all of the materials that Allergan considered in connection with its reliance on the letters." Defendants seek, in addition to the above, "documents relating to [Allergan's] other infringement and validity analyses of the patents." (*Id.* at 3)

b. From the court's perspective, the question posed by this discovery dispute is whether the scope of a party's voluntary waiver is defined by the course of conduct between the party and its opinion counsel, or whether it is defined by the subject matter discussed in the opinion letters. The court concludes that it is the latter.

c. It is undisputed that,

[w]hen an alleged infringer decides to respond to a claim of willful infringement by offering evidence that he or she reasonably and in good faith relied on advice of counsel in making, using or selling the allegedly infringing device, then the advice becomes relevant and admissible. Documents and testimony relating to that advice are relevant in that they are probative of the alleged infringer's intent. They are admissible because the alleged infringer has waived the privilege as to the subject matter of the advice. *Thorn EMI North Am., Inc. v. Micron Tech., Inc.,* 837 F.Supp. 616, 621 (D.Del.1993). In order to determine whether the alleged willful infringer "reasonably and in good faith relied on" the advice rendered by opinion counsel, it is appropriate to test the knowledge of the alleged willful infringer concerning the subject matter of the opinion. *Cf. id.* (the patentee should be entitled to discover facts relating to what the alleged willful infringer "knew and had concluded about the credibility, value and reasonableness of the opinions.").

d. Consistent with the above reasoning, the court concludes that the only equitable way for a patentee to test the knowledge of an alleged willful infringer (so as to test the reasonableness of its evaluation of counsel's opinions) is for the alleged willful infringer to disclose all of the information it possessed prior to or at the time it obtained opinions of counsel as to the subject matters discussed in such opinions. [FN1]

> FN1. The court recognizes that the scope of discovery allowed at bar is relatively broad and potentially prejudicial to plaintiffs. Therefore, rather than requiring disclosure consistent with this order at this time, the court will bifurcate the issue of willfulness, stay discovery relating to willfulness, and conduct a separate trial with a new jury in the event plaintiffs are found to infringe valid patents. *See Novartis Pharms. Corp. v. Eon Labs Mfg., Inc.,* No. 00-800-JJF, 2002 WL 576088, at \*3 n. 2 (D.Del. Mar. 28, 2002).

3. Plaintiffs' motion to compel the production of documents withheld under the common legal interest doctrine (D.I.99) is denied as untimely. The parties agreed to exchange their privilege logs on January 23, 2002. By stipulation filed on March 11, 2002, the discovery cutoff date was extended to March 15, 2002. Plaintiffs filed the instant motion on April 8, 2002. Motions that relate to fact discovery must be filed during fact discovery, especially where, as here, the underlying facts relating to the motion were known to plaintiffs in January 2002. Therefore, the court declines to address the motion on its merits.

**\*3** 4. Plaintiffs' motion for leave to file a sur-reply brief (D.I.96) is denied as moot.

2002 WL 1268047 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00141 (Docket) (Mar. 01, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

Westlaw.

Not Reported in F.Supp.
1996 WL 494132 (E.D.Pa.), 41 U.S.P.Q.2d 1302
(Cite as: 1996 WL 494132 (E.D.Pa.))

Page 1

**H**

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
ENVIRON PRODUCTS, INC., Plaintiff,
v.
TOTAL CONTAINMENT, INC., Defendant.
Civ. A. No. 95-4467.

Aug. 22, 1996.
John J. Marshall, Arthur H. Seidel, Joseph R. Del
Master, Jr., Seidel, Gonda, Lavorgna and Monaco,
P.C., Philadelphia, PA, for Plaintiff.

Charles J. Bloom, Stevens & Lee, P.C., Wayne, PA,
James J. Merek, Merek & Voorhees, Alexandria,
VA, for Defendant.

Charles N. Quinn, Dann, Dorfman, Herrell &
Skillman, Philadelphia, PA, for Movant.

*MEMORANDUM*

GAWTHROP, District Judge.

*I. Motion for a Preliminary Injunction*

**\*1** The plaintiff in this patent infringement action,
Environ Products, Inc. ("Environ"), has moved,
pursuant to 35 U.S.C. § 283, for the entry of a
preliminary injunction against defendant Total
Containment, Inc. ("TCI"), prohibiting TCI from
manufacturing and selling its Omniflex piping
system. The issue presented is whether the Omniflex
system infringes Claim 29 of United States patent
5,297,896 (the " '896 patent"), relating to a
secondarily contained piping system, and Claims 1,
2, 3, and 10 of United States patent 5,398,976 (the "
'976 patent"), relating to a connecting boot for joining
the flexible pipe of the '896 patent to another length
of pipe or other piping equipment.

In evaluating a patentee's motion for a preliminary
injunction pursuant to 35 U.S.C. § 283, a district
court must consider the following four factors: (1) a
reasonable likelihood of eventual success on the
merits, (2) irreparable harm if the injunction were not
granted, (3) whether the balance of hardships tips in
favor of the plaintiff, and (4) the impact, if any, of the

injunction on the public interest. *Novo Nordisk of
North America, Inc. v. Genentech, Inc.*, 77 F.3d 1364
(Fed.Cir.1996). The evidence presented at an
evidentiary hearing on Environ's motion does not
support the conclusion that Environ is reasonably
likely to prevail on the merits in this litigation. Thus,
its motion for a preliminary injunction must be
denied even without consideration of the remaining
three factors.

Environ first alleges that Omniflex literally infringes
Claim 29 of the '896 patent. TCI has presented
testimony that (1) Omniflex does not infringe Claim
29, (2) the claim is invalid in light of prior art, and
(3) the claim is unenforceable. For the purposes of
this motion, I shall assume, without deciding, that
Claim 29 is valid and enforceable. Because Environ
is not reasonably likely to prevail on the merits of its
contention that Omniflex literally infringes Claim 29,
it is not necessary to decide whether the claim is
actually valid or enforceable. Claim 29 reads as
follows:

29. A secondarily contained underground piping
system for connecting the elements of the system
including a dispensing pipe of an underground
storage tank to an above ground dispensing unit,
comprising:
(a) at least one chamber installed around at least
one of the elements of the system; and
(b) a flexible piping connecting the elements
consisting of an inner pipe member, an outer pipe
member circumscribing the inner pipe member, a
plurality of circumferentially spaced ribs extending
radially from one of said pipe members having a
surface confronting and snugly engaging the other
pipe member and defining a plurality of interstitial
spaces between the pipe members; and the
confronting surfaces of said ribs having a
predetermined configuration in a longitudinal
direction to permit migration of a fluid in said
interstitial spaces in all directions.

An accused product does not literally infringe a
patent unless every limitation in the claim is found in
the product. *Southwall Technologies, Inc. v.
Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995).
In this case, because not every limitation in the patent
is found in the Omniflex system, the system does not
literally infringe Claim 29. Environ claims an
invention that comprises a plurality of ribs which
define a "plurality of interstitial spaces between the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
1996 WL 494132 (E.D.Pa.), 41 U.S.P.Q.2d 1302
(Cite as: 1996 WL 494132 (E.D.Pa.))

pipe members." Environ contends that the Omniflex system literally conforms to this limitation in the claim. Environ's own product engineers, however, testified that Omniflex has only one interstitial space between the inner and outer pipes. This testimony belies Environ's contention that Omniflex piping exactly corresponds to the invention in Claim 29.

*2 Stephen Maloney, an Environ design engineer, explained that the outer surface of the inner pipe in the Omniflex system is textured in a way that prevents it from mating with the ribs on the inner surface of the outer pipe. As a result, "[i]t really ends up being one continuous space around there." (D. 2, p. 39, 11. 23-24.) On cross-examination, Mr. Maloney again testified that Omniflex has only one interstitial space. In particular, he said that the "surface of the two inter-mating parts ... acts as one space." (D. 2, p. 69, 11. 5-20.)

Christopher Ursillo, another Environ design engineer, also conceded that Omniflex piping does not have a plurality of interstitial spaces. Mr. Ursillo identified an interstitial space as the gap "between two walls." (D. 4, p. 35, 1. 16.) Under this definition, Omniflex "technically has one interstitial space." (D. 4, p. 37, 11. 4-5.) Although Mr. Ursillo said that Omniflex piping has a plurality of interstitial spaces between the outer wall of the inner pipe and the ribs on the inner wall of the outer pipe, he testified that there is only one interstitial space between the pipe members. (D. 4, p. 38, 11. 6-25.) The invention in Claim 29 has a plurality of ribs that define a "plurality of interstitial spaces between the pipe members." As Mr. Ursillo explained, Omniflex has only one interstitial space between the pipe members. Thus, not every limitation in Claim 29 is found in the Omniflex system, so Environ is not reasonably likely to succeed on the merits of its contention that Omniflex literally infringes Claim 29.

Next, Environ alleges that Omniflex infringes Claims 1, 2, 3, and 10 of the '976 patent under the doctrine of equivalents. TCI has presented testimony that Omniflex does not infringe these claims, as well as testimony that these claims are invalid in light of prior art. For the purposes of this motion, I shall assume, without deciding, that the claims are valid. Because Environ is not reasonably likely to prevail on the merits of its contention that Omniflex infringes these claims under the doctrine of equivalents, it is not necessary to decide whether the claims are actually valid.

An accused product infringes a patent under the doctrine of equivalents if the product performs substantially the same function, in substantially the same way, to obtain substantially the same result as the claimed invention. *Graver Tank v. Linde Air Products,* 339 U.S. 605, 608 (1950). The Federal Circuit recently held that "the application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes." *Hilton Davis Chemical Co. v. Warner-Jenkinson Co., Inc.,* 62 F.3d 1512, 1518 (Fed.Cir.1995) (en banc). The court further held that "a finding of infringement under the doctrine of equivalents requires proof [by the patentee] of insubstantial differences between the claimed and accused products, or processes." *Id.* at 1521-22. Environ has not proven that the differences between Omniflex piping and the inventions claimed in the '976 patent are insubstantial. Thus, it has not proven infringement.

*3 Claim 1 of the '976 patent describes a pipe system comprising "boot means for defining a chamber with a larger end snugly fitting said outer pipe and a smaller end snugly fitting said exposed outer wall of said inner pipe." The test boot in the Omniflex system connects to the coupling ferrule, rather than to the outer wall of the inner pipe. Thus, the Omniflex system can infringe the Claim 1 only if Environ shows that this difference is insubstantial. When asked whether this difference can be considered substantial, Mr. Maloney, Environ's design engineer, replied that he could not say whether this difference is substantial or insubstantial. (D. 2, p. 63, 11.17-20.)

Environ argues that the difference is not substantial, and that Omniflex performs the same function in the same way to achieve the same result as the invention in Claim 1. Mr. Maloney's testimony, however, rebuts this argument. He testified that clamping the test boot to the coupling ferrule (as in the Omniflex system) rather than to the inner pipe (as in the '976 patent) decreases the likelihood of leaks. The specification to the '976 patent provides that "[o]f primary importance is the need to have a fluid tight seal to the respective pipes." (Col. 7, 11. 8-9). That is, the '976 patent asserts that a tight seal between the test boot and the inner pipe is crucial to the invention. Yet the Omniflex system lacks this essential feature. This testimony bolsters TCI's contention that the difference between the '976 patent and the accused product is substantial.

Moreover, if the difference between the accused product and the claimed invention were insubstantial, then the invention claimed in the '976 patent is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                            Page 3
1996 WL 494132 (E.D.Pa.), 41 U.S.P.Q.2d 1302
(Cite as: 1996 WL 494132 (E.D.Pa.))

anticipated by prior art and the patent is thus invalid. Defendant's Exhibit 117 is a binder that includes TCI's engineering drawings for its EnviroFlex piping system. Environ stipulated that Defendant's Exhibit 117 is a "prior publication more than one year before the application date for the '976 patent." (D. 5, p. 50, 11. 14-17.) Analysis of this exhibit and of Mr. Ursillo's testimony leads to the conclusion that if the difference between the Omniflex system and the '976 patent is considered insubstantial, then these drawings anticipate the '976 patent, and the patent is invalid. 35 U.S.C. § 102(b).

Mr. Ursillo testified that the only difference between the EnviroFlex piping system depicted in DSA74129, one drawing in Defendant's Exhibit 117, and Claim 1 of the '976 patent is that the patent calls for "the smaller end [of the connecting boot] snugly fitting said outer wall of said inner pipe." (D. 6, p. 58, 11. 6-12.) This is also precisely the only difference between the Omniflex piping system, the accused devise in this action, and the '976 patent. Thus, if the Omniflex system infringes the '976 patent under the doctrine of equivalents, then Defendant's Exhibit 117 anticipates the '976 patent. It follows that if Omniflex infringes the '976 patent, then the patent must be invalid, since "[t]he doctrine of equivalents is limited in that the doctrine will not extend ... to cover an accused device in the prior art." *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 n. 1 (Fed.Cir.1987) (en banc), *cert. denied*, 485 U.S. 961 (1988).

*4 The burden is on the patentee to show that the "range of equivalents which it seeks would not ensnare the prior art." *Wilson Sporting Goods v. David Geoffrey & Assoc.*, 904 F.2d 677, 685 (Fed.Cir.1990). In this case, Environ has not shown that the range of equivalents sufficiently broad to encompass the Omniflex system does not ensnare the prior art, namely Defendant's Exhibit 117. Rather, Mr. Ursillo's testimony shows that if Omniflex infringes Claim 1 under the doctrine of equivalents, then Defendant's Exhibit 117 necessarily anticipates the '976 patent and renders it invalid. Thus, Environ is not reasonably likely to prevail on the merits of its contention that the Omniflex system infringes Claim 1 of the '976 patent under the doctrine of equivalents.

Because Omniflex does not infringe Claim 1, it also does not infringe Claim 2 or 3, which are dependent on Claim 1. *Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 798 (Fed.Cir.1990) (citing *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed.Cir.1989)). Similarly, Claim

10 contains the same limitation whose absence in the Omniflex system required the conclusion that Omniflex does not infringe Claims 1, 2, or 3. Thus, Omniflex does not infringe Claim 10, either.

The plaintiff has not met its burden of proving a reasonable likelihood that it could prevail on the merits of its contention that TCI has infringed the ' 896 and '976 patents. Thus, the motion for a preliminary injunction must be denied.

*II. Motion for a Protective Order*

In its Amended Answer and in its proposed Second Amended Answer, TCI alleges that the '896 patent is unenforceable because of the inequitable conduct of Environ and its agents during the reëxamination of the patent. TCI has served a Notice of Deposition on Joseph R. DelMaster, Jr., Esquire, who handled the reëxamination proceeding and is now Environ's trial counsel. Environ has moved for a protective order barring this deposition. It contends that TCI seeks to inquire into material protected by the attorney-client privilege and by the work-product doctrine. Environ also expresses the concerns that requiring Mr. DelMaster to appear as a witness may disrupt the professional adversarial relationship between the parties, and may even result in Mr. DelMaster's disqualification from this action. TCI says that Mr. DelMaster has information relevant to TCI's affirmative defenses of unenforceability, and the deposition is essential to discover this information. Because a deposition of Mr. DelMaster is the only way to conduct discovery into Environ's alleged inequitable conduct during the reëxamination of the '896 patent, the motion for a protective order must be denied.

The affirmative defense of inequitable conduct makes Mr. DelMaster's mental impressions during the reëxamination proceedings an issue in this litigation. A party is entitled to discover relevant, non-privileged information from any individual with access to such information, even when that individual is the opposing party's trial counsel. *In re Arthur Treacher's Franchise Litigation*, 92 F.R.D. 429, 438 (E.D.Pa.1991); *Frieman v. U.S. Air Group, Inc.*, No. 93-3142, 1994 WL 675221, at *5-6 (E.D.Pa. Nov. 23, 1994). Impressions protected by the work-product doctrine may be discovered when directly relevant to the litigation and when the need for production is compelling. *Bird v. Penn Central Co.*, 61 F.R.D. 43, 47 (E.D.Pa.1973). Such "compelling need" exists "whenever information is within the exclusive control of the party from whom discovery is sought." *In re*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 494132 (E.D.Pa.), 41 U.S.P.Q.2d 1302
**(Cite as: 1996 WL 494132 (E.D.Pa.))**

Page 4

*Sunrise Securities Litigation,* 130 F.R.D. 560, 569 (E.D.Pa.1989). Mr. DelMaster's conduct during the reëxamination bears on TCI's affirmative defense of unenforceability. This conduct is directly an issue in this litigation, and Mr. DelMaster's mental impressions relevant to this issue can only be discovered directly from him. Mr. DelMaster can also rest assured that he will not be disqualified from this litigation if "disqualification of the lawyer would work substantial hardship on the client." Pa.Rules of Professional Conduct Rule 3.7.

**\*5** TCI is thus entitled to a deposition of Mr. DelMaster. TCI may ask Mr. DelMaster for factual information relevant to this litigation which, unlike his mental impressions, are not protected by the work-product doctrine. TCI may also ask about Mr. DelMaster's mental impressions when they are directly relevant to TCI's affirmative defense of inequitable conduct and when this information cannot be obtained from another source. At the deposition, should TCI stray into areas covered by the attorney-client privilege or which remain protected by the work-product doctrine, the parties are invited to contact the court telephonically, then and there, for a prompt adjudication of the dispute. As for Environ's concern that the deposition is sought for purposes of harassment and may disrupt the professional adversarial relationship between the parties, I am heartened by the fact that Environ and TCI have displayed the highest level of professionalism throughout this litigation and related actions. I have no doubt that they will continue to adhere to this standard throughout the remainder of these proceedings. Commendably, they know how to be opponents without being enemies, how to fight the good fight without making it personal or taking it personally.

An order follows.

### ORDER
AND NOW, this 21st day of August, 1996, in accordance with today's Memorandum, it is hereby ORDERED as follows:

(1) The plaintiff's Motion for a Preliminary Injunction is DENIED;

(2) The defendant's Motion Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to Amend its Responsive Pleading is GRANTED; and

(3) The plaintiff's Motion for a Protective Order Barring Taking of Noticed Deposition is DENIED.

1996 WL 494132 (E.D.Pa.), 41 U.S.P.Q.2d 1302

**Motions, Pleadings and Filings (Back to top)**

• 2:95cv04467 (Docket) (Jul. 19, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.