**EXHIBIT 13**

S3 INCORPORATED, a Delaware corporation, Plaintiff, vs. nVIDIA CORPORATION, a Delaware corporation, Defendant.

No. C 98-1938 SBA

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

1999 U.S. Dist. LEXIS 23218

August 16, 1999, Decided
August 16, 1999, Filed

**DISPOSITION-1:** [*1] Application of defendant nVidia seeking leave to file a sur-opposition granted; defendant's summary judgment motions granted in part and denied in part; defendant's motions to reopen discovery and to amend answer denied.

**CORE TERMS:** patent, video, clock, specification, controller, signal, reply, display, output, circuitry, memory, stream, input, programmable, processing, graphic, disclose, digital, invention, pixel, frequency, declaration, multiplexer, summary judgment, definiteness, parties agree, chip, opening brief, scaling, mixing

**COUNSEL:** For S3 INCORPORATED, Plaintiff: Kirke M. Hasson, Pillsbury Winthrop LLP, San Francisco, CA. William K. West, Jr., David A. Jakopin, Mark J. Danielson, Brian J. Beatus, Pillsbury Winthrop LLP, Palo Alto, CA.

For NVIDIA CORPORATION, defendant: Tharan G. Lanier, Michelle Greer Galloway, Stephen C. Neal, Cooley Godward LLP, Palo Alto, CA.

For NVIDIA CORPORATION, Counter-claimant: Tharan G. Lanier, Michelle Greer Galloway, Stephen C. Neal, Cooley Godward LLP, Palo Alto, CA.

For S3 INCORPORATED, Counter-defendant: Kirke M. Hasson, Pillsbury Winthrop LLP, San Francisco, CA. Brian J. Beatus, Pillsbury Winthrop LLP, Palo Alto, CA.

**JUDGES:** SAUNDRA BROWN ARMSTRONG, United States District Judge.

**OPINIONBY:** SAUNDRA BROWN ARMSTRONG

**OPINION:** ORDER RE CLAIM CONSTRUCTION AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT, FOR LEAVE TO AMEND, AND TO REOPEN DISCOVERY

Pending before the Court are [*2] the parties' proposed claim constructions, two motions for summary judgment brought by the sole defendant, nVidia Corporation ("nVidia"), as well as defendant's motions for leave to amend and to reopen discovery. After conducting a claim construction hearing on May 6, 1999, and reviewing the parties' filings, the Court is prepared to rule on the pending matters. In accordance with the claim constructions rendered below, defendant's motions for summary judgment are granted in part and denied in part. Defendant's motions for leave to amend its answer and counterclaims, and to reopen discovery are denied. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n1 To the extent the Court has not entertained oral argument on issues raised by the parties, the Court adjudicates the issues without oral argument pursuant to N.D. Cal. Civ. L.R. 7-1(b).

- - - - - - - - - - - End Footnotes- - - - - - - - - -

## I. BACKGROUND

Plaintiff S3 Incorporated ("S3") alleges that nVidia has infringed and is continuing to infringe various claims of three United States Patents, numbered 5,581,279 (the " '279" patent); 5,402,513 (the [*3] "'513" patent); and 5,625,379 (the "'379" patent). Plaintiff claims defendant infringes these patents by making, selling and using multimedia accelerator products, including a multimedia accelerator chip referred to as the "RIVA 128," which utilize the inventions claimed in the patents. See Compl. at 5, PP17 & 18. In response, nVidia asserts fourteen affirmative defenses, as well as six counterclaims seeking declaratory relief that nVidia has not infringed any of the patents and that all of the patents are invalid. See Answer at 3-8. Based on these defenses, nVidia previously persuaded the Court to deny S3's request for a preliminary injunction. See

Order of July 24, 1998. The discovery cut-off date in this case was February 1, 1999.

On February 19, 1999, the parties submitted a Joint Claim Construction Statement in which various agreed-upon constructions are set forth, as well as each party's claim construction chart. On March 2, 1999, nVidia filed two summary judgment motions concerning the validity of the patent claims in suit, as well as motions to amend its answer and to reopen discovery. A week later, plaintiff S3 filed a brief in support of its claim constructions. [*4] On March 30, 1999, nVidia filed a claim construction opposition which raises issues of validity and includes a revised version of defendant's claim construction chart. On April 6, 1999, S3 filed a reply brief in which it defends its claim constructions on the merits, and which includes an extended claim construction chart identifying particular structures in the patent specifications that correspond to "means plus function" claim elements. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n2 S3's claim construction reply also asserted that various arguments made by nVidia were untimely. On April 14, nVidia filed an application for leave to file a sur-opposition in which it defends the timeliness of invalidity arguments made in the claim construction opposition. S3 subsequently filed an opposition to the application and a conditional sur-reply. The Court hereby grants nVidia's application; the sur-opposition and sur-reply shall be filed. For the reasons discussed below, the Court finds that some of nVidia's invalidity arguments are timely because they have previously been raised in defendant's summary judgment motions, while other invalidity arguments made by defendant are untimely.

- - - - - - - - - - - End Footnotes- - - - - - - -

[*5]

## II. STANDARDS OF REVIEW

### A. Claim Construction and Indefiniteness

Claim construction is a matter of law for the courts to decide. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996); compare Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1455 (Fed. Cir. 1998) (en banc) (majority opinion of Archer, J.) (rejecting view that claim construction may involve subsidiary or underlying questions of fact) with id. at 1466-67 (Mayer, C.J., concurring in judgment) (arguing that factual issues can arise in construing means-plus-function claims).

When interpreting a patent claim, "the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The intrinsic evidence is the most "significant source of the legally operative meaning of disputed claim language." Id. The words of a claim are generally given [*6] their ordinary and customary meaning but the patentee "may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." Id. The specification of the patent is the "single best guide to the meaning of a disputed term" and thus, claims must be read in view of the specification. See id. Similarly, the Court may consider the prosecution history, "which is often of critical significance in determining the meaning of the claims." Id.; see CVI/BETA Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1155-57 (Fed. Cir. 1997).

Where the intrinsic evidence alone resolves any ambiguity in a disputed claim term, it is error to consider extrinsic evidence, which includes expert and inventor testimony, treatises, dictionary definitions, n3 and sometimes prior art. n4 See Vitronics, 90 F.3d at 1583. This is because the intrinsic evidence constitutes the public record on which the public is entitled to rely. The scope of the patent claims, therefore, should not be altered or changed by any extrinsic evidence offered by either [*7] the patentee or the alleged infringer. See id.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n3 The Federal Circuit has clarified that, although technical treatises and dictionaries "fall within the category of extrinsic evidence, . . . . judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." Vitronics, 90 F.3d at 1584 n.6.

n4 Courts may admit and rely on prior art while excluding expert testimony to help demonstrate how a disputed term is used by those skilled in the art. But, where "the disputed terms can be understood from a careful reading of the public record," reliance on the prior art is unnecessary and improper. See Vitronics, 90 F.3d at 1584; see also Kearns v. Chrysler Corp., 32 F.3d 1541, 1547 (Fed. Cir. 1994) (affirming exclusion of prior art in claim construction analysis where it was unnecessary and viewed as the defendant's "back door" attempt to challenge validity). "Nor can [prior art] be used to vary claim terms from how they are defined, even implicitly, in the specification or file history." Vitronics, 90 F.3d at 1584-85.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*8]

Claim terms are to be interpreted as one of ordinary skill in the art would interpret them in light of the specification and prosecution history "regardless of how those skilled in the art would interpret a term in other situations . . . ." Id.; accord Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1578 (Fed. Cir. 1995). Further, it is elementary that claims cannot be construed one way for the purposes of validity, and another for the purposes of infringement. See Smithkline Diagnostics, Inc. v. Helena Lab. Corp., 859 F.2d 878, 882 (Fed. Cir. 1988).

Closely related to the question of claim construction is whether a claim meets the statutory requirement of definiteness. See Personalized Media Communications, LLC v. International Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998) ("A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."); see also id. at 702. Paragraph two of 35 U.S.C. § 112 requires that the specification of a patent "shall conclude with one or more claims particularly pointing [*9] out and distinctly claiming the subject matter which the applicant regards as his invention." A claim meets this definiteness requirement when "one skilled in the art would understand the bounds of the claim when read in light of the specification." Credle v. Bond, 25 F.3d 1566, 1576 (Fed. Cir. 1994); accord North Am. Vaccine, Inc. v. American Cyanamid Co., 7 F.3d 1571, 1579 (Fed. Cir. 1993).

The specification is particularly important in construing "means plus function" claims, and in determining whether such claims meet the definiteness requirement, because these kinds of claims are expressed in terms of a particular function performed by the invention (or part of the invention). The nature of "means plus function" claims is described in paragraph six of 35 U.S.C. § 112, which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Thus, [*10] the specification must specifically "set forth. . . an adequate disclosure showing what is meant by [functional] language." In re Donaldson Co., 16 F.3d 1189, 1195 (Fed. Cir. 1994). "Failure to describe adequately the necessary structure, material or acts in the written description means that the drafter has failed to comply with the [definiteness] mandate of § 112 P2. . . ." In re Dossel, 115 F.3d 942, 946 (Fed. Cir. 1997). It is, however, sufficient to describe a structure by referring to equivalent structures in well-known prior art. See Texas Instruments Inc. v. United States Int'l Trade Comm'n, 871 F.2d 1054, 1062-63 (Fed. Cir. 1989). Courts must consider specific claim language as well as the specification to determine whether patent claims "reasonably apprise those skilled in the art both of the utilization and scope of the invention." North Am. Vaccine, 7 F.3d at 1580. Determining the claimed function, as well as the corresponding structures claimed using "means plus function" language, are matters of claim construction for the courts. See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1308 (Fed. Cir. 1998).

[*11]

Because claim construction is a question of law, it is not subject to traditional burdens of proof. See Level One Communications, Inc. v. Seeq Tech., Inc., 987 F. Supp. 1191, 1196 (N.D. Cal. 1997). While compliance with the definiteness requirement is also a question of law, traditionally it has been held that indefiniteness must be shown by clear and convincing evidence. See North Am. Vaccine, 7 F.3d at 1580. n5

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n5 nVidia cites Quad Environmental Technologies Corp. v. Union Sanitary District, 946 F.2d 870 (Fed. Cir. 1991), for the proposition that the Court should not defer to an implicit finding of definiteness

by the patent examiner where, in fact, the examiner did not raise any question about definiteness. See '279 Summ. J. Reply at 1 n.1. While Quad Environmental states that district courts must review a patent's validity independently of the patent examiner, it is silent regarding the applicable burden of proof. See 946 F.2d at 876.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*12]

B. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

In opposing a summary judgment motion, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Thus, an opposition that fails to identify and reference triable facts is insufficient to preclude the Court's granting of a properly supported summary judgment motion. See Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec, 854 F.2d 1538, 1545 (9th Cir. 1988). [*13] However, any inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

A court may grant a summary judgment motion in a patent infringement case, as in any other case. See Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1561 (Fed. Cir. 1988).

C. Amending Pleadings

Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading should be "freely given when justice so requires." The decision to grant or deny a request for leave to amend rests within the discretion of the trial court. See International Ass'n of Machinists v. Republic Airlines, 761 F.2d 1386, 1390 (9th Cir. 1985). In exercising its discretion, however, the Ninth Circuit requires that district courts grant leave to amend with "extreme liberality." Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990).

The party opposing a motion for leave to amend bears the burden of demonstrating that a "substantial reason exists to deny leave to amend." Mueller v. Walgreen Corp., 175 F.R.D. 631, 637 (N.D. Cal. 1997). [*14] In assessing whether leave to amend is proper, courts should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." Moore v. Kayport Package Express, 885 F.2d 531, 538 (9th Cir. 1989). Of these factors, prejudice to the opposing party is the most important. See Jackson v. Bank of Hawaii, 902 F.2d 1385, 1387 (9th Cir. 1990) (affirming denial of motion to amend pleading based on undue prejudice and delay grounds). "Relevant to evaluating the delay issue is whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleadings." Id. at 1388. "Late amendments to assert new theories are not favorably reviewed when the facts and theory have been known to the party seeking amendment since the inception of the cause of action." Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1994).

III. ANALYSIS OF THE '279 PATENT

The following discussion addresses issues of claim construction and invalidity [*15] regarding the '279 patent. In doing so, questions of indefiniteness are addressed initially, as a matter of claim construction; claims found to be definite are then construed as necessary, followed by an analysis of the remaining validity issues. It is noteworthy that the parties' disputes regarding validity have informed the Court's claim construction by identifying terms that are in dispute and by clarifying the parties' positions with respect to the meaning of particular terms.

The '279 patent concerns technology for processing information that, ultimately, will allow a computer monitor to display certain color images. See generally '279 Summ. J. Mot. at 2-3; Expert Witness Report of Richard F. Ferraro in Daniel Decl. in Support of Claim Constr. Opening Brief, exh. 5. n6 In particular, the information directs the monitor to illuminate specific points on the screen with specific colors. To do this, the information must be generated and processed before being sent to the monitor.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n6 nVidia objects to the Ferraro report on three grounds: the declaration is hearsay, the declarant did not sign the report under penalty of perjury, and the defendant "has not had the opportunity to cross examine Mr. Ferraro." Claim Constr. Opp'n at 5 n.3 (citing Fed. R. Evid. 603, 702, 704, and 801). However, Ferraro's qualifications to appear as an expert are evident from the report and, as an expert, he may rely on hearsay under Fed. R. Evid. 703. Furthermore, on April 6, 1999 plaintiff filed Ferraro's statement affirming the accuracy of his report. Finally, nVidia does not explain its alleged inability to cross-examine Ferraro and, in particular, defendant does not claim that S3 failed to disclose Ferraro as an expert. Accordingly, defendant's objections to the Ferraro report are overruled.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*16]

The following is an overview of the invention; details will be reviewed in the subsequent discussion of the claims. Information to be processed originates from a "video controller." From the controller, the video information is sent to a random access memory ("RAM") and possibly also to a digital-to-analog converter ("DAC"). After the video information has been processed in RAM, it is sent on from the RAM to the DAC. In some situations, the DAC purportedly can receive information either directly from the video controller or from RAM; in these situations the DAC allegedly includes a device to select between the sources of information -- a device sometimes referred to as a "selector." Upon receiving the information, which is in digital form, the DAC converts the information to analog form and transmits it to the video monitor. Throughout this process, the timing of the transmission of information within the integrated circuit is governed by various electrical impulses called "clock signals."

Plaintiff S3 asserts that nVidia infringes the following claims of the '279 patent: independent claim 1, and dependent claims 2, 3, and 4; independent claim 5, and dependent claims 7 and 8; independent [*17] claim 9, and dependent claims 10 and 11. See Claim Constr. Opening Brief at 1; see generally Joint Claim Constr. Statement. Plaintiff has withdrawn claim 6 from suit. See Claim Constr. Opening Brief at 1 n.1.

A. Legal Issues: Indefiniteness and Claim Construction

**1. Indefiniteness**

nVidia contends that all of the asserted claims of the '279 patent -- that is, claims 1-5, and 7-11, are invalid for failing to comply with the definiteness requirement of 35 U.S.C. § 112. Plaintiff makes two related arguments: first, that the claims are not consistent with the specification and, second, that the specification fails to disclose the structure associated with particular "means-plus-function" claim elements. The arguments focus on the "video controller" and "digital-to-analog converter" elements appearing in all of the claims. See generally '279 Summ. J. Mot. at 6-11. Claims 1-4 and 9-11 are considered first, followed by claims 5, 7, and 8.

**a. Claims 1-4**

Claim 1 of the '279 patent is an independent claim covering an integrated circuit comprised of, among other things, a video controller and a DAC. The parties agree that these two [*18] elements, or limitations, are "means plus function limitations." See Joint Claim Constr. Statement at 2. The interpretation of these limitations is therefore governed by 35 U.S.C. § 112, P6. Defendant attacks the definiteness of both the video controller element and the DAC element of claim 1.

**i. "video controller"**

One function of the video controller stated in Claim 1 is to "produce a video information data stream." '279 Patent at 5:16-19. nVidia argues that this reference to the particular data stream produced by the video controller (i.e., the video controller's "output") "is indefinite because the specification contradicts the claim language." '279 Summ. J. Mot. at 6:4-5. Specifically, nVidia argues that, while the claim refers to only a single output, the specification and Figure 2 in the patent both indicate that the video controller may produce two different kinds of outputs.

The parties offer little analysis of the legal significance of inconsistencies or conflicts within claim elements or between elements and the specification. The only case offering much guidance on these issues in relation to the definiteness requirement is In re Cohn, 58 C.C.P.A. 996, 438 F.2d 989 (C.C.P.A. 1971). [*19] In that case, the court considered the definiteness of claims drafted pursuant to the same statutory provision that authorizes the "means plus function" element at issue here. See 438 F.2d at 991. The claims in Cohn differed slightly, however, because they pertained to "steps" rather than "means" for performing certain functions. Under section 112, therefore, the specification in Cohn was required to disclose the corresponding "material[] or acts in support" of the claimed "step," rather than disclosing a "structure" that corresponded to a claimed

"means." See 438 F.2d at 991 (quoting relevant portion of section 112, while omitting statutory references to "means" and "structure"). n7

------------- Footnotes ---------

n7 The portion of section 112 at issue here and in Cohn appeared in paragraph three of the statute at the time Cohn was decided; it has since become paragraph six, following the 1975 addition of new paragraphs three through five. See Pub. L. No. 94-131 § 7, 89 Stat. 685, 691 (1975).

------------ End Footnotes--------

The claims [*20] in Cohn pertained to methods for applying different kinds of finishes to aluminum surfaces. See 438 F.2d at 990. The claim on which the court's analysis focused included a step in the finishing process -- the "corrosion treatment" step -- that was to be performed "until the metallic appearance of the surface is supplanted by an opaque appearance." Id. Summarizing its holding, the Cohn court stated: "we are not sure that interested parties would be able to determine with adequate precision just what is the 'opaque appearance' which indicates completion of the 'corrosion treatment' step." 438 F.2d at 991. The patent applicant tried to address this concern by submitting an affidavit that those skilled in the art would recognize when the step was completed. See 438 F.2d at 992. Nevertheless, the court examined the patent specification, and compared it to the claims. In making this comparison, the court found that, while the specification made clear that an "opaque finish" could not be obtained using a certain process, the claims taught that the same process actually would yield an "opaque appearance." See 438 F.2d at 993. Because the meaning of "opaque" [*21] was entirely unclear, the claims failed to define precisely when the "corrosion treatment" step concluded and, furthermore, the specification failed to disclose and support adequately the "acts" corresponding to the claimed "step." See id. see also 438 F.2d at 991. In affirming the patent office's rejection of the application, the Cohn court noted that "no claim may be read apart from and independent of the supporting disclosure on which it is based." 438 F.2d at 993. With this statement, the court apparently disregarded the affidavit submitted by the applicant regarding knowledge of those skilled in the art.;

The question here, then, is whether the alleged inconsistency identified by nVidia shows that the video controller element is too ambiguous, or whether the specification fails to adequately disclose the structure corresponding to the claimed video controller means. To answer these questions, further examination of the '279 patent is necessary.

Consistent with claim 1, the specification for the '279 patent describes the video controller as producing a "video information stream," and outputting "video information." '279 Patent at 2:35-40, 3:14. However, in the passage on which [*22] nVidia relies, the specification also states that, "in certain modes of operation, it may be desirable" for the video controller to "instead provide video display information" directly to the DAC. See '279 Patent at 4:1-5 (emphasis added). Thus, the specification indicates that the video controller sends a "video information stream" to the RAM portion of the chip, but may also send "video display information" directly to the DAC portion of the chip. To confirm the fact that the specification indicates two types of information can be emitted from the controller, nVidia points to Figure 2 of the '279 patent, which shows two separate sources of information emanating from the controller: one source connected directly to the DAC and the other to the RAM. See '279 Summ. J. Mot. at 6:7-8. Meanwhile, the video controller element of claim 1 does not mention producing "video display information." Thus, as defendant asserts, there is at least a tension between the specification and the video controller element of claim 1.

So responds to defendant's argument mainly by attempting to redefine it. Specifically, S3 asserts that defendant's attack on the video controller claim is really [*23] the same as an attack defendant makes on another element of claim 1, the digital-to-analog converter ("DAC") element. See '279 Summ. J. Opp'n at 6 & n.3. But the two arguments are different. nVidia's argument about the video controller has to do with the number of different kinds of outputs produced by this component, while S3 responds by discussing the nature of information received by the DAC. See id. at 6-9. Although S3 shows that "video display information" can be received by the DAC either directly from the video controller or by way of the RAM, see '279 Opp'n at 7:17-25, this argument does not address the absence of any reference in the claim to "video display information" as a type of information being produced by the video controller.

Significantly, S3 does not argue that the DAC is capable of treating "video information" as though it were "video display information." To the contrary, S3 disclaims any such argument when its expert makes the following statement:

> Since the [DAC] cannot properly read video information that has not been translated into video display information, such video information is input to the RAM so that it can be translated to [*24] video display information. Since, however, the [DAC] can read video display information, video display information that is output from the VGA [video] controller can be directly read, and will therefore bypass the RAM.

Belgard Decl. in Support of '279 Summ. J. Opp'n P117. This statement shows that the video controller must be capable of emitting two different kinds of information, one of which is directly readable by the DAC while the other is not.

So does attempt to reconcile the specification and the claim by arguing that the "video information stream" produced by the video controller can be comprised of both "video information" and "video display information." See '279 Summ. J. Mot. at 7-9; see also Belgard Decl. in Support of '279 Summ. J. Opp'n P116. n8 In support of this argument, S3 points out that while the specification mentions that the video controller may produce "video display information," the specification does not "use[] the term 'video display information stream' to describe the output of the video controller." '279 Summ. J. Opp'n at 7:2-3. The suggestion, according to So, is that "video display information" is therefore included within the "video [*25] information stream" emitted by the video controller. In support of the argument, S3's expert declares as follows:

> The specification describes that the claimed "video information data stream" output by the video controller . . . has two paths. The path of the "video information data stream" that is input to the RAM contains "video information." . . . The path of the "video information data stream" that bypasses the RAM and is input directly by the DAC via the selector is "video display information."

Belgard Decl. in Support of '279 Summ. J. Opp'n P116.

------------- Footnotes ---------
------

N8 The patent uses the terms "stream" and "data stream" interchangeably, and the parties do not dispute that the terms mean the same thing. Therefore, the word "stream" in the following discussion also refers to "data stream."

------------ End Footnotes- -------
------

This argument is not persuasive. There is no suggestion in the specification that a "video information stream" can include "video display information." Indeed, the suggestion is contradicted by repeated references throughout the [*26] patent to the function of the RAM, which is to convert the "video information stream" and "video information" received from the video controller into a "video display information stream" and "video display information." See '279 Patent at 1:67 to 2:3, 2:35-40, 5:21-30, 6:4-7, 6:36-38. There is no indication anywhere in the patent that translation of any portion of the "video information stream" is unnecessary because some portion of the stream already contains "video display information" that can immediately be processed by the DAC. While the declaration of S3's expert tries to show this is nevertheless the case, the declaration is extrinsic evidence. And even if it could be considered, all the declaration shows is that the video controller is really producing two different kinds of "video information streams," at least one of which is not defined anywhere in the patent. Ultimately, the declaration merely shows that it is inconsistent for claim 1 to use the term "video information stream" to describe both the information the DAC receives directly from the video controller, and the information the RAM receives from the video controller. Compare '279 Patent at 5:22-23 [*27] with id. at 5:27-28. n9

-------------- Footnotes ---------
------

n9 In the same vein, S3 concedes that the specification's reference to "video display information" produced by the video controller "is clearly not the same 'video display information' that is output from the RAM." '279 Summ. J. Opp'n at 8:8-9 (emphasis added); see also id. at 8:14-16. This statement reveals another term used in the patent that is not sufficiently defined. The confusion continues when S3 further asserts that "the 'video information' being output from [the] video controller may or may not be the same as the 'video display information' being output from the video controller." Id. at 8 n.5; see also Claim Constr. Reply at 9 n.14 ("all information coming from the video controller is 'video information,' which sometimes is also

'video display information' . . . and sometimes is not").

------------ End Footnotes--------

The ill-defined term "video information stream" appearing in the video controller element of claim 1 does not involve quite the same, express contradiction that led to the [*28] rejection of the patent application in Cohn. Nevertheless, nVidia's argument and S3's response points out that the video controller element is not sufficiently definite. First, the meaning of the term "video information stream" is ambiguous because it can apply to two different outputs of the video controller, rendering unclear the claim's reference to "video information stream." Furthermore, ambiguity in the term "video information stream" precludes linking the claim with a particular structure that performs the function of producing such an information stream. These are the same defects on which the Cohn court relied to uphold the patent office's rejection of the claims in that case.

The problem of multiple meanings of "video information stream" is also similar to an issue of multiple meanings addressed in In re Merat, 519 F.2d 1390 (C.C.P.A. 1975). The Merat case is noteworthy because, like Cohn, it examined the effect of contradictory language on whether patent claims meet the definiteness requirement. See id. at 1396. In Merat, the claims concerned a method for breeding chickens. See id. at 1391. The claims [*29] all referred to "normal" chickens as the product of the breeding process, see id. at 1392-93, but the specification showed that different kinds of chickens could be produced following the process described in the specification, and the claims failed to identify precisely which kind of chicken was covered by the claims. See id. at 1394-96. The Merat court thus upheld the patent office's rejection of the claims. See id. at 1396. Here, too, the reference in claim 1 to "video information stream" can refer to different things -- that is, it is not apparent whether a particular "video information stream" would contain "video information," "video display information," or both.

S3's final argument in defense of the video controller element of claim 1 is that "one skilled in the art would . . . understand that the invention of claim 1 is directed to the 'bypass' capability described in the specification." '279 Summ. J. Opp'n at 8-9. In support of this argument, plaintiff cites to its expert's declaration. As the Cohn court noted, however, "no claim may be read apart from and independent of the supporting disclosure on which it is based. [*30] " 438 F.2d at 993. Thus, the Cohn court disregarded an affidavit offered to show that a claim was not indefinite because its meaning was clear to those skilled in the art. See id. at 992. Even considering S3's declaration, however, it states only that, "in [the expert's] opinion, one skilled in the art would realize that the two paths output from the [video controller] together comprise the claimed 'video information data stream." Belgard Decl. in Support of '279 Summ. J. Opp'n P115. Yet the declaration offers no specific factual basis for the expert's opinion. In similar situations, unsubstantiated opinions regarding the view of persons having ordinary skill in the art have been disregarded as irrelevant. For example, in In re Wright, 999 F.2d 1557, 1563 (Fed. Cir. 1993), the inventor's conclusory declaration that steps making up the claimed process were "well within the skill of the art" failed to show the patent application included an "enabling disclosure" of the invention, as required under section 112 -- even though the declaration cited, but failed to explain, a list of publications allegedly supporting the assertion. The Wright court, [*31] in turn, relied on In re Buchner, 929 F.2d 660, 661 (Fed. Cir. 1991), where an expert declaration offered no support at all for its assertion regarding the knowledge of those of ordinary skill in the art. Here, S3's expert offers no evidence to support his assertions regarding how the ordinary person skilled in the art would view claim 1 of the '279 patent. On this point, then, the declaration is unpersuasive at best. n10

-------------- Footnotes ---------

n10 The declaration of S3's expert is no more convincing when it summarily asserts -- again, without substantiating evidence -- "that one skilled in the art, and reading the entire specification and prosecution history, would find the specification consistent with the claims and would understand the scope of and how to build the inventions specified in the claims." Belgard Decl. in Support of '279 Summ. J. Opp'n P118.

------------ End Footnotes--------

Apart from the declaration of its expert, S3 also points to "nVidia's own technical expert who has admitted that the same data stream can carry two types of [*32] data," and to a statement by the inventor that the two outputs from the video controller shown in Figure 2 of the patent consist of different types of data. See '279 Summ. J. Opp'n at 8 n.7. However, the meaning of the cited statements is not entirely clear and, significantly, S3 excludes from its deposition excerpt the inventor's

answer to the question "What did you call those separate data streams?" See Danielson Decl. in Support of '279 Summ. J. Opp'n, exh. 2, at 98 (excerpt of inventor's deposition); see also id., exh. 3, at 23 (nVidia's expert). Furthermore, the statements do not show that a person of ordinary skill in the art would understand that the term "video information stream" would include two kinds of data. Finally, even if the statements could show that a person of ordinary skill would understand this, the terms of the patent claim are still so amorphous as to be unreasonably indefinite. See Cohn, 438 F.2d at 993 ("no claim may be read apart from and independent of the supporting disclosure on which it is based").

The essence of nVidia's argument is that claim 1 fails to state its scope distinctly and in a manner permitting one skilled in [*33] the art to link the claim with a "structure, material, or acts described in the specification," as required by 35 U.S.C. § 112, PP2, 6. For the reasons stated above, the Court agrees. Because the evidence and analysis clearly show claim 1 is indefinite, the claim is invalid. Cf. 35 U.S.C. § 282(3) (indicating indefiniteness will invalidate claim); Amgen, Inc. v. Chugai Pharm. Co., 927 F.2d 1200, 1217-18 (Fed. Cir. 1991) (upholding invalidity of claim based on indefiniteness of one element).

The same conclusion applies with respect to dependent claims 2, 3, and 4. Not only do each of these claims depend in part on the indefinite video controller element of claim 1, but each dependent claim differs from claim 1 only as to particular kinds of "video information data stream[s]." As nVidia points out, however, it is unclear whether this limitation describes the data streams transmitted from the video controller to the DAC or to the RAM or to both. See '279 Summ. J. Reply at 2-3, 9. The dependent claims are therefore invalid for indefiniteness on this ground as well.

ii. "digital-to-analog converter means" [*34]

nVidia's second indefiniteness challenge to claim 1, and to dependent claims 2-4, concerns the "digital-to-analog converter means" element, for which defendant asserts "the specification provides no corresponding structure for [the element's] selectivity limitation." '279 Summ. J. Mot. at 7:18. The Court previously found this argument persuasive when it denied S3's preliminary injunction motion, but recognized the argument "may not bear out in the long run." Order of July 23, 1998, at 6:18-19.

To show a disclosed structure corresponding to the selectivity limitation, S3 cites to four pieces of evidence: (1) a passage in the '279 specification, (2) a corresponding figure in the patent, (3) an excerpt from a deposition of one of the inventors, and (4) a declaration by S3's expert. See '279 Summ. J. Opp'n at 9-10. n11 The relevant passage in the patent reads:

> In certain modes of operation, it may be desirable for the VGA [video] controller 11 to bypass the RAM portion of the RAMDAC 23 and instead provide video display information directly to the DAC portion of the RAMDAC 23 through a selector 24.

'279 Patent at 4:1-5 (emphasis added). Plaintiff contends this [*35] passage discloses "selector 24" as the structure that performs the selectivity function. See '279 Summ. J. Opp'n at 9:19-20. However, the corresponding figure of the patent, Figure 2, merely shows a nondescript box marked "SEL" located between the RAM element and the DAC element, with no further detail. Thus, the structure of "selector 24" is not disclosed in the specification itself.

---------------- Footnotes ----------------

n11 S3 also cites to nVidia's interpretation of Claim 1, appearing at page 50 of the Joint Claim Construction Statement, that proposes that the "digital-to-analog converter means" be defined as a selector circuit. See '279 Summ. J. Opp'n at 9:21 to 10:3. S3 apparently views this proposed construction as a concession of definiteness. However, at page 47 of the statement, nVidia reserves its rights to raise section 112 defenses.

------------ End Footnotes-------------

In an attempt to cure this deficiency, S3 asserts that "the selector can be embodied by a simple multiplexer, whose structure is well known in the art." Id. at 10:12-13. To support this assertion, [*36] S3 cites to inventor Man S. Lee's deposition, in which he identifies the selector as a "multiplexer." See id. at 10:13-16; see also Danielson Decl. in Support of '279 Summ J. Opp'n, exh. 2, at 59. However, the inventor does not describe the multiplexer as "simple," as S3 suggests he did, and -- instead of describing a structure -- the inventor only sets out the function of a multiplexer: "[A] multiplexer[] . . . multiplexes the input from the video controller and also the output from the RAM by selecting which, you know, path to take." Id. at 59:10-12. The transcript cited by S3 also does not state expressly that the structure of multiplexers is well known in the art; the transcript only states that "sometimes people call [the

multiplexer] the selector." Id. at 59:15. The inventor's deposition thus fails to disclose either the structure of a selector or that a "multiplexer" would be either "simple" or well known in the art.

S3 also offers the declaration of its expert, who states that "it is [his] opinion that one skilled in the art would recognize that the selector . . . is a simple multiplexor, which is well known in the art." Belgard Decl. in Support of [*37] '279 Summ. J. Opp'n P121. However, the only factual bases offered for this opinion are unidentified statements by inventor Lee, which are not otherwise referenced in the expert's declaration. See id. Apparently S3's expert relies on the same statements of Lee discussed above. If so, then the Lee deposition provides little support for the statement. Significantly, the expert himself does not describe a "simple multiplexer," nor does he explain the difference (if any) between "simple" and other multiplexers. The expert's declaration also does not describe where such devices can be obtained, nor does it cite to other publications describing such devices. Cf. Texas Instruments, 871 F.2d at 1063 (patent applicant's citation to three prior patents describing relevant structure sufficiently disclosed structure claimed by "means plus function" language in patent). The structure of a "multiplexer" thus remains a mystery. n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n12 The declaration of S3's expert does discuss in some detail the nature of the electrical connections between the multiplexer and the rest of the invention. See Belgard Decl. in Support of '279 Opp'n PP122-23. These descriptions do not reveal the structure of the multiplexer itself. Furthermore, the discussion repeatedly asserts that the nature of the multiplexer's connections to the invention are known to "a person of ordinary skill in the art at the time." However, no factual support is offered for these assertions.

- - - - - - - - - - - End Footnotes- - - - - - - -

[*38]

The declaration of S3's expert does provide a thin reed on which to base its assertion that multiplexers are "well known in the art." The "reed" consists of an unidentified statement by inventor Lee (apparently the statement that "sometimes people call [the multiplexer] the selector") and, implicitly, the expert's own general experience in the field, see Belgard Decl. in Support of '279 Summ. J. Opp'n P1 & exh. B. This evidence is noteworthy because, in a case cited by S3, the "well known" structure of a device was sufficient to meet the definiteness requirement of section 112 -- even though the structure was not mentioned in the patent application. See In re Dossel, 115 F.3d 942, 946 (Fed. Cir. 1997). Plaintiff apparently relies on this case to show that a multiplexer is adequately disclosed. See '279 Summ. J. Opp'n at 10:18 (citing Dossel).

In Dossel, the Federal Circuit found that the written description of the invention sufficiently referred to a "general or special purpose computer," even though the description was only written in terms of "a unit which receives digital data, performs complex mathematical computations and outputs the results [*39] to a display." Id. (paraphrasing written description). The court noted that such operations "must be implemented by or on a general or special purpose computer." Id. at 947. To bolster its finding, the court observed that "it is well within the realm of common experience that computers are used to generate images for display by mathematically processing digital input." Id. Therefore, based on "the specific facts of the case," the Dossel court found the structure of the computer adequately disclosed by the written description. Significantly, the court did not refer to the knowledge of those skilled in the art in finding an adequate disclosure.

Although S3 offers some evidence that multiplexers are well known in the art, plaintiff cannot avail itself of the Dossel case to compensate for the failure of the '279 patent to expressly disclose the structure of such devices. Preliminarily, S3's evidence offers only slight support for its assertion regarding knowledge of those within the art. Furthermore, even if multiplexers are well known in the art, they are not analogous to the computer analyzed in Dossel, where the device and its function was "well [*40] within the realm of common experience," and was thus known even to those outside the relevant art. Certainly "common experience" does not suggest that the function described by the "selectivity" limitation refers to a "simple multiplexer." Cf. Atmel Corp. v. Information Storage Devices, Inc., 1998 U.S. Dist. LEXIS 5135 at 8, No. C 95-1987 FMS, 1998 WL 184274(N.D. Cal. Apr. 14, 1998)(Smith, J.)(distinguishing Dossel on the ground that information in the patent in suit did not "plainly refer" to a particular structure). n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n13 The Court in Atmel further noted that language in the patent in suit did "little more than restate the name of the means." See 1998 U.S. Dist. LEXIS 5135 at 11,



1998 WL 184274. The same can be said of the language to which S3 points in both the '279 patent and in the inventor's deposition, as both texts essentially describe only the function of the selector, not its structure. See '279 Patent at 4:1-5; Danielson Decl. in Support of '279 Summ J. Opp'n, exh. 2, at 59:10-12.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

It is also noteworthy that the [*41] Dossel court only considered the validity of a patent application. The court therefore was not immediately concerned with whether accused infringers had sufficient notice of the subject matter covered by an issued patent. Here, however, the patent has already issued. This Court therefore must be certain that the patent as issued gives sufficient notice to potential infringers of the subject matter covered by the patent. Because the structure claimed by the "selectivity" limitation is not disclosed in the specification as required by 35 U.S.C. § 112, P6, and because the evidence does not otherwise permit application of the rule in Dossel, claim 1 of the '279 is invalid based on the indefiniteness of the DAC element.

This alternate basis for invalidating claim 1 also applies to dependent claims 2, 3, and 4. nVidia essentially argues these claims are invalid because they all depend on the same DAC element appearing in claim 1, and therefore these elements are not sufficiently definite under 35 U.S.C. § 112, PP2, 6. See '279 Summ. J. Mot. at 9:6-11. S3 does not dispute that, if claim 1 is invalid, claims 2-4 are also invalid. [*42] See '279 Summ. J. Opp'n at 11. Therefore, because claim 1 is invalid for lack of definiteness, claims 2-4 are invalid on the same ground. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n14 nVidia also challenges the DAC element on the ground that, although it includes a selector, it appears that there is nothing to select between because both the video controller and the RAM transmit "video display information" to the DAC and, therefore, the selector actually is not doing anything. See '279 Summ. J. Mot. at 8-9; see also id. at 7:18-19 (asserting that function of "digital-to-analog converter means" element is "unintelligible as claimed"). S3 responds, in essence, that "the 'video display information' that is output from the VGA controller 11 is clearly not the same 'video display information' that is output from the RAM." '279 Summ. J. Opp'n at 8:7-9. Whether or not the problem here would invalidate the claim need not be decided, however, because the claim is invalid on at least two other grounds, as discussed above.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

b. Claims 9-11 [*43]

Turning to independent claim 9 (and dependent claims 10 and 11), nVidia argues these claims are indefinite for much the same reasons as claim 1. Defendant specifically asserts that, with respect to claim 9, "the output of the video controller is indefinite," and "the specification does not disclose how selector 24 is used to select between the inputs or how the inputs are connected." '279 Summ. J. Mot. at 11:6-8; see also '279 Summ. J. Reply at 1-3 (reiterating attack on video controller output without distinguishing among particular claims); id. at 3-5 (reiterating attack on selector element of claim 9).

Claim 9 is substantially similar to claim 1, with the only significant difference being that the parties agree the elements of claim 9 are not written as "means plus function" limitations. See Joint Claim Constr. Statement at 2. Neither party argues that any legal significance is attached to this difference, however. In particular, nVidia asserts that its arguments hold "whether [claim 9] is a means plus function [claim] or not." Id. at 4:2. Moreover, S3 contends only that its arguments regarding the definiteness of claims 1-4 "also establish that claims [*44] 9-11 are definite." '279 Summ. J. Opp'n at 13:4-5. The Court's conclusions with respect to claims 1-4 therefore also apply as to claims 9-11.

In any event, if claim 9 is not written in "means plus function" language -- as the parties agree -- the question of definiteness depends on "whether one skilled in the art would understand the bounds of the claim when read in light of the specification." Personalized Media, 161 F.3d at 705 (internal quotation omitted) (discussing definiteness of claim element after concluding that it was not written in "means plus function" language). Given the vagueness regarding the meaning of the "video information data stream" discussed with respect to claim 1, it is apparent that the bounds of claim 9 would not be understood by a person skilled in the art, when read in light of the specification. The term necessarily has multiple meanings, such that the scope of the claim is unintelligible. n15

Page 11

------------- Footnotes ----------

n15 As to the "selector" element of claim 9, nVidia has attacked this element -- or, more specifically, the corresponding element of claim 1 -- on the ground that the specification fails to disclose the selector's structure. However, when attacking a claim element that is not written in "means plus function" language, the question whether the patent discloses a structure corresponding to a claim is not an issue of claim definiteness. See Personalized Media, 161 F.3d at 706. Instead, disclosure of a structure "is relevant, if at all, only to the sufficiency of the written description to enable the practice of the invention of the claims, which is a [separate] ground of invalidity under § 112, P1." Personalized Media, 161 F.3d at 706. nVidia has not made an challenge to claim 9 based on the enablement requirement.

------------ End Footnotes---------

[*45]

Regarding claims 10 and 11, nVidia essentially argues that these are invalid because they depend on the same video controller and selector elements appearing in claim 9, and therefore these elements are not sufficiently definite under 35 U.S.C. § 112, PP2, 6. See '279 Summ. J. Mot. at 11:1-9. S3 does not dispute that, if claim 9 is invalid, claims 10 and 11 are also invalid. See '279 Summ. J. Opp'n at 13:3-5. Therefore, because claim 9 is invalid for lack of definiteness, claims 10 and 11 fail on the same ground.

c. Claims 5, 7, and 8

nVidia challenges the definiteness of claim 5 on three grounds. First, defendant attacks the "video controller" element on the same ground it attacked this element in claim 1. Specifically, nVidia argues that the "video information data stream" produced by the video controller of claim 5 "is contradicted by the specification and inconsistent with the drawings." See '279 Summ. J. Mot. at 9:14-15. However, claim 5 differs from claim 1 (and claim 9) in a significant way. In claim 1, the DAC means element is coupled to both the video controller and the RAM, and can receive information from either. See '279 Patent [*46] at 5:25-30. In claim 5, however, the DAC means element is only coupled to, and only receives information from, the RAM element. See id. at 6:8-11; see also '279 Summ. J. Opp'n at 11:10. Simply put, the video controller is not linked to the DAC. This is not necessarily inconsistent with the specification, because the relevant passage states only that "in certain modes of operation, it may be desirable for the VGA controller 11 to bypass the RAM . . . and instead provide video display information directly to the DAC." '279 Patent at 4:1-4. Claim 5 is therefore directed at devices that do not perform the "certain modes of operation" to which the specification passage refers. Cf. Stiftung v. Renishaw PLC, 945 F.2d 1173, 1181 (Fed. Cir. 1991) ("it is entirely consistent with the claim definiteness requirement . . . to present 'subcombination' claims, drawn to only one aspect or combination of elements of an invention"). As S3 contends, claim 5 applies where there is no direct connection between the video controller and the DAC. See '279 Summ. J. Mot. at 11-12. This avoids the contradiction that appears in claim 1, where it could not be determined whether the [*47] video controller produced more than one kind of output.

nVidia also challenges the definiteness of claim 5 on the ground that the DAC element's reception of a "video information data stream" is inconsistent with the assertion that the RAM element (to which the DAC is coupled) produces and transmits to the DAC a "video display information data stream." See '279 Summ. J. Mot. at 9. However, S3 applied to the Patent and Trademark Office to correct the DAC element in claim 5 so that it refers to receiving a "video display information data stream." See Lanier Decl. in Support of '279 Summ. J. Mot., exh. K. On May 25, 1999, the PTO issued the requested certificate of correction. See Letter from S3 (filed June 7, 1999) (attaching copy of certificate). This certificate resolves the inconsistency, although an issue remains whether the certificate can be considered in this lawsuit. The discussion turns to this issue before addressing nVidia's third indefiniteness challenge. n16

------------- Footnotes ----------

n16 nVidia also challenges the validity of the certificate of correction on the ground that it conflicts with a declaration given by the inventor during the prosecution of the patent. See nVidia Claim Constr. Opp'n at 11 (citing '279 FH 0167-0171). Paragraph seven of the declaration suffers from the same omission as the one corrected in the patent -- that is, it refers to the RAM transmitting "video information" to the DAC rather than "video display information." However, there is no reason to believe that the omission of the word

"display" from the declaration was anything but the result of innocent confusion. The case cited by nVidia, In re Conley, 490 F.2d 972 (C.C.P.A. 1974), does not suggest a contrary conclusion, as it only discusses the implications of "material submitted by [an inventor], other than his specification, [that] shows that a claim does not correspond in scope with what he regards as his invention." Id. at 976.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*48]

The statute governing certificates of correction provides that a corrected patent "shall have the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected form." 35 U.S.C. § 255. No decision has considered the meaning of this language at any length. See Carnegie Mellon Univ. v. Schwartz, 105 F.3d 863 (3d Cir. 1997) (noting issues of first impression regarding effect of certificates of correction, but declining to address them). nVidia's position regarding the certificate appears in a proposed order submitted to the Court on May 12, 1999. At page 11 of the proposed order, defendant suggests that "the correction would only be applied retroactively in an action filed after the issuance of the certificate of correction." (Emphasis added.) In support of this proposition, the proposed order cites Rohm & Haas Co. v. Lonza Inc., 997 F. Supp. 635 (E.D. Pa. 1998). In Rohm, the court disregarded a certificate of correction because the action was filed before the certificate issued. See id. at 642 n.9. However, the Rohm [*49] decision is not persuasive.

In essence, the Rohm court concluded that the phrase "arising thereafter" in section 255 modifies the word "actions" rather than the word "causes." In opposing nVidia's position, S3 essentially disagrees with this interpretation, and argues that the statutory language "arising thereafter" modifies the word "causes." Plaintiff further contends that "causes" can continue to arise within a previously-filed lawsuit where infringement is alleged to be ongoing. See Letter from S3 at 1-2 (filed May 18, 1999). This is a more reasonable interpretation of section 255. Under the interpretation proposed by nVidia, a patentee would be required to engage in the wasteful practice of filing a separate lawsuit upon the issuance of a certificate of correction in order to rely on the certificate, even if the new infringement action involved substantially the same facts as the initial lawsuit. Moreover, if a second lawsuit was somehow precluded, nVidia's construction of section 255 would effectively confer "intervening rights" upon infringers who began their unlawful conduct before the certificate issued. The Third Circuit has ruled, however, that a certificate of [*50] correction generally precludes intervening rights. See Eagle Iron Works v. McLanahan Corp., 429 F.2d 1375, 166 U.S.P.Q. 225, 231 (3d Cir. 1970). The Court therefore finds that the certificate of correction may be considered in this case. Because the certificate resolves the inconsistency on which defendant's second indefiniteness challenge focuses, this argument fails.

nVidia's final assault on the definiteness of claim 5 concerns the "programmable clock circuit means" element. See '279 Summ. J. Mot. at 10. This element pertains to a circuit that produces specialized clock signals (i.e., a "video memory clock signal" and a "video dot clock signal") by "receiving a reference clock signal" and "dividing" this signal using "devisor data." See '279 Patent at 5:46-50. nVidia asserts that, according to the specification, the reference clock signal is 14 MHz, yet dependent claim 6 (which is not in suit) and dependent claim 7 (which is in suit) refer to specialized clock signals greater than 14 MHz. nVidia argues this is not possible if the "devisor data" by which the reference signal is divided is greater than one. See '279 Summ. J. Mot. at 10.

Defendant's [*51] argument does not concern the definiteness of claim 5. Instead, when a claim allegedly requires a means for accomplishing an unattainable result, the issue is whether the invention is inoperative as claimed, such that the claim would be invalid based on either failure to meet the utility requirement of section 101 or the enablement requirement of section 112 of title 35. See Raytheon Co. v. Roper Corp., 724 F.2d 951, 956 (Fed. Cir. 1983). Indeed, nVidia describes its argument as one claiming inoperability, although defendant does not set out the relevant standards. See '279 Summ. J. Mot. at 10:6. Before deciding whether a claim is operative, it is first necessary to construe any elements whose meaning is disputed. See Raytheon, 724 F.2d at 956 ("in determining utility . . . the claims must first be interpreted to define the invention to be tested for utility"); see also Stiftung v. Renishaw PLC, 945 F.2d 1173, 1180 (Fed. Cir. 1991) (equating operability and utility). Furthermore, genuine issues of utility are for the factfinder, not the Court. See id. Accordingly, nVidia's third "definiteness" argument regarding the "programmable [*52] clock circuit means" element of claim 5 will be addressed below, in the contexts of construing disputed patent terms and, if necessary, determining whether underlying factual questions preclude summary judgment.

### 2. Claim Construction

The claims of the '279 patent that remain in suit are independent claim 5, and two of its dependent claims, claims 7 and 8. The elements of these claims are construed below, to the extent they are disputed by the parties.

#### a. Claim 5 (An Independent Claim)

##### i. "monolithic integrated circuit"

This element reads as follows: "a monolithic integrated circuit having . . . ." '279 Patent at 5:45. S3 contends that this element speaks for itself. See Claim Constr. Opening Brief at 6:8-11; Joint Claim Constr. Statement at 7:20. Citing two references in the patent specification, nVidia responds that the element should be interpreted to mean "an integrated circuit chip or chip set." See nVidia's Claim Constr. Opp'n at 6-7; see also id., exh. A, at 4. The references cited by defendant state that "the present invention generally provides a 'chip set' for a graphics adapter interface card where the chip set is effectively reduced to [*53] a single chip, or monolithic integrated circuit," such that various components "are all integrated on a single hybrid integrated circuit chip." '279 Patent at 1:60-63, 2:46-47. This language simply does not support the suggestion in nVidia's proposed interpretation that the alleged invention somehow includes a device that involves more than one circuit chip. An interpretation of the claim element "monolithic integrated circuit" that includes a "chip set" would ignore and, indeed, contradict the statement that the invention involves a "chip set [that] is effectively reduced to a single chip, or monolithic integrated circuit." Id. at 1:61-63.

Accordingly, the Court finds this element speaks for itself.

##### ii. "programmable clock circuit means"

This element reads as follows: "programmable clock circuit means for receiving a reference clock signal and devisor data and for dividing said reference clock signal by said devisor data to produce a video memory clock signal and a video dot clock signal." '279 Patent at 5:46-50 (emphasis added). The parties agree that this element is a "means plus function limitation." See Joint Claim Constr. Statement at 2. Three main [*54] issues of construction arise regarding this element: (A) the nature of the structure associated with the claimed function, (B) the meaning of "programmable," and (C) the meaning of "dividing."

##### (A) nature of associated structure

The parties generally agree that at least part of the structure associated with the function identified by this element "is a programmable clock signal generator (P clock) using two voltage-controlled oscillators ["VCOs"], each incorporated in a phase-locked loop ["PLL"], such that one produces the video memory clock signal and the other produces the video dot clock signal . . . ." Joint Claim Constr. Statement at 8:19-26. This is plaintiff's construction, but defendant's interpretation of this part of the structure differs only by omitting the reference to PLLs, and by including several details regarding the structure of VCOs. See Claim Constr. Opp'n, app. A at 5. As to the PLLs, neither defendant's claim construction opposition nor its summary judgment reply disputes S3's construction in this regard. See id. at 7, 12-13, 14; '279 Summ. J. Reply at 8. Indeed, nVidia appears to acknowledge implicitly the correctness of S3's construction (although [*55] defendant disagrees with whether the feature of multiple PLLs is sufficient to make the invention nonobvious, as discussed later). See id. at 8:23-24 (describing use of two phase-locked loops as "simply a matter of design choice"). n17

--------------- Footnotes ---------------

n17 Defendant does point out that the '279 patent "incorporates by reference U.S. Patent 5,036,216[,] which discloses a single PLL." '279 Summ. J. Reply at 8:24-25. However, the '216 patent is incorporated as an example of "V clock chips," and not as the structure associated with the "programmable clock circuit means" of the invention. See '279 Patent at 1:37-40.

------------ End Footnotes---------------

As for details of the VCO structure, S3 shows that these features are not necessary to perform the function claimed by the "programmable clock circuit means" element. See Claim Constr. Opp'n at 4-6; see also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1308 (Fed. Cir. 1998) (only structural aspects corresponding to recited function limit the scope of a [*56] means clause); cf. In re Dossel, 115 F.3d 942, 946 (Fed. Cir. 1997) (discussing need to describe adequately the necessary structure associated with claimed function). Furthermore, defendant offers no defense for this portion of its proposed construction. Accordingly, it is rejected.

##### (B) meaning of "programmable"

The remaining portion of S3's description of the structure associated with this element further describes the clock signal generator as follows: ". . . wherein the

operating frequency of each clock signal can at least be selected from one or more frequencies within a range of frequencies on the basis of the reference clock signal being divided by the devisor data." Joint Claim Constr. Statement at 8:26 to 9:4. This passage is essentially S3's construction of the meaning of "programmable." nVidia disputes this construction, asserting that "'programmable' means that the operating frequency of each clock signal can be selected only from among a set of predetermined frequencies." Claim Constr. Opp'n at 7:10-11, 13:17.

Defendant's position is more convincing. The patent states specifically that "the word 'programmable' as it appears herein is used in [*57] the [manner proposed by nVidia] unless otherwise indicated." '279 Patent at 1:46-48. Elsewhere, the specification discusses "programmability" as S3 seeks to define it, but in those passages the feature is referred to as "true programmability." See '279 Patent at 3:33, :41. Furthermore, these passages describe the current advantages of placing various components on a single chip, one of which is to facilitate the future development of "true programmability." Although the passages are somewhat ambiguous, they do not appear to describe "true programmability" as a feature of the claimed invention. In any event, when the claims are finally set out, the patent resorts to the unadorned word "programmable" -- as it appears, for example, in the element at issue here. The meaning of the term is therefore clear, based on the initial, express definition appearing at the outset of the patent. S3's only other argument is that this definition would improperly incorporate a limitation from the specification into the claims. However, the intention to define the word "programmable" even as it appears in the claims is clear and, furthermore, the specification remains particularly relevant when [*58] interpreting a "means plus function limitation" such as the present element. The Court therefore adopts defendant's proposed interpretation of "programmable" as it appears in the "programmable clock circuit means" element of claim 5. n18

------------- Footnotes ---------

n18 nVidia also proposes that the "reference clock signal" mentioned in this element be defined as "approximately 14 MHz." See Claim Constr. Opp'n at 5. Defendant does not otherwise discuss this proposed definition, and it is apparent that the patent is not so limited. The specification refers to this frequency merely by way of illustration: "the phase-locked loops receive a reference frequency from the computer mother board, approximately 14 MHz in IBM-compatible computers." '279 Patent at 3:26-28. Accordingly, this proposed limitation is rejected.

------------ End Footnotes--------

(C) meaning of "dividing"

Finally, nVidia's challenge to the operability of the "programmable circuit clock means" element, see '279 Summ. J. Mot. at 10, requires the Court to construe ambiguous terms on which the definition [*59] of the invention depends. See Raytheon, 724 F.2d at 956 ("in determining utility . . . the claims must first be interpreted to define the invention to be tested for utility"). Unfortunately, the parties have not identified exactly which terms give rise to the dispute over operability. See Claim Constr. Opp'n at 12-13; Claim Constr. Reply at 4 n.7. Some analysis of their arguments, however, discloses that the key term in dispute is the word "dividing."

The "programmable clock circuit means" element of claim 5 describes a circuit that produces specialized clock signals (i.e., a "video memory clock signal" and a "video dot clock signal") by "receiving a reference clock signal" and "dividing" this signal using "devisor data." See '279 Patent at 5:46-50. nVidia argues that, according to the specification, the reference clock signal is equal to a frequency of 14 MHz, yet dependent claim 6 (which is not in suit) and dependent claim 7 (which is in suit) refer to specialized clock signals greater than 14 MHz. nVidia argues this is not possible if the "devisor data" by which the reference signal is divided is an integer (i.e., a natural number, rather than a number [*60] less than one). n19 See '279 Summ. J. Mot. at 10:11-13; see also Stubben Decl. in Support of '279 Summ. J. Mot. P15.

-------------- Footnotes ---------

n19 The parties agree that the term "devisor data" simply refers to "a quantity used to divide another quantity." See Claim Constr. Opening Brief at 7:20-21; Claim Constr. Opp'n at 13:14-15. There is no question here that the devisor data could be greater than one.

------------ End Footnotes--------

In response, S3 points out that the element is written in terms of a reference "signal" being divided, rather than

dividing a reference "frequency." See '279 Summ. J. Opp'n at 12:19-22; see also '279 Patent at 5:46-50. nVidia acknowledges this, but proposes that "signal" should be interpreted as interchangeable with the term "frequency." See '279 Summ. J. Reply at 5:27-28, 6:13, 7:2-3. This is a reasonable proposal, given that the specification and claim 5 appear to use the two words interchangeably. See '279 Summ. J. Reply at 5:28 to 6:4 & n.5 (citing relevant portions of claim). However, it does not follow [*61] that "dividing" a frequency is the same as dividing the number that designates the frequency.

The key issue, then, is how the operation of "dividing" is to be performed. In other words: Is the operation performed on the number that designates a frequency, or is it performed on some other quantity, such that a "higher" number designating another frequency could be produced? S3's position, essentially, is that the actual quantity divided is not the number that designates a frequency, but the period (that is, the period of time between "on and off" pulses) associated with a frequency. See '279 Summ. J. Opp'n at 12:22 to 13:2; Belgard Decl. in Support of '279 Summ. J. Opp'n P129. Supporting this assertion, S3's expert avers that "[a] person of ordinary skill in the art would recognize that PLLs" use 'divisors' in this manner "to multiply a reference frequency," and that the '279 patent's citation to another patent explains this to be the case. See id. P130.

In reply, nVidia contends that "the specification never discusses dividing a period." '279 Summ. J. Reply at 6:20-7:1. Defendant does not dispute, however, that all frequencies can be expressed in terms of a period, see [*62] id. at 6:14, and that dividing the period associated with a frequency can yield a higher frequency. This is basic physics. Even so, nVidia points out that the patent cited in the '279 patent to explain the operation of the programmable clock circuit "expressly provides that the devisor data multiplies the equivalent to the reference clock by using divisor data." '279 Summ. J. Reply at 7 n.6 (emphasis added). While it is true that the cited patent uses the word "multiplies," however, nVidia offers no reason why the use of this word is inconsistent with the explanation of the cited patent offered by S3's expert. Accordingly, the Court finds that the quantity "divided" by "devisor data," as those terms are used in claim 5, is the period associated with the reference frequency.

In sum, the "programmable clock circuit means" element describes the following structure or its equivalents: A clock signal generator (P clock) using two voltage-controlled oscillators, each incorporated in a phase-locked loop, such that one produces a video memory clock signal and the other produces a video dot clock signal, where the operating frequency of each clock signal can be selected from among a [*63] set of predetermined frequencies on the basis of the period associated with the reference frequency being divided.

### iii. "video controller"

This element reads as follows: "a video controller coupled to said programmable clock circuit for providing said programmable clock circuit means with said devisor data and for receiving the video memory clock signal and the video dot clock signal and for producing a video information data stream." '279 Patent at 5:51 to 6:3. The parties agree that this element is a "means plus function limitation." See Joint Claim Constr. Statement at 2. The parties also basically agree that the element describes the following structure or its equivalents: a VGA controller with signal lines between the controller and the P clock and having an output to a random access memory. See Joint Claim Constr. Statement at 9:22-28; Claim Constr. Opp'n at 10 & exh. A at 6.

The only dispute regarding the meaning of terms in this element is whether the output of the VGA controller should be construed to be a maximum of 8 bits per pixel. See Claim Constr. Opp'n at 7. Defendant makes this argument with respect to the "video controller" element of claim 1, [*64] but it applies equally to claim 5 and S3 responds without distinguishing among particular claims. Defendant makes this argument based on the fact that the patent references only a "nondescript" VGA controller and, therefore, "the only fair interpretation of 'VGA controller' is that of a VGA controller at the time of the '279 patent." Id. at 7:21-22. However, defendant cites no authority for this approach to claim construction.

S3 persuasively responds that the patent specification does not clearly link or associate a structural limitation such as an 8-bit-per-pixel output with the function of 'producing a video information data stream.'" See Claim Constr. Reply at 7:4-5; see also Kahn v. GMC, 135 F.3d 1472, 1476 (Fed. Cir.) ("[a] structure disclosed in the specification is only deemed to be a 'corresponding structure' if the specification clearly links or associates that structure to the function recited in the claim"), cert. denied, 525 U.S. 875, 142 L. Ed. 2d 144, 119 S. Ct. 177 (1998). Furthermore, S3 points out that the '279 patent contemplates the use of a VGA controller with a 24-bit output. See Claim Constr. Reply at 7:8-10; cf. In re Fisher, 57 C.C.P.A. 1099, 427 F.2d 833, 839 (C.C.P.A. 1970) [*65] (patent may read on future embodiments of invention). The Court therefore rejects nVidia's proposed limitation on the "video controller" element.

The "video controller" element thus describes the following structure or its equivalents: a VGA controller with signal lines between the controller and the P clock and having an output to a random-access memory.

iv. "random-access memory means"

This element reads as follows: "random-access memory means, coupled to said video controller, for receiving the video information data stream and producing a video display information data stream." '279 Patent at 6:4-7. The parties agree that this element is a "means plus function limitation." See Joint Claim Constr. Statement at 2. The parties further agree that the element describes the following structure or its equivalents: a RAM configured as a color look up table. See Joint Claim Constr. Statement at 10; Claim Constr. Opp'n at 9:7-8 & exh. A at 7.

Despite the parties' basic agreement, two disputes arise concerning the interpretation of this element. First, nVidia asserts that the internal structure of the RAM is not disclosed in the patent specification. See Claim Constr. [*66] Opp'n at 8-9 (making argument with respect to RAM element of claim 1); see also id. at 12 n.11 (adopting argument as to RAM element of claim 5). nVidia's argument is pointless, however, as the defendant does not state the consequences of the alleged nondisclosure. In any event, "random access memory" is a sufficiently familiar component, and its function is sufficiently disclosed by the patent, that further disclosure of a RAM internal structure is unnecessary. See In re Dossel, 115 F.3d 942, 946-47 (Fed. Cir. 1997) (finding that written description of certain functions sufficiently suggested a computer, the functions of which were "well within the realm of common experience," so as to render unnecessary a further description of its structure); see also '279 Claim Constr. Opp'n at 8:4-5 (asserting that "performance aspects and internal compositions of [RAM] are known to the novice electrical engineer").

The second dispute concerns defendant's proposal that the word "directly" should describe the nature of the connections between the RAM and the video controller, and between the RAM and the digital-to-analog converter ("DAC"). See Claim Constr. Opp'n, [*67] exh. A at 7. Defendant makes no argument in support of this proposal, however. On the other hand, plaintiff points out that the element only uses the word "coupled" to describe the connection between the RAM and the video controller. See Claim Constr. Reply at 8:16. In addition, the element only uses the word "producing" to describe the RAM's output to the DAC. See '279 Patent at 6:4-5. In turn, the DAC element uses the word "coupled" to describe the connection between the RAM and the DAC. See id. at 6:8-9. As S3 contends, "there is no . . . 'direct' limitation in the claim, and no need for this coupling to be 'direct.'" See Claim Constr. Reply at 9:1-2. Because no reason appears why the word "coupled" cannot be used in its ordinary sense, the Court rejects nVidia's proposed construction.

In sum, the "random-access memory means" element describes the following structure or its equivalents: a RAM configured as a color look up table.

v. "digital-to-analog converter means"

This element reads as follows: "digital-to-analog converter means, coupled to said random-access memory means, for receiving the video display information data stream and converting the video [*68] display information data stream to analog video signals." '279 Patent at 6:8-11 (as corrected by certificate issued May 25, 1999). The parties agree that this element is a "means plus function limitation." See Joint Claim Constr. Statement at 2. The parties also agree that the element describes the following structure or its equivalents: a digital to analog converter. See Joint Claim Constr. Statement at 11; Claim Constr. Opp'n at 12:6-7 & exh. A at 7.

The main disputes concerning this element have been resolved by the issuance of the certificate of correction. See Claim Constr. Opening Brief at 7-8; Claim Constr. Opp'n at 11-12. The only remaining point is nVidia's assertion that "the meaning of a 'video information data stream' must be construed to exclude a 'video display information data stream.'" Id. at 12:6-7 (emphasis added). Defendant does not explain what it means by "exclude," but plaintiff agrees -- and it is clear -- that the two "streams" are different. See '279 Summ. J. Opp'n at 10:28 to 11:2 ("the specification is consistently clear in its usage of 'video display information data stream,' (meaning output from the RAM) and 'video information data [*69] stream,' (meaning output by the video controller"0; see also id. at 7:1-3 "the specification never uses the term 'video display information stream' to describe the output of the video controller") (emphasis omitted). Accordingly, the streams are interpreted to refer to different phenomena. n20

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n20 nVidia also renews its proposal to define the connection between the RAM and DAC in terms of information being provided "directly" from one structure to the other. See Claim Constr. Opp'n, app. A at 8. For the reasons previously stated, this proposal is rejected.

- - - - - - - - - - - End Footnotes - - - - - - - - - - - -

In sum, the "digital-to-analog converter means" element describes the following structure or its equivalents: a digital to analog converter.

### Vi. "programmable memory means"

This element reads as follows: "programmable memory means coupled to the monolithic integrated circuit for storing said devisor data to be received by the programmable clock circuit means." '279 Patent at 6:12-14. The parties agree that this element is a "means plus function [*70] limitation." See Joint Claim Constr. Statement at 2. The parties also essentially agree that the element describes the following structure or its equivalents, as set out in plaintiff's claim construction chart: an electrically programmable memory (EPROM) coupled to signal lines that are capable of bearing devisor data to the monolithic integrated circuit. See Joint Claim Constr. Statement at 11-12; see also Claim Constr. Opp'n at 13-14 & exh. A at 8.

nVidia asserts that the EPROM "must not be part of the integrated circuit chip or chip set [but] it must connect directly to the VGA as shown in Figure 1." Claim Constr. Opp'n at 14:3-4. As to the EPROM being separate from the integrated circuit, this requirement is conveyed by the description proposed by plaintiff. With respect to the "direct[] connection," defendant again offers no argument in support of this construction; it is rejected for the same reason as discussed above with respect to defendant's other proposals regarding "direct[]" connections.

In sum, the "programmable memory means" element describes the following structure or its equivalents: an electrically programmable memory (EPROM) coupled to signal [*71] lines that are capable of bearing devisor data to the monolithic integrated circuit.

### b. Claim 7 (A Claim Dependent on Claim 5)

The parties agree that the terms of this claim speak for themselves. See Joint Claim Constr. Statement at 2. Therefore, there is no dispute for the Court to resolve.

### c. Claim 8 (A Claim Dependent on Claim 5)

This claim reads as follows: "The arrangement of claim 5, wherein said programmable memory means may be selectively programmed with devisor data so as to selectively alter the frequency of said video memory clock signal and said video dot clock signal." '279 Patent at 6:23-26. The only dispute over this claim duplicates the parties' dispute, discussed above, over whether the "programmable clock circuit means" should be construed to cover a clock signal generator that can produce signals selected from a range of frequencies, or one that can only produce signals selected from a set of predetermined frequencies. In fact, S3 addresses claims 5 and 9 in the same discussion with respect to this issue. See Claim Constr. Reply at 4. As explained above, S3's argument in support of interpreting "programmable" to refer to a "range" of frequencies [*72] is not persuasive. Furthermore, nVidia points out that claim 8 does not even refer to selecting a "range" of frequencies. See Claim Constr. Opp'n at 14:10. Accordingly, the Court finds that claim 8 should be construed in a manner consistent with the previous construction of the "programmable clock circuit means" in claim 5.

nVidia's proposed construction of claim 8 is generally more consistent with the Court's finding regarding the nature of "programmability." See Claim Constr. Opp'n, exh. A at 9. (The construction proposed by S3 merely reiterates the language of the element appearing in the claim itself, see Joint Claim Constr. Statement at 12-13.) According to defendant's proposed construction, the claim refers to "an off chip EPROM directly connected to VGA video controller that is capable of being programmed so as to select alternate frequencies of said clock signals." See Claim Constr. Opp'n, exh. A at 9. Defendant's proposed construction is faulty in one respect, however, because it specifically requires a "direct[]" connection (a proposal similar to those rejected previously as unsupportable), and it also requires that the connection must be specifically to [*73] the VGA controller rather than the monolithic integrated circuit generally, as called for in claim 5. These aspects of defendant's proposal are rejected.

In sum, the reference in claim 8 to a "programmable memory means" describes the following structure or its equivalents: an off chip EPROM that is capable of being programmed so as to select alternate frequencies of said clock signals.

### B. Invalidity Based on Inoperability, Anticipation, or Obviousness

The discussion now turns to nVidia's remaining contentions that claims 5, 7, and 8 are invalid. At trial, S3's patents would be presumed valid under 35 U.S.C. § 282, and nVidia would be required to prove its invalidity defenses by "clear and convincing" evidence. See Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1216 (Fed. Cir. 1998). This standard guides the determination whether S3 has raised issues regarding validity that are sufficient to prevent summary judgment and require trial on nVidia's defenses. See Johns Hopkins Univ. v. Cellpro, Inc., 152 F.3d 1342, 1359 (Fed. Cir. 1998). nVidia attacks the validity of the patent claims in suit on several

grounds: inoperability [*74] under 35 U.S.C. §§ 101, 112; anticipation under 35 U.S.C. § 102; and obviousness under 35 U.S.C. § 103.

**1. Inoperability**

nVidia contends that the "programmable clock circuit means" element of claim 5 is inoperable because it calls for "dividing" a reference frequency in a manner that actually multiplies the frequency. See '279 Summ. J. Mot. at 10. However, the Court's construction of the term "dividing" resolves the inoperability issue because there is no dispute that the period associated with a frequency may be divided to yield a higher frequency. Accordingly, defendant's motion for summary judgment on the ground of inoperability must be denied.

**2. Anticipation**

A patent is invalid for lack of novelty (often called "anticipation") if the invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee. See 35 U.S.C. § 102; Hoover Group, Inc. v. Custom Metalcraft, Inc., 66 F.3d 299, 302 (Fed. Cir. 1995). "Anticipation is established only when a single prior art reference discloses, expressly [*75] or under principles of inherency, each and every element of a claimed invention." RCA Corp. v. Applied Digital Data Sys., Inc., 730 F.2d 1440, 1444 (Fed. Cir.), cert. dismissed, 468 U.S. 1228 (1984). "The exclusion of a claimed element from a prior art reference is enough to negate anticipation by that reference." Atlas Powder Co. v. E.I. Du Pont De Nemours & Co., 750 F.2d 1569, 1574 (Fed. Cir. 1984).

nVidia asserts that the remaining claims in suit are anticipated by two separate references: IMS G300 and the Killebrew '687 patent. Each reference is discussed separately below.

**a. IMS G300**

nVidia argues that claims 5, 7, and 8 are anticipated by the "inmos IMS G300 colour video controller Preliminary Data Sheet" ("IMS G300"). See '279 Summ. J. Mot. at 14:5-10; see also id. at 12-14 (arguing at greater length that same reference anticipates claim 1-4). Citing its expert's declaration, defendant contends that "each claim of the '279 [patent] is anticipated by the disclosure of IMS G300." See id. at 12:7-8. n21 S3 responds that IMS G300 lacks the "programmable clock circuit means" element and the "video controller" [*76] element of claims 5, 7, and 8. See '279 Summ. J. Opp'n at 15:17-18.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n21 In the course of its arguments regarding the IMS G300, nVidia also asserts that it is undisputed that most of the elements of the '279 claims are anticipated by a reference known as AVGA1. See '279 Summ. J. Mot. at 13 n.12; see also id. at 3:7-9. However, the extent to which AVGA1 discloses elements of the '279 patent is irrelevant to whether the separate IMS G300 reference completely discloses all such elements.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

To show that the "video controller" element is not disclosed by IMS G300, S3 relies on its interpretation of this element as a "VGA controller," and then asserts that IMS G300 does not disclose a VGA controller. See id. at 16:8-9 & n.14. n22 The parties agree that the "video controller" in claim 5 is a "VGA controller." See Joint Claim Constr. Statement at 9; Claim Constr. Opp'n, app. A at 6. And, in fact, nVidia concedes that the IMS G300 does not disclose a VGA controller. See '279 Summ. J. Reply at 8:5-6 ("nVidia [*77] does not contend that the IMS G300 includes a standard VGA controller."). Nevertheless, nVidia contends that the "video controller" element of claim 5 is disclosed by the IMS G300 reference because at one point during the prosecution of the '279 patent, an examiner found that IMS G300 disclosed an unspecified video controller. See id. at 8:6-7. Yet nVidia offers no record cite to support this assertion. See id. While nVidia's expert also makes this assertion, he too offers no citation to the record. See Stubben Decl. in Support of '279 Summ. J. Mot. P22. Furthermore, nVidia does not argue that the alleged finding is entitled to any deference and, ultimately, nVidia places only marginal reliance on the examiner's purported finding. See '279 Summ. J. Reply at 8:6-7.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n22 Much of S3's argument is made in the context of claims 1-4 of the '279 patent, but plaintiff has indicated that the same argument applies to other claims of the patent. See '279 Summ. J. Opp'n at 15:17-18.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

S3's expert also offers [*78] three reasons why IMS G300 does not disclose a VGA controller: First, the reference clock associated with the IMS G300 is