incompatible with IBM-type personal computers, while the reference clock associated with VGA controllers is compatible. See Belgard Decl. in Support of '279 Opp'n PP20-22. Second, IMS G300 does not provide two of the four "major functional areas" of the VGA controller and, as to the other two areas, IMS G300 is different from the VGA controller. See id. PP23-24. Finally, IMS G300 neither performs or supports five of the VGA controller's features. See id. P25.

nVidia only responds to the first of these three factual assertions, and then only by asserting that the reference clock characteristics of the VGA controller are not specifically included as a limitation in the "video controller" element of claim 5. See '279 Summ. J. Mot. at 8:12-17. The argument lacks merit, however, because nVidia does not dispute that the "video controller" element refers to a VGA controller and, by implication, the limitations of such a device. See Claim Constr. Opp'n, app. A at 6. Furthermore, defendant offers no evidence disputing S3's assertion regarding the IBM-compatibility [*79] of the reference clock normally associated with VGA controllers. Accordingly, there is at least a factual issue whether the reference clock characteristics are distinguishable from, and therefore avoid anticipation by, the IMS G300 reference.

In arguing that the IMS G300 discloses a VGA controller, nVidia also asserts -- and appears to cite evidence supporting the proposition -- that "industry publications predating the '279 [patent] confirm that IMS G300 is useful for PC applications and other graphics systems." '279 Summ. J. Reply at 8:7-9. Although it is not clear, defendant's point appears to be that IMS G300 must be compatible with IBM-type systems if it is "useful" for personal computers. Whatever the merits of defendant's argument, however, the cited evidence certainly does not refute conclusively S3's expert declaration that IMS G300 is incompatible with IBM-type PCs. Because a genuine issue of fact remains regarding whether IMS G300 discloses a VGA controller, summary judgment in favor of nVidia on an anticipation defense based on the IMS G300 reference must be denied.

Similarly, a genuine issue of fact remains for trial whether IMS G300 discloses the "programmable clock [*80] circuit means" element of claim 5. As construed above, the element refers in part to "two voltage-controlled oscillators, each incorporated in a phase-locked loop ['PLL']." See also Belgard Decl. in Support of '279 Opp'n P27. It is undisputed, however, that the IMS G300 uses only one PLL. See id. P28; '279 Summ. J. Reply at 8:18-24. While defendant asserts that the "distinction is immaterial and simply a matter of design choice," id. at 8:23-24, defendant cites no evidence in support of this proposition. Accordingly, summary judgment is not appropriate on the issue whether the "programmable clock circuit means" element of claim 5 is disclosed by IMS G300.

b. The Killebrew '687 Patent

nVidia's other anticipation argument is that the elements of the '279 claims are all disclosed by the Killebrew '687 patent. See '279 Summ. J. Mot. at 19:7-11. S3 responds that the Killebrew patent does not disclose placing the VGA video controller and the RAMDAC on the same integrated circuit, as taught by the '279 patent. See '279 Summ. J. Opp'n at 22:10-11; see also Belgard Decl. in Support of '279 Opp'n P94. In reply, nVidia implicitly concedes this point, and instead [*81] argues that combining these components would be an "obvious design choice," and that it had already been "achieved in the prior art." '279 Summ. J. Reply at 14:16, :18. Whatever the merit of these arguments, however, they are irrelevant to whether the Killebrew reference, specifically, anticipates claim 5 of the '279 by disclosing every element of the claim. Accordingly, summary judgment on the theory that Killebrew anticipates claim 5 is not appropriate.

As an additional basis on which to distinguish the Killebrew reference, S3 asserts that "Killebrew also does not describe a programmable dot clock generated on the basis of dividing a reference clock with devisor data." '279 Summ. J. Opp'n at 22:12-13. Neither party's argument or evidence on this issue are models of clarity. See '279 Summ. J. Reply at 13:16-25 (quoting from highly technical language of Killebrew patent, followed immediately by summary conclusion, without providing any analysis); Belgard Decl. in Support of '279 Opp'n P155 (failing to distinguish adequately among several different "clocks," and concluding with a possible typographical error -- referring to the '687 patent rather than the '279 patent -- that compounds [*82] the confusion).

However, the key point seems to be that, in the course of generating two clock signals (i.e., the video memory clock and the video dot clock) from a reference signal, the Killebrew reference actually uses the reference signal as the video dot clock, see Belgard Decl. in Support of '279 Opp'n at 22:26, 23:6, 39:17, whereas the "programmable clock circuit means" element of claim 5 of the '279 patent independently generates a video dot clock from the reference signal, see id. at 22:13; see also '279 Patent at 3:23-25. nVidia's only disagreement with S3's evidence on this point is a statement that S3's expert "admits that Killebrew discloses a programmable clock circuit means for generating a 'video memory clock' (i.e. SCLK) and a 'video dot clock' (CLKO or its derivative)." '279

Summ. J. Reply at 13:14-16 (citing Belgard Decl. PP99, 157). However, the declaration of S3's expert contains no such admission.

S3 also asserts that, in generating both clocks, the "programmable clock circuit means" element of claim 5 uses (and has been construed above as using) two phase-locked loops (PLLs), see also Belgard Decl. in Support of '279 Opp'n at 22:11-13, whereas [*83] the Killebrew reference does not use PLLs for generating either clock, see id. at 23:1-2; see also id. at 39:14-15. In response to this assertion, nVidia points to a passage in the Killebrew reference stating that "'now [and] in the future, PLL technology can offer more stability for video purposes in the higher frequency level so obtained, and thus is an alternative embodiment.'" '279 Summ. J. Reply at 14:7-10 (quoting from Lanier Decl. in Support of '279 Summ. J. Mot., exh. F, at 22:19-22). While this passage may support the proposition that Killebrew somehow utilizes PLLs, it is by no means conclusive on the question whether Killebrew anticipates the manner in which the "programmable clock circuit means" element of claim 5 of the '279 patent uses PLLs.

In sum, the existence of genuine issues regarding whether independent claim 5 is anticipated precludes summary judgment on this issue. This conclusion also necessarily means that genuine issues exist as to whether dependent claims 7 and 8 are anticipated. Cf. RCA Corp. v. Applied Digital Data Sys., Inc., 730 F.2d 1440, 1446 (Fed. Cir. 1984)(if prior art did not anticipate independent claim, it could not [*84] anticipate dependent claim). Accordingly, summary judgment is also not appropriate as to the dependent claims.

3. Obviousness

nVidia also seeks summary judgment based on two separate arguments that the remaining claims of the '279 patent are invalid for obviousness. One argument is based on the Killebrew patent and additional references; the other argument is based on references that include a publication called AVGA1.

The relevant standard for obviousness is set forth in section 103 of title 35, United States Code:

> A patent may not be obtained...if differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

While obviousness is a question of law, the legal determination of obviousness is based on four factual findings: (1) scope and content of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of ordinary skill in the pertinent art; and (4) other "secondary" considerations, which may serve as indicia of nonobviousness. [*85] See Graham v. John Deere Co., 383 U.S. 1, 17, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966); Litton Indus. Prods., Inc., v. Solid State Systems Corp., 755 F.2d 158, 163 (Fed. Cir. 1985). The secondary considerations include, but are not limited to: commercial success of the patented product, a long-felt need for the product, an attempt and failure of others to develop the product, the initial skepticism of experts, and evidence of copying. See Graham, 383 U.S. at 17; Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1569 (Fed. Cir. 1987).

a. Killebrew Combined with Other References

nVidia continues an argument addressed above regarding the Killebrew '687 patent. Defendant contends that, even if this reference does not anticipate claim 5 of the '279 patent, the claim is still rendered obvious when Killebrew is considered together with the IBM Technical Disclosure Bulletin, vol. 29, no. 11, entitled Programmable Dot Clock for Video Adapter (April 1987). See '279 Summ. J. Mot. at 19:12-13; Stubben Decl. In Support of '279 Summ. J. Mot. P47. The IBM article suggests using an PLL to generate a dot clock, which [*86] seems to provide an element missing from the Killebrew reference. See generally Lanier Decl. in Support of '279 Summ. J. Mot., exh. E. Furthermore, the passage in Killebrew mentioning PLLs (a passage not addressed by S3) may provide the motivation needed to combine the references. See Lanier Decl. in Support of '279 Summ. J. Mot., exh. F, at 22:19-22.

However, even if these two references might be combined to meet the "programmable clock circuit means" element of claim 5, this would still not disclose placing the VGA controller and the RAMDAC on the same integrated circuit, which is the other basis on which S3 argues against anticipation by Killebrew. See '279 Summ. J. Opp'n at 22:10-11; see also Belgard Decl. in Support of '279 Summ. J. Opp'n P94. While nVidia argues that combining these components would be an "obvious design choice," and that it had already been "achieved in the prior art," defendant cites only statements by the patent prosecutor to this effect rather than offering any citations to and analysis of specific prior art. See '279 Summ. J. Reply at 14:15-18. As a case cited by nVidia notes, see '279 Summ. J. Reply at 1 n.1, district courts must [*87] review a patent's validity independently of the patent examiner. See Quad Environmental Technologies Corp. v. Union

Page 21

Sanitary District, 946 F.2d 870, 876 (Fed. Cir. 1991). Accordingly, the patent examiner's findings alone are insufficient to merit summary judgment in favor of nVidia on the issue of obviousness. Cf. id. at 872 (noting that summary judgment is not indicated in relation to obviousness "when material facts are disputed, and testimonial, documentary, and expert evidence are needed for their resolution").

### b. AVGA1 Combined with Other References

nVidia also argues that claims 5, 7, and 8 are obvious in light of the IBM article combined with the Acumos VGA Video Controller AVGA1 Preliminary Data Sheet, or "AVGA1." See '279 Summ. J. Mot. at 18; see also Lanier Decl. in Support of '279 Summ. J. Mot., exh. B. Defendant asserts that AVGA1 "describes every element of the '279 patent's claim 5, with the possible exception[s] of the reference[s] to 'devisor data' and the 'programmable memory means . . . .'" '279 Summ. J. Mot. at 18:3-5; accord Stubben Decl. in Support of '279 Summ. J. Mot. P39. In support of this assertion, [*88] an exhibit to the declaration of nVidia's expert compares the elements of AVGA1 with claim 5 of the '279 patent. See id., exh. D, at 7-13; see also id. P28 (describing exhibit D). S3 responds by disputing whether AVGA1 in fact discloses several elements of the claims in suit. See Belgard Decl. in Support of '279 Summ. J. Opp'n at 11-14. Even if these elements were disclosed, however, the parties do not seriously dispute that AVGA1 does not disclose "devisor data" or the idea of programming phase-locked loops (PLLs) with devisor data. See '279 Summ. J. Reply at 11:11-16 (referring to S3's expert's description of AVGA1's clocks, and disputing only whether AVGA1 "teaches away" from installing clocks with additional frequencies). Thus, nVidia's obviousness argument depends in part on whether these components of claim 5 are disclosed by other art.

To make this showing, nVidia relies on the apparently conceded fact that, like claim 5, AVGA1 uses two PLLs to create the video memory clock and the video dot clock. See Belgard Decl. in Support of '279 Summ. J. Opp'n P83 (suggesting presence of two PLLs); '279 Summ. J. Reply at 11:10 (pointing out S3's apparent concession); [*89] see also '279 Summ. J. Opp'n at 21-22 (not disputing presence of two PLLs in AVGA1); Belgard Decl. in Support of '279 Opp'n PP53-55 (same); see generally Stubben Decl. in Support of '279 Summ. J. Mot., exh. D, at 7-10 (setting out components of AVGA1 that disclose the "programmable clock circuit means" of claim 5). However, the AVGA1 PLLs are apparently limited to two or four frequencies, and do not receive devisor data. See Belgard Decl. in Support of '279 Opp'n PP55, 57-59; see also '279 Summ. J. Reply 11-12. To make up for these gaps, nVidia cites both the IMS G300 and IBM references. See '279 Summ. J. Mot. at 18:21-22. There is no question that these references involve at least some use of devisor data or its equivalent. See Stubben Decl. in Support of '279 Summ. J. Mot. P41, exh. C at 3 (regarding IMS G300), exh. D at 7-8 (regarding IBM publication); see also '279 Summ. J. Mot. at 21-22 (not contesting IBM reference on this point, and not mentioning the IMS G300 reference).

In response, S3 asserts that the IBM reference "discloses only one [PLL] for generating the video dot clock signal, and teaches away from providing a second [PLL] for generating [*90] the video memory clock signal by teaching that all other clock signals in a video adapter should be derived from the video dot clock." '279 Summ. J. Opp'n at 22:1-4. Although S3 does not address IMS G300, the same could be said for this reference as well. See Stubben Decl. in Support of '279 Summ. J. Mot., exh. C at 3 (describing reference as having only one PLL and stating that "the PLL generates the video dot clock and the video memory clock is derived from the video dot clock (pixel clock)"). n23 S3's argument is persuasive, as neither reference suggests using a PLL to generate a video memory clock signal independently of the video dot clock signal. Furthermore, nVidia offers no evidence that taking this additional step would be obvious to a person skilled in the art. Cf. Stubben Decl. in Support of '279 Summ. J. Mot. P41. Viewing the evidence in the light most favorable to S3, it is clear that a genuine issue remains as to whether claim 5 would be obvious in light of the prior art. Accordingly, the motion for summary judgment on this issue is denied. Cf. Quad Environmental Technologies, 946 F.2d at 872 (noting that summary judgment is not indicated in relation [*91] to obviousness "when material facts are disputed, and testimonial, documentary, and expert evidence are needed for their resolution").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n23 S3's oversight in not addressing IMS G300 in this context is excusable for three reasons: the relevant subheading in nVidia's motion refers only to the IBM publication, see '279 Summ. J. Mot. at 18:1; the IMS G300 reference is substantially the same as the IBM reference that S3 does address; and nVidia does not assert that S3 made any concession by not addressing IMS G300.

- - - - - - - - - - - - End Footnotes - - - - - - - - - - -

The existence of genuine issues regarding whether independent claim 5 is obvious necessarily means that genuine issues also exist as to whether dependent claims 7 and 8 are obvious. Cf. In re Fine, 837 F.2d 1071 at 1076 (claims that depend from nonobvious claims are themselves nonobvious). Accordingly, summary judgment on obviousness is also inappropriate as to the dependent claims. n24

- - - - - - - - - - - - - Footnotes - - - - - - - - - -

n24 Finally, the Court rejects an assertion nVidia makes in a heading to one of its arguments, that "S3 implicitly conceded that secondary considerations need not be considered in this case." '279 Summ. J. Mot. at 19:14. The assertion is not repeated in the body of defendant's memorandum, nor is it supported by authority. Instead, the only supporting citation is to an 11-page interrogatory response by S3. See id. at 19:20 (citing exhibit O to the Lanier declaration). S3 persuasively refutes the point, see '279 Summ. J. Opp'n at 22-23, and nVidia does not reply, see '279 Summ. J. Reply at 15 n.16.

- - - - - - - - - - - - End Footnotes- - - - - - - -

[*92]

## IV. ANALYSIS OF THE '513 PATENT

The '513 patent generally pertains to a video window generator ("VWG") and scaling circuitry: "Such an apparatus and method permits an input video signal to be scaled down by a specified factor and output to a designated window in the screen of an output video device." Claim Constr. Opening Brief at 3. Plaintiff asserts that nVidia infringes the following claims of the '513 patent: independent claim 1, and dependent claims 2, 4 and 5; independent claim 7, and dependent claims 8 and 9; independent claim 24, and dependent claims 25, 27, and 28; independent claim 30, and dependent claims 31 and 32. See id. at 1; see generally Joint Claim Constr. Statement.

### A. Claim Construction

Much of defendant's claim construction opposition is devoted to arguing that the claims of the '513 patent are invalid for failure to comply with various requirements of 35 U.S.C. § 112, such as definiteness and enablement. As matters of claim construction, defendant has not raised the issues in a timely manner because defendant did not assert the arguments in response either to plaintiff's proposed claim infringement chart as required [*93] by Civil Local Rule 16-9(b)(4), or in response to plaintiff's proposed claim construction as required by Civil Local Rule 16-10(b). See generally Danielson Decl. in Support of Claim Constr. Reply, exhs. A & B (reproducing nVidia's responses). Indeed, plaintiff asserts that defendant's arguments are untimely under these rules, see Claim Constr. Reply at 2 n.2, 12:6-8, 14:20-21; see also Claim Constr. Sur-Reply at 4, and defendant's only response is to point out that "nothing in S3's initial claim construction suggested S3 would contend that section 112(6) applied to [various] elements," Claim Constr. Sur-Opp'n at 1-2. This does not excuse defendant's failure to comply with the local rules.

Regardless of S3's interpretation of the claims, nVidia has an independent obligation to seek out defenses to charges of patent infringement and, if it wished to raise those defenses in the context of claim construction, it was also obligated to comply with Rules 16-9 and -10. These rules facilitate the narrowing of issues between the parties and assure that parties have the notice necessary in order to research and develop their positions. As this Court has stated before, the local [*94] patent rules "are designed to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." Atmel Corp. v. Information Storage Devices, Inc., 1998 U.S. Dist. LEXIS 17564 at 7, 1998 WL 775115(N.D. Cal. Nov. 5, 1998)(Smith, J.). In denying plaintiff's motion to amend a claim chart, the Atmel court emphasized that "the intent behind the local patent rules [is] to ensure that litigants put all their cards on the table up front." Id. at *7. The court also aptly described the alternative, stating that if parties could routinely amend claim charts then "infringement cases would fall prey to a vexatious shuffling of positions -- a kind of musical chairs serving no purpose other than to entertain highly paid lawyers and to thwart the very intention behind the patent local rules." Id. at *6.

The fact that S3 may have facilitated defendant's new invalidity arguments by asserting that various claims are written in "means plus function" language does not excuse defendant's independent obligations to seek out defenses and abide by the local patent rules. In any event, defendant represents elsewhere that many [*95] of its invalidity arguments do not actually turn on whether or not the patent claims are written in "means plus function" language. See Claim Constr. Opp'n at 23:24-27 (asserting that "many of the same claim construction analyses apply," even in absence of "means plus function" language, because "claims are read in light of the specification and can only be of a scope commensurate with the teachings of the

Page 23

specification"). Defendant's excuse for failing to comply with the local rules is therefore insubstantial. Accordingly, only defendant's arguments regarding claim interpretation, rather than claim invalidity, will be considered in the context of construing disputed claim language. n25

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n25 nVidia also raises its section 112 challenge to the '513 patent in its summary judgment reply. See '513 & '379 Summ. J. Reply at 9-10. This, too, is an inappropriate manner in which to raise the argument, and, therefore, it will not be considered. See, e.g., United States v. Montoya, 45 F.3d 1286, 1300 (9th Cir. 1995) ("issues not 'specifically and distinctly raised and argued' in the opening brief need not be considered by the court"); Morton v. Rank America Inc., 812 F. Supp. 1062, 1071 (C.D. Cal. 1993).

- - - - - - - - - - - - End Footnotes- - - - - - - - -

[*96]

1. Claim 1 (An Independent Claim)

a. "a scaling input for receiving scaling information"

This element reads as follows: "a scaling input for receiving scaling information." '513 Patent at 22:16. The parties agree that the "scaling input" element is written in "means plus function" language. See Claim Constr. Opening Brief at 8:24; Claim Constr. Sur-Opp'n at 2:5-6. Plaintiff asserts that "the structure disclosed in the specification that is necessary for performing the function of receiving scaling information is control registers that are programmed with scale factors by software." Joint Claim Constr. Statement at 15:16-21. Plaintiff's proposal is consistent with the passage it cites in support of its interpretation. The passage, which describes the site where scaling occurs, states: "The controls for this system are provided by software which the user generates, these controls utilized to store operating parameters in control registers in the control section." '513 Patent at 11:40-43 (emphasis added).

Defendant responds that "the scaling information is 'shrink factor 208,'" and that "the only structures for receiving 'shrink factor 208' are the full adders [*97] XPADD 220 in Figure 11 and ADD 242 in Figure 12." Claim Constr. Opp'n at 22:13-15. On this basis, defendant contends that full adders should be construed as the relevant structure. nVidia's argument is not persuasive. Defendant offers no explanation for its assertion that "scaling information" is "shrink factor 208" or, even if it is, that "scaling information" is limited to "shrink factor 208." Indeed, the text of the patent cited by nVidia suggests that "scaling information" may include several "scaling factors." '513 Patent at 15:46-47 ("The shrink value may be the same as the shrink value on bus 208, but the scaling factor can be different for the X- and the Y-directions."). Furthermore, plaintiff asserts that "adders do not perform a function of 'inputting,' but clearly perform a function of 'adding.'" Claim Constr. Reply at 14:1-2. Indeed, a sentence in the patent that immediately follows a passage relied on by defendant states: "The adder 220 is operable to add the shrink value to the source register count on bus 208." '518 Patent at 14:51-53. Furthermore, defendant does not address whether the particular structures it identifies are "necessary" to perform the claimed function [*98] of the "scaling input." While defendant contends that a link is missing in the patent between the "scaling input" element and the structure identified by plaintiff, the argument lacks merit. The link exists because the passage on which S3 relies describes the site where scaling takes place.

Accordingly, the Court adopts S3's interpretation of this element: The structure disclosed in the specification that is necessary for performing the function of receiving scaling information is control registers that are programmed with scale factors by software.

b. "a video input"

This element reads as follows: "a video input for receiving real time input video information from the input video device." '513 Patent at 22:17-18. The parties agree that the "video input" element is written in "means plus function" language. See Claim Constr. Opening Brief at 8:24-25; Claim Constr. Sur-Opp'n at 2:5-6. Plaintiff asserts that "the structure disclosed in the specification that is necessary for performing the function of receiving real time input video information from an input video device is a data bus that can receive Y, U and V video data, the Y, U and V data being updated at a rate sufficient [*99] to depict real time motion from one frame of the video information to the next." Joint Claim Constr. Statement at 16:5-14. This interpretation is supported by passages in the specification describing the path of video signals when received by the video window generator (VWG). See Claim Constr. Reply, app. at 9 (citing '513 Patent at 1:53-55, 5:42-43, 6:60-64, 7:53-55).

nVidia contends, however, that "the 'video input' means corresponds to the input to video decoder 26."

Claim Constr. Opp'n at 23:6-7. The passage in the specification on which defendant bases its interpretation states that video inputs are each

input to a video decoder 26, which is a conventional device of the type that is manufactured by Phillips Corporation under part No. SAA 7191. This circuit is operable to receive a standard video input and convert it to a YC[b]C[r] 422 format, which is the standard video format defined in the CCIR 601 video standards.

'513 Patent at 4:24-30. Based on this passage, defendant asserts that "the 'video input' means corresponds to the input to the video decoder 26." Claim Constr. Opp'n at 24:6-7.

S3 responds that "the video decoder is not part of the claims [*100] of this patent, but in fact is the video input device to the invention of this patent." Claim Construction Reply at 14:9-11. Plaintiff's response is supported by text that follows the passage on which nVidia relies, which describes the path of the video data leaving the video decoder:

The YC[b]C[r] 422 formatted video is then input to the VWG 10, the VWG 10 operable to process and output a scaled down version of the input display space that was received at the input of the video decoder 26, or a scaled down portion thereof.

'518 Patent at 4:32-36. Because the VWG is the subject of the patent, see, e.g., '513 Patent at 3:28-31, it is reasonable that the structure relevant to the "video input" element must exist within the VWG. S3's interpretation is consistent with this reasoning. Furthermore, S3's interpretation accounts for language in the claim referring to both a "video input" and a separate "input video device." However, defendant's interpretation of "video input" does not account for, or explain the meaning of, the "input video device." The Court therefore adopts plaintiff's construction, and finds that the structure disclosed in the specification that [*101] is necessary for performing the function of receiving real time input video information from an input video device is a data bus that can receive Y, U and V video data, the Y, U and V data being updated at a rate sufficient to depict real time motion from one frame of the video information to the next.

c. "means for designating"

This element reads as follows: "means for designating a said window within said screen of said video output device." '513 Patent at 22:19-20. The parties agree that this element is a "means plus function limitation." See Joint Claim Constr. Statement at 2. S3 contends that "the structure disclosed in the specification that is necessary for performing the function of designating a said window is a portion of an assembler that receives the position information for a designated window." Joint Claim Constr. Statement at 16:24 to 17:3. This interpretation is supported by a passage in the specification describing a function of an assembler. See Claim Constr. Reply, app. at 10 (citing '513 Patent at 5:17-20).

nVidia does not dispute that the structure associated with this element is an assembler, but contends that the patent does not disclose the [*102] structure of the assembler. See Claim Constr. Opp'n at 20-21. However, this argument goes to the validity of the claim under 35 U.S.C. § 112. The argument is therefore untimely and will not be considered. The only other argument that defendant makes is that it is improper for the construction of this element to refer to only a portion of the assembler. See Claim Constr. Opp'n at 21:6-11. However, this limitation is appropriate because, as plaintiff points out (see S3 Claim Constr. Reply at 12 n.20), another portion of the assembler performs a function covered by a different element. See also id., app. at 10 (setting out proposed construction of "output" element).

In sum, the Court adopts plaintiff's interpretation of this element: The structure disclosed in the specification that is necessary for performing the function of designating a said window is a portion of an assembler that receives the position information for a designated window.

d. "an output for outputting"

This element reads: "an output for outputting scaled down video information into said designated window within said screen of said output video device in substantially [*103] real time." '513 Patent at 22:21-14. The parties agree that this element is written in "means plus function" language. See Claim Constr. Opening Brief at 8:25; Claim Constr. Sur-Opp'n at 2:5-6. Regarding this element, S3 contends that

the structure disclosed in the specification that is necessary for performing the function of outputting scaled down video information is a portion of the assembler that selects between pixel information corresponding to the designated video window and pixel information from other sources for output to the output video device, the pixel information being updated at a rate sufficient to depict real time motion from one frame of the video information to the next.

Joint Claim Constr. Statement at 17:14-27. This interpretation is supported by a passage in the specification describing another function of an assembler. See Claim Constr. Reply, app. at 10 (citing '513 Patent at 5:22-31). The Court adopts S3's interpretation of this element because nVidia does not disagree that the structure associated with this element is an assembler. Defendant's only argument is that the disclosure is inadequate, but this is an untimely

argument concerning [*104] validity and will not be considered.

### e. "an averaging circuit"

This element reads as follows:

an averaging circuit coupled to said scaling input, said video input, and said output for averaging received said video information corresponding to a predetermined area within a screen of said input video device in accordance with a predetermined averaging algorithm and outputting the averaged video information through said output into a predetermined area of said designated window within said screen of said output video device, the ratio of said predetermined area of said screen of the input video device to said predetermined area of said window within the screen of said output video device being determined by the scaling information received on the scaling input.

'513 Patent at 22:25-38. The parties agree that this element is a "means plus function limitation." See Claim Constr. Opening Brief at 8:25; Claim Constr. Sur-Opp'n at 2:5-6. S3 contends that the structure disclosed by the specification that corresponds to this element "is a linear resampler circuit that averages received video data in accordance with received scaling information, the ratio of the area [*105] of the video image received by the linear resampler circuit to the area of the video image output by the linear resampler circuit being determined by the scaling information." Joint Claim Constr. Statement at 18:24 to 19:5. In support of this interpretation, S3 cites a passage in the specification describing a linear resampler circuit. See Claim Constr. Reply, app. at 11 (citing '513 Patent at 6:14-18; 11:37-39, :43-49).

It is not clear that defendant disagrees with plaintiff's interpretation; certainly nVidia agrees that the structure associated with this element is a linear resampler circuit. See Claim Constr. Opp'n at 23:8-14. While defendant suggests that this element may be indefinite, this argument is untimely. Accordingly, the Court adopt's plaintiff's construction of this element: The structure disclosed by the specification that corresponds to this element is a linear resampler circuit that averages received video data in accordance with received scaling information, the ratio of the area of the video image received by the linear resampler circuit to the area of the video image output by the linear resampler circuit being determined by the scaling information.

[*106] **2. Claim 2 (A Claim Dependent on Claim 1)**

Dependent claim 2 adds the following element to claim 1:

a control circuit for receiving location parameters for determining the location of said predetermined area of said screen of said input video device that is to be scaled down for output to said window within said screen of said output video device.

'513 Patent at 22:40-44. The parties agree that this element is a "means plus function" limitation. See Claim Constr. Opening Brief at 8:25-26; Claim Constr. Sur-Opp'n at 2:5-6. S3 contends the structure disclosed by the specification that corresponds to this element "is the portion of a control unit that receives signals for determining a number of pixels to skip before collecting the input video information from the input video device." Joint Claim Constr. Statement at 19-20. In support of this interpretation, S3 cites passages in the specification describing a control circuit and its function. See Claim Constr. Reply, app. at 12 (citing '513 Patent at 2:19-23; 11:40-43; 11:47-48; 14:25-28).

nVidia contends that "the only reference to 'control circuit' in the specification is col. 20:61-62 which describes 'control [*107] unit 68.'" Claim Constr. Opp'n at 23:18-19. However, as cited by plaintiff, the specification does contain other references to the control circuit. See Claim Constr. Reply, app. at 12 (citing '513 Patent at 2:19-23; 11:40-43). Defendant also contends the specification does not refer to skipping pixels, as called for by S3's interpretation. Yet the portion of the specification cited by plaintiff appears to support S3's construction by referring to a "user defining a stop point and a start point for the horizontal and also along the vertical." '513 Patent at 11:47-48; see also id. at 14:25-28. Plaintiff's initial claim construction chart cites to these passages, see Joint Claim Constr. Statement at 19, yet defendant does not address them. Instead, defendant conclusorily asserts that the patent does not refer to skipping pixels. See Claim Constr. Opp'n at 23:20-22. This argument does not undermine plaintiff's proposed construction. Finally, while nVidia contests the reference in S3's interpretation to a "portion" of a control unit, defendant does not show that this is inaccurate. Accordingly, the Court adopts plaintiff's construction.

### 3. Remaining Claims

No further [*108] construction of the '513 claims is necessary. Neither party has briefed any other dispute regarding interpretation of this patent. Further, defendant asserts that a similar analysis "would apply to the similar elements of claims 2, 4, 5, and 7-9." Claim Constr. Opp'n at 23:23. Defendant also states that, "although claims 24-25, 27-28, [and] 30-32 are cast as method claims, many of the same claim construction analyses apply." Id. at 23:23-25. In addition, the Court notes that claims 1, 2, 4, and 5 are analogous to claims 7 to 9, to claims 24, 25, 27, and

28, and to claims 30 to 32, with each set of claims differing either in the form of the claims (apparatus or method) or in certain undisputed language (specifically, "averaging" versus "processing").

### B. Validity

nVidia contends that the claims-in-suit of the '513 patent are anticipated by both the Fleishman '934 patent and by the Fernandez '257 patent. See '513 & '379 Summ. J. Mot. at 10-11. S3's opposition focuses on the asserted independent claims of the '513 patent (i.e., claims 1, 7, 24, and 30). See '513 & '379 Summ. J. Opp'n at 7-8; see also RCA Corp. v. Applied Digital Data Sys., Inc., 730 F.2d 1440, 1446 (Fed. Cir. 1984) [*109] (if prior art did not anticipate independent claim, it could not anticipate dependent claim).

The four independent claims, and their respective dependent claims, substantially parallel one another, with the two main differences being (1) whether the claims pertain to an apparatus (independent claims 1 and 7), or to a method (independent claims 24 and 30), and (2) whether the claims pertain to "averaging" (independent claims 1 and 24), or "processing" (independent claims 7 and 30). Because the claims are substantially parallel, the parties frequently do not distinguish among the claims when making particular arguments.

### A. The Fleishman '934 Patent

Defendant presents evidence and argument that the Fleishman '934 patent contains every element of all the claims in suit. See '513 & '379 Summ. J. Mot. at 10; Hoff Decl. in Support of '513 & '379 Summ. J. Mot. P5 & exh. C. S3 responds that Fleishman fails to disclose many elements in numerous claims. See generally '513 & '379 Summ. J. Opp'n at 7-8. While S3 makes some effort to distinguish Fleishman from particular elements of the '513 patent, see id., the parties generally discuss the allegedly distinguishing features [*110] of the '513 patent without focusing on particular claim language. See id. at 8-9; '513 & '379 Summ. J. Reply at 11-12. For purposes of ruling on nVidia's summary judgment motion, the features in question can be considered without focusing on particular claims.

The allegedly distinguishing feature of the '513 patent that most clearly requires denial of defendant's motion is the invention's ability to "output[] the scaled down video [image] into window within a screen" and to "select[] the location of a specific output." Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n P24 (distinguishing the "means for designating" element of claims 7-9); see also '513 & '379 Summ. J. Opp'n at 8:27 to 9:1 (asserting this distinction). n26 In its reply, nVidia attempts to show (for the first time) that Fleishman "discloses positioning of the output window in the display." '513 & '379 Summ. J. Reply at 12:1. Defendant makes this argument by pointing out that Fleishman incorporates by reference a separate application that eventually became a patent known as the '590. See id. at 11:20-21. Defendant asserts that, because Fleishman incorporates '590, and the '590 patent allegedly [*111] discloses positioning the output image, Fleishman therefore discloses this feature. See generally id. at 11:20 to 12:1.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - -

n26 S3's expert also distinguishes other elements of claims 7-9 and all other claims in suit on the same basis. See Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n PP17, 19, 20, 21, 23, 25, 26, 28-30, 32-34.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - -

Defendant's argument is not sufficient to support its motion for summary judgment on anticipation. Ordinarily, defendant's reference to additional prior art such as the '590 patent would preclude anticipation as a matter of law. See RCA Corp. v. Applied Digital Data Sys., Inc., 730 F.2d 1440, 1444 (Fed. Cir.) ("anticipation is established only when a single prior art reference discloses, expressly or under principles of inherency, each and every element of a claimed invention"), cert. dismissed, 468 U.S. 1228 (1984). Only if Fleishman explicitly or clearly referred to a particular element of the '590 could that element be considered part of [*112] Fleishman for purposes of anticipation. See In re Saunders, 58 C.C.P.A. 1316, 444 F.2d 599, 602-03 (C.C.P.A. 1971); Atari Games Corp. v. Nintendo of Am., Inc., 1993 U.S. Dist. LEXIS 8183 at 59, 1993 WL 214886,(N.D. Cal. Apr. 15, 1993) (Smith, J.). But cf. Ultradent Prods., Inc. v. Life-Like Cosmetics, Inc., 127 F.3d 1065, 1069 (Fed. Cir. 1997) (apparently leaving open, but not discussing, possibility of anticipation by combination of references where one prior art reference incorporated "the entire contents of [another] disclosure"). Here, however, the Fleishman patent only notes as a general matter that "the present invention is related to" an application that became the '590 patent, "which application is hereby incorporated by reference." '934 Patent at 1:7-11, in Lanier Decl. in Support of '513 & '379 Summ. J. Mot., exh. C. Further, the '590 patent comprises several elements, such that a general reference is not enough to identify a particular feature of the patent. See generally '590 Patent, in Lanier Decl. in Support of '513 & '379 Summ. J.

Reply, exh. B. Thus, for purposes of whether Fleishman anticipates the '513 patent, the cross-reference [*113] in Fleishman to the '590 patent is not a sufficient disclosure of any "output" locating function that might be disclosed by the '590 in order for that function to be considered part of the Fleishman patent. Accordingly, nVidia's motion for summary judgment on the ground that Fleishman anticipates the claims of the '513 patent must be denied.

S3 makes several alternate arguments in opposing defendant's anticipation defense based on the Fleishman patent. Another distinguishing feature of the '513 patent that requires denial of defendant's motion is the invention's ability to select and operate upon "a predetermined area within a screen of [a] video input device." '513 Patent at 22:27-29 (claim 1); see also Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n P21 (distinguishing the "averaging circuit" element of claims 1, 2, 4, and 5 on this basis); '513 & '379 Summ. J. Opp'n at 8:26-28 (asserting this distinction). n27 To show that the Fleishman reference discloses operating on a predetermined area of the input video screen, nVidia cites to one passage of the Fleishman patent. See '513 & '379 Summ. J. Reply at 11:17-19. Significantly, the passage on which defendant finally [*114] relies was not cited in defendant's opening papers in connection with the "predetermined area" component. See Hoff Decl. in Support of '513 & '379 Summ. J. Mot. exh. C at 1-2. In any event, the passage does not show conclusively that Fleishman discloses operating on a predetermined area of the input screen. The passage states:

said scaler circuit being configured to receive said arrangement of picture elements, manipulate said arrangement of picture elements

> based upon said signal manipulation control signals to provide a manipulated arrangement of picture elements,

said manipulation including performing a discrete number of different operations on subsets of said arrangements of picture elements based upon said respective signal manipulation control signals, as discrete number of different operations being selectively enabled based upon said signal manipulation control signals, and

provide said manipulated arrangement of picture elements as a scaled image.

'934 Patent at 11:8-22 (emphasis added). nVidia's reply offers no explanation of this passage, see '513 & '379 Summ. J. Reply at 11:17-19, and its expert declaration offers only [*115] a summary conclusion: "A subset of picture elements corresponds to a predetermined area of the input image." Hoff Decl. in Support of '513 & '379 Summ. J. Reply at 5:1-2. This showing is not to show, by clear and convincing evidence, that the Fleishman reference discloses the "predetermined area" component of the '513 patent.

------------- Footnotes ---------
------

n27 S3's expert also distinguishes other elements of claims 1, 2, 4, and 5, as well as all other claims in suit, on the same basis. See Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n PP22, 26, 27, 30, 31, 34, 35.

------------ End Footnotes---------
------

In support of its argument that Fleishman discloses the "predetermined area" component, defendant also cites to the '590 patent. See '513 & '379 Summ. J. Reply at 11:20-24. However, for reasons previously discussed, defendant cannot rely on the '590 patent as part of its argument that the Fleishman reference anticipates the '513 patent because Fleishman does not specifically cross-reference to any portion of the '590 patent. In addition, defendant's expert refers [*116] to a "BLNK signal" in Fleishman as disclosing the "predetermined area" component. See Hoff Decl. in Support of '513 & '379 Summ. J. Reply at 5:2-5. However, defendant did not make the argument in either its opening or reply memoranda and, in any event, the expert does not adequately explain his assertions to show conclusively that Fleishman discloses the "predetermined area" component. For this reason as well, summary judgment on defendant's anticipation defense based on Fleishman is inappropriate. n28

------------- Footnotes ---------
------

n28 At a few points in its papers defendant seeks, in the alternative, to have the '513 patent found obvious based on Fleishman. This request appears only in a heading on defendant's motion, see '513 & 379 Summ. J. Mot. at 9:8, and briefly in defendant's reply, see '513 & 379 Summ. J. Reply at 12:3. These references can hardly suffice to show by "clear and convincing evidence" that a patent is invalid for obviousness. In particular, defendant offers no suggestion of any "motivation" that might prompt one skilled in the art to combine references such as Fleishman and the '590 patent to obtain the invention disclosed in the '513 patent.

Page 28

----------- End Footnotes--------
------

[*117]

## B. The Fernandez '257 Patent

The parties generally agree that the arguments and analysis regarding the Fernandez reference are very similar to those concerning Fleishman. See '513 & '379 Summ. J. Opp'n at 11:13-15; '513 & '379 Summ. J. Reply at 12:5-6. At the outset, defendant presents evidence and argument that Fernandez contains every element of all the claims in suit, see '513 & '379 Summ. J. Mot. at 10-11; Hoff Decl. in Support of '513 & '379 Summ. J. Mot. P8 & exh. D, and S3 disagrees, see generally '513 & '379 Summ. J. Opp'n at 11-13. As with the Fleishman reference, the parties generally discuss the allegedly distinguishing features of the '513 patent without focusing on particular claim language. See id. at 12-13; '513 & '379 Summ. J. Reply at 12.

The allegedly distinguishing feature of the '513 patent that most clearly requires denial of defendant's motion is the invention's ability to select and operate upon "a predetermined area within a screen of [a] video input device." '513 Patent at 22:27-29 (claim 1); see also Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n P39 (distinguishing the "averaging circuit" element of claims 1, 2, 4, and [*118] 5 on this basis); '513 & '379 Summ. J. Opp'n at 12:1-3, :18-21 (asserting this distinction). n29 Significantly, nVidia's opening memorandum and support declaration did not show how Fernandez met this component of the '513 patent. See Hoff Decl. in Support of '513 & '379 Summ. J. Mot. exh. D at 2, 6, 9, 13; see generally '513 & '379 Summ. J. Mot. at 10-11.

--------------- Footnotes ---------
------

n29 S3's expert also distinguishes other elements of claims 1, 2, 4, and 5, as well as all other claims in suit, on the same basis. See Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n PP42, 44, 47-48, 51-52, 55.

----------- End Footnotes--------
------

However, nVidia's reply cites to two figures and two passages in the Fernandez patent, and to another passage in an allegedly related document. See '513 & '379 Summ. J. Reply at 12:10-19. In themselves, however, the passages have little meaning, and defendant offers virtually no explanation of them. See also Hoff Decl. in Support of '513 & '379 Summ. J. Reply P15. Nor is any connection apparent between the cited passages and [*119] the figures in the patent to which defendant refers. At bottom, defendant's evidence does not amount to a "clear and convincing" showing that the Fernandez reference anticipates the "predetermined area" component of the '513 patent claims. Therefore, summary judgment on this defense is inappropriate. n30

--------------- Footnotes ---------
------

n30 It is also noteworthy that while S3 makes two other arguments in its opposition memorandum, defendant does not directly respond to them in its reply. First, defendant's reply does not address S3's assertion that Fernandez fails to disclose "computing a ratio." See '513 & '379 Summ. J. Opp'n at 12:23; see also Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n PP41, 46, 50, 54. Second, defendant does not reply to S3's argument that Fernandez does not enable certain disclosures. See '513 & '379 Summ. J. Opp'n at 12:9-16; see also Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n PP38, 43. Instead, nVidia's only response regarding this second argument is an untimely assertion that the disclosures of the '513 are themselves inadequate. See '513 & '379 Summ. J. Reply at 12-13; Hoff Decl. in Support of '513 & '379 Summ. J. Reply PP19-20.

----------- End Footnotes--------
------

[*120]

## V. ANALYSIS OF THE '379 PATENT

As summarized by S3, the '379 patent generally pertains to "a display system that permits video and graphics data to be simultaneously exhibited on a display." Claim Constr. Opening Brief at 2. Plaintiff asserts that nVidia infringes independent claim 10 of the '379 patent, as well as claims 12, 14, and 15 (all of which depend on claim 10). See Claim Constr. Opening Brief at 1; see generally Joint Claim Constr. Statement. Plaintiff does not assert that claims 1, 2, and 9 are infringed, however, and they are accordingly not part of this lawsuit. See Claim Constr. Opening Brief at 1 n.1; '513 & '379 Summ. J. Mot. at 14 n.16.

### A. Claim Construction

#### 1. Claim 10 (An Independent Claim)

#### a. "a display operable to"

This element reads as follows: "a display operable to display images as fields of a plurality of pixels, the display of said pixels timed with a pixel clock." '379 Patent at 15:4-6. The parties agree that this claim is written in "means plus function" language. See Claim Constr. Opening Brief at 9:27; Claim Constr. Sur-Opp'n at 2:5-6. S3 asserts that "the structure disclosed in the specification that [*121] is necessary for performing the function of displaying images as fields of a plurality of pixels is a display that displays pixels timed with a pixel clock." Joint Claim Constr. Statement at 39:20-25. nVidia responds that S3's interpretation fails to identify adequately the structure of the display as disclosed by the specification. See Claim Constr. Opp'n at 19:10-11. nVidia contends that "the display is a raster scan display." Id. at 19:12-13. S3's only response is to allege that "it is altogether unclear what NVIDIA is advocating." Claim Constr. Reply at 11:12-13. It is evident, though, that defendant is arguing that plaintiff has not sufficiently identified the structure associated with this element.

Both parties cite the same passage of the patent in support of their definition of the display in question. The passage reads as follows: "Display unit 107 may be for example a raster scan display system operable to display frames of images as fields of lines and pixels, each pixel being defined in color by analog RGB data received from DAC 20." '379 Patent at 4:30-33. Based on this passage, the Court finds nVidia's argument persuasive, particularly because the structure associated [*122] with an element written in "means plus function" language must be disclosed in the specification and S3's vague reference to a "display" does not sufficiently convey the nature of the structure that performs the display function.

Accordingly, plaintiff's interpretation of this element is modified to read: "the structure disclosed in the specification that is necessary for performing the function of displaying images as fields of a plurality of pixels is a raster scan display, or its equivalent, that displays pixels timed with a pixel clock."

#### b. "a graphics data source"

This element reads: "a graphics data source operable to generate graphics data defining pixels in a said field." '379 Patent at 15:7-8. The parties agree that this element is written in "means plus function" language. See Claim Constr. Opening Brief at 9:27-28; Claim Constr. Sur-Opp'n at 2:5-6. The parties do not dispute that the structure associated with this element is a VGA controller. See Joint Claim Constr. Statement at 40:12; Claim Constr. Opp'n, app. B at 1.

#### c. "graphics processing circuitry"

This element reads: "graphics processing circuitry operable to process said graphics data received [*123] from said graphics data source and provide in response signals for driving said display." '379 Patent at 15:9-11. The parties agree that this element is written in "means plus function" language. See Claim Constr. Opening Brief at 9:28; Claim Constr. Sur-Opp'n at 2:5-6. Plaintiff asserts that "the structure disclosed in the specification that is necessary for performing the functions of processing said graphics data received from said graphics data source and of providing in response signals for driving said display is a graphics processing circuit that receives graphics data produced by a VGA controller and outputs digital color data words associated with display pixels." Joint Claim Constr. Statement at 40:23 to 41:7 (emphasis added).

nVidia responds that plaintiff's interpretation is not sufficiently associated to a structure disclosed in the patent, and that "the 'graphics processing circuitry' element corresponds to the Graphics Processing/Clock Sync circuitry 202 in Figure 2 of the '379 patent specification." Claim Constr. Opp'n at 19:14-15. As with the "display operable" element, S3's only response is to allege that "it is altogether unclear what NVIDIA is advocating. [*124] " Claim Constr. Reply at 11:12-13. Again, however, it is evident that defendant is arguing that plaintiff has not sufficiently identified the structure associated with this element. And, again, the Court finds defendant's argument persuasive. Both parties have cited virtually the same passage in the '379 patent in support of their respective constructions. See Claim Constr. Opp'n, exh. B at 1 (citing '379 Patent at 5:65 to 6:22); Claim Constr. Reply, app. at 18-19 (citing '379 Patent at 5:65 to 6:13). The passage reads as follows:

> Graphics processing circuitry 202 includes an interface 210 for receiving up to 32-bits of graphics data from graphics frame buffer 105, 8-bits of VGA data and the graphic control signals and clocks previously described in connection with FIG. 1. Graphics processing circuitry 202 further includes a time multiplexing circuitry 211 which receives up to 32-bits of graphics data from the interface 210 and controls and times the selection from each 32-bit word of graphics data received of either one 24-bit pixel, two 16-bit pixels, four 8-bit pixels, or eight 4-bit pixels. The output of time multiplexer 21 is presented to multiplexer 212 for either addressing [*125] the color look-up table 213 (color palette RAM) or graphics chroma keyer 214. The single 24-bit pixel of the two 16-bit pixels output from time multiplexer 211

may be provided as true color data through multiplexer 215 thereby bypassing color look-up table 213.

Graphics processing circuitry 202 also includes clock sync circuitry 216 which receives up to two pixel clocks (PCLK) and a latch clock (LCLK) and outputs a shift clock to the VRAMs graphics memory 105 and/or graphics controller 103. The graphics shift clock (SCLK) is a divide down of the pixel clock and depends on the operating mode (i.e., the number of bits per pixel/number of pixels being processed for each 32-bit word received from either memory 104 or memory 105).

'379 Patent at 5:65 to 6:22. Review of the passage reveals the structural nature of the "graphics processing circuitry," the function of which is claimed by this element. Because the "means plus function" language of this element must be construed according to the corresponding structure disclosed in the specification, the Court adopts defendant's proposed interpretation. The element is construed as follows: The structure disclosed in the specification [*126] that is necessary for performing the functions of processing said graphics data received from said graphics data source and of providing in response signals for driving said display is circuitry corresponding to the Graphics Processing/Clock Sync circuitry 202 shown in Figure 2 and described at column 5, line 65, to column 6, line 22, of the '379 patent specification, or its equivalent. n31

------------- Footnotes ---------

n31 Plaintiff's proposed construction is also modified because, as explained hereafter, it improperly includes the word "digital."

------------ End Footnotes--------

d. "a video data source"

This element reads: "a video data source operable to generate video data defining pixels in a said field and a video clock." '379 Patent at 15:12-13. The parties agree that this element is written in "means plus function" language. See Plaintiff's Claim Constr. Opening Brief at 9:28; Claim Constr. Sur-Opp'n at 2:5-6. The parties do not brief whatever dispute they may have regarding this element; it appears they basically agree that the relevant structure is a [*127] video processor. See Claim Constr. Opp'n, exh. B at 1; Claim Constr. Reply, app. at 19.

e. "an interface for interfacing"

This element reads: "an interface for interfacing said graphics data source and said video data source to said display, comprising . . . ." '379 Patent at 15:14-15. The parties agree that this element is written in "means plus function" language. See Claim Constr. Opening Brief at 10:1; Claim Constr. Sur-Opp'n at 2:5-6. Plaintiff contends that "the structure disclosed in the specification that is necessary for performing the function of interfacing said graphics data source and said video data source to said display is a display interface device." Joint Claim Constr. Statement at 42:4-9. Defendant responds that the "interface" element corresponds to "DAC 20." See Claim Constr. Opp'n at 19:18, app. B at 2. Plaintiff only generally responds to this argument. See Claim Constr. Reply at 11:10-13. However, defendant does not cite any passage in the patent that would show that "DAC 20" corresponds with anything different than what plaintiff proposes. Accordingly, the Court adopts plaintiff's construction: The structure disclosed in the specification [*128] that is necessary for performing the function of interfacing said graphics data source and said video data source to said display is a display interface device.

f. "a memory"

This element reads: "a memory operable to store video data words received from said video data source, a write of a said video data word into said memory clocked by said video clock." '379 Patent at 15:16-18 (as corrected by certificate issued Feb. 17, 1998). The parties agree that this element is written in "means plus function" language. See Claim Constr. Opening Brief at 10:1; Claim Constr. Sur-Opp'n at 2:5-6. Plaintiff asserts that "the structure disclosed in the specification that is necessary for performing the function of storing video data words received from said video data source is a buffer memory into which video data is written in accordance with the video clock generated by the video data source." Joint Claim Constr. Statement at 42:18-25.

nVidia responds that this element is disclosed by either "FIFO 30 of Figure 2 or FIFO 301 of Figure 3." Claim Constr. Opp'n at 16:17-18. Again defendant contends that S3 has failed to identify with sufficient particularity the structure associated [*129] with an element written in "means plus function" language. Defendant's argument is persuasive. Nowhere in the passages cited by S3 in support of its construction is the relevant memory feature described in the broad language of "buffer memory" that plaintiff now seeks

to use. Instead, where the patent provides any indication of the nature of the memory's structure, it is with specific reference to a "first in/first out (FIFO) memory." '379 Patent at 6:48-49; see also id. at 2:29, 4:66. Finally, contrary to plaintiff's argument, see Claim Constr. Reply at 10:3-11, defendant is not seeking to read into this element structures that are not necessary to perform the claimed function.

In seeking to amend plaintiff's proposed construction, nVidia proposes referring to "FIFO 30 of Figure 2 or FIFO 301 of Figure 3." Claim Constr. Opp'n at 16:17-18. FIFO 301 is the actual "first in/first out (FIFO) memory," and the passage at lines 47 to 54 of column 6 describes the structure more accurately than merely referring to a figure in the patent. Accordingly, plaintiff's proposed construction is modified and adopted as follows: "the structure disclosed in the specification that is necessary [*130] for performing the function of storing video data words received from said video data source is the "first in/first out (FIFO) memory" described at lines 47 to 54 of column 6 of the '379 patent, or equivalents, into which video data is written in accordance with the video clock generated by the video data source."

g. "video processing circuitry"

This element reads as follows:
video processing circuitry operable to process said video data received from said memory and provide signals for driving said display in response, a read of a said video data word out of said memory, clocked by said pixel clock.
'379 Patent at 15:19-23. The parties agree that this element is written in "means plus function" language. See Claim Constr. Opening Brief at 10:1; Claim Constr. Sur-Opp'n at 2:5-6. As for the associated structure disclosed in the specification, S3 asserts the following:
the structure disclosed in the specification that is necessary for performing the functions of processing said video data received from said memory and of providing signals for driving said display in response is a video processing circuit that receives video data from the buffer [*131] memory at a rate determined by the pixel clock and outputs digital color data words associated with display pixels.
Joint Claim Constr. Statement at 43:10-20 (emphasis added).

Defendant asserts, without further discussion, that "the 'video processing circuitry' element corresponds to the Video Processing 201 in Figure 2 minus the FIFO 30 which corresponds to the memory element." Claim Constr. Opp'n at 19:16-17. As before, S3's main response is to allege that "it is altogether unclear what NVIDIA is advocating." Claim Constr. Reply at 11:12-13. However, defendant's argument is, again, apparent: plaintiff has not sufficiently identified the structure associated with this element. Indeed, defendant states this argument quite clearly with respect to the "video processing circuitry" element:
S3 cites to six different passages from the specification, including five columns of text (almost 33% of the specification). However, there is no specific[] identification of structure and it is unknown which specific elements S3 believes are part of the structures corresponding to this element.
Claim Constr. Opp'n at 19 n.18 (the five-column cite to which defendant refers [*132] appears at page 43, line 4, of the Joint Claim Construction Statement). Perhaps prompted by this footnote, plaintiff's revised claim construction chart omits the original citation covering five columns of the patent but, in its place, plaintiff cites nothing that describes the video processing circuitry. See Claim Constr. Reply, app. at 20. Meanwhile, there is a very explicit passage in the specification referring to the structure of the video processing circuitry, and this is the passage on which defendant relies to support its argument. See Claim Constr. Opp'n, app. B at 2 (citing '379 Patent at 5:58-64).

Because an element drafted in "means plus function" language must be linked with a structure appearing in the specification, the Court is persuaded by nVidia's argument. Accordingly, plaintiff's construction of this element is modified and adopted as follows:
The structure disclosed in the specification that is necessary for performing the functions of processing said video data received from said memory and of providing signals for driving said display in response is the "video processing circuitry 201 described at lines 58 to 64 of column 5 of the '379 patent [*133] minus FIFO 30, or the equivalents of such circuitry, and which receives video data at a rate determined by the pixel clock and outputs color data words associated with display pixels. n32



- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n32 Plaintiff's proposed construction is also modified because, as explained hereafter, it improperly includes the word "digital."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

h. "mixing circuitry"

This element reads as follows: "mixing circuitry for selecting between said signals generated by said video processing circuitry and said signals generated by said

graphics processing circuitry." '379 Patent at 15:23-26. The parties agree that this element is written in "means plus function" language. See Claim Constr. Opening Brief at 10:3-5; Claim Constr. Sur-Opp'n at 2:5-6. As to the relevant structure, plaintiff contends as follows:

the structure disclosed in the specification that is necessary for performing the function of selecting between said signals generated by said video processing circuitry and said signals generated by said graphics processing [*134] circuitry is a mixing circuit that is operable to select between digital color data words output by the graphics processing circuitry and video processing circuitry for display.

Joint Claim Constr. Statement at 44:5-15 (emphasis added). nVidia asserts, however, that "the corresponding structure disclosed in the specification is to mixer 205." Claim Constr. Opp'n at 18:10-11 (citing '379 Patent at 5:34-38).

The parties do not seriously dispute that the relevant structure is some type of multiplexer, as disclosed in the specification by the mixer 205 component. Compare Claim Constr. Opp'n at 18:10-13 (citing mixer 205) and id. app. C at 3 (referring to element 205 as a multiplexer) with Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n at 21:24 ("The [mixing] circuitry disclosed in the '379 specification . . . is a digital multiplexer 205."). The only question is whether or not the element is limited to a "digital" multiplexer.

As discussed below, nVidia has challenged the validity of claim 10 on the ground that it is anticipated by a prior reference known as the Marlton '467 patent. See '513 & '379 Summ. J. Mot. at 13. S3 attempts to distinguish [*135] this reference by asserting that "Marlton does not contain mixing circuitry that mixes digital signals generated by the graphics processing circuitry and the video processing circuitry, as those elements are properly interpreted." '513 & '379 Summ. J. Mot. at 15:20-23 (emphasis added); see also Claim Constr. Opp'n at 18 n.15 (noting plaintiff's argument). To effectuate this distinction, S3 proposes that the outputs of the graphics processing circuitry and video processing circuitry -- the two sources of signals received by the "mixing circuitry" element -- be interpreted at digital signals. See Joint Claim Constr. Statement at 41:6 (specifying that graphics processing circuit "outputs digital color data words"); id. at 43:19-20 (specifying that video processing circuit "outputs digital color data words"). Defendant responds that this alleged limitation does not appear in the "mixing circuitry" element, nor does the specification otherwise describe this circuitry in terms of receiving only digital data. See Claim Constr. Opp'n at 18-19; see also '513 & '379 Summ. J. Mot. at 13; '513 & '379 Summ. J. Reply at 5-7. The key question for claim construction, then, [*136] is whether S3 has properly proposed to limit the signals received by the "mixing circuitry" to "digital" signals. n33

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n33 Although S3's claim construction chart frames the issue in terms of whether these outputs should be interpreted as digital signals, plaintiff also phrases the issue in terms of whether the "mixing circuitry" that receives the outputs in question is "a digital multiplexer or its equivalent." '513 & '379 Summ. J. Opp'n at 16:5-6. It is undisputed that the issue here is the same, whichever way it is phrased.

- - - - - - - - - - - End Footnotes- - - - - - - - -

S3 offers virtually no evidence in support of the limitation it proposes on the nature of the signals received by the "mixing circuitry." To begin with plaintiff asserts that its claim construction chart is consistent with its arguments, see Claim Constr. Reply at 10:21 to 11:5, but what matters is whether the proposed constructions are supported by the patent and related intrinsic evidence. S3's citation to a patent application that is cross-referenced in the '379 patent is therefore [*137] far more relevant. See id. at 11 n.17. S3 asserts that the application "discloses an improvement on prior art analog mixing techniques, the improvement being a digital mixer," such that "the '379 patent does not disclose both analog and digital signals." Id. However, the only portion of the application to which plaintiff cites is a figure in the application, and S3 offers no explanation regarding the figure. See id. (citing Lanier Decl. in Support of '513 & '379 Summ. J. Reply, exh. C at 2618). Meanwhile, in cross-referencing this application, the '379 patent specification did not limit its reference to an "improvement" disclosed in the application. Instead, the specification generally refers to the application "for a more complete description of mixing (multiplexing) circuitry." '379 Patent at 5:44-46.

Review of the cross-referenced patent application shows that the publication unquestionably discusses the mixing of analog signals. See Lanier Decl. in Support of '513 & '379 Summ. J. Reply, exh. C at 2584. Whether or not digital signals are also discussed is not clear. But even if digital signals are disclosed, plaintiff offers no proper evidence to support [*138] its assertion that the "mixing circuitry" of the '379 patent is specifically limited to receiving digital signals. Thus, as nVidia asserts, the patent application

cross-referenced in the '379 patent tends to show that the "mixing circuitry" element need not receive only digital signals. See Claim Constr. Opp'n at 18 & n.17; '513 & '379 Summ. J. Reply at 6-7.

The only other evidence plaintiff provides is its expert's declaration, see Claim Constr. Reply at 11 n.17, but this declaration simply makes conclusory statements that the "mixing circuitry" of the '379 patent receives digital signals, specifically. See Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n PP66-69, 102-05. The only portion of the '379 patent cited by the expert does not refer to digital signals, see id. P67 (citing '379 Patent at 5:36-38), and review of the other allegedly supporting passages cited in S3's claim construction chart fails to disclose any reference to digital signals, see Joint Claim Constr. Statement at 40:13-15, 42:26 to 43:5; Claim Constr. Reply, app. A, at 18-19, 20. S3's expert also describes the Marlton invention at some length in order to distinguish it from the '379 [*139] patent. See Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n PP68, 104. However, the discussion is entirely premised on the assumption that the '379 patent is limited to "digital" signals -- an assumption for which plaintiff and its expert neither provide any intrinsic evidence nor identify any ambiguity requiring resort to extrinsic evidence in support of the proposed claim interpretation.

S3 further argues that, "if there were any ambiguity about the mixer being digital, the element must be construed so as to support the validity of the claims." Claim Constr. Reply at 11:6-7. However, S3 has not pointed to any ambiguity and, thus, the case on which plaintiff relies is distinguishable. See Harris Corp. v. IXYS Corp., 114 F.3d 1149, 1152-53 (Fed. Cir. 1997) (discussing disagreement over meaning of specific claim language). Here, the patent simply omits the "digital" limitation that plaintiff now seeks to read into the patent. Thus, the rule applicable here is that, while courts will construe claims if possible to sustain their validity, "it is well settled that no matter how great the temptations of fairness or policy making, courts do not redraft claims. [*140] " Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1584 (Fed. Cir. 1995) (rejecting request to remove language that broadened claims and, as a result, invalidated them); accord Intervet Am., Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989) (noting that limitations appearing in specification will not be imported into claims).

Finally, it is noteworthy that the '379 patent may well concern "mixing circuitry" that receives digital signals. What matters here, however, is that this limitation does not appear in the patent. In the absence of such a limitation, reliance on the alleged presence of digital signals in devices that happen to embody the invention covered by claim 10 is not sufficient in itself to refute nVidia's contention that claim 10 of the '379 patent is anticipated by the Marlton reference. Cf. 1 Donald S. Chisum, Chisum on Patents § 3.03[2], at 3-20 to -21 (1999) (discussing anticipation of generic elements by specific prior art references).

In sum, this element is construed as follows: The structure disclosed in the specification that is necessary for performing the function of selecting between said signals generated [*141] by said video processing circuitry and said signals generated by said graphics processing circuitry is a multiplexer that is operable to select between color data words output by the graphics processing circuitry and video processing circuitry for display.

### 2. Claim 12 (A Claim Dependent on Claim 10)

This claim reads as follows:
The device of claim 10 wherein said video processing circuitry includes format alignment circuitry operable to receive words of said video data coupled thereto from said memory in a first bit format and output said ones of said video data words in a second bit format.
'379 Patent at 16:3-7. The parties agree that the "format alignment circuitry" element in this claim is written in "means plus function" language. See Claim Constr. Opening Brief at 10:2; Claim Constr. Sur-Opp'n at 2:5-6. Plaintiff contends that "the structure disclosed in the specification that is necessary for performing the functions of receiving words of said video data coupled thereto from said memory in a first bit format and of outputting said ones of said video data words in a second bit format is a format aligner within the video processing circuit." Joint [*142] Claim Constr. Statement at 45:4-12 (emphasis added). The parties do not brief any issue respecting this element, and comparison of their claim charts discloses substantial agreement. Compare id. (referring to "format aligner" generally) with Claim Constr. Opp'n, app. B at 3 (focusing on "format aligner 40," as described in the '379 specification). Accordingly, the Court adopts plaintiff's construction.

### B. Validity

nVidia contends that independent claim 10 of the '379 patent, and certain dependent claims are anticipated by either the Marlton '467 patent or the Lumelsky '912 patent. See '513 & '379 Summ. J. Mot. at 12-13. n34

-------------- Footnotes ---------

n34 nVidia also cited the Siann '306 patent as an anticipating reference, see '513 & '379 Summ. J. Mot. at 13, but declines to press the argument in the face S3's

contention that the '306 patent is not relevant prior art. See '513 & '379 Summ. J. Reply at 1 n.1 (indicating that anticipation arguments are based on four patents, not including the '306); see also '513 & '379 Summ. J. Opp'n at 16 (asserting the '306 patent is not relevant prior art).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*143]

As with its previous anticipation arguments, nVidia simply cites to a chart prepared by its expert showing that all elements of the relevant claims of the '379 patent are disclosed by the Marlton and Lumelsky patents. See '513 & '379 Motion at 12-13 (citing Hoff Decl. in Support of '513 & '379 Motion, exhs. E (Lumelsky chart), F (Marlton chart). Similarly, as it did in response to nVidia's attack on the '513 patent, S3 focuses on showing that at least a genuine issue exists regarding whether the independent claim in suit, claim 10, is anticipated. See '513 & '379 Opp'n at 13-14.

### 1. The Marlton '467 Patent

Turning first to the Marlton '467 patent, defendant presents substantial evidence and argument that this reference contains every element of claims 10, 14, and 15. See '513 & '379 Summ. J. Mot. at 13; Hoff Decl. in Support of '513 & '379 Summ. J. Mot. PP15, 16 & exh. F. In response, S3 contends this reference fails to disclose the "mixing circuitry" element of independent claim 10 -- an element that S3 asserts "must be a digital multiplexer or its equivalent." '513 & '379 Summ. J. Opp'n at 16:5-6. S3's response is based solely on this element, as confirmed by [*144] the declaration of S3's expert. See Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n, PP66-69, 102-05 (distinguishing Marlton solely on basis of "mixing circuitry" element).

As construed above, the "mixing circuitry" element of claim 10 is not limited to receiving only digital signals, nor is the structure itself limited to "a digital multiplexer or its equivalent." S3 therefore cannot raise a genuine issue regarding anticipation of claim 10 by arguing that the Marlton reference does not disclose such a limitation. See 1 Donald S. Chisum, Chisum on Patents § 3.03[2], at 3-20 to -21 (1999) (discussing anticipation of generic elements by specific prior art references). Because a genuine issue of fact is lacking on this point, nVidia is entitled to summary judgment on its defense that the Marlton '467 patent anticipates, and therefore invalidates, claim 10 of the '379 patent. S3 makes no argument at all that claims 14 and 15 are any different from claim 10, with respect to the Marlton reference. Accordingly, these claims are also invalid as anticipated.

### 2. The Lumelsky '912 Patent

The only claim of the '379 patent remaining in suit is claim 12, which depends [*145] on claim 10. Although claim 10 is anticipated by Marlton, claim 12 may still be valid. Cf. Productivity Software Int'l, Inc. v. Healthcare Techs., Inc., 1995 U.S. Dist. LEXIS 6107 at 17 n.5, 1995 WL 267184(S.D.N.Y. May 8, 1995) (noting that "dependent claims may be valid despite depending from an independent claim anticipated by prior art," and discussing patent office procedure in such situations). nVidia therefore challenges claim 12 (together with claims 10 and 14) by offering evidence and argument that these claims are anticipated by the Lumelsky '912 patent. See '513 & '379 Summ. J. Mot. at 12-13; Hoff Decl. in Support of '513 & '379 Summ. J. Mot. PP13, 14 & exh. E.

In response, S3 asserts that claim 10 is distinguishable from the Lumelsky reference on several grounds. See '513 & '379 Summ. J. Opp'n at 14-15. Although S3's response to the Lumelsky '912 patent focuses on distinguishing claim 10 -- the claim on which claim 12 depends -- such arguments could suffice to show that claim 12 is not anticipated. See RCA Corp. v. Applied Digital Data Sys., Inc., 730 F.2d 1440, 1446 (Fed. Cir. 1984) (if prior art did not anticipate independent claim, it could not anticipate [*146] dependent claim). Regarding claim 10, plaintiff makes three arguments: (1) nVidia's expert improperly identified the same element of Lumelsky as meeting two different elements of claim 10; (2) Lumelsky "does not contain a memory that is clocked as required" by claim 10, and (3) Lumelsky "does not contain mixing circuitry that mixes the digital signals generated by the graphics processing circuitry and the video processing circuitry [of claim 10], as those elements are properly interpreted." '513 & '379 Summ. J. Opp'n at 14; see also Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n PP60-65, 87-101.

Considering these arguments in reverse order, S3's attempt to distinguish Lumelsky based on the "mixing circuitry" of claim 10 fails for the same reason as plaintiff's attempt to distinguish Marlton. Plaintiff offers no additional reasons why the "mixing circuitry" of claim 10 should be construed as limited to a "digital multiplexer or its equivalent," or why the outputs of the graphics processing circuitry and video processing circuitry should be construed as limited to digital signals. Accordingly, plaintiff's argument based on the "mixing circuitry" element is insufficient [*147] to raise a genuine issue regarding whether Lumelsky anticipates claim 10.

Plaintiff's next argument is that the "memory operable" element is "clocked" in a different manner from the relevant memory in Lumelsky. See '513 & '379 Summ. J. Opp'n at 14:12-13 & n.17. Specifically, plaintiff's expert asserts that the '379 patent uses two different clock rates, while Lumelsky only uses one. The expert states as follows:

The "memory operable to store video data words" of Claim 10 (and incorporated by dependency into claims 12, 14, and 15) must have the following enumerated characteristics: "a write of a said video data word into said memory clocked by said video clock" (Claim 10, '379 patent, Col. 15, ll. 17-18); and "a read of a said video data word out of said memory clocked by said pixel clock," (Claim 10, '379 patent, Col. 15, ll. 20-22.) Lumelsky teaches that a single clock, TVCK, corresponding to a video clock ("TV clock signal"), clocks data both into and out from FIFO 115. On writing to the FIFO, Lumelsky teaches: ". . . video data on line 117 is shifted into the FIFO at the rate of one video sample per TV Clock (TVCK) at gate 119" ('912 patent at Col. 7, ll. 61-63.) [*148] As to reading video data out of the FIFO, Lumelsky teaches: ". . . video data can be shifted out of the other end of the FIFO on line 121, also at the TVCLK [sic; TVCK] rate." ('912 patent at Col. 7, ll. 66-68.) Lumelsky further states: "This is critical, since the incoming video samples are being clocked out of the FIFO 115 at the TVCK rate, or approximately every 70 nsec in this system." ('912 patent at Col. 11, ll. 42-45.) Accordingly, the '912 patent expressly teaches clocking a FIFO using one independent clock, and in so doing does not disclose but teaches away from the memory required by Claim 10.

Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n P61; see also id. P100.

In contrast to plaintiff's detailed analysis of the '379 and '912 patents, nVidia's evidence regarding clocking of the memories in question is negligible. Defendant's expert initially states only that "one of ordinary skill in the art would understand that a FIFO is clocked by two independent clocks." Hoff Decl. in Support of '513 & '379 Summ. J. Mot., exh. E at 2. This statement is unaccompanied by any reference to evidence supporting the assertion regarding the understanding [*149] of those of "ordinary skill in the art." Cf. In re Buchner, 929 F.2d 660, 661 (Fed. Cir. 1991) (disregarding expert declaration which offered no support for its assertion regarding the knowledge of those of ordinary skill in the art). Significantly, nVidia's expert never explains the source of the second, independent clock to which he refers. Finally, in its reply to plaintiff's opposition, defendant's expert states only that the relevant components of Lumelsky "taken together meet all the requirements for the memory of claim 10 of the '379 patent." Hoff Decl. in Support of '513 & '379 Summ. J. Reply at 12:1-2. This certainly does not dispel the genuine issue raised by S3's expert regarding whether Lumelsky discloses the two clocking mechanisms associated with the "memory operable" element of claim 10. Accordingly, summary judgment on nVidia's claim of anticipation based on Lumelsky must be denied. Although independent claim 10 is invalid for the reasons previously discussed, dependent claim 12 of the '379 patent remains in suit. n35

---------------Footnotes---------

n35 Because the dispute whether Lumelsky discloses two clocks is sufficient ground on which to deny nVidia's motion with respect to this prior reference, it is unnecessary to consider S3's third argument regarding whether defendant's expert improperly identified the same element in Lumelsky as disclosing two different elements of claim 10. In any event, the showing by S3 on this point is sufficient to raise another genuine issue whether Lumelsky '912 patent discloses every element of claim 10. See '513 & '379 Opp'n at 14:18 to 15:6; see also Belgard Decl. in Support of '513 & '379 Summ. J. Opp'n PP87-94.

------------End Footnotes--------

[*150]

## VI. MOTIONS TO AMEND AND REOPEN DISCOVERY

nVidia moves for leave to amend its answer to include an affirmative defense and a counterclaim alleging that the '379 patent is unenforceable due to inequitable conduct. The motion is relevant with respect to claim 12 of the '379 patent, which still remains in suit.

### A. Background

On February 11, 1999, defendant nVidia deposed John Schafer ("Schafer"), one of the inventors of the '379 patent (see Motion to Reopen at 3:8). n36 During this deposition, both nVidia and S3 apparently learned for the first time that a chip, known as the "CL-PX 2080," made by Schafer's former employer, Cirrus Logic, Inc., was a commercial embodiment of the '379 patent (see S3's Reopening Opp'n at 1:12-15; id. at 3:2-4). On February 23, 1999, two weeks after Schafer's deposition, S3 produced to nVidia certain documents

relating to a previous case in which S3 had been sued for patent infringement (see Mot. to Reopen at 2:16-17).

------------- Footnotes ---------

n36 S3 cooperated with nVidia in allowing depositions to be scheduled after the February 1, 1999 discovery cutoff date (see S3's Opp'n at 1 n.1).

------------ End Footnotes- -------

[*151]

In the prior lawsuit, Brooktree Corp. v. S3 Corp., S3 argued that one of Brooktree's asserted patents, the Siann '306, was unenforceable for failure to disclose the CL-PX 2080 as prior art. Since the CL-PX 2080 was the basis of the '379 patent, nVidia asserts that S3 should have produced the litigation materials sooner in response to certain document requests. It appears that nVidia bases the proposed amendment to its answer upon this recently produced information.

## B. Analysis

In assessing whether leave to amend is proper, the relevant factors a court may consider include whether the proposed amendment "would cause the opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility or creates undue delay." Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989). S3 argues that nVidia's motion for leave to amend should be denied because of undue delay and because S3 will be prejudiced if nVidia is permitted to amend.

### 1. Undue Delay

nVidia did not file its motion for leave to amend until March 2, 1999, one month after discovery in this matter closed on February 1, 1999. S3 argues that the Court should [*152] deny nVidia's motion because of this delay.

nVidia argues that the delay occurred because it did not learn of the connection between the CL-PX 2080 chip and the '379 patent until Mr. Schafer's deposition. Further, S3 did not produce the Brooktree Corp. v. S3 Corp. documents until February 23, 1999, which documents included information regarding the relationship between the CL-PX 2080 chip and the '306 patent. n37

------------- Footnotes ---------

n37 S3 asserts that it also was unaware of the connection between the CL-PX 2080 chip and the '379 patent until Mr. Schafer's deposition on February 11, 1999. nVidia argues that S3's asserted ignorance is disingenuous because S3 argued in the Brooktree matter that the CL-PX 2080 chip was prior art to the '306 patent and, further, because S3 offered testimony of Mr. Reinert, an inventor of the '379 patent, in the Brooktree matter. nVidia's argument in this regard is unavailing. The '379 patent was not at issue in the Brooktree matter. Moreover, Mr. Reinert is not an employee of S3, nor is Mr. Schafer. There is no basis upon which the Court can conclude, or even infer, that S3 had knowledge of the connection between the CL-PX 2080 chip and the '379 patent prior to Mr. Schafer's deposition.

------------ End Footnotes- -------

[*153]

The flaw in nVidia's explanation for the delay in seeking leave to amend is that its proposed counterclaim alleges inequitable conduct based on five different patents that nVidia alleges were relevant to the patentability of the '379 patent and that nVidia alleges should have been disclosed to the PTO. Only one of those five patents, the '306, appears to have been implicated in either the Brooktree matter or Mr. Schafer's deposition testimony. nVidia does not explain when or how it learned of these four other patents. It is therefore not apparent how nVidia's delayed receipt of the Brooktree material, or the information attained at Mr. Schafer's deposition, accounts for nVidia's delay in seeking to amend. See Jackson v. Bank of Hawaii, 902 F.2d 1385, 1388 (9th Cir. 1990) ("Relevant to evaluating the delay issue is whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading.").

Furthermore, nVidia did not notice the deposition of Mr. Schafer until January 11, 1999, despite the fact that Mr. Schafer is identified on the face of the '379 patent as an inventor and was identified as such in S3's [*154] initial disclosures on August 19, 1998. Therefore, nVidia's own delay in deposing Mr. Schafer prevented it from learning of the connection between the CL-PX 2080 chip and the '379 patent until after the close of discovery. n38

------------- Footnotes ---------

n38 nVidia bemoans the fact that Mr. Schafer was difficult to serve with a subpoena. However, nVidia does not state the date upon which it first attempted to subpoena Mr. Schafer, nor does nVidia suggest that it was earlier than in January 1999, the last month in which discovery was permitted.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Although the policy toward amendments is a liberal one, leave to amend is given less freely where a party does not seek leave to amend until discovery has closed and trial is approaching. See Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1994) (affirming trial court's denial of leave to amend where the plaintiff did not seek leave until discovery was complete and trial was only two months away); Texaco v. Ponsoldt, 939 F.2d 794, 799 (9th Cir. 1991) (affirming denial [*155] of leave to amend where the plaintiff did not seek leave until after the close of discovery and trial was only four and a half months away). In this case, nVidia sought leave to amend after the close of discovery, at a time when trial was only three months away. Although the trial date which was in effect at that time, June 7, 1999, has been continued to January 10, 2000, pretrial filings are currently due at the end of August 1999 and the pretrial conference is scheduled for mid-September 1999. An amendment is certain to disrupt the pretrial schedule. Therefore, the factor of delay favors the denial of defendant's motion.

**2. Prejudice**

nVidia contends that its amendment would not prejudice S3 because it is only seeking limited discovery in regard to the amendment. However, this argument is unavailing. S3 was not involved in the prosecution of the '379 patent. Therefore, S3 would have to conduct its own potentially onerous discovery regarding the intent of the applicants of the '379 patent and their knowledge about the many prior art references cited in the proposed amendments to the answer. See Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., 162 F.3d 1113, 1122 (Fed. Cir. 1998) [*156] (inequitable conduct occurs "if the applicant does not disclose material information to the PTO . . . with an intent to deceive or mislead the examiner."). Furthermore, the defendant's motion seeks a "limited" production of all documents from S3 which mention the five prior art references on which the proposed inequitable conduct claim is based. Notwithstanding nVidia's characterization of this discovery request as "limited," it seeks documents referencing five separate patents and is therefore potentially quite expansive in scope. Thus, the Court is persuaded that nVidia's proposed amendment would unduly prejudice S3. See Western Shoshone Nat'l Council v. Molini, 951 F.2d 200, 204 (9th Cir. 1991) (affirming trial court's denial of leave to amend because, among other things, the amendment would interject a new issue at a late stage in the proceedings which would require extensive discovery).

For the foregoing reasons, nVidia's motion for leave to amend its answer and counterclaims is denied.

**C. Motion to Reopen Discovery**

Defendant also moves to reopen limited discovery in order to prepare its proposed defense and counterclaim of inequitable conduct. A [*157] trial court has "broad discretion" to permit or deny discovery. See Goehring v. Brophy, 94 F.3d 1294, 1305 (9th Cir. 1996). In light of the Court's denial of the defendant's motion for leave to amend to assert its proposed defense and counterclaim of inequitable conduct, defendant's motion to reopen discovery is denied.

**VII. CONCLUSION**

A. The application of defendant nVidia filed April 14, 1999 (Docket No. 149), seeking leave to file a sur-opposition is GRANTED; the Clerk shall file the proposed sur-opposition received the same day.

B. The claims in suit are construed as set forth above. Based on these constructions and for the reasons previously stated, defendant's summary judgment motions (Docket Nos. 73, 80) are GRANTED IN PART, AND DENIED IN PART. In accordance with these rulings, the following claims are HEREBY DECLARED INVALID: Claims 1, 2, 3, 4, 9, 10, and 11 of United States Patent No. 5,581,279; and Claims 10, 14, and 15 of United States Patent No. 5,625,379.

C. Defendant's motions to reopen discovery (Docket No. 91) and to amend the answer (Docket No. 93) are DENIED.

D. The May 10, 1999 pretrial preparation order is [*158] amended to extend the pretrial deadlines by two weeks. The pretrial filings due August 24, 1999 are now due September 7, 1999; (2) motions in limine and objections to evidence are now due September 14, 1999; (3) responses or objections to evidence or motions in limine are now due September 21, 1999. Furthermore, the prior trial conference scheduled for September 14 shall now be held on September 28, 1999, at 11:30 a.m.

IT IS SO ORDERED.

DATED: August 16, 1999

SAUNDRA BROWN ARMSTRONG

United States District Judge

ORDER GRANTING PLAINTIFF S3 INCORPORATED'S EXPEDITED MOTION FOR LEAVE TO MOVE FOR LIMITED RECONSIDERATION OF THE COURT'S ORDER RE CLAIM CONSTRUCTION AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

The Court having considered S3's Motion for Leave to Move for Limited Reconsideration of the Court's Order Re Claim Construction and Defendant's Motions for Summary Judgment, the Court finds the Motion meritorious.

THEREFORE IT IS ORDERED:

S3 may file a motion for limited reconsideration of this Court's Order Re Claim Construction and Defendant's Motions for Summary Judgment.

SO ORDERED

10-12-99

By: SAUNDRA BROWN ARMSTRONG

United States District Judge