# EXHIBIT A

## SICOR'S DOCUMENT PRODUCTION

| Date | Event |
|---|---|
| November 9, 2004 | Pharmacia serves its first set of requests for production (three weeks before Sicor) |
| December 7, 2004 | Sicor asks for a 30-day extension of time to respond to Pharmacia's requests for production |
| January 2005 | Sicor fails to produce documents |
| February 2005 | Sicor fails to produce documents |
| March 29, 2005 | Sicor produces its first documents (3,251 pages), but only its ANDA (served after Pharmacia's first production) |
| April 1, 2005 | Sicor produces 4,883 additional pages |
| April 11, 2005 | Sicor produces 10,445 additional pages |
| April 20, 2005 | Sicor produces 4,928 additional pages |
| June 6, 2005 (after the deadline for amending pleadings) | Sicor produces 14,451 additional pages |
| June 10, 2005 | Sicor produces 6,862 additional pages |
| August 4, 2005 (at Sicor's 30(b)(6) deposition) | Sicor produces its first portions of laboratory notebooks |
| August 24, 2005 | Sicor produces 4,460 additional pages (including laboratory notebook pages) |
| September 2, 2005 | Sicor produces 131 additional pages (relating to damages, shortly before Sicor's 30(b)(6) deposition on damages topics) |
| September 7, 2005 | Sicor produces 17 additional pages (relating to damages, shortly before Sicor's 30(b)(6) deposition on damages topics) |
| September 13, 2005 | Sicor produces 380 additional pages (relating to damages) |
| September 15, 2005 (Pharmacia's damages expert report due) | Sicor produces 62 additional pages (relating to damages) |
| September 16, 2005 | Sicor produces an additional page (relating to damages) |
| September 24, 2005 (later than it promised the Court) | Sicor produces batch and shipment records |
| October 3, 2005 | Sicor produces 17 additional pages (including materials related to Bradley Winter) |

# Exhibit B

**SICOR'S LACK OF DILIGENCE IN PURSUING TESTIMONY FROM INVENTORS**

| Date | Event |
|---|---|
| November 2, 2004 | Sicor's counsel informs the Court it will have to use Hague Convention procedures to obtain testimony from the inventors |
| December 2004 | Sicor does nothing to seek testimony from the inventors |
| January 2005 | Sicor does nothing to seek testimony from the inventors |
| February 2005 | Sicor does nothing to seek testimony from the inventors |
| March 2005 | Sicor does nothing to seek testimony from the inventors, despite the Court's March 17, 2005 warning that no extensions of discovery to take testimony would be provided |
| April 2005 | Sicor does nothing to seek testimony from the inventors |
| May 13, 2005 | Sicor sends draft deposition notices for the inventors to Pharmacia, knowing that none of the inventors is employed by Pharmacia |
| June 2005 | Sicor does nothing to seek testimony from the inventors (but Pharmacia seeks to have inventors testify) |
| July 21, 2005 | Sicor initiates Hague Convention procedures |
| September 27, 2005 | Sicor's selected commissioner contacts the parties to offer dates for taking of testimony; Sicor requests dates after the close of discovery |

# EXHIBIT C



McDonnell Boehnen Hulbert & Berghoff LLP

300 South Wacker Drive
Chicago, Illinois 60606-6709
www.mbhb.com

312 913 0001 phone
312 913 0002 fax

September 27, 2005

C/M No. 1144/2 Total Pages: 1

**VIA FACSIMILE 212 768 6800**
David R. Baum
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020-1089

**VIA FACSIMILE 312 876 7934**
Jordan A. Sigale
Sonnenschein Nath & Rosenthal LLP
8000 Sears Tower
233 South Wacker Drive
Chicago, Illinois 60606

Re: Pharmacia & Upjohn Co. LLC v. Sicor Inc.

Dear David and Jordan:

The vast majority of prosecution files that Brian Moriarty identified in Topic 3 of his letter of September 13, 2005 are not related to the '285 Patent in suit. Those prosecution files pertain to patents and patents applications that do not claim priority to GB8519452, and are not in the same family as the '285 patent. As such, they fall outside any of Sicor's existing document requests, which are limited to patents and patent applications that are related to the '285 patent and are, at best, of questionable relevance.

To the extent that Sicor now wants these additional documents – and we assume that you do – we ask that you provide us with a document request indicating as such. In the meantime, we will begin collecting these additional documents in anticipation of receiving your request. Assuming that you serve us with such a request promptly, we will try to get those documents to you in advance of the depositions of the inventors.

Very truly yours,

Grantland G. Drutchas
312-913-2121
Drutchas@mbhb.com



This transmittal is strictly for delivery only to the person listed above. It may contain confidential or privileged information, the disclosure of which is prohibited.

Please contact us if all pages are not received. If you received this fax in error, please contact us to arrange for return of the document.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY, LLC

Plaintiff,

v.

SICOR, INC., and
SICOR PHARMACEUTICALS, INC.

Defendants.

Civil Action No. 04-833 KAJ

**PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSE TO**
**SICOR, INC.'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Pharmacia & Upjohn Company, LLC ("Pharmacia"), by and through its undersigned attorneys, hereby supplements its response to Sicor, Inc.'s ("Sicor") First Set of Interrogatories.

**GENERAL OBJECTIONS**

Pharmacia asserts each of the following General Objections to each of Sicor's Interrogatories. In addition to these General Objections, Pharmacia may also state specific objections to Interrogatories where appropriate. By setting forth such additional specific objections, Pharmacia does not in any way intend to limit or restrict its General Objections. Moreover, to the extent Pharmacia asserts any additional specific objection to any Sicor Interrogatory, that specific objection shall not constitute a waiver of any General Objection or any other specific objection.

1. Pharmacia objects to any directions, definitions, and/or instructions contained in Sicor's Interrogatories that seek to impose upon Pharmacia any obligations or responsibilities

beyond those mandated by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Delaware.

2. Pharmacia objects to Sicor's Interrogatories to the extent that they seek the provision of information protected by the Attorney-Client Privilege, Attorney-Work Product Immunity, or any other applicable privilege or immunity, including materials prepared or information generated in anticipation of litigation or for trial. Instead, Pharmacia will prepare a withheld document log listing any relevant withheld documents and exchange such a listing with Sicor at a time mutually agreeable to the parties. In the event that any such protected documents are produced by Pharmacia, such production would be inadvertent and hence would not constitute a waiver of any privilege, immunity, or other applicable protection.

3. Pharmacia objects to Sicor's Interrogatories to the extent they require the provision of information beyond what is presently available to Pharmacia based upon a reasonable search of its own files and discussions with its current employees.

4. Pharmacia objects to Sicor's Interrogatories to the extent that they call upon Pharmacia to investigate, collect, and provide information that is not relevant to the subject matter of this litigation and that is not reasonably calculated to lead to the discovery of admissible evidence.

5. Pharmacia objects to Sicor's Interrogatories that are not restricted in time as overly broad, unduly burdensome, and seeking the production of irrelevant information.

6. Pharmacia objects to Sicor's Interrogatories to the extent they seek the provision of information subject to confidentiality obligations owed by Pharmacia to others.

7. Pharmacia objects to Sicor's Interrogatories to the extent they seek the provision of information generated after the commencement of suit against Sicor as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

8. Pharmacia objects to Sicor's Interrogatories generally on the grounds that they are unreasonably cumulative, duplicative, and burdensome in violation of Fed. R. Civ. P. 26(b).

9. Pharmacia objects to Sicor's Interrogatories to the extent they seek the provision of information that is publicly available, on the grounds that such information and/or documents are equally available to Sicor, and hence their production by Pharmacia would be unnecessarily burdensome.

10. Pharmacia objects to Sicor's Interrogatories that seek the production of "all" information when the relevant information can be supplied by the production of less than "all" information.

**GENERAL STATEMENTS**

The following statements apply to all responses to Sicor's Interrogatories.

1. All responses are made subject to the foregoing General Objections and these Statements, which may or may not be repeated in each response. To the extent specific General Objections and/or Statements are cited in a specific response, those specific citations are provided because they are believed to be particularly relevant to the specific Interrogatory and are not to be construed as a waiver of any other General Objection or Statement applicable to information falling within the scope of the request.

2. Where a partial response is made to an Interrogatory that is otherwise objectionable, the partial response is made without waiving any stated objection.

3. Responses are made without waiver of, and with preservation of:

(a) all questions as to competency, relevancy, materiality, privilege, and admissibility of each response herein as evidence in any further proceeding in this action, including trial;

(b) the right to object to the use of any response herein, or the subject matter thereof, in any further proceedings in this action, including trial, and in any other lawsuit or proceedings;

(c) the right to object on any ground at any time to a demand or request for a further response to this or any other discovery involving or relating to the subject matter of the responses herein provided; and

(d) the right at any time to revise, correct, add to, supplement, or clarify any of the responses contained herein.

4. A response stating that responsive documents and things will be produced is not meant and shall not be interpreted as an admission or representation that any responsive documents and things exist. It is solely a representation that, to the extent any non-objectionable documents and things are located after a reasonable search, they will be produced.

5. In responding to Sicor's Interrogatories, Pharmacia does not concede that any of the information sought or provided is relevant, material, admissible in evidence, or reasonably calculated to lead to the discovery of admissible evidence.

6. Pharmacia reserves the right to produce documents and things for inspection in the first instance, for subsequent production by Pharmacia of copies of those documents and things selected by Sicor during such inspection.

## INTERROGATORIES AND RESPONSES

**Interrogatory No. 1:**

Describe in detail each factual and legal basis for your allegations that Sicor has infringed and/or actively induced infringement of the '285 patent, and, as part of your response, identify each claim on an element-by-element basis that you contend Sicor has infringed together with your proposed construction of each such claim and the factual and legal basis for your claim construction.

**Response to Interrogatory No. 1:**

In addition to the foregoing General Objections and General Statements, Pharmacia objects to Interrogatory No. 1 as premature, in that it seeks Pharmacia's infringement contentions before Pharmacia has had an opportunity to complete deposition discovery or has obtained meaningful responses to written discovery. Pharmacia notes that Sicor has yet to provide a competent corporate witness to provide complete information on issues related to infringement. Pharmacia further objects to this interrogatory as premature as infringement and claim interpretation will be the subject of expert testimony, as well as subject to a *Markman* hearing that is scheduled for next year.

Subject to and without waiving these or the foregoing General Objections and General Statements, on the basis of the information currently available to Pharmacia, it is Pharmacia's preliminary contention that Sicor infringes claims 1, 2, 3, 9, 11, 12, and 13 of U.S. Patent No. 6,107,285 ("the '285 patent") under both 35 U.S.C. §§ 271(a) and (b). Pharmacia asserts that each of the claim terms should be given its plain meaning to one of ordinary skill in the relevant art. Set forth below is a comparison of the language of the asserted claims of the '285 patent and Sicor's own description of its Idarubicin Hydrochloride Injection Product as set forth in its package insert shows that there is no serious dispute of claim interpretation that effects infringement. A copy of Sicor's product description is attached hereto as Exhibit A and

obtainable at http://www.sicor.com/products/fdp/pi/idarubicin.pdf. Although certain language is repeated in the package insert several times, Sicor's infringement is admitted in the following three sentences in the first column of the package insert:

> Idarubicin hydrochloride injection is a sterile, red-orange, isotonic parenteral preservative-free solution available in 5 mL (5 mg), 10 mL (10 mg) and 20 mL (20 mL) single use only vials.
>
> Each mL contains idarubicin hydrochloride, USP 1 mg and the following inactive ingredients: Glycerin, USP 25 mg and Water for Injection, USP q.s. Hydrochloric acid, NF and/or Sodium Hydroxide, NF is used to adjust pH to a target of 3.5.

Similar information is available from Sicor's own description of its Idarubicin Hydrochloride Injection Product as set forth in its Material Safety Data Sheet. A copy of Sicor's MSDS is attached hereto as Exhibit B and is obtainable at http://sicor.com/products/fdp/msds/idarubicin-msd.pdf. Sicor's MSDS includes a chart which provides in part:

| CHEMICAL NAME | CAS# | % by wt |
|---|---|---|
| Idarubicin Hydrochloride | 57852-57-0 | 0.1 |
| Glycerin | 56-81-5 | 2.5 |
| Hydrochloric Acid (pH adjust.) | 7647-01-0 | Trace |
| Water (for injection) | 7732-18-5 | Balance |

The MSDS further provides that Sicor's Idarubicin Hydrochloride Injection Product is "Stable under normal conditions of storage and handling." The MSDS indicates that Sicor's Idarubicin Hydrochloride Injection Product should be protected from light and kept refrigerated at 2-8° C.

Although the charts below are divided for a convenient comparison of the language of the claims to the language of Sicor's package insert, Pharmacia does not assert that each division necessarily represents a separate element or limitation.

| Language of Claim 1 | Language of Package Insert |
|---|---|
| a physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride | Idarubicin hydrochloride injection is . . . .<br><br>Each mL contains idarubicin hydrochloride, USP 1 mg |
| dissolved in a physiologically acceptable aqueous solvent | Each mL contains . . . Water for Injection, USP q.s. |
| having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid | Hydrochloric acid, NF and/or Sodium Hydroxide, NF is used to adjust pH to a target of 3.5 |
| the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml | Each mL contains idarubicin hydrochloride, USP 1 mg [1 mg/ml] |
| wherein said solution is contained in a sealed container | available in . . . single use vials |

| Language of Claim 2 | Language of Package Insert |
|---|---|
| The solution of claim 1 wherein said physiologically acceptable aqueous solvent is selected from the group consisting of water, ethanol, polyethylene glycol, dimethylacetamide, and mixtures thereof. | Each mL contains . . . Water for Injection, USP q.s. |

| Language of Claim 3 | Language of Package Insert |
|---|---|
| The solution of claim 1 wherein said physiologically acceptable aqueous solvent is water. | Each mL contains . . . Water for Injection, USP q.s. |

| Language of Claim 9 | Language of Package Insert |
|---|---|
| The anthracycline glycoside solution of claim 1, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said range using said acids. | Idarubicin hydrochloride injection is a sterile, red-orange, isotonic parenteral preservative-free solution<br>(*see also* MSDS "Stable under normal conditions of storage and handling") |

| Language of Claim 11 | Language of Package Insert |
|---|---|
| The solution of claim 1 wherein the concentration of anthracycline glycoside is about 1 mg/ml. | Each mL contains idarubicin hydrochloride, USP 1 mg [1 mg/ml] |

| Language of Claim 12 | Language of Package Insert |
|---|---|
| The solution of claim 11 wherein the physiologically acceptable acid is hydrochloric acid. | Hydrochloric acid, NF and/or Sodium Hydroxide, NF is used to adjust pH |

| Language of Claim 13 | Language of Package Insert |
|---|---|
| The solution of claim 12 wherein the anthracycline glycoside is idarubicin hydrochloride. | Idarubicin hydrochloride injection is . . . .<br><br>Each mL contains idarubicin hydrochloride, USP 1 mg |

Sicor confirmed that it its Idarubicin Hydrochloride Injection Product has all of the elements of claims 1, 2, 3, 9, 11, 12, and 13 through August 4, 2005 testimony of its 30(b)(6) witness, Allyn Becker. Pharmacia incorporates that testimony herein. Pharmacia further incorporates the Expert Report of Joseph O. Falkinham, III herein.

Sicor infringes claims 1, 2, 3, 9, 11, 12, and 13 of the '285 patent under 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing its Idarubicin Hydrochloride Injection Product. Sicor infringes claims 1, 2, 3, 9, 11, 12, and 13 of the '285 patent under 35 U.S.C. § 271(b) by actively inducing its customers to use Sicor's Idarubicin Hydrochloride Injection Product, including through its package insert and promotional efforts. Pharmacia reserves the right to amend or supplement this response once Sicor provides requested discovery and as discovery in general in this action proceeds.

**Interrogatory No. 2:**

Describe in detail each factual and legal basis for your allegations that Sicor's alleged infringement was willful, and, as part of your response, describe in detail the factual and legal basis for your contention that this case is an exceptional case and detail all attorneys' fees that you have incurred to date.

**Response to Interrogatory No. 2:**

In addition to the foregoing General Objections and General Statements, Pharmacia objects to Interrogatory No. 2 as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Pharmacia further objects to Interrogatory No. 2 to the extent it seeks the production, identification or disclosure of information protected by the attorney-client privilege, attorney work product immunity or any other protection or immunity. Pharmacia objects to Interrogatory No. 2 as premature, in that it seeks Pharmacia's infringement contentions before Sicor has provided requested deposition discovery or has provided meaningful responses to written discovery. Moreover, Sicor has not yet produced a single document on this issue in response to Pharmacia's discovery requests or its Initial Disclosure obligations. Sicor has refused to provide responses to interrogatories related to willfulness, refused to provide a witness to testify regarding willfulness issues, and indicated that it intends to move for bifurcation of the willfulness issue. Pharmacia reserves the right to amend or supplement this response once Sicor provides the requested discovery and as discovery in general in this action proceeds.

Without waiving those objections, Pharmacia states that Sicor has knowingly chosen to infringe the claims of the '285 Patent. Sicor has admitted knowing of the '285 Patent since about the time this patent issued. Sicor filed an Abbreviated New Drug Application, which required Sicor to copy Pharmacia's idarubicin product, which is clearly covered by the claims of the '285 patent. Subsequently, Sicor was informed that its Idarubicin Hydrochloride Injection Product infringed the '285 Patent and other members of the '285 U.S. Patent Family and sought a license under the '285 Patent and '285 U.S. Patent Family. Despite that request for a license being denied and knowing that it lacked Pharmacia's permission to make, use, or sell any product

within the scope of the claims of the '285 Patent, Sicor decided to continue infringing making, using, and selling its infringing product.

Sicor has also provided no reason to believe that it undertook any of its actions with a good faith belief that it would not be infringing the valid claims of the '285 Patent. It has not stated that it sought or obtained advice of counsel regarding its infringement, or provided any other reason to believe that its infringement has not been willful.

**Interrogatory No. 3:**

Identify each and every instance that you licensed or negotiated a license, offered for license or sale, sought a license or sale, or sold any of the patent rights or other intellectual property rights relating to the '285 Patent, '285 U.S. Patent Family, '285 U.S. worldwide Patent Family, Idarubicin or any Anthracycline Glycoside, and, as part of your response, identify each party to each negotiation, agreement or offer, all witnesses or others having knowledge of any related facts and, if applicable, the performance by or to Pharmacia (e.g. payment or receipt of money) and royalty rates sought by or paid to Pharmacia.

**Response to Interrogatory No. 3:**

In addition to the foregoing General Objections and General Statements, Pharmacia objects to Interrogatory No. 3 as overly broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible evidence. For example, to the extent the interrogatory seeks "each and every instance," the interrogatory is unreasonably broad, especially to the extent that it includes licenses, negotiations for licenses, offers for licenses or sales, seeking of a license or sale, or sale of patent rights or other intellectual property rights among Pfizer and Pharmacia & Upjohn entities (which are within the definition of "you"). Pharmacia further objects to Interrogatory No. 3 to the extent it seeks the production, identification or disclosure of information protected by the attorney-client privilege, attorney work product immunity or any other protection or immunity. Subject to these objections,

Pharmacia responds that pursuant to Fed. R. Civ. P. 33(d), documents have been and will be produced from which the answers to Interrogatory No. 3 may be determined.

**Interrogatory No. 4:**

For each month of each year in which you have offered for sale or sold Idarubicin, identify your market share, your unit sales volume, unit sales price(s), cost of goods sold, revenues, and gross and net profits associated with such sales and all witnesses or others having knowledge of any facts concerning these topics.

**Response to Interrogatory No. 4:**

In addition to the foregoing General Objections and General Statements, Pharmacia objects to Interrogatory No. 4 as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Pharmacia further objects to Interrogatory No. 4 to the extent it seeks the production, identification or disclosure of information protected by the attorney-client privilege, attorney work product immunity or any other protection or immunity. Subject to these objections, Pharmacia responds that pursuant to Fed. R. Civ. P. 33(d), documents will be produced from which the answers to Interrogatory No. 4 may be determined.

**Interrogatory No. 5:**

For each month in which you contend that Pharmacia has been damaged by Sicor's alleged infringing sales of Idarubicin, identify whether you contend damages should be based on lost profits, a reasonable royalty, or any other basis or a combination of any bases, and, as part of your response, describe in detail the amount of damages allegedly incurred, the methods and information used to calculate damages and the factual and legal basis for this calculation.

**Response to Interrogatory No. 5:**

In addition to the foregoing General Objections and General Statements, Pharmacia objects to Interrogatory No. 5 as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Pharmacia further objects to Interrogatory No. 5 to the extent it seeks the production, identification or disclosure of information protected by the attorney-client privilege, attorney work product immunity or any other protection or immunity.

Pharmacia is entitled to lost profits, and Pharmacia's position regarding its claim for damages is set forth in the Expert Report of Gregory K. Bell, Ph.D., incorporated herein by reference. Pharmacia's position on damages (and Dr. Bell's report) will be supplemented once Pharmacia receives Sicor's additional discovery on damages up to the point of trial. In any event, Pharmacia is entitled to no less than a reasonable royalty for the use made of its invention by Sicor, together with interest and costs as fixed by the Court. 35 U.S.C. § 284. The damages should be increased up to three times the amount found because of Sicor's willful infringement. 35 U.S.C. § 284. In addition, Pharmacia should be awarded its attorney's fees because this is an exceptional case because, at least in part, of Sicor's willful infringement. 35 U.S.C. § 285.

**Interrogatory No. 6:**

Describe in detail each factual and legal basis for your contention that the claims of the '285 patent are not obvious, and, as part of your response, describe in detail each factual and legal basis for any actual, potential or theoretical secondary or objective considerations (e.g., evidence of copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention) that you contend rebut or would rebut a showing of prima facie obviousness of '285 patent, and the level of skill you contend that a person of ordinary skill in the art would possess with respect to the invention claimed in the '285 patent.

**Response to Interrogatory No. 6:**

In addition to the foregoing General Objections and General Statements, Pharmacia objects to Interrogatory No. 6 as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Pharmacia further objects to Interrogatory No. 6 to the extent it seeks the production, identification or disclosure of information protected by the attorney-client privilege, attorney work product immunity or any other protection or immunity. Finally, Pharmacia objects to Interrogatory No. 6 as premature, as Pharmacia has not yet had an

opportunity to conduct deposition discovery or obtained complete responses to written discovery regarding Sicor's contentions of invalidity under 35 U.S.C. § 103.

Sicor has made no showing, let alone a *prima facie* showing, that the invention claimed in the '285 patent was obvious. Until and unless Sicor makes a clear and convincing showing that the claims of the '285 patent are obvious, the claims are presumed to be nonobvious. Thus, there is no need to rebut any showing of obviousness. Furthermore, any claim of obviousness was rebutted in the prosecution of the '285 patent. *See, e.g.*, (all incorporated herein by this reference) Declaration under Rule 1.132 of Barbara Barhamand, dated June 2, 1988 (regarding risks and problems of lyophilized forms of doxorubicin hydrochloride and benefits to medical professionals of ready-to-use formulations of doxorubicin hydrochloride); Declaration of Carlo Confalonieri Pursuant to 37 C.F. R. 1.132, dated March 10, 1987 (regarding unexpected results of storage stability with physiologically acceptable acids at pH range claimed in '285 patent); Declaration of Carlo Confalonieri Pursuant to 37 C.F. R. 1.132, dated December 20, 1990 (regarding unexpected results of storage stability with physiologically acceptable acids, especially in comparison to teachings of Arcamone and Beijnen); Declaration of Carlo Confalonieri Pursuant to 37 C.F. R. 1.132, dated May 27, 1991 (regarding non-obviousness over 1983 Wassermann & Bundgaard paper, unexpected results of storage stability with physiologically acceptable acids, and teaching away from use of physiologically acceptable acids in knowledge of those skilled in the art); Declaration of Carlo Confalonieri Pursuant to 37 C.F. R. 1.132, dated December 9, 1992 (regarding unexpected results of storage stability with physiologically acceptable acids, especially in comparison to teachings of Arcamone); Declaration under Rule 1.132 of William Dana, Pharm.D., dated June 16, 1988 (regarding long-felt need for, desirability of, benefits of, and commercial success of ready-to-use formulations of

doxorubicin hydrochloride); Declaration under Rule 1.132 of Debra Holton-Smith, dated May 24, 1988 (regarding risks and problems of lyophilized forms of doxorubicin hydrochloride and benefits to medical professionals of ready-to-use formulations of doxorubicin hydrochloride); Declaration under Rule 1.132 of Mary Horstman, dated June 2, 1988 (regarding risks and problems of lyophilized forms of doxorubicin hydrochloride and benefits to medical professionals of ready-to-use formulations of doxorubicin hydrochloride); Declaration under Rule 1.132 (declaration B) of Nagesh Palepu, dated December 11, 1987 (regarding non-obviousness over 1985 Beijnen *et al.* paper); Declaration of William Ring, dated October 19, 1987 (regarding non-obviousness over 1972 Arcamone *et al.* paper); Declaration under Rule 1.132 of Julie Solms, dated June 13, 1988 (regarding commercial success of ready-to-use formulations of doxorubicin hydrochloride); and Declaration under Rule 132 of Martin Williamson and Frederick Grab, dated February 3, 1987 (regarding risks and problems of lyophilized forms of doxorubicin hydrochloride); *see also* responses to office actions (incorporated herein by this reference); PU 0016632-785; PU 0039360-71; PU 0041166-96; PU 0041336-39; PU 0041433-55.

Many of the objective indicia of non-obviousness apply to the subject matter claimed in the '285 patent. The invention, following upon the failures of others to satisfy the long-felt need for a ready-to-use physiologically acceptable solution of anthracycline glycosides, was made in the face of skepticism of those in the art and teaching away from the result obtained. Accordingly, the use of an acid chosen from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid to adjust pH to a specific range led to unexpected results in terms of stability and the invention had unexpected properties. The embodiments of the invention have been extremely commercially successful, both the

embodiments sold by Pharmacia and related companies and Sicor's copied infringing product. *See, e.g.*, Declaration under Rule 1.132 of Julie Solms, dated June 13, 1988; Expert Report of Gregory K. Bell, Ph.D.; *see also* documents set forth in Schedule 2 of Expert Report of Gregory K. Bell, Ph.D., incorporated herein under Rule 33(d) by this reference and attached hereto as Exhibit C; PU 0026912.

The invention claimed in the '285 patent satisfied a long-felt need within the medical community. See, *e.g.*, Declaration under Rule 1.132 of William Dana, Pharm.D., dated June 16, 1988; Expert Report of Laura T. Guerra; expert reports to be submitted subsequent hereto. Prior to the invention of the subject matter, no stable, ready-to-use formulation of anthracycline glycosides was available; only a lyophilized form that had to be reconstituted was available. *See, e.g.*, Declaration under Rule 1.132 of William Dana, Pharm.D., dated June 16, 1988; Declaration under Rule 1.132 of Debra Holton-Smith, dated May 24, 1988; Declaration under Rule 1.132 of Mary Horstman, dated June 2, 1988; Declaration under Rule 132 of Martin Williamson and Frederick Grab, dated February 3, 1987; Expert Report of Laura T. Guerra; expert reports to be submitted subsequent hereto. Anthracycline glycosides were necessary drugs for use in chemotherapy, but they were difficult to work with in medical facilities because reconstitution of the pre-existing product was both time-consuming and somewhat dangerous. *Id.* Because the nurses and physicians who would be reconstituting lyophilized anthracycline glycoside solutions were very busy satisfying other work demands, the time savings created by a ready-to-use formulation of anthracycline glycosides were in tremendous demand. *Id.* Furthermore, medical professionals reconstituting lyophilized anthracycline glycoside solutions were exposed to the drugs themselves, which were viewed as having severe adverse effects. *See id.*; *see also* 10 Scand. J. Work Environ. Health, p. 71-74 (1984); Chemistry Industry, p. 488 (Jul. 4, 1983);

Drug-Topics-Medical Economics-Co, p. 99 (Feb. 7, 1983). Additionally, the claimed formulations avoided dose calculation issues and potential contamination created by reformulation. *Id.* For all of these reasons, those in the field were seeking stable solutions of anthracycline glycosides for decades before the issuance of the '285 patent.

Although the need for stable ready-to-use formulations of anthracycline glycosides was long felt, those in the field not only failed in their attempts to develop such formulations, they showed skepticism for the solution found by the inventors and taught away from it. For example, Dr. Federico Arcamone, the "Father of Anthracycline Glycosides," suggested that acids of the types used in the claims of the '285 patent would not work to make a stable solution. In a 1972 article, he taught those in the art that it would not be sufficiently stable. Arcamone *et al.*, "Structure and Physicochemical Properties of Adriamycin (Doxorubicin)," *Int'l Symposium on Adriamycin*, pp. 9-22 (1972). He stated that solutions had stability of less than 20 hours at pH 1-2 in hydrochloric acid and more than one month (but apparently less than two months) at pH 3-6 in a phosphate buffer. *Id.*; *see also* expert reports to be submitted subsequent hereto; PU 0017453-522; PU 0017613-97; PU 0017844-76.

Under these circumstances, the claimed formulations had unexpected properties and provided unexpected results. *See* expert reports to be submitted subsequent hereto; PI 210-17; PI 235; PI 359-62; PI 380; PI 9796-10442; PI 11711-96; PU 0017453-522; PU 0000477-601; PU 0016632-785; PU 0017613-97; PU 0017453-522; PU 0017613-97; PU 0017844-76; PU 0020354-81; PU 0021473-90; PU 0021711-19; PU 0021854-67; PU 0021872-77; PU 0023022-108; PU 0023369-913; PU 0024403-09; PU 0024434; PU 0024443-89; PU 0025234-312; PU 0049034-36; PU 0049065-75. Prior to the invention, there appeared to be no way to prepare physiologically acceptable formulations of anthracycline glycosides that exhibited storage

stability. *Id.* Furthermore, it appeared that lowering the pH of the formulation with hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, or tartaric acid would not achieve that result. Thus, the far greater stability of formulations in which the pH had been lowered with those acids was unexpected in light of prior art ranges of physiologically acceptable formulations of anthracycline glycosides. However, not only was the stability of the formulation increased dramatically to the point at which it exhibits storage stability as a result of the adjustment of the pH, but it also avoided dose calculation errors. *See id.*; *see also* declarations of Barbara Barhamand, William Dana, Debra Holton-Smith, Mary Horstman, and sources cited therein. Thus, unexpectedly, the invention allowed commercialization of physiologically acceptable ready-to-use formulations of anthracycline glycosides.

The commercial embodiments of the invention, including both Pharmacia & Upjohn's products and generic company copies, have been tremendously commercially successful. *See* declaration of Julie Solms; Expert Report of Gregory K. Bell, Ph.D.; documents set forth in Exhibit C. The ready-to-use formulations of anthracycline glycosides have almost completely replaced all other formulations of anthracycline glycosides in the market. They have been licensed and adopted universally on the basis of the nature of the product. Indeed, the ready-to-use formulations of anthracycline glycosides falling within the scope of the claims of the '285 patent have been seen as so beneficial that others in the market, especially Sicor, have copied them. Notably, Sicor obtained FDA approval for its idarubicin hydrochloride product by filing an Abbreviated New Drug Application, relying on Pharmacia & Upjohn's idarubicin hydrochloride product New Drug Application. *See* testimony of Allyn Becker on behalf of Sicor and exhibits used therein. That is, Sicor's approval, and resulting sales, was completely contingent upon its copying of the invention claimed in the '285 patent.

Finally, despite the great desire for such ready-to-use formulations of anthracycline glycosides since long before the invention claimed in the '285 patent, no other person or group of persons has developed a commercializable ready-to-use formulation outside the scope of the claims. That is, all others – including Sicor – have failed in any attempts to design around the claims of the '285 patent. Instead, they have adopted the invention claimed in the '285 patent as the only means of producing a stable ready-to-use formulation of anthracycline glycosides.

**Interrogatory No. 7:**

Identify each lawsuit, opposition proceeding, interference, reexamination, reissue proceeding, nullity proceeding, revocation proceeding, arbitration conflict or dispute to which Pharmacia has been a party in any part of the world that concerned the '285 Patent, '285 U.S. Patent Family or '285 Worldwide Patent Family, and, as part of your response, describe the parties to the proceeding, the claims asserted and terms or nature of any resolution, including, if applicable, description of any consideration, settlement payment or royalty rate paid as a term of settlement or judgment.

**Response to Interrogatory No. 7:**

In addition to the foregoing General Objections and General Statements, Pharmacia objects to Interrogatory No. 7 as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Pharmacia further objects to Interrogatory No. 7 to the extent it seeks the production, identification or disclosure of information protected by the attorney-client privilege, attorney work product immunity or any other protection or immunity. Finally, Pharmacia objects to Interrogatory No. 7 as premature, as Pharmacia has not yet had an opportunity to conduct deposition discovery or has obtained meaningful responses to written discovery. In addition, Pharmacia objects to this interrogatory on the ground that the requested information will be readily ascertainable from documents that will be produced in response to Sicor's First Request for the Production of Documents.

Pharmacia identifies *Pharmachemie B.V. v. Pharmacia S.p.A. and Pharmacia Inc.*, Civil Action No. 95-40085 in the United States District Court for the District of Massachusetts. In that action, Pharmachemie asserted declaratory judgment claims asserting noninfringement and invalidity of U.S. Patent Nos. 4,946,831; 5,124,317; and 5,124,318 and Pharmacia asserted patent infringement counterclaims. The resolution of that case was by entry of stipulated final judgment of validity, enforceability, and infringement of all three patents at issue. Pharmacia further identifies a Belgian action for a saisie-description against N.V.O.P.G. Pharmachemie under Belgium Patent No. 905202. The resolution of that case was by dismissal. Pharmacia further identifies an opposition by Pharmachemie to Danish Patent No. 167557 and a confirmation proceeding by Pharmacia to uphold that patent and validate the injunction proceeding, as well as a revocation proceeding by Pharmachemie, NettoPharma A/S, and H. Lundbeck A/S and counterclaims for patent infringement and damages by Pharmacia regarding the same patent. The resolutions of those cases were by withdrawal of the opposition and dismissal of the cases. Pharmacia further identifies an opposition by Pharmachemie to Finnish Patent Application No. 862629. The resolution of that case was by withdrawal of the opposition. Pharmacia further identifies an opposition by Pharmachemie to Dutch Patent Application No. 8601698, as well as a proceeding by Pharmacia in the District Court of the Hague against Pharmachemie, NettoPharma A/S, H. Lundbeck A/S, Nycomed A.B., and N.V.O.P.G. Pharmachemie for injunctions under Belgan Patent No. 905202, Danish Patent No. 167557, Dutch Patent Application No. 8601698, and Swedish Patent No. 8602743. The resolution of the opposition was by withdrawal of the opposition. The resolution of the district court proceeding was by entry of a judgment that the patents were valid, enforceable, and infringed by Pharmachemie; the claims against the other parties were withdrawn. Pharmacia

further identifies an opposition by Pharmachemie to Norwegian Patent Application No. 862587. The resolution of that case was by withdrawal of the opposition. Pharmacia further identifies an invalidation proceeding by Boryung Pharmaceutical Co. Ltd. for South Korean Patent No. 63827. The resolution of that case was by withdrawal of the opposition. Pharmacia further identifies a revocation proceeding by Pharmachemie and Nycomed A.B. for Swedish Patent No. 8602743, as well as infringement proceedings by Pharmacia against Nycomed A.B. for Swedish Patent No. 8602743. The resolutions of those cases were by withdrawal of the opposition and dismissal of the case. A copy of the license agreement settling all of those actions will be produced at a mutually convenient time and place.

Pharmacia further identifies *Lemery v. Pharmacia & Upjohn S.p.A.*, PC 494/98 (N-332) 3958-I in the Mexican Patent and Trademark Office, affirmed by the Federal Tribunal of Tax and Administrative Justice, 13564/02-17-08-9/540/03-PL-01-04, affirmed by 13th Collegiate Tribunal of the 1st Federal Circuit DA 316/2004. Pharmacia & Upjohn S.p.A. prevailed in that opposition and those appeals.

Pharmacia further identifies *Pharmacia Italia S.p.A. v. Mayne Pharma Pty Ltd.*, No. V439 of 2003, in the Federal Court of Australia, Victoria District Registry, in which Pharmacia prevailed. Pharmacia further identifies *Mayne Pharma Pty Ltd. and Mayne Pharma PLC v. Pharmaica Italia S.p.A.*, in which Mayne's petition to the House of Lords to appeal was denied after Pharmacia had prevailed in the Court of Appeal, on Appeal from the High Court of Justice, Chancery Division, Patents Court, London, England. Pharmacia further identifies *Pharmacia Italia S.p.A. et al. v. Meda AB and Kaprilink AB*, in the District Court of Stockholm, 7th Division, Sweden. Pharmacia further identifies *Pharmacia Italia S.p.A. v Mayne Pharma (Hong Kong) Limited*, HCA No. 1345 of 2004, in the High Court of Hong Kong, the Court of First

Instance. Pharmacia further identifies *Pharmacia & Upjohn S.p.A. v. Cell Pharm GmbH*, Case No. 21 O 12951/01, in the District Court of Munich, Germany. Pharmacia further identifies *Pharmacia & Upjohn S.p.A. v. Cancernova GmbH Onkologische Arzneimittel*, Case No. 21 O 12950/01, in the District Court of Munich, Germany. Pharmacia further identifies *Hexal AG v. Pharmacia & Upjohn S.p.A.*, Case No. 14 W (pat) 55/03, in the Federal Patents Court, Germany. Pharmacia further identifies *Pfizer Canada Inc. and Pharmacia Italia S.p.A. vs. Mayne Pharma (Canada) Inc.*, Court Case No. F-1142-04, in Canadian Federal Court, Toronto. Pharmacia further identifies *Pfizer Canada Inc. et al. v. Novopharm Limited et al.*, Court File No. T-244-05, in the Canadian Federal Court in Toronto. Those cases are still pending.

Pharmacia further identifies *Ebewe v. Pharmacmia & Upjohn S.p.A.*, Case No. 1/200, a Nullity Action against Austrian Patent AT 397463. Pharmacia further identifies *Pharmacmia & Upjohn S.p.A v. Ebewe Pharmacia Upjohn S.p.A (Milano) v EBEWE*, Case No. 10 Cg 13/01v, in the Commercial Court of Vienna. The resolution of that case was that Pharmacia & Upjohn S.p.A. requested that the preliminary injunction be set side and withdrew the action.

Pharmacia further identifies a Cancellation Action by Ebewe Avalanche against Patent No. 277561 in the Czech Republic. This matter is still pending. Pharmacia further identifies a Declaratory Judgment by Ebewe Avalanche Reg. No. 1986-4708 in the Czech Republic. Pharmacia further identifies *Pharmacia Italia S.p.a. and partners v. Medico Uno Rt.*, case no.: 3. P. 631.385/2002, in Metropolitan Court of Budapest. This case is still pending.

Pharmacia further identifies a Nullity Action by Ebewe against Hungarian Patent No. 196123. Pharmacia further identifies a Revocation Action before Hungarian Patent Office by Medico Uno Rt against Hungarian Patent No. 196123. These cases are still pending. . Pharmacia further identifies a case before the Competition Office against Pharmacia for

providing misleading information to customers and for pursing unfair market activity filed by Medico Uno. Rt. Case no. Vj-172/2002 (reg.no.: 1688/1/2002) . Pharmacia further identifies a revocation of Marketing Authorization request against Ebewe before the National Pharmaceutical Institution (OGYT). Pharmacia further identifies a case brought by Medico Uno Rt. against Pharmacia, case no. 7.G.28.503/2002, in Pest County Court. Pharmacia prevailed in those cases.

Pharmacia further identifies *Pharmacia & Upjohn SPA & Pharmacia & Upjohn-Laboratorios, Lda. v. Farma APS-Productos Farmaceuticos*, case no. 6196/02-7, in Lda Lisbon Court of Appeal Proceedings. In that case Pharmacia filed for a preliminary injunction and lost, but then won on appeal. Farma appealed Pharmacia's win in Proceedings no. 6196/02-7 and lost. Pharmacia further identifies *Laboratorios, Lda. v. Farma APS-Productos Farmaceuticos, Lda*, Commercial Tribunal of Lisbon 2nd Court Case no. 449/04.OTYLSB, in the Court of Commerce of Lisbon. This case is still pending.

MORRIS NICHOLS ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
*Attorneys for Plaintiff*

OF COUNSEL:

Daniel A. Boehnen
Joshua R. Rich
MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 S. Wacker Drive
Chicago, IL 60606
(312) 913-0001

September 19, 2005
483742

# Exhibit A

Package Insert

℞ only



# IDARUBICIN

Hydrochloride Injection

sicor™

**FOR INTRAVENOUS USE ONLY**

**WARNINGS**

1. Idarubicin hydrochloride injection should be given slowly into a freely flowing intravenous infusion. It must never be given intramuscularly or subcutaneously. Severe local tissue necrosis can occur if there is extravasation during administration.
2. As is the case with other anthracyclines the use of idarubicin hydrochloride injection can cause myocardial toxicity leading to congestive heart failure. Cardiac toxicity is more common in patients who have received prior anthracyclines or who have pre-existing cardiac disease.
3. As is usual with antileukemic agents, severe myelosuppression occurs when idarubicin hydrochloride injection is used at effective therapeutic doses.
4. It is recommended that idarubicin hydrochloride injection be administered only under the supervision of a physician who is experienced in leukemia chemotherapy and in facilities with laboratory and supportive resources adequate to monitor drug tolerance and protect and maintain a patient compromised by drug toxicity. The physician and institution must be capable of responding rapidly and completely to severe hemorrhagic conditions and/or overwhelming infection.
5. Dosage should be reduced in patients with impaired hepatic or renal function. (See DOSAGE AND ADMINISTRATION.)

**DESCRIPTION**

Idarubicin hydrochloride injection is a sterile, semi-synthetic, preservative free solution (PFS) antineoplastic anthracycline for intravenous use. Chemically, idarubicin hydrochloride is 5, 12-Naphthacenedione, 9-acetyl-7-[(3-amino-2,3,6-trideoxy-α-L-lyxo-hexopyranosyl)oxy]-7,8,9,10-tetrahydro-6,9,11-trihydroxy-hydrochloride, (7S-cis). The structural formula is as follows:

$C_{26}H_{27}NO_9 \cdot HCl$ M.W. 533.96

Idarubicin hydrochloride injection is a sterile, red-orange, isotonic parenteral preservative-free solution available in 5 mL (5 mg), 10 mL (10 mg) and 20 mL (20 mg) single use only vials.

Each mL contains idarubicin hydrochloride, USP 1 mg and the following inactive ingredients: glycerin, USP 25 mg and water for injection, USP q.s. Hydrochloric acid, NF and/or sodium hydroxide, NF is used to adjust pH to a target of 3.5.

**CLINICAL PHARMACOLOGY**

**Mechanism of Action**

Idarubicin hydrochloride is a DNA-intercalating analog of daunorubicin which has an inhibitory effect on nucleic acid synthesis and interacts with the enzyme topoisomerase II. The absence of a methoxy group at position 4 of the anthracycline structure gives the compound a high lipophilicity which results in an increased rate of cellular uptake compared with other anthracyclines.

**Pharmacokinetics**

*General Pharmacokinetics*

Pharmacokinetic studies have been performed in adult leukemia patients with normal renal and hepatic function following intravenous administration of 10 to 12 mg/m² of idarubicin daily for 3 to 4 days as a single agent or combined with cytarabine. The plasma concentrations of idarubicin are best described by a two or three compartment open model. The elimination rate of idarubicin from plasma is slow with an estimated mean terminal half-life of 22 hours (range, 4 to 48 hours) when used as a single agent and 20 hours (range, 7 to 38 hours) when used in combination with cytarabine. The elimination of the primary active metabolite, idarubicinol, is considerably slower than that of the parent drug with an estimated mean terminal half-life that exceeds 45 hours; hence, its plasma levels are sustained for a period greater than 8 days.

**Distribution**

The disposition profile shows a rapid distributive phase with a very high volume of distribution presumably reflecting extensive tissue binding. Studies of cellular (nucleated blood and bone marrow cells) drug concentrations in leukemia patients have shown that peak cellular idarubicin concentrations are reached a few minutes after injection. Concentrations of idarubicin and idarubicinol in nucleated blood and bone marrow cells are more than a hundred times the plasma concentrations. Idarubicin disappearance rates in plasma and cells were comparable with a terminal half-life of about 15 hours. The terminal half-life of idarubicinol in cells was about 72 hours. The extent of drug and metabolite accumulation predicted in leukemia patients for Day 2 and 3 of dosing, based on the mean plasma levels and half-life obtained after the first dose, is 1.7- and 2.3-fold, respectively, and suggests no change in kinetics following a daily x 3 regimen. The percentages of idarubicin and idarubicinol bound to human plasma proteins averaged 97% and 94%, respectively, at concentrations similar to maximum plasma levels obtained in the pharmacokinetic studies. The binding is concentration independent. The plasma clearance is twice the expected hepatic plasma flow indicating extensive extra hepatic metabolism.

**Metabolism**

The primary active metabolite formed is idarubicinol. As idarubicinol has cytotoxic activity, it presumably contributes to the effects of idarubicin.

**Elimination**

The drug is eliminated predominately by biliary and to a lesser extent by renal excretion, mostly in the form of idarubicinol.

**Pharmacokinetics in Special Populations**

*Pediatric Patients*

Idarubicin studies in pediatric leukemia patients, at doses of 4.2 to 13.3 mg/m²/day x 3, suggest dose independent kinetics. There is no difference between the half-lives of the drug following daily x 3 or weekly x 3 administration. Cerebrospinal fluid (CSF) levels of idarubicin and idarubicinol were measured in pediatric leukemia patients treated intravenously. Idarubicin was detected in 2 of 21 CSF samples (0.14 and 1.57 ng/mL), while idarubicinol was detected in 20 of these 21 CSF samples obtained 18 to 30 hours after dosing (mean = 0.51 ng/mL; range, 0.22 to 1.05 ng/mL). The clinical relevance of these findings is unknown.

*Hepatic and Renal Impairment*

The pharmacokinetics of idarubicin have not been evaluated in leukemia patients with hepatic impairment. It is expected that in patients with moderate or severe hepatic dysfunction, the metabolism of idarubicin may be impaired and lead to higher systemic drug levels. The disposition of idarubicin may also be affected by renal impairment. Therefore, a dose reduction should be considered in patients with hepatic and/or renal impairment. (See DOSAGE AND ADMINISTRATION.)

**Drug-Drug Interactions**

No formal drug interaction studies have been performed.

**Clinical Studies**

Four prospective randomized studies, three U.S. and one Italian, have been conducted to compare the efficacy and safety of idarubicin (IDR) to that of daunorubicin (DNR), each in combination with cytarabine as induction therapy in previously untreated adult patients with acute myeloid leukemia (AML). These data are summarized in the following table and demonstrate significantly greater complete remission rates for the IDR regimen in two of the three U.S. studies and significantly longer overall survival for the IDR regimen in two of the three U.S. studies.

| | Induction Regimen Dose in mg/m² Daily x 3 Days | | Complete Remission Rate, All Pts Randomized | | Median Survival (Days) All Pts Randomized | |
|---|---|---|---|---|---|---|
| | IDR | DNR | IDR | DNR | IDR | DNR |
| **US (IND Studies)** | | | | | | |
| 1. MSKCC* (Age ≤ 60 years) | 12[a] | 50[b] | 51/65† (78%) | 38/65 (58%) | 508† | 435 |
| 2. SEG** (Age > 15 years) | 12[a] | 45[b] | 76/111† (68%) | 65/119 (55%) | 328 | 277 |
| 3. U.S. Multicenter (Age ≥ 18 years) | 13[a] | 45[a] | 68/101 (67%) | 66/113 (58%) | 393† | 281 |
| **Foreign (non-IND Study)** | | | | | | |
| GIMEMA*** (Age ≥ 55 years) | 12[c] | 45[c] | 49/124 (40%) | 49/125 (39%) | 87 | 169 |

* Memorial Sloan Kettering Cancer Center

** Southeastern Cancer Study Group

*** Gruppo Italiano Malattie Ematologiche Maligne dell'Adulto

† Overall $p < 0.05$, unadjusted for prognostic factors or multiple endpoints.

[a] Patients who had persistent leukemia after the first induction course received a second course.

[b] Cytarabine 25 mg/m² bolus IV followed by 200 mg/m² daily x 5 days by continuous infusion.

[c] Cytarabine 100 mg/m² daily x 7 days by continuous infusion.

There is no consensus regarding optimal regimens to be used for consolidation; however, the following consolidation regimens were used in U.S. controlled trials. Patients received the same anthracycline for consolidation as was used for induction.

Studies 1 and 3 utilized 2 courses of consolidation therapy consisting of idarubicin 12 or 13 mg/m² daily for 2 days, respectively (or DNR 50 or 45 mg/m² daily for 2 days), and cytarabine, either 25 mg/m² by IV bolus followed by 200 mg/m² daily by continuous infusion for 4 days (Study 1), or 100 mg/m² daily for 5 days by continuous infusion (Study 3). A rest period of 4 to 6 weeks is recommended prior to initiation of consolidation and between the courses. Hematologic recovery is mandatory prior to initiation of each consolidation course.

Study 2 utilized 3 consolidation courses, administered at intervals of 21 days or upon hematologic recovery. Each course consisted of idarubicin 15 mg/m² IV for 1 dose (or DNR 50 mg/m² IV for 1 dose), cytarabine 100 mg/m² every 12 hours for 10 doses and 6-thioguanine 100 mg/m² orally for 10 doses. If severe myelosuppression occurred, subsequent courses were given with 25% reduction in the doses of all drugs. In addition, this study included 4 courses of maintenance therapy (2 days of the same anthracycline as was used in induction and 5 days of cytarabine).

Toxicities and duration of aplasia were similar during induction on the 2 arms in the U.S. studies except for an increase in mucositis on the IDR arm in one study. During consolidation, duration of aplasia on the IDR arm was longer in all three studies and mucositis was more frequent in two studies. During consolidation, transfusion requirements were higher on the IDR arm in the two studies in which they were tabulated, and patients on the IDR arm in Study 3 spent more days on IV antibiotics (Study 3 used a higher dose of idarubicin).

The benefit of consolidation and maintenance therapy in prolonging the duration of remission and survival is not proven.

Intensive maintenance with idarubicin is not recommended in view of the considerable toxicity (including deaths in remission) experienced by patients during the maintenance phase of Study 2.

A higher induction death rate was noted in patients on the IDR arm in the Italian trial. Since this was not noted in patients of similar age in the U.S. trials, one may speculate that it was due to a difference in the level of supportive care.

**INDICATIONS AND USAGE**

Idarubicin hydrochloride injection in combination with other approved antileukemic drugs is indicated for the treatment of acute myeloid leukemia (AML) in adults. This includes French-American-British (FAB) classifications M1 through M7.

**WARNINGS**

Idarubicin is intended for administration under the supervision of a physician who is experienced in leukemia chemotherapy.

Idarubicin is a potent bone marrow suppressant. Idarubicin should not be given to patients with pre-existing bone marrow suppression induced by previous drug therapy or radiotherapy unless the benefit warrants the risk.

Severe myelosuppression will occur in all patients given a therapeutic dose of this agent for induction, consolidation or maintenance. Careful hematologic monitoring is required. Deaths due to infection and/or bleeding have been reported during the period of severe myelosuppression. Facilities with laboratory and supportive resources adequate to monitor drug tolerability and protect and maintain a patient compromised by drug toxicity should be available. It must be possible to treat rapidly and completely a severe hemorrhagic condition and/or a severe infection.

Pre-existing heart disease and previous therapy with anthracyclines at high cumulative doses or other potentially cardiotoxic agents are co-factors for increased risk of idarubicin-induced cardiac toxicity and the benefit to risk ratio of idarubicin therapy in such patients should be weighed before starting treatment with idarubicin.

Myocardial toxicity as manifested by potentially fatal congestive heart failure, acute life-threatening arrhythmias or other cardiomyopathies may occur following therapy with idarubicin. Appropriate therapeutic measures for the management of congestive heart failure and/or arrhythmias are indicated.

Cardiac function should be carefully monitored during treatment in order to minimize the risk of cardiac toxicity of the type described for other anthracycline compounds. The risk of such myocardial toxicity may be higher following concomitant or previous radiation to the mediastinal-pericardial area or in patients with anemia, bone marrow depression, infections, leukemic pericarditis and/or myocarditis. While there are no reliable means for predicting congestive heart failure, cardiomyopathy induced by anthracyclines is usually associated with a decrease of the left ventricular ejection fraction (LVEF) from pretreatment baseline values.

Since hepatic and/or renal function impairment can affect the disposition of idarubicin, liver and kidney function should be evaluated with conventional clinical laboratory tests (using serum bilirubin and serum creatinine as indicators) prior to and during treatment. In a number of Phase III clinical trials, treatment was not given if bilirubin and/or creatinine serum levels exceeded 2 mg%. However, in one Phase III trial, patients with bilirubin levels between 2.6 and 5 mg% received the anthracycline with a 50% reduction in dose. Dose reduction of idarubicin should be considered if the bilirubin and/or creatinine levels are above the normal range. (See DOSAGE AND ADMINISTRATION.)

*Pregnancy Category D*

Idarubicin was embryotoxic and teratogenic in the rat at a dose of 1.2 mg/m²/day or one tenth the human dose, which was nontoxic to dams. Idarubicin was embryotoxic but not teratogenic in the rabbit even at a dose of 2.4 mg/m²/day or two tenths the human dose, which was toxic to dams.

There is no conclusive information about idarubicin adversely affecting human fertility or causing teratogenesis. There has been one report of a fetal fatality after maternal exposure to idarubicin during the second trimester.

There are no adequate and well-controlled studies in pregnant women. If idarubicin is to be used during pregnancy, or if the patient becomes pregnant during therapy, the patient should be apprised of the potential hazard to the fetus. Women of childbearing potential should be advised to avoid pregnancy.

**PRECAUTIONS**

**General**

Therapy with idarubicin requires close observation of the patient and careful laboratory monitoring. Hyperuricemia secondary to rapid lysis of leukemic cells may be induced. Appropriate measures must be taken to prevent hyperuricemia and to control any systemic infection before beginning therapy.

Extravasation of idarubicin can cause severe local tissue necrosis. Extravasation may occur with or without an accompanying stinging or burning sensation even if blood returns well on aspiration of the infusion needle. If signs or symptoms of extravasation occur the injection or infusion should be terminated immediately and restarted in another vein. (See DOSAGE AND ADMINISTRATION.)

**Laboratory Tests**

Frequent complete blood counts and monitoring of hepatic and renal function tests are recommended.

**Carcinogenesis, Mutagenesis, Impairment of Fertility**

Formal long-term carcinogenicity studies have not been conducted with idarubicin. Idarubicin and related compounds have been shown to have mutagenic and carcinogenic properties when tested in experimental models (including bacterial systems, mammalian cells in culture and female Sprague-Dawley rats).

In male dogs given 1.8 mg/m²/day 3 times/week (about one seventh the weekly human dose on a mg/m² basis) for 13 weeks, or 3 times the human dose, testicular atrophy was observed with inhibition of spermatogenesis and sperm maturation with few or no mature sperm. These effects were not readily reversed after a recovery of 8 weeks.

**Pregnancy Category D**

(see WARNINGS)

**Nursing Mothers**

It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from idarubicin, mothers should discontinue nursing prior to taking this drug.

**Pediatric Use**

Safety and effectiveness in pediatric patients have not been established.

**ADVERSE REACTIONS**

Approximately 550 patients with AML have received idarubicin in combination with cytarabine in controlled clinical trials worldwide. In addition, over 550 patients with acute leukemia have been treated in uncontrolled trials utilizing idarubicin as a single agent or in combination. The table below lists the adverse experiences reported in U.S. Study 2 (see CLINICAL PHARMACOLOGY, Clinical Studies) and is representative of the experiences in other studies. These adverse experiences constitute all reported or observed experiences, including those not considered to be drug related. Patients undergoing induction therapy for AML are seriously ill due to their disease, are receiving multiple transfusions, and concomitant medications including potentially toxic antibiotics and antifungal agents. The contribution of the study drug to the adverse experience profile is difficult to establish.

| Induction Phase | Percentage of Patients | |
|---|---|---|
| **Adverse Experiences** | IDR (N=110) | DNR (N=118) |
| Infection | 95% | 97% |
| Nausea & Vomiting | 82% | 80% |
| Hair Loss | 77% | 72% |
| Abdominal Cramps/Diarrhea | 73% | 68% |
| Hemorrhage | 63% | 65% |
| Mucositis | 50% | 55% |
| Dermatologic | 46% | 40% |
| Mental Status | 41% | 34% |
| Pulmonary-Clinical | 39% | 39% |
| Fever (not elsewhere classified) | 26% | 28% |
| Headache | 20% | 24% |
| Cardiac-Clinical | 16% | 24% |
| Neurologic-Peripheral Nerves | 7% | 9% |
| Pulmonary Allergy | 2% | 4% |
| Seizure | 4% | 5% |
| Cerebellar | 4% | 4% |

The duration of aplasia and incidence of mucositis were greater on the IDR arm than the DNR arm, especially during consolidation in some U.S. controlled trials. (See Clinical Studies.)

The following information reflects experience based on U.S. controlled clinical trials.

**Myelosuppression**

Severe myelosuppression is the major toxicity associated with idarubicin therapy, but this effect of the drug is required in order to eradicate the leukemic clone. During the period of myelosuppression, patients are at risk of developing infection and bleeding which may be life-threatening or fatal.

**Gastrointestinal**

Nausea and/or vomiting, mucositis, abdominal pain and diarrhea were reported frequently, but were severe (equivalent to WHO Grade 4) in less than 5% of patients. Severe enterocolitis with perforation has been reported rarely. The risk of perforation may be increased by instrumental intervention. The possibility of perforation should be considered in patients who develop severe abdominal pain and appropriate steps for diagnosis and management should be taken.

**Dermatologic**

Alopecia was reported frequently and dermatologic reactions including generalized rash, urticaria and a bullous erythrodermatous rash of the palms and soles have occurred. The dermatologic reactions were usually attributed to concomitant antibiotic therapy. Local reactions including hives at the injection site have been reported. Recall of skin reaction due to prior radiotherapy has occurred with idarubicin administration.

**Hepatic And Renal**

Changes in hepatic and renal function tests have been observed. These changes were usually transient and occurred in the setting of sepsis and while patients were receiving potentially hepatotoxic and nephrotoxic antibiotics and antifungal agents. Severe changes in renal function (equivalent to WHO Grade 4) occurred in no more than 1% of patients, while severe changes in hepatic function (equivalent to WHO Grade 4) occurred in less than 5% of patients.

**Cardiac**

Congestive heart failure (frequently attributed to fluid overload), serious arrhythmias including atrial fibrillation, chest pain, myocardial infarction and asymptomatic declines in LVEF have been reported in patients undergoing induction therapy for AML. Myocardial insufficiency and arrhythmias were usually reversible and occurred in the setting of sepsis, anemia and aggressive intravenous fluid administration. The events were reported more frequently in patients over age 60 years and in those with pre-existing cardiac disease.

**OVERDOSAGE**

There is no known antidote to idarubicin. Two cases of fatal overdosage in patients receiving therapy for AML have been reported. The doses were 135 mg/m² over 3 days and 45 mg/m² of idarubicin and 90 mg/m² of daunorubicin over a three-day period.

It is anticipated that overdosage with idarubicin will result in severe and prolonged myelosuppression and possibly in increased severity of gastrointestinal toxicity. Adequate supportive care including platelet transfusions, antibiotics and symptomatic treatment of mucositis is required. The effect of acute overdose on cardiac function is not fully known, but severe arrhythmia occurred in 1 of the 2 patients exposed. It is anticipated that very high doses of idarubicin may cause acute cardiac toxicity and may be associated with a higher incidence of delayed cardiac failure.

Disposition studies with idarubicin in patients undergoing dialysis have not been carried out. The profound multicompartment behavior, extensive extravascular distribution and tissue binding, coupled with the low unbound fraction available in the plasma pool make it unlikely that therapeutic efficacy or toxicity would be altered by conventional peritoneal or hemodialysis.

**DOSAGE AND ADMINISTRATION** (see WARNINGS)

For induction therapy in adult patients with AML the following dose schedule is recommended:

Idarubicin hydrochloride injection 12 mg/m² daily for 3 days by slow (10 to 15 min) intravenous injection in combination with cytarabine. The cytarabine may be given as 100 mg/m² daily by continuous infusion for 7 days or as cytarabine 25 mg/m² intravenous bolus followed by cytarabine 200 mg/m² daily for 5 days continuous infusion. In patients with unequivocal evidence of leukemia after the first induction course, a second course may be administered. Administration of the second course should be delayed in patients who experience severe mucositis, until recovery from this toxicity has occurred, and a dose reduction of 25% is recommended. In patients with hepatic and/or renal impairment, a dose reduction of idarubicin hydrochloride injection should be considered. Idarubicin hydrochloride injection should not be administered if the bilirubin level exceeds 5 mg%. (See WARNINGS.)

The benefit of consolidation in prolonging the duration of remissions and survival is not proven. There is no consensus regarding optional regimens to be used for consolidation. (See Clinical Studies for doses used in U.S. Clinical studies.)

**Preparation and Administration Precautions**

Caution in handling the solution must be exercised as skin reactions associated with idarubicin hydrochloride injection may occur. Skin accidentally exposed to idarubicin hydrochloride injection should be washed thoroughly with soap and water and if the eyes are involved, standard irrigation techniques should be used immediately. The use of goggles, gloves, and protective gowns is recommended during preparation and administration of the drug.

Care in the administration of idarubicin hydrochloride injection will reduce the chance of perivenous infiltration. It may also decrease the chance of local reactions such as urticaria and erythematous streaking. During intravenous administration of idarubicin hydrochloride injection extravasation may occur with or without an accompanying stinging or burning sensation even if blood returns well on aspiration of the infusion needle. If any signs or symptoms of extravasation have occurred, the injection or infusion should be immediately terminated and restarted in another vein. If it is known or suspected that subcutaneous extravasation has occurred, it is recommended that intermittent ice packs (1/2 hour immediately, then 1/2 hour 4 times per day for 3 days) be placed over the area of extravasation and that the affected extremity be elevated. Because of the progressive nature of extravasation reactions, the area of injection should be frequently examined and plastic surgery consultation obtained early if there is any sign of a local reaction such as pain, erythema, edema or vesication. If ulceration begins or there is severe persistent pain at the site of extravasation, early wide excision of the involved area should be considered.

Idarubicin hydrochloride injection should be administered slowly (over 10 to 15 minutes) into the tubing of a freely running intravenous infusion of Sodium Chloride Injection, USP (0.9%) or 5% Dextrose Injection, USP. The tubing should be attached to a Butterfly needle or other suitable device and inserted preferably into a large vein.

**Incompatibility**

Unless specific compatibility data are available, Idarubicin hydrochloride injection should not be mixed with other drugs. Precipitation occurs with heparin. Prolonged contact with any solution of an alkaline pH will result in degradation of the drug.

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration whenever solution and containers permit.

**Handling And Disposal**

Procedures for handling and disposal of anticancer drugs should be considered. Several guidelines on this subject have been published.[1-7] There is no general agreement that all of the procedures recommended in the guidelines are necessary or appropriate.

**HOW SUPPLIED**

Each mL contains Idarubicin Hydrochloride 1 mg.

| NDC Number | *Idarubicin Hydrochloride Injection* |
|---|---|
| 0703-4154-11 | 5 mg single dose vial (1 mg/mL) packaged individually |
| 0703-4155-11 | 10 mg single dose vial (1 mg/mL) packaged individually |
| 0703-4156-11 | 20 mg single dose vial (1 mg/mL) packaged individually |

Sterile single use only, contains no preservative.

Store under refrigeration 2° to 8°C (36° to 46°F), and protect from light. Retain in carton until time of use. Discard unused portion.

**REFERENCES**


1. Recommendations for the Safe Handling of Parenteral Antineoplastic Drugs, NIH Publication No. 83-2621. For sale by the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402.
2. AMA Council Report, Guidelines for Handling Parenteral Antineoplastics, *JAMA*, 1985; 253 (11): 1590-1592.
3. National Study Commission on Cytotoxic Exposure – Recommendations for Handling Cytotoxic Agents. Available from Louis P. Jeffrey, Sc.D., Chairman, National Study Commission on Cytotoxic Exposure, Massachusetts College of Pharmacy and Allied Sciences, 179 Longwood Avenue, Boston, Massachusetts 02115.
4. Clinical Oncological Society of Australia. Guidelines and Recommendations for Safe Handling of Antineoplastic Agents. *Med J Australia*, 1983; 1:426-428.
5. Jones RB, et al: Safe Handling of Chemotherapeutic Agents: A Report from the Mount Sinai Medical Center. *CA–A Cancer Journal for Clinicians*, 1983; (Sep/Oct) 258-263.
6. American Society of Hospital Pharmacists Technical Assistance Bulletin on Handling Cytotoxic and Hazardous Drugs. *Am J. Hosp Pharm*, 1990; 47:1033-1049.
7. Controlling Occupational Exposure to Hazardous Drugs. (OSHA Work-Practice Guidelines), *Am J Health-Syst Pharm*, 1996; 53:1669-1685.



**sicor**™
SICOR Pharmaceuticals, Inc.
Irvine, CA 92618

Issued: August 2003

# Exhibit B

GensiaSicor® PHARMACEUTICALS
A Sicor Company

Idarubicin Hydrochloride Injection



# Material Safety Data Sheet

## 1. PRODUCT IDENTIFICATION

**Product Name** Idarubicin Hydrochloride Injection
**Product Use** Medical Treatment; Antileukemic Agent
**Manufacturer** Gensia Sicor Pharmaceuticals, Inc.
**Address** 19 Hughes
Irvine, CA 92618-1902

**Chemtrec Emergency No.** 1-800-424-9300 (United States)
1-202-483-7617 (International Collect)
**Business Phone** 1-800-729-9991
**Website Address** http://www.sicorinc.com

**Common Names** Idarubicin . HCl
**Chemical Name** (1S,3S)-3-Acetyl-1,2,3,4,6,11-hexahydro-3,5,12-trihydroxy-6,11-dioxo-1-naphthacenyl 3-amino-2,3,6-trideoxy-α-L-*lyxo*-hexopyranoside, hydrochloride

**Chemical Formula** $C_{26}H_{27}NO_9 \cdot HCl$
**Chemical Family** Anthracytine Antibiotic
**How Supplied** 5mg/5ml in 6ml vial; 10mg/10ml in 10ml vial; 20mg/20ml in 20ml vial

**Date of Preparation:** August 22, 2000

## 2. COMPOSITION AND INGREDIENTS

| CHEMICAL NAME | CAS# | % by wt | EXPOSURE LIMITS IN AIR | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | ACGIH | | OSHA | | IDLH | OTHER |
| | | | TLV | STE | PEL-Total | PEL-Resp | | |
| Idarubicin Hydrochloride | 57852-57-0 | 0.1 | NE | NE | NE | NE | NE | NE |
| Glycerin | 56-81-5 | 2.5 | 10 mg/m³ | NE | 15 mg/m³ | 5 mg/m³ | NE | NE |
| Hydrochloric Acid (pH adjust.) | 7647-01-0 | Trace | NE | NE | NE | NE | NE | NE |
| Water (for injection) | 7732-18-5 | Balance | NE | NE | NE | NE | NE | NE |

NE - Not Established C - Ceiling Limit Glycerin exposure limits identified for mists
NOTE: All WHMIS required information is included. It is located in appropriate sections based on the ANSI Z400.1 – 1998 format
CHEMTREC NUMBER: Use only in the event of a chemical emergency involving a spill, leak, fire, exposure or accident involving this drug.




Idarubicin Hydrochloride Injection

# Material Safety Data Sheet

## 3. HAZARD IDENTIFICATION

**EMERGENCY OVERVIEW:** Material is a red-orange liquid. Overexposure may cause damage to the heart, liver, kidneys, bone marrow and reproductive system. May be harmful to the fetus. Avoid exposure during pregnancy. Avoid breathing vapor. Avoid contact with eyes, skin and clothing. Do not taste or swallow. Wash thoroughly after handling.

Symptoms of Overexposure by Route of Exposure: This material is intended for intravenous injection under the supervision of physicians.

Inhalation: Inhalation of significant amounts of the product is not anticipated to occur because of the small size of individual containers.

Contact with Skin or Eyes: Contact may cause irritation. Effects may include stinging, watering, and redness of the eyes and redness and a burning sensation on the skin. High concentrations of Idarubicin Hydrochloride are irritating to tissues and may lead to local ulceration and necrosis.

Ingestion: Ingestion is not an anticipated route of occupational exposure. Symptoms similar to those identified under injection may occur.

Injection: Local redness and pain are the primary symptoms of accidental injection in an occupational setting. Medical personnel are not anticipated to experience over-exposures to the therapeutic doses of this product. See package insert for adverse reactions associated with therapeutic doses of this product.

Health Effects or Risks From Exposure **(An explanation in lay terms)**:

Acute: The primary health effects anticipated in an occupational setting include irritation of eyes and skin as well as redness and local swelling after accidental injection. In case of over-exposure by injection, burning sensation, infection, hair loss, abdominal cramps, headaches, nausea, vomiting, diarrhea, blood system effects, cardiac arrest, and a variety of other health effects may occur. Death can occur in the event of a massive accidental overdose.

Chronic: This product may cause reproductive disorders. Potential hazard to the fetus (see Section 11).

Target Organs: This product may produce adverse effects on the heart, liver, kidney, bone marrow and reproductive systems (see Section 11).

Pre-Existing Medical Conditions: Conditions aggravated by exposure may include skin, respiratory heart, liver, kidney, bone marrow and reproductive disorders. Cardiac toxicity is more common in patients who have received prior anthracyclines or who have pre-existing cardiac disease.

## 4. FIRST-AID MEASURES

Skin Exposure: Remove contaminated shoes and clothing and cleanse affected area(s) thoroughly by washing with mild soap and water. If irritation or redness develops and persists, seek medical attention.

GensiaSicor® PHARMACEUTICALS
A Sicor Company

Idarubicin Hydrochloride Injection

## Material Safety Data Sheet

### 4. FIRST-AID MEASURES cont.

Eye Exposure: If irritation or redness develops, move victim away from exposure and into fresh air. Flush eyes with clean water and seek medical attention. For direct contact, hold eyelids apart and flush the affected eye(s) with clean water for at least 15 minutes. Seek medical attention.

Inhalation: If respiratory symptoms develop, move victim away from source of exposure and into fresh air. If symptoms persist, seek medical attention. If victim is not breathing, clear airway and immediately begin artificial respiration. If breathing difficulties develop, oxygen should be administered by qualified personnel. Seek immediate medical attention.

Ingestion: If swallowed, seek emergency medical attention. If victim is drowsy or unconscious and vomiting, place on the left side with the head down and DO NOT give anything by mouth. If not vomiting and professional advice is not available, DO NOT induce vomiting. If possible, do not leave victim unattended and observe closely for adequacy of breathing.

Victims of chemical exposure must be taken for medical attention. Take a copy of the MSDS to the physician or health professional with victim. Physicians should refer to Section 11 (Toxicological Information) as well as the Physicians Desk Reference for additional treatment information.

### 5. FIRE-FIGHTING MEASURES

Flash Point: N/A Autoignition Temperature: N/A

Flammable Limits (in air by volume, %): Lower: N/A Upper: N/A

Fire Extinguishing Equipment: Use extinguishing agent suitable for type of surrounding fire.

| | | |
|---|---|---|
| Water Spray: OK | Carbon Dioxide: OK | Halon: OK |
| Foam: OK | Dry Chemical: OK | Other: Any "ABC" Class |

Unusual Fire and Explosion Hazards: No unusual fire or explosion hazards are expected.

Explosion Sensitivity to Mechanical Impact: Not sensitive.
Explosion Sensitivity to Static Discharge: Not sensitive.

Special Fire Fighting Procedures: For fires beyond the incipient stage, emergency responders in the immediate hazard area should wear bunker gear. When the potential chemical hazard is unknown, in enclosed or confined spaces, or when explicitly required by DOT, a self-contained breathing apparatus should be worn. In addition, wear other appropriate protective equipment as conditions warrant (see Section 8). Isolate immediate hazard area and keep unauthorized personnel out. Contain spill if it can be done with minimal risk. Move undamaged containers from immediate hazard area if it can be done with minimal risk. Cool equipment exposed to fire with water, if it can be done with minimal risk.

| NFPA HAZARD CLASS: | | |
|---|---|---|
| | Health: | 3 (High) |
| | Flammability: | 0 (Least) |
| | Reactivity: | 0 (Least) |

GensiaSicor® PHARMACEUTICALS
A Sicor Company

Idarubicin Hydrochloride Injection

# Material Safety Data Sheet

## 6. ACCIDENTAL RELEASE MEASURES

Spill and Leak Response:

For small releases of this product, wear latex or nitrile gloves and safety glasses. Absorb spilled liquid and rinse area thoroughly with soap and water.

For large or uncontrolled releases, stay upwind and away from spill. Isolate immediate hazard area and keep unauthorized personnel out. Contain spill if it can be done with minimal risk. Wear appropriate protective equipment including respiratory protection as conditions warrant (see Section 8). Prevent spilled material from entering sewers, storm drains, other unauthorized treatment drainage systems, and natural waterways. Dike far ahead of spill for later recovery or disposal. Spilled material may be absorbed into an appropriate absorbent material. Notify appropriate federal, state, and local agencies. Immediate cleanup of any spill is recommended.

## 7. HANDLING and STORAGE

Work and Hygiene Practices: IDARUBACIN HYDROCHLORIDE IS A CYTOTOXIC AGENT. ALL WORK PRACTICES MUST BE DESIGNED TO REDUCE HUMAN EXPOSURE TO THE LOWEST LEVEL. As with all chemicals, avoid getting this product ON YOU or IN YOU. Do not eat, drink, smoke or apply cosmetics while handling the product. Wash hands thoroughly after handling.

Particular care in working with this product must be practiced in pharmacies and other preparation areas, during manufacture of this product, and during patient administration. Precautions should be taken during the following activities:

- Withdrawal of needles from drug vials.
- Drug transfers using syringes and needles or filter straws.
- Expulsion of air from drug-filled syringes.

DO NOT CLIP OR CRUSH NEEDLE WITH WHICH THIS COMPOUND WAS IN COTNACT. Use of this compound should meet the following provisions.

- Work should be performed in a designated area for working with hazardous drugs;
- Containment devices, such as a Biological Safety Cabinet, should be used;
- Contaminated waste must be properly handled; and,
- Work areas must be regularly decontaminated.

Storage and Handling Practices: Employees must be trained to properly use the product. Ensure vials are properly labeled. Store only in approved containers. Keep away from any incompatible materials or conditions (see Section 10). Protect from light and store under refrigeration 2- 8°C (36-46°F). Hospital personnel preparing or administering antineoplastic agents should wear latex or surgical rubber gloves, safety glasses with side-shields, a closed-front gown with knit cuffs and masks. Preparation of all antineoplatic agents should be done in a class II laminar flow biological safety cabinet with exhaust air discharged external to the room environment.

Protective Practices During Maintenance of Contaminated Equipment: When cleaning non-disposable equipment, wear latex or nitrile gloves (double gloving is recommended), goggles, and lab coat. Wash equipment with soap and water. All needles, syringes, vials and other disposable items contaminated with this product should be disposed of properly.




Idarubicin Hydrochloride Injection

# Material Safety Data Sheet

## 8. EXPOSURE CONTROLS - PERSONAL PROTECTION

Ventilation and Engineering Controls: Use with adequate ventilation. Follow standard medical product handling procedures.

Respiratory Protection: Not normally required for routine, medical administration of this product. A NIOSH certified air-purifying respirator with a type 95 filter may be used under conditions where airborne concentrations are expected to be excessive. Protection provided by air purifying respirators is limited (see manufacturer's respirator selection guide). Use a positive pressure air supplied respirator if there is potential for uncontrolled release, exposure levels are not known, or any other circumstances where air-purifying respirators may not provide adequate protection. A respiratory protection program that meets OSHA's 29 CFR 1910.134 and ANSI Z88.2 requirements must be followed whenever workplace conditions warrant a respirator's use.

Eye Protection: Approved eye protection (e.g., safety glasses with side shields) to safeguard against potential eye contact, irritation or injury is recommended. Depending on conditions of use, a face shield may be necessary.

Hand Protection: Use latex, nitrile, or rubber gloves. Check gloves for leaks. Wash hands before and after using gloves.

Body Protection: No special body protection required for routine, medical administration of this product. Wear lab coat, gown, or smock, as appropriate for procedure.

Product Preparation Instructions for Medical Personnel: Follow standard procedure for handling pharmaceutical materials and recommendations presented on the Package Insert.

## 9. PHYSICAL and CHEMICAL PROPERTIES

| Relative Vapor Density (air = 1): | ND | Evaporation Rate (n-BuAc=1): | <1 |
|---|---|---|---|
| Specific Gravity (water = 1): | ~1 | Melting/Freezing Point: | ND |
| Solubility in Water: | Soluble | Boiling Point: | ND |
| Vapor Pressure, mm Hg @ 25°C. | ND | pH: | 3-4 |
| Odor Threshold: Odorless | | | |
| Appearance and Color: Clear, red-orange liquid | | | |

ND = No Data

## 10. STABILITY and REACTIVITY

Stability: Stable under normal conditions of storage and handling.

Materials With Which Substance is Incompatible: This product is generally compatible with other common materials in a medical facility.

Hazardous Polymerization: Will not occur.

Conditions To Avoid: Protect from light and keep refrigerated 2- 8°C (36-46°F).

GensiaSicor® PHARMACEUTICALS
A Sicor Company

Idarubicin Hydrochloride Injection

# Materials Safety Data Sheet

## 11. TOXICOLOGICAL INFORMATION

Toxicity Data: The following information is for Idarubicin Hydrochloride

IV LD50(rat) = 3080 ug/kg Oral LD50(rat) = 5430 ug/kg SubQ LD50 (mouse) = 4690 ug/kg
IV LD50(mouse) =4100 ug/kg Oral LD50(mouse) = 13980 ug/kg SubQ LD50 (rat) = 2930 ug/kg
IV LD50(dog) > 500 ug/kg

Suspected Cancer Agent: This product as well as all components of this product have **NOT** been identified as carcinogens by NTP, IARC or OSHA. Formal long-term carcinogenicity studies have not been conducted with Idarubicin Hydrochloride. Idarubicin Hydrochloride and related compounds have been shown to have carcinogenic properties when tested in experimental models (including Sprague-Dawley rats).

Irritancy of Product: This product may be irritating to contaminated skin, eyes and other tissues.

Sensitization to the Product: This product is not expected to cause sensitization although individual sensitivities may vary.

Reproductive Toxicity Information: Listed below is information concerning the effects of Idarubicin Hydrochloride on human and animal reproductive systems. This material is classified as a Pregnancy Category D (Positive Evidence of Risk).

Mutagenicity: Idarubicin Hydrochloride has been shown to be mutagenic when tested in experimental models, including bacterial systems and mammalian cell cultures.

Embryotoxicity/Teratogenicity/Reproductive Toxicity: Idarubicin Hydrochloride was embryotoxic and teratogenic in the rat at one tenth the human dose, which was nontoxic to dams. Idarubicin Hydrochloride was embryotoxic but not teratogenic in the rabbit, even at two tenths the human dose, which was toxic to dams. In male dogs given about one seventh the human dose for 13 weeks, or 3 times the human dose, testicular atrophy was observed with inhibition of spermatogenesis and sperm maturation with few or no mature sperm. These effects were not readily reversed after a recovery of 8 weeks.

There is no conclusive information about Idarubicin Hydrochloride adversely affecting human fertility or causing teratogenesis. There has been one report of a fetal fatality after maternal exposure during the second trimester

Target Organ Toxicity Information: This product may produce adverse effects on the heart, liver, kidney and bone marrow. When administered clinically by intravenous injection, Idarubicin Hydrochloride can cause myocardial toxicity leading to congestive heart failure. Cardiac toxicity is more common in patients who have received prior anthracyclines or who have pre-existing cardiac disease. Changes in hepatic and renal function tests have been observed. Severe myleosupression will occur in all patients given a therapeutic dose. Deaths due to infection and/or bleeding have been reported during the period of severe myleosuppression.

ACGIH Biological Exposure Indices: Currently there are no Biological Exposure Indices (BEIs) associated with the components of this product.

GensiaSicor® PHARMACEUTICALS
A Sicor Company

Idarubicin Hydrochloride Injection

## Materials Safety Data Sheet

### 12. ECOLOGICAL INFORMATION

All work practices must be aimed at eliminating environmental contamination.

Environmental Stability: This product will be relatively stable under ambient environmental conditions.

Effect of Materials on Plants or Animals: No specific information is available on the effect of Idarubicin Hydrochloride on plants or animals in the environment.

Effect of Chemicals on Aquatic Life: No specific information is available on the effect of Idarubicin Hydrochloride on plants or animals in the aquatic environment.

### 13. DISPOSAL CONSIDERATIONS

Preparing Wastes for Disposal: This material, if discarded as produced, is not a RCRA "listed" or "characteristic" hazardous waste. Use resulting in chemical or physical change or contamination may subject it to regulation as a hazardous waste. Along with properly characterizing all waste materials consult state and local regulations regarding the proper disposal of this material.

U.S. EPA Waste Number: None

### 14. TRANSPORTATION INFORMATION

This Materials is not Hazardous as Defined by 49 CFR 172.101 by the U. S. Department of Transportation

Proper Shipping Name: Not applicable
Hazard Class Number and Description: Not applicable
UN Identification Number: Not applicable
Packing Group: Not applicable
DOT Label(s) Required: Not applicable
North American Emergency Response Guidebook Number (1996): Not applicable.
MARINE POLLUTANT: No component of this product is listed as a Marine Pollutant (49 CFR 172.101, Appendix B)

Transport Canada Transportation of Dangerous Goods Regulations: Not applicable



Idarubicin Hydrochloride Injection

# Materials Safety Data Sheet

## 15. REGULATORY INFORMATION

**U.S. REGULATIONS:**

U.S. SARA Reporting Requirements: The components of this product are not subject to the reporting requirements of Sections 302, 304 and 313 of Title II of the Superfund Amendments and Reauthorization Act.

U.S. SARA Threshold Planning Quantity: Not applicable

U.S. CERCLA Reportable Quantities (RQ): Not applicable

U.S. TSCA Inventory Status: Idarubicin Hydrochloride is a "drug" as defined by the Federal Food, Drug and Cosmetic Act and is therefore not a chemical substance under TSCA.

California Safe Drinking Water and Toxic Enforcement Act (Proposition 65): This product does NOT contain a chemical known to the State of California to cause developmental and reproductive effects.

Other U.S. Federal Regulations: Based on this product's use, the requirements of the OSHA Bloodborne pathogen Standard (29 CFR 1910.1030) are applicable.

ANSI Labeling (Based on 129.1, Provided to Summarize Occupational Exposure Hazards):

OVEREXPOSURE MAY CAUSE DAMAGE TO THE HEART, LIVER, KIDNEYS, BONE MARROW AND REPRODUCTIVE SYSTEMS. Idarubicin Hydrochloride should be administered under the supervision of a qualified physician. Avoid over-exposure. Avoid exposure during pregnancy. Avoid breathing vapor. Avoid contact with eyes, skin and clothing. Do not eat, drink or smoke when handling Idarubicin Hydrochloride. Do not taste or swallow. Wash thoroughly after handling. Clean up spills promptly.

**CANADIAN REGULATIONS:**

Canadian DSL/NDSL Status: Idarubicin Hydrochloride is regulated by the Food and Drug Administration of Health Canada and is therefore exempt from the requirements of CEPA.

## 16. OTHER INFORMATION

Issue Date: 08/22/00
Previous Issue Date: None

The information in this document is believed to be correct as of the date issued. **HOWEVER, NO WARRANTY OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER WARRANTY IS EXPRESSED OR IS TO BE IMPLIED REGARDING THE ACCURACY OR COMPLETENESS OF THIS INFORMATION, THE RESULTS TO BE OBTAINED FROM THE USE OF THIS INFORMATION OR THE PRODUCT, THE SAFETY OF THIS PRODUCT, OR THE HAZARDS RELATED TO ITS USE.** This information and product are furnished on the condition that the person receiving them shall make his own determination as to the suitability of the product for his particular purpose and on the condition that he assume the risk of his use thereof.

# Exhibit C

Pharmacia & Upjohn Company LLC v. Sicor Inc. and Sicor Pharmaceuticals, Inc.

Information Reviewed

| Beginning Bates Number | Ending Bates Number | Beginning Bates Number | Ending Bates Number |
|---|---|---|---|
| SICOR-PNU0018580 | SICOR-PNU0018599 | SICOR-PNU0020687 | SICOR-PNU0020687 |
| SICOR-PNU0018600 | SICOR-PNU0018611 | SICOR-PNU0020702 | SICOR-PNU0020793 |
| SICOR-PNU0018612 | SICOR-PNU0018621 | SICOR-PNU0020794 | SICOR-PNU0020800 |
| SICOR-PNU0018622 | SICOR-PNU0018624 | SICOR-PNU0020801 | SICOR-PNU0020802 |
| SICOR-PNU0018625 | SICOR-PNU0018631 | SICOR-PNU0020803 | SICOR-PNU0020872 |
| SICOR-PNU0018632 | SICOR-PNU0018638 | SICOR-PNU0020873 | SICOR-PNU0020876 |
| SICOR-PNU0018716 | SICOR-PNU0018753 | SICOR-PNU0020877 | SICOR-PNU0021040 |
| SICOR-PNU0018756 | SICOR-PNU0018763 | SICOR-PNU0021042 | SICOR-PNU0021200 |
| SICOR-PNU0018823 | SICOR-PNU0018826 | SICOR-PNU0021201 | SICOR-PNU0021383 |
| SICOR-PNU0018827 | SICOR-PNU0018829 | SICOR-PNU0021385 | SICOR-PNU0021520 |
| SICOR-PNU0018831 | SICOR-PNU0018833 | SICOR-PNU0021521 | SICOR-PNU0021656 |
| SICOR-PNU0018838 | SICOR-PNU0018841 | SICOR-PNU0021657 | SICOR-PNU0021799 |
| SICOR-PNU0018842 | SICOR-PNU0018842 | SICOR-PNU0021909 | SICOR-PNU0022182 |
| SICOR-PNU0018843 | SICOR-PNU0018843 | SICOR-PNU0022199 | SICOR-PNU0022203 |
| SICOR-PNU0018844 | SICOR-PNU0018844 | SICOR-PNU0022775 | SICOR-PNU0022799 |
| SICOR-PNU0018845 | SICOR-PNU0018850 | SICOR-PNU0022800 | SICOR-PNU0022903 |
| SICOR-PNU0018851 | SICOR-PNU0018852 | SICOR-PNU0023062 | SICOR-PNU0023069 |
| SICOR-PNU0018853 | SICOR-PNU0018853 | SICOR-PNU0023070 | SICOR-PNU0023084 |
| SICOR-PNU0018854 | SICOR-PNU0018855 | SICOR-PNU0023085 | SICOR-PNU0023340 |
| SICOR-PNU0018856 | SICOR-PNU0018856 | SICOR-PNU0023341 | SICOR-PNU0023356 |
| SICOR-PNU0018857 | SICOR-PNU0018857 | SICOR-PNU0023358 | SICOR-PNU0023406 |
| SICOR-PNU0018858 | SICOR-PNU0018859 | SICOR-PNU0039597 | SICOR-PNU0039648 |
| SICOR-PNU0018860 | SICOR-PNU0018860 | SICOR-PNU0040032 | SICOR-PNU0040111 |
| SICOR-PNU0018861 | SICOR-PNU0018861 | SICOR-PNU0040112 | SICOR-PNU0040199 |
| SICOR-PNU0018862 | SICOR-PNU0018862 | SICOR-PNU0040200 | SICOR-PNU0040282 |
| SICOR-PNU0018863 | SICOR-PNU0018864 | SICOR-PNU0040283 | SICOR-PNU0040362 |
| SICOR-PNU0018865 | SICOR-PNU0018865 | SICOR-PNU0040363 | SICOR-PNU0040448 |
| SICOR-PNU0018866 | SICOR-PNU0018868 | SICOR-PNU0040449 | SICOR-PNU0040522 |
| SICOR-PNU0018869 | SICOR-PNU0018869 | SICOR-PNU0040523 | SICOR-PNU0040608 |
| SICOR-PNU0018870 | SICOR-PNU0018870 | SICOR-PNU0040609 | SICOR-PNU0040708 |
| SICOR-PNU0018871 | SICOR-PNU0018871 | SICOR-PNU0040709 | SICOR-PNU0040801 |
| SICOR-PNU0018872 | SICOR-PNU0018875 | SICOR-PNU0040803 | SICOR-PNU0040902 |
| SICOR-PNU0018876 | SICOR-PNU0018876 | SICOR-PNU0040903 | SICOR-PNU0040978 |
| SICOR-PNU0018877 | SICOR-PNU0018878 | SICOR-PNU0040979 | SICOR-PNU0041055 |
| SICOR-PNU0018879 | SICOR-PNU0018879 | SICOR-PNU0041056 | SICOR-PNU0041132 |
| SICOR-PNU0018880 | SICOR-PNU0018881 | SICOR-PNU0041133 | SICOR-PNU0041209 |
| SICOR-PNU0018882 | SICOR-PNU0018882 | SICOR-PNU0041210 | SICOR-PNU0041210 |
| SICOR-PNU0018883 | SICOR-PNU0018885 | SICOR-PNU0041211 | SICOR-PNU0041211 |
| SICOR-PNU0018886 | SICOR-PNU0018887 | SICOR-PNU0041212 | SICOR-PNU0041212 |
| SICOR-PNU0018888 | SICOR-PNU0018888 | SICOR-PNU0041213 | SICOR-PNU0041213 |
| SICOR-PNU0018889 | SICOR-PNU0018889 | SICOR-PNU0041214 | SICOR-PNU0041214 |
| SICOR-PNU0018890 | SICOR-PNU0018890 | SICOR-PNU0041215 | SICOR-PNU0041215 |
| SICOR-PNU0018891 | SICOR-PNU0018893 | SICOR-PNU0041216 | SICOR-PNU0041216 |
| SICOR-PNU0018894 | SICOR-PNU0018894 | SICOR-PNU0041217 | SICOR-PNU0041217 |
| SICOR-PNU0018895 | SICOR-PNU0018895 | SICOR-PNU0041218 | SICOR-PNU0041218 |
| SICOR-PNU0018896 | SICOR-PNU0018899 | SICOR-PNU0041219 | SICOR-PNU0041219 |
| SICOR-PNU0018900 | SICOR-PNU0018900 | SICOR-PNU0041220 | SICOR-PNU0041220 |
| SICOR-PNU0018901 | SICOR-PNU0018901 | SICOR-PNU0041221 | SICOR-PNU0041221 |
| SICOR-PNU0018902 | SICOR-PNU0018902 | SICOR-PNU0041222 | SICOR-PNU0041222 |
| SICOR-PNU0018903 | SICOR-PNU0018903 | SICOR-PNU0041223 | SICOR-PNU0041223 |
| SICOR-PNU0018904 | SICOR-PNU0018911 | SICOR-PNU0041234 | SICOR-PNU0041224 |
| SICOR-PNU0018912 | SICOR-PNU0018912 | SICOR-PNU0041225 | SICOR-PNU0041225 |
| SICOR-PNU0018913 | SICOR-PNU0018913 | SICOR-PNU0041226 | SICOR-PNU0041226 |
| SICOR-PNU0018914 | SICOR-PNU0018918 | SICOR-PNU0041227 | SICOR-PNU0041227 |
| SICOR-PNU0018919 | SICOR-PNU0018919 | SICOR-PNU0041228 | SICOR-PNU0041228 |
| SICOR-PNU0018921 | SICOR-PNU0018927 | SICOR-PNU0041229 | SICOR-PNU0041229 |
| SICOR-PNU0018970 | SICOR-PNU0018972 | SICOR-PNU0041230 | SICOR-PNU0041230 |
| SICOR-PNU0019534 | SICOR-PNU0019534 | SICOR-PNU0041231 | SICOR-PNU0041231 |
| SICOR-PNU0019535 | SICOR-PNU0019535 | SICOR-PNU0041232 | SICOR-PNU0041232 |
| SICOR-PNU0019536 | SICOR-PNU0019536 | SICOR-PNU0041233 | SICOR-PNU0041233 |
| SICOR-PNU0019537 | SICOR-PNU0019537 | SICOR-PNU0041234 | SICOR-PNU0041234 |
| SICOR-PNU0019749 | SICOR-PNU0019834 | SICOR-PNU0041235 | SICOR-PNU0041235 |
| SICOR-PNU0019835 | SICOR-PNU0019934 | SICOR-PNU0041236 | SICOR-PNU0041236 |
| SICOR-PNU0019991 | SICOR-PNU0020059 | SICOR-PNU0041237 | SICOR-PNU0041237 |
| SICOR-PNU0020060 | SICOR-PNU0020060 | SICOR-PNU0041238 | SICOR-PNU0041238 |
| SICOR-PNU0020061 | SICOR-PNU0020061 | SICOR-PNU0041239 | SICOR-PNU0041239 |
| SICOR-PNU0020062 | SICOR-PNU0020062 | SICOR-PNU0041240 | SICOR-PNU0041240 |
| SICOR-PNU0020063 | SICOR-PNU0020063 | SICOR-PNU0041241 | SICOR-PNU0041241 |
| SICOR-PNU0020064 | SICOR-PNU0020064 | SICOR-PNU0041242 | SICOR-PNU0041242 |
| SICOR-PNU0020065 | SICOR-PNU0020065 | SICOR-PNU0041243 | SICOR-PNU0041261 |
| SICOR-PNU0020066 | SICOR-PNU0020066 | SICOR-PNU0041262 | SICOR-PNU0041262 |
| SICOR-PNU0020067 | SICOR-PNU0020067 | SICOR-PNU0041263 | SICOR-PNU0041263 |
| SICOR-PNU0020068 | SICOR-PNU0020068 | SICOR-PNU0041264 | SICOR-PNU0041264 |
| SICOR-PNU0020069 | SICOR-PNU0020069 | SICOR-PNU0041265 | SICOR-PNU0041265 |
| SICOR-PNU0020070 | SICOR-PNU0020070 | SICOR-PNU0041266 | SICOR-PNU0041266 |
| SICOR-PNU0020071 | SICOR-PNU0020071 | SICOR-PNU0041267 | SICOR-PNU0041267 |
| SICOR-PNU0020072 | SICOR-PNU0020072 | SICOR-PNU0041268 | SICOR-PNU0041268 |
| SICOR-PNU0020073 | SICOR-PNU0020073 | SICOR-PNU0041269 | SICOR-PNU0041269 |

**Pharmacia & Upjohn Company LLC v. Sicor Inc. and Sicor Pharmaceuticals, Inc.**

**Information Reviewed**

| Beginning Bates Number | Ending Bates Number |
|---|---|
| SICOR-PNU0020074 | SICOR-PNU0020074 |
| SICOR-PNU0020075 | SICOR-PNU0020075 |
| SICOR-PNU0020076 | SICOR-PNU0020076 |
| SICOR-PNU0020077 | SICOR-PNU0020077 |
| SICOR-PNU0020078 | SICOR-PNU0020078 |
| SICOR-PNU0020079 | SICOR-PNU0020079 |
| SICOR-PNU0020080 | SICOR-PNU0020080 |
| SICOR-PNU0020081 | SICOR-PNU0020081 |
| SICOR-PNU0020082 | SICOR-PNU0020082 |
| SICOR-PNU0020083 | SICOR-PNU0020083 |
| SICOR-PNU0020087 | SICOR-PNU0020087 |
| SICOR-PNU0020088 | SICOR-PNU0020088 |
| SICOR-PNU0020089 | SICOR-PNU0020089 |
| SICOR-PNU0020090 | SICOR-PNU0020090 |
| SICOR-PNU0020091 | SICOR-PNU0020091 |
| SICOR-PNU0020092 | SICOR-PNU0020092 |
| SICOR-PNU0020093 | SICOR-PNU0020093 |
| SICOR-PNU0020094 | SICOR-PNU0020094 |
| SICOR-PNU0020095 | SICOR-PNU0020095 |
| SICOR-PNU0020096 | SICOR-PNU0020096 |
| SICOR-PNU0020097 | SICOR-PNU0020097 |
| SICOR-PNU0020098 | SICOR-PNU0020098 |
| SICOR-PNU0020099 | SICOR-PNU0020099 |
| SICOR-PNU0020100 | SICOR-PNU0020100 |
| SICOR-PNU0020101 | SICOR-PNU0020111 |
| SICOR-PNU0020126 | SICOR-PNU0020127 |
| SICOR-PNU0020128 | SICOR-PNU0020129 |
| SICOR-PNU0020130 | SICOR-PNU0020134 |
| SICOR-PNU0020135 | SICOR-PNU0020135 |
| SICOR-PNU0020142 | SICOR-PNU0020153 |
| SICOR-PNU0020154 | SICOR-PNU0020213 |
| SICOR-PNU0020214 | SICOR-PNU0020280 |
| SICOR-PNU0020281 | SICOR-PNU0020304 |
| SICOR-PNU0020333 | SICOR-PNU0020343 |
| SICOR-PNU0020344 | SICOR-PNU0020351 |
| SICOR-PNU0020354 | SICOR-PNU0020359 |
| SICOR-PNU0020360 | SICOR-PNU0020370 |
| SICOR-PNU0020375 | SICOR-PNU0020381 |
| SICOR-PNU0020382 | SICOR-PNU0020389 |
| SICOR-PNU0020390 | SICOR-PNU0020390 |
| SICOR-PNU0020439 | SICOR-PNU0020462 |
| SICOR-PNU0020463 | SICOR-PNU0020463 |
| SICOR-PNU0020464 | SICOR-PNU0020464 |
| SICOR-PNU0020467 | SICOR-PNU0020470 |
| SICOR-PNU0020476 | SICOR-PNU0020521 |
| SICOR-PNU0020530 | SICOR-PNU0020530 |
| SICOR-PNU0020531 | SICOR-PNU0020531 |
| SICOR-PNU0020532 | SICOR-PNU0020532 |
| SICOR-PNU0020533 | SICOR-PNU0020533 |
| SICOR-PNU0020534 | SICOR-PNU0020534 |
| SICOR-PNU0020535 | SICOR-PNU0020535 |
| SICOR-PNU0020536 | SICOR-PNU0020536 |
| SICOR-PNU0020537 | SICOR-PNU0020537 |
| SICOR-PNU0020538 | SICOR-PNU0020538 |
| SICOR-PNU0020539 | SICOR-PNU0020539 |
| SICOR-PNU0020541 | SICOR-PNU0020541 |
| SICOR-PNU0020542 | SICOR-PNU0020548 |
| SICOR-PNU0020573 | SICOR-PNU0020593 |
| SICOR-PNU0020594 | SICOR-PNU0020594 |
| SICOR-PNU0020595 | SICOR-PNU0020604 |
| SICOR-PNU0020651 | SICOR-PNU0020651 |
| SICOR-PNU0020654 | SICOR-PNU0020654 |
| SICOR-PNU0020655 | SICOR-PNU0020655 |
| SICOR-PNU0020656 | SICOR-PNU0020656 |
| SICOR-PNU0020657 | SICOR-PNU0020657 |
| SICOR-PNU0020660 | SICOR-PNU0020660 |
| SICOR-PNU0020661 | SICOR-PNU0020661 |
| SICOR-PNU0020662 | SICOR-PNU0020662 |
| SICOR-PNU0020665 | SICOR-PNU0020665 |
| SICOR-PNU0020666 | SICOR-PNU0020666 |
| SICOR-PNU0020667 | SICOR-PNU0020667 |
| SICOR-PNU0020670 | SICOR-PNU0020670 |
| SICOR-PNU0020671 | SICOR-PNU0020671 |
| SICOR-PNU0020672 | SICOR-PNU0020672 |
| SICOR-PNU0020675 | SICOR-PNU0020675 |
| SICOR-PNU0020676 | SICOR-PNU0020676 |
| SICOR-PNU0020677 | SICOR-PNU0020677 |
| SICOR-PNU0020680 | SICOR-PNU0020680 |
| SICOR-PNU0020681 | SICOR-PNU0020681 |
| SICOR-PNU0020682 | SICOR-PNU0020682 |
| SICOR-PNU0020685 | SICOR-PNU0020685 |
| SICOR-PNU0020686 | SICOR-PNU0020686 |

| Beginning Bates Number | Ending Bates Number |
|---|---|
| SICOR-PNU0041270 | SICOR-PNU0041270 |
| SICOR-PNU0041271 | SICOR-PNU0041271 |
| SICOR-PNU0041272 | SICOR-PNU0041272 |
| SICOR-PNU0041273 | SICOR-PNU0041273 |
| SICOR-PNU0041274 | SICOR-PNU0041274 |
| SICOR-PNU0041275 | SICOR-PNU0041275 |
| SICOR-PNU0041276 | SICOR-PNU0041276 |
| SICOR-PNU0041277 | SICOR-PNU0041277 |
| SICOR-PNU0041278 | SICOR-PNU0041278 |
| SICOR-PNU0041279 | SICOR-PNU0041279 |
| SICOR-PNU0041280 | SICOR-PNU0041280 |
| SICOR-PNU0041281 | SICOR-PNU0041281 |
| SICOR-PNU0041282 | SICOR-PNU0041282 |
| SICOR-PNU0041283 | SICOR-PNU0041283 |
| SICOR-PNU0041284 | SICOR-PNU0041284 |
| SICOR-PNU0041285 | SICOR-PNU0041285 |
| SICOR-PNU0041286 | SICOR-PNU0041286 |
| SICOR-PNU0041287 | SICOR-PNU0041287 |
| SICOR-PNU0041288 | SICOR-PNU0041288 |
| SICOR-PNU0041289 | SICOR-PNU0041289 |
| SICOR-PNU0041290 | SICOR-PNU0041290 |
| SICOR-PNU0041291 | SICOR-PNU0041291 |
| SICOR-PNU0041292 | SICOR-PNU0041292 |
| SICOR-PNU0041293 | SICOR-PNU0041293 |
| SICOR-PNU0041294 | SICOR-PNU0041294 |
| SICOR-PNU0041295 | SICOR-PNU0041295 |
| SICOR-PNU0041296 | SICOR-PNU0041296 |
| SICOR-PNU0041297 | SICOR-PNU0041297 |
| SICOR-PNU0041298 | SICOR-PNU0041298 |
| SICOR-PNU0041299 | SICOR-PNU0041299 |
| SICOR-PNU0041300 | SICOR-PNU0041300 |
| SICOR-PNU0041301 | SICOR-PNU0041375 |
| SICOR-PNU0041376 | SICOR-PNU0041456 |
| SICOR-PNU0041457 | SICOR-PNU0041527 |
| SICOR-PNU0041528 | SICOR-PNU0041601 |
| SICOR-PNU0041602 | SICOR-PNU0041602 |
| SICOR-PNU0041603 | SICOR-PNU0041603 |
| SICOR-PNU0041604 | SICOR-PNU0041604 |
| SICOR-PNU0041605 | SICOR-PNU0041605 |
| SICOR-PNU0041606 | SICOR-PNU0041606 |
| SICOR-PNU0041607 | SICOR-PNU0041607 |
| SICOR-PNU0041608 | SICOR-PNU0041608 |
| SICOR-PNU0041609 | SICOR-PNU0041609 |
| SICOR-PNU0041630 | SICOR-PNU0041610 |
| SICOR-PNU0041611 | SICOR-PNU0041611 |
| SICOR-PNU0041612 | SICOR-PNU0041612 |
| SICOR-PNU0041613 | SICOR-PNU0041613 |
| SICOR-PNU0041614 | SICOR-PNU0041614 |
| SICOR-PNU0041615 | SICOR-PNU0041615 |
| SICOR-PNU0041616 | SICOR-PNU0041616 |
| SICOR-PNU0041617 | SICOR-PNU0041617 |
| SICOR-PNU0041618 | SICOR-PNU0041618 |
| SICOR-PNU0041619 | SICOR-PNU0041619 |
| SICOR-PNU0041620 | SICOR-PNU0041620 |
| SICOR-PNU0041621 | SICOR-PNU0041621 |
| SICOR-PNU0041622 | SICOR-PNU0041622 |
| SICOR-PNU0041623 | SICOR-PNU0041623 |
| SICOR-PNU0041624 | SICOR-PNU0041624 |
| SICOR-PNU0041625 | SICOR-PNU0041625 |
| SICOR-PNU0041626 | SICOR-PNU0041626 |
| SICOR-PNU0041627 | SICOR-PNU0041627 |
| SICOR-PNU0041628 | SICOR-PNU0041628 |
| SICOR-PNU0041629 | SICOR-PNU0041629 |
| SICOR-PNU0041630 | SICOR-PNU0041630 |
| SICOR-PNU0041631 | SICOR-PNU0041631 |
| SICOR-PNU0041632 | SICOR-PNU0041632 |
| SICOR-PNU0041633 | SICOR-PNU0041633 |
| SICOR-PNU0041634 | SICOR-PNU0041634 |
| SICOR-PNU0041635 | SICOR-PNU0041635 |
| SICOR-PNU0041636 | SICOR-PNU0041636 |
| SICOR-PNU0043483 | SICOR-PNU0042549 |
| SICOR-PNU052510 | SICOR-PNU052527 |
| SICOR-PNU052108 | SICOR-PNU052509 |
| PU43359 | PU51349 |
| PU52090 | PU56797 |
| PI17801 | PI18381 |
| PI18386 | PI18396 |
| PI18508 | PI18514 |
| PI18516 | PI18516 |

**Pharmacia & Upjohn Company LLC v. Sicor Inc. and Sicor Pharmaceuticals, Inc.**

**Information Reviewed**

Craig Lee 9/8/2005 deposition and exhibits (rough transcript)
CIA World Factbook
Federal Reserve Bank Historical Statistics: AAA Corporate Bond Yields
*Kleinrock's Total Tax Guide* 2002 - 2005
Pfizer 2004 Annual Financial Report
www.gensiasicor.com
www.newsicor.com
National Comprehensive Cancer Network "Clinical Practice Guidelines in Oncology - Acute Myeloid Leukemia" - version 2 2005
*Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.* , 575 F.2d 1152, 1156 (6th Cir 1978)
2003 Pfizer Form 10-K
2004 Pfizer Form 10-K
2001 Pharmacia Form 10-K
2002 Pharmacia Form 10-K
6,107,285 Patent - "Injectable Ready-To-Use Solutions Containing An Antitumor Anthracycline Glycoside"; issued August 22, 2000
Electronic Orange Book; www.fda.gov

Conversations with Pfizer Personnel:

Brian Anderson
Maria Bernardo
Lecon Das-Young
Stuart Greenberg
Peter Lalvins
Meredith Manning
Howard Mayer
Bradley Winter

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the forgoing were caused to be served this 19th day of September, 2005 upon the following in the manner indicated:

**BY HAND DELIVERY**

Steven J. Balick
John G. Day
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

**BY FEDERAL EXPRESS**

Reid L. Ashinoff
Brian T. Moriarty
William J. Sipio
David R. Baum
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020

James W. Parrett, Jr.

483742