# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    PHARMACIA & UPJOHN COMPANY,          :   CIVIL ACTION
                                          :
5                                         :
               Plaintiff and             :
6              Counter-defendant,        :
                                          :
7    v.                                   :
                                          :
8    SICOR INC., and SICOR               :
     PHARMACEUTICALS INC.,               :
9                                         :
               Defendants and            :   NO. 04-833 (KAJ)
10             Counter-Claimants.        :
                               - - -

11
                         Wilmington, Delaware
12            Tuesday, October 11, 2005 at 3:00 p.m.
                      TELEPHONE CONFERENCE
13
                           - - -
14
     BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.
15
                           - - -
16   APPEARANCES:

17
                 MORRIS NICHOLS ARSHT & TUNNELL
18               BY:  MARYELLEN NORIEKA, ESQ.

19                   and

20               McDONNELL BOEHNEN HULBERT & BERGHOFF, LLP
                 BY:  DANIEL A. BOEHNEN, ESQ.,
21                    JOSHUA R. RICH, ESQ., and
                      GRANTLAND G. DRUTCHAS, ESQ.
22                   (Chicago, Illinois)

23                        Counsel for Pharmacia & Upjohn
                          Company
24

25                              Brian P. Gaffigan
                                Registered Merit Reporter

```
1   APPEARANCES:  (Continued)

2

3              ASHBY & GEDDES
               BY:   JOHN G. DAY, ESQ.
4
                     and
5
               SONNENSCHEIN NATH & ROSENTHAL, LLP
6              BY:   REID L. ASHINOFF, ESQ. and
                     DAVID R. BAUM, ESQ.
7                    (New York, New York)

8                    and

9              SONNENSCHEIN NATH & ROSENTHAL, LLP
               BY:   JORDAN A. SIGALE, ESQ.
10                   (Chicago, Illinois)

11                      Counsel for Sicor Inc. and Sicor
                        Pharmaceuticals Inc.
12

13

14                      - oOo -

15              P R O C E E D I N G S

16              (REPORTER'S NOTE:  The following telephone

17   conference was held in chambers, beginning at 3:00 p.m.)

18              THE COURT:  Hi, this is Judge Jordan.  Who do I

19   have on the line?

20              MS. NOREIKA:  Good afternoon, Your Honor.  It's

21   Maryellen Noreika from Morris Nichols for plaintiff

22   Pharmacia; and I have with me, Dan Boehnen and Joshua Rich

23   of the McDonnell Boehnen firm in Chicago.

24              MR. BOEHNEN:  Also with us in Chicago is Grant

25   Drutchas.
```

1          MS. NOREIKA:  Oh.  I apologize, Grant.

2          THE COURT:  All right.  Who do I have on for

3     Sicor?

4          MR. DAY:  Good afternoon, Your Honor.  On behalf

5     of Sicor, you have John Day from Ashby & Geddes as local

6     counsel; and from the Sonnenschein firm in New York, Reid

7     Ashinoff and David Baum; and from Sonnenschein's office in

8     Chicago, Jordan Sigale.

9          THE COURT:  All right.

10         MR. ASHINOFF:  Good afternoon, Your Honor.

11         THE COURT:  Good afternoon.  Well, by my count,

12    this is the fifth time we're getting together in this case

13    because we have discovery issues.  So this is not a good

14    record, ladies and gentlemen, but we're going to plow

15    through what we've got here.

16         Before we start, however, I have a question

17    for the folks at Sicor, and that is, I got the in camera

18    submission that you sent over.  Did you send a version,

19    redacted, if you thought necessary, of your legal argument

20    to the opposing counsel?

21         MR. ASHINOFF:  Your Honor, what we served on

22    the opposing counsel is a motion that we filed and a

23    privilege log that listed the privilege material that the

24    Court got.  What we served in camera on the Court was the

25    short discussion of the substance of the privileged material

1    and the actual privileged material.  We did not serve copies

2    of the discussion and description of the privilege material

3    or the actual material on our adversary.

4            THE COURT:  All right.  I need to have you

5    identify yourself for the record.

6            MR. ASHINOFF:  It's Reid Ashinoff.  I'm sorry,

7    Your Honor.

8            THE COURT:  All right.  Mr. Ashinoff, that's not

9    going to cut it.  I'm going to quote to you what I said in

10   our last teleconference on the 19th of September.  Page 24

11   of the transcript:

12            "You can certainly submit your documents in

13   camera and your legal arguments ought to be submitted so

14   that the other side can respond to them."

15            Later on the same page:

16            "In short, you give me the documents but you

17   give your arguments to the attorney side, too, so they can

18   respond unless it's something genuinely extraordinary that

19   you think will get past me; all right?"

20            And what I was trying to communicate there and

21   what I will reemphasize is I'm not going to let you give me

22   legal argument without an opportunity for them to respond to

23   legal argument.

24            MR. ASHINOFF:  Your Honor, I don't think we cite

25   any law at all in the material we submitted in camera.  What

1    we submitted in camera basically highlights certain lines

2    in the privileged text and points those out to the Court,

3    amongst the entirety of the text, points those lines out and

4    makes the factual points that we think those would prejudice

5    us.  All the legal argument is in the publicly filed motion

6    and the cases are in the publicly filed motion, as the Court

7    directed.

8              THE COURT:  All right.  On the other side, do

9    you have the documents with legal argument in it?

10              MR. BOEHNEN:  Your Honor, we have the document

11    that was titled their memorandum in law in support of the

12    motion.  Of course, we have nothing that contains any kind

13    of description even generic or otherwise of the documents

14    that are submitted in camera.

15              THE COURT:  Well --

16              MR. ASHINOFF:  Your Honor, they have a privilege

17    log that identifies each of the in camera documents.

18              THE COURT:  Yes.  Here is the problem I'm

19    having.  Well, let me ask you.  Again, I know I'm picking

20    this out instead of dealing in the first instance with the

21    stuff you guys teed up but this is important to get taken

22    care of so I'm taking the time while we're on the phone to

23    do it.

24              What did you have in mind, Mr. Ashinoff?  Say

25    you had the result you wanted, which was a bifurcation of

1    willfulness and, you know, that I agreed with you and to

2    throw my own language back at myself, I said "you'd need a

3    whale of a showing" and you've done it.  What did you have

4    in mind for how this was to be bifurcated?

5              MR. ASHINOFF:  Your Honor, what we had in

6    mind and what we suggested in the legal memo was that the

7    documents and the issue of willfulness would not be produced

8    now so we wouldn't have to produce privileged material and

9    we'll go to trial on the underlying liability issues, to the

10   extent that Sicor is successful at the end of the case.

11             To the extent it's Pharmacia is successful

12   and it does not resolve, what we contemplated was there is

13   only going to be about a very small handful of privileged

14   documents, as Your Honor can now see, and only two or three

15   witnesses at most who would really talk to them and we

16   contemplated bringing those witnesses to Delaware after the

17   first stage of the trial, have the same jury take a week

18   off or even four days for the expedited discovery of the

19   willfulness evidence.  We would then have -- obviously, we'd

20   be forced to waive.  If we were going to waive, we would put

21   the witnesses up in Delaware on an expedited basis for the

22   plaintiff and you would rebring the jury back four or five

23   days later and try willfulness.  That is the procedure we

24   contemplated.  We didn't contemplate a need to have a second

25   separate jury and we didn't contemplate any inordinate

1    delay; and obviously recognizing the Court's desire for

2    efficiency, we contemplated bringing the witnesses to be

3    deposed in Delaware for the convenience of plaintiff and

4    the Court.

5            THE COURT:  All right.  Based on what you have

6    been able to read, who on the Pharmacia side, if anybody,

7    wants to speak up and respond to that?

8            MR. BOEHNEN:  Your Honor, this is Dan Boehnen.

9            I would note that, first of all, the idea of

10   three or four days or a week I think would not be at all

11   fair, would put us at a great disadvantage.  We're envision-

12   ing the situation where the jury has found that the patents

13   are valid and infringed and we're now going into a damage

14   phase and one of the issues is going to be whether the

15   infringement is willful.  Well, I not only need time to take

16   discovery of the information that has been withheld based on

17   grounds of privilege but I need time to now go back over not

18   only the prior trial transcripts but all of the previous

19   discovery so as to connect the dots back up to the broader

20   picture.  That isn't going to be done in a matter of two or

21   three or four days.

22           THE COURT:  All right.

23           MR. BOEHNEN:  Second of all, we have lots of

24   document requests, interrogatories, depositions that we

25   wanted to take now that do not go to privileged subject

1    matter but do go to the willfulness issue.  And at this

2    point, Sicor has refused to provide those, too, until this

3    whole issue was resolved.

4         THE COURT:  Well, we're going to resolve it

5    in part right now, and here is how.  And I say that in

6    part for this reason:  We're not bifurcating discovery here

7    so anything that has to do with willfulness and isn't

8    privileged you give up right now, Mr. Ashinoff, and do it

9    post haste.  Get moving on it.

10        Second, I agree with the plaintiff here that

11   saying "well, I've give you three four days in between"

12   doesn't cut it.  If you want to rely on an advice of counsel

13   defense, you are going to waive your privilege and you are

14   going to do that now, although it does not mean that it's

15   going to be tried with the liability phase.

16        I've taken a look at what you sent over.  I

17   agree it raises some significant issues in terms of potent-

18   ial prejudice and so I am not deciding the bifurcation issue

19   today.  And that, all by itself, is I think a step forward

20   for the folks on the Sicor side because it is out of our

21   custom and practice or at least mine to think about doing

22   this, but you have raised enough of an issue that I'm

23   prepared to hear what the other side says, but it's going

24   to be something that the other side says based on an

25   understanding of exactly the character of the information

1  you believe so prejudicial that it must be kept from the

2  jury in the liability phase.

3          So you make your decision in your election.  If

4  you want to rely on this advice of counsel defense, you've

5  waived your privilege and you start producing even the

6  privilege material now, because I want to hear from the

7  other side what their response is to your argument that

8  there are aspects of this privilege material which are

9  of such prejudicial effect that it would taint a jury in

10 considering liability.

11         Now, Mr. Ashinoff, having heard that ruling, do

12 you want or need additional time to decide whether to rely

13 on an advice of counsel defense?

14         MR. ASHINOFF:  Absolutely, Your Honor.  I need

15 to be able to advise the senior decision makers at my client

16 and sit down with them at some point and get them obviously

17 in the near term to make a decision.

18         There is one aspect of what the Court is

19 suggesting that I just heard that maybe I should have heard

20 in the prior comments but didn't.  To the extent the Court

21 is suggesting that we need to make a decision on waiver and

22 produce privileged materials before the Court makes a

23 decision on bifurcation, that procedure is not something

24 we're familiar with.

25         We tried to follow the Federal Circuit authority

1    with the in camera submission and the Circuit authorities

2    and the other decisions that have found that bifurcation has

3    been appropriate, having not ordered the production of the

4    privileged material at this phase.  And if that is what the

5    Court is suggesting, respectfully, that is quite a departure

6    from the standard practice in the various Circuits on this

7    issue, if we haven't in fact been able to raise.  And we

8    greatly respect the Court's attention to the issue but in

9    fact we're prejudiced, the very handing over that material

10    to the other side is a manifestation of that prejudice and

11    harm.

12              THE COURT:   I understand I think pretty clearly

13    the arguments on both sides, and what I'm telling you is if

14    you want the benefit of a bifurcation here, it's going to be

15    a benefit you get in the context of appropriate respect for

16    what I deem to be the plaintiff's needs and the imposition

17    which it is on a jury to have to deal with this in a

18    bifurcated fashion.

19              So there is no prejudice in front of a jury if

20    you produce now and I say there is bifurcation.   The

21    prejudice, which is real and it don't think insignificant,

22    I grant you; that turning over attorney-client privileged

23    material is, in and of itself, a significant step; but you

24    can't have it the way you want it is what I'm telling you.

25    You can't say, okay, we think we're going to rely on advice

1    of counsel but we're keeping all of the information in our

2    hip pocket and we'll give you three-four days to figure out

3    how it fits in.  And, by the way, do your depositions and

4    review the documents in that time and we'll have the jury

5    on ice while that is happening and then we'll bring them

6    back and then we'll talk to them about it.  That will not

7    do.

8            So since it will not do, what I'm telling you

9    is you need to go back, talk to your clients, think about

10   whether you want to rely on this advice of counsel defense.

11   If you do and you are successful in persuading me that this

12   information shouldn't go in front of the jury because it's

13   so important, it won't.  And the jury will never hear a word

14   about it.  The only people that will know about it are going

15   to be your opponents.  And that is not an insignificant

16   thing but it doesn't mean the jury is going to hear about

17   it in the liability phase.

18           So you will suffer some effect from your

19   decision, but you don't get to put the other side and the

20   jury, as I said, in the kind of box that the proposal you're

21   making contemplates.  It's I don't think practical or fair,

22   given the demands of the litigation in this court and the

23   lawful and appropriate concerns that the plaintiff has.

24           So that's the procedure I'm telling you that I

25   want you to follow here.  Decide what you want to do.  In

1    effect, I'm giving you an opportunity to still make the case

2    that there is bifurcation.  And I'm suggesting to you that I

3    think you've made a decent argument based on what I've seen,

4    but I'm not going to allow you to have the procedure you're

5    looking for.

6            MR. ASHINOFF:  Your Honor, in light of what the

7    Court is saying, what I would like to do is basically get to

8    sit down with the senior decision makers at my client.  I

9    will tell the Court that this decision is going to be made

10   at the highest levels of the company, both legal and

11   business, so I'm going to need to gather them together.

12           I guess I would have a transcript of the Court's

13   comments within the next day or so.  There is a Jewish

14   holiday coming up.  I'd like to see if I can get them

15   together with me next week and get back to the Court, if I

16   can, later next week, subject to the holidays which I know

17   many of these clients observe, and we also do, this week.

18           THE COURT:  Yes, that's fine.  When do you think

19   I might hear from you next week, Mr. Ashinoff?

20           MR. ASHINOFF:  I would like to aim at advising

21   the Court and our adversaries by the end of next week.  And

22   the only condition, and I can't speak to it, I literally

23   don't know where the senior people of the company are in the

24   next week and, obviously, the first call I make after this

25   one will be to my client.  I just don't know the schedule of

1   the general counsel and the senior executives who will have

2   to make the decision.

3               THE COURT:  All right.  I will look for some

4   word from you.  We'll set this for a week from Friday at

5   the outside, okay?  That gives you a week and-a-half to

6   coordinate with people; and if you think you need more time,

7   let me know.  I understand it's a big decision.

8               MR. ASHINOFF:  Your Honor, could I have just a

9   week from Monday, just knowing what the ensuing week looks

10  like?

11              THE COURT:  Yes, done.

12              MR. ASHINOFF:  Thank you.

13              THE COURT:  And if you would be so good as

14  to make sure that this decision, without going into the

15  obviously any attorney-client discussions, is couched in a

16  way that you can advise me on the record, not in camera,

17  with a copy to the other side of your decision, I'd

18  appreciate that.

19              MR. ASHINOFF:  I understand that, Your Honor.

20  And just to pick up on your last point.  I would understand

21  that if we do waive privilege with respect to the decision

22  to launch the product, that waiver does not extend to

23  current litigation discussions between counsel and business

24  people making this judgments now about waiver.  I mean that

25  is a separate event.

1          THE COURT:  It is.  And let me dilate for

2    just a moment on that because to the extent it's helpful to

3    you in talking with your clients, I do not typically view

4    post-litigation decision making as within the scope of

5    waiver, so things that are being done now, decisions that

6    are being done now are not within that scope of waiver.  And

7    I also typically do not view attorney work product as being

8    within that scope of waiver.  If it hasn't been communicated

9    to between the attorney and the client, I typically do not

10   view that as within the scope of waiver.  I don't know if

11   that is of assistance to you or not, but to the extent it

12   is, there you go.

13         MR. ASHINOFF:  Your Honor, I appreciate that.  I

14   guess -- and I don't want to prolong this because there are

15   other matters that we need the Court's help on, but to the

16   extent that some of what is in the privilege materials is

17   in fact work product and we end up making a waiver decision

18   now, do we have the ability to redact the aspects of these

19   documents that we view as work product as opposed to advice,

20   per se?

21         THE COURT:  Yes, that is what I'm telling you.

22   I'm not telling you that everything you sent over to me is

23   going to the other side.  What I'm telling you is you need

24   to make an election about whether you want to invoke the

25   privilege.  If you do, you are going to have to give up

1   information that was communicated to the client associated

2   with the opinion that you want to rely on.  Okay?

3           MR. ASHINOFF:  That's fine for now, Your Honor.

4   And when we get back to you, if there is further issues,

5   we'll try to ask for help then.

6           THE COURT:  All right.

7           MR. ASHINOFF:  Thank you.

8           THE COURT:  Thanks.  Now, again, sorry for

9   taking that at the top of the hour but it's important to me

10  that this stuff get resolved and get resolved timely because

11  one of the issues that you want to deal with and you want

12  to deal with as part of this teleconference and that I will

13  again take out of the order you gave me is the discovery

14  cutoff.  I mean I'm acutely aware that we're within less

15  than a month of the discovery cutoff in this case and you

16  guys are still, you've got some cat-and-dog fighting going

17  on here.  So that's why I said, and I'll reemphasize, we

18  don't have a bifurcation of discovery going on here.  If you

19  are going to rely -- whether you are going to rely on advice

20  of counsel or not, your nonprivileged information associated

21  with willfulness, give it up.  That needs to happen.

22          Now, let's talk for a minute about the discovery

23  cutoff.  And I understand this is going to be informed by

24  the discussion we're going to have on some of these issues.

25  But I just want to get this clear up front.  Are both sides

1   saying you want a discovery cutoff extension or is that

2   coming from one side only?

3           MR. ASHINOFF:  Your Honor, Mr. Boehnen will have

4   to speak for the other side, but we've had some discussions

5   and I thought we were very far along on the parameters of an

6   agreed request for the extension.  I tried to confirm that

7   this morning with Mr. Boehnen in a letter, but I can't speak

8   for Mr. Boehnen.

9           THE COURT:  Well, give me your best under-

10  standing, Mr. Ashinoff, and then I'll hear from Mr. Boehnen.

11          MR. ASHINOFF:  My best understanding, Your

12  Honor, is that we had basically, without shaking hands,

13  over the phone, resolved the various points relating to a

14  discovery extension which would extend to December 2 the

15  time to finish up and take depositions subject to further

16  rulings of the Court on issues such as inequitable conduct,

17  that will open those up, and that we had also resolved

18  Mr. Boehnen's concern that written discovery not been open

19  ended, and I had both told Mr. Boehnen we're not sitting

20  here with any nefarious plan of launching some major

21  blunderbuss of additional discovery and I iterated in a

22  letter to him the three areas of additional follow-up

23  discovery that he and I had discussed yesterday as being

24  within the purview of what would be permissible between now

25  and December 2.  And my understanding was that we were close

1    to an agreement on the extension through December 2 pursuant

2    to the terms of the letter that I sent him.  I didn't send

3    it to the Court because I really hadn't heard back from him

4    literally until four minutes before the call in an e-mail

5    that said he still had some issues, but I'm not sure

6    fundamentally that we differ.

7            With respect to the discovery we need, Your

8    Honor, I think we've laid out the fact that the document

9    production has been delayed.  I'm not saying that to cast

10   any criticism, I'm just stating the fact that the documents

11   that have been coming from Pharmacia have extended over a

12   long period, including and up to the latest batch last

13   Monday, and we're doing what we can.  We're trying to get

14   witnesses scheduled.  We had served 30(b)(6) notices for

15   witnesses in mid September.  And the date I got offers for

16   one of the witnesses was November 2 and that's going to

17   lead to other discovery.

18           I don't want to go -- there is more I would

19   like to say if Mr. Boehnen is going to oppose this.  If not,

20   though, I don't need to take the Court's time on it.

21           THE COURT:  All right.  Mr. Boehnen, what is

22   your position?

23           MR. BOEHNEN:  And, Your Honor, I'll try not to

24   belabor points either other than to say that Pharmacia has

25   been very diligent in providing information.  We feel as

1    though we're still needing to drag information out of Sicor.

2            THE COURT:  I'm just looking for your position,

3    Mr. Boehnen, about whether you agree there is a discovery

4    cutoff.  I understand each side has got its feelings about

5    the other and I'm really don't want to go there now.

6            MR. BOEHNEN:  Okay.

7            THE COURT:  Just take me to the bottom line.

8            MR. BOEHNEN:  Yes, Your Honor.  The two concerns

9    that I have, and I've tried to explain them consistently to

10   Mr. Ashinoff, is that any extension of discovery -- first of

11   all, we don't think it's necessary.  We could do it with

12   cooperation but we're willing to not oppose an extension but

13   for two considerations:

14           Number one.  We believe that any extension of

15   discovery should be limited to cleaning up matters that

16   are continuing and should not be used as an opportunity to

17   initiate new discovery requests.  That's how we've already

18   gotten into the situation that we're in right now.

19           Number two.  If there is an extension, we're

20   concerned about the trickle-down effect that may have on

21   subsequent events such as the dispositive motion date now

22   set for December 5th.  And if that is extended, we're very

23   concerned that it could impact the January 19th hearing

24   date the Court has set.  And we do not want any extension

25   that would impact or extend that January 19th hearing date.

1          THE COURT:  Well, by definition, it's going to

2    effect both those dates because a one month extension puts

3    us one day before the dispositive motion filing deadline

4    and even with the platoons of attorneys I'm sure you folks

5    have working this case, that is a bit much to ask.  So this

6    would, perforce, move that back and in all likelihood be

7    moving back to some extent that January 19th date because

8    I'm going to -- look, unless you folks are prepared to

9    say hey, we've just got one or two issues and that's it,

10    something that I find hard to believe given the character of

11    the discovery battle and the multi-continent character of

12    the fight you all have had, I'm going to need some time to

13    do what I'm sure you both would like me to do and that is

14    be reasonably prepared when I sit down to talk with you.  So

15    take it as a given that that would have to shift and shift

16    some.  Are you saying in light of that, you're opposed to

17    any extension?

18          MR. BOEHNEN:  Well, there certainly are other

19    options, Your Honor.  Well, could I extend just, say, up

20    until the Tuesday before Thanksgiving.  That would be a two

21    or three week extension.  That would I think then not --

22    then we would not need to extend the dispositive motion

23    date.

24          THE COURT:  Mr. Ashinoff, what is your response?

25          MR. ASHINOFF:  Your Honor, that simply won't

1   work; and now, without too much detail, I do need to get

2   into what has been going on in discovery.

3           We asked, we served a 30(b)(6) notice in August,

4   with depositions in September.  The first witness we got

5   testified under oath that he really knew nothing about what

6   Pharmacia was doing before Pfizer bought it, in essence.

7   And when we pressed it, Mr. Boehnen said, "well, we'll have

8   another witness but the other witness can't come until

9   November" and he is not guaranteeing what that witness will

10  know.  And what Mr. Boehnen said is, "I do not promise you

11  that he will be able to give you detailed information about

12  what happened inside Pharmacia prior to the merger, nor do

13  I ever promise you that we're going to have a witness that

14  will be able to do that.  But we're trying to respond to

15  your questions and certainly you are not as sufficiently an

16  important a player on this that we ever tried to misuse or

17  waste your time."

18          Your Honor, the fact is we're getting witnesses

19  who are supposed to be educated.  That is the obligation of

20  a 30(b)(6) and who were being put up for deposition know

21  nothing.  So now we have to figure out who is going to

22  know something.  I said to Mr. Boehnen in one of the

23  conversations last week or early this week, "I'd like to

24  know who the right people are to depose and talk to.  Would

25  you tell me who does know because you are Pharmacia?"  And

1   he said, "Well, I'll inquire and see what I can find out."

2          We don't even have the right names of the people

3   to talk to yet, Your Honor.  We don't have the inventors in

4   the chair.  Now, we're talking about the inventors, if the

5   Italian referee can get them in the chair, for the week of

6   November 7th through 10th.  We've agreed with Mr. Boehnen

7   that we would take the European experts that he has seen

8   since to designate the week in Milan the same week we take

9   the inventors, assuming we can get the inventors, but we

10  are very transcontinental in this case.  We have a witness

11  in Australia we need who we believe has knowledge that the

12  plant that would have been used to produce this drug to meet

13  the need, had we not allegedly infringed, that the plant

14  basically was basically shut down by the FDA.  We served

15  document requests about that.  We asked for the witness.

16  They don't want to bring us the witness here and we don't

17  have the documents yet.

18         We're doing what we can do, Your Honor, but we

19  need more time.  And it's not because we're not trying.  We

20  served some additional notices of deposition.  I agreed to

21  get on the phone with Mr. Boehnen and with Mr. Sigale who is

22  home with pneumonia but is trying to work from home and is

23  the one who is handling the scientific aspects of the case.

24         I said I would sit down with Mr. Boehnen at

25  some point next week.  And from Mr. Sigale's and my point

1    of view, we can do it Thursday morning and go over with

2    Mr. Boehnen a list of the people we need and ask them to

3    cooperate in scheduling them, but a lot of these people

4    are former employees.  We found out just this week one of

5    them is in Canada and we need to implement the Hague

6    Convention to get that witness.

7           We're in a situation where the plaintiff started

8    the lawsuit but doesn't have witnesses with knowledge of

9    what we need to hear about and the documents.  And we're not

10   faulting them, the documents have not been coming in with

11   regularity.  Their letters to the Court now indicate they

12   are now collecting foreign patent information that we asked

13   for back in late 2004.

14          So again, without ascribing fault, the parties

15   simply are not ready to cut off discovery now and we now

16   need to find former Pharmacia employees with no real help

17   from the plaintiff here, find them, subpoena them, serve

18   Hague Convention requests and get them.

19          THE COURT:  All right.  Mr. Boehnen, I'll give

20   you a chance.  We've morphed into a discussion of how the

21   discovery has gone generally.  I'll give you your chance to

22   fire back.

23          MR. BOEHNEN:  Your Honor, I will try to hit only

24   the highlights, but then please understand I'm keeping it

25   very brief.

1          As to the witness, the 30(b)(6) witness whom

2    Mr. Ashinoff complains as not being offered until

3    November 2nd, we originally offered that witness on October

4    17th or 18th.  They said that wasn't acceptable.  We offered

5    him on October 5th, 6th or 7th or October 12th or 13th.

6    They said that wasn't acceptable.  Then finally they said

7    the only other day is November 2nd in the schedule and they

8    said, fine, we'll take that date.

9          As to the inventors, the Italian commissioner

10   offered the inventors for deposition in Milan the week of

11   October 24th or the week of November 7th.  We said we would

12   like to do it, we would prefer to do it the week of October

13   24th.  Sicor said November 7th, it really needed to be that.

14   Would everybody please go along with that?  And we agreed to

15   that.

16          The documents that they have requested are

17   documents that pertain to files that are not related to

18   these patents.  They've never requested them in the past.

19   We've explained this in your letter.  We said for the first

20   time, you've said now you want these files.  Even though you

21   did not previous request them in a Rule 34 request, we'll go

22   ahead and get them for you but don't blame us because you

23   didn't previously request them.

24          The fact of the matter is, and we've told this

25   to Sicor, for months, many months, none of the people that

1    were referred to as Pharmacia Legacy, the historic company,

2    are there so there is not anybody in the company who knows

3    what was historically done at the Legacy Company in relation

4    to Ita Rubesome (phonetic).  We simply do not have the

5    information they have.  We have given them all of the

6    documents that we have pertaining to Ita Rubesome from the

7    Legacy Company.  They've had those for months.  It isn't a

8    recent event; many months.  We can give you specific dates,

9    if you wish.

10            If they ask us, all we can do is go back to

11   those documents that we have already given to them, try to

12   identify people and track them down.  That is exactly what

13   they're now in the process of doing.  But they're doing it

14   now not because we haven't told them this is the situation

15   all along, it's that they have wanted to continually try to

16   blame us and put us in the position where we're responsible

17   for the fact that there is nobody in the company who knows

18   it.  Well, we aren't responsible for that.  That is a fact

19   of life and they need to deal with it as part of their

20   lawsuit.

21            THE COURT:  Well, I guess they would say as part

22   of "your" lawsuit, but that's neither here nor there.  I

23   take your points, Mr. Boehnen, as well as the things that

24   Mr. Ashinoff has said and here is going to be the upshot of

25   it.  I'm going to give you some more time, both sides.  And

1    I don't do this because I want to, because I don't.  This

2    trial date is going to stay, the pretrial date is going to

3    stay, and I'm going to end up taking some of my decision

4    time because you guys can't get on the same page but this

5    is the last time that is happening.

6            I'll go ahead and bump this discovery cutoff

7    to the 4th of December.  I'll give you the month you are

8    looking for Mr. Ashinoff.  And that means we're going to

9    have to bump the dispositive motion deadline.  We'll take

10   that back into January, since I think it's impractical,

11   given the holidays, to do it earlier than that.

12           Give me just a moment to put my hand on a

13   calendar here.

14           (Pause.)

15           MR. BOEHNEN:  Your Honor, may I make a comment?

16           THE COURT:  Yes.

17           MR. BOEHNEN:  When Mr. Ashinoff and I were

18   discussing moving back the summary judgment motion, we had

19   talked about moving the filing of those motions only one

20   week, to December 12th.

21           THE COURT:  Great.  Hey, if you can both live

22   with that.

23           MR. ASHINOFF:  Your Honor, that's something I

24   actually had asked Mr. Boehnen for a longer extension.  What

25   we did discuss and what I do recall us agreeing on is that

1   we don't need to move the claim construction submission.  So

2   we can get those filed but we will need the extra time on

3   the dispositive motions given the nature of the discovery

4   we're going to be going through, so we would appreciate a

5   January filing date.

6           THE COURT:  Put your claim construction stuff

7   in by the 12th then and go ahead and give me your case

8   dispositives by the 9th.

9           MR. ASHINOFF:  You're saying December 12th on

10  the claim conjunction and January 9th on the dispositive; is

11  that what you are saying?

12          THE COURT:  That's what I'm saying.

13          MR. ASHINOFF:  Okay.  Okay.

14          THE COURT:  That will give me 10 days.  We'll go

15  ahead and hold the January 19th date.  I won't bump that.

16          MR. BOEHNEN:  Your Honor, I think claim

17  construction has two dates.  There is an initial submission

18  and then an opposition.

19          THE COURT:  That won't work.  Hold on just a

20  moment, actually.  I think I'm going to have to bump that

21  19th.  Hold on.

22          (Pause.)

23          THE COURT:  If you submit by the 9th --

24          MR. ASHINOFF:  There is going to need to be

25  responding and reply papers on the dispositive, Your Honor.

1            THE COURT:  Right you are.  That's what I'm

2    looking at.

3            (Pause.)

4            THE COURT:  Okay.  Your briefing on the 9th

5    means that the answer will be due the 23rd and reply on the

6    30th of January.  I will look on my calendar and see if I

7    can't get you a date some time early in February for us to

8    get together and discuss this.  And I'll ask somebody in my

9    staff to help me with that while we continue our discussion.

10            All right.  Now, I have read your papers and I

11    have looked at your attachments and so I don't need anybody

12    to repeat the statements that are made in there, but let's

13    look at each one of these final things together.

14            I break it down this way.  And this is based on

15    the way the letters broke it down.  We have a question about

16    the location of expert witness depositions, we have an issue

17    with respect to the deposition of Mr. Winters and we have

18    an issue with respect to whether certain information is to

19    be extracted by contention interrogatories or 30(b)(6)

20    depositions.  Those are the three things that we still have

21    out there to deal with.

22            MR. ASHINOFF:  Your Honor?

23            THE COURT:  Yes.

24            MR. ASHINOFF:  Your Honor, if I may.  I think I

25    can give short shrift to two of the three but, frankly, the

1   areas that we're most concerned about we also feel we need

2   to deal with.  And I would appreciate if Mr. Sigale, my

3   partner, can address those and add, not repeat, what is in

4   the papers, but expand and respond to what your adversaries

5   said about the patent documents and the lab notebooks and

6   the foreign patent materials.  Mr. Sigale will not repeat

7   what is in the papers but Ms. Noreika's letter raises issues

8   that we really don't believe to be factually accurate and we

9   want to address those.  We need those lab notebooks and the

10  foreign patent materials, Your Honor.

11                THE COURT:  All right.  Well, let me interrupt

12  you, Mr. Ashinoff.  You say that you can shorten things up

13  on two of them.  Any shortening you can do, do it now.

14                MR. ASHINOFF:  Okay.  On the issue of the

15  foreign expert.  On the assumption that the inventors will

16  actually get put in the chair in Milan, the week of November

17  7th, Mr. Sigale who is on the phone will stay in Milan over

18  weekend and take the, Mr. Beijnen and Mr. Arcamone.  If

19  Mr. Boehnen will bring them to Milan early the following

20  week, the Monday-Tuesday, Mr. Boehnen and I agreed on this

21  subject to my checking with Mr. Sigale.  Mr. Sigale now has

22  pneumonia, Your Honor, and I wish he didn't and so does he,

23  but he can't travel before early November.  That is why we

24  couldn't take the October date.  He is the guy who knows the

25  area.  He is the member of the team.

1           THE COURT:  Okay.

2           MR. ASHINOFF:  But we will take the foreign

3   expert in Milan the week after we take the inventors and

4   solve that problem.

5           THE COURT:  All right.  And Mr. Boehnen, that is

6   what you had proposed and that is satisfactory to you, I

7   understand; correct?

8           MR. BOEHNEN:  Yes, Your Honor.

9           THE COURT:  Done.

10          MR. BOEHNEN:  We are still checking with our

11  experts but we believe that will work.

12          THE COURT:  Well, let's put it this way.

13  They're your experts, so make it work.  All right?

14          MR. BOEHNEN:  Yes, sir.

15          THE COURT:  Make it work.

16          MR. BOEHNEN:  Yes.

17          MR. ASHINOFF:  Your Honor, with respect to the

18  Australian deposition, what we proposed is the following:

19  We believe this is an important issue in the case and an

20  important issue.  To test that out, we're prepared to do an

21  hour on the telephone to ascertain whether in fact this is

22  the man with the knowledge we need from Pharmacia.  If he

23  is, we would like to continue it live and we will pay his

24  expenses for hotel room and a coach plane to come here.

25          THE COURT:  Mr. Boehnen?

1      MR. BOEHNEN:  Well, Your Honor, it seems like a

2  reasonable way to proceed.

3      THE COURT:  Okay.  Then we'll leave that at that

4  and hopefully you folks will work it out.  We won't need to

5  talk about it again.

6      All right.  Now let's --

7      MR. ASHINOFF:  Your Honor, the issue, what is

8  left is our deposition notice on secondary considerations

9  which Mr. Sigale is prepared to address and also our request

10  for the foreign patent information and the lab notebooks

11  also within his purview, if it pleases the Court.

12      THE COURT:  Yes, that's fine.  Go ahead,

13  Mr. Sigale.

14      MR. SIGALE:  Thank you, Your Honor.  With

15  respect to the foreign prosecution, I would rather not

16  quibble about it as long as Pharmacia is prepared to produce

17  those, and Ms. Noreika's letter seems to indicate --

18      THE COURT:  They say they will.

19      MR. SIGALE:  -- that they're doing it so I'm not

20  going to address that.

21      THE COURT:  Good.

22      MR. SIGALE:  But we believe they were requested

23  previously.

24      THE COURT:  Whatever.  It's coming to you now.

25      MR. SIGALE:  Okay.  Thank you, Your Honor.  With

1    respect to Dr. Confalonieri's lab notebooks, I think

2    Pharmacia's response misses the point.  If they intend to

3    rely upon Dr. Confalonieri's data, which is what they seem

4    to be contending in their interrogatory responses, we're

5    entitled to see all of Dr. Confalonieri's data.  He

6    submitted data to Patent Offices around the world and in

7    other litigations and magically some of the data that we

8    believe would be helpful to our defense has not been

9    produced but data that is helpful in their case has been.

10    And I've asked about what kind of search was undertaken.

11    I'm not satisfied that a sufficient search was done,

12    especially given the significance of this data.

13                THE COURT:  And the relief you want is what,

14    Mr. Sigale?

15                MR. SIGALE:  Well, I want to know what they've

16    done to search for this.  I'd like them to redouble their

17    efforts and confirm for me that they've checked with the

18    prior prosecution counsel, Oblon Spivack, that they checked

19    with the coordinating counsel and that they've checked the

20    files of the various companies.  It just is beyond belief

21    that lab notebooks that were used to support statements made

22    under penalty of perjury to the U.S. Patent Office and other

23    Patent Offices are not available.

24                THE COURT:  All right.  Who is speaking to this

25    from the other side?

1          MR. BOEHNEN:  Dan Boehnen, Your Honor.

2          First of all, it's not at all unusual that

3     foreign companies in the 1980s, that they did not have the

4     kind of lab notebooks that were used in the U.S. companies.

5     The rest of the world is not a first-to-invent situation.

6     There is not interference practice in the rest of the world.

7     Scientists have not and the rest of the world have not

8     been trained on lab notebooks, the way U.S. attorneys work.

9          Having said that, the fact is that we have made

10    a worldwide search on more than one occasion on all of the

11    lab notebooks.  We would very much like to collect all of

12    the lab notebooks.  We have collected all of the pages that

13    were there.  Mr. Sigale suggests that these were used in

14    Patent Offices and litigations around the world.  Well, they

15    have everything and are getting everything from those Patent

16    Offices in lawsuits around the world.  I would note anything

17    in the Patent Offices around the world is a public record

18    document so they've had an opportunity to get that for a

19    long time.

20          THE COURT:  Well, let's stick with -- hold on.

21    Let's stick with lab notebooks.  And I just need a real

22    precise answer to this.  I hear Mr. Sigale -- am I saying

23    your name right?  Is it see-gal (phonetic)?

24          MR. SIGALE:  That's fine, Your Honor.

25          THE COURT:  I hear him saying that he wants a

1    representation from you folks that you have checked with the

2    folks he just named, an affirmation that in fact you have

3    inquired of and heard from these people that there are no

4    lab notebooks belonging to this inventor.  And that's all

5    I'm hearing he is asking for.  Are you telling me you got an

6    issue with that?

7                MR. BOEHNEN:  To me, Your Honor, no, sir.  And I

8    understand, just to restate it, I believe he is referring to

9    the Oblon firm, Jake Wood, which is JA Kemp & Co. in the

10   U.K, and --

11                MR. SIGALE:  And the Nerviano Consulting firm

12   (phonetic) where many of these inventors found gainful

13   employment.

14                MR. BOEHNEN:  -- the people in the Nerviano

15   Medical Sciences Facility as well as Pfizer itself.

16                THE COURT:  Right.  Okay.

17                MR. BOEHNEN:  No, not a problem.  We'll be happy

18   to do that.

19                THE COURT:  Done.

20                MR. SIGALE:  If I might, I'd prefer to have the

21   notebooks.

22                THE COURT:  Well, I'm sure everybody would

23   prefer the notebooks were there because then we wouldn't be

24   having this fight at all.  So obviously if the notebooks are

25   there, they'll be produced, but if they're not, you will get

1   an affirmation of what was done to look for them with these

2   other folks, right?

3             MR. BOEHNEN:  Yes, sir.

4             MR. ASHINOFF:  Your Honor, just to go back half

5   a step.  On the foreign patent material that Mr. Boehnen,

6   Ms. Noreika say is now being collected, given that we plan

7   to try to go abroad and take the inventors on November 7th,

8   can we get some date not too late in October when that

9   material will be produced to us so we have the time to

10  assimilate it before we take the inventors?

11            THE COURT:  Mr. Boehnen.

12            MR. BOEHNEN:  We have already begun making every

13  effort to get that to them as soon as possible.  Let's see.

14  We can start a rolling production to them by the end of next

15  week and I think we hope to have it to them by the end of

16  October.

17            THE COURT:  All right.  End of October it is.

18  And a rolling production is a good idea.

19            MR. ASHINOFF:  Thank you.

20            THE COURT:  Okay.  Then we had the dispute about

21  the 30(b)(6) categories.

22            MR. ASHINOFF:  And I'm going to let Mr. Sigale

23  address that, Your Honor.

24            MR. SIGALE:  Your Honor, we propounded a number

25  of categories in a 30(b)(6) notice that asks for the factual

1    contentions underlying legal contentions I need to

2    understand and I thought this was an efficient way to do it.

3    For instance, if we take category number six.  We asked for

4    the facts concerning Pharmacia's allegation that licensing

5    and adoption of the ready-to-use formula is evidence that

6    the patent satisfied the obviousness requirement.

7            I need to know what facts those are.  That is

8    not a contention request.  It is what licensing are you

9    talking about?  What adoption are you talking about?  What

10   are the circumstances about that licensing?  And I thought

11   this was an efficient way to get that.  I can go through a

12   couple other categories but I can assure you I'm not looking

13   for legal contentions, that is a waste of time.  A lay

14   witness is not going to be able to give that to me, but

15   facts they certainly can.

16           THE COURT:  All right.  Mr. Boehnen, is this

17   yours again?

18           MS. NOREIKA:  Your Honor, this is Maryellen

19   Noreika.  I'll respond to this issue.

20           THE COURT:  Okay.

21           MS. NOREIKA:  Sicor, there doesn't seem to be

22   any disagreement that depositions are not the appropriate

23   means by which to obtain contentions.  Instead, they're

24   saying, well, we're just seeking facts.  But as the topic

25   that Mr. Sigale just read indicates, these are seeking

1   contentions:   All facts regarding Pharmacia's allegations

2   regarding copying, commercial success, failure of others.

3   There is a topic asking for the data Pharmacia contends

4   shows secondary considerations and the conclusions a person

5   skilled in the art would draw from that data.   There is a

6   topic asking for a witness to testify about Pharmacia's

7   response to a contention interrogatory on secondary

8   considerations.

9                   THE COURT:   Okay.

10                  MS. NOREIKA:   I mean the wording of these

11  topics.

12                  THE COURT:   I think I have your position.   I

13  have other folks who need my attention at 4:00 o'clock so

14  let me tell you, having read this, what my impression is.

15             I think there is some good force to the argument

16  being made by Pharmacia that the inserting of the word

17  "facts" doesn't make this less of an effort to get at what

18  is essentially the legal position of the party, although you

19  may get the benefit as well of saying, well, these are the

20  pieces of specific evidence.

21             So in the first instance, and on an expedited

22  basis, not a 30-day turnaround, if you want the chance to

23  answer these as contention interrogatories, I'm going to

24  direct that you accept them as such and you answer them

25  forthwith.   You know, the sort of thing that you get a

1    couple of weeks to respond to.

2           And then if you folks on the Sicor side want to

3    do some follow-up deposition discovery, targeted at

4    inquiring about specific facts that are revealed in the

5    context of these interrogatory responses, you're free to

6    do that.

7           I take the point that Pharmacia is making here,

8    which is it's so broadly worded, it can't help but really be

9    a circumstance where somebody is asked to know every fact

10   pertaining to every contention and that's a little bit much

11   to put on a deponent.

12          So that is the resolution to that.  You want to

13   treat them as contention interrogatory attorneys.  Done.

14   Answer them in two weeks.

15          And then if you have some follow-up and more

16   targeted and specific 30(b)(6) effort you want to make,

17   Sicor, you follow up on it that way.

18          MR. ASHINOFF:  Thank you, Your Honor.

19          THE COURT:  Now, let me tell you one last thing.

20   And this is for you, Mr. Ashinoff, in the discussions that

21   you are going to be having with your client, to the extent

22   again that this is helpful.

23          And again, we're treading here carefully and

24   I'm very careful when we talk about the attorney-client

25   privilege.  I want to assure you I have not made lightly

1    the decision I made about how to approach the bifurcation

2    request.  To the extent it's helpful in your discussing

3    with your client my understanding of the Knorr opinion, I

4    view Knorr-Bremse as saying no adverse inference can be

5    drawn from either failing to get an opinion or declining to

6    produce it; that you are entitled to get your opinion and

7    to stay silent about it.

8         Viewing it that way, I have never yet heard

9    anybody make a reasoned argument to me why it could be

10   put before a jury after the Knorr-Bremse opinion that an

11   opinion was received but not tendered.  And in the absence

12   of that, I'm inclined to think there probably isn't a

13   reasoned argument.  That the only reason for putting it

14   in front of a jury would be so they draw an adverse

15   inference, which with what Knorr-Bremse says could not

16   happen.

17        So I give that to you as my best reading of

18   Knorr, in the absence of people having really been able to

19   put it forth, but I think it only fair, since people are

20   trying to grope around and make a decision, that they grope

21   a little less blindly.  I hope that is helpful to you.

22        MR. ASHINOFF:  It is, Your Honor.  And it

23   actually comports with literally a 100-year old doctrine

24   in federal law in other appellate courts to the extent of

25   saying that to force somebody to assert the privilege in

1    front of a jury is reversible error and that comports with

2    what Your Honor is saying.

3            THE COURT:  Okay.  Well, I thank you for your

4    time today.  I hope it has been helpful in getting some

5    things worked out.  Let me tell you real quickly what I'm

6    looking for as a date in February because this is going to

7    appear in a revised scheduling order that we'll put out.

8    I'm going to see you folks for argument on February 3rd

9    instead of January 19th.  That's a Friday.  All right?

10           MR. BOEHNEN:  Your Honor, one quick point for

11   Pharmacia.

12           THE COURT:  Yes.

13           MR. BOEHNEN:  Can we have a new date when our

14   briefs in opposition to bifurcation will be due?  I would

15   suggest two weeks after they produced papers to us if they

16   chose to rely upon them.

17           THE COURT:  Mr. Ashinoff, you're fine with that,

18   I assume.

19           MR. ASHINOFF:  Yes, as long as Mr. Boehnen

20   doesn't in the interim try to put my witness in the chair

21   and force us to go through all kinds of contortions about

22   privilege.

23           THE COURT:  Well, I'm sure everybody wants to be

24   efficient here, or at least I would like to think so.

25           Mr. Boehnen, you take that point, I'm sure.

1    MR. BOEHNEN:  Yes, sir.

2    MR. ASHINOFF:  Your Honor, one last comment on

3    what Your Honor last said, and I apologize for this.

4    This law firm has an annual weekend once a year

5    where it gathers its partners and their spouses and et

6    cetera and it happens to be February 1st through 4th of

7    2006.

8    THE COURT:  Okay.  That is enough said.  I will

9    not trample on a firm tradition.  If it's the 1st through

10   the 4th, then I'm shifting you guys to the next day I can

11   give you.  And I think it's, yes, the next day I can give

12   you is the 9th and that's when I will set you down.  We'll

13   do this at 10:00 a.m. on February 9th.

14   Can you do that, Mr. Boehnen?

15   MR. BOEHNEN:  Yes, sir.

16   THE COURT:  Okay.

17   MR. ASHINOFF:  Thank you very much, Your Honor.

18   MR. SIGALE:  Your Honor, I'm sorry.  This is

19   Mr. Sigale.  We left open the claim construction dates.  You

20   were suggesting December 12th for the opening brief.  The

21   opposition brief would be due?

22   THE COURT:  It will follow the ordinary course:

23   Two weeks for answer, one week for reply.

24   MR. SIGALE:  Right, which would be the 26th of

25   December; and inasmuch as I don't observe Christmas, I would

1    hate to do it to the people that do.

2                THE COURT:  I'll tell you what, guys.  You talk

3    with each other about how best to do that.  In fact, based

4    on the dates we're giving you, I'm giving it to you to come

5    up with an agreed form of order to submit back to me.  And

6    then if you need to adjust a date in there like that, be

7    reasonable with each other and give it back to me; all

8    right?

9                MR. SIGALE:  Thank you, Your Honor.

10               THE COURT:  All right.  Thanks for your time.

11   Good-bye.

12               (The attorneys respond, "Thank you, Your

13   Honor.")

14               (Telephone conference ends at 3:57 p.m.)

15

16

17

18

19

20

21

22

23

24

25