# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d                                        Page 1
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: 2003 WL 21402512 (D.Del.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
ENZO LIFE SCIENCES, INC.,
Plaintiff/Counterclaim Defendant,
v.
DIGENE CORPORATION, Defendant/Counterclaim
Plaintiff
v.
ENZO BIOCHEM, INC., Additional Counterclaim
Defendant.
**No. Civ.A. 02-212-JJF.**

June 10, 2003.

Josy W. Ingersoll, and Sara Beth Reyburn of Young,
Conaway, Stargatt & Taylor, L.L.P., Wilmington,
Delaware, for Plaintiff, Enzo Life Sciences, Inc. and
Additional Counterclaim Defendant, Enzo Biochem,
Inc., Richard L. DeLucia, Jeffrey M. Butler, and Paul
M. Richter, Jr., of Kenyon & Kenyon, New York,
New York, of counsel.

Richard D. Kirk, of Morris, James, Hitchens &
Williams L.L.P., Wilmington, Delaware, for
Defendant, Digene Corporation, Mark R. Labgold,
Ph.D., Kevin M. Bell, Laura A. Donnelly, of Patton
Boggs L.L.P., McLean, Virginia. Richard J. Oparil,
of Patton Boggs L.L.P., Washington, DC, of counsel.

OPINION

FARNAN, J.

*1 A teleconference was held in this case on
Wednesday, June 4, 2003, to discuss the pending
motions. During the teleconference, the Court ruled
on several motions. Specifically, for the reasons
discussed below, the Court: 1) denied Enzo Biochem,
Inc.'s ("Enzo Biochem") Motion to Strike the Expert
Report of Stephen Jizmagian (D.I.144); (2) granted in
part and denied in part Enzo Biochem's and Enzo
Life Sciences Inc.'s ("Enzo Life Sciences") Joint
Motion to Bifurcate Trial on Digene's Business Tort
Claims (Counterclaims III-V) and Stay Discovery on
Them (D.I.145); 3) denied Digene Corporation's

("Digene") Motions for Protective Orders (D.I.104,
113); and 5) denied Enzo Life Sciences' Motion to
Compel (D.I.94).

I. *Factual Background*

This is a patent infringement action brought by
Plaintiff Enzo Life Sciences against defendant
Digene involving U.S. Patent No. 6,221,581B1 (the "
'581 Patent"), issued on April 24, 2001. Both Enzo
Life Sciences and Digene are companies involved in
the development, manufacture and distribution of
proprietary RNA and DNA testing systems. The '581
Patent concerns hybrid capture technology used in
diagnostic medical applications.

Plaintiff, Enzo Life Sciences has alleged that Digene
is infringing claims 16- 26, 30-40, 44-53, 73-87, 91-
100 and 104-107 of the '581 Patent by making,
selling and offering for sale its "Hybrid Capture"
diagnostic products. This action began on March 15,
2002 when Digene filed a Summons and Complaint
for Declaratory Judgment. Enzo Life Sciences filed a
separate lawsuit for patent infringement on March 20,
2002. During a May 2, 2002 status conference, the
Court suggested that the parties stipulate to a
dismissal of Digene's declaratory judgment
Complaint, without prejudice and proceed with Enzo
Life Sciences' patent infringement complaint. The
Court further explained that Digene would be
permitted to bring other claims against any Enzo
entity, including Enzo Biochem, as permissive
counterclaims. Thereafter, the parties filed a
Stipulated Proposed Scheduling Order dismissing
Digene's declaratory judgment action without
prejudice, and the parties agreed to proceed with all
pending and all related claims in Enzo Life Sciences'
patent infringement action. Additionally, Digene filed
Counterclaims against Enzo Life Sciences and Enzo
Biochem.

On June 28, 2002, Enzo Life Sciences, Inc. and Enzo
Biochem, Inc. moved to dismiss Digene's
Counterclaims. On March 31, 2003, the Court denied
the motion to dismiss Digene's Counterclaims.
(D.I.124). Fact discovery closed on February 24,
2003 and the parties are currently conducting expert
discovery which is scheduled to close on June 20,
2003.

II. *Enzo Biochem's Motion to Strike the Expert*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: 2003 WL 21402512 (D.Del.))

*Report of Stephen Jizmagian (D.I.144)*

A. *Parties' Contentions*

Enzo Biochem contends that the expert report of Dr. Stephen Jizmagian should be stricken in its entirety. Specifically, it contends that Digene's counterclaims III-V should be limited to those that were actually pled in the case, namely those that are based upon the two, 2001 press releases by Enzo Biochem regarding the '581 Patent. Enzo Biochem points out that Digene, in its counterclaims, alleging causes of action under: 1) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, 6 Del. C. § 2531 et seq. (Count IV); and 3) Tortious Interference With Prospective Business Relations (Count V), listed two press releases as the factual basis for such claims. However, at this juncture, Enzo Biochem argues that Dr. Jizmagian's expert report concerning damages as to these claims does not mention the press releases, but rather details alleged instances that are not asserted in Digene's counterclaims. For instance, Enzo, points out that the report states that Dr. Jizmagian was told by Digene that Enzo Biochem somehow prevented Digene from obtaining one million dollars in capital through Goldman Sachs in 2000. As a result, Enzo argues that Digene's new claim, as suggested by the expert report, is not that Enzo Biochem interfered with customers seeking to purchase the Hybrid Capture product, but that Enzo Biochem somehow interfered with Digene's ability to raise capital through Goldman Sachs, which allegedly led to lost sales. Based on these facts, Enzo Biochem claims that it is improper for Digene to amend its counterclaims through Dr. Jizmagian's expert report, and therefore, the report should be stricken in its entirety.

**\*2** In response, Digene asserts that its responses to Enzo Biochem's interrogatories plainly set forth the factual basis for its damages claims, where Digene listed all parties that it had contracts and/or agreements with from as early as 1992 that were terminated. *See* Ex. 1 to Kirk Decl. Further, in regard to the time period of damages, Digene contends that it affirmatively stated that Biochem's actions before or at the time the case was filed resulted in direct harm to Digene, where in an interrogatory response they stated:

As a direct result of Biochem's actions Digene was forced to respond to, participate in or otherwise conduct extensive due diligence, including requests from potential funding entities as well as requests from potential joint venturers. Such requests include but are not limited to requests made when Digene completed its IPO and subsequent follow-on private placement transaction and includes potential follow-on public offering and potential strategic partners such as requests from Cytyc, Affymetrix, Applera Corporation and Roche.

Ex. 1 to Kirk Decl. Further, Digene argues that all of the documents relied on by Dr. Jizmagian were produced during discovery, with the bulk of the disclosures, consisting of four hundred boxes of documents, produced as early as October 2002. Moreover, Digene argues that Enzo Biochem failed to pursue available discovery, because it did not take any depositions until the last week of extended fact discovery and points to the fact that during Ms. Seyfried's, Digene's Vice President of Business Development, deposition, she mentioned that the financing opportunities which were adversely affected by Enzo's actions included Goldman Sachs. *See* Ex. 6 to Kirk Decl. at 176-180. Digene contends that based on the fact that the Court determined that it properly pled the allegations in its Business Tort Counterclaims in its Memorandum Opinion regarding the motion to dismiss (D.I.124), and the fact that Digene provided all necessary discovery, Enzo's motion to strike should be denied.

B. *Discussion*

The Motion to Strike will be denied because the Court concludes that Digene pled the necessary elements and provided the relevant discovery.

First, in its Memorandum Opinion denying Enzo's Motion to Dismiss, the Court stated that: 1) the alleged factual basis for the counterclaims were the press releases, and 2) that in the context of interference with business relationships Biochem's alleged actions constitute attempts to induce third parties, namely customers buying Digene's Hybrid Capture® products, not to enter into or continue their business relations with Digene. (D.I. 124 at 2-3, 12). However, after finding that Digene had properly pled these counterclaims for purposes of a motion to dismiss, the Court qualified its conclusions and noted that "there are discovery mechanisms, such as interrogatories, for ascertaining more details regarding the allegations of the complaint." (D.I. 124 at 14).

**\*3** Here, Digene's Counterclaims involve claims under: 1) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, 6 Del. C. § 2531 et seq. (Count IV); and 3) Tortious

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: 2003 WL 21402512 (D.Del.))**

Interference With Prospective Business Relations (Count V). Although Digene listed two press releases as the factual basis for such counterclaims in its Complaint, all that it was required to do in its Complaint, under notice pleading, was to provide a short and plain statement showing that they are entitled to relief. Fed.R.Civ.P. 8(a)(2). The Court, in its Opinion regarding Enzo's Motion to Dismiss Digene's Counterclaims determined that Digene had fulfilled this requirement. (D.I.124). After this, and in line with the Court's suggestion, the parties conducted fact discovery to ascertain more details regarding the factual allegations of the Complaint. Although Digene did not give Enzo a factual roadmap for all of its allegations, it disclosed all the documents relied upon by Dr. Jizmagian in his report, disclosed potential contractual relationships and financial opportunities affected, including Goldman Sachs, and the relevant time periods, through discovery mechanisms such as interrogatories and depositions. In this case, Digene pled all relevant causes of action, and the parties were supposed to parse out the facts underlying those allegations through discovery. The Court concludes that the facts outlined by Enzo as not disclosed, were in fact disclosed through discovery, and were facts; not new causes of action as Enzo contends. Further, because Dr. Jazmagian's report does not discuss any new causes of action, and the dispute is not raised in the context of a Pretrial Order, the cases relied on by Enzo are inapposite. *See, e.g., Wilson v. Muckula,* 303 F.3d 1207, 1216 (10 th Cir.2003) (finding insufficient support in the amended complaint and ambiguous pretrial order to support a *claim* for negligent infliction of emotional distress); *Sound Video Unlimited, Inc. v. Video Shack, Inc.,* 700 F.Supp. 127, 148-149 (S.D N.Y.1998) (dealing with time period for calculation of damages in the context of a dispute over a proposed pretrial order). Based on the following: 1) the Court has already determined that Digene has properly pled all the causes of action alleged in their Business Tort Counterclaims; 2) no new causes of action are raised by Dr. Jizmagian's report; and 3) all documents relied upon by Dr. Jizmagian have been provided to Enzo through discovery mechanisms such as interrogatories, depositions and document production, the Motion to Strike will be denied.

### III. *Enzo Biochem and Enzo Life Science's Joint Motion to Bifurcate and Stay Discovery (D.I.145)*

#### A. *Parties' Contentions*

Enzo Biochem and Enzo Life Sciences (collectively "Enzo") contend that whether or not Dr. Jizmagian's report is stricken, further discovery on Digene's Counterclaims should be stayed and any trial on them should be bifurcated from the patent infringement claims. First, Enzo contends that trial of these Counterclaims and any further discovery would be simplified if not mooted upon a finding of invalidity or infringement of the '581 Patent. Further, Enzo claims that the issues raise by Counts III-V of Digene's Counterclaims are prime for bifurcation because many of the issues to be tried on the Counterclaims have little or no evidentiary overlap with the issues to be tried in the patent infringement action. For instance, Enzo points out that in the patent infringement trial, evidence regarding the amount of Digene's sales will be at issue, whereas these topics will not be raised in the context of the Counterclaims. Instead, Enzo argues, the Counterclaim trial will deal with issues related to Digene's relationship with third parties and how Digene contends that Enzo harmed these relationships. Enzo also contends that bifurcation is called for because of the complexities involved with having a trial involving not only the issues of infringement and validity but also the issues involved in the Counterclaims. Finally, Enzo argues that if Dr. Jizmagian's expert report is not stricken, bifurcating the Business Tort Counterclaims and staying discovery on them is even more appropriate and urgent. Specifically, it argues that it should not be denied a speedy trial on the issue of patent infringement, while additional discovery is taken regarding Dr. Jizmagian's expert report. For example, Enzo points out that it would need to seek discovery regarding the financing of Goldman Sachs and would have to serve subpoenas on Goldman Sachs and its intellectual property counsel to determine why the funds were unavailable to Digene.

*4 In response, Digene contends that Enzo's request for bifurcation is neither warranted nor proper given the facts of the case. First, Digene contends that there is significant evidentiary overlap between the Counterclaims and the patent claims. For example, Digene's validity defenses which contend that Enzo's amended claims (1) are not supported by the specifications; (2) claim subject matter that Enzo did not invent; and (3) encompass prior art known to both Enzo an Digene, are the facts that Enzo intends to rely on for its willful infringement, are the same facts which Digene will rely on in support of its validity arguments and in turn are the same facts which Digene relies on in its Counterclaims. Therefore, Digene argues, bifurcation is not warranted because it would require the Court and the jury to hear the same facts as many as three times. Further, Digene argues

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: 2003 WL 21402512 (D.Del.))**

that recent discovery has shown the interrelated nature of the Counterclaims, where documents received in the past two weeks from Johnson & Johnson demonstrate that the claims of the '581 Patent are not supported by the patent specification and that those limited embodiments which were disclosed in the patent specification were derived from another party. Digene argues that these documents further demonstrate the bad faith and anti-competitive nature of Enzo's acts which preceded the filing of this action and form a basis for Digene's Counterclaims. Finally, Digene argues that Enzo's request to stay further discovery on the Business Tort Counterclaims is untimely, where Enzo has been given unfettered access to Counterclaim discovery and has failed to pursue such discovery as evidenced by its failure to take any depositions until the last week of an already extended fact discovery.

B. *Discussion*

The Court concludes that the Counterclaim and patent issues will be bifurcated in order to avoid jury confusion on complex legal issues. Federal Rule of Civil Procedure 42(b) ("Rule 42(b)") governs the bifurcation of trials and, in relevant part, provides:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim ... or of any separate issue or ... issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Fed.R.Civ.P. 42(b).

Under Rule 42(b), "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management." *Gardco Mfg., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1212 (Fed.Cir.1987); *see also* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2388 (2d ed. 2002) ("Ultimately the question of separate trials under Rule 42(b) should be, and is, a matter left to the discretion of the trial court...."). Courts, when exercising their broad discretion to bifurcate issues for trial under Rule 42(b), should consider whether bifurcation will avoid prejudice, conserve judicial resources, and enhance juror comprehension of the issues presented in the case. *Union Carbide Corp. v. Montell N.V.,* 28 F.Supp.2d 833, 837 (S.D.N.Y.1998). "In deciding whether one trial or separate trials will best serve [the above factors] ... the major consideration is directed toward the choice most likely to result in a just final

disposition of the litigation." *In re Innotron Diagnostics,* 800 F.2d 1077, 1084 (Fed.Cir.1986); *see also* Wright & Miller, *supra,* § 2388.

*\*5* In the context of patent cases, "[e]xperienced judges use bifurcation and trifurcation both to simplify the issues in patent cases and to maintain manageability of the volume and complexity of the evidence presented to a jury." Thomas L. Creel & Robert P. Taylor, *Bifurcation, Trifurcation, Opinions of Counsel, Privilege and Prejudice,* 424 PLI/Pat 823, 826 (1995); *see also Manual for Complex Litigation* (Third) § 33.62 (1995) (advising trial judges to bifurcate or trifurcate overly complex patent trials). In fact, bifurcation of complex patent trials has become common. Steven S. Gensler, *Bifurcation Unbound,* 75 Wash. L.Rev. 705, 725 (2000) ("Bifurcation is also common in patent litigation...."); Creel & Taylor, *supra,* at 825 ("Bifurcation or even trifurcation is common in patent cases.").

Typically, courts bifurcate patent cases into liability and damage trials. *Swofford v. B & W, Inc.,* 336 F.2d 406 (5th Cir.1964), *cert. denied,* 379 U.S. 962 (1965) (bifurcating patent case into liability and damage trials). Courts also bifurcate complex patent cases in such a way to prevent jury confusion. *Smith v. Alyeska Pipeline Service Co.,* 538 F.Supp. 977, 984 (D.Del.1982) (finding "that one trial of both issues [i.e., liability and damages] would tend to clutter the record and to confuse the jury."). This reasoning is also applicable to cases involving both patent and non-patent claims.

Bifurcation is an important discretionary tool that district courts can use to ensure that the cases are resolved in a just manner by juries that understand the complex issues before them.

Many scholars have endorsed bifurcation in complex cases as a method of improving juror comprehension. Specifically, bifurcation might enhance jury decision making in two ways: (1) by presenting the evidence in a manner that is easier for the jurors to understand, and (2) by limiting the number of legal issues the jury must address at any particular time.

Gensler, *supra,* at 751.

In this case, the bifurcation of issues would prevent jury confusion, in that it would enable a jury to concentrate on one complex body of law at a time. Also, in order to enhance jury comprehension and avoid prejudice, the Court will separate the issues into three sequential phases for trial in the following

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: 2003 WL 21402512 (D.Del.))

Page 5

manner: 1) infringement; 2) validity; and 3) Business Tort Counterclaims. Although the Court recognizes that there is some evidentiary overlap, the parties will not be prejudiced by separate trials and the procedure will produce an efficient and fair disposition of the parties' claims.

The issue of staying discovery on the Counterclaims, however, is a more difficult question. The discovery phase in this case has already been extended and the Court is concerned that a stay of discovery on the Business Tort Counterclaims will prevent a fair and efficient resolution to the Counterclaims. Although the Court recognizes that the Counterclaims may be mooted or simplified depending on the outcome of the patent issues, this must be weighed against the importance of judicial efficiency and fairness. After weighing the relevant factors, the Court will deny the motion to stay because the Court finds that the interest in efficiently moving on with the resolution of the Counterclaims outweighs Enzo's concerns. Additionally, the Court concludes that the interest of fairness is served by a further extension of fact discovery as to those claims. Thus, the Motion to Bifurcate and Stay discovery will be granted in part and denied in part.

## IV. *Digene's Protective Orders* (D.I.104, 113)

*6 Digene has filed two Protective Orders in the instant case. The first, D.I. 104, asks the Court for a Protective Order to preclude Enzo from disclosing Digene's confidential or outside counsel only information to Enzo's proposed expert Dr. James Wetmur. The Court concludes that Digene has not met its burden of proof with regard to this issue and also concludes that the Stipulated Protective Order is sufficient at this time. Therefore, Digene's Motion for a Protective Order (D.I.104), will be denied.

The second motion requests a Protective Order precluding Enzo Life Sciences from taking Digene's Deposition pursuant to Rule 30(b)(6) because it is unnecessarily duplicative and unduly burdensome. After reviewing the parties' arguments, the Court finds that the deposition notice was not unreasonably duplicative or unduly burdensome, and therefore, Digene's Motion for a Protective Order (D.I.113) will be denied.

An appropriate Order will be entered.

ORDER
NOW THEREFORE, For The Reasons discussed in the Opinion issued this date, IT IS HEREBY

ORDERED this 10th day of June 2003, that:

1) Enzo Biochem's Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144) is *DENIED;*

2) Enzo Biochem's and Enzo Life Sciences' Joint Motion to Bifurcate and Stay Discovery (D.I.145) is *GRANTED* as to Bifurcation of issues but *DENIED* as to the Stay of Discovery on the Business Tort Counterclaims;

3) Fact Discovery as to the Business Tort Counterclaims shall be extended so as to be completed by August 15, 2003;

4) Digene's Motion for Protective Order (D.I.104) is *DENIED;*

5) Digene's Motion for Protective Order (D.I.113) is *DENIED;*

6) Plaintiff's Motion to Compel Digene to Produce a 30(b)(6) Deponent is *DENIED* as moot because the Parties have resolved the issue;

7) As discussed at the teleconference on Wednesday, June 4, 2003, Enzo counsel is permitted to show their clients an unredacted version of Dr. Jizmagian's expert report;

8) The parties shall submit a letter with a Proposed Agreed Upon Trial Date for February or March, 2004;

9) A Pretrial Conference will be held on Thursday, November 6, 2003 at 2:30 p.m., in Courtroom No. 4B on the 4th Floor, Boggs Federal Building, Wilmington, Delaware.

## Motions, Pleadings and Filings (Back to top)

• 1:02CV00212 (Docket) (Mar. 20, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



Not Reported in F.Supp.2d                                                                     Page 1
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
**(Cite as: 1999 WL 1565082 (D.N.J.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.
CONOPCO, INC. d/b/a Unipath Diagnostic Co.
v.
WARNER-LAMBERT CO.
**No. Civ.A. 99-101(KSH).**

Jan. 24, 2000.

INTRODUCTION

HEDGES, Magistrate J.

*\*1* This matter comes to me on plaintiff's motion to compel discovery. I have considered the papers in support of and in opposition to the motions. There was no oral argument. Rule 78.

BACKGROUND

Conopco, Inc., d/b/a Unipath Diagnostics Company ("Unipath"), commenced this action on January 8, 1999, alleging willful patent infringement by defendant Warner Lambert Company ("Warner-Lambert") and seeking damages and an injunction. Unipath contends that Warner-Lambert committed and continues to commit willful acts of infringement of its patents by making, using, selling and/or offering for sale e.p.t.® pregnancy tests and other products employing the subject matter, all without authority or license from Unipath. Unipath also contends that third-party Applied Biotech, Inc. ("ABI") has either manufactured and/or supplied the product to Warner-Lambert since 1993. The allegedly infringed patents are:

1. United States Letters Patent No. 5,622,871 entitled "Capillary Immunoassay and Device Therefore Comprising Mobilizable Particulate Labeled Reagents", issued to Keith May, et al. on April 22, 1997 and assigned to Unipath;

2. United States Letters Patent No. 5,602,040 entitled "Assays", issued to Keith May, et al. on February 11, 1997 and assigned to Unipath;

3. United States Letter Patent No. 5,656,503 entitled "TEST DEVICE FOR DETECTING ANALYTES IN BIOLOGICAL SAMPLES", issued to Keith may, et al. on August 12, 1997 and assigned to Unipath.

Warner-Lambert denies infringement, alleges that the patents are invalid and that Unipath did not properly mark its products. Warner-Lambert seeks declaratory judgment for non-infringement and invalidity of the patents.

On June 17, 1999, the Court entered a scheduling order setting forth discovery deadlines. On June 25, 1999. Unipath served Warner-Lambert and ABI (collectively "defendants") with document requests relating to the alleged infringement. On August 12, 1999, the Court ordered that document production be limited to the issue of patent infringement and that inspection of such documents be completed by September 17, 1999.

Unipath contends that it produced twelve boxes of documents which included laboratory research notebooks, development reports and other requests relating to the research, development, and testing of its patented product. Unipath claims that defendants produced only about one-and-one-half boxes and permitted a limited inspection of approximately 32 double-sized boxes of documents at ABI's San Diego, California site on September 26, 1999. Unipath admits that some documents were responsive to a few of its requests. However, Unipath claims that no documents were provided regarding the research, development, and testing of the e.p.t.® product or the purpose and function of the sugar used in the e.p.t.® product, the patent claim element in issue here. Unipath also claims that defendants produced only the most recent manufacturing specifications for the e .p.t.® product which show how the product is currently made, but do not reveal the function of sugar or other components in the operation of the device.

*\*2* Defendants also refused to produce documentation dated prior to February 11, 1997 (the earliest issue date for the patents-in-suit), documents concerning their knowledge of the patents-in-suit and foreign counterparts, and comparative product testing. [FN1] Unipath argues that tests, notebook entries, monthly reports, and memoranda may be highly probative of whether the e.p.t.® products use sugar to facilitate the mobility of the labeled reagents. Unipath contends that these documents are relevant and should be admissible and, at the very least, are likely to lead to the discovery of admissible evidence of patent infringement. Unipath also argues that the February 11, 1997 cut-off date is self-imposed by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Warner-Lambert.

> FN1. Unipath received a 201-page document
> production from Warner-Lambert at the time
> its brief was prepared.

Unsuccessful at attempts to resolve this discovery
dispute with defendants, Unipath has moved to
compel Warner-Lambert to produce documents
responsive to Unipath's Document Request Nos. 7, 8,
20, 21, 26, 31, 32, 34, 35, 43 and 51 and to compel
ABI to produce documents responsive to Unipath's
Document Request Nos. 6, 7, 19, 20, 25, 30, 31, 33,
34, and 42. [FN2] Unipath also objects to Warner-
Lambert's General Objection 6 and ABI's General
Objection 7, regarding the February 11, 1997 cut-off
date for discovery.

> FN2. The second motion is submitted by
> Warner-Lambert and is addressed by the
> Court in a separate Ruling.

Defendants oppose Unipath's motion. They contend
that they have produced all documents relevant to
patent infringement and that what has been produced
is sufficient to determine whether there is
infringement. Warner-Lambert claims that it
produced over 11,000 documents (six boxes) of
initial disclosures and other requested documents, as
well as eight boxes of documents produced for
inspection. ABI claims that it produced over 3,000
documents (two boxes) prior to the inspection, about
26 double-sized banker's boxes of documents at the
inspection, and since then, about 3,800 more
documents. The 26 ABI boxes allegedly contain
detailed information on the structure, operation, and
manufacture of each lot of the e.p.t.® product from
1997 to the present including the materials and
chemicals used, amounts and timing of when each
chemical is added. Defendants contend that the
documents describe how much sugar is used, when it
is added and where it is located, as well as design
changes made to parts, chemical, or assembly
procedures. Also provided were quality control
documents showing the operation and performance of
the product, manufacturing safety data sheets,
incoming specification sheets showing the contents,
purity, etc. for all outside raw materials used in the
product, all FDA submissions for the product, and all
documents for all dates showing comparisons made
between the e.p.t.® product and other third parties'
test products. Product samples were also produced.

Warner-Lambert also claims that its e.p.t.® product
does not infringe any claims of the patent because the

sugar, admittedly used in its test product, does not
perform the function of facilitating mobility of the
labeled reagent. Rather, Warner-Lambert argues that
the sugar stabilizes the labeled reagents, and the
amount of sugar, not its function, is at issue. Warner-
Lambert also contends that the function of sugar is
not the only claim at issue. Furthermore, defendants
claim that the documents that Unipath seeks related
to research, development, and testing documents and
to defendants' knowledge of the patents-in-suit, have
nothing to do with patent infringement, but relate
only to the damages issue of willful infringement on
which the Court deferred discovery. Defendants also
contend that evidence of copying is only potentially
relevant to interchangeability, which is not at issue in
this case.

### DISCUSSION

**\*3** The Federal Rules of Civil Procedure and
Evidence should be applied no differently in patent
cases than in other types of actions. *SRI Int'l v.
Matsushita Elec. Corp. of America,* 775 F.2d 1107,
1116 (Fed.Cir.1985). The scope of discovery under
the federal rules is very broad. Under Rule 26.
"[p]arties may obtain discovery regarding any matter,
not privileged, which is relevant to the subject matter
involved in the pending action." Relevant matter
includes any matter related to or that reasonably
could lead to other matter that is related to any issue
that is or may be in the action. *Hickman v. Taylor,*
329 U.S. 495, 506, 67 S.Ct. 385, 91 L.Ed. 451
(1947). Discovery of matter not "reasonably
calculated to lead to the discovery of admissible
evidence" is not within its scope of Rule 26(b)(1).

A party seeking discovery must show a relationship
between the information sought and the claimed
invention. *American Standard Inc. v. Pfizer, Inc.,* 828
F.2d 734, 741 (Fed.Cir.1987). Discovery should be
denied where proof of relevance or need is not
established. 828 F.2d at 743. "Need is enhanced when
information is uniquely available from the party from
whom it is sought." 828 F.2d at 743. To withhold
relevant documents, a party must justify that the
documents are protected under either the attorney-
client privilege or work product doctrine or both.
*Willemijn Houdstermaatschaapij BV v. Apollo
Computer,* 707 F.Supp. 1429, 1442 (D.Del.1989)
("*WHBV*").

Documents containing trade secret information are
subject to the protective order issued by the Court.
However, "a protective order is not a substitute for
establishing relevance or need. Its purpose [ ] is to
prevent harm by limiting disclosure of relevant and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 3
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
**(Cite as: 1999 WL 1565082 (D.N.J.))**

necessary information." *Micro Motion, Inc. v. Kane Steel Co., Inc. ., 894 F.2d 1318, 1325 (Fed.Cir.1990).*

PATENT LAW GENERALLY

"Patent infringement occurs when a device that is literally covered by the claims or is equivalent to the claimed subject matter, is made, used, or sold, without the authorization of the patent holder, during the term of the patent." *Stairmaster Sports/Med. Prod., Inc. v. Groupe Procycle, Inc., 25 F.Supp.2d 270, 278 (D.Del.1998).* Infringement may occur either literally or under the doctrine of equivalents. *W.R. Grace & Co.-Conn. v. Intercat, Inc., 7 F.Supp.2d 425, 434 (D.Del.1997), aff'd, 155 F.3d 572 (Fed.Cir.1998); see Graver Tank & Mfg. Co., Inc. v. Linde Air Prod. Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, (1950).* Infringement in both instances is a question of fact. *Stairmaster, 25 F.Supp.2d at 278.*

A two-step analysis is followed to determine if there is infringement. Patent claims must first be construed to determine their scope and, second, the construed claims must be compared to the accused device or product. 25 F.Supp.2d at 278. "Infringement, literal or by equivalence, is determined by comparing the accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit." *Stairmaster, 25 F.Supp.2d at 278 (quoting S.R.I. Int'l, 775 F.2d at 1118, 1121)* (claims are "construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, not in light of the accused device."); *see Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed.Cir.1995) (in banc ), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). [FN3]* This procedure applies to both types of infringement. *Stairmaster, 25 F.Supp.2d at 278.* Generally, "nothing can be held to be an infringement which does not fall within the terms the patentee has himself chosen to express his invention." *McClain v. Ortmayer, 141 U.S. 419, 425, 12 S.Ct. 76, 35 L.Ed. 800 (1891).*

> FN3. "[W]hen intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence to contradict meaning of the claims." *Georgia-Pacific Corp. v. United States Gypsum Co., 195 F.3d 1322, 1332 (Fed.Cir.1999).*

*\*4* "To establish literal infringement, a plaintiff must demonstrate by a preponderance of the evidence that

every limitation in the claim is literally met by the accused device." *Stairmaster, 25 F.Supp.2d at 278.* This rule is modified somewhat when the terminology within the claim meets the criteria set forth in 35 U.S.C. § 112, ¶ 6 for means-plus-function terminology. *Stairmaster, 25 F.Supp.2d at 278; see Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 933-34 (Fed.Cir.1987), cert. denied, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).* In this type of action, "a claim containing a functional limitation written in means-for form is literally infringed when the accused device performs the function stated in the claim, by measure of structure, material, or acts described in the specification or equivalents thereof." *Stairmaster, 25 F.Supp.2d at 278 (quoting Multiform Dessiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1479 (Fed.Cir.1998)).* "In turn, to determine structural equivalency under § 112, ¶ 6, the 'sole question,' which is a factual one, is 'whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function." ' *Stairmaster, 25 F.Supp.2d at 278 (quoting D.M.I., Inc. v. Deere & Co., 755 F.2d 1570, 1575 (Fed.Cir.1985)).* However, a device may fall within the literal words of a claim, but may be so far changed in principle from the patented article that it performs the same or similar function but in a different way and defeats a claim of infringement. *Graver Tank, 339 U.S. at 608-09.*

The second type of infringement, the doctrine of equivalents, was set forth first in 1854 in *Winans v. Denmead.* 56 U.S. 330, 15 How. 330, 14 L.Ed. 717 (1853); *see Warner Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S. 17, 26 n. 3, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).* The modern contours of the doctrine were provided in *Graver Tank, 339 U.S. at 607-08.* "Under this doctrine, an accused device 'that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." ' *Stairmaster, 25 F.Supp.2d at 283 (quoting Warner-Jenkinson, 520 U.S. at 21).*

The theory raises a question of fact in that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape." *Graver Tank, 339 U.S. at 608 (quoting Union Paper-Bag Machine Co. v. Murphy,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
**(Cite as: 1999 WL 1565082 (D.N.J.))**

Page 4

97 U.S. 120, 125, 24 L.Ed. 935 (1877)). [FN4] "[T]o permit imitation of a patented invention which does not copy every literal detail would ... encourage ... the unscrupulous copier to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of the law." Graver Tank, 339 U.S. at 607.

> FN4. The doctrine may be used against a patentee in an action for infringement "where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim." Graver Tank, 339 U.S. at 608-09.

*5 This doctrine is "applied to mechanical or chemical equivalents in compositions or devices." Graver Tank, 339 U.S. at 609. It is applied, not to the invention as a whole, but to each element of a claim individually. Stairmaster, 25 F.Supp.2d at 283. The trier of fact will apply the properly construed claim to determine if the "accused device, element by element, is equivalent to that which has been patented." Stairmaster, 25 F.Supp.2d at 283.

"Equivalence" is determined by "either focusing on whether the accused device performs substantially the same function in the same way to achieve substantially the same result (the so-called "function/way/result" test) ... or by considering whether there are "insubstantial differences" between the patent claim term and the accused device." 25 F.Supp.2d at 283. Although this "function-way-result" test can be utilized to determine whether two devices are equivalent, it is merely one of several relevant inquiries. Also to be considered under the doctrine of equivalents are "1) whether persons skilled in the art knew that the item was interchangeable with the item in the patent in suit; 2) if there is substantial evidence that defendant copied the patent in suit, 3) if there is evidence of independent development by defendant and 4) if defendant designed around the patent." Glaxo Wellcome, Inc. v. Pharmadyne Corp., 32 F.Supp.2d 265, 284 (D.Md.1998).

A significant factor to be considered in determining equivalency is the "interchangeableness" between the elements in the accused device and claimed elements in the patented invention. Stairmaster, 25 F.Supp.2d at 284. "Copying suggests that the

differences between the claimed and accused products or processes ... are insubstantial.' Evidence that the accused product was 'designed around' a patent claim weighs against a finding of infringement under the doctrine of equivalence and support the inference that the developer designed substantial changes into the new product to avoid infringement." Queen's Univ. at Kingston v. Knedyne Corp., 910 F.Supp. 527, 533 (D.Kan.1995); see California Medical Prods., Inc. v. Tecnol Medical Prods., Inc., 921 F.Supp. 1219, 1244 (D.Del.1995).

Alternatively, independent development shows that the accused infringer did not have knowledge of the invention when the product was developed. Hilton Davis Chem. Co. v. Warner-Jenkinson, 62 F.3d 1512, 1519 (Fed.Cir.1995) reversed on other grounds, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). "Unlike copying or designing around ... independent development itself provides no information about the substantiality of the differences." Hilton Davis, 62 F.3d at 1519. However, an independently developed product that is within the patent claims still infringes. 62 F.3d at 1519. In effect, anyone who makes only insubstantial change to a patent is liable for infringement. 62 F.3d at 1519.

ARBITRARY CUT-OFF DATE

*6 Warner-Lambert contends in its General Objection No. 6, and ABI in its General Objection No. 7, that all materials dated prior to February 11, 1997, the date of issuance of the first patent-in-suit, are not relevant to the issue of infringement because "until the patent is issued, there is no property right in it." Marsh v. Nichols, Shepherd & Co., 128 U.S. 605, 612, 9 S.Ct. 168, 32 L.Ed. 538 (1888). Alternatively, Unipath argues that it is entitled to discovery of these documents "if there is any possibility that the information sought may be relevant to the subject matter of the action." Ares-Serono, Inc. v. Organon Int'l B.V., 121 F.R.D. 215, 219 (D.Mass.1993).

The Court concludes, however, that pre-issuance (pre-February 11, 1997) information may be relevant or may lead to the discovery of information relevant to infringement and should be produced. See, e.g., Warner-Jenkinson, 520 U.S. at 37 (under the doctrine of equivalents, "whether an accused element is equivalent to a claimed element, the proper time for evaluating equivalency ... is at the time of infringement, not at the time the patent was issued.") Such documents may also be relevant to the issues surrounding the function and operation of the devices or lead to information that is. Thus, discovery

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
(Cite as: 1999 WL 1565082 (D.N.J.))

documents should be produced for the time period prior to February 11, 1997.

SPECIFIC DOCUMENT REQUESTS

Unipath moves to compel Warner-Lambert to provide complete answers to Document Request Nos. 7, 8, 20, 21, 26, 31, 32, 34, 35, 43 and 51 dated September 10, 1999. Unipath also moves to compel ABI to provide complete answers to Document Request Nos. 6, 7, 19, 20, 25, 30, 31, 33, 34, and 42 propounded on the same date. Unipath's requests of ABI mirror those to Warner-Lambert, except for Warner-Lambert No. 51, so the Court will address these together.

*REQUEST NO. 7 (ABI NO. 6): ALL DOCUMENTS CONCERNING THE STRUCTURE AND OPERATION OF ALL WARNER-LAMBERT TEST PRODUCTS, INCLUDING, BUT NOT LIMITED TO, PRODUCT DRAWINGS, MANUALS, AND DOCUMENTS DESCRIBING THE SUPPRESSION OR BLOCKING OF POTENTIAL BINDING SITES, RELEASE OR DISPERSION OF LABELED ANTIBODIES, IMMUNOASSAY REACTIONS, CHEMICAL REACTIONS, ANTIBODY REACTIONS, ANALYTE REACTIONS, MOBILITY OF LABELED ANTIBODIES, IMMOBILIZATION OF ANTIBODIES AND DETECTION OF A TEST RESULT.*

Defendants claim that they provided these documents to Unipath and that pre-February 1997 documents are not relevant to infringement. Unipath argues that the production is incomplete, in part, because the pre-1997 documents were not provided, but also because the documents provided thus far did not provide information regarding the function of defendants' product.

First, as ordered above, defendants will produce all responsive, non-privileged pre-February 11, 1997 documents, as well as any 1999 or subsequent documents that were withheld due to production reasons. Second, Unipath's request for documents on the "operation" of defendants' products, in the Court's view, includes the function of the product. The plain meaning of "operate" is "to perform a function ... to produce an appropriate effect". WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 827 (1986). Such documents may be relevant or lead to the production of relevant documents and will be produced as they relate to the e.p.t.® products, infringement, and in particular, the function of sugar.

*7 *REQUEST NO. 8: ALL DOCUMENTS CONCERNING THE DESIGN, DEVELOPMENT AND TESTING OF ANY VERSION OF ALL WARNER-LAMBERT TEST PRODUCTS, INCLUDING, BUT NOT LIMITED TO ALL LABORATORY AND/OR DEVELOPMENT NOTEBOOKS, SPECIFICATIONS, MEMORANDA, REPORTS, ENGINEERING DRAWINGS, MEETING NOTES OR MINUTES, PRESENTATIONS, APPROVALS, TRIALS, TESTS AND STUDIES.*

Defendants agreed to produce documents relating to design (i.e., structure), but refused to produce documents related to development and testing. Defendants contend that Unipath does not need such records. Defendants argue that only the final product is relevant to infringement and that testing and development are not.

Defendants further claim that they withdrew similar requests documents because such documents are not relevant to patent infringement. Instead Warner-Lambert contends that its requests focused on the development of the subject matter of the patents-in-suit which is relevant to what the inventors believed their invention was, not the development of Unipath's commercial products, which is irrelevant to infringement. *Spectrum Int'l Inc. v. Serilite Corp., 164 F.3d 1372, 1381 (Fed.Cir.1998)* ("court may not predicate an infringement determination on a comparison of an accused product with a patentee's commercial embodiment of his claimed invention").

Alternatively, Unipath contends that research and development records are substantial evidence of patent infringement. *W.R. Grace, 7 F.Supp.2d at 443-44.* Unipath also argues that the patent claim element at issue in this action concerns the function of a sugar that is used in the e.p.t. ® pregnancy test devices. Unipath argues that the documents being withheld by defendants are the very research, development, and testing documents that will disclose the function of the sugar used in Warner-Lambert's products. Unipath argues that these documents are relevant to patent infringement and will be admissible, and at the very least, will likely lead to the discovery of admissible evidence of patent infringement.

Unipath also contends that Warner-Lambert's current product is the result of research, development, and testing that occurred prior to the issuance of Unipath's patents, but with full knowledge of Unipath's foreign patent specifications and presumed U.S. filings. Unipath's specifications of the patents-in-suit were made public nearly ten years before they

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
(Cite as: 1999 WL 1565082 (D.N.J.))

issued in the United States. Trinity Biotech U.S.A. Corp. is the United States subsidiary of an Irish company that acquired rights to and is now a party to the supply and development agreement under which ABI manufactures and develops the accused infringing product for Warner-Lambert. Discovery from Trinity shows that ABI monitored Unipath's U.K. priority filings and that ABI considered the pending issuance of Unipath's United States patents to be material to its Supply and Development Agreement with Warner-Lambert. Also, for this reason, Unipath argues that records pre-1997 are relevant to the action of infringement.

*8 Defendants argue that any subjective belief regarding the function of the sugar in the e.p.t.® product is not relevant to Unipath's claims; rather the amount of the sugar used and whether it is "effective to reduce interaction" are relevant to infringement. Defendants argue that discovery provided to Unipath disclosed the exact amount of sugar used in the e.p.t.® product and that no development and testing documents are necessary.

The Court acknowledges that defendants claim that they provided all relevant documents from 1997 onwards relating to the "design of all parts of the e.p.t.®)) products of Warner-Lambert". Again, the Court orders defendants to produce any responsive pre-1997 documents. The Court also finds that research and development records of the defendants may be relevant to infringement or the function of sugar or lead to the discovery of such documents. *See, e.g., Smithkline Beecham Corp. v. Apotex Corp.,* 1999 WL 311697, 2 (N.D.Ill. May 13, 1999) (holding that laboratory notebooks maintained by defendant's technicians and chemists and documents related to the development, manufacture, and regulatory approval of an accused product are reasonably related to the discovery of admissible evidence); *Afros S.P.A. v. Krauss-Maffei,* 671 F.Supp. 1402, 1439 (D.Del.1987), *aff'd,* 848 F.2d 1244 (Fed.Cir.1988) (research and development and engineering documents may be probative of infringement, are crucial to both sides, and subject to discovery); *Union Carbide Corp. v. Dow Chemical Co.,* 619 F.Supp. 1036, 1051 (D.Del.1985) (litigant may not hide research, experiments, and tests pertinent to a patent application behind the work product doctrine); *Kurtzon v. Sterling Industries,* 227 F.Supp. 393, 394 (E.D.Pa.1964) (defendant must produce engineering drawings and data having to do with the manufacture and development of the alleged infringing article if defendant shall rely on any of its products or activities as prior art to invalidate the plaintiff's

patent); *Graver Tank,* 339 U.S. at 611 (noting absence of evidence on the record showing that the accused patent device was developed by way of independent research or experiments). Defendants shall provide all relevant, non-privileged documents related to development and testing to Unipath.

*REQUEST NO. 20 (ABI NO. 19): ALL DOCUMENTS CONCERNING ANY COMPARISON, INCLUDING DIFFERENCES OR SIMILARITIES IN THE SUPPRESSION OR BLOCKING OF POTENTIAL BINDING SITES, THE RELEASE OR DISPERSION OF LABELED ANTIBODIES WHEN CONTACTED BY A LIQUID SAMPLE, FLOW RATES OF LABELED ANTIBODIES, IMMUNOASSAY REACTIONS, CHEMICAL REACTIONS, ANTIBODY REACTIONS, ANALYTE REACTIONS, MOBILITY OF LABELED ANTIBODIES, IMMOBILIZATION OF ANTIBODIES AND DETECTION OF A TEST RESULT, BETWEEN ANY WARNER-LAMBERT TEST PRODUCT AND: A) ANY UNIPATH TEST PRODUCTS; OR B) ANY THIRD-PARTY TEST PRODUCT.*

Defendants contend that these were produced. Unipath contends that this document request is at issue in that such records were not produced prior to February 11, 1997. Defendants will now produce such records.

*9 *NO. 21: ALL DOCUMENTS CONCERNING ANY DIFFERENCES OR SIMILARITIES IN STRUCTURE OR OPERATION BETWEEN ANY WARNER-LAMBERT TEST PRODUCT AND" A) ANY UNIPATH PRODUCT; OR B) ANY THIRD-PARTY TEST PRODUCT.*

Defendants contend that these were produced. Unipath contends that this document request is at issue in that such records were not produced prior to February 11, 1997. As with Document Request No. 20, defendants will produce responsive, non-privileged documents prior to February 11, 1997.

*NO. 26 (ABI NO. 25): ALL COMMUNICATIONS BETWEEN OR AMONG WARNER-LAMBERT, SYBRON, ABI AND/OR TRINITY REGARDING ANY OR ALL WARNER-LAMBERT TEST PRODUCTS.*

Defendants object to this document request as overbroad, unduly burdensome, not relevant, expensive, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request as not relevant and not

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
**(Cite as: 1999 WL 1565082 (D.N.J.))**

reasonably calculated to lead to the discovery of admissible evidence on the issue of infringement. ABI further objects to this document request as unreasonably cumulative, duplicative, and obtainable Warner-Lambert.

The Court agrees that this request to provide all documents between all of these entities regarding Warner-Lambert products is overbroad. However, the parties will produce all responsive, non-privileged information related to the infringement of Unipath's patent-in-suit by e.p.t.® or other accused products, in particular, documents related to the functionality/process/operation of the accused products.

*No. 31 (ABI No. 30): All reports, memoranda, notes, minutes, proposals, projections, marketing requests, authorizations or presentations concerning all Warner-Lambert test products, the patents-in-suit, Unipath's test products and/or third-party test products. (Excluding "projections, marketing requests, authorizations or presentations.").*

Defendants object to this request as seeking documents protected from discovery under the attorney-client privilege or work-product immunity. Defendants also object to this request as overbroad, unduly burdensome, not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the request as vague, ambiguous, overbroad, and unduly burdensome to the extent it requests all such materials "concerning" all Warner-Lambert test products, the patents-in-suit, Unipath's test products and/or third-party test products. Defendants further object to this request as overbroad and unduly burdensome and expensive to the extent it seeks "all" such materials.

The Court concludes that certain documents falling under this request should be produced. Like advertising material, marketing information would not be in Unipath's possession and may contain "evidence as to the nature and operation of the defendant's article ." *Kurtzon v. Sterling Indus., Inc.,* 227 F.Supp. 393 (E.D.Pa.1964). Defendants' primary objection to this request is that it would violate the attorney-client privilege and work product protection. The Court addresses these separately.

ATTORNEY-CLIENT PRIVILEGE

*\*10* Determination of whether the privilege or doctrine apply should be reviewed on a case-by-case

basis. *Applied Telematics, Inc. v. Sprint Communications Co.,* 1996 WL 539595, 3 (E.D.Pa. Sept.18, 1996). The attorney-client privilege applies if:

  1) the asserted holder of the privilege is or sought to become a client;
  2) the person to whom the communication was made a) is a member of the bar of a court, or his or her subordinate, and b) in connection with this communication is acting as a lawyer;
  3) the communication relates to a fact of which the attorney was informed a) by his client b) without the presence of strangers c) for the purpose of securing primarily either i) an opinion of law or ii) legal services or iii) assistance in some legal proceedings, and d) not for the purpose of committing a crime or a tort; and
  4) the privilege has been a) claimed and b) not waived by the client

1996 WL 539595 at 2 (*quoting Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.,* 32 F.3d 851, 862 (3d Cir.1994)). Only communications between the attorney and the client are privileged. *Applied Telematics,* 1996 WL 539595 at 2. Underlying facts are not privileged, nor are the circumstances surrounding the relationship of the attorney and client. *Applied Telematics,* 1996 WL 539595 at 2 (reviewed documents for privilege and work product); *Allegheny Ludlum Corp. v. Nippon Steel Corp.,* 1991 WL 61144 (E.D.Pa. Apr.15, 1991) (reviewed plaintiff's documents for applicability of attorney-client privilege); *Knogo Corp. v. United States,* 213 U.S.P.Q. 936, 940 (U.S.Ct.Cl.1980) (privilege does not apply to technical information as long as it is sought by other discovery techniques outside of the attorney-client privilege). In patent suits, generally, the privilege should apply to documents that are 'fundamentally legal opinions and analyses." *Hogan v. Zletz* (*In re Natta* ), 410 F.2d 187, 193 (3d Cir.1969). Although many courts have held that patent attorneys are mere scriveners or conduits for the inventor to the patent office, this is not the view of our court of appeals. *Applied Telematics,* 1996 WL 539595 at 3.

The privilege "does not protect technical information such as the results of research, tests, and experiments communicated to the attorney, not calling for a legal opinion or interpretation, but meant primarily for aid in completing a patent application." *Hercules Inc. v. Exxon Corp.,* 434 F.Supp. 148 (D.Del.1977). For example, a client cannot claim the privilege if he is questioned as to how an invention works, but can if asked to recall what he told his attorney about how it works. *Knogo,* 213 U.S.P.Q. at 940. The privilege

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 8
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
**(Cite as: 1999 WL 1565082 (D.N.J.))**

applies to the communication, but not the information contained within. _Knogo,_ 213 U.S.P.Q. at 940.

If Warner-Lambert and ABI have difficulty in identifying and providing Unipath with non-privileged, responsive documents, the Court may perform an in camera review of any questionable documents.

WORK PRODUCT

*11 The work product doctrine was summarized by the Supreme Court in _Hickman v. Taylor_ as a "general policy against invading the privacy of an attorney's course of preparation." 329 U.S. 495, 512, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ("[n]ot even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney"). "The essential problem whenever work product is invoked is to prevent the use of the discovery machinery to hinder the orderly and proper administration of justice by impairing the effectiveness of a lawyer's preparation of his client's case and at the same time not to defeat the purposes of discovery by allowing suppression of relevant facts." _E.I. Du Pont De Nemours & Co. v. Phillips Petroleum Co.,_ 24 F.R.D. 416, 420-21 (D.Del.1959).

Under the doctrine, no universal protection against the disclosure of facts are provided merely because they were discovered by or came to the attention of one's lawyer while preparing for litigation. 24 F.R.D. at 420. A party cannot refuse to answer interrogatories simply because the information is within the knowledge of its attorney. 24 F.R.D. at 420. "Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had." _Hickman,_ 329 U.S. at 511:

> Broadly speaking, the rule is nothing more than an extension of the requirement for a showing of good cause for the production of documents to information of all kinds developed by a lawyer in preparing his case for trial, with the addition ... that in such cases, the courts are ... put to the very difficult task of finding very good cause as distinguished from good cause. The essential problem whenever work product is invoked is to prevent the use of the discovery machinery to hinder the orderly and proper administration of justice by impairing the effectiveness of a lawyer's preparation of his client's case and at the same time not to defeat the purposes of discovery by allowing suppression of relevant facts.

_Du Pont,_ 24 F.R.D. at 420-21. "The test to be applied is whether, in light of the nature of the documents and the factual situation in this particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." _Hercules,_ 434 F.Supp. at 151. For patent proceedings, work product immunity has been given to:

> preliminary drafts of legal documents, license agreements and/or assignments, _Jack Winter, Inc. v. Keratron Co.,_ [54 F.R.D. 44 (N.D.Cal.1971) ]; opinion letters and background memoranda with respect to the scope and validity of patents and patent applications, _Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.,_ [62 F.R.D. 454 (N.D.Ill.1974), aff'd, 534 F.2d 330 (7th Cir.1976) ]; _Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,_ [47 F.R.D. 334 (S.D.N.Y.1969) ]; attorney's analysis or assessments of a party's position with respect to other parties in an ongoing interference, _In re Natta,_ 410 F.2d 187 (3d Cir.), [cert denied, 396 U.S. 836, 90 S.Ct. 95, 24 L.Ed.2d 87 (1969) ], and intra-office file notes and memoranda containing summaries of conferences, legal research and comments on technical information, prepared by outside patent counsel or patent department attorneys in connection with an interference. _Natta v. Zletz,_ 418 F.2d 633 (7th Cir.1969).

*12 _Union Carbide,,_ 619 F.Supp. at 1050-51 (quoting Hercules, Inc., 434 F.Supp. at 151). Work product may also protect documents prepared in anticipation of proceedings before the Board of Patent Interferences. _Union Carbide,_ 619 F.Supp. at 1051. However, purely factual recitation of technical data and research experiments conducted by a patentee's employees, not created in preparation for or anticipation of litigation, are not attorney work product, even if prepared by or forwarded to counsel. 619 F.Supp. at 1051. A litigant may not hide research, experiments, and tests pertinent to a patent application behind the work product doctrine. 619 F.Supp. at 1051.

_NO. 32 (ABI NO. 31): ALL DOCUMENTS CONCERNING ANY DECISION TO MARKET, LAUNCH, INTRODUCE OR SELL ANY OR ALL WARNER-LAMBERT TEST PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY COMMERCIAL AND/OR TECHNICAL BENEFITS AND/OR IMPROVEMENTS WHICH CONTRIBUTED TO SUCH DECISIONS._

Defendants object to this request as vague, ambiguous, overbroad and unduly burdensome

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
**(Cite as: 1999 WL 1565082 (D.N.J.))**

Page 9

because it requests all documents "concerning" any decision to market, launch, introduce or sell any or all Warner-Lambert test products. Defendants also object to this request as overbroad and unduly burdensome and expensive to the extent it seeks "all" such documents. Defendants further object to this request as not relevant and not reasonably calculated to lead to the discovery of admissible evidence and because it is premature in that it seeks materials unrelated to issues of alleged infringement. ABI objects to this request as duplicative and obtainable from Warner-Lambert.

The Court concludes that this request is overbroad in that it requests information regarding all Warner-Lambert products. Defendants shall produce all non-privileged documents that relate only to the accused products, infringement, and the function/process/operation of the products.

*NO. 34 (ABI NO. 33): WITH RESPECT TO THE PATENTS-IN-SUIT, ALL DOCUMENTS AND THINGS CONCERNING:*
*1. WARNER-LAMBERT' first knowledge thereof and/or of the invention(s) claimed and/or described therein;*
*2. WARNER-LAMBERT's first knowledge of any of the applications or patents in the chain from which the patents-IN-SUIT ISSUED OR CLAIMED PRIORITY;*
*3. WARNER-LAMBERT's first knowledge of any foreign equivalents to the patents-IN-SUIT, AND/OR ANY OF THE APPLICATIONS OR PATENTS IN THE CHAIN FROM WHICH SUCH FOREIGN EQUIVALENT ISSUED AND/OR CLAIMED PRIORITY; AND*
*4. ANY ATTEMPTS BY WARNER-LAMBERT TO "DESIGN AROUND" THE PATENTS-IN-SUIT, ANY OF THEIR FOREIGN EQUIVALENTS, AND/OR ANY OF THE APPLICATIONS OR PATENTS IN THE CHAIN FROM WHICH THE PATENTS-IN-SUIT OR ANY OF THEIR FOREIGN EQUIVALENTS ISSUED OR CLAIMED PRIORITY.*

Defendants object to this request as vague, ambiguous, overbroad and unduly burdensome to the extent it requests all documents and things "concerning" such subject matters. Defendants also object to this request as overbroad and unduly burdensome and expensive to the extent it seeks "all" such documents. Defendants also object to this request as not relevant and not reasonably calculated to lead to the discovery of admissible evidence on the issue of infringement. Further, ABI objects to this

request as unduly burdensome, unreasonably cumulative, duplicative and obtainable from Warner-Lambert.

**\*13** "Copying" is evidence of willful infringement. *Princeton Biochemical, Inc. v. Beckman Indus.,* 180 F.R.D. 254, 258 (D.N.J.1997). When an attempt to copy has occurred, the Court may infer that the copier, usually one of skill in the art, made a copy with insubstantial changes. *Graver Tank,* 339 U.S. at 612. Intent is not an element of infringement.. *Warner Jenkinson Co.,* 520 U.S. at 35-36. Neither the literal infringement or the doctrine of equivalents requires it. 520 U.S. at 35-36. Motive may affect damages, but not liability. *Hilton Davis,* 62 F.3d at 1519.

Although "copying", as well as "designing around", include intent, they bear on obviousness, and the evidence of same is admissible when reviewing the validity of the patent as evidence of nonobviousness. *See, e.g., W.R. Grace & Co.--Conn. v. Intercat,* Inc., 7 F.Supp.2d 425, 464, 475 (D.Del.1997). "A patent may be found invalid for obviousness in accordance with 35 U. S.C. § 103. *W.R. Grace,* 7 F.Supp.2d at 455-56.

Moreover, under the doctrine of equivalents, the "inquiry requires proof of insubstantial differences which may be informed by other factors such as evidence of copying, designing around or evidence that persons reasonably skilled in the art would have known of the interchangeability elements." *Boehringer Ingelheim Animal Health, Inc. v. Schering-Plough Corp.,* 6 F.Supp.2d 324, 329 (1998). The Court should evaluate factors such as copying and designing around if helpful. 6 F.Supp.2d at 331. [FN5]

> FN5. Designing around" may be relevant to the "operability, criticality or scope of the process patent claims," but permitting such discovery creates the possibility of the need to protect one's research activities from improper use by the opposition. *Bristol-Meyers Squibb Co., v. Rhone-Poulenc Rorer, Inc.,* 1996 WL 529046. 2 (S.D.N.Y. Sept. 18, 1996).

The Court finds that the issues pertaining to the knowledge of when defendants became aware of the patents-in-suit are relevant to the issue of infringement. However, they generally shall not be produced because they are primarily important to the determination of willful infringement, not liability.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 10
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
(Cite as: 1999 WL 1565082 (D.N.J.))

*Afros,* 671 F.Supp. at 1439. However, if such documents contain factual information related to the function of the device as may have been discovered during scientific study during the development of the accused products, they shall be produced.

Furthermore, defendants have not set forth in detail their defenses to infringement. To the extent that defendants shall rely on the defense of invalidity due to obviousness, defendants will produce documents related to "copying" and "designing around" in that these are related to the validity of the patents-in-suit. If defendants do not produce such information, they will not be permitted to introduce it as evidence later. Unfortunately, there may be overlap in the production of evidence when a patent case is bifurcated between liability and willfulness/damages. *Princeton Biochemicals, Inc. v. Beckman Instruments, Inc.,* 45 U.S.P.Q.2d 1757, 1761 (1997); *see Avia Group, Int'l v. Nike, Inc.,* 22 U .S.P.Q.2d 1475, 1478 (D.Or.1991) (because willfulness is not relevant to the issue of liability, a request to stay all discovery related to willfulness until after a determination of liability is reasonable).

**\*14** *NO. 35 (ABI NO. 34): WITH RESPECT TO THE PATENTS-IN-SUIT, ALL DOCUMENTS AND THINGS CONCERNING:*

*1. SYBRON'S, ABI'S, AND/OR TRINITY'S FIRST KNOWLEDGE THEREOF OR OF THE INVENTION(S) CLAIMED AND/OR DESCRIBED THEREIN;*

*2. SYBRON'S, ABI'S, AND/OR TRINITY'S FIRST KNOWLEDGE OF ANY OF THE APPLICATIONS OR PATENTS IN THE CHAIN FROM WHICH THE PATENTS-IN-SUIT ISSUED OR CLAIMED PRIORITY;*

*3. SYBRON'S, ABI'S, AND/OR TRINITY'S FIRST KNOWLEDGE OF ANY FOREIGN EQUIVALENTS TO THE PATENTS-IN-SUIT, OR ANY OF THE APPLICATIONS OR PATENTS IN THE CHAIN FROM WHICH SUCH FOREIGN EQUIVALENT ISSUED OR CLAIMED PRIORITY; AND*

*4. ~ANY ATTEMPTS BY SYBRON, ABI, AND/OR TRINITY TO "DESIGN AROUND" THE PATENTS-IN-SUIT, ANY OF THEIR FOREIGN EQUIVALENTS, OR ANY OF THE APPLICATIONS OR PATENTS IN THE CLAIM FROM WHICH THE PATENTS-IN-SUIT OR ANY OF THEIR FOREIGN EQUIVALENTS ISSUED OR CLAIMED PRIORITY.*

See the Court's response to Document Request No. 34.

*NO. 43 (ABI NO. 42): ALL DOCUMENTS CONCERNING ANY COMPARATIVE TEST OR INVESTIGATION CONDUCTED BY OR ON BEHALF OF WARNER-LAMBERT, SYBRON, ABI, AND/OR TRINITY TO DETERMINE WHETHER OR NOT ANY WARNER-LAMBERT TEST PRODUCT IS COVERED BY ANY CLAIM OF THE PATENTS-IN-SUIT.*

On September 30, 1999, the Court ordered Warner-Lambert and ABI/Sybron to produce all comparative testing of Warner-Lambert's test products with Unipath's and/or other third parties' test products. Defendants argue that such comparisons are not relevant to the issue of patent infringement and that it would be reversible error to compare the accused device to Unipath's commercial product or other entities' products. *Zenith Labs., Inc. v. Bristol-Meyers Squibb Co.,* 19 F.3d 1418, 1423 (Fed.Cir.1994), *cert. denied, Bristol-Meyers Squibb Co. v. Zenith Labs.,* 513 U.S. 995, 115 S.Ct. 500, 130 L.Ed.2d 409 (1994) ("it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent"). Alternatively, Unipath argues that this information should be provided, in part, because it supplied Warner-Lambert with comparative product testing information.

Based on the foregoing, the Court will clarify its Order. *See Brooktree Corp. v. Advanced Micro Devices,* 977 F.2d 1555, 1577 (Fed.Cir.1993) ("[d]etermining patent infringement requires examination of the patent claims and a comparison of those claims to the alleged infringing product, not a comparison of the accused product and the patentee's product). Although a court, during claim construction, may not rely on extrinsic evidence to determine the meaning of a disputed term in the patent when it is clear from intrinsic evidence, the court may rely on such evidence when attempting to understand the underlying technology. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1584-85 (Fed.Cir.1996); *see Markman,* 52 F.3d at 980-81 (extrinsic evidence may be used to understand the patent, but cannot vary or contradict the claim). Based on the foregoing, the Court concludes that such documentation may be relevant, but may not be used by the Court in its analysis of the claims as noted above. However, such information may provide Unipath with relevant information or lead to the discovery of admissible evidence. To that extent,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
(Cite as: 1999 WL 1565082 (D.N.J.))

defendants will provide documents relating to comparative testing.

**\*15** *NO. 51: ALL DOCUMENTS AND THINGS THAT WERE RELIED UPON, REFERRED TO, OR OTHERWISE CONSIDERED IN PREPARING WARNER-LAMBERT'S RESPONSES TO ANY OF PLAINTIFF UNIPATH'S FIRST SET OF INTERROGATORIES TO DEFENDANT WARNER-LAMBERT.*

Warner-Lambert objects to this request as overbroad and unduly burdensome and expensive to the extent it seeks "all" such documents. Warner-Lambert also objects to this request as vague, ambiguous, overbroad and unduly burdensome to the extent it requests all documents and things "considered" in preparing Warner-Lambert's responses to interrogatories.

The Court concludes such information may be relevant or could lead to the discovery of admissible evidence, so defendants are required to produce any non-privileged documents.

*PRODUCTION OF ABI'S DOCUMENTS IN SAN DIEGO*

On September 26, 1999, Unipath representatives traveled to San Diego to inspect ABI documents, which allegedly included 32 double-sized banker's boxes of documents related to the product master file and design change records. Defendants contend that this provided full discovery on "every e.p.t.® product of Warner-Lambert since 1997." David Lerner, Letter of Sept. 22, 1999. Because these boxes were in the form of those "in the regular course of business" and allegedly included non-e.p.t.® documents, a paralegal representing ABI acted as gatekeeper. To view a document, Unipath was required to look at a copy of ABI's bill of materials listing of components parts and assembly steps for the e.p . t.® product and incoming specification identification sheets for raw materials. From these documents, Unipath was required to give the paralegal the part or procedure numbers and then the paralegal would retrieve any related documents from the commingled documents. Despite the protective order, defendants only offered 1997 through 1998 documents. Defendants used February 11, 1997 as a cut-off date based on the issue date of the patents-in-suit and barred 1999 documents because their use would affect operations.

By way of their document products, defendants advised the Court that Unipath would "know

everything about [defendants'] product which they can use to compare it to the claims and address the issue of patent infringement. There is nothing else to be known nor to be produced, Your Honor ..." (Proceedings of Sept. 23, 1999, at 4). Moreover, defendants claimed that they would "make documents available to the plaintiff that will tell them exactly how much sugar is in there and what the sugar does. That's what we've done." (Proceedings of Sept. 23, 1999, at 6).

Alternatively, Unipath contends that this procedure did not enable it to conduct a proper document review. Unipath argues that the search was impeded by the fact that only one paralegal at the onset was assisting in preparing the documents for their review. Furthermore, Unipath contends that because of the gatekeeping procedure, it did not have complete access to the documents. Although defendants claim that all documents requested were provided within the boxes monitored by the paralegal, Unipath claims that its representatives could not find them.

**\*16** The Court concludes that the gatekeeper procedure was creative but not effective. Therefore, the documents must be produced in an alternate manner that will offer Unipath a fair opportunity to review all produced documents. Unipath shall not be subjected to the mere chance that some luck will enable it to correctly select a part off an item list that corresponds to all documents that it needs, with the chance that if it errs, it misses relevant documents. With such a procedure, defendants may claim that they "provided" all requested documents to Unipath for its review. Such a tactic is not fair, and the Court will not allow it. Defendants will make arrangement with Unipath for its review of these documents to take place no later than March 1, 2000. Furthermore, defendants will include pre-February 11, 1997 documents as well as responsive 1999 documents.

All parties must respond with information responsive to the requests no later than 30 days from the date hereof. If not, and documentation later appears that was responsive to the request, the parties will not be permitted to use it at trial. The Court also reminds the parties that Rule 26(e) sets forth that they have a duty to supplement the information they provide if they later learn that the response needs correction or if the Court so orders. The new discovery cut-off date is March 31, 2000. I will conduct a status conference at 11:00 a.m. on April 12, 2000.

CONCLUSION

Based on the foregoing, Unipath's motion to compel

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 12
Not Reported in F.Supp.2d, 1999 WL 1565082 (D.N.J.)
**(Cite as: 1999 WL 1565082 (D.N.J.))**

is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

Not Reported in F.Supp.2d, 1999 WL 1565082
(D.N.J.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.                                                                                          Page 1
Not Reported in F.Supp., 1992 WL 58733 (D.Or.), 22 U.S.P.Q.2d 1960
**(Cite as: 1992 WL 58733 (D.Or.))**

**H**

**Motions, Pleadings and Filings**


United States District Court, D. Oregon.
ARMSTRONG MANUFACTURING COMPANY,
an Oregon corporation, Plaintiff,
v.
WRIGHT MACHINE TOOL COMPANY, Inc., an
Oregon corporation, Defendant.
**CIV. No. 91-1021-FR.**

March 20, 1992.
James S. Leigh, Klarquist, Sparkman, Campbell,
Leigh & Whinston, Portland, Oregon, for plaintiff.

Daniel P. Chernoff, Chernoff, Vilhauer, McClung &
Stenzel, Paul R. Duden, Tooze Shenker Holloway &
Duden, Portland, Oregon, for defendant.

OPINION AND ORDER

FRYE, District Judge:

*1 The matter before the court is defendant's motion
for bifurcation of liability and damages issues (# 49).

Plaintiff, Armstrong Manufacturing Company
(Armstrong), brings this action against defendant,
Wright Machine Tool Company, Inc. (Wright),
charging infringement of two patents owned by
Armstrong.

Wright moves the court, pursuant to Rule 42(b) of
the Federal Rules of Civil Procedure, for an order
bifurcating, for purposes of further discovery and for
trial, the issues of liability and damages.

The court has reviewed the materials submitted by
Wright and by Armstrong and finds that it would
further the interests of justice and judicial economy
to bifurcate the issues of liability and damages for
trial. There is some evidence, however, that is
relevant to both issues. Therefore, the court will
schedule the trial so that both issues be tried to the
same jury.

Wright's motion for bifurcation of liability and
damages issues (# 49) is GRANTED as to trial and
DENIED as to discovery. A two-stage trial will be

scheduled in this case. In the first phase of the trial,
the issue of liability will be tried to the jury. In the
second phase of the trial, any relevant damages issues
will be resolved by the same jury. The second phase
of the trial will be scheduled to begin two weeks after
the conclusion of the first phase of the trial.

IT IS SO ORDERED.

Not Reported in F.Supp., 1992 WL 58733 (D.Or.),
22 U.S.P.Q.2d 1960

**Motions, Pleadings and Filings (Back to top)**

• 3:91cv01021 (Docket) (Oct. 01, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.                                                                  Page 1
Not Reported in F.Supp., 1993 WL 761974 (W.D.Mich.), 32 U.S.P.Q.2d 1365
**(Cite as: 1993 WL 761974 (W.D.Mich.))**

**H**

Motions, Pleadings and Filings

United States District Court, W.D. Michigan.
HAWORTH, INC., Plaintiff,
v.
HERMAN MILLER, INC., Defendant.
**No. 1:92 CV 877.**

July 20, 1993.

*OPINION*

ROWLAND, United States Magistrate Judge.

**\*1** This matter comes before the Court on *Defendant Herman Miller's Motion For Separate Trials On Liability, Damages and Willfulness, And For A Stay Of Discovery On The Issue Of Willfulness,* filed January 25, 1993 (dkt. # 139). By its motion, defendant seeks to have separate trials to the same jury on the issues of liability and, if necessary, damages, and thereafter to the bench on the issue of the willfulness of defendant's alleged patent infringement. Uncharacteristically, both parties agree that trial in this matter should be separated in some fashion. However, they differ greatly in their positions on how the trial should be separated, as well as the method of conducting discovery in this case. Based upon my review of both party's arguments, I conclude that defendant's motion shall be granted in part. There shall be separate trials on the issues of liability and damages. Furthermore, defendant's affirmative defenses of laches and estoppel shall be tried in the liability phase, as will plaintiff's claim that defendant's alleged actions of infringing plaintiff's patents were willful. Defendant's request that discovery be stayed on the issue of willfulness shall be denied. Finally, discovery shall be stayed on the issue of damages until such time as defendant's liability is determined.

Plaintiff filed suit against defendant, alleging that defendant has infringed plaintiff's patents. Plaintiff also seeks treble damages, alleging defendant's patent infringement was willful. On January 29, 1992, defendant answered plaintiff's complaint asserting *inter alia* as affirmative defenses invalidity, non-infringement, laches, and estoppel. In their briefs,

both parties point out the extensive amount of time which will be involved not only to conduct discovery, but to try this case as well. Plaintiff asserts compensatory damages may exceed $300 million, and that this phase of the litigation very well could consume the most time and money. The argument in favor of separating trial and discovery on the issues of liability and damages is strong.

A district court has authority, in order to further convenience to the parties, to avoid prejudice, or to achieve expedition and economy, to order separate trials on issues or claims. Fed.R.Civ.P. 42(b). A decision to order separate trial is left to the sound discretion of the court, to be exercised in light of the need to avoid prejudice to the party, to expedite the litigation, economy of judicial administration, and dissimilarity of the issues. *In re Benedectin Litigation,* 857 F.2d 290, 307 (6th Cir.1988), *cert. denied,* 488 U.S. 1006 (1989).

**\*2** I shall briefly summarize both party's respective positions. They both propose a three-stage procedure for the trial of this case, with the result that discovery also would take place in stages. Defendant proposes that stage one would consist of trial on the liability issues only, including resolution of the equitable defenses of laches and estoppel. At stage two, trial would be had to the same jury on the issues of damages. At stage three, trial would be to the bench on the issue of the willfulness of defendant's alleged infringement. Under defendant's proposed separation of trials, discovery would proceed on the issue of plaintiff's damages as well as liability, but would be stayed on the issue of willfulness until liability should be ascertained. Defendant asserts this would produce economy to both the court and the litigants, while at the same time preserving its attorney-client privilege.

Plaintiff proposes that at stage one trial be conducted on the issue of liability alone, but should not include a resolution of defendant's equitable defenses of laches and estoppel. Plaintiff proposes a stay on damages discovery until the threshold issue of liability is determined. Plaintiff proposes that at stage two trial be conducted with a second jury after a sufficient amount of time has been allowed to conduct discovery. Plaintiff proposes that at stage three, trial be conducted to the bench on the equitable defenses of laches and estoppel as well as defendant's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 2
Not Reported in F.Supp., 1993 WL 761974 (W.D.Mich.), 32 U.S.P.Q.2d 1365
(Cite as: 1993 WL 761974 (W.D.Mich.))

alleged willfulness in infringing plaintiff's patents.

While I find great merit in separating trial on the liability and damages issues in this case, it appears to me the respective positions of both litigants are not being taken solely for the salutary goal of relieving the burden on the court as well as themselves, but instead are being taken for tactical advantages. For example, defendant's proposal to conduct damage discovery at the same time as liability discovery makes little sense if the issues are to be tried separately. Let's assume defendant prevails on the issue of liability. Trial on the issue of damages would be unnecessary. However, all the discovery conducted on the issue of damages will have been unnecessary if this scenario comes to pass. Plaintiff asserts that discovery and trial on the damages issue will consume the majority of the litigants' as well as the court's time. Defendant does not dispute this. Defendant asserts that plaintiff's position is merely another way of delaying ultimate resolution of this case. I harbor no doubts that defendant would prefer to have this case concluded. However, conducting damages discovery at the same time as liability discovery, especially in light of the uncontroverted representation that damage discovery will constitute the bulk of the discovery which needs to be conducted, merely serves to delay the potential resolution of this case.

If it is to prevail on the issue of liability, the sooner it can do so the better for defendant. However, conducting damages discovery and preparing for trial on this issue, to be presented to the same jury that will determine liability, will slow down the process and delay resolution of the issue of liability. Both litigants have demonstrated an uncanny propensity to generate pre-trial issues which slow down the process of preparing to resolve their substantive disputes. Removing damage discovery from their arena of contention shall assist in streamlining this case, potentially leading to cost savings for both parties as well as a speedier determination of their correlative rights and liabilities. Therefore, it is in the best interest of both parties as well as of the court that the issues of liability and damages be separated both for trial and discovery.

*3 Plaintiff's position is equally as inconsistent. At the same time plaintiff argues that it makes sense to delay damage discovery because of the time, effort, and money which would be involved, it proposes to delay trial of defendant's equitable defenses of estoppel and laches until after liability would otherwise be established and damages assessed. In effect, plaintiff requests that the liability aspect of this case be bifurcated to both prior to and after an assessment of damages. Under this scenario, it is quite possible the jury could find plaintiff's patents valid and that defendant infringed them, could fix and assess damages, but at stage three it could be determined the defenses of laches or estoppel would bar plaintiff's right to recover. If this scenario came to fruition, a tremendous amount of litigant time and money, as well as court and jury time, would have been consumed for no legitimate purpose.

Plaintiff asserts that the laches and estoppel defenses should be tried at the same time the issue of defendant's willfulness is determined, and this is why the two defenses should be considered at stage three of the process. Defendant asserts there is no correlation between the defenses of laches and estoppel and the resolution of the willfulness of its alleged patent infringements. I find plaintiff has the better of the argument, but because all three: laches, estoppel, and willfulness all relate to defendant's liability or lack thereof instead of an assessment of damages, I conclude all three issues should be determined at the liability stage of a two-step separate trial.

Recently, the Federal Circuit Court of Appeals set forth the elements and analysis of the equitable defenses of laches and estoppel in patent litigation in the case of *A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020 (Fed.Cir.1992)*. To establish the defense of laches, the alleged infringer must show the patentee's delay in bringing suit was unreasonable and inexcusable, and that the alleged infringer suffered material prejudice attributable to this delay. *Id.* at 1028. Laches operates as a defense against damages for infringement up to the date of filing suit. *Id.* On the other hand, equitable estoppel may operate to bar an entire claim for damages. In order to establish the defense of equitable estoppel, the alleged infringer must show that through misleading conduct the patentee led the infringer to reasonably infer the patentee did not intend to enforce its patent against the infringer; the alleged infringer relied on the patentee's conduct; and that due to its reliance, the infringer would be materially prejudiced if the patentee was allowed to proceed with its claim. *Id.* Even though the alleged infringer might be able to establish the equitable defenses of laches and estoppel, this defense by the infringer may be defeated by the patentee if it can show the infringer "has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor." *Id.* at 1033 (quoting *Bott v. Four Star Corp.,*

Not Reported in F.Supp.                                                                                      Page 3
Not Reported in F.Supp., 1993 WL 761974 (W.D.Mich.), 32 U.S.P.Q.2d 1365
(Cite as: 1993 WL 761974 (W.D.Mich.))

807 F.2d 1567, 1576 (Fed.Cir.1986)). "Conscious copying may be such a factor weighing against the defendant, whereas ignorance or a good faith belief in the merits of a defense may tilt matters in its favor." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d at 1033.

*4 In this case, defendant is asserting the defenses of laches and estoppel, claiming plaintiff knew of defendant's actions which allegedly infringed plaintiff's patents in suit for numerous years, yet failed to timely assert claims for patent infringement. On the other hand, plaintiff is asserting that defendant was aware that its patents were valid and enforceable, especially in light of the *Haworth v. Steelcase* litigation which still is pending in this court, that defendant had an obligation to investigate the validity and enforceability of these patents, and therefore defendant's actions constituted a willful infringement of plaintiff's patents. A determination of willfulness includes assessment of factors such as whether the infringer deliberately copied the ideas or designs of the patentee, whether the infringer investigated the scope of the patent and informed a good faith belief it was valid or it was not infringed, and the behavior of the infringer as a party to the litigation. *Bott v. Four Star Corp.*, 807 F.2d at 1572. Where a potential infringer has actual notice of a patentee's patent rights, that potential infringer has an affirmative duty to exercise due care to determine whether or not its actions infringe that patent. *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389 (Fed.Cir.1983). This affirmative duty includes an obligation to seek and obtain competent legal advice from counsel prior to the initiation of any possible infringing activity. *Id.* at 1390.

In light of the foregoing, the issues of laches, estoppel, and willfulness are intertwined with common factual determinations. Defendant may be able to establish the defenses of laches or estoppel, yet its actions could be egregious enough that plaintiff would still prevail. It could be determined that defendant's patent counsel informed defendant that plaintiff's patents were valid and enforceable, and that defendant's actions infringed plaintiff's patents in suit. It also could be established that defendant failed to seek competent legal advice regarding the validity and enforceability of plaintiff's patents as well as whether defendant's products infringed plaintiff's patents. Moreover, defendant might be asserting that in the defense of equitable estoppel, it relied on plaintiff's failure to assert infringement of its patents in suit, while plaintiff may show that defendant actually was relying on legal

advice instead of plaintiff's failure to assert the infringement of its patents in suit for a significant amount of time. *Southwire Co. v. Essex Group, Inc.*, 570 F.Supp. 643, 649 (N.D.Ill.1983). In fact, it would be unfair to plaintiff to allow defendant to proceed on the equitable defenses of laches and estoppel while at the same time impeding plaintiff in its ability to show that defendant's actions were sufficiently egregious to negate these defenses.

The final issue for resolution is whether there should be a stay on discovery concerning the issue of willfulness. Defendant asserts that discovery on issues of its willfulness will necessarily require discovery of material protected by the attorney-client privilege. In light of the foregoing discussion, it clearly appears that discovery of communications between attorney and client in a patent case is necessary to ascertain whether defendant's actions, if they are construed to infringe plaintiff's patent in suit, was willful, thereby justifying treble damages. Moreover, by asserting the defense of equitable estoppel, defendant has interjected the issue of its reliance on plaintiff's actions in failing to assert its patents were infringed. In doing so, defendant opened up the door to discovery of its own patent counsel so that plaintiff can discover whether in fact defendant relied on advice from its patent counsel instead of plaintiff's failure to assert patent infringement for an extensive amount of time. *Id.*

*5 Defendant asserts that the decision in *Southwire* does not apply, because courts only have compelled the waiver of the attorney-client privilege where the party asserting the privilege attempts to rely on the privileged documents. Defendant's argument is disposed of by the express language used by the Northern District of Illinois in *Southwire*. "What Essex is arguing here is that Southwire is not entitled to prove what Essex actually relied on, even though the court should be entitled to infer actual reliance from Essex's own proof. The unfairness of Essex's position is manifest.... In effect, Essex is saying, 'we can say we relied on our lawyers, but you can't.' " *Id.* at 649. By its answer to plaintiff's complaint, defendant asserted the affirmative defenses of laches and estoppel. In its joint preliminary statement and scheduling order filed with the court in the Northern District of Georgia, defendant identified the issues to be tried as including whether plaintiff's cause of action was barred or limited by the doctrines of laches or estoppel (dkt. # 27 at p. 2). By doing so, defendant has interjected into this case the issue of whether its actions were egregious to the point that plaintiff would not be barred by the defenses of

Not Reported in F.Supp.                                                                                 Page 4
Not Reported in F.Supp., 1993 WL 761974 (W.D.Mich.), 32 U.S.P.Q.2d 1365
**(Cite as: 1993 WL 761974 (W.D.Mich.))**

laches or estoppel from recovering damages, or
whether defendant's actions constituted a willful
infringement of plaintiff's patents, entitling plaintiff
to treble damages. Therefore, defendant's request for
a stay of discovery on the issue of willfulness shall be
denied.

In summary, trial in this matter shall be separated on
the issues of liability and damages. The liability
aspect of the trial shall include a determination of
defendant's defenses of laches and estoppel, as well
as the resolution of whether defendant willfully
infringed plaintiff's patents in suit. Discovery shall
be conducted on all of these issues. If necessary, a
later trial shall be conducted on the issue of plaintiff's
damages. Discovery on damages shall be stayed
until after resolution of defendant's liability is
established.

*ORDER*

**\*1** In accordance with the Opinion entered this date:

IT IS HEREBY ORDERED that *Defendant's Motion
For Separate Trials On Liability, Damages And
Willfulness And For A Stay Of Discovery On The
Issue Of Willfulness,* filed January 25, 1993 (dkt. #
139), is granted in part and denied in part. Separate
trials shall be conducted on the issues of defendant's
liability and plaintiff's damages, if necessary.
Included in the liability phase of the trial shall be
resolution of defendant's equitable defenses of
estoppel and laches, as well as whether defendant
willfully infringed plaintiff's patents in suit.

IT IS FURTHER ORDERED that *Defendant's
Motion For Stay Of Discovery On The Issue Of
Willfulness* is denied.

IT IS FURTHER ORDERED that discovery as to
plaintiff's damages shall be stayed until after the issue
of defendant's liability is determined at trial.

Not Reported in F.Supp., 1993 WL 761974
(W.D.Mich.), 32 U.S.P.Q.2d 1365

**Motions, Pleadings and Filings (Back to top)**

• 1:92cv00877 (Docket) (Dec. 17, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1991 WL 16494 (D.N.J.), 17 U.S.P.Q.2d 1149
**(Cite as: 1991 WL 16494 (D.N.J.))**

c

**Motions, Pleadings and Filings**


United States District Court, D. New Jersey.
Donna Mae MELLON, Plaintiff,
v.
BEECHAM GROUP PLC, et al., Defendants.
**Civ. No. 86-2179(HAR).**

Jan. 3, 1990.
Goldstein, Till, Lite & Reiken by Allyn Lite, and
Kenyon & Kenyon by Thomas Creel, for plaintiff.

Hopgood, Calimafde, Kalil, Blaustein & Judlowe by
Paul H. Blaustein,  Jesse Reingold, and  Eve Kunen,
for defendant Beecham.

OPINION

ACKERMAN, District Judge.

**\*1** THE COURT:  May I have the appearances,
please.

MR. CREEL:  For Mellon, Thomas Creel.

MR. LITE:  Allyn Lite for the plaintiff.

MR. BLAUSTEIN:  For Beecham, Paul Blaustein.

MR. REINGOLD:  Jesse Reingold.

THE COURT:  I've had the pleasure of meeting you
before, Mr. Blaustein.

MR. REINGOLD:  Jesse Reingold.

THE COURT:  I've had the pleasure of meeting you
as well.

MS. KUNEN:  Eve Kunen.

THE COURT:  My pleasure also.

Now, we have two appeals from Magistrate Chesler.
Each side is unhappy.

I've read all the papers.   I'm ready to decide the
matter.

Is there anything you haven't said in the papers in
this very voluminous case which has been going on
and on and on that you wish to tell me now?

MR. BLAUSTEIN:  Your Honor, we've said in our
papers our position.

THE COURT:  I know you have.  I've read them.

MR. BLAUSTEIN:  I'm not going--I have nothing
else to add, unless you have any questions.

THE COURT:  I don't.

Mr. Creel?

MR. CREEL:  Your Honor, I have, as Mr. Blaustein
does on this.  I do call your attention to one case that
was cited in our reply brief on the bifurcation
question.

THE COURT:  The Brad Regan case?

MR. CREEL:  The Sherry case, that indicates that
the question of wilful infringement is tried to the
jury, not to the judge.

THE COURT:  Thank you.

This is an appeal of Magistrate Chesler's order, dated
September 29, 1989.

The order concerned two matters:  Plaintiff Mellon's
motion to compel defendants Beecham Group P.L.C.
and Beecham, Inc. (Beecham) to produce certain
privileged documents and defendants' motion to
bifurcate the liability and damages phases of
discovery and trial.   The order in question granted
both motions (the motion to compel the production of
documents only in part) and each side herein appeals.

In this suit, plaintiff Mellon asserts that defendants
Beecham Group P.L.C. and Beecham, Inc. have
infringed a patent belonging to her late husband;  this
patent is known as the Lewellen invention and
concerns a method for suspending two high-yield
gels of similar rheological properties in a single
medium.   The plaintiff asserts that the defendants'
product known as Aqua-Fresh infringes upon the
Lewellen patent.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 2
Not Reported in F.Supp., 1991 WL 16494 (D.N.J.), 17 U.S.P.Q.2d 1149
(Cite as: 1991 WL 16494 (D.N.J.))

In response to plaintiff's claims of patent infringement, the defendant has asserted that the plaintiff's patent is invalid based upon prior art, as well as the affirmative defenses of laches and estoppel.

The order being disputed today reads as follows:

1. Discovery and trial shall be bifurcated as follows:

"First, only the liability issues, i.e., validity, infringement, laches and enforceability shall be discovered and tried;

"Second, in the event plaintiff is successful in establishing liability, the damage issues shall be discovered and tried.    B.    The issue of wilful infringement shall be decided following the trial on liability, as part of the damages trial.  2.A.  Plaintiff's request for production of defendants' withheld documents is granted for all documents which are dated prior to March 7, 1984 and;

*2 "1. which are communications from counsel and patent agents to either defendant and are communications from either defendant to counsel or patent agents and which mention William B. Lewellen, his widow, his patent or patent applications and/or samples sent by Mr. Lewellen to Beecham;  or

"2. which are documents that reflect or memorialize discussions or communications between either defendant and their counsel or patent agents relating to William Lewellen, his widow, his patent or patent applications and/or samples sent by Mr. Lewellen to Beecham;

"3. which are internal documents of either defendant, including documents generated by inside counsel of either defendant, including to William Lewellen, his widow, his patent or patent applications and/or samples sent by Mr. Lewellen to Beecham.

"B. Plaintiff's motion is denied.   As to all other documents identified in plaintiff's motion to compel is denied covered by the attorney-client privilege."

The plaintiff argues that in asserting the defenses of laches and estoppel, the defendant has waived any possible privilege concerning documents that would tend to show what exactly the defendant was relying on in making their determination that Aqua-Fresh did not infringe upon the Lewellen invention.

Thus, documents that relate to, e.g., the advice of counsel concerning the legality of patenting and marketing Aqua-Fresh without first obtaining the rights to the Lewellen patent would tend to disprove defendants' claim that they relied on plaintiff's inactivity:  The showing which is necessary for the defense of laches.

In turn, defendants argue that they relied on "objective facts";  hence, the test of estoppel can be determined without reference to defendants' "subjective beliefs" based upon the opinions of counsel.

The defendant asserts that it relied upon the advice of counsel concerning the patentability of its own product, (see Beecham's responses to Interrogatories 19 and 20), and that, therefore, this material, if discoverable at all, is only discoverable during the damages phase of the trial insofar as it speaks to the question of wilful infringement.

The parties have characterized the dispute here as centering on the two different views of the applicable law expressed in *Southwire Co. v. Essex Group, Inc.*, 570 F.Supp. 643 (N.D.Ill.1983) and *A.C. Aukerman Co. v. Miller Formless Co., Inc.*, 693 F.2d 687 (7th Cir.1982).

Different, who has asserted that there is a conflict between these two cases, urges this Court to follow *Aukerman.*  Plaintiff has suggested that the two cases do not conflict as much as they rely upon different factual predicates. The parties' own research as well as that of this Court reveals that these two cases are the only two cases directly on point.   A brief review, however, of the nature of the attorney-client privilege is in order.

The attorney-client privilege imports that a confidential communication between attorney and client will be kept confidential when its discovery is sought.    This privilege "foster[s] disclosure and communication between the attorney and client." *United States v. Fisher,* 692 F.Supp. 488, 490 (E.D.Pa.1988) (*quoting In re Grand Jury, Investigation,* 599 F.2d 1224, 1235 (3d Cir.1979)), *appeal dism'd,* 871 F.2d 444 (3d Cir.1989).

*3 The burden of proving that the privilege exists is on the party asserting the privilege, see, e.g., *In re Bevill, Bressler & Schulman Asset Management Corp.,* 805 F.2d 120, 126 (3d Cir.1986);  *United States v. Martin,* 773 F.2d 579, 584 (4th Cir.1985), because the privilege "stand[s] in derogation of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1991 WL 16494 (D.N.J.), 17 U.S.P.Q.2d 1149
(Cite as: 1991 WL 16494 (D.N.J.))

search for truth and must therefore be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.' " *See* Fisher, 692 F.Supp. at 490 and cites therein.

If the communication is disclosed to third parties, then the protection which the privilege provides vanishes. *E.g.,* Hercules, Inc. v. Exxon Corp., 434 F.Supp. 136, 156 (D.Del.1977) ("The privilege or immunity has been found to be waived only if the facts relevant to a particular, narrow subject matter have been disclosed in circumstances in which it would be unfair to deny the other part an opportunity to discover other relevant facts with respect to that subject matter").

Clients waive the attorney-client privilege by deliberately injecting into the litigation the advice which the clients received from counsel. *See* Smith v. Alyeska Pipeline Serv., 538 F.Supp. 977, 979 (D.Del.1982), *aff'd mem.,* 758 F.2d 668 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1066 (1985).

Similarly, the "advice of counsel" exception to the privilege states that where a party asserts as an essential element of their defense that it relied upon the advice of counsel, that party waives the privilege regarding communications pertaining to that advice. *See, e.g.,* Painter v. Marshall Field & Co., 80 F.R.D. 718, 721 (N.D.Ill.1978).

Under Federal Rule of Civil Procedure 26(b)(1), to be discoverable information must be "relevant to the subject matter involved in the pending application." Moreover, the information sought must pass the threshold of relevancy by relating to an issue that the party seeking the privilege has raised. *See* Barr Marine Products Co., Inc. v. Borg-Warner Corp., 84 F.R.D. 631 (E.D.Pa.1979).

The crux of the disagreement between the two cases relevant here is whether or not the defenses of laches and estoppel require an inquiry into defendants' state of mind or behavioral predicates.

To prove estoppel, defendants must show four elements: (1) that plaintiff unreasonably and inexcusably delayed enforcement of its rights; (2) that the delay prejudiced the defendant; (3) that the plaintiff's affirmative conduct induced the belief that plaintiff had abandoned its claims against defendants; and (4) that defendants relied on plaintiff's actions to their detriment. *See, e.g.,* Continental Coatings Corp. v. Metco, Inc., 464 F.2d (7th Cir.1972); *Aukerman, supra.*

The first two elements, i.e., the plaintiff's delay in enforcing his rights and the defendants' consequential prejudice is a sufficient showing for the defense of laches. The *Southwire* court reasoned that by asserting laches and estoppel, the defendant implicitly asserts that defendant was not relying upon the advice of counsel. Moreover, this somewhat narrow holding supports the conclusion that a defendants' state of mind is discoverable whenever that state of mind is inserted by the defendant into the litigation.

**\*4** The defendants argue that to follow *Southwire* is erroneous, and that this Court should find that Magistrate Chesler erred in following the *Southwire* precedent, as opposed to that of *Auckerman.* Defendant's further argue that Magistrate Chesler's presumption, per *Southwire,* that either defendant relied upon the advice of counsel or it relied upon the plaintiff's delay is implausible.

In reality, defendants argue a cautious and prudent client will seek both the advice of counsel and wait "until a substantial period of time passes" before engaging in the allegedly infringing activity. Thus, defendants argue that their laches defense does not *a fortiori* preclude reliance on counsel. Defendants further allege that if the logic of the *Southwire* Court were followed, no manufacturer could ever raise an estoppel defense without first disclosing counsel's opinions.

*The Standard Of Review*

This Court has appellate over a magistrate's nondispositive order pursuant to ?? U.S.C. Section 636(b)(1)(A), Federal Rule of Civil Procedure 72(a) and Rule 40(a) of the local rules of the United States District Court for the District of New Jersey.

Under Third Circuit law, I can set aside a magistrate's decision under Section 636(b)(1)(A) only if it is found to be "clearly erroneous or contrary to law." Cippollone v. Liggett and Group, Inc., 785 F.2d 1108, 1113 (3d Cir.1986)

The United States Supreme Court has stated "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395 (1948).

Bearing that standard in mind, let me now turn to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 4
Not Reported in F.Supp., 1991 WL 16494 (D.N.J.), 17 U.S.P.Q.2d 1149
**(Cite as: 1991 WL 16494 (D.N.J.))**

Magistrate Chesler's order.

In deciding to compel the defendants to produce those documents which related to the Lewellen patent, Magistrate Chesler found that, "The basic analysis of whether or not the attorney-client privilege has been waived is whether or not you're trying to use the privilege as a shield or as a sword.... When you assert estoppel, you cannot assert that as a defense with one hand and then with the other hand say ... you can't explore our subjective intent.... You're not permitted to do that because you put the subjective intent affirmatively in issue, and you will not be permitted to pick and choose your proofs." Transcript at Page 8.

Moreover, Magistrate Chesler found that, "[b]y asserting estoppel and laches as a defense to liability and also asserting reasonable reliance on the advice of counsel to the wilful infringement claim ... (the defendants have set up) defenses which raise a sufficient hint of inconsistency to warrant permitting plaintiff to fully explore (defendants') defenses." Transcript at Page 14.

In determining that *Southwire* established the parameters under which discovery of this material may be ordered, the Magistrate held that, "*Southwire* does not just deal with wilful infringement.   It says the estoppel defense also ends up constituting a waiver in part.   It holds that there is a full waiver under the facts of this case where you set up inconsistent defenses....   The law is that where you affirmatively inject an issue into the suit in such a manner that those communications then become indeed the most relevant evidence on the issue, but then seek to preclude discovery of it, you're using the privilege as a sword rather than a shield." Transcript at Pages 16 and 19.

**\*5** As the defendants' reply brief indicates, the narrow question currently before the Court is whether this Court should follow *Southwire* or *Aukerman*, given the absence of applicable Third Circuit or Federal Circuit law.   The parties agree, and it is indeed indisputable that if Magistrate Chesler correctly apprehended the state of the law, the facts in this case warrant the result reached in the proceedings below.

Let me begin by noting that the *Southwire* Court did not perceive *Aukerman* to stand in firm opposition to the proposition that a subjective inquiry into the defendant's state of mind is justified in certain circumstances.   In this regard, the *Southwire* Court

noted the following passage in *Aukerman*, "This case can and should be decided on the existing record which excluded defendant's internal thinking, even if we assume that in some other litigation the internal position of the accused infringer might be relevant and discoverable."    *Southwire*, at 648 *citing Aukerman* at 702.

In *Aukerman*, the plaintiff brought suit against another alleged infringer.    While that suit was pending, the plaintiff conducted license negotiations with the defendant at issue.   Moreover, the patentee had given notice that infringement had occurred, threatened enforcement and "proceeded with an extended period of nonenforcement."    *Aukerman* at 701.

Given the totality of the circumstances, the Court felt that plaintiff's affirmative conduct was such that an alleged infringer could reasonably infer that the claim against it had been abandoned. *Id.*

Finally, the district court denied the plaintiff's motion to compel the production of the attorney-client documents because this, "belated motion came nine months after defendant asserted its claims of privilege and four months after defendant's motion for summary judgment had been filed and after briefs had been submitted on that motion." *Id.* at 702.

I think it also worth noting that this Appellate Court was determining whether or not lower court had abused its discretion in denying the discovery requested;  thus the Court was obligated to give the district court all of the appropriate difference due to a trial court making a discretionary determination.

*Aukerman* deals with a unique set of factual circumstances, distinguishable from those before this Court, or the *Southwire* Court.   Here, like *Southwire* and unlike *Aukerman*, the defendant has asserted that it relied upon the advice of counsel in making its defense to a claim of wilful infringements.

As Magistrate Chesler correctly points out, the inconsistency between the two defenses entitles the plaintiff to limited discovery on the advice of counsel, otherwise the defendant would be using the privilege as a sword rather than a shield.    As the *Southwire* court noted in support of its decision to order production, "Here, in contrast to *Aukerman*, the record does contain some support for *Southwire's* contention that Essex relied on its patent attorneys and not *Southwire's* inaction." *Southwire*, at Page 648.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 5
Not Reported in F.Supp., 1991 WL 16494 (D.N.J.), 17 U.S.P.Q.2d 1149
**(Cite as: 1991 WL 16494 (D.N.J.))**

*6 The *Southwire* Court noted, "If *Southwire* has evidence that Essex actually relied on something other than *Southwire's* actions or silence, that serves to undercut the inference that Essex seeks to have drawn from its "objective evidence." *Id.*.

The *Southwire* court correctly perceived that estoppel in general has been construed so as to include questions concerning the defendant's state of mind. *See,* in this regard, *Naxon Telesign Corp. v. Bunker Ramo Corp., 686 F.2d 1258 (7th Cir.1982),* in which the court referred to the following definition of estoppel, derived from the United States Supreme Court in *Dickerson v. Colgrove,* 100 U.S. 578, 580 (1879): "He who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted." *Naxon,* at 1263, n. 8. *See also, Minnesota Mining and Mfg. Co. v. Berwick Industries, Inc.,* 373 F.Supp. 851, 869 (D.N.J.1973).

The dual showing in *Southwire,* i.e., that the defendant raised the estoppel defense and that the defendant used its patent counsel's opinions to prove reliance upon those opinions in connection with another issue in the case, applies with equal force here. Moreover, this Court agrees with the plaintiff and the *Southwire* Court in holding that *Aukerman* does not truly stand for the proposition that a defendant's state of mind is never an issue in the context of an estoppel defense.

The defendant here has deliberately injected its state of mind into the litigation by asserting that it relied upon the advice of counsel. Under the applicable law governing waiver of privilege, I find that the defendant has, by its own litigation and prelitigation behavior, waived any possible privilege concerning advice of counsel referring to the Lewellen patent.

Based on the foregoing, I find that Magistrate Chesler correctly formulated the applicable law, and hereby affirm his order compelling the production of certain privileged documents.

Let me now turn to the Magistrate's order concerning the bifurcation of the damages and liability phases of trial and discovery, which plaintiff Melon is appealing.

In urging that this Court overturn the Magistrate's order. The plaintiff alleges that there are new facts before this Court which the Magistrate did not consider. Specifically, plaintiff's counsel agreed to defer deposing trial counsel, so as to avoid the issues of possible disqualification of trial counsel. The plaintiff suggests that discovery should therefore proceed with the caveat noted above, even if the actual trial is bifurcated.

The other "new" factor is the representation by plaintiff's counsel that the plaintiff had sought to settle the litigation, only to discover that the parties had radically different views. The plaintiff urges that at the least, discovery on damages will facilitate settlement since treble damages are allowable upon a showing of wilful infringement.

*7 In support of their motion for a bifurcated trial and for a stay on discovery pending the completion of the original trial, the defendants advanced several arguments:

First, the issues in this case are complex and severance will aid the jury and result in substantial savings in both economy and time for the Court and the parties; second, the issue of damages is necessarily complex and time consuming; and third, it is typical for patent cases to proceed in a severed fashion.

The defendants further averred that bifurcation will not violate the defendants' right to a trial by jury. In response, the plaintiff suggests that the prejudice to her cause will be manifest, due to the advanced age of some of the witnesses as well as the fact they are located in England and that the plaintiff will, therefore, incur additional, needless expense were discovery to be bifurcated.

The plaintiff suggests that the parties in this litigation already engaged in considerable wrangling over whether or not discovery should proceed in a given deposition and that Magistrate Chesler's decision will aggravate this situation.

The plaintiff expressed concern that bifurcation will entail further confusion over specific deposition questions or document requests. The plaintiff also maintains that there is nothing inherently complex about damages in this case, that in fact any discovery concerning damages will cover the same witnesses deposed during the liability phase and that Beecham's sales and profit data are relevant both to a determination of validity and of wilful infringement.

Finally, the plaintiff argues that the defendant has the burden of proof and that the defendant has not put

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 6
Not Reported in F.Supp., 1991 WL 16494 (D.N.J.), 17 U.S.P.Q.2d 1149
**(Cite as: 1991 WL 16494 (D.N.J.))**

forth specific reasons justifying bifurcation. As noted before, under 28 U.S.C. Section 636(b)(1)(A), I may reconsider the Magistrate's orders if they are "clearly erroneous or contrary to law." Decisions on discovery matters are left to the sound discretion of the judge. *See* 8 Wright & Miller, *Civil Practice and Procedure,* Section 2040.

Accordingly, only if the Magistrate's orders constituted an abuse of discretion, may I reconsider them. I may not substitute my judgment for that of the Magistrate because the test is not whether I would have ruled the same way in the first instance. Nonetheless, I must examine the basis of the Magistrate's exercise of discretion.

The Third Circuit has noted in an analogous context that there is the equivalent of an abuse of discretion "if the trial court has not held the defendants to their proper burden or has clearly erred in weighing the factors to be considered." *See Reyno v. Piper Aircraft Co., 630 F.2d 149, 160 (3d Cir.1980), rev'd on other grounds, 70 L.Ed.2d 419 (1982) (forum non conveniens* discretionary determination).

Similarly, Judge Wisdom, in his dissent in *In re Unterweser Reederei, GMBH, 428 F.2d 888 (5th Cir.1970), rev'd sub nom., M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972)* commented "It is truism that we do not observe an exercise of discretion that was misled by an erroneous view of the law." 428 F.2d at 907.

**\*8** I also should add, as I stated earlier and I want to repeat, from the *Gypsum* case, *supra,* that a finding is clearly erroneous, although there is evidence to support it, the reviewing court, to the entire evidence, is left with the definite and firm conviction that a mistake has been committed.

I believe that the Magistrate erred in making the decision that he did, in making a mistake. I first note that Rule 42(b) of the Federal Rules of Civil Procedure specifically provides the district court with discretion to separate issues for trial in furtherance of convenience, or to avoid prejudice, or when separate trials will be conducive to expedition or economy.

It should be noted, at the outset, that back in April of 1988, in declining to bifurcate this same trial along the validity and infringement lines, I specifically noted that a piecemeal trial on separate issues involved in one suit is not necessarily in the interest of swift, economical and nonprejudicial justice. *See* Wright and A. Miller, *Federal Practice and*

*Procedure,* Section 2388 at 279, 283; *H.B. Fuller Co. v. National Starch & Chemical Corp., 595 F.Supp. 622, 625 (D.Del.1984).*

Whenever a separation would involve similar witnesses and evidence, the proceedings would be duplicative and any time savings would be speculative. *See Reliable Volkswagen Sales & Services C. v. Worldwide Auto Corp., 34 F.R.D. 134, 138 (D.N.J.1963).*

The parties seeking bifurcation has the burden of showing that bifurcation is proper in light of the general principle that a single trial tends to lessen the delay, expense and inconvenience to all parties. *See McRae v. Pittsburgh Corning Corp., 97 F.R.D. 490, 492 (E.D.Pa.1983).*

While my findings concerning infringement and invalidity are distinct from the considerations involved in damages and liability, the reasoning applies with equal force.

The plaintiff has argued that the Lewellen invention was nonobvious and in support of this position the plaintiff will introduce secondary considerations such as the commercial success of the Beecham product and the contacts between Beecham, Lewellen, as well as Lewellen and other companies. The plaintiff persuasively argues that these are the same factors relevant to damages. Such secondary considerations are clearly relevant and probative. *See Graham v. John Deere, 383 U.S. 1, 17-18 (1966).*

I have lived with this case. I'm not in any way denigrating or deprecating the fact that Judge Chesler has also. He is, as I have often remarked, an extremely able Magistrate. But I find that he has-- that his finding in this regard is clearly erroneous, that he made a mistake here. I do myself, on many occassions and I have appellate courts reminding me of that fact.

I find there will be considerable overlap between the witnesses and the nature of the information sought and that the defendants' argument that reasonable royalty damages are inherently complex are unpersuasive.

**\*9** Furthermore, the plaintiff's concern over the advanced age of a number of the relevant witnesses, I believe, supports the plaintiff's position that prudence dictates proceeding with these witnesses now, without waiting until a liability trial has been completed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 16494 (D.N.J.), 17 U.S.P.Q.2d 1149
**(Cite as: 1991 WL 16494 (D.N.J.))**

While not specifically considered by the Magistrate, the plaintiff's agreement to defer deposition and other discovery of defendant's trial counsel should circumvent any potential problems concerning the disqualification of trial counsel.

I'm not going to pass on the Seventh Amendment problem, Mr. Creel.  I don't think I have to.

Because I find that the defendant has persuasively argued that there would be a sufficient, and more importantly, significant savings in time and expense, and I say at the risk of being considered immodest or sounding immodest, and hopefully logical, that the logic which I employed in declining to bifurcate infringement and invalidity applies, as I said a little while ago, with equal force, after examining all the issues here.

Therefore, I decided to overrule the Magistrate's opinion in which he bifurcated the trial with respect to damages, liability and stay discovery.  It should have been--it should not have been the ruling and I reverse it for the reasons stated.

I will ask you, Mr. Creel, if you will--I better ask Mr. Lite, since he's local counsel.

Mr. Lite, will you be kind enough to draw an appropriate order reflecting my findings?

MR. LITE:  I certainly will, your Honor.  I want to move on with this trial.

Not Reported in F.Supp., 1991 WL 16494 (D.N.J.), 17 U.S.P.Q.2d 1149

**Motions, Pleadings and Filings (Back to top)**

• 2:86CV02179 (Docket) (Jun. 04, 1986)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.