**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PHARMACIA & UPJOHN COMPANY, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. 04-833-KAJ |
| | ) |
| SICOR INC. and SICOR | ) |
| PHARMACEUTICALS, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**SECOND AMENDED ANSWER TO FIRST AMENDED
COMPLAINT, COUNTERCLAIM AND DEMAND FOR A JURY TRIAL**

Defendants, Sicor Inc. and SICOR Pharmaceuticals, Inc. (collectively "Sicor"),

respectfully request a jury trial and hereby respond to the First Amended Complaint ("Amended

Complaint") filed by Pharmacia & Upjohn Company ("Pharmacia") as follows:

1.      Sicor denies knowledge or information sufficient to form a belief as to the truth of

the allegations set forth in paragraph 1 of the Amended Complaint.

2.      Sicor denies the allegations set forth in paragraph 2 of the Amended Complaint,

except admits that Sicor Inc. is incorporated in the State of Delaware and has a principal place of

business at 19 Hughes, Irvine, California 92618 and, through wholly-owned subsidiaries, is in

the business of, inter alia, making and selling generic injectable pharmaceutical products for the

human healthcare market.

3.      Sicor denies the allegations set forth in paragraph 3 of the Amended Complaint,

except admits that SICOR Pharmaceuticals, Inc. is incorporated in the State of Delaware and has

a principal place of business at 19 Hughes, Irvine, California 92618, and is in the business of,

inter alia, making, and, through a wholly-owned subsidiary, selling generic injectable

pharmaceutical products for the human healthcare market.

4.    The allegations in paragraph 4 are conclusions of law to which no response is required.  To the extent a response is required, Sicor denies the allegations, except states that it does not contest the subject matter jurisdiction of this Court for purposes of this action only.

5.    The allegations in paragraph 5 are conclusions of law to which no response is required.  To the extent a response is required, Sicor denies the allegations, except states that it does not contest venue in this judicial district for purposes of this action only.

6.    Sicor denies the allegations set forth in paragraph 6 of the Amended Complaint, except admits that Sicor Inc. and SICOR Pharmaceuticals, Inc. are incorporated under the laws of the State of Delaware, and that those entities, through their subsidiaries, distribute and sell products throughout the United States, including in this judicial district.  Sicor further states that it does not contest personal jurisdiction over it by this Court for purposes of this action only.

7.    Sicor denies the allegations set forth in paragraph 7 of the Amended Complaint, except admits that United States Patent No. 6,107,285 (the "'285 patent") was issued on August 22, 2000 and is entitled "Injectable Ready-To-Use Solutions Containing an Antitumor Anthracycline Glycoside," and that the patent states that the assignee is Pharmacia & UpJohn Company.

8.    Sicor denies the allegations set forth in paragraph 8 of the Amended Complaint, except admits that, through its wholly-owned subsidiaries, Sicor lawfully manufactures, sells and offers to sell Idarubicin HCl, and respectfully refers the Court to the FDA-approved package insert for the ingredients thereof.

9.    Sicor denies the allegations set forth in paragraph 9 of the Amended Complaint.

## COUNT I

10.    Each of preceding paragraphs 1-9 is incorporated as if fully set forth herein.

11.    Sicor denies the allegations set forth in paragraph 11 of the Amended Complaint.

12.     Sicor denies the allegations set forth in paragraph 12 of the Amended Complaint.

13.     Sicor denies the allegations set forth in paragraph 13 of the Amended Complaint, except admits that, through its wholly-owned subsidiaries, Sicor continues to lawfully manufacture, sell and offer to sell Idarubicin HCl.

## COUNT II

14.     Each of the preceding paragraphs 1-13 is incorporated as if fully set forth herein.

15.     Sicor denies the allegations set forth in paragraph 15 of the Amended Complaint.

16.     Sicor denies the allegations set forth in paragraph 16 of the Amended Complaint.

17.     Sicor denies the allegations set forth in paragraph 17 of the Amended Complaint.

18.     Sicor denies the allegations set forth in paragraph 18 of the Amended Complaint.

## AFFIRMATIVE DEFENSES

### First Defense

### Invalidity of the '285 Patent

The '285 patent is invalid under the patent laws of the United States, including without limitation 35 U.S.C. §§ 101, 102, 103 and 112.

### Second Defense

### Noninfringement of the '285 Patent

The manufacture, sale and offer for sale of Sicor's Idarubicin HCl does not infringe any valid and enforceable claim of the '285 patent.

### Third Defense

### Unclean Hands

This action is barred in whole or in part by the doctrine of unclean hands.

## Fourth  Defense

### Equitable Estoppel

This action is barred in whole or in part by the doctrine of equitable estoppel.

### Fifth Defense

### Laches

This action is barred in whole or in part by the doctrine of laches.

### Sixth Defense

### Inequitable Conduct

The '285 patent is unenforceable on grounds of inequitable conduct, as described in more detail below.

## AMENDED COUNTERCLAIMS

For its amended counterclaims against plaintiff Pharmacia, Sicor Inc. and SICOR Pharmaceuticals, Inc. (collectively "Sicor"), allege as follows with knowledge as to its own conduct and  actions and upon information and belief  as to all other matters:

### The Parties

1.      Sicor Inc. is a Delaware corporation having a principal place of business at 19 Hughes, Irvine, California 92618.  Through its wholly-owned subsidiaries, Sicor Inc. is engaged in the business of, inter alia, making and selling generic pharmaceutical products for the human healthcare market.

2.      SICOR Pharmaceuticals, Inc. is a Delaware corporation having a principal place of business at 19 Hughes, Irvine, California 92618.  SICOR Pharmaceuticals, Inc. is engaged in the business of, inter alia, making and, through a wholly-owned subsidiary, selling generic pharmaceutical products for the human healthcare market.

3.      Plaintiff-Counterdefendant Pharmacia is a Delaware corporation having a principal place of business at 7000 Portage Road, Kalamazoo, Michigan 49001, and is engaged in the business of researching, developing, making and selling pharmaceutical products for the human healthcare market.

## Jurisdiction and Venue

4.      This Court has jurisdiction over the subject matter of these counterclaims under the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202, and under the laws of the United States concerning actions relating to patents, 28 U.S.C. §§ 1331 and 1338(a), and federal common law.

5.      Venue is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

6.      An actual justicable case or controversy exists between Sicor and Pharmacia concerning the validity, scope and enforceability of the '285 patent and Sicor's alleged liability for alleged infringement thereof.

## Count I

## Counterclaim for Declaratory Relief: The '285 Patent is Invalid

7.      The '285 patent is invalid because it fails to comply with the requirements of the patent laws of the United States, including but not limited to 35 U.S.C. §§ 101, 102, 103 and 112.

8.      Pharmacia is entitled to no relief because the manufacture, sale and offer for sale of Sicor's Idarubicin HCl does not infringe any valid and enforceable claim of the '285 patent.

<u>**Count II**</u>

<u>**Counterclaim for Inequitable Conduct: The '285 Patent is Unenforceable**</u>

**A.**    <u>**The Duty of Candor**</u>

9.    At all times during the pendency of a patent application, all individuals associated with the filing or prosecution of a patent application have a duty of candor and good faith to meaningfully and truthfully disclose to the U.S. Patent and Trademark Office (hereinafter "U.S. Patent Office") material information of which they were aware (the "Duty of Candor"). For purposes of the Duty of Candor, information is material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. Section 1.56(b)(1991). In some cases, a stricter standard of materiality has been cited wherein information is "material to patentability when it is not cumulative to information already of record or being made of record in the application, and

> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>
>> (i) Opposing an argument of unpatentability relied on by the Office, or
>>
>> (ii) Asserting an argument of patentability . . . "

37 C.F.R. Section 1.56(b)(1992).

10.    Pharmacia applied for patent rights to what ultimately became the '285 patent, in United States Patent Application Serial Number 07/827,742 (hereinafter "the '742 Application"), filed with the U.S. Patent Office in 1992.

11.    Each individual associated with the filing or prosecution of the '742 Application who was aware of material information was required by the U.S. Patent Office practice to submit, or cause to submit, such information to the U.S. Patent Office as part of an Information

Disclosure Statement ("IDS") as early in prosecution of the '742 Application as it was known.

According to 37 C.F.R. Section 1.56(c):

> Individuals associated with the filing or prosecution of a patent application within the meaning of this section are: (1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

12.     During the course of the prosecution of the '742 Application, which matured into the '285 patent, the named inventors of the '742 Application, and the attorneys, agents, and employees of Pharmacia acting on behalf of Pharmacia in connection with the filing and prosecution of the '742 Application (hereinafter the "Applicants"), had a Duty of Candor to the U.S. Patent Office.  Moreover, the Applicants knew or were charged with knowledge that they had such a Duty of Candor.

13.     During the course of the prosecution of the '742 Application, U.S. Patent Office practice and the Duty of Candor dictated that the Applicants should avoid the submission of long lists of references in an IDS, and further that if such a long list of references was submitted, the Applicants submitting the IDS should highlight those references which were known to be of significance, particularly those references that might refute, or were inconsistent with, positions taken by the inventors or assignees, or their attorneys or agents, before the U.S. Patent Office.

14.     The Duty of Candor further required, among other things, that each Applicant disclose to the U.S. Patent Office material information arising from related foreign applications and related litigation, and from communications with competitors or other potential infringers. According to Section 2001.06 of the Manual of Patent Examining Procedure (MPEP)(emphasis added):

Such individuals may be or become aware of material information from various sources such as, for example, co-workers, trade shows**, communications from or with competitors, potential infringers, or other third parties, related foreign applications** (see MPEP Section 2001.06(a)), prior or copending United States patent applications (see MPEP Section 2001.06(b)), **related litigation** (see MPEP Section 2001.06(c)) and preliminary examination searches.

15.    The Duty of Candor further required that the Applicants avoid dumping reams of information upon the U.S. Patent Office late in the course of the prosecution of the '742 Application, which belated dumping involved burying key references within long lists of documents in hopes of hiding information from the attention of U.S. Patent Office.

16.    As set forth below, Applicants violated their Duty of Candor in each of these ways in an effort to hide highly material information from the U.S. Patent Office in connection with the '742 Application.  Applicants knowingly withheld from the U.S. Patent Office material, non-cumulative information, which information refuted or was inconsistent with statements made to the U.S. Patent Office by Applicants during the prosecution of the '742 Application.

B.    **The '742 Application and the Adriamycin Product**

17.    Farmitalia Carlo Erba S.r.L (hereinafter "Farmitalia") was the developer of doxorubicin hydrochloride (trade name : Adriamycin) in the late 1960's, for which Farmitalia received patents in numerous countries that were to expire in or around 1987.  Adriamycin was commercially a very successful and highly profitable chemotherapy drug from the start. Doxorubicin hydrochloride is a member of a larger class of drugs used to treat cancer known as anthracycline glycosides.  Another example of such an anthracycline glycoside is idarubicin hydrochloride, or idarubicin.

18.    By the early 1980's Farmitalia was concerned about the impending expiration of the basic Adriamycin patent and the effect this would have on its profits.  Farmitalia knew it could not simply extend its patents on Adriamycin.  Instead it sought to patent not the basic drug

itself, but a certain solution of the drug in water, even though these water-based solutions were well known to others and the subject of numerous publications. On August 2, 1985, Farmitalia filed United Kingdom Patent Application No. 85-19452 disclosing water-based solutions of doxorubicin hydrochloride and idarubicin hydrochloride (hereinafter the "UK '452 Application"). Once the UK '452 patent application was on file, Farmitalia then began filing virtually identical patent applications around the world. One such application was the '742 Application, filed in the United States in 1992. Because the '742 Application and the '285 patent contain the same written description as the UK '452 Application, the UK '452 is considered under U.S. patent practice to be a "related foreign application" to the '742 Application and the '285 patent.

19.     In 1993 Pharmacia AB acquired Farmitalia, thus becoming one of the largest pharmaceutical companies in the world. Adriamycin was still one of Pharmacia AB's top ten products two years later, when Pharmacia AB and The Upjohn Company ("Upjohn") merged into what is now the plaintiff entity in this lawsuit. Prior to the merger, Upjohn and Pharmacia AB had been business competitors throughout the world, including in particular in the United States and in Australia.

20.     The prosecution of the '742 patent application before the U.S. Patent Office spanned over eight years, beginning on January 29, 1992 and ending on August 22, 2000.

**C.     The U.S. Patent Office's Rejections of the '742 Application Based on Prior Art**

21.     During the course of the eight year prosecution of the '742 Application, the U.S. Patent Office repeatedly rejected the '742 Application, upon the grounds (i) that the prior art taught that solutions of doxorubicin hydrochloride, one of the drugs claimed in the '285 patent, were known to be stable in the pH range of 2.3 to at least 4.0 and higher, and within the range Applicants sought to claim, and (ii) that the prior art taught the use of an acid to adjust the pH of

such solutions. The U.S. Patent Office Examiner asserted that based on this prior art the '742 Application did not provide sufficient grounds to warrant a patent.

22.     The Applicants repeatedly challenged these rejections and stated (1) that stable solutions of doxorubicin hydrochloride were not known in the art, and (2) that those solutions that were described in the prior art were not adjusted with hydrochloric acid, as Applicants sought to claim, but instead were adjusted with buffers.

23.     The Applicants repeatedly stated, including through the submission of declarations on July 12, 1996, that people skilled in the art would adjust the pH of solutions of injectable products to the level of pH 1 or 2 with an acid, but would not adjust the pH of such solutions to a level <u>above</u> about 2 using an acid. Instead, the Applicants stated that persons skilled in the art would have used a buffer instead of an acid to adjust the pH of a solution above about 2. For example, in a declaration dated May 27, 1991, which was resubmitted to the U.S. Patent Office as part of the '742 Application on July 12, 1996, one of the inventors Carlo Confalonieri ("Confalonieri Declaration") stated that "[b]ased upon the experience of those skilled in the art, when one was preparing the solution of [doxorubicin hydrochloride] for use in chemotherapy, any adjustment above about 2 would have been performed with a buffer and not with hydrochloric acid."

**D.     Pharmacia's Failure to Disclose Material Information Concerning The '742
        Application From the Australian Litigation Between Pharmacia and Upjohn**

24.     In or about 1991, prior to merging with Pharmacia, Upjohn had been engaged in a business relationship in Australia with a pharmaceutical company named Delta West Pty. Limited ("Delta West"). Among other aspects, the business relationship between Upjohn and Delta West involved the production and distribution of a doxorubicin hydrochloride product, a generic version of competitor Farmitalia's Adriamycin product.

25.     In August 1991, Farmitalia sought assurances from Upjohn that its dealings with Delta West would not infringe the Australian Patent No. 598197 (the "Australian '197 Patent"), which purported to describe pharmaceutical products containing doxorubicin hydrochloride and idarubicin hydrochloride.

26.     Upjohn assumed the responsibility of responding to Farmitalia's allegations.  On February 7, 1992, in response to Farmitalia's infringement allegations, Upjohn wrote to Farmitalia, stating that each of the claims of Australian '197 Patent was invalid.  In support Upjohn provided a non-exhaustive list of sixteen (16) publications and nine (9) patent publications, all of which were available before the claimed priority date, which prior art publications Upjohn contended invalidated the Australian '197 Patent.

27.     In 1992, Farmitalia brought suit before the Federal Court of Australia Victoria District Registry General Division against Delta West, claiming that Delta West's sale of its doxorubicin hydrochloride product infringed the Australian '197 Patent.  For at least the next several years -- until Pharmacia AB bought and merged with Upjohn in 1995 -- Upjohn, which had by then acquired Delta West, vigorously asserted that the Australian '197 Patent was invalid.  As of the date of the Pharmacia/Upjohn merger in 1995, doxorubicin hydrochloride was the fourth largest selling drug of the combined companies.  As such, the Applicants were clearly aware of the details of the pending Australian litigation with Upjohn.

28.     According to Section 2001.06(c) of the MPEP (emphasis added):

> Where the subject matter for which a patent is being sought is or
> has been involved in litigation, the existence of such litigation and
> any other material information arising therefrom must be brought
> to the attention of the Patent and Trademark Office.  Examples of
> such material information include evidence of possible prior public
> use or sales, questions of inventorship, prior art, allegations of
> "fraud," "inequitable conduct," and "violation of duty of
> disclosure."  Another example of such material information is any
> assertion that is made during litigation which is contradictory to
> assertions made to the examiner. Environ Prods., Inc. v. Total

- 11 -

Containment, Inc., 43 USPQ2d1288, 1291 (E.D. Pa. 1997). Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, depositions, and other documents and testimony.

29.    The Applicants were aware of their obligation to bring material information from related foreign litigations to the attention of the Patent Examiner handling the '742 Application, as evidenced by their submission to the U.S. Patent Office on September 2, 1994 of a **German** Opposition Proceeding involving German Patent Number 36 21 844, a related foreign application to the '742 Application because it also claims priority from the UK '452 Application (like the '742 Application).

30.    Despite this knowledge, the Applicants failed to disclose to the U.S. Patent Office important, material information that arose from a patent infringement litigation in **Australia** between Pharmacia and Upjohn, based upon the Australian '197 Patent. The Australian '197 Patent also claims its priority from the UK '452 Application and, thus, has the same written description as the '285 patent, making it another related foreign application to the '742 Application.

31.    In April 1995, prior to its merger with Pharmacia, and as part of the ongoing Australian patent infringement litigation, Upjohn served upon Farmitalia the affidavits of two experts in the pharmaceutical field, Dr. William Neil Charman and Mr. Robert Laurence Weston.

32.    Dr. Charman's 36-page report (exclusive of exhibits) explained in detail the basis for his expert opinion that the claims of the Australian '197 Patent are invalid in view of many of the same references set forth in Upjohn's February 1992 letter to Farmitalia.

33.    Mr. Weston's 18-page report (exclusive of exhibits) explains in detail the basis for his expert opinion that the claims of the Australian '197 Patent are invalid in view of many of the same references set forth in Upjohn's February 1992 letter to Farmitalia.

34.     Notwithstanding the significance of the Australian Patent infringement litigation, and of the expert analyses, prior art references and opinions expressed therein, the Applicants still failed to disclose to the U.S. Patent Office the expert analyses and at least a half-dozen of the references that were raised during the Australian litigation, as well as the two Upjohn expert opinions.

35.     Among the material, non-cumulative references that the Applicants failed to disclose from the Australian Litigation was the complete copy of portions of Lachman, The Theory and Practice of Industrial Pharmacy (2nd Ed. Lea & Febiger 1976) produced as exhibit WNC5 to Dr. Charman's expert report.  While Applicants did disclose a number of selected pages from the 3rd Edition (1986) of Lachman, that third edition was not prior art to the '285 patent and, more importantly, the omitted pages taught, among other things, the potentially deleterious effect a buffer could have on the stability of a final drug product and the experimental method whereby one of ordinary skill in the art would identify buffers having such an effect.

36.     Among the other material, non-cumulative references that Applicants failed to disclose to the U.S. Patent Office during the pendency of the '742 Application from the Australian Litigation was U.S. Patent No. 4,310,515.  The '515 patent was discussed in Dr. Charman's expert report.  In particular, the '515 patent disclosed an injectable, water-based solution having a pH in the range of 2.3 to 2.7 adjusted and stabilized by the presence of the appropriate amount of hydrochloric acid, not a buffer.

37.     Pharmacia also failed to disclose the material, non-cumulative expert reports of Dr. Charman and Mr. Weston, written on behalf of Upjohn itself.

38.     Paragraphs 80-91 of Dr. Charman's report discuss the method by which Dr. Charman graphed the data (see Exhibit WNC10) provided in Wassermann and Bundgaard, Int. J. Pharmaceut., 14, 73-78 (1983) and two other prior art references (Kaniewska and Bevenuto),

which information would have enabled a person skilled in the art in 1985 to make the anthracycline glycoside solutions of either doxorubicin or idarubicin in a pH range of approximately **2.5 to 5**.  This aspect of Dr. Charman's withheld report directly contradicts the sworn statements in the Confalonieri Declaration concerning an important 1983 prior art reference by Wassermann et al. (hereinafter referred to as "Wassermann"):  "It is my opinion that Wassermann provides no information which would allow one skilled in the art to produce a storage stable Adriamycin solution."  Notwithstanding the fact that Dr. Charman's April 1995 report refuted and is inconsistent with the position statements in the Confalonieri Declaration, Pharmacia's patent lawyers resubmitted that same Confalonieri Declaration on July 12 1996, to oppose the Patent Examiner's argument of unpatentability, without ever providing Dr. Charman's report to the Examiner.

39.    Based on a terminal disclaimer filed in the '742 Application on August 12, 1996, Upjohn had also become the assignee of the '742 Application through its merger with Pharmacia at about the time the patent lawyers resubmitted the Confalonieri Declaration.

40.    Notwithstanding its ownership of the '742 Application, its statements regarding invalidity made in its February 1992 letter to Farmitalia and its own expert reports of Dr. Charman and Mr. Weston in the Australian litigation, contesting the validity of the patent, neither Upjohn nor any of the Applicants ever submitted any of this material, non-cumulative information to the U.S. Patent Office during the pendency of the '742 Application.

41.    Applicants failed to submit the foregoing material, non-cumulative information to the U.S. Patent Office during the pendency of the '742 Application with an intent to deceive the U.S. Patent Office. This conclusion naturally follows the very materiality of the omitted references and their direct contradiction of the arguments for patentability made by Pharmacia to the U.S. Patent Office Examiner over an 8 year period.

E.    **Pharmacia Made False and Misleading Statements to the U.S. Patent Office About Wasserman, A Material Prior Act Reference**

42.    Applicants also breached their Duty of Candor by, among other things, misrepresenting material facts and submitting statements in a declaration under oath to the U.S. Patent Office that the Applicants knew were false concerning Wassermann.

43.    In violation of their Duty of Candor, Applicants submitted the Confalonieri Declaration, which falsely stated that Wasserman provided "no information" that would allow one skilled in the art to produce storage stable doxorubicin solutions.  Confalonieri also falsely stated in that declaration that "one skilled in the art would not have been lead by the Wassermann reference to have recognized the unique advantages to be achieved by adjusting the Adriamycin [doxorubicin] solutions to a pH of  from 2.5 to 5.0 with hydrochloric acid" and that "there is nothing in Wassermann which would suggest that solutions would have long term storage stable characteristics…".

44.    Contrary to the misrepresentations in the Confalonieri Declaration, using the data disclosed in Wassermann and standard chemical kinetics equations that were known in the prior art, disclosed by Wasserman and well known to the Applicants, Wassermann provides all of the information necessary for determining the estimated shelf-life stability of doxorubicin in acidic solution containing hydrochloric acid.

45.    Applicants were aware that the degradation of doxorubicin in acidic solution was described by the kinetic equations disclosed in Wasserman and that the shelf-life (stability) could be readily estimated from the degradation rate of doxorubicin which, in turn, could be routinely calculated.  For example, in a declaration dated December 14, 1994 submitted to the Swedish Patent Office in a foreign application related to the '285 patent, Confalonieri stated that "In practice the Kobs [observed rate of degradation for doxorubicin at acidic pH] is calculated on a scientific calculator," that "[t]his is a routine procedure for those skilled in the art", and that

"once Kobs is known, the t90 [shelf-life] is known" and acknowledged that he had been using these standard techniques since before the UK '452 Application was filed.  Applicants had knowledge of the Wassermann reference, and of the applicability of the rate equations and rate constant values and activation energy for the doxorubicin degradation reaction disclosed therein. Applicants also had knowledge of the standard prior art chemical equations for estimating shelf-life of the doxorubicin solution disclosed in Wassermann.  For example, in his declaration dated December 14, 1994 submitted to the Swedish Patent Office, Confalonieri stated that "[t]he relationship between reaction rate and temperature is well established" by the Arrhenius equation.

46.     In the Amendment and Communication submitted to the Patent Office on January 6, 1993, based on the submission of false comparative data, Applicants further misrepresented that Wassermann's teaching of an aqueous doxorubicin solution adjusted to a pH of 2.13 had inferior storage stability to the claimed invention.  In particular, Applicants compared data in Exhibit C of tab 2 of the Confalonieri Declaration to support their conclusion that "a doxorubicin hydrochloride solution which has its pH adjusted to 2.5 with hydrochloric acid has superior storage stability to doxorubicin hydrochloride solutions whose pH has been adjusted to 2.0 with hydrochloric acid."  Yet, the only data set forth for pH 2.0 and 2.5 in Exhibit C of tab 2 of the Confalonieri Declaration were for aqueous solutions of doxorubicin adjusted with *glycine-HCl*, a physiologically acceptable *buffer*, not a physiologically acceptable *acid* (in particular, *HCl* (hydrochloric acid)) as argued to the Patent Office.  This false comparison is particularly material given the distinctions that Applicants had previously drawn during prosecution of the patent application between using unpatentable buffers to adjust pH and the allegedly unexpected properties provided by using acids to adjust the pH of an aqueous doxorubicin solution.

47.    Applicants breached their Duty of Candor by, among other things, misrepresenting material facts and submitting statements in a declaration under oath to the U.S. Patent Office that the Applicants knew were false concerning the Wassermann reference and by failing to submit a copy of the Confalonieri Swedish Declaration to the U.S. Patent Office notwithstanding it was highly material to the '742 Application.

48.    Applicants' false statements to the U.S. Patent Office were material and were made with the intent to deceive the Patent Office.

## F.    Pharmacia's False Statements in the '742 Patent Application That They Had Conducted Actual Stability Testing on Anthracycline Glycosides Other than Doxorubicin Hydrochloride

49.    The '742 patent application contains experimental data from fourteen examples of the stability of aqueous solutions of doxorubicin hydrochloride having pH values at 2.62, 2.71, 2.95, 2.96, 2.99, 3.0, 3.03, 3.06, 3.07, 3.11 (2 examples), 3.14, 4.6, and 5.2 and initial drug concentrations of either approximately 1 mg/ml or approximately 20 mg/ml. Following thirteen of the examples the '742 application states that:

> Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, danuorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml.

50.    Although the foregoing paragraph communicates that actual stability tests on these molecules were conducted prior to the filing of the priority document for the '742 patent application (i.e. the UK '452 patent application), no stability data actually existed for any of the molecules (other than doxorubicin) at the time of filing. In particular, there was no stability data at the time of filing for the two molecules claimed in the '285 patent aside from doxorubicin hydrochloride: idarubicin (i.e. 4-demethoxy-daunorubicin) hydrochloride or epirubicin (i.e. 4'-epi-doxorubicin) hydrochloride.

51.    Applicants breached their Duty of Candor by, among other things, misrepresenting in these thirteen paragraphs of the '742 application that they had in fact conducted actual stability testing on these molecules, when in fact it appears that at the time of filing of the '742 patent application the statements were merely prophetic.

52.    Applicants' false statements to the U.S. Patent Office were material and were made with the intent to deceive the Patent Office.

53.    Sicor believes that Applicants made other material misrepresentations to the Patent Office for which it is still taking further discovery to prove that such other material misrepresentations were made with an intent to deceive the Patent Office.

**G.    Pharmacia Engaged in Dumping and Burying Material References After Applicants Knew Their Rights Were Secure**

54.    In correspondence from the U.S. Patent Office dated June 23, 1998, the U.S. Patent Office informed the Applicants that some of the claims of the '742 Application would be allowed to issue as a patent.  Thus, at this point, the Applicants knew that more than over six years of discussions with the U.S. Patent Office they would receive a patent.

55.    Just nine days later, on July 1, 1998, the Applicants submitted a document titled the "Ninth Supplemental Information Disclosure Statement" which disclosed to the U.S. Patent Office an exceedingly long list of references -- 228 separate references -- and informed the U.S. Patent Office that this information was submitted  "insofar as the [U.S. Patent Office] Examiner might consider any of the cited documents important in deciding whether to allow the ['742] application to issue as a patent . . . "  In so doing, the Applicants invited the U.S. Patent Office to wade though this pile of information, knowing full well that at this late stage of the prosecution and after six years of dealing with the '742 Application that the Patent Examiner would give this information little or no scrutiny.

56.     Among the references buried in the Ninth Supplemental Information Disclosure Statement that were being submitted to the U.S. Patent Office for the first time during the course of the prosecution of the '742 Application were eight references raised with Pharmacia during the Australian litigation, years earlier.

57.     Also buried within these 228 references were material references that were not highlighted to the U.S. Patent Office, including a 1967 reference by Sandell and a 1959 reference by Schou and Jensen.  The Sandell and Schou and Jensen references refuted, and at the very least were inconsistent with, the position the Applicants repeatedly took with the U.S. Patent Office that persons skilled in the art would adjust a solution to a pH above about 2 with a buffer and not an acid.

58.     By burying these material references in a long list of documents dumped on the U.S. Patent Office after six years of prosecution and after learning that a patent would issue, the Applicants acted with an intent to deceive and to mislead the U.S. Patent Office and ensured that their repeated statements that persons skilled in the art would not adjust a solution of doxorubicin hydrochloride to a pH above about 2 with an acid, but instead would use a buffer, would not be challenged and that the patent they long sought would issue.

*       *       *

59.     By effectively withholding material information from the U.S. Patent Office with an intent to deceive, and burying important references with an intent to conceal, the Applicants engaged in inequitable conduct that renders each claim of the '285 patent unenforceable.

- 19 -

## JURY DEMAND

Sicor respectfully requests a trial by jury on all issues so triable.

WHEREFORE, Sicor respectfully requests the following relief:

A.    The entry of judgment on the Amended Complaint against Pharmacia, and in favor of Sicor, denying Pharmacia the relief requested in the Amended Complaint and any relief whatsoever;

B.    A declaration that the '285 patent is invalid and unenforceable;

C.    A declaration that the manufacture, sale and offer for sale of Idarubicin HCl does not infringe any valid and enforceable claim of the '285 patent;

D.    A permanent injunction enjoining Pharmacia, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the judgment, from directly or indirectly charging infringement, or instituting any action for infringement of the '285 patent against Sicor or any of its subsidiaries, affiliates, customers, distributors, licensees or suppliers;

E.    A declaration that this case is exceptional, and an award to Sicor of its reasonable attorneys' fees and costs; and

F.    Such other and further relief as the Court deems proper and just.

ASHBY & GEDDES

*/s/ Steven J. Balick*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Defendants*

*Of Counsel:*

Reid L. Ashinoff
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Jordan A. Sigale
SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
Chicago, Illinois 60606
(312) 876-8000

Dated: March 17, 2006

167721.1