IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PHARMACIA & UPJOHN COMPANY, LLC | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-833 (KAJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SICOR, INC., and | ) | |
| SICOR PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### PHARMACIA & UPJOHN'S OPENING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200
mnoreika@mnat.com
  Attorneys for Plaintiff
  Pharmacia & Upjohn Company LLC

OF COUNSEL:

Daniel A. Boehnen
Joshua R. Rich
McDONNELL BOEHNEN
  HULBERT & BERGHOFF LLP
300 S. Wacker Drive
Chicago, Illinois  60606
(312) 913-0001

May 31, 2006

## TABLE OF CONTENTS

I.    PROCEDURAL HISTORY ...................................................................1

II.   SUMMARY OF ARGUMENT ..............................................................1

III.  FACTUAL BACKGROUND ................................................................2

    A.    The '285 Patent ........................................................................2

    B.    Anthracycline Glycosides ........................................................3

    C.    The Nature of the Problem Faced By One of Ordinary Skill Seeking to
        Prepare a Ready-To-Use Solution ...........................................6

    D.    The Prosecution of the '285 Patent ..........................................7

        1.    Prosecution of the '784 Application .................................7

        2.    Prosecution of the '999 Application .................................9

        3.    Prosecution of the '856 Application ...............................10

        4.    Prosecution of the '742 Application ...............................10

IV.   ARGUMENT ...................................................................................14

    A.    Legal Standards for Claim Construction...................................14

    B.    The Person of Ordinary Skill in the Relevant Art.....................16

    C.    Construction of the Terms at Issue ..........................................17

        1.    "Physiologically acceptable" ........................................17

        2.    "Of".........................................................................24

        3.    "Anthracycline glycoside"...........................................25

        4.    "Sealed" [container].....................................................28

        5.    "Storage stability" ......................................................32

V.    CONCLUSION.................................................................................37

# TABLE OF AUTHORITIES

*Electro Med. Sys. S.A. v. Cooper Life Scis., Inc.*,
    34 F.3d 1048 (Fed. Cir. 1994)................................................................15

*Fin Control Sys. Pty, Ltd. v. OAM, Inc.*,
    265 F.3d 1311, 1318 (Fed. Cir. 2001)..................................................19

*In re Herz*,
    537 F.2d 549, 551-52 (CCPA 1976).....................................................19

*Kumar v. Ovonic Battery Co.*,
    351 F.3d 1364, 1368 (Fed. Cir. 2003)..................................................15

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967, 979-981 (Fed. Cir. 1995)(en banc), *aff'd*, 517 U.S. 370 (1996)..14-15

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340, 1349-50 (Fed. Cir. 2004) ............................................15

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
    75 F.3d 1545, 1551 (Fed. Cir. 1996)....................................................34

*Phillips v. AWH Corp.*,
    415 F.3d 1303, 1312-13, 1316-19, 1324 (Fed. Cir. 2005) (*en banc*)...............14-16

*PPG Indus. v. Guardian Indus. Corp.*,
    156 F.3d 1351, 1354 (Fed. Cir. 1998)..................................................19

*Resonate Inc. v. Alteon Websystems, Inc.*,
    338 F.3d 1360, 1364-65  (Fed. Cir. 2003) ............................................15

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576, 1582-83 (Fed. Cir. 1996) ........................................14-15

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
    442 F.3d 1322, 1328 (Fed. Cir. 2006)..................................................19

## I. <u>PROCEDURAL HISTORY</u>

Plaintiff Pharmacia & Upjohn Company, LLC ("Pharmacia") filed this action against Defendants Sicor, Inc. and Sicor Pharmaceuticals, Inc. (collectively, "Sicor"), asserting that Sicor has infringed U.S. Patent No. 6,107,285 ("the '285 patent"). Ex. 1. This Court has scheduled a *Markman* hearing to be held on July 20, 2006 to construe the contested claim terms of the '285 patent, preceded by a schedule for the parties to submit opening and responsive claim construction briefs. On May 18 and 19, 2006, the parties met and conferred regarding the meaning of claim terms. They narrowed the contested terms to those discussed in this brief. The parties' Joint Claim Construction Chart was submitted to the Court on May 30, 2006, one day before the opening claim construction briefs.

## II. <u>SUMMARY OF ARGUMENT</u>

Pharmacia contends that the asserted claims of the '285 patent (claims 9 and 13) are clear, with the plain meaning governing the construction of all of the disputed claim terms as follows:

| Claim Term | Pharmacia's Construction |
|---|---|
| physiologically acceptable [solution], [aqueous solvent], or [acid] | the substance is stable, sterile, pyrogen-free, and otherwise suitable for administration to humans or animals |
| of | of |
| anthracycline glycoside | a class of chemical compounds having the following generic structure:  |
| sealed [container] | a closed container which is further secured against access, leakage and passage by a fastening, membrane, or coating that must be broken to be removed |

| storage stability | retaining physiological acceptability and at least 90% potency under suggested storage conditions for at least 18 months |

Pharmacia's proposed definitions not only reflect the ordinary meanings of the claim terms, they are supported by the intrinsic evidence. That is, the other claims, specification, and prosecution history all suggest that Pharmacia's claim constructions should be adopted.

### III.  FACTUAL BACKGROUND

#### A.    The '285 Patent

The '285 patent, entitled "Injectable Ready-To-Use Solutions Containing An Antitumor Anthracycline Glycoside," issued on August 22, 2000.  Ex. 1.  It was based on Application Serial No. 827,742 ("the '742 application"), filed in the United States Patent and Trademark Office on January 29, 1992.  *Id.*  Through a series of prior filings, the '742 application claimed a right of priority to United Kingdom Patent Application Ser. No. 8519452, filed August 2, 1985 ("the 1985 U.K. application").  *Id.* at 1.

All of the claims of the '285 patent are directed to solution formulations of idarubicin, epirubicin, and/or doxorubicin hydrochloride, which are anti-cancer drugs from a generic class of compounds known as anthracycline glycosides.  *Id.* at col. 23, line 5 – col. 24, line 23.  Specifically, asserted claims 9 and 13 (rewritten in independent form)[1] cover:

> 9.    A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution is contained in a sealed container, and wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

---

[1]    Claim 9 is dependent on claim 1.  Ex. 1, col. 24, lines 12-14.  Claim 13 is dependent on claim 12, which is dependent on claim 11, which is dependent on claim 1.  *Id.* at col. 24, lines 18-24.

13.    A physiologically acceptable solution of idarubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with hydrochloric acid, the concentration of said idarubicin hydrochloride being about 1 mg/ml, wherein said solution is contained in a sealed container.

*Id*.

## B.    Anthracycline Glycosides

Idarubicin, epirubicin, and doxorubicin hydrochloride are part of a unique class of anti-cancer compounds derived from certain *Streptomyces* organisms. Ex. 2 (Beijnen Expert Report), p. 11, 13. They are used to treat a wide variety of cancers, including lung cancer, breast cancer, prostate cancer, ovarian cancer, and Hodgkin and non-Hodgkin lymphomas. *Id*. at 13; Ex. 1, col. 4, lines 28-39. Their molecular structure has a tetracyclic (four-ringed) anthraquinoid aglycone linked to an amino sugar by a glycosidic bond. Ex. 2, p. 11. The identity of various substituents (or "R" groups) on the aglycone and the amino sugar determines the identity of a particular anthracycline glycoside:



*Id*. at 11-12. The structures of doxorubicin (Fig. 1), epirubicin (Fig. 2), and idarubicin (Fig. 3) are shown below. *Id*.; *see also* Ex. 1.

**Figure 1: Doxorubicin**     **Figure 2: Epirubicin**     **Figure 3: Idarubicin**

Although certain anthracycline glycosides provide important chemotherapeutic benefits, their use has presented substantial challenges. For example, as of 1985, idarubicin, epirubicin, and doxorubicin hydrochloride created significant handling issues. Researchers recognized early on that doxorubicin hydrochloride – the most widely used of these compounds – was profoundly cytotoxic, and exposure to even small amounts of these compounds was eventually linked to severe adverse health effects in medical professionals, including hair loss, tissue death, miscarriage, and infertility. Ex. 2, p. 14; Ex. 3 (Guerra Expert Report), p. 7-8. To avoid those health risks, medical professionals desired safer formulations of idarubicin, epirubicin, and doxorubicin hydrochloride that they would not have to handle.

Although desired, such "ready-to-use" formulations of these compounds were thought impossible prior to 1985 because the molecules are delicate and need to be prepared and handled very carefully. Studies dating back as early as 1969 established that therapeutic dosages of these compounds degraded rapidly in aqueous solutions. Ex. 2, p. 14-15. Accordingly, as of 1985, commercially marketed products containing anthracycline glycosides were available only in lyophilized (that is, freeze-dried powder) form, requiring reconstitution prior to administration, as opposed to ready-to-use solutions. *Id*. at 22.

Lyophilized idarubicin, epirubicin, and doxorubicin hydrochloride commercial products avoided the degradation problem observed in aqueous solutions but did not alleviate all of the

handling concerns.  In fact, lyophilized formulations created additional risks for both the health care professional and the patient.  The lyophilized commercial products available in 1985 were distributed as sealed vials of freeze-dried powder which had to be reconstituted prior to administration.  *Id.*, p. 7, 22.  Reconstitution typically involved the steps of piercing the seal of the vial with a syringe, injecting a suitable solvent, removing the syringe, and shaking the vial for a period of time to dissolve the lyophilizate.  *Id.*, p. 7-8; Ex. 3, p. 6-7.  The step of injecting solvent generally increased the vial's internal pressure, which often resulted in an aerosolized "spray-back" of reconstituted drug upon syringe removal.  Ex. 2, p. 8; Ex. 3, p. 7.  The piercing of the seal to inject the solvent, combined with shaking to dissolve the reconstituted product, increased the possibility of exposure via leakage through the pierced seal.  Ex. 2, p. 8.  In addition, reconstitution using the wrong solvent or amount of solvent could negate the drug's intended therapeutic effect, or even place a patient at immediate risk of death.  *Id.*; Ex. 3, p. 8.

Lyophilized commercial products also did not fully solve the problem of degradation, however, because once the lyophilized powders were reconstituted using the manufacturers' protocols, the active compound in solution was subject to rapid degradation.  Ex. 2, p. 9.  Product literature available in 1985 for commercial doxorubicin hydrochloride, for example, stated that the reconstituted formulations were stable for a maximum of 48 hours when refrigerated.  *Id.* at 22.  If the entire volume of the reconstituted drug solution was not administered to a patient within that time, the remaining solution had to be discarded, presenting substantial cost and public health concerns.  *Id.* at 9.

The fact that commercially available products with these active compounds were only available in lyophilized form as of 1985 constituted a significant disadvantage in their use.  *Id.* at 22.  As discussed above, health care professionals prefer ready-to-use drug solutions to lyophilized

formulations because of the ease of use and reduction of handling-related risks. *Id*. at 7, 22-23. Thus, companies seeking to market injectable drugs generally disfavor lyophilized products, and commercialize such product forms only after having first attempted but failed to develop a ready-to-use solution. *Id*. at 22. That is, while it was apparent as of 1985 that lyophilized anthracycline glycoside formulations were less than satisfactory, all of the then-available scientific data indicated that a ready-to-use solution was not likely to ever be achieved. *Id*.

**C.     The Nature of the Problem Faced By One of Ordinary
          Skill Seeking to Prepare a Ready-To-Use Solution**

A person of ordinary skill in 1985 attempting to prepare a ready-to-use solution of a therapeutic concentration of idarubicin, epirubicin, or doxorubicin hydrochloride would have been doing so in the face of an extensive body of literature suggesting that such a solution would be impossible to formulate. *Id*. This literature taught that anthracycline glycosides were complex molecules capable of interacting with a variety of ions, adsorbing to a variety of surfaces, and self-associating in concentrated solutions, and were photolabile (likely to break down in light) and subject to oxidation. *Id.* at 15, 17, 19-20.

The few publications that did report on the chemical stability (that is, the ability to avoid molecular degradation) of anthracycline glycosides in solution reported contradictory results. *Id.* at 17. In addition, the stability information that could be gleaned from these early reports was diminished by the fact that many of the early studies failed to employ standardized test conditions where the effect of a single variable, such as pH or ionic strength, was isolated by maintaining all other variables constant. *Id*. at 16. Despite all of the shortcomings of the early stability studies, the results overall indicated that anthracycline glycosides in aqueous solution are readily degraded under acidic conditions and are not sufficiently stable to produce a ready-to-use commercial product. *Id*. at 15-16, 20.

**D.     The Prosecution of the '285 Patent**

The '285 patent issued from the '742 application, which was filed on January 29, 1992.  Ex. 1.  The '742 application is a divisional application of U.S. Patent Application No. 07/503,856 ("the '856 application"), now U.S. Patent No. 5,124,317, which was filed on April 3, 1990.  *Id.* at 1.  The '856 application is, in turn, a divisional application of U.S. Patent Application No. 07/385,999 ("the '999 application"), now U.S. Patent No. 4,946,831, which was filed on July 27, 1989.  *Id.*, certificate of correction dated May 18, 2004.  The '999 application is a continuation application of U.S. Patent Application No. 06/878,784 ("the '784 application"), now abandoned, which was filed on June 26, 1986.  *Id.*  The '784 application, and ultimately every application in the line of the '285 patent, claims priority from a U.K. application (No. 85/19,452) filed August 2, 1985.  *Id.* at 1.

All of the patent applications that gave rise to the '285 patent are related to ready-to-use solutions of anthracycline glycosides, and these priority applications contain claim language and statements from the inventors relevant to some of the disputed claim terms in the '285 patent.

**1.     Prosecution of the '784 Application**

The '784 application was filed with 30 claims directed to sterile, pyrogen-free anthracycline glycoside solutions, as well as processes for making and methods of using those sterile, pyrogen-free anthracycline glycoside solutions.  Ex. 4 ('784 application), p. PI 775-77.  During prosecution of the application, the inventors added a new claim directed to a sealed glass container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution where the solution was not reconstituted from a lyophilizate.  Ex. 5 (Response to Office Action mailed October 2, 1986), p. PI 840.  The inventors argued against rejections on the grounds that the prior art failed to teach the "sealed container" and "storage stability" limitations of the new claim.  *Id.* at p. PI 841-45; Ex. 6

(Response to Office Action mailed June 29, 1987), p. 875-80; Ex. 7 (Response to Office Action mailed September 28, 1988), p. 928-30.

The inventors distinguished any prior art on the basis of the stability required to meet the "sealed container" limitation included in the claims:

> The claim is now directed to a sealed container which contains a solution of doxorubicin therein where the pH of the solution is within a specified range. It should be pointed out that even if a solution of doxorubicin at the same pH and concentration range as a solution according to the present invention were known, unless it were also known that the solution were stable in the long term, there would be no reason for someone to put the solution into a sealed glass container. ***Putting a solution into a sealed glass container implies that one is aware that the solution is stable in the long term***.

Ex. 5, p. PI 844 (emphasis added). The inventors subsequently clarified why the "sealed container" limitation was important:

> The claims <u>require</u> that the solution be contained in a <u>sealed</u> glass container. This is a meaningful limitation, because one of ordinary skill in the art would never go to the trouble of sealing an unstable solution of an anticancer drug in a container.

Ex. 6, p. PI 877 (emphasis in original). Finally, the inventors argued:

> The act of sealing the solution in a container itself requires an appreciation that the solution is extraordinarily stable. It would be a waste of time and energy to seal a doxorubicin solution in a container if one did not appreciate that doxorubicin is stable over a particular pH range.

Ex. 7, p. PI 928.

In a November 21, 1988 declaration, Dr. Carlo Confalonieri (one of the inventors) discussed the meaning of "stable" in relation to the claimed solutions:

> Whereas, in accordance with what is widely accepted in the scientific community in the USP and in other Pharmacopoeias, ***a drug is defined as stable over the period in which it maintains an assay of 90% or higher of the initial***, one can conclude that:
>
> > the stability at 22°C of doxorubicin·HCL dissolved at 2 mg per ml diluted hydrochloric acid pH 3.0 is higher than the stability at 22°C of doxorubicin·HCl dissolved at 2 mg per ml 0.06 M phosphate

buffer pH 3.0 and 6.0, and ***can reach 18 months at a storage temperature between 2 and 8°C*** as shown in the patent application serial No. 878,784.

Ex. 8, p. PI 939 (emphasis added).

The '784 application was eventually abandoned in favor of prosecuting the '999 application.[2]

### 2.    Prosecution of the '999 Application

The '999 application was filed on July 27, 1989 as a continuation of the '784 application; at the same time, the inventors filed a preliminary amendment to the claims.  Ex. 1, certificate of correction dated May 18, 2004; Ex. 9 (Preliminary Amendment filed July 27, 1989), p. PI 55-67. The claims of the '999 application were directed to a sealed glass container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution in which the solution was not reconstituted from a lyophilizate.  *See* Ex. 7, p. 923; Ex. 9, p. PI 55.  The inventors successfully argued against prior art rejections on the grounds that the stable, intravenously injectable, sterile, pyrogen-free solutions of the claims were not taught by the prior art.  *See* Ex. 9, p. PI 59-66; Ex. 10 (Office Action mailed January 2, 1990), p. 86-88.  The '999 application then issued as U.S. Patent No. 4,946,831 on August 7, 1990.[3]  Ex. 11.

### 3.    Prosecution of the '856 Application

---

[2]    Before abandoning the '784 application, the inventors also filed a continuation-in-part application, Serial No. 07/064,653, that led to another family of patents.

[3]    Claim 1 of the '831 patent covers:

A sealed glass container containing therein a stable, intravenously injectable, sterile, pyrogen-free doxorubicin anti-tumor composition in a solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefor, wherein said solution has not been reconstituted from a lyophilizate, and wherein said solution has a pH adjusted to 2.71 - 3.14 with hydrochloric acid, and a concentration of said doxorubicin of from 0.01 to 100 mg/ml.

Ex. 11, col. 20, lines 36-44; certificate of correction dated February 18, 1992.

The '856 application was filed as a continuation of the '999 application with the original claims of the '784 application. Ex. 1, certificate of correction dated May 18, 2004; Ex. 12 ('856 application), p. PI 167-69. After the first Office Action, Ex. 13, the original claims were cancelled and new claims were substituted. Ex. 14 (Response to Office Action mailed August 6, 1990), p. PI 191-93. The new claims were directed to physiologically acceptable doxorubicin hydrochloride solutions that were not reconstituted from lyophilizates. *Id.* The inventors again successfully presented argument and data that the prior art failed to meet all of the limitations of the pending claims, this time including the physiologically acceptable limitation. *Id.* at PI 193-200; Ex. 15 (Response to Office Action mailed April 11, 1991), p. 252-57. The '856 application then issued on June 23, 1992 as U.S. Patent No. 5,124,317.[4] Ex. 16.

### 4.    Prosecution of the '742 Application

The '742 application was filed as a continuation of the '856 application; at the time of filing, the inventors filed a Preliminary Amendment that canceled original claim 1 and substituted new claims. Ex. 1, certificate of correction dated May 18, 2004; Ex. 17 (Preliminary Amendment filed January 29, 1992). Among the claims introduced in the Preliminary Amendment were the following claims relevant to what eventually became claim 1 of the '285 patent:[5]

---

[4]       Claim 1 of the '317 patent covers:

A physiologically acceptable solution of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 5.0 with hydrochloric acid and doxorubicin concentration of from 0.1 to 100 mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

Ex. 16, col 20, lines 33-38.

[5]       The claims were renumbered at the time of issuance. Thus, claim 31 of the '742 application became claim 1 of the '285 patent.

31. A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of epirubicin hydrochloride, idarubicin hydrochloride and doxorubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid and the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

32.     The solution of Claim 31 which is contained in a sealed container.

* * *

41.  The solution of Claim 31 wherein said physiologically acceptable acid is selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, ethonesulfonic acid, tartatic acid, acetic acid, succinic acid, ascorbic acid, citric acid, and glutamic acid.

Ex. 17, p. PU 14911-12.

The Examiner rejected the claims as obvious; the inventors filed a response that explained how their invention differed from the prior art, in part based on "storage stability":

Applicants are the first to develop storage stable anthracycline solutions.

* * *

Prior to applicants [sic] invention, aqueous solutions were considered to have short term stability only.  No practical method existed which allowed the pharmaceutical manufacturer to offer to the medical community aqueous solutions of anthracyclines which were ready for use until the present invention.

* * *

Applicants' invention [lies] in the preparation of storage stable anthracycline aqueous solutions whose stability far exceed any which was achieved prior to the present invention.

Ex. 18 (Response to Office Action mailed July 6, 1992), p. PU 14995-98.  At that time, the inventors moved the list of  physiologically acceptable acids from claim 41 into claim 31, and also specified that the solvent was aqueous. *Id*. at PU 14993-94.

The inventors also submitted another declaration from Dr. Confalonieri that presented comparative stability data for solutions that incorporated a variety of anthracycline glycosides,

including epirubicin and idarubicin, and employed a variety of physiologically acceptable acids.
Ex. 19 (Declaration of Dr. Carlo Confalonieri dated December 9, 1992), p. PU 15002-05.  The
declaration summarized the comparative data as follows:

> Prior to the present invention, the conventional wisdom was that it was impossible
> to produce anthracycline aqueous solutions which had long term stability.
> Further, that although the prior art had been [sic] recognized that pH had an effect
> upon storage stability of aqueous solution [sic], the conventional wisdom in the
> art was that the pH should be adjusted with a buffer as taught by Arcamone.
> ***Thus, it was surprising and unexpected to discover that by adjusting the pH of
> the aqueous solution with a physiologically acceptable acid, a solution having
> storage stability . . . would result***.  Prior to the present invention the expectation
> of those skilled in the art was that the nature of the pH adjusting medium would
> have no effect on the stability of the aqueous solution.  Accordingly, it was
> extremely surprising and unexpected to find that[,] contrary to conventional
> wisdom, the pH adjusting medium had a significant and beneficial effect.

*Id*. at PU 15004-05 (emphasis added).

The inventors then amended claim 31 to recite the sealed container limitation previously
presented in claim 32.  Ex. 20 (Response to Office Action mailed November 15, 1993), p. PU
15067-68.  At this point in prosecution, the claim that eventually became claim 1 of the '285
patent recited as follows:

> 31.   A physiologically acceptable solution of anthracycline glycoside selected
> from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride
> and epirubicin hydrochloride dissolved in a physiologically acceptable solvent,
> having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid
> selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric
> acid, methane sulfonic acid, tartaric acid, the concentration of said anthracycline
> glycoside being from 0.1 to 100 mg/ml, wherein said solution is contained in a
> sealed container and has not been reconstituted from a lyophilizate.

*Id*. at PU 15067.  Despite the amendment, argument, and evidence, the Examiner maintained her
obviousness rejection in an Office Action.  Ex. 21 (Office Action mailed September 26, 1994).

Starting with that Office Action, an important exchange then took place regarding
claim 31's recited "not … reconstituted from a lyophilizate" limitation.  In responding to the

inventors' efforts to distinguish the claimed compositions from the cited prior art on the basis of reconstitution from a lyophilizate, the Examiner stated: "a lyophilizate which is reconstituted in water is not been to be [sic] patentably distinct from an unlyophilized solution." *Id.* at 15077.

On June 28, 1996, in light of the Examiner's comments indicating that whether the claimed stable solutions were reconstituted from lyophilizate was immaterial to patentability, the inventors amended claim 31 to delete the phrase "and has not been reconstituted from a lyophilizate." Ex. 22 (Response to Office Action mailed January 30, 1996), p. PU 15155. The inventors also presented new claim 45, which remained unchanged thereafter and became eventual claim 9 of the '285 patent. *Id.* at PU 15156.

The inventors' response explained why the obviousness rejection was inappropriate, emphasizing that a novel property of the claimed solutions was their capacity for long term storage, and that none of the prior art was even remotely directed toward achieving the goal of long term storage-stable solutions. *Id.* at PU 15157, 15158, 15161, 15162. The inventors' response also pointed out that the Arcamone reference cited by the Examiner actually taught away from the claimed invention, by teaching that a doxorubicin solution was stable for only a few hours when pH was adjusted with hydrochloric acid, and was stable for only a few weeks when pH was adjusted to the range of 3-6 with a non-acid buffer. *Id.* at PU 15159, 15162.

Eventually, the '285 patent issued with claims 1 and 9 in the same form they had achieved through the June 28, 1996 amendment.

## IV. <u>ARGUMENT</u>

### A.    **Legal Standards for Claim Construction**

The claims of a patent define the invention. *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). Claim construction is an issue of law reserved

exclusively for the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)(en banc), *aff'd*, 517 U.S. 370 (1996). The meaning of the claims is determined by interpreting the claim language in light of the intrinsic evidence – the patent specification, the prosecution history and the other claims – as well as any relevant extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman*, 52 F.3d at 979-80. However, because extrinsic evidence is generally "less reliable than the patent and its prosecution history in determining how to read claim terms," when the intrinsic evidence is clear, claim interpretation should be based solely upon that intrinsic evidence without resort to extrinsic evidence. *Phillips*, 415 F.3d at 1318; *see also Vitronics*, 90 F.3d at 1583; *Markman*, 52 F.3d at 981.

Interpretation of patent claims begins with an examination of the claim language itself because "the claims themselves provide substantial guidance as to the meaning of claim terms." *Phillips*, 415 F.3d at 1314; *see also Vitronics*, 90 F.3d at 1582. The claim language is examined through the eyes of one of ordinary skill in the art at the time of filing the patent application. *Phillips*, 415 F.3d at 1312-13. The words of all of the claims, both asserted and non-asserted, are used to define the scope of the invention. *Vitronics*, 90 F.3d at 1582. Moreover, "the context in which an asserted claim term is used can be highly instructive." *Phillips*, 415 F.3d at 1314.

Words are ascribed their ordinary and customary meanings unless it appears that the inventor used them in another manner. *Vitronics*, 90 F.3d at 1582. Although the Court should normally look for the ordinary and customary meaning of claim terms, the ordinary meaning of claim terms may not be readily apparent from the claims themselves. In such situations, the court should construe these terms in view of the specification and the patent's prosecution history. *Markman,* 52 F.2d at 979-80. The written description and drawings must be consulted

to determine if the patentee has specially defined the term or otherwise limited the scope of the claim. *Phillips*, 415 F.3d at 1316. The specification "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. However, the written description is not a substitute for the chosen claim language, nor can the written description be used to rewrite the claims. *Resonate Inc. v. Alteon Websystems, Inc.,* 338 F.3d 1360, 1364-65 (Fed. Cir. 2003). Though understanding the claim language can be aided by the explanations provided in the written description, it is improper to import into a claim limitations that are not a part of the claims. *Id.,* citing *Electro Med. Sys. S.A. v. Cooper Life Scis., Inc*., 34 F.3d 1048 (Fed. Cir. 1994).

The prosecution history is also relevant to the claim interpretation process because it demonstrates how the patentee and the Patent Office understood the invention, and may contain statements which limit the scope of the invention. *Vitronics*, 90 F.3d at 1582-83. The prosecution history includes not only the representations made by the patentee and Patent Office, but also statements in prior art cited during the prosecution. *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence"). In addition, the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application. *Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340, 1349-50 (Fed. Cir. 2004). Any statement of the patentee in the prosecution of a related application as to the scope of the invention is relevant to claim construction. *Id.* at 1350.

Beyond the intrinsic evidence, extrinsic evidence such as dictionaries (including technical dictionaries), learned treatises and expert and inventor testimony may be used to aid in claim construction. *Phillips*, 415 F.3d at 1317-19; *Markman,* 52 F.2d at 980-981. However, the extrinsic sources should be used as a supplement to the intrinsic evidence "as long as those

[extrinsic] sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324.

### B.       The Person of Ordinary Skill in the Relevant Art

As a result of the complexity and toxicity of anthracycline glycosides, experience with injectable cytotoxic drugs would be an integral part of the knowledge base of one of ordinary skill in the relevant art as of 1985. One of ordinary skill in the art as of 1985 would be generally familiar with the prior art on cytotoxic drugs, particularly the art regarding anthracycline glycosides. One of ordinary skill in the art as of 1985 would also have some common general knowledge relevant to the formulation of cytotoxic drugs, and would also have been knowledgeable regarding the formulation of injectables, in both lyophilized and ready-to-use forms. Further, one of ordinary skill in the art as of 1985 would be familiar with the hazards inherent in formulating and administering of injectable cytotoxic compounds.

At least as early as 1985, one of ordinary skill in the art would have been capable of designing and interpreting solution-state stability studies. That would include familiarity with abstract mathematical tools and theoretical techniques for determining stability (such as the concepts of $t_{90}$ and $t_{50}$ and the Arrhenius equation and resulting plots) and practical experience in conducting stability studies. Further, one of ordinary skill in the art would be familiar with techniques of analytical chemistry and instrumental analysis, including high pressure liquid chromatography (or HPLC).

Pharmacia contends it would be rare that one of ordinary skill in the art of the '285 patent in 1985 would have been a single person; instead, the knowledge and skills constituting ordinary skill in the art would generally be found in a team of people who collectively possessed the knowledge and skills described above. Such a team would likely be led by a person with a

Masters or a Ph.D. in Chemistry or Pharmaceutical Chemistry with several years experience studying the physiochemical characteristics, including chemical stability, of pharmaceutical compounds. The rest of the team would likely include members with bachelor's degrees in chemistry, pharmacy, or pharmaceutical chemistry with experience with stability studies on pharmaceutical compounds and the formulation of injectable cytotoxic drugs.

## C.     Construction of the Terms at Issue

### 1.     "Physiologically acceptable"

| Proper Claim Construction of "Physiologically Acceptable" |
|---|
| the substance is stable, sterile, pyrogen-free, and otherwise suitable for administration to humans or animals |

The phrase "physiologically acceptable" is used in the claims to describe the claimed solutions, the aqueous solvent used to formulate the solutions, and the acids used to adjust the pH of the solutions. The parties appear to agree on the meaning of the terms "solution," "aqueous solvent," and "acid," meaning that only the modifying phrase is contested. The dispute appears to arise out of one fundamental distinction: whether the term is meant to be construed in the context of a pharmaceutical compound administered to human or animal patients, and therefore stable, sterile, and pyrogen-free (Pharmacia's construction) or not in that context (Sicor's construction). The claims, specification, prosecution history, and extrinsic evidence all point toward a claim construction tied to administration to a human or animal patient; Pharmacia's construction should therefore be adopted.

"Physiologically acceptable" is one of the most commonly used terms in pharmaceutical patents – almost 6,000 patents issued since 1976 use it in the claims and over 22,000 use it in the specification. It is used uniformly as a descriptive term to denote solutions, solvents, acids, salts, and other materials that are suitable for administration to humans or animals at relevant

concentrations without any untoward physiological response.[6]  *See, e.g.,* Ex. 23 (U.S. Patent No.

4,220,667), col. 2, lines 36-40.  In other words, the well-established understanding of something

that is "physiologically acceptable" is that the substance is stable, sterile, pyrogen-free, and will

not provoke unintended pathological or physiological changes, such as an immune response or

metabolic alterations due to toxicity, in a patient upon administration.  *See, e.g.,* Ex. 24 (U.S.

Patent No. 4,927,806), col. 3, lines 31-36.

The claims of the '285 patent make it clear that the ordinary meaning of "physiologically

acceptable" should apply.  The term is used in relation to the constituents of solutions described

as both "physiologically acceptable" (claim 1) and "stable, intravenously injectable, sterile,

pyrogen-free" (claim 8).[7]  Ex. 1, col. 23, line 5; col. 24, lines 5-6.  The language of claim 8

makes it especially clear that the two descriptions are generally interchangeable.  The use of the

same "physiologically acceptable" term in claims 1 and 8 is presumed to have the same meaning

in both claims.  *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328

(Fed. Cir. 2006) (quoting *Fin Control Sys. Pty, Ltd. v. OAM, Inc.,* 265 F.3d 1311, 1318 (Fed. Cir.

2001)).

Not only does unasserted claim 8 use the term "physiologically acceptable" to describe

the solvent and acid used in the claimed "stable, intravenously injectable, sterile, pyrogen-free"

---

[6]     For example, each of the patents that uses the term "physiologically acceptable" in the claims and
claims priority to a 1985 foreign application relates to a pharmaceutical product or material to be
used in a pharmaceutical product.

[7]     Claim 8 covers:

A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin
solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically
acceptable solvent therefore, wherein said solution has a pH adjusted to 2.5 to 5.0 with a
physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

Ex. 1, col. 24, lines 5-11; certificate of correction dated May 21, 2002.

solution, it uses the transitional language "which consists essentially of."  Ex. 1, col. 24, lines 5-11.  That transitional language limits the scope of the claim to the specified materials "and those that do not *materially* affect the *basic* and *novel* characteristic(s)" of the claimed invention.  *In re Herz*, 537 F.2d 549, 551-52 (CCPA 1976) (emphasis in original); *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998).

In combination, those two requirements indicate that the "physiologically acceptable" solvent and acid of claims 1 and 8 are part of a "stable, intravenously injectable, sterile, pyrogen-free" solution without material changes, meaning that the "physiologically acceptable" solvent and acid of claim 8 must also be "stable, intravenously injectable, sterile, pyrogen-free."  Both "intravenously injectable" and "pyrogen-free"[8] make sense only in the context of a human or animal who has veins and a body that can rise in temperature above the basal level.  Thus, the claims dictate that "physiologically acceptable" must be defined in the context of a patient – and therefore must include the characteristics of being stable, intravenously injectable, sterile, pyrogen-free.

The specification confirms that the claimed solutions must be "physiologically acceptable" in human or animal patients:

> Owing to the well known anti-tumor activity of the anthracycline glycoside active drug substance, the pharmaceutical compositions of the invention are useful for treating tumors in both human and animal hosts.

Ex. 1, col. 4, lines 25-28.   The specification also repeatedly uses the words "stable," "intravenously injectable," "sterile," and "pyrogen-free" to describe the claimed physiologically acceptable solution.  *Id.* at title ("injectable ready-to-use); abstract ("sterile, pyrogen-free, ready-to-use); col. 1, lines 6-7 ("stable intravenously injectable ready-to-use"); col. 1, lines 50-51 ("stable, therapeutically acceptable intravenously injectable"); col. 1, line 54 ("sterile, pyrogen-

---

[8]      A pyrogen is a foreign substance that induces fever, such as a bacterium or protein fragment.

free"); col. 3, line 60 ("sterile, pyrogen-free"); col. 4, lines 42, 44 ("injectable").  All of those references make it clear that the ordinary meaning of "physiologically acceptable" applies in the claims of the '285 patent, including the characteristics of being stable, intravenously injectable in humans or animals, sterile, and pyrogen-free.

Similarly, the prosecution history supports the ordinary meaning of "physiologically acceptable" as requiring the stability, sterility, and lack of pyrogenicity sufficient to be used in patients.  In earlier related applications, the claimed solutions were described as "sterile, pyrogen-free," *see, e.g.*, Ex. 4, p. PI 775-77, or "stable, intravenously injectable, sterile, pyrogen-free," *see, e.g.,* Ex. 5, p. PI 840.  The importance of those characteristics was emphasized throughout the prosecution history.

In the prosecution of the original '784 application, the inventors stated:

> The solution must also be <u>sterile</u> and <u>pyrogen free</u>.  Again, these limitations impose stringent requirements on the types and amounts of impurities which may be contained in the solution in the sealed glass container.  Unless one purposefully sterilizes the solution and renders it pyrogen free, it cannot be concluded that such a solution meets these limitations.  In fact, it can be concluded without doubt that such a solution is <u>not</u> sterile or pyrogen free.

Ex. 6, p. PI 878-79 (emphasis in original).  Those "physiologically acceptable" characteristics of the solution were used to distinguish prior art:

> [T]here is no indication that the solutions [in the cited reference, Arcamone et al, International Symposium on Adriamycin, p. 9-22 (1972)] were sterilized or rendered pyrogen free.

> \* \* \*

> [S]ince the experiments involved in <u>Beijnen el al</u> [*Pharmaceutisch Weekblad Scientific Edition*, vol. 7 (1985), pp. 109-16] are laboratory experiments, and there is no indication that the solutions were sterilized or rendered pyrogen free, it can be concluded the these features are <u>not</u> met by the solutions of <u>Beijnen et al</u>. <u>***Since the solutions are not sterile and are not pyrogen free, then they cannot be intravenously injectable either***</u>.

*Id.* at PI 881, 883 (emphasis in original and added); *see also* Ex. 25 (Declaration of William J. Ring dated October 19, 1987, noting that claim 31 was directed to intravenously injectable solutions and that industry standards required such solutions to meet strict sterility requirements). The inventors continued distinguishing the Beijnen *et al.* reference based on physiological acceptability of the solution:

> [T]he solution must be <u>intravenously injectable</u>.  This is a meaningful limitation since it imposes stringent requirements on the nature and quantity of the impurities contained in the solution.  For example, as will be discussed in greater detail below, some of the solutions in the prior art references contain materials which would render them non-intravenously injectable.
>
> * * *
>
> [T]he solutions of <u>Beijnen et al</u> contain perchloric acid, as indicated by page 114, the left had paragraph.  Perchloric acid is <u>not</u> an intravenously injectable material, as one of ordinary skill in the art would readily appreciate.

*See* Ex. 6, p. PI 878, 883 (emphasis in original).

Then, during prosecution of the '856 application, the inventors repeated their distinction of the Beijnen *et al.* reference based, in part, on the absence of any teaching of pH adjustment with a "physiologically acceptable" acid:

> Beijnen was not concerned with whether or not his solutions were physiologically acceptable or, indeed, if they had any practical value at all.
>
> * * *
>
> Finally, Beijnen utilizes perchloric acid, a physiologically unacceptable pH adjusting media.

Ex. 14, p. PI 196.  In doing so, the inventors relied on Dr. Confalonieri's declaration that explained that the use of perchloric acid would lead to a physiologically unacceptable solution:

> In my opinion, the technique of Beijnen, adjusting the pH with perchloric acid, would not be practiced by one of skill in this art to obtain storage stable physiologically acceptable doxorubicin hydrochloride solutions for several reasons.  First, perchloric acid is not a pharmaceutically acceptable material for incorporation into pharmaceuticals which are to be administered intravenously to

patients.  That is, it would be impossible to prepare a clinically acceptable solution using perchloric acid.

Ex. 26 (Declaration of Dr. Carlo Confalonieri dated December 20, 1990), p. PI 203 at ¶5.

In the prosecution of the '742 application, the inventors distinguished other prior art references that did not teach using a "physiologically acceptable" acid for pH adjustment:

> Britton-Robinson buffers [of Kaniewska, *Pharmacia Polska*, vol. 9, p. 539-42] are not considered pharmaceutically acceptable and cannot be used for pharmaceutical preparations due to the presence of physiologically unacceptable substances such as boric acid.

Ex. 27 (Response to an Office Action mailed December 6, 1996), p. PU 15280.  All of those statements by the inventors indicate that "physiologically acceptable" has the ordinary meaning of being administrable to humans or animal patients without adverse effects, which also requires being stable, sterile, and pyrogen-free.

Pharmacia's proposed definition of "physiologically acceptable" is consistent with the meaning of that phrase as understood by those of skill in the art, including  Dr. Jacob Beijnen:

> Q:  I am wondering if you could help me understand what, "Physiologically acceptable," means.
>
> A:  I interpret that as a solution that can be administered to a human being.
>
> * * *
>
> Q:  In the context of the '285 patent, what types of chemical issues do you have to take into account in deciding whether or not something is proper to administer to a human being?
>
> A:  Well, I think still we can discuss this in a general way because there are general issues that are applying here as well, and so in my view, in my interpretation, **_a physiologically acceptable solution is a solution that can be administered in a safe way to a human being which means that when it is administered correctly, or after dilution or whatever is the way it should be administered to patients, that we realise the issue on pH, isotonicity, free of precipitates, microbiologically safe, compatible with blood_**.  These are general issues, I realise that, but they also apply to this case.

Ex. 28 (Beijnen deposition), p. 140:21-142:9 (emphasis added, objections omitted).  By

identifying microbiological safety as a key issue, Dr. Beijnen was saying that the solution

must be sterile and pyrogen-free.  Dr. Federico Arcamone testified to the same effect:

> Q:  Let me make sure that we are using terms the same way.  When you hold the opinion that a solution is physiologically acceptable, what characteristics does that solution have?
>
> A:  That does no harm to the patients.  This is physiologically acceptable.
>
> Q:  Is there any other aspect to what a solution needs to be to be physiologically acceptable?
>
> A:    It is the main point, to be of no harm for the patient.

Ex. 29 (Arcamone deposition), p. 137:4-17 (objection omitted).  *See also id.* at 108–09.

Similarly, as noted by Dr. Beijnen: "'Intravenously injectable', means that it is pharmaceutically,

medically allowed to inject that solution into a human being."  Ex. 28, p. 144:4-6.  In short,

Pharmacia's proposed definition should be adopted because it is the only one consistent with the

claims, specification, prosecution history, and understanding of those of skill in the art.

### 2.    "OF"

| Proper Claim Construction of "Of" |
|---|
| of |

"Of" is a simple English word with many slightly different definitions; Pharmacia believes that many of them would be equally appropriate in their use in relation to the claims of the '285 patent and there is no need to further construe the word.  Sicor, however, submits that "of" has a special meaning because it has been used as transitional language in claim 1 of the '285 patent.  Trying to fit a square peg into a round hole, Sicor contends that "of" is intended to reflect the open transitional language "comprising."  The inventors employed counsel who could have chosen to use "comprising" (or, for that matter, "consisting essentially of" or "consisting of") as transitional language; there is simply no reason to believe that the choice to reject traditional transitional language should be ignored.

The word "of" is used four times in claim 1 alone.  Sicor apparently believes that it should be given at least three different meanings in that one claim – one for transitional language, one in the *Markush* groups, and one in the phrase "the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml."  Pharmacia believes that there is no reason to adopt any unusual meaning in any of those uses, or any need to attempt to define the term with anything more than the broadly accepted meaning of the word.  There is no need to construe the word "of."

### 3.     "Anthracycline glycoside"

| Proper Claim Construction of "Anthracycline Glycoside" |
| --- |
| A class of chemical compounds having the following generic structure:  |

"Anthracycline glycoside" is used in the claims to describe the class of compounds to which the claimed active molecules (idarubicin, epirubicin, and doxorubicin hydrochloride) belong.  The parties agree on the generic structure for this class of compounds, but disagree as to whether there are other requirements to be imported into the claims from the specification.  Specifically, Sicor attempts to import a "non-lyophilized" limitation that is simply not present in the plain meaning of the claims, and contradicts the intrinsic evidence.

Unquestionably, by the time of the invention, the class of anthracycline glycoside compounds was sufficiently well described in the art that one of skill in the art could readily comprehend the structure of the compounds.  *See*, *e.g.*, Ex. 30 (Beijnen *et al.*, "Aspects of the Chemical Stability of Doxorubicin and Seven Other Anthracyclines in Acidic Solution," *Pharmaceutisch Weekblad Scientific Edition*, vol. 7, p. 109-16 (1985)), p. PU 14935-36.  Pharmacia believes that the definition should end there, and that the prosecution history of the '285 patent unequivocally reinforces the general rule that limitations should not be imported from the specification; indeed, the additional "non-lyophilized" limitation that Sicor proposes does not even appear in the specification.  The error of Sicor's proposed definition is especially clear because Sicor's attempt to engraft a "non-lyophilized" limitation onto the term

"anthracycline glycoside" ignores the intrinsic evidence.  A similar limitation was part of an earlier set of claims but, at the Examiner's suggestion, was removed by the inventors during prosecution.  In short, the record of the prosecution history irrefutably rebuts Sicor's position, and no "non-lyophilized" limitation should be imported from the specification or elsewhere into the claims.

The original independent claims from the Preliminary Amendment in the '784 application contained a specific limitation which required that the claimed solutions were "not been reconstituted from a lyophilizate":

> 31. A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of epirubicin hydrochloride, idarubicin hydrochloride and doxorubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid and the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

* * *

> 42. A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefor, wherein the solution has not been reconstituted from a lyophilizate, wherein said solution has a pH adjusted to 2.71 to 3.14 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

Ex. 17, p. PU 14911-13.

In an Office Action mailed September 26, 1994 (and re-mailed January 30, 1996), the Examiner concluded that the inventors' arguments regarding differences between the claimed invention and prior art based on the use of lyophilized material was a distinction without a difference material to patentability:

> Applicants contend that the Japanese application and Baurain et al. are both directed to anthracycline solutions which form a lyophilizate, which is later reconstituted in water.  *Same argument has not been found persuasive because a*

> *lyophilizate which is reconstituted in water is not been [found] to be patentably*
> *distinct from an unlyophilized solution.*

Ex. 21, p. PU 15077-78 (emphasis added).

In reliance on the Examiner's statement that a solution reconstituted from a lyophilizate is not patentably distinct from an unlyophilized solution, the inventors amended the claims to remove the "not been reconstituted from a lyophilizate" limitation from the claims (while adding other, distinguishing limitations):

> The Claims of this application were previously drafted in a way that distinguished Applicants' solutions from certain prior art products which are reconstituted from lyophilizate powder in vials by medical personnel at the time of drug administration. ***The comments of the Examiner in the last Office Action indicated that whether the solution was reconstituted from lyophilizate is immaterial because patentability must reflect the inherent properties of the claimed solution and the prior art. Consistent with the Examiner's comments, Claims 31, 42, and 44 are now amended (by deleting the lyophilizate limitation) to show that the important and claimed properties of the present invention do arise from the inherent properties of the solution, regardless of whether the solution is prepared from lyophilizates in vials***.

Ex. 22, p. PU 15157 (emphasis added).  Thus, the inventors adopted the Examiner's position and got rid of the extraneous (and patently irrelevant) limitation from the claims.  Sicor now attempts to re-introduce a similar – although broader – limitation into one of the remaining claim limitations, "anthracycline glycoside."  But the re-importation into the claims that has been expressly removed is just as improper as ignoring a claim term that has been added.

Just as importantly, nothing in the prosecution history or specification supports Sicor's position.  The specification provides specific examples of anthracycline glycoside compounds, without suggesting they must be "non-lyophilizated," stating:

> Preferably the anthracycline glycoside is chosen from the group consisting of doxorubicin, 4'-epi-doxorubicin (i.e. epirubicin), 4'-desoxy-doxorubicin (i.e. esorubicin), 4'-desoxy-4'-iodo-doxorubicin, daunorubicin and 4-demethoxydaunorubicin (i.e. idarubicin).

Ex. 1, col. 1, lines 61-65.

Certainly, the specification elsewhere discusses anthracycline glycosides that have not been reconstituted from a lyophilizate to demonstrate one advantage of the claimed invention – that reconstitution at a patient's bedside is not necessary with the claimed solutions – but when doing so always uses the phrase "which has not been reconstituted from a lyophilizate" to further characterize those anthracycline glycoside solutions. This further description of some anthracycline glycoside solutions does not justify an attempt to import a "non-lyophilized" limitation into the phrase "anthracycline glycoside" itself.

Furthermore, the specification and prosecution history never use Sicor's proposed term "non-lyophilized." Thus, the plain meaning of the claims, as supported by the intrinsic evidence, does not support Sicor's attempt to read a "non-lyophilized" limitation into the phrase "anthracycline glycosides."

### 4.   "SEALED" [container]

| Proper Claim Construction of "Sealed" [Container] |
|---|
| A closed container which is further secured against access, leakage and passage by a fastening, membrane, or coating that must be broken to be removed |

The term "sealed container" appears in claim 1 of the '285 patent, as well in unasserted claim 8. Sicor asserts that "sealed" means merely closed; the intrinsic evidence establishes that "sealed" requires more than mere "closure." Indeed, even Sicor witnesses have testified that sealed containers have more than a mere closure.

The specification of the '285 patent describes the anthracycline glycoside solutions of the invention as provided in a sealed container. *Id.* at col. 1, line 9; col. 1, line 60. It then describes the seal used in the examples, specifically contrasting "closing" a vial with "sealing" it:

> The solution was filtered through a 0.22μ microporous membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then *closed* with chlorobutyl teflon-faced rubber stoppers and *sealed* with aluminium [sic] caps.

*Id.* at col. 6, lines 5-10 (emphasis added). The inventors used this exact same language in every one of the examples in the specification. *See id.* col. 6, line 65 – col. 7, line 3; col. 8, lines 9-34; col. 9, lines 24-29; col. 10, lines 27-32; col. 12, lines 27-32; col. 13, lines 27-32; col. 14, lines 26-31; col. 16, lines 27-32; col. 17, lines 25-30; col. 18, lines 25-30; col. 20, lines 21-26; col. 21, lines 20-25; col. 22, lines 19-24. These passages make clear that the inventors consider a sealed container to be something more than merely a closed container.

The prosecution history of the '285 patent supports Pharmacia's proposed construction. On three separate instances in the prosecution of the original '784 application, the inventors indicated that sealing the anthracycline glycoside solution of the claimed invention in a container is an extraordinary measure, acknowledging that it is appropriate only if the contents have been shown to be stable over the long term. Thus, the inventors indicated that a sealed container is something other than a closed, or stoppered, container:

> The claim is now directed to a sealed container which contains a solution of doxorubicin therein where the pH of the solution is within a specified range. It should be pointed out that even if a solution of doxorubicin at the same pH and concentration range as a solution according to the present invention were known, unless it were also known that the solution were stable in the long term, there would be no reason for someone to put the solution into a sealed glass container. Putting a solution into a sealed glass container implies that one is aware that the solution is stable in the long term.

Ex. 5, p. PI 844.

> The claims <u>require</u> that the solution be contained in a <u>sealed</u> glass container. This is a meaningful limitation, because one of ordinary skill in the art would never go to the trouble of sealing an unstable solution of an anticancer drug in a container.

Ex. 6, p. PI 877 (emphasis in original).

> The act of sealing the solution in a container itself requires an appreciation that the solution is extraordinarily stable. It would be a waste of time and energy to seal a doxorubicin solution in a container if one did not appreciate that doxorubicin is stable over a particular pH range.

Ex. 7, p. PI 928. Several years later, in the prosecution of the '742 application, the inventors again clarified the meaning of the sealed container limitation in distinguishing prior art:

> A sealed container effectively precludes [subsequent] lyophilization, since to lyophilize an unlyophilized solution would necessarily involve removal of water from the container and destruction of the seal.

Ex. 31 (Response to Office Action mailed November 15, 1993), p. PU 15057. These passages from the prosecution history of the applications that gave rise to the '285 patent make clear that the inventors considered a "sealed container" to be something more than merely a "closed container."

Witnesses, including Sicor witnesses, have indicated that a "sealed container" in the pharmaceutical field is more than just closed. As Dr. Beijnen testified, a stoppered tube "is closed to a certain extent, but it is not a sealed container. In pharmaceutical practice, sealed containers are, for instance, containers with a rubber stopper and with an aluminum cap on it where, under pressure, it is closed very tightly." Ex. 28, p. 195:21-196:1; *see also id.* at 193:17-194:12 ("If you have a sealed container then you are dealing with another type of closure of the container [as compared to a polypropylene stopper]."). Dr. Beijnen explained the benefits of a sealed container as follows: "Sealed containers are, for instance, necessary when you want to exclude an easy leakage out of the tubes, an easy leakage out of the flasks, an easy dropping from oxygen from outside." *Id.* at 196:6-9.

Wesley Fach, a Sicor officer, identified the nature of a sealed container in terms similar to those used in the specification:

Q:  Was -- what was your understanding of the meaning of the term "sealed container" that formed the basis of the invalidity analysis in the patent opinion letter?

A:  I'm sorry.  I think I may have lost something.  What is my understanding now or was then?

Q:  Was then.

A:  *To the best of my recollection, my understanding then was that a sealed container was a container such as one would normally keep a pharmaceutical product in.*

Q:  And why did you believe that was the meaning used in the patent opinion letter?

A:  Because I don't recall any specific discussion in the opinion letter about a sealed container that would give it any meaning other than what I would think to be a common meaning.

Q:  When you talk about the type of container you normally keep a pharmaceutical in, what are the attributes of that kind of container?

A:  Injectable pharmaceuticals, which is what a ready-to-use solution of idarubicin to be.  And the  type of products manufactured by -- that were manufactured by Sicor at the time were typically a vial that had a closure, a seal, that was put on there that rendered it not necessarily airtight in -- in an absolute sense, but such that if you tipped it upside down, the drug wouldn't come out.

Q:  And would a stopper -- in your mind, when you read the opinion letter, did you understand that a stopper would be sufficient to be a seal?

A:  Well, a stopper as used in a -- *what I thought to be a normal pharmaceutical product, that there's more than simply the rubber stopper.  There's typically a rubber stopper and then a metal cap, a crimped type of cap, that goes around that, that I would term the normal or customary packaging for an injectable pharmaceutical product.*

Ex. 32 (Fach deposition), p. 148:21-150:12 (emphasis added, objection omitted).

Thus, the meaning of the term "sealed container," viewed in the context of the specification and the file history is a closed container which is further secured against access, leakage and passage by a fastening, membrane, or coating that must be broken to be removed.

5.     "Storage stability"

| Proper Claim Construction of "Storage Stability" |
|---|
| Retaining physiological acceptability and at least 90% potency for at least 18 months |

The parties agree that "storage stability" should be defined, at least in part, in terms of retaining at least 90% potency; they differ on whether "storage stability" prohibits the solution from becoming harmful during that time, and whether the required time for potency is 18 months or 180 days. The context of the claims, specification, prosecution history, and contemporaneous art all dictate that the pharmaceutical solutions of claim 9 must remain physiologically acceptable and potent for at least 18 months. Accordingly, Pharmacia's construction of "storage stability" should be adopted.

There is no dispute between the parties that one measure of "storage stability" is 90% potency (also known as $t_{90}$). The specification describes its experiments as establishing that "[t]he solutions of the invention are characterized by a good stability. Solutions in various solvents and with different pH's and concentrations have been found to be stable for long periods at temperatures accepted for the storage of pharmaceutical preparations." Ex. 1, col. 4, lines 20-24. It then reports fourteen experiments, thirteen of which conclude with a calculated $t_{90}$ term. Id. at Tables 1-13. Experiment 1 in the specification involves a prior art solution (that is, one that does not involve adjustment of the pH of the solution with an acid) and reports $t_{90}$ terms of 480 and 815 days – less than 18 months at the higher temperature. Id. at Table 1. The other experiments relate to claimed solutions; they report $t_{90}$ terms of up to 5815 days, over fifteen years. Id. *Every experiment on a product within the claims had a $t_{90}$ term of over 18 months (540 days) at Sicor's suggested temperature of 4º C.* Id. at Tables 2-13.

Similarly, the claimed solutions are discussed as pharmaceuticals uniformly in the claims, specification, and prosecution history; as the inventors recognized, use as a pharmaceutical requires a solution to remain stable, and that it be intravenously injectable in humans or animals, sterile, and pyrogen-free – that is, physiologically acceptable – throughout storage.

Throughout prosecution of the '285 patent, the inventors repeatedly pointed out, in statements and arguments, that the inventors were the first to develop "storage stable" anthracycline glycoside solutions. *See, e.g.,* Ex. 18, p. PU 14995-96. Moreover, the inventors characterized any prior art teaching of stability of anthracycline glycoside solutions as merely possessing "short term storage stability only." *See id.* at PU 14996. These statements and arguments are, for the most part, general in nature. However, in a few instances, the inventors provided insight into the parameters for "storage stability," *i.e.*, long-term stability.

During prosecution of the '784 application, the inventors clearly indicated that an 18 month time frame was the appropriate period for determination of stability, based on Pharmacopeias. To overcome prior art, they submitted a declaration demonstrating the unexpected results of the claimed invention. The declaration provides a stability definition on the "widely accepted" definition in the field at that time – that stability required at least 90% potency over an 18 month period:

> Whereas, in accordance with what is widely accepted in the scientific community in the USP and other Pharmacopoeias, a drug is defined as stable over the period in which it maintains an assay of ***90% or higher*** of the initial, one can conclude that:
>
> > the stability at 22°C of doxorubicin HCl dissolved at 2 mg per ml diluted hydrochloric acid pH 3.0 is higher than the stability at 22°C of doxorubicin HCl dissolved at 2 mg per ml 0.06 M phosphate buffer pH 3.0 and 6.0, and can reach ***18 months at a storage temperature between 2 and 8°C*** as shown in the patent application serial No 878,784.

Ex. 8, p. PI 939 (emphasis added).  The declaration cites the stability data presented in the application (which is the same data presented in the examples in the '285 patent) as clear support for its conclusion that the stability of doxorubicin hydrochloride solutions within the pH and concentration parameters of the claims of the '285 patent "can reach 18 months."  Thus, the file history, consistent with the specification, ties the 90% potency level to an 18 month timeframe. Where, as here, numerical definitions are well supported in the specification and/or prosecution history, they are properly considered in construing claims.  *See Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996).

The inventors made several other statements relevant to the "storage stability" limitation, all of which confirm the definition proposed by Pharmacia, including the use of the $t_{90}$ value over an 18 month time frame.  First, the inventors made statements that linked the "sealed container" limitation to the "storage stability" limitation.  For example, in a Response to the Office Action mailed October 2, 1986, the inventors made clear that the solution must be storage stable for a long term:

> It should be pointed out that even if a solution of doxorubicin at the same pH and concentration range as a solution according to the present invention were known, unless it were also known that the solution were stable in the long term, there would be no reason for someone to put the solution into a sealed glass container. Putting a solution into a sealed glass container implies that one is aware that the solution is stable in the long term.

Ex. 5, p. PI 844.  Similarly, in the response to the Office Action mailed June 29, 1987, the inventors stated:

> The claims <u>require</u> that the solution be contained in a <u>sealed</u> glass container.  This is a meaningful limitation, because one of ordinary skill in the art would never go to the trouble of sealing an unstable solution of an anticancer drug in a container. A certain minimum stability is required before one would even think to carry out such action.

Ex. 6, p. PI 877 (emphasis in original).  In the response to the Office Action mailed September

28, 1988, the inventors stated:

> The act of sealing the solution in a container itself requires an appreciation that
> the solution is *extraordinarily stable*. It would be a waste of time and energy to
> seal a doxorubicin solution in a container if one did not appreciate that
> doxorubicin is stable over a particular pH range.  According to the prior art,
> solutions of doxorubicin decompose very quickly, thus requiring the solution to
> be prepared very shortly before use.  Sealing a solution in a glass container is
> completely incompatible with this understanding.

Ex. 7, p. PI 928 (emphasis added).

The Pharmacopeia discussed in the declaration, and other contemporaneous sources,

suggest the use of $t_{90}$ as a measure for stability of pharmaceutical products.  The United States

Pharmacopeia (USP) entry for the lyophilized doxorubicin product available at the time of the

invention included a requirement that the mixture of doxorubicin hydrochloride and lactose

contain "not less than 90.0 percent and not more than 115.0 percent of the labeled amount of

$C_{27}H_{29}NO_{11}$·HCl [doxorubicin hydrochloride]."  Ex. 33 (USP XX (1980)), p. PU 82286; Ex. 34

(USP XXI (1985)), p. PU 8809. Similarly, a leading pharmaceutical treatise stated:

> Stability of a pharmaceutical product may be defined as the capability of a
> particular formulation, in a specific container/closure system to remain within its
> physical, chemical, microbiological, therapeutic, and toxicological specifications.
>                                     * * *
> Stability of a drug also can be defined as the time from the date of manufacture
> and packaging of the formulation until its chemical or biological activity is not
> less than a predetermined level of labeled potency and its physical characteristics
> have not changed appreciably or deleteriously.  Although there are exceptions,
> 90% of labeled potency generally is recognized as the minimum acceptable
> potency level.

Ex. 36 (Remington's Pharmaceutical Sciences, 17th Ed. (1985)), p. PU 96472.

As confirmed by the testimony of Dr. Beijnen, those of skill in the art as of would have

applied the 18-month time frame, and consideration of physiological acceptability, based on

Pharmacopeial requirements:

Q:  At any point in time that you have been working on your opinions that you offer in the matter of Pharmacia versus Sicor, did you ever have a working understanding of what the term, "Stability", means in the context of the '285 patent that you are opining on?

A:  The concerning of a ready-to-use solution for pharmaceutical purposes, for pharmaceutical marketing, under the storage conditions that are proposed by the manufacturer, then there will be a requirement for such a ready-to-use solution to be stable, and I will come back to the word, "Stable", later on, but be _**stable for at least 18, 24 months in the refrigerator**_, because that would allow such a product to be manufactured, to be distributed, to be purchased, to be handled in a Pharmacy department, and in such a way that you can use the drug before the expiry data has been passed.  _**So, in this context for a ready-to-use solution the stability means that the drug is not degraded during storage, does not form -- not in a chemical way, and in a physical way, and that the quality of the product, you can, let's say -- pharmacopoeia requirements are fulfilling for the quality of the product**_, and for -- yes, well, that is what I wanted to say about it.

Q:  Let's see if I cannot kind of split this up and figure out where it comes from. When you say, "Pharmacopoeia stability", it is not exactly the term you used, but you referred to the pharmacopoeia when you were defining stability.  How does that play into your definition of stability?

A:  _**The pharmacopoeia gives a requirement for product quality,**_ so the quality should fulfill these requirements which means data is -- _**that there is chemical and physical stability**_.

Ex. 28, p. 115:9-116:25 (emphasis added, objections omitted).[9]  *See also id.* at 245:5-20, 251:5-252:25, 255:4-256:10.

---

[9]    Dr. Beijnen testified regarding the absolute amount of an active drug remaining as a percentage of its initial concentration required for a drug to be considered "stable."  *See* Ex. 28, p. 183:1 – 186:13.  Dr. Beijnen testified that, now, he "would not accept a 10% degradation [$t_{90}$] as a terminology of stable for a pharmaceutical product."  *Id.* at 183:5-7.  He further testified: "Well, in view of the characteristics of anthracyclines, one would read out of the patent that there are certain conditions under which the drug remains above 99% of its initial concentration or potency … I would only accept the product as a stable product, and that would certainly be valued where I would start to think about less than 1% degradation of being stable."  *Id.* at 186:3-13.  Dr. Beijnen's definition reflects the tightening of the stability requirement in the USP.  In the 2005 version of the USP, doxorubicin hydrochloride must contain "not less than 98.0 percent and not more than 102.0 percent of $C_{27}H_{29}NO_{11}$.HCl [doxorubicin hydrochloride], calculated on the anhydrous, solvent-free basis."  *See* Ex. 36 (USP XXVIII, NF (National Formulary) XXIII, Supplement II (2005) (Exhibit 143 to the Beijnen deposition)), p. 1.

The meaning of the term "storage stability," therefore, viewed in the context of the specification and the file history is a solution capable of retaining at least 90% potency and remaining physiologically acceptable for at least 18 months.

## V.  CONCLUSION

Pharmacia respectfully requests that the Court enter an order construing the disputed claim terms as set forth above.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Maryellen Noreika*
_____
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200
  Attorneys for Plaintiff
  Pharmacia & Upjohn Company LLC

OF COUNSEL:

Daniel A. Boehnen
Joshua R. Rich
McDONNELL BOEHNEN
  HULBERT & BERGHOFF LLP
300 S. Wacker Drive
Chicago, Illinois  60606
(312) 913-0001

May 31, 2006
522761

## <u>CERTIFICATE OF SERVICE</u>

I, Maryellen Noreika, hereby certify that on May 31, 2006 I electronically filed

the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such

filing(s) to the following:

>Steven J. Balick
>John G. Day, Esquire
>ASHBY & GEDDES

and that on May 31, 2006 I also caused copies to be served upon the following in the manner

indicated:

### <u>BY HAND</u>

>Steven J. Balick
>John G. Day
>ASHBY & GEDDES
>222 Delaware Avenue
>Wilmington, DE  19801

### <u>BY FEDERAL EXPRESS</u>

>Reid L. Ashinoff
>David R. Baum
>SONNENSCHEIN NATH & ROSENTHAL LLP
>1221 Avenue of the Americas
>New York, NY  10020

>Jordan Sigale
>SONNENSCHEIN NATH & ROSENTHAL LLP
>8000 Sears Tower
>Chicago, IL  60606

>*/s/ Maryellen Noreika (#3208)*
>MORRIS, NICHOLS, ARSHT & TUNNELL LLP
>(302) 658-9200
>mnoreika@mnat.com