EXHIBIT 2

(PART 2 OF 2)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE 2

**INITIAL VALUES**
Concentration: 1.992 mg/ml          pH = 3.0
Relative % Assay: 100.0

TEMPERATURE

| TIME (weeks) | 4 C° | | 35 C° | | 45 C° | | 55 C° | |
|---|---|---|---|---|---|---|---|---|
| | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay |
| 1 | 1.995 | 100.2 | 1.952 | 98.0 | 1.919 | 96.3 | 1.493 | 75.0 |
| 2 | | | 1.889 | 94.8 | 1.851 | 92.9 | 1.036 | 51.9 |
| 3 | | | 1.876 | 94.2 | 1.565 | 78.6 | 0.730 | 46.7 |
| 4 | 1.979 | 99.4 | 1.808 | 90.8 | 1.393 | 69.9 | | |
| 12 | 1.972 | 99.0 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:
$t_{90}$ at 4 C° = 3870 days
$t_{90}$ at 8 C° = 2000 days

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE 3

**INITIAL VALUES**
Concentration: 20.06 mg/ml          pH = 2.95
Relative % Assay: 100.0

TEMPERATURE

| TIME (weeks) | 4 C° | | 35 C° | | 45 C° | | 55 C° | |
|---|---|---|---|---|---|---|---|---|
| | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay |
| 1 | 20.06 | 100.0 | 19.56 | 97.5 | 17.84 | 88.9 | 12.31 | 61.4 |
| 2 | | | 18.87 | 94.1 | 15.61 | 77.8 | 7.09 | 35.3 |
| 3 | | | 18.24 | 90.9 | 13.41 | 66.8 | 3.13 | 15.6 |
| 4 | 19.91 | 99.2 | 17.51 | 87.3 | 11.07 | 55.2 | | |
| 12 | 19.80 | 98.7 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:
$t_{90}$ at 4 C° = 3700 days
$t_{90}$ at 8 C° = 1780 days

28

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In addition, as shown by the following Table 14 (taken directly from the patent) long-tem

stability was measured directly at 4° C and 8° C:

TABLE 14

INITIAL VALUES
Concentration: 20.39 mg/ml                        pH = 3.06
Relative % Assay: 100.0

TEMPERATURE

| TIME (months) | 4 C° | | 8 C° | |
|---|---|---|---|---|
| | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay |
| 1 | 1.983 | 97.3 | 1.959 | 96.1 |
| 3 | 1.984 | 97.3 | 1.983 | 97.3 |
| 6 | 2.012 | 98.7 | 2.002 | 98.2 |

Importantly, the stability data reflected by those examples does not mirror the $t_{90}$ values

calculated by Professor Clark. The data presented in the '285 patent – and actual real life

experience – showed that the anthracycline glycoside solution is far more stable when pH is

adjusted to 3.0 with hydrochloric acid than the result suggested by Professor Clark's assumptions

and extrapolations. That is, because of the nature of anthracycline glycosides, testing under the

intended final conditions was necessary to establish how doxorubicin would react to those

conditions because actual results were quite unpredictable. Also vitally important, the acidic

doxorubicin solutions described in the '285 patent did not show the precipitation at higher

concentrations discussed in my 1986 article. This is apparently due to the aglycone forming a

part of the stacking complex rather than precipitating out of solution.

 This situation produces a complex result. On the one hand, the avoidance of precipitates

is a necessary and essential aspect of a safe injection solution. But on the other hand, the fact

that aglycone precipitates are avoided by solubilization of the aglycone, i.e., stacking of the aglycone between the anthracycline glycoside, presents a new and potentially more dangerous result. That is, the solubilization of the aglycone may have masked the presence the aglycone, which would normally have precipitated out of solution, and which is even more toxic than the anthracycline glycoside substance. Regardless of the complexity of the situation, the invention of the '285 patent achieved stable and physiologically acceptable solutions of anthracycline glycosides at relatively high concentrations, when other results would suggest they would not be achieved.

In another aspect, Professor Clark opines "that the '285 patent would be understood by 'those of ordinary skill in the art' to describe an invention in which avoiding a lyophilizate in manufacturing or administering anthracycline glycosides is an essential feature of the invention"; I do not agree that avoiding a lyophilizate in manufacturing is an essential feature of the invention. Claim 1 of the '285 patent covers:

> 1.    A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution is contained in a sealed container.

In my understanding, one of ordinary skill in the art would not have understood the terms "lyophilizate" and "reconstitution" (terms used in Professor Clark's discussion) to be limitations on the claims of the '285 patent, and my understanding differs from Professor Clark's understanding in this respect. In the context of a cytotoxic injectable product, like those claimed in the '285 patent, one of ordinary skill in the art would have considered a product a "lyophilizate" only if it was in the freeze dried powder form as a finished drug product. One of

30

ordinary skill in the art would not consider the intermediate manufacturing steps as relevant to a determination of whether the product was a lyophilizate. Thus, if the final drug product was in the form of a ready-to-use solution, it would not have had to be reconstituted from a lyophilizate. This is the situation with all of the examples of the '285 patent, in each of which doxorubicin (in an unspecified dry form) was dissolved in water to form a solution. *See, e.g.*, col. 5, lines 65-67; col. 6, lines 59-61; col. 8, line 1-3. Similarly, one of ordinary skill in the art would view "reconstitution" only as a process that occurs immediately before administration to a patient. As prior patents showed, the purification of anthracycline glycosides involved numerous steps, including repeated concentration and solution steps. See, e.g., U.S. Patent Nos. 3,590,028; 3,803,124; and 4,107,423. Thus, in my opinion, one of ordinary skill in the relevant art would view avoiding the reconstitution of a lyophilizate of the anthracycline glycoside as part of having a ready-to-use solution in a sealed container only to the extent that the reconstitution of the lyophilizate would be at the time of administration. The same considerations do not apply in manufacturing.

D.     The 1985 Janssen *et al.* Paper

The 1985 Janssen *et al.* paper summarized research efforts undertaken with the goal of developing a liposome formulation of doxorubicin or DXR. I was personally familiar with this paper and the work reported in the paper, as the authors worked in the same laboratory as me at the time. In addition, the authors discussed issues related to the paper with me, as they acknowledged at the end of the paper (although my name is misspelled). However, I had no responsibility for creating the data reported in the 1985 Janssen *et al.* paper.

The 1985 Janssen *et al.* paper is notable in its criticism of earlier research. On page 2, the authors stated:

> Many studies on the stability of DXR on storage have been published, but only a few investigators used techniques that provide a combination of good selectivity and precision like HPLC (Hoffman *et al.*, 1979; Benvenuto *et al.*, 1981; Poochikian *et al.*, 1981; Williamson *et al.*, 1983; Karlsen *et al.*, 1983). Systematic work to gain insight into the mechanism of degradation is rare (Wassermann and Bundgaard, 1983). <u>It is therefore impossible to make exact predictions on DXR decomposition rates in aqueous systems to be used in pharmaceutical practice.</u>

(emphasis added). There would, therefore, be no motivation to combine the 1985 Janssen *et al.* paper with any prior reference; indeed, the paper teaches away from using information from any prior study. It was against that backdrop of unpredictability, also shown in the numerous other articles discussed above, that the authors undertook their research.

In summarizing the pre-formulation research they had undertaken, the authors of the 1985 Janssen *et al.* paper compared stability of doxorubicin in aqueous medium under various conditions, especially liposome encapsulation. In such a formulation, the doxorubicin is encapsulated in a liposome, which is a lipid or fat-like miscible system. The authors considered the stability of liposome-encapsulated doxorubicin in comparison to aqueous Tris buffer and phosphate buffer solutions at two pH levels, 4.0 and 7.4. Most of the reported results, especially the quantitative results (*see* Tables 1 and 3, Figures 1 and 2), compared the two buffer systems at pH 7.4. In addition, the authors studied certain solutions with Tris and phosphate buffers at pH 4.0. All of the research discussed in the paper was performed at relatively low concentrations (50 μg/ml to 500 μg/ml) because the authors observed precipitation at higher concentrations.

Importantly, the 1985 Janssen *et al.* paper involved the use of Tris buffer and phosphate buffers, not the physiologically acceptable acids claimed in the '285 patent. The following media were used.

(1)    Tris buffers with pH 7.4 or 4.0: 0.01 mol/l Tris and 0.8% sodium chloride. The pH was adjusted with 2 mol/l hydrochloric acid.

(2)    Phosphate with pH 7.4 or 4.0: 0.01 mol/l sodium dihydrogen phosphate and 0.8% sodium chloride. The pH was adjusted with 2 mol/l hydrochloric acid or 2 mol/l sodium hydroxide.

The paper does not say how the solutions were prepared. However, the only logical interpretation of the description of the materials section of the paper is that the authors added hydrochloric acid to the Tris buffer and to the phosphate buffer in order to adjust the pH of the buffers to 7.4 or 4.0, and then added the pH adjusted buffers to doxorubicin solutions. It certainly would not be correct to suggest that buffers and doxorubicin solutions were mixed (prior to the addition of hydrochloric acid) and then, afterward, hydrochloric acid was added to adjust the pH of the resulting solution. Professor Clark appears to suggest exactly that in support of his conclusion that the 1985 Janssen *et al.* paper discloses all of the elements of claims 1, 2, 3, and 9 of the '285 patent. If that is what he is suggesting, he is incorrect in my opinion. That element is missing from the 1985 Janssen *et al.* paper.

Professor Clark relies upon only one element of the experimentation described in the 1985 Janssen *et al.* paper, incubation of various buffered solutions at 4° C:

One ml samples of DXR-containing solutions or liposome dispersions (100 μg/ml) were incubated in various buffers in 10 ml glass vials in a refrigerator. The solutions were deoxygenated by passing through nitrogen before dissolving DXR. In some cases polypropylene tubes were used, too, for comparison.

During storage, data on the DXR content were collected in triplicate experiments. The DXR concentration of each sample vial was determined in duplicate.

The following buffers were used: Tris pH 4.0 and 7.4 as well as phosphate pH 4.0 and 7.4.

The paper did not provide any quantitative results for the incubations at 4° C and pH 4.0. Rather, the paper indicates that "no significant DXR degradation was recorded over a 60-day period of storage at pH 4.0." However, the paper treats less than a 10% degradation (that is, the degradation seen at $t_{90}$) as too insignificant to report. *See* Tables 2, 4. Thus, when the authors state "no significant DXR degradation was recorded over a 60-day period," it is unclear whether the authors were merely suggesting that the $t_{90}$ for 100 µg/ml solutions of doxorubicin in Tris buffer or phosphate buffers at pH 4.0 was at least 60 days at 4° C. Certainly the paper does not support any conclusion beyond that. Sixty days of stability would not be considered stable.

Dr. Clark relies on a mathematical approach using the Arrhenius equation to extrapolate from the data that was reported in the 1985 Janssen *et al.* paper. Even if such an approach might be appropriate in some circumstances, the data in the Janssen *et al.* paper itself shows that such an approach would not be proper in the present case. The paper includes Arrhenius plots for both buffers at pH 7.4 and various temperatures. The plots are not linear, even in the narrow (seven degree), elevated (29° C to 36° C) temperature range set forth in Figure 2. That is, the Arrhenius plots themselves indicate that an extrapolation from testing at higher temperatures or other conditions to determine the stability of doxorubicin at pH 4.0 would be inaccurate in an unpredictable way. Furthermore, the authors did not start measuring concentration until after seven days had passed. *See* Table 1. As a result, the data set forth is incomplete for the purposes imposed by Dr. Clark and the data does not lead to any predictable conclusion of the type suggested by Dr. Clark.

Contrary to Professor Clark's assumption based on "good laboratory practice and simple common sense," the authors did not indicate that the samples were kept in sealed containers. Moreover, the nature of the seals employed would be important to a determination of the effect

34

of the container on stability of anthracycline glycoside. The situation involving such compounds is not as simple as Dr. Clark seems to assume. Indeed, that may be precisely why the authors did not report that the compounds were kept in sealed containers. In contrast to the complete lack of information in the 1985 Janssen *et al.* paper, the '285 patent specification indicates that, in the examples, the solutions were contained in type-I colorless glass vials having 5/7 ml capacity which were enclosed with chlorobutyl Teflon-faced rubber stoppers and sealed with aluminum caps. The sealed container element of the '285 patent was simply not disclosed in the 1985 Janssen et al. paper.

Furthermore, there is no indication whatsoever that the authors took any steps to ensure that their solutions would be physiologically acceptable. In the description of reagents, the paper states that the doxorubicin and doxorubicinone reagents were "used without purification." Additionally, there is no indication (as there normally would be) that the authors used sterile media for the formulation of the doxorubicin, or that the doxorubicin solutions were filtered to remove bacterial contaminants. It is not surprising that there was no discussion of such steps because the research reported was merely preliminary testing to determine if there were conditions under which liposomal encapsulation would improve stability. However, it does mean that the "physiologically acceptable solution" element of claim 1 of the '285 patent was not disclosed in the 1985 Janssen *et al.* paper.

In addition, the authors noted on page 8 of the 1985 Janssen *et al.* paper that "[t]he concentration of DXR was found to be a critical parameter for its stability," although they indicated that two previous studies had found the opposite. That is, the authors contrasted two previous studies, by Tavoloni *et al.* and Poochikian *et al.*, both of which found that the rate of doxorubicin decomposition was independent from concentration. The authors based their

criticism of those two papers by noting the "poor specificity of the fluorescence technique" discussed in the Tavoloni *et al.* paper and the lack of data reported in the Poochikian *et al.* paper.

The authors assayed decomposition rates for the Tris buffer and the phosphate buffer systems at pH 7.4 for 50 µg/ml and 500 µg/ml at 37°C and 61°C. The results were reported in Table 3 of the 1985 Janssen *et al.* paper. The results showed, for both buffer systems and at both temperatures, that the higher concentration was less stable. Although the authors suggested that "for both degradation processes (pseudo) first-order kinetics describe the decomposition profile well," the results indicate that the relationship is not direct, as $k_{obs}$ increases indirectly with concentration for both buffers and at both temperatures. Furthermore, the experiments were conducted only on concentrations up to only 500 µg/ml (and then, only at pH 7.4). I know that at higher concentrations, the investigators noted precipitation to occur. Such precipitation would make the formulation a suspension, not a solution, and physiologically unacceptable. Thus, not only did the authors' results indicate that it would not be possible to calculate $t_{90}$ figures accurately (as $k_{obs}$ was not actually a constant) from their research, they suggested that higher concentrations would not be stable.

I know that the authors of the 1985 Janssen *et al.* paper were well aware that they had not solved the problem of stability of doxorubicin in solution. In fact, the ultimate conclusion of the paper on page 10 was that "[i]n our laboratory work [was] in progress to address the problem related to the chemical stability of DXR in a systematic way." I became involved in this work. My subsequent paper on this work was published as "Aspects of the degradation kinetics of doxorubicin in aqueous solution" at Intl. J. Pharm. 32, 123-131, 1986.

36

In conclusion, I believe that the following underlined elements of claim 1 of the '285 patent are not present in the 1985 Janssen *et al.* paper:

> 1. A <u>physiologically acceptable</u> solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, <u>having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid,</u> the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, <u>wherein said solution is contained in a sealed container.</u>

Claims 2, 3, and 9 incorporate all of those elements, and those elements are therefore missing from those claims also. The additional element of claim 9 ("wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids") is missing from the 1985 Janssen *et al.* paper as well. I understand that Professor Clark does not assert that the additional elements of claims 11, 12, and 13 are found in the 1985 Janssen *et al.* paper. If he were to do so, all of the above elements would be missing from those claims as well as the additional elements of claims 11, 12, and 13.

E.     The 1983 Wassermann & Bundgaard Paper

The 1983 Wassermann & Bundgaard paper reported on research regarding the kinetics of hydrolysis of doxorubicin to determine whether it would degrade in (i) the acidic mobile phases used in liquid chromatography or (ii) in the gastrointestinal tract. For that reason, the authors studied doxorubicin at extremely low concentration (about 1.2 $\mu$g/ml), very low pH levels (between 0.43 and 2.13), elevated temperature (37° C), and hypertonic conditions. All of those conditions render the 1983 Wassermann & Bundgaard paper irrelevant to pharmaceutical solutions as found in the claims of the '285 patent.

37

Notably, like the authors of the subsequent 1985 Janssen *et al.* paper, Wassermann and Bundgaard criticized earlier research as providing insufficient information to understand the kinetics of anthracycline glycoside degradation.

> [N]o information appears to be available about the kinetics of degradation under acidic conditions, the only stability studies reported being concerned with photolytic degradation (Tavoloni et al., 1980; Williams and Tritton, 1981) and the stability in various infusion fluids (Poochikian et al., 1981).

That is, like the 1985 Janssen *et al.* paper, the 1983 Wassermann & Bundgaard paper teaches one of ordinary skill in the art away from combining the reference with any prior reference.

Because the concentration and pH levels discussed in the 1983 Wassermann & Bundgaard paper were so low, the results are of no use in determining how doxorubicin would act at the concentrations and pH levels claimed in the '285 patent. The concentration in the paper is low enough that there would have been neither any possibility of aglycone precipitation nor any need to consider a possible stacking effect (whether stabilizing or destabilizing). In addition, because the concentration was so low, the concentration dependence shown in the 1985 Janssen *et al.* paper would not appear. It would be simply impossible to extrapolate accurately from the 1.2 $\mu$g/ml concentrations in the 1983 Wassermann & Bundgaard paper to the higher concentrations claimed in the '285 patent.

Similarly, it would be improper to extrapolate from the extremely low pH levels employed in the 1983 Wassermann & Bundgaard paper to the higher pH levels in the claims of the '285 patent. The paper acknowledges that water-catalyzed and base-catalyzed reactions occur at some pH level higher than the extremely low pH levels used in the paper, but does not consider them because of the extremely low pH conditions. However, one of skill in the art would know that it would <u>not</u> be a fair assumption that those other reactions could be ignored at higher pH levels. Indeed, by 1986, it was shown that there was a water-catalyzed reaction that

predominates at about pH 4.0. Accordingly, one of ordinary skill in the art would know that the 1983 Wassermann & Bundgaard paper did not teach that doxorubicin hydrochloride would be stable at a pH between 2.5 and 5.0.[24]

In conclusion, I believe the following elements of claim 1 of the '285 patent are missing from the 1983 Wassermann & Bundgaard paper:

> 1. A <u>physiologically acceptable</u> solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, <u>having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid</u> selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, <u>the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution is contained in a sealed container.</u>

Claims 2, 3, 9, 11, 12, and 13 incorporate all of those elements, and those elements are therefore missing from those claims also. The additional element of claim 9 ("wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids") is missing from the 1983 Wassermann & Bundgaard paper as well.

Professor Clark apparently asserts that the additional elements of claims 11, 12, and 13 are found in the 1983 Wassermann & Bundgaard paper. There is no basis for that assertion, as neither of the additional elements (the concentration of the anthracycline glycoside is about 1 mg/ml and the anthracycline glycoside is idarubicin hydrochloride) are found in the 1983 Wassermann & Bundgaard paper.

---

[24] The 1983 Wassermann & Bundgaard paper also did not disclose a physiologically acceptable solution or the solution being contained in a sealed container.

F.    The 1980 Mori *et al.* Paper

The 1980 Mori *et al.* paper is entitled "Physicochemical Properties and Stability of Aclacinomycin A Hydrochloride."[25] The authors studied aclacinomycin A hydrochloride (or "ACM-HCl"), a drug very different from the anthracycline glycosides claimed in the '285 patent. While doxorubicin, epirubicin, and idarubicin have minor structural differences (as shown in Table 1 above), ACM-HCl is fundamentally different. ACM-HCl has three sugars rather than one; ACM-HCl also has an ester attached to the aglycone portion of the molecule and several other structural differences. Thus, the teachings of the 1980 Mori *et al.* paper would not have led one of ordinary skill in the relevant art to any conclusions whatsoever regarding anthracycline glycosides such as doxorubicin, epirubicin, and idarubicin.

The 1980 Mori *et al.* paper involved a number of experiments on ACM-HCl, including experiments on the stability of ACM-HCl in solutions of various pH levels in a 0.1 M phosphate-citrate buffer at 37°C. Both the buffer and temperature conditions were so different from those discussed in the '285 patent that the results would be of little relevance, even if other conditions were similar. Furthermore, the authors tested the stability of ACM-HCl using only TLC, which was known by 1985 to be inaccurate. Thus, one of ordinary skill in the art would not consider the 1980 Mori *et al.* paper as providing any guidance with regard to the stability of doxorubicin, epirubicin, or idarubicin under the conditions set forth in the '285 patent.

Finally, the 1980 Mori *et al.* paper taught away from the conclusion that anthracycline glycosides would be stable in acidic solutions. After its discussion of studies of ACM-HCl in solution, the authors concluded, "In pharmaceutical preparations of ACM-HCl, therefore, it

---

[25] According to Professor Clark's "List of Documents Considered," the Mori *et al.* reference he discusses is actually another paper, "Studies on the Stability of Aclacinomycin Hydrochloride." However, only one-half page of that article was actually translated into English. Regardless of which article was used, however, much of the data was the same.

should be lyophilized or dry-filled into ampules or vials with a stabilizer including lactose or maltose." Thus, one of ordinary skill in the relevant art reviewing the 1980 Mori *et al.* paper would be led to believe that ready-to-use formulations of anthracycline glycosides would not be appropriate for pharmaceutical preparations.

In conclusion, I believe the following elements of claim 1 of the '285 patent are missing from the 1980 Mori *et al.* paper:

> 1. A <u>physiologically acceptable</u> solution of anthracycline glycoside <u>selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride</u> dissolved in a physiologically acceptable aqueous solvent, <u>having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid,</u> the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, <u>wherein said solution is contained in a sealed container.</u>

Claims 2, 3, 9, 11, 12, and 13 incorporate all of those elements, and those elements are therefore missing from those claims also. The additional element of claim 9 ("wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids") is missing from the 1980 Mori *et al.* paper as well.

Professor Clark apparently asserts that the additional elements of claims 11, 12, and 13 are found in the 1980 Mori *et al.* paper. There is no basis for that assertion, as neither of the additional elements (the concentration of the anthracycline glycoside is about 1 mg/ml and the anthracycline glycoside is idarubicin hydrochloride) are found in the 1980 Mori *et al.* paper.

G.    Other References

On page 20 of his report, Professor Clark indicates his belief that "[a] number of other references also teach that doxorubicin HCl solutions are stable in a pH range of 2.5 to 5.0." I am

41

quite familiar with each of the references Professor Clark cites and disagree with his conclusion. None of those papers taught that doxorubicin as a pharmaceutical product is stable in an aqueous solution with a pH adjusted to 2.5 to 5.0. Furthermore, none of those references provided any teaching or suggestion that they should be combined with the 1985 Janssen *et al.* paper, the 1983 Wassermann & Bundgaard paper, or the 1980 Mori *et al.* paper. Finally, none of the references discusses idarubicin, which is the only anthracycline glycoside in claim 13 of the '285 patent.

1.    *The 1980 Vigevani and Williamson Paper*

Professor Clark cites a 1980 paper on doxorubicin by Vigevani and Williamson published in Analytical Profiles of Drug Substances. That paper was apparently a review article based on prior publications. That is, especially with regard to stability, the paper appears not to involve any original research, only a summary of what was said in earlier papers. The stability section has only a brief, vague summary of doxorubicin in solution, which contrasts strongly to the quantitative results recited for the active drug substance:

> The effect of pH values and buffer concentrations on the stability of aqueous solutions of doxorubicin hydrochloride has been determined by spectrophotometric and chromatographic methods. Doxorubicin is stable in acidic solutions in the pH range 3.0 to 6.5, but decomposes at increasing rates as the pH is increased from 6.5 to 12. Decomposition in aqueous solution gives complex mixtures of pigmented compounds with a wide range of chromatographic potencies. Apart from the isolation of adriamycinone from dilute acid solutions the identification of the components of these mixtures has not been accomplished.

The only reference cited in that discussion of stability is the 1972 Arcamone *et al.* paper discussed below.

The 1980 Vigevani and Williamson paper would not lead one of ordinary skill in the relevant art to believe that a solution of doxorubicin demonstrates physiologically acceptable

42

stability after having its pH adjusted to from 2.5 to 5.0. It indicates that spectrophotometric and chromatographic (apparently thin-layer) methods were used; those methods were known by 1985 to be clearly inadequate. As discussed above, direct spectrophotometric analysis simply is not a valid indication of stability. One of the degradation products of anthracycline glycosides like doxorubicin is an aglycone. The ultraviolet-visible absorbance of the aglycone breakdown product is similar to that of the corresponding intact anthracycline glycoside. As a result, spectrophotometric analysis does not yield results accurate enough to determine stability. Also as discussed above, TLC similarly lacks necessary selectivity in most cases, including those relevant here.

As of 1985, one of ordinary skill in the relevant art would have known that the only reliable way of obtaining accurate results indicative of stability would have been HPLC. Merely using HPLC equipment and methodology would not have been sufficient; HPLC must be carried out under the correct conditions. However, the early references in the relevant field, such as those cited in the 1980 Vigevani and Williamson paper, reported experiments that did not even use HPLC. The reliability of the data reported in those references would, therefore, have been of questionable value at best. All of this would have been know to a person of ordinary skill in the relevant art as of the priority date of the '285 patent.

In addition, the 1980 Vigevani and Williamson paper gives no context as to time, purpose, or conditions. Indeed, not only is any information on stability of any value completely lacking, the term "stable" is not defined. It appears to be used only as a contrast between the stability shown under acidic conditions and that under basic conditions, which can be as low as mere hours. Also, how stability was tested is not defined and there is no mention of an acid being used to adjust pH, only that conditions were acidic relative to isotonicity (but not the

native pH of doxorubicin). Indeed, the comments on stability appear to be based on the 1972 Arcamone *et al.* paper discussed below. The 1972 Arcamone *et al.* paper is reference 13 on page 263 of the 1980 Vigevani and Williamson paper. The comments I make below in relation to the 1972 Arcamone *et al.* paper therefore apply to the 1980 Vigevani and Williamson paper also.

     2.    *The 1972 Arcamone et al. Paper*

Professor Clark cites the 1972 Arcamone *et al.* paper that was in turn cited in the 1980 Vigevani and Williamson paper. Professor Clark suggests that the 1972 Arcamone *et al.* paper "disclose[d] that doxorubicin HCl is stable in acidic solutions in the pH range of 3-6." In the article, which provides a general review of the characteristics of doxorubicin (also known as adriamycin), the authors specifically did <u>not</u> characterize any solution of doxorubicin as stable, in contrast to solid forms:

> Adriamycin hydrochloride is stable in the solid state, as it was stored for years at room temperature without chemical modification and without any loss of activity.
> The stability of aqueous solutions of adriamycin varies with pH and with buffer concentration (Table 2 and Fig. 12) as established on the basis of spectrophotometric and chromatographic methods.

Table 2 indicates that a 2 mg/ml solution of doxorubicin hydrochloride at pH 3-6 in a 0.06 M phosphate buffer at 22° C was greater than one month, as determined by spectrophotometry and TLC.

The stability data on doxorubicin hydrochloride at pH 3-6 does not appear to relate to a solution in which the pH has been adjusted with an acid. Unlike the entry in the table relating to a solution at pH 1 and 2, which indicates that the solution was prepared with dilute aqueous hydrochloric acid, there is no indication of any acid. Furthermore, the article states, "Mild acid hydrolysis of adriamycin (Scheme 1) gave the water insoluble aglycone, adriamycinone (V) and

44

an aminosugar which was isolated as the hydrochloride, and identified with daunosamine . . . ."
Thus, it is not clear that the stability data relates to a solution in which pH is adjusted with an
acid, which would be disfavored according to the paper itself.

The data set forth in the 1972 Arcamone *et al.* paper would also tell one of ordinary skill
in the art nothing about the stability of anthracycline glycosides because of the methods used to
determine stability. As discussed above, the spectrophotometry and TLC methods used in 1972
were known by 1985 to be outmoded. Indeed, given the known overstatement of the stability of
anthracycline glycosides by those methods and the use of whole numbers (that is, > 1 month
stability for doxorubicin at pH 3-6), one of ordinary skill in the art would be led to believe that a
doxorubicin solution as prepared in the manner disclosed in the 1972 Arcamone *et al.* paper
would demonstrate stability for less than two months. That would not be sufficient to be
considered "stable" for a pharmaceutical product, and that authors did not characterize it as such.

In addition to the difficulties that existed with the analytical techniques employed by the
authors, the data in the 1972 Arcamone *et al.* paper would give one of ordinary skill in the art
little guidance because more than one variable was changed between experiments. For example,
the authors varied both pH and the presence of a buffer between pH 1-2 (dilute aqueous
hydrochloric acid) and pH 3-6 (0.06 M phosphate buffer). However, the data indicated that the
dilute hydrochloric acid gave substantially lower stability (albeit at a lower pH) than when a
phosphate buffer was used. Thus, in my view, the 1972 Arcamone *et al.* paper clearly taught one
of ordinary skill in the art that stability as required for a pharmaceutical product cannot be
achieved for a ready-to-use formulation.

3.    *The 1979 Hoffman et al. Paper*

Professor Clark cites a 1979 paper by Hoffman *et al.*, suggesting that the paper "discloses that an aqueous doxorubicin HCl solution reconstituted according to the procedure set forth in the PDR[26] was stable for up to six months when refrigerated at 4°C (as taught by Arcamone, 1972, the pH of such a reconstituted doxorubicin HCl solution was approximately 5)." The 1979 Hoffman *et al.* paper, one of the references that were considered insufficient in the 1985 Janssen *et al.* paper, reported the results of refrigerating and freezing 2 mg/ml doxorubicin hydrochloride solutions formulated with Water for Injection, USP. It is notable that the 1979 Hoffman *et al.* paper never reports the pH of the reconstituted doxorubicin solutions; Professor Clark assumed that the pH would be the same as reported in the 1972 Arcamone *et al.* paper, which he suggested would be "approximately 5," but which Table 2 of the 1972 Arcamone *et al.* paper reported as 5.5. That is, the 1972 Arcamone *et al.* paper cannot be read into the 1979 Hoffman *et al.* paper to suggest a pH between 2.5 and 5.0, as Professor Clark assumes. Nor can the 1979 Hoffman *et al.* paper be combined with the 1985 Janssen *et al.* paper or the 1983 Wassermann & Bundgaard paper.

The data reported in the 1979 Hoffman *et al.* paper shows that no conclusion can be drawn in relation to the effect of variation of pH on the stability of anthracycline glycosides. After preparing the doxorubicin hydrochloride solutions (that is, reconstituting lyophilized doxorubicin hydrochloride with sterile water to a concentration of 2 mg/ml), the pH of the resulting solutions was not varied by the authors. Thus, the doxorubicin hydrochloride solutions were tested at only a single, unspecified pH. As a result, nothing in the 1979 Hoffman *et al.*

---

[26] Professor Clark does not identify which PDR he believed was the source for the formulation protocol. The 1979 Hoffman *et al.* paper indicates the formulation protocol was the result of personal communications with F. Mancini.

paper indicates to one of skill in the art what effect variation of pH has on the stability of a doxorubicin solution.

Instead of showing that doxorubicin hydrochloride solutions are stable in a pH range of 2.5 to 5.0, as suggested by Professor Clark, the data presented in the 1979 Hoffman et al. paper would lead one of ordinary skill in the art to believe that a ready-to-use solution of an anthracycline glycoside would <u>not</u> be stable. Although the solution of doxorubicin hydrochloride retained 96% potency (reported as a percentage of the measured to the estimated initial doxorubicin hydrochloride) after six months of storage at 4°C, the starting potency of this solution was 106.5%. Thus, the relative loss of potency over six months was 10.5%, less than the $t_{90}$ value. This is not an insignificant loss. Moreover, the potency reported after one year of storage at 4°C is only 64.2%, for a loss of over 42% potency in just one year. That would not be considered "stable" or suitable for an injectable pharmaceutical solution product.

4.    *The 1981 Ketchum et al. Paper*

Professor Clark cites a 1981 paper by Ketchum *et al.*, stating that the paper "disclos[es] pH of reconstituted solution of 3.8 to 6.5; noting that reconstituted solutions prepared under laminar air-flow hoods and kept in sealed vials showed no loss of potency when stored at 25°C or 5°C for 28 days." The 1981 Ketchum *et al.* paper reported the results of storing for 28 days at 25°C or 5°C very dilute (10μg/ml) doxorubicin hydrochloride solutions formulated with 0.9% sodium chloride solution. Stability was determined only by spectrographic testing.

The first part of Professor Clark's characterization of the 1981 Ketchum *et al.* paper, that the pH of a reconstituted solution was 3.8 to 6.5, does not relate to the solutions employed in the stability assays. Instead, the authors merely reported that "[t]he pH of [a reconstituted] solution, containing doxorubicin HCl 2 mg/ml, ranges from 3.8 to 6.5." That is, the 1981 Ketchum *et al.*

47

paper suggests a doxorubicin hydrochloride solution, without adjustment with an acid, falls somewhere within the pH range from 3.8 to 6.5; the 1981 Poochikian *et al.* paper indicated that a very dilute (20 μg/ml) solution had a pH of 6.2, the 1972 Arcamone *et al.* paper indicated a pH of 5.5, and the '285 patent indicates that a 2 mg/ml solution reconstituted with Water for Injection, USP had a pH of 5.2. However, the authors of the 1981 Ketchum *et al.* paper did not use a 2 mg/ml solution for the stability studies, and never reported the specific pH of either the reconstituted solutions they prepared as an intermediate step or the dilute doxorubicin solutions that were actually used in the stability studies.

The second part of Professor Clark's characterization of the 1981 Ketchum *et al.* paper is similarly inaccurate due to the choice of spectrographic analysis. As discussed above, by 1985, it was known to one of skill in the art that this was an unreliable method for monitoring stability of anthracycline glycosides, resulting in an underestimation of degradation and an overcalculation of stability. Given the shortcomings of the spectrophotometric method, it is not surprising that the 1981 Ketchum *et al.* paper reports virtually no loss of potency in dilute doxorubicin hydrochloride solutions stored at 25°C or 5°C for 28 days. It appears that the authors of the 1981 Ketchum *et al.* paper recognized the unreliability of the results presented since, although very minimal loss of potency was observed at 28 days, the authors concluded "reconstituted doxorubicin may be stored at either room temperature (25°C) or refrigeration (5°C) for seven days without a significant loss of potency."

The experimental conditions used in the stability studies reported in the 1981 Ketchum *et al.* paper render the results of no use to one of skill in the art of the '285 patent. First, the concentration of the doxorubicin solutions is so low, 10μg/ml, that one of skill in the art would not have considered these results reliable predictors of the stability of higher concentration

48

doxorubicin solutions as claimed in the '285 patent. As discussed above with respect to the 1983 Wassermann & Bundgaard paper, extreme dilution of solutions of anthracycline glycosides eliminates the possibility of precipitation and stacking effects, both of which could play a role in pharmaceutical acceptability of the solution. Second, no conclusion can be drawn from the data reported in the 1979 Hoffman *et al.* paper regarding the effect of variation of pH on the stability of anthracycline glycosides. After the dilute doxorubicin hydrochloride solutions were prepared for the stability assays, the pH levels were not varied, meaning that the dilute doxorubicin hydrochloride solutions were tested at only a single, unspecified pH. It would have been apparent to one of skill in the art in 1985 that the combination of the experimental conditions and the assay method used render these results reported in the 1981 Ketchum *et al.* paper irrelevant to the claims of the '285 patent, as well as questionable in accuracy. Therefore, one of skill in the art as of 1985 would not have been motivated to combine the 1981 Ketchum *et al.* paper with the 1985 Janssen *et al.* paper or the 1983 Wassermann & Bundgaard paper.

### 5.    The 1981 Poochikian et al. Paper

Finally, Professor Clark cites a 1981 paper by Poochikian *et al.*, suggesting that the paper "disclos[ed] that reconstituted solutions of anthracycline antibiotics, including doxorubicin and daunorubicin, stored in glass stoppered flasks were more stable at pH of 4.5 than at pH 6.2, 6.3 or 7.4." The 1981 Poochikian *et al.* paper related to a study, motivated by recent studies that had examined the advantages of administering doxorubicin by continuous intravenous infusion, to determine the stability of very low concentrations of four different anthracycline glycosides (10 $\mu$g/ml and 20 $\mu$g/ml solutions of doxorubicin, 20 $\mu$g/ml solutions of daunorubicin, 50 $\mu$g/ml solutions of zorubicin, and 128 $\mu$g/ml solutions of aclacinomycin A) in four different infusion

fluids. Nothing in the 1981 Poochikian *et al.* paper would have led one of ordinary skill in the relevant art to combine the paper with the 1985 Janssen *et al.* paper or the 1983 Wassermann & Bundgaard paper, or to believe that a more concentrated solution of anthracycline glycoside would demonstrate physiologically acceptable stability after having its pH adjusted to from 2.5 to 5.0 with specific physiologically acceptable acids.

As discussed above in relation to the 1985 Janssen *et al.* paper and the 1983 Wassermann & Bundgaard paper, the 1981 Poochikian *et al.* paper was expressly considered by those references and viewed as insufficient to allow for valid predictions on doxorubicin decomposition rates in acidic aqueous systems to be used in pharmaceutical practice. Given that express rejection by those two references, one of ordinary skill in the art would not combine them with the 1981 Poochikian *et al.* paper.

Even if one of ordinary skill in the art had not been instructed not to consider the 1981 Poochikian *et al.* paper, the nature of the study would lead one of ordinary skill in the art to recognize that the results would not be useful in determining whether anthracycline glycosides would be stable under the conditions claimed in the '285 patent. The research involved too many differences in conditions to allow it to be meaningful in relation to the '285 patent. First, just as similar very low concentrations would render the 1983 Wassermann & Bundgaard paper irrelevant, they would render the 1981 Poochikian *et al.* paper irrelevant. Second, the temperature at which the stability of anthracycline glycosides was measured was elevated, again making the data inapposite. Third, the infusion fluids in which the anthracycline glycosides were studied, not merely the pHs of those fluids, were different. That is, not only were the pH levels not adjusted by the physiologically acceptable acids described in the claims of the '285 patent, there were numerous other differences in the fluids. Because the pH levels of those infusion

50

fluids cannot be isolated from the other attributes of the fluids, any comparison based solely on pH would be inherently flawed.

The data reported in the 1981 Poochikian *et al.* paper shows that no conclusion can be drawn in relation to stability of anthracycline glycosides at a given pH. Zorubicin was shown to be least stable in a 5% dextrose injection fluid at pH 4.5 (the most acidic fluid tested) and most stable in a Normosol-R fluid at pH 7.4 (the most basic fluid tested). Daunorubicin was shown to be more stable in a Normosol-R fluid at pH 7.4 than in a Lactated Ringer's Injection fluid at pH 6.3, and aclacinomycin A was shown to be more stable in a 0.9% sodium chloride injection fluid at pH 6.2 than in a 5% dextrose injection fluid at pH 4.5 or a Lactated Ringer's Injection fluid at pH 6.3. Even if there were some value to the data, however, it would suggest that none of the anthracycline glycosides was stable. The $t_{90}$ values reported for all of the anthracycline glycosides is remarkably short, ranging from .35 hours (zorubicin in a 5% dextrose injection fluid at pH 4.5) to 108 hours (aclacinomycin A in a 0.9% sodium chloride injection fluid at pH 6.2).

In addition to reinforcing the notion that anthracycline glycosides have only short lifespan in solution under any pH conditions, the 1981 Poochikian *et al.* paper makes it clear that other issues may prevent their pharmaceutical uses:

> While stability of the drug admixture is an important consideration in the selection of an infusion fluid, consideration must also be given to the biological or pharmacological stability of this choice as it pertains to the patient's clinical situation. Also, the data are limited to physical and chemical determinants of stability.

For example, doxorubicin was noted to partially adsorb onto the glass surfaces of the container during the course of the experiment. That is, the $t_{90}$ values are not the only determinant of stability or physiological suitability, which Professor Clark ignored.

51

## VI.   CONCLUSION

As detailed above, Professor Clark makes mistakes both in the approach he takes and the data he uses in that approach. He assumes an extrapolated $t_{90}$ value of some relatively short length would be sufficient to have a solution considered "stable" or "physiologically acceptable." That is not true. It is improper to extrapolate from lower pH to pH 2.5 to 5.0 because water-catalyzed reactions begin to predominate starting below a pH of 4.0 and predominate at a pH of about 4.0. It is improper to extrapolate from lower concentrations to those on the '285 patent because there are concentration effects, both stabilizing and destabilizing. It is improper to ignore the possibility of precipitation because that would make a solution not physiologically acceptable. Even in the case where there is no precipitation visible, it is improper to ignore the occurrence of toxic degradation products, such as the aglycone by-products of anthracycline glycoside degradation because these by by-products are toxic and did not precipitate as expected. In short, none of the references on which Dr. Clark relies, or any combination of the references on which he relies, teaches all of the elements of claims 1, 2, 3, 9, 11, 12, and 13 of the '285 patent. Furthermore, there is no reason to combine the references; the references themselves actually suggest that their teachings cannot be combined.

It was well known as of the 1985 priority date of the '285 patent that doxorubicin stability could be influenced by many factors: pH, light conditions, container materials, presence of oxygen, trace metal ions, concentration, temperature, ionic strength, buffer ions, etc. It was questionable whether any of the results reported in the cited papers were obtained from experiments which were executed under thoroughly standardized conditions. The stability required for an injectable anthracycline glycoside solution  was never suggested in the prior art

and could not have been expected as of 1985. That stability could not have been anticipated from the limited literature available prior to the priority date.

It is my opinion that person of ordinary skill in relevant art would have been aware that, as of the priority date of the '285 patent, anthracycline glycoside stability was a complex issue that was influenced by many parameters. In particular, for a drug like doxorubicin, it had been shown that reliable stability data under certain conditions could be obtained only when the stability tests had been performed under _exactly_ the same conditions. I would therefore _never_ have recommended somebody to make extrapolations from the data available at the priority date of the '285 patent, nor would any person of ordinary skill in the art at that time have accepted such a suggestion. It should therefore be clear that I would not have expected the formulation claimed in the '285 patent to be physically and chemically stable for at least eighteen months or more, so it is in my view certainly non-obvious to a person of ordinary skill in the art at that time.

Executed in Amsterdam, The Netherlands on September 26, 2005.

Jacob H. Beijnen, Ph.D.

# Exhibit A

69 page
Curriculum vitae of
Jos. H. Beijnen
omitted

## CERTIFICATE OF SERVICE

I hereby certify that copies of the forgoing were caused to be served this 26th day of September, 2005 upon the following in the manner indicated:

### BY HAND DELIVERY

Steven J. Balick
John G. Day
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899

### BY FEDERAL EXPRESS

Reid L. Ashinoff
Brian T. Moriarty
William J. Sipio
David R. Baum
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY  10020

James W. Parrett, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------x
                                     )
PHARMACIA & UPJOHN                   )
COMPANY LLC,                         )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        Civil Action No. 04-833 (KAJ)
                                     )
SICOR INC. and                       )
SICOR PHARMACEUTICALS, INC.,         )
                                     )
                Defendants.          )
------------------------------------------------------x
```

## NOTICE OF SERVICE

The undersigned hereby certifies that copies of Plaintiff's Second Amended Initial

Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1); Expert Report of Federico Arcamone; and

Expert Report of Jacob H. Beijnen were caused to be served on September 26, 2005 upon the

following in the manner indicated:

### BY HAND DELIVERY

Steven J. Balick
John G. Day
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

### BY FEDERAL EXPRESS

Reid L. Ashinoff
Brian T. Moriarty
William J. Sipio
David R. Baum
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020

MORRIS, NICHOLS, ARSHT & TUNNELL

_/s/ James W. Parrett, Jr._
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
   Attorneys for Plaintiff
   Pharmacia & Upjohn Company, LLC

OF COUNSEL:

Daniel A. Boehnen
Joshua R. Rich
Lara V. Fleishman
MCDONNELL BOEHNEN HULBERT
 & BERGHOFF LLP
300 S. Wacker Drive
Chicago, IL  60606
(312) 913-0001

September 26 , 2005

## CERTIFICATE OF SERVICE

I, James W. Parrett, Jr., hereby certify that on September 26th, 2005 I electronically filed the foregoing Notice of Service with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Steven J. Balick, Esquire
John G. Day, Esquire
ASHBY & GEDDES

I also certify that copies were caused to be served on September 26th, 2005 upon the following in the manner indicated:

### BY HAND

Steven J. Balick, Esquire
John G. Day, Esquire
Ashby & Geddes
222 Delaware Avenue
Wilmington, DE 19801

### BY FAX

Reid L. Ashinoff, Esquire
Brian T. Moriarty, Esquire
William J. Sipio, Esquire
David R. Baum, Esquire
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020

_/s/ James W. Parrett, Jr._
James W. Parrett, Jr. (#4292)
Morris, Nichols, Arsht & Tunnell
 (302) 658-9200
jparrett@mnat.com