# EXHIBIT 5



FILED, ... MAR 31 1987 GROUP 120

6/2 HP 4/2/87

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF          : GROUP ART UNIT:  123

GAETANO GATTI ET AL           :

SERIAL NO:  878,784           :

FILED:  JUNE 26, 1986         : EXAMINER:  PESELEV

FOR:  INJECTABLE READY-TO-USE :
      SOLUTIONS CONTAINING AN
      ANTITUMOR ANTHRACYCLINE  :
      GLYCOSIDE

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

      Responsive to the Official Action dated October 2,

1986, Applicants respectfully request reconsideration

in light of the following amendments and remarks.


IN THE SPECIFICATION

      Page 2, line 3, change "antineaplastic" to

--antineoplastic--.

      Page 40, line 18, change "rabber" to --rubber--.


IN THE CLAIMS

      Please cancel Claims 1-15, 18, 19, and 26-28.

      Please add the following new claim:

PI 839

-2-

--31.  A sealed glass container containing therein a stable, intravenously injectable, sterile, pyrogen-free doxorubicin anti-tumor composition in a solution which consists essentially of a physiologically acceptable salt of doxorubicin dissolved in a physiologically acceptable solvent therefor, wherein said solution has not been reconstituted from a lyophilizate, and wherein said solution has a pH from 2.7-8.1 and a concentration of said doxorubicin of from 0.1 to 100 mg/ml.--

*3.14.*

Please amend the following new claims:

Claim 16, line 1, change "14 or 15" to --31--.

Claim 20, line 1, change "any one of claims 14 to 19" to --claim 31--.

Claim 22, line 1, change "any one of claims 14 to 21" to --claim 31--.

--29.  (Amended)  A method of inhibiting the growth of a tumour selected from the group consisting of sarcomas, carcinomas, lymphomas, neuroblastoma, melanoma, myeloma, leukemias and Wilms tumour, which [method] comprises administering to a host suffering from said tumour a sterile, pyrogen-free solution according to [any one of claims 1 to 25] claim 31, containing [the active drug substance] doxorubicin in an amount sufficient to inhibit the growth of said tumour.--

-3-

## REMARKS

After the above amendment, the active claims are 16, 17, 20-25, and 29-31. Reconsideration and allowance of the active claims is respectfully requested.

Applicants' U.S. representative wishes to thank Examiner Peselev for the helpful and courteous interview which was held in her office on December 17, 1986. The discussion which was held at that time is summarized and expanded upon the remarks which follow.

As described in the new claim herein, the present invention is directed to a sealed glass container containing a solution of doxorubicin at a particular pH and concentration range. In the present solution, doxorubicin is unexpectedly more stable than could have been predicted based on the prior art.

Doxorubicin is a well-known anticancer drug which has been widely used to treat a variety of cancers. The Examiner's attention is directed to Exhibit A herewith, which reports the various diseases for which doxorubicin, also known as Adriamycin®, may be used.

As with many anticancer drugs, doxorubicin is toxic to normal tissue. In fact, the drug is so toxic that it should not even be touched or contacted at all by those who work with it. The Examiner's attention is now directed to Exhibit B, taken from the United States Pharmacopeia, particularly the yellow highlighted portions.

PI 841

-4-

A great deal of time and energy have been expended in looking for ways to avoid contact with the drug by those who handle it. A number of patented inventions have as one of their objects prevention of contact with toxic drugs such as doxorubicin. The Examiner's attention is directed to U.S. Patents 4,564,054, 4,588,403, 4,537,593, and 4,576,211, copies of which are filed herewith. These are illustrative of the great deal of time and effort which has gone into trying to protect those working with anticancer drugs such as doxorubicin from coming into contact with them.

Another major problem with doxorubicin is its relative instability. In the past, doxorubicin has been prepared and stored in a lyophilized, solid form since it is notably unstable in solution. The Examiner's attention is directed to Exhibit D, which is a copy of the product information which accompanies Adriamycin® as it is sold from the principal supplier, Adria Laboratories. The Examiner will note on the third page of this exhibit, the highlighted portions, that once the lyophilized doxorubicin is reconstituted into a solution, it is only stable for 24 hours at room temperature and 48 hours under refrigeration. This is quite clearly a very short period of time, and can lead to waste of the drug and a great deal of inconvenience.

-5-

Because doxorubicin is presently sold in lyophilized form, it must be reconstituted into a solution before it is administered. Medical personnel must add a solution to the lyophilized material and dissolve it. Unfortunately, it takes time to dissolve the lyophilized material in solution and the solution must be shaken until dissolution occurs. Often, during this shaking/dissolving step, small droplets become dispersed in the air and these are likely to be inhaled by a person nearby. Again, this puts people handling the drug in danger.

In view of these problems, a relatively stable solution of doxorubicin which could be sold as a solution rather than a lyophilized material has been sought. The present invention is the first teaching of how to go about making a long-term, stable doxorubicin solution.

The Examiner's attention is now directed to a Rule 132 Declaration, which is filed herewith, signed by two top research scientists at Adria Laboratories. This Declaration substantiates and expands on the above points. The Examiner's attention is directed in particular to Exhibit 3 attached to the Rule 132 Declaration. See page 5, the highlighted portion for an important comment on the state of the art in this area.

-6-

The claims have been amended as discussed with the Examiner. The claim is now directed to a sealed container which contains a solution of doxorubicin therein where the pH of the solution is within a specific range. It should be pointed out that even if a solution of doxorubicin at the same pH and concentration range as a solution according to the present invention were known, unless it were also known that the solution were stable in the long term, there would be no reason for someone to put the solution into a sealed glass container. Putting a solution into a sealed glass container implies that one is aware that the solution is stable in the long term.

The amended claims are limited to a pH range of 2.7 to 3.1. This range is supported in the specification as filed by Examples 6 on pages 24 and 25, and Example 11 on pages 34 and 35. This range is therefore not new matter. The Examiner will note that the $t_{90}$ at 4°C and 8°C for these pH values are longer than any of the other examples, thus supporting superior results over this range. The Examiner's attention is now directed to a second Rule 132 Declaration (Declaration II). The data presented in this Declaration clearly supports the criticality of the pH range which is now recited in the present claims.



-7-

It is also important to recognize that the container is a <u>glass</u> container. The Examiner's attention is directed to Exhibit E, which teaches that doxorubicin is <u>less</u> stable in glass than in plastic. Note the highlighted portions of the reference. This reference teaches away from the present invention which calls for a glass rather than a plastic container.

The claims stood rejected under 35 USC 102(b) as anticipated by or, in the alternative, under 35 USC 103 as obvious over <u>Penco et al</u>, <u>Arcamone et al</u> '663 and <u>Arcamone et al</u> '519. These rejections are respectfully traversed.

In light of the new and amended claims presented herein, it is believed to be clear that the references are no longer properly applied in a rejection of the claims. None of these references says anything about a sealed glass container containing a doxorubicin solution having a pH between the range of 2.7 to 3.1. The long- term stability of the solutions of the present invention is believed to be completely un-expected in view of these references. None of them says anything about how to increase the stability of doxorubicin in solution. Accordingly, Applicants' invention is believed to be completely unobvious over these references.



-8-

In view of the amendments to the claims, it is submitted that the rejections thereof under 35 USC 112 are either obviated or overcome. The objection to the specification and rejection of Claim 29 are believed to be no longer sustainable in view of Exhibit A.

Applicants file herewith an Information Disclosure Statement citing all references which are pertinent to the present invention and known to Applicants. The relevancy of these references is commented upon in the remarks below.

Reference AR (<u>Bosanquet</u>) is a recent review article discussing the stability of solutions of various antineoplastic agents. Table 3 on page 4 of the reference talks about a variety of studies conducted to determine the stability of solutions Adriamycin®. The Examiner will note that the pH of the solutions disclosed therein, where reported, are different from the pH range recited in the present application.

Reference AS (<u>Arcamone</u>) talks about the structure and physiochemical properties of adriamycin. Table 2 on page 20 of the reference does state that adriamycin hydrochloride at a pH of 3 to 6 has a stability of greater than 1 month. However, this general statement does not single out the particular range within the

-9-

broad disclosed range where superior stability could be found. According to the data in the Rule 132 Declaration discussed above, the present solutions are stable for <u>over 5,000 days</u> (>160 months) at 4°C. This is submitted to be much greater than one would expect based on <u>Arcamone</u>. The Examiner should keep in mind that the literature accompanying the product as sold by the principal supplier states that a solution of doxo-rubicin is only stable for around 24-48 hours! Of course, the present claimed invention is clearly novel over <u>Arcamone</u> since it is a solution of doxorubicin in a <u>sealed container</u>. Thus, the present invention is both novel and unobvious over this reference.

It is submitted that none of the other references anticipates or renders obvious the present claims either. There is simply too much conflicting data to give one of ordinary skill in the art any clear idea as to how to go about perparing a stable solution of doxo-rubicin. Moreover, none of them discloses a sealed container containing a solution of doxorubicin having a pH over the range claimed herein.

In light of the above amendments and remarks, it is respectfully submitted that the present application

PI 847

-10-

is now in condition for allowance, and an early notice

to that effect is respectfully requested.

Respectfully submitted,

OBLON, FISHER, SPIVAK,
McCLELLAND & MAIER, P.C.

*Robert R. Cook*

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Robert R. Cook, Ph.D.
Registration No. 31,602

Crystal Square Five - Suite 400
1755 S. Jefferson Davis Highway
Arlington, Virginia  22202
(703) 521-5940
75/map

# EXHIBIT 6



769-080-0
60/

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION:                  :

GAETANO GATTI ET AL                 :  GROUP ART UNIT: 123

SERIAL NO: 06/878,784               :

FILED:  JUNE 26, 1986               :  EXAMINER:  PESELEV

FOR:  INJECTABLE READY-TO-USE       :
      SOLUTIONS CONTAINING AN
      ANTITUMOR ANTHRACYCLINE       :
      GLYCOSIDE

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Responsive to the Official Action dated June 29,

1987, Applicants respectfully request reconsideration

in light of the following amendments and remarks.


IN THE CLAIMS

Claim 31, line 9, change "3.1" to --3.14.--


REMARKS

After the above amendments, Claims 16-17, 20-25

and 29-31 remain active in this application.

Reconsideration is respectfully requested.

Applicants' U.S. representative wishes to thank

Examiner Peselev for the helpful and courteous

interview which was held in her office on October 27,

S.N. 878,784 File History
Page 146

PI 875

-2-

1987. The matters which were discussed at that time
are summarized and expanded upon in the remarks which
follow.

The claims stand rejected under 35 USC 102(b) as
anticipated by or, in the alternative, under 35 USC 103
as obvious over <u>Beijnen et al</u> and <u>Arcamone et al</u>.
These rejections are respectfully traversed.

In order for a reference to anticipate a claim,
within the meaning of 35 USC 102, all material elements
of the claim must be found in one prior art source.
<u>In re Marshall</u> (CCPA 1978) 577 F2d 301, 198 USPQ 344;
<u>In re Kalm</u> (CCPA 1967) 378 F2d 959, 154 USPQ 10. There
are a number of material elements in present Claim 31,
which must be met by either of the two prior art
references in order for either one of them to
anticipate the claim.

The following are some of the relevant material
elements of Claim 31:

"sealed glass container"

"intravenously injectable"

"sterile"

"pyrogen-free"

"said solution has not been reconstituted from a
lyophilizate"

"pH is 2.7 - 3.14".

-3-

Further, the claims use partially closed claim language, "consists essentially of" with reference to the materials which may be contained in the solution. Thus, the claims exclude any other materials not recited therein if they would materially affect the solution.

The Examiner will recall that the present invention is directed to an extraordinarily stable doxorubicin or Adriamycin® solution. Both doxorubicin and Adriamycin® refer to an anti-cancer drug. Doxorubicin is the common name of the drug, while Adriamycin® is the trademark under which the drug is sold. The claims require that the solution be contained in a sealed glass container. This is a meaningful limitation, because one of ordinary skill in the art would never go to the trouble of sealing an unstable solution of an anticancer drug in a container. A certain minimum stability is required before one would even think to carry out such action. It should be kept in mind that according to the literature accompanying the commercially sold product (Adriamycin®) which is sold in a solid lyophilized form, a reconstituted solution thereof is stable for 24 hours at room temperature and 48 hours under refrigeration (4-10°C). See Exhibit A, page 3, the sixth paragraph.

-4-

The further limitation that the container be made of glass is also material. In the past, it was thought that glass rendered the Adriamycin® solutions less stable than other types of materials, such as polypropylene and other plastics. For example, the Examiner's attention is directed to the highlighted portions of Exhibits B and C, which show that doxorubicin can be adsorbed on and even partially decomposed on containers made of glass. The discovery in the present invention that glass is compatible with the extremely stable Adriamycin® solutions runs counter to these teachings. Thus, this limitation is also material.

The other material limitations listed above relate to the solution itself. First, the solution must be intravenously injectable. This is a meaningful limitation since it imposes stringent requirements on the nature and quantity of the impurities contained in the solution. For example, as will be discussed in greater detail below, some of the solutions in the prior art references contain materials which would render them non-intravenously injectable.

The solution must also be sterile and pyrogen free. Again, these limitations impose stringent requirements on the types and amounts of impurities which may be contained in the solution in the sealed glass container. Unless one purposefully sterilizes

-5-

the solution and renders it pyrogen free, it cannot be
concluded that such a solution meets these limita-
tions.  In fact, it can be concluded without doubt that
such a solution is not sterile or pyrogen free.

The solutions according to the present invention
are also not reconstituted from a lyophilizate
according to the claims.  In the past, doxorubicin was
sold in the form of a solid which had been
lyophilized.  This can be seen in Exhibit A on page 3,
under the heading "How Supplied".  It was thought that
doxorubicin was too unstable in solution to be storage
stable.  Accordingly, after the doxorubicin was
prepared at the manufacturing plant, it was lyophilized
for storage purposes.  Since it is now recognized
according to the present invention that under certain
conditions a solution of doxorubicin can be rendered
extraordinarily stable, the step of preparing the
solution from a lyophilized powder is no longer
necessary.  It would simply be an unnecessary
expenditure of energy to lyophilize the material first
and then prepare a storage stable solution from it.
However, unless one knew that a particular solution of
doxorubicin were very stable, one would still expect to
have to prepare the solution from a lyophilizate.
Again, it is submitted that this limitation in the
claims is a material limitation.

-6-

Another important material limitation in the
present claims is the pH of the solution.  Over the
relatively narrow range of pH recited in the present
claims, 2.7-3.14, it has been unexpectedly found that
the doxorubicin solutions exhibit enhanced stability.
The pH of greatest stability of doxorubicin has been
hotly debated in the literature.  Reference 5 of the
Information Disclosure Statement filed with the last
response (March 13, 1987) (Poochikian et al), discloses
that doxorubicin is most stable in 5% Dextrose
Injection, USP, which has a pH of 4.5.  See Table 2,
the left-hand heading.

According to reference 3 of the Information
Disclosure Statement (Beijnen et al 1985), the maximum
stability of doxorubicin solutions is at about pH 4-
5.  See page 221 of the reference, the left hand
column, the next to the last paragraph.

Reference 10 of the Information Disclosure
Statement (Janssen et al) states that the results
obtained in that study "indicated that pH 4 and 4°C
provide optimum shelf life conditions" of aqueous
doxorubicin solutions.  See the summary of the paper on
page 1, the third sentence.  It can be seen based on
the above references that the prior art has clearly not
appreciated that a pH of 2.7-3.14 is the pH of maximum
stability of a doxorubicin solution.  Note that two of



-7-

these references are dated in 1985 and one is dated in 1981.

The cited references will now be examined in light of the above material limitations of the present claims to determine whether the references do in fact anticipate the present claims. <u>Arcamone et al</u> is a relatively early study from 1972, reporting on the stability of Adriamycin® hydrochloride at 22°C. The study run in <u>Arcamone et al</u> was an analytical study conducted in a laboratory. The reference states that solutions having a pH of 3-6 have a stability of greater than one month. These solutions contained 2 mg/ml of Adriamycin® hydrochloride, and 0.06 molar phosphate buffer.

First of all, <u>Arcamone et al</u> says nothing about a <u>sealed glass container</u>. Second, there is no indication that the solutions were sterilized or rendered pyrogen free. The Examiner's attention is directed to a Declaration (Declaration A) signed by an expert in the field of injectable pharmaceuticals, William J. Ring, who concludes that the solutions in the <u>Arcamone et al</u> reference do <u>not</u> meet several of the above-described material limitations of Claim 31.

It is also notable that the <u>Arcamone et al</u> reference, which was published in 1972, has definitely not lead to an appreciation that a pH of 2.7-3.14 is an

-8-

unexpectedly good pH range for stability of doxo-
rubicin, as clearly shown by the above-described
references which teach that the maximum stability of
doxorubicin solutions is at a pH of from 4 to 5. In
fact, the range of pH listed by Arcamone et al, 3-6 is
so broad that it does not lead one of ordinary skill in
the art to an appreciation of any particular narrow
range which would give rise to extraordinary stability
or even that such a range exists. Previous cases have
held that there can be no anticipation where the
reference disclosure is so broad that the likelihood of
arriving at the claimed composition is highly
unlikely. Ex parte Garvey (POBA 1939) 41 USPQ 5583;
Ex parte Starr (POBA 1938) 44 USPQ 545. The narrow pH
range of 0.44 pH units according to the present
invention as compared to the broad range of 3-6, is
believed to be such a situation where anticipation does
not result because of a broad disclosure in the
reference.

In accordance with the above comments, and
Declaration A filed herewith, it is respectfully
submitted that the Arcamone et al reference does not
anticipate the claims of the present invention.

For similarly reasons, it is respectfully
submitted that Beijnen et al does not anticipate the
claims of the present invention. In the right-hand

-9-

column, page 109 of Beijnen et al, it can be seen that the solutions were kept in "stoppered polypropylene test tubes, since unlike glass containers, no adsorption to polypropylene occurs". Thus, at the outset, the solutions in Beijnen et al are in plastic rather than glass containers. Second, the solutions of Beijnen et al, contain perchloric acid, as indicated by page 114, the left hand paragraph. Perchloric acid is not an intravenously injectable material, as one of ordinary skill in the art would readily appreciate. Declaration B, signed by Dr. Nagesh Palapu, an expert in the field of drug formulations, substantiates the fact that the solutions of Beijnen et al are not intravenously injectable.

Finally, as discussed above in connection with the Arcamone et al reference, since the experiments involved in Beijnen et al are laboratory experiments, and there is no indication that the solutions were sterilized or rendered pyrogen free, it can be concluded that these features are not met by the solutions of Beijnen et al. Since the solutions are not sterile and are not pyrogen free, then they cannot be intravenously injectable either.

In light of these distinctions between the present claims and Beijnen et al, and in view of Declaration B, it is respectfully submitted that Beijnen et al does not anticipate the present claims.

-10-

The claims have also been rejected in the alterna-
tive for obviousness over <u>Beijnen et al</u> or <u>Arcamone et
al</u>. These rejections are also respectfully traversed.

The thrust of the Examiner's rejection is one of
inherency. Clearly, neither of the two references
recognize the extraordinary stability of doxorubicin
solutions under the conditions of the present claims,
including a pH of 2.7-3.14. Based on subsequent
references, as late as 1985, the pH of greatest
stability of doxorubicin has been thought to be between
4 and 5. Furthermore, the stability of doxorubicin has
been thought to be greater in polypropylene or poly-
vinylchloride rather than in glass. For these reasons,
it can be seen that one of ordinary skill in the art
has certainly not found it obvious to prepare a
solution of doxorubicin at a pH of 2.7-3.14, to thereby
achieve greatly enhanced stability.

The Examiner's attention is directed to the
Declaration which was filed with the last amendment.
A portion of this declaration, designated Exhibit D
herein, is filed herewith for the Examiner's con-
venience. It can be seen that there is a trough in the
graph of $k_{obs}$-pH profile, the trough being centered
around 2.7-3.14. This same trough is exhibited whether
the doxorubicin is in sterile water, dextrose or
saline. If one goes to a pH of between 4 and 5,

-11-

previously recognized as the pH of greatest stability
of a doxorubicin solution, the k observed, which is
directly related to the decomposition of doxorubicin,
increases precipitously.  For example, in sterile
water, it goes up by a factor of at least 3.  It
continues to rise beyond pH 5.  One of ordinary skill
in the art could not have predicted, based on the
references, that this narrow pH range would give rise
to such stability.  In the absence of this realization,
one of ordinary skill in the art would not have placed
such a doxorubicin solution in a sealed glass container
nor would this person have avoided reconstitution from
lyophilized solid material.  How can it be said that it
is obvious to prepare such a solution as in the present
invention when a group of references have stated that
the maximum stability of doxorubicin solutions is
between 4 and 5?  Further, if the stability of such
solutions had been previously appreciated, why would
the manufacturer of Adriamycin® still prepare it in
lyophilized form, and state that its stability upon
reconstitution ranges from 24 hours to 48 hours at room
temperature or under refrigeration, respectively?  The
extraordinary stability over the very narrow pH range
of the present claims, has simply not been previously
appreciated.  Previously, the prior art has taught that
doxorubicin solutions were maximally stable at higher

-12-

pH's than those involved (and claimed) in the present invention. Therefore, it is submitted that the present claimed invention is unobvious over either or both of the cited references.

Applicants are filing herewith a second Information Disclosure Statement making of record a few additional references, which are not believed to be any more relevant than the previously cited references. However, Applicants wish to bring these references to the Examiner's attention to fully satisfy their duty of complete disclosure.

In light of the above amendments and remarks, and the Rule 132 Declarations filed herewith, it is respectfully submitted that this application is now in condition for allowance, and an early notice to that effect is earnestly solicited.

Respectfully submitted,

OBLON, FISHER, SPIVAK,
McCLELLAND & MAIER, P.C.

*Robert R. Cook*

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Robert R. Cook, Ph.D.
Registration No. 31,602

Crystal Square Five - Suite 400
1755 South Jefferson Davis Highway
Arlington, Virginia  22202
(703) 521-5940
60/jmw,mkn

EXHIBIT 7

769-080-0
35/

RECEIVED
08 NOV 30 AM 11: 08
GROUP 180

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF            :

GAETANO GATTI ET AL             :

SERIAL NO:  06/878,784          :  GROUP ART UNIT:  183

FILED:  JUNE 26, 1986           :  EXAMINER:  PESELEV

FOR:  INJECTABLE READY-TO-USE   :
      SOLUTIONS CONTAINING AN
      ANTITUMOR ANTHRACYCLINE   :
      GLYCOSIDE

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

    Responsive to the Official Action dated
September 28, 1988, Applicants respectfully request
reconsideration in light of the following amendments
and remarks.

IN THE SPECIFICATION

    Page 7, line 21, change "glutammic" to
--glutamic--.

IN THE CLAIMS

    Please amend Claim 31 as follows:

    *1* --31. (Amended)  A sealed glass container
containing therein a stable, intravenously injectable,

-2-

sterile, pyrogen-free doxorubicin anti-tumor
composition in a solution which consists essentially of
[a physiologically acceptable salt of] doxorubicin
hydrochloride dissolved in a physiologically acceptable
solvent therefor, wherein said solution has not been
reconstituted from a lyophilizate, and wherein said
solution has a pH adjusted to [from] 2.7-3.14 with
hydrochloric acid, and a concentration of said
doxorubicin of from 0.1 to 100 mg/ml --

Please cancel Claims 16, 17, 22, 29 and 30.

Please amend Claim 23 as follows:

Claim 23, line 1, change "22" to --31--.

## REMARKS

After the above amendments, Claims 20, 21, 23-25 and
31 are active in this application. Reconsideration is
respectfully requested.

Applicants have now amended Claim 31 to limit the
physiologically acceptable salt doxorubicin to the
hydrochloride. Furthermore, Applicants have amended
the claim to require that the pH of the solution is
adjusted to 2.7-3.14 with hydrochloric acid. These
amendments are supported in the specification as filed
on page 7, lines 22-23 and, in general, the examples.
See also page 5, lines 16-18. Attention is further
directed to page 16, lines 10-11. Clearly, the

-3-

additional limitations in Claim 31 are supported by the
specification.  No new matter has been added.

Claims 16, 17, 20-25 and 29-31 stand rejected
under 35 U.S.C. 103 as being unpatentable over Beijnen
et al, Arcamone et al, Bosanquet in view of Arcamone et
al '519 and Benvenuto et al.  These rejections are
respectfully traversed in light of the above
amendments.

As pointed out above, the present claims have now
been limited to the doxorubicin hydrochloride which is
dissolved in a solvent at a certain pH, wherein the pH
has been adjusted with hydrochloric acid.  Applicants
respectfully submit that unexpected results, in terms
of stability, flow from the adjustment with
hydrochloric acid.  The Examiner's attention is
directed to a Rule 132 Declaration filed herewith.  It
can be seen from this Declaration in Tables 1 and 2,
that the hydrochloride of doxorubicin at a pH of 3.0 is
more stable than doxorubicin hydrochloride in a
phosphate buffer at the same pH.  Phosphate buffer at
pH 3.0 is representative of Arcamone et al.  Note that
in Arcamone et al, the stability of doxorubicin
hydrochloride over a pH range of 3-6 is reported in
0.06 molar phosphate buffer.

-4-

The stability difference is significant.  The Examiner's attention is directed to Table 2, which shows that after 60 days at 22°C, the solution adjusted to pH 3.0 with hydrochloric acid still retains 95.4% of the intact doxorubicin hydrochloride.  Under exactly the same conditions except for the buffer, the phosphate containing solution at pH 3.0 only retains 66.6% of intact doxorubicin after 60 days.  This difference is respectfully submitted to be highly unexpected, particularly in view of the prior art cited by the Examiner.  Arcamone et al teaches that over the pH range of 3-6, a phosphate buffer is to be used. Only over the pH range of 1-2 is hydrochloric acid used for pH adjustment.  However, over the pH range of 1-2, the stability is reported to be practically insignifi- cant. Based on Arcamone et al, one of ordinary skill in the art would clearly use a phosphate buffer rather than hydrochloric acid over the range claimed in the active claims herein.

In Beijnen et al, cited by the Examiner, the pH range is 0-3.5.  Beijnen et al does not teach one anything about the use of hydrochloric acid for adjusting the pH of the solution.  It only teaches the use of perchloric acid.  Moreover, perchloric acid is not physiologically acceptable nor intravenously

-5-

injectable. This has been established on the record by Exhibit B, filed December 23, 1987.

Bosanquet does not address the question of how to adjust the pH, and even states that "very little can be categorically stated about the stability of adriamycin, and a very carefully designed study is urgently required to resolve these conflicting results."

Arcamone et al '519 and Benvenuto et al have been cited to show doxorubicin contained in a glass container. Neither of these references leads one to any appreciation of enhanced stability in a hydro-chloric acid containing solution.

In considering newly amended Claim 31 herein, the Examiner should bear in mind the additional distinctions between the present invention and the prior art which have been discussed in previously-filed responses. The claims are limited to a very narrow pH range over which significantly higher stability has been demonstrated, as compared to pH's outside of the range. How could one have predicted that this narrow pH range would give rise to significantly higher stability? Several references even state that the most stable pH for doxorubicin is from 4 to 5. See Exhibits A, B and C, filed with the response of May 26, 1988.

-6-

The act of sealing the solution in a container itself requires an appreciation that the solution is extraordinarily stable.  It would be a waste of time and energy to seal a doxorubicin solution in a container if one did not appreciate that doxorubicin is stable over a particular pH range.  According to the prior art, solutions of doxorubicin decompose very quickly, thus requiring the solution to be prepared very shortly before use.  Sealing a solution in a glass container is completely incompatible with this understanding.

The idea of using a glass container is also inconsistent with prior art teachings.  According to the prior art, the stability of doxorubicin is greater in plastic than in glass.  See Figure 2, page 1917 of Benvenuto et al, cited in the latest Official Action. Striving for a stable solution of doxorubicin, one would clearly choose plastic over glass.

Applicants have even demonstrated that the marketplace has been very receptive to the stable solutions of the present claims, which is indicative of solving a long-felt need, and hence, unobviousness. See Exhibits G and H filed with the response filed on May 26, 1988.

-7-

The present Declaration showing that pH adjustment with hydrochloric acid gives rise to unexpectedly greater stability as compared to a phosphate buffer, removes the claims even one step further from the prior art and adds yet another facet of unpredictability over the prior art.

Following the teachings of the prior art, one of ordinary skill in the art could not have known that a solution of doxorubicin of sufficient stability to meet actual pharmaceutical requirements could have been prepared. However, if someone had tried to prepare a stable doxorubicin solution, the person would have chosen a different pH (4-5), a different material in which to place the doxorubicin (plastic), and a different buffer solution (phosphate).

There is no evidence on this record that anyone has ever before prepared a stable doxorubicin solution in a sealed glass container. The Examiner has already recognized this since the rejection is for obviousness and not anticipation. There is no question that if one of ordinary skill in the art knew that the doxorubicin solution was particularly stable over a pH range of 2.7 to 3.1, such a person would be able to put the solution in a sealed glass container. The question to be considered is not whether this was technologically

-8-

feasible, but rather whether there was any <u>reason</u> to do so. Since there was no appreciation in the art that a doxorubicin solution having a pH of 2.7-3.1, adjusted with hydrochloric acid, would have extraordinary stability, there was no reason to seal the solution in a container, much less one made of glass. Thus, the present invention cannot be obvious over the prior art.

The rejection of Claims 29 and 30 under 35 U.S.C. 101 has been rendered moot by cancellation of these claims. Applicants respectfully submit that doxorubicin is well known to be useful to treat tumors and to even inhibit their growth. However, in order to streamline prosecution and to minimize the issues herein, Applicants have cancelled these claims. They reserve the right to file a divisional application directed to these claims in the future.

Respectfully submitted,

OBLON, FISHER, SPIVAK,
McCLELLAND & MAIER, P.C.

*Robert R. Cook*

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Robert R. Cook, Ph.D.
Registration No. 31,602

Crystal Square Five - Suite 400
1755 S. Jefferson Davis Highway
Arlington, Virginia  22202
(703) 521-5940
35/maf/sjh

PI 930

# EXHIBIT 8

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF                    :

GAETANO GATTI ET AL                     :

SERIAL NO:  06/878,784                  :  GROUP ART UNIT:  123

FILED:  JUNE 26, 1986                   :  EXAMINER:  PESELEV

FOR:  INJECTABLE READY-TO-USE           :
      SOLUTIONS CONTAINING AN
      ANTITUMOR ANTHRACYCLINE            :
      GLYCOSIDE

RULE 1.132 DECLARATION

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

    Now comes ___Carlo Confalonieri___ a citizen

of Italy, and a resident of via Ticino 5, Cusano Milanino

(Milan), _____ Italy, who declares

and says that:

    1.  I am an employee of Farmitalia Carlo Erba S.r.l

since 1964 _____, and an expert in the

chemistry of ___anthracyclins_____, and have

worked in the field of pharmaceutical analysis_____

for at least _ten_ years.

    2.  I graduated from _the University of Milan____

_____, with a degree in

_Pharmacy_____ in the year of 1976 .

-2-

3. I have directly supervised or carried out the following experiments in order to show that a solution of doxorubicin hydrochloride in a solution at a pH of from 2.7-3.14, wherein the pH is adjusted by addition of hydrochloric acid, is more stable than a solution which is identical with the exception that phosphate rather than hydrochloric acid is utilized to adjust pH. In the following experiments, the doxorubicin hydrochloride concentration was determined by an HPLC method which was validated in accordance with FDA requirements for precision, sensitivity, linearity, specificity and stability-indicating ability.

The experimental details are described hereinbelow:

EXPERIMENTAL DETAILS

Reagents

Doxorubicin·HCl (batch No. 5043 L 619) supplied by Farmitalia Carlo Erba

Phosphoric acid (85%), monobasic potassium phosphate ($KH_2PO_4$), 0.1N NaOH and 1.0N HCl, all of analytical grade, were supplied by Carlo Erba Analyticals (Milano, Italy)

-3-

## PACKAGING

• Colorless glass (type I) vials with a 10 ml top
capacity supplied by Bormioli (Parma, Italy)

• Chlorobutyl, teflon-faced rubber stoppers
supplied by Pharma Gummi Wimmer West GmbH (Eschweiler,
West Germany)

• Aluminium seals supplied by Fishem (Trezzano sul
Naviglio, Milano, Italy)

Before use, the vials were washed, sterilized and
depyrogenated (dry heating at 200°C for 1 hour) while
the stoppers and seals were steam sterilized (121°C for
30 minutes).

## INSTRUMENTATION

• Thermostatic oven model TPAR 80 supplied by
Vismara (Trezzano sul Naviglio, Milano, Italy)

• pH meter model 632 supplied by Metrohom
(CH, 9100 Herisau, Switzerland) standardized according
to USP XXI

• Liquid chromatograph Spectra-Physics model SP
8700 equipped with:

 · chromatographic column (length 250 mm, internal
   diameter 4.6 mm) filled with Zorbax TMS (average
   particle size 6 microns) supplied by DuPont
   Instruments Wilmington, Delaware)

 · injection valve Rheodyne model 7125

-4-

· detector Spectra-Physics model SP 8440

· integrating recorder Spectra-Physics model SP 4270

## BUFFERS AND SOLVENTS

● Phosphate pH 3.0 prepared by dissolving 13.9 g 85% phosphoric acid with about 800 ml distilled water in a 1000 ml volumetric flask, adjusting the pH to 3.0 with 0.1N NaOH and filling to the mark with distilled water.

● Phosphate pH 6.0 prepared by dissolving 16.3 g of $KH_2PO_4$ with about 800 ml distilled water in a 1000 ml volumetric flask, adjusting the pH to 6.0 with 0.1N NaOH and filling to the mark with distilled water.

● 0.5 HCl prepared by diluting to the mark 500 ml 1.0N HCl with distilled water in a 1000 ml volumetric flask.

● Doxorubicin·HCl 2 mg per ml 0.06 M phosphate buffer pH 3.0

200 ml phosphate buffer pH 3.0 were added dropwise, under stirring and nitrogen bubbling, to 200 ml of a 4 mg per ml doxorubicin·HCl solution in deaerated water for injection.

The buffered doxorubicin·HCl solution was maintained under nitrogen bubbling for a further twenty minutes and sterilized by filtration through a 0.22

PI 934


-6-

• <u>Doxorubicin·HCl 2 mg per ml hydrochloride acid</u>
  <u>pH 3.0</u>

400 mg of doxorubicin·HCl were dissolved, under
stirring and nitrogen bubbling, in about 180 ml
deaerated water for injection.

0.5N HCl was added dropwise to adjust the pH to
3.0. Further deaerated water for injection was added
to bring the solution to its final volume (200 ml).

The solution was maintained under nitrogen
bubbling for a further twenty minutes and sterilized by
filtration through a 0.22 microns membrane which was
previously sterilized (121°C for 30 minutes) and tested
for integrity (before and after filtration) by the
bubble point determination.

5.0 ml of the sterilized solution were filled into
vials which were subsequently stoppered and sealed.

Filling, stoppering and sealing were carried out
in a sterile area.

The solution showed a doxorubicin·HCl concentra-
tion of 1.967 mg per ml and a pH of 3.0.

<u>STORAGE CONDITIONS</u>

Immediately After their preparation, samples of
doxorubicin·HCl in 0.06 M phosphate buffer pH 3.0 and
in diluted hydrochloric acid pH 3.0 were transferred in
a thermostatic oven at a temperature of 22 ± 1°C.

S.N. 878,784 File History
Page 207

-7-

The doxorubicin·HCl concentration was determined immediately after the sample preparation and after 8, 15, 22, 30, 44 and 60 days storage for the solution in phosphate buffer and after 8, 15, 30, 44 and 60 days storage for the solution in diluted hydrochloric acid.

### ANALYTICAL METHOD

The doxorubicin·HCl concentrations were determined by an ion pair HPLC method.

The method was validated for precision, accuracy, sensitivity, linearity, specificity and stability-indicating power in accordance with the FDA require-ments reported in the "Guidelines for submitting samples and analytical data for methods validation".

The validation package of the analytical assay method is enclosed.

### 4.    RESULTS

Table I shows the concentrations (mg/ml) of doxorubicin·HCl in 0.06 M phosphate buffer pH 3.0 and in diluted hydrochloric acid pH 3.0 after different times of storage at 22 ± 1° C.

Table II shows the percent stability of the same solutions at the same storage conditions.

-8-

## COMMENTS ON THE STABILITY RESULTS

After one month storage at 22°C, doxorubicin·HCl dissolved at 2 mg per ml 0.06 M phosphate buffer pH 3.0 (described by Arcamone et al) shows a residual drug concentration of 83.3 percent of the initial.

This means that at this storage condition and during this time a 16.7 percent degradation takes place.

The extent of the degradation increases to 33.40 percent after 60 days at 22°C, the residual doxorubicin·HCl concentration being, after this time, 66.60 percent of the initial.

After one month storage at 22°C, doxorubicin·HCl dissolved at 2 mg per ml diluted hydrochloric acid pH 3.0 (claimed by the Applicants) shows a residual drug concentration of 99.6 percent of the initial which is equivalent to 0.4 percent degradation.

After 60 days at 22°C the drug degradation increases to 4.60 percent being the residual drug concentration 95.40 percent of the initial.

The physical stability at 22°C of the doxorubicin·HCl solution at a concentration of 2 mg drug per ml 0.06 M phosphate buffer pH 6.0 (described by Arcamone et al) is less than one hour.

Within this time the solution gives rise to a precipitate which does not dissolve by stirring.

-9-

5. **CONCLUSIONS**

Whereas, in accordance with what is widely accepted in the scientific community in the USP and in other Pharmacopoeias, a drug is defined as stable over the period in which it maintains an assay of 90% or higher of the initial, one can conclude that:

the stability at 22°C of doxorubicin·HCl dissolved at 2 mg per ml diluted hydrochloric acid pH 3.0 is higher than the stability at 22°C of doxorubicin·HCl dissolved at 2 mg per ml 0.06 M phosphate buffer pH 3.0 and 6.0, and can reach 18 months at a storage temperature between 2 and 8°C as shown in the patent application serial No. 878,784.

It is unexpected that two solvents (0.06 M phosphate buffer and diluted hydrochloric acid) with the same pH (3.0) affect the doxorubicin·HCl stability to an extent which determines the therapeutic use and the commercial exploitation of the solution.

-10-

## TABLE I

HPLC assay (mg/ml) of doxorubicin. HCl dissolved in
0.06 M phosphate buffer pH 3.0 and in diluted
hydrochloric acid during storage at 22 ± 1°C

| Time (days) | Phosphate pH 3.0 | HCl pH 3.0 |
|:-----------:|:----------------:|:----------:|
| 0  | 1.951 | 1.967 |
| 8  | 1.844 | 1.979 |
| 15 | 1.793 | 2.004 |
| 22 | 1.680 | n.d.  |
| 30 | 1.625 | 1.959 |
| 44 | 1.510 | 1.888 |
| 60 | 1.300 | 1.877 |

n.d. = not determined

Each concentration value is the mean of three

independent determinations.



-11-

## TABLE II

Percent stability of doxorubicin·HCl dissolved in
0.06 M phosphate buffer pH 3.0 and in diluted
hydrochloric acid pH 3.0 during storage at 22 ± 1°C

| Time (days) | Phosphate pH 3.0 | HCl pH 3.0 |
|:---:|:---:|:---:|
| 0 | 100.0 | 100.0 |
| 8 | 94.5 | 100.6 |
| 15 | 91.9 | 101.9 |
| 22 | 86.1 | n.d. |
| 30 | 83.3 | 99.6 |
| 44 | 77.4 | 96.0 |
| 60 | 66.6 | 95.4 |

n.d. - not determined

The values in this table were calculated from those in
Table I

-12-

6.  I declare further that all statements made of my own knowledge are true and all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of this application or any patent issuing thereon.

7.  Further declarant saith not.

Date: _November 21st, 1988_     _Carlo Confalonieri_
                                Carlo Confalonieri

EXHIBIT 9

769-080-0 FWC
75/

25
E
9-28-89

RECEIVED
00 SEP 12 PM 3:05
GROUP 180

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF          :   GROUP ART UNIT:  183

GAETANO GATTI ET AL           :        18c 9-14-89
                                                  061
SERIAL NO: 06/878,784         :

FILED: JUNE 26, 1986          :   EXAMINER:  PESELEV

FOR:  INJECTABLE READY-TO-USE
      SOLUTIONS CONTAINING AN
      ANTITUMOR ANTHRACYCLINE
      GLYCOSIDE

PRELIMINARY AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

        In advance of prosecution, please amend the above-

identified application as follows:

IN THE CLAIMS

     Claim 31, line 9, delete "2.7" and insert therefor

--2.71--

          line 11, delete "mg/m." and insert

therefor --mg/ml.--.

-2-

## REMARKS

Claims 20, 21, 23, 24, 25, and 31 remain active in this application. Reconsideration is respectfully requested.

Applicants express their appreciation to Examiners Johnnie Brown and Elli Peselev for the very helpful interview granted on July 25, 1989. As a result of that discussion, Applicants are submitting herewith a new Rule 132 Declaration, and have amended the claims as recommended by Ms. Brown, and it is believed that this application will be favorably reconsidered. Attending the interview was Dr. Tosolini, former Director of Galenical Research of Farmitalia Carlos Erba, Dr. Confalonieri, one of the inventors of the present invention, Dr. Ferrario, Manager Patent Department Farmitalia, Ms. Colburn, General Manager Patent Department Adria Laboratories, Professor Stella, an independent expert from Kansas State University and myself Norman Oblon, attorney for Applicants.

Doxorubicin is one of a relatively few drugs which is currently in wide use throughout the world for treatment of malignant tumors. Although doxorubicin is extremely effective pharmaceutically, it is a substance which is extremely unsafe for the personnel administering the drug. Until now, it was necessary

fffff

-3-

for doctors to reconstitute lyophilized powdered doxorubicin just prior to injection since it was impossible to supply the doctor with ready made injectable solutions. Solutions of doxorubicin were found to be highly unstable and not storable for any reasonable period of time. The difficulty with requiring the medical personnel to reconstitute the solutions themselves, however, is that if the doctor or nurse drops even small amounts on their own body, there is a considerable danger of severe medical harm to themselves, including formation of cancer cells. In reconstituting the lyophilized power, the doctor must mix the powder with water and shake or stir the solution. In the process, the probability of spillage onto the fingers is very great if the doctor becomes even slightly careless. Thus, there is a considerable need to provide stable doxorubicin solutions which can be distributed to the medical profession in sealed containers, ready to use, thereby avoiding the necessity of the doctor or nurse having to reconstitute the solution from the lyophilized powder. But to meet this need, a stable solution had to first be found.

In the quest for a storage stable solution, common knowledge indicated that the way to attempt to stabilize a salt solution is to look for a particular



-4-

pH at which the solution will hopefully remain
stable. Not surprisingly, therefore, many researchers,
including the present Applicants, conducted extensive
pH studies, and numerous literature references
describing just such studies were supplied to the
Examiner. In doing their pH studies, Dr. Confalonieri
and Gatti, the present inventors, made a curious
finding: On occasion they were able to obtain a stable
solution at a pH of 3. But on occasion they were not
able to obtain a stable solution at pH 3. That pH 3
should give a stable solution on occasion was itself
surprising, since previous studies on doxorubicin
solutions indicated that the pH of maximum stability
was other than pH 3, as will be explained below. What
was even more baffling however, was why did they
sometimes obtain good results at pH 3 but sometimes
they obtained very poor results at pH 3? The point of
maximum stability should be reproducible time after
time, not intermittently. The researchers at first
thought that perhaps the variations in their results
was caused by impurities in the solution, or was a
result of the use of the glass beakers in which the
solutions were held, since the prior art was replete
with admonitions against the use of glass as a
container for doxorubicin solutions, as will also be
explained below.

-5-

Drs. Gatti and Confalonieri, the inventors herein, finally realized that they were obtaining a stable solution at pH 3 only when they were forming the solution in a most unconventional manner. It is common knowledge, so much so that it is something learned in first year college chemistry, that in shifting the pH of an acidic solution to a somewhat lower value and in maintaining such a value one should not use a strong acid, such as hydrochloric acid, but rather should use a buffered solution of a weak acid. This is, of course, easily explainable by the calculations we had learned to do in freshman chemistry. Whereas one would use a strong acid such as hydrochloric acid to obtain a pH of 1 or 2, one would not use a strong acid to obtain solutions of 3 and higher. Instead one would tend to use a weaker acid in a buffered solution.

What the present inventors were doing however, was making their pH 3 solutions with hydrochloric acid, a procedure which was then and is now quite inexplicable. Surprisingly, the inventors discovered that it was only when they obtained their solution at pH of about 3 using hydrochloric acid, that they achieved a stable doxorubicin solution. When they substituted a phosphoric acid buffer solution to obtain pH 3, the result was quite the opposite.

PI 59

-6-

However, this was not the only surprising aspect of their discovery. It was also well known that doxorubicin will absorb onto various surfaces, particularly glass. (See the Beijnen et al reference, the Benvenuto et al reference, the Tomlinson reference, (Journal of Pharmaceutical Sciences Vol. 71, No. 10, Oct. 1982, pp. 1121-1125) all cited in the parent application.) Of course, to be able to package a solution of doxorubicin in glass containers, would be of real importance since it means a greater ease in obtaining FDA approval. Much to the present inventors' surprise, contrary to all of the prior art, when the solution is stabilized at pH 3 using hydrochloric acid, the stability is so good that the solution can even be contained in glass. The departure from the prior art is thus complete. Not only did the present inventors find stability of doxorubicin solutions at a pH which is at variance with all the data reported in the prior art, and not only did they use a strong acid to form the solution, which would be contrary to conventional wisdom, they discovered that unlike all the admonitions in the prior art, their solution remained so stable that it could even be sealed in glass containers.

The prior art not only fails to render the present claims obvious, but actually supports Applicants' claims of unobviousness.

-7-

The Beijnen reference, Pharm Weekblad (1985), specifically reports instability in the range pH 0 to 3.5, see page 109, column 1, last sentence. Beijnen also admonishes against the use of glass containers and specifically advocates the use of polypropylene containers, see column 2, last paragraph. On page 115, Beijnen reports that the enthalpy of activation for the initiation of degradation of doxorubicin is highest at pH 3, see column 1, Table III, last line. The fact is that Beijnen reported failed experiments, not successful ones. Some months later, Beijnen reported in International Journal of Pharmaceutics, 32 (1986) 123 to 131 that

> "The pH profile shows maximum
> stability for doxorubicin at about
> pH 4." (Page 123, summary lines 4
> to 5.)

Beijnen also published in the Journal of Parenteral Science and Technology, enclosed herewith, that maximum stability of doxorubicin is about pH 4 to 5, see page 221, column 1, line 7 from top of Table 1. What makes it even more surprising is that in Beijnen's 1985 studies, he formed his solutions in perchloric acid, see page 114, which he admixed with sodium perchlorate, see column 1, second paragraph. At counsel's request, Dr. Confalonieri repeated Dr. Beijnen's experiments which is shown in Table 1 of the accompanying Rule 132

-8-

Declaration. In the reproduction of Beijnen's tests, at 35°C, doxorubicin solution degradation dropped to 80.1% by the end of the third week as compared to stability at 94.2% when the solution was prepared with hydrochloric acid. At 45°C, the degradation of Beijnen's solution as compared with Applicants' was even more pronounced.

The difference between Beijnen's solution and Applicants' is the difference between useless and useful.

The teaching of Beijnen therefore, is (1) do not use pH 3; (2) do not use glass containers; (3) the maximum stability is at pH 4 to 5; and (4) solutions at pH 3 are expected to be unstable. Beijnen certainly supports the unobviousness of the present invention.

The Arcamone reference, International Symposium on Adriamycin, also reports failed experiments. At 22°C, and at all pH levels tested, doxorubicin solutions showed themselves to be vastly unstable as compared with solid crystallized or lyophilized doxorubicin, see Table 2 and note that the solid state material was stable for 2 to 5 years whereas solutions throughout the pH ranges reported were stable for periods of 20 hours to about one month. Using conventional wisdom, when Arcamone made up his solution at pH's 1 and 2, he,



-9-

of course, used dilute aqueous HCl. But when he went to higher pH's of 3 to 6, he used a phosphate buffer. Had <u>Arcamone</u> used dilute aqueous HCl at pH 3, he would have found remarkable stability, which is Applicants' discovery, but instead <u>he switched</u> from aqueous hydrochloric acid to a phosphate buffer when going from pH 2 to pH 3, and therefore completely missed the ball game.

Returning to Table I of the accompanying Rule 132 Declaration, it can be seen that at 35°C the drop off in stability reproducing the <u>Arcamone</u> experiments with phosphate buffer, was even more dramatic than the results obtained by <u>Beijnen</u>. If <u>Beijnen's</u> solutions were useless, <u>Arcamone's</u> is less than useless. In these accelerated tests, after only 15 days, stability was down to 76.4% as compared with 94.8% in the present invention. At 45°C, the drop off in stability was down to 71% after only eight days as compared with 96.3% for one week in the present invention.

It is reasonable to question whether the testing at 35°C and 45°C, as shown in Table I of the Rule 132 Declaration, was representative of the <u>Arcamone</u> experiments, which were carried at 22°C. Applicants therefore, have conducted experiments which they report at the bottom of page 4 of the Declaration that show

-10-

that at pH 2 and 22°C, even using hydrochloric acid,
stability dropped way down to the unsatisfactory
range.  In contrast, even after 90 days, at pH 3, 22°C,
and using hydrochloric acid, stability was at 95.6%.
Temperature is not the factor, proper pH adjustment
using hydrochloric acid is.  Using HCl, one achieves
surprising stability at all temperatures tested 22°C,
35°C, 45°C 55°C, see top of page 4 of Rule 132
Declaration, as compared with phosphoric acid buffer or
perchloric acid.

     During the discussion with Ms. Brown and Ms.
Peselev, Ms. Brown questioned whether the surprising
stability is obtained over the entire range of pH's as
presently claimed, 2.71 to 3.14.  Accordingly, tests as
shown in Table 2, page 4 of the accompanying
Declaration shows the remarkable stability at pH 2.71
up to 3.14 in an accelerated test at 55°C using HCl,
and the remarkable drop off in stability at pH 3.7.
This is not to say that going below 2.71 slightly or
slightly above 3.14 in pH would not also give
reasonably good results, but that the range of 2.71 to
3.14 very well pinpoints Applicants' maximum stability
pH range when hydrochloric acid is used to adjust the
pH.



-11-

The <u>Bosanquet</u> reference in Cancer Chemother
Pharmacol (1986) 17:1-10, which is not prior art to the
present application which has a filing date of August
2, 1985 as compared with the <u>Bosanquet</u> publication date
in 1986, nevertheless, confirms that even a year after
Applicants' invention, there was still confusion in the
prior art over reported pH studies.  At page 5, column
1 <u>Bosanquet</u>, a year after Applicants' invention, the
reference states

> "In conclusion, very little can be
> catagorically stated about the
> stability of adriamycin, and a very
> carefully designed study is urgently
> required to resolve these
> conflicting results."  (Page 5,
> column 1, lines 14 to 11 from bottom
> of the page.)

Moreover, <u>Bosanquet</u> continues to admonish against the
use of glass containers, see page 1, column 1, second
paragraph and also page 7, column 1, number 8

> "As far as possible work with dilute
> solutions in polypropylene or
> siliconized glass, and keep them
> away from metals."

The <u>Benvenuto et al</u> reference, American Journal of
Hospital Pharmacy, Vol. 38, December 1981, 1914-1918
and <u>Tomlinson</u>, Journal of Pharmaceutical Sciences, Vol.
71, No. 10, October 1982, 1121 to 1125, both
specifically report on studies of the instability of
doxorubicin in contact with glass, at page 1915, column

-12-

2, lines 5 to 4 from the bottom, <u>Benvenuto et al</u>
reports

> "In glass, however, the initial
> decrease was greater and more
> rapid."

See also Table 5, page 1916.  See also <u>Tomlinson</u>, page
1124, column 1, lines 5 to 7 under Table 2.

The <u>Kaniewska</u> reference, a translation of which is
herewith, indicates maximum stability at pH 2.6 and
indicates that as pH increases, <u>stability decreases</u>;
which would be a disincentive for one to try to go
higher than 2.6.  Of course, <u>Kaniewska</u> turned out to be
wrong.  Moreover, <u>Kaniewska</u> actually teaches <u>away</u> from
the use of hydrochloric acid alleging in the first full
paragraph that doxorubicin in the presence of
hydrochloric acid under certain conditions, will break
down the doxorubicin to form a precipitate liberating
daunosamine.  So here we have a clear teaching away
from the use of hydrochloric acid.

The <u>Eksborg</u> reference reports that phosphoric acid
is the acid of <u>choice</u>, page 298 the bottom, and reports
maximum stability at pH 2 and finally the <u>Poochikian</u>
reference reports maximum stability at pH 4.5.

Everyone thought that pH was the factor.  It turns
out everyone was wrong.  The factor was the use of
hydrochloric acid <u>and</u> a pH of about 3, and in so doing,



-13-

the solution is so stable, that even in glass, it
retains its stability.

Applicants are also enclosing herewith trade
literature distributed by Adria Laboratories which
speaks of the reduced risk to the medical profession
which the present invention enables.

It is believed that this application is now in
condition for allowance and early notice to that effect
is respectfully solicited.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Crystal Square Five - Fourth Floor
1755 Jefferson Davis Highway
Arlington, Virginia  22202
(703)  521-5940
75/map

'831 File History
Page 20

PI 67

# EXHIBIT 10



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07738579999 | 07727789 | GATTI | G | 7690800FWC |

OBLON, SPIVAK, MC CLELLAND, MAIER
AND NEUSTADT
4TH FLOOR
1755 JEFF. DAVIS HWY.
ARLINGTON, VA 22202

| | EXAMINER |
|---|---|
| | PESELEV, E |
| ART UNIT | PAPER NUMBER |
| 183 | 28 |

DATE MAILED:     01/02/90

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined   ☒ Responsive to communication filed on *10-12-89*   ☐ This action is made final.

A shortened statutory period for response to this action is set to expire _____3_____ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☒ Notice of References Cited by Examiner, PTO-892.   2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.   4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.   6. ☐ _____

**Part II   SUMMARY OF ACTION**

1. ☒ Claims *20-21, 23-25 and 31* _____ are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☒ Claims *31* _____ are allowed.

4. ☒ Claims *20-21 and 23-25* _____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
   are ☐ acceptable. ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the
    examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed on _____ has been ☐ approved. ☐ disapproved (see explanation).

12. ☒ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☒ been filed in parent application, serial no. *878 784* ; filed on *6/26/86*

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
    accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

P1 86

**EXAMINER'S ACTION**

PTOL-326 (Rev. 8-88)

Serial Number  385,999                              -2-

Art Unit  183


    Claims 20-21 and 23-25 are rejected under 35 U.S.C.
112, second paragraph, as being indefinite for failing
to particularly point out and distinctly claim the sub-
ject matter which applicant regards as the invention.

    The preamble in claims 20-21 and 23-25 i.e. "A
solution" should be changed to " A sealed glass container
containing therein a solution" to correspond to claim 31
from which claims 20-21 and 23-25 depend.

    Applicant's arguments filed October 12, 1989 have
been fully considered but they are not deemed to be per-
suasive.

    The Arcamone et al article discloses doxorubicin
solution at pH 3 in a phosphate buffer and doxorubicin
solution at pH 2 in a hydrochloric acid solution.
Applicants claim a doxorubicin solution at pH 2.71-3.14
in a hydrochloric acid solution.  Applicants have sub-
mitted the Declaration on October 12, 1989 showing that
doxorubicin solution with HCl at pH 3 has a higher stabi-
lity than doxorubicin solution with phosphate buffer at
pH 3 and a doxorubicin solution with HCl at pH 2.  The
Declaration also shows the high stability of the
doxorubicin solution with HCl at pH 2.71, 2.8 and 3.14.
The same declaration has been found convincing in over-
coming the prior art rejection.

Serial Number  395,999                          -3-

Art Unit  183


    Any inquiry concerning this communication or earlier communications from the examiner should be directed to Elli Peselev whose telephone number is (703) 557-3634.

    Any inquiry of a general nature, or relating to the status of this application, should be directed to the Group receptionist whose telephone number is (703) 557-0664.


OK
Elli Peselev:dm

(703) 557-3634

December 18, 1989

*Elli Peselev*
ELLI  PESELEV
PATENT  EXAMINER
ART  UNIT  123