EXHIBIT 19



MAIL ROOM
JAN 6 1993
PAT. & TRADEMARK OFF.

Docket NO: 769-249-0 DIV

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| IN RE APPLICATION OF: | : | |
| GAETANO GATTI, ET AL | : | GROUP ART UNIT:  1803 |
| SERIAL NO:  07/827,742 | : | |
| FILED:    JANUARY 29, 1992 | : | EXAMINER: PESELEV, E. |
| FOR:   INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE | : | |

### DECLARATION OF CARLO CONFALONIERI
### PURSUANT TO 37 C.F.R. 1.132

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

Now come Carlo Confalonieri, a citizen of Italy, and a resident of Cusano Milanino (Milan), Italy who declares and states that:

1. I am the Carlo Confalonieri who previously submitted declarations pursuant to 37 C.F.R. 1.132 in application Serial Number 07/503,865 executed on December 20, 1990 and May 27, 1991 found at tabs 1 and 2 respectively to this declaration.

2. In order to demonstrate that the results illustrated in my declaration found at tab 1, were obtained with other physiologically acceptable acids, I conducted additional comparative testing found at tabs 8 through 10 attached hereto. The procedures employed in conducting these tests were the same as those described in my previous declarations, and in particular

PU 0015002

as set forth in tab 1 hereto.  In addition to testing other
physiologically acceptable acids, stability testing for
epirubicin and idarubicin is also presented in tabs 3 through 8.
As can be seen from these tabs epirubicin shows, under both
accelerated and long term testings, a very similar stability
behaviour as doxorubicin, while idarubicin appears to be even
more stable under both accelerated and long term conditions.

    3.  From these tests it is apparent that the storage
stability conferred on aqueous solutions of doxorubicin is
not unique to hydrochloric acid but the stability is also
conferred by other physiologically acceptable acids.  In all
instances, the physiologically acceptable acids at pHs between
2.5 and 5 produced aqueous solutions having superior storage
stability as compared with the use of phosphate buffers as
taught by Arcamone.  Indeed, even the use of phosphoric acid
resulted in superior storage stability when compared with the
use of phosphate buffers as taught in Arcamone.

    4.  In conducting the storage stability tests, I tested a
wide variety of physiologically acceptable acids which produced
aqueous solutions in which the various anthracyclines were
soluble.  In particular, results obtained with acetic acid as
well as hydrochloric acid are illustrated at tab 8.  Tabs 9 and
10 compare sulfuric acid, phosphoric acid, methanesulphonic acid
and tartaric acid with hydrochloric acid with results at tab 10
also comparing the Beijnen formulation using perchloric acid and

2

769-249-0 DIV

PU 0015003

the Arcamone phosphate buffers. As can be seen, all of the tested physiologically acceptable acids produced results vastly superior to that for the phosphate buffers.

Furthermore, as evident, e.g., from tab 6, the acetic acid used as pH controlling agent for idarubicin under accelerated and long term conditions produced results comparable to those achieved with hydrochloric acid.

That is, that the results achieved with acetic acid would demonstrate comparable stability values as for the acids identified previously.

5.  Based on these results, it is my conclusion that any physiologically acceptable acid which yielded solutions in which the anthracycline of interest was soluble will, at the recited pHs, result in a storage stable aqueous solution. I find such results to be quite surprising since until the time of our invention, it was considered that pH alone was the determining factor in establishing storage stability of aqueous solutions as discussed in my previous declarations found at tabs 1 and 2. From the results which have been presented, it is apparent that the nature of the specific acid employed is not critical (although hydrochloric acid appears to yield the best results) but, rather, that any physiologically acceptable acid results in solutions having superior storage stability.

6.  Prior to the present invention, the conventional wisdom was that it was impossible to produce anthracycline aqueous solutions which had long term storage stability. Further, that although the prior art had been recognized that pH had an effect upon storage stability of aqueous solution, the conventional wisdom in the art was that the pH should be adjusted with a

769-249-0 DIV

3

PU 0015004

buffer as taught by Arcamone.  Thus, it was surprising and
unexpected to discover that by adjusting the pH of the aqueous
solution with a physiologically acceptable acid, a solution
having a storage stability as demonstrated at tabs 3 through
10 hereto, would result.   Prior to the present invention
the expectation of those skilled in the art was that the nature
of the pH adjusting medium would have no effect on the stability
of the aqueous solution.  Accordingly, it was extremely
surprising and unexpected to find that contrary to conventional
wisdom, the pH adjusting medium had a significant and beneficial
effect.

     I hereby declare that all statements made herein of my own
knowledge are true and that all statements made on information
and belief are believed to be true; and further that these
statements were made with the knowledge that willful false
statements and the like so made are punishable by fine or
imprisonment, or both, under Section 1001 of Title 18 of the
United States Code and that such willful false statements may
jeopardize the validity of the application or any patent issued
thereon.

Carlo Confalonieri

Dated: 9th December, 1992

760-249-0 DIV

4

PU 0015005

# EXHIBIT 20

769-249-0 DIV
769-206-0 DIV

## IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:                :

GAETANO GATTI, ET AL.                :    EXAMINER:  PESELEV

SERIAL NO:  07/827,742               :

FILED:  JANUARY 29, 1992             :    GROUP ART UNIT:  1803

FOR:  INJECTABLE READY-TO-USE
      SOLUTIONS CONTAINING
      AN ANTITUMOR                   :
      ANTHRACYCLINE GLYCOSIDE

### AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

    Responsive to the Official Action mailed November 15,
1993, Applicants submit the following remarks.

### IN THE CLAIMS

31. (Three times amended)  A physiologically acceptable
solution of anthracycline glycoside selected from the
consisting of idarubicin hydrochloride, doxorubicin
hydrochloride and epirubicin hydrochloride dissolved in a
physiologically acceptable aqueous solvent, having a pH
adjusted to from 2.5 to 5.0 with a physiologically acceptable
acid selected from the group consisting of hydrochloric acid,
sulfuric acid, phosphoric acid, methane sulfonic acid,
tartaric acid, the concentration of said anthracycline
glycoside being from 0.1 to 100mg/ml, wherein said solution is
contained in a sealed container and has not been reconstituted
from a lyophilizate.

PU 0015067

-2-

Cancel claim 32.

<u>REMARKS</u>

Claims 31, 33-38, 40, and 42 appear in this application.
Claim 31 has been amended to distinguish Applicants' solutions
from prior art solutions which are reconstituted from
lyophilizates.  Basis for the amendment to Claim 31 is found
in canceled Claim 32.  The claims stand rejected under 35 USC
103 as obvious over Japanese Patent no. 60-92212 in
combination with Baurain et al. (U.S. Patent No. 4,296,105)
and Arcamone et al.

According to the Examiner,

The Japanese patent discloses adjusting
the pH of doxorubicin HCl-containing solution to 2.3
with sulfuric acid. . .
Baurain et al disclose adjusting the pH of
doxorubicin HCl-containing solution to 4.0 with
sulfuric acid. . .

Japanese application 60-92212 and Baurain et al. (U.S.
Patent 4,296,105) are both directed to anthracycline solutions
which are freeze-dried to form a lyophilizate, which is later
reconstituted in water immediately prior to use.  The
recitation of a sealed container in Claim 31 distinguishes
Applicants' invention from the Japanese application and other
prior art references which involve lyophilizates.  A sealed
container effectively precludes lyophilization, since to
lyophilize an unlyophilized solution would necessarily involve
removal of water from the container and destruction of the
seal.

The adjustment of the pH to 2.3 in the Japanese
application is directed to improving the poor <u>rate of</u>

PU 0015068

-3-

solvation of doxorubicin salts, which arises from their
facility at forming relatively slow-dissolving gels when first
placed in solution.  The stability characteristics of these
solutions is neither mentioned nor claimed.  Consequently,
Japanese application 60-92212 contains no teaching of long-
term storage stable solutions of anthracycline glycosides, and
does not suggest the storage-stable solutions achieved by
Applicants.

As with the Japanese application, Baurain et al. does not
teach stable solutions of doxorubicin or other anthracyclines.
Instead, it is directed toward new derivatives of doxorubicin.
The sulfuric acid treatment of the Baurain et al. solution is
merely a step lasting ten minutes in the overall preparation
of the doxorubicin derivatives claimed (Col. 3, lines 33-38).
Consequently it does not teach or suggest Applicants' long-
term storage stable solutions.  The recitation of a sealed
container, together with the requirement that the solution has
not been reconstituted from a lyophilizate, effectively
distinguishes Baurain et al.

The study conducted by Arcamone et al. was directed to
ascertaining the stereochemical properties of adriamycin, not
to achieving a new solution achieving long-term storage
stability for such compounds.  Arcamone et al. used a
phosphate buffer, a known technique which does not suggest the
use of acids as practiced by Applicants.  Arcamone et al.
simply prepared several solutions of adriamycin with the well-
known phosphate buffers and recorded the "stability."

PU 0015069

-4-

Moreover, the Arcamone et al. claim of achieving a stability of ">1 month" at pH ranges of 3 - 6 is vague, since the actual time over which the compound remained stable is not given, nor is there established any methodology by which stability is determined. Consequently, Applicants disagree with the Examiner's assertion that

> the instant claims [] encompass solutions which have the same stability as the prior art solutions and are therefore not patentable therefrom.

More to the point, neither Arcamone et al. nor any other reference teaches or suggests that strong acids may be substituted for phosphate or other buffers to obtain even equal storage stabilities. In fact, as demonstrated by Applicants, their anthracycline solutions provide superior storage stabilities to the Arcamone buffer solutions.

Prior to Applicants' development of storage stable anthracycline solutions, the practice of reconstituting such solutions from lyophilized powders was common in the prior art. The toxicity of these powders posed significant health risks to health care workers from accidental exposure during handling and reconstitution. By dramatically increasing the storage stability of anthracycline glycosides in solution over the prior art, Applicants' invention allows medical personnel to handle these compounds in sealed glass containers, substantially reducing the risk of accidental exposure.

In view of the above amendments and remarks, it is respectfully submitted that this application is now in

-5-

condition for allowance.   Early notice to this effect is
respectfully requested.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Richard D. Kelly
Registration No. 27,757

Crystal Square Five - Fourth Floor
1755 South Jefferson Davis Highway
Arlington, VA   22202
(703) 413-3000
RDK/TLS

PU 0015071

EXHIBIT 21



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 07/827,742 | 01/29/92 | GATTI | G   769-249-0-DI |

EXAMINER

PESELEV, E    *#26*

| ART UNIT | PAPER NUMBER |
|---|---|

18N1/0926
OBLON, SPIVAK, MC CLELLAND, MAIER AND
NEUSTADT
FOURTH FLOOR
1755 JEFFERSON DAVIS HWY.
ARLINGTON, VA 22202

1803
DATE MAILED:    *Remailed*
*89726794*
*1-30-96*

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined    ☒ Responsive to communication filed on *5-12-94*    ☒ This action is made final.

A shortened statutory period for response to this action is set to expire ___3___ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I  THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.    2. ☐ Notice of Draftsman's Patent Drawing Review, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.    4. ☐ Notice of Informal Patent Application, PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.    6. ☐ _____

**Part II  SUMMARY OF ACTION**

1. ☒ Claims *31, 33-38, 40 and 42* _____ are pending in the application.

    Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims *31, 33-38, 40 and 42* _____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ ; _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
    are ☐ acceptable; ☐ not acceptable (see explanation or Notice of Draftsman's Patent Drawing Review, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____, has (have) been ☐ approved by the
    examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☒ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☐ been filed in parent application, serial no. *07/503,856*; filed on *4-3-90*.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
    accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**EXAMINER'S ACTION**

PTOL-326 (Rev. 2/93)

PU 0015075

Serial No. 827742                              -2-

Art Unit    1803

    The following is a quotation of 35 U.S.C. § 103 which forms
the basis for all obviousness rejections set forth in this Office
action:

    A patent may not be obtained though the invention is not
    identically disclosed or described as set forth in section
    102 of this title, if the differences between the subject
    matter sought to be patented and the prior art are such that
    the subject matter as a whole would have been obvious at the
    time the invention was made to a person having ordinary
    skill in the art to which said subject matter pertains.
    Patentability shall not be negatived by the manner in which
    the invention was made.

    Subject matter developed by another person, which qualifies
    as prior art only under subsection (f) or (g) of section 102
    of this title, shall not preclude patentability under this
    section where the subject matter and the claimed invention
    were, at the time the invention was made, owned by the same
    person or subject to an obligation of assignment to the same
    person.

    This application currently names joint inventors.  In
considering patentability of the claims under 35 U.S.C. § 103,
the examiner presumes that the subject matter of the various
claims was commonly owned at the time any inventions covered
therein were made absent any evidence to the contrary.  Applicant
is advised of the obligation under 37 C.F.R. § 1.56 to point out
the inventor and invention dates of each claim that was not
commonly owned at the time a later invention was made in order
for the examiner to consider the applicability of potential 35
U.S.C. § 102(f) or (g) prior art under 35 U.S.C. § 103.

    Claims 31, 32-38, 40, 42 and 44 are rejected under 35 U.S.C.

§ 103 as being unpatentable over the Japanese patent no. 60-92212

in combination with Baurain et al (U.S. Patent no. 4,296,105) and

Arcamone et al.

    The Japanese patent discloses adjusting the pH of

doxorubicin HCl-containing solution to 2.3 with hydrochloric acid

(see page 9).

    Baurain et al disclose adjusting the pH of doxorubicin HCl-

PU 0015076

Serial No. 827742                                        -3-
Art Unit   1803

containing solution to 4.0 with sulfuric acid (see column 3).

Arcamone et al disclose a solution of doxorubicin having the pH in the range of 3-6.

Therefore, a person having ordinary skill in the art at the time the instant invention was made would have been motivated to adjust the pH of anthracycline glycoside- containing solution to 2.5 with hydrochloric acid because such a person would have expected the pH of 2.3 and the pH of 2.5 to produce the same results. Further, a person having ordinary skill in the art would have been motivated to adjuct the pH of anthracycline glycoside-containing solution to a higher pH such as pH 4 as disclosed by Baurain et al or higher as disclosed by Arcamone et al with other physiologically acceptable acid, such as sulfuric acid, as disclosed by Baurain et al, because such a person would have expected the resulting solutions to have similar stabilities.

Applicant's arguments filed May 12, 1994 have been fully considered but they are not deemed to be persuasive.

Applicants contend that the Japanese application and Baurain et al. are both directed to anthracycline solutions which form a lyophilizate, which is later reconstituted in water. Same argument has not been found persuasive because a lyophilizate which is reconstituted in water is not been to be patentably distinct from an unlyophilized solution. Further, the purpose

PU 0015077

Serial No. 827742                                    -4-
Art Unit    1803

for which the doxorubicin solution was adjusted to pH of 2.3 as
disclosed by the Japanese patent is immaterial and the stability
of the formed solution is an inherent property of said solution.
Also, the stability of solution disclosed by Baurain et al is an
inherent property of said solutions even if said solutions
represented merely a step lasting ten minutes in the preparation
of doxorubicin derivatives.         Applicants have not presented
any evidence in verified form showing that the claimed
compositions have a significantly better stability than the
compositions disclosed by the Japanese paten and Baurain et al.
Note that the Arcamone et al reference was used only to show
the adjustment of the pH of doxorubicin solutions to 3-6.  The
substitution of phosphate buffer disclosed by Arcamone et al with
hydrochloric acid disclosed by the Japanese patent or sulfuric
acid disclosed by Baurain et al. would have been prima facie
obvious to a person having ordinary skill in the art at the time
of the instant invention.

     Claims 31, 32-38, 40, 42 and 44 are rejected under the
judicially created doctrine of obviousness-type double patenting
as being unpatentable over claims 1-6 of U.S. Patent No.
4,946,831.  Although the conflicting claims are not identical,
they are not patentably distinct from each other because the
compositions claimed in the patent no. 4,946,831 are encompassed
by the instant claims.

PU 0015078

Serial No. 827742                              -5-

Art Unit    1803

The obviousness-type double patenting rejection is a judicially established doctrine based upon public policy and is primarily intended to prevent prolongation of the patent term by prohibiting claims in a second patent not patentably distinct from claims in a first patent. *In re Vogel*, 164 USPQ 619 (CCPA 1970). A timely filed terminal disclaimer in compliance with 37 C.F.R. § 1.321(b) would overcome an actual or provisional rejection on this ground provided the conflicting application or patent is shown to be commonly owned with this application. See 37 C.F.R. § 1.78(d).

The English translation of the Bohne et al reference has not been received.

THIS ACTION IS MADE FINAL. Applicant is reminded of the extension of time policy as set forth in 37 C.F.R. § 1.136(a).

A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS FINAL ACTION IS SET TO EXPIRE THREE MONTHS FROM THE DATE OF THIS ACTION. IN THE EVENT A FIRST RESPONSE IS FILED WITHIN TWO MONTHS OF THE MAILING DATE OF THIS FINAL ACTION AND THE ADVISORY ACTION IS NOT MAILED UNTIL AFTER THE END OF THE THREE-MONTH SHORTENED STATUTORY PERIOD, THEN THE SHORTENED STATUTORY PERIOD WILL EXPIRE ON THE DATE THE ADVISORY ACTION IS MAILED, AND ANY EXTENSION FEE PURSUANT TO 37 C.F.R. § 1.136(a) WILL BE CALCULATED FROM THE MAILING DATE OF THE ADVISORY ACTION. IN NO EVENT WILL THE STATUTORY PERIOD FOR RESPONSE EXPIRE LATER THAN SIX MONTHS FROM THE DATE OF THIS FINAL ACTION.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Elli Peselev whose telephone number is (703) 308-4616.

Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-0196.

JOHN W. ROLLINS
PRIMARY EXAMINER
ART UNIT 180

Peselev/tf
September 15, 1994

PU 0015079

EXHIBIT 22

CERTIFICATE UNDER 37 CFR 1.8: The undersigned hereby certifies that this Transmittal Letter and the paper, as described in paragraph 1 hereinabove, are being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed for: Asst. Commissioner for Patents, BOX AF, Washington, D.C. 20231 on this 28th day of June, 1996.

By _Daniel A. Boehnen_
Daniel Boehnen

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF GAETANO GATTI, et al.      :

SERIAL NO.: 07/827,742      :      EXAMINER PESELEV

FILED: JANUARY 29, 1992      :      GROUP ART UNIT: 1803

FOR: INJECTABLE READY-TO-USE SOLUTIONS      :
     CONTAINING AN ANTITUMOR
     ANTHRACYCLINE GLYCOSIDE      :

RECEIVED
JUL 12 1996
GROUP 1800

**AMENDMENT UNDER 37 C.F.R. § 1.116**

ASSISTANT COMMISSIONER OF PATENTS & TRADEMARKS
BOX AF
WASHINGTON, D.C. 20231

SIR:

Responsive to the final Official Action mailed January 30, 1996, Applicants state:

**IN THE CLAIMS**

Please amend independent Claims 31, 42, and 44 as follows:

31. (Four times amended)    A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100mg/ml, wherein said solution is contained in a sealed container [and has not been reconstituted from a lyophilizate].

1

PU 0015155

42.    (Amended)    A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefore, [wherein the solution has not been reconstituted from a lyophilizate,] wherein said solution has a pH adjusted to 2.71 to 3.14 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

44.    (Twice Amended)    A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, [wherein said solution has not been reconstituted from a lyophilizate].

        Please cancel Claim 40, and add the following claims 45-47:

45.    The anthracycline glycoside solution of Claim 31, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

46.    The container of Claim 42, wherein said doxorubicin solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

47.    The anthracycline glycoside solution of Claim 44, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids. --

2

PU 0015156

## REMARKS

### Introduction

Claims 31, 33-38, 42, and 44 remain in this application. Prior Claim 40 has been canceled, and new claims 45-47 are submitted. Applicants had previously paid for Claims 31-42, so no new fee is required. None of these changes raise any substantial new issue, and they place the application in condition for allowance. Reconsideration of this application, as amended, is respectfully requested.

The Claims of this application were previously drafted in a way that distinguished Applicants' solutions from certain prior art products which are reconstituted from lyophilizate powder in vials by medical personnel at the time of drug administration. The comments of the Examiner in the last Office Action indicated that whether the solution was reconstituted from lyophilizate is immaterial because patentability must reflect the inherent properties of the claimed solution and the prior art. Consistent with the Examiner's comments, Claims 31, 42, and 44 are now amended (by deleting the lyophilizate limitation) to show that the important and *claimed* properties of the present invention do arise from the inherent properties of the solution, regardless of whether the solution is prepared from lyophilizates in vials.

Along those same lines, the novel property of the claimed solution relates to its capacity for long term storage stability. As explained more fully herein, this long term storage stability of the present invention permits it to be pre-packaged and sold as a ready-to-use solution product, rather than to be reconstituted from lyophilizate in vials by medical personnel in conventional manner. This novel property of the present invention was completely unrecognized by the prior art and provides the basis for satisfying a long felt need and achieving commercial success. Also

3

PU 0015157

importantly for patentability, these aspects of the invention establish a motivation to achieve

something new and different, a factor which is necessary for a finding of obviousness under

§103, but was completely lacking from the prior art

**Double Patenting Rejection**

The Examiner has rejected all of the claims on the grounds obviousness-type double

patenting over U.S. Pat. No. 4,946,831. Applicants note that, in the Office Action mailed

11/15/93, the Examiner indicated that the terminal disclaimer, although re-submitted by

applicants, has not been found in the file. Applicants acknowledge that they will file a new

terminal disclaimer to obviate the double patenting rejection. Applicants request that this be

held in abeyance until agreement on patentable subject matter has been reached.

**Obviousness Rejection**

The Examiner has also rejected all of the claims under 35 U.S.C. §103 as being

unpatentable over the Japanese patent no. 60-92212 in combination with Baurain et al. (U.S. Pat.

No. 4,296,105) and Arcomone et al. Applicants respectfully request reconsideration of this

rejection and allowance of the pending claims.

Before discussing the rejection in detail, it is important to note that the entire thrust and

purpose of the present invention is to achieve technology enabling the long term storage of

doxorubicin in solution, preferably in a pharmaceutically acceptable solution. There is no

question but that none of the prior art cited by the last Office Action are even remotely directed

toward achieving a long term storage stable solution of doxorubicin. JP 60-92212 is directed

toward the discovery of formulations of doxorubicin salts that "are capable of being completely

4

dissolved [from reconstitute] in saline solutions within a very short span of time." *See* the first full paragraph on p. 3 of the reference. Baurain is directed to the discovery of N-leucyl-doxorubicin and its salts, as a new active ingredient. Arcomone is directed to a generalized explanation of the structural and physiochemical properties of doxorubicin, including solubility, spectroscopic characteristics, stability, and analytical methods for determining same. However, as will be detailed below, to the extent that Arcomone discussed stability, the references expressly teaches *away from the present invention, i.e.,* by teaching that doxorubicin has a stability in solution of only a few hours when pH is adjusted with HCL and only a few weeks when pH is adjusted to the range of 3-6 (using a something other than an acid to adjust the pH.) The bottom line is that, to the extent JP 60-92212, or Baurain, or Arcomone have any similarity to the claimed invention beyond merely dealing with doxorubicin , the similarities result from pure happenstance, and have nothing to do with the goals and objectives of the present invention.

The last Office Action implicitly acknowledges that all of the elements of the claimed invention were *not* found in a single prior art reference. That is, by virtue of rejecting the claims under Section 103, rather than Section 102, the Office Action acknowledges that the subject matter of the present invention claims is different from the prior art.

In particular, the Office Action relies upon the teaching of a single example in JP 60-92212 that discloses adjusting the pH to a level of 2.3, and the Office Action acknowledges that this pH of 2.3 is below the pH range of 2.5-5.0 that is taught and claimed in the present invention. However, the Office Action holds that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results."

As to Baurain and Arcomone, the Office Action fails to acknowledge how or why these references differ from the present invention. Apparently, however, the Office Action relies upon

5

these references only to disclose the existence of doxorubicin solutions at pH higher than 2.3. Thus, Baurain discloses a doxorubicin salt solution at pH of 4.0, and Arcomone discloses a doxorubicin salt solution at pH of 3-6. The Office Action holds that, "a person of ordinary skill in the art would have been motivated to adjust the pH of anthracyline glycoside-containing solution to higher pH such as pH 4 disclosed by Baurain et al. or higher as disclosed by Arcomone et al with other physiologically acceptable acid, as disclosed by Baurain et al., because such a person would have expected the resulting solutions to have similar stabilities."

Applicants respectfully submit that there are at least four (4) fundamental problems with the rejection in the last Office Action.

- There is no basis on this record for the motivation holding, *i.e.*, for holding that a person of ordinary skill would have been motivated to increase the pH of JP 60-92212 to the higher levels of Baurain and/or Arcomone. Rather, the only motivation for such combination arises via hindsight reliance on the teaching of the present invention.

- Assuming *arguendo* that a person of ordinary skill was motivated to combine the references in order to achieve a "similar stability" (as suggested in the Office Action), the question is similar to what? The only teaching *vis a vis* "stability" to be found anywhere in the present references is a teaching that doxorubicin solution is *not* stable as per the invention. *See* Arcomone, p.21.

- By ignoring the other differences between the claimed subject matter and the prior art, the Office Action does a disservice to the claimed invention. Assuming *arguendo* that a solution was made by following a combination of the references, the resulting combination does not fall within the pending claims.

6

PU 0015160

● Scientific test data comparing the stability of the claimed subject matter to the stability of the solution of JP 60-92212, shows that stability of the claimed invention (pH 2.5-50) is unexpectedly higher than the stability of the JP 60-92212 solution (pH 2.3).

For at least these reasons, Applicants respectfully request that the present rejection be withdrawn and the claims be allowed. Once Applicants thereafter submit an appropriate terminal disclaimer, the claims should be passed to issue.

## Lack of Motivation for Combination

As previously noted, there is absolutely nothing in any of the cited references that refers to a possible improvement in the long term storage stability of doxorubicin solutions. These references are oblivious to the problem, much less the solution. More likely, the authors of these references merely accepted the general belief (prior to the invention) that doxorubicin could not be prepared into long term storage stable solutions, and, thus, the authors never explored nor considered the possibility. In any event, none of the references -- alone or in combination -- provide any motivation for a person skilled in the art to pursue, adapt, modify, or combine any of the references toward any common goal, much less the goal of achieving a long term storage stable solution of doxorubicin hydrochloride.

To the contrary, JP 60-92212 fails to provide any teaching or suggestion that varying pH may have any effect (either negative or positive) on the doxorubicin solution. The same is true of Baurain. Although Arcomone discloses several examples with differing pH, the examples vary several parameters at the same time, such that it is impossible to draw any conclusion on how to achieve a long term storage stable solution of doxorubicin.

7

PU 0015161

## The References Teach a *LACK* of Stability

The Office Action suggests that a person of ordinary skill would be motivated to combine the references to achieve "similar stability." It is only fair to ask, what does the Examiner mean by achieving similar stability? If the intention is achieve similar stability to the claimed invention, then Applicants respectfully submit that proves that the Examiner was relying upon hindsight reason to combine the references. If the intention was to achieve similar stability to the most stable prior art solution, then Applicants respectfully submit that references expressly taught that such resulting solution was *not* long term storage stable.

As previously noted, neither JP 60-92212 nor Baurain even mention storage stability of the solution. Rather, both of those references focus on products which are lyophilized, presumably because it was recognized that they were *not* stable. The only reference that provides any express teaching as to storage stability is the Arcomone reference, and this reference expressly teaches that the only way to achieve long term storage stability for doxorubicin is via lyophilization, because the solutions are *not* stable.

> "Adriamycin [doxorubicin] hydrochloride is stable in the solid state .... The stability of aqueous solutions of adriamycin varies with pH and the buffer concentration (Table 2 and Fig. 12) as established on the basis of spectrophotometric and chromatographic analysis."

*See* p. 21 of Arcomone. Table 2 indicates that doxorubicin in solution with HCL is stable for less than 20 hours. HCL is the only acid discussed vis a vis stability. Table 2 further indicates that doxorubicin in solution can be stable for more than a month at pH 3-6 when a phosphate buffer is used. Fig. 12 provides more specific information on the use of phosphate buffers with doxorubicin solutions; specifically, Fig. 12 indicates that a 90% stability of doxorubicin in phosphate buffered solution will expire in about 10 days. In sum, these references — considered alone or in combination -- teach away from, not toward, the present invention.

8

PU 0015162

### The Hypothetical Combination Is Different Than The Claimed Invention

Assuming *arguendo* that a person of ordinary skill were motivated to combine the cited references, the resulting combination would be different than the claimed subject matter. The Baurain reference differs from the pending invention in several respects, most notably in that Baurain adds L-leucine carboxyanhydride to the pH 10.2 solution. Although Baurain teaches that the pH of the solution is thereafter reduced to pH 4, the purpose and result of doing so is to convert the doxorubicin hydrochloride to N-(L-leucyl) doxorubicin. Thus, assuming a person were to combine JP 60-92212 and Baurain, the result would be a solution of N-(L-leucyl) doxorubicin at pH 4, rather than the present claimed invention. There is no basis to conclude that the resulting combination would comprise doxorubicin hydrochloride solution at the requisite doxorubicin concentration level and the requisite pH level.

Similarly, Arcomone teaches that doxorubicin solutions may be adjusted to a pH of 3-6 using a phosphate buffer solution, or to a pH of 1-2 using HCl. Arcomone presents these as alternatives, and fails to teach or suggest in any way that the acid (rather than the buffer) should be used when adjusting pH to 3-6. (Note: Arcomone teaches at Table 2 that HCL used to adjust the doxorubicin solution will achieve a stability of *less than 20 hours*. Thus, Arcomone teaches away from using HCl to adjust pH for long term storage stability.) Assuming a person were to combine JP 60-92212 and Arcomone, the result would be solution of doxorubicin hydrochloride in which the pH was adjusted by phosphate buffer, rather than HCL as required by the pending claims. There is no basis to conclude the combination of JP 60-92212 and Arcomone would comprise doxorubicin hydrochloride solution at the requisite pH level.

9

PU 0015163

<u>Scientific Evidence Establishes An Unexpected Stability Difference</u>

It is important to recognize that the claimed subject matter is based upon using particular acids to adjust the pH of the solution to a particular pH range. Applicants have demonstrated time and again in comparative data in this application that the resulting solution exhibits surprisingly better long term storage stability than solutions having a pH outside the recited pH range or using a buffer other than the claimed acids to adjust the pH.

Lest there be any doubt on this point, Applicants are submitting herewith yet another declaration still further addressing the issue of stability. *See* Declaration of Carlo Confalonieri, filed herewith. Applicants have prepared four different solutions. The first solution involves following the procedure of example 6 of the JP 60-92212 patent except modified as to the amount of the material made. The pH of the solution was 2.3 as taught in JP 60-92212. This first solution also contained the mannitol excipient of example 6 of JP 60-92212. Two other solutions not containing the mannitol excipient of the Japanese patent were also prepared having a pH of 2.3, one having a concentration of 2mg/ml and one having 5mg/ml concentration. A fourth solution prepared in accordance with the present invention has a pH of 2.5 and a concentration of 2 mg/ml. As can be seen from the enclosed declaration of Dr. Confalonieri, the solution prepared according to the present invention, having a pH of 2.5, exhibited superior stability as compared with each of the solutions having a pH of 2.3. Indeed, the solution having the mannitol excipient taught in the Japanese patent resulted in a composition which had a worse stability than the corresponding composition not containing the excipient. *See* the results of 35°C. (Note: The one and four week stability of the 2.3 pH solution not containing the excipient was superior to the 2.3 pH solution containing the excipient at 45°C, thus demonstrating that the Japanese patent could not have been concerned with long-term storage

10

PU 0015164

stability.) More importantly, the solution having a pH of 2.5 according to the present invention exhibited significantly better stability than each solution having a pH of 2.3 at all temperatures.

These results conclusively demonstrate that solutions having pH 2.5, adjusted by HCL, achieve unexpected and nonobvious results in storage stability *vis a vis* solutions having a pH 2.3. Perhaps more important, these results directly contradict and disprove that a doxorubicin solution having a pH of 2.3 has the same stability as a doxorubicin solution having a pH of 2.5.

The last Office Action held that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results." Accepting *arguendo* the statement in the last Office Action as to what a person of ordinary skill in the art would have expected, the evidence submitted herewith proves that expectation is incorrect. Thus, the basic assumption of the rejection in the last Office Action is incorrect. That error, without more, warrants reconsideration and reversal of the rejection.

**Secondary Evidence of NonObviousness**
**Also Provides Strong Evidence of Patentability**

The evidence presented above as to the differences, results, and motivations of the claimed invention *vis a vis* the prior art fully establishes the patentability of the present invention. Above and beyond that evidence, however, the additional available evidence as to secondary considerations of non-obviousness further confirms the patentability of the claimed invention. The examiner should keep in mind the fact that the present invention is not a paper patent but is one which has found commercial success and has solved a long felt need. If it was so obvious to adopt the technique of the present application, it certainly would have been done much earlier given the problem which has been solved.

11

PU 0015165

In *Stratoflex, Inc. v. Aeroquip Corp.* 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed. Cir. 1983), the Federal Circuit Court of Appeals said:

> [E]vidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness. *In re Sernaker,* 702 F.2d 989, 217 USPQ 1 (Fed. Cir. 1983) citing *In re Fielder and Underwood,* 471 F.2d 640, 176 USPQ 300 (CCPA 1983), *see In re Mageli et al.,* 470 F.2d 1380, 1384, 176 USPQ 305, 307 (CCPA 1973) . . . . Indeed, *evidence of secondary considerations may often be the most probative and cogent evidence in the record.* (Emphasis in original.)

After reviewing a decision which failed to give due consideration to evidence of the secondary considerations of non-obviousness, the Federal Circuit Court of Appeals reversed, noting that such evidence is not relegated to second-class status, and whether to consider such evidence is *not* discretionary:

> That approach was error. All evidence bearing on the issue of obviousness, as with any other issue raised in the conduct of the judicial process, must be considered and evaluated *before* the required legal conclusion is reached.

*W.L. Gore & Associates, Inc. V. Garlock, Inc.,* 721 F.2d 1540, 1555, 220 USPQ 303, 314 (Fed. Cir. 1983) (emphasis in original). *See also Minnesota Min. and Mfg. V. Johnson & Johnson,* 976 F.2d 1559, 1573 (Fed. Cir. 1992) ("Objective evidence such as commercial success, failure of others, long-felt need, and unexpected results must be considered before a conclusion on obviousness is reached."); *and see Gillette Co. v. S.C. Johnson & Son, Inc.,* 919 F.2d 720, 725 (Fed. Cir. 1990).

"The rationale for giving weight to the so-called secondary considerations is that they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1391 (Fed. Cir. 1988). As the United States Supreme Court has stated:

> These legal inferences or subtests do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of

PU 0015166

judicial treatment than are the highly technical facts often present in patent
litigation.

*Graham v. John Deere Co.*, 383 U.S. 1, 35-36, 86 S.Ct. 684, 702-03, 15 L.Ed.2d 545, (1966);

As to evidence of long felt need and/or failure of others, Judge Learned hand has stated,

". . . the length of time the art, though needing the invention, went without it" is one of the best

non-technical considerations for determining whether a patented invention is unobvious. *Safety*

*Car Heating & Lighting co. v. General Electric Co.,* 155 F.2d 937, 939 (2d. Cir. 1946). *See also*

*Panduit Corp. v. Dennison Mfg. Co.,* 774 F.2d 1082, 1099 (Fed. Cir. 1985), *vacated,* 475 U.S.

809 (1986), *on remand,* 810 F.2d 1561 (Fed. Cir. 1987), *cert. den.,* 481 U.S. 1052 (1987), *later*

*proceeding,* 836 F.2d 1329 (Fed. Cir. 1987). The evidence of long felt need and failure of others

in this case is particularly enlightening in this case.

What applicants have surprisingly discovered is that the combination of pH and the pH

adjusting means has allowed them to produce a storage stable solution of these anthracyclines.

As the examiner is aware, anthracyclines have demonstrated significant value in the treatment

of various cancerous tumors, while the anthracyclines have the benefit of tending to destroy

cancerous tumors, they also have the detriment of serious side effects, including the destruction

of heart muscle. These destructive capabilities are exhibited not only when the drug is injected,

but also when the drug becomes ingested such as by inhalation, contact with the skin and the

like. These latter exposures are significant to the health care personnel. Prior to the present

invention, it was necessary for the health care personnel to dissolve the dry, lyophilized

anthracyclines before administering same to the patient. This step of dissolving the lyophilized

dry anthracycline created the possibility of direct exposure of the medical personnel to the

anthracycline. Over time, such continued exposures could have significant adverse

consequences. Thus, the present invention satisfies a long felt need.

13

PU 0015167

Applicant has previously submitted numerous affidavits in support of commercial success and the long felt need solved by this invention. In particular, Declarations of William J. Dana, and Mary Horstman, and Debra Holton-Smith were previously filed in related case S.N. 06/878,784. For the convenience of the Examiner, copies of these declarations are enclosed and submitted now for consideration in this case.

Conclusion

In view of the foregoing amendment and remarks, it is respectfully submitted that this application is in condition for allowance. Early notice to this effect is respectfully requested.

Respectfully submitted,

June 28, 1996

Daniel A. Boehnen, Reg. No. 28,399
Emily Miao, Ph.D., Reg. No. 35,285
BANNER & ALLEGRETTI, LTD.
Suite 3000
10 South Wacker Drive
Chicago, Illinois 60606
312-715-1000

14

PU 0015168

EXHIBIT 23

# United States Patent [19]

## Jakinovich, Jr.

[11]  **4,220,667**

[45]  **Sep. 2, 1980**

[54]  **ZINC CONTAINING CONDIMENTS**

[75]  Inventor:  **William Jakinovich, Jr.,** Cincinnati, Ohio

[73]  Assignee:  **The Procter & Gamble Company,** Cincinnati, Ohio

[21]  Appl. No.: **931,073**

[22]  Filed:  **Aug. 4, 1978**

### Related U.S. Application Data

[63]  Continuation of Ser. No. 750,926, Dec. 15, 1976, abandoned.

[51]  Int. Cl.$^2$ ....................... **A23L 1/237; A23L 1/226**
[52]  U.S. Cl. ......................................... **426/96;** 426/97; 426/103; 426/289; 426/649; 426/658
[58]  Field of Search .................. 426/96, 97, 103, 289, 426/295, 331, 649, 650, 658, 443, 74

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,489,758 | 11/1949 | Dunn et al. | 426/649 |
| 2,550,726 | 5/1951 | Searle | 426/96 X |
| 2,606,839 | 8/1952 | Evans | 426/648 |
| 2,744,823 | 5/1956 | Diamond | 426/649 X |
| 2,764,485 | 9/1956 | Bash et al. | 426/96 X |
| 2,999,752 | 9/1961 | Webb | 426/74 |
| 3,514,296 | 5/1970 | Frank et al. | 426/649 |

### FOREIGN PATENT DOCUMENTS

747247  9/1970  Belgium .

### OTHER PUBLICATIONS

Eckstein et al., Chem. Abs., vol. 64, 16726b, 1966.

*Primary Examiner*—Esther M. Kepplinger
*Attorney, Agent, or Firm*—Jerry J. Yetter; Julius P. Filcik; Richard C. Witte

[57]  **ABSTRACT**

Condiments, especially sodium chloride, are coated with saliva-insoluble zinc salts to prevent caking and to provide a dietary zinc supplement suitable for human use.

**32 Claims, No Drawings**

4,220,667

1

## ZINC CONTAINING CONDIMENTS

This is a continuation, of application Ser. No. 750,926, filed Dec. 15, 1976 now abandoned.

## BACKGROUND OF THE INVENTION

The importance of zinc in animal and human nutrition is receiving increased attention. Zinc has been shown to play an important role in taste acuity, enzyme reactions, and other physiological responses such as wound healing. Many modern diets do not provide optimal amounts of zinc to mammals. Supplementation of animal and human diets with zinc is, therefore, very important.

One supplemental dietary source of zinc is "sea salt," which is obtained by evaporating natural salt water. However, sea salt is very hygroscopic and inconvenient to handle. Like table salt (sodium chloride), sugar and other granulated or powdered condiments, sea salt tends to "cake" or form large clumps on storage under ambient conditions. In order to keep these condiments free flowing and easy to dispense under humid conditions, anti-caking agents such as magnesium silicate or calcium silicate are used. However, such agents add little, if anything, of nutritive value to the condiments and certainly do not provide a dietary source of zinc.

It is an object of this invention to provide a palatable condiment which will not cake and which also provides the daily requirement of zinc.

## RELATED PATENT ART

U.S. Pat. No. 2,489,758, issued to Dunn, et al. (1949), describes a mineral salt block which is used to supplement a normal animal diet with trace minerals. Various bioavailable zinc salts, including zinc oxide and zinc carbonate are used to supply the zinc requirement. The salt blocks of the '758 patent are prepared by mixing the mineral supplements with ordinary salt, which is then compressed under pressure into a dense, solid mass.

U.S. Pat. No. 2,999,752, issued to Webb (1961), relates to a method of supplying zinc oxide as an additive to animal feed and fertilizer mixes. Zinc oxide is described as the preferred material since it is readily available to body tissues through the digestive processes. In order to minimize the difficulty in mixing zinc oxide with the minerals and animal feed, the zinc oxide is mixed with dolomitic lime to form it into discrete particles which are easier to handle in preparing animal feed mixes.

U.S. Pat. No. 2,606,839, issued to Evans (1952), describes a process for making a non-caking sea salt by first alkalizing and carbonating sea water to convert the magnesium and calcium salts to the corresponding carbonates before evaporating the sea water to dryness. The modified sea salt is said to be non-hygroscopic and to remain free-flowing for long periods.

Belgian Pat. No. 747,247, issued to Deutsche Solvay-Werke (1970), describes a method of reducing the agglomeration of sodium chloride or mixtures containing it by adding an additive of an alkali metal ferrocyanide and a zinc compound. The sodium chloride is preferably sprinkled with a suspension of the zinc ferrocyanide complex before milling or mixing.

None of the above references appears to have appreciated that the process of coating the mineral salt or feed particles with a zinc salt in the form of a finely divided powder would provide a zinc supplemented

2

condiment and also reduce the tendency of condiments to cake. The "zinc coated" material provided herein is easy to handle and readily mixes with other foods or mineral salts to serve as a food supplement.

## SUMMARY OF THE INVENTION

The present invention encompasses non-caking, palatable and nutritional compositions, comprising a granular condiment, especially table salt, the individual particles of said condiment being substantially coated with a safe and effective amount of a saliva-insoluble, physiologically acceptable zinc salt in the form of a finely divided powder. A process for preparing said nutritional composition by mixing the finely divided zinc salt with the granular condiment particles is also disclosed.

## DETAILED DESCRIPTION OF THE INVENTION

This invention relates to non-caking and palatable condiment compositions which supply a nutritional amount of zinc.

By "condiment" is meant a material used to enhance the flavor of food, e.g., table salt, sea salt, sugar, seasoned salt, and the like.

By "non-caking" is meant that the condiment remains in a free flowing particulate form, even under humid conditions.

By "palatable" is meant that the composition is agreeable or pleasant to the sense of taste. In particular, zinc salts used herein are selected from non-astringent materials which do not substantially alter the taste of the condiment being coated.

By "nutritional" is meant that the composition supplies zinc in a bioavailable form. The condiment thus serves as a zinc supplement to the animal or human diet.

By "physiologically acceptable" is meant that the zinc salts used in the compositions are suitable for ingestion by humans or animals without any untoward physiological response, commensurate with a reasonable benefit/risk ratio.

By "safe and effective amount" is meant an amount of the zinc salt which both prevents caking of the condiment and alleviates dietary deficiencies of zinc (or supplements dietary levels), and yet causes no undesirable side effects (at a reasonable benefit/risk ratio). An amount sufficient to supply about 50 mg of zinc per day is typically used. The amount of zinc supplied will depend upon the zinc salt which is used and the amount of condiment which is ingested.

By "substantially coated" is meant that the outer surfaces of the individual particles of the condiment are, for the most part, covered with the zinc salt.

By "saliva-insoluble" is meant that the zinc salt is essentially insoluble, i.e., less than ca. 5% dissolved, in the secretions of the salivary glands. However, the zinc salts used herein are soluble in the acidic digestive juices; thus, they become nutritionally available in the stomach or intestines.

By "comprising" is meant that various other compatible ingredients may be present in the compositions in such proportions as will not adversely affect the non-caking and nutritional properties or the palatability of the compositions. The term "comprising" thus encompasses and includes the more restrictive terms "consisting of" and "consisting essentially of" within its scope.

All percentages and ratios herein are by weight, unless otherwise specified herein.

4,220,667

**3**

Certain condiments, especially sea salt, table salt and sugar are typically used in the form of granular particles, which are hygroscopic. In order to keep the particles from clumping or forming large masses, an anti-caking agent, for example, magnesium or calcium silicate, is added to the condiments. Simple zinc salts have not heretofore been used as anti-caking agents.

Many salts of zinc are nutritionally available, but due to other undesirable properties, they are not useful as anti-caking agents. Zinc sulfate, for example, is an emetic. Other zinc salts have an astringent effect in the mouth and therefore are unpalatable. In addition, many zinc salts such as zinc sulfate, and the like, are quite hygroscopic and are totally unsuitable for use with free flowing granular condiments such as table salt.

Zinc salts which are saliva-insoluble, non-hygroscopic and physiologically acceptable are used in the present compositions. Typical zinc salts with these properties include zinc oxide, zinc carbonate and zinc phosphate. These zinc salts are non-emetic, non-hygroscopic and, because they are insoluble in saliva, are non-astringent and do not have a bitter taste. These salts can be used alone or in combination in the practice of this invention. Indeed, zinc oxide reacts with carbon dioxide in the air, and therefore may contain some zinc carbonate.

The zinc salts which are used in the invention are chosen from the food and drug grade items of commerce. The amount of contamination by heavy metals such as arsenic, lead and cadmium should be within the acceptable range of safety. Preferably, the zinc salts will be free of any such contamination.

Condiments which can be kept from caking, and yet act as a vehicle for delivering the nutritional amount of zinc to the animal or human, are preferably those which form a part of a daily diet. Sugar; common table salt; dietic salts, i.e., mixtures of from about 20% to about 80% sodium chloride and from about 20% to about 80% potassium chloride; and seasoned salts, for example, garlic salt, onion salt and other flavored salts containing mixtures of herbs, spices and flavorings, are especially useful in this invention. For aesthetic purposes, those condiments which are white, or which contain white particles or granules, are most preferred, since the saliva-insoluble, non-hygroscopic zinc salts are commonly white.

The condiment is in a granular form suitable for use at the table or in cooking. If the condiment is in lumps or large blocks, it is ground and sieved to a particle size of from about 100 microns to about 600 microns, preferably from about 250 microns to about 500 microns in size. Any standard method of grinding and/or sieving the condiment can be used. If the condiment is extremely hygroscopic, such as sea salt, the grinding and sieving should be carried out under dry conditions to prevent the caking of the particles of granules.

The saliva-insoluble physiologically acceptable zinc salt is used in the form of a finely divided powder. The particles of the zinc salt are from about 1 micron to about 270 microns, preferably from about 30 to about 250 microns, most preferably from about 50 to about 100 microns in size.

The weight ratio of the condiment to zinc salt used herein is dependent both upon the zinc salt and the condiment which are used. In this regard, the molecular weight of the zinc salt and the average daily intake of the condiment are the two most important factors to be considered.

**4**

For example, one gram of zinc oxide supplies about 800 mg of available zinc; 1 gram of zinc phosphate supplies about 420 mg of zinc; and 1 gram of zinc carbonate supplies about 650 mg of zinc. Since the average daily intake of sugar is usually greater than the average daily intake of salt in the normal diet, less zinc needs to be added to sugar as a nutritional supplement than to salt.

Typical ratios of condiment:zinc salt are in the range of from about 1:0.001 to about 1:0.1, preferably from 1:0.01 to 1:0.05.

For zinc oxide and table salt, with an average ingestion of 1 gram to 6 grams per day, a weight ratio in the range of from about 1 part table salt to from about 0.01 to about 0.05 zinc salt supplies the 50 milligram per day requirement of zinc.

The zinc salt and the condiment are mixed in a manner which causes the individual condiment particles to become substantially coated with a safe and effective amount of the zinc salt. The mixing can be done in a commercial mixer or blender, or simply shaking in a closed container containing the two materials.

There is no need for an adhesive or other chemical or physical method to coat the condiment particles with the zinc salts. The finely powdered zinc salt particles adhere to the larger condiment particles by electrostatic attraction. Zinc oxide is available as a very fine powder. As such, it is highly preferred for use in the practice of this invention.

If the particles of the granular condiment are not substantially coated with the zinc salts, the condiment will cake or form lumps. Moreover, the homogeneous mixture of the condiment and zinc salt provided by the coating process is preferred because the uniform distribution of the zinc salt throughout the condiment assures a uniform administration of the zinc supplement.

When the condiment which is substantially coated with the zinc salt is used in the normal way, that is, to season or flavor foods, the daily requirement of dietary zinc will be met. These condiments can be used to alleviate a zinc deficiency, or to supplement a diet which is deficient in zinc. As noted above, zinc is known to be useful in the metabolism of glucose, plays an important role in many enzyme reactions, promotes wound healing, and is implicated in the treatment of hypertension. In some cases, zinc has been shown to increase taste acuity and has been used as a treatment for children suffering from pica, and acrodermatitis enteropathica. Moreover, enough zinc decreases desire for sodium chloride and therefore the present invention helps to control hypertension.

The following examples illustrate the practice, but are not intended to be limiting thereof.

**EXAMPLE I**

A palatable zinc supplemented table salt is prepared by mixing 3.13 grams of zinc oxide and 96.87 grams of granular, common table salt. The zinc oxide particles are less than 177 microns in diameter, and the table salt granules are greater than 250 microns in diameter. The table salt and zinc oxide are placed in a glass bottle which is stoppered and then shaken vigorously for 2 to 3 minutes to coat the individual table salt particles.

This zinc supplemented salt provides about 25 milligrams of zinc per gram of sodium chloride. When stored under conditions of 73% relative humidity and 90° F., the salt does not cake and remains free-flowing.

4,220,667

**5**

The table salt prepared in Example I is sprinkled on cooked eggs. No difference in taste is perceived between the eggs "salted" with the zinc supplemented salt and those flavored with ordinary table salt. No aftertaste is perceived.

When the zinc oxide of Example I is replaced with 3.85 grams zinc carbonate, similar results are obtained.

When the zinc oxide of Example I is replaced with 5.95 grams of zinc phosphate, similar results are obtained.

In contrast with the procedure of Example I, 96.87 grams of granular, common table salt and 3.13 grams of the finely-powdered zinc oxide are admixed by simply sprinkling the zinc oxide on the sodium chloride to form a heterogeneous mixture. No coating step is used. When stored at 73° F., and 50% relative humidity for one week, the sodium chloride cakes and is no longer free flowing.

**EXAMPLE II**

| Ingredient | Amount |
|---|---|
| Sucrose | 100 g. |
| Zinc phosphate | 6.5 g. |

The sucrose (commercial granulated table sugar) and zinc phosphate are placed in a mechanical mixer and mixed until the zinc phosphate substantially coats the sugar particles. When this mixture is stored under ambient conditions for about 1 week, no caking is observed.

This mixture will supply about 25 milligrams of zinc per gram of sugar.

**EXAMPLE III**

| Ingredient | Amount |
|---|---|
| Granular sea salt | 50 g. |
| Zinc oxide | 5 g. |

The zinc oxide and granular sea salt are mechanically blended until the zinc oxide substantially coats the individual particles of sea salt. When stored under humid conditions, no caking or lumping is observed.

When the zinc oxide is replaced with zinc phosphate, similar results are observed.

**EXAMPLE IV**

| Ingredient | Amount |
|---|---|
| Sodium chloride | 20 g. |
| Potassium chloride | 80 g. |
| Zinc chloride | 5.5 g. |

The sodium chloride and potassium chloride are mechanically blended with the zinc oxide until it substantially coats the individual particles of the two salts. The resulting composition is a low sodium salt particularly useful for those who are on sodium restricted diets.

When stored under humid conditions, no caking is observed.

**EXAMPLE V**

When the table salt prepared according to Example I is substituted for table salt in a human diet, the person consumes less salt than before the substitution is made.

**6**

The appetite for salt is decreased by the consumption of zinc supplemented table salt.

What is claimed is:

1. A non-caking, palatable and nutritional composition, comprising: a granular condiment selected from the group consisting of sodium chloride, mixtures of sodium chloride and potassium chloride, and sugar, the individual particles of said condiment being substantially coated with an amount of a saliva-insoluble, physiologically acceptable zinc salt selected from the group consisting of zinc oxide, zinc carbonate, and zinc phosphate, and mixtures thereof, in the form of a finely divided powder sufficient to prevent caking of said granular condiment, to supplement dietary zinc levels and to alleviate dietary deficiencies of zinc.

2. A composition according to claim 1 in which the weight ratio of condiment to zinc salt is in the range of from about 1:0.001 to about 1:0.1.

3. A composition according to claim 2 in which the zinc salt is zinc oxide.

4. A composition according to claim 3 in which the weight ratio of condiment to zinc oxide is in the range of from about 1:0.01 to about 1:0.05.

5. A composition according to claim 1 in which the condiment is common granular table salt.

6. A composition according to claim 5 in which the weight ratio of table salt to zinc salt is in the range of from about 1:0.001 to about 1:0.1.

7. A composition according to claim 6 in which the table salt is from 100 microns to about 600 microns in size.

8. A composition according to claim 7 in which the zinc salt is zinc oxide.

9. A composition according to claim 8 in which the zinc oxide particles are from about 30 to about 250 microns in size.

10. A composition according to claim 1 in which the condiment is a dietic table salt which comprises a mixture of from about 20% to about 80% by weight sodium chloride and from about 20% to about 80% by weight potassium chloride.

11. A composition according to claim 10 in which the weight ratio of condiment to zinc salt is in the range of from about 1:0.001 to about 1:0.1.

12. A composition according to claim 11 in which the zinc salt is zinc oxide.

13. A composition according to claim 2 in which the condiment is a seasoned table salt.

14. A composition according to claim 2 in which the condiment is granular sea salt.

15. A composition according to claim 2 in which the condiment is sugar.

16. A process for preparing a non-caking, palatable and nutritional composition comprising: mixing particles of a granular condiment selected from the group consisting of sodium chloride, mixtures of sodium chloride and potassium chloride, and sugar with a saliva-insoluble, physiologically acceptable zinc salt selected from the group consisting of zinc oxide, zinc carbonate, and zinc phosphate, and mixtures thereof in the form of a finely divided powder to substantially coat said condiment particles with said zinc salt.

17. A process according to claim 16 in which said condiment particles are mechanically blended with said zinc salts.

18. A process according to claim 17 in which the weight ratio of condiment to zinc salt is in the range of from about 1:0.001 to about 1:0.1.

4,220,667

7

19. A process according to claim 18 in which the zinc salt is zinc oxide.

20. A process according to claim 19 in which the weight ratio of condiment to zinc oxide is in the range of from about 1:0.01 to about 1:0.05.

21. A process according to claim 16 in which the condiment is granular, common table salt.

22. A process according to claim 21 in which the weight ratio of condiment to zinc salt is in the range of from about 1:0.001 to about 1:0.1.

23. A process according to claim 22 in which the table salt is from about 100 microns to about 600 microns in size.

24. A process according to claim 23 in which the zinc salt is zinc oxide.

25. A process according to claim 24 in which the zinc oxide particles are from about 30 to about 250 microns in size.

8

26. A process according to claim 16 in which the condiment is a dietetic table salt which comprises a mixture of from about 20% to about 80% by weight sodium chloride and from about 20% to about 80% by weight potassium chloride.

27. A process according to claim 26 in which the weight ratio of condiment to zinc salt is in the range of from about 1:0.001 to about 1:0.1.

28. A process according to claim 27 in which the zinc salt is zinc oxide.

29. A process according to claim 16 in which the condiment is a seasoned table salt.

30. A process according to claim 16 in which the condiment is granular sea salt.

31. A process according to claim 16 in which the condiment is sugar.

32. A process according to claim 16 wherein said condiment particles are electrostatically coated with said zinc salt.

*  *  *  *  *

EXHIBIT 24

# United States Patent [19]

## Kramer et al.

[11] **Patent Number:** 4,927,806

[45] **Date of Patent:** * May 22, 1990

[54] **SATURATED SALT/CONCENTRATED DEXTRAN FORMULATION TO TREAT HEMORRHAGE**

[75] Inventors: **George C. Kramer**, Davis; **Paul R. Perron**, Citrus Heights, both of Calif.

[73] Assignee: **The Regents of the University of California,** Berkeley, Calif.

[ * ] Notice: The portion of the term of this patent subsequent to Mar. 13, 2007 has been disclaimed.

[21] Appl. No.: **41,605**

[22] Filed: **Apr. 23, 1987**

[51] Int. Cl.$^5$ ................... A61K 37/02; A61K 31/715
[52] U.S. Cl. .......................................... 514/2; 514/54; 514/59; 514/60; 514/832; 514/833; 514/921
[58] Field of Search ...................... 514/59, 60, 2, 832, 514/833, 921, 54

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,864,478 | 2/1975 | Bonhard | 424/101 |
| 3,993,750 | 11/1976 | Fox, Jr. | 514/921 |
| 4,049,795 | 9/1977 | Laborit | 514/921 |
| 4,271,144 | 6/1981 | Holly | 514/59 |
| 4,308,255 | 12/1981 | Raj et al. | 424/153 |

### OTHER PUBLICATIONS

Modig, cited in Biol. Abstracts 78(3) 2473 No. 21745, 1983.

Pristoupil, cited in Chem. Abstracts, vol. 82, 1975, No. 4772b.

Shimazaki, Shuji, et al. Body Fluid Changes During Hypertonic Lactated Saline Solution Therepay for Burn Shock, the Journal of Trauma, 17:38–43, 1977.

Lopes, O. U., Pontieri, V., Rocha, M., Silva, Jr., E., and Velasco, I. T., Hyperosmotic NaCl and Severe Hemorrhagic Shock: Role of the Innervated Lung, Am. J. Physiol 241 (Heart Cir. Physio 20: H883–H890) 1981.

Rush, Jr., B. F., M.D.–Treatment of Experimental Shock: Comparison of the Effects of Norepinephrine, Dibenzyline, Dextran, Whole Blood, and Balanced Saline Solutions, Surgery, vol. 61, No. 6, pp. 938–944 (1967).

Velasco, I. T., Pontieri, V., Rocha E. Silva, Jr., M., and Lopes, O. U., Hyperosmotic NaCl and Severe Hemorrhagic Shock, Am. J. Physiol. 239(5) H664–H673, 1980.

Brooks, D. K.; Williams, W. G.; Morley, R. W.; Whiteman, R., Osmolar and Electrolyte Changes in Haemorrhagic Shock, The Lancet. pp. 521–527, Mar. 9, 1963.

Silbert, Samuel, The Treatment of Thromboangiitis Obliterans, Journal A.M.A. 1759–1761 (Jun. 5, 1926).

Baue, M. D., Arthur E., et al.—A Comparison of Isotonic and Hypertonic Solutions Blood on Blood Flow and Oxygen Consumption in the Initial Treatment of Hemorrhagic Shock, J. of Trauma, vol. 7, No. 5, pp. 743–756 (1967).

Fraser, John; Cowell, E. M., Clinical Study of Blood Pressure in Wound Conditions, Journal A.M.A. Feb. 23, 1918, pp. 520–535, vol. 70, No. 8.

Danowski, T. S.; Winkler, A. W.; Elkinton, J. R.–The Treatment of Shock Due to Salt Depletion; Comparison of the Hemodynamic Effects of Isotonic Saline, of Hypertonic Saline, and of Isotonic Glucose Solutions, J.C.I. 25:130–138 (1946).

Lopes et al.; Chemical Abstracts vol. 96:617p (1982).

Velasco et al.; Chemical Abstracts vol. 93:215562r (1980).

*Primary Examiner*—Ronald W. Griffin
*Assistant Examiner*—Nancy S. Carson
*Attorney, Agent, or Firm*—Pretty, Schroeder Brueggemann & Clark

[57] **ABSTRACT**

A highly concentrated solution is provided which is both hyperosmotic and hyperoncotic with respect to blood plasma and has utility in treating patients experiencing or threatening to experience hypodynamic shock. The physiologically acceptable solution comprises a crystalloid to provide a osmolarity in excess of 5000 mOsms and a colloid to provide an oncocity in excess of 200 mm Hg. The solution is easily transported and administered by a single, rapid infusion of about less than about 1 ml/kg of body weight and results in a rapid and sustained normalization of circulatory function.

**15 Claims, 1 Drawing Sheet**

**U.S. Patent**          May 22, 1990          **4,927,806**



_Fig. 1_

HEMMORAGE & RESUSCITATION

ARTERIAL PRESSURE (mmHg)

INJECTION

BASELINE    SHOCK    RESUSCITATION

◇  DEXTRAN + HYPERTONIC SALINE
◆  HYPERTONIC SALINE ALONE
■  DEXTRAN ALONE
□  NO RESUSCITATION



_Fig. 2_

HEMMORRAGE + RESUSCITATION

CARDIAC OUTPUT (L/min)

INJECTION

BASELINE    SHOCK    RESUSCITATION

◇  DEXTRAN + HYPERTONIC SALINE
◆  HYPERTONIC SALINE ALONE
■  DEXTRAN ALONE
□  NO RESUSCITATION

10-29-85

4,927,806

**1**

## SATURATED SALT/CONCENTRATED DEXTRAN FORMULATION TO TREAT HEMORRHAGE

This invention was made with Government support under Grant No.: DAMD 17-86 C-6115 with the United States Department of Defense and the University of California. The Government has certain rights in this invention.

### BACKGROUND OF THE INVENTORY

This invention relates generally to the area of treatments for circulatory shock and more specifically to a solution which is both hyperosmotic and hyperoncotic for use in preventing and treating hypodynamic shock.

Trauma is the major cause of death in persons under 38 years of age and accounts for over 150,000 deaths per year in this country. Among the most hazardous consequences of traumatic injury is bleeding. The loss of more than 50% of the starting blood volume is not unusual in such injuries and is fatal if not treated promptly.

While field therapy of many medical emergencies, such as cardiac arrest, asthmatic attacks and diabetic crisis has become increasingly successful due to the ever increasing armanentarium of effective drugs, considerably less success has been realized with field treatment of trauma and shock. No drugs have proven effective for the initial treatment of trauma victims. Initial therapy of trauma and hemorrhage currently centers on effecting the cessation of bleeding and on the infusion of large volumes of solutions to replace lost blood volume. Large volume infusion (2 to 8 liters) has generally been considered necessary to restore normal circulatory functions such as arterial blood pressure, cardiac output, oxygen consumption and renal function. Such treatment must be accomplished rapidly to be effective.

The infusion of large volumes of solution involves risks and complications, however. Fluid overload, or "overexpansion", and congestive pulmonary atelectasis may result after use of excessive amounts of fluid. Limited personnel and difficult conditions at the site of an accident make adequate field resuscitation difficult to impossible. In addition to the time necessary merely to infuse such volumes, critical minutes are lost due to difficulties in gaining access to the vascular system. Paramedical personnel must be highly trained to perform such operations. As a result, the average trauma patient has received only 700 ml of fluid prior to arrival in the emergency room, a volume which is normally insufficient to effectively treat hypodynamic shock.

Fluid replacement infusion normally utilizes solutions which have a similar osmolarity to blood plasma. Osmolarity refers to the total concentration of molecules or solutes in a solution. Water will tend to move across a semi-permeable membrane into a solution having a higher concentration of solutes. Thus, the introduction into, for example, the blood vessels, of a fluid having an osmolarity higher than that of normal body fluids will establish an osmotic gradient across the membranes, resulting in an initial change of fluid volume within the vascular system. Osmolarity is generally expresses as millimoles per liter of solution or mOsms.

Small molecules will themselves gradually leak out of the blood vessels, however, so that vascular volume will return eventually to preinfusion levels. Larger molecules, such as colloids, will not escape from the blood vessels as easily, and thus will maintain an osmotic gra-

**2**

dient across the membranes. Because the osmotic pressure exerted by colloids in the blood, which is in the range of about 1 to 2 mOsms, is so much smaller than that of the total osmotic pressure generated by all solutes, colloidal osmotic pressure, or oncotic pressure, is expressed in terms of mm Hg. Blood plasma has an osmolarity of about 283 to 295 mOsms and an oncotic pressure of about 25 mm Hg. Solutions which exceed these levels are termed hyperosmotic or hyperoncotic, respectively.

Recently, attempts have been made to treat animals in hypodynamic shock with highly hyperosmotic saline solutions, having an osmolarity in the range of 2400 mOsms. Such treatment has the advantage of requiring smaller total fluid volume and results in brief initial promotion of circulatory function. Because this improvement is short-lived, however, with critical parameters deteriorating over time, hyperosmotic saline does not provide an effective, sustained treatment for shock.

There thus exists a longfelt need for an effective solution for treating shock victims, particularly those experiencing hypodynamic shock. Administration of a small volume of such a solution should result in the rapid and sustained normalization of circulatory function. Additionally, the solution should be inexpensive and have a long shelf life. The present invention satisfies these needs and provides related advantages as well.

### SUMMARY OF THE INVENTION

The present invention provides physiologically acceptable solutions which are both hyperosmotic and hyperoncotic with respect to blood plasma and have utility in treating patients experiencing or threatening to experience hypodynamic shock. When given a small volume of the solution, on the order of 4 to 5 ml/kg of body weight, or even less if the solution is highly concentrated, patients who have lost a significant proportion of their blood volume exhibit immediate, unexpectedly improved and sustained circulatory functioning as indicated by increased arterial pressure, cardiac output, and oxygen consumption and lowered peripheral resistance. Moreover, cellular membrane potentials and intracellular electrolyte balances are thereby restored. In addition, blood flow to the kidneys and other vital organs may be augmented and urine output is unexpectedly and rapidly increased, thereby decreasing the possibility of acute renal failure, a major complication of shock. Because these solutions are effective in very small volumes, they are particularly convenient to both transport and administer.

In one embodiment, the physiologically acceptable solution comprises a hyperosmotic concentration of a crystalloid (in excess of about 1800 mOsms, preferably about 2000 to 2800 mOsms) and a hyperoncotic concentration of a colloid (in excess of about 30 mm Hg, preferably about 70 mm Hg). This solution has been found to be effective in treating victims experiencing shock when administered in a volume of 250 ml, or about 3 to 5 ml/kg. This physiologically acceptable solution is inexpensive to manufacture and is not adversely affected by temperature extremes, including freezing. As another aspect of the invention, the physiologically acceptable solution is easily administered by single, rapid infusion of approximately equal to or less than 4 to 5 ml/kg of body weight and results in a rapid and sustained normalization of circulatory function.

In another embodiment, the physiologically acceptable solution comprises a highly concentrated solution

4,927,806

**3**

having an osmolality in excess of 5,000 mOsms, preferably about 8,000 to 15,000 mOsms, and an oncotic pressure or oncocity in excess of about 200 mm Hg, and preferably about 300 mm Hg. The maximum of concentration of the crystalloid is determined by the level at which the solution becomes fully saturated, about 29% sodium chloride in a Dextran 70 solution. The upper limit of the colloid concentration relates to the level above which the increasing viscosity of the solution makes it impractical to administer, about 30% Dextran 70.

Other features and advantages of the present invention will become apparent from the following, more detailed description which illustrates, by way of example, the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows arterial pressure as a function of time in animals receiving a hyperosmotic sodium chloride/hyperoncotic dextran solution and those receiving control solutions.

FIG. 2 shows cardiac output as a function of time in animals receiving a hyperosmotic sodium chloride/hyperoncotic dextran solution and those receiving control solutions.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention provides physiologically acceptable solutions which are hyperosmotic and hyperoncotic with respect to blood plasma. The term "physiologically acceptable" as used herein means that a small volume of the solution can be injected directly into a mammal without inducing pathological changes, such as an immune response or metabolic alterations due to toxicity. The physiologically acceptable solution has particular utility for use in preventing or treating hypodynamic shock, and results in an unexpected improvement in circulatory function which is sustained for at least several hours. The solution is effective when administered in small quantities, permitting relatively easy transport and rapid administration, thereby facilitating easy and effective treatment at or near the site of injury.

The solution comprises a crystalloid and a colloid, both of which are present in concentrations exceeding those of human blood plasma, thus establishing an osmotic gradient across the walls of the blood vessels. The crystalloid may be any small molecule which will exert osmotic pressure including, but not limited to, sugars, sugar alcohols, salts, and other ions having molecular weights less than about 1000. Preferably, the crystalloid is sodium chloride, which in water comprises a saline solution. The concentration of the crystalloid is selected to provide an osmolarity which is sufficiently high so as to be effective in restoring circulatory function, without exerting detrimental effect on the cells and tissues or causing adverse physiological effects such as convulsions. Preferably, the osmolarity is between about 1800 to about 3000 mOsms, e.g., 2000 to 2800 mOsms, and ideally about 2400 mOsms. Such a solution is effective in a dose of about 4 ml/kg. Alternatively, the solution may be considerably more concentrated, having an osmolality greater than about 5,000 mOsms, preferably in the range of about 8,000 to 15,000 mOsms and ideally about 11,000 mOsms.

A colloid is also provided in the solution, selected from physiologically acceptable colloids (i.e., so-called plasma volume expanders) having an average molecular

**4**

weight higher than about 30,000 and usually lower than 400,000, preferably lower than 250,000, for example lower than 100,000. Such colloids include, but are not limited to, dextran, hydroxyethyl starches and gelatins of various average molecular weights and proteins, such as plasma proteins and hemoglobin. Preferably, the colloid is dextran 70 (molecular weight of about 70,000) or dextran 60 (molecular weight of about 60,000). The concentration is selected so as to provide maximum salutory effect without damage to cells or tissues, and the colloidal osmotic pressure is higher than about 30 mm Hg, preferably about 70 mm Hg which is about 6% Dextran 70, or in excess thereof. Alternatively, the solution may be of much greater concentration, having an oncocity in excess of 200 mm Hg and preferably about 300 mm Hg. Because of the problems of maximum solubility and increasing viscosity which interferes with ease of administration by the means disclosed, the concentration is preferably below about 30% weight/volume. However, concentrations of as high as about 600 mm Hg and preferably about 300 mm Hg, or 24% Dextron 70, may be usefully employed.

A hyperosmotic/hyperoncotic solution is advantageously utilized to treat hypodynamic circulatory shock resulting from such cases as hemorrhage, trauma, burns, or shock. It is also useful to treat acute renal failure and cerebral edema. The solution is administered in the field or may be used as an initial treatment in an emergency room or critical care unit where a patient exhibits rapid blood loss or unresponsive hypodynamic circulation. The solution may be infused rapidly in a single bolus through a vascular catheter or may be injected directly into a peripheral vessel, with a concomitant saving of critical time. The solution is effective in unexpectedly low dosages, which, depending on the concentratin of the solution may be equal to or less than about 4 to 5 ml/kg of body weight, or less than 1 ml/kg with a highly concentrated solution, or with a highly concentrated solution less than about 1 ml/kg body weight, which amounts to only about 10% to 0.25% the volume presently used to treat victims exhibiting shock through conventional volume replacement therapy. Because only such small volumes are necessary, logistical problems of providing the solution at the site of injury are obviated. The same volume of fluid necessary to treat one patient through conventional therapy may be effectively used to treat many patients when a hyperosmotic/hyperoncotic solution is utilized.

After administration of a small volume of a hyperosmotic/hyperoncotic solution, various indicators of circulatory function are found to rapidly achieve normality, and to sustain such normality. Among these indicators are arterial pressure, cardiac output, oxygen consumption, peripheral resistance, urine output, cellular membrane potentials and intracellular electrolyte balance.

## EXAMPLE I

### Comparative Treatment of Hypodynamic Circulatory Shock in Sheep

Solutions of varying composition were used to treat hypodynamic circulatory shock in adult sheep weighing 40 to 50 kg. Chronic cannultion of the thoracic aorta, superior vena cava and pulmonary artery were performed on sheep anesthetized with halothane/nitrous oxide, and silastic and Swan-Ganz thermodilution catheters (Edwards Laboratories, Santa Ana, CA) in-

5

serted. A Foley catheter was emplaced to monitor urine output. Food and water were withheld for 24 to 36 hours before the beginning of the experimental protocol. Experiments were performed at least 72 hours after surgery.

All experiments were conducted on unanesthetized animals kept unrestrained in cages. Physiological parameters measured and recorded during experiments includded vascular pressures (arterial, central venous, pulmonary artery and pulmonary wedge), cardiac output, urine flow rate, heart rate and respiratory rate. Blood samples were taken for subsequent analysis of hematocrit, serum osmolarity and serum $Na^+$, $K^+$ and $Cl^-$. After an initial one hour period of baseline data collecting, the sheep were bled to a mean arterial pressure of 50 mm Hg, and maintained at 40 to 55 mm Hg by continued bleeding for the next two hours. Measurement protocols followed those detailed in Example II.

Each experimental sheep received a bolus infusion of about 4 ml/kg of hyperosmotic/hyperoncotic solution (1.2M sodium chloride, 6% weight/volume dextran 70 (Macrodex ®, Pharmacia Fine Chemicals, Piscataway, NJ) in deionized, sterile water; osmolarity 2400 mOsms, oncotic pressure 70 mm Hg) and was monitored for three hours. Control sheep were given either no resuscitation, a hyperosmotic sodium chloride solution (1.2M, 2400 mOsms), or a hyperoncotic dextran solution (6% weight/volume, 70 mm Hg). As indicated in FIGS. 1 and 2, administration of all solutions resulted in an enhancement of cardiac output and arterial pressure. However, only the hyperosmotic/hyperoncotic solution effected a full restoration of baseline levels and resulted in sustained, near normal functioning. No other solution produced so full or sustained a response. The animals exhibited no apparent ill effect from the experimental protocol.

### EXAMPLE II

#### Physiological Measurements

Vascular pressures were measured with a Gould P23 pressure transducer (Gould, Inc., Oxnard, CA) connected to a multichannel strip chart recorder for continuous monitoring. Transducers were leveled to the point of the shoulder. Cardiac output was measured by thermodilution, using a Model 9520A Cardiac Output Computer (Edwards Laboratories, Santa Ana, CA). Urine was collected in a closed drainage system equipped with a graduated cylinder. Hematocrits were determined with an IEC Microhematocrit Centrifuge (Damon Instruments, Needham Heights, MA). Sodium and potassium were measured by a Model 143 Flame Photometer (Instrumentation Laboratories, Lexington, MA). Blood urea nitrogen and creatinine were measured on a Clinical Chemical Analyzer System 103 (Gilford Instruments, Oberlin, OH). Osmolarity was determined on an Osmette A Freeze Point Osmometer (Precision Instruments, Sudbury, MA). Plasma volume was measured by the Evans Blue dye dilution technique (Gibson et al., J. Clin. Invest., 16:301 (1937) which is incorporated by reference).

### EXAMPLE III

#### Comparative Efficacy of Solutions Tested

Studies were performed to compare the efficacy of a hyperosmotic/hyperoncotic solution (1.2M NaCl, 6% dextran 70), with a hyperosmotic sodium chloride solu-

6

tion (1.2M), a hyperoncotic dextran solution (6%) and with no resuscitative measures.

FIGS. 1 and 2 depict the effect which these solutions have on arterial pressure and cardiac output, respectively. Baseline arterial pressure ranged from about 86 to 101 mm Hg. In order to induce hypodynamic circulatory shock, the pressure was reduced to about 50 mm Hg. When no resuscitative measures were undertaken, this level rose spontaneously to about 65 mm Hg. An infusion of a small volume of dextran solution resulted in elevation of arterial pressure to about 70 mm Hg, but this level deteriorated over the course of the following three hours. An infusion of either the hyperosmotic sodium chloride solution or the hyperosmotic sodium chloride/hyperoncotic dextran solution resulted in an immediate return to baseline levels. With the hyperosmotic sodium chloride solution, however, the arterial pressure declined some 20% below baseline. The hyperosmotic sodium chloride/hyperoncotic dextran solution effects a rapid, immediate, sustained return of arterial pressure to baseline levels.

Cardiac output decreased from about 5 l/min to about 2.25 l/min upon bleeding. An infusion of a small amount of hyperoncotic dextran solution resulted in a small improvement in cardiac output while an infusion of hyperosmotic sodium chloride solution resulted in a transient return to baseline, followed by rapid deterioration. Infusion of the hyperosmotic sodium chloride/hyperoncotic dextran solution, however, not only immediately resulted in cardiac output even somewhat above baseline but a sustained level at or near baseline as well. Thus, the hyperosmotic/hyperoncotic solution results in a rapid and sustained normalization of cardiac output.

Different hyperoncotic colloid solutions were also compared. In addition to the studies referred to above utilizing hyperoncotic dextran 70, experiments were performed utilizing 1.2M sodium chloride solutions to which different colloids were added in hyperoncotic concentrations. These included hyperoncotic human albumin (25% weight/volume), hyperoncotic dextran 40 (15% weight/volume) and hyperoncotic hydroxyethyl starch (6% weight/volume). The oncotic pressure of these solutions is not known precisely, but such is well above 70 mm Hg and presumably above 150 mm Hg. Two hundred milliliters of each solution were used in an experimental protocol as in Example I. Results of the cardiac output responses are shown in Table I.

### TABLE I

| DIFFERENT HYPERONCOTIC SOLUTIONS EACH MIXED WITH 1.2 M SODIUM CHLORIDE IN DEIONIZED STERILE WATER | | |
|---|---|---|
| Cardiac Ootout (liters/minute) | | |
| | | 15% | |
| | 25% Albumin | Dextran 40 | 6% Starch |
| Baseline | 4.3 | 5.2 | 5.6 |
| Hemorrhage | 1.75 | 2.3 | 2.9 |
| 10 min. post resuscitation | 8.5 | 5.3 | 5.6 |
| 60 min. post resuscitation | 6.9 | 5.6 | 6.5 |
| 120 min. post resuscitation | 6.9 | 5.0 | 6.4 |

All hyperosmotic/hyperoncotic solutions resulted in an immediate and sustained improvement in cardiovascular function.

Different hyperosmotic sodium chloride solutions (1200, 1800, 2400 and 3600 mOsms) and an isoosmotic sodium chloride solution (about 285 mOsms), each

4,927,806

7

mixed with 6% dextran 70 (70 mm Hg) were also com-
pared. Results of these studies are shown in Table II.
All hyperosmotic solutions were more effective than
the isoosmotic solution. Cardiovascular response gener-
ally improved as osmolarity increased to 2400 mOsms.
Concentrations equivalent to 3600 mOsms and higher
caused convulsions. Data suggests 2400 mOsms sodium
chloride/70 mm Hg dextran solution is near optimal,
when given in volumes of 3–5 ml/kg.

TABLE II

SODIUM CHLORIDE SOLUTIONS OF
DIFFERENT OSMOLARITIES,
EACH MIXED WITH 6% DEXTRAN 70
Cardiac Outout (liters/minute)

| | | | | Osmolarity | |
| | 300 | 1200 | 1800 | 2400 | 3600 |
|---|---|---|---|---|---|
| Baseline | 5.1 | 5.9 | 4.9 | 5.3 | 4.3 |
| Hemorrhage | 2.2 | 2.3 | 2.1 | 2.2 | 1.8 |
| 10 min. post resuscitation | 3.2 | 4.6 | 5.0 | 6.2 | 7.0* |
| 60 min. post resuscitation | 3.1 | 4.3 | 4.8 | 4.9 | 4.8 |
| 120 min. post resuscitation | 3.2 | 4.4 | 4.3 | 4.7 | 4.3 |

*Convulsion occurred after infusion with 3600 mOsm solution.

The efficacy of a total of 6 solutions having osmolari-
ties of about 2400 mOsms, but varying in ionic composi-
tions and concentrations were compared using the ex-
perimental protocol in Example I. All solutions were
made up in sterilized deionized water and included
aqueous solutions of sodium chloride, sodium chlori-
de/sodium acetate, sodium chloride/mannitol, sodium
chloride/dextran, qlucose and sodium bicarbonate. The
solutions tested are listed in Table III.

TABLE III

SIX 2400 mOsms SOLUTIONS

| | |
|---|---|
| NaCl | 1.2 M NaCl |
| NaHCO3 | 1.2 M NaHCO3 |
| NaAc | 0.6 M NaCl and 0.6 M NaAcetate |
| Man | 0.7 M NaCl and 1.0 M Mannitol |
| Dex | 1.2 M NaCl and 6% Dextran 70 |
| Glu | 2.4 M Glucose |

The results of the tests with these various solutions
are presented in Table IV. All hyperosmotic crystalloid
soltions caused a rapid improvement in cardiac output.
However, the response was only sustained with the
addition of a hyperoncotic colloid. With a hyperos-
motic/hyperoncotic solution, such as sodium chloride
(2400 mOsms)/dextran 70 (70 mm Hg), the sheep exhib-
ited a sustained normalization of cardiac output, oxygen
consumption, vascular pressures, urine output and total
peripheral resistance.

TABLE IV

SIX 2400 mOsms SOLUTIONS
EFFECTS ON CARDIAC OUTPUT (liters/minute)

| | NaCl | NaHCO3 | NaAc | Man | Dex | Glu |
|---|---|---|---|---|---|---|
| Baseline | 5.1 | 5.3 | 5.5 | 5.0 | 5.3 | 5.3 |
| Hemorrhage | 2.3 | 2.0 | 2.3 | 2.1 | 2.2 | 2.1 |
| 10 min. post resuscitation | 5.3 | 4.0 | 6.3 | 5.0 | 6.2 | 5.3 |
| 60 min. post resuscitation | 3.9 | 3.5 | 3.9 | 3.4 | 4.9 | 3.3 |
| 120 min. post resuscitation | 3.6 | 3.0 | 3.5 | 3.2 | 4.7 | 3.2 |
| 180 min. post resuscitation | 3.8 | — | 3.9 | — | 5.0 | — |

8

EXAMPLE IV

Survivorship of Animals Treated with Various Fluids

Experimental tests performed by Dr. Peter Maningas
at the U.S. Army's Letterman Institute of Research
have confirmed the efficacy of hyperosmotic/hyperon-
cotic solutions for treating hypodynamic shock. Experi-
ments compared the effects of hyperosmotic and hyper-
oncotic solutions on survival in a severe hemorrhage
rapid exsanguination model in swine (Traverso, Circu-
latory Shock, 12:1, (1984) which is incorporated by
reference). Adult swine which were bled to 50% of
estimated blood volume in 15 minutes, were treated
with small resuscitation volumes of the following aque-
ous solutions: isoosmotic sodium chloride solution; hy-
perosmotic sodium chloride solution (2400 mOsms);
hyperoncotic dextran solution (70 mm Hg); and hyper-
osmotic sodium chloride (2400 mOsms)/ hyper oncotic
dextran (70 mm Hg) solution. Survival rates are shown
in Table V. There was 100% survival with a solution of
hyperosmotic/hyperoncotic solution while only limited
success was achieved with solutions of either solute
alone. No animals survived with isotonic saline or with
no treatment.

TABLE V

SWINE SURVIVAL AFTER RAPID 50% BLOOD LOSS

| Resuscitation Fluid | Survival |
|---|---|
| Isoosmotic Sodium Chloride | 0 |
| Hyperosmotic Sodium Chloride | 50% |
| Hyperoncotic Dextran | 66% |
| Hyperosmotic Sodium Chloride/ Hyperoncotic Dextran Solution | 100% |

EXAMPLE V

Use of Hyperosmotic/Hyperoncotic Solution To Treat
Hypodynamic Shock

A paramedic gives about 200–300 ml of a hyperos-
motic/hyperoncotic solution by bolus injection into the
peripheral vein of a trauma victim experiencing shock
or threatening to experience shock at the scene of an
accident. This small volume rapidly stabilize the pa-
tient's circulatory function until arrival at an emergency
room or trauma center. This rapid restoration of cardiac
output, blood pressure, renal function and oxygen con-
sumption lowers the morbidity and mortality of trauma
and hemorrhage.

Small volume resuscitation is also effective in several
other hypodynamic circulatory states, such as during
and after extensive surgical procedures, for burn injury
and after organ transplantation, where hypodynamic
shock is threatened or experienced.

EXAMPLE VI

Experimental Treatment With a Highly Concentrated
Solution

Adult sheep in which hypodynamic shock was in-
duced were treated with a small volume with a highly
concentrated hyperosmotic/hyperoncotic solution. Six
unanesthetized sheep weighing 36 to 43 kg were bled of
more than half of their estimated blood volume (about
1500 ml) so as to maintain an arterial pressure of 50 mm
Hg for 2 hours.

A solution was prepared containing 28.2% sodium
chloride and 24% Dextran 70 (Macrodex, Pharmacia

4,927,806

**9**

Fine Chemicals, Piscataway, N.J.) in deionized sterile water. The solution was calculated to have an osmolarity of about 12,000 mOsms, and an oncotic pressure (oncocity) of 24 mm Hg. The solution was almost fully saturated and had the viscosity of maple syrup. Attempts to make a more concentrated solution were abandoned because over a concentration of about 30% Dextran 70 the viscosity became too high to be acceptable for injection and was therefore unacceptable for therapeutic use.

Each experimental sheep received a bolus infusion of about 1 ml/kg body weight of this hyperosmotic/hyperoncotic solution. Physiological parameters were monitored as in Examples I and II for 3 hours post-infusion.

As indicated in Table VI, cardiac output and mean arterial pressure returned to or exceeded baseline levels shortly after administration.

TABLE VI

| | Resuscitation of hemorrhage with 40 ml of 28% NaCl/24% Dextran 70 | |
| | Mean Arterial Pressure | Cardiac Output |
|---|---|---|
| Baseline | 90 ± 6 | 4.8 ± 0.3 |
| Hemorrhage | 48 ± 4 | 2.3 ± 0.8 |
| 3 min. post resuscitation | 98 ± 8 | 6.4 ± 1.6 |
| 15 min. post resuscitation | 98 ± 8 | 5.5 ± 1.3 |
| 30 min. post resuscitation | 91 ± 6 | 5.4 ± 1.4 |
| 60 min. post resuscitation | 83 ± 9 | 4.8 ± 1.3 |
| 120 min. post resuscitation | 80 ± 6 | 4.8 ± 1.4 |
| 180 min. post resuscitation | 79 ± 4 | 4.6 ± 1.2 |

Mean Arterial Pressure in mm Hg
Cardiac Output in l/minute

**EXAMPLE VII**

Therapeutic Treatment of Hypodynamic Shock With a Highly Concentrated Solution

A trauma victim experiencing shock, or having been injured so to be as expected to experience shock imminently, is given a bolus injection of the highly concentrated hyperoncotic/hyperosmotic solution of Example VI. The volume of solution given is sufficiently small such that it can be administered through a single syringe. The solution is preferably administered by injection into a peripheral vessel, although alternative modes of injection are possible. The amount given is about 50 ml, which is equal to about 0.7 ml/kg for a 150 pound victim. This small volume rapidly restores the cardiac output, blood pressure, renal function and oxygen consumption to near normal conditions.

Alternatively, the victim may be given multiple small doses of the solution, either by injection of about 25 ml at the time of injury followed by injection of 25 ml

**10**

approximately 5 minutes later if blood pressure response to the first injection is inadequate.

Although the invention has been described with reference to the presently-preferred embodiment, it should be understood that various modifications can be made by those skilled in the art without departing from the invention. Accordingly, the invention is limited only by the following claims.

We claim:

1. A physiologically acceptable solution for treating hypodynamic circulatory shock in a mammal, said solution containing a crystalloid having a molecular weight less than about 1,000 in a concentration of at least about 5,000 mOsms and a colloid having a molecular weight in excess of 30,000 in a concentration of at least about 200 mm Hg.

2. The physiologically acceptable solution of claim 1, wherein said crystalloid concentration is between about 8,000 to 15,000 mOsms.

3. The physiologically acceptable solution of claim 1, wherein the crystalloid is selected from the group consisting of sodium salts, sugar alcohols, and sugars.

4. The physiologically acceptable solution of claim 1, wherein said colloid concentration is between about 200 to about 600 mm Hg.

5. The physiologically acceptable solution of claim 1, wherein said colloid is selected from the group consisting of dextran, hydroxyethyl starch, gelatin and protein.

6. The physiologically acceptable solution of claim 1, wherein said crystalloid concentration is about 11,000 mOsms and said colloid concentration is about 300 mm Hg.

7. A method of preventing or treating hypodynamic circulatory shock in a mammal, comprising the step of administering to said mammal in a condition of existing or impending shock, a therapeutically effective dose of a physiologically acceptable solution containing a crystalloid in a concentration of at least about 5,000 mOsms and a colloid in a concentration of at least about 200 mm Hg.

8. The method of claim 7, wherein said crystalloid concentration is between about 8,000 to 15,000 mOsms.

9. The method of claim 7, wherein said crystalloid is selected from the group consisting of physiologically acceptable sodium salts, sugar alcohols, and sugars.

10. The method of claim 7, wherein said colloid concentration is between about 300 to about 600 mm Hg.

11. The method of claim 7, wherein said crystalloid concentration is about 11,000 mOsms and said colloid concentration is about 300 mm Hg.

12. The method of claim 7, wherein said colloid is selected from the group consisting of a physiologically acceptable amount of any of dextran, hydroxyethyl starch, gelatin and protein.

13. The method of claim 7, wherein said physiologically acceptable solution is infused intravascularly.

14. The method of claim 7, wherein said physiologically acceptable solution is injected.

15. The method of claim 7, wherein said therapeutically effective dose is equal to or less than 1 ml/kg of body weight.

* * * * *

65

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   :  4,927,806

DATED        :  May 22, 1990

INVENTOR(S) :  Kramer et al.

**It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:**

In column 1, line 11, delete "INVENTORY" and insert therefor --INVENTION--.

In column 1, line 63, delete "expresses and insert therefor --expressed--.

In column 2, line 24, delete"susstained"and insert therefor --sustained--.

In column 4, line 21, delete "Dextron" and insert therefor --Dextran--.

In column 4, line 36, delete "concentratin" and insert therefor --concentration--.

In column 5, line 9, delete"includded" and insert therefor --included--.

In column 6, line 53, delete "Outout" and insert therefor --Output--.

In column 7, line 14, delete "Outout" and insert therefor --Output--.

In column 7, line 33, delete "qlucose" and insert therefor --glucose--.

In column 7, line 46, delete "soltions" and insert therefor --solutions--.

In column 9, line 4, after 24 insert --%--.

**Signed and Sealed this**

**Twenty-first Day of January, 1992**

*Attest:*

HARRY F. MANBECK, JR.

*Attesting Officer*          *Commissioner of Patents and Trademarks*