# EXHIBIT 25



769-080-0
55/

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF: :

GAETANO GATTI ET AL : GROUP ART UNIT: 123

SERIAL NO: 878,784 :

FILED: JUNE 26, 1986 : EXAMINER: PESELEV

FOR: INJECTABLE READY-TO-USE :
SOLUTIONS CONTAINING AN
ANTITUMOR ANTHRACYCLINE :
GYCOSIDE

DECLARATION

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

NOW COMES William J. Ring, a citizen of the United States of America, and a resident of Westerville, Ohio, Franklin County, who declares and says that:

1. I received a Bachelor of Science (BS) in Biology and Chemistry from St. Joseph's College, Rensselaer, Indiana in 1962 and a Masters of Business Administration (MBA) from the University of Dayton in 1985.

2. From 1967-1977, I was employed by Warren-Teed Pharmaceuticals Inc. (W-T), which was acquired by Adria Laboratories Division of Erbamont, Inc. in 1977.

3. I have held positions of increasing responsibility with Warren-Teed and Adria Laboratories;



-2-

primarily in the areas of manufacture of finished
pharmaceuticals and quality control of the manufactur-
ing process for producing finished pharmaceutical
products.

4. Since 1985 I have held the position of
Director of Quality Assurance for Adria Laboratories;
in this position I am responsible for insuring that the
finished pharmaceutical products manufactured by and
for Adria Laboratories meet certain specifications
which are mandated by federal (e.g., Federal Food and
Drug Administration) and state regulatory agencies as
well as internal Adria standards. It is my responsi-
bility to be thoroughly familiar with the standards and
criteria for preparing injectable pharmaceutical
solutions suitable for human use.

5. I have read and am familiar with Claim 31 of
U.S. Serial No. 878,784, filed June 26, 1986; a copy of
this claim is appended hereto as Exhibit A.

6. Based on my knowledge and expertise in the
area of manufacture of pharmaceutical solutions suit-
able for injection into humans, I conclude that the
solution described by Claim 31 has the properties
described below.

7. The solution described by Claim 31 is
"intravenously injectable", i.e., it is an "injection"
as that term is understood by one familiar with the



-3-

manufacture of pharmaceutical solutions which may be injected into humans and as this term is described in U.S. Pharmacopeia, XXI Revision, 1985, U.S. Pharmacopeial Convention, Inc., Rockville, Maryland, at pp. 1137-1139, a copy of which is attached as Exhibit B.

8. In the manufacture of such an intravenously injectable solution, in the case of an antineoplastic active pharmaceutical agent, such as doxorubicin, the aqueous solution must be filter sterilized prior to being placed into the glass container. Both heat sterilization and filter sterilization are common techniques known to the art. The result of performing such sterilization procedures is to reduce the microbial contamination to a certain specified level as described in the individual drug monograph with respect to the test for sterility. In general, the criteria for conducting sterility tests would be according to the method set forth in the USP XXI at pp. 1156-1160, Exhibit C.

9. I have read and am familiar with the article entitled "Structure and Physicochemical Properties of Adriamycin (doxorubicin)", by F. Arcamone, et al.; a copy of the relevant portion of this article is attached, Exhibit D.

-4-

10. There is no consideration given in the Arcamone, et al. article to the preparation of a pyrogen-free solution. For example, there is no indication that the water used to prepare the solution was depyrogenated using high temperatures, i.e., temperatures 250°F and higher which is, of course, beyond the boiling point of water, which is 212°F. The article does not state that the solution was made up in glassware which had been cleaned according to customary and usual procedures and either treated to multiple rinsings with pyrogen-free, sterile water or else exposed to high temperatures 250°F or higher to produce pyrogen-free, sterile glassware.

Further, there is no direction or consideration given in the Arcamone, et al. article which would leave one to believe that the solutions which are described were prepared according to aseptic techniques.

In order for a solution to be safe for intravenous injection into humans, it must meet the criteria described in the USP. The most common method for sterilizing solutions containing heat-labile materials is to filter the solution through a membrane containing very submicroscopic openings which allows the liquid to pass, but which filters out both microbes as well as fine particulate matter. This technique is known as filter sterilization or sterilization using membrane

PI 890

-5-

filtration.  This type of procedure is described in
USP XXI, pp. 1347-1352, a copy of which is attached as
Exhibit E.

11.  Unless evidence is provided to the contrary,
I would expect that an aqueous solution made up with
distilled or deionized water would not be sterile or
pyrogen free.  As previously stated, high temperatures,
that is, 250°F or higher are needed to depyrogenate
glassware and water.  Such temperatures are not
normally present in either common laboratory glassware
washing procedures or techniques employed to distill
water.  Further, based on my personal experience, I am
aware that unless sterile techniques are followed in
the production of distilled water used in chemical
laboratories, the water is not sterile.

12.  From my consideration of the Arcamone, et al.
article, I conclude that the article is concerned with
the chemical stability of ~~adriamycin~~ doxorubicin hydrochloride at
22°C.  The article describes a solution containing
2 mgs per ml of adriamycin hydrochloride in 0.06 molar
phosphate buffer at pH 3-6.  I further conclude that
this solution is <u>not</u> suitable for injection into humans
because there is no indication that such solution was
made under aseptic manufacturing conditions.  Further,
I conclude that the solution is neither sterile nor
pyrogen-free nor would it meet any of the other

PI 891

-6-

criteria outlined in the USP for an injectable solution.

13.  I declare further that all statements made of my own knowledge are true and all statements made on information and belief are believed to be true; and further that the statements were made with the knowl-edge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of this application or any patent issuing thereon.

14.  Further declarant saith not.

Oct. 19, 1987
Date

William J. Ring
William J. Ring

55/mkn

PI 892

EXHIBIT 26

9
1-31-91

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:                    :

GAETANO GATTI ET AL                      :        GROUP ART UNIT: 183

SERIAL NO. 07/503,856                    :        EXAMINER:  PESELEV

FILED:  APRIL 3, 1990                    :

FOR:   INJECTABLE READY-TO-USE           :
       SOLUTIONS CONTAINING AN           :
       ANTITUMOR ANTHRACYCLINE           :
       GLYCOSIDE                         :

                 DECLARATION PURSUANT TO 37 C.F.R. 1.132

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

    Now comes Carlo Confalonieri who states that:

    1.    I have been an employee of Farmitalia Carlo Erba,

S.r.l. since 1964.  I have been involved in the field of

pharmaceutical analysis for over 10 years and I am an expert

in the chemistry of anthracyclines.

    2.    I obtained a degree in Pharmacy in 1976 from the

University of Milan.

    3.    I am the same Carlo Confalonieri who provided the

August 11, 1989 declaration which was filed in Application

Serial No. 07/385,999 now U.S. Patent 4,946,831.

    4.    That I have conducted further tests to demonstrate

the   stability   of   doxorubicin   hydrochloride   solutions

prepared by the method described in Application Serial No.

503,586.  These tests compare doxorubicin hydrochloride

-2-

solutions prepared according to the present invention with those
prepared following the teachings of Beijnen who tested the
stability of doxorubicin hydrochloride by adjusting the pH with
perchloric acid and of Arcamone who proposed adjusting the pH of
doxorubicin hydrochloride with phosphate buffer. In the tables
and graphs which follow on Exhibit A, the composition of the
present invention is identified as FICE while the phosphate
buffer technique of Arcamone is identified under the name by the
term "ARCAMONE" and the adjustement of the pH using perchloric
acid is identified by the name "BEIJNEN". The concentration of
doxorubicin hydrochloride was maintained at 2 mg/ml for both the
FICE and ARCAMONE solutions. The concentration in the Beijnen
examples was maintained at 5 µg/ml (mcg/ml). This low
concentration in the Beijnen examples is meaningless for the
clinical practice but was necessary because at higher
concentrations the doxorubicin hydrochloride would not remain in
solution. In particular, at a concentration of 2 mg/ml the
doxorubicin precipitated immediately after preparation when
perchloric acid was used. At a concentration of 1 mg/ml
precipitation occurred within 30 minutes. When the concentration
was further reduced to 0.5 mg/ml the presence of gelatinous lumps
in suspension was noted after but a few hours which then became
completely opalescent. Since the objective of the present test
was to demonstrate long term stability it was necessary to

-3-

utilize a concentration of doxorubicin in the presence of perchloric acid which would remain stably in solution for a long period of time. Accordingly, the 5 µg/ml reported in the Beijnen article was selected as the concentration for the test.

5.    In my opinion, the technique of Beijnen, adjusting the pH with perchloric acid, would not be practiced by one skilled in this art to obtain storage stable physiologically acceptable doxorubicin hydrochloride solutions for several reasons. First, perchloric acid is not a pharmaceutically acceptable material for incorporation into pharmaceuticals which are to be administered intravenously to patients.  That is, it would be impossible to prepare a clinically acceptable solution using perchloric acid. Second, even if perchloric acid had been pharmaceutically acceptable, the instability of the doxorubicin hydrochloride solution would render the material unacceptable. It is necessary that the pharmaceutical manufacture be able to deliver reasonably concentrated solutions of doxorubicin hydrochloride to the medical facility to be of any practical value. As demonstrated by the test described above, it is impossible to formulate reasonably concentrated solutions of doxorubicin hydrochloride where the pH has been adjusted with perchloric acid.

6.    Further, the utilization of hydrochloric acid to adjust the pH of the solution to arrive within the pH range of from 2.5 to 5, 2.5 to 3.5 or 2.62 to 3.14 would not have been a technique

-4-

utilized by those skilled in the art. In my opinion, the description contained in Arcamone is typical of what those skilled in the pharmaceutical arts would have done prior to the present invention. Arcamone following conventional wisdom prepared his initial solutions having pH's of 1 and 2 utilizing dilute aqueous hydrochloric acid. On the other hand, when he desired to prepare a solution having a higher pH, pH's of from 3 to 6, Arcamone used phosphate buffer, the conventional technique utilized in the art. Accordingly, it is my opinion that those skilled in the art would not have used hydrochloric acid to adjust the pH of a doxorubicin hydrochloride solution to have the pH ranges specified above. Furthermore, the following tables and graphs which represent the results of stability experiments conducted either by me or under my supervision and control demonstrate that those solutions prepared utilizing hydrochloric acid to adjust the pH to within the stated ranges possessed unexpectedly superior stability when compared with the solution prepared utilizing a phosphate buffer. Furthermore, even if it were possible to utilize perchloric acid to prepare the doxorubicin hydrochloride solution, these tests demonstrate that superior results are obtained when one uses hydrochloric acid in the pH range of from approximately 2.5 to approximately 3.5. The perchloric acid solutions, however, demonstrate somewhat superior storage stability at higher pH's, 3.5 to about 5. However, as

-5-

noted above, perchloric acid is not a pharmaceutically acceptable material and thus could not be used to produce pharmaceutically acceptable storage stable solutions. Also, the perchloric acid would not allow the preparation of solutions having the claimed concentrations which were storage stable over the pH range specified since the doxorubicin hydrochloride would not remain in solution. A product intended for intravenous administration which contains precipitate or gelatinous lumps is unacceptable in the pharmaceutical field.

7. Based on the experiments reported in my March 10, 1987 declaration filed in Serial No. 878,784 and attached hereto as Exhibit C, it is my conclusion that a doxorubicin hydrochloride solution which has its pH adjusted to 2.5 with hydrochloric acid has superior storage stability to doxorubicin hydrochloride solutions whose pH has been adjusted to 2.0 with hydrochloric acid. The data in Exhibit C on the doxorubicin hydrochloride stability at pH 2.0 and 2.5 support this conclusion. This conclusion is based not only upon the data in my March 1987 declaration but also the data reported herein. As can be seen from Exhibit D, the stability of doxorubicin hydrochloride solution whose pH is below 3 is dropping rapidly. From that data I would have expected that at a pH of 2.0 the stability would be significantly below the stability at a pH at 2.5. As can be seen from my earlier declaration, at 55°C the stability of doxorubicin hydrochloride solutions having a pH of 2.0 was significantly inferior to the same solution wherein the pH was adjusted to 2.5.

-6-

Table 4 of the declaration reports that the decomposition rate
for doxorubicin hydrochloride at a pH of 2 was more than 2.5
times the decomposition rate at a pH of 2.5.

The improvement in the storage stability of doxorubicin hydro-
chloride at a pH of 2.5 as compared with that at 2.0 wherein the
pH in both instances is adjusted with hydrochloric acid is
surprising in view of the teaching of Arcamone.  On page 20
Arcamone demonstrates that at pH's of 1 and 2 where the pH is
adjusted with hydrochloric acid the stability of 22°C is less
than 20 hours while at pH's of from 3 to 6 where it is adjusted
with phosphate buffer, the stability is greater than 1 month.

There is simply nothing in Arcamone which would suggest that by
adjusting the pH to 2.5 with hydrochloric acid one would achieve
a doxorubicin hydrochloride solution having significantly better
stability than a doxorubicin hydrochloride solution whose pH has
been adjusted to 2.5 with a phosphate buffer.  Indeed, nothing in
Arcamone suggests that the medium used for adjusting the pH has
any effect upon the storage stability of the solution.

     8.    Exhibit E hereto reports on stability results obtained
when doxorubicin hydrochloride whose pH had been adjusted with
hydrochloric acid was stored in a variety of plastic containers
including  polypropylene,  polyvinyl  chloride,  high  density
polyethylene (PEHD) and low density polyethylene (PELD).  Based
upon this data reported in Exhibit E, it is my opinion that the



-7-

results obtained in my other experiments utilizing glass
containers would also be applicable to containers made of other
materials such as plastics. Under the tested conditions reported
in Exhibit E, doxorubicin hydrochloride solutions whose pH had
been adjusted with hydrochloric acid to within the claimed ranges
exhibited stability similar to that obtained in glass containers.
I base this conclusion upon the similarity of results reported in
Exhibit E as compared with, e.g., the results which are reported
in Table 2 of the '831 patent, which shows data on the same
solution stored in a glass container.

9.    The tests reported in these experiments were all
conducted at concentrations of 2 mg/ml of doxorubicin hydro-
chloride with the exception of Beijnen as noted previously. It
is my opinion that similar stability data would be obtained if
these tests were conducted at other concentrations of doxorubicin
hydrochloric within the scope of the claims, that is, from
concentrations of 0.1 to 100 mg/ml. While the absolute stability
of the various solutions may be different depending upon the
concentration, those solutions whose pH has been adjusted to
within the claimed range with hydrochloric acid will exhibit
superior stability as compared with solutions whose pH has been
adjusted in accordance with the prior art teachings.

10.    Also presented is a table (Exhibit B) comparing the
half-life of doxorubicin hydrochloride solution under accelerated

-8-

test conditions at 55°C where in addition to hydrochloric acid other acids disclosed on page 5 of the present application were employed to adjust the pH. To my knowledge, the use of these other acids to adjust the pH to within the range specified in the claim is not suggested in the prior art. This table demonstrates under accelerated test conditions, hydrochloric acid is better than the other disclosed acids.

The undersinged declares further that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Further deponent saith not.

Date: December 20, 1990                    Carlo Confalonieri

                                           Carlo Confalonieri

EXHIBIT A

**COMPARATIVE STABILITY DATA OF DOXORUBICIN.HCl IN FICE, BEIJNEN AND ARCAMONE FORMULATION WITH DIFFERENT pHs AT 35 °C**

| pH | FICE stability (%) | BEIJNEN stability (%) | ARCAMONE stability (%) | TIME (weeks) |
|---|---|---|---|---|
| | 100.0 | 100.0 | 100.0 | 0 |
| | 98.8 | 83.1 | 95.2 | 1 |
| 2.5 | 96.5 | 76.9 | 87.3 | 2 |
| | 92.4 | 66.7 | 83.9 | 3 |
| | 86.1 | 62.0 | 81.2 | 4 |
| | 100.0 | 100.0 | 100.0 | 0 |
| | 98.0 | 94.9 | 85.8 | 1 |
| 3.0 | 94.8 | 88.8 | 78.4 | 2 |
| | 94.2 | 80.1 | 71.5 | 3 |
| | 90.8 | 77.5 | 60.1 | 4 |
| | 100.0 | 100.0 | 100.0 | 0 |
| | 98.7 | 98.3 | 85.8 | 1 |
| 3.5 | 97.2 | 97.9 | 81.5 | 2 |
| | 93.4 | 90.2 | 64.3 | 3 |
| | 87.4 | 87.8 | 56.4 | 4 |
| | 100.0 | 100.0 | 100.0 | 0 |
| | 99.2 | 94.4 | 77.8 | 1 |
| 4.0 | 94.0 | 97.0 | 67.3 | 2 |
| | 90.4 | 97.8 | 55.7 | 3 |
| | 85.6 | - | 48.8 | 4 |
| | 100.0 | 100.0 | 100.0 | 0 |
| | 95.9 | 93.3 | 67.5 | 1 |
| 4.5 | 88.9 | 96.8 | 57.2 | 2 |
| | 86.7 | 96.3 | 49.7 | 3 |
| | 83.0 | - | 40.6 | 4 |
| | 100.0 | 100.0 | 100.0 | 0 |
| | 95.8 | 95.1 | 50.5 | 1 |
| 5.0 | 89.4 | 95.6 | 40.1 | 2 |
| | 86.7 | 93.4 | - | 3 |
| | 83.6 | - | 18.3 | 4 |

**COMPARATIVE STABILITY DATA OF DOXORUBICIN.HCl IN FICE, BEIJNEN AND ARCAMONE FORMULATION WITH DIFFERENT pHs AT 35 °C**

| pH | FICE | | BEIJNEN | | ARCAMONE | | TIME (weeks) |
|---|---|---|---|---|---|---|---|
| | pH | stability (%) | pH | stability (%) | pH | stability (%) | |
| | 2.49 | 100.0 | 2.49 | 100.0 | 2.52 | 100.0 | 0 |
| | 2.50 | 98.8 | 2.32 | 83.1 | 2.47 | 95.2 | 1 |
| 2.5 | 2.31 | 96.5 | 2.36 | 78.9 | 2.50 | 87.3 | 2 |
| | 2.35 | 92.4 | 2.19 | 68.7 | 2.45 | 83.9 | 3 |
| | 2.27 | 86.1 | 2.10 | 62.0 | 2.40 | 81.2 | 4 |
| | 3.00 | 100.0 | 3.00 | 100.0 | 3.00 | 100.0 | 0 |
| | 2.98 | 98.0 | 2.78 | 94.9 | 3.08 | 85.8 | 1 |
| 3.0 | 2.93 | 94.8 | 2.81 | 88.8 | 3.05 | 76.4 | 2 |
| | 2.92 | 94.2 | 2.85 | 80.1 | 3.04 | 71.5 | 3 |
| | 2.92 | 90.8 | 3.11 | 77.5 | 3.02 | 60.1 | 4 |
| | 3.52 | 100.0 | 3.52 | 100.0 | 3.50 | 100.0 | 0 |
| | 3.52 | 98.7 | 3.30 | 98.3 | 3.59 | 85.6 | 1 |
| 3.5 | 3.30 | 97.2 | 3.41 | 97.9 | 3.48 | 81.5 | 2 |
| | 3.33 | 93.4 | 3.22 | 90.2 | 3.42 | 64.3 | 3 |
| | 3.24 | 87.4 | 3.13 | 87.8 | 3.40 | 56.4 | 4 |
| | 4.01 | 100.0 | 4.01 | 100.0 | 4.04 | 100.0 | 0 |
| | 3.90 | 99.2 | 3.71 | 94.4 | 3.93 | 77.8 | 1 |
| 4.0 | 3.82 | 94.0 | 3.96 | 97.0 | 3.81 | 67.3 | 2 |
| | 3.76 | 90.4 | 3.69 | 97.8 | 3.74 | 55.7 | 3 |
| | 3.69 | 85.6 | . | . | 3.68 | 48.8 | 4 |
| | 4.50 | 100.0 | 4.50 | 100.0 | 4.49 | 100.0 | 0 |
| | 4.50 | 95.9 | 4.50 | 93.3 | 4.15 | 67.5 | 1 |
| 4.5 | 4.28 | 88.9 | 4.45 | 96.8 | 4.04 | 57.2 | 2 |
| | 4.20 | 86.7 | 4.68 | 96.3 | 3.98 | 49.7 | 3 |
| | 4.02 | 83.0 | . | . | 3.86 | 40.6 | 4 |
| | 5.00 | 100.0 | 5.00 | 100.0 | 5.06 | 100.0 | 0 |
| | 4.72 | 95.6 | 4.77 | 95.1 | 4.83 | 50.5 | 1 |
| 5.0 | 4.40 | 89.4 | 4.77 | 95.6 | 4.83 | 40.1 | 2 |
| | 4.31 | 86.7 | 4.83 | 93.4 | . | . | 3 |
| | 4.13 | 83.6 | . | . | 4.63 | 18.3 | 4 |



**STABILITY DATA OF DOXORUBICIN.HCl IN ARCAMONE, FICE AND BEIJNEN FORMULATION WITH DIFFERENT pHs AFTER 4 WEEKS AT 35 °C**

FICE CLAIMED FORMULATION
(2 mg/ml)

ARCAMONE FORMULATION
(2 mg/ml)

BEIJNEN FORMULATION
(5 mcg/ml)

Data extrapolated from experimental values



**STABILITY DATA OF DOXORUBICIN.HCl IN ARCAMONE, FICE AND BEIJNEN FORMULATION WITH DIFFERENT pHs AFTER 4 WEEKS AT 35 °C**

FICE CLAIMED FORMULATION
(2 mg/ml)

ARCAMONE FORMULATION
(2 mg/ml)

BEIJNEN FORMULATION
(5 mcg/ml)

Data extrapolated from the experimental values



## COMPARATIVE STABILITY DATA OF DOXORUBICIN.HCl IN FICE, BEIJNEN AND ARCAMONE FORMULATION WITH DIFFERENT pHs AT 45 °C

| pH | FICE | | BEIJNEN | | ARCAMONE | | TIME (weeks) |
|---|---|---|---|---|---|---|---|
| | pH | stability (%) | pH | stability (%) | pH | stability (%) | |
| | 2.49 | 100.0 | 2.49 | 100.0 | 2.52 | 100.0 | 0 |
| | 2.50 | 83.5 | 2.35 | 36.8 | 2.46 | 68.7 | 1 |
| 2.5 | 2.26 | 66.7 | 2.24 | 18.0 | 2.45 | 55.5 | 2 |
| | 2.26 | 56.4 | 2.25 | 9.8 | 2.45 | 37.0 | 3 |
| | 2.24 | 44.8 | - | - | 2.37 | 27.8 | 4 |
| | 3.00 | 100.0 | 3.00 | 100.0 | 3.00 | 100.0 | 0 |
| | 2.95 | 92.9 | 2.79 | 77.0 | 3.09 | 71.0 | 1 |
| 3.0 | 2.85 | 84.2 | 2.84 | 60.9 | 3.05 | 50.7 | 2 |
| | 2.82 | 78.6 | 2.86 | 48.9 | 3.01 | 37.2 | 3 |
| | 2.77 | 69.9 | 3.21 | 38.8 | 2.95 | 18.7 | 4 |
| | 3.52 | 100.0 | 3.52 | 100.0 | 3.50 | 100.0 | 0 |
| | 3.53 | 92.0 | 3.25 | 82.5 | 3.46 | 53.5 | 1 |
| 3.5 | 3.24 | 84.3 | 3.35 | 77.3 | 3.37 | 33.8 | 2 |
| | 3.10 | 78.3 | - | - | 3.30 | 19.7 | 3 |
| | 3.01 | 68.8 | 3.12 | 68.6 | 3.27 | 12.0 | 4 |
| | 4.01 | 100.0 | 4.01 | 100.0 | 4.04 | 100.0 | 0 |
| | 3.82 | 89.7 | 3.70 | 88.2 | 3.73 | 48.2 | 1 |
| 4.0 | 3.56 | 82.9 | 3.88 | 87.9 | - | - | 2 |
| | 3.43 | 71.6 | 3.86 | 87.5 | 3.55 | 24.7 | 3 |
| | 3.33 | 66.8 | - | - | 3.41 | 17.0 | 4 |
| | 4.50 | 100.0 | 4.50 | 100.0 | 4.49 | 100.0 | 0 |
| | 4.0 | 87.4 | 4.19 | 92.9 | 3.80 | 42.0 | 1 |
| 4.5 | 3.62 | 80.8 | 4.48 | 88.2 | - | - | 2 |
| | 3.40 | 71.3 | 4.31 | 86.6 | 3.68 | 20.1 | 3 |
| | 3.22 | 64.6 | - | - | 3.51 | 14.5 | 4 |
| | 5.00 | 100.0 | 5.00 | 100.0 | 5.06 | 100.0 | 0 |
| | 3.99 | 87.2 | 4.50 | 90.0 | 3.81 | 43.7 | 1 |
| 5.0 | 3.63 | 74.0 | 4.31 | 92.0 | - | - | 2 |
| | 3.54 | 67.7 | 4.24 | 90.7 | 3.9 | 17.3 | 3 |
| | 3.41 | 60.1 | - | - | 4.25 | 3.0 | 4 |

## COMPARATIVE STABILITY DATA OF DOXORUBICIN.HCl IN FICE, BEIJNEN AND ARCAMONE FORMULATION WITH DIFFERENT pHs AT 45 °C

|  | FICE | BEIJNEN | ARCAMONE |  |
|---|---|---|---|---|
| pH | stability (%) | stability (%) | stability (%) | TIME (weeks) |
|  | 100.0 | 100.0 | 100.0 | 0 |
|  | 83.5 | 36.8 | 68.7 | 1 |
| 2.5 | 66.7 | 18.0 | 55.5 | 2 |
|  | 56.4 | 9.8 | 37.0 | 3 |
|  | 44.8 | . | 27.8 | 4 |
|  | 100.0 | 100.0 | 100.0 | 0 |
|  | 92.9 | 77.0 | 71.0 | 1 |
| 3.0 | 84.2 | 60.9 | 50.7 | 2 |
|  | 78.6 | 48.9 | 37.2 | 3 |
|  | 69.9 | 38.8 | 18.7 | 4 |
|  | 100.0 | 100.0 | 100.0 | 0 |
|  | 92.0 | 82.5 | 53.5 | 1 |
| 3.5 | 84.3 | 77.3 | 33.8 | 2 |
|  | 78.3 | . | 19.7 | 3 |
|  | 68.8 | 68.6 | 12.0 | 4 |
|  | 100.0 | 100.0 | 100.0 | 0 |
|  | 89.7 | 88.2 | 48.2 | 1 |
| 4.0 | 82.9 | 87.9 | . | 2 |
|  | 71.6 | 87.5 | 24.7 | 3 |
|  | 66.8 | . | 17.0 | 4 |
|  | 100.0 | 100.0 | 100.0 | 0 |
|  | 87.4 | 92.9 | 42.0 | 1 |
| 4.5 | 80.8 | 88.2 | . | 2 |
|  | 71.3 | 86.6 | 20.1 | 3 |
|  | 64.8 | . | 14.5 | 4 |
|  | 100.0 | 100.0 | 100.0 | 0 |
|  | 87.2 | 90.0 | 43.7 | 1 |
| 5.0 | 74.0 | 92.0 | . | 2 |
|  | 67.7 | 90.7 | 7.3 | 3 |
|  | 60.1 | . | 3.0 | 4 |



**STABILITY DATA OF DOXORUBICIN.HCl IN ARCAMONE, FICE AND BEIJNEN FORMULATION WITH DIFFERENT pHs AFTER 4 WEEKS AT 45 °C**

FICE CLAIMED FORMULATION   ARCAMONE FORMULATION
(2 mg/ml)                                      (2 mg/ml)

BEIJNEN FORMULATION
(5 mca/ml)

PI 216

Data extrapolated from experimental values



**STABILITY DATA OF DOXORUBICIN.HCl IN ARCAMONE, FICE AND BEIJNEN FORMULATION WITH DIFFERENT pHs AFTER 4 WEEKS AT 45 °C**

FICE CLAIMED FORMULATION
(2 mg/ml)

ARCAMONE FORMULATION
(2 mg/ml)

BEIJNEN FORMULATION
(5 mcg/ml)

Data extrapolated from experimental values

EXHIBIT B

'317 FILE HISTORY
Page 97

## HALF-LIFE OF DOXORUBICIN.HCl FICE FORMULATION AT VARIOUS pHs WITH DIFFERENT ACIDS. ACCELERATED TESTS AT 55 °C

|  | pH 2.5 $t_{50\%}$ (days) | pH 3.0 $t_{50\%}$ (days) | pH 3.5 $t_{50\%}$ (days) |
|---|---|---|---|
| Hydrochloric acid | 6.5 | 13.6 | 12.0 |
| Sulphuric acid | 5.9 | 11.1 | 11.8 |
| Phosphoric acid | 5.9 | 10.1 | 11.1 |
| Methanesulfonic acid | 5.4 | 12.9 | 11.9 |
| Tartaric acid | 5.7 | 10.7 | 11.8 |

EXHIBIT C

'317 FILE HISTORY
Page 99




769-080-0
75/

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF          :  GROUP ART UNIT:  123

GAETANO GATTI ET AL           :

SERIAL NO:  878,784           :

FILED:  JUNE 26, 1986         :  EXAMINER:  PESELEV

FOR:  INJECTABLE READY-TO-USE  :
      SOLUTIONS CONTAINING AN
      ANTITUMOR ANTHRACYCLINE   :
      GLYCOSIDE

DECLARATION UNDER RULE 1.132 DECLARATION II

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

NOW COMES  Carlo Confalonieri       , a citizen of

Italy, and a resident of Cusano Milanino/ (Milan) , Italy, who

declares and says that:

1.  I am an employee of Farmitalia Carlo Erba S.p.A.

since 1964            , and an expert in the chemistry

of  anthracyclins         , and have worked in the field

of pharmaceutical analysis  for at least  ten  years.

2.  I graduated from the University of Milan      ,

with a degree in   Pharmacy            in the year of

1976.

3.  I supervised the following experiments:



-2-

4.  The following experiments were carried out under accelerated temperature conditions on 5.0 ml of 2 mg/ml doxorubicin·HCl solutions in a container-closure system consisting of:  glass type I, 8 ml top capacity vial; teflon-faced chlorobutyl rubber bung; aluminum seal.

## pH-stability profile at 55°C of doxorubicin·HCl solutions in sterile water, 5% dextrose, 0.9% saline

2 mg/ml doxorubicin·HCl solutions were prepared in the following I=0.05 buffers:  a) glycine·HCl pH 2.0, 2.5 and 3.0; b) formate pH 3.5; c) acetate pH 4.0, 5.0 and 5.5.

5.0 ml of each solution in glass vials were stored at 55°C and analyzed at prefixed times (up to 120 hours) for doxorubicin·HCl assay and pH.

Tables 1, 2 and 3 attached hereto give the doxorubicin·HCl residual concentration and percent stability at 55°C, at different pH's and times of storage for sterile water, 5% dextrose and 0.9% saline solutions, respectively.

The doxorubicin·HCl assays are the mean of three independent determinations performed by the USP HPLC method (USP XXI).  At each pH value, the pseudo-first order rate constants ($K_{obs}$) for the degradation were calculated by linear regression analysis of the natural logarithm of the residual concentration of

-3-

doxorubicin·HCl ($|Dx|_t$) versus time as depicted by the following equation:

$$\ln |Dx|_t = \ln |Dx| - K_{obs} \cdot t$$

J. Thuro Carstens , Theory of Pharmaceutical Systems, Volume 1/ General Principles, page 172, Academic Press, New York and London 1972

Kenneth A. Connors, Gordon L. Amidon, Lloyd Kennon, Chemical Stability of Pharmaceuticals, chapter 2, John Wiley and Sons, New York 1979

Arthur Qsol, Remington's Pharmaceutical Sciences, 16th Edition, chapter 18, Mack Publishing Company, Easton, Pennsylvania 1980

Valentino J. Stella, Chemical and Physical Bases Determining the Instability and Incompatibility of Formulated Injectable Drugs, Journal of Parenteral Sciences & Technology, July-August 1986, page 142

Tables 4, 5 and 6 attached hereto give the observed rate constants ($K_{obs}$) for the degradation kinetics of doxorubicin·HCl at 55°C and at different pH's for sterile water, 5% dextrose and 0.9% saline solutions, respectively.

Figures A, B and C attached hereto show the $K_{obs}$-pH profile for the doxorubicin·HCl degradation at 55°C in the above mentioned media. The data in Tables 1-6 and the Figures A-C evidence that the 2 mg/ml doxorubicin·HCl solutions show at 55°C the maximum stability in the pH range about 3.0-3.5 (± 0.2, e.g., 2.8, 3.2 and 3.3, 3.7) for all the three media tested.

-4-

5.  I declare further that all statements made of
my own knowledge are true and all statements made on
information and belief are believed to be true; and
further that these statements were made with the knowl-
edge that willful false statements and the like so made
are punishable by fine or imprisonment, or both, under
Section 1001 of Title 18 of the United States Code and
that such willful false statements may jeopardize the
validity of this application or any patent issuing
thereon.

6.  Further declarant saith not.

| March 10, 1987 | Carlos Couplowien |
|---|---|
| Date | Signature |

75/mkn

Table 1 - Accelerated (55°C) stability data of 2 mg/ml doxorubicin.HCl solutions in sterile water at various pHs

| Buffers | Tests | 0 | 8 | 16 | 24 | 48 | 72 | 120 |
|---|---|---|---|---|---|---|---|---|
| | | | | Time (hours) | | | | |
| pH 2.0 glycine-HCl | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.022 | 1.892 | 1.669 | 1.554 | 1.145 | 0.801 | |
| | . % stability | 100.0 | 93.6 | 82.6 | 76.9 | 56.6 | 39.6 | |
| | pH | 2.00 | 2.01 | 2.02 | 2.01 | 2.01 | 2.02 | |
| pH 2.5 glycine-HCl | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 1.992 | 1.926 | 1.835 | 1.718 | 1.557 | 1.000 | |
| | . % stability | 100.0 | 96.7 | 92.1 | 86.2 | 78.2 | 50.2 | |
| | pH | 2.51 | 2.50 | 2.50 | 2.52 | 2.51 | 2.52 | |
| pH 3.0 glycine-HCl | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.003 | 1.958 | 1.881 | 1.831 | 1.696 | 1.525 | 1.258 |
| | . % stability | 100.0 | 97.8 | 93.9 | 91.4 | 84.7 | 76.1 | 62.8 |
| | pH | 3.00 | 3.03 | 3.02 | 3.02 | 3.01 | 3.02 | 3.00 |
| pH 3.5 formate | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.035 | 1.950 | 1.887 | 1.840 | 1.650 | 1.538 | 1.241 |
| | . % stability | 100.0 | 95.8 | 92.7 | 90.4 | 81.1 | 75.6 | 61.0 |
| | pH | 3.51 | 3.51 | 3.51 | 3.51 | 3.52 | 3.52 | 3.51 |
| pH 4.0 acetate | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.032 | 1.788 | 1.681 | 1.581 | 1.167 | | |
| | . % stability | 100.0 | 88.0 | 82.7 | 76.8 | 57.4 | | |
| | pH | 4.00 | 4.00 | 4.04 | 4.02 | 4.02 | | |
| pH 5.0 acetate | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.019 | 1.823 | 1.688 | 1.512 | 1.060 | | |
| | . % stability | 100.0 | 90.3 | 83.6 | 74.9 | 52.5 | | |
| | pH | 5.03 | 5.05 | 5.04 | 5.04 | 5.05 | | |
| pH 5.5 acetate | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.047 | 1.806 | 1.427 | 1.228 | 0.903 | | |
| | . % stability | 100.0 | 88.3 | 69.7 | 60.0 | 44.1 | | |
| | pH | 5.50 | 5.53 | 5.53 | 5.54 | 5.56 | | |

PI 225



Table 2 - Accelerated (55°C) stability data of 2 mg/ml doxorubicin.HCl solutions in 5% dextrose at various pHs

| Buffers | Tests | Time (hours) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 0 | 8 | 16 | 24 | 34 | 48 | 72 | 96 | 120 |
| pH 2.0 glycine-HCl | Doxorubicin.HCl assay . mg/ml | 1.993 | 1.851 | 1.683 | 1.513 | 1.361 | 1.078 | 0.765 | | |
| | . % stability | 100.0 | 92.8 | 84.4 | 75.9 | 68.3 | 54.1 | 38.4 | | |
| | pH | 2.14 | 2.13 | 2.14 | 2.15 | 2.18 | 2.21 | 2.16 | | |
| pH 2.5 glycine-HCl | Doxorubicin.HCl assay . mg/ml | 1.967 | 1.897 | 1.822 | 1.760 | 1.682 | 1.499 | 1.305 | | |
| | . % stability | 100.0 | 96.4 | 92.8 | 89.5 | 85.5 | 76.2 | 66.3 | | |
| | pH | 2.56 | 2.56 | 2.56 | 2.58 | 2.60 | 2.56 | 2.61 | | |
| pH 3.0 glycine-HCl | Doxorubicin.HCl assay . mg/ml | 1.975 | | 1.908 | 1.832 | | 1.645 | 1.508 | 1.344 | 1.206 |
| | . % stability | 100.0 | | 96.6 | 92.7 | | 83.3 | 76.4 | 68.0 | 61.1 |
| | pH | 3.04 | | 3.05 | 3.05 | | 3.06 | 3.00 | 3.13 | 3.16 |
| pH 3.5 formate | Doxorubicin.HCl assay . mg/ml | 1.963 | | 1.897 | 1.858 | | 1.622 | 1.324 | 1.222 | |
| | . % stability | 100.0 | | 95.7 | 93.7 | | 81.8 | 66.8 | 61.6 | |
| | pH | 3.58 | | 3.59 | 3.60 | | 3.63 | 3.60 | 3.63 | |
| pH 4.0 acetate | Doxorubicin.HCl assay . mg/ml | 2.003 | 1.913 | 1.716 | 1.665 | 1.487 | 1.312 | 1.081 | | |
| | . % stability | 100.0 | 95.5 | 85.6 | 83.1 | 74.2 | 65.5 | 53.9 | | |
| | pH | 4.10 | 4.10 | 4.11 | 4.11 | 4.16 | 4.15 | 4.12 | | |
| pH 5.0 acetate | Doxorubicin.HCl assay . mg/ml | 2.012 | 1.906 | 1.673 | 1.608 | 1.418 | 1.163 | | | |
| | . % stability | 100.0 | 94.7 | 83.2 | 79.9 | 70.4 | 57.8 | | | |
| | pH | 5.06 | 5.06 | 5.06 | 5.06 | 5.07 | 5.04 | | | |
| pH 5.5 acetate | Doxorubicin.HCl assay . mg/ml | 1.991 | 1.841 | 1.470 | 1.246 | 1.091 | | | | |
| | . % stability | 100.0 | 92.5 | 73.8 | 62.6 | 54.8 | | | | |
| | pH | 5.56 | 5.54 | 5.48 | 5.50 | 5.46 | | | | |

Table 3 – Accelerated (55°C) stability data of 2 mg/ml doxorubicin.HCl solutions in 0.9% saline at various pHs

| Buffers | Tests | 0 | 4 | 8 | 16 | 24 | 34 | 48 | 72 | 96 | 120 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| pH 2.0 glycine-HCl | Doxorubicin.HCl assay . mg/ml | 1.998 | | 1.857 | 1.580 | 1.397 | 1.231 | 0.931 | 0.701 | | |
| | . % stability | 100.0 | | 92.9 | 79.1 | 69.9 | 61.6 | 46.6 | 35.1 | | |
| | pH | 2.16 | | 2.16 | 2.18 | 2.16 | 2.22 | 2.20 | 2.19 | | |
| pH 2.5 glycine-HCl | Doxorubicin.HCl assay . mg/ml | 1.946 | | 1.875 | 1.670 | 1.602 | 1.368 | 1.132 | | | |
| | . % stability | 100.0 | | 96.3 | 85.8 | 82.3 | 70.3 | 58.1 | | | |
| | pH | 2.59 | | 2.59 | 2.59 | 2.56 | -2.62 | 2.62 | | | |
| pH 3.0 glycine-HCl | Doxorubicin.HCl assay . mg/ml | 1.994 | | | 1.818 | 1.771 | | 1.571 | 1.375 | 1.205 | 1.003 |
| | . % stability | 100.0 | | | 91.2 | 88.8 | | 78.8 | 69.0 | 60.4 | 50.3 |
| | pH | 3.06 | | | 3.07 | 3.07 | | 3.06 | 3.13 | 3.14 | 3.12 |
| pH 3.5 formate | Doxorubicin.HCl assay . mg/ml | 1.997 | | | 1.824 | 1.742 | | 1.543 | 1.323 | 1.178 | 0.819 |
| | . % stability | 100.0 | | | 91.4 | 87.2 | | 77.3 | 66.2 | 58.9 | 46.0 |
| | pH | 3.58 | | | 3.56 | 3.56 | | 3.66 | 3.61 | 3.64 | 3.63 |
| pH 4.0 acetate | Doxorubicin.HCl assay . mg/ml | 1.972 | 1.885 | 1.828 | 1.653 | 1.594 | | | | | |
| | . % stability | 100.0 | 95.6 | 92.7 | 83.8 | 80.8 | | | | | |
| | pH | 4.10 | 4.10 | 4.10 | 4.10 | 4.11 | | | | | |
| pH 5.0 acetate | Doxorubicin.HCl assay . mg/ml | 1.979 | | 1.732 | 1.469 | 1.442 | 1.278 | | | | |
| | . % stability | 100.0 | | 87.5 | 74.2 | 72.8 | 64.6 | | | | |
| | pH | 5.04 | | 5.06 | 5.04 | 5.05 | 5.05 | | | | |
| pH 5.5 acetate | Doxorubicin.HCl assay . mg/ml | 2.023 | | 1.847 | 1.548 | 1.330 | | | | | |
| | . % stability | 100.0 | | 91.3 | 76.5 | 65.7 | | | | | |
| | pH | 5.58 | | 5.56 | 5.55 | 5.53 | | | | | |



Table 4 – $K_{obs}$ values (1/days) for the degradation of doxorubicin.HCl

2 mg/ml solutions in sterile water at various pHs at 55°C

| Buffer | pH | $K_{obs}$ x $10^3$ | 95% confidence limits |
|---|---|---|---|
| • Glycine–HCl (I = 0.05) | 2.0 | 309.5 | ± 12.7 |
| • Glycine–HCl (I = 0.05) | 2.5 | 138.3 | ± 0.6 |
| • Glycine–HCl (I = 0.05) | 3.0 | 93.1 | ± 4.6 |
| • Formate (I = 0.05) | 3.5 | 96.7 | ± 4.4 |
| • Acetate (I = 0.05) | 4.0 | 269.8 | ± 18.7 |
| • Acetate (I = 0.05) | 5.0 | 322.6 | ± 19.2 |
| • Acetate (I = 0.05) | 5.5 | 415.4 | ± 45.7 |

Table 5 – $K_{obs}$ values (1/days) for the degradation of doxorubicin.HCl
2 mg/ml solutions in 5% dextrose at various pHs at 55°C

| Buffer | pH | $K_{obs}$ x $10^3$ | 95% confidence limits |
|---|---|---|---|
| Glycine–HCl (I = 0.05) | 2.0 | 323.8 | ± 17.2 |
| Glycine–HCl (I = 0.05) | 2.5 | 138.7 | ± 9.9 |
| Glycine–HCl (I = 0.05) | 3.0 | 100.5 | ± 5.9 |
| Formate (I = 0.05) | 3.5 | 132.0 | ± 20.7 |
| Acetate (I = 0.05) | 4.0 | 209.7 | ± 12.7 |
| Acetate (I = 0.05) | 5.0 | 273.1 | ± 27.7 |
| Acetate (I = 0.05) | 5.5 | 453.7 | ± 59.2 |

PI 229

Table 6 – $K_{obs}$ values (1/days) for the degradation of doxorubicin.HCl
2 mg/ml solutions in 0.9% saline at various pHs at 55°C

| Buffer | pH | $K_{obs}$ x $10^3$ | 95% confidence limis |
|---|---|---|---|
| . Glycine–HCl (I = 0.05) | 2.0 | 362.4 | ± 19.4 |
| . Glycine–HCl (I = 0.05) | 2.5 | 276.5 | ± 30.2 |
| . Glycine–HCl (I = 0.05) | 3.0 | 133.2 | ± 8.0 |
| , Formate (I = 0.05) | 3.5 | 148.1 | ± 11.1 |
| . Acetate (I = 0.05) | 4.0 | 215.7 | ± 35.4 |
| . Acetate (I = 0.05) | 5.0 | 301.2 | ± 60.1 |
| . Acetate (I = 0.05) | 5.5 | 430.3 | ± 59.9 |



Figure B – $K_{obs}$ – pH profile for doxorubicin.HCl degradation at 55°C in 5% dextrose



Figure A – $K_{obs}$ – pH profile for doxorubicin.HCl degradation at 55°C
in sterile water



Figure C  -  $K_{obs}$ - pH profile for doxorubicin.HCl degradation at 55°C
          in 0.9% saline

EXHIBIT D

PI 234



**STABILITY DATA OF DOXORUBICIN.HCl IN ARCAMONE, FICE AND BEIJNEN FORMULATION WITH DIFFERENT pHs AFTER 4 WEEKS AT 45 °C**

FICE CLAIMED FORMULATION
(2 mg/ml)

ARCAMONE FORMULATION
(2 mg/ml)

BEIJNEN FORMULATION
(5 mcg/ml)

Data extrapolated from experimental values

EXHIBIT E

DOXORUBICIN HCl RTU 2 mg/ml P8199/48/B (POLYPROPYLENE)

INITIAL VALUES
--------------
Concentration: 2.174 mg/ml          pH = 2.74
Relative % Assay : 100.00

| TIME (days) | TEMPERATURE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 4°C | | 25°C | | 35°C | | 45°C | | 55°C | |
| | CONC. (mg/ml) | REL. % Assay | CONC. (mg/ml) | REL. % Assay | CONC. (mg/ml) | REL. % Assay | CONC. (mg/ml) | REL. % Assay | CONC. (mg/ml) | REL. % Assay |
| 2 | | | | | 2.113 | 97.22 | 2.075 | 95.48 | 1.754 | 80.69 |
| 4 | | | | | 2.062 | 94.88 | 1.979 | 91.04 | 1.337 | 61.52 |
| 8 | | | 2.139 | 98.38 | 2.037 | 93.71 | 1.847 | 84.97 | 0.849 | 39.04 |
| 14 | | | | | 2.002 | 92.09 | 1.697 | 78.09 | | |
| 21 | | | | | 1.976 | 90.92 | 1.502 | 69.08 | | |
| 28 | 2.176 | 100.09 | 2.128 | 97.91 | 1.971 | 90.65 | 1.377 | 63.36 | | |
| 45 | 2.164 | 99.56 | 2.041 | 93.91 | 1.829 | 84.14 | 0.997 | 45.88 | | |
| 60 | 2.156 | 99.17 | 2.018 | 92.85 | 1.772 | 81.52 | 0.696 | 32.00 | | |
| 90 | 2.156 | 99.19 | 1.937 | 89.11 | 1.627 | 74.84 | | | | |

t 90 (days) extrapolated according to Arrhenius equation :
t 90 at 4°C = 5244 days
t 90 at 8°C = 2427 days

RAW DATA : DOXOPOLYPR

June,1990

DOXORUBICIN HCl RTU 2 mg/ml P8199/48/A (PVC)

INITIAL VALUES
--------------
Concentration: 2.157 mg/ml          pH = 2.77
Relative % Assay : 100.00

| TIME (days) | TEMPERATURE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 4°C | | 25°C | | 35°C | | 45°C | | 55°C | |
| | CONC. (mg/ml) | REL. % Assay | CONC. (mg/ml) | REL. % Assay | CONC. (mg/ml) | REL. % Assay | CONC. (mg/ml) | REL. % Assay | CONC. (mg/ml) | REL. % Assay |
| 2 | | | | | 2.105 | 97.57 | 2.067 | 95.84 | 1.800 | 83.46 |
| 4 | | | | | 2.074 | 96.15 | 1.969 | 91.30 | 1.408 | 65.26 |
| 8 | | | | | 2.044 | 94.76 | 1.841 | 85.33 | | |
| 14 | 2.154 | 99.86 | 2.125 | 98.53 | 2.016 | 93.46 | 1.699 | 78.77 | | |
| 21 | | | 2.047 | 94.88 | 1.968 | 91.22 | 1.495 | 69.31 | | |
| 28 | 2.159 | 100.09 | 2.038 | 94.48 | 1.931 | 89.54 | 1.277 | 59.22 | | |
| 45 | 2.147 | 99.55 | 2.027 | 93.97 | 1.832 | 84.93 | 0.949 | 43.97 | | |
| 60 | 2.149 | 99.64 | 1.984 | 91.96 | 1.774 | 82.24 | 0.688 | 31.87 | | |
| 90 | 2.156 | 99.93 | 1.891 | 87.65 | 1.601 | 74.24 | | | | |

t 90 (days) extrapolated according to Arrhenius equation :
t 90 at 4°C = 4156 days
t 90 at 8°C = 1978 days

RAW DATA : DOXOPVC

June,1990

DOXORUBICIN HC1 RTU 2 mg/ml F8199/48/D (PRED)

INITIAL VALUES
--------------
Concentration: 2.173 mg/ml          pH = 2.80
Relative % Assay : 100.00

| TIME (days) | TEMPERATURE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 4°C | | 25°C | | 35°C | | 45°C | | 55°C | |
| | CONC. ( mg/ml) | REL. % Assay | CONC. ( mg/ml) | REL. % Assay | CONC. ( mg/ml) | REL. % Assay | CONC. ( mg/ml) | REL. % Assay | CONC. ( mg/ml) | REL. % Assay |
| 2 | | | | | 2.096 | 96.46 | 2.053 | 94.49 | 1.648 | 75.85 |
| 4 | | | | | 2.080 | 95.75 | 1.971 | 90.72 | 1.380 | 63.53 |
| 8 | | | 2.068 | 95.18 | 2.041 | 93.94 | 1.824 | 83.95 | 0.970 | 44.65 |
| 14 | 2.186 | 100.61 | | | 2.009 | 92.48 | 1.643 | 75.64 | | |
| 21 | | | | | 1.990 | 91.59 | 1.434 | 66.02 | | |
| 28 | 2.179 | 100.28 | 2.055 | 94.56 | 1.954 | 89.91 | 1.320 | 60.74 | | |
| 45 | 2.155 | 99.19 | 2.042 | 94.00 | 1.862 | 85.69 | 0.885 | 40.75 | | |
| 60 | 2.134 | 98.22 | 1.987 | 91.47 | 1.767 | 81.33 | 0.626 | 28.83 | | |
| 90 | 2.144 | 98.70 | 1.932 | 88.92 | 1.620 | 74.58 | | | | |

t 90 (days) extrapolated according to Arrhenius equation :
t 90 at 4°C = 5521 days
t 90 at 8°C = 2557 days

RAW DATA : DOXOPRED

June,1990

PI 239

DOXORUBICIN HC1 RTW 2 mg/ml P8199/48/C (PKLD)

INITIAL VALUES
--------------
Concentration: 2.147 mg/ml          pH = 2.78
Relative % Assay : 100.00

| TIME (days) | TEMPERATURE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 4°C | | 25°C | | 35°C | | 45°C | | 55°C | |
| | CONC. ( mg/ml) | REL. % Assay | CONC. ( mg/ml) | REL. % Assay | CONC. ( mg/ml) | REL. % Assay | CONC. ( mg/ml) | REL. % Assay | CONC. ( mg/ml) | REL. % Assay |
| 2 | | | | | 2.103 | 97.94 | 2.053 | 95.62 | | |
| 4 | | | | | | | 1.950 | 90.84 | 1.362 | 63.44 |
| 8 | | | | | 2.026 | 94.35 | 1.822 | 84.86 | 0.927 | 43.16 |
| 14 | | | | | | | 1.689 | 78.68 | | |
| 21 | | | | | 1.974 | 91.94 | 1.430 | 66.59 | | |
| 28 | 2.148 | 100.06 | 2.119 | 98.70 | 1.966 | 91.59 | 1.308 | 60.91 | | |
| 45 | 2.143 | 99.81 | 2.045 | 95.23 | 1.806 | 84.21 | 0.883 | 41.13 | | |
| 60 | 2.156 | 100.42 | 2.007 | 93.49 | 1.779 | 82.86 | 0.618 | 28.80 | | |
| 90 | 2.150 | 100.14 | 1.934 | 90.08 | 1.643 | 76.54 | | | | |

t 90 (days) extrapolated according to Arrhenius equation :
t 90 at 4°C = 5187 days
t 90 at 8°C = 2411 days

RAW DATA : DOXOPKLD

June,1990

EXHIBIT 27

CERTIFICATE OF MAILING

I hereby certify that this paper and every
paper referred to therein as being enclosed
is being deposited with the U.S. Postal Ser-
vice as first class mail, postage prepaid,
in an envelope addressed to: Commissioner of
Patents & Trademarks, Washington, DC 20231,
on _May 06, 1997_ (Date of Deposit)

_5/06/97_   _Daniel A. Boehnen_
/Date/            Name

#4/1/1
_signature_
6/10/97

**PATENT**

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
### (Case No. 96,926)

| | |
|---|---|
| In re Application of: | ) |
| | ) |
| Gaetano Gatti et al. | ) |
| | ) |
| Serial No.: 07/827,742 | )   Examiner: E. Peselev |
| | ) |
| Filed:  January 29, 1992 | )   Art Unit: 1211 |
| | ) |
| For:   INJECTABLE READY-TO-USE | ) |
|      SOLUTIONS CONTAINING AN | ) |
|      ANTITUMOR ANTHRACYCLINE | ) |
|      GLYCOSIDE | ) |

### AMENDMENT

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

    This is in response to the Office Action mailed December 6, 1996. A Petition for an extension of time (two months) and requisite fee are attached herewith.  Please amend this application as shown below.

### IN THE CLAIMS

    Please add the following new dependent claims as shown below.  A clean copy of the entire set of pending claims, after amendment, is attached as Appendix A.

PU 0015277

37.    (Amended)  The solution of claim 31 wherein the concentration of doxorubicin is about 2 mg/ml.

38.    (Amended)  The solution of claim 31 wherein the concentration of doxorubicin is about 5 mg/ml.

46.    The solution of claim 31 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

49.    The solution of claim 46 wherein the physiologically acceptable acid is hydrochloric acid.

50.    The solution of claim 49 wherein the anthracycline glycoside is idarubicin hydrochloride.

51.    The solution of claim 44 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

52.    The solution of claim 51 wherein the physiologically acceptable acid is hydrochloric acid.

53.    The solution of claim 52 wherein the anthracycline glycoside is idarubicin hydrochloride. —

2

PU 0015278

## REMARKS

Reconsideration of this application, as amended, is respectfully requested.

Claims 31, 33-38, 40, 42 and 44-47 were pending in this application. New dependent claims 48-53 were added to further specify other embodiments of the invention. Claims 31, 33-38, 40, 42, and 44-53 are now pending in this application.

Support for the new dependent claims can be found in the application as originally filed. For instance, the subject matter of new claims 49 and 52 can be found on page 3, lines 23 and 24; new claims 48 and 51 can be found on page 6, lines 17 and 18; and new claims 47 and 53 can be found on page 3, line 13. Support for the amendment of claims 37 and 38 can be found on page 6, lines 14-24, in the specification. Accordingly, no new matter has been introduced into the application as a result of the above amendment.

Turning to the Office Action, claims 31, 33-38, 40 and 42 stand rejected under 35 U.S.C. 103 as being unpatentable over Janssen et al., International J. Pharmaceutics, Vol. 23 (1985), pp. 1-11 ("Janssen"). These claims also stand rejected under 35 U.S.C. 103 as being unpatentable over Kaniewska (Chem. Abstracts, Vol. 88, 1978, Abst. No. 197526x) ("Kaniewska I") or Kaniewska (Pharmacia Polska, Vol. 9, pp. 539-542) ("Kaniewska II") in combination with Janssen. Applicants respectfully traverse these rejections.

The Federal Circuit has reiterated the manner in which obviousness rejections are to be reviewed. Where claimed subject matter has been rejected as obvious in view of a combination of prior art references, "a proper analysis under § 103 requires, inter alia, consideration of two factors: (1) whether the prior art would have suggested to those of ordinary skill in the art' that they should make the claimed composition or device, or carry out the claimed process; and (2) whether the prior art would also have revealed that in so making or carrying out, those of ordinary skill would have a reasonable expectation of success." In re Vaeck, 947 F.2d 488, 493, 20 U.S.P.Q.2d 1438, 1442 (Fed. Cir. 1991), cited In re Dow Chemical Co., 837 F.2d 469, 473, 5 U.S.P.Q.2d 1529, 1531 (Fed. Cir. 1988). As the Federal Circuit emphasized by succinctly summarizing: "Both the suggestion and the reasonable expectation of success must be founded in the prior art, not in the Applicants' disclosure." Id. In the present case, neither Janssen, Kaniewska I, nor Kaniewska II provide any suggestion for the combination of references. Moreover, neither Janssen, Kaniewska I nor Kaniewska II, alone or in combination with each other, teach an expectation of success for doing what the Applicants have done, i.e. achieving a storage stable solution of anthracycline glycosides in a pharmaceutically accepted solution.

3

PU 0015279

Janssen merely relates to a doxorubicin-HCl salt dissolved in Tris or phosphate buffer or cell culture medium for determination of decomposition kinetics in the presence or absence of liposomes. While Janssen teaches that doxorubicin decomposition rates can be modulated by buffer choice and temperature, Janssen does not teach or suggest that any of the disclosed buffers are "pharmaceutically acceptable solutions" as recited in the present claims. Moreover, Janssen does not suggest that its result can be achieved irrespective of the manner of adjusting the pH, *i.e.*, irrespective of using buffer. The reader knows only that the buffer used therein achieved the results disclosed. There is nothing in Janssen that implies the need for a storage stable physiologically acceptable solution of anthracycline glycoside. There is also nothing in Janssen that suggest the same result could be obtained by pH adjustment of a physiologically acceptable aqueous solvent medium with the use of a physiologically acceptable acid. Moreover, as the Examiner had acknowledged on page 2 of the prior Office Action, Janssen does not teach or suggest a concentration of anthracycline glycoside ranging from 0.1 to 100 mg/ml in pharmaceutically acceptable solution or otherwise.

Like Janssen, Kaniewska I is mainly concerned with decomposition kinetics, and merely states that adriamycin-HCl in buffered solutions followed first order kinetics at increasing pH of the medium. While Kaniewska describes measurement of a decomposition rate constant at pH 2.6, Kaniewska does not teach or suggest any "pharmaceutically acceptable solution." Indeed, Kaniewska I is completely silent with respect to the chemical identity of the solution, other than the fact that it is buffered. Like Janssen, Kaniewska I fails to suggest that the results are achieved without use of a buffer, *i.e.*, irrespective of how pH is adjusted. While Kaniewska I does disclose determination of a rate constant at pH 2.6 as the Examiner noted on page 2 of the Action, this determination is not a disclosure of a pharmaceutically acceptable solution having the recited pH range as presently claimed.

Finally, Kaniewska II merely concerns decomposition kinetics of adriamycin hydrochloride in solid form and in a 2% solution of "Britton-Robinson" buffer at various pH values. As shown in the attached article by Britton and Robinson (J. Chem. Soc., 458, 1456 (1931)), the Britton-Robinson buffer merely refers to an aqueous solution of sodium hydroxide, acetic acid, phosphoric acid and boric acid. Acetic acid is replaceable with phenylacetic acid and in one version, a barbituric drug substance, veronal, was also included. Britton-Robinson buffers are not considered pharmaceutically acceptable and cannot be used for pharmaceutical preparations due to the presence of physiologically unacceptable substances such as boric acid.

Accordingly, a person of ordinary skill in the art would not be motivated by Janssen's teachings concerning non-physiologically acceptable phosphate or TRIS buffer or cell growth

4

PU 0015280

medium containing doxorubicin, or Kaniewska I's teachings concerning unknown buffered solutions for decomposition-kinetic studies, or Kaniewska's adriamycin solutions in Britton-Robinson buffers for decomposition kinetic studies to make and use the presently claimed physiologically acceptable solution with any reasonable expectation of success.   There is no teaching in the cited references that the results are achieved irrespective of what is used to adjust the pH level, and the teaching of the cited references was not achieved in a physiologically accepted solution.  As a threshold matter, obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination.  In re Geiger, 815 F.2d 686 (Fed. Cir. 1987); In re Fine, 837 F.2d 1071 (Fed. Cir. 1988). Withdrawal of the § 103 rejection based on Janssen, Kaniewska I and II, alone or in combination with each other, is in order and is respectfully requested.

These references merely illustrate that, prior to the present invention, scientists were searching for an answer to a long-term storage stable solution of anthracycline glycosides in a pharmaceutically acceptable solution.  These references do not teach the solution.  Rather, they confirm the long-standing need of the problem.  Indeed, Janssen et al. expressly acknowledged that they had not solved the problem: "In our laboratory, work is in progress to address the problem related to the chemical stability of DXR [i.e., doxorubicin] in a systematic way." Janssen et al., p. 10.

In view of the above amendment and discussion, Applicants respectfully submit that claims 31, 33-38, 40, 42, and 44-53 are allowable and that a Notice of Allowance should be issued in this case.  The Applicants urge the Examiner to contact the Applicants' undersigned representative if the Examiner believes that this would expedite prosecution of this application.

Respectfully submitted,

Dated: May 6, 1997

Daniel A. Boehnen
Registration No. 28,399

McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Chicago, Illinois 60606
Phone:  (312) 913-0001
Facsimile:  (312) 913-0002

5

PU 0015281

## APPENDIX A

31.    A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution is contained in a sealed container.

33.    The solution of Claim 31 wherein said physiologically acceptable aqueous solvent is selected from the group consisting of water, ethanol, polyethylene glycol, N.N.-dimethylacetamide, and mixtures thereof.

34.    The solution of Claim 31 wherein the physiologically acceptable aqueous solvent is water.

35.    The solution of Claim 31 wherein the concentration of the doxorubicin is from 0.1 to 50 mg/ml.

36.    The solution of Claim 35 wherein the concentration of doxorubicin is from 1 to 20 mg/ml.

37.    The solution of Claim 31 wherein the concentration of doxorubicin is about 2 mg/ml.

38.    The solution of Claim 31 wherein the concentration of doxorubicin is about 5 mg/ml.

40.    The solution of Claim 31 further comprising a tonicity adjusting agent.

6

PU 0015282

42.    A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefor, wherein said solution has a pH adjusted to 2.5 to 5.0 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

44.    A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml.

45.    The anthracycline glycoside solution of Claim 31, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

46.    The container of Claim 42, wherein said doxorubicin solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

47.    The anthracycline glycoside solution of Claim 44, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

48.    The solution of claim 31 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

49.    The solution of claim 48 wherein the physiologically acceptable acid is hydrochloric acid.

7

PU 0015283

50.    The solution of claim 49 wherein the anthracycline glycoside is idarubicin hydrochloride.

51.    The solution of claim 44 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

52.    The solution of claim 51 wherein the physiologically acceptable acid is hydrochloric acid.

53.    The solution of claim 52 wherein the anthracycline glycoside is idarubicin hydrochloride.

8

PU 0015284

EXHIBIT 28

J. Baijnen

1

```
1  UNITED STATES DISTRICT COURT
   DISTRICT OF DELAWARE
2  _____
   PHARMACIA & UPJOHN                )
3  COMPANY LLC,                      )
                                     )C.A. No. 04-833 (KAJ)
4              Plaintiffs,           )HONORABLE KENT A. JORDAN
                                     )
5              -v-                   )
                                     )
6  SICOR INC, and                    )
   SICOR PHARMACEUTICALS, INC.,      )
7                                    )
               Defendants.           )
8  _____  )
9
           C O N F I D E N T I A L
10
             deposition of:
11
         DR. JACOB BEIJNEN
12
               taken at
13         the offices of:
         Exter, Polak & Charlouis
14               on
           1st March 2006
15
16
17         HIGHLY CONFIDENTIAL
18
19
20
21
22
23
24
25
```

J. Baijnen

2

```
 1              A P P E A R A N C E S
 2   On behalf of the Plaintiffs:
 3           MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
             300 South Wacker Drive
 4           Chicago, Illinois 60606-6709
             t: (312) 913-2130
 5           f: (312) 913-0002
             e: tully@mbhb.com
 6
             by:
 7
             MR. PAUL TULLY
 8
 9   On behalf of the Defendants:
10           SONNENSCHEIN NATH & ROSENTHAL LLP
             1221 Avenue of the Americas
11           New York, NY 10020
             t: (212) 398-5760
12           f: (212) 768-6800
             e: jsigale@sonnenschein.com
13
             by:
14
             MR. JORDAN SIGALE
15
16   Court Reporter:
17           EMMA WHITE, MIVR
             Boscen Reporting Services Ltd.
18           PO BOX 2111
             Seaford
19           BN25 9AG
             t: +44 (0)1483 235 407
20           f: +44 (0)1323 872 116
             e: info@boscen.com
21
22   Also Present:
             MR. JOSHUA RICH, McDonnell Boehnen Hulbert & Berghoff
23           MR. JOHN KEYES, Sonnenschein, Nath & Rosenthal
24
25
```

J. Baijnen

115

1    that you have just described into account with

2    respect to the information that is provided by the

3    '285 patent, what does that lead you to conclude

4    with respect to the meaning of, "Stability"?

5            MR. TULLY:  Object to the form of the

6        question.

7        A    I don't think I understand the question

8    well.

9            MR. SIGALE:  At any point in time that you

10       have been working on your opinions that you

11       offer in the matter of Pharmacia versus Sicor,

12       did you ever have a working understanding of

13       what the term, "Stability", means in the

14       context of the '285 patent that you are opining

15       on?

16           MR. TULLY:  Object to the form of the

17       question.

18       A    The concerning of a ready-to-use solution

19   for pharmaceutical purposes, for pharmaceutical

20   marketing, under the storage conditions that are

21   proposed by the manufacturer, then there will be

22   a requirement for such a ready-to-use solution to be

23   stable, and I will come back to the word, "Stable",

24   later on, but be stable for at least 18, 24 months

25   in the refrigerator, because that would allow such

J. Baijnen

116

1   a product to be manufactured, to be distributed, to

2   be purchased, to be handled in a Pharmacy

3   department, and in such a way that you can use the

4   drug before the expiry data has been passed.  So, in

5   this context for a ready-to-use solution the

6   stability means that the drug is not degraded during

7   storage, does not form -- not in a chemical way, and

8   in a physical way, and that the quality of the

9   product, you can, let's say -- pharmacopoeia

10  requirements are fulfilling for the quality of the

11  product, and for -- yes, well, that is what I wanted

12  to say about it.

13      MR. SIGALE:  Let's see if I cannot kind of

14      split this up and figure out where it comes

15      from.  When you say, "Pharmacopoeia stability",

16      it is not exactly the term you used, but you

17      referred to the pharmacopoeia when you were

18      defining stability.  How does that play into

19      your definition of stability?

20      MR. TULLY:  Object to the form of the

21      question.

22      A    The pharmacopoeia gives a requirement for

23  product quality, so the quality should fulfill these

24  requirements which means data is -- that there is

25  chemical and physical stability.

J. Baijnen

1    degradation kinetics of Daunorubicin, and when you

2    go back to it you will see the conditions on page

3    247.

4    (2.24 pm)

5                    OFF THE RECORD

6    (2.32 pm)

7            MR. SIGALE:  Dr. Beijnen, I think you

8        still have in front of you Exhibit 4 which is

9        the patent in suit.  It is right in the

10       right-hand corner of the documents that you

11       have. I think you can actually put your thesis

12       off to the side.  I think we are done with it

13       for the most part.  I would like you to turn to

14       Column 23 of the patent, pretty near the end.

15       Let me know when you are there.

16       A    Okay.

17       Q    Great.  At line 5 in Column 23 there is

18   this number 1 and then right after it it says:

19               "A physiologically acceptable

20   solution".

21               I am wondering if you could help me

22   understand what, "Physiologically acceptable",

23   means.

24           MR. TULLY:  Object to the form of the

25       question.

J. Baijnen

141

1      A    I interpret that as a solution that can be

2   administered to a human being.

3           MR. SIGALE:  What plays into the

4       determination of whether a solution can be

5       administered to a human being?

6           MR. TULLY:  Object to the form of the

7       question.

8      A    You want an answer in general?

9           MR. SIGALE:  You know, probably not.  Why

10      don't I make the question a little more narrow?

11      Your report goes into it in generalities, but

12      I think I would probably like it in the context

13      of the '285 patent, and we can all go home

14      earlier today, so let me rephrase it.

15          In the context of the '285 patent, what

16      types of chemical issues do you have to take

17      into account in deciding whether or not

18      something is proper to administer to a human

19      being?

20          MR. TULLY:  Object to the form of the

21      question.

22     A    Well, I think still we can discuss this in

23   a general way because there are general issues that

24   are applying here as well, and so in my view, in my

25   interpretation, a physiologically acceptable

J. Baijnen

142

1  solution is a solution that can be administered in

2  a safe way to a human being which means that when it

3  is administered correctly, or after dilution or

4  whatever is the way it should be administered to

5  patients, that we realise the issue on pH,

6  isotonicity, free of precipitates, microbiologically

7  safe, compatible with blood.  These are general

8  issues, I realise that, but they also apply to this

9  case.

10     Q    What about the phrase, "Physiologically

11  acceptable", tells you -- I am sorry,

12  "Physiologically acceptable solution", tells you

13  that the solution has to be compatible with blood?

14         MR. TULLY:  Object to the form of the

15      question.

16     A    "Physiological", that means that if you

17  inject it into a patient, that the patient is, let's

18  say, not immediately get a toxic reaction because

19  all kinds of reactions occur.  They are just simply

20  compounds that cannot be injected into human beings.

21         MR. SIGALE:  What portion of,"

22      physiologically acceptable solution", tells you

23      that the solution has to be injectable?

24         MR. TULLY:  Object to the form of the

25      question.

J. Baijnen

144

1    that correct?

2          MR. TULLY:  Object to the form of the

3      question.

4      A    "Intravenously injectable", means that it

5    is pharmaceutically, medically allowed to inject

6    that solution into a human being.

7          MR. SIGALE:  And that would include

8      compatibility with blood?

9          MR. TULLY:  Object to the form of the

10      question.

11      A    Also compatibility with the human being

12    and part of the human being is blood.

13          MR. SIGALE:  That would also include the

14      issues of isotinicity and -- no.  Strike that

15      question.

16          That would also include the issue of

17      isotinicity; correct?

18          MR. TULLY:  Object to the form of the

19      question.

20      A    Yes.

21          MR. SIGALE:  Now, it says here:

22          "Sterile, pyrogen free".

23          Is that another way of saying

24      microbiologically safe?

25          MR. TULLY:  Object to the form of the

J. Baijnen

183

1      A    No, because the problem that I have with

2  these data is that, well, it is not clear to me

3  whether that 10% degradation in terms of T90 is used

4  as the stability term here, because I would not

5  interpret it, 10% degradation as -- I would not

6  accept a 10% degradation as a terminology of stable

7  for a pharmaceutical product.

8          MR. SIGALE:  So, based on your definition

9      of stability, you don't believe that Janssen

10     discloses a solution that is stable at a pH of

11     4.0?

12         MR. TULLY:  Object to the form of the

13     question.

14     A    I have a problem with the statement that

15  it is optimum shelf-life conditions.

16         MR. SIGALE:  Where are you referring?

17     A    Page 17, line 3 from the bottom where

18  Janssen states that:

19             "pH4 at 4¦ provide optimal shelf-life

20  conditions".

21     Q    I can understand why you would have

22  a problem with that, how about the next sentence

23  which says:

24             "... no significant DXR degradation

25  was recorded over a 60-day period at storage of pH

J. Baijnen

1    4.0".
2                    Do you have trouble understanding
3    what that refers to?
4            MR. TULLY:  Object to the form of the
5        question.
6        A    I have problems with the interpretation of
7    that, because I have the feeling that it is a T90
8    value that is used over there.
9            MR. SIGALE:  So, you believe that when
10        Janssen said that there was no significant
11        Doxorubicin degradation over a 60-day period,
12        you read that to say that over a 60-day period
13        the drug had not degraded more than 90%?
14            MR. TULLY:  Object to the form of the
15        question.
16            MR. SIGALE:  I am sorry, it was actually
17        a bad question to begin with.  Let me rephrase
18        that.
19            You read, Dr. Beijnen, when it says, "No
20        significant Doxorubicin degradation was
21        recorded", to mean that there was less than 10%
22        degradation and you don't believe that that is
23        stable?
24            MR. TULLY:  Object to the form of the
25        question.

J. Baijnen

185

1     A     10% degradation can, in my opinion, not be
2  indicated as stable and pharmaceutically acceptable
3  and referring to optimal storage conditions.
4  Optimal Shelf life conditions.
5          MR. SIGALE:  What does the '285 patent use
6      as its definition of stability to your
7      understanding?
8          MR. TULLY:  Object to the form of the
9      question.
10     A     I have found no definition of stability in
11  the '285 patent.
12         MR. SIGALE:  Have you tried to reach any
13     understanding as to what one of ordinary skill
14     in the art would understand the term,
15     "Stability", to mean after reading the '285
16     patent?
17         MR. TULLY:  Object to the form of the
18     question.
19     A     How a person -- could you repeat it?
20  How ...
21         MR. SIGALE:  Have you tried to form an
22     opinion as to how a person of ordinary skill in
23     the art, remember your definition on page 23 or
24     24, how one of those people, the team of people
25     that you got after reading the '285 patent

J. Baijnen

186

1      would understand the term, "Stability".

2          MR. TULLY:  Same objection.

3      A    Well, in view of the characteristics of

4      anthracyclines, one would read out of the patent

5      that there are certain conditions under which the

6      drug remains above 99% of its initial concentration

7      or potency, how they mentioned it here, and there

8      are certain conditions where it clearly degrades

9      rapidly, and in view of interpretation of stability,

10      I would only accept the product as a stable product,

11      and that would certainly be valued where I would

12      start to think about less than 1% degradation of

13      being stable.

14          MR. SIGALE:  So, using your definition of

15          stability I would like you to turn to Table 14.

16          Are you with me on Table 14 of the '285 patent?

17      A    Yes, I am.

18      Q    Using your definition of stability which

19      is less than 1% loss of the initial concentration of

20      Doxorubicin, would you agree with me that the

21      experiment set forth in Table 14 at 4|C is not

22      stable by month 1?

23          MR. TULLY:  Object to the form of the

24          question. Mischaracterizes his testimony.

25      A    Well, we discussed earlier the standard

J. Baijnen

193

1    whether or not Ms. Janssen did, in fact, keep

2    the solutions that she was analyzing that she

3    reports in her paper in sealed containers.

4        MR. TULLY:  Object to the form of the

5    question.

6    A    What I can recall from her studies, but

7    that is also written in her publication, is that she

8    used polypropylene tubes.

9    Q    What do you draw from the fact that it

10   says in her study, which is Defendant's Exhibit 18,

11   that she used polypropylene tubes?

12       MR. TULLY:  Object to the form of the

13   question.

14   A    Well, propylene tubes are not sealed

15   containers.

16       MR. SIGALE:  What are polypropylene tubes?

17   A    Tubes.  If you have a sealed container

18   then you are dealing with another type of closure of

19   the container where you are -- that you are using in

20   your study.

21   Q    Can you describe what a polypropylene tube

22   that would be used in a chemical study would look

23   like?

24   A    It is a tube, I think usually 10

25   centimeters long with a radius of 1 centimeter, and

J. Baijnen

194

1    with a polypropylene stopper on it for the purposes

2    of your experimental work.

3         Q    Is the bottom of this polypropylene tube

4    closed or open?

5         A    The bottom?  It is, of course, a closed

6    bottom otherwise everything would drop out.

7         Q    The bottom of it is closed, it is a tube,

8    kind of like a test tube?

9         A    It is a test tube, yes.

10        Q    It has a polypropylene stopper in your

11   experience?

12        A    It has a polypropylene stopper.

13        Q    Now, in addition to mentioning

14   polypropylene tubes being used in some cases, this

15   is at page 4 of Exhibit 18, there is also

16   a reference to the fact that some of the samples

17   were incubated in 10ml glass vials.  What are 10ml

18   glass vials?

19        A    These are small vials, 10mls, something

20   like that, we call them usually, "Penicillin

21   flasks", and these small flasks are usually closed

22   with a screw top.  A screw stopper or -- how do you

23   mention that?

24        Q    A screw cap?

25        A    A screw cap.

J. Baijnen

195

1    Q    I am trying to understand what the issue

2    is.  Is it your position that glass vials and

3    polypropylene tubes are not containers?

4         MR. TULLY:  Object to the form of the

5         question.

6    A    These are containers, but these are not

7    sealed containers.

8         MR. SIGALE:  And why are they not sealed

9         containers?

10   A    Because they are not sealed.

11   Q    You just referred to a screw top cap, and

12   to a polypropylene stopper.  Let me split that up.

13   Strike the question and let me start over again.

14             In speaking of the polypropylene tube

15   you also referred to a polypropylene stopper.  If

16   the unit that you are thinking of, polypropylene

17   tube with a polypropylene stopper is used, is that,

18   in your opinion, not a closed container?

19        MR. TULLY:  Object to the form of the

20        question.

21   A    It is closed to a certain extent, but it

22   is not a sealed container.  In pharmaceutical

23   practice, sealed containers are, for instance,

24   containers with a rubber stop and with an aluminium

25   cap on it where, under pressure, it is closed very

J. Baijnen

196

1    tightly.  I have used these containers a lot in

2    studies myself.

3            MR. SIGALE:  So, when you use the term,

4        "Sealed container", that means something

5        different to you than, "Closed container"?

6        A    Sealed containers are, for instance,

7    necessary when you want to exclude an easy leakage

8    out of the tubes, an easy leakage out of the flasks,

9    an easy dropping from oxygen from outside.  When

10    I did studies under anaerobic conditions, then

11    I used, in particular, these sealed containers

12    because that is a way to be quite sure that you have

13    a container which is closed to such an extent that

14    there is no exchange with its environment.

15        Q    So, when you read the '285 patent and you

16    see the phrase, "Sealed container", in Claim 1, this

17    is Column 23 of the '285 patent, that means to you

18    a container that is closed using a rubber stopper

19    and an aluminium cap?

20            MR. TULLY:  Object to the form of the

21        question.

22        A    That is an example of a sealed container,

23    yes.

24            MR. SIGALE:  What else is a sealed

25        container to your understanding of that term as

J. Baijnen

245

1    stability", as it is used in the '285 patent?

2              MR. SIGALE:  Objection, leading, compound.

3        A    This statement is as it is here.  Could

4    you be more specific?  What do you mean?

5              MR. TULLY:  What does, "Shelf stability",

6        mean to you in terms of the claims of the '285

7        patent?

8        A    A shelf stability for a pharmaceutical

9    product like a ready-to-use solution means that the

10   product can be stored under acceptable conditions,

11   for instance between 4-8 degrees for at least

12   a period of time of 18 months without physical

13   instability and without any chemical instability, so

14   that when you want to use the product, let's say one

15   day before the expiration date, then it has still

16   the high quality that you expect from such a product

17   to be before administration to human beings.

18       Q    Can you explain a little bit more what you

19   mean by, "Eight months"?

20       A    I said 18 months.  I am sorry.

21       Q    Given that definition of shelf stability,

22   is Example 1 consistent with a material that has

23   such shelf stability?

24       A    Number 1?

25       Q    Yes.

J. Baijnen

251

1        Claim 1 wherein said solution exhibits storage

2        stability".

3            Do you see where I am at?

4        A    Yes.

5        Q    I am curious.  Could you explain to me

6    what the relationship is between exhibiting storage

7    stability and your testimony regarding shelf

8    stability?

9            MR. TULLY:  I will object to the form of

10        the question.

11        A    The difference between storage stability

12    and shelf stability?

13            MR. SIGALE:  Exhibiting storage stability.

14        A    Exhibiting storage stability.

15        Q    Your testimony that you just gave with

16    respect to shelf stability.

17        A    Well, the terminology used like, "Storage

18    stability", or, "Shelf stability", and I think you

19    can use these terminologies at the same way.  I do

20    not see many differences a storage stability and

21    a shelf stability.  Storage is done on the shelf, so

22    it refers -- and so storage stability and shelf

23    stability, but we should be very careful in how we

24    define such a stability.

25        Q    I couldn't agree with you more.  What I am

J. Baijnen

252

1  curious about is although you don't see many

2  differences between shelf stability and exhibiting

3  storage stability, what are those differences that

4  you do see?

5        MR. TULLY:  Object to the form of the

6     question, and mischaracterizes his testimony.

7     A    The difference between 9 and 1?  That is

8  Claim 9 and Claim 1?

9        MR. SIGALE:  No.  I want to know the

10    difference between your testimony on shelf

11    stability and the term in Claim 9 where it

12    says, "Exhibits storage stability". You see,

13    they are not the same, and you said we need to

14    be careful about definitions.  I agree, and so

15    I asked you if they were the same and you said

16    you don't see many differences.  Well, the flip

17    side of that is that there are some

18    differences; correct?

19       MR. TULLY:  Object to the form of the

20    question. Mischaracterizes his previous

21    testimony.

22    A    No.  I don't -- well, storage stability or

23  shelf stability are terminologies that are used in

24  common practice where I am from for the same

25  purposes.

J. Baijnen

255

1   I specifically focus on one solution here?  It is --

2   well, then, the question is not clear to me.  I am

3   sorry.  I cannot give you an answer.

4        MR. SIGALE:  Okay.  So, it is not clear to

5        you, the context that storage stability is used

6        in the claim of the '285 patent?

7        MR. TULLY:  Object to the form of the

8        question, mischaracterizes his testimony.

9   A    It is clear to me as I just explained to

10  you.

11  Q    You told me that if it was at a patient's

12  bedside storage stability would be one thing, and if

13  it was manufacturing it would mean another thing and

14  if it was pharmacy it would mean yet another thing.

15  A    Yes.

16  Q    So --

17       MR. TULLY:  And I will object to the form

18       of the question. Go ahead.

19       MR. SIGALE:  So I asked you how I know

20       which form is being used here on Column 24 of

21       the patent.

22  A    Well, that is very clear to me.  It is

23  used in the process of developing a pharmaceutical

24  product to be intended to market and to be available

25  for the medical community in such a way that it is

J. Baijnen

256

1  a stable product, a ready-to-use solution, stable

2  for what I have mentioned in my testimony, at least

3  18 to 24 months because that is the requirement that

4  you can define for such a product.

5          MR. SIGALE:  And this 18-24 months appears

6      where in the '285 patent?

7          MR. TULLY:  Object to the form of the

8      question.

9      A    These data of 18-24 months are not

10 presented in this patent in this manner.

11         MR. SIGALE:  In fact, the only long-term

12     stability data presented in the patent is six

13     months.  Is that correct?

14         MR. TULLY:  Object to the form of the

15     question.  Again, beyond the scope.

16     A    The actual stability data presented here

17 for the longest period of time is six months.

18         MR. SIGALE:  I have no further questions.

19         MR. TULLY:  I have nothing.

20         VIDEOGRAPHER:  Going off-the-record.  The

21     time is 18.25.

22         MR. SIGALE:  We can do stipulations

23     without video.

24         MR. RICH:  We will use our normal

25     stipulations.