**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PHARMACIA & UPJOHN COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-833-KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| SICOR INC. and SICOR PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Of Counsel:*                                           *Attorneys for Defendants*
Reid L. Ashinoff
Michael S. Gugig
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Jordan A. Sigale
SONNENSCHEIN NATH & ROSENTHAL LLP
8000 Sears Tower
Chicago, Illinois 60606
(312) 876-8000

Dated: May 31, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................... 2

   A.   The State of the Art Prior to the Invention of the Subject Matter Claimed
        in the '285 Patent .......................................................................................... 2

   B.   The '285 patent .............................................................................................. 2

   C.   The Prosecution History of the '285 Patent ................................................ 3

III.  APPLICABLE LAW .............................................................................................. 4

IV.   CLAIM CONSTRUCTION .................................................................................... 4

   A.   Background ..................................................................................................... 4

   B.   Agreed Upon Terms ....................................................................................... 5

   C.   Disputed Claim Terms .................................................................................. 7

        (a)   The term "physiologically acceptable" in Claims 1, 9, and 11-13 means
              "suitable for administration to humans or animals." ............................. 8

        (b)   The transition phrase "of" in Claims 1, 9, and 11-13 means "including,
              but not limited to." ............................................................................... 12

        (c)   The term "anthracycline glycoside" in Claims 1, 9, and 11-13 requires
              a non-lyophilized preparate.................................................................. 14

        (d)   The term "sealed" in Claims 1, 9, and 11-13 means "closed in some
              fashion such that it does not allow the passage of the solution."........ 18

        (e)   The term "storage stability" in Claim 9 means that at least 90% of the
              original amount of anthracycline glycoside dissolved in solution remains
              in the solution when stored at a temperature of about 4 °C or 8 °C for a
              period of at least 180 days. .................................................................. 21

V.    CONCLUSION..................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082 (Fed. Cir. 2003).............................................6

*Cryovac Inc., v. Pechiney Plastic Packaging, Inc.*, No. 04-1278-KAJ,
   2006 WL 956599 (D. Del., April 13, 2006).........................................................4, 7, 12

*Custom Accessories, Inc. v. Jeffrey-Allan Industrial, Inc.*, 807 F.2d 955
   (Fed. Cir. 1986)...............................................................................................................8

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) ....................................4

*Elkay Manufacturing Co. v. Ebco Manufacturing Co.*, 192 F.3d 973
   (Fed. Cir. 1999).................................................................................................................4

*Innova/Pure Water, Inc. v. Safari Water Filtration System, Inc.*, 381 F.3d 1111
   (Fed. Cir. 2004).................................................................................................................7

*Jonsson v. Stanley Works*, 903 F.2d 812 (Fed. Cir. 1990)...................................................4

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968 (Fed. Cir. 1999).................10

*Microstrategy Inc. v. Bus. Objects Americas*, 410 F. Supp. 2d 348 (D. Del. 2006)...........4

*Nystrom v. TREX Co., Inc.*, 424 F.3d 1136.........................................................................9

*PPG Industrial v. Guardian Industrial Corp.*, 156 F.3d 1351 (Fed. Cir. 1998)...............13

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .................................................4, 6

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998).............12

*SciMed Life System, Inc. v. Advanced Cardiovascular System, Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001).........................................................................15, 16, 17

*Tandon Corp. v. United States International Trade Commission*, 831 F.2d 1017
   (Fed. Cir. 1987).................................................................................................................9

*In re Thorpe*, 777 F.2d 695 (Fed. Cir. 1985) ....................................................................18

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)...............................4

**STATUTES**

35 U.S.C. §112 ..........................................................................................................19

**OTHER AUTHORITIES**

Dennis M. Hoffman, et al., *Stability of Refrigerated and Frozen Solutions of Doxorubicin Hydrochloride*, 36 Am. J. Hosp. Pharm. 1536 (1979)..............................2

Manual of Patent Examining Procedure §201 .................................................................3, 4

The Manual of Patent Examining Procedure, § 2111 ....................................................11, 13

## I.    INTRODUCTION

Plaintiff, Pharmacia & Upjohn Company LLC ("Pharmacia") alleges infringement of U.S. Patent No. 6,107,285 ("the '285 patent") by the idarubicin hydrochloride injection products made, used, sold and/or offered for sale by Defendants, Sicor Inc. and SICOR Pharmaceuticals, Inc. ("Sicor"). A copy of the '285 patent is provided as Exhibit A.[1]

Generally speaking, the '285 patent discloses and claims "ready-to-use" solutions of a group of chemotherapy drugs called anthracycline glycosides. ('285 patent, 4:25-28.[2]) One type of anthracycline glycoside is idarubicin; other types claimed by the '285 patent include doxorubicin and epirubicin. Idarubicin is the active pharmaceutical ingredient in Sicor's idarubicin hydrochloride injection product. (Package Insert for Sicor Idarubicin HCl Injection, Exhibit B.) Use of the term "hydrochloride" (or "HCl") is meant to indicate that the "salt" form of idarubicin is the raw ingredient in Sicor's solution. *Id.*

In manufacturing its Idarubicin Hydrochloride Injection product, Sicor starts its process with a "lyophilized preparation" of idarubicin hydrochloride. "Lyophilized" is a fancy term for freeze-dried. (See generally, Expert Report of Douglas S. Clark, Exhibit C, at pp. 14-15 and Expert Report of Jacob H. Beijnen, Exhibit D, at p. 7.) The process of lyophilization involves "dissolving the drug (and, generally, a bulking agent) in a suitable solvent" and then freezing a liquid solution and removing the water under pressure. (Beijnen Expert Report, Exhibit D, at p. 7.) This process is used in making freeze-dried (or lyophilized) instant coffees and other products. To manufacture its product, Sicor then "reconstitutes" the lyophilized idarubicin hydrochloride into a stable solution to form an injectable liquid. ("Compounding Procedure for Idarubicin Hydrochloride Injection 10 mg/vial Bulk Solution," Exhibit E.)

In the present litigation, Sicor argues that its Idarubicin Hydrochloride Injection product does not infringe the '285 patent because Sicor uses lyophilized idarubicin hydrochloride. Sicor also argues that the '285 patent is invalid for anticipation and obviousness, among other theories, and that the '285 patent was procured by inequitable conduct rendering it unenforceable.

---

[1] The exhibits are being filed contemporaneously herewith in a separate appendix.

[2] References to content within U.S. patents will be made in "column: line number" format. For example, 4:25-28 refers to column 4, lines 25 through 28.

## II.    BACKGROUND

A.    <u>The State of the Art Prior to the Invention of the Subject Matter Claimed in the</u>
<u>'285 Patent</u>

Doxorubicin is the most widely used anthracycline glycoside. ('285 patent at 1:12-15.)
The purified form of doxorubicin was patented by Pharmacia's predecessor-in-interest,
Farmitalia Carlo Erba ("FICE") or its predecessors as early as 1971 in U.S. Patent No. 3,590,028.
(Exhibit F.) The '028 patent and patents covering other anthracycline glycoside in their basic
form expired by the late 1980's.

Through Adria Laboratories, FICE sold the salt of doxorubicin (i.e. doxorubicin
hydrochloride) in its lyophilized form in sealed containers ('285 patent, 1:25-28) under the trade
name "Adriamycin®." According to the Adriamycin® package insert, the lyophilized
doxorubicin hydrochloride should only have been reconstituted (i.e. rehydrated) immediately
prior to administration of the drug to a patient to ensure stability. (Dennis M. Hoffman, et al.,
*Stability of Refrigerated and Frozen Solutions of Doxorubicin Hydrochloride*, 36 Am. J. Hosp.
Pharm. 1536 (1979), Exhibit G, at p. 1536.) Reconstitution of Adriamycin® required hospital
personnel to add a suitable solvent (such as water for injection) to the lyophilized doxorubicin
and shake vigorously to form an injectable liquid. ('285 patent, 1:42-46.) Because
lyophilization required the addition of other substances to the anthracycline glycoside compound,
reconstitution often required prolonged shaking. ('285 patent, 1:42-46 and 4:12-19.)

Since anthracycline glycosides are extremely toxic compounds, the personnel involved in
both their manufacture and administration are exposed to the risks of contamination that raise
particularly serious health concerns. ('285 patent, 1:25-41.)

B.    <u>The '285 patent</u>

The '285 patent, entitled "Injectable ready-to-use solutions containing an antitumor
anthracycline glycoside," issued on August 22, 2000. In particular, the claims of the '285 patent
are directed to solutions of any of three anthracycline glycoside salts: doxorubicin hydrochloride,
epirubicin hydrochloride, and idarubicin hydrochloride. ('285 patent, 1:61-65.) The inventors
of the '285 patent believed they had developed stable ready-to-use solutions of these
anthracycline glycosides whose preparation or administration did not require either
lyophilization or reconstitution. ('285 patent, 1:50-53.) As a result of this development, the
inventors believed they had highly reduced the health risks connected with both the manufacture

and reconstitution of a lyophilized preparation of an extremely toxic group of drug compounds. ('285 patent, 1:47-53.)

    C.    The Prosecution History of the '285 Patent

    The '285 patent is one of a handful of U.S. and International patents that trace their lineage back to a single patent application filed in the United Kingdom on August 2, 1985 (UK Patent Application Serial Number 85/19452). The first named inventor on the original British Patent Application was Mr. Gaetano Gatti. As such, the patents that trace their lineage back to the '452 UK Patent Application (including the '285 patent) are commonly referred to as being part of the "Gatti Patent Family."

    The U.S. lineage of the '285 patent began with the filing of U.S. Patent Application Serial Number 06/878,784 on June 26, 1986. The '784 patent application contained the entirety of the '452 UK Patent Application plus an additional experimental example, which is referred to in the '285 patent as "EXAMPLE 14." ('285 patent, 21:60 - 22:66.) A continuation[3] patent application (U.S. Patent Application Serial Number 07/385,999) was filed on July 27, 1989, from the '784 application. In turn, a divisional[4] patent application (U.S. Patent Application Serial Number 07/503,856) was filed on April 3, 1990, from the '999 application. Then, another divisional patent application (U.S. Patent Application Serial Number 07/827,742) was filed on January 29, 1992, from the '856 application. Over eight years later, after several rejections of its claims, the '742 patent application issued into the '285 patent.

    Collectively these applications (i.e. the '784, '999, '856 and '742 patent applications) comprise the prosecution history of the '285 patent. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."); *Jonsson v. Stanley*

_____

[3] A "continuation" patent application is "a second application for the same invention claimed in a prior [] application. . . ." Manual of Patent Examining Procedure §201.07 (Exhibit H.)

[4] A "divisional" patent application is "[a] later application for an independent or distinct invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier or parent application. . . ." Manual of Patent Examining Procedure §201.06 (Exhibit H.)

- 3 -

*Works*, 903 F.2d 812, 818 (Fed. Cir. 1990) (prosecution history of parent application is relevant to understanding scope of claims issuing in a continuation-in part application).

Portions of the prosecution history of the '285 patent that are relevant to the present claim construction issues are collected in Exhibit I.

## III.    APPLICABLE LAW

Patent claims are construed as a matter of law, *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (en banc), and are given the meaning attributable to those of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

This Court is well familiar with the law on patent claim construction. See for example *Cryovac Inc., v. Pechiney Plastic Packaging, Inc.*, No. 04-1278-KAJ, 2006 WL 956599, at *1-3 (D. Del., April 13, 2006) (Exhibit J), and *Microstrategy Inc. v. Bus. Objects Americas*, 410 F. Supp. 2d 348, 353-354 (D. Del. 2006). In addition to the law reviewed in *Cryovac* and *Microstrategy*, additional precedent has been provided where it may be useful in construction.

## IV.    CLAIM CONSTRUCTION

### A.    Background

Presently, Pharmacia is asserting that Sicor infringes only Claims 9 and 13 of the '285 patent. Claim 9 depends from Claim 1 and thus includes all the limitations of Claim 1. Claim 13 depends from Claim 12, which in turn depends from Claim 11, which in turn depends from claim 1. Thus, Claim 13 includes all the limitations of Claims 1, 11, and 12.

**Claim 1** of the '285 patent recites the following (disputed terms underlined):

> 1. A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution is contained in a sealed container.

**Claim 9** of the '285 patent recites the following:

> 9. The anthracycline glycoside solution of claim 1, wherein said solution exhibits <u>storage stability</u> as a result of said pH being adjusted to the said pH range using said acids.

**Claim 11** of the '285 patent recites the following:

> 11. The solution of claim 1 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

**Claim 12** of the '285 patent recites the following:

> 12. The solution of claim 11 wherein the physiologically acceptable acid is hydrochloric acid.

**Claim 13** of the '285 patent recites the following:

> 13. The solution of claim 12 wherein the anthracycline glycoside is idarubicin hydrochloride.

B.     <u>Agreed Upon Terms</u>

Contemporaneously herewith the parties have submitted a joint list of agreed definitions of certain claim terms. (Joint Claim Construction Chart, Exhibit K.)  "While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).  So that the contextual words are available for the Court, Sicor sets them forth in the following chart reflecting the parties' agreement on these terms.

| Claim term | Agreed Upon Definition |
|---|---|
| "Anthracycline glycoside"* | a class of chemical compounds having the following generic structure: |
| "selected from the group consisting of" | that must be [element a], [element b] or [element c] |
| "idarubicin hydrochloride" | a monohydrochloride salt form of an anthracycline glycoside compound having the following structure: |
| "doxorubicin hydrochloride" | a monohydrochloride salt form of an anthracycline glycoside compound having the following structure: |
| "epirubicin hydrochloride" | a monohydrochloride salt form of an anthracycline glycoside compound having the following structure: |

---

* Although the parties agree on the chemical structure of this element, as discussed below, the parties dispute whether the claim requires that the anthracycline glycoside be in the form of a non-lyophilized preparate.

- 6 -

| | |
|---|---|
| | |
| "having a pH adjusted to" | obtaining a solution that has a pH within the specified range due to the use of a pH adjusting agent |
| "as a result of said pH being adjusted to the said pH range using said acids" | because the solution has a pH within the specified range due to the use of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, or tartaric acid |

C.    Disputed Claim Terms

Sicor submits that, in accordance with well established principles of claim construction, the remaining disputed terms used in the claims of the '285 patent should be given the meaning as one of ordinary skill in the art at the time of the invention would have understood them, *Cryovac Inc.,* 2006 WL 956599, at *1 (citing *Phillips,* 415 F.3d at 1313), in view of the claims, the specification, the prosecution history and "'extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* at *2 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

The first step in the analysis is to define the "person of ordinary skill in the art in question at the time of the invention." The Federal Circuit has taught that the person of ordinary skill

> is a hypothetical person who is presumed to be aware of all the pertinent prior art. The actual inventor's skill is not determinative. Factors that may be considered in determining level of skill include: type of problems encountered in art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field. Not all such factors may be present in every case, and one or more of them may predominate.

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 962-63 (Fed. Cir. 1986) (footnotes omitted).

In this case, the parties appear to agree that, at a minimum, the person of ordinary skill in the art of the '285 patent would have been a scientist or engineer with an advanced degree and/or experience in chemistry, pharmaceutical science, bioengineering and/or similar fields. This person would be familiar with cytotoxic drugs (and their hazards), lyophilization and ready-to-use dosing forms, techniques of analytical chemistry and instrumental analysis. They would have laboratory experience with various analytical chemistry techniques and a working knowledge of chemical reaction kinetics, with an emphasis on theoretical and experimental techniques for determining stability parameters for organic compounds. This would include familiarity with abstract mathematical tools and theoretical techniques for determining stability (such as the concepts of $t_{90}$ and $t_{50}$ and the Arrhenius equation and resulting plots) and practical experience in conducting stability studies. (See Clark Expert Report, Exhibit C, at pp.13-14 and Beijnen Expert Report, Exhibit D, at pp. 23-25).

**(a)      The term "physiologically acceptable" in Claims 1, 9, and 11-13 means "suitable for administration to humans or animals."**

Sicor believes that one of ordinary skill in the art would have understood the term "physiologically acceptable" as used with "solution," "aqueous solvent," and "acid" in the '285 patent, to refer to solutions, aqueous solvents and acids that are "suitable for administration to humans or animals."[5] Pharmacia[6] now contends its use of the term "physiologically acceptable" in the '285 patent must also be construed to incorporate the limitations "stable," "sterile" and "pyrogen-free."[7]   (Joint Claim Construction Chart, Exhibit K.) Sicor disagrees.

Looking first to the language of the claims, while the phrase "physiologically acceptable" appears three times in Claim 1, at no point in this claim do the express limitations "stable," "sterile" or "pyrogen-free" appear. However, Claim 8 -- which is unasserted by Pharmacia in this action -- provides a sharp and telling contrast. In Claim 8, Pharmacia does not use the express limitation "physiologically acceptable," but rather uses the terms "sterile" and "pyrogen-

---

[5] This definition is based on the common ground reached by Pharmacia and Sicor on this particular claim term during negotiations on joint claim constructions.

[6] References to Pharmacia as discussed herein, in association with the prosecution history are intended to refer to Pharmacia & Upjohn Company LLC and its various predecessors-in-interest to the Gatti Patent Family.

[7] Sicor believes there is no dispute that "pyrogen-free" means free of any fever-causing microbes.

free." ('285 patent, 24:5-6.) Similarly, in Claims 9 and 10, Pharmacia uses the express limitation "stability" that does not appear in Claim 1. ('285 patent, 24:13 and 24:16.) From this distinct difference between Claim 1 on the one hand and Claims 8, 9 and 10 on the other, an initial conclusion can be drawn that where Pharmacia chose to claim something as a stable, sterile, and pyrogen-free solution, it both knew how to and in fact used that specific language.

"When different words or phrases are used in separate claims, a difference in meaning is presumed. This principle of claim construction would suggest that the difference in the use of terms has significance. . . ." *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (citing *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)), superseding 374 F.3d 1105 (Fed. Cir. June 28, 2004),[8] reh'g and reh'g en banc denied.

The difference in the use of claim language may not be dispositive, however, as "[d]ifferent terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper." *Id.* (citing *Tandon*, 831 F.2d at 1023-24). With respect to the '285 patent, the written description and prosecution history both support the final conclusion that one of ordinary skill would understand there to be a difference in meaning between "physiologically acceptable" on the one hand and "stable" and "sterile, pyrogen-free" on the other. The specification of the '285 patent discusses various physiologically acceptable anthracycline glycoside salts ('285 patent, 2:1-9); physiologically acceptable solvents ('285 patent, 2:10-34; 2:46-49); and physiologically acceptable acids ('285 patent, 2:50-58). The written description teaches that by mixing these physiologically acceptable anthracycline glycosides, physiologically acceptable solvents and physiologically acceptable acids, and then "passing the resulting solution through a sterilising [sic] filter" a sterile, pyrogen-free solution is formed. ('285 patent, 3:59-67).[9] The written description's teaching of a separate filtering process in order to create a sterile solution from the physiologically acceptable anthracycline glycoside, aqueous solvent, and acid

---

[8] Between the two opinions the Federal Circuit decided *Phillips en banc*.

[9] Each of the fourteen examples of the '285 patent use this technique of mixing physiologically acceptable constituents and then passing the mixture through a $0.22\mu$ microporous sterilizing membrane before experimentation. (See e.g., '285 patent, 6:59-66 ("EXAMPLE 2"); 8:1-10 ("EXAMPLE 3"); and 22:9-20 ("EXAMPLE 14").)

would lead one of ordinary skill to the conclusion that Pharmacia did *not* intend to use the term "physiologically acceptable" to connote sterility and pyrogen-free on its own.

While the '285 patent further states that "a sterile, pyrogen-free, doxorubicin solution" is "a ***particularly preferred feature*** of the invention," ('285 patent, 3:25-30 (emphasis added).), a preferred feature of an invention does not dictate how a claim should be interpreted. Indeed, the correct claim construction is rarely a construction that limits the patentee to their preferred embodiment. *See, e.g., Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 973 (Fed. Cir. 1999) ("The general rule, of course, is that the claims of a patent are not limited to the preferred embodiment, unless by their own language.") As with any general rule, there are exceptions that arise from the use of a clear disclaimer, as well as from prosecution history estoppel, but those exceptions do not apply to the construction of "physiologically acceptable" here.

In fact, the prosecution history of the '285 patent only further confirms that "physiologically acceptable" would have a different meaning from "stable,""sterile, pyrogen-free." The most telling aspect of the prosecution history in this accord occurred following the Examiner's rejection of all of the then pending claims as obvious over Beijnen, Arcamone et al, Bosanquet in view of Arcamone et al '519 and Benvenuto et al. (U.S. Patent Application Serial No. 878,784, Paper No. 18 at p. 3 (PI 917-920).) In response, Pharmacia amended the pending claims by limiting them to adjustment to pH 2.7-3.14 with hydrochloric acid and then argued that:

> In Beijnen et al., cited by the Examiner, the pH range is 0-3.5. Beijnen et al does not teach one anything about the use of hydrochloric acid for adjusting the pH of the solution. It only teaches the use of perchloric acid. Moreover, perchloric acid is not physiologically acceptable . . . .

(U.S. Patent Application Serial No. 878,784, Paper No. 20 at p. 4-5 (PI 926)(emphasis in original).) Because Pharmacia's argument referred to perchloric acid generically (as opposed to the particular perchloric acid used in Beijnen), one of ordinary skill would further conclude from this argument that in general perchloric acid is not considered suitable for administration to humans or animals even if that perchloric acid is otherwise made sterile and pyrogen-free. As such, consistent with the claims and written description, Pharmacia described the perchloric acid as being "physiologically ***un***acceptable." *Id.* (emphasis added). Moreover, although the Beijnen

prior art used unsterilized anthracycline glycoside, acid and solvent and failed to use a sterilizing filter, Pharmacia said nothing about this in their argument. *Id.*

Another aspect of the prosecution history that confirms Sicor's construction involves the declaration submitted on December 9, 1992, by named inventor Dr. Carlo Confalonieri. (Exhibit L.) There Dr. Confalonieri distinguishes the then pending claims (still directed to "physiologically acceptable solutions") over the Beijnen prior art reference, making the very same, primary point that "physiologically acceptable" means "suitable for administration in humans or animals." Dr. Confalonieri attests:

> the technique of Beijnen, adjusting the pH with perchloric acid, would not be practiced by one skilled in this art to obtain storage stable *physiologically acceptable* doxorubicin hydrochloride solutions for several reasons. First, perchloric acid is not a pharmaceutically acceptable material for incorporation into pharmaceuticals which are to be administered intravenously to patients. That is, it would be impossible to prepare a clinically acceptable solution using perchloric acid.

(*Id.* at PU0016644-45, ¶5 (emphasis added).)[10]  In other words, even if one otherwise sterilized and made the perchloric acid pyrogen-free it would still be unfit for clinical use because it's physiologically *un*acceptable.

Thus, based on the claims, written description and prosecution history of the '285 patent, one of ordinary skill in the art would have understood "physiologically acceptable" to mean simply "suitable for administration to humans or animals."[11]  As such, Pharmacia's attempt to

---

[10] Dr. Confalonieri's declaration continued on to distinguish Beijnen on the further bases that (2) doxorubicin had poor solubility in perchloric acid and (3) even the smaller amount of doxorubicin was not as stable in perchloric acid as it would have been in hydrochloric acid. (*Id.*)

[11] The claims, specification and prosecution history of the '285 patent never provide a specific meaning for "physiologically acceptable." However, the parties' common ground comports with the plain meanings of "physiological" found in dictionaries general available at or before the date of the claimed invention (i.e. 1985):

- "consistent with the normal functioning of an organism." "physiological" Random House Dictionary of the English Language (1983 Random House). (Exhibit M.)
- "characteristic of or promoting normal, or healthy, functioning" "physiological" Webster's New Twentieth Century Dictionary (1983 Simon & Schuster). (Exhibit N.)

now add the "stable," "sterile," and "pyrogen-free" limitation into Claim 1 should be resisted. In the end, Sicor's construction "'stays true to the claim language and most naturally aligns with the patent's description of the invention'" making it "'the correct construction.'" *Cryovac Inc.*, 2006 WL 956599, at *2 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

**(b)     The transition phrase "of" in Claims 1, 9, and 11-13 means "including, but not limited to."**

Patent claims generally have three parts: (1) the preamble; (2) a transition phrase; and (3) the body. For instance, the preamble of Claim 1 of the '285 patent is "[a] physiologically acceptable solution" and of Claim 8 is "[a] sealed container." The body of Claim 1 sets forth the limitations of that claim, which include, among other limitations, a non-lyophilized anthracycline glycoside, a physiologically acceptable aqueous solvent, a physiologically acceptable acid and a sealed container. The transition phrase of Claim 1 appears to be the word "of" between the preamble "[a] physiologically acceptable solution" and the body of the claim. This is an unusual transition phrase. Typically patent claims use one of three traditional transition phrases: "comprising," "consisting of," or "consisting essentially of." The transition phrase "comprising" denotes an open claim, i.e. the claimed invention may include other elements not explicitly set forth in the body. On the other end of the spectrum, the transition phrase "consisting of" denotes a closed claim, i.e. no other elements may be included in the claimed invention other than those elements recited in the body of the claim. The transition phrase "consisting essentially of" occupies a middle ground signaling that the invention may include elements not listed in the body that do not materially affect the basic and novel properties of the invention. *PPG Indus. v. Guardian Indus. Corp.* 156 F.3d 1351, 1354 (Fed. Cir. 1998); *see also* The Manual of Patent Examining Procedure, § 2111.03 (Exhibit H).

Sicor submits that the one of ordinary skill in the art in 1985 would have understood Claims 1-7, 9, and 11-13 of the '285 patent to be open (i.e. "including, but not limited to") claims. Notwithstanding otherwise fruitful claim construction discussions between counsel on many other terms, Pharmacia refused to offer any construction of the transition phrase "of."

---

- "in accord with or characteristic of the normal functioning of a living organism." "physiological" The American Heritage Dictionary: Second College Edition (1982 Houghton Mifflin Company). (Exhibit O.)

- 12 -

Looking first to the claim language, Claim 8 -- unasserted by Pharmacia in this action -- significantly uses the transition phrase "consists essentially of." ('285 patent, 23:5 - 24:23.)

The prosecution history confirms that the difference in transition phrases between the two independent claims of the '285 patent was intentional. In the preliminary amendment filed with the '742 patent application, Pharmacia filed two independent claims, 31 and 42, as follows:

> 31. A physiologically acceptable solution *of* an anthracycline glycoside selected from the group consisting of epirubicin hydrochloride, idarubicin hydrochloride and doxorubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid and the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

> *       *       *

> 42. A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which *consists essentially of* doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefor, wherein the solution has not been reconstituted from a lyophilizate, wherein said solution has a pH adjusted to 2.71 to 3.14 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

(U.S. Patent Application Serial No. 07/827,742, Paper No. 3, at p. 1 (PU 0014911-13) (emphasis added).) Furthermore, although Pharmacia amended application claim 31 four times and application claim 42 once, none of those amendments altered the transition language of either application claim. Application claims 31 and 42 of the '742 application finally issued as Claims 1 and 8, respectively, in the '285 patent.

Pharmacia's silence here is telling because Pharmacia is well aware of the legal force occasioned by different transition phrases. In the great grandparent application of the '285 patent, Pharmacia specifically argued, in part, that the then pending application claim[12] was patentable over the references cited by the examiner because the particular claim then at issue

---

[12] "A sealed glass container containing therein a stable, intravenously injectable, sterile, pyrogen-free doxorubicin anti-tumor composition in a solution which *consists essentially of...*" (U.S. Patent Application Serial No. 878,784, Paper No. 6, at p. 2 (PI 775)).

- 13 -

used the "consists essentially of" transitional language to "exclude any other materials not recited therein if they would materially affect the solution." (U.S. Patent Application Serial No. 878,784, Paper No. 11, at p. 3 (PI 877).) Claim 1 of the '285 patent pointedly does not use this exclusionary transition phrase.

A sharp contrast is also provided by Pharmacia's later prosecution of the '742 application, in which Pharmacia raised the existence of additional elements in the prior art (i.e. a "mannitol excipient"), but did *not* use those additional elements to distinguish the prior art, let alone argue that the rejection by the Examiner at that point was improper because application claim 31 was "closed" or even "partially closed." (U.S. Patent Application Serial No. 07/827,742, Paper No. 31, at p. 10-11 (PU 0015155-68).) Instead Pharmacia expended time and effort to perform and submit comparative testing to argue over that prior art solution. *Id.* Thus, it is clear that neither Pharmacia nor the Examiner ever understood Claim 1 of the '285 patent to be closed or even partially closed.

Finally, the specification of the '285 patent specifically discloses that "[t]he solution of the invention may also contain one or more additional components such as a co-solubilizing agent, a tonicity adjustment agent and a preservative." ('285 patent, 2:12-15.) Further, at least Examples 4, 5, 6, 7, 9, 10, and 11 from the specification of the '285 patent, each contain co-solubilizing agents. ('285 patent, 9:5-18:26.) Construction of the transition phrase "of" in Claim 1 to be anything other than open would preclude the claim from covering solutions that used the co-solubilizing agents, toxicity adjustment agents, and preservatives described at 2:19-45 of the specification, not to mention other embodiments specifically discussed in the '285 patent.

Consequently, Sicor's proposed construction of the transition term "of" to mean "including, but not limited to" would be the definition understood by a person of ordinary skill in the art.

   (c)    **The term "anthracycline glycoside" in Claims 1, 9, and 11-13 requires a non-lyophilized preparate.**

A person of ordinary skill in the art in 1985 after reading the '285 patent would have understood that the invention of the '285 patent as a whole requires that the anthracycline glycoside used in making the claimed solutions must be ***non-lyophilized***.

Yet, the term "non-lyophilized form" does not appear in a single claim of the '285 patent. Nevertheless, inclusion of a "non-lyophilized " limitation in the claims unavoidably follows the

- 14 -

written description of the '285 patent, which "makes clear that the invention does not include" lyophilized forms of anthracycline glycoside, and so "that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).

Simply put, the specification of the '285 patent clearly disclaims coverage of solutions made with lyophilized forms of anthracycline glycoside. Indeed, the '285 patent itself touts its non-lyophilized preparation as the major scientific advance and innovation, and focuses from the outset on disparaging lyophilized anthracycline glycosides. Beginning with its background, the '285 patent cites the serious safety risks associated with using lyophilized anthracycline glycosides in preparations:

> Both the ***manufacturing*** and the ***reconstitution*** of such preparations expose the involved personnel (workers, pharmacists, medical personnel, nurses) to risks of contamination which are particularly serious due to the toxicity of the antitumor substances.

> *        *        *

> As the ***risks connected with the manufacturing and the reconstitution of a lyophilized preparate would be highly reduced if a ready-to-use solution of the drug were available***, we have developed a stable, therapeutically acceptable intravenously injectable solution of an anthracycline glycoside drug, e.g. doxorubicin, ***whose preparation and administration does not require <u>either</u> lyophilization or reconstitution***.

('285 patent, 1:25-29 and 1:47-53 (underlining, italics and bold type added)). Thus, the '285 patent claims to remedy the severe adverse effects observed in medical personnel and factory workers from exposure to lyophilized anthracycline glycosides by teaching stable anthracycline glycoside solutions "whose preparation and administration does not require *either* lyophilization or reconstitution." *Id. See SciMed*, 242 F.3d at 1342 ("Second, in discussing the disadvantages of certain prior art structures, the written description of each of the [SciMed] patents explains that the prior art . . . 'suffer[s] from several disadvantages.'").

The '285 specification also extols the virtues arising from the inventive solutions' avoidance of lyophilized anthracycline glycosides. In particular, the '285 patent states that with all of the solutions of the invention:

> it is possible to obtain compositions having a very high concentration of the anthracycline glycoside active substance even at 50 mg/ml and more. ***This constitutes a great advantage over the presently available lyophilized preparates*** wherein high concentrations of anthracycline glycoside can only be obtained with difficulty because of solubilization problems encountered in reconstitution, mainly with saline. The presence of the excipient, e.g. lactose, in the lyophilized cake . . . has a negative effect on solubilization so that difficulties may arise in obtaining dissolution of the lyophilized cake, especially for concentrations of anthracycline glycoside higher than 2 mg/ml.

('285 patent, 4:5-19 (emphasis added).)  Notably, the scope of Claim 1 expands to fully exploit the inherent advantages of non-lyophilized anthracycline glycosides by including drug concentrations that extend well past 2 mg/ml and even past 50 mg/ml all the way to 100 mg/ml. ('285 patent 23:13-15).  Given that the written description of the '285 patent teaches that solutions with higher drug concentrations would be difficult, if not impossible, to make with a lyophilized form of anthracycline glycoside, the invention of Claim 1 of the '285 patent disclaimed coverage of any lyophilized form of anthracycline glycoside.

Both the abstract of the '285 patent and the portion of the written description that summarizes the invention also exclude lyophilized anthracycline glycoside from the scope of the invention. (See, e.g., '285 patent, Abstract and 1:54-58).  In fact, notwithstanding numerous lists of variations set forth in the summary (e.g. various salts, solvents and acids, additional co-solubilizing and tonicity adjusting agents and preservatives), the '285 patent never discloses a single embodiment that uses a lyophilized preparate to form a solution.  ('285 patent, 1:54-2:59.) Thus, the '285 patent describes the present invention as only having non-lyophilized embodiments. *See SciMed*, 242 F.3d at 1343 ("Third, the 'Summary of the Invention' portion of the [SciMed] patents describes 'the present invention' as having [only the preferred embodiment].")

Consequently, after reading the background, summary and detailed description sections of the '285 patent those of ordinary skill in the art would be left with the clear impression that the subject matter of the '285 patent is solely directed to solutions utilizing a non-lyophilized preparate of anthracycline glycosides.  (See, e.g., Clark Expert Report, Exhibit C at p.13-14).

Pharmacia reaffirmed its disclaimer of claim coverage for lyophilized preparates of anthracycline glycosides throughout the prosecution of the '285 patent.  From the outset,

Pharmacia focused examination on the *material* significance of not having to lyophilize the anthracycline glycoside under the present invention. (U.S. Patent Application Serial No. 878,784, Paper No. 11 at p. 5 (PI 879)) To that end, Pharmacia broadly noted that :

> Since it is now recognized according to the present invention that under certain conditions a solution of doxorubicin can be rendered extraordinarily stable, *the step of preparing the solution from a lyophilized powder is no longer necessary*. It would simply be an unnecessary expenditure of energy to lyophilize the material first and then prepare a storage stable solution from it.

(*Id.* (emphasis added).)

The lyophilization limitation was not substantively considered during prosecution for more than six years. Then, in response to the Examiner's obviousness rejection of the then pending claims over Japanese Patent No. 60-92212 in combination with Baurain, U.S. Patent No. 4,296,105 (U.S. Patent Application Serial No. 07/827,742, Paper No. 18 (PU 0015046-50)), Pharmacia argued that both of the prior art references used in the rejection were inapposite because they disclosed "solutions which are reconstituted from lyophilizates." (U.S. Patent Application Serial No. 07/827,742, Paper No. 24, p. 2 (PU 0015066-71).) Thus, with respect to Baurain, Pharmacia argued primarily that:

> The recitation of a sealed container, together with the requirement that the solution has not been reconstituted from a lyophilizate, effectively distinguishes Baurain et al.

(U.S. Patent Application Serial No. 07/827,742, Paper No. 24, p. 3.) The Examiner responded directly to the lyophilization distinction by contending that "a lyophilizate which is reconstituted in water is [sic] not been [sic: found] to be patentably distinct from an unlyophilized solution." (U.S. Patent Application Serial No. 07/827,742, Paper No. 26, p. 3 (PU 0015075-79).) The Examiner's argument, put another way, is that the resulting solution is the same whether the lyophilized or non-lyophilized form of anthracycline glycoside is dissolved. See *In re Thorpe*, 777 F.2d 695, 698 (Fed. Cir. 1985) (patentability of a product claim does not dependent on its method of production). The Examiner's reaction, however, did not change the fact that the written description of Pharmacia's patent application and prior prosecution statements made clear that its claimed invention disclaimed coverage of lyophilized anthracycline glycosides.

- 17 -

In reaction to the Examiner's comment, Pharmacia simply deleted the "has not been reconstituted from a lyophilizate" language from the literal wording of its claims. (U.S. Patent Application Serial No. 07/827,742, Paper No. 32 (PU 0015155-68).)

Pharmacia's response flatly contradicts the specification and the prior prosecution history of the '285 patent. First, Pharmacia continued to claim that the use of lyophilized anthracycline glycosides implicates the very safety hazards that the inventors set out to avoid, and that its invention solved. Second, based on the discussion in the specification, one would expect dissolution of the lyophilized form of anthracycline glycoside to be slower and less complete as well as resulting in the presence of lactose in solution. ('285 patent 4:5-19.) Third, lyophilizates are more expensive to produce than the non-lyophilized forms of the same active pharmaceutical ingredient, which advantage Pharmacia touted with this invention. (U.S. Patent Application Serial No. 878,784, Paper No. 11, p. 5 (PI 879).)

Pharmacia's sleight of hand with the PTO notwithstanding, one cannot read the '285 patent's abstract, background, invention summary, general description, examples, and prosecution history without understanding the '285 patent's clear disclaimer of lyophilized preparations. As such, one of ordinary skill in the art in 1985 would have understood the claims of the '285 patent to be limited to non-lyophilized anthracycline glycoside constituents.[13]

**(d)     The term "sealed" in Claims 1, 9, and 11-13 means "closed in some fashion such that it does not allow the passage of the solution."**

Sicor submits that one of ordinary skill in the art in 1985 would understand the term "sealed" to mean "closed in some fashion such that it does not allow the passage of the solution." Pharmacia now contends its use of term "sealed" in the '285 patent must be construed to also include an additional element "further secur[ing] against access, leakage and passage by a fastening, membrane, or coating that must be broken to be removed." (Joint Claim Construction Chart, Exhibit K.) Although slightly obfuscated by Pharmacia's proposal, the clear intent is to incorporate the "aluminum cap" limitation of the preferred embodiment of the '285 patent into the claims.

---

[13] If the Court rejects Sicor's construction of this claim term, then the case would be ripe for summary judgment on the issue of invalidity under 35 U.S.C. §112, because the claims fail to meet the written description requirement. There is simply no support in the specification of the '285 patent for solutions of certain anthracycline glycosides where the solutions are made by first reconstituting a lyophilized preparation containing the salt of the anthracycline glycoside.

Looking first to the language of the claims, we note that the four limitations (i.e. "fastening", "membrane", or "coating" each of which "must be broken to be removed") do not appear anywhere in any of the claims of the '285 patent nor anywhere in its written description.

While the written description of the '285 patent teaches that "[p]referably the solution of the invention is provided in a sealed container," ('285 patent, 1:59-60.) it says nothing about the substance or nature of the material that seals the container. The most detail provided by the '285 patent with respect to "sealed" containers is that:

> **Suitable packaging** for the anthracycline glycoside solutions **may be all approved containers intended for parenteral use**, such as plastic and glass containers, ready-to-use syringes and the like. *Preferably* the container is a sealed glass container, e.g. a vial or an ampoule.

('285 patent, 3:21-25 (emphasis added).) The '285 patent also provides fourteen examples -- which "illustrate but **do not limit in any way** the invention" ('285 patent, 4:62-63) -- that describe only that "vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminum caps." (See, e.g., '285 patent, 6:5-10.)

So, the sum total of the written description of the '285 patent describes that all approved containers may be used including, but not limited to, vials, ampoules, and syringes and that in some circumstances glass vials may be sealed with a teflon-faced rubber stopper and aluminum cap. On this record, it cannot be said that the claims incorporate the limitations of fasteners, membranes or coatings that "must be broken to be removed" any more than the claims could be restricted to the preferred embodiment actually set forth in the '285 patent that uses a rubber stopper and an aluminum cap.

The prosecution history of the '285 patent provides additional insight as to the meaning of "sealed container." The Examiner had rejected a set of claims (which claims had a limitation "sealed glass container") on the grounds that the claims were anticipated (as well as made obvious) by *Beijnen et al.* and *Arcamone et al.* Pharmacia argued in response that "[sealed glass container] is a meaningful limitation, because one of ordinary skill in the art would never go to the trouble of sealing an unstable solution of an anticancer drug in a container. . . ." (U.S. Patent

- 19 -

Application Serial No. 878,784, Paper No. 11 at p. 3 (PI 877).)[14]  Pharmacia also argued over *Arcamone et al.* by noting first that it "says nothing about a sealed glass container." (*Id.* at p. 7 (PI 881)(emphasis in the original).)  Then, Pharmacia attempted to refute the specific disclosure of *Beijnen*:

> It is respectfully submitted that *Beijnen et al* does not anticipate the claims of the present invention.  In the right-hand column, page 109 of *Beijnen et al*, it can be seen that the solutions were kept in "stoppered polypropylene test tubes, since unlike glass containers, no absorption to polypropylene occurs".  Thus, at the outset, the solutions in *Beijnen et al* are in plastic rather than glass containers. Second, the solutions of *Beijnen et al*, contain perchloric acid . . . [which] is not an intravenously injectable material . . . .

(U.S. Patent Application Serial No. 878,784, Paper No. 11 at p. 8-9 (PI 882-83)(emphasis in original).)  Most significantly to the construction at issue, Pharmacia did not argue to the Examiner that Beijnen's "stoppered" test tubes did not constitute "sealed containers" because they lacked a "fastener", "membrane", or "coating" that "must be broken to be removed." Rather this is an argument that Pharmacia has created out of whole cloth and first previewed in this motion.  The clear implication of Pharmacia's silence during prosecution is hard to hide from here; simply put, Pharmacia believed that the "stoppered test tubes" of the Beijnen prior art were "sealed" containers.

Further demonstrating that it viewed the "sealed container" limitation the same way Sicor presents it here, the prosecution history also reflects Pharmacia's response to an earlier rejection of its claims by the Examiner.  Arguing that its "sealed container" limitation was a meaningful one, Pharmacia added it to what was then application claim 31 (the limitation was already a part of then co-pending application claim 42).  (U.S. Patent Application Serial No. 07/827,742, Paper No. 24, at p.1).  In relevant part, Pharmacia argued that "[a] sealed container effectively precludes lyophilization, since to lyophilize an unlyophilized solution would necessarily involve removal of water from the container and destruction of the seal." (U.S. Patent Application Serial No. 07/827,742, Paper No. 24, at p. 2-3 (PU 0015068-69).)  From this argument it follows that

---

[14] It should be noted that this argument contradicts the written description of the '285 patent, itself, where the background risks of inadvertent anthracycline glycoside exposure are discussed extensively.

- 20 -

the sealed nature of the container must block the "removal of water" (i.e. the passage of the solution) from a container. This is precisely Sicor's construction of the term.

Finally, Sicor believes that the plain and customary meaning of "sealed" as shown by dictionaries at the date of the claimed invention corroborate the correct claim construction that "sealed" means "closed in some fashion such that it does not allow the passage of the solution," as follows:

- "anything that tightly or completely closes or secures a thing; to close by any form of fastening that must be broken before access can be gained" "seal" Random House Dictionary of the English Language (1983 Random House). (Exhibit M.)
- "something that seals, closes, or fastens tightly; to shut, to close, to close completely; as to seal one's lips" "seal" Webster's New Twentieth Century Dictionary (1983 Simon & Schuster). (Exhibit N.)
- "an airtight closure . . . . to close hermetically" "seal" The American Heritage Dictionary: Second College Edition (1982 Houghton Mifflin Company). (Exhibit O.)

**(e)     The term "storage stability" in Claim 9 means that at least 90% of the original amount of anthracycline glycoside dissolved in solution remains in the solution when stored at a temperature of about 4 °C or 8 °C for a period of at least 180 days.**

The parties' dispute over the term "storage stability" centers around the elapsed time necessary to make a solution "storage" stable, but also includes the temperature at which the stability is measured.

First, we turn to the language of the claims themselves. However, the language of the claims provides no guidance beyond the plain use of the phrase "storage stable." Next, we turn to the specification of the '285 patent. The specification provides little to no guidance because the phrase "storage stability" does not appear in the written description of the '285 patent outside of the claims themselves. In fact, the nearest the written description of the '285 patent comes to "storage stability" is the discussion that:

> [t]he solutions of the invention are characterized by a good stability. Solutions in various solvents and with different pH's and concentrations have been found to be stable for long periods at temperatures accepted for the storage of pharmaceutical preparations. *This is illustrated in the Examples that follow.*

'285 patent, 4:20-25 (emphasis added).

All of the illustrative examples of the '285 patent measure the time when **90% (i.e. the $t_{90}$ value)** of the initial assay could be expected. '285 patent, 5:46-47. See also, Declaration of Carlo Confalonieri dated November 21, 1988, in U.S. Patent Application Serial No. 06/878,784,

- 21 -

at p. 9 (PI 939) ("Whereas, in accordance with what is widely accepted in the scientific community in the USP and in other pharmacopoeias, *a drug is defined as stable over the period in which it maintains an assay of 90% or higher of the initial*") (emphasis added). Moreover, the only temperature storage conditions disclosed in the '285 patent are **4 ºC** and **8 ºC**, both of which fall within the range of refrigeration temperatures. (Beijnen Expert Report, Exhibit D, at p. 26 ("kept for extended periods in sealed containers at refrigerated temperatures (4 ºC to 8 ºC)").) In fact, all of the experimental data set forth in the '285 patent is extrapolated to both 4 ºC and 8 ºC.

As to the period of stability, the first thirteen examples of the '285 patent reflect data gathered using accelerated stability testing and extrapolation of the results to 4 ºC and 8 ºC using the Arrhenius equation (a kinetic chemistry equation). These first thirteen examples also provided actual experimental data only for twelve weeks (3 months) of storage for various concentrations of doxorubicin hydrochloride solutions at 4 ºC.

Between the original UK patent application it filed on August 2, 1985 and the original U.S. patent application it filed on June 26, 1986, Pharmacia added a fourteenth set of data, "EXAMPLE 14" to the U.S. patent application. EXAMPLE 14 provides longer actual stability data (i.e. 6 months) for 2 mg/ml doxorubicin hydrochloride solution at both 4 ºC and 8 ºC. ('285 patent, 22:27-65.) Notably, Pharmacia had more than 10 months between the filing dates of the British and U.S. Patent Applications to perform the additional stability tests, yet it only submitted tests covering 6 months. Given the paucity of other description in the prosecution history and the specification and Pharmacia's addition of 6 month (180 days) stability data; it appears that 6 months or 180 days constitutes storage stability.

Accordingly, storage stability in the '285 patent would be understood by one of ordinary skill in the art in 1985 to be based on storage for at least 6 months, in 4 ºC and 8 ºC, and requires that 90% of the original amount of the drug dissolved in solution remains in solution.

## V.  CONCLUSION

For the foregoing reasons, Sicor respectfully request the Court adopt the constructions discussed above for the disputed claim terms, as follows:

| Claim Language | Sicor's Proposed Construction |
| --- | --- |
| physiologically acceptable | suitable for administration to humans or animals |

- 22 -

| Claim Language | Sicor's Proposed Construction |
|---|---|
| of | including, but not limited to, |
| anthracycline glycoside | requires a non-lyophilized preparate |
| sealed | closed in some fashion such that it does not allow the passage of the solution |
| storage stability | at least 90% of the original amount of anthracycline glycoside dissolved in solution remains in the solution when stored at a temperature of about 4 °C or 8 °C for a period of at least 180 days |

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

_____

Steven J. Balick (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Reid L. Ashinoff
Michael S. Gugig
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Jordan A. Sigale
SONNENSCHEIN NATH & ROSENTHAL LLP
8000 Sears Tower
Chicago, Illinois 60606
(312) 876-8000

Dated:  May 31, 2006

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 31st day of May, 2006, the attached **DEFENDANTS'**

**OPENING CLAIM CONSTRUCTION BRIEF** was served upon the below-named counsel of

record at the address and in the manner indicated:

Jack B. Blumenfeld, Esquire                                      <u>HAND DELIVERY</u>
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19801

Joshua R. Rich, Esquire                                          <u>VIA ELECTRONIC MAIL</u>
McDonnell Boehnen Hulbert & Berghoff          <u>AND FEDERAL EXPRESS</u>
300 South Wacker Drive
Suite 3200
Chicago, IL 60606



                                                          */s/ Lauren E. Maguire*
                                                          ————————————————
                                                          Lauren E. Maguire