# EXHIBIT I

# REGULAR UTILITY

Form PTO-436 (Rev. 6/78)

| SERIAL NUMBER | PATENT DATE | PATENT NUMBER |
|---|---|---|
| 878784 | | |

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 06/878,784 | 06/26/86 | ~~424~~ 514 | 251 | ~~123~~ 183 | Peselev |

APPLICANTS: GAETANO GATTI, SESTO SAN GIOVA, ITALY; DIEGO OLDANI, ROBECCO SUL NAV, ITALY; GIUSEPPE BOTTONI, BERGAMO, ITALY; CARLO CONFALONIERI, CUSANO MILANINO, ITALY; LUCIANO GAMBINI, CORNAREDO, ITALY; ROBERTO DE PONTI, MILAN, ITALY.

**CONTINUING DATA**********************
VERIFIED

**FOREIGN/PCT APPLICATIONS************
VERIFIED GREAT BRITAIN 8519452 08/02/85

| Foreign priority claimed / 35 USC 119 conditions met / Verified and Acknowledged | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|
| ☒ yes ☐ no / ☒ yes ☐ no | | ITX | 0 | 30 | 2 | $ 618.00 | 769-080-0 |

ADDRESS: OBLON, FISHER, SPIVAK, MC CLELLAND & MAIER, CRYSTAL SQ. 5, STE. 400, 1755 S. JEFF. DAVIS HWY., ARLINGTON, VA 22202

TITLE: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

U.S. DEPT. of COMM.-Pat. & TM Office—PTO-436L (rev. 10-78)

PARTS OF APPLICATION FILED SEPARATELY

PREPARED FOR ISSUE

(Assistant Examiner) (Docket Clerk)

AT ALLOWANCE

| SHEETS DRWGS. | FIGURES DRWGS. | CLAIMS | CLASS | SUBCLASS |
|---|---|---|---|---|
| | | | | |

EXAMINED AND PASSED FOR ISSUE

(Primary Examiner) (Art Unit)

Estimate of printed pages: Drawings / Specs. — Issue fee due (est.)

Notice of allowance and issue fee due (est.): Date mailed / $ Fees paid

RETENTION LABEL

PI 730

S.N. 878,784 File History
Page 1



w/ Declns (2)
1-20-88

769-080-0
60/

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION:

GAETANO GATTI ET AL : GROUP ART UNIT: 123

SERIAL NO: 06/878,784 :

FILED: JUNE 26, 1986 : EXAMINER: PESELEV

FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE :

RECEIVED
JAN 19 1988
GROUP 120

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Responsive to the Official Action dated June 29, 1987, Applicants respectfully request reconsideration in light of the following amendments and remarks.

IN THE CLAIMS

Claim 31, line 9, change "3.1" to --3.14.--

REMARKS

After the above amendments, Claims 16-17, 20-25 and 29-31 remain active in this application. Reconsideration is respectfully requested.

Applicants' U.S. representative wishes to thank Examiner Peselev for the helpful and courteous interview which was held in her office on October 27,

1987. The matters which were discussed at that time are summarized and expanded upon in the remarks which follow.

The claims stand rejected under 35 USC 102(b) as anticipated by or, in the alternative, under 35 USC 103 as obvious over Beijnen et al and Arcamone et al. These rejections are respectfully traversed.

In order for a reference to anticipate a claim, within the meaning of 35 USC 102, all material elements of the claim must be found in one prior art source. In re Marshall (CCPA 1978) 577 F2d 301, 198 USPQ 344; In re Kalm (CCPA 1967) 378 F2d 959, 154 USPQ 10. There are a number of material elements in present Claim 31, which must be met by either of the two prior art references in order for either one of them to anticipate the claim.

The following are some of the relevant material elements of Claim 31:

"sealed glass container"

"intravenously injectable"

"sterile"

"pyrogen-free"

"said solution has not been reconstituted from a lyophilizate"

"pH is 2.7 - 3.14".

Further, the claims use partially closed claim language, "consists essentially of" with reference to the materials which may be contained in the solution. Thus, the claims exclude any other materials not recited therein if they would materially affect the solution.

The Examiner will recall that the present invention is directed to an extraordinarily stable doxorubicin or Adriamycin® solution. Both doxorubicin and Adriamycin® refer to an anti-cancer drug. Doxorubicin is the common name of the drug, while Adriamycin® is the trademark under which the drug is sold. The claims require that the solution be contained in a sealed glass container. This is a meaningful limitation, because one of ordinary skill in the art would never go to the trouble of sealing an unstable solution of an anticancer drug in a container. A certain minimum stability is required before one would even think to carry out such action. It should be kept in mind that according to the literature accompanying the commercially sold product (Adriamycin®) which is sold in a solid lyophilized form, a reconstituted solution thereof is stable for 24 hours at room temperature and 48 hours under refrigeration (4-10°C). See Exhibit A, page 3, the sixth paragraph.

The further limitation that the container be made of glass is also material. In the past, it was thought that glass rendered the Adriamycin® solutions less stable than other types of materials, such as polypropylene and other plastics. For example, the Examiner's attention is directed to the highlighted portions of Exhibits B and C, which show that doxorubicin can be adsorbed on and even partially decomposed on containers made of glass. The discovery in the present invention that glass is compatible with the extremely stable Adriamycin® solutions runs counter to these teachings. Thus, this limitation is also material.

The other material limitations listed above relate to the solution itself. First, the solution must be intravenously injectable. This is a meaningful limitation since it imposes stringent requirements on the nature and quantity of the impurities contained in the solution. For example, as will be discussed in greater detail below, some of the solutions in the prior art references contain materials which would render them non-intravenously injectable.

The solution must also be sterile and pyrogen free. Again, these limitations impose stringent requirements on the types and amounts of impurities which may be contained in the solution in the sealed glass container. Unless one purposefully sterilizes

the solution and renders it pyrogen free, it cannot be concluded that such a solution meets these limitations. In fact, it can be concluded without doubt that such a solution is <u>not</u> sterile or pyrogen free.

The solutions according to the present invention are also <u>not</u> reconstituted from a lyophilizate according to the claims. In the past, doxorubicin was sold in the form of a solid which had been lyophilized. This can be seen in Exhibit A on page 3, under the heading "How Supplied". It was thought that doxorubicin was too unstable in solution to be storage stable. Accordingly, after the doxorubicin was prepared at the manufacturing plant, it was lyophilized for storage purposes. Since it is now recognized according to the present invention that under certain conditions a solution of doxorubicin can be rendered extraordinarily stable, the step of preparing the solution from a lyophilized powder is no longer necessary. It would simply be an unnecessary expenditure of energy to lyophilize the material first and then prepare a storage stable solution from it. However, unless one knew that a particular solution of doxorubicin were very stable, one would still expect to have to prepare the solution from a lyophilizate. Again, it is submitted that this limitation in the claims is a material limitation.

Another important material limitation in the present claims is the pH of the solution. Over the relatively narrow range of pH recited in the present claims, 2.7-3.14, it has been unexpectedly found that the doxorubicin solutions exhibit enhanced stability. The pH of greatest stability of doxorubicin has been hotly debated in the literature. Reference 5 of the Information Disclosure Statement filed with the last response (March 13, 1987) (Poochikian et al), discloses that doxorubicin is most stable in 5% Dextrose Injection, USP, which has a pH of 4.5. See Table 2, the left-hand heading.

According to reference 3 of the Information Disclosure Statement (Beijnen et al 1985), the maximum stability of doxorubicin solutions is at about pH 4-5. See page 221 of the reference, the left hand column, the next to the last paragraph.

Reference 10 of the Information Disclosure Statement (Janssen et al) states that the results obtained in that study "indicated that pH 4 and 4°C provide optimum shelf life conditions" of aqueous doxorubicin solutions. See the summary of the paper on page 1, the third sentence. It can be seen based on the above references that the prior art has clearly not appreciated that a pH of 2.7-3.14 is the pH of maximum stability of a doxorubicin solution. Note that two of



these references are dated in 1985 and one is dated in 1981.

The cited references will now be examined in light of the above material limitations of the present claims to determine whether the references do in fact anticipate the present claims. Arcamone et al is a relatively early study from 1972, reporting on the stability of Adriamycin® hydrochloride at 22°C. The study run in Arcamone et al was an analytical study conducted in a laboratory. The reference states that solutions having a pH of 3-6 have a stability of greater than one month. These solutions contained 2 mg/ml of Adriamycin® hydrochloride, and 0.06 molar phosphate buffer.

First of all, Arcamone et al says nothing about a sealed glass container. Second, there is no indication that the solutions were sterilized or rendered pyrogen free. The Examiner's attention is directed to a Declaration (Declaration A) signed by an expert in the field of injectable pharmaceuticals, William J. Ring, who concludes that the solutions in the Arcamone et al reference do not meet several of the above-described material limitations of Claim 31.

It is also notable that the Arcamone et al reference, which was published in 1972, has definitely not lead to an appreciation that a pH of 2.7-3.14 is an

unexpectedly good pH range for stability of doxorubicin, as clearly shown by the above-described references which teach that the maximum stability of doxorubicin solutions is at a pH of from 4 to 5. In fact, the range of pH listed by Arcamone et al, 3-6 is so broad that it does not lead one of ordinary skill in the art to an appreciation of any particular narrow range which would give rise to extraordinary stability or even that such a range exists. Previous cases have held that there can be no anticipation where the reference disclosure is so broad that the likelihood of arriving at the claimed composition is highly unlikely. Ex parte Garvey (POBA 1939) 41 USPQ 5583; Ex parte Starr (POBA 1938) 44 USPQ 545. The narrow pH range of 0.44 pH units according to the present invention as compared to the broad range of 3-6, is believed to be such a situation where anticipation does not result because of a broad disclosure in the reference.

In accordance with the above comments, and Declaration A filed herewith, it is respectfully submitted that the Arcamone et al reference does not anticipate the claims of the present invention.

For similarly reasons, it is respectfully submitted that Beijnen et al does not anticipate the claims of the present invention. In the right-hand

column, page 109 of Beijnen et al, it can be seen that the solutions were kept in "stoppered polypropylene test tubes, since unlike glass containers, no adsorption to polypropylene occurs". Thus, at the outset, the solutions in Beijnen et al are in plastic rather than glass containers. Second, the solutions of Beijnen et al, contain perchloric acid, as indicated by page 114, the left hand paragraph. Perchloric acid is not an intravenously injectable material, as one of ordinary skill in the art would readily appreciate. Declaration B, signed by Dr. Nagesh Palepu, an expert in the field of drug formulations, substantiates the fact that the solutions of Beijnen et al are not intravenously injectable.

Finally, as discussed above in connection with the Arcamone et al reference, since the experiments involved in Beijnen et al are laboratory experiments, and there is no indication that the solutions were sterilized or rendered pyrogen free, it can be concluded that these features are not met by the solutions of Beijnen et al. Since the solutions are not sterile and are not pyrogen free, then they cannot be intravenously injectable either.

In light of these distinctions between the present claims and Beijnen et al, and in view of Declaration B, it is respectfully submitted that Beijnen et al does not anticipate the present claims.

The claims have also been rejected in the alternative for obviousness over Beijnen et al or Arcamone et al. These rejections are also respectfully traversed.

The thrust of the Examiner's rejection is one of inherency. Clearly, neither of the two references recognize the extraordinary stability of doxorubicin solutions under the conditions of the present claims, including a pH of 2.7-3.14. Based on subsequent references, as late as 1985, the pH of greatest stability of doxorubicin has been thought to be between 4 and 5. Furthermore, the stability of doxorubicin has been thought to be greater in polypropylene or polyvinylchloride rather than in glass. For these reasons, it can be seen that one of ordinary skill in the art has certainly not found it obvious to prepare a solution of doxorubicin at a pH of 2.7-3.14, to thereby achieve greatly enhanced stability.

The Examiner's attention is directed to the Declaration which was filed with the last amendment. A portion of this declaration, designated Exhibit D herein, is filed herewith for the Examiner's convenience. It can be seen that there is a trough in the graph of $k_{obs}$-pH profile, the trough being centered around 2.7-3.14. This same trough is exhibited whether the doxorubicin is in sterile water, dextrose or saline. If one goes to a pH of between 4 and 5,

previously recognized as the pH of greatest stability of a doxorubicin solution, the k observed, which is directly related to the decomposition of doxorubicin, increases precipitously. For example, in sterile water, it goes up by a factor of at least 3. It continues to rise beyond pH 5. One of ordinary skill in the art could not have predicted, based on the references, that this narrow pH range would give rise to such stability. In the absence of this realization, one of ordinary skill in the art would not have placed such a doxorubicin solution in a sealed glass container nor would this person have avoided reconstitution from lyophilized solid material. How can it be said that it is obvious to prepare such a solution as in the present invention when a group of references have stated that the maximum stability of doxorubicin solutions is between 4 and 5? Further, if the stability of such solutions had been previously appreciated, why would the manufacturer of Adriamycin® still prepare it in lyophilized form, and state that its stability upon reconstitution ranges from 24 hours to 48 hours at room temperature or under refrigeration, respectively? The extraordinary stability over the very narrow pH range of the present claims, has simply not been previously appreciated. Previously, the prior art has taught that doxorubicin solutions were maximally stable at higher

pH's than those involved (and claimed) in the present invention. Therefore, it is submitted that the present claimed invention is unobvious over either or both of the cited references.

Applicants are filing herewith a second Information Disclosure Statement making of record a few additional references, which are not believed to be any more relevant than the previously cited references. However, Applicants wish to bring these references to the Examiner's attention to fully satisfy their duty of complete disclosure.

In light of the above amendments and remarks, and the Rule 132 Declarations filed herewith, it is respectfully submitted that this application is now in condition for allowance, and an early notice to that effect is earnestly solicited.

Respectfully submitted,

OBLON, FISHER, SPIVAK,
McCLELLAND & MAIER, P.C.

Robert R. Cook

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Robert R. Cook, Ph.D.
Registration No. 31,602

Crystal Square Five - Suite 400
1755 South Jefferson Davis Highway
Arlington, Virginia 22202
(703) 521-5940
60/jmw,mkn



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 06/878,784 | 06/26/86 | GATTI | 787-080-0 |

OBLON, FISHER, SPIVAK,
MC CLELLAND & MAIER
CRYSTAL SQ. 5, STE. 400
1755 S. JEFF. DAVIS HWY.
ARLINGTON, VA 22202

| EXAMINER | |
|---|---|
| PESELEV,E | |
| ART UNIT | PAPER NUMBER |
| 153 | 13 |

DATE MAILED: 04/11/88

This is a communication from the examiner in charge of your application.

COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined ☐ Responsive to communication filed on ________ ☐ This action is made final.

A shortened statutory period for response to this action is set to expire 3 month(s), ______ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice re Patent Drawing, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449
4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474
6. ☐ ________

Part II SUMMARY OF ACTION

1. ☒ Claims 16-17, 20-25 and 29-31 are pending in the application.

   Of the above, claims ________ are withdrawn from consideration.

2. ☐ Claims ________ have been cancelled.

3. ☐ Claims ________ are allowed.

4. ☒ Claims 16-17, 20-25 and 29-31 are rejected.

5. ☐ Claims ________ are objected to.

6. ☐ Claims ________ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings which are acceptable for examination purposes until such time as allowable subject matter is indicated.

8. ☐ Allowable subject matter having been indicated, formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on ________. These drawings are ☐ acceptable; ☐ not acceptable (see explanation).

10. ☐ The ☐ proposed drawing correction and/or the ☐ proposed additional or substitute sheet(s) of drawings, filed on ________, has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed ________, has been ☐ approved. ☐ disapproved (see explanation). However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

12. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. ________; filed on ________.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

P1 899

PTOL-326 (Rev. 7-82) EXAMINER'S ACTION

Serial No. 878,784 2

Art Unit 123

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
>
> Subject matter developed by another person, which qualifies as prior art only under subsection (f) and (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103, the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of potential 35 U.S.C. 102(f) or (g) prior art under 35 U.S.C. 103.

Claims 16-17, 20-25 and 29-31 are rejected under 35 U.S.C. 103 as being unpatentable over Bejnen et al or Arcamone et al in view of Arcamone et al '519 or Benvenuto et al. Arcamone et al show adriamycin hydrochloride solution at pH 3-6. Bejnen et al show adriamycin solution at a pH 2.7-3.1. Applicants claim a sealed glass container containing stable intraveneously injectable solution of adriamycin at a pH 2.7-3.1. Since a

pH range claimed by applicants is within the range shown by Bejnen et al and Arcamone et al, and since doxorubicin contained in a sealed glass container is known, as shown by Benvenuto et al, it would be within the ordinary skill of the art to place solutions shown by Bejnen et al or Arcamone et al in a sealed glass container, shown by Benvenuto et al. Note, that intraveneously injectable solution of adriamycin is known as shown by Arcamone et al. The instant solutions are deemed obvious therefrom.

Applicant's arguments filed December 23, 1987 have been fully considered but they are not deemed to be persuasive.

Applicants point out that in addition to claiming a specific pH range, the claims are also limited to "sealed glass container", "intraveneously injectable", "sterile," "pyrogen-free" and "said solution not being reconstituted from a lyophilizate." However, it is the Examiner's position that the stability of adriamycin solution claimed by applicants is due to a certain pH range i.e. 2.7-3.14 as was shown by the Declaration submitted on March 13, 1987. Since that pH range is within the pH range shown by the art of record, the adriamycin solution shown by the art of record (Bejnen et al and Arcamone et al) would be expected to exhibit the same

stability as the claimed solutions. The Declarations submitted by applicants on December 23, 1987 have been considered but are not deemed to be persuasive since they are seen to present statement of what Arcamone et al and Bejnen et al teach i.e. that each of the references does not teach pyrogen-free intravenously injectable adriamycin solutions. However, it is well known in the art how to make adriamycin solutions suitable for intravenous administration (see Arcamone et al Patent No. 4,058,519). It is still seen to be within the ordinary skill of the art to take adriamycin solutions shown by Bejnen et al or Arcamone et al and to put said solution in a sealed glass container shown by Benvenuto et al. The instant composition is deemed obvious therefrom.

The copies of the French patent and Martindale, listed on PTO-1449 submitted by applicants must be supplied and their English translations, if the above references are to be considered by the Examiner.

The Group and/or Art Unit location of your application in the PTO has changed. To aid in correlating any papers for this application, all further correspondence regarding this application should be directed to Group Art Unit 183.

Serial No. 878,784 5

Art Unit 123

Any inquiry concerning this communication should be directed to Elli Peselev at telephone number 703-557-0664 .

E.P.

EPeselev/klc

703/557-3920

3-23-88

Johnnie R. Brown
J. R. BROWN
SUPERVISORY PATENT EXAMINER
ART UNIT 123

S.N. 878,784 File History
Page 174

PI 903



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 06/878,784 | 06/26/86 | GATTI | 769-080-0 |

OBLON, FISHER, SPIVAK,
MC CLELLAND & MAIER
CRYSTAL SQ. 5, STE. 400
1755 S. JEFF. DAVIS HWY.
ARLINGTON, VA 22202

| EXAMINER | |
|---|---|
| PESELEV | |
| ART UNIT | PAPER NUMBER |
| 183 | 18 |

DATE MAILED: 09/28/88

This is a communication from the examiner in charge of your application.

COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined ☒ Responsive to communication filed on 3-13-87 6-30-87 ☐ This action is made final.

A shortened statutory period for response to this action is set to expire 3 month(s), —— days from the date of this letter. Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449
4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474
6. ☐ ______

Part II SUMMARY OF ACTION

1. ☒ Claims 16-17, 20-25 and 29-31 are pending in the application.
   Of the above, claims ______ are withdrawn from consideration.
2. ☐ Claims ______ have been cancelled.
3. ☐ Claims ______ are allowed.
4. ☒ Claims 16-17, 20-25 and 29-31 are rejected.
5. ☐ Claims ______ are objected to.
6. ☐ Claims ______ are subject to restriction or election requirement.
7. ☐ This application has been filed with informal drawings which are acceptable for examination purposes until such time as allowable subject matter is indicated.
8. ☐ Allowable subject matter having been indicated, formal drawings are required in response to this Office action.
9. ☐ The corrected or substitute drawings have been received on ______. These drawings are ☐ acceptable; ☐ not acceptable (see explanation).
10. ☐ The ☐ proposed drawing correction and/or the ☐ proposed additional or substitute sheet(s) of drawings, filed on ______ has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).
11. ☐ The proposed drawing correction, filed ______, has been ☐ approved. ☐ disapproved (see explanation). However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.
12. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. ______; filed on ______.
13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.
14. ☐ Other

PI 917

S.N. 878,784 File History
Page 188

PTOL-326 (Rev. 7-82)

EXAMINER'S ACTION

Claims 29-30 are rejected under 35 USC 101 and 112, first paragraph as being based on a lack of demonstrated utility that the claimed methods are effective in inhibiting any tumors. Note, that the term "inhibiting" reads on prevention of the tumor growth, for which there is no support in the specification. The term "treating" is seen to be more appropriate. Also, due to unpredictability of treating various tumors, there is a good reason to doubt that the instant method is effective in the treatment of all sarcomas, lymphomas, neuroblastoma, melanoma, myeloma and leukemias in humans in the absence of a showing of such utility in humans by proper evidence with statistically significant data based on all the tests conducted.

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
>
> Subject matter developed by another person, which qualifies as prior art only under subsection (f) and (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103, the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of potential 35 U.S.C. 102(f) or (g) prior art under 35 U.S.C. 103.

Claims 16-17, 20-25 and 29-31 are rejected under 35 U.S.C. 103 as being unpatentable over Beijnen et al Pharm. Weekblad, Scient. Ed., Arcamone et al, Bosanquet' Cancer Chemother. Pharmac. in view of Arcamone et al '519 and Benvenuto et al.

Beijnen et al disclose a solution of doxorubicin in the pH region 0-3.5. Arcamone et al disclose a solution of doxorubicin at a pH region 3-6. Bosanquet teaches doxorubicin solution at a pH of 2.6 and 3.0-6.5 and also teaches doxorubicin solution in a glass container. Applicants claim doxorubicin solution having pH from 2.7 to 3.14 in a sealed glass container wherein the solution has not been reconstituted from a lyophilizate. Since pH range claimed by applicants is within the range shown by the art of record, since doxorubiun contained in a glass container is known, as shown by Bosanquet and Benvenuto et al, it would be obvious to a person having ordinary skill in the art to place intravenously injectable, sterile and pyrogen-free solution of doxorubiun which has not been reconstituted from

lyophilizate in a glass container at a pH of 2.7 -3.14.

Note, also, that intravenously injectable solution of doxorubiin is well known in the art as shown by Arcamone et al. The instant compositions and methods are deemed obvious therefrom.

Applicant's arguments filed June 30, 1988 have been fully considered but they are not deemed to be persuasive.

The declarations submitted on March 13, 1987 have been considered, however, same are not persuasive. The Declaration submitted showing commercial success of the claimed doxorubicin solution and the Declaration stating the problems encountered with lyophilized doxorubicin solutions have been considered, however, same are seen to be insufficient to overcome the art rejection. The instant composition is still seen to consist of an old compound in a solution. The fact that the claimed solution is free of contaminants contained in the solutions shown by the art of record doesn't patentably distinguish it from the reference's solution since it would be within the ordinary skill of the art to make a pure doxorubicin solution. The instant composition and method are still deemed obvious from the art of record.

Any inquiry concerning this communication should be directed to Elli Peselev at telephone number 703-557-3634.

CP.
EPeselev/klc
9-16-88

Johnnie R. Brown
JOHNNIE R. BROWN
SUPERVISORY PATENT EXAMINER
ART UNIT 183

RECEIVED
88 NOV 30 AM 11:08
GROUP 180

20
C
12-6-88

769-080-0
35/

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF :

GAETANO GATTI ET AL :

SERIAL NO: 06/878,784 : GROUP ART UNIT: 183

FILED: JUNE 26, 1986 : EXAMINER: PESELEV

FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE : :

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Responsive to the Official Action dated September 28, 1988, Applicants respectfully request reconsideration in light of the following amendments and remarks.

IN THE SPECIFICATION

Page 7, line 21, change "glutammic" to --glutamic--.

IN THE CLAIMS

Please amend Claim 31 as follows:

1 ~~31~~. (Amended) A sealed glass container containing therein a stable, intravenously injectable,

C'

sterile, pyrogen-free doxorubicin anti-tumor composition in a solution which consists essentially of [a physiologically acceptable salt of] doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefor, wherein said solution has not been reconstituted from a lyophilizate, and wherein said solution has a pH adjusted to (from) 2.7 3.14 with hydrochloric acid, and a concentration of said doxorubicin of from 0.1 to 100 mg/ml.--

Please cancel Claims 16, 17, 22, 29 and 30.

Please amend Claim 23 as follows:

Claim 23, line 1, change "22" to --31--.

REMARKS

After the above amendments, Claims 20, 21, 23-25 and 31 are active in this application. Reconsideration is respectfully requested.

Applicants have now amended Claim 31 to limit the physiologically acceptable salt doxorubicin to the hydrochloride. Furthermore, Applicants have amended the claim to require that the pH of the solution is adjusted to 2.7-3.14 with hydrochloric acid. These amendments are supported in the specification as filed on page 7, lines 22-23 and, in general, the examples. See also page 5, lines 16-18. Attention is further directed to page 16, lines 10-11. Clearly, the

additional limitations in Claim 31 are supported by the specification. No new matter has been added.

Claims 16, 17, 20-25 and 29-31 stand rejected under 35 U.S.C. 103 as being unpatentable over Beijnen et al, Arcamone et al, Bosanquet in view of Arcamone et al '519 and Benvenuto et al. These rejections are respectfully traversed in light of the above amendments.

As pointed out above, the present claims have now been limited to the doxorubicin hydrochloride which is dissolved in a solvent at a certain pH, wherein the pH has been adjusted with hydrochloric acid. Applicants respectfully submit that unexpected results, in terms of stability, flow from the adjustment with hydrochloric acid. The Examiner's attention is directed to a Rule 132 Declaration filed herewith. It can be seen from this Declaration in Tables 1 and 2, that the hydrochloride of doxorubicin at a pH of 3.0 is more stable than doxorubicin hydrochloride in a phosphate buffer at the same pH. Phosphate buffer at pH 3.0 is representative of Arcamone et al. Note that in Arcamone et al, the stability of doxorubicin hydrochloride over a pH range of 3-6 is reported in 0.06 molar phosphate buffer.

The stability difference is significant. The Examiner's attention is directed to Table 2, which shows that after 60 days at 22°C, the solution adjusted to pH 3.0 with hydrochloric acid still retains 95.4% of the intact doxorubicin hydrochloride. Under exactly the same conditions except for the buffer, the phosphate containing solution at pH 3.0 only retains 66.6% of intact doxorubicin after 60 days. This difference is respectfully submitted to be highly unexpected, particularly in view of the prior art cited by the Examiner. Arcamone et al teaches that over the pH range of 3-6, a phosphate buffer is to be used. Only over the pH range of 1-2 is hydrochloric acid used for pH adjustment. However, over the pH range of 1-2, the stability is reported to be practically insignificant. Based on Arcamone et al, one of ordinary skill in the art would clearly use a phosphate buffer rather than hydrochloric acid over the range claimed in the active claims herein.

In Beijnen et al, cited by the Examiner, the pH range is 0-3.5. Beijnen et al does not teach one anything about the use of hydrochloric acid for adjusting the pH of the solution. It only teaches the use of perchloric acid. Moreover, perchloric acid is not physiologically acceptable nor intravenously

injectable. This has been established on the record by Exhibit B, filed December 23, 1987.

Bosanquet does not address the question of how to adjust the pH, and even states that "very little can be categorically stated about the stability of adriamycin, and a very carefully designed study is urgently required to resolve these conflicting results."

Arcamone et al '519 and Benvenuto et al have been cited to show doxorubicin contained in a glass container. Neither of these references leads one to any appreciation of enhanced stability in a hydrochloric acid containing solution.

In considering newly amended Claim 31 herein, the Examiner should bear in mind the additional distinctions between the present invention and the prior art which have been discussed in previously-filed responses. The claims are limited to a very narrow pH range over which significantly higher stability has been demonstrated, as compared to pH's outside of the range. How could one have predicted that this narrow pH range would give rise to significantly higher stability? Several references even state that the most stable pH for doxorubicin is from 4 to 5. See Exhibits A, B and C, filed with the response of May 26, 1988.

The act of sealing the solution in a container itself requires an appreciation that the solution is extraordinarily stable. It would be a waste of time and energy to seal a doxorubicin solution in a container if one did not appreciate that doxorubicin is stable over a particular pH range. According to the prior art, solutions of doxorubicin decompose very quickly, thus requiring the solution to be prepared very shortly before use. Sealing a solution in a glass container is completely incompatible with this understanding.

The idea of using a glass container is also inconsistent with prior art teachings. According to the prior art, the stability of doxorubicin is greater in plastic than in glass. See Figure 2, page 1917 of Benvenuto et al, cited in the latest Official Action. Striving for a stable solution of doxorubicin, one would clearly choose plastic over glass.

Applicants have even demonstrated that the marketplace has been very receptive to the stable solutions of the present claims, which is indicative of solving a long-felt need, and hence, unobviousness. See Exhibits G and H filed with the response filed on May 26, 1988.

The present Declaration showing that pH adjustment with hydrochloric acid gives rise to unexpectedly greater stability as compared to a phosphate buffer, removes the claims even one step further from the prior art and adds yet another facet of unpredictability over the prior art.

Following the teachings of the prior art, one of ordinary skill in the art could not have known that a solution of doxorubicin of sufficient stability to meet actual pharmaceutical requirements could have been prepared. However, if someone had tried to prepare a stable doxorubicin solution, the person would have chosen a <u>different pH</u> (4-5), a <u>different material</u> in which to place the doxorubicin (plastic), and a <u>different buffer solution</u> (phosphate).

There is no evidence on this record that anyone has <u>ever</u> before prepared a stable doxorubicin solution in a sealed glass container. The Examiner has already recognized this since the rejection is for obviousness and not anticipation. There is no question that if one of ordinary skill in the art <u>knew</u> that the doxorubicin solution was particularly stable over a pH range of 2.7 to 3.1, such a person would be <u>able</u> to put the solution in a sealed glass container. The question to be considered is not whether this was technologically

feasible, but rather whether there was any reason to do so. Since there was no appreciation in the art that a doxorubicin solution having a pH of 2.7-3.1, adjusted with hydrochloric acid, would have extraordinary stability, there was no reason to seal the solution in a container, much less one made of glass. Thus, the present invention cannot be obvious over the prior art.

The rejection of Claims 29 and 30 under 35 U.S.C. 101 has been rendered moot by cancellation of these claims. Applicants respectfully submit that doxorubicin is well known to be useful to treat tumors and to even inhibit their growth. However, in order to streamline prosecution and to minimize the issues herein, Applicants have cancelled these claims. They reserve the right to file a divisional application directed to these claims in the future.

Respectfully submitted,

OBLON, FISHER, SPIVAK, McCLELLAND & MAIER, P.C.

Robert R. Cook

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Robert R. Cook, Ph.D.
Registration No. 31,602

Crystal Square Five - Suite 400
1755 S. Jefferson Davis Highway
Arlington, Virginia 22202
(703) 521-5940
35/maf/sjh

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF :
GAETANO GATTI ET AL :
SERIAL NO: 06/878,784 : GROUP ART UNIT: 123
FILED: JUNE 26, 1986 : EXAMINER: PESELEV
FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE :

RULE 1.132 DECLARATION

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Now comes Carlo Confalonieri a citizen of Italy, and a resident of via Ticino 5, Cusano Milanino (Milan), Italy, who declares and says that:

1. I am an employee of Farmitalia Carlo Erba S.r.l since 1964, and an expert in the chemistry of anthracyclins, and have worked in the field of pharmaceutical analysis for at least ten years.

2. I graduated from the University of Milan, with a degree in Pharmacy in the year of 1976.

3. I have directly supervised or carried out the following experiments in order to show that a solution of doxorubicin hydrochloride in a solution at a pH of from 2.7-3.14, wherein the pH is adjusted by addition of hydrochloric acid, is more stable than a solution which is identical with the exception that phosphate rather than hydrochloric acid is utilized to adjust pH. In the following experiments, the doxorubicin hydrochloride concentration was determined by an HPLC method which was validated in accordance with FDA requirements for precision, sensitivity, linearity, specificity and stability-indicating ability.

The experimental details are described hereinbelow:

**EXPERIMENTAL DETAILS**

**Reagents**

Doxorubicin·HCl (batch No. 5043 L 519) supplied by Farmitalia Carlo Erba

Phosphoric acid (85%), monobasic potassium phosphate ($KH_2PO_4$), 0.1N NaOH and 1.0N HCl, all of analytical grade, were supplied by Carlo Erba Analyticals (Milano, Italy)

PACKAGING

• Colorless glass (type I) vials with a 10 ml top capacity supplied by Bormioli (Parma, Italy)

• Chlorobutyl, teflon-faced rubber stoppers supplied by Pharma Gummi Wimmer West GmbH (Eschweiler, West Germany)

• Aluminium seals supplied by Fishem (Trezzano sul Naviglio, Milano, Italy)

Before use, the vials were washed, sterilized and depyrogenated (dry heating at 200°C for 1 hour) while the stoppers and seals were steam sterilized (121°C for 30 minutes).

INSTRUMENTATION

• Thermostatic oven model TPAR 80 supplied by Vismara (Trezzano sul Naviglio, Milano, Italy)

• pH meter model 632 supplied by Metrohom (CH, 9100 Herisau, Switzerland) standardized according to USP XXI

• Liquid chromatograph Spectra-Physics model SP 8700 equipped with:

- chromatographic column (length 250 mm, internal diameter 4.6 mm) filled with Zorbax TMS (average particle size 6 microns) supplied by DuPont Instruments Wilmington, Delaware)

- injection valve Rheodyne model 7125

- detector Spectra-Physics model SP 8440
- integrating recorder Spectra-Physics model SP 4270

BUFFERS AND SOLVENTS

- Phosphate pH 3.0 prepared by dissolving 13.9 g 85% phosphoric acid with about 800 ml distilled water in a 1000 ml volumetric flask, adjusting the pH to 3.0 with 0.1N NaOH and filling to the mark with distilled water.
- Phosphate pH 6.0 prepared by dissolving 16.3 g of $KH_2PO_4$ with about 800 ml distilled water in a 1000 ml volumetric flask, adjusting the pH to 6.0 with 0.1N NaOH and filling to the mark with distilled water.
- 0.5 HCl prepared by diluting to the mark 500 ml 1.0N HCl with distilled water in a 1000 ml volumetric flask.

- Doxorubicin·HCl 2 mg per ml 0.06 M phosphate buffer pH 3.0

200 ml phosphate buffer pH 3.0 were added dropwise, under stirring and nitrogen bubbling, to 200 ml of a 4 mg per ml doxorubicin·HCl solution in deaerated water for injection.

The buffered doxorubicin·HCl solution was maintained under nitrogen bubbling for a further twenty minutes and sterilized by filtration through a 0.22

microns membrane which was previously sterilized (121°C for 30 minutes) and tested for integrity (before and after filtration) by the bubble point determination. 5.0 ml of the sterilized solution were filled into vials which were subsequently stoppered and sealed. Filling, stoppering and sealing were carried out in a sterile area.

The solution showed a doxorubicin·HCl concentration of 1.951 mg per ml and a pH of 3.0.

• Doxorubicin·HCl 2 mg per ml 0.06 M phosphate buffer pH 6.0

200 ml phosphate buffer pH 6.0 were added dropwise, under stirring and nitrogen bubbling, to 200 ml of a 4 mg per ml doxorubicin·HCl solution in deaerated water for injection.

The buffered doxorubicin·HCl solution was maintained under nitrogen bubbling for a further twenty minutes and sterilized by filtration through a 0.22 microns membrane previously sterilized (121°C for 30 minutes) and tested for integrity (before and after filtration) by the bubble point determination.

During the filling of 5.0 ml portions into vials, the sterilized solution produced a precipitate which did not dissolve by stirring.

• Doxorubicin·HCl 2 mg per ml hydrochloride acid pH 3.0

400 mg of doxorubicin·HCl were dissolved, under stirring and nitrogen bubbling, in about 180 ml deaerated water for injection.

0.5N HCl was added dropwise to adjust the pH to 3.0. Further deaerated water for injection was added to bring the solution to its final volume (200 ml).

The solution was maintained under nitrogen bubbling for a further twenty minutes and sterilized by filtration through a 0.22 microns membrane which was previously sterilized (121°C for 30 minutes) and tested for integrity (before and after filtration) by the bubble point determination.

5.0 ml of the sterilized solution were filled into vials which were subsequently stoppered and sealed.

Filling, stoppering and sealing were carried out in a sterile area.

The solution showed a doxorubicin·HCl concentration of 1.967 mg per ml and a pH of 3.0.

STORAGE CONDITIONS

Immediately After their preparation, samples of doxorubicin·HCl in 0.06 M phosphate buffer pH 3.0 and in diluted hydrochloric acid pH 3.0 were transferred in a thermostatic oven at a temperature of 22 ± 1°C.

The doxorubicin·HCl concentration was determined immediately after the sample preparation and after 8, 15, 22, 30, 44 and 60 days storage for the solution in phosphate buffer and after 8, 15, 30, 44 and 60 days storage for the solution in diluted hydrochloric acid.

ANALYTICAL METHOD

The doxorubicin·HCl concentrations were determined by an ion pair HPLC method.

The method was validated for precision, accuracy, sensitivity, linearity, specificity and stability-indicating power in accordance with the FDA requirements reported in the "Guidelines for submitting samples and analytical data for methods validation".

The validation package of the analytical assay method is enclosed.

4. RESULTS

Table I shows the concentrations (mg/ml) of doxorubicin·HCl in 0.06 M phosphate buffer pH 3.0 and in diluted hydrochloric acid pH 3.0 after different times of storage at 22 ± 1° C.

Table II shows the percent stability of the same solutions at the same storage conditions.

COMMENTS ON THE STABILITY RESULTS

After one month storage at 22°C, doxorubicin-HCl dissolved at 2 mg per ml 0.06 M phosphate buffer pH 3.0 (described by Arcamone et al) shows a residual drug concentration of 83.3 percent of the initial.

This means that at this storage condition and during this time a 16.7 percent degradation takes place.

The extent of the degradation increases to 33.40 percent after 60 days at 22°C, the residual doxorubicin-HCl concentration being, after this time, 66.60 percent of the initial.

After one month storage at 22°C, doxorubicin-HCl dissolved at 2 mg per ml diluted hydrochloric acid pH 3.0 (claimed by the Applicants) shows a residual drug concentration of 99.6 percent of the initial which is equivalent to 0.4 percent degradation.

After 60 days at 22°C the drug degradation increases to 4.60 percent being the residual drug concentration 95.40 percent of the initial.

The physical stability at 22°C of the doxorubicin-HCl solution at a concentration of 2 mg drug per ml 0.06 M phosphate buffer pH 6.0 (described by Arcamone et al) is less than one hour.

Within this time the solution gives rise to a precipitate which does not dissolve by stirring.

## 5. CONCLUSIONS

Whereas, in accordance with what is widely accepted in the scientific community in the USP and in other Pharmacopoeias, a drug is defined as stable over the period in which it maintains an assay of 90% or higher of the initial, one can conclude that:

the stability at 22°C of doxorubicin-HCl dissolved at 2 mg per ml diluted hydrochloric acid pH 3.0 is higher than the stability at 22°C of doxorubicin-HCl dissolved at 2 mg per ml 0.06 M phosphate buffer pH 3.0 and 6.0, and can reach 18 months at a storage temperature between 2 and 8°C as shown in the patent application serial No. 878,784.

It is unexpected that two solvents (0.06 M phosphate buffer and diluted hydrochloric acid) with the same pH (3.0) affect the doxorubicin-HCl stability to an extent which determines the therapeutic use and the commercial exploitation of the solution.

TABLE I

HPLC assay (mg/ml) of doxorubicin. HCl dissolved in 0.06 M phosphate buffer pH 3.0 and in diluted hydrochloric acid during storage at 22 ± 1°C

| Time (days) | Phosphate pH 3.0 | HCl pH 3.0 |
|---|---|---|
| 0 | 1.951 | 1.967 |
| 8 | 1.844 | 1.979 |
| 15 | 1.793 | 2.004 |
| 22 | 1.680 | n.d. |
| 30 | 1.625 | 1.959 |
| 44 | 1.510 | 1.888 |
| 60 | 1.300 | 1.877 |

n.d. = not determined

Each concentration value is the mean of three independent determinations.



TABLE II

Percent stability of doxorubicin·HCl dissolved in 0.06 M phosphate buffer pH 3.0 and in diluted hydrochloric acid pH 3.0 during storage at 22 ± 1°C

| Time (days) | Phosphate pH 3.0 | HCl pH 3.0 |
|---|---|---|
| 0 | 100.0 | 100.0 |
| 8 | 94.5 | 100.6 |
| 15 | 91.9 | 101.9 |
| 22 | 86.1 | n.d. |
| 30 | 83.3 | 99.6 |
| 44 | 77.4 | 96.0 |
| 60 | 66.6 | 95.4 |

n.d. - not determined

The values in this table were calculated from those in Table I

6. I declare further that all statements made of my own knowledge are true and all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of this application or any patent issuing thereon.

7. Further declarant saith not.

Date: November 21st,1988

Carlo Confalonieri
Carlo Confalonieri



JUMBO

07/385999

DATE AUG 07 1990

PATENT NUMBER 4946831

SERIAL NUMBER 07/385,999 FILING DATE 07/27/89 CLASS 514 SUBCLASS 25 GROUP ART UNIT 183

APPLICANTS: GAETANO GATTI, MILAN, ITALY; DIEGO OLDANI, MILAN, ITALY; GIUSEPPE BOTTONI, BERGAMO, ITALY; CARLO CONFALONIERI, MILAN, ITALY; LUCIANO GAMBINI, MILAN, ITALY; ROBERTO DE PONTI, MILAN, ITALY.

**CONTINUING DATA**********************
VERIFIED THIS APPLN IS A CON OF 06/878,784 06/26/86 ABN

**FOREIGN/PCT APPLICATIONS************
VERIFIED GREAT BRITAIN 8519452 08/02/85

| AS FILED | STATE OR COUNTRY | SHEETS DRAWING | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|
| | ITX | 0 | 6 | 1 | $ 370.00 | 7690800FWE |

ADDRESS: OBLON, SPIVAK, MC CLELLAND, MAIER AND NEUSTADT 4TH FLOOR 1735 JEFF. DAVIS HWY. ARLINGTON, VA 22202

TITLE: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

U.S. DEPT. of COMM. Pat. & TM Office—PTO-436L

PARTS OF APPLICATION FILED SEPARATELY

NOTICE OF ALLOWANCE MAILED

PREPARED FOR ISSUE

Assistant Examiner — Docket Clerk

SUPERVISORY PATENT EXAMINER — Primary Examiner

CLAIMS ALLOWED — Total Claims — Print Claim

DRAWING — Sheets Drwg. — Figs. Drwg. — Print Fig.

ISSUE FEE — Amount Due — Date Paid 4/30/90

ISSUE CLASSIFICATION — Class 514 — Subclass 34

ISSUE BATCH NUMBER C84

RETENTION LABEL — DO NOT DESTROY

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

PI 48

07/503,856 04/03/90 RULE 60 | 34 | 183

GAETANO GATTI, SESTO SAN GIOVANNI, ITALY; DIEGO OLDANI, MILAN, ITALY; GIUSEPPE BOTTONI, BERGAMO, ITALY; CARLO CONFALONIERI, MILAN, ITALY; LUCIANO GAMBINI, CORNAREDO, ITALY; ROBERTO DE PONTI, MILAN, ITALY.

**CONTINUING DATA**********************
VERIFIED THIS APPLN IS A DIV OF 07/385,999 07/27/89 Pat. No 4946831

**FOREIGN/PCT APPLICATIONS************
VERIFIED GREAT BRITAIN 8519452 08/02/85

| Foreign priority claimed 35 USC 119 conditions met | AS FILED | STATE OR COUNTRY | SHEETS DRWGS | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|
| | | ITX | 0 | 30 | 2 | $ 658.00 | 7692060BIV |

NORMAN F. OBLON
OBLON, SPIVAK, MC CLELLAND, MAIER & NEUSTADT
1755 JEFFERSON DAVIS HWY, 4TH FLR.,
ARLINGTON, VA 22202

INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

U.S. DEPT. of COMM.- Pat. & TM Office—PTO-436L (rev. 10-78)

CERTIFICATE OF CORRECTION

PARTS OF APPLICATION FILED SEPARATELY

NOTICE OF ALLOWANCE MAILED: 01-09-90
ISSUE FEE: Amount Due $1130.00 Date Paid 1-29-90
PREPARED FOR ISSUE
CLAIMS ALLOWED: Total Claims 9, Print Claim 1
DRAWING: Figs. Drwg. 0
ISSUE CLASSIFICATION: Class 514, Subclass 034
ISSUE BATCH NUMBER: W14

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

PI 122

#517 FILE HISTORY
Page 1





ITALY; DIEGO (LODI), ROMCCO SUL NAV, ITALY; CARLO CONFALONIERI, ITALY; ROBERTO

07/503,836 04/03/90

CERTIFICATE

MAY 2 1 2002

OF CORRECTION

08/02/85

$650.00 769-249-U-D)

DO NOT DESTROY

PU 0014832



827740

B

Docket No: 769-249-0 DIV

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF: :

GAETANO GATTI, ET AL : GROUP ART UNIT:

SERIAL NO: NEW DIVISIONAL APPLN. OF USSN 07/503,856 :

FILED: HEREWITH : EXAMINER:

FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

PRELIMINARY AMENDMENT

HONORABLE COMMISSIONER OF PATENTS AND TRADEMARKS
WASHINGTON, D.C. 20231

Preliminary to examination, please amend the above-identified application as follows:

IN THE CLAIMS

Cancel Claim 1 and substitute the following new claims therefor:

B'

31. A physiologically acceptable solution of an anthracycline glycoside selected from the group consisting of epirubicin hydrochloride, idarubicin hydrochloride and doxorubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid and the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

32. The solution of Claim 31 which is contained in a sealed container.

33. The solution of Claim 31 wherein said physiologically acceptable solvent is selected from the group consisting of water, ethanol, polyethylene glycol, dimethylacetamide, and mixtures thereof.

34. The solution of Claim 31 wherein the physiologically acceptable solvent is water.

35. The solution of Claim 31 wherein the concentration of the doxorubicin is from 0.1 to 50 mg/ml.

36. The solution of Claim 35 wherein the concentration of doxorubicin is from 1 to 20 mg/ml.

37. The solution of Claim 31 wherein the concentration of doxorubicin is 2 mg/ml.

38. The solution of Claim 31 wherein the concentration of doxorubicin is 5 mg/ml.

39. The solution of Claim 31 wherein the pH is adjusted with hydrochloric acid to from 2.52 to 3.14.

40. The solution of Claim 31 comprising a tonicity adjusting agent.

41. The solution of Claim 31 wherein said physiologically acceptable acid is selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, ethanesulfonic acid, tartaric acid, acetic acid, succinic acid, ascorbic acid, citric acid, and glutamic acid.

42. A sealed container containing a stable, intravenously

injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefor, wherein the solution has not been reconstituted from a lyophilizate, wherein said solution has a pH adjusted to 2.5 to 5.0 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.

Richard D. Kelly
Registration No. 27,757

1755 Jefferson Davis Highway
Fourth Floor
Arlington, Virginia 22202
(703) 521-5940



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 07/827,742 | 01/29/92 | GATTI | G 769-249-0-DI |

18M1/1115

OBLON, SPIVAK, MC CLELLAND, MAIER AND NEUSTADT
FOURTH FLOOR
1755 JEFFERSON DAVIS HWY.
ARLINGTON, VA 22202

| EXAMINER | |
|---|---|
| PESELEV,E | |
| ART UNIT | PAPER NUMBER |
| 1803 | 18 |

DATE MAILED: 11/15/93

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined ☒ Responsive to communication filed on 9-22-93 ☐ This action is made final.

A shortened statutory period for response to this action is set to expire 3 month(s), —— days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice of Draftsman's Patent Drawing Review, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ ______________

Part II SUMMARY OF ACTION

1. ☒ Claims 31-38, 40, 42 and 44 are pending in the application.

   Of the above, claims ______________ are withdrawn from consideration.

2. ☐ Claims ______________ have been cancelled.

3. ☐ Claims ______________ are allowed.

4. ☒ Claims 31-38, 40, 42 and 44 are rejected.

5. ☐ Claims ______________ are objected to.

6. ☐ Claims ______________ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on ______________. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice of Draftsman's Patent Drawing Review, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on ______________, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed ______________, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. ______________; filed on ______________.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

EXAMINER'S ACTION

In view of the newly submitted prior art, the Final Rejection of April 9, 1993, is hereby withdrawn in order to present a new ground of rejection. The examination on the merits of claims 31-38, 40, 42 and 44, all the claims in the case, is given herein below.

The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
>
> Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. § 103, the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 C.F.R. § 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of potential 35 U.S.C. § 102(f) or (g) prior art under 35 U.S.C. § 103.

Claims 31-38, 40, 42 and 44 are rejected under 35 U.S.C. § 103 as being unpatentable over the Japanese patent no. 60-92212 in combination with Baurain et al (U.S. Patent No. 4,296,105) and

Arcamone et al.

The Japanese patent discloses adjusting the pH of doxorubicin HCl - containing solution to 2.3 with hydrochloric acid (see page 9).

Baurain et al disclose adjusting the pH of doxorubicin HCl - containing solution to 4.0 with sulfuric acid (see column 3).

Arcamone et al disclose a solution of doxorubicin having the pH in the range of 3-6.

Therefore, a person having ordinary skill in the art at the time the instant invention was made would have been motivated to adjust the pH of anthracycline glycoside - containing solution to 2.5 with hydrochloric acid because such a person would have expected the pH of 2.3 and the pH of 2.5 to produce the same results. Further, a person having ordinary skill in the art would have been motivated to adjust the pH of anthracycline glycoside - containing solution to a higher pH such as pH 4 as disclosed by Baurain et al or higher as disclosed by Arcamone et al with other physiologically acceptable acids, such as sulfuric acid, as disclosed by Baurain et al, because such a person would have expected the resulting solutions to have similar stabilities.

Applicant's arguments filed on September 22, 1993 have been fully considered but they are not deemed to be persuasive.

Applicants contend that the single incidence in which the stability of applicants' solutions are less strikingly superior

to the phosphate buffer solutions taught by Arcamone et al fails to demostrate obviousness of the claimed solutions. Same argument has not been found persuasive because the instant claims still encompass solutions which have the same stability as the prior art solutions and are therefore not patentable therefrom.

Claims 31-38, 40, 42 and 44 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 4,946,831. Although the conflicting claims are not identical, they are not patentably distinct from each other because the compositions claimed in the U.S. patent no. 4,946,831 are encompassed by the instant claims.

The obviousness-type double patenting rejection is a judicially established doctrine based upon public policy and is primarily intended to prevent prolongation of the patent term by prohibiting claims in a second patent not patentably distinct from claims in a first patent. In re Vogel, 164 USPQ 619 (CCPA 1970). A timely filed terminal disclaimer in compliance with 37 C.F.R. § 1.321(b) would overcome an actual or provisional rejection on this ground provided the conflicting application or patent is shown to be commonly owned with this application. See 37 C.F.R. § 1.78(d).

Applicant's arguments filed on September 22, 1993 have been fully considered but they are not deemed to be persuasive.

Applicants' statement that a terminal disclaimer has been re-submitted has been noted. However, since such a terminal disclaimer has not been found in the instant application file, the above obviousness-type double patenting rejection has not been overcome.

Any inquiry concerning this communication or earlier

Serial No. 827742
Art Unit 1803

-5-

communications from the examiner should be directed to Elli Peselev whose telephone number is (703) 308-4616.

Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-0196.

Johnnie R. Brown
JOHNNIE R. BROWN
SUPERVISORY PATENT EXAMINER
ART UNIT 183

ep
Elli Peselev
November 9, 1993

#34/F
JW 7/12/94

769-249-0 DIV
769-206-0 DIV

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF: :

GAETANO GATTI, ET AL. : EXAMINER: PESELEV

SERIAL NO: 07/827,742 :

FILED: JANUARY 29, 1992 : GROUP ART UNIT: 1803

FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE :

RECEIVED JUN 2 1994

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Responsive to the Official Action mailed November 15, 1993, Applicants submit the following remarks.

IN THE CLAIMS

31. (Three times amended) A physiologically acceptable solution of anthracycline glycoside selected from the consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100mg/ml, wherein said solution is contained in a sealed container and has not been reconstituted from a lyophilizate.

Cancel claim 32.

REMARKS

Claims 31, 33-38, 40, and 42 appear in this application. Claim 31 has been amended to distinguish Applicants' solutions from prior art solutions which are reconstituted from lyophilizates. Basis for the amendment to Claim 31 is found in canceled Claim 32. The claims stand rejected under 35 USC 103 as obvious over Japanese Patent no. 60-92212 in combination with Baurain et al. (U.S. Patent No. 4,296,105) and Arcamone et al.

According to the Examiner,

> The Japanese patent discloses adjusting the pH of doxorubicin HCl-containing solution to 2.3 with sulfuric acid. . .
> Baurain et al disclose adjusting the pH of doxorubicin HCl-containing solution to 4.0 with sulfuric acid. . .

Japanese application 60-92212 and Baurain et al. (U.S. Patent 4,296,105) are both directed to anthracycline solutions which are freeze-dried to form a lyophilizate, which is later reconstituted in water immediately prior to use. The recitation of a sealed container in Claim 31 distinguishes Applicants' invention from the Japanese application and other prior art references which involve lyophilizates. A sealed container effectively precludes lyophilization, since to lyophilize an unlyophilized solution would necessarily involve removal of water from the container and destruction of the seal.

The adjustment of the pH to 2.3 in the Japanese application is directed to improving the poor rate of

solvation of doxorubicin salts, which arises from their facility at forming relatively slow-dissolving gels when first placed in solution. The stability characteristics of these solutions is neither mentioned nor claimed. Consequently, Japanese application 60-92212 contains no teaching of long-term storage stable solutions of anthracycline glycosides, and does not suggest the storage-stable solutions achieved by Applicants.

As with the Japanese application, Baurain et al. does not teach stable solutions of doxorubicin or other anthracyclines. Instead, it is directed toward new derivatives of doxorubicin. The sulfuric acid treatment of the Baurain et al. solution is merely a step lasting ten minutes in the overall preparation of the doxorubicin derivatives claimed (Col. 3, lines 33-38). Consequently it does not teach or suggest Applicants' long-term storage stable solutions. The recitation of a sealed container, together with the requirement that the solution has not been reconstituted from a lyophilizate, effectively distinguishes Baurain et al.

The study conducted by Arcamone et al. was directed to ascertaining the stereochemical properties of adriamycin, not to achieving a new solution achieving long-term storage stability for such compounds. Arcamone et al. used a phosphate buffer, a known technique which does not suggest the use of acids as practiced by Applicants. Arcamone et al. simply prepared several solutions of adriamycin with the well-known phosphate buffers and recorded the "stability."

Moreover, the Arcamone et al. claim of achieving a stability of ">1 month" at pH ranges of 3 - 6 is vague, since the actual time over which the compound remained stable is not given, nor is there established any methodology by which stability is determined. Consequently, Applicants disagree with the Examiner's assertion that

> the instant claims [] encompass solutions which have the same stability as the prior art solutions and are therefore not patentable therefrom.

More to the point, neither Arcamone et al. nor any other reference teaches or suggests that strong acids may be substituted for phosphate or other buffers to obtain even equal storage stabilities. In fact, as demonstrated by Applicants, their anthracycline solutions provide superior storage stabilities to the Arcamone buffer solutions.

Prior to Applicants' development of storage stable anthracycline solutions, the practice of reconstituting such solutions from lyophilized powders was common in the prior art. The toxicity of these powders posed significant health risks to health care workers from accidental exposure during handling and reconstitution. By dramatically increasing the storage stability of anthracycline glycosides in solution over the prior art, Applicants' invention allows medical personnel to handle these compounds in sealed glass containers, substantially reducing the risk of accidental exposure.

In view of the above amendments and remarks, it is respectfully submitted that this application is now in

condition for allowance. Early notice to this effect is respectfully requested.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.

Richard D. Kelly
Registration No. 27,757

Crystal Square Five - Fourth Floor
1755 South Jefferson Davis Highway
Arlington, VA 22202
(703) 413-3000
RDK/TLS

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
| --- | --- | --- | --- |
| 07/827,742 | 01/29/92 | GATTI | 749-243-0-DI |

EXAMINER: PESELEV,E

ART UNIT: 1803 PAPER NUMBER: 38

18N1/0926
OBLON, SPIVAK, MC CLELLAND, MAIER AND NEUSTADT
FOURTH FLOOR
1755 JEFFERSON DAVIS HWY.
ARLINGTON, VA 22202

DATE MAILED: Remailed 09/20/94 1-30-96

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined ☒ Responsive to communication filed on 5-12-94 ☒ This action is made final.

A shortened statutory period for response to this action is set to expire 3 month(s), —— days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice of Draftsman's Patent Drawing Review, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ ______

Part II SUMMARY OF ACTION

1. ☒ Claims 31, 33-38, 40 and 42 are pending in the application.

Of the above, claims ______ are withdrawn from consideration.

2. ☐ Claims ______ have been cancelled.
3. ☐ Claims ______ are allowed.
4. ☒ Claims 31, 33-38, 40 and 42 are rejected.
5. ☐ Claims ______ are objected to.
6. ☐ Claims ______ are subject to restriction or election requirement.
7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.
8. ☐ Formal drawings are required in response to this Office action.
9. ☐ The corrected or substitute drawings have been received on ______. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice of Draftsman's Patent Drawing Review, PTO-948).
10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on ______, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).
11. ☐ The proposed drawing correction, filed ______, has been ☐ approved; ☐ disapproved (see explanation).
12. ☐ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. 07/503,856; filed on 4-3-90.
13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.
14. ☐ Other

PTOL-326 (Rev. 2/93)

EXAMINER'S ACTION

The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
>
> Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. § 103, the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 C.F.R. § 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of potential 35 U.S.C. § 102(f) or (g) prior art under 35 U.S.C. § 103.

Claims 31, 32-38, 40-42 and 44 are rejected under 35 U.S.C. § 103 as being unpatentable over the Japanese patent no. 60-92212 in combination with Baurain et al (U.S. Patent no. 4,296,105) and Arcomone et al.

The Japanese patent discloses adjusting the pH of doxorubicin HCl-containing solution to 2.3 with hydrochloric acid (see page 9).

Baurain et al disclose adjusting the pH of doxorubicin HCl-

containing solution to 4.0 with sulfuric acid (see column 3).

Arcamone et al disclose a solution of doxorubicin having the pH in the range of 3-6.

Therefore, a person having ordinary skill in the art at the time the instant invention was made would have been motivated to adjust the pH of anthracycline glycoside- containing solution to 2.5 with hydrochloric acid because such a person would have expected the pH of 2.3 and the pH of 2.5 to produce the same results. Further, a person having ordinary skill in the art would have been motivated to adjuct the pH of anthracycline glycoside-containing solution to a higher pH such as pH 4 as disclosed by Baurain et al or higher as disclosed by Arcamone et al with other physiologically acceptable acid, such as sulfuric acid, as disclosed by Baurain et al, because such a person would have expected the resulting solutions to have similar stabilities.

Applicant's arguments filed May 12, 1994 have been fully considered but they are not deemed to be persuasive.

Applicants contend that the Japanese application and Baurain et al. are both directed to anthracycline solutions which form a lyophilizate, which is later reconstituted in water. Same argument has not been found persuasive because a lyophilizate which is reconstituted in water is not been to be patentably distinct from an unlyophilized solution. Further, the purpose

for which the doxorubicin solution was adjusted to pH of 2.3 as disclosed by the Japanese patent is immaterial and the stability of the formed solution is an inherent property of said solution. Also, the stability of solution disclosed by Baurain et al is an inherent property of said solutions even if said solutions represented merely a step lasting ten minutes in the preparation of doxorubicin derivatives. Applicants have not presented any evidence in verified form showing that the claimed compositions have a significantly better stability than the compositions disclosed by the Japanese paten and Baurain et al. Note that the Arcamone et al reference was used only to show the adjustment of the pH of doxorubicin solutions to 3-6. The substitution of phosphate buffer disclosed by Arcamone et al with hydrochloric acid disclosed by the Japanese patent or sulfuric acid disclosed by Baurain et al. would have been prima facie obvious to a person having ordinary skill in the art at the time of the instant invention.

Claims 31, 32-38, 40, 42 and 44 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 4,946,831. Although the conflicting claims are not identical, they are not patentably distinct from each other because the compositions claimed in the patent no. 4,946,831 are encompassed by the instant claims.

Serial No. 827742 -5-

Art Unit 1803

The obviousness-type double patenting rejection is a judicially established doctrine based upon public policy and is primarily intended to prevent prolongation of the patent term by prohibiting claims in a second patent not patentably distinct from claims in a first patent. *In re Vogel*, 164 USPQ 619 (CCPA 1970). A timely filed terminal disclaimer in compliance with 37 C.F.R. § 1.321(b) would overcome an actual or provisional rejection on this ground provided the conflicting application or patent is shown to be commonly owned with this application. See 37 C.F.R. § 1.78(d).

The English translation of the Bohne et al reference has not been received.

THIS ACTION IS MADE FINAL. Applicant is reminded of the extension of time policy as set forth in 37 C.F.R. § 1.136(a).

A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS FINAL ACTION IS SET TO EXPIRE THREE MONTHS FROM THE DATE OF THIS ACTION. IN THE EVENT A FIRST RESPONSE IS FILED WITHIN TWO MONTHS OF THE MAILING DATE OF THIS FINAL ACTION AND THE ADVISORY ACTION IS NOT MAILED UNTIL AFTER THE END OF THE THREE-MONTH SHORTENED STATUTORY PERIOD, THEN THE SHORTENED STATUTORY PERIOD WILL EXPIRE ON THE DATE THE ADVISORY ACTION IS MAILED, AND ANY EXTENSION FEE PURSUANT TO 37 C.F.R. § 1.136(a) WILL BE CALCULATED FROM THE MAILING DATE OF THE ADVISORY ACTION. IN NO EVENT WILL THE STATUTORY PERIOD FOR RESPONSE EXPIRE LATER THAN SIX MONTHS FROM THE DATE OF THIS FINAL ACTION.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Elli Peselev whose telephone number is (703) 308-4616.

Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-0196.

JOHN W. ROLLINS
PRIMARY EXAMINER
ART UNIT 18C

Peselev/tf
September 15, 1994

Corrected [illegible]
BOX AF

CERTIFICATE OF MAILING UNDER 37 CFR 1.8: The undersigned hereby certifies that this paper, as described in paragraph 1 hereinabove, is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Asst. Commissioner for Patents, BOX AF, Washington, D.C. 20231 on the 28th day of June, 1996.

By [signature]

760-0 DIV
759-206-0 DIV

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF GAETANO GATTI, et al. :

SERIAL NO.: 07/827,742 : EXAMINER PESELEV

FILED: JANUARY 29, 1992 : GROUP ART UNIT: 1803

FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE :

RECEIVED
JUL 12 1996
GROUP 1800

AMENDMENT UNDER 37 C.F.R. § 1.116

ASSISTANT COMMISSIONER OF PATENTS & TRADEMARKS
BOX AF
WASHINGTON, D.C. 20231

SIR:

Responsive to the final Official Action mailed January 30, 1996, Applicants state:

IN THE CLAIMS

Please amend independent Claims 31, 42, and 44 as follows:

31. (Four times amended) A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100mg/ml, wherein said solution is contained in a sealed container [and has not been reconstituted from a lyophilizate].

PU 0015155

8 42. (Amended) A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefore, [wherein the solution has not been reconstituted from a lyophilizate,] wherein said solution has a pH adjusted to 2.71 to 3.14 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

44. (Twice Amended) A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, [wherein said solution has not been reconstituted from a lyophilizate].

Please cancel Claim 40, and add the following claims 45-47:

9 – 45. The anthracycline glycoside solution of Claim 41, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

10 46. The container of Claim 42, wherein said doxorubicin solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

47. The anthracycline glycoside solution of Claim 44, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids. --

## REMARKS

**Introduction**

Claims 31, 33-38, 42, and 44 remain in this application. Prior Claim 40 has been canceled, and new claims 45-47 are submitted. Applicants had previously paid for Claims 31-42, so no new fee is required. None of these changes raise any substantial new issue, and they place the application in condition for allowance. Reconsideration of this application, as amended, is respectfully requested.

The Claims of this application were previously drafted in a way that distinguished Applicants' solutions from certain prior art products which are reconstituted from lyophilizate powder in vials by medical personnel at the time of drug administration. The comments of the Examiner in the last Office Action indicated that whether the solution was reconstituted from lyophilizate is immaterial because patentability must reflect the inherent properties of the claimed solution and the prior art. Consistent with the Examiner's comments, Claims 31, 42, and 44 are now amended (by deleting the lyophilizate limitation) to show that the important and *claimed* properties of the present invention do arise from the inherent properties of the solution, regardless of whether the solution is prepared from lyophilizates in vials.

Along these same lines, the novel property of the claimed solution relates to its capacity for long term storage stability. As explained more fully herein, this long term storage stability of the present invention permits it to be pre-packaged and sold as a ready-to-use solution product, rather than to be reconstituted from lyophilizate in vials by medical personnel in conventional manner. This novel property of the present invention was completely unrecognized by the prior art and provides the basis for satisfying a long felt need and achieving commercial success. Also

importantly for patentability, these aspects of the invention establish a motivation to achieve something new and different, a factor which is necessary for a finding of obviousness under §103, but was completely lacking from the prior art

Double Patenting Rejection

The Examiner has rejected all of the claims on the grounds obviousness-type double patenting over U.S. Pat. No. 4,946,831. Applicants note that, in the Office Action mailed 11/15/93, the Examiner indicated that the terminal disclaimer, although re-submitted by applicants, has not been found in the file. Applicants acknowledge that they will file a new terminal disclaimer to obviate the double patenting rejection. Applicants request that this be held in abeyance until agreement on patentable subject matter has been reached.

Obviousness Rejection

The Examiner has also rejected all of the claims under 35 U.S.C. §103 as being unpatentable over the Japanese patent no. 60-92212 in combination with Baurain et al. (U.S. Pat. No. 4,296,105) and Arcomone et al. Applicants respectfully request reconsideration of this rejection and allowance of the pending claims.

Before discussing the rejection in detail, it is important to note that the entire thrust and purpose of the present invention is to achieve technology enabling the long term storage of doxorubicin in solution, preferably in a pharmaceutically acceptable solution. There is no question but that none of the prior art cited by the last Office Action are even remotely directed toward achieving a long term storage stable solution of doxorubicin. JP 60-92212 is directed toward the discovery of formulations of doxorubicin salts that "are capable of being completely

dissolved [from reconstitute] in saline solutions within a very short span of time." *See* the first full paragraph on p. 3 of the reference. Baurain is directed to the discovery of N-leucyl-doxorubicin and its salts, as a new active ingredient. Arcomone is directed to a generalized explanation of the structural and physiochemical properties of doxorubicin, including solubility, spectroscopic characteristics, stability, and analytical methods for determining same. However, as will be detailed below, to the extent that Arcomone discussed stability, the references expressly teaches *away from the present invention, i.e.*, by teaching that doxorubicin has a stability in solution of only a few hours when pH is adjusted with HCL and only a few weeks when pH is adjusted to the range of 3-6 (using a something other than an acid to adjust the pH.) The bottom line is that, to the extent JP 60-92212, or Baurain, or Arcomone have any similarity to the claimed invention beyond merely dealing with doxorubicin , the similarities result from pure happenstance, and have nothing to do with the goals and objectives of the present invention.

The last Office Action implicitly acknowledges that all of the elements of the claimed invention were *not* found in a single prior art reference. That is, by virtue of rejecting the claims under Section 103, rather than Section 102, the Office Action acknowledges that the subject matter of the present invention claims is different from the prior art.

In particular, the Office Action relies upon the teaching of a single example in JP 60-92212 that discloses adjusting the pH to a level of 2.3, and the Office Action acknowledges that this pH of 2.3 is below the pH range of 2.5-5.0 that is taught and claimed in the present invention. However, the Office Action holds that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results."

As to Baurain and Arcomone, the Office Action fails to acknowledge how or why these references differ from the present invention. Apparently, however, the Office Action relies upon

these references only to disclose the existence of doxorubicin solutions at pH higher than 2.3. Thus, Bauxsin discloses a doxorubicin salt solution at pH of 4.0, and Arcomone discloses a doxorubicin salt solution at pH of 3-6. The Office Action holds that, "a person of ordinary skill in the art would have been motivated to adjust the pH of anthracycline glycoside-containing solution to higher pH such as pH 4 disclosed by Bauxsin et al. or higher as disclosed by Arcomone et al with other physiologically acceptable acid, as disclosed by Bauxsin et al., because such a person would have expected the resulting solutions to have similar stabilities."

Applicants respectfully submit that there are at least four (4) fundamental problems with the rejection in the last Office Action.

- There is no basis on this record for the motivation holding, *i.e.*, for holding that a person of ordinary skill would have been motivated to increase the pH of JP 60-92212 to the higher levels of Bauxsin and/or Arcomone. Rather, the only motivation for such combination arises via hindsight reliance on the teaching of the present invention.
- Assuming *arguendo* that a person of ordinary skill was motivated to combine the references in order to achieve a "similar stability" (as suggested in the Office Action), the question is similar to what? The only teaching *vis a vis* "stability" to be found anywhere in the present references is a teaching that doxorubicin solution is not stable as per the invention. *See* Arcomone, p.21.
- By ignoring the other differences between the claimed subject matter and the prior art, the Office Action does a disservice to the claimed invention. Assuming *arguendo* that a solution was made by following a combination of the references, the resulting combination does not fall within the pending claims.

- Scientific test data comparing the stability of the claimed subject matter to the stability of the solution of JP 60-92212, shows that stability of the claimed invention (pH 2.5-50) is unexpectedly higher than the stability of the JP 60-92212 solution (pH 2.3).

For at least these reasons, Applicants respectfully request that the present rejection be withdrawn and the claims be allowed. Once Applicants thereafter submit an appropriate terminal disclaimer, the claims should be passed to issue.

*Lack of Motivation for Combination*

As previously noted, there is absolutely nothing in any of the cited references that refers to a possible improvement in the long term storage stability of doxorubicin solutions. These references are oblivious to the problem, much less the solution. More likely, the authors of these references merely accepted the general belief (prior to the invention) that doxorubicin could not be prepared into long term storage stable solutions, and, thus, the authors never explored nor considered the possibility. In any event, none of the references -- alone or in combination -- provide any motivation for a person skilled in the art to pursue, adapt, modify, or combine any of the references toward any common goal, much less the goal of achieving a long term storage stable solution of doxorubicin hydrochloride.

To the contrary, JP 60-92212 fails to provide any teaching or suggestion that varying pH may have any effect (either negative or positive) on the doxorubicin solution. The same is true of Bastrain. Although Arcamone discloses several examples with differing pH, the examples vary several parameters at the same time, such that it is impossible to draw any conclusion on how to achieve a long term storage stable solution of doxorubicin.

<u>The References Teach a *LACK* of Stability</u>

The Office Action suggests that a person of ordinary skill would be motivated to combine the references to achieve "similar stability." It is only fair to ask, what does the Examiner mean by achieving similar stability? If the intention is achieve similar stability to the claimed invention, then Applicants respectfully submit that proves that the Examiner was relying upon hindsight reason to combine the references. If the intention was to achieve similar stability to the most stable prior art solution, then Applicants respectfully submit that references expressly taught that such resulting solution was <u>not</u> long term storage stable.

As previously noted, neither JP 60-92212 nor Bassein even mention storage stability of the solution. Rather, both of those references focus on products which are lyophilized, presumably because it was recognized that they were <u>not</u> stable. The only reference that provides any express teaching as to storage stability is the Arcamone reference, and this reference expressly teaches that the only way to achieve long term storage stability for doxorubicin is via lyophilization, because the solutions are <u>not</u> stable.

> "Adriamycin [doxorubicin] hydrochloride is stable in the solid state . . . . The stability of aqueous solutions of adriamycin varies with pH and the buffer concentration (Table 2 and Fig. 12) as established on the basis of spectrophotometric and chromatographic analysis."

*See* p. 21 of Arcamone. Table 2 indicates that doxorubicin in solution with HCL is stable for less than 20 hours. HCL is the only acid discussed vis a vis stability. Table 2 further indicates that doxorubicin in solution can be stable for more than a month at pH 3-6 when a phosphate buffer is used. Fig. 12 provides more specific information on the use of phosphate buffers with doxorubicin solutions; specifically, Fig. 12 indicates that a 90% stability of doxorubicin in phosphate buffered solution will expire in about 10 days. In sum, these references -- considered alone or in combination -- teach away from, not toward, the present invention.

<u>The Hypothetical Combination Is Different Than The Claimed Invention</u>

Assuming *arguendo* that a person of ordinary skill were motivated to combine the cited references, the resulting combination would be different than the claimed subject matter. The Baurain reference differs from the pending invention in several respects, most notably in that Baurain adds L-leucine carboxyanhydride to the pH 10.2 solution. Although Baurain teaches that the pH of the solution is thereafter reduced to pH 4, the purpose and result of doing so is to convert the doxorubicin hydrochloride to N-(L-leucyl) doxorubicin. Thus, assuming a person were to combine JP 60-92212 and Baurain, the result would be a solution of N-(L-leucyl) doxorubicin at pH 4, rather than the present claimed invention. There is no basis to conclude that the resulting combination would comprise doxorubicin hydrochloride solution at the requisite doxorubicin concentration level and the requisite pH level.

Similarly, Arcamone teaches that doxorubicin solutions may be adjusted to a pH of 3-6 using a phosphate buffer solution, or to a pH of 1-2 using HCl. Arcamone presents these as alternatives, and fails to teach or suggest in any way that the acid (rather than the buffer) should be used when adjusting pH to 3-6. (Note: Arcomone teaches at Table 2 that HCL used to adjust the doxorubicin solution will achieve a stability of *<u>less than 20 hours</u>*. Thus, Arcamone teaches away from using HCl to adjust pH for long term storage stability.) Assuming a person were to combine JP 60-92212 and Arcamone, the result would be solution of doxorubicin hydrochloride in which the pH was adjusted by phosphate buffer, rather than HCL as required by the pending claims. There is no basis to conclude the combination of JP 60-92212 and Arcomone would comprise doxorubicin hydrochloride solution at the requisite pH level.

Scientific Evidence Establishes An Unexpected Stability Difference

It is important to recognize that the claimed subject matter is based upon using particular acids to adjust the pH of the solution to a particular pH range. Applicants have demonstrated time and again in comparative data in this application that the resulting solution exhibits surprisingly better long term storage stability than solutions having a pH outside the recited pH range or using a buffer other than the claimed acids to adjust the pH.

Lest there be any doubt on this point, Applicants are submitting herewith yet another declaration still further addressing the issue of stability. *See* Declaration of Carlo Confalonieri, filed herewith. Applicants have prepared four different solutions. The first solution involves following the procedure of example 6 of the JP 60-92212 patent except modified as to the amount of the material made. The pH of the solution was 2.3 as taught in JP 60-92212. This first solution also contained the mannitol excipient of example 6 of JP 60-92212. Two other solutions not containing the mannitol excipient of the Japanese patent were also prepared having a pH of 2.3, one having a concentration of 2mg/ml and one having 5mg/ml concentration. A fourth solution prepared in accordance with the present invention has a pH of 2.5 and a concentration of 2 mg/ml. As can be seen from the enclosed declaration of Dr. Confalonieri, the solution prepared according to the present invention, having a pH of 2.5, exhibited superior stability as compared with each of the solutions having a pH of 2.3. Indeed, the solution having the mannitol excipient taught in the Japanese patent resulted in a composition which had a worse stability than the corresponding composition not containing the excipient. *See* the results of 35°C. (Note: The one and four week stability of the 2.3 pH solution not containing the excipient was superior to the 2.3 pH solution containing the excipient at 45°C, thus demonstrating that the Japanese patent could not have been concerned with long-term storage

stability.) More importantly, the solution having a pH of 2.5 according to the present invention exhibited significantly better stability than each solution having a pH of 2.3 at all temperatures.

These results conclusively demonstrate that solutions having pH 2.5, adjusted by HCL, achieve unexpected and nonobvious results in storage stability *vis a vis* solutions having a pH 2.3. Perhaps more important, these results directly contradict and disprove that a doxorubicin solution having a pH of 2.3 has the same stability as a doxorubicin solution having a pH of 2.5.

The last Office Action held that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results." Accepting *arguendo* the statement in the last Office Action as to what a person of ordinary skill in the art would have expected, the evidence submitted herewith proves that expectation is incorrect. Thus, the basic assumption of the rejection in the last Office Action is incorrect. That error, without more, warrants reconsideration and reversal of the rejection.

**Secondary Evidence of NonObviousness**
**Also Provides Strong Evidence of Patentability**

The evidence presented above as to the differences, results, and motivations of the claimed invention *vis a vis* the prior art fully establishes the patentability of the present invention. Above and beyond that evidence, however, the additional available evidence as to secondary considerations of non-obviousness further confirms the patentability of the claimed invention. The examiner should keep in mind the fact that the present invention is not a paper patent but is one which has found commercial success and has solved a long felt need. If it was so obvious to adopt the technique of the present application, it certainly would have been done much earlier given the problem which has been solved.

In *Stratoflex, Inc. v. Aeroquip Corp.* 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed. Cir. 1983), the Federal Circuit Court of Appeals said:

> [E]vidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness. *In re Sernaker*, 702 F.2d 989, 217 USPQ 1 (Fed. Cir. 1983) citing *In re Fielder and Underwood*, 471 F.2d 640, 176 USPQ 300 (CCPA 1983), *see In re Mageli et al.*, 470 F.2d 1380, 1384, 176 USPQ 305, 307 (CCPA 1973) . . . . Indeed, ***evidence of secondary considerations may often be the most probative and cogent evidence in the record***. (Emphasis in original.)

After reviewing a decision which failed to give due consideration to evidence of the secondary considerations of non-obviousness, the Federal Circuit Court of Appeals reversed, noting that such evidence is not relegated to second-class status, and whether to consider such evidence is *not* discretionary:

> That approach was error. All evidence bearing on the issue of obviousness, as with any other issue raised in the conduct of the judicial process, must be considered and evaluated *before* the required legal conclusion is reached.

*W.L. Gore & Associates, Inc. V. Garlock, Inc.*, 721 F.2d 1540, 1555, 220 USPQ 303, 314 (Fed. Cir. 1983) (emphasis in original). *See also Minnesota Min. and Mfg. V. Johnson & Johnson*, 976 F.2d 1559, 1573 (Fed. Cir. 1992) ("Objective evidence such as commercial success, failure of others, long-felt need, and unexpected results must be considered before a conclusion on obviousness is reached."); *and see Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725 (Fed. Cir. 1990).

"The rationale for giving weight to the so-called secondary considerations is that they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). As the United States Supreme Court has stated:

> These legal inferences or subtests do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of

PU 0015166

> judicial treatment than are the highly technical facts often present in patent litigation.

*Graham v. John Deere Co.*, 383 U.S. 1, 35-36, 86 S.Ct. 684, 702-03, 15 L.Ed.2d 545, (1966);

As to evidence of long felt need and/or failure of others, Judge Learned hand has stated, "... the length of time the art, though needing the invention, went without it" is one of the best non-technical considerations for determining whether a patented invention is unobvious. *Safety Car Heating & Lighting co. v. General Electric Co.*, 155 F.2d 937, 939 (2d. Cir. 1946). *See also Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1099 (Fed. Cir. 1985), *vacated*, 475 U.S. 809 (1986), *on remand*, 810 F.2d 1561 (Fed. Cir. 1987), *cert. den.*, 481 U.S. 1052 (1987), *later proceeding*, 836 F.2d 1329 (Fed. Cir. 1987). The evidence of long felt need and failure of others in this case is particularly enlightening in this case.

What applicants have surprisingly discovered is that the combination of pH and the pH adjusting means has allowed them to produce a storage stable solution of these anthracyclines. As the examiner is aware, anthracyclines have demonstrated significant value in the treatment of various cancerous tumors. while the anthracyclines have the benefit of tending to destroy cancerous tumors, they also have the detriment of serious side effects, including the destruction of heart muscle. These destructive capabilities are exhibited not only when the drug is injected, but also when the drug becomes ingested such as by inhalation, contact with the skin and the like. These latter exposures are significant to the health care personnel. Prior to the present invention, it was necessary for the health care personnel to dissolve the dry, lyophilized anthracyclines before administering same to the patient. This step of dissolving the lyophilized dry anthracycline created the possibility of direct exposure of the medical personnel to the anthracycline. Over time, such continued exposures could have significant adverse consequences. Thus, the present invention satisfies a long felt need.

Applicant has previously submitted numerous affidavits in support of commercial success and the long felt need solved by this invention. In particular, Declarations of William J. Dana, and Mary Horstman, and Debra Holton-Smith were previously filed in related case S.N. 08/878,784. For the convenience of the Examiner, copies of these declarations are enclosed and submitted now for consideration in this case.

**Conclusion**

In view of the foregoing amendment and remarks, it is respectfully submitted that this application is in condition for allowance. Early notice to this effect is respectfully requested.

Respectfully submitted,

June 28, 1996

Daniel A. Boehnen

Daniel A. Boehnen, Reg. No. 28,399
Emily Miao, Ph.D., Reg. No. 35,285
BANNER & ALLEGRETTI, LTD.
Suite 3000
10 South Wacker Drive
Chicago, Illinois 60606
312-715-1000

Emily Miao