# EXHIBIT J

**Westlaw.**

Slip Copy
Slip Copy, 2006 WL 956599 (D.Del.)
(Cite as: Slip Copy)

Page 1

**H**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
CRYOVAC INC., Plaintiff/Counter-Defendant,
v.
PECHINEY PLASTIC PACKAGING, INC.,
Defendant/Counter-Plaintiff.
No. Civ.A. 04-1278-KAJ.

April 13, 2006.

John W. Shaw, Karen E. Keller, Michele Sherretta, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Plaintiff, Ford F. Farabow, Jr., Joann M. Neth, Courtney B. Meeker, Mark J. Feldstein, Rebecca D. Hess, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L .P., Washington, D.C., of counsel.

N. Richard Powers, Connolly Bove Lodge & Hutz, Wilmington, Delaware, for Defendant, Donald P. Cassling, Steven R. Trybus, Shelley Smith, Brian P. O'Donnell, Jenner & Block LLP, Chicago, IL, of counsel.

**OPINION**

JORDAN, J.

**I. INTRODUCTION**

*\*1* This is a patent infringement case. Before me are the parties' requests to construe the disputed claim language of U.S. Patent No. 4,755,419 (issued July 5, 1988) (the " '419 patent") pursuant to *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370 (1996). Plaintiff Cryovac, Inc. ("Cryovac") and Defendant Pechiney Plastic Packaging, Inc., ("Pechiney") have fully briefed their positions and appeared before me in oral argument on December 16, 2005. Jurisdiction is proper under 28 U.S.C. § § 1331 and 1338.

**II. BACKGROUND**

*A. Procedural Background*

Cryovac filed its initial complaint for patent infringement on September 20, 2004 (Docket Item ["D.I."] 1), and amended it on July 25, 2005 (D.I.125) and October 12, 2005 (D.I. 185, the "Second Amended Complaint"). In the Second Amended Complaint, Cryovac accuses Pechiney of infringing claim 11 of the '419 patent (D.I. 185 at ¶ 11), of willfully infringing that claim (*id.* at ¶ ¶ 30-34, 44), of tortious interference with contract (*id.* at ¶ 21) and of tortious interference with prospective contractual relations (*id.* at ¶ 28). In its answer to the Second Amended Complaint (D.I. 260, the "Answer"), Pechiney denied infringement, and asserted counter-claims that the '419 patent is invalid and unenforceable. (D.I. 260 at 11-15.) The parties are scheduled to try this case to a jury beginning on June 12, 2006. (D.I.237.)

*B. The Disclosed Technology*

The '419 patent discloses "[a] multilayer film with a combination of oxygen barrier properties, toughness, shrinkability, and good optical properties," ('419 patent, Abstract), used "to package various articles, including perishable food products" (*Id .* at col. 1, lns. 10-11). Cryovac alleges that products sold by Pechiney under the trade name ClearShield™ improperly embody the patented technology. (D.I. 185 at ¶ ¶ 10-11.) Claim 11 of the '419 patent, the only claim asserted here, claims the following:

An oriented coextruded film having at least seven layers arranged symmetrically comprising:

(a) a core layer comprising an ethylene vinyl alcohol copolymer;

(b) two intermediate layers each comprising a polyamide;

(c) two outer layers each comprising a polymeric material or blend of polymeric materials; and

(d) two layers, each comprising an adhesive polymeric material, which adhere each of said intermediate layers to a respective outer layer.

(the '419 patent, at col. 9, ln. 67-col. 10, ln. 9.)

**III. APPLICABLE LAW**

Patent claims are construed as a matter of law. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454-56 (Fed.Cir.1998) (en banc). "[T]he words of a claim 'are generally given their ordinary and customary meaning.' " *Phillips v. AWH Corp.,* 415 F.3d 1303,

Slip Copy
Slip Copy, 2006 WL 956599 (D.Del.)
(Cite as: Slip Copy)

1312 (Fed.Cir.2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996)). That ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.

**\*2** To determine the ordinary meaning, the court should review "the same resources as would" the person of ordinary skill in the art. *Multiform Dessicants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed.Cir.1998). Those resources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art ." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed.Cir.2004).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Both "the context in which a term is used in the asserted claim" and the "[o]ther claims of the patent in question" are useful for understanding the ordinary meaning. *Id.*

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." ' *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). In short, the claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. Thus, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed.Cir.1998).

On occasion, "the specification may reveal a special definition given to a claim term ... that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir.2002)). The specification may also "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor ... [, which] is regarded as dispositive." *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed.Cir.2001)).

The court "should also consider the patent's prosecution history ." *Markman*, 52 F.3d at 980. "Like the specification, the prosecution history

provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citing *Lemelson v. Gen. Mills, Inc .*, 968 F.2d 1202, 1206 (Fed.Cir.1992)).

The court may also rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. In particular, "dictionaries, and especially technical dictionaries, ... have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology." *Phillips*, 415 F.3d at 1318 (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed.Cir.2002)). However, extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language." ' *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed.Cir.2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed.Cir.2004)).

**\*3** During claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Phillips*, 415 F.3d at 1324.

## IV. CLAIM CONSTRUCTION

Cryovac alleges that Pechiney's ClearShield products infringe claim 11 of the '419 patent. (D.I. 185 at ¶ ¶ 10-11.) In that claim, the parties dispute the meaning of the following claim terms: "oriented," "oriented coextruded film," "arranged symmetrically," and "at least seven layers arranged symmetrically." **FN1** (D.I.203, 204.)

> **FN1.** In addition to these two claim terms, in their briefing and their joint claim construction chart, the parties dispute every word in claim 11 of the '419 patent. (See D.I. 247 at 1-15; D.I. 203 at 11-38; D.I. 204 at 5-32.) However, the parties essentially agree on the construction of many of those terms, and even where they disagree, they appear to agree that the construction of those terms does not affect the outcome of the case. (See D.I. 247 at 3 (construction of the term "film"); *Id.* at 6 (construction of the term "layers"); D.I. 204 at 6 (Pechiney

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 3
Slip Copy, 2006 WL 956599 (D.Del.)
(Cite as: Slip Copy)

statement that "it believes that the Court need not address [the] ... claim terms" other than "arranged symmetrically" and "oriented"; D.I. 298 (Oral Argument Transcript) at 8.) Additionally, although the parties dispute the construction of the term "coextruded," both parties agree that to be "coextruded," all of the layers of a film must leave the coextrusion die at the same time. (See D.I. 240 at 27; D.I. 298 (Oral Argument Transcript) at 18-19.) Under this definition, Pechiney concedes that the accused ClearShield film meets this claim limitation. (D.I. 240 at 26-27.) Thus, the issues of infringement and invalidity do not depend on the construction of any of the terms of claim 11 other than those that are construed here. (D.I. 204 at 6; D.I. 298 at 8.)

A. "Oriented" and "Oriented Coextruded Film"

1. The Parties' Proposed Constructions

Cryovac asserts that the term "oriented" should be construed as a part of the term "oriented coextruded film" to mean "a film formed by coextrusion that is then heated to its orientation temperature range and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process." (D.I. 203 at 11.) Cryovac contends that this construction is supported by the definition given for the term "oriented" in the specification, and that broader constructions were disclaimed during prosecution. (Id. at 11-16.) Pechiney, on the other hand, claims that the term "oriented" should be construed to mean "a polymeric material which has been heated and stretched to realign the molecular configuration." (D.I. 204 at 20.) Pechiney asserts that the language "this stretching accomplished by a racking or blown bubble process" should not be included in the construction of the term oriented, as this language would improperly import a product-by-process limitation into the claim. (Id. at 21-22.) Pechiney further argues that the term "oriented coextruded film" should simply be a combination of the definitions of "oriented" and "coextruded", not a separate claim term, and should be defined to mean "an oriented film formed by coextrusion." (D.I. 204 at 20.)

2. The Court's Construction

The specification of the '419 patent states that "[t]he term 'oriented' and the like is used herein to define a polymeric material which has been heated and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process." U.S. Patent No. 4,755,419 at col. 3, lns. 45-49. The parties agree that where a patent applicant provides "an explicit definition in the specification for a claim term[,] ... the definition selected by the patent applicant controls." Renishaw PLC, 158 F.3d at 1249.

The dispute between the parties over the construction of the term "oriented" centers on whether the phrase "this stretching accomplished by a racking or blown bubble process" should be included in the construction of the term. (See D.I. 204 at 21.) While Pechiney asserts that the inclusion of this phrase improperly imports a product-by-process limitation into the claim (id.), Cryovac argues that this final phrase is part of the definition intended by the patentee, and that to define the term differently is inconsistent with the specification of the patent (D.I. 203 at 16-18).

*4 Phillips teaches that claim construction is a practical exercise, in which a claim term is defined to reflect what one of ordinary skill in the art reading the patent would understand. 415 F .3d at 1324 ("[T]here is no magic formula or catechism for conducting claim construction. Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence ..."). However, as earlier noted, the language of the specification " '[u]sually ... is dispositive; it is the single best guide to the meaning of a disputed term.' " Id. at 1315 (quoting Vitronics, 90 F.3d at 1582).

Federal Circuit precedent, is seemingly in conflict regarding whether a product-by-process claim is limited by the process disclosed in the claim. In Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, (Fed.Cir.1991), the court stated that "the correct reading of product-by-process claims is that they are not limited to product prepared by the process set forth in the claims." Scripps Clinic & Research Found., 927 F.2d at 1583. However, just over one year later, the Federal Circuit relied on "a line of [Supreme Court] cases that [stated] the infringement inquiry for product claims with process limitations focuses on whether the accused product was made by the claimed process or its equivalent." Atlantic Thermoplastics Co. v. Faytex Corp., 970 F.2d 834, 842 (Fed.Cir.1992). Thus, the court in Atlantic Thermoplastics held that "process terms in

Slip Copy
Slip Copy, 2006 WL 956599 (D.Del.)
(Cite as: Slip Copy)

Page 4

product-by-process claims serve as limitations in determining infringement." *Id.* at 846-47. In light of the decisions in *Scripps, Atlantic Thermoplastics,* and the Supreme Court cases cited by the Federal Circuit in *Atlantic Thermoplastics,*[FN2] it appears that the determination of whether the process is properly viewed as a limitation is a context-specific inquiry.[FN3] Thus, in keeping with the en banc decision of the Federal Circuit in *Phillips,* each claim, whether it contains a product-by-process limitation or not, must be construed in light of the specification.

FN2. Those cases include, inter alia, *Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486 (1877)* and *Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293 (1884).*

FN3. Indeed, in the Federal Circuit's most recent statement on this issue, *Smithkline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 2006 WL 435838 (Fed.Cir. Feb. 24, 2006),* although the majority stated that it "need not address this controversy here" (*id.* at *4), Judge Newman filed a dissenting opinion which clearly sets out the debate between *Scripps* and *Atlantic Thermoplastics. Id.* at *8-11. In her dissent, Judge Newman stated that the rule emphasized in *Phillips,* that "claims are construed in light of the specification ... is not suspended when product and process limitations appear in the same claim." *Smithkline Beecham Corp., 2006 WL,* at *9. Judge Newman goes on to state that *Scripps* and *Atlantic Thermoplastics* are "not in conflict; they simply deal with different situations." *Id.* at *10.

Here, the patentee specifically defined the term "oriented" in the specification to include the language "accomplished by a racking or blown bubble process." U.S. Patent No. 4,755,419 at col. 3, lns. 48-49 Additionally, the examples provided by the patentee in the specification strongly suggest that this limitation was intended to be a part of the claim. *See id.* at col. 4, lns. 52-55 (stating that the film was "produced by ... cast coextrusion methods, and subsequently oriented ... typically by means of a blown bubble process"); *id.* at col. 8, lns. 60-64 ("the coextruded and cooled tube is heated to its orientation temperature range to orient the film in e.g. a blown bubble process"). Under the guidance given by *Phillips,* the language in the specification of the '419 patent "is the single best guide" to the meaning

of the term oriented. *Phillips, 415 F.3d at 1315.* Under Federal Circuit and Supreme Court case law, this is not changed simply because the definition given by the patentee contains a limitation that describes a process. Thus, I will use the definition given by the patentee in the specification, and will construe the term "oriented" to mean, with reference to a polymeric material, "heated and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process." [FN4]

FN4. Cryovac asserts that I should construe the phrase "oriented coextruded film" rather than just "oriented." (D.I. 203 at 11-16.) However, the construction of this phrase is simply a combination of the construction of "oriented" given here, and the meaning of "coextruded," on which the parties fundamentally agree (*see supra* note 1). Thus, the term "oriented coextruded film" needs no further definition here.

B. *"Arranged Symmetrically" and "At Least Seven Layers Arranged Symmetrically"*

1. The Parties' Proposed Constructions

*5 Cryovac argues that the claim term "arranged symmetrically" should be construed as part of the phrase "at least seven layers arranged symmetrically" to mean:

at least the seven layers recited in subparagraphs (a), (b), (c) and (d) of claim 11 arranged such that one layer (b), one layer (c) and one layer (d) are in the same order on each of the opposite sides of the core layer (a), for example c/d/b/a/b/d/c. This claim phrase limits the arrangement of the layers. It does not limit the thickness of the layers. Nor does it limit the amounts of recited components or additives that may be included in the layers.

(D.I. 203 at 24.) In support of their proposed construction, Cryovac argues that the context, grammar, specification, and prosecution history of claim 11 show that only the arrangement of the layers must be symmetrical and that there is no limitation requiring symmetry in the thickness or chemical composition of the layers. (D.I. 203 at 25.) Specifically, Cryovac contends that "symmetrically" modifies "arranged", which shows only that the layers must be in symmetric order, not that "the layers are themselves symmetric." (*Id.*) Additionally,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cryovac argues that the specification of the '419 patent, which has language referring to the thickness of "each" layer, shows that the thickness of the layers can vary individually. (Id. at 27.) Cryovac also asserts that Pechiney's proposed construction would exclude preferred embodiments (Id. at 28), and that the prosecution history does not support the additional limitations Pechiney attempts to read into the claim (id. at 30).

Pechiney, on the other hand, argues that absolute symmetry is required in the thickness of the layers and their chemical composition. Pechiney asserts that the intrinsic evidence in the patent and the ordinary meaning of the terms support its reading of the claim. (D.I. 204 at 7-8.) Pechiney proposes that "arranged symmetrically" should be construed to mean:
Putting the layers in a desired symmetrical order when the film is viewed in cross-section, that is, putting the layers in an order so that the geometrical center line of the core layer is in the geometrical center line of the film and there is correspondence in the size (thickness) and composition of layers being minor images of each other, with the same thickness and the same chemical composition.

(D.I. 204 at 7.) Pechiney contends that its construction is consistent with the specification of the '419 patent, as the specification discusses a "symmetrical seven layer structure," but never defines the term "arranged symmetrically," and gives no example in which corresponding layers had different thicknesses. (Id. at 10-13.) Pechiney further argues that because during prosecution Cryovac distinguished claim 11 of the '419 patent from a prior art film that was "asymmetric", that claim 11 only covers films that are symmetrical in arrangement, layer thickness, and layer composition. (Id. at 13-17.) Finally, Pechiney argues that in looking at the whole claim, Cryovac's construction renders the "arranged symmetrically" limitation superfluous. (Id. at 18-20 .) Thus, the dispute between the parties hinges on whether the claim term "arranged symmetrically" refers simply to the order of the layers, as Cryovac asserts, or whether that term requires absolute geometrical symmetry, as Pechiney contends.

### 2. The Court's Construction

*6 The plain language of claim 11 and the prosecution history of the '419 patent support Cryovac's assertion that the term "arranged symmetrically" requires only symmetrical arrangement of the layers in the film, but not precise

identity in the thickness or chemical composition of those layers. First, looking simply at the plain language and grammar of claim 11 of the '419 patent, what is claimed is a film "having at least seven layers arranged symmetrically." See U.S. Patent No. 4,755,419 at col. 9, lns. 67-68. The word "symmetrically" modifies the word "arranged," and thus requires only that the layers should be symmetrical in their arrangement. Nothing about this language requires or even suggests that corresponding layers must be precisely identical in thickness or chemical composition, having geometric symmetry around a center line.

Furthermore, the prosecution history of the '419 patent favors this construction of the term "arranged symmetrically". To support its argument that there must be absolute symmetry in the thickness and chemical composition of the layers of the film, Pechiney attempts to rely on the fact that, during prosecution of the '419 patent, Cryovac added the "arranged symmetrically" claim limitation to overcome a prior art rejection. (D.I. 204 at 16.) Indeed, Cryovac added this limitation to overcome an obviousness rejection over U.S. Patent No. 4,284,674 to Sheptak ("Sheptak") in view of U.S. Patent No. 4,532,189 to Mueller ("Mueller"). (D.I. 249, Ex. 3 at CR056-000155.) Sheptak, however, disclosed an eight layer film, with five layers that were symmetrically arranged and an additional three layers added to one side of the five layer film, making the overall structure asymmetric. (D.I. 249, Ex. 6 (showing a film orientation of c/b/a/b/c/d/e/f).) Mueller disclosed three and five layer films that appear to have a symmetrical arrangement, although that symmetry is not explicitly claimed. (D.I.216, Ex. 12.)

Cryovac argued during prosecution of the '419 patent that Sheptak disclosed an asymmetrical film and that, as a result, adding the outer layers of the film disclosed in Mueller would still give a structure that was asymmetrical. (D.I. 249, Ex. 3 at CR056-000155.) Cryovac asserted that the film disclosed in the '419 patent had, by contrast, "at least seven layers [that were] ... symmetrically arranged." (Id.) Cryovac claims that through this amendment it was simply distinguishing the prior art by pointing out that the three additional layers added to the Sheptak film's symmetrical layers made that whole film asymmetrical in arrangement, and that such an arrangement would remain asymmetrical even with the addition of the outer layers from Mueller. (D.I. 248 at 29-31.) Nothing about this amendment shows, as Pechiney urges, that Cryovac was asserting with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 956599 (D.Del.)
(Cite as: Slip Copy)

the addition of this limitation that its claimed film had perfect symmetry in thickness and chemical composition of the layers of the film. Accordingly, the prosecution history supports a construction of the term "arranged symmetrically" that does not require precise identity in the thickness and chemical composition of the layers.

*7 Finally, Pechiney urges that if Cryovac's proposed construction is adopted, the "arranged symmetrically" limitation would be superfluous, as the body of the claim describing layers (a), (b), (c), and (d) teaches a film that is arranged symmetrically under Cryovac's definition. However, although the body of the claim does teach that layers (b), (c), and (d) must be put in a symmetrical order, nothing in the body of the claim prevents the addition of layers on one side of the (a) layer. Therefore, without the limitation that the film must be "arranged symmetrically," an additional layer could be added on one side of the (a) layer, making the film have a structure of c/d/b/a/e/b/c/d. Thus, "arranged symmetrically" is not superfluous as I have construed it.

Having determined that precise identity in the thickness and chemical composition of the layers is not required by the term "arranged symmetrically," there still remains the question of just how much alike the corresponding layers must be. The claim language itself provides the answer to that question. Claim 11 of the '419 patent describes the composition of each of the layers of the film. ('419 patent at col. 10, lns. 1-9.) For example, (b) layers must each comprise a polyamide, and (c) layers must each comprise a "polymeric material or blend of polymeric materials." (Id. at col. 10, lns. 3-6.) Thus, the chemical composition of the layers of the film

claimed in claim 11 of the '419 patent is limited only by the definitions of the layers themselves, as stated in the claim, and not by the claim term "arranged symmetrically."

Accordingly, I construe "arranged symmetrically" to mean "putting the layers in a desired symmetrical order when the film is viewed in cross-section, so that the layers are in the same order on each side of the core of the film, for example c/d/b/a/b/d/c. This claim phrase limits only the arrangement of the layers, and does not require precise identity in the thickness of the layers or the amounts of recited components or additives that may be included in the layers." [FN5]

> FN5. Cryovac has urged that I construe the phrase "at least seven layers arranged symmetrically" rather than simply "arranged symmetrically." Its proposed construction encompasses limitations set forth not only in that phrase, but also in other parts of the claim. Because the limitations that Cryovac attempts to import into the construction of "at least seven layers arranged symmetrically" are in other parts of the claim, I decline to import them into the construction of this term. Additionally, because the meaning of "at least seven layers" is clear, I have construed only the phrase "arranged symmetrically."

## V. CONCLUSION

For these reasons, the disputed claim terms will be construed as follows:

| Claim Term | The Court's Construction |
|---|---|
| "oriented" | The court construes "oriented" to mean, with reference to a polymeric material, "heated and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process." |
| "arranged symmetrically" | The court construes "arranged symmetrically" to mean "putting the layers in a desired symmetrical order when the film is viewed in cross-section, so that the layers are in the same order on each side of the core of the film, for |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 956599 (D.Del.)
(Cite as: Slip Copy)

example c/d/b/a/b/d/c. This claim phrase limits only the arrangement of the layers, and does not require precise identity in the thickness of the layers or the amounts of recited components or additives that may be included in the layers."

*8 An appropriate order will issue.

For the reasons set forth in the Opinion issued today, it is hereby ORDERED that the following disputed claim terms of U.S. Patent No. 4,755,419 (issued July 5, 1988) are construed as follows:

### ORDER

| Claim Term | The Court's Construction |
|---|---|
| "oriented" | The court construes "oriented" to mean, with reference to a polymeric material, "heated and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process." |
| "arranged symmetrically" | The court construes "arranged symmetrically" to mean "putting the layers in a desired symmetrical order when the film is viewed in cross-section, so that the layers are in the same order on each side of the core of the film, for example c/d/b/a/b/d/c. This claim phrase limits only the arrangement of the layers, and does not require precise identity in the thickness of the layers or the amounts of recited components or additives that may be included in the layers." |

D.Del.,2006.
Cryovac Inc. v. Pechiney Plastic Packaging, Inc.
Slip Copy, 2006 WL 956599 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3666863 (Trial Pleading) Answer to Second Amended Complaint (Oct. 24, 2005)
• 2005 WL 3666861 (Trial Motion, Memorandum and Affidavit) Pechiney's Motion for Summary Judgment on Patent Issues (Oct. 19, 2005)
• 2005 WL 3666862 (Trial Motion, Memorandum and Affidavit) Pechiney's Motion for Partial Summary Judgment on Tortious Interference Claims (Oct. 19, 2005)
• 2005 WL 3666860 (Trial Pleading) Second Amended

Complaint for Patent Infringement (Oct. 12, 2005)
• 1:04cv01278 (Docket) (Sep. 20, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY, LLC,     )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )     C.A. No. 04-833-KAJ
                                      )
SICOR INC. and SICOR                  )
PHARMACEUTICALS, INC.,                )
                                      )
                    Defendants.       )

## JOINT CLAIM CONSTRUCTION CHART

Pursuant to this Court's Amended Scheduling Order of December 6, 2005 and the Stipulated Order of May 22, 2006, Plaintiff Pharmacia & Upjohn Company, LLC ("Pharmacia") and Defendants Sicor, Inc. and SICOR Pharmaceuticals, Inc. (collectively, "Sicor") herein provide a Joint Claim Construction Chart listing the claim terms, as well as their proposed constructions, at issue in this case. For those terms that are contested, each Party's proposed construction is provided; for those terms that are not contested, a jointly proposed construction is provided.

### Claim 1

|  |  |  |
| --- | --- | --- |
| A physiologically acceptable solution | a solution that is stable, sterile, pyrogen-free, and otherwise suitable for administration to humans or animals | a solution that is suitable for administration to humans or animals |
| of | of | including, but not limited to, |

| | | |
|---|---|---|
| anthracycline glycoside | a class of chemical compounds having the following generic structure:<br> | a non-lyophilized preparate of the class of chemical compounds having the following generic structure:<br> |
| selected from the group consisting of | either [element a], [element b], [element c] … or [element x], but not combinations of the elements | |
| idarubicin hydrochloride | a monohydrochloride salt form of an anthracycline glycoside compound having the following structure:<br> | |
| doxorubicin hydrochloride | a monohydrochloride salt form of an anthracycline glycoside compound having the following structure:<br> | |

| epirubicin hydrochloride | a monohydrochloride salt form of an anthracycline glycoside compound having the following structure: | |
|---|---|---|
| |  | |
| dissolved in | dissolved in | |
| a physiologically acceptable aqueous solvent | an aqueous solvent that is stable, sterile, pyrogen-free, and otherwise suitable for administration to humans or animals | an aqueous solvent that is suitable for administration to humans or animals |
| having a pH adjusted to from 2.5 to 5.0 | obtaining a solution that has a pH within the specified range due to the use of a pH adjusting agent | |
| with | with | |
| a physiologically acceptable acid | an acid that is stable, sterile, pyrogen-free, and otherwise suitable for administration to humans or animals | an acid that is suitable for administration to humans or animals |
| selected from the group consisting of | either [element a], [element b], [element c] … or [element x], but not combinations of the elements | |
| hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid | hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid | |
| the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml | the concentration is between 0.1 and 100 mg/ml, inclusive | |
| wherein said solution is contained in | wherein the solution is contained in | |
| a sealed container | a closed container which is further secured against access, leakage and passage by a fastening, membrane, or coating that must be broken to be removed | a container that is closed in some fashion such that is does not allow the passage of the solution |

3

**Claim 9**

| | | |
|---|---|---|
| The anthracycline glycoside solution of claim 1 | an anthracycline glycoside solution meeting all of the limitations of claim 1 | |
| wherein said solution exhibits | the solution exhibits | |
| storage stability | a solution which retains physiological acceptability and at least 90% potency under suggested storage conditions for at least 18 months | at least 90% of the original amount of anthracycline glycoside dissolved in solution remains in the solution when stored at a temperature of about 4°C or 8°C for a period of at least 180 days |
| as a result of said pH being adjusted to said pH range using said acids | because the solution has a pH of within the specified range due to the use of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, or tartaric acid | |

**Claim 11**

| | |
|---|---|
| The solution of claim 1 | an anthracycline glycoside solution meeting all of the limitations of claim 1 |
| wherein the concentration of anthracycline glycoside is about 1 mg/ml | the concentration of the anthracycline glycoside in solution is about 1 mg/ml |

4

**Claim 12**

|  |  |
|---|---|
| The solution of claim 11 | an anthracycline glycoside solution meeting all of the limitations of claims 1 and 11 |
| wherein the physiologically acceptable acid is hydrochloric acid | the pH is adjusted to from 2.5 to 5.0 with hydrochloric acid |

**Claim 13**

|  |  |
|---|---|
| The solution of claim 12 | an anthracycline glycoside solution meeting all of the limitations of claims 1, 11, and 12 |
| wherein the anthracycline glycoside is idarubicin hydrochloride | the anthracycline glycoside in solution is idarubicin hydrochloride |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP    ASHBY & GEDDES

*/s/ Maryellen Noreika*
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200
  *Attorneys for Plaintiff*

OF COUNSEL:
Daniel A. Boehnen
Joshua R. Rich
McDONNELL BOEHNEN HULBERT &
BERGHOFF LLP
300 S. Wacker Drive
Chicago, Illinois  60606
(312) 913-0001

May 30, 2006

*/s/ John G. Day*
Steven J. Balick (#2114)
John G. Day (#2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
  *Attorneys for Defendants*

OF COUNSEL:
Reid L. Ashinoff
David R. Baum
SONNENSCHEIN NATH &
ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY  10020

Jordan Sigale
SONNENSCHEIN NATH &
ROSENTHAL LLP
8000 Sears Tower
Chicago, IL  60606

# EXHIBIT L

Docket No. 769-249-0 DIV

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:

GAETANO GATTI, ET AL

SERIAL NO: 07/827,742

FILED:    JANUARY 29, 1992

FOR:   INJECTABLE READY-TO-USE SOLUTIONS
       CONTAINING AN ANTITUMOR
       ANTHRACYCLINE GLYCOSIDE

GROUP ART UNIT:  1803

EXAMINER: PESELEV, E.

DECLARATION OF CARLO CONFALONIERI
PURSUANT TO 37 C.F.R. 1.132

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

    Now come Carlo Confalonieri, a citizen of Italy, and a
resident of Cusano  Milanino (Milan), Italy who declares and
states that:

    1.   I am the Carlo Confalonieri who previously submitted
declarations pursuant to 37 C.F.R. 1.132 in application Serial
Number 07/503,865 executed on December 20, 1990 and May 27, 1991
found at tabs 1 and 2 respectively to this declaration.

    2.   In order to demonstrate that the results illustrated in
my declaration found at tab 1, were obtained with other
physiologically acceptable acids, I conducted additional
comparative testing found at tabs 8 through 10 attached hereto.
The procedures employed in conducting these tests were the same
as those described in my previous declarations, and in particular



PU 0016632

as set forth in tab 1 hereto.  In addition to testing other
physiologically acceptable acids, stability testing for
epirubicin and idarubicin is also presented in tabs 3 through 8.
As can be seen from these tabs epirubicin shows, under both
accelerated and long term testings, a very similar stability
behaviour as doxorubicin, while idarubicin appears to be even
more stable under both accelerated and long term conditions.

3.  From these tests it is apparent that the storage
stability conferred on aqueous solutions of doxorubicin is
not unique to hydrochloric acid but the stability is also
conferred by other physiologically acceptable acids.  In all
instances, the physiologically acceptable acids at pHs between
2.5 and 5 produced aqueous solutions having superior storage
stability as compared with the use of phosphate buffers as
taught by Arcamone.  Indeed, even the use of phosphoric acid
resulted in superior storage stability when compared with the
use of phosphate buffers as taught in Arcamone.

4.  In conducting the storage stability tests, I tested a
wide variety of physiologically acceptable acids which produced
aqueous solutions in which the various anthracyclines were
soluble.  In particular, results obtained with acetic acid as
well as hydrochloric acid are illustrated at tab 8.  Tabs 9 and
10 compare sulfuric acid, phosphoric acid, methanesulphonic acid
and tartaric acid with hydrochloric acid with results at tab 10
also comparing the Beijnen formulation using perchloric acid and

2

PU 0016633

the Arcamone phosphate buffers.  As can be seen, all of the tested physiologically acceptable acids produced results vastly superior to that for the phosphate buffers.

Furthermore, as evident, e.g., from tab 6, the acetic acid used as pH controlling agent for idarubicin under accelerated and long term conditions produced results comparable to those achieved with hydrochloric acid.

That is, that the results achieved with acetic acid would demonstrate comparable stability values as for the acids identified previously.

5.  Based on these results, it is my conclusion that any physiologically acceptable acid which yielded solutions in which the anthracycline of interest was soluble will, at the recited pHs, result in a storage stable aqueous solution.  I find such results to be quite surprising since until the time of our invention, it was considered that pH alone was the determining factor in establishing storage stability of aqueous solutions as discussed in my previous declarations found at tabs 1 and 2. From the results which have been presented, it is apparent that the nature of the specific acid employed is not critical (although hydrochloric acid appears to yield the best results) but, rather, that any physiologically acceptable acid results in solutions having superior storage stability.

6.  Prior to the present invention, the conventional wisdom was that it was impossible to produce anthracycline aqueous solutions which had long term storage stability.  Further, that although the prior art had been recognized that pH had an effect upon storage stability of aqueous solution, the conventional wisdom in the art was that the pH should be adjusted with a

3

PU 0016634

buffer as taught by Arcamone.  Thus, it was surprising and
unexpected to discover that by adjusting the pH of the aqueous
solution with a physiologically acceptable acid, a solution
having a storage stability as demonstrated at tabs 3 through
10 hereto, would result.   Prior to the present invention
the expectation of those skilled in the art was that the nature
of the pH adjusting medium would have no effect on the stability
of the aqueous solution.  Accordingly, it was extremely
surprising and unexpected to find that contrary to conventional
wisdom, the pH adjusting medium had a significant and beneficial
effect.

I hereby declare that all statements made herein of my own
knowledge are true and that all statements made on information
and belief are believed to be true; and further that these
statements were made with the knowledge that willful false
statements and the like so made are punishable by fine or
imprisonment, or both, under Section 1001 of Title 18 of the
United States Code and that such willful false statements may
jeopardize the validity of the application or any patent issued
thereon.


Carlo Confalonieri                    Dated: 9th December, 1992

766-249-0 DIV

PU 0016635

1

1

PU 0016636

769-086-0 FWC

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| IN RE APPLICATION OF: | : | |
| GAETANO GATTI ET AL | : | GROUP ART UNIT: 183 |
| SERIAL NO. 07/503,856 | : | EXAMINER:  PESELEV |
| FILED:   APRIL 3, 1990 | : | |
| FOR:  INJECTABLE READY-TO-USE | : | |
|      SOLUTIONS CONTAINING AN | : | |
|      ANTITUMOR ANTHRACYCLINE | : | |
|      GLYCOSIDE | : | |

### DECLARATION PURSUANT TO 37 C.F.R. 1.132

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS

WASHINGTON, D.C. 20231

SIR:

Now comes Carlo Confalonieri, a citizen of Italy, and a resident of Cusano Milanino (Milan), Italy, who declares and states that:

1.   I am an employee of Farmitalia Carlo Erba, S.r.l. since 1964 and I am an expert in the chemistry of anthracyclines.

2.   I graduated from the University of Milan, with a degree in Pharmacy in 1976.

3.   That I supervised the accelerated stability test originally presented in my March 10, 1987 declaration filed in Serial No. 878,784, a copy of which is Exhibit C to my December 20, 1990 Declaration filed in Serial No. 07/503,856.

The complete details of the experiments which were conducted are found on pages 2 and 3 of Exhibit C.

PU 0016637

4.    In Table 1, pH's of from 2 to 3.0 were compared at 55°C for stability wherein the pH was adjusted with HCl.  As can be seen, the composition wherein the pH was 2.5 had superior stability as compared with the same solution at a pH of 2.0.  The superiority of stability is particularly apparent beginning at about 16 hours and continuing thereafter.  In Table 2, further comparisons of solutions having a pH from 2.0 to 3.0 and adjusted with HCl are reported.  The actual pH for the solution having a reported pH of 2.0 is, as set forth in the table, variable over the time of the test beginning at 2.14 and varying from a low of 2.13 to a high of 2.21.  Similarly, the solution with a recorded pH of 2.5 varied somewhat over the test period and ranged from an initial pH of 2.56 to a high of 2.61.

5.    I am also familiar with the Wassermann reference, Exhibit F, hereto.  The Wassermann reference is reporting on the decomposition of Adriamycin under acidic conditions at a pH of about 2.  In the experiments, Wassermann reports a pH of 2.13.  The composition of Wassermann differs from the composition which is the subject of the above-identified application in that the concentration of Adriamycin in the solution is only about 1/80th of the minimum of concentration specified in the present claims and, (2) the pH is lower than the minimum specified in the claim of 2.5.  It is my opinion that Wassermann was not concerned with long term storage stability but, rather, was solely concerned with the kinetics of Adriamycin decomposition under acidic conditions as are found in the gastric system and in liquid

-2-

PU 0016638

chromatography using acidic mobile phases. It is my opinion that
Wassermann provides no information which would allow one skilled
in the art to produce a storage stable Adriamycin solution.  My
opinion is confirmed by the Beijnen article, Exhibit G hereto.
On the first page of the article (page 109) Beijnen describes the
Wassermann article thusly:

> Furthermore, as explained by Wassermann and
> Bundgaard, data with respect to the acid
> catalyzed hydrolysis of anthracyclines are of
> importance in relation to gastric degradation
> and liquid chromatography using acidic mobile
> phases.

6.    The test results reported on Table 2 further confirm my
opinion that Wassermann was unconcerned with long term storage
stability.  As can be seen, when a pH is adjusted to 2.14 the
storage stability of the solution for the first 8 hours 55°C is
comparatively good, approximately 92.8% of the anthracycline
remains in an active form.  This is in agreement with
Wassermann's statement that under the conditions of HPLC,
degradation will not be a factor and, that in the gastric system
of a patient having normal retention times, the anthracyclines
will survive largely intact.  However, as can be seen from Table
2 long term stability of the solution at a pH of 2.14
(approximately) is not good.  After 16 hours at 55°C, only 84.4%
of the doxorubicin remains in active form as compared with 92.6%
of the doxorubicin having a pH of about 2.5 (2.56).  As the time
is extended the 72 hours, the difference in stability of the two
solutions becomes even more apparent.  It is my opinion that the

-3-

PU 0016639

tests reported in Table 2 demonstrate that the Wassermann solution would not be considered a long term storage stable product.

7. Based on the extensive experimentations which I have carried out and my experience with the experiments reported on Tables 1-3, the difference between a pH of 2.5 and a pH of 2.56 will not have a significant effect on the overall stability of the doxorubicin solutions as can be seen from Table 1, at a pH of 2.51, the doxorubicin solution had approximately the same stability as that reported for a pH of 2.56 in Table 2. Accordingly, it is my opinion that the test results presented in Table 2 are a fair comparison of a solution having pH of 2.5 versus a solution having a pH of 2.14 wherein the pH was achieved by adjustment with hydrochloric acid.

8. In conclusion, it is my opinion that one skilled in the art would not have been lead by the Wassermann reference to have recognized the unique advantages to be achieved by adjusting Adriamycin solutions to a pH of from 2.5 to 5.0 with hydrochloric acid. There is nothing in Wassermann which would suggest that such solutions would have long term storage stable characteristics such as those which are the subject of the claims of the above-identified application. Based upon the experience of those skilled in the art, when one was preparing the solution of Adriamycin for use in chemotherapy, any adjustment of pH above about 2 would have been performed with a buffer and not with hydrochloric acid. Thus, it is my opinion that it was quite

-4-

surprising and unexpected to find that the use of hydrochloric acid to adjust the pH of an Adriamycin solution to from 2.5 to 5.0 resulted in a storage stable solution.

9.   The undersigned declares further that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

10.   Further deponent saith not.

Date: 27th May, 1991

Carlo Confalonieri

-5-

PU 0016641

2

2

PU 0016642

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:                    :

GAETANO GATTI ET AL                      :        GROUP ART UNIT: 183

SERIAL NO. 07/503,856                    :        EXAMINER:  PESELEV

FILED:  APRIL 3, 1990                    :

FOR:  INJECTABLE READY-TO-USE            :
      SOLUTIONS CONTAINING AN            :
      ANTITUMOR ANTHRACYCLINE            :
      GLYCOSIDE                          :

DECLARATION PURSUANT TO 37 C.F.R. 1.132

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Now comes Carlo Confalonieri who states that:

1.    I have been an employee of Farmitalia Carlo Erba,
S.r.l. since 1964.  I have been involved in the field of
pharmaceutical analysis for over 10 years and I am an expert
in the chemistry of anthracyclines.

2.    I obtained a degree in Pharmacy in 1976 from the
University of Milan.

3.    I am the same Carlo Confalonieri who provided the
August 11, 1989 declaration which was filed in Application
Serial No. 07/385,999 now U.S. Patent 4,946,831.

4.    That I have conducted further tests to demonstrate
the  stability  of  doxorubicin  hydrochloride  solutions
prepared by the method described in Application Serial No.
503,586.  These tests compare doxorubicin hydrochloride

-2-

solutions prepared according to the present invention with those prepared following the teachings of Beijnen who tested the stability of doxorubicin hydrochloride by adjusting the pH with perchloric acid and of Arcamone who proposed adjusting the pH of doxorubicin hydrochloride with phosphate buffer. In the tables and graphs which follow on Exhibit A, the composition of the present invention is identified as FICE while the phosphate buffer technique of Arcamone is identified under the name by the term "ARCAMONE" and the adjustement of the pH using perchloric acid is identified by the name "BEIJNEN". The concentration of doxorubicin hydrochloride was maintained at 2 mg/ml for both the FICE and ARCAMONE solutions. The concentration in the Beijnen examples was maintained at 5 μg/ml (mcg/ml). This low concentration in the Beijnen examples is meaningless for the clinical practice but was necessary because at higher concentrations the doxorubicin hydrochloride would not remain in solution. In particular, at a concentration of 2 mg/ml the doxorubicin precipitated immediately after preparation when perchloric acid was used. At a concentration of 1 mg/ml precipitation occurred within 30 minutes. When the concentration was further reduced to 0.5 mg/ml the presence of gelatinous lumps in suspension was noted after but a few hours which then became completely opalescent. Since the objective of the present test was to demonstrate long term stability it was necessary to

PU 0016644

-3-

utilize a concentration of doxorubicin in the presence of perchloric acid which would remain stably in solution for a long period of time. Accordingly, the 5 µg/ml reported in the Beijnen article was selected as the concentration for the test.

5.   In my opinion, the technique of Beijnen, adjusting the pH with perchloric acid, would not be practiced by one skilled in this art to obtain storage stable physiologically acceptable doxorubicin hydrochloride solutions for several reasons. First, perchloric acid is not a pharmaceutically acceptable material for incorporation into pharmaceuticals which are to be administered intravenously to patients. That is, it would be impossible to prepare a clinically acceptable solution using perchloric acid. Second, even if perchloric acid had been pharmaceutically acceptable, the instability of the doxorubicin hydrochloride solution would render the material unacceptable. It is necessary that the pharmaceutical manufacture be able to deliver reasonably concentrated solutions of doxorubicin hydrochloride to the medical facility to be of any practical value. As demonstrated by the test described above, it is impossible to formulate reasonably concentrated solutions of doxorubicin hydrochloride where the pH has been adjusted with perchloric acid.

6.   Further, the utilization of hydrochloric acid to adjust the pH of the solution to arrive within the pH range of from 2.5 to 5, 2.5 to 3.5 or 2.62 to 3.14 would not have been a technique

PU 0016645

-4-

utilized by those skilled in the art. In my opinion, the description contained in Arcamone is typical of what those skilled in the pharmaceutical arts would have done prior to the present invention. Arcamone following conventional wisdom prepared his initial solutions having pH's of 1 and 2 utilizing dilute aqueous hydrochloric acid. On the other hand, when he desired to prepare a solution having a higher pH, pH's of from 3 to 6, Arcamone used phosphate buffer, the conventional technique utilized in the art. Accordingly, it is my opinion that those skilled in the art would not have used hydrochloric acid to adjust the pH of a doxorubicin hydrochloride solution to have the pH ranges specified above. Furthermore, the following tables and graphs which represent the results of stability experiments conducted either by me or under my supervision and control demonstrate that those solutions prepared utilizing hydrochloric acid to adjust the pH to within the stated ranges possessed unexpectedly superior stability when compared with the solution prepared utilizing a phosphate buffer. Furthermore, even if it were possible to utilize perchloric acid to prepare the doxorubicin hydrochloride solution, these tests demonstrate that superior results are obtained when one uses hydrochloric acid in the pH range of from approximately 2.5 to approximately 3.5. The perchloric acid solutions, however, demonstrate somewhat superior storage stability at higher pH's, 3.5 to about 5. However, as

PU 0016646

PU 0016647

noted above, perchloric acid is not a pharmaceutically acceptable
material and thus could not be used to produce pharmaceutically
acceptable storage stable solutions. Also, the perchloric acid
would not allow the preparation of solutions having the claimed
concentrations which were storage stable over the pH range
specified since the doxorubicin hydrochloride would not remain in
solution. A product intended for intravenous administration
which contains precipitate or gelatinous lumps is unacceptable in
the pharmaceutical field.

7.    Based on the experiments reported in my March 10, 1987
declaration filed in Serial No. 878,784 and attached hereto as
Exhibit C, it is my conclusion that a doxorubicin hydrochloride
solution which has its pH adjusted to 2.5 with hydrochloric acid
has superior storage stability to doxorubicin hydrochloride
solutions whose pH has been adjusted to 2.0 with hydrochloric
acid. The data in Exhibit C on the doxorubicin hydrochloride
stability at pH 2.0 and 2.5 support this conclusion. This conclu-
sion is based not only upon the data in my March 1987 declaration
but also the data reported herein.   As can be seen from Exhibit
D, the stability of doxorubicin hydrochloride solution whose pH
is below 3 is dropping rapidly. From that data I would have
expected that at a pH of 2.0 the stability would be significantly
below the stability at a pH at 2.5.   As can be seen from my
earlier declaration, at 55°C the stability of doxorubicin
hydrochloride solutions having a pH of 2.0 was significantly
inferior to the same solution wherein the pH was adjusted to 2.5.

-6-

Table 4 of the declaration reports that the decomposition rate for doxorubicin hydrochloride at a pH of 2 was more than 2.5 times the decomposition rate at a pH of 2.5.

The improvement in the storage stability of doxorubicin hydro-chloride at a pH of 2.5 as compared with that at 2.0 wherein the pH in both instances is adjusted with hydrochloric acid is surprising in view of the teaching of Arcamone. On page 20 Arcamone demonstrates that at pH's of 1 and 2 where the pH is adjusted with hydrochloric acid the stability of 22°C is less than 20 hours while at pH's of from 3 to 6 where it is adjusted with phosphate buffer, the stability is greater than 1 month. There is simply nothing in Arcamone which would suggest that by adjusting the pH to 2.5 with hydrochloric acid one would achieve a doxorubicin hydrochloride solution having significantly better stability than a doxorubicin hydrochloride solution whose pH has been adjusted to 2.5 with a phosphate buffer. Indeed, nothing in Arcamone suggests that the medium used for adjusting the pH has any effect upon the storage stability of the solution.

8. Exhibit E hereto reports on stability results obtained when doxorubicin hydrochloride whose pH had been adjusted with hydrochloric acid was stored in a variety of plastic containers including polypropylene, polyvinyl chloride, high density polyethylene (PEHD) and low density polyethylene (PELD). Based upon this data reported in Exhibit E, it is my opinion that the

PU 0016648

-7-

results obtained in my other experiments utilizing glass
containers would also be applicable to containers made of other
materials such as plastics. Under the tested conditions reported
in Exhibit E, doxorubicin hydrochloride solutions whose pH had
been adjusted with hydrochloric acid to within the claimed ranges
exhibited stability similar to that obtained in glass containers.
I base this conclusion upon the similarity of results reported in
Exhibit E as compared with, e.g., the results which are reported
in Table 2 of the '831 patent, which shows data on the same
solution stored in a glass container.

9.    The tests reported in these experiments were all
conducted at concentrations of 2 mg/ml of doxorubicin hydro-
chloride with the exception of Beijnen as noted previously. It
is my opinion that similar stability data would be obtained if
these tests were conducted at other concentrations of doxorubicin
hydrochloric within the scope of the claims, that is, from
concentrations of 0.1 to 100 mg/ml. While the absolute stability
of the various solutions may be different depending upon the
concentration, those solutions whose pH has been adjusted to
within the claimed range with hydrochloric acid will exhibit
superior stability as compared with solutions whose pH has been
adjusted in accordance with the prior art teachings.

10.    Also presented is a table (Exhibit B) comparing the
half-life of doxorubicin hydrochloride solution under accelerated

PU 0016649

-8-

test conditions at 55°C where in addition to hydrochloric acid other acids disclosed on page 5 of the present application were employed to adjust the pH. To my knowledge, the use of these other acids to adjust the pH to within the range specified in the claim is not suggested in the prior art. This table demonstrates under accelerated test conditions, hydrochloric acid is better than the other disclosed acids.

The undersigned declares further that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Further deponent saith not.

Date: December 20, 1990                Carlo Confalonieri
                                       Carlo Confalonieri

PU 0016650

EXHIBIT C

PU 0016666

769-080-0
75/

## IN THE UNITED STATES PATENT & TRADEMARK OFFICE

| | |
|---|---|
| IN RE APPLICATION OF | : GROUP ART UNIT: 123 |
| GAETANO GATTI ET AL | : |
| SERIAL NO: 878,784 | : |
| FILED: JUNE 26, 1986 | : EXAMINER: PESELEV |
| FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE | : |

### DECLARATION UNDER RULE 1.132 DECLARATION II

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

NOW COMES  Carlo Confalonieri     , a citizen of
Italy, and a resident of Cusano Milanino/(Milan), Italy, who
declares and says that:

1.  I am an employee of Farmitalia Carlo Erba S.p.A.
since 1964         , and an expert in the chemistry
of  anthracyclins      , and have worked in the field
of pharmaceutical analysis  for at least  ten  years.

2.  I graduated from the University of Milan    ,
with a degree in   Pharmacy      in the year of
1976.

3.  I supervised the following experiments:

PU 0016667

-2-

4. The following experiments were carried out under accelerated temperature conditions on 5.0 ml of 2 mg/ml doxorubicin·HCl solutions in a container-closure system consisting of: glass type I, 8 ml top capacity vial; teflon-faced chlorobutyl rubber bung; aluminum seal.

## pH-stability profile at 55°C of doxorubicin·HCl solutions in sterile water, 5% dextrose, 0.9% saline

2 mg/ml doxorubicin·HCl solutions were prepared in the following I=0.05 buffers: a) glycine·HCl pH 2.0, 2.5 and 3.0; b) formate pH 3.5; c) acetate pH 4.0, 5.0 and 5.5.

5.0 ml of each solution in glass vials were stored at 55°C and analyzed at prefixed times (up to 120 hours) for doxorubicin·HCl assay and pH.

Tables 1, 2 and 3 attached hereto give the doxorubicin·HCl residual concentration and percent stability at 55°C, at different pH's and times of storage for sterile water, 5% dextrose and 0.9% saline solutions, respectively.

The doxorubicin·HCl assays are the mean of three independent determinations performed by the USP HPLC method (USP XXI). At each pH value, the pseudo-first order rate constants ($K_{obs}$) for the degradation were calculated by linear regression analysis of the natural logarithm of the residual concentration of

PU 0016668

-3-

doxorubicin·HCl ($|Dx|_t$) versus time as depicted by the following equation:

$$\ln |Dx|_t = \ln |Dx| - K_{obs} \cdot t$$

J. Thuro Carstens , Theory of Pharmaceutical Systems, Volume 1/ General Principles, page 172, Academic Press, New York and London 1972

Kenneth A. Connors, Gordon L. Amidon, Lloyd Kennon, Chemical Stability of Pharmaceuticals, chapter 2, John Wiley and Sons, New York 1979

Arthur Osol, Remington's Pharmaceutical Sciences, 16th Edition, chapter 18, Mack Publishing Company, Easton, Pennsylvania 1980

Valentino J. Stella, Chemical and Physical Bases Determining the Instability and Incompatibility of Formulated Injectable Drugs, Journal of Parenteral Sciences & Technology, July-August 1986, page 142

Tables 4, 5 and 6 attached hereto give the observed rate constants ($K_{obs}$) for the degradation kinetics of doxorubicin·HCl at 55°C and at different pH's for sterile water, 5% dextrose and 0.9% saline solutions, respectively.

Figures A, B and C attached hereto show the $K_{obs}$-pH profile for the doxorubicin·HCl degradation at 55°C in the above mentioned media. The data in Tables 1-6 and the Figures A-C evidence that the 2 mg/ml doxorubicin·HCl solutions show at 55°C the maximum stability in the pH range about 3.0-3.5 (± 0.2, e.g., 2.8, 3.2 and 3.3, 3.7) for all the three media tested.

PU 0016669

-4-

5.  I declare further that all statements made of my own knowledge are true and all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of this application or any patent issuing thereon.

6.  Further declarant saith not.

March 10, 1987
_____
Date

Signature

75/mkn

# EXHIBIT M

# RANDOM
# HOUSE
# DICTIONARY
## of the
# ENGLISH
# LANGUAGE

**JESS STEIN**
Editor in Chief

**LAURENCE URDANG**
Managing Editor

**LIBRARY**

ᴀᴘʀ 0 9 1984

RUBIN BAUM LEVIN
CONSTANT & FRIEDMAN



**RANDOM HOUSE/ NEW YORK**

opyright, 1983, 1981, 1979, 1973, 1971, 1970, 1969, 1967, 1966, by Random House, Inc.

ights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced
of form or by any means, electronic or mechanical, including photocopying, without permission in writing from the publisher.
nquiries should be addressed to Random House, Inc., 201 E. 50th Street, New York, N.Y. 10022.

.BED IN NEW YORK BY RANDOM HOUSE, INC.

SIMULTANEOUSLY IN TORONTO BY RANDOM HOUSE OF CANADA LIMITED

Random House Dictionary of the English Language and its abbreviations RHD and RHD/SL are trademarks of Random House, Inc.

ary of Congress Catalog Card Number: 74-129725

N: 0-394-47176-3

uthor of colored words which we have reason to believe constitute trademarks have been designated as such.
ever, neither the presence nor the absence of such designation should be regarded as affecting the legal status of any trademark.

Concise French Dictionary, edited by Francesca L. V. Langbaum, Copyright, 1954, by Random House, Inc.

Concise Spanish Dictionary, edited by Donald F. Sola, Copyright, 1954, by Random House, Inc.

Concise Italian Dictionary, edited by Robert A. Hall, Jr. © Copyright, 1957, by Random House, Inc.

Concise German Dictionary, edited by Jenni Karding Moulton, © Copyright, 1959, by Random House, Inc.

as Dates in World History, edited by Charles D. Lieber and Anne Dyer Murphy, © Copyright, 1964, by Random House, Inc.

he contents of the Atlas and the index to the maps, © Copyright, 1966, by C. S. Hammond & Company.

er of Periodic Table of the Elements, © Copyright, 1964, by E. H. Sargent & Co.

le of Common Proofreader's Marks, Copyright, 1958, © 1956, by Alfred A. Knopf, Inc.

**phylloid**

**phytonadione**



Great Seal of the United States



Sealyham terrier (16½ in. high at shoulder)





Sea otter (Total length 4 ft.; tail 1 ft.)

# EXHIBIT N

# WEBSTER'S

## NEW UNIVERSAL

# UNABRIDGED

# DICTIONARY

### DELUXE
### SECOND EDITION

BASED UPON THE BROAD FOUNDATIONS LAID DOWN BY

## Noah Webster

EXTENSIVELY REVISED BY THE PUBLISHER'S EDITORIAL STAFF UNDER THE GENERAL SUPERVISION OF

## JEAN L. McKECHNIE

INCLUDING ETYMOLOGIES, FULL PRONUNCIATIONS, SYNONYMS, AND AN ENCYCLOPEDIC SUPPLEMENT OF
GEOGRAPHICAL AND BIOGRAPHICAL DATA, SCRIPTURE PROPER NAMES, FOREIGN WORDS AND PHRASES,
PRACTICAL BUSINESS MATHEMATICS, ABBREVIATIONS, TABLES OF WEIGHTS AND MEASURES, SIGNS AND
SYMBOLS, AND FORMS OF ADDRESS

ILLUSTRATED THROUGHOUT

## Dorset & Baber

# WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY

## Second Edition

Copyright © 1983 and 1955, 1956, 1957, 1958, 1959, 1960, 1962, 1964,
1966, 1970, 1975, 1977, 1979 by Simon & Schuster, a Division of Gulf & Western Corporation
Full-Color Plates Copyright © 1972 by Simon & Schuster , a Division of Gulf & Western Corporation
All rights reserved
including the right of reproduction
in whole or in part in any form
Published by New World Dictionaries/Simon and Schuster
A Simon & Schuster Division of Gulf & Western Corporation
Simon & Schuster Building
Rockefeller Center
1230 Avenue of the Americas
New York, New York 10020
SIMON AND SCHUSTER, TREE OF KNOWLEDGE and colophon are trademarks
of Simon & Schuster.

*Dictionary Editorial Offices*
*New World Dictionaries*
*850 Euclid Avenue*
*Cleveland, Ohio 44114*

Manufactured in the United States of America

DW 20 19 18 17

Library of Congress Catalog Card Number: 83-42537

ISBN 0-671-41819-X

Previous editions of this book were pub-
lished by The World Publishing Company,
William Collins +World Publishing Co., Inc.
and William Collins Publishers, Inc.

PRINTED IN THE UNITED STATES OF AMERICA

Introductio
Outline His
Guide to I

A DICT

A          ion
Dic      tion
A      ic  tion
A Diction
   ...tion.
A Diction
  and Ph
A Diction
   Names
Abbreviat
  Writing
Practical
Forms of
Tables of

FULL-PA

phyllosoma

physiologize

phys·i·at·rics, n. [Gr. *physis*, nature, and *iatreia*, healing.] the cure of disease by nature.

phys·ic, n. [OFr. *phisique*, *phisike*; Fr. *physique*, from L. *physica*, natural science, from Gr. *physikē*, from *physis*, nature, from *phyein*, to produce.]
  1. the art or science of healing diseases; the art of medicine and therapeutics. [Archaic.]
  2. a medicine, especially a medicine that purges; a laxative or cathartic.
  3. the science of physics. [Rare.]

phys·ic, v.t.; physicked, pt., pp.; physicking, ppr. 1. to dose with medicine, especially with a cathartic.
  2. to cause to have a bowel movement.
  3. to have a curative effect on; to heal; relieve.

phys·i·cal, a. [Gr. *physikos*, pertaining to nature.
  1. of nature and all matter; natural; material; opposed to *spiritual*, *moral*, *mental*.
  2. of natural science or natural philosophy.
  3. of or according to the laws of nature; as, the force of gravity is a *physical* fact.
  4. of, or produced by the forces of physics.
  5. of the body as opposed to the mind; as, *physical* exercise.
  6. relating to the art of healing; as, a *physical* treatise. [Rare.]
  7. medicinal; promoting the cure of diseases. [Obs.]
  8. resembling medicine; as, a *physical* taste. [Obs.]

*physical astronomy*; the branch of astronomy which treats of the motions, masses, positions, etc. of celestial bodies.

*physical chemistry*; the branch of chemistry dealing with the physical properties of substances as they relate to the chemical properties and changes.

*physical education*; instruction in the exercise, care, and hygiene of the human body; especially, a course in gymnastics, athletics, etc., as in a school or college.

*physical examination*; an examination of the body to determine the health or condition of a person.

*physical geography*; the study of the features and nature of the earth's surface, atmosphere and climate, distribution of plant and animal life, etc.

*physical science*; any of the sciences that deal with inanimate matter or energy, as physics, chemistry, geology, etc.

*physical signs*; signs of the state of the body, as revealed by a physical examination, as eruptions, swellings, etc.

*physical therapy*; the treatment of disease, injury, etc. by physical means rather than with drugs, as by massage, infrared or ultraviolet light, electrotherapy, hydrotherapy, heat, or exercise; also called *physiotherapy*.

phys·i·cal·ly, adv. 1. with reference to the laws of nature; materially.
  2. with regard to the body; corporeally.

phys·i·cal·ness, n.

phy·si·cian, n. [OFr. *physicien*; Fr. *physicien*; a scientist, from *physis*, nature.]
  1. a person licensed to practice medicine; a doctor of medicine.
  2. a general medical practitioner, as distinguished from a surgeon.
  3. any person or thing that heals, relieves, or comforts.

phys·i·cist, n. a licensed to practice medicine. [Obs.]

phys·i·cism, n. the practice of ascribing everything in the universe to physical or material causes; materialism.

phys·i·cist, n. an expert in physics.

phys·ic·nut, the nut or seed of several species of *Jatropha*, a genus of the *Euphorbiaceæ*; also called *Barbados nut*.

phys·i·co-chem·i·cal, a. caused by the action, or involving the principles, of both physics and chemistry.

phys·i·co·log·ic, n. logic illustrated by natural philosophy.

phys·i·co·log·i·cal, a. pertaining to physicology.

phys·i·co-math·e·mat·ics, n. mathematics applied to the investigation and solution of physical conceptions and problems; mixed mathematics.

phys·i·co-phi·los·o·phy, n. natural philosophy.

phys·i·co-the·ol·o·gy, n. theology illustrated or enforced by physics or natural philosophy.

phys·i·o-ther·a·peu·tic, a. relating to physiotherapy, or physical therapy.

phys·i·o-ther·a·peu·tics, n. physiotherapy, or physical therapy.

phys·i·o-ther·a·py, n. physiotherapy, or physical therapy.

phys·ics, n.pl. [construed as sing. in senses 1 and 2.] [Gr. *physika*, physical or natural things.]
  1. originally, natural science or natural philosophy.
  2. the science dealing with the properties, changes, interaction, etc. of matter and energy; physics is subdivided into mechanics, thermodynamics, optics, acoustics, etc.
  3. a book or treatise on this.
  4. physical properties or processes; as, the *physics* of flight.

phys·i·o-, [from Gr. *physis*, nature.] a combining form meaning *nature*, *natural*, as in *physiography*; also, before a vowel, *physi-*.

phys·i·o·crat·ic, n. the economic plan and doctrines of the physiocrats; physiocratism.

phys·i·o·crat, n. [Gr. *physis*, nature, and *kratein*, to rule.] a believer in the economic theory that land and its products are the only true wealth and hence the only logical sources of revenue and that freedom of opportunity and trade and security of person and property are essential to prosperity.

phys·i·o·crat·ic, a. of or pertaining to the theories of the physiocrats.

phys·i·oc·ra·tism, n. same as *physiocracy*.

phys·i·o·gen·y, n. same as *physiogeny*.

phys·i·og·e·net·ic, a. same as *physiogenetic*.

phys·i·og·e·ny, n. pertaining to physiogeny; relating to physiological evolution and development.

phys·i·og·no·my, n. [Gr. *physis*, nature, and root of *gignōskein*, to come into being.] in biology, the science or history of the evolution of vital activities in the individual; the genesis of organic functions; a branch of ontogeny.

phys·i·og·nath·mist, n. see *physiognomist*.

phys·i·og·nom·ic, a. same as *physiognomonic*.

phys·i·og·nom·i·cal·ly, adv. in accordance with the principles of physiognomy.

phys·i·og·no·mics, n. same as *physiognomy*.

phys·i·og·no·mist, n. a person who tries to judge character and mental qualities by observing the facial features.

phys·i·og·no·mize, v.t.; physiognomized, pt., pp.; physiognomizing, ppr. to study the physiognomy of. [Rare.]

phys·i·og·no·my, n. same as *physiognomic*.

phys·i·og·no·my, n. [from Gr. *physiognōmonia*; *physis*, nature, and *gnōmōn*, one who knows) from stem of *gignōskein*, to know.]
  1. the practice of trying to judge character and mental qualities by observation of bodily, especially facial, features.
  2. the face; facial features and expression, especially as supposedly indicative of character.
  3. apparent characteristics; outward features or appearance.

phys·i·og·e·ny, n. [Gr. *physis*, nature, and *gonē*, generation.] the production or generation of nature.

phys·i·og·ra·pher, n. a specialist in physiography.

phys·i·o·graph·ic, a. pertaining to physiography.

phys·i·o·graph·i·cal, a. same as *physiographic*.

phys·i·og·ra·phy, n. [Gr. *physis*, nature, and *graphein*, to describe.]
  1. a description of the features and phenomena of nature.
  2. physical geography.

phys·i·ol·a·try, n. [Gr. *physis*, nature, and *latreia*, worship.] the cult of the powers of nature; nature worship.

phys·i·o·log·ic, a. same as *physiological*. [Rare.]

phys·i·o·log·ic, a. same as *physiological*.

phys·i·o·log·i·cal, a. 1. of physiology.
  2. characteristic of or promoting normal, or healthy, functioning.

phys·i·o·log·i·cal·ly, adv. 1. according to the principles of physiology.
  2. so as to be physiological.

phys·i·ol·o·gist, n. a specialist in physiology.

phys·i·ol·o·gize, v.i.; physiologized, pt., pp.; physiologizing, ppr. to engage in physiological speculation or investigation.

**sea-car**

**sealer**

*Haliotus leucocephalus;* also, any fish-bird related to the bald eagle.

the osprey.

the eagle ray, a fish of the genus *Mylio-*

*****, n., any mollusk of the genus *Holi-*

an eel living in salt water; especially, conger eel.

**n.,** a sea urchin.

**-phant,** any of several very large ***** of the seal family, *Macrorhinus leoninus,* that are hunted for oil; they sometimes attain a length of twenty feet. The nose of the adult male is elongated into **-bocis,** somewhat like that of an elephant.



**-fan,** a gorgonean coral that branches in the form of a fan.

**-fer,** n., a traveler by sea; especially, a sailor or mariner.

**-ing,** a. of or engaged in life at sea.

**-ing,** the business or profession sailor.

travel by sea.

**-feather** (feth'*), n.,** 1. any plumelike gorgonian; a sea pen.

2. a polyp, *Virgularia grandiflora.*

**-fish,** same as *samphire.*

**-fern,** a variety of coral resembling a fern.

**-fight** (fit), a battle fought between ships as a naval action.

**-fir,** any of certain polyps of the family *Sertularida.*

**-fire,** phosphorescence in the sea.

**-flea,** any sand flea.

**-flower,** a sea anemone or a similar flower.

**-foam,** 1. the froth or foam of the sea. meerschaum.

**-food,** food prepared from or consisting of fish or other sea shellfish.

**-fowl,** n., a marine fowl; any bird that lives in or near the sea.

**-fox,** a kind of shark, *Alopias vulpes,* with a long tail fin: also called *fox shark.*



SEA FOX (*Alopias vulpes*)

**-front,** the part of a town or other built-up place facing on the sea.

**-froth,** same as *sea foam.*

**-furbelow,** any brown variety of seaweed, as of the genus *Laminaria.*

**-gate,** n., a long rolling wave or swell: also called *sea-gone.*

**-gate,** 1. the entrance to a harbor from the sea.

**-gate,** a gate to keep the water out of a dock, basin, etc.

**-gauge,** 1. the draft, or depth, of water said to float a ship.

**-gauge,** a gauge for ascertaining the depth of the sea.

**-gherkin** (gèr"), any small holothurian that is formed like a gherkin or cucumber.

**-girdle,** a seaweed, *Laminaria digitata:* so called simply, *sea wand,* etc.

**-girt,** a., surrounded by the sea or ocean; as, a sea-girt isle.

**-god,** a marine deity; a deity supposed to preside over the ocean or sea, as Neptune.

**-goddess,** a female deity of the ocean; a marine goddess.

**-going,** a., suitable for use on the open sea; a seagoing craft; also, seafaring.

**sea goose,** 1. a phalarope.

2. a dolphin.

**sea goose'foot,** the sea blite, a marine plant.

**sea gown,** a gown to be worn at sea. [Obs.]

**sea grape,** 1. a plant of the genus *Ephedra;* especially, *Ephedra distachya,* closely allied to the conifers. The species consist of small trees or twiggy shrubs with jointed stems.

2. the galvweed.

3. the eggs of cuttlefishes, when agglutinated together in masses resembling bunches of grapes.

**sea grass,** 1. an aquatic plant of the genus *Ruppia.*

2. eelgrass.

**sea'-green,** a., having the color of sea water; a pale bluish-green.

**sea green,** a sea-green color.

**sea gud'geon,** the black goby, *Gobius niger.*

**sea gull,** a bird with long wings and webbed feet, living near and feeding from the water; a gull.

**se'ah,** n. [Heb.] a Hebrew dry measure containing about twenty-four pints.

**sea hare,** a mollusk of the genus *Aplysia.*

**sea hawk,** the jaeger.

**sea heath,** either of two species of British plants, *Frankenia lævis* and *Frankenia pulverulenta.*

**sea hedge'hog,** a sea urchin.

**sea hen,** the guillemot.

**sea hog,** the porpoise.

**sea hol'ly,** a small plant of the genus *Eryngium,* with pale-blue flowers and spiny, bluish leaves.

**sea holm,** sea holly.

**sea horse,** 1. the walrus.

2. the hippocampus, a small, semitropical fish with a slender tail, plated body, and a head and forepart somewhat like those of a horse.

3. a sea panther.

4. a mythical sea creature depicted with fore parts like those of a horse, and with hinder parts like those of a fish.

**sea'hound,** n., a dogfish (shark).

**sea hulver,** sea holly.

**Sea'-Is'land** (*), a., of or from the Sea Islands, along the coast of Georgia, South Carolina, and Florida; as, sea-island cotton.

**sea'-is'land cot'ton,** a fine kind of longfibered cotton grown originally in the Sea Islands and now in other areas.

**sea jel'ly,** a jellyfish.

**sea kale,** a fleshy mustard plant, *Crambe maritima,* whose young shoots are used like asparagus; sea cabbage.

**sea kid'ney,** a polyp of the genus *Renilla,* resembling a kidney in shape.

**sea king,** [Ice. *sækonungr,* a sea king, a viking.] a Norse pirate chief of the Middle Ages.

**sea kit'tie,** the kittiwake. [Brit.]

**seal,** n.; pl. seals or seal, [M.E. *sele;* A.S. *seolh,* a seal; Ice. *selr;* Dan. *sæl;* Sw. *själ;* O.H.G. *selah,* a seal.]

1. a sea mammal, of the family *Phocidæ,* the true seals, or *Otariidæ,* the eared seals, with a torpedo-shaped body, a dog-like head, and four webbed feet or flippers; it lives in cold or temperate waters and eats fish; fur seals are hunted for the valuable fur.



FUR SEAL (3-6 ft. long)

2. (a) the fur of the fur seal; sealskin; (b) a similar fur used as a substitute for this.

3. leather made from sealskin.

**seal,** n., to hunt seals.

**seal,** n. [M.E. *seel;* OFr. *seel,* a seal or signet, from L. *sigillum,* a seal, mark, lit., a little mark, from *signum,* a sign, mark.]

1. a design, initial, or other device placed on a letter, document, etc. as a signature or

proof of authenticity; letters were formerly closed with a wafer of molten wax into which was pressed the distinctive seal of the sender.

2. a stamp, signet ring, etc. used for making such an impression.

3. a wax wafer, piece of paper, etc. bearing the impression of some design recognized, usually by law, as official.

4. something that seals, closes, or fastens tightly.

5. something that confirms, authenticates, or guarantees; a pledge; as, his fear was a seal of secrecy.

6. an indication; a sign; a token; as, their handshake was a seal of friendship.

7. any device, as a looped trap filled with water, preventing the passage of gas through a pipe.

8. an ornamental paper stamp; as, a Christmas seal.

common seal, the official seal of a corporation, etc.

**seal,** v.t.; sealed, pt., pp.; sealing, ppr. [M.E. *selen;* OFr. *seeler;* L. *sigillare,* to seal.]

1. to fasten with a seal; to attach together with a wax wafer or with mucilage, tape, etc.; as, to seal a letter.

2. to set or affix a seal to; as, to seal a deed.

3. to confirm; to ratify; to establish.

4. to shut; to close; to close completely; as, to seal one's lips.

This is my alms mater; kind in the charity with which she sealed in sorrow my brief but stormy career within these walls.

—Henry W. Grady.

5. to mark with a stamp, as an evidence of standard exactness, of a given size, capacity, quality, etc.; as, to seal weights and measures.

6. to attest to or confirm the truth or genuineness of (a promise, etc.).

7. to grant, assign, or designate with a seal, pledge, etc.; as, he has sealed his estate to his son.

8. to settle, determine, or decide finally or irrevocably.

9. to fix, as a piece of wood or iron in a wall with cement, plaster, or other binding for staples, hinges, etc.

10. In Mormonism, (a) to make formal and binding; to solemnize; said of a marriage, adoption, etc.; (b) to give (a woman) in marriage.

11. in electricity, to bring into full, interlocking contact, as a plug and jack.

Syn.— confirm, establish, ratify, close, fasten, shut.

**seal,** v.t. to affix one's seal. [Obs.]

**Sea'lab,** n. [sea, and laboratory.] any of a series of experimental underwater laboratories developed by the United States Navy for undersea explorations and for research in oceanography, marine biology, etc.

**sea lace,** same as sea catgut.

**sea lam'prey,** a common marine lamprey.

**sea lan'guage,** the slang, terms, and phraseology of seamen.

**sea lark,** a bird of the sandpiper kind, as the dunlin, turnstone, etc. [Brit. Dial.]

**sea lav'en-der,** any of a number of related stiff plants with white, pink, lavender, or yellow flowers and many branches.

**sea law'yer,** 1. a contentious sailor, who likes to argue points of sea law, usually on the basis of slight knowledge. [Colloq.]

2. the gray snapper.

3. a shark.

**seal'-brown,** a, of a rich dark-brown color, like the dyed fur of a seal.

**seal brown,** a seal-brown color.

**sealed or'ders,** written orders or instructions given to the captain of a ship informing him of his destination, mission, etc., given in a sealed envelope not to be opened until a specified time or place is reached.

**sea legs,** the ability to walk on a ship's deck without loss of balance, especially when it is pitching or rolling.

**sea lem'on,** a marine, nudibranchiate gastropod, of the genus *Doris,* having an oval body, convex, marked with numerous punctures, and of a lemon color.

**sea leop'ard** (lep'*), an animal of the seal family near the antarctic circle; so named from being spotted like the leopard.

**seal'er,** n., 1. one who or that which seals.

2. an officer appointed by proper authority, to inspect, test, and certify weights and measures, and set a stamp on such as are according to the standards established by the law.

1635

bull, brute, turn, up; cry, myth; cat, machine, ace, church, chord; gem, anger, (Fr.) bon, as; this, thin; azure

# EXHIBIT O

Second College Edition

# The American Heritage Dictionary

# Second College Edition

# Heritage Dictionary

**Houghton Mifflin Company** BOSTON

Words that are believed to be registered trademarks
have been checked with authoritative sources. No in-
vestigation has been made of common-law trademark
rights in any word, because such investigation is im-
practicable. Words that are known to have current
registrations are shown with an initial capital and are
also identified as trademarks. The inclusion of any
word in this Dictionary is not, however, an expres-
sion of the Publisher's opinion as to whether or not it
is subject to proprietary rights. Indeed, no definition
in this Dictionary is to be regarded as affecting the
validity of any trademark.

Copyright © 1982 by Houghton Mifflin Company. All
rights reserved. No part of this work may be repro-
duced or transmitted in any form or by any means,
electronic or mechanical, including photocopying and
recording, or by any information storage or retrieval
system, except as may be expressly permitted by
1976 Copyright Act or in writing by the Publisher.

All correspondence and inquiries should be directed to
Reference Division, Houghton Mifflin Company
Two Park Street, Boston, MA 02108

Library of Congress Cataloging in Publication Data
Main entry under title:
American Heritage dictionary.

Rev. ed. of: American Heritage dictionary of the
English language. New college ed. c1976.
    1. English language—Dictionaries.    I. Morris,
William, 1913–
PE1625.A54    1982    423    82-9346
ISBN 0-395-32943-4
ISBN 0-395-32944-2 (thumb index)
ISBN 0-395-33959-6 (deluxe edition)

Manufactured in the United States of America

physician | pica²

mechanical means such as exercise, heat, light, and massage.

**phy·si·cian** (fĭ-zĭsh'ən) n. 1. A person licensed to practice medicine; medical doctor. 2. A person who heals or exerts a healing influence. [ME *fisicien* < OFr. < *fisique*, medical science. —see PHYSIC.]

**phys·i·cist** (fĭz'ĭ-sĭst) n. A scientist who specializes in physics.

**phys·i·co·chem·i·cal** (fĭz'ĭ-kō-kĕm'ĭ-kəl) *adj.* 1. Pertaining to properties that are both physical and chemical. 2. Pertaining to physical chemistry.

**phys·ics** (fĭz'ĭks) n. (*used with a sing. verb*). 1. The science of matter and energy and of interactions between the two, grouped in traditional fields such as acoustics, optics, mechanics, thermodynamics, and electromagnetism, as well as in modern extensions including atomic and nuclear physics, cryogenics, solid-state physics, particle physics, and plasma physics. 2. Physical properties, interactions, processes, or laws; *the physics of supersonic flight*. 3. *Archaic*. The study of the natural or material world and phenomena; natural philosophy. [Lat. *physica* < Gk. *phusika*, neuter pl. of *phusikos*, of nature < *phusis*, nature.]

**physio–** or **physi–** *pref.* 1. Nature; natural: *physiography*. 2. Physical: *physiatry*. [Gk. *phusio-* < *phusis*, nature. —see PHYSIC, to grow.]

**phys·i·og·no·my** (fĭz'ē-ŏg'nə-mē, -ŏn'ə-mē) n. pl. **-mies**. 1. a. The art of judging human character from facial features. b. Divination based on facial features. 2. a. Facial features, esp. when regarded as revealing character. b. Aspect and character of an inanimate or abstract entity: *the physiognomy of New England*. [ME *phisonomie* < OFr. < LLat. *physiognomia* < Gk. *phusiognomonia* : *phusis*, appearance + *gnomon*, interpreter < *gignoskein*, to know.] —**phys·i·og·no·mic** (fĭz'ē-ŏg-nŏm'ĭk, fĭz'ē-ə-nŏm'ĭk), **phys·i·og·no·mi·cal** *adj.* —**phys·i·og·no·mi·cal·ly** *adv.* —**phys·i·og·no·mist** n.

**phys·i·og·ra·phy** (fĭz'ē-ŏg'rə-fē) n. Physical geography. —**phys·i·og·ra·pher** n. —**phys·i·o·graph·ic** (fĭz'ē-ə-grăf'ĭk), **phys·i·o·graph·i·cal** *adj.* —**phys·i·o·graph·i·cal·ly** *adv.*

**phys·i·o·log·i·cal** (fĭz'ē-ə-lŏj'ĭ-kəl) also **phys·i·o·log·ic** (-ĭk) *adj.* 1. Of or pertaining to physiology. 2. In accord with or characteristic of the normal functioning of a living organism. —**phys·i·o·log'i·cal·ly** *adv.*

**physiological saline** n. A sterile salt solution that is isotonic to body fluids.

**phys·i·ol·o·gy** (fĭz'ē-ŏl'ə-jē) n. 1. The biological science of essential and characteristic life processes, activities, and functions. 2. All the vital processes of an organism. [Lat. *physiologia* < Gk. *phusiologia* : *phusis*, nature + *logos*, account.] —**phys·i·ol'o·gist** n.

**phys·i·o·ther·a·py** (fĭz'ē-ō-thĕr'ə-pē) n. Physical therapy. —**phys·i·o·ther'a·peu·tic** (-thĕr'ə-pyoo'tĭk) *adj.*

**phy·sique** (fĭ-zēk') n. The body considered with reference to its proportions, muscular development, and appearance: *a short man with... the physique of a swimmer* (John Le Carré). [Fr. < *physique*, physical < Lat. *physicus*, of nature < Gk. *phusikos* < *phusis*, nature.] —**phy·sique'** *adj.*

**phy·so·stig·mine** (fĭ'sə-stĭg'mēn') also **phy·so·stig·min** (-mĭn) n. A colorless or pink poisonous crystalline compound, $C_{15}H_{21}N_3O_2$, extracted from the Calabar bean, and used in a variety of medicines. [< NLat. *Physostigma*, genus name of the Calabar bean < Gk. *phusa*, bellows + Gk. *stigma*, tattoo.]

**phy·to·bez·oar** (fī'tō-bĕ'zôr') n. Having a connecting tube between the air bladder and a part of the alimentary canal, as in certain fishes. [Gk. *phusa*, bladder + -STOM(E) + -OUS.]

**phyto–** *pref.* Variant of phyto–.

–**phyte** *suff.* 1. A plant with a specified character or habitat: *halophyte*. 2. A pathological growth: *osteophyte*. [Gk. *phuton*, plant < *phuein*, to grow.]

**phyto–** or **phyti–** *pref.* Plant: *phytogenesis* [NLat. < Gk. *phuto-* < *phuein*, plant < *phuein*, to grow.]

**phy·to·chem·is·try** (fī'tō-kĕm'ĭ-strē) n. The chemistry of plants. —**phy·to·chem'i·cal** (-ĭ-kəl) *adj.* —**phy·to·chem'i·cal·ly** *adv.* —**phy·to·chem'ist** n.

**phy·to·gen·e·sis** (fī'tō-jĕn'ĭ-sĭs) also **phy·tog·e·ny** (fī-tŏj'ə-nē) n. The origin and evolutionary development of plants. —**phy·to·ge·net·ic** (-jə-nĕt'ĭk), **phy·to·ge·net'i·cal** *adj.* —**phy·to·ge·net'i·cal·ly** *adv.*

**phy·to·gen·ic** (fī'tō-jĕn'ĭk) also **phy·tog·e·nous** (fī-tŏj'ə-nəs) *adj.* Having a plant origin, as coal.

**phy·to·ge·og·ra·phy** (fī'tō-jē-ŏg'rə-fē) n. The study of the distribution of plants. —**phy·to·ge·og'ra·pher** n. —**phy·to·ge·o·graph·ic** (-jē'ō-grăf'ĭk), **phy·to·ge·o·graph'i·cal** *adj.* —**phy·to·ge·o·graph'i·cal·ly** *adv.*

**phy·tog·ra·phy** (fī-tŏg'rə-fē) n. The science of plant description; descriptive botany.

**phy·to·hor·mone** (fī'tō-hôr'mōn') n. A hormone produced by a plant, esp. one that affects plant growth.

**phy·tol** (fī'tôl', -tŏl') n. A liquid alcohol, $C_{20}H_{40}O$, used in the synthesis of vitamins E and K.

**phy·to·lith** (fī'tə-lĭth') also **phy·to·lite** (-līt') n. A fossil plant.

**phy·tol·o·gy** (fī-tŏl'ə-jē) n. The study of plants; botany. —**phy·to·log·ic** (fī'tə-lŏj'ĭk), **phy·to·log'i·cal** *adj.*

**phy·ton** (fī'tŏn') n. A unit of plant structure, esp. the smallest part of a plant that, when cut off, is able to grow. [Gk. < Gk. *phuton*, plant < *phuein*, to grow.] —**phy·ton'ic** *adj.*

**phy·to·path·o·gen** (fī'tō-păth'ə-jən) n. An organism that is pathogenic to a plant. —**phy·to·path·o·gen'ic** (-jĕn'ĭk) *adj.*

**phy·to·pa·thol·o·gy** (fī'tō-pə-thŏl'ə-jē) n. The science of plant diseases. —**phy·to·path·o·log·ic** (-păth'ə-lŏj'ĭk), **phy·to·path·o·log'i·cal** *adj.* —**phy·to·pa·thol'o·gist** n.

**phy·to·plank·ton** (fī'tō-plăngk'tən) n. Minute, floating aquatic plants. —**phy·to·plank·ton'ic** (-plăngk-tŏn'ĭk) *adj.*

**phy·to·so·ci·ol·o·gy** (fī'tō-sō'sē-ŏl'ə-jē, -shē-) n. The branch of ecology that deals with the characteristics, relationships, and distribution of associated plants. —**phy·to·so·ci·o·log·i·cal** (-sō'sē-ə-lŏj'ĭ-kəl) *adj.* —**phy·to·so·ci·ol'o·gist** n.

**phy·to·tox·ic** (fī'tō-tŏk'sĭk) *adj.* Poisonous to plants. —**phy·to·tox·ic'i·ty** (-tŏk-sĭs'ĭ-tē) n.

**pi¹** (pī) n., *pl.* **pis**. 1. The 16th letter of the Greek alphabet. See table at alphabet. 2. *Symbol π Math*. A transcendental number, approximately 3.14159, representing the ratio of the circumference to the diameter of a circle and appearing as a constant in a wide range of mathematical problems. [Med. Gk. < Gk. *pei*, of Phoenician orig.; akin to Heb. *pē*.]

**pi²** also **pie** (pī) *Printing*. —n., *pl.* **pies** also **pies**. An amount of type that has been jumbled or thrown together at random. —v. **pied**, **pi·ing**, **pies** also **pied**, **pie·ing**, **pies**, —*tr*. To jumble or mix up (type). —*intr*. To become jumbled. [Orig. unknown.]

**pia** (pī'ə, pē'ə) n. The pia mater. —**pi'al** *adj.*

**pi·ac·u·lar** (pī-ăk'yə-lər) *adj.* 1. Making expiation or atonement for a sacrilege: *piacular sacrifice*. 2. Requiring expiation; wicked; blameworthy. [Lat. *piacularis* < *piaculum*, propitiatory sacrifice < *piare*, to appease < *pius*, dutiful.]

**pi·af·fe** (pyä'f) n. A movement in which a horse trots in place with high action of the legs. [Fr. < *piaffer*, to prance.]

**pia ma·ter** (mā'tər, mä'tər) n. The fine vascular membrane that envelops the brain and spinal cord under the arachnoid membrane and the dura mater. [ME < Med. Lat. *tender mother*.]

**pi·an·ism** (pē-ăn'ĭz'əm, pē'ə-nĭz'əm) n. The technique or execution of piano playing.

**pi·a·nis·si·mo** (pē'ə-nĭs'ə-mō') *Mus.* —*adv.* Very softly or quietly. Used as a direction. —*adj.* Very soft or quietly played; soft part of a composition. [Ital. superl. of *piano*, soft < Lat. *planus*, level.] —**pi'a·nis·si·mo** *adj.*

**pi·a·nist** (pē-ăn'ĭst, pē'ə-nĭst) n. One who plays the piano.

**pi·a·nis·tic** (pē'ə-nĭs'tĭk) *adj.* 1. Of or pertaining to the piano. 2. Well-adapted to the piano. —**pi'a·nis'ti·cal·ly** *adv.*

**pi·a·no·forte** (pē-ăn'ə-fôr'tā) n. A musical instrument with a manual keyboard actuating hammers that strike wire strings, producing sounds that may be softened or sustained by means of pedals. [Ital., short for *pianoforte*. —see PIANOFORTE.]

**pi·an·o¹** (pē-ăn'ō) n., *pl.* **-os**. A piano. [Ital. < *pianoforte*. —see PIANOFORTE.]

**pi·a·no²** (pē-ä'nō) *Mus.* —*adv.* Softly; quietly. Used as a direction. —*n., pl.* **-nos**. A passage to be played softly. [Ital. < Lat. *planus*, flat.] —**pi'a·no** *adj.*

**piano bar** n. A cocktail lounge featuring entertainment by a pianist.

**pi·an·o·for·te** (pē-ăn'ō-fôr'tā, -fôr'tē, -fôrt') n. A piano. [Ital. *piano*, soft + *forte*, loud.]

**piano hinge** n. A long narrow hinge with a pin running the entire length of its joint.

**pi·as·sa·va** (pē'ə-sä'və) also **pi·as·sa·ba** (-sä'bə) n. 1. Either of two South American palm trees, *Attalea funifera* or *Leopoldinia piassaba*, from which a strong, coarse fiber is obtained. 2. The fiber of the piassava, used for making ropes, brushes, and brooms. [Port. *piassava* < Tupi *piaçaba*.]

**pi·as·ter** also **pi·as·tre** (pē-ăs'tər, -ä'stər) n. 1. See table at currency. 2. A piece of eight. [Fr. *piastre* < Ital. *piastra*, plate of metal plate < Lat. *emplastrum*, medical dressing. —see PLASTER.]

**pi·az·za** (pē-ăz'ə, -ä'zə) n., *pl.* **-zas**. 1. (*also* -ät'sə) *pl.* also **pi·az·ze** (-ät'sā). A public square in an Italian town. 2. A roofed and arcaded passageway; colonnade. 3. A verandah. [Ital. < Lat. *platea*, street < Gk. *plateia* (*hodos*), broad (*way*).]

**pi·broch** (pē'brŏKH') n. A series of variations on a traditional dirge or martial theme for the Highland bagpipe. [Sc. Gael. *piobaireachd*, pipe music.]

**pic** (pĭk) n., *pl.* **pics** or **pix**. *Slang*. 1. A photograph. 2. A movie. [Short for PICTURE.]

**pi·ca¹** (pī'kə) n. 1. a. A printer's unit of type size, equal to 12 points or about ⅙ inch. b. An equivalent unit of composition measurement used in determining the dimensions of lines, illustrations, or printed pages. 2. A type size for typewriters, providing 10 characters to the inch. [Prob. < Med. Lat. *List of church services*.]

**pi·ca²** (pī'kə) n. A craving for unnatural food, as seen in hysteria and pregnancy. [NLat. < Lat. *pica*, magpie.]



piano¹



**.scutum | sea lily**



sea anemone



sea cucumber



sea gull



sea horse



seal
Gaudalupe fur seal

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of June, 2006, the attached **REDACTED PUBLIC VERSION OF APPENDIX TO DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** was served upon the below-named counsel of record at the address and in the manner indicated:

Jack B. Blumenfeld, Esquire                                    HAND DELIVERY
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE  19801

Joshua R. Rich, Esquire                                    VIA FEDERAL EXPRESS
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606


*/s/ John G. Day*
_____
John G. Day