IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY, LLC

                              Plaintiff,

                    v.                                    Civil Action No. 04-833 KAJ

SICOR, INC., and
SICOR PHARMACEUTICALS, INC.

                              Defendants.

PHARMACIA & UPJOHN'S REPLY CLAIM CONSTRUCTION BRIEF

                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                    Jack B. Blumenfeld (#1014)
                    Maryellen Noreika (#3208)
                    1201 N. Market Street
                    P.O. Box 1347
                    Wilmington, Delaware  19899-1347
                    (302) 658-9200
                      Attorneys for Plaintiff
                      Pharmacia & Upjohn Company LLC

OF COUNSEL:

Daniel A. Boehnen
Joshua R. Rich
McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 S. Wacker Drive
Chicago, Illinois  60606
(312) 913-0001

June 19, 2006

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CITATIONS                                                      ii

INTRODUCTORY STATEMENT                                                  1

SICOR'S INTRODUCTION AND BACKGROUND                                     1

ARGUMENT                                                                4

I.    SICOR UNDERESTIMATES THE LEVEL OF ORDINARY
      SKILL IN THE ART.                                                 4

II.   SICOR'S PROPOSED DEFINITION OF "PHYSIOLOGICALLY
      ACCEPTABLE" IS TOO VAGUE BECAUSE IT IGNORES
      VITAL REQUIREMENTS FOR PHARMACEUTICALS.                           5

III.  SICOR ERRONEOUSLY SUGGESTS THE TERM "OF" NEEDS
      CONSTRUCTION.                                                     10

IV.   AN "ANTHRACYCLINE GLYCOSIDE" DOES NOT HAVE TO
      BE A "NON-LYOPHILIZED PREPARATE".                                 12

V.    A "SEALED" CONTAINER REQUIRES MORE THAN MERE
      CLOSURE.                                                          15

VI.   "STORAGE STABILITY" REQUIRES A SUBSTANCE TO BE
      "PHYSIOLOGICALLY ACCEPTABLE" FOR AT LEAST
      EIGHTEEN MONTHS.                                                  16

CONCLUSION                                                              18

ii.

<u>TABLE OF CITATIONS</u>

<u>Page(s)</u>

<u>Cases</u>

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003)                                       7, 17

*Hill v. McDonough*,
    No. 05-8794, ___ U.S. ___ (June 12, 2006)                            8

*Markman v. Westview Instr., Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)           11

*Mayne Pharma Pty Ltd. v. Pharmitalia Italia S.P. A*,
    [2005] EWCA Civ 137 (United Kingdom)**,** p. 9                        2

*Nystrom v. TREX Co., Inc.*,
    424 1136 (Fed. Cir. 2005)                                            7, 11

*Pall Corp. v. PTI Techs., Inc.*,
    259 F.3d 1383 (Fed. Cir. 2001)                                       10

*Pharmitalia Italia S.P. A v. Mayne Pharma Pty Ltd.*,
    [2005] FCA 1066 (Australia), p. 20                                   3

*Schumer v. Laboratory Computer Sys., Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002)                                       10, 11, 16

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,*
    442 F.3d 1322 (Fed. Cir. 2006)                                       7

<u>Other Authorities</u>

35 U.S.C. § 119                                                          17

## INTRODUCTORY STATEMENT

Sicor's Opening Claim Construction Brief actually supports Pharmacia's claim construction contentions in many respects. In many other respects, Sicor's arguments are riddled with mistakes, both factual and legal. Indeed, much of Sicor's focus rests on a term that does not appear in the claims of the '285 patent, "not reconstituted from a lyophilizate." In short, Sicor provides no solid reason to reject Pharmacia's ordinary meaning interpretation of the disputed terms of the claims of the '285 patent.

## SICOR'S INTRODUCTION AND BACKGROUND

Sicor raised several points in its Introduction and Background sections that relate to a term that does not appear in the claims of the '285 patent. Those points are disputed, but rather than expend judicial resource resolving those disputes, those points should be rejected out of hand since they pertain to terms that are not found anywhere within the claims of the '285 patent.

Unlike many of its related patents, the '285 patent has claims that do not require that the claimed solution "has not been reconstituted from a lyophilizate." For example, U.S. Patent No. 5,977,082 is a member of the family of patents that issued from a continuation-in-part application, Serial No. 07/064,653, claiming priority to the '784 application. *See* Pharmacia Memo, p. 9 n. 2. Claim 23 of the '082 patent is nearly identical to claim 1 of the '285 patent, except that it requires that the solution not be reconstituted from a lyophilizate:

> A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 3.5 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution is in a sealed container and has not been reconstituted from a lyophilizate in said container.

Ex. 38, col. 35-36.[1]

In that context, a "lyophilizate" is not merely something that has been freeze-dried as Sicor urges.  Rather, the lyophilization process described in the specifications of patents related to the '285 patent (as well as described but not claimed in the '285 patent) indicate that the lyophilizate also requires an excipient or "bulking agent" to ensure sufficient mass to form a "lyophilizate cake."  *See* Sicor Memo, p. 2; *see also* Ex. 1, col. 1, lines 42-46, col. 4, lines 12-19 (describing a lyophilized preparation as a "lyophilized cake").  As Sicor's own Memorandum admitted, "[L]yophilization itself _required_ the addition of other substances to the anthracycline glycoside compound."  *Id.* at 2 (citing Ex. 1, col. 1, lines 42-46; col. 4, lines 12-19) (emphasis added).  Courts all over the world have considered foreign counterparts to the patent family-in-suit, specifically construing the term, "has not been reconstituted from a lyophilizate," and those courts have found that such a term does not exclude a manufacturing step of freeze-drying.  *See*, *e.g.*, *Mayne Pharma Pty Ltd. v. Pharmitalia Italia S.P. A*, [2005] EWCA Civ 137 (United Kingdom)**,** p. 9 (Ex. 41);[2] *Pharmitalia Italia S.P. A v. Mayne Pharma Pty Ltd.*, [2005] FCA 1066

---

[1]     Unlike claim 1 of the '285 patent, claim 23 of the '082 patent covers doxorubicin hydrochloride and epirubicin hydrochloride but not idarubicin hydrochloride.  It also does not require the solvent to be aqueous.

[2]     On appeal, the panel of the House of Lords stated:

> I have come to the conclusion that [Pharmacia's counsel] is right, essentially for the reasons he advanced.   I need elaborate only a little.   I think the skilled man would see the real point of the teaching in the description as being the provision of a stable, ready-to-use solution.   Such a desirable substance was not previously available.  The patent teaches him how to make it.  He can make it without having to lyophilize the material in the vials.  He knows he will have to start his formulation with active ingredient raw material.  But he would not regard the nature of that as part of the formulation process.  The patent teaches him how to do away with a previously essential lyophilization.

(continued . . .)

(Australia), p. 20 ("References in the body of the specification to lyophilized preparations known as at the priority date were references to lyophilized preparations in a vial.") (Ex. 42). Thus, this Court should not accept Sicor's urging that a lyophilizate in merely something "freeze dried," and there is no reason to believe that products like Sicor's product – which does not include any such excipient – should be considered to have been "reconstituted from a lyophilizate."

Similarly, "reconstitution" is not merely rehydrating as Sicor urges. Rather, reconstitution is a particular solvating process performed by medical professionals before administration of the resulting solution to a patient. Again, as Sicor's own Memorandum admitted, "Reconstitution . . . _required_ hospital personnel to add a suitable solvent (such as water for injection) to the lyophilized doxorubicin and shake vigorously to form an injectable liquid." Sicor Memo, p. 2 (citing Ex. 1, col. 1, line 42-46) (emphasis added). Thus, reconstitution in the context of the '285 patent is not an industrial process performed during the manufacture and packaging of a product. Rather, reconstitution is something performed in a hospital or clinic by medical professionals.

---

(. . . continued)

When he comes to read claim 1, knowing that its purpose in law is to set out the monopoly, he sees that it is the "ready-to-use solution" which must not "have been reconstituted from a lyophilizate." With the understanding of the purpose and teaching of the description he would read it as meaning that the solution itself has not been made by reconstitution – it is avoidance of that which fulfils the purpose of doing away with the previously essential step. If he considered the nature of the starting raw material, lyophilized or not, he would see it made no real difference – just that starting with lyophilizate would introduce an unnecessary complication.

Ex. 41, p. 9 (¶¶ 28-29).

## ARGUMENT

### I.      SICOR UNDERESTIMATES THE LEVEL OF ORDINARY SKILL IN THE ART.

Sicor has proposed a level of ordinary skill in the relevant art that is lower and less specific than appropriate.  For example, Sicor has proposed that education in fields wholly unrelated to pharmacy or anthracycline glycosides, such as "bioengineering and/or similar fields" would be sufficient to meet the definition of one of ordinary skill in the relevant art.  Sicor Memo, p. 8.  Bioengineering and similar fields would be particularly inappropriate to the field of the patent in 1985, when the original patent application was filed.  Remarkably, Sicor's proposal suggests that one of ordinary skill in the art does not need to have any knowledge of or experience with anthracycline glycosides; rather, Sicor contends that it would be sufficient that one of ordinary skill in the art be "familiar with cytotoxic drugs."  *Id.*  Indeed, Sicor would not require any practical experience whatsoever, only "laboratory experience with various analytical chemistry techniques."  *Id.*  Such a proposed skill level does not match any of the scientists who published and worked in that field at that time.

Pharmacia believes that far more knowledge and experience is necessary to be qualified as one of ordinary skill in the art at the time of the invention.  As Dr. Jacob Beijnen – who was heavily involved in the field of anthracycline glycosides at the time of the invention – indicated in his expert report, one of ordinary skill in the art needed significant experience with injectable cytotoxic drugs, *including* anthracycline glycosides. Ex. 2, p. 23; *see also* Pharmacia Memo, p. 16.  Furthermore, one of ordinary skill would have the knowledge of chemistry and pharmacy needed for a practical application of information learned in the laboratory.  Pharmacia Memo, p. 16-17; Ex. 2, p. 24**.**  Rather than just having performed laboratory experiments, one of skill in the

art would have to have "experience with stability studies on pharmaceutical compounds and the formulation of injectable cytotoxic drugs." Pharmacia Memo, p. 17; Ex. 2, p. 24.

The distinction between the two levels of ordinary skill in the art proposed by the parties is important in the claim construction process. For example, although a person having no practical experience with pharmaceuticals (as Sicor has proposed) might not know that a "sealed container" is a well-recognized form of closure in the pharmaceutical industry, even one of Sicor's own officers testified that those in the pharmaceutical industry would know otherwise. Ex. 32, p. 148-50; Pharmacia Memo, p. 30-31. Further, and most clearly, a purely academic scientist or engineer might ignore the importance of a pharmaceutical needing to remain physiologically acceptable in order to demonstrate "storage stability."[3] In short, many of the errors in Sicor's proposed construction of claim terms can be traced to the inadequate knowledge and experience in its definition of one of ordinary skill in the art.

## II. SICOR'S PROPOSED DEFINITION OF "PHYSIOLOGICALLY ACCEPTABLE" IS TOO VAGUE BECAUSE IT IGNORES VITAL REQUIREMENTS FOR PHARMACEUTICALS.

To one of skill in the art, the term "physiologically acceptable" means that "the substance is stable, sterile, pyrogen-free, and otherwise suitable for administration to humans or animals"; Sicor has proposed the vaguer construction of "suitable for administration to humans and

---

[3]     An indication of the danger of ignoring the practical side of the definition of one of ordinary skill in the art came out in the deposition of Dr. Douglas Clark, Sicor's technical expert. *Prior to reading Dr. Beijnen's Expert Report, Dr. Clark did not know that one of the breakdown products of doxorubicin hydrochloride was highly toxic, and could only speculate regarding the toxicity of idarubicin hydrochloride breakdown products*. Ex. 39, p. 99-104. Thus, applying only his mathematical and laboratory concepts, Dr. Clark believed that a solution with toxic levels of breakdown products could be considered to have "storage stability."

animals."[4]  *Compare* Pharmacia Memo, p. 17-23 *to* Sicor Memo, p. 8-12.  Sicor's proposed definition is based on an inaccurate characterization of the claims and specification and appears to be purposefully vague so as to allow key aspects of the term – such as stability, sterility, and lack of pyrogenicity – to be read out of the definition.  But a person experienced with pharmacy, as one of skill in the art would be, would understand "physiologically acceptable" to include those requirements, such that Sicor is not correct.

Sicor's argument is premised on the doctrine of claim differentiation using claims 1 and 8.  In particular, Sicor's position is based on the proposition that "[i]n claim 8, Pharmacia does not use the express limitation 'physiologically acceptable,' but rather uses the terms 'sterile' and 'pyrogen-free.'"[5]  Sicor Memo at 8-9.  *That is simply wrong*.  Instead, the canons of claim construction applied to identical language in claims 1 and 8 compel the conclusion of Pharmacia's position when the claim language is read in full.  Claim 8 covers:

> A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a *physiologically acceptable* solvent therefore, wherein said solution has a pH adjusted to 2.71 to 3.14 with a *physiologically acceptable* acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

---

[4]      Notably, Sicor originally took the position that "physiologically acceptable" meant "compatible with processes that occur naturally in a normal biological system."  Ex. 40.  Sicor gave no reason for its switch of construction.

[5]      Sicor indicates its belief that the parties jointly believe that the term "pyrogen-free . . . means free of any fever-causing microbes."  Sicor Memo, p. 8 n. 7.  Sicor's definition is too restrictive, as non-living foreign materials, such as viruses, can be pyrogens as well.  *See* Pharmacia Memo, p. 19 n. 8.  However, the Court likely does not need to resolve the distinction between those definitions for this case.

Ex. 1, col. 24 (emphasis added).[6]   In claim 8, the term "stable, intravenously injectable, sterile, pyrogen-free" are used to describe the broader doxorubicin solution, whereas the term "physiologically acceptable" is used to describe the solvent and acid components of the solution. The structure of the sentence shows that the latter limitation is intended to include at least the attributes of the former.   Rather than differentiating the claims of the '285 patent, the term "physiologically acceptable" in claim 8 shows that the term requires components that are stable, sterile, and pyrogen-free, which is consistent with claim 1, not different from claim 1.  *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co*., 442 F.3d 1322, 1328 (Fed. Cir. 2006). "Physiologically acceptable" is broader than merely "stable, sterile, and pyrogen-free," but it certainly includes those attributes.

Sicor also errs by reading each word of claim 8 separately.  The Federal Circuit has soundly rejected such an approach, instead requiring courts to read claims as a whole and the limitations of the claims within the context of the whole claim.  *See, e.g.*, *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").  That is especially true in this case. That is, the broader solution of claim 8 must be "stable, intravenously injectable, sterile, [and] pyrogen-free," whereas the narrow solvent must

---

[6]     Notably, Sicor then continues its misleading argument by stating, "Similarly, in Claims 9 and 10, Pharmacia uses the express limitation 'stability' that does not appear in Claim 1." Sicor Memo, p. 9.  It is true that claim 1 does not use the word "stability," but not true either that claim 8 uses the term "stability" or that the limitation is claims 9 and 10 are merely "stability." *See* Ex. 1, col. 23-24.  As shown above, claim 8 includes the word "stable" as part of the description of the claimed solution; claims 9 and 10 describe the claimed solution as having "*storage* stability."  *Id.* at col. 24.  Under the doctrine of claim differentiation, because claim 10 is dependent on claim 8, "storage stability" must mean something more than merely conveying that the solution is, among other things, "stable." *See*, *e.g.*, *Nystrom v. TREX Co., Inc.*, 424 1136, 1143 (Fed. Cir. 2005).

be "physiologically acceptable." The term "physiologically acceptable" must mean something that encompasses and goes beyond the words of preamble solution. It does, because (under either party's construction) "physiologically acceptable" permits administration by routes other than intravenous injection, such as oral ingestion or intramuscular injection or subcutaneous injection.

Even if the words of claim 8 were considered independently, out of context, they would not have the same scope as "physiologically acceptable." That is, the limitation "physiologically acceptable" must encompass different from "stable," "sterile," and "pyrogen-free" independently. Many substances can have the attributes of being "stable," "sterile," and "pyrogen-free" without also being suitable for administration to humans or animals. For example, many states enforce the death penalty by lethal injection of solutions that are stable, sterile, and pyrogen-free, but are intentionally *unsuitable* for administration to a human or animal. *See*, *e.g.*, *Hill v. McDonough*, No. 05-8794, ___ U.S. ___ (June 12, 2006). There are numerous other examples, including purified poisons and the prions that cause bovine spongy encephalopathy (better known as "Mad Cow disease"). None of those "stable," "sterile," and "pyrogen-free" substances would be "physiologically acceptable."

After arguing based on its misreading of the claims, Sicor turns to the specification in seeking to avoid the ordinary meaning of "physiologically acceptable." Sicor cites a passage from the specification in describing a process in which the final sterile, pyrogen-free solution is passed through a sterilizing filter as the final step. Sicor Memo, p. 9. Sicor's argument misses the point that "physiologically acceptable" means more than "sterile" and "pyrogen-free." It is clear that the filter process is vital to ensuring that the final solution – not just the salt and acid used therein – is "physiologically acceptable." That is, as one of skill in the art would know, it is

vitally important (both literally and figuratively) to ensure that a solution is suitable for administration even if the reagents were themselves previously suitable for administration because biological growth can occur, or other harmful foreign elements can be introduced, during pharmaceutical formulation.  Ex. 2, p. 24; Pharmacia Memo, p. 17 (one of skill in the art must have "experience with . . . the formulation of injectable cytotoxic drugs").  But this is completely consistent with Pharmacia's definition, providing that "pharmaceutically acceptable" encompasses and is broader than "stable, sterile, and pyrogen-free."  That is, Pharmacia's construction is the only one supported by the claims and specification.

Sicor argues that the prosecution history somehow supports its arguments because the inventors distinguished one reference by making an easy, common sense argument that perchloric acid is never physiologically acceptable.  Sicor Memo, p. 10-11.  Sicor correctly notes that "in general perchloric acid is not considered suitable for administration to humans and animals even if that perchloric acid is otherwise made sterile and pyrogen-free."  *Id.* at 10.  That is absolutely correct, but utterly irrelevant.  The correct definition of "physiologically acceptable" requires that something be stable, sterile, and pyrogen-free, but also that it be "otherwise suitable for administration to humans or animals."  *See* Pharmacia Memo, p. 17.  That is, this passage supports Pharmacia's position that "pharmaceutically acceptable" requires more than being stabile, sterile, and pyrogen-free; it would not be enough for the substance to be only stable, sterile, and pyrogen-free, if the substance otherwise possessed attributes that made it not otherwise suitable for administration to humans or animals.  Nor would it be enough to be otherwise suitable for administration to humans or animals if not stable, sterile, and pyrogen-free.

Finally, Sicor notes that the inventors never had to argue that the perchloric acid reference was not sterilized. Sicor Memo, p. 10-11. But there is no requirement that an inventor must continue to beat a dead horse in patent prosecution if it can prevail with one blow. If one argument is successful, other unmade arguments are irrelevant. The Federal Circuit has made very clear that an inventor need not make every argument available to it in prosecution, and no negative inference can be drawn from its choice to use one successful argument over the other available ones. *See, e.g.*, *Schumer v. Laboratory Computer Sys., Inc.*, 308 F.3d 1304, 1313 (Fed. Cir. 2002) (quoting *Pall Corp. v. PTI Techs., Inc.*, 259 F.3d 1383, 1393 (Fed. Cir. 2001)) ("the prosecution history limits even clear claim language so as to exclude any interpretation that was surrendered during prosecution, but only where the accused infringer can demonstrate that the patentee surrendered that interpretation 'with reasonable clarity and deliberateness.'").

The record clearly establishes that the term "physiologically acceptable" means "the substance is stable, sterile, pyrogen-free, and otherwise suitable for administration to humans or animals."

### III.    SICOR ERRONEOUSLY SUGGESTS THE TERM "OF" NEEDS CONSTRUCTION.

Sicor submits that the term "of" requires construction, but only with respect to one of the four uses of the term "of" in claim 1. Sicor is incorrect, not only because claim 1 is not in the format that Sicor asserts, but also because even the evidence Sicor cites does not support any idiosyncratic definition of the term "of."[7] In short, "of" should just be left to the jury to apply in its ordinary and customary usage.

---

[7]    It is clear that "of" does not mean the same thing as "consisting of" or "consisting essentially of" either, the two other traditional transitional phrases.

Sicor begins its argument by recognizing that "[p]atent claims _generally_ have three parts," including a transition phrase. *See* Sicor Memo, p. 12 (emphasis added). But Sicor uses that proposition to argue that claim 1 _must_ have a transition phrase. Acting as their own lexicographers, the inventors were entitled to structure the claims however they wished, including by foregoing the use of a transition phrase. *See*, *e.g.*, *Markman v. Westview Instr., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). That is, while an inventor is generally presumed to have structured claims with a transition phrase, it is not necessary, and is not the case here. That is especially clear because the inventors chose to structure claim 8 in the traditional format with a "consisting essentially of" transition phrase. Ex. 1, col. 24. As Sicor itself has recognized, the context of such an unasserted claim helps provide a clearer view of the proper construction of the terms of the asserted claims, including "of." Sicor Memo, p. 9 (citing *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005)); *see also* Sicor Memo, p. 12-13 (contrasting claims in application).

Sicor next argues that the prosecution history of the '285 patent is relevant because of arguments that Pharmacia could have made, but did not make. Sicor Memo, p. 13-14. As noted before with respect to the term "physiologically acceptable," the decision to make one argument and not another in prosecution does not give rise to any prosecution history estoppel or provide any insight into the meaning of claim terms. *Schumer*, 308 F.3d at 1313. Thus, the arguments not made in prosecution do not help in any construction of the term "of."

Sicor cites only one passage from the specification to support its argument, but misquotes the language of the specification to do so. After restoring (and emphasizing the language that Sicor omitted, the sentence quoted by Sicor properly reads, "The solution of the invention may also contain one or more additional components such as a co-solubilizing agent _(which may be_

*the same as a solvent)*, a tonicity adjustment agent and a preservative." *Compare* Ex. 1, col. 2, lines 12-15 (emphasis added) *to* Sicor Memo, p. 14. In fact, claim 2 expressly recognizes the possibility of a co-solubilizing agent being a component of the solvent in narrowing claim 1 to a solution "wherein [the] physiologically acceptable aqueous solvent is selected from the group consisting of water, ethanol, polyethylene glycol, dimethylacetamide, and mixtures thereof" – dimethylacetamide is the co-solubilizing agent used in example 11 of the specification. *See* Ex. 1, col. 18; *Id.* at col. 23. That is, a co-solubilizing agent is not necessarily distinct from a solvent. In short, the specification does nothing to suggest any special meaning for "of." Sicor has admitted that "of" should be construed with its ordinary meaning, but seeks to have this Court adopt an idiosyncratic meaning. Ex. 40. This Court should not do so.

## IV.    AN "ANTHRACYCLINE GLYCOSIDE" DOES NOT HAVE TO BE A "NON-LYOPHILIZED PREPARATE".

There is no dispute between the parties as to what is an "anthracycline glycoside" compound. Rather, the dispute is whether there is an additional implied limitation in the claims of the '285 patent that the compound must be a "non-lyophilized preparate." Sicor asserts

> A person of ordinary skill in the art in 1985 after reading the '285 patent would have understood that the invention of the '285 patent as a whole requires that the anthracycline glycoside used in making the claimed solutions must be non-lyophilized.

> Yet, the term "non-lyophilized form" does not appear in a single claim of the '285 patent.

Sicor Memo, p. 14 (emphasis omitted). There is a good reason why the term "non-lyophilized" does not appear in the claims of the '285 patent – namely, the term does not appear anywhere in the '285 patent. Sicor's argument should be disregarded in its entirety, not only for this reason, but also because – as noted above in Section II – such a position merely leads to another dispute about the meaning of "lyophilized," which also not in the claims.

There are also valid reasons why the term "has not been reconstituted from a lyophilizate," which does appear in the specification, does not appear in the claims. Sicor quotes two passages from the specification and one passage from the prosecution history in support of its argument, but none of them stands for the proposition that the claimed solutions exclude those reconstituted from a lyophilizate. *See* Sicor Memo, p. 15, 16. Rather, with proper understanding, the passages from the specification both stand for the proposition that the claimed solutions are not limited to solutions reconstituted from a lyophilizate (as was done in the prior art):

> As the risks connected with the manufacturing and the reconstitution of a lyophilized preparate would be highly reduced if a ready-to-use solution of the drug were available, we have developed a stable, therapeutically acceptable intravenously injectable solution of an anthracycline glycoside drug, e.g. doxorubicin, whose preparation and administration does not *require* either lyophilization or reconstitution.

> \* \* \*

> With the solutions of the invention it is possible to obtain compositions having a very high concentration of the anthracycline glycoside active substance even at 50 mg/ml and more. This constitutes a great advantage over the *presently available* lyophilized preparates wherein high concentrations of anthracycline glycoside can only be obtained with difficulty because of solubilization problems encountered in reconstitution, mainly with saline. The presence of the excipient, e.g. lactose, in the lyophilized cake, and its generally high proportion in respect of the active substance, even up to 5 parts of excipient per part of active substance, has a negative effect on solubilization so that difficulties may arise in obtaining dissolution of the lyophilized cake, especially for concentrations of anthracycline glycoside higher than 2 mg/ml.

*See* Sicor Memo, p. 15-16 (quoting Ex. 1, col. 1, lines 47-53, col. 4, line 5-19) (emphasis added).

The quotation from the prosecution history takes the same position, that lyophilization was not required:

> Since it is now recognized according to the present invention that
> under certain conditions a solution of doxorubicin can be rendered
> extraordinarily stable, the step of preparing the solution from a
> lyophilized powder is no longer _necessary_.  It would simply be an
> unnecessary expenditure of energy to lyophilize the material first
> and then prepare a storage stable solution from it.

See Sicor Memo, p. 17 (quoting PI 879) (emphasis added).  Developing an invention that does

not _require_ reconstitution is a far cry from "disclaim[ing] coverage of solutions made with

lyophilized forms of anthracycline glycoside."  *See* Sicor Memo, p. 15.  Instead, in all three

instances, the language stands for the simple proposition that the issue of lyophilization is

irrelevant to whether a solution falls within the scope of the claims of the '285 patent.

Sicor argues that the inventors pulled a "sleight of hand" on the PTO by having "simply

deleted the 'has not been reconstituted from a lyophilizate' language from the literal wording of

its claims."  Sicor Memo, p. 18.  As Pharmacia established in its opening brief, that is not so.

The inventors amended the claims in response to the Examiner's indication that "a lyophilizate

which is reconstituted in water is not been [found] to be patentably distinct from an

unlyophilized solution."  Ex. 21, p. PU 15077-78.  Thus, that phrasing and substance was

originally focused by the Examiner as being irrelevant to the invention.  Indeed, when amending

the claims, the inventors highlighted the increased breadth of the claims:

> The Claims of this application were previously drafted in a way
> that distinguished Applicants' solutions from certain prior art
> products which are reconstituted from lyophilizate powder in vials
> by medical personnel at the time of drug administration.  _The
> comments of the Examiner in the last Office Action indicated that
> whether the solution was reconstituted from lyophilizate is
> immaterial because patentability must reflect the inherent
> properties of the claimed solution and the prior art.  Consistent
> with the Examiner's comments, Claims 31, 42, and 44 are now
> amended (by deleting the lyophilizate limitation) to show that the
> important and claimed properties of the present invention do arise
> from the inherent properties of the solution, regardless of whether
> the solution is prepared from lyophilizates in vials_.

Ex. 22, p. PU 15157 (emphasis added). That is, far from pulling any trick, the inventors stressed that the amendment leading to the asserted claims of the '285 patent would lead to solutions being covered regardless whether the solutions were prepared from lyophilizates.

That is, every indication in the claims, specification, and prosecution history of the '285 patent is that there is no implied "non-lyophilized preparate" limitation in the claims.

## V.    A "SEALED" CONTAINER REQUIRES MORE THAN MERE CLOSURE.

Sicor's arguments regarding the "sealed" container limitation cites evidence that supports Pharmacia's construction. That is, all the evidence points to the realization that a "seal" constitutes something more than a mere closure. A sealed container is a "closed container which is further secured against access, leakage and passage by a fastening, membrane, or coating that must be broken to be removed." Sicor's only argument to the contrary is that the inventors waived claim scope by not presenting arguments over certain prior art on the basis of the sealed nature of the container; as previously noted, the Federal Circuit has flatly rejected that position as a basis for claim construction. Thus, Pharmacia's construction of "sealed" container should be adopted.

Sicor argues that the Court should ignore the embodiments of the invention set forth in the specification, even though all those embodiments use the term "sealed" to indicate something more than a mere closure. Sicor Memo, p. 19; *see*, *e.g.*, Ex. 1, col. 6, lines 5-10. Instead, Sicor directs the Court to the prosecution history, specifically a passage that states, "A sealed container effectively precludes [subsequent] lyophilization, since to lyophilize an unlyophilized solution would necessarily involve removal of water from the container *and destruction of the seal*." *Id.* at 20 (quoting Ex. 20, p. PU 0015068-69) (emphasis added). Not only would it be wrong to ignore all of the teachings of the specification, but the statement from the prosecution history

also actually supports Pharmacia's position that a seal constitutes something more than a mere closure. A closure may be opened and closed without destruction, whereas a seal must be destroyed to gain access.

Similarly, Sicor cites a number of dictionary definitions, the first of which expressly indicates that "sealed" is "anything that tightly or completely closes or secures a thing; to close by any form of fastening *that must be broken before access can be gained*." *Id.* at 21 (emphasis added). Each of those sources supports Pharmacia's construction of sealed, not Sicor's. Like the prosecution history noted above, this definition actually supports Pharmacia's position that a seal requires something more than a closure, *i.e.*, a seal must be broken to gain access, whereas a closure can be opened and closed repeatedly.

Sicor's only remaining argument is that the inventors somehow waived the common definition "sealed" by foregoing arguments based on the "sealed" container when other available arguments were easier. *See* Sicor Memo, p. 20 (relying on the inventors distinguishing polypropylene tubes from then existing claims on the basis of being plastic, not glass). Again, that is not the law, but rather is contrary to established precedent; only if the patentee surrendered a claim interpretation "with reasonable clarity and deliberateness" does prosecution history give rise to a waiver argument. *Schumer*, 308 F.3d at 1313. That simply cannot be the case when an inventor chooses to make other, simpler arguments instead of more complex ones.

## VI.     "STORAGE STABILITY" REQUIRES A SUBSTANCE TO BE "PHYSIOLOGICALLY ACCEPTABLE" FOR AT LEAST EIGHTEEN MONTHS.

In its final claim construction argument, Sicor not only ignores the context of the patent, but also selects 180 days as a period for required stability without any clear basis for doing so. To Pharmacia's understanding, Sicor does this in an attempt to read out the requirement that a

claimed solution be "physiologically acceptable" throughout the period required for "storage stability," To the contrary, the prosecution history clearly indicates that at least eighteen months is the appropriate minimum period to remain stable:

> Whereas, in accordance with what is widely accepted in the scientific community in the USP and other Pharmacopoeias, a drug is defined as stable over the period in which it maintains an assay of 90% or higher of the initial, one can conclude that:
>
>> the stability at 22°C of doxorubicin HCl dissolved at 2 mg per ml diluted hydrochloric acid pH 3.0 is higher than the stability at 22°C of doxorubicin HCl dissolved at 2 mg per ml 0.06 M phosphate buffer pH 3.0 and 6.0, and can reach *18 months* at a storage temperature between 2 and 8°C as shown in the patent application serial No 878,784.

Ex. 8, p. PI 939 (emphasis added). The experiment on which Sicor relies was developed between the deadline for the foreign priority filing and the initial domestic filing; because of these deadlines, the time period had to be less than one year long. 35 U.S.C. § 119 (requiring filing with twelve months to claim priority to earlier initial application). Such statements were never intended to define the length of time required for storage stability. The express statement in the prosecution history must take precedence over the circumstances of foreign filing.

In addition, the context of the '285 patent is a pharmaceutical product, which dictates that the solution must remain pharmaceutically acceptable throughout storage. *See*, *e.g.*, *ACTV*, 346 F.3d at 1088. Sicor completely ignores the context of the claims of the '285 patent in failing to address any requirement beyond mere chemical stability. That is improper, and claim 9 of the '285 patent should be construed as requiring the solution to remain "physiologically acceptable" throughout the period of "storage stability."

## CONCLUSION

For the reasons set forth above, as well as those set forth in Pharmacia's Opening Claim Construction Brief, Pharmacia respectfully requests that this Court adopt Pharmacia's claim construction positions on the terms "physiologically acceptable," "of," "anthracycline glycoside," "sealed," and "storage stability."

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Maryellen Noreika*
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
  *Attorneys for Plaintiff*
  *Pharmacia & Upjohn Company LLC*

OF COUNSEL:

Daniel A. Boehnen
Joshua R. Rich
McDONNELL BOEHNEN
  HULBERT & BERGHOFF LLP
300 S. Wacker Drive
Chicago, IL  60606
(312) 913-0001

June 19, 2006

## CERTIFICATE OF SERVICE

I, Maryellen Noreika, hereby certify that on June 19, 2006 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Steven J. Balick, Esquire
> John G. Day, Esquire
> ASHBY & GEDDES

and that I also caused copies to be served upon the following in the manner indicated:

### BY HAND

> Steven J. Balick, Esquire
> John G. Day, Esquire
> ASHBY & GEDDES
> 222 Delaware Avenue
> Wilmington, DE  19801

### BY FEDERAL EXPRESS

> Reid L. Ashinoff, Esquire
> David R. Baum, Esquire
> SONNENSCHEIN NATH & ROSENTHAL LLP
> 1221 Avenue of the Americas
> New York, NY  10020

> Jordan Sigale, Esquire
> SONNENSCHEIN NATH & ROSENTHAL LLP
> 8000 Sears Tower
> Chicago, IL  60606

*/s/  Maryellen Noreika*
Maryellen Norieka (#3208)
mnoreika@mnat.com