# EXHIBIT 39

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE


PHARMACIA & UPJOHN COMPANY,      )

             Plaintiff,      )

  -vs-                           )   CA No. 04-833-KAJ

SICOR, INC., and SICOR           )

PHARMACEUTICALS, INC.,           )

            Defendants.       )


       The videotaped deposition of DOUGLAS S.

CLARK, called for examination, taken pursuant to

the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before THERESA A. VORKAPIC, a

Notary Public within and for the County of Kane,

State of Illinois, and a Certified Shorthand

Reporter, CSR No. 84-2589, of said state, at Suite

3100, 300 South Wacker Drive, Chicago, Illinois,

on the 1st day of November, A.D. 2005, at

approximately 9:34 a.m.

DOUGLAS S. CLARK - NOVEMBER 1, 2005

Page 2

1    PRESENT:

2         McDONNELL BOEHNEN HULBERT & BERGHOFF, LLP,

3         (300 South Wacker Drive, Suite 3100,

4         Chicago, Illinois 60606-6709,

5         312-913-2133), by:

6         MR. JOSHUA R. RICH,

7         rich@mbhb.com,

8         MR. DANIEL A. BOEHNEN,

9              appeared on behalf of the Plaintiff;

10        SONNENSCHEIN NATH & ROSENTHAL,

11        (8000 Sears Tower,

12        Chicago, Illinois 60606,

13        312-876-8025), by:

14        MR. JORDAN A. SIGALE,

15        jsigale@sonnenschein.com,

16        MR. DANIEL CELANDER,

17             appeared on behalf of the Defendants.

18

19    VIDEOTAPED BY:  NOAH CARNEY, Esquire Deposition

20                 Services

21

22

23    REPORTED BY:  THERESA A. VORKAPIC,

24             C.S.R. Certificate No. 84-2589

340d33ca-d313-47f1-9093-f707e0b71890

DOUGLAS S. CLARK - NOVEMBER 1, 2005

Page 98

1   BY THE WITNESS:
2       A.   No, I don't believe it's sparingly
3   soluble.
4   BY MR. RICH:
5       Q.   Is it more soluble than sparingly
6   soluble or less soluble than sparingly soluble?
7       A.   I believe that's more soluble than
8   sparingly soluble, but I don't know the specific
9   definition of sparingly soluble, so it's difficult
10  for me -- I can't give a -- I can't give a precise
11  answer to that question unless you define
12  sparingly soluble.
13      Q.   When you've heard it used, what has it
14  meant to you?
15      A.   I've always found it vague.  I don't
16  typically use that terminology.
17      Q.   What terminology would you use to
18  describe your understanding of how soluble
19  adriamycinone is under the conditions I've
20  provided for you?
21      A.   I would use the solubility limit as a
22  concentration.
23      Q.   And you've already testified that you
24  don't know what that is?

Page 99

1       A.   That's correct.
2       Q.   So is there any other way you have --
3   is there any way whatsoever you have of
4   identifying what the solubility of adriamycinone
5   is under the conditions I've provided to you?
6       A.   I would quantify it.
7       Q.   And you've testified you don't know
8   what that quantification is?
9       A.   That's correct.
10      Q.   So there's no way that you have sitting
11  here today to characterize the solubility of
12  adriamycinone under the conditions I've given you?
13      A.   No, I can speculate as to whether all
14  of the adriamycinone that would be produced in the
15  hypothetical cleavage of doxorubicin under those
16  conditions -- whether or not it would all
17  dissolve, which I believe was the question.
18      Q.   No.  But that's okay.  Do you have any
19  idea of whether adriamycinone is toxic?
20      A.   Yes.
21      Q.   Is it?
22      A.   I have -- according to what I have
23  read, yes, adriamycinone is toxic.
24      Q.   What about the breakdown products of

Page 100

1   idamycin -- I'm sorry.  Let me start over.
2       What about the breakdown products of
3   idarubicin?  Do you have any knowledge as to
4   whether they're toxic?
5       A.   Well, the breakdown aglycone of
6   idarubicin, it would be an inference that would be
7   -- it would be speculation on my part as to
8   whether the breakdown product was toxic.
9       Q.   So you don't know?
10      A.   I have not read confirmation of whether
11  it is toxic.
12      Q.   You said it would be speculation.
13      A.   Yes.
14      Q.   Does that mean you do not know?
15      A.   That means I do not know for certain,
16  yes.
17      Q.   What is your speculation?
18      A.   My speculation is that it would be.
19      Q.   What is -- do you have any knowledge as
20  to the solubility of the breakdown aglycone of
21  idarubicin under the conditions I've provided
22  earlier?
23      MR. SIGALE:  Objection.  Vague.  You've
24  provided a lot of conditions earlier, Counsel.

Page 101

1   BY THE WITNESS:
2       A.   Which conditions?
3   BY MR. RICH:
4       Q.   You recall your testimony regarding the
5   breakdown of doxorubicin under pH between 2.5 and
6   5, temperature four --
7       A.   Which I would like to stress is a very
8   slow process under the conditions you've defined.
9       Q.   And yet you weren't able to identify
10  the limit of solubility of adriamycinone under
11  those conditions?  That's correct?
12      MR. SIGALE:  Objection.  Compound.
13  Mischaracterized his testimony.
14  BY THE WITNESS:
15      A.   No.  I don't know the solubility limit
16  of adriamycinone.
17  BY MR. RICH:
18      Q.   Do you know the solubility limit of the
19  breakdown aglycone of idarubicin?
20      A.   No, I don't know the solubility limit
21  of the breakdown aglycone of idarubicin, which is
22  structurally similar but different than the
23  aglycone of doxorubicin.
24      Q.   Do you know whether the breakdown

26 (Pages 98 to 101)

340d33ca-d313-47f1-9093-f707e0b71890

DOUGLAS S. CLARK - NOVEMBER 1, 2005

Page 102

1  products of doxorubicin are more or less toxic
2  than doxorubicin?
3      A.   According to the report that I have
4  read, they are apparently more toxic.
5      Q.   And that's Dr. Beijnen's expert report?
6      A.   Yes.
7      Q.   Do you have any other basis for knowing
8  one way or the other?
9      A.   I have not read or do not recall having
10 read papers dealing specifically with the toxicity
11 of the aglycone product.
12     Q.   Do you have any reason to believe that
13 the breakdown products of idarubicin are more or
14 less toxic than idarubicin itself?
15     A.   They are chemically different so it is
16 difficult to speculate on whether they are --
17 well, let me back up.
18          Could you repeat the question?
19          (WHEREUPON, the record was
20          read by the reporter.)
21 BY THE WITNESS:
22     A.   Than of idarubicin itself?
23 BY MR. RICH:
24     Q.   Yes.

Page 103

1      A.   The reason to believe if I were to
2  speculate would be that since the breakdown
3  products of doxorubicin are more toxic than
4  doxorubicin, possibly the doxorubicin or the
5  breakdown products of idarubicin are also more
6  toxic than idarubicin.
7      Q.   But it's pure speculation or is there
8  some factual basis to that?
9      A.   No factual basis that I am aware of.
10     Q.   Is it fair to say that you don't have
11 any experience working with the breakdown products
12 of doxorubicin?
13     MR. SIGALE:  Objection.  Vague.
14 BY THE WITNESS:
15     A.   Well, we do have experience working
16 with the breakdown products of doxorubicin.  We
17 just have not -- yes, we do have experience
18 working with the breakdown products of
19 doxorubicin.
20 BY MR. RICH:
21     Q.   But you've never characterized the
22 toxicity of those breakdown products?
23     A.   No, we've never characterized the
24 toxicity of these breakdown products nor have we

Page 104

1  characterized the solubility of these breakdown
2  products under the conditions you've defined.
3      Q.   And you don't have any experience
4  determining the toxicity of the breakdown products
5  of idarubicin and --
6      A.   No, we personally do not.
7      Q.   And you have not no knowledge of the
8  toxicity of the breakdown products of doxorubicin
9  apart from information you've learned in this case
10 from the expert report of Dr. Beijnen?
11     A.   No direct knowledge.
12     Q.   Any indirect knowledge?
13     A.   Well, yes, we do have indirect
14 knowledge.  For example, it's obvious to one who
15 knows the mechanism of toxicity of doxorubicin or
16 of idarubicin that the breakdown products would be
17 toxic.  That's clearly evident to somebody who
18 understands the mechanisms by which these
19 molecules work.
20          Now, the relative toxicity of the
21 aglycone to the parent molecule is not something
22 in particular that we or my group has been
23 concerned with.
24     Q.   And it's not something that you knew --

Page 105

1      A.   I knew it was toxic.
2      Q.   But you didn't know the relative
3  toxicity?
4      A.   I did not know the relative toxicities.
5      MR. RICH:  Why don't we break there?
6      THE VIDEOGRAPHER:  Going off the video
7  record.  The time is 12:43 p.m.
8          (WHEREUPON, the deposition was
9          recessed until 1:30 p.m., this
10         date, 11/1/05.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

27 (Pages 102 to 105)

340d33ca-d313-47f1-9093-f707e0b71890

# EXHIBIT 40


SONNENSCHEIN NATH & ROSENTHAL LLP

8000 Sears Tower
233 South Wacker Drive
Chicago, IL 60606
312.876.8000
312.876.7934 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, N.J.
St. Louis
Washington, D.C.
West Palm Beach

Jordan A. Sigale
312.876.7391
jsigale@sonnenschein.com

October 21, 2005

<u>VIA FACSIMILE</u>

Joshua Rich, Esq.
McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606-6709

      Re:   Meet and Confer on Claim Construction

Dear Joshua:

This is in furtherance of my letter of October 17, 2005, your response of October 18, 2005 and Reid Ashinoff's letter of October 19, 2005.

While Judge Jordan's Scheduling Order didn't require either party to disclose claim terms that needed construction prior to October 17, 2005, Sicor's Supplemental Response to Pharmacia's Interrogatory No. 2 certainly apprised Pharmacia of Sicor's position that the patent specification, claim limitations and prosecution history of the '285 patent require the non-lyophilized form of the anthracycline glycoside.

As for the other claim terms, although Sicor agrees that these terms should be given their "ordinary meaning," countless post-Markman patent litigations have shown that parties often have different definitions of an "ordinary meaning" for the claim language. To avoid unnecessarily distracting disputes on these issues during summary judgment proceedings, trial preparation and trial, we hope that the parties can negotiate and reach an agreement (where possible) to the "ordinary meaning" of these claim terms. We believe this was the procedure contemplated by Judge Jordan's Order.

To start our discussions, Sicor provides herewith proposed constructions for these claim terms.



Joshua Rich, Esq.
October 21, 2005
Page 2

| Claim term or phrase | Proposed Construction |
| --- | --- |
| physiologically acceptable solution | a solution that is compatible with processes that occur naturally in a normal biological system |
| Of | including, but not limited to, |
| anthracycline glycoside | a non-lyophilized chemical compound having a glycosidic structure in which a tetrahydronaphthacenequinone chromophore is linked to one or more sugar residues |
| selected from the group consisting of | that must be [element a], [element b], [element c] or combinations thereof |
| idarubicin hydrochloride | a non-lyophilized, monohydrochloride salt form of idarubucin. |
| physiologically acceptable aqueous solvent | an aqueous solvent that is compatible with processes that occur naturally in a normal biological system |
| having a pH adjusted to | the resulting solution has a pH of [insert numeric range], which is different from the pH of the same solution without a pH adjusting agent |
| physiologically acceptable acid | an acid that is compatible with processes that occur naturally in a normal biological system. |
| sealed container | a receptacle that is closed in some fashion such that it does not allow the passage of the solution |
| storage stability | at least 90% of the original amount of anthracycline glycoside dissolved in solution remains in the solution when stored at a temperature of about 4°C for a period of at least 180 days. |


**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

Joshua Rich, Esq.
October 21, 2005
Page 3

| as a result of said pH being adjusted to the said pH range using said acids | because the resulting solution has a pH of [insert numeric range], which is different from the pH of the same solution without the acid. |
| --- | --- |

As you know, discovery is ongoing. Sicor reserves the right to revisit these proposed terms based on future discovery.

Again, we look forward to scheduling a discussion with you at the appropriate juncture to determine whether the parties can stipulate to joint constructions for any of these terms and phrases.

Sincerely,

Jordan A. Sigale

cc:     David Baum
        Reid Ashinoff
        Daniel Boehnen
        Maryellen Noreika
        John Day

# EXHIBIT 41



Neutral Citation Number: [2005] EWCA Civ  137

Case No: A3/2004/2433

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION (PATENTS COURT)**
**Mr Roger Wyand QC**
**HC-04-CO1628**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 17/02/2005

Before :

**THE PRESIDENT**
**THE RT HON LORD JUSTICE JACOB**
and
**THE RT HON LORD JUSTICE HOOPER**

- - - - - - - - - - - - - - - - - - - - -

Between :

(1)  **Mayne Pharma Pty Ltd**          **Respond-**
(2)  **Mayne Pharma plc**              **Ents/**
                                        **Claimants**

- and -                                 **Appellant/**
**Pharmacia Italia SPA**               **Defendant**

" - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

Colin Birss  (instructed by Taylor Wessing) for the Claimants
Richard Miller QC (instructed by Clifford Chance) for the Defendant

Hearing date : 9 February 2005
- - - - - - - - - - - - - - - - - - - - -

# Judgment Approved by the court
# for handing down
# (subject to editorial corrections)

**Lord Justice Jacob:**

1.  This is a patentee's appeal in a case rightly subjected to the streamlined procedure. The litigation began on 17th May 2004 when the respondents ("Mayne") commenced proceedings for a declaration of non-infringement of Pharmacia's UK patent No. 2,178,311. A counterclaim for infringement followed. The only issue was whether Mayne's product falls within claim 1 of the Patent. The case was heard before Mr Roger Wyand QC, sitting as a Deputy Judge. He gave judgment, holding non-infringement, on 1st November 2004 and granted permission to appeal. So the case has gone from start to determination on appeal in less than 9 months.

*What the dispute is about*

2.  Mayne wish to sell an injectable solution of an anti-cancer drug called epirubicin (an anthracycline glycoside) hydrochloride. They say it does not fall within any of the claims of the patent. Pharmacia say it does. It is agreed that the whole question turns on claim 1. This reads:

    "An injectable, ready-to-use, sterile, pyrogen-free, anthracycline glycoside solution which consists essentially of a physiologically acceptable salt of an anthracycline glycoside dissolved in a physiologically acceptable aqueous solvent therefor at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted to from 2.5 to 5.0 solely with a physiologically acceptable acid, the said acid being selected from hydrochloric, sulfuric, phosphoric, acetic, succinic, tartaric, ascorbic, citric, glutamic, methanesulphonic or ethanesulphonic acid."

3.  "Lyophilization" (US spelling) means freeze-drying. What Mayne do is described, it is agreed accurately, by the Deputy Judge as follows:

    "Mayne purchase epirubicin hydrochloride which has been subjected to a bulk lyophilization process. Mayne takes this lyophilizate, dissolve it in water, add […]. The resulting solution is […] and is then filled into vials […]."

4.  So lyophilization of the epirubicin hydrochloride forms part of the history of Mayne's product, but it is not the immediate precursor to its production – it is an "upstream" process. Is the final product nonetheless covered by the claim? This turns on its meaning, particularly the words *solution ... which has not been reconstituted from a lyophilizate.* It is conceded that the Mayne process fulfils the remainder of the claim, pH adjustment with appropriate acid.

*The Principles of Construction*

5.  To decide upon that meaning one must construe the claim in context. I summarised the principles in paragraph 41 of my judgment in *Technip SA's Patent* [2004] RPC 919. The House of Lords in *Kirin-Amgen* [2004] UKHL 46, through Lord Hoffmann's speech, has approved those principles (save for one minor matter) and

provided a much fuller justification for them than did I.  As a practical working guide, it will generally be sufficient to use my summary as approved.   I repeat it here, but stripped down to bare essentials:

"(a)    The first, overarching principle, is that contained in Art 69 itself.

(b)    Art 69 says that the extent of protection is determined *by the terms of the claims*.  It goes on to say that the description and drawings shall be used to interpret the claims.   In short the claims are to be construed in context.

(c)    It follows that the claims are to be construed purposively – the inventor's purpose being ascertained from the description and drawings.

(d)    It further follows that the claims must not be construed as if they stood alone – the drawings and description only being used to resolve any ambiguity.   Purpose is vital to the construction of claims.

(f)    Nonetheless purpose is not the be-all and end-all.   One is still at the end of the day concerned with the meaning of the language used.   Hence the other extreme of the Protocol – a mere guideline – is also ruled out by Art 69 itself.   It is the terms of the claims which delineate the patentee's territory.

(g)    It follows that if the patentee has included what is obviously a deliberate limitation in his claims, it must have a meaning.   One cannot disregard obviously intentional elements.

(h)    It also follows that where a patentee has used a word or phrase which, <u>acontextually</u>, might have a particular meaning (narrow or wide) it does not necessarily have that meaning in context.

(i)    It further follows that there is no general "doctrine of equivalents".

(j)    On the other hand purposive construction can lead to the conclusion that a technically trivial or minor difference between an element of a claim and the corresponding element of the alleged infringement nonetheless falls within the meaning of the element when read purposively.   This is not because there is a doctrine of equivalents:  it is because that is the fair way to read the claim in context.

(k)    Finally purposive construction leads one to eschew what Lord Diplock in *Catnic* called (at p.243):

> "the kind of meticulous verbal analysis which lawyers are
> too often tempted by their training to indulge.""

*The Skilled Man and Common General Knowledge*

6.      In this case it is agreed that the "Protocol questions" do not assist.    What matters is
the meaning of the claim read in context.    Since the claim is assumed to be read by
the person skilled in the art, it is sensible to begin by summarising his relevant
background knowledge - the common general knowledge.   I accept here, as Mr Birss,
for Mayne, contended, that the relevant notional skilled man would be a
pharmaceutical manufacturer, not merely a hospital pharmacist.  Such a man (or team)
would have knowledge not only of how the end product was to be used but also how
to make it.

7.      In particular he would know that:

  i)     The active ingredient to be used for the invention (anthracycline glycosides)
         were anti-tumour agents having widespread actual use;

  ii)    The agents were very toxic so that any risk of medical staff or manufacturing
         staff coming into accidental contact with them was serious;

  iii)   The existing products on the market were vials containing a "cake" consisting
         of a mixture of the active ingredient with an excipient such as lactose;

  iv)    The vials were used by injecting solvent through the rubber stopper to dissolve
         the cake.  Shaking was necessary.   Once the solid material had been dissolved
         there could be a bit of adjustment to get the solution toward isotonicity;

  v)     The cake within the vials consisted of a lyophilized product.   They were made
         this way: the appropriate amount of a solution containing the active ingredient
         and the excipient or bulking agent was placed in the open vials.   These were
         placed in lyophilizing conditions.   Broadly (the details do not matter) this
         consisted of freezing followed by low pressure to evaporate the ice;

  vi)    The resulting product was, to use Mr Birss's word, "fluffy" – it had a low-bulk
         density. So there is more risk involved in handling this than handling
         crystalline material.   The latter, being denser, is less apt to fly about;

  vii)   The reason for using the solid product in the vials, rather than simply having a
         solution was because solutions did not have very good stability – the product
         would deteriorate.

*The specification of the patent*

8.      With that, I can turn to the specification.  Its title is "Injectable ready-to-use solutions
containing an antitumor anthracycline glycoside."    The opening general words say
this:

> "The present invention relates to a stable intravenously
> injectable ready-to-use solution of an antitumor anthracycline
> glycoside, e.g. doxorubicin, to a process for preparing such a

> solution, and provide the same in a sealed container, and to a
> method for treating tumors by the use of the said ready-to-use
> solution."

9.  Next it acknowledges that the anthracycline glycoside compounds are well known and
    used as anti-tumor agents.  It then sets out the nature of the existing products on the
    market:

> "At present, anthracycline glycoside antitumor drugs, in
> particular, e.g., doxorubicon, are solely available in the form of
> lyophilized preparations, which need to be reconstituted before
> administration."

10. After summarising two references which discuss the dangers to medical personnel
    from this type of agent in general, the patent says this:

> "To administer a lyophilized preparation, double handling of
> the drug is required, the lyophilized cake having to be first
> reconstituted and then administered and, moreover, in some
> cases, the complete dissolution of the powder may require
> prolonged shaking because of solubilization problems."

11. It then states the problem to be solved by the invention:

> "As the risks connected with the manufacturing and the
> reconstitution of a lyophilized preparate would be highly
> reduced if a ready-to-use solution of the drug were available,
> we have developed a stable, therapeutically acceptable
> intravenously injectable solution of an anthracycline glycoside
> drug, e.g. doxorubicin, whose preparation and administration
> does not require either lyophilization or reconstitution."

12. Next it sets out what the invention is in the so-called consistory clause.  It is repeated
    in claim 1 so I need not set it out again.  There then follows a second consistory
    clause, which corresponds to independent claim 31:

> "A process for producing a solution according to any one of the
> preceding claims; which process comprises dissolving the
> physiologically acceptable salt of the anthracycline glycoside,
> which salt is not in the form of a lyophilizate, in the
> physiologically acceptable aqueous solvent therefor;  adding
> solely the physiologically acceptable acid to adjust the pH
> within the said range as desired;  optionally, adding an
> additional component selected from a co-solublizing agent, a
> tonicity adjustment agent and a preservative to the solution;
> and then passing the resulting solution through a sterilising
> filter."

13. There then follows detail about how the solution is made.  None of the detail matters
    for present purposes save this:  that the description of the detailed variants of the
    process at no point mentions the use of lyophilized product.  All the 12 examples

start with the words "Doxorubicin.HCl was dissolved …" without explicitly saying whether it was lyophilized or not.

14.    The last passage I need mention is a general statement on p. 9 about an advantage of the invention:

> "With the solutions of the invention it is possible to obtain compositions having a very high concentration of the anthracycline glycoside active substance even at 50 mg/ml. This constitutes a great advantage over the presently available lyophilized preparates wherein high concentrations of anthracycline glycoside can only be obtained with difficulty because of solubilization problems encountered in reconstitution, mainly with saline.  The presence of the excipient, e.g. lactose, in the lyophilized cake, and its generally high proportion in respect of the active substance, even up to 5 parts of excipient per part of active substance, has a negative effect on solubilization so that difficulties may arise in obtaining dissolution of the lyophilized cake, especially for concentrations of anthracycline glycoside higher than 2 mg/ml."

*The detailed arguments on construction*

15.    Mr Richard Miller QC for the patentees contended that the patent was essentially about formulation of the ready-to-use solution.   It was this formulation step which had not to involve lyophilization and its reconstitution on the ward.   The starting materials for the formulation were not part of the invention.  He submitted in detail that:

i)      The heart of the invention was, as its title said, an injectable ready-to-use solution.

ii)     The passage about "the manufacturing and the reconstitution" is of "such preparations", i.e. the vials on the market. It is saying that the making and use of these each involves exposing people to risk. The workers at risk are those who operate the lyophilizing machines containing the vials.   The medical workers at risk are those who have to inject solution into the vials to reconstitute (dissolve) the solid material within them.

iii)    The passage about administration ("To administer a lyophilized preparation ..") is clearly only about the formulated product.   The "lyophilized preparation" is that contained in such a product.

iv)     The passage about "The risks connected with the manufacturing and the reconstitution of a lyophilized preparate …" is likewise about the final product.   What it is saying is that if final product were a ready-to-use stable solution the risks would be reduced.   The risks being talked about are those concerned with the manufacture of the vials containing lyophilized preparations and their use.

v)      The passage on p. 9 about the great advantage of the invention is by comparison with the "presently available lyophilized preparates" i.e. those on the market now.   It is saying you can get high concentration of the active ingredient and avoid the solubilisation problems of the prior art.    That has nothing to do with the nature of the original raw material active ingredient.

vi)     So the essential teaching of the patent is not concerned with the nature of that basic raw material.    It is about how you make a stable, ready-to-use solution from such a material.

vii)    The fact that claim 31 is more limited than claim 1 (as it is) makes no difference.  Claim 31 is, Mr Miller accepts, not infringed.   This is because it is specifically limited to a process which starts with a raw material ("salt") which "is not in the form of a lyophilizate".   Mr Miller says that by contrast in claim 1 it is "the solution which has not been reconstituted from a lyophilizate".   There is a shift from the unlyophilized starting material of claim 31 to the unlyophilized material used to make the ready-to-use solution.

16.    Mr Birss submits that his case is crucially dependent upon whether the Deputy Judge was right in his paragraph 36:

> "36.    On a fair reading of the claims and in the context of the specification and such evidence of common general knowledge as is before me I find that the skilled addressee would form the view that the patentee regarded lyophilization as not just an unnecessary but as an undesirable process step in the production of the injectable solution and intended to exclude a solution made by the use of such a step, even if it were to be followed by other steps, such as the adjustment of pH and sterilising by filtration."

17.    Putting it another way, he submitted that the whole teaching of the patent is about the complete avoidance of lyophilization.   You do not need lyophilization at any stage. And it is that which is to be avoided if you are to avoid danger to workers during any part of the manufacture.     As he put it "you can throw away the lyophilizing machine."

18.    He drew a homely analogy – with instant coffee.   If you want a cup of real coffee (i.e. coffee which has not been reconstituted from a lyophilizate) containing milk and sugar you will not be satisfied with a cup of instant coffee where the milk and sugar has been added after the reconstitution.

19.    Mr Birss further relied upon the process aspect of the invention – claim 31.  First he pointed out that if the examples were truly indifferent as to whether the starting material was lyophilized or not, then none of them would be examples of the process of the invention.   So it was implicit that the starting material was not lyophilized. Second he submitted that claim 31 tracks claim 1 and in particular both claims use the word "lyophilizate".  If Mr Miller were right then the word would have a different meaning in each claim which was improbable.

*The Deputy Judge's conclusions*

20.     I have already quoted the most crucial paragraph of his judgment.  But I should mention some other points too.   First there is the way he dealt with claim 31.   He said this:

> "28.    Pharmacia counters by saying that claim 31 is effectively dependent on claim 1 and is therefore narrower than claim 1 and should be construed in such a way.  This is not strictly correct.  Claim 31 is a process claim whereas claim 1 is a product claim.  Whilst it is correct that the process of claim 31 may not be the only process that will produce a product within claim 1 this does not mean that it must necessarily be construed as a subset of the processes that can produce such a product.  There may be other processes:  there may not.  It is neutral."

21.     I think that is right.  In general in a patent with product and process claims one may perhaps expect the process to produce the product, but there is no necessary corollary that the product must be made only by the process.  All depends on the language used in context.

22.     In the preceding paragraph the Judge said this:

> "27.    Mayne submit that their product is made by the process of claim 31 except that the salt of the anthracycline glycoside which they dissolve **is** in the form of a lyophilizate.  Thus, they do not infringe claim 31, as is acknowledged by Pharmacia.  They point out that the examples being silent as to how the API is produced, it must be assumed that the API is not a lyophilizate otherwise there is no example of the process claimed.   Thus, they say, the skilled addressee would understand the phrase in claim 1 "which has not been reconstituted from a lyophilizate" as excluding a solution which has been made by the process of claim 31 but with the starting material, the API, being a lyophilizate."

23.     Mr Birss submitted that the Judge's comment about the claim 31 argument being "neutral" did not apply to this paragraph.  I think he is right.  On the other hand the Judge here does no more than record Mr Birss' argument about the examples.  He never found it necessary to take the argument specifically into account, though he may have done in his crucial paragraph 36.

24.     Next I should mention the Judge's paragraphs 33 and 34:

> "I have two problems with Pharmacia's approach to construction of the disputed phrase.  The first is that even if the patent does not teach achieving stability by adjusting the pH the claim also refers to an anthracycline glycoside concentration of from 0.1 to 50 mg/ml.  The passage set out above from page 9 line 11 of the patent explains that this is an advantage over "the presently available lyophilized preparates".  I have heard no evidence as to how the skilled addressee would regard this passage but on its face it seems to be teaching away from the use of lyophilizates.

> The second problem is more fundamental.  If one concludes that the skilled
> addressee does not regard the disputed phrase as necessarily excluding **any**
> lyophilization/reconstitution step, where does he/she draw the line?   The
> suggestion by Pharmacia is that the skilled addressee would understand the
> phrase to mean that lyophilization was not used on the final product but could
> have been used on a precursor.  This, says Pharmacia, would only exclude
> precisely what was done before in the hospital pharmacy."

25.    I do not agree with either of these points.   As Mr Miller pointed out the passage on
       p.9 is by way of contrast with the existing product – "the teaching away from
       lyophilizates" relates only to lyophilizates in the final product.

26.    Nor do I see any real problem about where the line is drawn.  Mr Miller put it this
       way:  "only if the step of reconstitution produces a ready-to-use solution is there no
       infringement."    Mr Birss suggested there was a problem here:  suppose you
       reconstituted and then diluted the solution or added saline for isotonicity – as you
       sometimes did with the prior art.  Would that mean no infringement?  I see no
       problem.  The product is either ready-to-use or it is not.  If it is, then if the
       immediately prior step was reconstitution, there is no infringement – otherwise there
       is.

27.    Finally the Judge thought there was support from a linguistic analysis of the claim.   I
       do not go into the detail of this – Mr Birss did not seek to support it as such.   His
       support for the Judge, as I have already said, rested essentially on paragraph 36.

*My opinion*

28.    I have come to the conclusion that Mr Miller is right, essentially for the reasons he
       advanced.   I need elaborate only a little.  I think the skilled man would see the real
       point of the teaching in the description as being the provision of a stable, ready-to-use
       solution.   Such a desirable substance was not previously available.   The patent
       teaches him how to make it.  He can make it without having to lyophilize the material
       in the vials.   He knows he will have to start his formulation with active ingredient
       raw material.  But he would not regard the nature of that as part of the formulation
       process.   The patent teaches him how to do away with a previously essential
       lyophilization.

29.    When he comes to read claim 1, knowing that its purpose in law is to set out the
       monopoly, he sees that it is the "ready-to-use solution" which must not "have been
       reconstituted from a lyophilizate."    With the understanding of the purpose and
       teaching of the description he would read it as meaning that the solution itself has not
       been made by reconstitution – it is avoidance of that which fulfils the purpose of
       doing away with the previously essential step.   If he considered the nature of the
       starting raw material, lyophilized or not, he would see it made no real difference – just
       that starting with lyophilizate would introduce an unnecessary complication.

30.    I think this construction is that which is consistent with the inventor's purpose as
       disclosed in his specification – the manufacture of a ready-to-use solution which does
       not involve the previously essential lyophilization stage.

31.    As to Mr Birss's coffee example, like many analogies it is beguilingly misleading –
there is no true analogy because coffee in its raw material form can never be
lyophilized.   Nor do I think it matters whether the examples are read as starting with
unlyophilized material – whether they do or not is not what matters because they are
essentially about producing the stable solution.

32.    Accordingly I would allow the appeal.    I would not want to part from this case
without paying tribute to the high quality of the argument on both sides.    Sadly,
however, I must also record the fact that I was most disappointed to see the quite
extraordinary number of files of paper produced, quite unnecessarily, for this appeal.
We were only referred to two pages not included in the one main file.  They were
obviously not wanted on voyage or to put it more formally not "relevant to
proceedings in the Court of Appeal" within the meaning of para. 15.1(1) of the
Practice Direction to Part 52 of the CPR.  No doubt this will be taken into account on
assessment of costs.

**Lord Justice Hooper:**

33.    I agree.

**Dame Elizabeth Butler-Sloss P:**

34.    I also agree.

EXHIBIT 42

# FEDERAL COURT OF AUSTRALIA

## Pharmacia Italia S.P.A v Mayne Pharma Pty Ltd [2005] FCA 1066

**INTELLECTUAL PROPERTY** – patents – claim for infringement – clarity of expression used in a claim – exclusionary integer – principles of construction – whether permissible to qualify a claim by reference to the body of specification – whether substance of invention taken.

*Patents Act 1990* (Cth), ss 40(2)(b), 117, 120

*Assidoman Multipack (formerly Multipack Wraparound Systems) v Mead Corporation* [1995] RPC 321 cited

*Attorney-General v Prince Ernest Augustus of Hanover* [1957] AC 436 cited

*Catnic Components Ltd v Hill & Smith Ltd (No. 1)* [1982] RPC 183 discussed

*Clark v Adie* (1875) LR 10 Ch. App. 667 cited

*Commonwealth Industrial Gases Ltd v MWA Holdings Pty Ltd* (1990) 180 CLR 160 followed

*Décor Corporation Pty Ltd v Dart Industries Inc* (1998) 13 IPR 385 applied

*Electric & Musical Industries Ltd v Lissen Pty Ltd* (1936) 54 RPC 23 cited

*Flexible Steel Lacing Co v Beltreco Ltd* (2000) 49 IPR 331 cited

*General Tire & Rubber Co. v Firestone Tyre & Rubber Co Ltd (No. 1)* [1972] RPC 457 cited

*Improver Corp v Remington Consumer Products Ltd* [1990] FSR 181 cited

*Interlego AG v Toltoys Pty Ltd* (1973) 130 CLR 461 cited

*Kimberly-Clark Australia Pty Limited v Arico Trading International Pty Limited and Others* (2001) 207 CLR 1 applied

*Kirin-Amgen Inc v Hoescht Marion Roussel Ltd* [2005] 1 All ER 667 cited

*Leonardis v Sartas No. 1 Pty Ltd* (1996) 67 FCR 126 cited

*Marconi v Mullard* (1923) 40 RPC 159 cited

*Martin Engineering Co v Trison Holdings Pty Ltd* (1989) 14 IPR 330 cited

*Mayne Pharma Pty Ltd and Mayne Pharma plc v Pharmacia Italia SPA* [2005] EWCA Civ 137 considered

*Minerals Separation North American Corp v Noranda Mines* (1952) 69 RPC 81 cited

*Minnesota Mining and Manufacturing Co v Beiersdorf (Australia) Ltd* [1979-1980] 144 CLR 253 cited

*Nesbit Evans Group Australia Pty Ltd v Impro Ltd and Anor* (1997) 39 IPR 56 cited

*Nicaro Holdings Pty Ltd v Martin Engineering Co* (1990) 91 ALR 513 cited

*Olin Corporation v Super Cartridge Co Pty Ltd and Anor* (1977) 51 ALJR 525 applied

*Populin v H.B. Nominees Pty Ltd* (1982) 41 ALR 471 applied

*Radiation Ltd v Galliers & Klaerr Pty Ltd* (1938) 60 CLR 36 applied

*Rehm Pty Ltd v Websters Security Systems (International) Pty Ltd and Ors* (1988) 81 ALR 79 cited

*Root Quality Pty Ltd and Anor v Root Control Technologies Pty Ltd and Others* (2000) 177 ALR 231 cited

*Walker v Alemite Corp* (1933) 49 CLR 643 applied

*Welch Perrin and Company Proprietary Limited v Worrel* (1961-1962) 106 CLR 588 followed

- 2 -

GS Banker and CT Rhodes, *Modern Pharmaceutics* (1979)
*Dictionary of Pharmacy, Pharmaceutical Products Press,* 2004

.

**PHARMACIA ITALIA S.P.A and PFIZER (PERTH) PTY LIMITED v MAYNE
PHARMA PTY LTD and F H FAULDING & CO LTD and FAULDING
HEALTHCARE PTY LTD**

VID 439 OF 2003

CRENNAN J
5 AUGUST 2005
MELBOURNE

GENERAL DISTRIBUTION

**IN THE FEDERAL COURT OF AUSTRALIA**

**VICTORIA DISTRICT REGISTRY**                                **V439 OF 2003**

BETWEEN:          **PHARMACIA ITALIA S.P.A**
                  **FIRST APPLICANT**

                  **PFIZER (PERTH) PTY LIMITED**
                  **SECOND APPLICANT**

AND:              **MAYNE PHARMA PTY LTD**
                  **FIRST RESPONDENT**

                  **F H FAULDING & CO LTD**
                  **SECOND RESPONDENT**

                  **FAULDING HEALTHCARE PTY LTD**
                  **THIRD RESPONDENT**

**JUDGE:**          **CRENNAN J**

**DATE OF ORDER:**  **5 AUGUST 2005**

**WHERE MADE:**     **MELBOURNE**

**THE COURT ORDERS THAT:**

1.    The parties to prepare short minutes of final orders on liability in accordance with
      these reasons and include any other orders or directions as appropriate for the further
      disposition of the matter.

Note:   Settlement and entry of orders is dealt with in Order 36 of the Federal Court Rules.

GENERAL DISTRIBUTION

IN THE FEDERAL COURT OF AUSTRALIA

VICTORIA DISTRICT REGISTRY                                  V439 OF 2003

BETWEEN:          PHARMACIA ITALIA S.P.A
                  FIRST APPLICANT

                  PFIZER (PERTH) PTY LIMITED
                  SECOND APPLICANT

AND:              MAYNE PHARMA PTY LTD
                  FIRST RESPONDENT

                  F H FAULDING & CO LTD
                  SECOND RESPONDENT

                  FAULDING HEALTHCARE PTY LTD
                  THIRD RESPONDENT

JUDGE:            CRENNAN J
DATE:             5 AUGUST 205
PLACE:            MELBOURNE

## REASONS FOR JUDGMENT

### INTRODUCTION

1        This proceeding concerns the alleged infringement of Australian Patent No. 598197, entitled 'Injectable ready-to-use solutions containing an antitumor anthracycline glycoside' ('Patent') within s 117 of the *Patents Act 1990* (Cth) (the '*Patents Act*'). The first applicant, Pharmacia Italia S.p.A, a company incorporated in Italy, is the registered proprietor of the Patent; the second applicant, Pfizer (Perth) Pty Limited, a company incorporated in Australia, is a manufacturer of pharmaceuticals (together, 'the applicants'). Since 23 July 2003 the second applicant has been the exclusive licensee in Australia of the invention described in the Patent in relation to epirubicin hydrochloride.

2        The first respondent, Mayne Pharma Pty Ltd is a manufacturer, distributor and exporter of pharmaceutical products. The second and third respondents are F H Faulding & Co Ltd, and Faulding Healthcare Pty Ltd respectively. The three respondent companies form

- 2 -

part of the Mayne Pharma group of companies, all of which are incorporated in Australia (together, 'the respondents'). The applicants allege that the respondents have infringed certain claims of the Patent by 'manufacturing, selling, using and keeping a ready –to-use antitumor anthracycline glycoside solution as claimed in the Patent' (the 'respondents' product') and have made application to this court under s 120 of the *Patents Act*.

3          It is noted that on 23 July 2003 an order by consent was made in the following terms:

> *'The decisions of the questions of law and issues of fact in respect of the validity (if put in issue by way of Cross-claim) and liability for infringement of Australian Letters Patent 598197 be made separately from and before any other question in the proceeding.'*

Accordingly, the only question to be resolved by the Court, at this stage, is whether the respondents have infringed certain claims of the Patent by making and selling epirubicin hydrochloride in injectable ready-to-use solutions.

4          The primary issue of infringement is whether the respondents' product has been 'reconstituted from a lyophilizate' as that phrase is used in Claim 1 of the Patent, which states that the invented pharmaceutical product 'has not been reconstituted from a lyophilizate'. A secondary issue is whether the specific occasions on which the respondents used sodium hydroxide, in addition to hydrochloric acid, to adjust the pH of the solution avoid infringement, when Claim 1 of the Patent refers to the pH being adjusted '**solely** with a physiologically acceptable acid' (emphasis added).

5          The invention, the subject of the Patent relates to:

(a) a pharmaceutical product, being a stable intravenously injectable ready-to-use solution of an antitumor anthracycline glycoside, e.g. doxorubicin;

(b) a process for preparing such a solution, [providing] the same in a sealed container; and

(c) a method for treating tumours by the use of the ready-to-use solution.

6          The priority date of the Patent is 2 August 1985. Anthracycline glycosides are anticancer drugs which were well known at the priority date. It appears that at that time they were commercially available solely in the form of lyophilized preparations (in a solid form) that needed to be reconstituted into an injectable form (a liquid) before administration to a patient.

7          Lyophilization is a process which is colloquially described as 'freeze-drying' whereby the temperature of the subject material is lowered to freeze it. A vacuum is drawn then the temperature is raised such that the frozen solvent (usually water) sublimates directly from a solid to a gas. Accordingly, a 'lyophilizate' is the dried or solid form of a product which was formerly in a liquid form and has undergone lyophilization.

8          Anthracycline glycosides cannot be administered to a patient in their lyophilized solid form yet they are unstable in aqueous solution and degrade, resulting in both a loss of pharmaceutical activity and the precipitation of solid particles, which prevents them from being administered intravenously. Because of the problems related to instability, anthracycline glycosides were not manufactured in the form of ready-to-use solutions before the priority date. As mentioned above, they were only marketed in the form of a lyophilized solid in a vial, which was required to be reconstituted into a liquid form before the product could be injected into a patient.

9          In the body of the Patent specification it is noted that the manufacturing and reconstitution of such preparations expose the personnel involved to risks of contamination which are particularly serious because of the toxicity of the antitumour substances. The complete specification states:

> 'To administer a lyophilized preparation, double-handling of the drug is required, the lyophilized cake having to be first reconstituted and then administered and, moreover, in some cases, the complete dissolution of the powder may require prolonged shaking because of solubilization problems.' (p2)

10         The complete specification indicates that the invention is targeted at circumventing the problems of handling cytotoxic material safely:

> 'As the risks connected with the manufacturing and the reconstitution of a lyophilized preparate would be highly reduced if a ready-to-use solution of the drug were available, we have developed a stable, therapeutically acceptable intravenously injectable solution of an anthracycline glycoside drug, e.g. doxorubicin, whose preparation and administration does not require either lyophilization or reconstitution.' (p2)

### THE COMPLETE PATENT SPECIFICATION

11         The entitlement of the complete specification is set out in paragraph 1 above. The body of the Patent specification describes the product, process and method of treatment

- 4 -

which are defined in the claims thus:

> 'The present invention relates to a stable intravenously injectable ready-to-use solution of an antitumour anthracycline glycoside, e.g. doxorubicin, to a process for preparing such a solution, and provide the same in a sealed container, and to a method for treating tumours by the use of the said ready-to-use solution.'

12    Then follows a description of relevant prior art and the problems which the invention seeks to overcome as set out in paragraphs 9 and 10 above.

13    The complete specification then sets out the consistory clause for the product, which underlines Claim 1, as follows:

> 'According to the present invention, there is provided a sterile, pyrogen-free, anthracycline glycoside solution which comprise a physiologically acceptable salt of an anthracycline glycoside dissolved in a physiologically acceptable aqueous solvent therefor at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate, and the pH of which has been adjusted from 2.5 to 5.0 solely with a physiologically acceptable acid.  Preferably the solution of the invention is provided in a sealed container.'

14    The language of the consistory clause for the product is then reflected in a preferred embodiment as follows:

> 'According to a particularly preferred embodiment of the invention, there is provided a sterile, pryogen-free, doxorubicin solution which consists essentially of a physiologically acceptable salt of doxorubicin dissolved in a physiologically acceptable solvent therefor at a doxorubicin concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted from 2.5 to 5.0 solely with a physiologically acceptable acid.'

15    The complete specification then sets out the consistory clause for the process as follows:

> 'The invention also provides a process for producing a sterile, pyrogen-free anthracycline glycoside solution with a pH of from 2.5 to 5.0, which process comprises dissolving the physiologically acceptable salt of the anthracycline glycoside, which salt is not in the form of a lyophilizate, in the physiologically acceptable solvent therefor; adding solely a physiologically acceptable acid to adjust the pH within the said range as desired; passing the resulting solution through a sterilising filter and, optionally, adding an additional component selected from a co-solubilizing agent, a tonicity adjustment agent and a preservative, for instance of the kind previously specified, to the solution prior to passing the solution through the sterilising filter.'

- 5 -

16          The complete specification then proceeds:

> 'With the solutions of the invention it is possible to obtain compositions
> having a very high concentration of the anthracycline glycoside active
> substance even at 50 mg/ml and more. This constitutes a great advantage
> over the presently available lyophilized preparates wherein high
> concentrations of anthracycline glycoside can only be obtained with difficulty
> because of solubilization problems encountered in reconstitution, mainly with
> saline. The presence of the excipient, e.g. lactose in the lyophilized cake, and
> its generally high proportion in respect of the active substance, even up to 5
> parts of excipient per part of active substance, has a negative effect on
> solubilization so that difficulties may arise in obtaining dissolution of the
> lyophilized cake.'

17          Then the complete specification sets out the consistory clause for the method as
follows:

> '... according to the invention there is also provided a method of inhibiting
> the growth of a tumour, in particular one of those indicated above, which
> comprises administering to a host suffering from said tumour an injectable
> solution according to the invention containing the active drug substance in an
> amount sufficient to inhibit the growth of said tumour. The injectable
> solutions of the invention are administered by rapid intravenous injection or
> infusion according to a variety of possible dose schedules.'

18          Further, in terms of preferred embodiments, the complete specification then provides
12 examples which 'illustrate but do not limit in any way the invention' and they include the
dissolution of doxorubicin, and the adjustment of the solution's pH, followed by the filtration
and containment of the solution in sealed vials. The stability of the 12 solutions is then
described over various periods of time.

19          The invention is the subject of 26 claims. The pharmaceutical product (solution)
claims are claims 1 to 19 and 22. The process claims are claims 20, 21, 23 and 24 and the
claims relating to a method of treatment using the product are claims 25 and 26.

20          The applicants allege the respondents have infringed:

            (a)     product claims 1 to 3, 5 to 10, 14 and 15; and

            (b)     method claims 25 and 26.

21          Claim 1 is the only independent claim relating to a solution of the invention and the
only claim that refers to the invention as a solution 'which has not been reconstituted from a

- 6 -

lyophilizate' and 'the pH of which has been adjusted from 2.5 to 5.0 solely with a physiologically acceptable acid.'

22          The parties are agreed that resolution of the construction of Claim 1, in respect of those parts emphasised below, will resolve the controversy between them. Claim 1 is now set out with numbers (1) to (6) interpolated to identify its six integers:

> '1.    (1)    A sterile,
>
>        (2)    pyrogen-free
>
>        (3)    anthracycline glycoside solution
>
>        (4)    which comprises
>
>               (i)  a physiologically acceptable salt of an anthracycline glycoside
>
>               (ii) dissolved
>
>                    (a)  in a physiologically acceptable aqueous solvent therefor
>
>                    (b)  at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml,
>
>        (5)    **which has not been reconstituted from a lyophilizate**
>
>        (6)    and the pH of which
>
>               (i)  has been adjusted from 2.5 to 5.0
>
>               (ii) **solely** with a physiologically acceptable acid.'

23          It is also necessary to set out Claim 20, the process claim, relied on by the respondents as an aid to construing Claim 1:

> '20.   A process for producing a sterile, pyrogen-free, anthracycline glycoside solution with a pH of from 2.5 to 5.0, according to any one of the preceding claims; which process comprises dissolving a physiologically acceptable salt of the anthracycline glycoside, which salt is not in the form of a lyophilizate, in a physiologically acceptable aqueous solvent therefore; adding solely a physiologically acceptable acid to adjust the pH within the said range as desired; passing the resulting solution through a sterilising filter; and, optionally, adding an additional component selected from a cosolubilizing agent, a tonicity adjustment agent and a preservative to the solution prior to passing the solution through the sterilising filter.'

24          The invention is for a new combination. Accordingly, to establish infringement, the applicants must demonstrate that the respondents have taken 'each and every one of the essential integers': *Populin v H.B. Nominees Pty Ltd* (1982) 41 ALR 471 at 475. The respondents have admitted their product has the features of the new combination in Claim 1

- 7 -

except those covered by integer (5) and the emphasised part of integer (6)(ii).

25        Each of the respondents is involved in one of the manufacture, distribution or sale of the respondents' product. In a written outline of submissions, the respondents' product is described as:

> '... a sterile, pyrogen-free anthracycline glycoside solution which comprises a physiologically acceptable salt of an anthracycline glycoside dissolved in a physiologically acceptable aqueous solvent therefor at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml. The pH of the solution has been adjusted to a figure within the range of 2.5 to 5.0.'

26        The respondents assert that their product does not infringe the Patent because, at an early stage in the manufacturing process, the dissolution of bulk lyophilizate takes place, and that therefore their solution has been 'reconstituted from a lyophilizate', a feature of production which it asserts is expressly excluded by Claim 1 of the Patent. It can be noted in this context that the applicant conceded that the bulk powder used in the manufacture of the respondents' product is a lyophilizate.

27        The applicants assert that the Patent is to be construed such that the words 'which has not been reconstituted from a lyophilizate' in Claim 1 are limited to mean the process that takes place just prior to administration of the solution to a patient. They submit that the expression means (and thereby excludes from the monopoly claimed) solutions made up shortly before administration to a patient, which were known at the priority date and does not mean the dissolution of the lyophilizate in the respondents' method of manufacture. Therefore, it is submitted, the respondents' product is within the scope of Claim 1.

28        Thus the two questions to be resolved by the court are whether (i) the respondents' product has been 'reconstituted from a lyophilizate' as the phrase is used in Claim 1 and (ii) the pH of the respondents' product has been adjusted solely with a physiologically acceptable acid.

29        The claims in a complete specification define the invention: s 40(2)(b) of the *Patents Act*. They mark out the monopoly operating to disclaim what is not specifically and definitely claimed: *Walker v Alemite Corp* (1933) 49 CLR 643 at 656. This is to ensure that the public and specifically a manufacturer will not have difficulty being satisfied that a claim is not infringed: *General Tire & Rubber Co. v Firestone Tyre & Rubber Co Ltd (No. 1)*

- 8 -

[1972] RPC 457 at 515 (*'General Tire & Rubber Co.'*). There are no special rules for the interpretation of patent specifications: *Décor Corporation Pty Ltd v Dart Industries Inc* (1998) 13 IPR 385 at 391 (per Lockhart J) (*'Décor'*). The approach to be taken is discussed by the High Court in *Kimberly-Clark Australia Pty Limited v Arico Trading International Pty Limited and Others* (2001) 207 CLR 1 at [24] (*'Kimberly-Clark'*):

> *'It is well settled that the complete specification is not to be read in the abstract; here it is to be construed in the light of the common general knowledge and the art before 2 July 1984, the priority date; the court is to place itself "in the position of some person acquainted with the surrounding circumstances as to the state of [the] art and manufacture at the time".'*

30        The parties were substantially in agreement that the skilled addressee for the purposes of this case was a 'team' as is appropriate with highly developed technology: *General Tire & Rubber Co.* at 485. The team included not only a pharmacist working in a hospital but also persons involved in the manufacture of cytotoxic drugs for hospital pharmacists, as at the priority date 2 April 1985.

31        Speaking broadly, it was contended for the applicants that the word 'reconstituted' as it occurs in the phrase 'has not been reconstituted from a lyophilizate' in Claim 1 was a term of art. It was conceded that the word had an ordinary English meaning in pharmaceutical science but it was contended that it also had a specialist meaning in pharmaceutical science. Thus the word 'reconstitution' was capable of having more than one meaning. It was submitted that ambiguity or lack of clarity could be dispelled by resort to the body of the specification.

32        Alternatively, if 'reconstituted' as used in Claim 1 is not a term of art, it was contended that the complete specification, ie. the context showed the expression was used in a special and narrow sense. Either way the exclusionary integer would indicate to the skilled addressee that the invention did not cover known prior art.

33        It was contended for the respondents that the word 'reconstituted' as used in Claim 1 is not a term of art. Next, it was submitted it was a word of ordinary English meaning, which as a matter of principle precluded resort to the body of the specification to qualify Claim 1. Further, the express terms of Claim 1 were relied on as not limiting the phrase in contention, to solutions in a vial or to injectable solutions. It was submitted that the applicants' attempts to construe the exclusionary integer narrowly should fail.

- 9 -

34          Numerous experts gave evidence about the meaning of the term 'reconstituted' which is unexceptional given the terms of the dispute: *Minnesota Mining and Manufacturing Co v Beiersdorf (Australia) Ltd* [1979-1980] 144 CLR 253 at 270 ('*Minnesota Mining*'); *Leonardis v Sartas No. 1 Pty Ltd* (1996) 35 IPR 23 at 36.

35          The applicants' experts did not dispute the fact that 'reconstitution' has a usual, or as they put it, general meaning, perhaps best exemplified by the relevant entry in the 1982 *Supplement to the Oxford English Dictionary*:

> '**reconstituted,** *that has been constituted or formed anew; applied spec. to food which has been dehydrated and subsequently made ready for use by adding liquid.*'

36          It was also conceded by the applicants that the word 'reconstituted' was used in the pharmaceutical sciences with a usual but narrower meaning of describing the step of putting lyophilized material into solution. This is exemplified in an entry after the priority date in the *Dictionary of Pharmacy, Pharmaceutical Products Press, 2004*:

> '**reconstitution**  *process of adding a solvent or suspending liquid (usually purified water) to a previously prepared spray-dried or freeze-dried drug formulation intended to be used in a short period of time (usually within two weeks) after the addition (generally refrigerated following reconstitution); example: reconstitution of an antibiotic suspension*'

37          Professor Stella, an American Professor of Pharmaceutical Chemistry, gave evidence on behalf of the applicants that as at the priority date, in 1985, all anthracycline glycosides were supplied for use as lyophilizates prepared in a particular way to produce an intravenously injectable solution.

38          Dr Williams, a specialist pharmacist in manufacturing from Westmead Teaching Hospital in New South Wales, gave evidence on behalf of the applicants of his experience also as at the relevant date. He gave evidence that anthracycline glycosides were provided to pharmacists in single dose sealed vials:

> '. . . *which had to be prepared by the pharmacist for administration to the patient by a reconstitution. A reconstitution was carried out as part of the general dispensing process in response to receipt of a prescription. The doses were reconstituted immediately prior to the administration to a patient, either on the day of administration or no more than one day before administration.*'

- 10 -

He also gave evidence he performed many such reconstitutions and trained many others in the procedure:

> 'Pharmacists used the term "reconstitution" to describe the act of adding a sterile diluent to a sterile solid drug in a vial (or, rarely, in an ampoule) to dissolve or suspend the drug in order to prepare an injection, installation or irrigation, and a product which is reconstituted has been prepared in this way.
>
> In the specific context of reconstituting cytotoxic drugs for intravenous injection, other important aspects of a reconstitution include the fact the resulting product must be fully dissolved and that the reconstituted solution must be free of pyrogens.
>
> Reconstitution technique is an important element of pharmacy training and practice. Hospital pharmacists, in particular, may perform reconstitutions . many times a day; larger hospitals including Westmead have dedicated reconstitution units including cytotoxic reconstitution units, as I have mentioned. Accordingly, reconstitution is a well known procedure and the term "reconstituted" is well understood by pharmacists.'

He did not accept that 'reconstitution' was a synonym for 'dissolution' in the context of hospital pharmacy practice.

39      The applicants also relied on the evidence of Dr Marshall, a Consulting Pharmaceutical Scientist from South Australia who gave the following evidence:

> 'I have been asked . . . to consider what term or expression would be used by pharmaceutical formulation chemists to describe the step where a lyophilizate is put into solution as part of a manufacturing process. The words I would use are "dissolve" or "dissolution". The words "dissolve" and "dissolution" are in my experience frequently used both orally and in writing (such as in operating manuals or manufacturing instructions) in describing processes involving putting solid pharmaceutical compounds into solution. I cannot recall (before or after 1985) seeing the words "reconstitute" or "reconstitution" used in a technical document (of which I have seen hundreds) relating to the process of dissolving pharmaceutical compounds in the manufacturing of pharmaceuticals or formulations of such pharmaceuticals.
>
> The word "reconstitution" is, however, used in the pharmaceutical industry in relation to finished product powders, whether lyophilized or not, which are dissolved or suspended before administration to a patient . . .'

40      Dr Marshall referred to the text *Modern Pharmaceutics* by Gilbert S. Banker and Christopher T. Rhodes (1979) which states:

> 'Several ophthalmic drugs are prepared as sterile powders for reconstitution

- 11 -

*by the pharmacist before dispensing to the patient... The sterile powder is usually manufactured by lyophilization and is packaged separately from the diluent, and a sterile dropper assembly is provided. In powder form these drugs have a much longer shelf life than that of their solution forms. The pharmacist should use only the diluent provided with the product since it has been developed to maintain the optimum potency and preservation of the reconstituted solution. The pharmacists should use great care in performing the reconstitution to prevent microbial contamination of the sterile product and dropper. Each product has an expiration date for the reconstituted solution which should be explained to the patient along with the proper storage conditions and method of usage.'*

41          Professor Peter Stewart, Head of the Department of Pharmaceutics, Victorian College of Pharmacy, upon whom the applicants also rely, echoed the evidence of Dr Marshall as follows:

> *'Reconstitution has a particular meaning in the context of pharmacy. It refers to the following fundamental steps taken shortly before administration of the drug to the patient.*
> *(a) Taking a solid form of an active pharmaceutical compound (plus any excipients).*
> *(b) Adding a solvent to the solid to make an acceptable delivery system.*
> *The delivery system produced by reconstitution is referred to as "reconstituted".'*

Dr Stewart also gave evidence that:

> *'For injectable delivery systems reconstitution is usually a matter of hours before administration.'*

42          Dr Richard Oppenheim, a chemist with some 30 years experience in the area of 'human pharmaceuticals', was at the relevant time a member of the Pharmaceutics faculty of the Victorian College of Pharmacy in Melbourne. He gave clear evidence on behalf of the respondents that:

> *'The term "reconstitution" refers to the process of adding a suitable and appropriate liquid or liquid system to a solid that has previously been associated with that liquid or some other liquid system, to form a solution, dispersion or suspension suitable for its intended use. If a solid has undergone the process of reconstitution by the addition of a suitable liquid or liquid system, the resultant solution, dispersion or suspension is said to have been "reconstituted".'*

He also gave evidence of an instance of doxorubicin being available as bulk lyophilizate for research purposes only, as at the priority date. In this respect, his knowledge and experience differed from that of the other experts.

43          Dr Kenneth Brown, Consultant Pharmaceutical Scientist in Pharmaceutics, from New South Wales, provided a similar assessment as follows:

> 'The process of reconstitution does not necessarily involve bringing the solution back to exactly the same form as the previous solution. The practical essence of reconstitution is the re-association of the lyophilizate with solvent.
>
> In the pharmaceutical sciences "reconstitution" includes the reconstitution of a lyophilized product by a pharmacist immediately prior to administration. However, this is not the only meaning of the term. "Reconstitution" is a broad and non-specific term which applies at any time a lyophilizate is redissolved into a solvent or passes into solution.'

44          The respondents' experts did not disagree that 'reconstitution' has a meaning, in the pharmaceutical sciences, of 'reconstitution of a lyophilized product prior to administration to a patient'. However, they did not accept that reconstitution in that pharmacy context can only occur shortly before administration to a patient. When cross-examined about the references to 'lyophilized cake' and the reconstitution of 'a lyophilized preparate' which occur in the passages extracted respectively in paragraphs 9 and 10 above describing the prior art, Dr Oppenheim agreed these reference were to material in a vial, that is, they were references to the drug as it was available in a hospital environment. Dr Brown also agreed that the reference to 'lyophilizate preparate' extracted in paragraph 10 above is a reference to the product available in the hospital environment.

45          I now turn to consider submissions in more detail. Mr Caine, of senior counsel, appearing for the applicants conceded that the term 'reconstituted' has a general meaning in the context of pharmaceutical sciences to describe the step of putting lyophilized material into solution. However, he submitted that 'reconstituted' was used also as a term of art in the context of cytotoxic drugs which meant the process of preparing a liquid dosage form of a cytotoxic drug before administration to a patient. He submitted that the essence of the invention is a reformulation of a known drug in a ready-to-use solution which was something that had never before been achieved. I agree with that description of the essence of the invention. He then submitted the context of the specification makes it clear that the phrase in contention in Claim 1 was a disclaimer in respect of the prior art. It was a reference to the lyophilised preparation, known at the priority date, which needed to be made up before administration.

46          It was further submitted that the process undertaken by the respondents is one in which a manufacturer produces a lyophilized material, in bulk, and supplies it to one of the Mayne entities, which then takes that freeze-dried, raw material and makes it into a ready-to-use solution. The applicants assert that the bulk lyophilization from the supplier entity is different from the prior art disclaimed and dealt with by the inventors in the Patent specification. Mr Caine's submissions are that the reconstitution referred to in the complete specification is reconstitution which involves a lyophilized cake in a vial; and that it is this specific reconstitution which is carved out from the definition of the monopoly of Claim 1.

47          The applicants submit that the complete specification refers to the dangers involved in the systems, as they were in 1985, being risks to the staff who had to reconstitute the lyophilized preparations shortly before administration because the preparations were unstable in solution over a longer period of time. This was the problem sought to be overcome through the invention of the ready-to-use solution.  The invention did not involve the problematic process of reconstitution just prior to administration.  Therefore, the applicants submit that the act of reconstitution just prior to administration is that which is sought to be disclaimed in Claim 1 through use of the phrase 'which has not been reconstituted from a lyophilizate.'

48          Mr Macaw, of senior counsel for the respondents, submitted that the words 'reconstituted from a lyophilizate' as occurring in Claim 1 bear an ordinary meaning and no special sense for them exists in the pharmaceutical industry, which would confine the meaning to a subset of their usual or ordinary meaning.  It was contended that the meaning of the exclusionary integer of the claim including the word 'reconstituted' is plain and unambiguous, and in accordance with well-settled principle, the meaning of the exclusionary integer could not be qualified by resort to the body of the specification.

49          It was next submitted that even if resort were had to the body of the specification to clarify the expression in contention, such resort supports the ordinary meaning.  Reliance was placed on the inventor's failure in the body of the specification to expressly state that 'lyophilized preparates' referred to in the body of the specification (about which Drs Brown and Oppenheim were cross-examined) were confined to what was known as at the priority date.  Reliance was also placed on the fact that Claim 1 was not confined to a solution in a sealed container, as occurs in dependent Claim 2, and also placed on the fact that there was a

- 14 -

broad reference to containers in the body of the specification which was arguably not confined to vials or ampoules.

50          Further, the respondents relied on the consistory clause for the process in the body of the specification and the definition of the process in Claim 20 as it referred to 'anthracycline glycoside, which salt is not in the form of a lyophilizate' to support an argument that the dissolution of a salt was synonymous with 'reconstitution from a lyophilizate'.

## THE SKILLED ADDRESSEE

51          As at the priority date the skilled addressee would have known that:

- anthracycline glycosides were well known compounds in the antineoplastic group of agents which were used widely as antitumour drugs;

- antineoplastic drugs, because of their toxicity, posed serious risks to persons handling them, whether manufacturing workers or pharmacists, medical personnel or nurses;

- the active ingredient in the solution was subject to stability problems with the attendant risk that the product deteriorated; and

- the lyophilized preparations, existing as at the priority date, for administration to cancer patients, came in the form of lyophilized cake in a vial, the lyophilized cake containing the active substance and an excipient.

52          The process of administration of the drug available at the relevant time was also known to the skilled addressee as follows:

- administration required reconstitution of the lyophilized cake and sometimes prolonged shaking was required to achieve complete dissolution; and

- commercially available anthracycline glycosides came in the abovementioned form.

53          It is necessary to apply well-settled principles concerning the proper construction of a patent specification and claims forming part of a complete specification. The court's task is

- 15 -

to make a 'commonsense assessment' of what the expression 'which has not been reconstituted from a lyophilizate', as used in Claim 1, conveys 'in the context of then-existing published knowledge': *Populin v H.B. Nominees Pty Ltd* (1982) 41 ALR 471 at 476.

54    Reference has already been made to the relevant observations in *Kimberly-Clark* at [24] that the court is *'to place itself in the position of some person acquainted with the surrounding circumstances as to the state of [the] art and manufacture at the time'*. As observed by Lockhart J in *Décor* at 391:

> 'The words used in a specification are to be given the meaning which the normal person skilled in the art would attach to those words, both in the light of his own general knowledge and in the light of what is disclosed in the body of the specification: British Thomson-Houston Co Ltd v Corona Lamp Works Ltd *(1921) 39 RPC 49 per Viscount Haldane at 67, per Lord Shaw at 89;* Monsanto Co v Commissioner of Patents *(1974) 48 ALJR 59 per Stephen J at 60.'*

55    In *Décor*, at 400, Sheppard J distilled ten rules of construction from the authorities:

> '(1)    The claims define the invention which is the subject of the patent. These must be construed according to their terms upon ordinary principles. Any purely verbal or grammatical question that can be answered according to ordinary rules for the construction of written documents is to be resolved accordingly.
>
> (2)    It is not legitimate to confine the scope of the claims by reference to limitations which may be found in the body of the specification but are not expressly or by proper inference reproduced in the claims themselves. To put it another way, it is not legitimate to narrow or expand the boundaries of monopoly as fixed by the words of a claim by adding to those words glosses drawn from other parts of the specification.
>
> (3)    Nevertheless, in approaching the task of construction, one must read the specification as a whole.
>
> (4)    In some cases the meaning of the words used in the claims may be qualified or defined by what is said in the body of the specification.
>
> (5)    If a claim be clear, it is not to be made obscure because obscurities can be found in particular sentences in other parts of the document. But if an expression is not clear or is ambiguous, it is permissible to resort to the body of the specification to define or clarify the meaning of words used in the claim.
>
> (6)    A patent specification should be given a purposive construction rather than a purely literal one.
>
> (7)    In construing the specification, the court is not construing a written instrument operating inter partes, but a public instrument which must define a monopoly in such a way that it is not reasonably capable of being misunderstood.
>
> (8)    The body, apart from the preamble, is there to instruct those skilled in

- 16 -

> the art concerned in the carrying out of the invention; provided it is comprehensive to, and does not mislead, a skilled reader, the language used is seldom of importance.
>
> (9)   Nevertheless, the claims, since they define the monopoly, will be scrutinised with as much care as is used in construing other documents defining a legal right.
>
> (10)   If it is impossible to ascertain what the invention is from a fair reading of the specification as a whole, it will be invalid. But the specification must be construed in the light of the common knowledge in the art before the priority date.'

56      Particularly relevant are the principles that the specification as a whole must be read and the context of a specification may qualify the *prima facie* meaning of a word or expression in a claim. If a word used in a claim is not a term of art, by reference to the technical knowledge possessed by persons skilled in the art, and is used in a plain, clear and unambiguous way in a claim, there should be no resort to the body of the specification to aid in the construction of the claim: *Welch Perrin and Company Proprietary Limited v Worrel* (1960-1961) 106 CLR 588 at 610; *Electric & Musical Industries Ltd v Lissen Ltd* (1936) 54 RPC 23 at 41. That principle is subject to the proviso that any lack of clarity or ambiguity in a claim can be resolved by resort to the body of the specification: *Interlego AG v Toltoys Pty Ltd* (1973) 130 CLR 461 at 457/8 (per Barwick CJ and Mason J); *Décor* at 391; *Marconi v Mullard* (1923) 40 RPC 159 at 175.

57      There is no inconsistency in the principles governing construction of patent specifications as explained by Hely J in *Flexible Steel Lacing Co v Beltreco Ltd* (2000) 49 IPR 331 at [73] – [76] and especially [78]. It is as true of patent specifications, as of statutes (or any documents), as noted by Viscount Simonds in *Attorney-General v Prince Ernest Augustus of Hanover* [1957] AC 436:

> '. . . words, and particularly general words, cannot be read in isolation: their colour and context are derived from context (at 461) . . . the elementary rule must be observed that no one should profess to understand any part of a statute or of any other document before he has read the whole of it. Until he has done so he is not entitled to say that it or any part of it is clear and unambiguous (at 463).'

58      Similarly, the meaning of a word in a particular context may involve some limitation on its application in a patent claim, but such a meaning can only be derived from the context in which the word is used: see some examples, *Henriksen v Tallon* [1965] RPC 434 at 445 (per Reid LJ); *Minnesota Mining* at 261 ff, esp. 272 (per Aickin J) and *Décor* at 410-411

- 17 -

(per Sheppard J).

59          The word 'reconstituted' as it appears in the relevant expression in Claim 1 is not a
term of art used to refer to the dissolution of a lyophilized product so as to produce a solution
suitable for intravenous injection shortly thereafter.  It is clear however that both the word
'reconstituted' and the expression of which it forms a part in Claim 1 are used in a special
sense in the specification.  Alternatively, because the word is capable of more than one
meaning it lacks clarity.  It is permissible to have resort to the body of the specification both
to see whether a word or expression has a special meaning or whether it requires clarification
because the ordinary, or usual, meaning is not sufficiently precise.  To find a word or
expression is used in a special sense it is only necessary that an intention to so use the word
or expression is plainly indicated in the specification: *Minerals Separation North American
Corp v Noranda Mines* (1952) 69 RPC 81 at 96.

60          The body of the specification shows the expression 'which has not been reconstituted
from a lyophilizate' in Claim 1 disclaims preparations known in the prior art, the better to
mark out the monopoly and to define the invention.   References in the body of the
specification to lyophilized preparations known as at the priority date were references to
lyophilized preparations in a vial.   Contextually, the exclusionary integer refers to a
ready-to-use solution, produced from a lyophilizate in a vial which needed to be reconstituted
before administration to a patient; that is what was known at the priority date and that is what
is disclaimed by the exclusionary integer, so as to be excluded from the monopoly claimed
for the invention.  A reference in dependent Claim 20 to a process which is not confined
expressly to such preparations does not detract from such a conclusion.  Accordingly, the
claim for infringement by reference to integer (5) of Claim 1 is made out.

61          It next becomes necessary to consider whether the respondents' product infringes by
reference to integer (6)(ii) of Claim 1.  In relation to a process used after August 2004, the
respondents admit the pH has been adjusted to be within the stated range by use of a
physiologically acceptable acid being hydrochloric acid.  Accordingly, textual infringement
has occurred in respect of product produced by that process.

62          An original process used before August 2004 involved production of certain product
where the adjustment of the pH of the solution to within the range specified in Claim 1 was

achieved also by the use solely of hydrochloric acid. That product accordingly also constitutes a textual infringement. However, there was a third batch where after hydrochloric acid was used to adjust the pH of the solution to be within the claimed range of 2.5 – 5.0 (adjusted to 2.7 (or 2.8)) the respondents then added a minor amount of sodium hydroxide to further adjust the pH to 2.9. Thus there was no textual infringement with this product. However, the question in respect of an infringement of a combination patent is whether the essence or substance of an invention underlying its form has been taken, such that in substance and effect an infringement has occurred: *Clark v Adie* (1875) LR 10 Ch. App. 667 at 675 (per James LJ) referred to with approval by Dixon J in *Radiation Ltd v Galliers & Klaerr Pty Ltd* (1938) 60 CLR 36 at 51/52 (*'Radiation Ltd'*). There Dixon J eschewed literalism as an approach to assessing whether an alleged infringement fell within the language of the claim:

> *'But, on a question of infringement, the issue is not whether the words of the claim can be applied with verbal accuracy or felicity to the article or device alleged to infringed. It is whether the substantial idea disclosed by the specification and made the subject of a definite claim has been taken and embodied in the infringing thing.'*

That approach continues to apply unless the claims make it clear that the relevant area has been deliberately left out of the claim: *Olin Corporation v Super Cartridge Co Pty Ltd and Anor* (1977) 51 ALJR 525 at 530 (per Gibbs J); *Minnesota Mining* at 286 (per Aickin J). Immaterial variations will not escape infringement: *Populin* at 475.

63        In *Commonwealth Industrial Gases Ltd v MWA Holdings Pty Ltd* (1990) 180 CLR 160 (*'CIG'*) Menzies J dealt with a combination patent in respect of which a defendant consciously sought to avoid infringement by making a slight modification in manufacture to a particular part of a piece of equipment. He said at 167:

> *'Patent rights are not to be set at naught by such a subterfuge which . . . added nothing to the equipment and was made merely in an attempt to take full advantage of the invention while avoiding infringement of the plaintiff's letters patent by a modification so small as to be insignificant.'*

Menzies J went on to find the modification in manufacture did not avoid an essential feature because the defendant's product was so close as to still 'take the invention'.

64        The addition of a minor amount of sodium hydroxide, which avoids textual infringement in respect of integer 6(ii) is a modification so small as to be insignificant. The

- 19 -

consequence of adding a minor amount of sodium hydroxide was to produce water and sodium chloride both of which were already present in large quantities in the solution. The consequential variations in total water and sodium chloride present were within normal manufacturing tolerances. This is a modification which makes no material difference and in substance the invention is still taken. It cannot be said the modification was deliberately left outside the claim. Accordingly, the respondents' product for which the respondents use sodium hydroxide, in addition to hydrochloric acid, to adjust the pH is a product which is no different relevantly from the invention. Accordingly, the respondents do not thereby avoid infringement of Claim 1.

65        It needs to be mentioned that on this aspect of the dispute, the applicants relied on a principle of 'purposive' construction as advanced by Lord Diplock in *Catnic Components Ltd v Hill & Smith Ltd (No.1)* [1982] RPC 183 (*'Catnic Components'*), cited in numerous Australian cases. The respondents submitted there was no place for a purposive approach to construction on the facts of the case, because the word 'solely' in the relevant integer was a word of clear and ordinary meaning and because it is reasonable to infer the restriction was deliberate on the part of the patentee.

66        It has been recognised in numerous authorities that Lord Diplock was expounding the relevant common law rather than advancing any novel principle of infringement, as is made plain, in any event, in *Catnic Components* at 242/243: see *Kirin-Amgen Inc v Hoescht Marion Roussel Ltd* [2005] 1 All ER 667 at [33]-[35] and [42]-[43] (per Hoffman LJ); *Assidoman Multipack Limited (formerly Multipack Wraparound Systems) v Mead Corporation* [1995] RPC 321 at 330-333 (Aldous J); *PLG Research Ltd v Ardon International Ltd* [1995] RPC 287 at 309 (per Millett LJ). See also *Rhone-Poulenc Agrochinie SA v UIM* (1986) 12 FCR 477 at 498 (per Lockhart J); *Azuko Pty Ltd and Anor v Old Digger Pty Ltd (formerly SDS Digger Tools Pty Ltd)* (2001-2002) 52 IPR 75 at 99 (per Beaumont J); *Leonardis v Sartas No 1 Pty Ltd* (1996) 67 FCR 126 at 148 (per Burchett, Hill and Tamberlin JJ); *Nicaro Holdings Pty Ltd & Ors v Martin Engineering Co* (1989) 91 ALR 513 at 528/529 (per Gummow J); *Rehm Pty Ltd v Webster's Security Systems (International) Pty Ltd and Ors* (1988) 81 ALR 79 at 92 (Gummow J); *Martin Engineering Co v Trison Holdings Pty Ltd* (1989) 14 IPR 330 at 347/348 (Burchett J): cf *Root Quality Pty Ltd and Anor v Root Control Technologies Pty Ltd and Others* (2000) 177 ALR 231 at [39] and [44] (Finkelstein J) (*'Root Quality'*).

- 20 -

67        Lord Diplock suggests in *Catnic Components*, at 243:

> *'The question in each case is: whether persons with practical knowledge and experience of the kind of work in which the invention was intended to be used, would understand that strict compliance with a particular descriptive work or phrase appearing in the claim was intended by the patentee to be an essential requirement of the invention so that* any *variant would fall outside the monopoly claimed, even though it could have no material effect upon the way the invention worked.'*

68        Following that suggestion, Hoffman J in *Improver Corp v Remington Consumer Products Ltd* [1990] FSR 181 at 198 suggested that the court should ask itself, what have come to be known as the three *'Improver'* questions, as an aid to 'purposive' construction:

> *'(1)    Does the variant have a material effect upon the way the invention works? If yes, the variant is outside the claim. If no –*
> *(2)    Would this (i.e., that the variant had no material effect) have been obvious at the date of publication of the patent to a reader skilled in the art. If no, the variant is outside the claim. If yes -*
> *(3)    Would the reader skilled in the art nevertheless have understood from the language of the claim that the patentee intended that strict compliance with the primary meaning was an essential requirement of the invention. If yes, the variant is outside the claim.'*

69        It is not necessary for the resolution of this case to do other than apply the Australian authorities referred to above. I note, however, that some Australian courts have derived assistance from the *Catnic Components* approach in deciding the ambit of the monopoly of a claim: see for example *Nesbit Evans Group Australia Pty Ltd v Impro Ltd and Anor* (1997) 39 IPR 56 and *Root Quality*. Had I regarded it as being of assistance to ask the *Improver* questions of the variant, the conclusion would have been that the variant is not outside the claim.

**UK PATENT**

70        A corresponding patent in the United Kingdom was the subject of a judgment of the English Court of Appeal dated 17 February 2005, reported as *Mayne Pharma Pty Ltd and Mayne Pharma plc v Pharmacia Italia SPA* [2005] EWCA Civ 137. The Mayne parties had sought a declaration of non-infringement in respect of Pharmacia's equivalent United Kingdom Patent 2,178,311 ('UK Patent'). A counterclaim for infringement followed and the issue, as here, was whether Mayne's product fell within Claim 1 (worded slightly differently). At first instance, a Deputy Judge found non-infringement. The Court of Appeal construed

- 21 -

Claim 1, as contended for by Pharmacia and upheld the appeal. On 10 March 2005 the Court of Appeal refused an application for leave to appeal to the House of Lords. A petition to the House of Lords directly for leave to appeal was then in prospect.

71      The applicants and respondents filed supplementary submissions dated, respectively, 24 and 11 March 2005. Essentially the applicants contended the principles of construction were consistent with those expressed in *Populin* and *Décor* and there was no basis upon which the position in Australia could be distinguished from that reached by the Court of Appeal.

72      The respondents drew attention to a distinction between Claim 1 in the Patent and Claim 1 in the UK Patent; the latter included the words 'injectable, ready-to-use' after the word 'An' at the beginning of Claim 1 and before the epithet 'sterile' in line 1.

73      The respondents noted in their submissions that in the United Kingdom the 'overarching principle of construction is contained in Article 69 of the European Patent Convention' and there is no equivalent to Article 69 in Australia. The compatibility between the principles of construction in Article 69 and the *Catnic Components* approach, (which stated the law applicable to the 1949 U.K. Act) is explained by Aldous J in *Assidoman* at 332-333, which explanation was approved in *Kirin-Amgen Inc* at [46] (per Hoffman LJ).

74      The respondents also relied on the fact that the process claims in the United Kingdom (claim 31) and Australia (claim 20) contained similar directions. The respondents urged again that the words in Claim 1 'which has not been reconstituted from a lyophilizate' refer to and include product which is reconstituted from a bulk lyophilizate at some point because the process claim is not limited to product which is reconstituted in a vial.

75      The decision of the English Court of Appeal is persuasive, to the extent that the complete specifications of the Patent and the UK Patent are very similar, although not identical, and there is a commonality of applicable principles.

76      It can be noted, however, that I have reached the conclusions set out above on the evidence before me and by applying principles as settled in the abovementioned Australian authorities. Orders will not be made today. The parties can prepare short minutes of final

- 22 -

orders on liability in accordance with these reasons and include any other orders or directions as appropriate for the further disposition of the matter.

I certify that the preceding seventy-six (76) numbered paragraphs are a true copy of the Reasons for Judgment herein of the Honourable Justice Crennan.

Associate:

Dated:           5 August 2005

Counsel for the Applicant:        B Caine SC
                                  H Rofe

Solicitor for the Applicant:      Allens Arthur Robinson

Counsel for the Respondent:       R Macaw QC
                                  P Collinson

Solicitor for the Respondent:     Clayton Utz

Dates of Hearing:                 27, 28, 29 & 30 September 2004
                                  1 October 2004

Date of Judgment:                 5 August 2005