EXHIBIT 8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY,   }

                 v.           }      Case Action No. 04-833

SICOR, INC. and SICOR        }

PHARMACEUTICALS, INC.,      }

<u>Expert Report of Douglas S. Clark, Ph.D.</u>

I, Dr. Douglas Clark, if called to testify in the above-captioned matter presently expect to testify with regard to the opinions, and the bases and reason therefore, expressed below:

## I. QUALIFICATIONS AND CREDENTIALS

I am currently a tenured full Professor of Chemical Engineering at the University of California, Berkeley ("U.C. Berkeley"). From 1995-1998, I served as Vice-Chairman of the Chemical Engineering Department of U.C. Berkeley. U.C. Berkeley is one of the world's premier universities, and our Chemical Engineering Department is consistently ranked among the top three chemical engineering departments in the country. While at U.C. Berkeley, I have taught classes in chemical kinetics and chemical reactor design, unit operations (e.g., individual processes used in the manufacture and formulation of chemical and pharmaceutical products), heat and mass transfer, and biochemical engineering, as well as laboratory courses in transport phenomena and biochemical engineering. Material covered in chemical kinetics and chemical reactor design, unit operations, and biochemical engineering (which includes drug formulation) is particularly relevant to the issues that I have been asked to consider.

I received my B.S. in Chemistry from the University of Vermont in 1979 (*Summa Cum Laude*) and my Ph.D. in Chemical Engineering from the California Institute of Technology ("CalTech") in 1983. CalTech has been consistently recognized as one of the preeminent science and technology academic institutions in the world. From 1984 to 1986, I was an Assistant Professor of Chemical Engineering at Cornell University. While

at Cornell, I taught classes in chemical kinetics and chemical reactor design, and biochemical engineering.

In addition to my current duties as a full professor at U.C. Berkeley, I am currently Editor-in-Chief of *Biotechnology and Bioengineering,* a peer-reviewed journal that is widely distributed worldwide to academic and research institutions and companies. *Biotechnology and Bioengineering* publishes papers on a wide range of topics, including the production, purification, formulation (including lyophilization), and stabilization of pharmaceuticals, pharmacokinetics, mechanisms of drug action, bioanalytical methods and drug detection, and all aspects of chemical kinetics as they relate to the activity and properties of pharmaceuticals and biotherapeutics. Notably, this journal reviewed and published in 1969 one of the first papers on the production and properties of doxorubicin, which was written by Federico Arcamone. This seminal paper was republished during my tenure as Editor-in-Chief on the fortieth anniversary of the Journal.

Before becoming Editor-in-Chief I was often called upon to review papers dealing with biochemical reaction kinetics and the stability of biomolecules.

I am also on the Editorial Boards of *Extremophiles* and *Enzyme and Microbial Technology*. I have received several national and international awards including the 2003 Food, Pharmaceutical, and Bioengineering Award from the American Institute of Chemical Engineers, the 2003 International Enzyme Engineering Award, and the 2003 Amgen Award in Biochemical Engineering. In 2003 I was named a Fellow of the American Association for the Advancement of Science, and in 1995 a Fellow of the American Institute of Medical and Biomedical Engineers. I am a member of the American Institute of Chemical Engineers and American Chemical Society. My other notable achievements include:

- Merck Centennial Lecturer in Biochemical Engineering, California Institute of Technology, 1992;
- Director: Food, Pharmaceutical, and Bioengineering Division of the American Institute of Chemical Engineers and American Chemical Society, 1991 -1994;

- Merck Faculty Development Award, 1988;
- Presidential Young Investigator Award, National Science Foundation, 1986; and
- Phi Beta Kappa, 1978.

I was a co-founder of the drug discovery company EnzyMed in 1994, and from 1994-99 served on the company's Board of Directors and Scientific Advisory Board. In 1999 EnzyMed was acquired by Albany Molecular Research, Inc. One of my major responsibilities at EnzyMed was to interview and select industrial collaborators and contractors, which provided me with a broad overview of the problems encountered by the pharmaceutical industry related to the stability and formulation of new drugs. Through my contacts with medicinal chemists, project managers, directors of research, and pharmaceutical executives, I obtained direct experience as to how problems are approached and solved within the pharmaceutical industry, and participated in the identification and resolution of such problems. I am also currently a co-founder of the medical device company Solidus Biosciences, Inc.

I have consulted for a variety of pharmaceutical and chemical companies, including Millipore, Syntex, Engelhard, Mobil, ExxonMobil, Johnson Matthey, and Kosan. In this capacity, I have had the opportunity to work closely with industrial scientists and develop an understanding of their backgrounds and approach to problem solving.

As Editor-in-Chief of the journal *Biotechnology and Bioengineering* for over ten years I have overseen or managed the review of over 5,000 technical manuscripts, many of which have dealt with issues related to the production, formulation, and functional properties of pharmaceuticals, including their stability and shelf-life.

I am co-author of the textbook entitled "Biochemical Engineering," the first edition of which was published in 1995. This textbook has been widely adopted worldwide for use in courses at both the undergraduate and graduate levels. It includes detailed treatments of biochemical reaction kinetics, including pH, temperature, and concentration effects on reaction rates, and methods for the separation of biomolecules, including

chromatography, as well as discussion of the purification and formulation of anticancer injectable therapeutics.

I am the author or coauthor of over 150 scientific publications, and the co-inventor of six issued patents. Among the topics discussed in these papers and/or patents are enzymatic reaction kinetics, lyophilization, temperature effects on enzyme stability and inactivation kinetics, the synthesis and properties of bioactive compounds, including doxorubicin derivatives, and improved methods for determining the activity and safety of drugs and drug candidates.

My Ph.D. thesis, which I completed in 1983, focused on the structure and function of immobilized enzymes, including their stability and inactivation kinetics. This research involved extensive analysis and modeling of chemical reaction kinetics and the determination of half-lives ($t_{50\%}$ values) for enzymes in free and immobilized form. Enzyme stability was studied as a function of pH, temperature, solvent, and enzyme concentration.

My current curriculum vitae is attached as Exhibit A.

## II. PREVIOUS EXPERT TESTIMONY

I have not testified as an expert at trial or by deposition in the preceding four years.

## III. COMPENSATION

I am being compensated for my time as an expert at the rate of $250 per hour. My compensation is not dependent upon the outcome of the litigation.

## IV. OPINIONS

For ease of reference, attached as Exhibit B is a glossary that defines various scientific terms used in or relevant to this report. Exhibit C is also attached, which provides a list of documents I have considered including short citations to those documents that I will use in this report.

A. Overview of Anthracycline Glycosides

I have reviewed U.S. Patent Number 6,107,285. In general, the '285 patent deals with anthracycline glycosides, which are a family of antitumor antibiotics. Clinically useful anthracyclines include natural products produced by *Streptomyces sp.* as well as variants of the natural products produced by chemical synthesis. A representative and particularly important example of an anthracycline glycoside is doxorubicin, which exhibits activity against a broad range of cancers, including acute lymphoblastic leukemia, acute myeloblastic leukemia, soft tissue and bone sarcomas, breast and ovarian carcinomas, and Hodgkin and non-Hodgkin type lymphomas.

Anthracycline glycosides have been used in the treatment of acute leukemias since at least the mid 1970's (see e.g., Arcamone, 1969; Arcamone, 1972; and Arcamone, 1978). By 1978, doxorubicin was established as being active against breast adenocarcinoma, soft tissues and bone sarcomas, bladder adenocarcinoma, bronchogenic carcinoma, testicular carcinoma, pediatric solid tumors, malignant lymphomas, and acute leukemias (Arcamone, 1978). In fact, Dr. Arcamone and others received a patent in 1971 on doxorubicin (U.S. Patent Number 3,590,028) and another patent in 1974 on a process for producing doxorubicin salts, including the hydrochloride salt (U.S. Patent Number 3,803,124).

By the time of publication of the Physician's Desk Reference (PDR) of 1975, the salt, doxorubicin HCl, was commercially known as adriamycin. The PDR is a standard reference book that is published annually and compiles drug descriptions prepared and approved by the respective manufacturers. According to the 1984 PDR, the most commonly used dosage schedule for adriamycin was 60-75 $mg/m^2$ as a single intravenous injection administered at 21-day intervals. An alternative dose schedule was also noted in the 1984 PDR as 20 $mg/m^2$ per week, which was reported to produce a lower incidence of congestive heart failure. According to this 1984 PDR as well as another standard reference (Trissel, 1980 (citing the adriamycin package insert dated October 1977)), adriamycin was to be reconstituted in a sealed vial containing either 10 mg or 50 mg of

drug by injecting Sodium Chloride Injection USP (United States Pharmacopoeia) (0.9%) or Sterile Water for Injection USP into that sealed vial followed by shaking to give a final adriamycin concentration of 2 mg/ml. The PDR also recommended storing the reconstituted doxorubicin HCl solution in a refrigerator (4°C).

Other known anthracycline glycosides included daunorubicin (daunomycin) and idarubicin (idamycin). The efficacy of daunomycin on acute leukemia was reported as early as 1965. Idarubicin (4-demethoxydaunorubicin) is an analog of daunorubicin lacking the methoxy group at the C-4 position of the aglycone (e.g., Kaplan, 1982; Bonfante 1983). Studies on idarubicin showed that, like daunorubicin and doxorubicin, it was active as an antineoplastic agent, and also had a superior therapeutic index (e.g., Arcamone, 1976; Kaplan, 1982; Berman, 1983; Bonfante, 1983; and Eridani, 1985). The improved therapeutic index notwithstanding, idarubicin is still a cytotoxic drug that, like doxorubicin, must be handled with special care and precautions, both in the manufacturing and administration of the drug (see Ketchum, 1981).

Bonfante (1983) also reported that a solution of idarubicin was prepared for intravenous administration in clinical studies by reconstituting the drug with distilled water at a concentration of 2 mg/ml. Kaplan (1982) and Berman (1983) described clinical studies using intravenous idarubicin solutions of a concentration of 1 mg/ml.

B. Overview of Chemical and Kinetic Issues Related to Anthracycline Glycosides

The structures of two anthracycline antibiotics, doxorubicin (adriamycin) and daunorubicin (daunomycin), are reproduced below from Arcamone (1972).



I
ADRIAMYCIN

II
DAUNOMYCIN

In general, these compounds, like other members of the anthracycline glycoside family of compounds, consist of three structural elements: 1) a four-ringed structure known as a tetracyclic aglycone (a tetrahydronaphthacenequinone chromophore), 2) an amino sugar, and 3) a glycosidic bond or glycosidic linkage, linking the aglycone and the amino sugar.

The stability of anthracycline glycoside solutions is mentioned in the '285 patent. The stability of anthracycline glycoside solutions has been discussed in various papers, including Arcamone (1972) and Wassermann (1983). For instance, Arcamone (1972) reports that the glycosidic bond is important to the stability of doxorubicin and the mechanism of its degradation, particularly in an acidic environment. In particular, the dominant pathway for chemical degradation of doxorubicin under acidic conditions (e.g., pH 2.5 to 5) involves hydrolytic cleavage of the glycosidic bond (a process known as hydrolysis) to give adriamycinone and daunosamine, as discussed by Arcamone (1972) and shown in this figure taken from Wassermann (1983).

The glycosidic bond present in idarubicin is functionally equivalent and structurally identical to the glycosidic bond in doxorubicin; therefore, the glycosidic bond of idarubicin will also be subject to hydrolysis under acidic conditions (e.g., a pH of 2.5 to 5). Furthermore, based on the structural similarity of these two molecules a scientist would expect the two molecules to have similar stabilities under similar acidic conditions.


C. Drug Stability and Rates of Degradation

In general, the rate of a chemical reaction in solution, drug degradation in this case, is proportional to the concentration of the reactants (e.g., the drug) raised to some power (see, e.g., Lachman, 1976; Connors, 1979).  In general, this relationship is represented mathematically by:

$$d[\text{Drug}]/dt = -k[\text{Drug}] \qquad \text{Equation (1)}$$

where

      [Drug] is the drug concentration,

      $d[\text{Drug}]/dt$ is the rate of change with time of the drug concentration, [Drug], and

      k is the proportionality constant known as a rate constant.

The use of the negative sign in Equation (1) indicates that the drug concentration decreases with time.  In Equation (1), the drug concentration is the sole concentration and is raised to the "first power"--as opposed to being raised to some other power, such as 2

(commonly referred to as "squared," e.g., $x^2$); hence, Equation (1) is referred to as the rate equation for a first order reaction. It is important to point out that the rate constant of Equation (1) is not an absolute constant. The rate constant, k, from Equation (1) will generally exhibit a fairly strong dependence on temperature and can also depend on other properties of the solution.

In the situation where the drug degradation rate is dependent on the solution pH, Equation (1) can be expanded to include the effect of pH in a buffered solution:

$$d[Drug]/dt = -(k_H[H^+] + k_0 + k_{OH}[OH^-] + k_A[A] + k_B[B]) [Drug] \qquad \text{Equation (2)}$$

where

    [Drug] is the drug concentration,

    $d[Drug]/dt$ is the rate of change with time of the drug concentration, [Drug],

    $k_H$ is the rate constant for specific acid catalysis by hydrogen ions, $H^+$,

    $k_0$ is a pH-independent rate constant that may include the concentration of water (present in such large excess it can be assumed constant),

    $k_{OH}$ is the rate constant for specific base catalysis by hydroxide ions, $OH^-$,

    [A] and [B] represent the acid and base concentrations in the buffer, respectively, and

    $k_A$ and $k_B$ are the rate constants for general acid and base catalysis by the acid and base of the buffer, respectively.

If degradation occurs at a constant (or even near-constant) pH, i.e., the concentrations of hydrogen ions, hydroxide ions, buffer acid, and buffer base ($[H^+]$, $[OH^-]$, [A], and [B]) are substantially constant during the degradation process, then all of the terms in the parentheses of Equation (2) — the rate constants and the concentrations -- can be

combined into a single rate constant known as $k_{obs}$. Thus, Equation (2) can be consolidated as follows:

$$d[Drug]/dt = -k_{obs}[Drug] \qquad \text{Equation (3)}$$

where

$$k_{obs} = (k_H[H^+] + k_0 + k_{OH}[OH^-] + k_A[A] + k_B[B]) \qquad \text{Equation (4)}$$

Equation (3) is known as a pseudo first order rate equation because it is mathematically analogous to a first order rate equation. The rate constant, $k_{obs}$, is referred to as the observed rate constant because it is the rate constant that will be observed in the degradation experiment. Furthermore, $k_{obs}$ in Equation (3) is referred to as a pseudo first order rate constant because only one of the reactant concentrations (the drug concentration) changes during the reaction with a first order dependence on itself.

Equation (3) shows that a larger value of $k_{obs}$ corresponds to a faster rate of degradation. From Equation (4) it is evident that the presence of a buffer, i.e., the presence of [A] and [B], will result in a larger value of $k_{obs}$ (note that rate constants such as $k_{obs}$, $k_A$, and $k_B$ are always positive quantities). This explains why degradation occurs faster in a buffered solution, provided that pH (i.e., $[H^+]$ and $[OH^-]$) remains effectively constant, and $k_A$ and $k_B$ are not negligible. The effects of buffers and their contribution to degradation are discussed at greater length in Lachman (1976) and Windheuser (1963).

If degradation is measured at an acidic pH (i.e., $[H^+] \gg [OH^-]$), $k_{obs}$ is typically expressed as:

$$k_{obs} = (k_H[H^+] + k_0 + k_A[A] + k_B[B]) \quad \text{Equation (5)}$$

The majority of drugs degrading in aqueous solution tend to follow kinetics of the kind described by Equation (3), and the rate constant $k_{obs}$ has been a standard tool used by scientists and engineers for at least decades to quantitatively analyze chemical reactions.

In the pharmaceutical industry, drug stability is typically expressed in terms of $t_{90\%}$ and $t_{50\%}$, which represent the time for 10% and 50% of the initial drug to degrade, respectively. There is a specific mathematical relationship between $t_{90\%}$ and $t_{50\%}$ and $k_{obs}$. Specifically, mathematical integration of Equation (3) allows one to solve for $t_{90\%}$ or $t_{50\%}$ and results in the following equations:

$$t_{90\%} = 0.105/k_{obs} \qquad \text{Equation (6)}$$

$$t_{50\%} = 0.693/k_{obs} \qquad \text{Equation (7)}$$

As mentioned above, rate constants are dependent on temperature, and the temperature dependence is typically described in mathematical terms by the well-accepted equation known as the Arrhenius equation, which was introduced over a century ago by the Nobel Prize winning, Swedish scientist, Svante Arrhenius, and has since been firmly validated by the scientific community through both experimentation and theoretical analysis. The Arrhenius equation is:

$$k = Ae^{-Ea/RT} \qquad \text{Equation (8)}$$

where

   $k$ is the rate constant,

   $A$ is a constant that depends on the reaction,

   $E_a$ is the observed energy of activation,

   $R$ is the gas constant (1.9872 grams calories/mole/K), and

   $T$ is temperature expressed in Kelvin (K).

The activation energy, $E_a$, can be calculated from experimental data using an Arrhenius plot, and is a measure of the temperature sensitivity of a chemical reaction rate. Thus, in practice, knowledge of the activation energy allows one to predict $k_{obs}$ (and the corresponding $t_{90\%}$ or $t_{50\%}$) for degradation of a drug in a solution at a first selected temperature (often at refrigeration temperature) from the $k_{obs}$ measured at a second selected temperature (often an elevated temperature), provided that the reaction is

described by the same activation energy (e.g., corresponding to the same hydrolysis mechanism) at both selected temperatures.

Prior to the filing of the '285 patent, Arrhenius plots and principles of chemical reaction kinetics were (and remain as) standard tools used in pharmaceutical research and development, particularly in the prediction and analysis of chemical stability, as evidenced by Wassermann (1983), Mori (1980) and Trissel (1980), among other publications.

D. The '285 Patent

In reading the '285 patent it became readily apparent that many of the techniques and concepts I had learned in my undergraduate and graduate coursework are central to the discussion in the '285 patent. For instance, temperature stability issues pertaining to doxorubicin are the same as those I dealt with for enzymes in my 1979-1983 Ph.D. research. The standard tools used to quantify rates of degradation at different temperatures, the basic theory underlying such tools, and the issues scientists must be aware of when applying them in practice, were integral to my own 1979-1983 Ph.D. research. Furthermore, these same tools are used in my research group's work and are covered in courses that I have taught throughout my career.

The '285 patent reports the dissolution of an anthracycline glycoside, doxorubicin hydrochloride, at different concentrations in acidic aqueous solutions having different pH values. In some cases the pH was adjusted with 0.1 N hydrochloric acid (HCl), and in some cases the solution included substances described by the '285 patent as "co-solubilizing agents," i.e., ethanol, propylene glycol, polyethylene glycol 400, N,N-dimethylacetamide, and polyvinylpyrrolidone ('285 patent, 2:19-36).

The '285 patent describes the benefits of avoiding lyophilization in the manufacture of the anthracycline glycoside and subsequent reconstitution of the drug prior to administration. The abstract of the '285 patent focuses on this issue by noting that "the invention . . . provide[s] a sterile, pyrogen-free, ready-to-use solution of an anthracycline

glycoside . . . which has not been reconstituted from a lyophilizate and which has a pH of from 2.5 to 6.5." The patent contends that the invention is an improvement over lyophilized forms of anthracycline glycoside preparations that need to be lyophilized in manufacturing and later reconstituted from the lyophilizate before administration ('285 patent, 1:22-25; 47-54). According to the patent, "both the manufacturing and the reconstitution of such preparations expose the involved personnel (workers, pharmacists, medical personnel, nurses) to risks of contamination which are particularly serious due to the toxicity of the antitumor substances" ('285 patent, 1:26-29). According to the patent, it seeks to reduce "the risks connected with the manufacturing and the reconstitution of a lyophilized" anthracycline glycoside through the creation of a ready-to-use solution of the drug ('285 patent, 1:47-49).

Specifically, the patent describes the invention as one which avoids the use of lyophilized anthracycline glycoside salts: "The invention also provides a process for producing a sterile, pyrogen-free anthracycline glycoside solution with a pH of from 2.5 to 6.5, which process comprises dissolving a physiologically acceptable salt of the anthracycline glycoside, which salt is not in the form of a lyophilizate, in a physiologically acceptable solvent therefor" ('285 patent, 3:59-64). Likewise, the patent describes reconstitution problems arising in solubilization of a lyophilized preparation ('285 patent, 4:5-19). In particular, the presence of excipient (i.e., lactose) in a 5-fold excess over doxorubicin HCl would preclude reconstitution of a physiologically acceptable solution of the drug at concentrations approaching 100 mg/ml due to solubility limitations of the lactose. The patent also asserts that the invention "constitutes a great advantage over the presently available lyophilized preparates" ('285 patent, 4:8-10). Accordingly, none of the examples in the '285 patent – which were expressly included to illustrate the invention – employ a lyophilizate ('285 patent, 3:59-64, 4:62-63 and Examples 1-14). Given the patent's criticism of lyophilized product, it is my opinion that the '285 patent would be understood by "those of ordinary skill in the art" to describe an invention in which avoiding a lyophilizate in manufacturing or administering anthracycline glycosides is an essential feature of the invention.

I have been asked to determine the qualifications and experience of "those of ordinary skill in the art." I have been told that the way to make this determination is to identify the problems to be solved by the '285 patent and define the background of persons who, in my experience, would be qualified to resolve those problems. I was also told that I was to read and consider the '285 patent and other publications I discuss herein based from the standpoint of "those of ordinary skill in the art."

The problem described in the '285 patent is to find the conditions under which physiologically acceptable solutions of anthracycline glycosides, which were not reconstituted from a lyophilizate, would have "good stability" ('285 patent, 4:13-21). Based on my various experiences described above, I believe this type of problem would ordinarily be resolved by a scientist or engineer with an advanced degree and/or experience in chemistry, pharmaceutical science, bioengineering and/or similar fields. This person would need laboratory experience with various analytical chemistry techniques and a working knowledge of chemical reaction kinetics, with an emphasis on theoretical and experimental techniques for determining stability parameters for organic compounds. From this background, these persons of ordinary skill in the art would be intimately familiar with accelerated stability testing, Arrhenius plots and their use in extrapolations, and $t_{50\%}$ and $t_{90\%}$ calculations.

The specific measures of doxorubicin HCl stability reported in the '285 patent, $t_{90\%}$ values at 4°C and 8°C in particular, were determined from extrapolations based on actual measurements from accelerated stability studies of doxorubicin HCl degradation taken at various higher temperatures. In particular, the '285 patent acknowledges that "[t]he extrapolation of the analytical data in order to determine the time when the 90% of the initial assay could be expected ($t_{90\%}$ value) was made following an Arrhenius plot. . . . This procedure of analytical data treatment is well known and widely used and described in the art: see, e.g., Chemical Stability of Pharmaceuticals, Kennet A. Connors, Gordon L. Amidon, Lloyd Kennon, Publ. John Wiley and Sons, New York, N.Y., 1979" ('285 patent, 5:45-53). The '285 patent says that similar stability data "can be observed for other analogous solutions" of anthracycline glycoside that vary in the drug concentration

(e.g., 5 mg/ml of doxorubicin HCl) and the drug identity (i.e., 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin [idarubicin], as hydrochloride salts) (e.g., '285 patent, 6:41-47). It is interesting to note that the '285 patent reports no actual stability data (be it accelerated or long-term data) for those analogous solutions of structurally similar anthracycline glycosides, leading me to conclude that the "can be observed" language in the patent represents a prediction based on the reported observations and related $t_{90\%}$ calculations for doxorubicin HCl.

E. Janssen Discloses All of the Elements of Claims 1, 2, 3 and 9

I have been asked to review Janssen (1985) to determine whether it discloses all of the elements of any of claims 1, 2, 3, 9, 11, 12 and 13 of the '285 patent. I have concluded that Janssen would be understood by those of ordinary skill in the art to disclose all of the elements of claims 1, 2, 3 and 9. In particular, Janssen would have been understood to disclose a physiologically acceptable solution of doxorubicin HCl dissolved in a physiologically acceptable aqueous solvent, i.e., water (Summary, line 2), at a pH value adjusted with hydrochloric acid—a physiologically acceptable acid--to 4.0 (p. 4, lines 9-10). In Janssen, the doxorubicin HCl solutions that had a concentration of 0.1 mg/ml were stored at 4°C (p. 4, lines 20-21). Janssen further discloses that the solutions were stored in 10-ml glass vials or polypropylene tubes (p. 4, lines 21 and 23). It necessarily follows from good laboratory practice and simple common sense, and thus would be understood by one skilled in the art, that the containers (i.e., vials and tubes) disclosed in Janssen were sealed to avoid contamination, evaporation, and dangerous exposure of the researchers to doxorubicin, which is a highly cytotoxic agent that requires extreme care in handling. In addition, Janssen states that "pH 4 and 4°C provide optimum shelf-life conditions" for doxorubicin HCl solutions (Summary, lines 5-6; see also, e.g., p. 9-10), and that "no significant DXR [doxorubicin HCl] degradation was recorded over a 60-day period at storage of pH 4.0." (p. 5, lines 12-13). And thus, a person of ordinary skill would understand that this Janssen solution adjusted to pH 4 using hydrochloric acid exhibits storage stability.

F. Various Publications Teach the Aqueous Solutions of Claims 1, 2, 3, 9, 11, 12 and 13

I have looked at a number of references including several of the references mentioned in the '285 patent. These references, which were all publicly available prior to August 2, 1985, all concern aqueous solutions of anthracycline glycoside antineoplastics or general pharmaceutical principles for formulating aqueous injectable products and thus would have been the kind of references a person of ordinary skill would have combined in trying to solve the problem posed by the 285 patent. Based on the references identified below, in particular Janssen and Wassermann, it is my opinion that those of ordinary skill in the art would have been motivated to create an aqueous solution of an anthracycline

glycoside antineoplastic compound with all of the elements of claims 1, 2, 3, 9, 11, 12 and 13 of the '285 patent prior to August 1985. I will discuss these references below.

Janssen (1985) studied the stability of doxorubicin HCl dissolved in either an acidic or alkaline (pH 4.0 and 7.4) aqueous solution. Janssen would have been understood by those of ordinary skill in the art to disclose a physiologically acceptable solution of doxorubicin HCl dissolved in a physiologically acceptable aqueous solvent, i.e., water (Summary, line 2), at a pH value adjusted with hydrochloric acid---a physiologically acceptable acid--to 4.0 (p. 4, lines 9-10). Janssen discloses doxorubicin HCl solutions at pH 4.0 having concentrations from 0.05 mg/ml to 0.5 mg/ml. At pH 4.0, in addition to hydrochloric acid, the Janssen solutions contained either 0.01 mol/l Tris buffer or 0.01 mol/l phosphate buffer. Tris buffer (tromethamine) is a common biological buffer that is physiologically acceptable (see Merck Index, 10th Edition, p. 1253; FDA Inactive Ingredient List). In Janssen, the Tris buffer solution was adjusted from pH of greater than 7.4 with 2 mol/l hydrochloric acid down to a pH of 4.0. As explicitly noted in the Janssen article, the buffering capacity of Tris at pH 4.0 is low. A person of ordinary skill in the art would have understood prior to August 1985 that the buffering capacity of Tris at this pH would have been negligible, and also that the pH of the solution was being adjusted with hydrochloric acid.

Moreover, as mentioned above, Lachman (1976) and Windheuser (1963) teach that buffers contribute to degradation. This is also evident from Equations (4) and (5). Thus, any effect that Tris or the phosphate buffer used in Janssen would have had on the stability of doxorubicin HCl in aqueous solution would be to increase the rate of degradation. Thus, one skilled in the art would know that using hydrochloric acid to adjust the pH to 4.0 and omitting a buffer would result in a doxorubicin HCl solution with even better stability than the already stable buffered solutions of Janssen of the same pH, including a solution buffered by phosphate. In fact as noted above, Janssen states that "pH 4 and 4°C provide optimum shelf-life conditions" (Summary, lines 5-6; see also, e.g., p. 9-10), and that "no significant DXR [doxorubicin HCl] degradation was recorded over a 60-day period at storage of pH 4.0." (p. 5, lines 12-13). Thus, a person of ordinary

skill would understand that doxorubicin HCl solutions adjusted to pH 4 using hydrochloric acid exhibit storage stability.

In sum, one of ordinary skill in the art would have been taught by Janssen that solutions of doxorubicin HCl at concentrations up to 0.5 mg/ml would be stable at 4°C when the pH is adjusted to 4.0 with hydrochloric acid. Given the wide (ten-fold) range of doxorubicin HCl concentrations tested in Janssen at pH 4.0, a skilled artisan would also have understood from the teachings of Janssen that solutions of doxorubicin HCl would be stable at higher concentrations such as 1 mg/ml and 2 mg/ml, which were known concentrations for injectable solutions of doxorubicin HCl prior to August 1985. In addition, given the close structural similarity between doxorubicin HCl and idarubicin HCl, including the identical glycosidic linkage, it would be reasonable for a person skilled in the art to conclude that a solution of idarubicin HCl at a concentration of 1 mg/ml (see e.g. Berman, 1983, and Kaplan, 1982 (noting the desirability of 1 mg/ml idarubicin HCl solutions)) and a pH of 4.0 adjusted with hydrochloric acid would display similar stability as the doxorubicin HCl solution.

Janssen further discloses that the solutions stored at 4°C were in 10-ml glass vials or polypropylene tubes (p. 4, lines 21 and 23). Further, it would have been a matter of common sense for those of ordinary skill in the art to distribute and/or otherwise handle any anthracycline glycoside solution in a sealed container. It necessarily follows from good laboratory practice and simple common sense, and thus would be understood by one skilled in the art, that any containers used to hold either a solution of doxorubicin HCl or idarubicin HCl would need to be sealed to avoid contamination, evaporation, and dangerous exposure of the researchers to these agents, which are highly cytotoxic and require extreme care in handling (see Ketchum, 1981).

Wassermann (1983) is also instructive. Wassermann studied the kinetics of doxorubicin HCl hydrolysis in aqueous solutions of 0.01-0.5 M hydrochloric acid over a pH range of 2.1 to 0.4. Wassermann found that the hydrolysis of doxorubicin HCl exhibited a pseudo first order dependence (see Equation (3) above) on the doxorubicin HCl concentration

over the range of pH values tested. By measuring degradation rates at 37°C and at different pH values, Wassermann was able to calculate $k_{obs}$ values and determine the value of $k_H$ for specific acid-catalyzed hydrolysis, as it would have been possible for those of ordinary skill in the art to do prior to August 1985. Likewise, it would have been understood by one skilled in the art from the data in Wassermann that $k_H$ was effectively independent of pH. Wassermann also determined the activation energy ($E_a$) for doxorubicin HCl hydrolysis by measuring hydrolysis rates over the temperature range of 22-50°C and analyzing the experimental data with an Arrhenius plot.

The value of $k_H$ determined by Wassermann would have allowed those of ordinary skill in the art prior to August 1985 to have simply calculated the value of $k_{obs}$ for higher pH values in the acidic range (e.g., 3.0 and 4.0, where the same hydrolysis mechanism predominates) and, thus, predict the better stability of the aqueous doxorubicin HCl solution adjusted to those higher pH values. While the value of $k_{obs}$ could have been calculated directly from the data and Equation (5) above, from Wassermann's results those of ordinary skill in the art would have understood that $k_0$ was negligible and both $k_A[A]$ and $k_B[B]$ were zero (because the solution was not buffered), allowing them to further simplify Equation (5) to $k_{obs} = k_H[H^+]$.

Furthermore, the value of $E_a$ reported by Wassermann would have allowed one to predict the stability of a doxorubicin HCl solution at temperatures lower than 37°C using the Arrhenius equation and the $t_{90\%}$ equation. In fact, this is the same methodology used in the '285 patent to calculate the $t_{90\%}$ values at 4°C and 8°C. Using the data and equations disclosed in Wassermann, I have calculated $t_{90\%}$ values at 4°C at pH 3.0 and pH 4.0 (in the same way a person of ordinary skill would have done prior to August 1985) with the following results: the $t_{90\%}$ values at 4°C and pH 3.0 and pH 4.0 are 224 days and 2236 days, respectively, indicating that a physiologically acceptable solution of doxorubicin HCl dissolved in water (a physiologically acceptable aqueous solvent) having a pH adjusted by hydrochloric acid to either pH 3.0 or pH 4.0 is stable. It is my opinion that those of ordinary skill in the art would have understood prior to August 1985 from reading Wassermann together with Janssen that a doxorubicin HCl solution adjusted with

hydrochloric acid to a pH of 3.0 or 4.0 would be stable regardless of whether the drug concentration is 0.001 mg/ml, 0.1 mg/ml, or 1 mg/ml.

Mori (1980) discloses aqueous acidic solutions of an anthracycline glycoside (aclacinomycin hydrochloride (ACM-HCl)) at an even higher concentration: 2 mg/ml. In Mori, the optimum stability of the ACM-HCl solution is at pH 4.5. To reach this determination the Mori group used standard chemical kinetic techniques that were known to people skilled in the art and also used in the '285 patent and Wassermann. The techniques used included the Arrhenius equation and an Arrhenius plot, which Mori used to calculate the activation energy, $E_a$.

Mori (1980) also investigated the effect of solvents on the stability of various solutions and found that adjusting the pH with acid alone gave better stability than using a buffer. In particular, Mori demonstrates the known practice of adjusting the pH of aqueous solutions with hydrochloric acid (at a pH of 4.5). See also NCI (1984) (noting solutions of ACM-HCl were pH adjusted with hydrochloric acid). Likewise, Schou (1959) teaches the use of hydrochloric acid for pH adjustment of injectable liquids down to 3. Similarly, Sandell (1967) teaches the use of hydrochloric acid for adjusting the pH of an injectable solution down to 3. Thus, it is my opinion that it would have been known to those of ordinary skill in the art prior to August 1985 to use hydrochloric acid to adjust the pH of an injectable pharmaceutical solution when the desired pH is within the range of 2.5 to 5.0.

A number of other references also teach that doxorubicin HCl solutions are stable in a pH range of 2.5 to 5.0. For example, Vigevani (1980) discloses that doxorubicin hydrochloride is stable in acidic solutions in the pH range of 3.0 to 6.5. Similarly, Arcamone (1972) discloses that doxorubicin HCl is stable in acidic solutions in the pH range of 3-6. In view of the problem to be solved, these and other references would also have provided additional motivation to those of ordinary skill in the art to create an aqueous solution of doxorubicin HCl having an acidic pH. Hoffman (1979) discloses that an aqueous doxorubicin HCl solution reconstituted according to the procedure set forth in

the PDR was stable for up to six months when refrigerated at 4°C (as taught in Arcamone, 1972, the pH of such a reconstituted doxorubicin HCl solution was approximately 5). See Ketchum (1981) (disclosing pH of reconstituted solution of 3.8 to 6.5; noting that reconstituted solutions prepared under laminar air-flow hoods and kept in sealed vials showed no loss of potency when stored at 25°C or 5°C for 28 days); Poochikian (1981) (disclosing that reconstituted solutions of anthracycline antibiotics, including doxorubicin and daunorubicin, stored in glass stoppered flasks were more stable at pH of 4.5 than at pH 6.2, 6.3 or 7.4).

Based on the foregoing references it is my opinion that a person of ordinary skill in the art would have been motivated prior to August 1985 to formulate an aqueous solution of anthracycline glycosides adjusted with hydrochloric acid (or other physiologically acceptable acid) to an acidic pH that would be expected to have good stability. Thus, a person of ordinary skill in the art prior to August 1985 would have been motivated to make aqueous solutions of both idarubicin HCl and doxorubicin HCl with a pH in the range of 2.5 to 5.0 adjusted with hydrochloric acid in sealed containers at concentrations from 0.1 mg/ml to 2 mg/ml. In addition, a person skilled in the art would know that an intrinsic property of these solutions would be that they exhibit storage stability.

## V. INFORMATION CONSIDERED IN FORMING MY OPINIONS

In forming the opinions expressed herein, I have reviewed the information identified in Exhibit C.

## VI. CONCLUSION

In addition to the documents cited herein, I may develop and testify using demonstrative and summary exhibits. I may also supplement my opinions as appropriate based on additional information produced or developed during the case.

Dated: August 15, 2005

Douglas S. Clark, Ph.D.

21

Exhibit A:
35 page
Curriculum vitae of
Douglas S. Clark
omitted

Glossary of Terminology

Exhibit B

The glossary includes definitions compiled from the following sources: The Condensed
Chemical Dictionary, Tenth Edition,

http://chemistry.about.com/library/glossary/blglossary.htm,

http://www.shodor.org/unchem/glossary.html,

http://antoine.frostburg.edu/chem/senese/101/ glossary.shtml,

http://www.webref.org/chemistry/h.htm, http://chemistry.about.com,

http://composite.about.com/library/glossary

**Accelerated Stability Studies** Determining drug stability by measuring the concentration
of a drug, [Drug], remaining to degrade as a function of time at relatively high
temperatures (typically exceeding the storage temperature of the drug). The degradation
rates at the high temperatures are then used to predict the stability of the drug at the lower
storage temperature through the use of an Arrhenius plot.

**Acid** A chemical species that donates protons or hydrogen ions, $H^+$, and/or accepts
electrons.

**Acidic** Having a pH lower than 7 or having a concentration of hydrogen ions, $[H^+]$,
greater than $10^{-7}$ molar.

**Activation Energy** The minimum amount of energy required to initiate a chemical
reaction. The activation energy is denoted by $E_a$.

**Aglycone** An organic compound combined with the sugar portion of a glycoside.

**Alkaline** Having a pH greater than 7 or having a concentration of hydroxide ions, $[OH^-]$,
greater than $10^{-7}$ molar.

**Anion** An ionic species having a negative charge. (Example: free chloride $(Cl^-)$ in an
aqueous table salt (NaCl) solution.)

**Aqueous** Made from, with, or by water. A substance dissolved in water.

**Arrhenius Relationship, Arrhenius Equation**

This relationship, given below, is known as the Arrhenius relationship or the Arhennius
equation:

$$k = Ae^{-Ea/RT}$$

The rate constant k is equal to the total frequency of collisions between reaction molecules A times the fraction of collisions $\exp(-E_a/RT)$ that have an energy that exceeds a threshold activation energy $E_a$ at a temperature of T (in Kelvin). R is the gas constant.

**Base** A chemical species that donates electrons or hydroxide ions, $OH^-$, or that accepts protons, $H^+$.

**Buffer** A solution containing both a weak acid and its conjugate base whose pH changes only slightly on the addition of acid or alkali. The weak acid becomes a buffer when alkali is added, and the weak base becomes a buffer on addition of acid. A substance capable of producing such an effect.

**Catalyst** A substance that increases the rate of a chemical reaction by reducing the activation energy, but itself is left unchanged by the reaction.

**Catalysis** The acceleration of a chemical reaction by a catalyst.

**Cation** Ionic species with a positive charge.

**Chemical Reaction** A chemical change that forms new substances. (Example: The chemical reaction $H_2$(gas) + 1/2 $O_2$(gas) --> $H_2O$(liquid) describes the formation of water ($H_2O$) from its elements ($H_2$ and $O_2$ )).

**Chemical Reaction Kinetics** The dependence of a chemical reaction rate on the concentrations of the chemical reactants, as expressed by the rate expression or rate law of the reaction. This dependence is defined by the mechanism of the reaction. Also, the study of the rates of chemical reactions.

**Chromatography** The process of selective retardation of one or more components of a fluid solution as the fluid uniformly percolates through a column or matrix composed of a finely divided substance, or through capillary passageways.

**Concentration** The amount of substance in a specified unit of a mixture or solution. Common methods of stating concentration are percent by weight or percent by volume, or mass (or moles) per unit volume. A common measure of concentration is molarity, expressed as moles per liter and denoted by brackets (e.g., $[OH^-]$ denotes the concentration in molarity of hydroxide ions).

**Covalent Bond** A chemical link between two atoms in which electrons are shared between them.

**Degradation** A chemical change in the molecular structure of a compound that renders the compound inactive.

**Evaporation** The process of the change in the state of a liquid or solid to a gas or vapor. The rate of evaporation of liquids varies with their chemical nature and with the temperature.

**First-Order Reaction** A reaction for which the sum of concentration exponents in the rate law is one. For example, $d[A]/dt = k[A]$ is a first-order reaction because the exponent of the concentration of A (represented by $[A]$) is implicitly one.

**Free Energy Diagram** A graphical representation that relates the energies of reactants, intermediates, and products of a chemical reaction.

**General Acid-Base catalysis** Catalysis of a chemical reaction by the buffer substance present in solution, i.e., the acid or base of the buffer itself. In general acid-base catalysis, the reaction rate will depend on the buffer concentration. Note that general acid-base catalysis can occur in the same solution in which specific acid-base catalysis occurs, with the two mechanisms being additive.

**Glycoside** A sugar derivative that contains a non-sugar group bonded to an oxygen atom and that upon hydrolysis yields the sugar and an aglycone.

**Half-life ($t_{50\%}$)** The time required to convert one half of a reactant to product.

**HPLC** High Pressure Liquid Chromatography is a chromatographic technique that utilizes a liquid mobile phase to separate the components of a mixture. These components (or analytes) are first dissolved in a solvent, and then forced to flow through a chromatographic column under high pressure. In the column, the mixture is resolved into its components.

**Hydrolysis** A chemical reaction in which water reacts with another substance to form two or more new substances, whereby the oxygen in water makes a bond with and splits the original substance.

**Hydronium Ion** An ion ($H_3O^+$) formed by capture of a hydrogen ion by a water molecule. A strong covalent bond is formed between the hydrogen ion and a water molecule's oxygen atom. All hydrogen ions in aqueous solution are bound inside

hydronium ions; thus, hydronium ions are usually written more simply as hydrogen ions, $H^+$.

**Inactivation** A modification reaction on a compound that renders it inactive or nonfunctional. The loss of activity or functionality of the chemical compound.

**Ionic Strength** A measure of a solution's ion content, expressed as

$$\mu = \tfrac{1}{2} \sum m_i Z_i^2$$

where $\mu$ is the ionic strength, $m_i$ is the molar concentration of ion $i$, and $Z_i$ is the valence (net charge) of the ion.

**Kelvin** Denoting a temperature scale in which the temperature (in Kelvin or K) is determined by (T + 273.15), where T is temperature in degrees Celsius. For example, 25°C is equivalent to 298.15 K, and 4°C is equivalent to 277.15 K.

**$k_{obs}$** The *observed* rate constant of a chemical reaction, so named because it is the rate constant that is measured by experiment.

**Logarithmic Scale** A scale of numerical values based on logarithms, generally the logarithm to the base 10. Logarithmic scales are convenient for expressing properties based on parameters that span several powers of ten in their magnitude (e.g., 10 to $10^{-14}$), e.g., pH based on $[H^+]$, and the magnitude of an earthquake based on energy dissipation (the Richter scale).

**Lyophilization (a/k/a Freeze Drying)** A dehydration process for separating water from organic or biological materials. The material is first frozen and then placed in a high vacuum so that the water (ice) vaporizes in the vacuum (i.e., sublimes) without melting, and the non-water components are left behind in an undamaged state.

**Mole** A chemical mass unit, defined to be $6.022 \times 10^{23}$ molecules, atoms, or some other unit. The mass of a mole is the gram formula mass of a substance.

**Molecules** A chemical unit composed of two or more atoms chemically combined.

**PDR** The Physician's Desk Reference, a standard reference used by physicians and in the pharmaceutical industry.

**pH** Measures the acidity or alkalinity of a solution. In pure water it is the negative logarithm (or log) of the concentration of the hydrogen ions in a substance, i.e., pH = -log[$H^+$].

**pKa** Measures the completeness of dissociation of hydrogen ions from an acid, and is a measure of the strength of a weak acid. It is the negative logarithm of the equilibrium constant, Ka, for dissociation of the proton.

**Pseudo-First-Order** Refers to a chemical reaction or rate constant for which the reaction appears to follow first order kinetics because only one of the reactant concentrations changes during the reaction.

**Rate Constant** ($k$) A rate constant is a non-negative proportionality constant that appears in a rate law. For example, $k$ is the rate constant in the rate law $d[A]/dt = k[A]$. Rate constants are independent of concentration but depend on other factors, most notably temperature.

**Rate Law** A rate law or rate equation relates the reaction rate with the concentrations of reactants, catalysts, and inhibitors. For example, the rate law for the one-step reaction A + B $\rightarrow$ C is $d[C]/dt = k[A][B]$.

**Reaction Order** The order of a reaction is the sum of concentration exponents in the rate law for the reaction. For example, a reaction with rate law $d[C]/dt = k[A]^2[B]$ would be a third-order reaction because this particular example reaction depends on the square (second-order) of the concentration of A, [A], and the first-order of the concentration of B, [B], i.e., 2 + 1 = 3.

**Reaction Mechanism** A list of all elementary reactions that occur in the course of an overall chemical reaction. A reaction mechanism is comprised of its elementary reactions, which are the individual chemical reactions between atoms or molecules that cannot be broken down into a series of simpler reactions.

**Reaction Rate** A reaction rate is the speed at which reactants are converted into products in a chemical reaction. The reaction rate is given as the instantaneous rate of change for any reactant or product, and is usually written as a derivative (e. g. $d[A]/dt$) with units of concentration per unit time (e. g., mol $L^{-1}$ $s^{-1}$).

**Reaction Progress Curve** The graphical representation between reactants and products on a free energy diagram.

**Salt** Ionic compounds that can be formed by replacing one or more of the hydrogen ions of an acid with another positive ion.

**Solvent** The component of a solution that is present in the greatest amount. It is the substance in which the solute is dissolved. Liquid in which something is dissolved, e.g., the water in saltwater.

**Specific Acid-Base Catalysis** Catalysis of a chemical reaction by hydrogen ions and/or hydroxide ions in solution. In specific acid-base catalysis, the reaction rate will depend on the hydrogen ion concentration and/or hydroxide ion concentration. Note that specific acid-base catalysis can occur in the same solution in which general acid-base catalysis occurs, with the two mechanisms being additive.

**Sugar** A simple saccharide (a building block of carbohydrates) typically having a molecular formula of $C_n(H_2O)_n$ where $n \geq 3$.

**$t_{90\%}$** The time required to convert one-tenth of a reactant to product. In pharmaceutical terms, this reflects the time required to reduce the concentration of a drug to 90% of its initial value.

**TLC** Thin Layer Chromatography is a chromatographic technique in which the sample is placed on an absorbent cake spread on a smooth glass plate or plastic back plate.

List of Documents Considered

Exhibit C

1.    Acton *et al.* (1984) Med. Chem. 27:638-645.

2.    Arcamone *et al.* (1969) Biotechnol. Bioengin. XI:1101-10. (Arcamone (1969)).

3.    Arcamone *et al.* (1971) U.S. Patent No. 3,590,028.

4.    Arcamone *et al.* (1972) International Symposium on Adriamycin pp. 9-22 (Arcamone (1972)).

5.    Arcamone (1974) U.S. Patent No. 3,803,124.

6.    Arcamone *et al.* (1978) U.S. Patent No. 4,107,423 (Arcamone (1978)).

7.    Biejnen *et al.* (1985) Pharm. Weekbl. Sci., 7:109-16.

8.    Beijnen *et al.* (1985) J. Paren. Sci. Tech., 39:220-222.

9.    Benvenuto *et al.* (1981) Am. J. Hosp. Pharm., 38:1914-1918.

10.    Berman *et al.* (1983) Cancer Res., 43:6069-101 (Berman (1983)).

11.    Bonfante *et al.* (1983) Investigational New Drugs, 1:161-8 (Bonfante (1983)).

12.    Bourne *et al.* (1983) Biotechnol. Bioeng., 25:1625-1639.

13.    Connors *et al.* (1979) THE CHEMICAL STABILITY OF PHARMACEUTICALS  (Connors (1979)).

14.    Ducep *et al.* (1977) UK Patent No. 1 491 184.

15.    Drewinko *et al.* (1983) Cancer Research 43:2648-2653.

16.    Eridani *et al.* (1985) Blut, 50:369-72 (Eridani (1985)).

17.    Eriksen (1982) Pharm. Int'l 3:264-67.

18.    FDA Inactive Ingredient List (http://www.fda.gov/cder/drug/iig/default.htm).

19.    Franco R. *et al.* 1984 Intl. J. Cell Cloning 2:2-8.

20.    Franco *et al.* (1985) International Journal of Cell Cloning 3:424-426.

21.    Gatti *et al.* (2000) U.S. Patent No. 6,107,285 ('285 patent).

22.    Gatti *et al.* (2000) Prosecution History of U.S. Patent Application Serial No. 07/827,742.

23.    Granatek *et al.* (1982) U.S. Patent No. 4,310,515.

24.    Hawley (1981) Condensed Chemical Dictionary 10th ed.

25.    Hoffman *et al.* (1979) Am. J. Hosp. Pharm., 36:1536-1538 (Hoffman (1979)).

26.    Ilver (1971) Almen Galenisk Farmaci--Forel sningsnoter, Dansk Farmaceutforenings Forlag, pp. 132-136.

27.    Janssen *et al.* (1985) Intl. J. Pharmaceutics, 23:1-11 (Janssen (1985)).

28.    Kaniewska (1977) Pharmacia Polska, 9:539-542.

29.    Kaplan *et al.* (1982) Eur. J. Cancer and Clin. Oncol. 18:1303 (Kaplan (1982)).

30.    Karlsen *et al.* (1983) Nor. Pharm. Acta 45:6-67.

31.    Kasan *et al.* (1989) US 4,883,805.

32.    Kotake *et al.* (1985) J. Chromatog., 337:194-200.

33.    Ketchum *et al.* (1981) Am. J. Intravenous Ther. Clin. Nut., 8:15-18 (Ketchum (1981)).

34.    Lachman *et al.* (1976) in THE THEORY AND PRACTICE OF INDUSTRIAL PHARMACY (Lachman *et al.* eds., 2nd edition), Chapter 3 "Kinetic Principles and Stability Testing" (Lachman (1976)).

35.    Lachman *et al.* (1986) in THE THEORY AND PRACTICE OF INDUSTRIAL PHARMACY (Lachman *et al.* eds., 3rd edition), pp. 191-194, 195-196, 459-460, 471-472, 477-478, 764-765.

36.    Lachman *et al.* (1986) in THE THEORY AND PRACTICE OF INDUSTRIAL PHARMACY (Lachman *et al.* eds., 3rd edition) Chapter 26 "Kinetic Principles and Stability Testing."

37.    MERCK MANUAL "Tris"

38.    Mori *et al.* (1980) Japan. J. Antibiot., 33:618.

39.    Mori *et al.* (1980) Japan. J. Antibiotics, XXXIII-4:466 (original Japanese article and English translation provided) (Mori (1980)).

40.    Mosher *et al.*, (1982) J. Med. Chem. 25:18-24.

41.    NCI Investigational Drugs Pharmaceutical Data 1982, pp. 48-50, 130-133, 148-151.

42.    NCI Investigational Drugs Pharmaceutical Data 1983, pp. 52-54, 148-151.

43.    NCI Investigational Drugs Pharmaceutical Data 1984, pp. 51-53, 134-137, 161-162.

44.    NCI Investigational Drugs Pharmaceutical Data 1985, pp. 46-48, 124-127.

45.    PHYSICIAN'S DESK REFERENCE (1975) 29:550-51 (PDR (1975))

46.    PHYSICIAN'S DESK REFERENCE (1982) 36:1129-30.

47.    PHYSICIAN'S DESK REFERENCE (1984) (PDR (1984)).

48.    PHYSICIAN'S DESK REFERENCE (1985) 39:1169-70.

49.    Poochikian *et al.* (1981) Am. J. Hosp. Pharm., 38:483-486 (Poochikian (1981)).

50.    Porumb (1978) Prog. Biophys. Molecul. 34:175-195.

51.    Robison (1986) U.S. Patent No. 4,619,935.

52.    Sandell (1967) Galenisk Farmaci, 2nd edition, Stockholm. (Sandell (1967)).

53.    Schou *et al.* (1959) Troek of den flaeniske farmaci, Store Nordiske Videnskabsboghandel, p.220 (with English translations) (Schou (1959)).

54.    Stella (1986) J. Paren. Sci. Tech. 40:142-63.

55.    Tavaloni et al. (1980) J. Pharm. Parmacol. 32, pp. 860-862.

56.    Trissel (1980) HANDBOOK OF INJECTABLE DRUGS (Elsevier 2nd ed. 1980) (Trissel (1980)).

57.    Vietti *et al.* (1973) Proc. Am. Assoc. Cancer Res., 14:24.

58.    Vigevani and Williamson (1980) "Doxorubicin" in Analytical Profiles of Drug Substances, 9:245-75 (Vigevani (1980)).

59.    Wasserman *et al.* (1983) Intl. J. Pharmaceutics, 14:73-78 (Wassermann (1983)).

60.    Windheuser (1963) Bull. Parenteral Drug Assoc., 17:1-8 (Windheuser (1963)).

61.    Yang *et al.* (1985) Cancer Res., 45:1511-15.

## PROOF OF SERVICE

I am employed in the County of Cook, State of Illinois.  I am over the age of 18 and not a party to the within action.  My business address is 8000 Sears Tower, 233 South Wacker Drive, Chicago, Illinois, 60606.

On  August 15, 2005, I served the foregoing document, described as Expert Report of Douglas S. Clark, Ph.D. on each interested party in this action, as follows:

Joshua R. Rich, Esq.
McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Dr.
Chicago, IL  60606

[X]  **(VIA OVERNIGHT EXPRESS DELIVERY)**  I placed a true copy of the foregoing document in a sealed envelope addressed to each interested party as set forth above.  I placed each such envelope, with postage thereon fully prepaid, for collection and overnight express delivery at Sonnenschein Nath & Rosenthal LLP, Chicago, Illinois.  I am readily familiar with Sonnenschein Nath & Rosenthal LLP's practice for collection and overnight express delivery.  Under that practice, the correspondence would be deposited with an overnight express delivery service on that same day in the ordinary course of business.

[X]  **(VIA ELECTRONIC MAIL)** I caused a true copy of the document to be served by electronic mail to each interested party at the following electronic mail address: rich@mbhb.com.

Executed on August 15, 2005, at Chicago, Illinois.

I declare under penalty of perjury that the foregoing is true and correct.


_Daniel W. Celander_
Daniel W. Celander, Ph.D.

## PROOF OF SERVICE

I am employed in the County of Cook, State of Illinois. I am over the age of 18 and not a party to the within action. My business address is 8000 Sears Tower, 233 South Wacker Drive, Chicago, Illinois, 60606.

On August 17, 2005, I served the foregoing document, described as Exhibit A of the Expert Report of Douglas S. Clark, Ph.D. on the following interested party in this action:

Joshua R. Rich, Esq.
McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, IL 60606

[X] **(VIA OVERNIGHT EXPRESS DELIVERY)** I placed a true copy of the foregoing document in a sealed envelope addressed to the interested party as set forth above. I placed each such envelope, with postage thereon fully prepaid, for collection and overnight express delivery at Sonnenschein Nath & Rosenthal LLP, Chicago, Illinois. I am readily familiar with Sonnenschein Nath & Rosenthal LLP's practice for collection and overnight express delivery. Under that practice, the correspondence would be deposited with an overnight express delivery service on that same day in the ordinary course of business.

[X] **(VIA ELECTRONIC MAIL)** I caused a true copy of the document to be served by electronic mail transmission to the interested party at the following electronic mail address: rich@mbhb.com.

Executed on August 17, 2005, at Chicago, Illinois.

I declare under penalty of perjury that the foregoing is true and correct.

_Daniel W. Celander_
Daniel W. Celander, Ph.D.

# EXHIBIT 9

SHEET 1

1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4    PHARMACIA & UPJOHN COMPANY,          :   CIVIL ACTION
                                           :
 5                                         :
              Plaintiff and               :
 6            Counter-defendant,           :
                                           :
 7    v.                                   :
                                           :
 8    SICOR INC., and SICOR               :
      PHARMACEUTICALS INC.,                :
 9                                         :
              Defendants and              :   NO. 04-833 (KAJ)
10            Counter-Claimants.            - - -

11
                         Wilmington, Delaware
12            Monday, September 19, 2005 at 4:30 p.m.
                      TELEPHONE CONFERENCE
13                          - - -

14
      BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.
15                          - - -

16    APPEARANCES:

17
              MORRIS NICHOLS ARSHT & TUNNELL
18            BY:  MARYELLEN NORIEKA, ESQ.

19                and

20            McDONNELL BOEHNEN HULBERT & BERGHOFF, LLP
              BY:  DANIEL A. BOEHNEN, ESQ., and
21                 JOSHUA R. RICH, ESQ.
                   (Chicago, Illinois)

22                      Counsel for Pharmacia & Upjohn Company

23

24
                                Brian P. Gaffigan
25                              Registered Merit Reporter
```

— SHEET 4 —

**10**

1 have those in our possession by next Monday, Your Honor, a
2 week from today, and then we would like to have a date for a
3 witness to resume and complete that 30(b)(6) deposition, and
4 then we would like our expert report to be deferred until a
5 week after the deposition is done.
6     MR. MORIARTY: Your Honor, we have already given
7 them a date for the continuation of the 30(b)(6) witness who
8 one of the categories is "what sort of search did you do to
9 find the documents" and he'll have more thorough answers at
10 this time. But we offered them a date of I believe a week
11 from this Thursday, and that is why we're making sure they
12 get the production in advance of that.
13     THE COURT: All right.
14     MR. MORIARTY: I would note we have never been
15 asked about extending expert reports. It's never been
16 mentioned until Mr. Boehnen just spoke, and I don't believe
17 any of these records have anything to do with their expert
18 report on validity which is due this Friday. So I don't
19 want to go off on a tangent, I want to stick to the R&D
20 documents, if Your Honor wants to hear that, but maybe Mr.
21 Ashinoff wants to return to that point.
22     THE COURT: Let's not go to expert reports yet.
23 One side or the other may persuade me this is all related
24 but, right now, I just want to know documents are getting
25 done, discovery depositions are getting done. What I hear

**11**

1 you telling me is you are going to get them the supplemental
2 document production by Friday and you have offered them a
3 witness by Thursday of next week. Have I got it right?
4     MR. MORIARTY: You have that right. That
5 witness will also -- we've also produced the R&D documents
6 and that witness will be fully prepared to testify about the
7 scope and thoroughness and completeness of the production of
8 the R&D documents.
9     And, Your Honor, one of the points we made in
10 our letter is we made a generic product. We're not similar
11 to Pharmacia. We don't have volumes of R&D documents. That
12 may allay Mr. Boehnen's concerns.
13     THE COURT: I read your paper, and I assume
14 Mr. Boehnen did, too.
15     So, Mr. Boehnen, you are going to have the R&D
16 documents likewise, or they say you've got them and you are
17 going to have a witness to address those additional R&D
18 document. Is there anything else with respect to the R&D
19 documents that you think you don't have or you want to
20 raise with me right now?
21     MR. BOEHNEN: No, Your Honor. I understand
22 we're talking all documents, R&D and manufacturing
23 documents, on Friday and then a witness next Thursday.
24     THE COURT: Is that right, Mr. Moriarty?
25     MR. MORIARTY: Yes, Your Honor.

**12**

1     THE COURT: Okay. Done.
2     Now, before we start talking about expert
3 reports, let's stay with issues associated with discovery
4 disputes. Have you guys worked out your contention
5 interrogatory kind of issues, or are we finished with
6 interrogatory disputes? Mr. Boehnen.
7     MR. BOEHNEN: Your Honor, in our view, we're not
8 but we are in the following sense. We think that at this
9 point, Your Honor should make it very clear perhaps by an
10 order that the parties are not going to be able to introduce
11 any arguments, theories, positions that have not been set
12 forth to date in either their interrogatory responses or
13 expert witness reports.
14     THE COURT: Well, let me hear Mr. Moriarty.
15 You've got an issue with that?
16     MR. ASHINOFF: Your Honor, this is Mr. Ashinoff.
17 I'll respond to that.
18     THE COURT: All right.
19     MR. ASHINOFF: I do, Your Honor. We have an
20 obligation to supplement interrogatory responses, as do our
21 adversaries.
22     THE COURT: Yes. Well, we're not talking
23 about discovery here. Right now, speak specifically to
24 contentions. All right?
25     MR. ASHINOFF: Your Honor, I don't believe

**13**

1 Mr. Boehnen is stating now contention interrogatories. We
2 essentially don't think we are deficient in our contention
3 interrogatories at this point. We supplemented a number of
4 times. And Mr. Boehnen's letter, as we point out, simply
5 fails to specify in any way where we're deficient. And we
6 don't believe we are.
7     THE COURT: Here is what I understand him to be
8 saying, and I'm just not going to jump the gun on this.
9 That it's been pulling teeth to get you folks to give them
10 responses. You've got some now. He doesn't want later
11 surprises. That's how I read his letters.
12     MR. ASHINOFF: Your Honor, we have laid out
13 what we know and as we get it -- we have our own issues with
14 Pharmacia's production. Those are not on the table for
15 today and I won't put them there. Suffice it to say, we're
16 awaiting long overdue for a lot of discovery and as we get
17 discovery from them, if that discovery leads us to revise
18 our theories and our contentions, we will file amended
19 interrogatory responses.
20     THE COURT: All right.
21     MR. ASHINOFF: We're current in terms of what we
22 have from them now.
23     THE COURT: So what I hear you saying is unless
24 they give you something that changes your mind, you know
25 what your positions are and you have given them your

14

1  positions; right?
2      MR. ASHINOFF: Yes, Your Honor. With the
3  exception of the subject matter of the second letter which
4  I won't raise yet which is the willfulness contention.
5      THE COURT: Yes. All right. Then we're going
6  to let things just lay where they are right now. If there
7  comes some point later in the case where either side feels
8  like somebody was pulling a rabbit out of the hat and
9  playing a "gotcha" with new legal theories and contentions,
10  we'll just have to address it then. Hopefully, no one will
11  be inclined to try to pull something like that at the last
12  minute. But for right now, I don't think there is any
13  dispute for me to resolve in this regard.
14      MR. BOEHNEN: Your Honor, there is one
15  interrogatory which is not a contention-type interrogatory
16  where we asked for -- it's Interrogatory No. 4 -- where we
17  asked for their identification of prospective witnesses.
18      THE COURT: And your issue with their response
19  is what, Mr. Boehnen?
20      MR. BOEHNEN: And this is their witnesses in
21  relation to the laches and estoppel defense. So again, as
22  long as we don't have anybody new coming up later on that
23  was already known to them, we're okay with that. Our
24  problem with what has happened to date is that even though
25  they keep supplementing, they supplement with respect to

16

1  that's fine.
2      THE COURT: I guess we're --
3      MR. MORIARTY: Again, Your Honor, we didn't
4  identify them in the interrogatories. We viewed those as
5  contention interrogatories. I don't want to get into a
6  semantic game with Mr. Boehnen here.
7      THE COURT: I don't want to get into a
8  semantic game either. So what I'm telling you is if you
9  guys have identified your witnesses -- now, if they put an
10  interrogatory to you that says "tell us people who have
11  information on the following topics," are you telling me
12  you don't have to answer that?
13      MR. MORIARTY: No. If they still don't think
14  they have that and Mr. Boehnen off-line tells me the
15  interrogatories as to which he wants, that I'm happy to
16  supplement. I'll do it this week.
17      THE COURT: All right. Get it done.
18      MR. MORIARTY: Okay. Mr. Boehnen, you can call
19  me back.
20      MR. BOEHNEN: I think we made that very clear
21  that we believe we don't have that information. I don't
22  know how many --
23      THE COURT: Yes, whoa. Stop. I'm not getting
24  into it, and I'm not going to let you get into it on this
25  record. If you have something more you think you need, I'm

15

1  information they have long, long ago.
2      THE COURT: All right. Well, I'm not going to
3  get into whether they believe that or you believe that.
4  Suffice it to say that, Mr. Moriarty or Mr. Ashinoff, with
5  discovery time ticking away and people needing to schedule
6  depositions, is there a problem with the request that you
7  identify witnesses on these topics?
8      MR. MORIARTY: No, Your Honor. We actually
9  responded to these as contention interrogatories. I don't
10  believe we responded to them with witness identifications,
11  but we have previously I think served a list of the people
12  we think have relevant knowledge in the case and they've had
13  that for the better part of a year. So there really
14  shouldn't be surprises here.
15      But we responded to these as contention
16  interrogatories. We didn't view these as an additional
17  identification of witnesses. But the truth, Your Honor,
18  is that they are the counterpart to the discussion and
19  our witnesses, our fact witnesses from our end have been
20  identified for a long time in our initial disclosure of
21  witnesses.
22      THE COURT: Mr. Boehnen, do you have any dispute
23  with their assertion?
24      MR. BOEHNEN: As long as they don't bring in any
25  witnesses who haven't already been identified, Your Honor,

17

1  hearing him say they'll give it to you this week. Done.
2      MR. MORIARTY: Okay. Mr. Boehnen, call me.
3  We'll talk about witnesses. I don't think we identified.
4      MR. BOEHNEN: I'm leaving from here to the
5  airport. I won't have an opportunity to call you.
6      THE COURT: All right. Whoa, whoa, whoa, whoa.
7  Stop, both of you. I'm just not being clear enough with
8  you, I guess.
9      Don't talk to each other. I can't have you do
10  that on this record I've got. I got the court reporter
11  here. You guys have to address your remarks to me. It's as
12  if we're in open court, only we got the teleconference going
13  here.
14      So you guys know how to get in touch with each
15  other or people on your team can get in touch with each
16  over. Take that piece off-line. You don't have to do the
17  logistics part of it right now.
18      MR. MORIARTY: Yes, Your Honor.
19      MR. BOEHNEN: Yes, Your Honor. If I may briefly
20  comment, though. I think it's unfair for Sicor to say if
21  you don't have it let me know. We have been telling them
22  for months. The deposition is no different now than it was
23  a month ago.
24      THE COURT: Okay. Whether that is true or not
25  true, to me, right now is not significant. What is

# EXHIBIT 10

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY,    }

               v.    }    Case Action No. 04-833

SICOR, INC. and SICOR    }

PHARMACEUTICALS, INC.    }

<u>Supplemental Expert Report of Douglas S. Clark</u>

I have read the reports submitted by Dr. Arcamone and Dr. Beijnen in response to my expert report dated August 15, 2005. This report is a supplement to that previous expert report, the entire contents of which I reaffirm. I do not believe that any of the points or arguments offered by Dr. Arcamone or Dr. Beijnen change the conclusions of my report; however, there are several issues raised by Dr. Arcamone's and Dr. Beijnen's reports that I wish to address.

Dr. Beijnen's report relies in large part on the premise that anthracycline glycosides are far more complex than other drugs and, hence, their behavior is unpredictable. Dr. Beijnen's report makes too much of this premise. In fact, under the conditions relevant to the claimed pH and concentration ranges of the '285 patent the behavior of doxorubicin HCl is predictable and is the subject of abundant data in the pre- '285 patent literature. Dr. Beijnen's own report illustrates that doxorubicin HCl degradation, in the absence of buffer influences, occurs by a single mechanism (acid-catalyzed hydrolysis) and follows pseudo first order kinetics in acidic media up to a pH of about 4. This point is also demonstrated up to pH 3.5 in a paper published by Beijnen in 1985 for doxorubicin HCl and seven other anthracycline glycosides, which was consistent with the data reported by Wassermann in 1983 for pH 0.43 to 2.1 and Janssen's findings at pH 4.0.

Similarly, Dr. Arcamone's central discussion of his "scheme 1" decomposition processes is irrelevant. In fact, Dr. Arcamone's own report acknowledges that his "scheme 1" takes place in solution only at pH values of 7 and greater. Arcamone Report at Page 6 ("in

1

solution in neutral and basic conditions"). Hence, Dr Arcamone's statement that "the scheme 1 . . . degradation processes, [] predominate at pH levels above (pH) 2.5" is at least imprecise and certainly inconsistent with Dr. Beijnen's report, as noted above. Thus, under the conditions relevant to the claimed pH range of the '285 patent Arcamone's "scheme 1" decomposition processes can be ignored entirely.

Although Dr. Beijnen suggests something to the contrary, his report actually illustrates that the stability of doxorubicin HCl at pH 7.4, and the corresponding Arrhenius plots reported by Janssen for pH 7.4, are irrelevant to the predictability of doxorubicin HCl stability at pH values less than 4. In fact, my August 2005 conclusions did not rely on the data from Janssen obtained at pH 7.4.

I disagree with Dr. Beijnen's claim that the teachings of the references I cite in my August report would not be combined by one of ordinary skill in the art to teach all of the elements of the claims of the '285 patent. As of 1985 there were many published investigations of anthracycline glycosides, many of which used different analytical techniques and different experimental conditions. When surveying the body of available literature, one of ordinary skill in the art would have recognized such differences and understood how to harmonize those results. Frankly, this is standard practice for researchers.

Much is made in the two reports about the alleged importance of doxorubicin concentration and the resulting stacking of the aglycone degradation product and dimerization of doxorubicin HCl. However, there is no aglycone degradation product if doxorubicin HCl does not hydrolyze. Under conditions where an acidic solution of doxorubicin HCl is stable, there will thus be very little, if any, aglycone available for stacking, making the aglycone issue moot.

As for dimerization (e.g., stable molecular aggregates), if it occurs, the glycosidic bonds of the dimer are likely to be even less accessible to hydrogen ions, and hence less subject to acid-catalyzed hydrolysis, than the glycosidic bond of a single doxorubicin HCl

2

molecule. This is because the dimer will have a higher density of positive charge, which repels hydrogen ions, than the monomer. In addition, the glycosidic bonds of the dimer will be more sterically hindered and hence less accessible to hydrogen ions. Therefore, doxorubicin HCl dimers should be more stable in acidic solutions than doxorubicin HCl monomers, which would make doxorubicin HCl even more stable than the $t_{90\%}$ values extrapolated from the data of Wassermann. Finally, with regard to concentration effects, the concentration used by Janssen was 100 μg/ml, which is within the concentration range claimed by the '285 patent.

Contrary to Dr. Beijnen's statement on p. 33 of his report, it is standard practice (as any of my graduate students would tell you) to adjust the pH of a solution by adding acid or base as the last step, especially when the dissolved species, e.g., doxorubicin HCl, can alter the pH by its presence. Whether the authors of Janssen (1985) would have done so is admittedly not discussed; however, one of ordinary skill would have recognized that standard practice calls for adjusting the pH with HCl after adding the doxorubicin.

I may further supplement my opinions as appropriate based on additional information produced or developed during the case.

Dated: October 24, 2005

Douglas S. Clark, PhD.

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of October, 2005, the attached **SUPPLEMENTAL**

**EXPERT REPORT OF DOUGLAS S. CLARK** was served upon the below-named counsel of

record at the address and in the manner indicated:


Jack B. Blumenfeld, Esquire                    HAND DELIVERY
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899

Joshua R. Rich, Esquire                        VIA FEDERAL EXPRESS
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606



_____
Steven J. Balick

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY,        )
                                   )
                Plaintiff,         )
                                   )
        v.                         )
                                   )    C.A. No. 04-833-KAJ
SICOR INC. and SICOR               )
PHARMACEUTICALS, INC.,             )
                                   )
                Defendants.        )

## NOTICE OF SERVICE

The undersigned hereby certifies that on the 24th day of October, 2005,

**SUPPLEMENTAL EXPERT REPORT OF DOUGLAS S. CLARK** was served upon the

following counsel of record at the address and in the manner indicated:


Jack B. Blumenfeld, Esquire                    HAND DELIVERY
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899


Joshua R. Rich, Esquire                      VIA FEDERAL EXPRESS
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606

ASHBY & GEDDES

/s/ *Steven J. Balick*

---

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Reid Ashinoff
Michael S. Gugig
David R. Baum
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Francis C. Lynch
Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

Dated: October 24, 2005
149886.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of October, 2005, the attached **NOTICE OF**

**SERVICE** was served upon the below-named counsel of record at the address and in the manner

indicated:


Jack B. Blumenfeld, Esquire                                    HAND DELIVERY
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899


Joshua R. Rich, Esquire                                        VIA FEDERAL EXPRESS
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606



/s/ *Steven J. Balick*
_____
Steven J. Balick