# EXHIBIT 14

$74- /02

JAN 2  1995

2-3-93

MAIL ROOM
JAN
6
1993
PAT. & TRADEMARK

Docket No:  769-249-0 DIV

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:                    :

GAETANO GATTI, ET AL                     :    GROUP ART UNIT:   1803

SERIAL NO:  07/827,742                   :    EXAMINER:  PESELEV, E.

FILED:  JANUARY 29, 1992                 :

FOR:  INJECTABLE READY-TO-USE SOLUTIONS :
      CONTAINING AN ANTITUMOR
      ANTHRACYCLINE GLYCOSIDE

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS AND TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

     Responsive to the Official Action mailed July 6, please

amend the above-identified application as follows:

IN THE SPECIFICATION

     Amend the Specification by inserting after "January 25,

1990", --now United States Patent 5,124,317--.

IN THE CLAIMS

     Please amend Claim 31 to read as follows:

     31.  A physiologically acceptable solution of anthracycline

glycoside selected from the group consisting of idarubicin

hydrocholoride doxorubicin hydrochloride and epirubicin

hydrochloride dissolved in a physiologically acceptable aqueous

solvent, having a pH adjusted to from 2.5 to 5.0 with a

physiologically acceptable acid selected from the group

consisting of hydrochloric acid, sulfuric acid, phosphoric acid,

methane sulfonic acid, ethanesulfonic acid, tartaric acid, acetic

IPO WP 01/22/93 07827742              1 102       76.00 CK

PU 0014993

*C 1*

acid, succinic acid, ascorbic acid, citric acid, and glutamic acid and the concentration of said anthracycline glycoside being from 0.1 to 100mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

Amend Claim 33, line 3 by amending "dimethylacetamide" to read --N.N.-dimethylacetamide--.

Please amend Claim 40, line 1 by inserting before "comprising" the term --further--.

Please amend Claim 42, line 6, by replacing "2.71 to 3.14" with --2.5 to 5.0--.

Cancel Claims 39 and 41.

Please add the following new claims:

43. A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride and doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid and the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

44. A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 5.0 with

2

769-249.AM

PU 0014994

a physiologically acceptable acid selected from the group
consisting of hydrochloric acid, sulfuric acid, phosphoric acid,
methanesulfonic acid, tartaric acid and acetic acid and the
concentration of said anthracycline glycoside being from 0.1 to
100 mg/ml, wherein said solution has not been reconstituted from
a lyophilizate.

## REMARKS

Claims 31, 33, 40 and 42 have been amended, Claims 39 and 41
have been cancelled from this application and Claims 43 and 44
have been added to the application. Accordingly, Claims 31-38,
40, and 42-44 appear in this application. Reconsideration is
respectfully requested.

Applicants' counsel wishes to thank Examiner Peselev for the
most useful and helpful interview held in her office on July 22,
1992 concerning this application and related application Serial
No. 07/827,938. As reflected on the Examiner Interview Summary
Record, applicants are submitting herewith a declaration making
of record all of the comparative data which was shown to the
Examiner during the interview. The remarks which follow reflect
the arguments presented at the interview.

Applicants are the first to develop storage stable
anthracycline solutions. Prior to the development of applicants
invention, anthracyclines were sold and distributed as
lyophilized powders. It was necessary for the medical personnel
to dissolved the lyophilized powder in an aqueous solution prior

769-249.AM

3

PU 0014995

to administration to the patient. This exposed the medical personnel to significant health risks since anthracyclines have potent side effects which, with long term exposure, can be fatal. Applicants' invention for the first time allowed the pharmaceutical manufacturer to provide the medical personnel with anthracyclines in aqueous solutions thereby substantially reducing the risk of accidental exposure of the medical personnel to the anthracyclines.

Prior to applicants invention, aqueous solutions were considered to have short term storage stability only. No practical method existed which allowed the pharmaceutical manufacturer to offer to the medical community aqueous solutions of anthracyclines which were ready for use until the present invention.

The Examiner has rejected Claims 31-42 under 35 U.S.C. 103 as being unpatentable of Beijnen, Arcamone or Bosaquent in combination with Benvenuto and Arcamone ('579) Wasserman, Patelli or Mori. These rejections are respectfully traversed.

As the Examiner is aware from the prosecution of the parent applications, both of which have now matured into United States Patents, none of the references which have been cited by the Examiner disclose any aqueous solutions of anthracyclines which are storage stable to the degree that applicants have achieved. The primary references all teach the desirability of preparing anthracycline solutions having acid pHs from lyophilized

769-249.AM

4

anthracyclines. Arcamone and Bosaquent specifically used conventional pH adjusting agents, buffers. It is the use of buffers which is the conventional technique for adjusting pH in the medical field. Beijnen does disclose the use of perchloric acid to adjust very dilute concentrations of doxorubicin in aqueous solutions. Beijnen's objective was to determine the rate constant of doxorubicin decomposition at various pHs. This can be appreciated from the fact that perchloric acid is not physiologically acceptable and from the extremely dilute concentrations employed in Beijnen. As noted in the declaration found at tab 1 to Dr. Confalonieri's most recent declaration, it was impossible to produce stable aqueous solutions of doxorubicin whose pH had been adjusted with perchloric acid having a concentration greater than 0.1 mg/ml, the minimum concentration required in the present claims.

Accordingly, none of the primary references would suggest to anyone skilled in the art that the use of an acid to adjust the pH of aqueous solutions of doxorubicin would offer unexpected results as compared with the use of buffers, the conventional approach.

Wasserman teaches adjusting an aqueous doxorubicin solution to a pH of 2.1 with hydrochloric acid. However, at this low pH the solution has inferior storage stability as compared with a pH of 2.5. Further discussion of Wasserman is to be found in Dr.

5

PU 0014997

Confalonieri's May 27, 1991 declaration, found at tab 2 to his present declaration.

The remaining secondary references are cited for the concept of sterile anthracycline solution and the use of glass containers to contain the solutions. Applicants' invention does not lie in the preparation of sterile solutions nor in the use of glass containers, but rather, in the preparation of storage stable anthracycline aqueous solutions whose stability far exceed any which was achieved prior to the present invention.

Attached hereto is a declaration by Dr. Confalonieri who has previously provided declarations in each of the parent applications. Dr. Confalonieri has established that the unexpected results previously demonstrated when the pH of the aqueous solution was adjusted with hydrochloric acid is also obtained with other physiologically acceptable acids. The present claims are not limited to any specific acid other than the requirement that it be physiologically acceptable and that the solution contain at least from 0.1 mg/ml of anthracycline.

Applicants have amended Claim 31 to recite the physiologically acceptable acids presented in Claim 41 which are described on the page 10 of the present Specification as well as to specify that the solution is aqueous. In addition, applicants have added Claim 44 which identifies the physiologically acceptable acids as being selected from a group of acids which have been specifically tested by Dr. Confalonieri. Newly

769-249.AM

6

PU 0014998

presented Claim 43 is identical to originally presented Claim 31 except for the limitation that the solutions is "aqueous". It is respectfully submitted that each of these claims is fully supported by the disclosure as filed and is allowable over the prior art of record.

During the prosecution of the parent application, Serial No. 471,005, now United States Patent 5,124,318, applicants submitted extensive Information Disclosure Statements to the Examiner. Copies of these statements are enclosed. However, it is not believed that the prior art which was cited is anymore relevant than the prior art which has been cited by the Examiner in this Office Action.

The Examiner has also rejected the claims on the basis of double patenting over applicants issued United States Patent 4,946,831. This rejection is now moot in view of the submission of the enclosed terminal disclaimer.

The Examiner also entered rejections under 35 U.S.C. 112 which are believed to be overcome by the present amendments and are, therefore, moot.

In view of the above amendments and remarks, it is respectfully submitted that this application is now in condition

7

769-249.AM

PU 0014999

for allowance.  Early notice to this effect is respectfully requested.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Richard D. Kelly
Registration No. 27,757

1755 Jefferson Davis Highway
Fourth Floor
Arlington, Virginia  22202
(703) 521-5940

8

769-249.AM

PU 0015000

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY, LLC,

Plaintiff,

v.

SICOR, INC., and
SICOR PHARMACEUTICALS, INC.,

Defendants.

C.A. No. 04-833-KAJ

## EXPERT REPORT OF JACOB H. BEIJNEN

I, JACOB H. BEIJNEN, being over the age of eighteen and competent in all respects to testify, hereby declare as follows:

## I.    STATEMENT OF QUALIFICATIONS

A copy of my *curriculum vitae*, which includes a listing of my publications, is attached to this report as Exhibit A.

Since 1986, I have worked as a pharmacist at The Netherlands Cancer Institute/Antoni van Leeuwenhoek Hospital and Slotervaart Hospital in Amsterdam, The Netherlands. Since 1990, I have been the Director of the Netherlands Laboratory Foundation for Anti-Cancer Drug Formulation ("NLADF") in Amsterdam, The Netherlands. Since 1997, I have also been the head of the Department of Pharmacy and Pharmacology at The Netherlands Cancer Institute/Antoni van Leeuwenhoek Hospital and Slotervaart Hospital in Amsterdam, The Netherlands. From 1994 to the present,I have been and remain a Professor at Utrecht University, first of Pharmaceutical Analysis and later of Drug Toxicology.

I received a Bachelor's degree and a Masters degree, *cum laude*, in Pharmacy from Utrecht University in 1978 and 1981, respectively. I was awarded a Ph.D., *cum laude*, in Mathematics and Natural Sciences from Utrecht University in 1986. The title of my Ph.D. dissertation was "Chemical Stability of Mitomycin and Anthracycline Antineoplastic Drugs." I have been a Certified Pharmacist since 1983 and a Registered Hospital Pharmacist since 1989.

I hold numerous appointments on committees and organizations that focus on the formulation of antineoplastic (anticancer) and cytotoxic (literally, "cell death") drugs. I have been a member of the Dutch Oncology Association since 1988. I represent the European Organization for Research and Treatment of Cancer ("EORTC") on the EORTC/Cancer Research Campaign/National Cancer Institute Joint Formulation working party. The Joint Formulation working party is mandated to formulate cytotoxic and antineoplastic drugs and

2

brings together representatives from three of the world's leading cancer research organizations. Between 1991 and 1995, I was Chairman of the Joint Formulation working party.

I have held and continue to hold editorial positions with a number of peer-reviewed academic journals, including the positions of Editor-in-Chief of *Pharmacy World and Science* from 1991 to 1994 and Vice Chairman of the Editorial Board of *Pharmaceutisch Weekblad* (*Pharmaceutical Weekly*) from 1991 to 1994. *Pharmaceutisch Weekblad* is a leading Dutch journal of pharmaceutical science. I am also a member of numerous editorial boards for publications in the area of antineoplastic and cytotoxic drugs, including (i) *Anti-Cancer Drugs*, (ii) the *Journal of Oncology Pharmacy and Practice*, (iii) *Pharmacological Research*, (iv) *Cancer Chemotherapy and Pharmacology*, (v) *Clinical Pharmacokinetics*, (vi) *Journal of Drug Assessment*, (vii) *Current Cancer Therapy Reviews*, (viii) *Current Clinical Pharmacology*, (ix) *European Journal of Hospital Pharmacy Science*, and (x) *BMC Pharmacology* .

At Utrecht University, I lecture on antineoplastic and cytotoxic drugs. My current research work at NLADF, at Utrecht University, and for The Netherlands Cancer Institute includes bioanalysis, pharmacokinetics and pharmacodynamics of investigational anticancer drugs, and pharmaceutical formulation of anticancer drugs. Within my laboratories at NLADF and Utrecht University, I typically supervise approximately 25 Ph.D. candidates.

I have published over 700 papers in peer-reviewed academic journals. In particular, I have written extensively on anthracycline glycosides, including doxorubicin. I am the first named author of two of the references that Douglas S. Clark, Ph.D. considered in forming the opinions set forth in his expert report. One of the principal areas of my Ph.D. research related to the stability characteristics of anthracycline glycosides, including doxorubicin. In 1986, I published the first complete pH stability profiles of the anthracycline glycosides doxorubicin and

3

daunorubicin. By the mid-1980s, I was devoting a significant portion of my research to anthracycline glycosides and their stability characteristics.

Over the past fifteen years, I have given numerous invited lectures to medical professionals at medical institutions a.o. on the stability, handling, and formulation of cytotoxic drugs, including with respect to anthracycline glycosides.

## II.     BACKGROUND AND COMPENSATION

A list of the cases in which I have testified, either by deposition or at trial, is attached to this report as Exhibit B. I am not being personally compensated for my efforts in conjunction with this litigation. However, the NLADF will be compensated at the rate of € 375.00 per hour, plus expenses, for my efforts in conjunction with this litigation.

## III.     INFORMATION CONSIDERED AND ASSUMPTIONS

I have been retained by the law firm of McDonnell Boehnen Hulbert & Berghoff LLP to comment on the invention of U.S. Patent No. 6,107,285, to review the Expert Report of Douglas S. Clark, Ph.D. and to opine on the substance of Dr. Clark's report. In doing so, I understand that discovery in the case is ongoing, and that I may be asked to analyze other information if it becomes available.

In forming my analysis and comparison, I have considered the following materials:

a.     U.S. Patent No. 6,107,285 ("the '285 patent");

b.     Expert Report of Douglas S. Clark, Ph.D.;

c.     Documents Considered by Douglas S. Clark, Ph.D. (*see* Exhibit C to Expert Report of Douglas S. Clark, Ph.D.);

4

d.    Expert Report of Laura T. Guerra;

e.    Declarations of Martin Williamson and Frederick Grab, Mary Horstman, Barbara Barhamand, Debra Holton-Smith, and William Dana;

f.    Beijnen *et al.*, "Stability of intravenous admixtures of doxorubicin and vincristine," *Am. J. Hosp. Pharm.*, 43:3022-3027 (1986);

g.    Beijnen *et al.*, "Aspects of the degradation kinetics of daunorubicin in aqueous solution," *Int. J. Pharm.*, 31:75-82 (1986);

h.    Beijnen *et al.*, "Aspects of the degradation kinetics of doxorubicin in aqueous solution," *Int. J. Pharm.*, 32:123-131 (1986);

i.    Beijnen *et al.*, "Structure elucidation and characterization of daunorubicin degradation products," *Int. J. Pharm.*, 34:247-257 (1987);

j.    Bekers *et al.*, "Effect of cyclodextrins on anthracycline stability in acidic aqueous media," *Pharmaceutisch Weekblad Sci. Ed.*, 10:207-212 (1988);

k.    Bekers *et al.*, "Effect of cyclodextrin complexation on the chemical stability of doxorubicin and daunorubicin in aqueous solutions," *Pharmaceutisch Weekblad Sci. Ed.*, 72:123-130 (1991); and

l.    Bouma *et al.*, "Anthracycline antitumor agents: A review of physicochemical, analytical and stability properties," *Pharmaceutisch Weekblad Sci. Ed.*, 8:109-133 (1986).

## IV.    SUMMARY OF OPINIONS

It is my opinion that Professor Clark's report is inaccurate and incomplete in several important ways. My opinion is based upon my review of Professor Clark's report, the materials cited in his report, the materials cited in my report, and my overall knowledge of the science of

5

anthracycline glycosides. First, I do not believe that Professor Clark has correctly described the qualifications and characteristics of persons of ordinary skill in the art to which the '285 patent pertains. Second, I do not believe those of ordinary skill in the art would understand the claims of the '285 patent as describing an invention in which avoiding a lyophilizate in manufacturing anthracycline glycosides is an essential feature of the invention. Third, I do not believe that one of ordinary skill in the art would understand the 1985 Janssen *et al.* article to disclose all of the claimed elements of claims 1, 2, 3, and 9 of the '285 patent. Fourth, I do not believe that one of ordinary skill in the art would have been motivated or taught by the references cited by Professor Clark to create an aqueous solution of an anthracycline glycoside antineoplastic compound with all of the elements of claims 1, 2, 3, 9, 11, 12, and 13 of the '285 patent prior to August 1985. Overall, I believe that the invention of the '285 patent represents a non-obvious inventive step for the development of anthracycline glycosides in relation to the prior art at the time of the invention, particularly in relation to the art cited in Dr. Clark's report.

I understand that the Court has not yet given its legal interpretation of the language of the patent claims. Thus, I may amend or supplement my opinion as that additional information becomes available.

## V.    OPINIONS

### A.    Technical Background of the '285 Patent

The '285 patent is related to injectable solutions of cytotoxic drugs, in particular, the class of drugs known as anthracycline glycosides. By way of background, I will begin with a general discussion of injectable products, followed by a discussion of anthracycline glycosides. Within the discussion of injectable products, I will discuss lyophilized and ready-to-use products. Within the discussion of anthracycline glycosides, I will discuss structural and functional aspects

6

of the molecules. Finally, I will discuss available formulations of anthracycline glycosides and other antineoplastic agents as of 1985.

### 1.    *Injectable Products*

Injectable products are part of the parenteral class of pharmaceutical products. A "parenteral" is a product that is administered under or through one or more layers of the skin or mucous membrane. In 1985, injectable formulations of certain cytotoxic drugs were available as lyophilized products; injectable formulations of other cytotoxic drugs were available as ready-to-use solutions. Absent other issues, health professionals would always prefer ready-to-use solutions, particularly when dealing with cytotoxic drugs. However, as I will explain later, anthracycline glycosides were available only as lyophilized products as of 1985.

Lyophilized products are distributed and marketed as vials of freeze-dried powder. They are typically reconstituted with an appropriate physiologically acceptable solvent prior to use. A lyophilized product is made by first dissolving the drug (and, generally, a bulking agent) in a suitable solvent. The resulting solution is then filtered to sterilize the drug solution. Dosage form containers (such as vials) are filled with the sterile solution, and the solution is then freeze-dried in the vials. The freeze-drying process drives off the solvent, leaving the drug and bulking agent in the containers in a sterile environment. The vials are then sealed and packaged for distribution and sale.

The use of lyophilized cytotoxic drug products poses several difficulties in the clinic or hospital owing to the fact that the drug must be reconstituted prior to administration to a patient. The lyophilizate is reconstituted by piercing the seal of the vial with a hypodermic needle,

7

injecting a suitable solvent, and shaking the vial for a period of time to dissolve the lyophilizate. Once properly reconstituted, the resulting solution is ready for administration to the patient.

One problem with using reconstituted lyophilized cytotoxic drugs is the risk of exposing the health professional to the drug during the reconstitution process. The phenomenon of spray-back is one such risk that a health professional faces during the reconstitution process. The act of injecting the solvent into the sealed vial to reconstitute the product may increase the internal pressure in the vial. The increased pressure in the vial could lead to an aerosol of the reconstituted drug spraying back through the hole in the seal when the needle is removed, exposing the health professional to the reconstituted drug. Spray-back can be a real problem in hospitals. Reconstitution by shaking also increases the possibility of the vial leaking.

A further problem with using lyophilized cytotoxic drugs is the potential for error in drug administration caused by inaccuracies in the reconstitution procedure. For example, too much or too little of the solvent for reconstituting the lyophilizate could be added to the vial. Similarly, the wrong solvent could be injected into the vial during the reconstitution. Thus, the reconstitution procedure provides several opportunities for introducing error in drug administration. I have reviewed the Expert Report of Laura T. Guerra and the declarations of Martin Williamson and Frederick Grab, Mary Horstman, Barbara Barhamand, Debra Holton-Smith, and William Dana, and agree with their conclusions with regard to the dangers of reconstitution of lyophilized anthracycline glycosides and benefits of ready-to-use formulations.

An additional problem with using lyophilized cytotoxic drugs is related to the shelf-life of the reconstituted drugs. Lyophilization is recognized as a "method for formulating substances that are stable in the solid state but lack the necessary stability in aqueous solutions."[1] Thus,

---

[1] Davignon & Cradock, "Pharmaceutical Aspects of Antitumor Agents," *Pharmaceutisch Weekblad*, 119:1144-1150 (1984), at 1147. *See also* Williams & Polli, "The Lyophilization of Pharmaceutical: A

lyophilization can be used to generate cytotoxic drugs that are stable for longer periods of time than solutions of the same drug. Once the lyophilized product is reconstituted, however, the reconstituted cytotoxic drug may begin to degrade more rapidly than the lyophilized product or otherwise become unsuitable for administration to a patient. If the entire volume of the reconstituted drug is not administered to a patient or patients prior to the time when the drug is unsuitable for administration to a patient, the remaining solution should be discarded. This has substantial cost and public health implications.

In contrast to lyophilized cytotoxic drugs, ready-to-use cytotoxic drug products do not require reconstitution immediately prior to use. They are distributed as solutions in sealed vials or ampoules which can be administered to patients with a minimum amount of handling by the health professional. Moreover, ready-to-use products may also be administered more quickly than lyophilized products because a health professional does not need to go through the steps of reconstruction with a ready-to-use product prior to administration. Thus, ready-to-use products overcome many of the problems associated with using lyophilized cytotoxic drug products.

In formulating an injectable cytotoxic drug product, whether as a lyophilized cytotoxic drug product or as a ready-to-use cytotoxic drug solution, a number of factors need to be considered, including:

- the nature of the drug;

- whether (and how) the drug has been previously formulated;

- the route of administration (subcutaneous, intravenous, intramuscular, etc.);

- the vehicle (aqueous, organic, etc.);

- the solubility of the drug and any other excipients in the formulation;

_____

Literature Review," *J. Parenteral Sci. and Tech.*, 38:48-59 (1984), at 48; Flamberg, "Manufacturing

9

- the effect of any degradation by-products of the drug or other excipients;

- the tonicity (an effect based on amount of dissolved particles in the solution, isotonic is usually preferred) of the solution;

- the pH of the formulation (large volume parenterals are typically at or near the physiological pH of 7.4 in order to avoid altering the physiological pH; small volume parenterals may vary in pH relying on the natural buffering ability of blood to absorb the formulation without affecting the physiological pH);

- preservation (resistance to microbiological growth); and

- the stability (both chemical and physical) of the drug.

The pH of an injectable formulation can affect both the chemical and the physical stability of a formulation (concepts I discuss below) through manufacture, distribution, and storage. Once a formulation has been prepared, it is important to maintain a relatively constant pH.

Almost all aqueous parenteral formulations show a drift in pH unless the formulation is buffered. A buffered formulation resists changes in pH of the formulation. For this reason, buffered solutions are strongly preferred for injectable formulations. Preferred buffers are typically made using conjugate acid-base pairs. Well-known pharmaceutical buffers include acetic acid/acetate, citric acid/citrate and phosphoric acids/salts. The use of an acid or a base alone (such as hydrochloric acid or sodium hydroxide) will not provide a formulation with buffering capacity. Buffer capacity is a measure of how much strong acid or base is required to provide a change in pH of one unit for a given quantity of buffer. Buffer capacity is increased by raising the concentration of the buffer and also by using a pH that is at or near the acid disassociation constant of the buffer.

---

Considerations in the Lyophilization of Parenteral Products," *Pharm. Mfg.*, 3:29-31, 48 (1986), at 29.

The use of buffers in injectable drug products maintains the pH of the preparation over time and allows the product to resist pH drift. The selection of an appropriate buffer for a particular drug is dependent on the pH profile of the drug:

> A suitable buffer system can be selected from knowledge of a pH profile of the drug in solution. ... By following the degradation over a given pH range and plotting the rate constants versus pH, the pH of maximum stability ... can be determined. ... Once the desired pH is determined, a buffer system that provides sufficient buffer capacity can be selected.[2]

### 2.    *Anthracycline Glycosides*

Anthracycline glycosides are a unique class of cytotoxic compounds produced by certain *Streptomyces* microorganisms. Anthracycline glycosides comprise a tetracyclic (four-ringed) anthraquinoid aglycone linked to an amino sugar by what is known as a glycoside bond. *See* Figure 1. Depending on the identity of the groups identified as $R_1$ through $R_5$, different compounds are obtained. *See* Table 1.



**Figure 1**

---

[2] DeLuca & Boylan, "Formulation for Small Volume Parenterals", in PHARMACEUTICAL DOSAGE FORMS: PARENTERAL MEDICATIONS, VOLUME 1, 139-201 (Avis *et al.* eds., 1984), at 156.

Table 1     Substitutions $R_1$ to $R_5$ for various anthracycline glycosides

| Compound | $R_1$ | $R_2$ | $R_3$ | $R_4$ | $R_5$ |
|----------|-------|-------|-------|-------|-------|
| Daunorubicin | =O | H | OH | H | $OCH_3$ |
| Doxorubicin | =O | OH | OH | H | $OCH_3$ |
| Epirubicin | =O | OH | H | OH | $OCH_3$ |
| Idarubicin | =O | H | OH | H | H |
| Esorubicin | =O | OH | H | H | $OCH_3$ |

The first anthracycline glycosides were isolated in the early 1960s. Research continued through the 1960s, leading in 1962 to the isolation and identification of daunorubicin (also known as rubidomycin or daunomycin) and later, in 1967, to the isolation and identification of doxorubicin (also known as adriamycin). *See* Figures 2 and 3. Research into anthracycline glycosides was conducted simultaneously at a number of pharmaceutical companies. In fact, daunorubicin was apparently developed independently at about the same time by Rhone-Poulenc and Farmitalia Carlo Erba (or "Farmitalia"), while doxorubicin was identified by Farmitalia in 1969.[3] Patent applications covering daunorubicin and doxorubicin were filed in 1962 and 1967, respectively.[4]



**Figure 2: Daunorubicin**



**Figure 3: Doxorubicin**

---

[3] *See* Arcamone, DOXORUBICIN: ANTICANCER ANTIBIOTICS (1981), at 10; Di Marco *et al.*, "Daunomycin, a New Antibiotic of the Rhodomycin Group," *Nature*, 201:706-707 (1964), at 706.

[4] A patent application, No. 898,076, covering daunorubicin was filed in France on May 18, 1962 by Rhone-Poulenc (*see, e.g.*, the priority claim in UK Patent 985,598, filed May 16, 1963). A patent

While anthracycline glycosides were (and are) technically classified as antibiotics, they cannot be used to treat ordinary infections because they are highly toxic. However researchers recognized by the late 1960s that anthracycline glycosides were useful in the treatment of certain forms of cancer.[5] The recognition that anthracycline glycosides were effective antineoplastics increased the intensity of research into this class of compounds.

Anthracycline glycosides continued to be the subject of pharmaceutical research into the 1980s and beyond, with new compounds being developed and investigated by pharmaceutical companies and academic researchers. By 1985, dozens of anthracycline glycosides had been isolated, synthesized and characterized, including 4'-epi-doxorubicin (also known as epirubicin) (*See* Figure 4), 4-demethoxy-daunorubicin (also known as idarubicin) (*see* Figure 5), carminomycin, aclacinomycin (*see* Figure 6), and 4'-deoxydoxorubicin (also known as esorubicin).



**Figure 4: Epirubicin**                    **Figure 5: Idarubicin**

Epirubicin, idarubcin, and esorubicin have structures very similar to daunorubicin and doxorubicin (*see* Table 1). Aclacinomycin, while still considered an anthracycline, is a very different molecule in terms of structure and, as a result, in terms of chemical characteristics.

application covering doxorubicin was filed in Italy in 1967 (*see, e.g.,* US Patent 3,590,028, filed April 18, 1968 claiming priority to Italian Application No. 15,056/67 filed April 18, 1967).

**Figure 6: Aclacinomycin A**

While anthracycline glycosides were recognized as potent antineoplastics at an early stage, it was also apparent to researchers that the compounds were profoundly cytotoxic and therefore very difficult to handle. Exposure to even small amounts could lead to severe health problems, including tissue death or necrosis.[6] One study suggested a higher miscarriage rate among medical personnel involved in the reconstitution of cytotoxic drugs.[7] In addition, I have reviewed the Expert Report of Laura T. Guerra and agree that her opinions and experiences conform to those expressed and observed in the literature.

Very early work with anthracycline glycosides revealed that these compounds, in addition to being extremely cytotoxic, are also delicate molecules that need to be treated carefully. Numerous references dating back as early as 1969 establish that anthracycline

---

[5] *See* Arcamone *et al.*, "Adriamycin (14-hydroxydaunomycin), a Novel Antitumor Antibiotic," *Tetrahedron Lett.*, 13:1007-10 (1969), at 1007; Boiron *et al.*, "Daunorubicin in the Treatment of Acute Myelocytic Leukemia," *The Lancet* 1:330-333 (1969), at 330.

[6] *See, e.g.*, "Drug Information – 84", in AMERICAN HOSPITAL FORMULARY SERVICE (McEvoy *et al.* eds., 1984), at 252.

[7] Selevan, "Study of Occupational Exposure to Antineoplastic Drugs and Fetal Loss in Nurses," *New England J. Med.*, 313:1173-1201 (1985).

14

glycosides are readily degraded in acid.[8] For example, in 1972, Arcamone *et al.* reported the hydrolysis of doxorubicin to adriamycinone (an aglycone) and the aminosugar daunosamine in 0.1N HCl.[9]

By 1985, the physiochemical properties of several anthracycline glycosides had been investigated. Extensive research on the anthracycline glycoside doxorubicin revealed that it interacts with a variety of ions, chelates strongly with divalent and trivalent metal ions, adsorbs to a variety of surfaces including glass, is photolabile, and is liable to oxidation.[10] Anthracycline glycosides are also prone to self-association in concentrated solutions.[11] The self-association is thought to occur due to interactions between the planar aromatic rings of the aglycone moiety of the anthracycline glycosides, specifically via interactions between $\pi$-electron systems in the aromatic rings. This mechanism is referred to as stacking.[12]

From the early reports of acid hydrolysis of anthracycline glycosides, there were many further studies on the chemical stability (the ability to avoid molecular degradation) of these compounds. Many of these studies were inadequate due to the use of inappropriate analytical techniques, including the failure to use stability-indicating assays. Although the results of these early studies were questionable, the results indicated that anthracycline stability was not

---

[8] Arcamone *et al.*, "Adriamycin (14-hydroxydaunomycin), a Novel Antitumor Antibiotic," *Tetrahedron Lett.*, 13:1007-10 (1969) (reporting the acid hydrolysis of adriamycin (doxorubicin) but not providing details regarding the acid used).

[9] Arcamone *et al.*, "Structure and Physicochemical Properties of Adriamycin (Doxorubicin)," *Int'l Symposium on Adriamycin*, pp. 9-22 (1972).

[10] *See* Beijnen *et al.*, "Aspects of the Degradation Kinetics of Doxorubicin in Aqueous Solution", *Int'l. J. Pharm.* 32:123-131 (1986), at 123-124, and references cited therein.

[11] Menozzi *et al.*, "Self-Association of Doxorubicin and Related Compounds in Aqueous Solution," *J. Pharma. Sci.*, 73:766-770 (1984).

[12] *See* Bouma *et al.*, "Anthracycline Antitumor Agents: A Review of Physicochemical, Analytical and Stability Properties.," *Pharmaceutisch Weekblad Sci. Ed.*, 8:109-133 (1986), at 113.

satisfactory to achieve a pharmaceutical solution. Analytical techniques used by researchers to study the chemical stability of anthracycline glycosides were frequently inadequate. Many researchers used spectrophotometric techniques (such as ultraviolet absorbance) or thin layer chromatography ("TLC"). The former technique was unreliable because the aglycone degradation product of an anthracycline glycoside absorbs ultraviolet light with a profile similar to undegraded anthracycline glycoside. The latter technique generally lacked sufficient selectivity (that is, it lacked the ability to distinguish between compounds). By 1985, high pressure liquid chromatography ("HPLC") was the preferred technique for evaluating stability of anthracycline glycosides. Accordingly, much of the early work on the stability of anthracycline glycosides employed analytical techniques which, by 1985, were understood to have given unreliable quantitative results.

In order to properly test the stability of anthracycline glycosides, it is essential to use stability indicating assays and to employ standardized conditions. In a stability indicating assay, the degradants are separated from the parent molecule and the technique is validated to confirm its accuracy. Standardization of conditions means that the researcher has designed the experiment so that the effect of only a single variable is measured while other variables are maintained constant. This is particularly important in the case of anthracycline glycosides, which have multiple sensitivities. Unfortunately, many of the early studies failed to use stability indicating assays and to employ standardized conditions. Such deficiencies were also recognized by 1985 as calling into question the results of the early studies of chemical stability of anthracycline glycosides.

The unreliability of the early work on the chemical stability of anthracycline glycosides and the difficulties involved in conducting stability studies on anthracycline glycosides were the subject of several academic papers.

Bosanquet described the problem in a 1986 paper, noting the difficulties in making statements about doxorubicin stability:

> Many of the results of the stability studies with adriamycin were found to be at variance with each other, with a 20-fold difference in stability being reported in one case by different groups from virtually identical experiments. <u>Definitive statements about adriamycin stability are therefore impossible, but it is clear that it is sensitive to light, adsorbs to membrane filters and containers (except polypropylene and siliconised glass), chelates metal ions and probably degrades rapidly in medium. Adriamycin's analogues may well have the same spectrum of sensitivity.</u>[13]

Later in the same paper, the author noted that the stability of doxorubicin was affected by many factors, some of which had probably not been properly controlled in previous studies.

> Amongst the antitumor antibiotics ... the most stability work has been undertaken on adriamycin. Its stability is affected by many different factors, and probably because some of these have not been controlled whilst others were under investigation, many contradictory results have been published. There have also been problems with measuring the drug, as it adsorbs to many materials, including chelating to the ferrous ion of HPLC columns. Table 3 summarizes the drug stability results that have been published. Note that very different results have been recorded at virtually every temperature, and these are now discussed further.[14]

In a paper that I co-authored in 1985, I also commented on the lack of systematic studies on the degradation of anthracycline glycosides .

> Only the degradation of Dx [doxorubicin] in the pH region 0.4-2.1 has been investigated systematically so far. Other stability studies relate to photolytic degradation, stability in infusion fluids or enzymatic degradation, but no systematic studies are published yet concerning the anthracycline stability in

---

[13] Bosanquet, "Stability of Solutions of Antineoplastic Agents During Preparation and Storage for In Vitro Assays," *Cancer Chemother. Pharmacol.*, 17:1-10 (1986), at 1 (emphasis added).
[14] *Id.* at 3.

aqueous solution. Therefore, this systematic investigation was undertaken in order to obtain more detailed knowledge on the kinetics of the initial degradation step of anthracycline cytostatics, including the influences of external factors (pH, ionic strength, temperature) on this decomposition process.[15]

Another problem with references from before 1985 is a failure to quantify what is meant by the term "stable" in the context of the references. Stability is a relative measure of how something changes over time, but the term "stable" has an absolute component in the context of injectable pharmaceutical products. Both chemical stability and physical stability (such as the ability to avoid precipitation of ingredients) are relevant to the formulation of injectables. Thus, the context in which the term "stable" is used must be considered to determine if the author is referring to chemical or physical stability.

Almost all compounds are chemically unstable to some degree, with the degree of instability depending on the time frame, and other variables such as temperature, physical state, and moisture. Some compounds degrade over a few seconds, others over a few hours, still others over years. Ideally, a researcher referring to the chemical stability of a compound or formulation will provide some parameters to assess what he or she means by "stable" (for example, a certain level of degradation over a give period of time). The researcher may also indicate for what purpose he or she is considering stability. In some references "stable" may simply mean that the researcher was able to maintain sufficient stability for the minutes or hours necessary to conduct an experiment or an analysis. In other cases, the author may be considering the stability of a finished pharmaceutical preparation and the time frame may stretch to years. Accordingly, a bare reference in a paper to a compound or a formulation as being "stable" is of little assistance to a one of ordinary skill in the art.

---

[15] Beijnen *et al.*, "Aspects of the Chemical Stability of Doxorubicin and Seven Other Anthracyclines in Acidic Solution," *Pharmaceutisch Weekblad Sci. Ed.*, 7:109-116 (1985), at 109 (footnotes omitted).

In addition to the level of chemical stability, one of ordinary skill in the art will need to consider how changes in stability affect the efficacy of the product. That is, chemical stability is a necessary, but not sufficient, condition for a solution to be physiologically acceptable. For some products, a very high degree of both chemical and physical stability may be necessary in order to achieve therapeutic activity and/or avoid side effects from degradation by-products. For example, if a formulation has highly toxic degradation products, a very high chemical stability level may be necessary. Similarly, physical stability is particularly relevant to injectable formulations since, as discussed below, even small amounts of precipitation are unacceptable.

In a 1986 paper which I co-authored, my co-authors and I described some of the difficulties in dealing with doxorubicin. These included chelation, adsorption onto glass surfaces, concentration effects, photolysis, and oxidation.

> Over the past 15 years, doxorubicin (Dx) . . . unquestionably has proven to be of considerable medical value . . . . Considering the substantial interest in this oncochemotherapeutic drug, it is remarkable that hardly any systematic studies on the degradation of Dx have been reported. So far, systematic stability studies have only dealt with its degradation in acidic medium (pH < 3.5) (Wassermann and Bundgaard, 1983; Beijnen et al., 1985a). On the other hand, data of Dx stability in infusion fluids, of paramount importance for its clinical applications, are available [references excluded]. However, these studies do not contribute to a better insight into the underlying mechanisms of the chemical degradation processes. An in-depth systematic approach of this matter is required in order to attain the necessary information.
>
> The hesitation of investigators to study the degradation of Dx may be reduced to the fact that, from an analytical point of view, Dx is far from an ideal drug. It interacts with all kinds of ions (Porumb, 1978), chelates strongly with divalent and trivalent metal ions (Martin, 1985), adsorbs onto various materials amongst which glass surfaces (Benvenuto et al., 1981; Tomlinson and Malspeis, 1982), tends to self associate in more concentrated solutions (Menozzi et al., 1984), is liable to photolytic decomposition (Daugherty et al., 1979; Tavoloni et al., 1980 Thoma et al., 1980) and to oxidation (Arcamone, 1978).[16]

---

[16] Beijnen *et al.*, "Aspects of the Degradation Kinetics of Doxorubicin in Aqueous Solution", *Int'l. J. Pharm.*, 32:123-131 (1986), at 123-124 (emphasis added).

While the early reports on the stability of anthracycline glycosides must be treated cautiously, there is no question that these studies taken as a whole clearly taught that anthracycline glycosides in solution are degraded under acid conditions. Moreover, these reports also clearly demonstrated that anthracycline glycosides in solution were susceptible to a variety of interactions, including chelation, adsorption, photolysis and oxidation.

By the late 1980's, systematic stability studies were performed using both daunorubicin and doxorubicin to provide insight into the underlying mechanism of the chemical degradation process.[17] The influence of various factors, including pH, buffers, ionic strength, drug concentration and temperature, on the degradation process was thoroughly investigated. These studies overcame the shortcoming of the earlier reports on the stability of anthracycline glycosides by using HPLC, the accepted technique for evaluating stability of anthracycline glycosides, and by employing stability indicating assays under standardized conditions. One aspect of these systematic studies was to analyze the kinetics of degradation as a function of pH. Correcting for buffer and ionic strength influences, the rate constant (k') was determined over a pH range of 0-14 (daunorubicin) and 1-11 (doxorubicin). A plot of log k' against pH reveals a curve with a slope of -1 in the range below 3, indicating specific proton catalysis to give rise to the anthraquinoid aglycone and amino sugar degradation products.[18] At around pH of 4, the water catalyzed degradation becomes a predominant factor in the degradation.[19]

---

[17] *See, e.g.*, *Id.*; Beijnen *et al.*, "Aspects of the Degradation Kinetics of Daunorubicin in Aqueous Solution," *Int'l. J. Pharm.*, 31:75-82 (1986).

[18] Beijnen *et al.*, "Aspects of the Degradation Kinetics of Doxorubicin in Aqueous Solution", *Int'l. J. Pharm.*, 32:123-131 (1986), at 126; Beijnen *et al.*, "Aspects of the Degradation Kinetics of Daunorubicin in Aqueous Solution," *Int'l. J. Pharm.*, 31:75-82 (1986), at 81.

[19] *Id.*

Fig. 3. Log k′–pH profiles for doxorubicin (O) and daunorubicin (●) degradation at 50°C corrected for buffer and ionic strength influences

Other issues beyond chemical stability at a given pH subsequently proved to be important to determining physical stability as well. One key issue was precipitation of the degradation products of doxorubicin out of solution. As my co-authors and I stated in a 1986 article:

> In the literature there is no common opinion whether the decomposition of Dx is dependent on its initial concentration. Both Tavoloni et al. (1980) and Poochikian et al. (1981) found no evidence for the occurrence of a concentration-dependent Dx degradation. However, Janssen et al. (1985) ascertained that Dx degrades faster in solutions containing 500 μg/ml than 50 μg/ml at pH 7.4. We found no indications for the existence of a concentration-dependent degradation rate of Dx in 0.01 M phosphate buffers pH 8 (50°C; 5 X $10^{-4}$ M EDTA; μ = 0.3) in the range 1-20 μg/ml. In solutions of higher Dx concentrations (50, 100, 500 μg/ml) precipitates were formed during the course of the degradation process. Analysis of the precipitate revealed the presence of considerable amounts of undegraded Dx, apart from degradation products. When Dx precipitates arise, no proper degradation kinetics can be established. The formation of Dx precipitates at higher concentrations is probably related to the high ionic strengths and the presence of buffer ions with specific catalytic properties in the reaction solutions, promoting sedimentation as time elapses (Porumb, 1978).[20]

These precipitation issues were vitally important for doxorubicin as a pharmaceutical because any precipitation would make the formulation (then a suspension, not a solution) physiologically

_____

[20] Beijnen *et al.*, "Aspects of the Degradation Kinetics of Doxorubicin in Aqueous Solution", *Int'l. J. Pharm.*, 32:123-131 (1986), at 126.

unacceptable. Precipitate particles in a suspension to be injected intravenously could easily cause pulmonary embolism, which could be fatal.

3.    *Available formulations of anthracycline glycosides as of 1985*

While anthracycline glycosides were a topic of intensive research, as of 1985 the only commercially marketed products were doxorubicin and daunorubicin, both available only as lyophilizates. The product literature available in 1985 for both doxorubicin and daunorubicin products indicated that reconstituted formulations were stable when refrigerated for a maximum of 48 hours.

In contrast to anthracycline glycosides, other antineoplastics were available as ready-to-use solutions.[21] Indeed, companies seeking to market injectable cytotoxic compounds would generally first try to develop ready-to-use formulations and, if stability was lacking, would formulate the drug as a powder for reconstitution such as a lyophilizate.

The fact that anthracycline glycosides were only available in lyophilized form constituted a significant disadvantage in their use. The hazards associated with reconstitution (discussed above ) were particularly problematic because of the profound cytotoxicity of these drugs. While it was apparent in 1985 (and earlier) that the lyophilized formulation was less than satisfactory, all of the scientific data indicated that a ready-to-use solution was not obvious or likely to be achieved . As a result, medical personnel continued to use the lyophilized formulation. I know, both personally and through discussions with others, that pharmacists and

---

[21] For example, vincristine was available as a solution. *See, e.g.,* my paper Beijnen *et al.,* "Stability of Intravenous Mixtures of Doxorubicin and Vincristine," *Am. J. Hosp. Pharm.* 43:3022-3027 (1986), which reports the use of a commercial vincristine sulfate solution (vincristine sulfate in 0.9% sodium chloride injection).

other medical professionals would have wanted ready-to-use formulations of anthracycline glycosides instead of lyophilized forms.

B.    Level of Ordinary Skill in the Relevant Art

I have been asked to express my opinions from the point of view of the person of ordinary skill in the art of the '285 patent as of the filing date of the priority application in August 1985. I consider myself to have been a person of greater than ordinary skill in the art of stability issues of anthracycline glycoside solutions at that time, but I am able to appreciate and comment on the level of skill in the art as of the time the priority application was filed in 1985.

As discussed below, the '285 patent is related to pharmaceutical solutions of injectable cytotoxic drugs, in particular, the class of drugs known as anthracycline glycosides. As discussed above, these drugs are exceptionally complex molecules which are sensitive to a variety of interactions including degradation in acid, adsorption onto glass surfaces, chelation with metal ions, and self-association. Relative to other classes of drug molecules, anthracycline glycosides exhibit far more complex behavior. In addition, as a result of their cytotoxicity, anthracycline glycosides present unique challenges related to their handling by medical personnel.

As a result of the complexity and toxicity of anthracycline glycosides, experience with cytotoxic drugs would be an integral part of the knowledge base of one of ordinary skill in the relevant art as of 1985. One of ordinary skill in the art as of 1985 would be generally familiar with the prior art on cytotoxic drugs, particularly the art regarding anthracycline glycosides. One of ordinary skill in the art as of 1985 would also have some common general knowledge relevant to the formulation of cytotoxic drugs. One of ordinary skill in the art as of 1985 would have

23

been knowledgeable regarding the formulation of injectables, in both lyophilized and ready-to-use forms. Further, one of ordinary skill in the art as of 1985 would be familiar with the hazards inherent in formulating and administering of injectable cytotoxic compounds.

At least as early as 1985, one of ordinary skill in the art would have been capable of designing and interpreting solution state stability studies. That would include familiarity with abstract mathematical tools and theoretical techniques for determining stability (such as the concepts of $t_{90}$ and $t_{50}$ and the Arrhenius equation and resulting plots) and practical experience in conducting stability studies. Further, one of ordinary skill in the art would be familiar with techniques of analytical chemistry and instrumental analysis, including HPLC.

In my view, it would be rare that one of ordinary skill in the art of the '285 patent in 1985 would have been a single person; instead, the knowledge and skills constituting ordinary skill in the art would generally be found in a team of people who collectively possessed the knowledge and skills described above. Such a team would likely be led by a person with a Masters or a Ph.D. in Chemistry or Pharmaceutical Chemistry with several years experience studying the physiochemical characteristics, including chemical stability, of pharmaceutical compounds. The rest of the team would likely include members with bachelor's degrees in chemistry, pharmacy, or pharmaceutical chemistry with experience with stability studies on pharmaceutical compounds and the formulation of injectable cytotoxic drugs.

I have reviewed Professor Clark's report and note that he does not suggest that persons of ordinary skill in the art would have any experience with any cytotoxic drugs, much less with anthracycline glycosides. As discussed above, because of the complex and delicate nature of anthracycline glycosides, I believe his description in this regard is too general. Furthermore, I

24

believe his description fails to place enough weight on practical experience and specific knowledge of cytotoxic drugs and anthracycline glycosides in particular.

C.    The '285 Patent

The '285 patent is entitled "Injectable Ready-to-Use Solutions Containing an Antitumor Anthracycline Glycoside." The face of the patent indicates that the application from which it issued (Appl. No. 07/827,742) was filed on June 29, 1992, and a certificate of correction indicates that the '285 patent ultimately claims priority from a U.S. application filed June 26, 1986. The face of the '285 patent also indicates that it claims priority from a U.K. application (No. 85/19,452) filed August 2, 1985.

In column 1, the specification of the '285 patent discusses some of the risks in using anthracycline glycosides, stating:

> The present invention relates to a stable intravenously injectable ready-to-use solution of an antitumor anthracycline glycoside, e.g. doxorubicin, to a process for preparing such a solution, and provid[ing] the same in a sealed container, and to a method for treating tumors by the use of the said ready-to-use solution.

> The anthracycline glycoside compounds are well known class of compounds in the antineoplastic group of agents, wherein doxorubicin is a typical, and the most widely used representative...

> At present, anthracycline glycoside antitumor drugs, in particular, e.g. doxorubicin, are solely available in the form of lyophilized preparations, which need to be reconstituted before administration.

> Both the manufacturing and the reconstitution of such preparations expose the involved personnel (workers, pharmacists, medical personnel, nurses) to risks of contamination which are particularly serious due to the toxicity of the antitumor substances.

> The Martindale Extra Pharmacopoeia 28th edition, page 175 left column, reports, indeed, about adverse effects of antineoplastic drugs and recommends that "They must be handled with great care and contact with skin and eyes avoided; they should not be

25

inhaled. Care must be taken to avoid extravasion since pain and tissue damage may ensue."

Similarly, Scand. J. Work Environ Health vol. 10 (2), pages 71-74 (1984), as well as articles on Chemistry Industry, Issue Jul. 4, 1983, page 488, and Drug-Topics-Medical-Economics-Co, Issue Feb. 7, 1983, page 99, report about severe adverse effects observed in medical personnel exposed to use of cytostatic agents, including doxorubicin.

To administer a lyophilized preparation, double handling of the drug is required, the lyophilized cake having to be first reconstituted and then administered and, moreover, in some cases, the complete dissolution of the powder may require prolonged shaking because of solubilization problems.

Motivated by the risks and problems related to the administration of existing anthracycline glycoside preparations, the inventors of the subject matter sought a means of allowing administration of anthracycline glycosides without reconstitution by medical personnel or other exposure to the drugs. The inventors solved those problems by adjusting the pH of an aqueous solution of doxorubicin, epirubicin, or idarubicin to a pH of from 2.5 to 5.0 with one of several specified physiologically acceptable acids. The inventors found, through the experiments reported in the specification of the patent, that the stability of the solutions was such that they could be kept for extended time periods in sealed containers at refrigerated temperatures (4° C to 8° C),[22] allowing health professionals to avoid reconstitution of the drug.

The '285 patent includes fourteen examples in the specification that compare unadjusted doxorubicin solutions to doxorubicin solutions in which the pH has been adjusted with an acid (and, in some cases, having co-solubilizing agents added). Importantly, the solutions were prepared in a manner that isolated variables of pH, concentration, and co-solubilizing agents. That is, unlike earlier articles, the '285 patent properly employed standardized conditions.

---

[22] Professor Clark performed his calculations based on the presumption that stability should be determined for a solution at 4°C. That is an improper assumption; refrigeration is considered to be up to 8°C, which would lead to a shorter shelf-life. *See* Stella, "Chemical and Physical Bases Determining the Instability and Incompatibility of Formulated Injectable Drugs," *J. Parenteral Sci. & Tech.* 40:142-163 (1986), at 148. That is, his calculations may suggest greater stability than appropriate.

Stability at 4° C and 8° C was calculated based on storage at 4° C, 35° C, 45° C, and 55° C. The following Tables 1, 2, and 3 (taken directly from the '285 patent) compare the stability of a 2 mg/ml doxorubicin solution without pH adjustment (Table 1), a 2 mg/ml doxorubicin solution with pH adjusted to 3 with hydrochloric acid (Table 2), and a 20 mg/ml doxorubicin solution with pH adjusted to 3 with hydrochloric acid (Table 3).[23]

TABLE 1

INITIAL VALUES
Concentration: 1.994 mg/ml          pH = 5.2
Relative % Assay: 100.0

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4 C° | | 35 C° | | 45 C° | | 55 C° | |
| | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay |
| 1 | 1.992 | 99.9 | 1.917 | 96.1 | 1.768 | 88.7 | 1.493 | 75.0 |
| 2 | | | 1.843 | 92.4 | 1.618 | 81.1 | 1.166 | 58.5 |
| 3 | | | 1.774 | 89.0 | 1.506 | 75.5 | 0.830 | 41.6 |
| 4 | 1.974 | 99.0 | 1.720 | 86.3 | 1.393 | 69.9 | | |
| 12 | 1.980 | 99.3 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:
$t_{90}$ at 4 C° = 815 days
$t_{90}$ at 8 C° = 480 days

---

[23] Professor Clark stated, "The specific measures of doxorubicin HCl stability reported in the '285 patent, $t_{90\%}$ values at 4° C and 8° C in particular, were determined from extrapolations based on actual measurements from accelerated stability studies of doxorubicin HCl degradation taken at various higher temperatures." That is simply not correct. Unlike many of the references Professor Clark cited, one of the temperatures in the examples of the '285 patent was 4° C.

27

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE 2

INITIAL VALUES
Concentration: 1.992 mg/ml       pH = 3.0
Relative % Assay: 100.0

TEMPERATURE

| TIME (weeks) | 4 C° | | 35 C° | | 45 C° | | 55 C° | |
|---|---|---|---|---|---|---|---|---|
| | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay |
| 1 | 1.995 | 100.2 | 1.952 | 98.0 | 1.919 | 96.3 | 1.493 | 75.0 |
| 2 | | | 1.889 | 94.8 | 1.851 | 92.9 | 1.036 | 51.9 |
| 3 | | | 1.876 | 94.2 | 1.565 | 78.6 | 0.730 | 46.7 |
| 4 | 1.979 | 99.4 | 1.808 | 90.8 | 1.393 | 69.9 | | |
| 12 | 1.972 | 99.0 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:
$t_{90}$ at 4 C° = 3870 days
$t_{90}$ at 8 C° = 2000 days

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE 3

INITIAL VALUES
Concentration: 20.06 mg/ml       pH = 2.95
Relative % Assay: 100.0

TEMPERATURE

| TIME (weeks) | 4 C° | | 35 C° | | 45 C° | | 55 C° | |
|---|---|---|---|---|---|---|---|---|
| | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay |
| 1 | 20.06 | 100.0 | 19.56 | 97.5 | 17.84 | 88.9 | 12.31 | 61.4 |
| 2 | | | 18.87 | 94.1 | 15.61 | 77.8 | 7.09 | 35.3 |
| 3 | | | 18.24 | 90.9 | 13.41 | 66.8 | 3.13 | 15.6 |
| 4 | 19.91 | 99.2 | 17.51 | 87.3 | 11.07 | 55.2 | | |
| 12 | 19.80 | 98.7 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:
$t_{90}$ at 4 C° = 3700 days
$t_{90}$ at 8 C° = 1780 days

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In addition, as shown by the following Table 14 (taken directly from the patent) long-tem

stability was measured directly at 4° C and 8° C:

TABLE 14

INITIAL VALUES
Concentration: 20.39 mg/ml
Relative % Assay: 100.0

pH = 3.06

TEMPERATURE

| TIME (months) | 4 C° | | 8 C° | |
|---|---|---|---|---|
| | Conc. mg/ml | Rel. % Assay | Conc. mg/ml | Rel. % Assay |
| 1 | 1.983 | 97.3 | 1.959 | 96.1 |
| 3 | 1.984 | 97.3 | 1.983 | 97.3 |
| 6 | 2.012 | 98.7 | 2.002 | 98.2 |

Importantly, the stability data reflected by those examples does not mirror the $t_{90}$ values

calculated by Professor Clark. The data presented in the '285 patent – and actual real life

experience – showed that the anthracycline glycoside solution is far more stable when pH is

adjusted to 3.0 with hydrochloric acid than the result suggested by Professor Clark's assumptions

and extrapolations. That is, because of the nature of anthracycline glycosides, testing under the

intended final conditions was necessary to establish how doxorubicin would react to those

conditions because actual results were quite unpredictable. Also vitally important, the acidic

doxorubicin solutions described in the '285 patent did not show the precipitation at higher

concentrations discussed in my 1986 article. This is apparently due to the aglycone forming a

part of the stacking complex rather than precipitating out of solution.

This situation produces a complex result. On the one hand, the avoidance of precipitates

is a necessary and essential aspect of a safe injection solution. But on the other hand, the fact

29

that aglycone precipitates are avoided by solubilization of the aglycone, i.e., stacking of the aglycone between the anthracycline glycoside, presents a new and potentially more dangerous result. That is, the solubilization of the aglycone may have masked the presence the aglycone, which would normally have precipitated out of solution, and which is even more toxic than the anthracycline glycoside substance. Regardless of the complexity of the situation, the invention of the '285 patent achieved stable and physiologically acceptable solutions of anthracycline glycosides at relatively high concentrations, when other results would suggest they would not be achieved.

In another aspect, Professor Clark opines "that the '285 patent would be understood by 'those of ordinary skill in the art' to describe an invention in which avoiding a lyophilizate in manufacturing or administering anthracycline glycosides is an essential feature of the invention"; I do not agree that avoiding a lyophilizate in manufacturing is an essential feature of the invention. Claim 1 of the '285 patent covers:

> 1.      A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution is contained in a sealed container.

In my understanding, one of ordinary skill in the art would not have understood the terms "lyophilizate" and "reconstitution" (terms used in Professor Clark's discussion) to be limitations on the claims of the '285 patent, and my understanding differs from Professor Clark's understanding in this respect. In the context of a cytotoxic injectable product, like those claimed in the '285 patent, one of ordinary skill in the art would have considered a product a "lyophilizate" only if it was in the freeze dried powder form as a finished drug product. One of

ordinary skill in the art would not consider the intermediate manufacturing steps as relevant to a determination of whether the product was a lyophilizate. Thus, if the final drug product was in the form of a ready-to-use solution, it would not have had to be reconstituted from a lyophilizate. This is the situation with all of the examples of the '285 patent, in each of which doxorubicin (in an unspecified dry form) was dissolved in water to form a solution. *See, e.g.*, col. 5, lines 65-67; col. 6, lines 59-61; col. 8, line 1-3. Similarly, one of ordinary skill in the art would view "reconstitution" only as a process that occurs immediately before administration to a patient. As prior patents showed, the purification of anthracycline glycosides involved numerous steps, including repeated concentration and solution steps. See, e.g., U.S. Patent Nos. 3,590,028; 3,803,124; and 4,107,423. Thus, in my opinion, one of ordinary skill in the relevant art would view avoiding the reconstitution of a lyophilizate of the anthracycline glycoside as part of having a ready-to-use solution in a sealed container only to the extent that the reconstitution of the lyophilizate would be at the time of administration. The same considerations do not apply in manufacturing.

D.    The 1985 Janssen *et al.* Paper

The 1985 Janssen *et al.* paper summarized research efforts undertaken with the goal of developing a liposome formulation of doxorubicin or DXR. I was personally familiar with this paper and the work reported in the paper, as the authors worked in the same laboratory as me at the time. In addition, the authors discussed issues related to the paper with me, as they acknowledged at the end of the paper (although my name is misspelled). However, I had no responsibility for creating the data reported in the 1985 Janssen *et al.* paper.

The 1985 Janssen *et al.* paper is notable in its criticism of earlier research. On page 2, the authors stated:

> Many studies on the stability of DXR on storage have been published, but only a few investigators used techniques that provide a combination of good selectivity and precision like HPLC (Hoffman *et al.*, 1979; Benvenuto *et al.*, 1981; Poochikian *et al.*, 1981; Williamson *et al.*, 1983; Karlsen *et al.*, 1983). Systematic work to gain insight into the mechanism of degradation is rare (Wassermann and Bundgaard, 1983). <u>It is therefore impossible to make exact predictions on DXR decomposition rates in aqueous systems to be used in pharmaceutical practice.</u>

(emphasis added). There would, therefore, be no motivation to combine the 1985 Janssen *et al.* paper with any prior reference; indeed, the paper teaches away from using information from any prior study. It was against that backdrop of unpredictability, also shown in the numerous other articles discussed above, that the authors undertook their research.

In summarizing the pre-formulation research they had undertaken, the authors of the 1985 Janssen *et al.* paper compared stability of doxorubicin in aqueous medium under various conditions, especially liposome encapsulation. In such a formulation, the doxorubicin is encapsulated in a liposome, which is a lipid or fat-like miscible system. The authors considered the stability of liposome-encapsulated doxorubicin in comparison to aqueous Tris buffer and phosphate buffer solutions at two pH levels, 4.0 and 7.4. Most of the reported results, especially the quantitative results (*see* Tables 1 and 3, Figures 1 and 2), compared the two buffer systems at pH 7.4. In addition, the authors studied certain solutions with Tris and phosphate buffers at pH 4.0. All of the research discussed in the paper was performed at relatively low concentrations (50 μg/ml to 500 μg/ml) because the authors observed precipitation at higher concentrations.

Importantly, the 1985 Janssen *et al.* paper involved the use of Tris buffer and phosphate buffers, not the physiologically acceptable acids claimed in the '285 patent. The following media were used.

(1)     Tris buffers with pH 7.4 or 4.0: 0.01 mol/l Tris and 0.8% sodium chloride. The pH was adjusted with 2 mol/l hydrochloric acid.

(2)     Phosphate with pH 7.4 or 4.0: 0.01 mol/l sodium dihydrogen phosphate and 0.8% sodium chloride. The pH was adjusted with 2 mol/l hydrochloric acid or 2 mol/l sodium hydroxide.

The paper does not say how the solutions were prepared. However, the only logical interpretation of the description of the materials section of the paper is that the authors added hydrochloric acid to the Tris buffer and to the phosphate buffer in order to adjust the pH of the buffers to 7.4 or 4.0, and then added the pH adjusted buffers to doxorubicin solutions. It certainly would not be correct to suggest that buffers and doxorubicin solutions were mixed (prior to the addition of hydrochloric acid) and then, afterward, hydrochloric acid was added to adjust the pH of the resulting solution. Professor Clark appears to suggest exactly that in support of his conclusion that the 1985 Janssen *et al.* paper discloses all of the elements of claims 1, 2, 3, and 9 of the '285 patent. If that is what he is suggesting, he is incorrect in my opinion. That element is missing from the 1985 Janssen *et al.* paper.

Professor Clark relies upon only one element of the experimentation described in the 1985 Janssen *et al.* paper, incubation of various buffered solutions at 4° C:

One ml samples of DXR-containing solutions or liposome dispersions (100 $\mu$g/ml) were incubated in various buffers in 10 ml glass vials in a refrigerator. The solutions were deoxygenated by passing through nitrogen before dissolving DXR. In some cases polypropylene tubes were used, too, for comparison.

During storage, data on the DXR content were collected in triplicate experiements. The DXR concentration of each sample vial was determined in duplicate.

The following buffers were used: Tris pH 4.0 and 7.4 as well as phosphate pH 4.0 and 7.4.

The paper did not provide any quantitative results for the incubations at 4° C and pH 4.0. Rather, the paper indicates that "no significant DXR degradation was recorded over a 60-day period of storage at pH 4.0." However, the paper treats less than a 10% degradation (that is, the degradation seen at $t_{90}$) as too insignificant to report. *See* Tables 2, 4. Thus, when the authors state "no significant DXR degradation was recorded over a 60-day period," it is unclear whether the authors were merely suggesting that the $t_{90}$ for 100 μg/ml solutions of doxorubicin in Tris buffer or phosphate buffers at pH 4.0 was at least 60 days at 4° C. Certainly the paper does not support any conclusion beyond that. Sixty days of stability would not be considered stable.

Dr. Clark relies on a mathematical approach using the Arrhenius equation to extrapolate from the data that was reported in the 1985 Janssen *et al.* paper. Even if such an approach might be appropriate in some circumstances, the data in the Janssen *et al.* paper itself shows that such an approach would not be proper in the present case. The paper includes Arrhenius plots for both buffers at pH 7.4 and various temperatures. The plots are not linear, even in the narrow (seven degree), elevated (29° C to 36° C) temperature range set forth in Figure 2. That is, the Arrhenius plots themselves indicate that an extrapolation from testing at higher temperatures or other conditions to determine the stability of doxorubicin at pH 4.0 would be inaccurate in an unpredictable way. Furthermore, the authors did not start measuring concentration until after seven days had passed. *See* Table 1. As a result, the data set forth is incomplete for the purposes imposed by Dr. Clark and the data does not lead to any predictable conclusion of the type suggested by Dr. Clark.

Contrary to Professor Clark's assumption based on "good laboratory practice and simple common sense," the authors did not indicate that the samples were kept in sealed containers. Moreover, the nature of the seals employed would be important to a determination of the effect

of the container on stability of anthracycline glycoside. The situation involving such compounds is not as simple as Dr. Clark seems to assume. Indeed, that may be precisely why the authors did not report that the compounds were kept in sealed containers. In contrast to the complete lack of information in the 1985 Janssen *et al.* paper, the '285 patent specification indicates that, in the examples, the solutions were contained in type-I colorless glass vials having 5/7 ml capacity which were enclosed with chlorobutyl Teflon-faced rubber stoppers and sealed with aluminum caps. The sealed container element of the '285 patent was simply not disclosed in the 1985 Janssen et al. paper.

Furthermore, there is no indication whatsoever that the authors took any steps to ensure that their solutions would be physiologically acceptable. In the description of reagents, the paper states that the doxorubicin and doxorubicinone reagents were "used without purification." Additionally, there is no indication (as there normally would be) that the authors used sterile media for the formulation of the doxorubicin, or that the doxorubicin solutions were filtered to remove bacterial contaminants. It is not surprising that there was no discussion of such steps because the research reported was merely preliminary testing to determine if there were conditions under which liposomal encapsulation would improve stability. However, it does mean that the "physiologically acceptable solution" element of claim 1 of the '285 patent was not disclosed in the 1985 Janssen *et al.* paper.

In addition, the authors noted on page 8 of the 1985 Janssen *et al.* paper that "[t]he concentration of DXR was found to be a critical parameter for its stability," although they indicated that two previous studies had found the opposite. That is, the authors contrasted two previous studies, by Tavoloni *et al.* and Poochikian *et al.*, both of which found that the rate of doxorubicin decomposition was independent from concentration. The authors based their

criticism of those two papers by noting the "poor specificity of the fluorescence technique" discussed in the Tavoloni *et al.* paper and the lack of data reported in the Poochikian *et al.* paper.

The authors assayed decomposition rates for the Tris buffer and the phosphate buffer systems at pH 7.4 for 50 µg/ml and 500 µg/ml at 37°C and 61°C. The results were reported in Table 3 of the 1985 Janssen *et al.* paper. The results showed, for both buffer systems and at both temperatures, that the higher concentration was less stable. Although the authors suggested that "for both degradation processes (pseudo) first-order kinetics describe the decomposition profile well," the results indicate that the relationship is not direct, as $k_{obs}$ increases indirectly with concentration for both buffers and at both temperatures. Furthermore, the experiments were conducted only on concentrations up to only 500 µg/ml (and then, only at pH 7.4). I know that at higher concentrations, the investigators noted precipitation to occur. Such precipitation would make the formulation a suspension, not a solution, and physiologically unacceptable. Thus, not only did the authors' results indicate that it would not be possible to calculate $t_{90}$ figures accurately (as $k_{obs}$ was not actually a constant) from their research, they suggested that higher concentrations would not be stable.

I know that the authors of the 1985 Janssen *et al.* paper were well aware that they had not solved the problem of stability of doxorubicin in solution. In fact, the ultimate conclusion of the paper on page 10 was that "[i]n our laboratory work [was] in progress to address the problem related to the chemical stability of DXR in a systematic way." I became involved in this work. My subsequent paper on this work was published as "Aspects of the degradation kinetics of doxorubicin in aqueous solution" at Intl. J. Pharm. 32, 123-131, 1986.

36

In conclusion, I believe that the following underlined elements of claim 1 of the '285 patent are not present in the 1985 Janssen *et al.* paper:

> 1. A <u>physiologically acceptable</u> solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, <u>having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid,</u> the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, <u>wherein said solution is contained in a sealed container.</u>

Claims 2, 3, and 9 incorporate all of those elements, and those elements are therefore missing from those claims also. The additional element of claim 9 ("wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids") is missing from the 1985 Janssen *et al.* paper as well. I understand that Professor Clark does not assert that the additional elements of claims 11, 12, and 13 are found in the 1985 Janssen *et al.* paper. If he were to do so, all of the above elements would be missing from those claims as well as the additional elements of claims 11, 12, and 13.

E.    The 1983 Wassermann & Bundgaard Paper

The 1983 Wassermann & Bundgaard paper reported on research regarding the kinetics of hydrolysis of doxorubicin to determine whether it would degrade in (i) the acidic mobile phases used in liquid chromatography or (ii) in the gastrointestinal tract. For that reason, the authors studied doxorubicin at extremely low concentration (about 1.2 $\mu$g/ml), very low pH levels (between 0.43 and 2.13), elevated temperature (37° C), and hypertonic conditions. All of those conditions render the 1983 Wassermann & Bundgaard paper irrelevant to pharmaceutical solutions as found in the claims of the '285 patent.

37

Notably, like the authors of the subsequent 1985 Janssen *et al.* paper, Wassermann and Bundgaard criticized earlier research as providing insufficient information to understand the kinetics of anthracycline glycoside degradation.

> [N]o information appears to be available about the kinetics of degradation under acidic conditions, the only stability studies reported being concerned with photolytic degradation (Tavoloni et al., 1980; Williams and Tritton, 1981) and the stability in various infusion fluids (Poochikian et al., 1981).

That is, like the 1985 Janssen *et al.* paper, the 1983 Wassermann & Bundgaard paper teaches one of ordinary skill in the art away from combining the reference with any prior reference.

Because the concentration and pH levels discussed in the 1983 Wassermann & Bundgaard paper were so low, the results are of no use in determining how doxorubicin would act at the concentrations and pH levels claimed in the '285 patent. The concentration in the paper is low enough that there would have been neither any possibility of aglycone precipitation nor any need to consider a possible stacking effect (whether stabilizing or destabilizing). In addition, because the concentration was so low, the concentration dependence shown in the 1985 Janssen *et al.* paper would not appear. It would be simply impossible to extrapolate accurately from the 1.2 $\mu$g/ml concentrations in the 1983 Wassermann & Bundgaard paper to the higher concentrations claimed in the '285 patent.

Similarly, it would be improper to extrapolate from the extremely low pH levels employed in the 1983 Wassermann & Bundgaard paper to the higher pH levels in the claims of the '285 patent. The paper acknowledges that water-catalyzed and base-catalyzed reactions occur at some pH level higher than the extremely low pH levels used in the paper, but does not consider them because of the extremely low pH conditions. However, one of skill in the art would know that it would not be a fair assumption that those other reactions could be ignored at higher pH levels. Indeed, by 1986, it was shown that there was a water-catalyzed reaction that

38

predominates at about pH 4.0. Accordingly, one of ordinary skill in the art would know that the

1983 Wassermann & Bundgaard paper did not teach that doxorubicin hydrochloride would be

stable at a pH between 2.5 and 5.0.[24]

In conclusion, I believe the following elements of claim 1 of the '285 patent are missing

from the 1983 Wassermann & Bundgaard paper:

> 1. A <u>physiologically acceptable</u> solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, <u>having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid</u> selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and tartaric acid, <u>the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution is contained in a sealed container.</u>

Claims 2, 3, 9, 11, 12, and 13 incorporate all of those elements, and those elements are

therefore missing from those claims also. The additional element of claim 9 ("wherein

said solution exhibits storage stability as a result of said pH being adjusted to the said pH

range using said acids") is missing from the 1983 Wassermann & Bundgaard paper as

well.

Professor Clark apparently asserts that the additional elements of claims 11, 12,

and 13 are found in the 1983 Wassermann & Bundgaard paper. There is no basis for that

assertion, as neither of the additional elements (the concentration of the anthracycline

glycoside is about 1 mg/ml and the anthracycline glycoside is idarubicin hydrochloride)

are found in the 1983 Wassermann & Bundgaard paper.

---

[24] The 1983 Wassermann & Bundgaard paper also did not disclose a physiologically acceptable solution or the solution being contained in a sealed container.

F.    The 1980 Mori *et al.* Paper

The 1980 Mori *et al.* paper is entitled "Physicochemical Properties and Stability of Aclacinomycin A Hydrochloride."[25]  The authors studied aclacinomycin A hydrochloride (or "ACM-HCl"), a drug very different from the anthracycline glycosides claimed in the '285 patent. While doxorubicin, epirubicin, and idarubicin have minor structural differences (as shown in Table 1 above), ACM-HCl is fundamentally different.  ACM-HCl has three sugars rather than one; ACM-HCl also has an ester attached to the aglycone portion of the molecule and several other structural differences.  Thus, the teachings of the 1980 Mori *et al.* paper would not have led one of ordinary skill in the relevant art to any conclusions whatsoever regarding anthracycline glycosides such as doxorubicin, epirubicin, and idarubicin.

The 1980 Mori *et al.* paper involved a number of experiments on ACM-HCl, including experiments on the stability of ACM-HCl in solutions of various pH levels in a 0.1 M phosphate-citrate buffer at 37°C.  Both the buffer and temperature conditions were so different from those discussed in the '285 patent that the results would be of little relevance, even if other conditions were similar.  Furthermore, the authors tested the stability of ACM-HCl using only TLC, which was known by 1985 to be inaccurate.  Thus, one of ordinary skill in the art would not consider the 1980 Mori *et al.* paper as providing any guidance with regard to the stability of doxorubicin, epirubicin, or idarubicin under the conditions set forth in the '285 patent.

Finally, the 1980 Mori *et al.* paper taught away from the conclusion that anthracycline glycosides would be stable in acidic solutions.  After its discussion of studies of ACM-HCl in solution, the authors concluded, "In pharmaceutical preparations of ACM-HCl, therefore, it

---

[25] According to Professor Clark's "List of Documents Considered," the Mori *et al.* reference he discusses is actually another paper, "Studies on the Stability of Aclacinomycin Hydrochloride."  However, only one-half page of that article was actually translated into English.  Regardless of which article was used, however, much of the data was the same.

should be lyophilized or dry-filled into ampules or vials with a stabilizer including lactose or

maltose." Thus, one of ordinary skill in the relevant art reviewing the 1980 Mori *et al.* paper

would be led to believe that ready-to-use formulations of anthracycline glycosides would not be

appropriate for pharmaceutical preparations.

In conclusion, I believe the following elements of claim 1 of the '285 patent are missing

from the 1980 Mori *et al.* paper:

> 1. A <u>physiologically acceptable</u> solution of anthracycline glycoside
> <u>selected from the group consisting of idarubicin hydrochloride, doxorubicin</u>
> <u>hydrochloride and epirubicin hydrochloride</u> dissolved in a physiologically
> acceptable aqueous solvent, <u>having a pH adjusted to from 2.5 to 5.0 with a</u>
> <u>physiologically acceptable acid selected from the group consisting of</u>
> <u>hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, and</u>
> <u>tartaric acid,</u> the concentration of said anthracycline glycoside being from 0.1 to
> 100 mg/ml, <u>wherein said solution is contained in a sealed container.</u>

Claims 2, 3, 9, 11, 12, and 13 incorporate all of those elements, and those elements are

therefore missing from those claims also. The additional element of claim 9 ("wherein

said solution exhibits storage stability as a result of said pH being adjusted to the said pH

range using said acids") is missing from the 1980 Mori *et al.* paper as well.

Professor Clark apparently asserts that the additional elements of claims 11, 12,

and 13 are found in the 1980 Mori *et al.* paper. There is no basis for that assertion, as

neither of the additional elements (the concentration of the anthracycline glycoside is

about 1 mg/ml and the anthracycline glycoside is idarubicin hydrochloride) are found in

the 1980 Mori *et al.* paper.

G.    Other References

On page 20 of his report, Professor Clark indicates his belief that "[a] number of other

references also teach that doxorubicin HCl solutions are stable in a pH range of 2.5 to 5.0." I am

41

quite familiar with each of the references Professor Clark cites and disagree with his conclusion. None of those papers taught that doxorubicin as a pharmaceutical product is stable in an aqueous solution with a pH adjusted to 2.5 to 5.0. Furthermore, none of those references provided any teaching or suggestion that they should be combined with the 1985 Janssen *et al.* paper, the 1983 Wassermann & Bundgaard paper, or the 1980 Mori *et al.* paper. Finally, none of the references discusses idarubicin, which is the only anthracycline glycoside in claim 13 of the '285 patent.

1.    *The 1980 Vigevani and Williamson Paper*

Professor Clark cites a 1980 paper on doxorubicin by Vigevani and Williamson published in Analytical Profiles of Drug Substances. That paper was apparently a review article based on prior publications. That is, especially with regard to stability, the paper appears not to involve any original research, only a summary of what was said in earlier papers. The stability section has only a brief, vague summary of doxorubicin in solution, which contrasts strongly to the quantitative results recited for the active drug substance:

> The effect of pH values and buffer concentrations on the stability of aqueous solutions of doxorubicin hydrochloride has been determined by spectrophotometric and chromatographic methods. Doxorubicin is stable in acidic solutions in the pH range 3.0 to 6.5, but decomposes at increasing rates as the pH is increased from 6.5 to 12. Decomposition in aqueous solution gives complex mixtures of pigmented compounds with a wide range of chromatographic potencies. Apart from the isolation of adriamycinone from dilute acid solutions the identification of the components of these mixtures has not been accomplished.

The only reference cited in that discussion of stability is the 1972 Arcamone *et al.* paper discussed below.

The 1980 Vigevani and Williamson paper would not lead one of ordinary skill in the relevant art to believe that a solution of doxorubicin demonstrates physiologically acceptable

42

stability after having its pH adjusted to from 2.5 to 5.0.  It indicates that spectrophotometric and chromatographic (apparently thin-layer) methods were used; those methods were known by 1985 to be clearly inadequate.  As discussed above, direct spectrophotometric analysis simply is not a valid indication of stability.  One of the degradation products of anthracycline glycosides like doxorubicin is an aglycone.  The ultraviolet-visible absorbance of the aglycone breakdown product is similar to that of the corresponding intact anthracycline glycoside.  As a result, spectrophotometric analysis does not yield results accurate enough to determine stability.  Also as discussed above, TLC similarly lacks necessary selectivity in most cases, including those relevant here.

As of 1985, one of ordinary skill in the relevant art would have known that the only reliable way of obtaining accurate results indicative of stability would have been HPLC.  Merely using HPLC equipment and methodology would not have been sufficient; HPLC must be carried out under the correct conditions.  However, the early references in the relevant field, such as those cited in the 1980 Vigevani and Williamson paper, reported experiments that did not even use HPLC.  The reliability of the data reported in those references would, therefore, have been of questionable value at best.  All of this would have been know to a person of ordinary skill in the relevant art as of the priority date of the '285 patent.

In addition, the 1980 Vigevani and Williamson paper gives no context as to time, purpose, or conditions.  Indeed, not only is any information on stability of any value completely lacking, the term "stable" is not defined.  It appears to be used only as a contrast between the stability shown under acidic conditions and that under basic conditions, which can be as low as mere hours.  Also, how stability was tested is not defined and there is no mention of an acid being used to adjust pH, only that conditions were acidic relative to isotonicity (but not the

native pH of doxorubicin). Indeed, the comments on stability appear to be based on the 1972 Arcamone *et al.* paper discussed below. The 1972 Arcamone *et al.* paper is reference 13 on page 263 of the 1980 Vigevani and Williamson paper. The comments I make below in relation to the 1972 Arcamone *et al.* paper therefore apply to the 1980 Vigevani and Williamson paper also.

2. *The 1972 Arcamone et al. Paper*

Professor Clark cites the 1972 Arcamone *et al.* paper that was in turn cited in the 1980 Vigevani and Williamson paper. Professor Clark suggests that the 1972 Arcamone *et al.* paper "disclose[d] that doxorubicin HCl is stable in acidic solutions in the pH range of 3-6." In the article, which provides a general review of the characteristics of doxorubicin (also known as adriamycin), the authors specifically did <u>not</u> characterize any solution of doxorubicin as stable, in contrast to solid forms:

> Adriamycin hydrochloride is stable in the solid state, as it was stored for years at room temperature without chemical modification and without any loss of activity.
> The stability of aqueous solutions of adriamycin varies with pH and with buffer concentration (Table 2 and Fig. 12) as established on the basis of spectrophotometric and chromatographic methods.

Table 2 indicates that a 2 mg/ml solution of doxorubicin hydrochloride at pH 3-6 in a 0.06 M phosphate buffer at 22° C was greater than one month, as determined by spectrophotometry and TLC.

The stability data on doxorubicin hydrochloride at pH 3-6 does not appear to relate to a solution in which the pH has been adjusted with an acid. Unlike the entry in the table relating to a solution at pH 1 and 2, which indicates that the solution was prepared with dilute aqueous hydrochloric acid, there is no indication of any acid. Furthermore, the article states, "Mild acid hydrolysis of adriamycin (Scheme 1) gave the water insoluble aglycone, adriamycinone (V) and

44

an aminosugar which was isolated as the hydrochloride, and identified with daunosamine . . . ." Thus, it is not clear that the stability data relates to a solution in which pH is adjusted with an acid, which would be disfavored according to the paper itself.

The data set forth in the 1972 Arcamone *et al.* paper would also tell one of ordinary skill in the art nothing about the stability of anthracycline glycosides because of the methods used to determine stability. As discussed above, the spectrophotometry and TLC methods used in 1972 were known by 1985 to be outmoded. Indeed, given the known overstatement of the stability of anthracycline glycosides by those methods and the use of whole numbers (that is, > 1 month stability for doxorubicin at pH 3-6), one of ordinary skill in the art would be led to believe that a doxorubicin solution as prepared in the manner disclosed in the 1972 Arcamone *et al.* paper would demonstrate stability for less than two months. That would not be sufficient to be considered "stable" for a pharmaceutical product, and that authors did not characterize it as such.

In addition to the difficulties that existed with the analytical techniques employed by the authors, the data in the 1972 Arcamone *et al.* paper would give one of ordinary skill in the art little guidance because more than one variable was changed between experiments. For example, the authors varied both pH and the presence of a buffer between pH 1-2 (dilute aqueous hydrochloric acid) and pH 3-6 (0.06 M phosphate buffer). However, the data indicated that the dilute hydrochloric acid gave substantially lower stability (albeit at a lower pH) than when a phosphate buffer was used. Thus, in my view, the 1972 Arcamone *et al.* paper clearly taught one of ordinary skill in the art that stability as required for a pharmaceutical product cannot be achieved for a ready-to-use formulation.

45

3.    *The 1979 Hoffman et al. Paper*

Professor Clark cites a 1979 paper by Hoffman *et al.*, suggesting that the paper "discloses that an aqueous doxorubicin HCl solution reconstituted according to the procedure set forth in the PDR[26] was stable for up to six months when refrigerated at 4°C (as taught by Arcamone, 1972, the pH of such a reconstituted doxorubicin HCl solution was approximately 5)." The 1979 Hoffman *et al.* paper, one of the references that were considered insufficient in the 1985 Janssen *et al.* paper, reported the results of refrigerating and freezing 2 mg/ml doxorubicin hydrochloride solutions formulated with Water for Injection, USP. It is notable that the 1979 Hoffman *et al.* paper never reports the pH of the reconstituted doxorubicin solutions; Professor Clark assumed that the pH would be the same as reported in the 1972 Arcamone *et al.* paper, which he suggested would be "approximately 5," but which Table 2 of the 1972 Arcamone *et al.* paper reported as 5.5. That is, the 1972 Arcamone *et al.* paper cannot be read into the 1979 Hoffman *et al.* paper to suggest a pH between 2.5 and 5.0, as Professor Clark assumes. Nor can the 1979 Hoffman *et al.* paper be combined with the 1985 Janssen *et al.* paper or the 1983 Wassermann & Bundgaard paper.

The data reported in the 1979 Hoffman *et al.* paper shows that no conclusion can be drawn in relation to the effect of variation of pH on the stability of anthracycline glycosides. After preparing the doxorubicin hydrochloride solutions (that is, reconstituting lyophilized doxorubicin hydrochloride with sterile water to a concentration of 2 mg/ml), the pH of the resulting solutions was not varied by the authors. Thus, the doxorubicin hydrochloride solutions were tested at only a single, unspecified pH. As a result, nothing in the 1979 Hoffman *et al.*

---

[26] Professor Clark does not identify which PDR he believed was the source for the formulation protocol. The 1979 Hoffman *et al.* paper indicates the formulation protocol was the result of personal communications with F. Mancini.

46

paper indicates to one of skill in the art what effect variation of pH has on the stability of a doxorubicin solution.

Instead of showing that doxorubicin hydrochloride solutions are stable in a pH range of 2.5 to 5.0, as suggested by Professor Clark, the data presented in the 1979 Hoffman et al. paper would lead one of ordinary skill in the art to believe that a ready-to-use solution of an anthracycline glycoside would not be stable. Although the solution of doxorubicin hydrochloride retained 96% potency (reported as a percentage of the measured to the estimated initial doxorubicin hydrochloride) after six months of storage at 4°C, the starting potency of this solution was 106.5%. Thus, the relative loss of potency over six months was 10.5%, less than the $t_{90}$ value. This is not an insignificant loss. Moreover, the potency reported after one year of storage at 4°C is only 64.2%, for a loss of over 42% potency in just one year. That would not be considered "stable" or suitable for an injectable pharmaceutical solution product.

4.      *The 1981 Ketchum et al. Paper*

Professor Clark cites a 1981 paper by Ketchum *et al.*, stating that the paper "disclos[es] pH of reconstituted solution of 3.8 to 6.5; noting that reconstituted solutions prepared under laminar air-flow hoods and kept in sealed vials showed no loss of potency when stored at 25°C or 5°C for 28 days." The 1981 Ketchum *et al.* paper reported the results of storing for 28 days at 25°C or 5°C very dilute (10μg/ml) doxorubicin hydrochloride solutions formulated with 0.9% sodium chloride solution. Stability was determined only by spectrographic testing.

The first part of Professor Clark's characterization of the 1981 Ketchum *et al.* paper, that the pH of a reconstituted solution was 3.8 to 6.5, does not relate to the solutions employed in the stability assays. Instead, the authors merely reported that "[t]he pH of [a reconstituted] solution, containing doxorubicin HCl 2 mg/ml, ranges from 3.8 to 6.5." That is, the 1981 Ketchum *et al.*

47

paper suggests a doxorubicin hydrochloride solution, without adjustment with an acid, falls somewhere within the pH range from 3.8 to 6.5; the 1981 Poochikian *et al.* paper indicated that a very dilute (20 μg/ml) solution had a pH of 6.2, the 1972 Arcamone *et al.* paper indicated a pH of 5.5, and the '285 patent indicates that a 2 mg/ml solution reconstituted with Water for Injection, USP had a pH of 5.2. However, the authors of the 1981 Ketchum *et al.* paper did not use a 2 mg/ml solution for the stability studies, and never reported the specific pH of either the reconstituted solutions they prepared as an intermediate step or the dilute doxorubicin solutions that were actually used in the stability studies.

The second part of Professor Clark's characterization of the 1981 Ketchum *et al.* paper is similarly inaccurate due to the choice of spectrographic analysis. As discussed above, by 1985, it was known to one of skill in the art that this was an unreliable method for monitoring stability of anthracycline glycosides, resulting in an underestimation of degradation and an overcalculation of stability. Given the shortcomings of the spectrophotometric method, it is not surprising that the 1981 Ketchum *et al.* paper reports virtually no loss of potency in dilute doxorubicin hydrochloride solutions stored at 25°C or 5°C for 28 days. It appears that the authors of the 1981 Ketchum *et al.* paper recognized the unreliability of the results presented since, although very minimal loss of potency was observed at 28 days, the authors concluded "reconstituted doxorubicin may be stored at either room temperature (25°C) or refrigeration (5°C) for seven days without a significant loss of potency."

The experimental conditions used in the stability studies reported in the 1981 Ketchum *et al.* paper render the results of no use to one of skill in the art of the '285 patent. First, the concentration of the doxorubicin solutions is so low, 10μg/ml, that one of skill in the art would not have considered these results reliable predictors of the stability of higher concentration

doxorubicin solutions as claimed in the '285 patent. As discussed above with respect to the 1983 Wassermann & Bundgaard paper, extreme dilution of solutions of anthracycline glycosides eliminates the possibility of precipitation and stacking effects, both of which could play a role in pharmaceutical acceptability of the solution. Second, no conclusion can be drawn from the data reported in the 1979 Hoffman *et al.* paper regarding the effect of variation of pH on the stability of anthracycline glycosides. After the dilute doxorubicin hydrochloride solutions were prepared for the stability assays, the pH levels were not varied, meaning that the dilute doxorubicin hydrochloride solutions were tested at only a single, unspecified pH. It would have been apparent to one of skill in the art in 1985 that the combination of the experimental conditions and the assay method used render these results reported in the 1981 Ketchum *et al.* paper irrelevant to the claims of the '285 patent, as well as questionable in accuracy. Therefore, one of skill in the art as of 1985 would not have been motivated to combine the 1981 Ketchum *et al.* paper with the 1985 Janssen *et al.* paper or the 1983 Wassermann & Bundgaard paper.

### 5.    The 1981 Poochikian et al. Paper

Finally, Professor Clark cites a 1981 paper by Poochikian *et al.*, suggesting that the paper "disclos[ed] that reconstituted solutions of anthracycline antibiotics, including doxorubicin and daunorubicin, stored in glass stoppered flasks were more stable at pH of 4.5 than at pH 6.2, 6.3 or 7.4." The 1981 Poochikian *et al.* paper related to a study, motivated by recent studies that had examined the advantages of administering doxorubicin by continuous intravenous infusion, to determine the stability of very low concentrations of four different anthracycline glycosides (10 $\mu$g/ml and 20 $\mu$g/ml solutions of doxorubicin, 20 $\mu$g/ml solutions of daunorubicin, 50 $\mu$g/ml solutions of zorubicin, and 128 $\mu$g/ml solutions of aclacinomycin A) in four different infusion

fluids. Nothing in the 1981 Poochikian *et al.* paper would have led one of ordinary skill in the relevant art to combine the paper with the 1985 Janssen *et al.* paper or the 1983 Wassermann & Bundgaard paper, or to believe that a more concentrated solution of anthracycline glycoside would demonstrate physiologically acceptable stability after having its pH adjusted to from 2.5 to 5.0 with specific physiologically acceptable acids.

As discussed above in relation to the 1985 Janssen *et al.* paper and the 1983 Wassermann & Bundgaard paper, the 1981 Poochikian *et al.* paper was expressly considered by those references and viewed as insufficient to allow for valid predictions on doxorubicin decomposition rates in acidic aqueous systems to be used in pharmaceutical practice. Given that express rejection by those two references, one of ordinary skill in the art would not combine them with the 1981 Poochikian *et al.* paper.

Even if one of ordinary skill in the art had not been instructed not to consider the 1981 Poochikian *et al.* paper, the nature of the study would lead one of ordinary skill in the art to recognize that the results would not be useful in determining whether anthracycline glycosides would be stable under the conditions claimed in the '285 patent. The research involved too many differences in conditions to allow it to be meaningful in relation to the '285 patent. First, just as similar very low concentrations would render the 1983 Wassermann & Bundgaard paper irrelevant, they would render the 1981 Poochikian *et al.* paper irrelevant. Second, the temperature at which the stability of anthracycline glycosides was measured was elevated, again making the data inapposite. Third, the infusion fluids in which the anthracycline glycosides were studied, not merely the pHs of those fluids, were different. That is, not only were the pH levels not adjusted by the physiologically acceptable acids described in the claims of the '285 patent, there were numerous other differences in the fluids. Because the pH levels of those infusion

50

fluids cannot be isolated from the other attributes of the fluids, any comparison based solely on pH would be inherently flawed.

The data reported in the 1981 Poochikian *et al.* paper shows that no conclusion can be drawn in relation to stability of anthracycline glycosides at a given pH. Zorubicin was shown to be least stable in a 5% dextrose injection fluid at pH 4.5 (the most acidic fluid tested) and most stable in a Normosol-R fluid at pH 7.4 (the most basic fluid tested). Daunorubicin was shown to be more stable in a Normosol-R fluid at pH 7.4 than in a Lactated Ringer's Injection fluid at pH 6.3, and aclacinomycin A was shown to be more stable in a 0.9% sodium chloride injection fluid at pH 6.2 than in a 5% dextrose injection fluid at pH 4.5 or a Lactated Ringer's Injection fluid at pH 6.3. Even if there were some value to the data, however, it would suggest that none of the anthracycline glycosides was stable. The $t_{90}$ values reported for all of the anthracycline glycosides is remarkably short, ranging from .35 hours (zorubicin in a 5% dextrose injection fluid at pH 4.5) to 108 hours (aclacinomycin A in a 0.9% sodium chloride injection fluid at pH 6.2).

In addition to reinforcing the notion that anthracycline glycosides have only short lifespan in solution under any pH conditions, the 1981 Poochikian *et al.* paper makes it clear that other issues may prevent their pharmaceutical uses:

> While stability of the drug admixture is an important consideration in the selection of an infusion fluid, consideration must also be given to the biological or pharmacological stability of this choice as it pertains to the patient's clinical situation. Also, the data are limited to physical and chemical determinants of stability.

For example, doxorubicin was noted to partially adsorb onto the glass surfaces of the container during the course of the experiment. That is, the $t_{90}$ values are not the only determinant of stability or physiological suitability, which Professor Clark ignored.

51

# VI. CONCLUSION

As detailed above, Professor Clark makes mistakes both in the approach he takes and the data he uses in that approach. He assumes an extrapolated $t_{90}$ value of some relatively short length would be sufficient to have a solution considered "stable" or "physiologically acceptable." That is not true. It is improper to extrapolate from lower pH to pH 2.5 to 5.0 because water-catalyzed reactions begin to predominate starting below a pH of 4.0 and predominate at a pH of about 4.0. It is improper to extrapolate from lower concentrations to those on the '285 patent because there are concentration effects, both stabilizing and destabilizing. It is improper to ignore the possibility of precipitation because that would make a solution not physiologically acceptable. Even in the case where there is no precipitation visible, it is improper to ignore the occurrence of toxic degradation products, such as the aglycone by-products of anthracycline glycoside degradation because these by by-products are toxic and did not precipitate as expected. In short, none of the references on which Dr. Clark relies, or any combination of the references on which he relies, teaches all of the elements of claims 1, 2, 3, 9, 11, 12, and 13 of the '285 patent. Furthermore, there is no reason to combine the references; the references themselves actually suggest that their teachings cannot be combined.

It was well known as of the 1985 priority date of the '285 patent that doxorubicin stability could be influenced by many factors: pH, light conditions, container materials, presence of oxygen, trace metal ions, concentration, temperature, ionic strength, buffer ions, etc. It was questionable whether any of the results reported in the cited papers were obtained from experiments which were executed under thoroughly standardized conditions. The stability required for an injectable anthracycline glycoside solution  was never suggested in the prior art

52

and could not have been expected as of 1985. That stability could not have been anticipated from the limited literature available prior to the priority date.

It is my opinion that person of ordinary skill in relevant art would have been aware that, as of the priority date of the '285 patent, anthracycline glycoside stability was a complex issue that was influenced by many parameters. In particular, for a drug like doxorubicin, it had been shown that reliable stability data under certain conditions could be obtained only when the stability tests had been performed under *exactly* the same conditions. I would therefore *never* have recommended somebody to make extrapolations from the data available at the priority date of the '285 patent, nor would any person of ordinary skill in the art at that time have accepted such a suggestion. It should therefore be clear that I would not have expected the formulation claimed in the '285 patent to be physically and chemically stable for at least eighteen months or more, so it is in my view certainly non-obvious to a person of ordinary skill in the art at that time.

Executed in Amsterdam, The Netherlands on September 26, 2005.

Jacob H. Beijnen, Ph.D.

# Exhibit A

69 page
Curriculum vitae of
Jos. H. Beijnen
omitted

## CERTIFICATE OF SERVICE

I hereby certify that copies of the forgoing were caused to be served this 26th day of September, 2005 upon the following in the manner indicated:

### BY HAND DELIVERY

Steven J. Balick
John G. Day
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

### BY FEDERAL EXPRESS

Reid L. Ashinoff
Brian T. Moriarty
William J. Sipio
David R. Baum
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020

James W. Parrett, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
                                    )
PHARMACIA & UPJOHN                  )
COMPANY LLC,                        )
                                    )
            Plaintiff,              )
                                    )
      v.                            )         Civil Action No. 04-833 (KAJ)
                                    )
SICOR INC. and                      )
SICOR PHARMACEUTICALS, INC.,        )
                                    )
            Defendants.             )
------------------------------------------------------x

## NOTICE OF SERVICE

The undersigned hereby certifies that copies of Plaintiff's Second Amended Initial

Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1); Expert Report of Federico Arcamone; and

Expert Report of Jacob H. Beijnen were caused to be served on September 26, 2005 upon the

following in the manner indicated:

### BY HAND DELIVERY

Steven J. Balick
John G. Day
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

### BY FEDERAL EXPRESS

Reid L. Ashinoff
Brian T. Moriarty
William J. Sipio
David R. Baum
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020

MORRIS, NICHOLS, ARSHT & TUNNELL


*/s/ James W. Parrett, Jr.*
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
   Attorneys for Plaintiff
   Pharmacia & Upjohn Company, LLC

OF COUNSEL:

Daniel A. Boehnen
Joshua R. Rich
Lara V. Fleishman
MCDONNELL BOEHNEN HULBERT
 & BERGHOFF LLP
300 S. Wacker Drive
Chicago, IL 60606
(312) 913-0001

September 26 , 2005

2

## CERTIFICATE OF SERVICE

I, James W. Parrett, Jr., hereby certify that on September 26th, 2005 I electronically filed the foregoing Notice of Service with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Steven J. Balick, Esquire
> John G. Day, Esquire
> ASHBY & GEDDES

I also certify that copies were caused to be served on September 26th, 2005 upon the following in the manner indicated:

### BY HAND

> Steven J. Balick, Esquire
> John G. Day, Esquire
> Ashby & Geddes
> 222 Delaware Avenue
> Wilmington, DE 19801

### BY FAX

> Reid L. Ashinoff, Esquire
> Brian T. Moriarty, Esquire
> William J. Sipio, Esquire
> David R. Baum, Esquire
> Sonnenschein Nath & Rosenthal LLP
> 1221 Avenue of the Americas
> New York, NY 10020

> */s/ James W. Parrett, Jr.*
> James W. Parrett, Jr. (#4292)
> Morris, Nichols, Arsht & Tunnell
> (302) 658-9200
> jparrett@mnat.com