IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY,    )
                               )    **REDACTED PUBLIC VERSION**
            Plaintiff,         )
                               )
       v.                      )    C.A. No. 04-833-KAJ
                               )
SICOR INC. and SICOR           )
PHARMACEUTICALS, INC.,         )
                               )
            Defendants.        )

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Reid Ashinoff
Michael S. Gugig
David R. Baum
Mirella Moshe Siskindovich
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Dated:  June 26, 2006

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT .................................................................................................... 4

I.   THE TERM "PHYSIOLOGICALLY ACCEPTABLE" IN CLAIMS 1, 9,
     AND 11-13 MEANS "SUITABLE FOR ADMINISTRATION TO
     HUMANS OR ANIMALS .................................................................... 4

II.  PHARMACIA OFFERS NO ALTERNATIVE TO DEFINING THE
     TRANSITION PHRASE "OF" TO MEAN "INCLUDING, BUT NOT
     LIMITED TO" IN CLAIMS 1, 9 AND 11-13 ........................................ 8

III. "ANTHRACYCLINE GLYCOSIDE" IN CLAIMS 1, 9 AND 11-13
     REQUIRES A NON-LYOPHILIZED PREPARATE ............................ 10

IV.  THE TERM "SEALED" IN CLAIMS 1, 9 AND 11-13 MEANS "CLOSED
     IN SOME FASHION SUCH THAT IT DOES NOT ALLOW THE
     PASSAGE OF THE SOLUTION" ...................................................... 19

V.   THE TERM "STORAGE STABILITY" IN CLAIM 9 MEANS THAT AT
     LEAST 90% OF THE ORIGINAL AMOUNT OF ANTHRACYCLINE
     GLYCOSIDE DISSOLVED IN SOLUTION REMAINS IN THE
     SOLUTION WHEN STORED AT A TEMPERATURE OF ABOUT
     4 °C OR 8 °C FOR A PERIOD OF AT LEAST 180 DAYS ................. 22

CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                    <u>Page</u>

*Bates v. Coe*,
　　98 U.S. 31 (1878)..............................................................................13

*Cephalon, Inc. v. Barr Laboratories, Inc.*,
　　389 F. Supp. 2d 602 (D. Del. 2005)..................................................15

*Cultor Corp. v. A.E. Staley Manufacturing Co.*,
　　224 F.3d 1328 (Fed. Cir. 2000)..........................................................15

*Goldenberg v. Cytogen, Inc.*,
　　373 F.3d 1158 (Fed. Cir. 2004)............................................................5

*Inverness Medical Switz. GmbH v. Warner Lambert Co.*,
　　309 F.3d 1373 (Fed. Cir. 2002)..........................................................16

*Markman v. Westview Instruments, Inc.*,
　　517 U.S. 370 (1996)..........................................................................13

*Nystrom v. TREX Co., Inc.*,
　　424 F.3d 1136 (Fed. Cir. 2005)............................................................5

*O.I. Corp. v. Tekmar Co.*,
　　115 F.3d 1576 (Fed. Cir. 1997)..........................................................15

*Phillips v. AWH Corp.*,
　　415 F.3d 1303 (Fed. Cir. 2005)................................................. *passim*

*Renishaw PLC v. Marposs Societa' Per Azioni*,
　　158 F.3d 1243 (Fed. Cir. 1998)......................................................9, 14

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
　　311 U.S. 211 (1940)..........................................................................13

*Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
　　242 F.3d 1337 (Fed. Cir. 2001)......................................................13, 14

*Tandon Corp. v. United States International Trade Commission*,
　　831 F.2d 1017 (Fed. Cir. 1987)............................................................5

*Texas Digital System Inc. v. Telegenix Inc.*,
　　308 F.3d 1193 (Fed. Cir. 2002)............................................................5

*Wang Laboratoriess, Inc. v. America Online*, Inc.,
    197 F.3d 1377 (Fed. Cir. 1999)...........................................................................14

*Watts v. XL Systems, Inc.*,
    232 F.3d 877 (Fed. Cir. 2001)............................................................................14

*White v. Dunbar*,
    119 U.S. 47 (1886)...........................................................................................13

Defendants Sicor Inc. and SICOR Pharmaceuticals, Inc. (collectively, "Sicor")
respectfully submit this Memorandum of Law in response to the claim construction brief filed by
plaintiff Pharmacia & Upjohn Company, LLC ("Pharmacia") (D.I. 232).[1]

## PRELIMINARY STATEMENT

Sicor's suggested construction of the disputed terms is grounded in the language of the
'285 patent, its specification, and prosecution history. In urging its suggested construction, Sicor
also relies on judicial authority in analogous cases, and has offered its views with the applicable
standard – how a person of ordinary skill in the art at the time of the invention would understand
the disputed term – always in mind.

On the other hand, Pharmacia's opening brief is remarkable in its inconsistency and
reliance, not on the intrinsic evidence associated with the '285 patent, but on fast and loose
language usage and extrinsic (purported expert) opinions about how this Court should construe
language as a matter of law. Patent claims are simply not to be interpreted in this fashion.
Nonetheless, Pharmacia asks this Court to do precisely that.

For example, with respect to the meaning of "physiologically acceptable," Pharmacia
generally refers to "well-established understandings" and purported "ordinary meanings" that
appear nowhere in the evidence intrinsic to the '285 patent (the claims, specification and
prosecution history). Apparently, Pharmacia believes that this Court should ignore the abundant
intrinsic evidence and rely instead on Pharmacia's self-serving assertions of what is "well
established" and "ordinary." However, this is not the law.

Similarly, Pharmacia states that the word "of" need not be interpreted because its
meaning is "obvious." But, in the very next sentence, Pharmacia concedes that "of" can have

---

[1]     Citations to Pharmacia's opening claim construction brief (D.I. 232) take the form of
"(Pharmacia Br. at __)." Citations to Sicor's opening claim construction brief (D.I. 234) take the
form of "(Sicor Br. at __)."

numerous different meanings, any one of which could apply to the '285 patent's claims. (Pharmacia Br. at 24). These statements are mutually exclusive.

In addition, when Pharmacia wants the Court to read language from the '285 patent's specification into the patent's claims, it argues that incorporation is proper. However, when incorporation would be disadvantageous to its litigation position, Pharmacia argues that it is impermissible. For example, Pharmacia asks this Court to read the phrase "stable, sterile and pyrogen-free" into the meaning of "physiologically acceptable" in Claim 1, but simultaneously states that it would be impermissible as a matter of law for the Court to define "anthracycline glycoside" as requiring a "non-lyophilized" formulation, even though from the earliest point in the prosecution of the '285 patent through its issuance Pharmacia distinguished its invention from the prior art specifically because it was non-lyophilized – and does so again in unambiguous fashion in its opening claim construction brief here.

As the party who drafted the '285 patent, its specification and the documents submitted to the U.S. Patent and Trademark Office ("USPTO") during the eight-year prosecution history and multiple rejections by the USPTO, Pharmacia should be held to account for the language it chose to employ. Pharmacia cannot now be permitted to run away from that language, or place strained interpretations upon it, as it attempts to do with respect to each of the disputed definitions.

Apparently dissatisfied with the words it used in the patent-in-suit and prosecution documents, Pharmacia offers bought and paid-for expert testimony to try and persuade this Court of the correctness of its suggested interpretation of the disputed terms. However, claim construction is a question of law for the Court. Consequently, the U.S. Court of Appeals for the Federal Circuit has long held that expert testimony regarding how a claim should be interpreted

is strongly *disfavored*. Yet, this is the type of purported "evidence" that Pharmacia asks this Court to credit.

However, in so doing, Pharmacia again speaks out of both sides of its mouth – urging the Court to rely on purported expert testimony to interpret claims, while stating in its June 12, 2006 letter to the Court: "[I]t is only the objective written record of the patent and prosecution history (read by one of skill in the art) . . . that are [sic] relevant to claim construction." (D.I. 239 at 3). Taking such inconsistent positions appears to be the hallmark of Pharmacia's claim construction analysis.

In short, for the reasons discussed below and in Sicor's opening claim construction brief, a person of ordinary skill in the relevant art, when reading the patent claims in the context of its specifications and prosecution history, would define the disputed terms in the same way as Sicor, and the Court should thus do the same.

**ARGUMENT**

I.    **THE TERM "PHYSIOLOGICALLY ACCEPTABLE" IN CLAIMS 1, 9, AND 11-13 MEANS "SUITABLE FOR ADMINISTRATION TO HUMANS OR ANIMALS"**

The fundamental problem with Pharmacia's proposed construction of the claim term "physiologically acceptable" is that in making its arguments, Pharmacia ignores its own language of the claims and specification. Instead, Pharmacia presents arguments based on its unsubstantiated presentation of extrinsic evidence, including unrelated patents, alleged "well-established understandings" and "ordinary meanings" that are set forth nowhere in the '285 patent claims or specification, and selected quotations from its paid expert witnesses in this case. To the extent that Pharmacia adverts to the prosecution history of the '285 patent, it presents snippets from filings addressed to claims that did not survive in the '285 patent as issued.

While not limited to the claims language, claim construction must start there. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). Claim 8 of the '285 patent states:

> A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefore; wherein said solution has a pH adjusted to 2.71 to 3.14 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

(Ex. A to Sicor Br: '285 Patent, Claim 8).[2]

In this unasserted claim, the inventors clearly and explicitly used the term "physiologically acceptable" to describe the solvent and acid, and the terms "stable, intravenously injectable, sterile, pyrogen-free" to describe the solution. As this Court, the U.S.

---

[2]    Citations to the '285 patent attached as Exhibit A to Sicor's opening claim construction brief take the form of ("'285 Patent").

Supreme Court, and innumerable Federal Circuit cases have held, when inventors use different

terms they are presumed to mean different things. "When different words or phrases are used in

separate claims, a difference in meaning is presumed. This principle of claim construction would

suggest that the difference in the use of terms has significance. . . ." *Nystrom v. TREX Co., Inc.*,

424 F.3d 1136, 1143 (Fed. Cir. 2005) (citing *Tandon Corp. v. United States Int'l Trade Comm'n*,

831 F.2d 1017, 1023 (Fed. Cir. 1987)), *superseding* 374 F.3d 1105 (Fed. Cir. 2004).[3]

There can be no disagreement that the language of Claims 1, 9 and 11-13 of the '285

patent, as drafted by Pharmacia, did not include any of the additional limitations "stable,"

"sterile," or "pyrogen-free." Pharmacia simply fails to make any showing, let alone an adequate

showing, to import these additional un-claimed limitations into these claims. There is no doubt

that Pharmacia could have amended Claims 1, 9 and 11-13 of the '285 patent to include the

language "stable, sterile, and pyrogen-free" if that was the interpretation it intended these claims

to have. In fact, Pharmacia amended the language that became Claim 1 of the '285 patent at

least four times during prosecution.

Furthermore, the inventors could have, but chose not to, define "physiologically

acceptable" anywhere in their claims or specification. Pharmacia turns proper claim construction

on its head by beginning its claim construction argument by citing two patents that are unrelated

to the '285 patent family (U.S. Patent Nos. 4,220,667 and 4,927,806). These unrelated patent

specifications are wholly extrinsic to and offer Pharmacia no help in construing the '285 patent.

*See Texas Digital Sys. Inc. v. Telegenix Inc.*, 308 F.3d 1193, 1211 (Fed. Cir. 2002) (holding that

an unrelated patent "sheds no light" on the claims of the patent at issue); *see also Goldenberg v.*

*Cytogen, Inc.*, 373 F.3d 1158, 1167 (Fed. Cir. 2004). In any event, unlike Pharmacia, the

patentees of the two patents on which Sicor relies chose to define in the patents' written

---

[3]    Between its two *Nystrom* opinions, the Federal Circuit's en banc *Phillips* opinion was
delivered.

specification the claim definitions that mattered to their invention. (*See* Exs. 23 and 24 to Pharmacia Br.: U.S. Patent No. 4,220,667, col. 2 lines 36-40, U.S. Patent No. 4,927,806, col. 3 lines 31-36). On occasion, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips,* 415 F.3d at 1316.

With respect to Claim 8 of the '285 patent, Pharmacia makes the illogical argument that "physiologically acceptable" means "sterile" and "pyrogen free," even though the inventors use those terms separately and distinctly. Pharmacia's reasoning, that since the solution of Claim 8 is "sterile, pyrogen-free" it must therefore consist of sterile, pyrogen free "physiologically acceptable" solvents and acids, not only is illogical, but also ignores the teachings of the '285 patent specification. The specification makes clear that the invention "also provides a process" for producing that sterile, pyrogen-free solution, specifically "passing the resulting solution through a sterilizing filter." ('285 Patent at 3:59-67). To the same point, every example in the '285 patent starts with "physiologically acceptable" components and applies this filtering process (which process does not materially change the elements of the solution) to obtain a sterilized solution. (*See, e.g.,* for example '285 Patent, at 6:65, 8:9, 12:20, 16:26). In this context, Pharmacia's construction argument, that its use throughout its patent claims of the term "physiologically acceptable" means that each of the so-described acids, solvents, and solutions are themselves necessarily "sterile and pyrogen free," makes no sense. If that were so, why would the invention provide a process for sterilization of the resulting solution?

Pharmacia's citations to the prosecution history of the '784 application have little, if anything, to do with Claims 1, 9 and 11-13 of the '285 patent, as they all relate to a different application claim (31) that contained the literal claim language "stable, intravenously injectable,

sterile, pyrogen-free."[4] Thus, arguments related to that application claim, which includes the limitations "stable, intravenously injectable, sterile, pyrogen-free," are not pertinent to the analysis of the claims of the '285 patent that do not contain the same literal language. The more pertinent sections of the prosecution history are those cited by Sicor in its opening brief (*see* Sicor Br. at 10-11), as well as by Pharmacia, where the inventors describe perchloric acid and Britton-Robison buffers as not physiologically acceptable. These responses by the inventors demonstrate once again that "physiologically acceptable" and "stable, sterile and pyrogen-free" are two distinct concepts; even if one sterilized and made the perchloric acid and Britton-Robison buffers pyrogen-free, they would still be unsuitable for administration to humans or animals, because they contain unacceptable substances and hence are not "pharmaceutically acceptable."

Lastly, Pharmacia's substantial reliance on testimony of its own experts Drs. Beijnen and Arcamone to vary the meaning of "physiologically acceptable" conferred by the intrinsic evidence is not well-placed. *See Phillips*, 415 F.3d at 1317-18 ("extrinsic evidence . . . is less significant than the intrinsic record in determining the legally operative meaning of claim language," "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court") (quotation marks omitted). Even setting aside that expert testimony is extrinsic evidence, Dr. Beijnen and Arcamone's cited expert deposition testimony on behalf of Pharmacia reflects, at best, their current opinion regarding only matters of general relevance to

---

[4]     Application Claim 31 of U.S. Patent Application Serial No. 878,784, which is the subject of the prosecution history excerpts that Pharmacia provides, reads (emphasis added):

> 31. a sealed glass container containing therein a ***stable, intravenously injectable, sterile, pyrogen-free*** doxorubicin anti-tumor composition in a solution which consists essentially of a physiologically acceptable salt of doxorubicin dissolved in a physiologically acceptable solvent thereof, wherein said solution has not been reconstituted from a lyophilizate, and wherein said solution has a pH from 2.7-3.1 and a concentration of said doxorubicin of from 0.1 to 100 mg / ml.

the '285 patent, not even their opinion as to what a person of ordinary skill in the art would have understood the term to mean at the time of the invention. *See id.* at 1313 ("[T]he ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."). Moreover, even if this testimony were on point, "extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* at 1318.

Pharmacia repeatedly references in its opening claim construction brief what it asserts to be the "ordinary meaning" of "physiologically acceptable," as if it has a monopolistic understanding of that term. However, as the discussion above shows, Pharmacia has provided no intrinsic support for its proposed construction of the term. The best reference of the ordinary meaning of "physiologically acceptable" remains Sicor's definition, which constitutes a part of Pharmacia's definition – "suitable for administration to humans or animals." Nothing offered by Pharmacia suggests otherwise.

## II.  PHARMACIA OFFERS NO ALTERNATIVE TO DEFINING THE TRANSITION PHRASE "OF" TO MEAN "INCLUDING, BUT NOT LIMITED TO" IN CLAIMS 1, 9, AND 11-13

Pharmacia's response to Sicor's proposed construction of the word "of" is no response at all. Pharmacia concedes that the word has "many slightly different meanings," many of which Pharmacia believes would be "equally appropriate in their use in relation to the claims of the '285 patent." (Pharmacia Br. at 24). Yet, Pharmacia does not concede that Sicor's proposed, open construction ("including but not limited to") is a correct one and, argues instead that, notwithstanding those many potential meanings, "there is no need to further construe the word." Pharmacia is simply wrong.

In *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998), the

United States Court of Appeals for the Federal Circuit rejected an argument similar to

Pharmacia's here. In that case, the Court construed the word "when" as it was used in a patent

claim. In so doing, the Court found that:

> 'when' is not a broad and general term when standing in isolation.
> Instead, it has several meanings, each of which may prevail based
> on the context.

*Id.* at 1251. As Pharmacia concedes, the same is true with respect to the word "of" in the '285

patent.

Pharmacia does not dispute that "of" is used as a transition term in the claims, but it

contends that this Court need not construe whether the transition is open (i.e., meaning

"including but not limited to"), closed (i.e., meaning "including only") or somewhere in between.

However, interpreting the transition phrase "of" is essential to determining the scope of the

disputed claims. For example, if "of" is a closed transition, many of the examples set forth in the

'285 patent could not be covered by the patented invention. As noted in Sicor's opening brief,

Examples 4 through 7 and 9 through 11 of the '285 patent each contain co-solubulizing and other

agents, such as polyvinylpyrrolidone, propylene glycol and ethanol. Unless the transition term

"of" is defined as "including but not limited to," such agents would be precluded from being

covered under the claims at issue.

Also discussed in Sicor's opening brief, in unasserted Claim 8 of the '285 patent, and in

its prosecution of the patent, Pharmacia used the transition phrase "consists essentially of" where

it wanted to say something other than an open construction. Indeed, Pharmacia concedes that its

use of the term "which consists essentially of" in Claim 8 "limits the scope of the claim to the

specified materials . . ." (Pharmacia Br. at 19). Especially read in this context, Sicor's proposed

construction of the transition term "of" as an open term meaning "including but not limited to," would be the definition understood by a person of ordinary skill in the field.

Pharmacia states that the term "of" need not be interpreted even though it admittedly could have many meanings. Pharmacia's position – to allow ambiguity to remain in construing its claims – makes no sense and should be rejected.

## III. "ANTHRACYCLINE GLYCOSIDE" IN CLAIMS 1, 9, AND 11-13 REQUIRES A NON-LYOPHILIZED PREPARATE

Pharmacia's argument here runs from the specification in the '285 patent. The '285 patent's specification and prosecution history steadfastly distinguish lyophilized anthracycline glycoside formulations from the covered invention at every turn. Pharmacia has not supported and cannot support with material intrinsic evidence its view that the '285 patent covers lyophilized forms of anthracycline glycosides.

The '285 patent's specification, description of the invention, and prosecution history highlight the *disadvantages* of lyophilized preparations, and extol the virtues of the non-lyophilized nature of the invention. Pharmacia's contentions that the "non-lyophilized limitation that Sicor proposes does not even appear in the specification," and that Sicor's proposed construction "ignores" and "contradicts" the intrinsic evidence (Pharmacia Br. at 25-26), are objectively false.[5] All of the intrinsic evidence expressly narrows the scope of the term "anthracycline glycoside" to cover only *non*-lyophilized preparations.

---

[5]    Further undermining its claim construction position here, Pharmacia's opening claim construction brief continues to forcefully press Pharmacia's argument that lyophilized anthracycline glycoside formulations are inferior to non-lyophilized preparates. (Pharmacia Br. at 5-6). Pharmacia's brief states (among other things):

"The fact that commercially available products with these active compounds [idarubicin, doxorubicin, etc.] were only available in lyophilized form as of 1985 constituted a *significant disadvantage* in their use." (Pharmacia Br. at 5) (emphasis added);

Commencing with the '285 patent's ABSTRACT, Pharmacia announces that its invention "has not been reconstituted from a lyophilizate":

> According to the invention there is provided a sterile, pyrogen-free, ready-to-use solution of an anthracycline glycoside, especially doxorubicin, which consists essentially of a physiologically acceptable salt of an anthracycline glycoside dissolved in a physiologically acceptable solvent therefor, *which has not been reconstituted from a lyophilizate* and which has a pH of from 2.5 to 6.5.

('285 Patent at ABSTRACT; *see also* '285 Patent at 1:56-58) (emphasis added).

The '285 patent's written description goes on to explain (among other things):

> At present, anthracycline glycoside antitumor drugs . . . are solely available in the form of *lyophilized* preparations, which need to be reconstituted before administration.

> Both the *manufacturing* and the reconstitution of such [lyophilized] preparations expose the involved personnel . . . to risks of contamination which are particularly serious due to the toxicity of the antitumor substances.

> \*\*\*

> As the risks connected with the *manufacturing* and the reconstitution of a lyophilized preparate would be highly reduced if a ready-to-use solution of the drug were available, we have developed a stable, therapeutically acceptable intravenously injectable solution of an anthracycline glycoside drug, e.g. doxorubicin, *whose preparation and administration does not require either lyophilization or reconstitution.*

> \*\*\*

---

"In fact, lyophilized formulations created additional risks for both the health care professional and the patient." (*Id.*);

"[H]ealth care professionals prefer ready-to-use drug solutions to lyophilized formulations because of the ease of use and reduction of handling-related risks." (*Id.* at 5-6);

"Thus, companies seeking to market injectable drugs generally disfavor lyophilized products, and commercialize such product forms only after having first attempted but failed to develop a ready-to-use solution." (*Id.* at 6).

- 11 -

> [The invention covered by the '285 patent] constitutes a *great advantage over the presently available lyophilized preparates*. . . .

('285 Patent at 1:22-60, 4:8-10) (emphasis added).

"Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of *what the inventors actually invented and intended to envelop with the claim*. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw*, 158 F.3d at 1250) (emphasis added). Here, the specification and written description leaves no doubt that the inventors intended and claimed to have invented a solution using a non-lyophilized form of anthracycline glycoside. Under well-settled authority from the United States Supreme Court and the United States Court of Appeals for the Federal Circuit, Pharmacia cannot ignore its own descriptions of its invention because it now finds those descriptions to be unhelpful in litigation. The Federal Circuit's *Phillips* case makes this clear, holding:

> The claims, of course, do not stand alone. Rather, they are part of a "fully integrated written instrument" consisting principally of a specification that concludes with the claims. For that reason, claims "must be read in view of the specification, of which they are a part." As we stated in *Vitronics*, **the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."**

*Phillips*, 415 F.3d at 1315 (internal citations omitted) (emphasis added).

"[T]he descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as *the words of the claims must be based on the description*. The specification is, thus, *the primary basis for construing the claims*." *Id.* (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)) (emphasis added). And, *Phillips* relies on voluminous Supreme Court authority – dating back more than a century – holding that

it is critical for courts to refer to specifications in interpreting patent claims. *See, e.g., Bates v. Coe*, 98 U.S. 31, 38 (1878) ("in case of doubt or ambiguity it is proper in *all cases* to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims") (emphasis added); *White v. Dunbar*, 119 U.S. 47, 51 (1886) (holding that the specification is properly resorted to "for the purpose of better understanding of the meaning of the claim"); *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 217 (1940) ("The claims of a patent *are always* to be read or interpreted in light of its specifications.") (emphasis added); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996) ("[A claim] term can be defined *only* in a way that comports with the instrument as a whole.") (emphasis added).

     The '285 patent's description of the invention distinguishes itself from lyophilized anthracycline glycosides over and over again. Pharmacia cannot avoid this intrinsic record and urge a broad, unsupported claim construction – and it surely cannot do so by misstating that no intrinsic evidence supporting Sicor's construction. Indeed, "the person of ordinary skill in the art [who is attempting to construe a claim] is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, *but in the context of the entire patent, including the specification*." *Phillips*, 415 F.3d at 1313 (emphasis added).

     Many Federal Circuit cases have employed precisely the analysis that Sicor urges here. In *Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337 (Fed. Cir. 2001), for example, the Federal Circuit addressed a closely analogous fact pattern. In that case, the Court construed the term "lumen" in a patent for a balloon dilation catheter. The question was whether the patent claim's use of the term "lumen" covered two types of lumen configurations, or only one of them (either "coaxial" or "dual" lumens). The Court found that the language of the patent's specification *disclaimed* the dual lumen configuration, and thus held

- 13 -

that only coaxial lumens were covered by the patent, *even though* the literal claim language was broad enough to cover both types of lumens.  In reaching this conclusion, the Federal Circuit succinctly held:

> Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.

*Id.* at 1341.

This is precisely the case here.  The specification (and even Pharmacia's opening brief) expressly distinguishes the invention covered by the '285 patent from the lyophilized formulations of anthracycline glycosides that existed in the prior art.  As the *Scimed* Court held, the mere fact that a claim term might be broad enough to encompass a certain feature does not mean that it in fact encompasses that feature, particularly where – like here – the patent's specifications disavow, and emphasize the disadvantages of, the feature in question.  The intrinsic evidence in this case makes clear that the anthracycline glycosides covered by the '285 patent are non-lyophilized, and that a non-lyophilized formulation was intended by the inventors. *See Scimed*, 242 F.3d at 1342-43 (limiting claim in part because the specification discussed the "disadvantages of certain prior art structures" which the patentee argued should be covered by the disputed claim); *Renishaw*, 158 F.3d at 1252 ("Renishaw's proffered construction of "when," . . . is so broad that it would require us to ignore the abounding statements in the written description that point decidedly the other way."); *Watts v. XL Systems, Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2001) (limiting seemingly broad patent claim based "on the words of the limitation, the specific disclosure of the [ ] patent, and the distinguishing remarks contained in both the specification and in the prosecution history of the patent"): *Wang Labs, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1382-83 (Fed. Cir. 1999) (finding that the word "frame" used in a patent

claim only applied to "character based systems" and not to "bit mapped display systems"
because the "only system that is described" in the specification "uses a character-based
protocol"); *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000) (holding,
based on the patent's written description, that a claim referring broadly to dissolving
polydextrose in water was limited only to polydextrose prepared using a citric acid catalyst,
because the specification disclaimed forms of water-soluble polydextrose prepared using other
catalysts); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581-82 (Fed. Cir. 1997) (limiting claims
based on the specification, which described only non-smooth or conical passages and
distinguished the covered invention over the prior art based on these characteristics).

Judge Farnan's recent decision in *Cephalon, Inc. v. Barr Labs, Inc.*, 389 F. Supp. 2d 602
(D. Del. 2005) is strikingly similar to the case at bar. In *Cephalon*, the issue was whether the
claimed drug-containing lollipop, whose specification only discussed formulations made from
dry materials (*i.e.*, powders), should be construed to require the absence of free liquid. The
patentee averred that the plain meaning of the claim language did not require the absence of free
liquid. Judge Farnan held otherwise, finding that the claim required the absence of free liquid
because the patentee, like Pharmacia here, consistently identified the absence of free liquid in the
specification: "[m]any of the [inventors'] statements [in the patent's specification] indicate that
the inventors viewed their invention as enveloping only the dry mixing and compression of
powders to form the drug-containing lollipops." *Id.* at 606. In the end, Judge Farnan found, in
accordance with *Nystrom* and *Phillips* that, "the consistent use of a claim term by the inventor in
the specification may serve to limit the scope of a claim." *Id.*

Precisely the same result is warranted here. Pharmacia described its invention as being
non-lyophilized in the patent's abstract and throughout its written description. The '285 patent's
specification goes to great lengths to distinguish the invention from the previously manufactured

lyophilized formulations of anthracycline glycosides. To be true to the written description, the meaning of "anthracycline glycoside" in the claims of the '285 patent must be limited to non-lyophilized forms of the drugs.

Pharmacia seeks refuge from its own patent description by citing to the '285 patent prosecution history regarding the "not reconstituted from a lyophilizate" limitation. As an initial matter, as this Court knows, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317 (citing *Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002)). Here, where the specification so clearly limits the claimed invention to the non-lyophilized form of the drug, the prosecution history would be of marginal additional value in construing this claim.

Notwithstanding this rule of construction, the prosecution history in this case only supports Sicor's construction, not Pharmacia's. That history is replete with Pharmacia's proclamations, throughout years of prosecution, that its invention is not reconstituted from a lyophilizate, thus distinguishing it from the prior art and the alleged problems and disadvantages of the then-existing lyophilized preparations. Pharmacia's statements include for example:

> The solutions according to the present invention are also <u>not</u> reconstituted from a lyophilizate according to the claims.....

> It would simply be an unnecessary expenditure of energy to lyophilize the material first and then prepare a storage stable solution from it.....

> Again, it is submitted that this limitation in the claims is a material limitation.

(Ex. A: Response to Office Action dated 12.23.87, '784 application, at 5 (PI 879))

(emphasis added).

In reference to American Journal of Intravenous Therapy and Clinical Nutrition: (1981), Vol. 8, no. 4, Pages 15-18 (Ketchum et al): "The solutions studied by Ketchum et al are therefore the opposite of those of the present invention, which must not have been reconstituted from a lyophilizate."

In reference to Cancer Treatment Reports (1983), 6, 133-142 (Garnick et al): "There is no suggestion in Garnick et al of the ready-to-use solutions of the invention which have not been reconstituted from a lyophilizate and whose pH has been adjusted to from 2.5 to 3.5 solely by means of a physiologically acceptable acid."

In reference to Cancer treatment Report (1981) 65, 21-27 (Savlov et al): "In all probability, the doxorubicin formulations have been reconstituted from lyophilized material as that was the only material available at the time. There is no suggestion in Savlov et al of the solutions of the invention."

In reference to Handbook on Injectable Drugs, Lawrence A. Trissel, Third Edition 1983: "In each case, only lyophilized material is described. The pH ranges relate to reconstituted solutions of the lyophilized materials. There is no disclosure or suggestion of the material of the invention."

(Ex. B: Information Disclosure Statement dated 2.25.92, '856 application, at 1, 3, 5-6

(SICOR-PNU 084160, 62, 64-65)).

The recitation of a sealed container, together with the requirement that the solution has not been reconstituted from a lyophilizate, effectively distinguishes Baurain et al.

(Ex. C: Response to Office Action dated 6.27.94, '742 application, at 3 (PU 0016225)).

The only portion of the prosecution history on which Pharmacia relies reflects its withdrawal of the words "not reconstituted from a lyophilizate" from its claim language, after the Examiner rejected the notion that the "not reconstituted from a lyophilizate" limitation alone could confer patentability. (Pharmacia Br. at 27). However, removing those words from its claim language did not at all mean that Pharmacia was in any way modifying its invention, as steadfastly described in the specifications. To the contrary, Pharmacia changed its claimed invention not a wit.

Moreover, Pharmacia throughout the prosecution history stood fast to the significance of non-lyophilization for its invention.  In the very PTO submission in which it deleted the express limitation from the claim, in the paragraph immediately following its statement to the Examiner that the claims language was being changed, Pharmacia (through its attorney Daniel Boehnen) stated:

> As explained more fully herein . . . the present invention permits
> [the solution] to be pre-packaged and sold as a ready-to-use
> solution product, *rather than to be reconstituted from lyophilizate*
> in vials by medical personnel in conventional manner.  *This novel*
> *property of the present invention* was completely unrecognized by
> the prior art . . .

(Ex. D: Response to Office Action dated 6.22.96, '742 Application, at 3 (PU 0015157)) (emphasis added).

Although Pharmacia's opening claim construction brief quoted its statements deleting the express non-lyophilized language from the claims, Pharmacia chose not to inform the Court that the paragraph in the USPTO submission immediately thereafter continued to forcefully distinguish the present invention from the prior art specifically on account of its non-lyophilized nature.  Simply put, Pharmacia may have removed the "not reconstituted from a lyophilizate" language from the wording of the claim, but it did not and could not change its invention.  And it is "what the inventors actually invented and intended to envelop within the claim" that matters. *Phillips*, 415 F.3d at 1316.

A person of ordinary skill in the art, reading the '285 patent in the context of its claims, specifications and prosecution history would undoubtedly view the term "anthracycline glycosides" to be limited to non-lyophilized forms, and the term should thus be construed in this fashion by this Court.

## IV.    THE TERM "SEALED" IN CLAIMS 1, 9, AND 11-13 MEANS "CLOSED IN SOME FASHION SUCH THAT IT DOES NOT ALLOW THE PASSAGE OF THE SOLUTION"

Pharmacia's claim construction brief attempts to muddy the water by misstating Sicor's proposed construction of the word "sealed." Sicor does not suggest that "sealed" be defined as "mere[ly] closed" as Pharmacia states on page 28 of its brief. Sicor suggests that "sealed" means much more than "merely closed;" it should be construed as meaning "closed in some fashion such that it does not allow the passage of the solution." (Sicor Br. at 18). As set forth in detail in Sicor's opening brief, this construction is amply supported by the plain and ordinary meaning of the word "sealed" in view of the specification and prosecution history of the '285 patent.

In an attempt to bolster its suggested interpretation, Pharmacia stretches the intrinsic evidentiary record beyond its seams, and relies almost exclusively on extrinsic purported evidence in proposing a much narrower construction of "sealed" that would require "securing against access, leakage and passage by a fastening, membrane or coating that must be broken to be removed." (Pharmacia Br. at 28). This formulation is not even remotely suggested in the '285 patent's claims, specification or prosecution history.

In fact, none of the four separate portions of the prosecution history cited by Pharmacia in support of its proposed construction say anything about a sealed container having to include "fasteners, membranes or coatings that must be broken." (Pharmacia Br. at 29-30). These portions of the prosecution history simply state that the container being used must be "sealed." This cannot undergird Pharmacia's proposed construction of the term "sealed."

In addition, the '285 patent's examples on which Pharmacia relies simply note that in the exemplary experiments set forth in the '285 patent aluminum caps were used. ('285 Patent at 6:8-10). Nowhere in the patent's claims, specification or prosecution history is the word "sealed" defined as narrowly as Pharmacia suggests. Only Pharmacia's last citation to the

specification offers even some guidance.[6] Yet, Pharmacia relies on that language only to support the unremarkable proposition that a "sealed container" is "something more than merely a 'closed container'." Sicor agrees, which is why its proposed construction defines "sealed" as meaning something more than simply "closed", *i.e.*, "closed in some fashion such that it does not allow the passage of the solution."

Without support in the intrinsic evidentiary record, Pharmacia turns to unhelpful extrinsic evidence. First in the form of statements from its retained expert witness, Dr. Beijnen, and second in the form of deposition testimony of Sicor's general counsel, Mr. Fach. As discussed above, the Federal Circuit has held that expert testimony (and all other extrinsic evidence for that matter) will provide little if any help to the Court regarding the meaning of disputed patent claim terms. *See Phillips*, 415 F.3d at 1317-18. Moreover, even if it were to be considered by the Court, the testimony of Dr. Beijnen does not support Pharmacia's proposed construction. Indeed, Dr. Beijnen's testimony says nothing about a "coating that must be broken to be removed," or other elements in Plaintiff's proposed construction. (Pharmacia Br. at 30). His testimony is silent on those issues.

Finally, and most outrageously, Pharmacia attempts to rely on the testimony of in-house Sicor counsel Wesley Fach in support of its claim construction position. Pharmacia concedes (as it must) that claim construction is based on the understanding of a person of ordinary skill in the relevant art at the time of the invention. (Pharmacia Br. at 14). However, as Mr. Fach testified, he is not a chemist, pharmacist or any other type of scientist. Mr. Fach is not even a patent lawyer. (Ex. E: Wes Fach Deposition dated May 3, 2006 at 11:23-24). In short, Mr. Fach bears

---

[6]     "A sealed container effectively precludes [subsequent] lyophilization, since to lyophilize an unlyophilized solution would necessarily involve removal of water from the container and destruction of the seal." (Pharmacia Br. at 30).

no resemblance whatsoever to a person of ordinary skill in the art of the '285 patent, even as Pharmacia defines it. (Pharmacia Br. at 16; Ex. E: Fach Dep. at 11-16, 20:10-21:3).

Moreover, as this Court is well aware, the only reason that Mr. Fach (and for that matter, Jessica Wolff, Sicor's outside patent counsel) were offered for deposition was in connection with Sicor's "advice of counsel" defense to Pharmacia's willful infringement claim. Indeed, this Court has bifurcated liability and willfulness specifically to avoid prejudicing Sicor by having a fact finder be apprised of willfulness-related evidence in considering liability. By relying on Mr. Fach's testimony for purposes of claim construction – which is solely a liability issue – Pharmacia is attempting to circumvent this Court's bifurcation order, and particularly the reasoning behind that order (*i.e.*, to avoid unfairly prejudicing Sicor by providing Pharmacia an unfair advantage in adjudicating liability).[7]

In short, Pharmacia's proposed definition of "sealed" is belied by the very intrinsic evidence on which this Court should rely in fulfilling its claim construction role. On the other hand, Sicor's suggested construction of "sealed" as meaning "closed in some fashion such that it does not allow the passage of the solution," is supported by the intrinsic evidence described in detail in Sicor's opening claim construction brief, and is in accord with how a person of ordinary skill in the relevant art at the time of the invention would understand its meaning after reading the patent's claims, specifications, and prosecution history.

---

[7]    Sicor respectfully moves to strike any use Pharmacia has made or may make in connection with claim construction or other liability issues, of documents and/or testimony provided exclusively on account of Sicor's advice of counsel defense to Pharmacia's willful infringement claim.

V.    THE TERM "STORAGE STABILITY" IN CLAIM 9 MEANS THAT AT LEAST
      90% OF THE ORIGINAL AMOUNT OF ANTHRACYCLINE GLYCOSIDE
      DISSOLVED IN SOLUTION REMAINS IN THE SOLUTION WHEN STORED
      AT A TEMPERATURE OF ABOUT 4 °C OR 8 °C FOR A PERIOD OF AT
      LEAST 180 DAYS

The parties' disagreement over the meaning of "storage stability" primarily revolves

around whether the storage time required to support a "stability" finding is 180 days (Sicor's

view) or 540 days (18 months) (Pharmacia's view).  Nothing in the '285 patent would provide a

person of ordinary skill in the art at the time of the invention the understanding, let alone the

required notice, that the storage time period necessary to support stability is 540 days.  The

examples set forth in the '285 patent suggest a wide range of storage time periods, yet none of

the examples suggests an 18-month storage time period for stability, nor does anything else in

the '285 patent support this now-asserted time period.  Moreover, all of the time periods set forth

in the examples of the '285 patent that are longer than 180 days were achieved only by

extrapolating actual stability testing results using a kinetic chemistry equation.  The actual

experiments in these examples were only for 3 weeks, 4 weeks, and 12 weeks ('285 Patent, 6:14-

16).

While extrapolation of data is common, the '285 patent does not provide the requisite

data to support its calculations.  In fact, when the Examiner asked Pharmacia to provide

underlying statistical data to support nearly identical stability assertions made by Dr.

Confalanieri in one of his declarations to the USPTO, Pharmacia did not provide it, and has not

done so since.  (Ex. F: Office Action dated 4.9.93 '742 application, at 5-6) (PU 0015027-

0015028)).  In addition, when Dr. Confalanieri testified in a Canadian deposition concerning a

related patent, he stated that he relied on such extrapolated data only for general direction, not

specific time periods.  (Ex. G: Deposition of Carlo Confalonieri dated February 17, 1999, pp.

61:5-64:1 (PU 0017596)).

Example 14 in the patent, on the other hand, provides <u>actual</u> testing data of 180 days, which Pharmacia curiously chose not to further extrapolate. Pharmacia's claim that 18 months is the appropriate storage time period for stability is nothing more than an arbitrary, after-the-fact choice, made to support its present litigation position.

The closest Pharmacia can come to stating that it conducted actual stability tests exceeding 180 days is a statement by one of the inventors that "in accordance with" an unspecified article, "one can conclude" that stability "can reach 18 months." (Pharmacia Br. at 33). This is a far cry from describing an actual experiment, and cannot support an 18-month stability finding when the only actual experiments discussed in the '285 patent, its specification, examples and prosecution history, demonstrate stability for a maximum of 180 days.[8]

Without the benefit of actual data to support its 18-month claim, Pharmacia resorts to the testimony of the expert it retained in this case, Dr. Beijnen. It is now beyond peradventure that expert testimony should not be relied upon in determining the meaning of claim language as a matter of law. The Federal Circuit made this perfectly clear in *Phillips*, holding:

> [C]onclusory, unsupported assertions by experts as to the definition of a claim term are *not useful to a court*.
>
> ***
>
> We have viewed extrinsic evidence [including expert testimony] in general as less reliable than the patent and it prosecution history in determining how to read claim terms, for several reasons. First, extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning. *** [E]xtrinsic evidence consisting of expert reports

---

[8]     Pharmacia's citations to inventor declarations stating that the solution is "extraordinarily stable," or that a "certain minimum stability is required," or that the solution "had to be stable in the long term," (Pharmacia Br. at 34-35) are meaningless. None of the declarations discuss specific lengths of time – they only speak in the most general of terms. In fact, the language relied upon by Pharmacia could as easily require 3-months of stability, 6 months of stability, 18 months of stability or even more. In other words, the inventor declarations relied upon by Pharmacia do not inform this stability discussion at all.

> *and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence.* The effect of that bias can be exacerbated if the expert is not one of skill in the relevant art or if the expert's opinion is offered in a form that is not subject to cross-examination.
>
> * * *
>
> In sum, extrinsic evidence may be useful to the court, but it is *unlikely to result in a reliable interpretation of patent claim scope* unless considered in the context of the intrinsic evidence.

*Phillips*, 415 F.3d at 1318-19 (emphasis added).

It surely would come as no surprise to anyone that Pharmacia's retained expert would testify in accordance with his client's litigation position. This is precisely why the Federal Circuit held that such testimony is not persuasive – particularly when the expert was testifying in 2006 concerning the meaning of language drafted one to two decades earlier, and did not even attempt to testify as to the opinion of a person of ordinary skill in the art at the time of the alleged invention, which is the relevant standard for claim interpretation. *See Phillips*, 415 F.3d at 1312-13 ("We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.' We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective date of the patent application.") (internal citations omitted). Dr. Beijnen's reliance on the 2005 version of a treatise discussing storage stability demonstrates its utter unreliability in assessing the meaning of the term in 1985 (Pharmacia Br. at 36), the time of the invention at issue here (Pharmacia Br. at 2 (seeking priority dating back to the 1985 filing of United Kingdom Patent Application Ser. No. 8519452, filed August 2, 1985)).

In short, Pharmacia's 18-month stability claim is unsupported by the intrinsic evidence, and would not be accepted by one of ordinary skill in the relevant art at the time of the invention.

The only objective intrinsic evidence concerning storage stability confirms that Sicor's suggested meaning of 180 days should be adopted.

## CONCLUSION

For the foregoing reasons, and those set forth in Sicor's opening claim construction brief, Sicor respectfully request the Court adopt the constructions discussed above for the disputed claim terms, as follows:

| Claim Language | Sicor's Proposed Construction |
|---|---|
| physiologically acceptable | suitable for administration to humans or animals |
| of | including, but not limited to, |
| anthracycline glycoside | requires a non-lyophilized preparate |
| sealed | closed in some fashion such that it does not allow the passage of the solution |
| storage stability | at least 90% of the original amount of anthracycline glycoside dissolved in solution remains in the solution when stored at a temperature of about 4 °C or 8 °C for a period of at least 180 days |

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Reid Ashinoff
Michael S. Gugig
David R. Baum
Mirella Moshe Siskindovich
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Jordan A. Sigale
SONNENSCHEIN NATH & ROSENTHAL LLP
8000 Sears Tower
Chicago, Illinois 60606
(312) 876-8000

Dated: June 19, 2006

170564.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of June, 2006, the attached **REDACTED PUBLIC VERSION OF DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF** was served upon the below-named counsel of record at the address and in the manner indicated:

Jack B. Blumenfeld, Esquire                                   <u>HAND DELIVERY</u>
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE  19801

Joshua R. Rich, Esquire                                       <u>VIA ELECTRONIC MAIL</u>
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606


*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon