# EXHIBIT C

769-249-0 DIV
769-206-0 DIV

## IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:          :

GAETANO GATTI, ET AL.          : EXAMINER:  PESELEV

SERIAL NO:  07/827,742         :

FILED:  JANUARY 29, 1992       : GROUP ART UNIT:  1803

FOR:  INJECTABLE READY-TO-USE :
      SOLUTIONS CONTAINING
      AN ANTITUMOR             :
      ANTHRACYCLINE GLYCOSIDE

### AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

Responsive to the Official Action mailed November 15, 1993, Applicants submit the following remarks.

### IN THE CLAIMS

31. (Three times amended)  A physiologically acceptable solution of anthracycline glycoside selected from the consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100mg/ml, wherein said solution is contained in a sealed container and has not been reconstituted from a lyophilizate.

PU 0016223

-2-

Cancel claim 32.

<u>REMARKS</u>

Claims 31, 33-38, 40, and 42 appear in this application.
Claim 31 has been amended to distinguish Applicants' solutions
from prior art solutions which are reconstituted from
lyophilizates. Basis for the amendment to Claim 31 is found
in canceled Claim 32. The claims stand rejected under 35 USC
103 as obvious over Japanese Patent no. 60-92212 in
combination with Baurain et al. (U.S. Patent No. 4,296,105)
and Arcamone et al.

> According to the Examiner,
>
> The Japanese patent discloses adjusting
> the pH of doxorubicin HCl-containing solution to 2.3
> with sulfuric acid. . .
> Baurain et al disclose adjusting the pH of
> doxorubicin HCl-containing solution to 4.0 with
> sulfuric acid. . .

Japanese application 60-92212 and Baurain et al. (U.S.
Patent 4,296,105) are both directed to anthracycline solutions
which are freeze-dried to form a lyophilizate, which is later
reconstituted in water immediately prior to use. The
recitation of a sealed container in Claim 31 distinguishes
Applicants' invention from the Japanese application and other
prior art references which involve lyophilizates. A sealed
container effectively precludes lyophilization, since to
lyophilize an unlyophilized solution would necessarily involve
removal of water from the container and destruction of the
seal.

The adjustment of the pH to 2.3 in the Japanese
application is directed to improving the poor <u>rate of</u>

PU 0016224

-3-

solvation of doxorubicin salts, which arises from their facility at forming relatively slow-dissolving gels when first placed in solution. The stability characteristics of these solutions is neither mentioned nor claimed. Consequently, Japanese application 60-92212 contains no teaching of long-term storage stable solutions of anthracycline glycosides, and does not suggest the storage-stable solutions achieved by Applicants.

As with the Japanese application, Baurain et al. does not teach stable solutions of doxorubicin or other anthracyclines. Instead, it is directed toward new derivatives of doxorubicin. The sulfuric acid treatment of the Baurain et al. solution is merely a step lasting ten minutes in the overall preparation of the doxorubicin derivatives claimed (Col. 3, lines 33-38). Consequently it does not teach or suggest Applicants' long-term storage stable solutions. The recitation of a sealed container, together with the requirement that the solution has not been reconstituted from a lyophilizate, effectively distinguishes Baurain et al.

The study conducted by Arcamone et al. was directed to ascertaining the stereochemical properties of adriamycin, not to achieving a new solution achieving long-term storage stability for such compounds. Arcamone et al. used a phosphate buffer, a known technique which does not suggest the use of acids as practiced by Applicants. Arcamone et al. simply prepared several solutions of adriamycin with the well-known phosphate buffers and recorded the "stability."

-4-

Moreover, the Arcamone et al. claim of achieving a stability of ">1 month" at pH ranges of 3 - 6 is vague, since the actual time over which the compound remained stable is not given, nor is there established any methodology by which stability is determined. Consequently, Applicants disagree with the Examiner's assertion that

> the instant claims [] encompass solutions which have the same stability as the prior art solutions and are therefore not patentable therefrom.

More to the point, neither Arcamone et al. nor any other reference teaches or suggests that strong acids may be substituted for phosphate or other buffers to obtain even equal storage stabilities. In fact, as demonstrated by Applicants, their anthracycline solutions provide superior storage stabilities to the Arcamone buffer solutions.

Prior to Applicants' development of storage stable anthracycline solutions, the practice of reconstituting such solutions from lyophilized powders was common in the prior art. The toxicity of these powders posed significant health risks to health care workers from accidental exposure during handling and reconstitution. By dramatically increasing the storage stability of anthracycline glycosides in solution over the prior art, Applicants' invention allows medical personnel to handle these compounds in sealed glass containers, substantially reducing the risk of accidental exposure.

In view of the above amendments and remarks, it is respectfully submitted that this application is now in

PU 0016226

-5-

condition for allowance.   Early notice to this effect is
respectfully requested.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Richard D. Kelly
Registration No. 27,757

Crystal Square Five - Fourth Floor
1755 South Jefferson Davis Highway
Arlington, VA    22202
(703) 413-3000
RDK/TLS

PU 0016227

# EXHIBIT D

Comm... B... 14...B

BOX A"

CERTIFICATE UNDER 37 CFR 1.8:  The undersigned hereby certifies that this Transmittal Letter and
the paper, as described in paragraph 1 hereinabove, are being deposited with the United States Postal
Service with sufficient postage as first class mail in an envelope addressed to:  Asst. Commissioner for
Patents, BOX AF, Washington, D.C. 20231 on the 28th day of June, 1996.

By _____ Daniel A. Boehnen _____

Daniel Boehnen

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF GAETANO GATTI, et al.        :

SERIAL NO.: 07/827,742        :        EXAMINER PESELEV

FILED:  JANUARY 29, 1992        :        GROUP ART UNIT: 1803

FOR:   INJECTABLE READY-TO-USE SOLUTIONS        :
           CONTAINING AN ANTITUMOR
           ANTHRACYCLINE GLYCOSIDE        :        RECEIVED

AMENDMENT UNDER 37 C.F.R. § 1.116        JUL 1 2 1996

GROUP 1800

ASSISTANT COMMISSIONER OF PATENTS & TRADEMARKS
BOX AF
WASHINGTON, D.C.  20231

SIR:

Responsive to the final Official Action mailed January 30, 1996, Applicants state:

## IN THE CLAIMS

Please amend independent Claims  31, 42, and 44  as follows:

31.    (Four times amended)      A physiologically acceptable solution of anthracycline

glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin

hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous

solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected

from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic

acid, and tartaric  acid, the concentration of said anthracycline glycoside being from 0.1 to

100mg/ml, wherein said solution is contained in a sealed container [and has not been

reconstituted from a lyophilizate].

1

PU 0015155

42. (Amended)    A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefore, [wherein the solution has not been reconstituted from a lyophilizate,] wherein said solution has a pH adjusted to 2.71 to 3.14 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/mL.

44. (Twice Amended)    A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, [wherein said solution has not been reconstituted from a lyophilizate].

Please cancel Claim 40, and add the following claims 45-47:

45.    The anthracycline glycoside solution of Claim 31, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

46.    The container of Claim 42, wherein said doxorubicin solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

47.    The anthracycline glycoside solution of Claim 44, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids. —

2

PU 0015156

<u>**REMARKS**</u>

<u>Introduction</u>

Claims 31, 33-38, 42, and 44 remain in this application. Prior Claim 40 has been canceled, and new claims 45-47 are submitted. Applicants had previously paid for Claims 31-42, so no new fee is required. None of these changes raise any substantial new issue, and they place the application in condition for allowance. Reconsideration of this application, as amended, is respectfully requested.

The Claims of this application were previously drafted in a way that distinguished Applicants' solutions from certain prior art products which are reconstituted from lyophilizate powder in vials by medical personnel at the time of drug administration. The comments of the Examiner in the last Office Action indicated that whether the solution was reconstituted from lyophilizate is immaterial because patentability must reflect the inherent properties of the claimed solution and the prior art. Consistent with the Examiner's comments, Claims 31, 42, and 44 are now amended (by deleting the lyophilizate limitation) to show that the important and *claimed* properties of the present invention do arise from the inherent properties of the solution, regardless of whether the solution is prepared from lyophilizates in vials.

Along those same lines, the novel property of the claimed solution relates to its capacity for long term storage stability. As explained more fully herein, this long term storage stability of the present invention permits it to be pre-packaged and sold as a ready-to-use solution product, rather than to be reconstituted from lyophilizate in vials by medical personnel in conventional manner. This novel property of the present invention was completely unrecognized by the prior art and provides the basis for satisfying a long felt need and achieving commercial success. Also

3

PU 0015157

importantly for patentability, these aspects of the invention establish a motivation to achieve

something new and different, a factor which is necessary for a finding of obviousness under

§103, but was completely lacking from the prior art

## Double Patenting Rejection

The Examiner has rejected all of the claims on the grounds obviousness-type double

patenting over U.S. Pat. No. 4,946,831.  Applicants note that, in the Office Action mailed

11/15/93, the Examiner indicated that the terminal disclaimer, although re-submitted by

applicants, has not been found in the file.  Applicants acknowledge that they will file a new

terminal disclaimer to obviate the double patenting rejection.  Applicants request that this be

held in abeyance until agreement on patentable subject matter has been reached.

## Obviousness Rejection

The Examiner has also rejected all of the claims under 35 U.S.C. §103 as being

unpatentable over the Japanese patent no. 60-92212 in combination with Baurain et al. (U.S. Pat.

No. 4,296,105) and Arcomone et al.  Applicants respectfully request reconsideration of this

rejection and allowance of the pending claims.

Before discussing the rejection in detail, it is important to note that the entire thrust and

purpose of the present invention is to achieve technology enabling the long term storage of

doxorubicin in solution, preferably in a pharmaceutically acceptable solution.  There is no

question but that none of the prior art cited by the last Office Action are even remotely directed

toward achieving a long term storage stable solution of doxorubicin.  JP 60-92212 is directed

toward the discovery of formulations of doxorubicin salts that "are capable of being completely

4

PU 0015158

dissolved [from reconstitute] in saline solutions within a very short span of time." *See* the first full paragraph on p. 3 of the reference. Baurain is directed to the discovery of N-leucyl-doxorubicin and its salts, as a new active ingredient. Arcomone is directed to a generalized explanation of the structural and physiochemical properties of doxorubicin, including solubility, spectroscopic characteristics, stability, and analytical methods for determining same. However, as will be detailed below, to the extent that Arcomone discussed stability, the references expressly teaches *away from the present invention*, *i.e.,* by teaching that doxorubicin has a stability in solution of only a few hours when pH is adjusted with HCL and only a few weeks when pH is adjusted to the range of 3-6 (using a something other than an acid to adjust the pH.) The bottom line is that, to the extent JP 60-92212, or Baurain, or Arcomone have any similarity to the claimed invention beyond merely dealing with doxorubicin, the similarities result from pure happenstance, and have nothing to do with the goals and objectives of the present invention.

The last Office Action implicitly acknowledges that all of the elements of the claimed invention were *not* found in a single prior art reference. That is, by virtue of rejecting the claims under Section 103, rather than Section 102, the Office Action acknowledges that the subject matter of the present invention claims is different from the prior art.

In particular, the Office Action relies upon the teaching of a single example in JP 60-92212 that discloses adjusting the pH to a level of 2.3, and the Office Action acknowledges that this pH of 2.3 is below the pH range of 2.5-5.0 that is taught and claimed in the present invention. However, the Office Action holds that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results."

As to Baurain and Arcomone, the Office Action fails to acknowledge how or why these references differ from the present invention. Apparently, however, the Office Action relies upon

5

PU 0015159

these references only to disclose the existence of doxorubicin solutions at pH higher than 2.3. Thus, Baurain discloses a doxorubicin salt solution at pH of 4.0, and Arcomone discloses a doxorubicin salt solution at pH of 3-6. The Office Action holds that, "a person of ordinary skill in the art would have been motivated to adjust the pH of anthracyline glycoside-containing solution to higher pH such as pH 4 disclosed by Baurain et al. or higher as disclosed by Arcomone et al with other physiologically acceptable acid, as disclosed by Baurain et al., because such a person would have expected the resulting solutions to have similar stabilities."

Applicants respectfully submit that there are at least four (4) fundamental problems with the rejection in the last Office Action.

- There is no basis on this record for the motivation holding, *i.e.*, for holding that a person of ordinary skill would have been motivated to increase the pH of JP 60-92212 to the higher levels of Baurain and/or Arcomone. Rather, the only motivation for such combination arises via hindsight reliance on the teaching of the present invention.

- Assuming *arguendo* that a person of ordinary skill was motivated to combine the references in order to achieve a "similar stability" (as suggested in the Office Action), the question is similar to what? The only teaching *vis a vis* "stability" to be found anywhere in the present references is a teaching that doxorubicin solution is *not* stable as per the invention. *See* Arcomone, p.21.

- By ignoring the other differences between the claimed subject matter and the prior art, the Office Action does a disservice to the claimed invention. Assuming *arguendo* that a solution was made by following a combination of the references, the resulting combination does not fall within the pending claims.

6

- Scientific test data comparing the stability of the claimed subject matter to the stability of the solution of JP 60-92212, shows that stability of the claimed invention (pH 2.5-50) is unexpectedly higher than the stability of the JP 60-92212 solution (pH 2.3).

For at least these reasons, Applicants respectfully request that the present rejection be withdrawn and the claims be allowed. Once Applicants thereafter submit an appropriate terminal disclaimer, the claims should be passed to issue.

### Lack of Motivation for Combination

As previously noted, there is absolutely nothing in any of the cited references that refers to a possible improvement in the long term storage stability of doxorubicin solutions. These references are oblivious to the problem, much less the solution. More likely, the authors of these references merely accepted the general belief (prior to the invention) that doxorubicin could not be prepared into long term storage stable solutions, and, thus, the authors never explored nor considered the possibility. In any event, none of the references – alone or in combination – provide any motivation for a person skilled in the art to pursue, adapt, modify, or combine any of the references toward any common goal, much less the goal of achieving a long term storage stable solution of doxorubicin hydrochloride.

To the contrary, JP 60-92212 fails to provide any teaching or suggestion that varying pH may have any effect (either negative or positive) on the doxorubicin solution. The same is true of Baurain. Although Arcomone discloses several examples with differing pH, the examples vary several parameters at the same time, such that it is impossible to draw any conclusion on how to achieve a long term storage stable solution of doxorubicin.

7

PU 0015161

### The References Teach a *LACK* of Stability

The Office Action suggests that a person of ordinary skill would be motivated to combine the references to achieve "similar stability." It is only fair to ask, what does the Examiner mean by achieving similar stability? If the intention is achieve similar stability to the claimed invention, then Applicants respectfully submit that proves that the Examiner was relying upon hindsight reason to combine the references. If the intention was to achieve similar stability to the most stable prior art solution, then Applicants respectfully submit that references expressly taught that such resulting solution was *not* long term storage stable.

As previously noted, neither JP 60-92212 nor Baurain even mention storage stability of the solution. Rather, both of those references focus on products which are lyophilized, presumably because it was recognized that they were *not* stable. The only reference that provides any express teaching as to storage stability is the Arcomone reference, and this reference expressly teaches that the only way to achieve long term storage stability for doxorubicin is via lyophilization, because the solutions are *not* stable.

> "Adriamycin [doxorubicin] hydrochloride is stable in the solid state . . . . The stability of aqueous solutions of adriamycin varies with pH and the buffer concentration (Table 2 and Fig. 12) as established on the basis of spectrophotometric and chromatographic analysis."

*See* p. 21 of Arcomone. Table 2 indicates that doxorubicin in solution with HCL is stable for less than 20 hours. HCL is the only acid discussed vis a vis stability. Table 2 further indicates that doxorubicin in solution can be stable for more than a month at pH 3-6 when a phosphate buffer is used. Fig. 12 provides more specific information on the use of phosphate buffers with doxorubicin solutions; specifically, Fig. 12 indicates that a 90% stability of doxorubicin in phosphate buffered solution will expire in about 10 days. In sum, these references — considered alone or in combination — teach away from, not toward, the present invention.

8

PU 0015162

### The Hypothetical Combination Is Different Than The Claimed Invention

Assuming *arguendo* that a person of ordinary skill were motivated to combine the cited references, the resulting combination would be different than the claimed subject matter. The Baurain reference differs from the pending invention in several respects, most notably in that Baurain adds L-leucine carboxyanhydride to the pH 10.2 solution. Although Baurain teaches that the pH of the solution is thereafter reduced to pH 4, the purpose and result of doing so is to convert the doxorubicin hydrochloride to N-(L-leucyl) doxorubicin. Thus, assuming a person were to combine JP 60-92212 and Baurain, the result would be a solution of N-(L-leucyl) doxorubicin at pH 4, rather than the present claimed invention. There is no basis to conclude that the resulting combination would comprise doxorubicin hydrochloride solution at the requisite doxorubicin concentration level and the requisite pH level.

Similarly, Arcomone teaches that doxorubicin solutions may be adjusted to a pH of 3-6 using a phosphate buffer solution, or to a pH of 1-2 using HCl. Arcamone presents these as alternatives, and fails to teach or suggest in any way that the acid (rather than the buffer) should be used when adjusting pH to 3-6. (Note: Arcomone teaches at Table 2 that HCL used to adjust the doxorubicin solution will achieve a stability of *less than 20 hours*. Thus, Arcamone teaches away from using HC1 to adjust pH for long term storage stability.) Assuming a person were to combine JP 60-92212 and Arcomone, the result would be solution of doxorubicin hydrochloride in which the pH was adjusted by phosphate buffer, rather than HCL as required by the pending claims. There is no basis to conclude the combination of JP 60-92212 and Arcomone would comprise doxorubicin hydrochloride solution at the requisite pH level.

9

PU 0015163

<u>Scientific Evidence Establishes An Unexpected Stability Difference</u>

It is important to recognize that the claimed subject matter is based upon using particular acids to adjust the pH of the solution to a particular pH range. Applicants have demonstrated time and again in comparative data in this application that the resulting solution exhibits surprisingly better long term storage stability than solutions having a pH outside the recited pH range or using a buffer other than the claimed acids to adjust the pH.

Lest there be any doubt on this point, Applicants are submitting herewith yet another declaration still further addressing the issue of stability. *See* Declaration of Carlo Confalonieri, filed herewith. Applicants have prepared four different solutions. The first solution involves following the procedure of example 6 of the JP 60-92212 patent except modified as to the amount of the material made. The pH of the solution was 2.3 as taught in JP 60-92212. This first solution also contained the mannitol excipient of example 6 of JP 60-92212. Two other solutions not containing the mannitol excipient of the Japanese patent were also prepared having a pH of 2.3, one having a concentration of 2mg/ml and one having 5mg/ml concentration. A fourth solution prepared in accordance with the present invention has a pH of 2.5 and a concentration of 2 mg/ml. As can be seen from the enclosed declaration of Dr. Confalonieri, the solution prepared according to the present invention, having a pH of 2.5, exhibited superior stability as compared with each of the solutions having a pH of 2.3. Indeed, the solution having the mannitol excipient taught in the Japanese patent resulted in a composition which had a worse stability than the corresponding composition not containing the excipient. *See* the results of 35°C. (Note: The one and four week stability of the 2.3 pH solution not containing the excipient was superior to the 2.3 pH solution containing the excipient at 45°C, thus demonstrating that the Japanese patent could not have been concerned with long-term storage

10

PU 0015164

stability.) More importantly, the solution having a pH of 2.5 according to the present invention exhibited significantly better stability than each solution having a pH of 2.3 at all temperatures.

These results conclusively demonstrate that solutions having pH 2.5, adjusted by HCL, achieve unexpected and nonobvious results in storage stability *vis a vis* solutions having a pH 2.3. Perhaps more important, these results directly contradict and disprove that a doxorubicin solution having a pH of 2.3 has the same stability as a doxorubicin solution having a pH of 2.5.

The last Office Action held that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results." Accepting *arguendo* the statement in the last Office Action as to what a person of ordinary skill in the art would have expected, the evidence submitted herewith proves that expectation is incorrect. Thus, the basic assumption of the rejection in the last Office Action is incorrect. That error, without more, warrants reconsideration and reversal of the rejection.

**Secondary Evidence of NonObviousness**
**Also Provides Strong Evidence of Patentability**

The evidence presented above as to the differences, results, and motivations of the claimed invention *vis a vis* the prior art fully establishes the patentability of the present invention. Above and beyond that evidence, however, the additional available evidence as to secondary considerations of non-obviousness further confirms the patentability of the claimed invention. The examiner should keep in mind the fact that the present invention is not a paper patent but is one which has found commercial success and has solved a long felt need. If it was so obvious to adopt the technique of the present application, it certainly would have been done much earlier given the problem which has been solved.

11

PU 0015165

In *Stratoflex, Inc. v. Aeroquip Corp.* 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed. Cir. 1983), the Federal Circuit Court of Appeals said:

> [E]vidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness. *In re Sernaker*, 702 F.2d 989, 217 USPQ 1 (Fed. Cir. 1983) citing *In re Fielder and Underwood*, 471 F.2d 640, 176 USPQ 300 (CCPA 1983), *see In re Mageli et al.*, 470 F.2d 1380, 1384, 176 USPQ 305, 307 (CCPA 1973) . . . . Indeed, *evidence of secondary considerations may often be the most probative and cogent evidence in the record.* (Emphasis in original.)

After reviewing a decision which failed to give due consideration to evidence of the secondary considerations of non-obviousness, the Federal Circuit Court of Appeals reversed, noting that such evidence is not relegated to second-class status, and whether to consider such evidence is *not* discretionary:

> That approach was error. All evidence bearing on the issue of obviousness, as with any other issue raised in the conduct of the judicial process, must be considered and evaluated *before* the required legal conclusion is reached.

*W.L. Gore & Associates, Inc. V. Garlock, Inc.*, 721 F.2d 1540, 1555, 220 USPQ 303, 314 (Fed. Cir. 1983) (emphasis in original). *See also Minnesota Min. and Mfg. V. Johnson & Johnson*, 976 F.2d 1559, 1573 (Fed. Cir. 1992) ("Objective evidence such as commercial success, failure of others, long-felt need, and unexpected results must be considered before a conclusion on obviousness is reached."); *and see Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725 (Fed. Cir. 1990).

"The rationale for giving weight to the so-called secondary considerations is that they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). As the United States Supreme Court has stated:

> These legal inferences or subtests do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of

12

PU 0015166

judicial treatment than are the highly technical facts often present in patent litigation.

*Graham v. John Deere Co.*, 383 U.S. 1, 35-36, 86 S.Ct. 684, 702-03, 15 L.Ed.2d 545, (1966);

As to evidence of long felt need and/or failure of others, Judge Learned hand has stated, "... the length of time the art, though needing the invention, went without it" is one of the best non-technical considerations for determining whether a patented invention is unobvious. *Safety Car Heating co. v. General Electric Co.*, 155 F.2d 937, 939 (2d. Cir. 1946). *See also Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1099 (Fed. Cir. 1985), *vacated,* 475 U.S. 809 (1986), *on remand,* 810 F.2d 1561 (Fed. Cir. 1987), *cert. den.,* 481 U.S. 1052 (1987), *later proceeding,* 836 F.2d 1329 (Fed. Cir. 1987). The evidence of long felt need and failure of others in this case is particularly enlightening in this case.

What applicants have surprisingly discovered is that the combination of pH and the pH adjusting means has allowed them to produce a storage stable solution of these anthracyclines. As the examiner is aware, anthracyclines have demonstrated significant value in the treatment of various cancerous tumors. while the anthracyclines have the benefit of tending to destroy cancerous tumors, they also have the detriment of serious side effects, including the destruction of heart muscle. These destructive capabilities are exhibited not only when the drug is injected, but also when the drug becomes ingested such as by inhalation, contact with the skin and the like. These latter exposures are significant to the health care personnel. Prior to the present invention, it was necessary for the health care personnel to dissolve the dry, lyophilized anthracyclines before administering same to the patient. This step of dissolving the lyophilized dry anthracycline created the possibility of direct exposure of the medical personnel to the anthracycline. Over time, such continued exposures could have significant adverse consequences. Thus, the present invention satisfies a long felt need.

13

PU 0015167

Applicant has previously submitted numerous affidavits in support of commercial success and the long felt need solved by this invention. In particular, Declarations of William J. Dana, and Mary Horstman, and Debra Holton-Smith were previously filed in related case S.N. 06/878,784. For the convenience of the Examiner, copies of these declarations are enclosed and submitted now for consideration in this case.

Conclusion

In view of the foregoing amendment and remarks, it is respectfully submitted that this application is in condition for allowance. Early notice to this effect is respectfully requested.

Respectfully submitted,

June 28, 1996

Daniel A. Boehnen, Reg. No. 28,399
Emily Miao, Ph.D., Reg. No. 35,285
BANNER & ALLEGRETTI, LTD.
Suite 3000
10 South Wacker Drive
Chicago, Illinois 60606
312-715-1000

14

PU 0015168

769-249-0 DIV
769-206-0 DIV

CERTIFICATE UNDER 37 CFR 1.8: The undersigned hereby certifies that this Transmittal Letter and the paper, as described in paragraph 1 hereinbelow, are being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Asst. Commissioner for Patents, BOX AF, Washington, D.C. 20231 on this 28th day of June, 1996.

By _Daniel L. Boehnen_
      Daniel Boehnen

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF GAETANO GATTI, et al.    :

SERIAL NO.: 07/827,742    :    EXAMINER PESELEV

FILED:  JANUARY 29, 1992    :    GROUP ART UNIT: 1803

FOR:  INJECTABLE READY-TO-USE SOLUTIONS    :
        CONTAINING AN ANTITUMOR
        ANTHRACYCLINE GLYCOSIDE    :

RECEIVED

JUL 12 1996

GROUP 1800

SUBMISSION OF DECLARATIONS IN SUPPORT OF
AMENDMENT UNDER 37 C.F.R. § 1.116

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

Applicants are filing herewith an Amendment Under 37 C.F.R. §1.116 in the above-identified case.  The Amendment refers to and incorporates by reference several Declarations that have been previously filed in other cases dealing with related subject matter.  In particular, the declarations present information on long felt need, commercial success, and scientific testing that establishes differences between the prior art and the subject matter of the present invention. In order to establish a clear record, Applicants note that the Declarations submitted herewith include Declarations Under Rule 1.132 of the following individuals:

1.    William J. Dana, dated June 16, 1988, and filed in case S.N. 06/878,784;

2.    Mary Horstman, dated June 2, 1988, and filed in case S.N. 06/878,784;

3.    Debra Holton-Smith, dated May 24, 1988, and filed in case S.N. 06/878,784;

4.    Carlo Confalonieri, dated 21 May 1991, and filed in case S.N. 07/503,856;

PU 0015169

5.   Carlo Confalonieri, dated December 20, 1990, and filed in S.N. 07/503,856; and

6.   Carlo Confalonieri, dated March 10, 1987, and filed in S.N. 06/878,784, and refiled as

      Exhibit C to the Confalonieri Declaration dated Dec. 20, 1990 in S.N. 07/503,856

Respectfully submitted,

June 28, 1996

Daniel A. Boehnen, Reg. No. 28,399
Emily Miao, Ph.D., Reg. No. 35,285
BANNER & ALLEGRETTI, LTD.
Suite 3000
10 South Wacker Drive
Chicago, Illinois 60606
312-715-1000

PU 0015170