# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PHARMACIA & UPJOHN COMPANY, | } | |
| v. | } | Case Action No. 04-833 |
| SICOR, INC. and SICOR | } | |
| PHARMACEUTICALS, INC., | } | |

<u>Expert Report of Douglas S. Clark, Ph.D.</u>

I, Dr. Douglas Clark, if called to testify in the above-captioned matter presently expect to testify with regard to the opinions, and the bases and reason therefore, expressed below:

## I. QUALIFICATIONS AND CREDENTIALS

I am currently a tenured full Professor of Chemical Engineering at the University of California, Berkeley ("U.C. Berkeley"). From 1995-1998, I served as Vice-Chairman of the Chemical Engineering Department of U.C. Berkeley. U.C. Berkeley is one of the world's premier universities, and our Chemical Engineering Department is consistently ranked among the top three chemical engineering departments in the country. While at U.C. Berkeley, I have taught classes in chemical kinetics and chemical reactor design, unit operations (e.g., individual processes used in the manufacture and formulation of chemical and pharmaceutical products), heat and mass transfer, and biochemical engineering, as well as laboratory courses in transport phenomena and biochemical engineering. Material covered in chemical kinetics and chemical reactor design, unit operations, and biochemical engineering (which includes drug formulation) is particularly relevant to the issues that I have been asked to consider.

I received my B.S. in Chemistry from the University of Vermont in 1979 (*Summa Cum Laude*) and my Ph.D. in Chemical Engineering from the California Institute of Technology ("CalTech") in 1983. CalTech has been consistently recognized as one of the preeminent science and technology academic institutions in the world. From 1984 to 1986, I was an Assistant Professor of Chemical Engineering at Cornell University. While

1

I have been asked to determine the qualifications and experience of "those of ordinary skill in the art." I have been told that the way to make this determination is to identify the problems to be solved by the '285 patent and define the background of persons who, in my experience, would be qualified to resolve those problems. I was also told that I was to read and consider the '285 patent and other publications I discuss herein based from the standpoint of "those of ordinary skill in the art."

The problem described in the '285 patent is to find the conditions under which physiologically acceptable solutions of anthracycline glycosides, which were not reconstituted from a lyophilizate, would have "good stability" ('285 patent, 4:13-21). Based on my various experiences described above, I believe this type of problem would ordinarily be resolved by a scientist or engineer with an advanced degree and/or experience in chemistry, pharmaceutical science, bioengineering and/or similar fields. This person would need laboratory experience with various analytical chemistry techniques and a working knowledge of chemical reaction kinetics, with an emphasis on theoretical and experimental techniques for determining stability parameters for organic compounds. From this background, these persons of ordinary skill in the art would be intimately familiar with accelerated stability testing, Arrhenius plots and their use in extrapolations, and $t_{50\%}$ and $t_{90\%}$ calculations.

The specific measures of doxorubicin HCl stability reported in the '285 patent, $t_{90\%}$ values at 4°C and 8°C in particular, were determined from extrapolations based on actual measurements from accelerated stability studies of doxorubicin HCl degradation taken at various higher temperatures. In particular, the '285 patent acknowledges that "[t]he extrapolation of the analytical data in order to determine the time when the 90% of the initial assay could be expected ($t_{90\%}$ value) was made following an Arrhenius plot. . . . This procedure of analytical data treatment is well known and widely used and described in the art: see, e.g., Chemical Stability of Pharmaceuticals, Kennet A. Connors, Gordon L. Amidon, Lloyd Kennon, Publ. John Wiley and Sons, New York, N.Y., 1979" ('285 patent, 5:45-53). The '285 patent says that similar stability data "can be observed for other analogous solutions" of anthracycline glycoside that vary in the drug concentration

14

(e.g., 5 mg/ml of doxorubicin HCl) and the drug identity (i.e., 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin [idarubicin], as hydrochloride salts) (e.g., '285 patent, 6:41-47). It is interesting to note that the '285 patent reports no actual stability data (be it accelerated or long-term data) for those analogous solutions of structurally similar anthracycline glycosides, leading me to conclude that the "can be observed" language in the patent represents a prediction based on the reported observations and related $t_{90\%}$ calculations for doxorubicin HCl.

skill would understand that doxorubicin HCl solutions adjusted to pH 4 using hydrochloric acid exhibit storage stability.

In sum, one of ordinary skill in the art would have been taught by Janssen that solutions of doxorubicin HCl at concentrations up to 0.5 mg/ml would be stable at 4°C when the pH is adjusted to 4.0 with hydrochloric acid. Given the wide (ten-fold) range of doxorubicin HCl concentrations tested in Janssen at pH 4.0, a skilled artisan would also have understood from the teachings of Janssen that solutions of doxorubicin HCl would be stable at higher concentrations such as 1 mg/ml and 2 mg/ml, which were known concentrations for injectable solutions of doxorubicin HCl prior to August 1985. In addition, given the close structural similarity between doxorubicin HCl and idarubicin HCl, including the identical glycosidic linkage, it would be reasonable for a person skilled in the art to conclude that a solution of idarubicin HCl at a concentration of 1 mg/ml (see e.g. Berman, 1983, and Kaplan, 1982 (noting the desirability of 1 mg/ml idarubicin HCl solutions)) and a pH of 4.0 adjusted with hydrochloric acid would display similar stability as the doxorubicin HCl solution.

Janssen further discloses that the solutions stored at 4°C were in 10-ml glass vials or polypropylene tubes (p. 4, lines 21 and 23). Further, it would have been a matter of common sense for those of ordinary skill in the art to distribute and/or otherwise handle any anthracycline glycoside solution in a sealed container. It necessarily follows from good laboratory practice and simple common sense, and thus would be understood by one skilled in the art, that any containers used to hold either a solution of doxorubicin HCl or idarubicin HCl would need to be sealed to avoid contamination, evaporation, and dangerous exposure of the researchers to these agents, which are highly cytotoxic and require extreme care in handling (see Ketchum, 1981).

Wassermann (1983) is also instructive. Wassermann studied the kinetics of doxorubicin HCl hydrolysis in aqueous solutions of 0.01-0.5 M hydrochloric acid over a pH range of 2.1 to 0.4. Wassermann found that the hydrolysis of doxorubicin HCl exhibited a pseudo first order dependence (see Equation (3) above) on the doxorubicin HCl concentration