# EXHIBIT C



769-080-0
60/

w/ Declais ②
1-20-88

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION:          :

GAETANO GATTI ET AL         :  GROUP ART UNIT: 123

SERIAL NO: 06/878,784       :

FILED: JUNE 26, 1986        :  EXAMINER: PESELEV

FOR: INJECTABLE READY-TO-USE  :
     SOLUTIONS CONTAINING AN
     ANTITUMOR ANTHRACYCLINE   :
     GLYCOSIDE

RECEIVED
JAN 19 1988
GROUP 120

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Responsive to the Official Action dated June 29,
1987, Applicants respectfully request reconsideration
in light of the following amendments and remarks.

IN THE CLAIMS

Claim 31, line 9, change "3.1" to --3.14.--

REMARKS

After the above amendments, Claims 16-17, 20-25
and 29-31 remain active in this application.
Reconsideration is respectfully requested.

Applicants' U.S. representative wishes to thank
Examiner Peselev for the helpful and courteous
interview which was held in her office on October 27,

S.N. 878,784 File History
Page 146

PI 875

-2-

1987.  The matters which were discussed at that time are summarized and expanded upon in the remarks which follow.

The claims stand rejected under 35 USC 102(b) as anticipated by or, in the alternative, under 35 USC 103 as obvious over <u>Beijnen et al</u> and <u>Arcamone et al</u>. These rejections are respectfully traversed.

In order for a reference to anticipate a claim, within the meaning of 35 USC 102, all material elements of the claim must be found in one prior art source. <u>In re Marshall</u> (CCPA 1978) 577 F2d 301, 198 USPQ 344; <u>In re Kalm</u> (CCPA 1967) 378 F2d 959, 154 USPQ 10.  There are a number of material elements in present Claim 31, which must be met by either of the two prior art references in order for either one of them to anticipate the claim.

The following are some of the relevant material elements of Claim 31:

"sealed glass container"

"intravenously injectable"

"sterile"

"pyrogen-free"

"said solution has not been reconstituted from a lyophilizate"

"pH is 2.7 - 3.14".

-3-

Further, the claims use partially closed claim language, "consists essentially of" with reference to the materials which may be contained in the solution. Thus, the claims exclude any other materials not recited therein if they would materially affect the solution.

The Examiner will recall that the present invention is directed to an extraordinarily stable doxorubicin or Adriamycin® solution. Both doxorubicin and Adriamycin® refer to an anti-cancer drug. Doxorubicin is the common name of the drug, while Adriamycin® is the trademark under which the drug is sold. The claims require that the solution be contained in a sealed glass container. This is a meaningful limitation, because one of ordinary skill in the art would never go to the trouble of sealing an unstable solution of an anticancer drug in a container. A certain minimum stability is required before one would even think to carry out such action. It should be kept in mind that according to the literature accompanying the commercially sold product (Adriamycin®) which is sold in a solid lyophilized form, a reconstituted solution thereof is stable for 24 hours at room temperature and 48 hours under refrigeration (4-10°C). See Exhibit A, page 3, the sixth paragraph.

-4-

The further limitation that the container be made of glass is also material.  In the past, it was thought that glass rendered the Adriamycin® solutions less stable than other types of materials, such as polypropylene and other plastics.  For example, the Examiner's attention is directed to the highlighted portions of Exhibits B and C, which show that doxorubicin can be adsorbed on and even partially decomposed on containers made of glass.  The discovery in the present invention that glass is compatible with the extremely stable Adriamycin® solutions runs counter to these teachings.  Thus, this limitation is also material.

The other material limitations listed above relate to the solution itself.  First, the solution must be intravenously injectable.  This is a meaningful limitation since it imposes stringent requirements on the nature and quantity of the impurities contained in the solution.  For example, as will be discussed in greater detail below, some of the solutions in the prior art references contain materials which would render them non-intravenously injectable.

The solution must also be sterile and pyrogen free.  Again, these limitations impose stringent requirements on the types and amounts of impurities which may be contained in the solution in the sealed glass container.  Unless one purposefully sterilizes

-5-

the solution and renders it pyrogen free, it cannot be
concluded that such a solution meets these limita-
tions.  In fact, it can be concluded without doubt that
such a solution is not sterile or pyrogen free.

The solutions according to the present invention
are also not reconstituted from a lyophilizate
according to the claims.  In the past, doxorubicin was
sold in the form of a solid which had been
lyophilized.  This can be seen in Exhibit A on page 3,
under the heading "How Supplied".  It was thought that
doxorubicin was too unstable in solution to be storage
stable.  Accordingly, after the doxorubicin was
prepared at the manufacturing plant, it was lyophilized
for storage purposes.  Since it is now recognized
according to the present invention that under certain
conditions a solution of doxorubicin can be rendered
extraordinarily stable, the step of preparing the
solution from a lyophilized powder is no longer
necessary.  It would simply be an unnecessary
expenditure of energy to lyophilize the material first
and then prepare a storage stable solution from it.
However, unless one knew that a particular solution of
doxorubicin were very stable, one would still expect to
have to prepare the solution from a lyophilizate.
Again, it is submitted that this limitation in the
claims is a material limitation.

-6-

Another important material limitation in the present claims is the pH of the solution. Over the relatively narrow range of pH recited in the present claims, 2.7-3.14, it has been unexpectedly found that the doxorubicin solutions exhibit enhanced stability. The pH of greatest stability of doxorubicin has been hotly debated in the literature. Reference 5 of the Information Disclosure Statement filed with the last response (March 13, 1987) (Poochikian et al), discloses that doxorubicin is most stable in 5% Dextrose Injection, USP, which has a pH of 4.5. See Table 2, the left-hand heading.

According to reference 3 of the Information Disclosure Statement (Beijnen et al 1985), the maximum stability of doxorubicin solutions is at about pH 4-5. See page 221 of the reference, the left hand column, the next to the last paragraph.

Reference 10 of the Information Disclosure Statement (Janssen et al) states that the results obtained in that study "indicated that pH 4 and 4°C provide optimum shelf life conditions" of aqueous doxorubicin solutions. See the summary of the paper on page 1, the third sentence. It can be seen based on the above references that the prior art has clearly not appreciated that a pH of 2.7-3.14 is the pH of maximum stability of a doxorubicin solution. Note that two of



-7-

these references are dated in 1985 and one is dated in 1981.

The cited references will now be examined in light of the above material limitations of the present claims to determine whether the references do in fact anticipate the present claims. Arcamone et al is a relatively early study from 1972, reporting on the stability of Adriamycin® hydrochloride at 22°C. The study run in Arcamone et al was an analytical study conducted in a laboratory. The reference states that solutions having a pH of 3-6 have a stability of greater than one month. These solutions contained 2 mg/ml of Adriamycin® hydrochloride, and 0.06 molar phosphate buffer.

First of all, Arcamone et al says nothing about a sealed glass container. Second, there is no indication that the solutions were sterilized or rendered pyrogen free. The Examiner's attention is directed to a Declaration (Declaration A) signed by an expert in the field of injectable pharmaceuticals, William J. Ring, who concludes that the solutions in the Arcamone et al reference do not meet several of the above-described material limitations of Claim 31.

It is also notable that the Arcamone et al reference, which was published in 1972, has definitely not lead to an appreciation that a pH of 2.7-3.14 is an

-8-

unexpectedly good pH range for stability of doxo-
rubicin, as clearly shown by the above-described
references which teach that the maximum stability of
doxorubicin solutions is at a pH of from 4 to 5.  In
fact, the range of pH listed by Arcamone et al, 3-6 is
so broad that it does not lead one of ordinary skill in
the art to an appreciation of any particular narrow
range which would give rise to extraordinary stability
or even that such a range exists.  Previous cases have
held that there can be no anticipation where the
reference disclosure is so broad that the likelihood of
arriving at the claimed composition is highly
unlikely.  Ex parte Garvey (POBA 1939) 41 USPQ 5583;
Ex parte Starr (POBA 1938) 44 USPQ 545.  The narrow pH
range of 0.44 pH units according to the present
invention as compared to the broad range of 3-6, is
believed to be such a situation where anticipation does
not result because of a broad disclosure in the
reference.

In accordance with the above comments, and
Declaration A filed herewith, it is respectfully
submitted that the Arcamone et al reference does not
anticipate the claims of the present invention.

For similarly reasons, it is respectfully
submitted that Beijnen et al does not anticipate the
claims of the present invention.  In the right-hand

-9-

column, page 109 of Beijnen et al, it can be seen that the solutions were kept in "stoppered polypropylene test tubes, since unlike glass containers, no adsorption to polypropylene occurs". Thus, at the outset, the solutions in Beijnen et al are in plastic rather than glass containers. Second, the solutions of Beijnen et al, contain perchloric acid, as indicated by page 114, the left hand paragraph. Perchloric acid is not an intravenously injectable material, as one of ordinary skill in the art would readily appreciate. Declaration B, signed by Dr. Nagesh Palapu, an expert in the field of drug formulations, substantiates the fact that the solutions of Beijnen et al are not intravenously injectable.

Finally, as discussed above in connection with the Arcamone et al reference, since the experiments involved in Beijnen et al are laboratory experiments, and there is no indication that the solutions were sterilized or rendered pyrogen free, it can be concluded that these features are not met by the solutions of Beijnen et al. Since the solutions are not sterile and are not pyrogen free, then they cannot be intravenously injectable either.

In light of these distinctions between the present claims and Beijnen et al, and in view of Declaration B, it is respectfully submitted that Beijnen et al does not anticipate the present claims.

-10-

The claims have also been rejected in the alternative for obviousness over <u>Beijnen et al</u> or <u>Arcamone et al</u>. These rejections are also respectfully traversed.

The thrust of the Examiner's rejection is one of inherency. Clearly, neither of the two references recognize the extraordinary stability of doxorubicin solutions under the conditions of the present claims, including a pH of 2.7-3.14. Based on subsequent references, as late as 1985, the pH of greatest stability of doxorubicin has been thought to be between 4 and 5. Furthermore, the stability of doxorubicin has been thought to be greater in polypropylene or polyvinylchloride rather than in glass. For these reasons, it can be seen that one of ordinary skill in the art has certainly not found it obvious to prepare a solution of doxorubicin at a pH of 2.7-3.14, to thereby achieve greatly enhanced stability.

The Examiner's attention is directed to the Declaration which was filed with the last amendment. A portion of this declaration, designated Exhibit D herein, is filed herewith for the Examiner's convenience. It can be seen that there is a trough in the graph of $k_{obs}$-pH profile, the trough being centered around 2.7-3.14. This same trough is exhibited whether the doxorubicin is in sterile water, dextrose or saline. If one goes to a pH of between 4 and 5,

-11-

previously recognized as the pH of greatest stability
of a doxorubicin solution, the k observed, which is
directly related to the decomposition of doxorubicin,
increases precipitously.  For example, in sterile
water, it goes up by a factor of at least 3.  It
continues to rise beyond pH 5.  One of ordinary skill
in the art could not have predicted, based on the
references, that this narrow pH range would give rise
to such stability.  In the absence of this realization,
one of ordinary skill in the art would not have placed
such a doxorubicin solution in a sealed glass container
nor would this person have avoided reconstitution from
lyophilized solid material.  How can it be said that it
is obvious to prepare such a solution as in the present
invention when a group of references have stated that
the maximum stability of doxorubicin solutions is
between 4 and 5?  Further, if the stability of such
solutions had been previously appreciated, why would
the manufacturer of Adriamycin® still prepare it in
lyophilized form, and state that its stability upon
reconstitution ranges from 24 hours to 48 hours at room
temperature or under refrigeration, respectively?  The
extraordinary stability over the very narrow pH range
of the present claims, has simply not been previously
appreciated.  Previously, the prior art has taught that
doxorubicin solutions were maximally stable at higher

-12-

pH's than those involved (and claimed) in the present
invention. Therefore, it is submitted that the present
claimed invention is unobvious over either or both of
the cited references.

Applicants are filing herewith a second
Information Disclosure Statement making of record a few
additional references, which are not believed to be any
more relevant than the previously cited references.
However, Applicants wish to bring these references to
the Examiner's attention to fully satisfy their duty of
complete disclosure.

In light of the above amendments and remarks, and
the Rule 132 Declarations filed herewith, it is
respectfully submitted that this application is now in
condition for allowance, and an early notice to that
effect is earnestly solicited.

Respectfully submitted,

OBLON, FISHER, SPIVAK,
McCLELLAND & MAIER, P.C.

*Robert R. Cook*

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Robert R. Cook, Ph.D.
Registration No. 31,602

Crystal Square Five - Suite 400
1755 South Jefferson Davis Highway
Arlington, Virginia  22202
(703) 521-5940
60/jmw,mkn