IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PHARMACIA & UPJOHN COMPANY, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 04-833-KAJ |
| SICOR INC. and SICOR PHARMACEUTICALS, INC., | ) ) ) | |
| Defendants. | ) ) | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT OF ANTICIPATION**

Steven J. Balick (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

Reid L. Ashinoff
Michael S. Gugig
David R. Baum
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Jordan A. Sigale
SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
Chicago, Illinois 60606
(312) 876-8000

Dated:    July 13, 2006

<u>**TABLE OF CONTENTS**</u>

SUMMARY OF ARGUMENT ...................................................................................... 1

ARGUMENT .............................................................................................................. 3

THERE IS NO MATERIAL ISSUE OF DISPUTED FACT THAT THE ASSERTED CLAIMS
OF '285 ARE INVALID AS ANTICIPATED ................................................................... 3

    A.    The Court Has Subject Matter Jurisdiction over Claims 1 through 4 .................... 3

    B.    Sicor's Motion is Procedurally Proper .................................................................. 4

    C.    Pharmacia Obtained Discovery of Benvenuto and Adriamycin for Injection® ..... 6

    D.    Janssen Anticipates Claims 1 through 4 and 9 of the '285 Patent .......................... 8

        1.    "Physiologically Acceptable" .................................................................... 9
        2.    "Acid" .................................................................................................... 11
        3.    "Sealed" ................................................................................................. 12
        4.    "Storage Stability" ................................................................................. 13

    E.    Benvenuto Anticipates Claims 1 through 4 and 9 of the '285 Patent .................... 13

        1.    "Acid" .................................................................................................... 14
        2.    "Sealed" ................................................................................................. 15
        3.    "Storage Stability" ................................................................................. 15

    F.    Reconstituted Adriamycin for Injection Anticipates Claims 1 through 4 ............. 15

        1.    "Acid" .................................................................................................... 16
        2.    "Sealed" ................................................................................................. 16
        3.    "Storage Stability" ................................................................................. 17

**CONCLUSION** ...................................................................................................... 17

## TABLE OF AUTHORITIES

### FEDERAL CASES

*ATD Corp. v. Lydall, Inc.*, 159 F.3d 534 (Fed. Cir. 1998)......................................................8

*Biogen Inc. v. Amgen Inc.*, 913 F. Supp. 35 (D. Mass. 1996)...............................................4

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995)...........4

*Tritec Industrial, Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292 (Fed. Cir. 2002) .................5, 7

### FEDERAL STATUTES

35 U.S.C. § 288.............................................................................................................1, 3, 4

Fed. R. Civ. P. 26(e) ....................................................................................................7

Fed. R. Civ. P. 33(d) ....................................................................................................7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PHARMACIA & UPJOHN COMPANY,  )
LLC,     )
       )
    Plaintiff,   )
       )
    v.     )   C.A. No. 04-833-KAJ
       )
SICOR INC. and SICOR   )
PHARMACEUTICALS, INC.,  )
       )
    Defendants.  )

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT OF ANTICIPATION**

Defendants Sicor Inc. and SICOR Pharmaceuticals, Inc. ("Sicor") submit this reply

Memorandum of Law in further support of their motion for summary judgment on the grounds

that Claims 1 through 4 and 9 of the patent-in-suit, U.S. Patent No. 6,107,285 ("the '285

patent"), are anticipated.

**SUMMARY OF ARGUMENT**

Although Pharmacia withdrew its assertion of Claims 1 through 4 of the '285 patent,

Sicor moved for summary judgment against those claims on the grounds of anticipation because,

among other things, it would preclude the recovery of costs under 35 U.S.C. § 288. In response,

Pharmacia attempts to elude the preclusion of costs (and other consequences) by concocting a

theory that its withdrawal of those claims divests the Court of subject matter jurisdiction. There

is no legal basis for Pharmacia's argument. In sum, Pharmacia conferred subject matter over

Claims 1 through 4 by asserting them at the outset of this litigation and drawing Sicor's (still

pending) counterclaim for a declaratory judgment that the claims are invalid. Pharmacia's

belated withdrawal of the claims -- a tacit admission that they are invalid -- does not avoid the

preclusion of costs under 35 U.S.C. § 288.

1

Pharmacia also argues that summary judgment against Claims 1 through 4 and 9 of the '285 patent should be denied as a matter of law because Sicor purportedly did not construe the relevant claims and compare the anticipating references to those claims. Pharmacia's argument is frivolous. There is no dispute that both parties submitted separate briefs on claim construction, and that the instant motion for summary judgment makes a detailed comparison of the prior art to the claimed terms, incorporating the claim construction arguments by reference. Sicor need not duplicate its claim construction brief in its entirety in the instant motion.

Pharmacia's professed surprise at Sicor's reliance on Benvenuto and Adriamycin for Injection® as anticipating prior art and its request to have the evidence excluded is nothing short of a desperate attempt to avoid the effect of those references. As set forth below, Sicor had no obligation to include those references in response to Pharmacia's poorly drafted interrogatory, which simply did not cover anticipation based on those references. Moreover, Pharmacia had ample notice of the references, as it is undisputed that Sicor provided a copy of its written opinion of counsel in document discovery *five months* prior to the end of discovery, which explicitly identified these prior art references and set forth in detail the basis for Sicor's reliance on them.

By the time Pharmacia gets around to responding to the substance of the instant motion, it offers the same predictable and meritless arguments that were advanced in its own motion for summary judgment on anticipation. In short, Pharmacia's arguments ignore Sicor's claim construction, the dispositive testimony of its own experts and the law of inherency, under which basic scientific principles necessitate the existence of claimed elements in the prior art. Pharmacia's inability to counter Sicor's demonstration of anticipation in its opening brief compels summary judgment against Claims 1 through 4 and 9 of the '285 patent.

- 2 -

# ARGUMENT

## THERE IS NO MATERIAL ISSUE OF DISPUTED FACT
## THAT THE ASSERTED CLAIMS OF '285 ARE INVALID AS ANTICIPATED

### A.  The Court Has Subject Matter Jurisdiction over Claims 1 through 4

Pharmacia does not even purport to dispute that, under 35 U.S.C. § 288, the assertion of a patent without disclaiming invalid claims precludes recovery of costs.  (*See* D.I. 255, at 1, n.1 (Sicor's Opening Brief).  Nevertheless, Pharmacia argues that it has unilaterally divested the Court of subject matter jurisdiction -- and therefore avoided the preclusion of costs under 35 U.S.C. § 288 -- by withdrawing Claims 1 through 4 of the '285 patent, which are four invalid claims that were initially asserted against Sicor.  Pharmacia should not, and cannot, escape the penalty under 35 U.S.C. § 288 for the assertion of invalid patent claims against a defendant.

Pharmacia chose to assert Claims 1 through 4 against Sicor at the outset of this litigation. As a consequence, Sicor filed a counterclaim for declaratory judgment that the claims are invalid.  It is undisputed that the competing lawsuit over those claims conferred separate subject matter jurisdiction.  Sicor recognizes that -- in a tacit admission that they are invalid -- Pharmacia elected to drop Claims 1 through 4 of the '285 patent.  However, Sicor has not dropped its counterclaim for declaratory judgment because, as set forth above, a judgment that the wrongfully asserted claims are invalid will preclude Pharmacia's ability to recover costs in the action under 35 U.S.C. § 288.  Pharmacia should not and cannot have the ability to unilaterally strip Sicor of its rights by belatedly dropping the invalid claims; the fact remains that Pharmacia chose to assert those claims before the Court and Sicor has expended time and resources to defend them.

- 3 -

Not one case cited by Pharmacia (D.I. 260, at 19 (Pharmacia's Opposition Brief)) supports the argument that its belated withdrawal of invalid claims can divest a court of subject matter jurisdiction and thereby elude the preclusion of costs under 35 U.S.C. § 288. For example, in *Biogen Inc. v. Amgen Inc.*, 913 F. Supp. 35 (D. Mass. 1996), the court dismissed a counterclaim for declaratory judgment that was aimed at patent claims that were never asserted in the lawsuit at all. Similarly, in *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995), the court merely held that it had no jurisdiction over a defendant's counterclaim for declaratory judgment after the plaintiff withdrew its *entire* infringement case, leaving the plaintiff with no case at all and therefore no costs to recover. Unlike either case, Pharmacia did, in fact, assert invalid claims, and continues to litigate this case and seek its costs despite its belated withdrawal of those claims. Thus, Pharmacia has no legal support for its theory that it can elude the preclusion of costs under 35 U.S.C. § 288 as a result of its assertion of invalid patent claims.[1]

## B. Sicor's Motion is Procedurally Proper

Pharmacia makes the bizarre (and erroneous) contention that Sicor's motion for summary judgment against Claims 1 through 4 and 9 of the '285 patent should be denied as a matter of law because Sicor purportedly failed to ask the Court to construe the relevant claims and compare the anticipating references to those claims as part of a "two step process" in accordance with Federal Circuit precedent. (D.I. 260, at 2, 16). Pharmacia's argument has no basis in fact or law.

---

[1] The argument that Sicor did not raise Claims 1 through 4 in connection with the parties' claim construction (D.I. 260, at 19-20) is inaccurate. The claim terms at issue in Claims 1 through 4 are no different than in Claim 9, which the parties did discuss at length, and which are the subject of the parties' claim construction briefs. Moreover, Pharmacia's contention that Sicor did not serve discovery requests concerning Claims 1 through 4 (D.I. 260, at 19) is irrelevant; Sicor simply did not need additional discovery on those claims to demonstrate that they were invalid.

- 4 -

It is a matter of record that Sicor asked the Court to construe the claimed terms in its claim construction brief, which was filed prior to the submission of the instant summary judgment brief. The filing of the claim construction was explicitly noted at the outset of Sicor's opening summary judgment brief in the Nature and Stage of Proceedings section. (D.I. 255, at 1). The remainder of Sicor's brief is dedicated to a detailed discussion of how three separate prior art references each discloses the claimed terms set forth in the claim construction brief. Indeed, Pharmacia's contention that Sicor "completely ignores" the jointly proposed claim constructions is clearly wrong; Sicor explicitly refers to the Joint Claim Construction in its discussion of Janssen's disclosure of the claimed term "acid" at pages 9-10 of its opening brief.

To be sure, there is no support for Pharmacia's apparent contention that a brief in support of summary judgment on anticipation must copy and paste a parties' claim construction brief. First, creating duplicate claim construction and anticipation briefs would create an unnecessary burden on the Court. Second, there is no legal authority setting forth such a requirement. Pharmacia's only legal citation on this point, *Tritec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1294 (Fed. Cir. 2002), merely stands for the unremarkable principle that a court determines whether or not a claim is anticipated by first construing the claims and then comparing the anticipating references to them; the case does not set forth any requirements for the format of a summary judgment brief on anticipation. Finally, Pharmacia does not even follow the proposed format for its own motion for summary judgment on the grounds that Janssen purportedly does not anticipate Claim 9 of the '285 patent. Like Sicor, Pharmacia referenced its own claim construction brief for the construction of the relevant claimed terms; it did not recite at length the detailed arguments set forth in the claim construction brief.

### C. Pharmacia Obtained Discovery of Benvenuto and Adriamycin for Injection®

Pharmacia's professed surprise at Sicor's reliance on Benvenuto and Adriamycin for Injection is disingenuous, at best. There is absolutely no merit to Pharmacia's inflammatory accusation that Sicor "hid" the references until discovery closed (D.I. 260, at 18), and therefore no basis for the exclusion of that evidence on this motion or at trial. As set forth below, Sicor had no obligation to include those references in response to Pharmacia's interrogatory, which merely sought the identification of prior art references that pertained to Sicor's invalidity contentions under Sicor's own claim construction. Moreover, Pharmacia had ample notice of the references, and the importance that Sicor attached to them. As Pharmacia's own brief concedes, Sicor provided document discovery *five months* prior to the end of discovery that explicitly set forth the basis for Sicor's reliance on those articles as prior art. (D.I. 260, at 10).

Sicor contends that the '285 patent is limited to non-lyophilized forms of anthracycline glycosides, as the form disclosed in Janssen. (*See* D.I. 234, at 14-18 (Sicor's Opening Claim Construction Brief)). As set forth in Sicor's opening brief, Benvenuto and Adriamycin for Injection are *not* anticipating prior art references under Sicor's claim construction because each discloses reconstituted lyophilized doxorubicin hydrochloride. It is *only* in the event that the Court rejects Sicor's claim construction and finds that the invention covers both lyophilized and non-lyophilized forms of anthracycline glycosides that Sicor would consider Benvenuto and Adriamycin for Injection as additional anticipating prior art references. Accordingly, there was no basis for Sicor to identify the articles as prior art in response to interrogatories that merely requested the "factual and legal basis for *Sicor's contention* that the 'the 285 patent is invalid under 35 U.S.C. §§ 101 & 102....'" (Ex. 6 to D.I. 260, at 4, Interrogatory No. 1, Subpart No. 1) (emphasis added). Given the ambiguity of Pharmacia's interrogatory, Sicor included the express

- 6 -

reservation in its interrogatory response that it was "subject to the Court's ruling on claim construction." (Ex. 6 to D.I. 260, at 5, Response to Interrogatory No. 1, Subpart No. 1). As discovery closed prior to the Court's ruling on claim construction, Sicor had no basis under which it needed to supplement its interrogatory responses to include these references.

Moreover, Sicor stated in its interrogatory responses that it "would produce documents" that "are sufficient for Plaintiff to derive or ascertain additional information in response to this interrogatory." (*Id.*) Pursuant to Fed. R. Civ. P. 33(d), "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," it is a sufficient answer to the interrogatory to produce such documents from which the answer may be ascertained. Pharmacia concedes, as it must, that Sicor produced its opinion of counsel in October 2005 and "that opinion letter relied upon all three of the references [Janssen, Benvenuto and Adriamycin for Injection] asserted in Sicor's Motion." (D.I. 260, at 10, 15-16). Accordingly, Pharmacia did, in fact, receive all of the discovery that it sought, whether or not its (poorly constructed) interrogatories properly called for the identification of the prior art references in question.[2]

In addition, Sicor's production of the opinion letter renders any purported deficiency in the interrogatory responses harmless. Fed. R. Civ. P. 26(e) imposes a duty to supplement or correct a disclosure or response only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process *or* in writing." Fed. R. Civ. P. 26(e) (emphasis added); *see also* Advisory Committee Notes to the 1993 Amendment

---

[2] Sicor refers to the October 2005 disclosure of Sicor's March 2001 opinion of counsel merely to show that Pharmacia had ample notice of all prior art references and has no basis to claim that any of them should be excluded. Sicor will not and does not need to introduce the March 2001 opinion letter in the liability trial phase to rely upon the prior art references cited therein, which were also independently produced to Pharmacia as part of document productions.

- 7 -

to Fed. R. Civ. P. 26(e) ("There is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process.") (emphasis added). Here, it is undisputed that Pharmacia was aware of Sicor's reliance on Benvenuto and Adriamycin for Injection as anticipating prior art references more than *five months* prior to the close of discovery. Although Pharmacia attempts to manufacture an argument that it was prejudiced because it "could not anticipate having to conduct discovery on those references" (D.I. 260, at 18), it fails to disclose any particular additional discovery that it would have pursued. The reason is obvious: Pharmacia was well-aware that, under some claim constructions, Sicor considered the two references as anticipating prior art, and Pharmacia had every opportunity to conduct discovery on those references during the last five months of discovery.[3]

Thus, Sicor's interrogatory responses were appropriate, and any alleged deficiency was harmless. The Court should therefore consider Benvenuto or Adriamycin for Injection as evidence of prior art.

### D. Janssen Anticipates Claims 1 through 4 and 9 of the '285 Patent

In opposition to Sicor's motion for summary judgment, Pharmacia makes the same erroneous arguments concerning Janssen that were set forth in Pharmacia's own anticipation summary judgment motion. Those arguments fare no better in opposition to Sicor's motion for summary judgment; Janssen discloses each element as set forth in Claims 1 through 4 and 9. In

---

[3] Pharmacia's string cite of cases concerning the exclusion of evidence for discovery violations does not, as it suggests, represent "situations like this one." (D.I. 260, at 17). Not one case cited involved an allegedly deficient written discovery response that was either justified or rendered harmless by a document production that provided the requested information. *See, e.g., ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 550 (Fed. Cir. 1998) (excluding evidence that was "not disclosed in response to *any* of the discovery requests or during the discovery period" where defendant offered "no reason to justify" the belated submission) (emphasis added).

particular, Pharmacia contends that Janssen does not disclose the terms "physiologically acceptable," "acid," "sealed container" and "storage stability."

### 1.    "Physiologically Acceptable"

As set forth in its claim construction brief, Sicor contends that one of ordinary skill in the art at the time of the invention would have understood the term as used with "solution," "aqueous solvent," and "acid" in the '285 patent to mean "suitable for administration to humans or animals." (*See* D.I. 234, at 8-12). In its own motion for summary judgment, Pharmacia failed to offer any evidence that the solutions in Janssen were unsuitable for administration to humans or animals. In opposition to the instant motion, however, Pharmacia mildly attempts to dispute the point, selectively citing to the following testimony by Sicor's expert Dr. Douglas Clark to a vague and ambiguous question posed by Pharmacia's counsel:

> Q:    Would you inject analytical grade reagents into your veins?
>
> A:    No, I would not.

(Ex. 1, Clark Tr. at 167:1-3).

Dr. Clark's answer that he would not choose to inject random chemicals into his veins for no apparent reason is not tantamount to a statement that the chemicals are not physiologically acceptable. To the contrary, Pharmacia is well-aware that, on the prior page of the transcript, Dr. Clark testified unambiguously that he would, in fact, consider certain concentrations of analytical grade reagents to be physiologically acceptable. (Ex. 1, Clark Tr. 166:1-18).

Notably, Pharmacia fails to cite any testimony by, or other evidence from, any expert that the reagents were unsuitable for human or animal administration. Rather, Pharmacia's only substantive argument on the point is based upon its own proposed claim construction, namely, that Janssen used chemicals that were not themselves "stable," "sterile" and "pyrogen-free."

- 9 -

(*See* D.I. 260, at 22).  As fully set forth in Sicor's opposition to Pharmacia's motion for summary

judgment on anticipation, and Sicor's claim construction briefs, these limitations are not found in

the '285 patent claim language, nor does the specification or prosecution history define or

otherwise limit "physiologically acceptable" to include these extra limitations.  (D.I. 264, at 10-

12).  Consequently, Pharmacia's attempt to import unnecessary limitations from the specification

in its claim construction of "physiologically acceptable" are plainly improper.  (*See Id.*; D.I. 234,

at 8-12).

Significantly, one of the inventors of the '285 patent, Dr. Diego Oldani, admitted at his

recent June 2006 deposition that -- as in Janssen -- the ingredients used in the development of the

subject matter of the '285 patent were *not* sterile or pyrogen-free.  (Ex. 9 to D.I. 264, Oldani Tr.

at 41:13-42:16 (Sicor's Opposition Brief on Anticipation)).  Instead, the claimed resulting

solution was sterilized after all of the analytical grade components were mixed into the solution.

(*Id.*)  Finally, as set forth in more detail in Sicor's claim construction brief, the proposed

limitations are inconsistent with the prosecution history of the '285 patent.  For example,

Pharmacia represented to the patent office that one particular sterile and pyrogen-free acid was,

nonetheless, *not* physiologically acceptable.  (*See* D.I. 234, at 8-11).

Thus, Pharmacia's construction of the term "physiologically acceptable" should be

rejected, and, accordingly, Pharmacia's argument that Janssen does not disclose "physiologically

acceptable" chemicals and solutions must fail.[4]

---

[4] As set forth in its prior papers, Sicor does not contest that, in the event that Pharmacia's
proposed claim construction of "physiologically acceptable" is adopted, Janssen would not
anticipate Claims 1 through 4 and  9.

- 10 -

## 2.     "Acid"

In its opposition to Sicor's motion for summary judgment, Pharmacia repeats its

contention that Janssen does not disclose the claimed element "acid" because the solution pH

was adjusted with a buffer rather than a physiologically acceptable acid claimed in the '285

patent. (D.I. 260, at 22). As set forth in its opening brief and opposition brief to Pharmacia's

motion for summary judgment, Pharmacia is simply wrong because one of ordinary skill in the

art of the '285 patent would read Janssen to disclose adjusting the solution pH with hydrochloric

acid, which is a physiologically acceptable acid.[5] (D.I. 255, at 6-7). Pharmacia acknowledges as

much in its motion for summary judgment on anticipation when it block quotes from Janssen as

follows:

> The following media were used.
>
> (1)     Tris buffers with pH 7.4 or 4.0: 0.01 mol/l Tris and 0.8%
> sodium chloride. *The pH was adjusted with 2 mol/l hydrochloric*
> *acid.*

(D.I. 253, at 9 (Pharmacia's Opening Brief on Anticipation) (*citing* Ex. 24 of same, at p. 4 (PU

0013749) (emphasis added)). In other words, the predominant ingredient of Janssen's "Tris

buffer" at pH 4.0 is hydrochloric acid, which acts as a pH adjusting agent for the doxorubicin

solutions. (Ex. 24 to D.I. 253, at p. 4 (PU 0013749), lines 9-10). Notwithstanding Pharmacia's

attempt to dismiss the admissions of its own technical experts as "semantic legerdemain," the

testimony of Dr. Frederico Arcamone is very clear that it is the hydrochloric acid in the Janssen

buffer that acts as the pH adjusting agent in the solution. (*See* D.I. 264, at 7-8; Ex. 6 to D.I. 264,

Arcamone Tr. at 189:21-190:3).

---

[5] According to the '285 patent, "when it is desired to adjust the pH of the above said preferred
solution to a value of from 2.5 to about 5, hydrochloric acid is an especially preferred acid." (Ex.
D to D.I. 255, '285 patent, 3:43-49; *see also* Ex. I to D.I. 255, Beijnen Tr. at 176:17-177:3).

### 3.    "Sealed"

Pharmacia does not, and cannot, dispute that its own technical expert, Dr. Beijnen, testified that the tubes in Janssen were closed with polypropylene stoppers and screw-capped glass tubes. (D.I. 260, at 25). This testimony of Pharmacia's expert is consistent with Sicor's expert Dr. Clark, confirming that it is inherent that the tubes were closed to prevent leakage and possible health risk to those working with the highly toxic solution. (*See* Ex. E to D.I. 255, Clark Report at p. 18; Ex. K to D.I. 255, Clark Tr. at 206:24-208:19). Thus, it is inherent in Janssen that the containers were "sealed" under Sicor's construction of the term, *i.e.*, "closed in some fashion such that it does not allow passage of the solution." (*See* D.I. 234, at 18).

Unable to dispute that the containers in Janssen were inherently closed to prevent the passage of solution, Pharmacia ignores Sicor's claim construction altogether. Skipping over its expert's concession that the containers were necessarily closed, Pharmacia cites other testimony by its expert that the containers were not sealed based on *Pharmacia's* claim construction, *i.e.*, "sealed against access, leakage and passage by a fastening, membrane, or coating that must be broken to be removed." (D.I. 260, at 25). As set forth in Sicor's claim construction brief, Pharmacia's attempt to incorporate additional limitations -- limitations that are not even set forth in the '285 patent specification -- into this claim term are improper. (D.I. 234, at. 18-21). Nevertheless, Sicor does not contest that, under Pharmacia's overreaching claim construction, Janssen does not disclose a sealed container; Sicor only contends that Janssen discloses a sealed container under *its own* claim construction. As Pharmacia does not dispute that the containers in Janssen were inherently closed to prevent the passage of solution, there is no dispute that Janssen discloses "sealed containers" in the event that Sicor's claim construction is adopted.

- 12 -

### 4.    "Storage Stability"

Pharmacia argues that Janssen provides no indication of shelf-life of the solution at pH

4.0.  To the contrary, Janssen specifically states that "no significant [doxorubicin] degradation

was recorded over a 60-day period of storage at pH 4.0." (Ex. A to D.I. 255, Janssen, p. 5, lines

11-12; *see also* Ex. E to D.I. 255, Clark Rep. at 14-15).  One of ordinary skill in the art, reading

Janssen, would have understood this to mean that Janssen exhibited storage stability. (Ex. E to

D.I. 255, at 18).  As Dr. Clark explained during his deposition, one skilled in the art would have

understood "no significant degradation" to mean less than 2% degradation because the Janssen

article discloses a measurement sensitivity of 2% or better. (Ex. 1, Clark Dep., at 201:19 -

206:3).

Thus, after 60 days at pH 4.0 Janssen discloses that there was at least 98% doxorubicin

left in solution.  Janssen further discloses that this reaction at pH 4.0 is (pseudo) first order (*i.e.*, a

logarithmic function of time). (Ex. A to D.I. 255, at p.4, lines 4-5; Ex. 21 to D.I. 260, at 20-21

(Beijnen Report)).  Hence, Janssen inherently discloses that a solution of doxorubicin adjusted to

pH 4.0 with hydrochloric acid would remain stable (i.e. at least a 90% concentration) for much,

much longer than 180 days at 4°C. (See, Ex. K to D.I. 234, at p. 4 "storage stability.").

### E.   Benvenuto Anticipates Claims 1 through 4 and 9 of the '285 Patent

Pharmacia's contention that Sicor is "readily reject[ing] its own claimed claim

construction" by raising Benvenuto as another anticipating reference is nothing more than

hyperbolic attorney rhetoric.  Far from rejecting its own claim construction, Sicor vigorously

contends that "anthracycline glycosides" does not include lyophilized forms, and that the case

should be dismissed on grounds of non-infringement because Sicor's product is reconstituted

from lyophilizate.  By this motion, Sicor merely raises alternative grounds for dismissal: if the

- 13 -

claim construction of "anthracylcine glycoside" is limited to non-lyophilized forms, Claims 1

through 4 and 9 are anticipated by Janssen, and if the scope of this claim term includes both

lyophilized and non-lyophilized forms, then Claims 1 through 4 and 9 are anticipated by Janssen,

Benvenuto and Adriamycin for Injection.

### 1.    "Acid"

With respect to the claimed term "acid," Pharmacia's argument boils down to the

conclusory statement that Benvenuto does not disclose a pH adjusted … with … acid" because

the Benvenuto reference only discussed a solution of water and doxorubicin hydrochloride.

Pharmacia completely misses the point, as it fails to address, much less rebut, Sicor's

demonstration that the Benvenuto solution is pH adjusted by hydrochloric acid that is necessarily

present in the solution and acts as a pH adjusting agent.  (*See* D.I. 255, at 9-12).

Pharmacia does not even purport to dispute that hydrochloric acid is necessarily present

in the Benvenuto solution because: (1) doxorubicin hydrochloride naturally disassociates in

water into doxorubicin and hydrochloric acid; and (2) in the manufacture of bulk doxorubicin

hydrochloride, traces of hydrochloric acid remain unreacted.  (*Id.*).  Pharmacia also does not

dispute that the hydrochloric acid adjusts the pH for the solution, *i.e.*, that the hydrochloric acid

acts as a pH adjusting agent.  Accordingly, the Benvenuto anticipates a solution that has a pH

within the specified range due to the use of a pH adjusting agent.

Moreover, Pharmacia does not seriously dispute the alternative argument that the '285

patent is a product-by-process claim, and that product-by-process claims may be rendered invalid

if the claimed product produced by the process is the same as a product in the prior art, even if

the product in the prior art was obtained by a different process.  (*See* D.I. 255, at 10-11).

Although Claim 1 of the '285 patent is limited and defined by the process of adjusting the pH

- 14 -

level with an acid, prior art may anticipate the claim whether or not the acid in the ultimate product was the actual agent that adjusted the pH level. Pharmacia does not and cannot seriously dispute that Benvenuto discloses a doxorubicin solution that has a pH within the range claimed by the '285 patent in both plastic and glass containers. (Ex. B to D.I. 255, Benvenuto at p. 1915 Table 1).

### 2.     "Sealed"

Pharmacia misrepresents to the Court that "Sicor makes no effort whatsoever to argue that the Benvenuto reference involves a 'sealed' container...." (D.I. 260, at 27). Contrary to Pharmacia's contention, Sicor set forth in a detailed disclosure chart the fact that Benvenuto disclosed doxorubicin hydrochloride solutions in sealed viaflex polyvinyl chloride bags. (D.I. 255, at 9, 12). Pharmacia does not even purport to dispute that viaflex polyvinyl chloride bags are, in fact, sealed. Accordingly, it is undisputed that Benvenuto discloses that claimed element.

### 3.     "Storage Stability"

With respect to storage stability, Benvenuto disclosed that the doxorubicin solution at pH 4.2 in plastic had no apparent decrease doxorubicin concentration after 48 hours and exhibited a $t_{50\%}$ of 14146 hours (i.e., 589.4 days) in 5% dextrose. (Ex. B to D.I. 255, at p. 1916, table 2 and 1917 and figure 2). Thus, Benvenuto necessarily would have disclosed to one skilled in the art a storage stable solution under Sicor's proposed definition of storage stability (i.e., retain at least 90% of the doxorubicin for at least 180 days).

### F.  Reconstituted Adriamycin for Injection Anticipates Claims 1 through 4

Similarly, if the Court finds that the claim term "anthracycline glycoside" covers lyophilized forms (in addition to non-lyophilized forms), Claims 1 through 4 is also anticipated

by Pharmacia's own Adriamycin (doxorubicin hydrochloride) for Injection product, which is the product used in Benvenuto and discussed in Trissel.

### 1.    "Acid"

With respect to Adriamycin for Injection, Pharmacia restates the same argument that the product does not disclose a pH adjusted with acid because the solution was merely comprised of water and doxorubicin hydrochloride.  As with Benvenuto, Pharmacia fails to address, much less rebut Sicor's demonstration that the solution is pH adjusted by hydrochloric acid that is necessarily present in the solution and acts as a pH adjusting agent.  Moreover, Pharmacia does not dispute that, under the law governing product-by-process claims, Adriamycin for Injection may anticipate the claim whether or not the acid was the actual agent that adjusted the pH level.

### 2.    "Sealed"

Pharmacia makes the remarkable argument that the container in Adriamycin for Injection fails to meet Sicor's claim construction (*i.e.*, "closed in some fashion such that it does not allow passage of the solution") even though the vial containing the solution is shaken.  (Ex. K to D.I. 234, at p. 3 "sealed container.").  Not surprisingly, Pharmacia fails to explain how its own highly toxic product can be shaken in an open vial without leakage and health risk to those working with the solution.  Indeed, Pharmacia's suggestion that shaking Adriamycin for Injection in an open vial during reconstitution undermines the very statement by the '285 patent applicants that a particular feature of the invention -- that it does not require either lyophilization or reconstitution -- significantly reduces the health risks associated with the manufacture and reconstitution of lyophilized preparations of the toxic drug compound.  (Ex. D to D.I. 255, '285 patent, at 1:47-53).  Despite Pharmacia's inconsistent positions, it is inescapable that Adriamycin

- 16 -

for Injection is contained in closed vials during the shaking in the reconstitution process, which

meets Sicor's claim construction of "sealed container."

### 3.    "Storage Stability"

Adriamycin for Injection exhibits "storage stability" as required by Claim 9 of the '285

patent.  In particular, Hoffmann discloses that Adriamycin for Injection, i.e., "doxorubicin

hydrochloride, when reconstituted with sterile water for injection, may be refrigerated for six

months or frozen for one month without loss of potency."  (Ex. G to D.I. 255, Hoffmann, at

p.1536).  Hoffmann further discloses that after 6 months (or 180 days), the reconstituted

Adriamycin for Injection still had 96% potency.  Thus, Adriamycin for Injection necessarily

would have disclosed to one skilled in the art a storage stable solution under Sicor proposed

definition of storage stability (i.e. retain at least 90% of the doxorubicin for at least 180 days).

## CONCLUSION

For the reasons set forth in Sicor's opening brief and further supported above, there is no

material issue of disputed fact that Claims 1 through 4 and 9 of the '285 patent are anticipated.

Sicor is therefore entitled to summary judgment.

ASHBY & GEDDES

*/s/Steven J. Balick*

Steven J. Balick (I.D. # 2114)
Tiffany Geyer Lydon (I.D. #3950)
John G. Day (I.D. # 2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888

*Attorneys for Defendants*

- 17 -

*Of Counsel:*

Reid L. Ashinoff
Michael S. Gugig
David R. Baum
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Jordan A. Sigale
SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
Chicago, Illinois 60606
(312) 876-8000

Dated:    July 13, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of July, 2006, the attached **REPLY**

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION**

**FOR SUMMARY JUDGMENT OF ANTICIPATION** was served upon the below-named

counsel of record at the address and in the manner indicated:

Jack B. Blumenfeld, Esquire                        HAND DELIVERY
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE  19801

Joshua R. Rich, Esquire                            VIA ELECTRONIC MAIL
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606


                                    /s/ Steven J. Balick
                                    _____
                                    Steven J. Balick

# EXHIBIT 1

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                     DISTRICT OF DELAWARE

 3

 4   PHARMACIA & UPJOHN COMPANY,      )

 5                  Plaintiff,        )

 6      -vs-                          )  CA No. 04-833-KAJ

 7   SICOR, INC., and SICOR          )

 8   PHARMACEUTICALS, INC.,          )

 9                  Defendants.       )

10

11          The videotaped deposition of DOUGLAS S.

12   CLARK, called for examination, taken pursuant to

13   the Federal Rules of Civil Procedure of the United

14   States District Courts pertaining to the taking of

15   depositions, taken before THERESA A. VORKAPIC, a

16   Notary Public within and for the County of Kane,

17   State of Illinois, and a Certified Shorthand

18   Reporter, CSR No. 84-2589, of said state, at Suite

19   3100, 300 South Wacker Drive, Chicago, Illinois,

20   on the 1st day of November, A.D. 2005, at

21   approximately 9:34 a.m.

22

23

24
```

DOUGLAS S. CLARK - NOVEMBER 1, 2005

Page 166

1    Q.    You used the term "physiologically
2    acceptable solution," which I think you used
3    "physiologically acceptable" several different
4    times.
5    A.    Uh-huh.
6    Q.    What does that mean to you?
7    A.    "Physiologically acceptable" means to
8    me a compound or solution that will not cause or
9    have deleterious effects on normal physiological
10   function.
11   Q.    To one of ordinary skill in the art,
12   would analytical grade reagents be considered
13   physiologically acceptable?
14   A.    Potentially.
15   Q.    Under what circumstances?
16   A.    Concentrations, for example, below
17   which the compound in question would not be
18   physiologically harmful.
19   Q.    Are analytical grade reagents sterile
20   filtered?
21   A.    Not routinely, no.
22   Q.    Are analytical grade reagents treated
23   to avoid pyrogenicity?
24   A.    Not routinely, no.

Page 167

1    Q.    Would you inject analytical grade
2    reagents into your veins?
3    A.    No, I would not.
4    Q.    Would it be fair to say that you would
5    not consider analytical grade reagents
6    physiologically acceptable for yourself?
7    A.    As I said, depending on the
8    concentration, they might be acceptable, an
9    analytical grade glucose solution for example.
10   Q.    What about an unpurified doxorubicin
11   hydrochloride reagent?
12   A.    Excuse me.  What is the question?
13   Q.    Would you consider that physiologically
14   acceptable?
15   MR. SIGALE:  Objection.  Incomplete
16   hypothetical.
17   BY THE WITNESS:
18   A.    At what concentration?  Under what
19   other conditions?  It would not be my preference.
20   BY MR. RICH:
21   Q.    Would you need more information to
22   determine whether it would be physiologically
23   acceptable?
24   MR. SIGALE:  Objection, vague.  More

Page 168

1    information than what?
2    MR. RICH:  Well, you objected as an
3    incomplete hypothetical and I'm testing his belief
4    to see if he thinks it's an incomplete
5    hypothetical.
6    MR. SIGALE:  Can you repeat the prior
7    question that I objected to, please.
8    (WHEREUPON, the record was
9    read by the reporter.)
10   BY THE WITNESS:
11   A.    Yes, that may not be physiologically
12   acceptable, however, from the experiments, for
13   example, performed in Wassermann and Janssen that
14   may have used unpurified doxorubicin hydrochloride
15   preparations, I believe one can draw conclusions
16   about the behavior of such a solution using
17   physiologically acceptable ingredients.
18   BY MR. RICH:
19   Q.    So it's your opinion that although the
20   solution -- let's handle these one at a time.
21   A.    Okay.
22   Q.    It's your opinion that a solution of
23   doxorubicin hydrochloride in Janssen used without
24   purification would not create a physiologically

Page 169

1    acceptable solution?
2    A.    It could produce a physiologically
3    acceptable solution.
4    Q.    Under what conditions?
5    A.    Under conditions where there were no
6    physiologically harmful components in the final
7    solution.
8    Q.    Would it necessarily create a
9    physiologically acceptable solution?
10   MR. SIGALE:  Objection.  Vague.  It what?
11   BY THE WITNESS:
12   A.    It meaning?
13   BY MR. RICH:
14   Q.    Would doxorubicin hydrochloride used
15   without purification necessarily create a
16   physiologically acceptable solution?
17   A.    As used by Janssen?
18   Q.    As used by Janssen.
19   A.    Just to confirm the conditions of
20   Janssen, may I see the --
21   Q.    Why don't we do this.  Why don't I give
22   you both Janssen and Wassermann.  We'll go through
23   a couple of questions.
24   MR. RICH:  Again, I object to Mr. Sigale's

43 (Pages 166 to 169)

DOUGLAS S. CLARK - NOVEMBER 1, 2005

Page 198

1  art have understood from the statement it is
2  therefore impossible to make exact predictions on
3  doxorubicin deposition rates in aqueous systems to
4  be used in pharmaceutical practice?
5      A.   I think would have interpreted that to
6  be the opinion of the authors, and exact
7  predictions is open to interpretation.
8      Q.   Would it be fair to say that the
9  authors -- one of ordinary skill in the art would
10  have viewed the authors as suggesting that
11  previous papers were not reliable for exact
12  predictions?
13      A.   No.  I think it would be interpreted to
14  mean that this is a vague statement, aqueous
15  systems to be used in pharmaceutical practice.
16  That's not -- it's not clear exactly what that
17  means.  I might also point out that that statement
18  precedes the publication of this article, or, in
19  other words that paper or that statement refers to
20  papers that were published prior to this article
21  and it's also the opinion of the author.
22      Q.   Well --
23      A.   I think this article contributes to the
24  ability to make predictions on doxorubicin

Page 199

1  decomposition rates to be used in pharmaceutical
2  practice.
3      Q.   My question is not what this article
4  teaches with regard to the contents of the article
5  itself, but with regard to prior articles,
6  wouldn't one of ordinary skill in the art reading
7  that statement believe the authors to be
8  suggesting that prior articles made it impossible
9  to make exact predictions on doxorubicin
10  decomposition rates in aqueous solutions --
11  aqueous systems to be used in pharmaceutical
12  practice?
13      A.   That is how somebody of ordinary skill
14  in the art would interpret that statement, that
15  that is the author's opinion in writing this
16  paper.
17      Q.   And would one of ordinary skill in the
18  art have understood that the authors would not
19  have relied on previous articles for making
20  predictions on doxorubicin decomposition?
21      MR. SIGALE:  Objection.  Compound, vague.
22  BY THE WITNESS:
23      A.   Could you read the question back,
24  please.

Page 200

1          (WHEREUPON, the record was
2          read by the reporter.)
3  BY THE WITNESS:
4      A.   One of ordinary skill could have
5  interpreted that statement to mean depending on
6  how they interpret exact predictions that the
7  authors would not have used this previous data to
8  make such predictions.
9  BY MR. RICH:
10      Q.   If you turn to the conclusion of the
11  paper, Page 119 --
12      A.   However, if I may just follow up.
13      Q.   Go ahead.
14      A.   That doesn't mean that reading those
15  prior papers that one of ordinary skill in the art
16  would not have drawn their own conclusions about
17  the ability to make predictions about doxorubicin
18  stability in aqueous solution.
19      Q.   On the last page of the text, the last
20  few sentences before the acknowledgments, it says:
21  "A certain of degradation products is formed.  This
22  causes an extremely complex situation.  It is
23  difficult to discriminate between the cytotoxic
24  action of the parent compound and the degradation

Page 201

1  products.  In our laboratory, work is in progress
2  to address the problem related to the chemical
3  stability of DXR in a systematic way."
4          Do you see that?
5      A.   Yes, I do.
6      Q.   Would one of ordinary skill in the art
7  reading that have come to the conclusion of the
8  problem related to the chemical stability of
9  doxorubicin in a systematic way was a complex
10  situation?
11      A.   No, not necessarily.  First they have
12  to read the context that this sentence appears in.
13      Q.   It's in the section called Conclusions,
14  right?
15      A.   Yes.  I don't think one reading this
16  would conclude that decomposition at pH 4 is
17  complex because the conclusion states that at pH 4
18  no significant decomposition was observed.
19      Q.   What did they mean by "no significant
20  decomposition?"
21      A.   One of ordinary skill in the art would
22  interpret that to mean that no decomposition
23  within the sensitivity of their measurements.
24      Q.   What was the sensitivity of their

51 (Pages 198 to 201)

Page 202

1  measurements?
2      A.    I estimate the sensitivity of their
3  measurements ranged from either .5 or .6 to
4  roughly two percent.
5      Q.    What's the basis for that?
6      A.    If you look on Page 112, you see on the
7  paragraph Quantitation of Doxorubicin
8  Concentrations, "Calibration curves in the range
9  of 3 to 150 nanograms of doxorubicin (absolute
10 injected amounts) were constructed using peak
11 heights."
12        One way to interpret, then, the
13 sensitivity is that the absolute amount that they
14 could detect by HPLC was three nanograms.
15        Then it goes on to say, "A series of
16 doxorubicin solutions was prepared by diluting
17 five microliter portions of stock solution
18 solutions of a stock solution containing 1.2,"
19 et cetera, et cetera, 5, 10, or 25 microliters of
20 these solutions were injected.
21        So if we assume that they are using the
22 smallest injectable volume, that would be five
23 micro liters that they inject in their analysis.
24 If you then turn to the conditions for stability

Page 203

1  measurements at pH 4, those include concentrations
2  of a hundred micrograms per milliliter. If you
3  calculate the amount of doxorubicin present in
4  five microliters, which was injected into the HPLC
5  of a solution containing a hundred micrograms per
6  milliliter, and you take as a percentage of that
7  three nanograms, which is the sensitivity limit of
8  their measurement, the percentage is less than
9  one.
10        So based on the volume of injection,
11 the concentration of doxorubicin in their injected
12 solution and the sensitivity of their
13 measurements, it's very reasonable to conclude
14 that their sensitivity limit at least in
15 experiments where the concentration was a hundred
16 micrograms per milliliter was on the ordinary of
17 one percent. So when they say no significant
18 degradation occurred, I think a conservative
19 estimate is that the degradation was less than two
20 percent.
21      Q.    So you're reading "significant" as
22 being equated to the limit of measurement, the
23 limit of detection?
24      A.    Yes.

Page 204

1      Q.    What's the basis for reading it in that
2  manner?
3      A.    "Significant" is a word that appears
4  often in the scientific literature. Something
5  does not differ significantly from something else,
6  something exhibited no significant change. The
7  meaning can be somewhat ambiguous.
8        Given no further definition of what
9  significant means within the context of a
10 particular paper, one concludes that it is either
11 within the experimental error of the measurement
12 or that it is beyond the sensitivity of the
13 measurement.
14      Q.    Is there anything in this paper to lead
15 you to believe that "significant" means within the
16 error of the measurement or within the uncertainty
17 of the measurement?
18      A.    The use of the term, the context in
19 which the term is used, yes.
20      Q.    And what statements regarding
21 measurement does -- gives you that definition of
22 no significant decomposition?
23      A.    Within this paper?
24      Q.    Uh-huh. Any specific statement?

Page 205

1      MR. RICH:  Why don't we break to change the
2  tape?
3      THE VIDEOGRAPHER:  Going off the video
4  record. The time is 4:07 p.m.
5          (WHEREUPON, discussion was had
6          off the record.)
7      THE VIDEOGRAPHER:  We're back on the video
8  record. The time is 4:08 p.m.
9      MR. SIGALE:  Could you repeat the question?
10         (WHEREUPON, the record was
11         read by the reporter.)
12 BY THE WITNESS:
13     A.    There is not a specific statement that
14 the authors used to define what they mean by no
15 significant degradation. They cite in connection
16 with some of their deactivation measurements that
17 the degradation was less than 10 percent. I
18 assume, and it's reasonable to assume, that since
19 they use different wording to describe no
20 significant degradation that the degradation is
21 well below 10 percent since in other instances
22 they make a specific point when it is less than 10
23 percent, that affirms in my mind that no
24 significant means well below 10 percent, and

52 (Pages 202 to 205)

DOUGLAS S. CLARK - NOVEMBER 1, 2005

Page 206

1 consistent with that affirmation is that no
2 significant would mean beyond the limits of their
3 detection.
4    Q.    Below 10 percent they don't report any
5 results, correct?
6    A.    That's correct, but they can measure it
7 obviously.
8    Q.    But they don't make any effort to
9 report anything below 10 percent, correct?
10   MR. SIGALE:  Objection.  Calls for
11 speculation.
12 BY THE WITNESS:
13   A.    I don't know why they didn't report
14 specific numbers less than 10 percent.
15 BY MR. RICH:
16   Q.    But they didn't?
17   A.    They don't report any numbers less than
18 10 percent in the tables, however, as I consult
19 Table 1 -- excuse me, Figure 1, if you look at the
20 data at 37 degrees C, it's difficult by eye for me
21 to tell whether the first datum reflects
22 degradation of less than 10 percent, so I can't
23 say for sure.
24   Q.    Is there any indication in the Janssen

Page 207

1 paper that they used sealed containers in their
2 experiments?
3    MR. SIGALE:  Objection.  Vague.
4 BY THE WITNESS:
5    A.    There are many indirect indications in
6 Janssen that they used sealed containers.
7 BY MR. RICH:
8    Q.    Did they necessarily use sealed
9 containers?
10   A.    It would be assumed by one of ordinary
11 skill in the art that they did.
12   Q.    Is it inevitable?
13   A.    The data in Figure 3, good laboratory
14 practice, the understanding of the cytotoxicity of
15 the compound they were working with, which they
16 were clearly aware of, based on if nothing else
17 the breadth of papers discussed in their
18 introduction, the knowledge that avoiding
19 evaporation would be essential to obtain accurate
20 degradation kinetics at elevated temperatures
21 would all lead one to conclude that the containers
22 were sealed.
23      Furthermore, looking at the data of
24 Figure 3, excuse me, Figure 1, would further

Page 208

1 suggest that the containers were sealed because if
2 the containers were not sealed, significant
3 evaporation would have occurred over these times
4 at these elevated temperatures, which would have
5 caused the degradation kinetics at 61 degrees and
6 72 degrees to deviate from linearity one would
7 assume.  So this provides further evidence that
8 the containers were sealed.
9      So in my opinion, yes, the containers
10 must have been sealed.
11   Q.    It's absolutely inevitable in your
12 mind?
13   A.    It's not absolutely inevitable.  Very
14 little is absolutely inevitable.
15   Q.    And Figure 1 relates only to a
16 phosphate buffer at pH 7.4, correct?
17   A.    Yes, but the assumption is that if the
18 containers were sealed in some experiments, they
19 were sealed in all experiments.
20   Q.    Is that necessarily true?
21   A.    It's not inevitable.
22   Q.    If I could have you turn to --
23   MR. SIGALE:  If you're done with this
24 reference, I'd really like to take break.

Page 209

1    MR. RICH:  Why don't we take a break no
2 matter what?
3    MR. SIGALE:  Thank you.
4    THE VIDEOGRAPHER:  Going off the video
5 record.  The time is 4:16 p.m.
6      (WHEREUPON, a recess was had.)
7    THE VIDEOGRAPHER:  Back on the video record.
8 The time is 4:23 p.m.
9 BY MR. RICH:
10   Q.    If you could turn in your expert report
11 to Page 16, and I'm looking at the last sentence
12 before the letter F on Page 16, it says:  "And
13 thus, a person of ordinary skill would understand
14 that this Janssen solution adjusted to pH 4 using
15 hydrochloric acid exhibits storage stability."
16      Do you see that?
17   A.    Yes, I do.
18   Q.    What did you mean by "storage
19 stability"?
20   A.    I meant would exhibit a value of T-90
21 of six months using an arbitrary definition of
22 "storage stability."
23   Q.    So I guess if it's an arbitrary
24 decision, you didn't have a source that you went

53 (Pages 206 to 209)