# EXHIBIT 10



THE PATENT OFFICE
**STATE HOUSE**
**66–71 HIGH HOLBORN**
**LONDON WC1R 4TP**

## 2178311

I, the undersigned, being an officer duly authorised in accordance with Section 62(3) of the Patents and Designs Act 1907, to sign and issue certificates on behalf of the Comptroller-General, hereby certify that annexed hereto is a true copy of the documents as originally filed in connection with the patent application identified therein.

In accordance with the Patents (Companies Re-registration) Rules 1982, if a company named in this certificate and any accompanying documents, has re-registered under the Companies Act 1980 with the same name as that with which it was registered immediately before re-registration save for the substitution as, or the inclusion as, the last part of the name of the words "public limited company" or their equivalents in Welsh, references to the name of the company in this certificate and any accompanying documents shall be treated as references to the name with which it is so re-registered.

In accordance with the rules, the words "public limited company" may be replaced by p.l.c., plc, P.L.C. or PLC.



SEAL BROKEN BY
CERTIFIED OFFICE COPIES



Please turn over

C 1

M1181

Re-registration under the companies Act does not constitute a new legal entity but merely subjects the company to certain additional company law rules.

Witness my hand this

19th day of   M A Y        19 86

COC 1

PATENTS FORM No. 1/77 (Revised 1982)
(Rules   16, 19)

.e Comptroller
The Patent Office
25 Southampton Buildings
. London, WC2A 1AY

1985
1 9 4 5 2
05/08/85 A5466  PAT***  10.00

## REQUEST FOR GRANT OF A PATENT

8519452

THE GRANT OF A PATENT IS REQUESTED BY THE UNDERSIGNED  ON THE BASIS OF THE PRESENT APPLICATION

| | | |
|---|---|---|
| I | Applicant's or Agent's Reference *(Please insert if available)* | P. 3191GW |

II    Title of Invention  INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

III    Applicant or Applicants *(See note 2)*

.Name (First or only applicant)  FARMITALIA CARLO ERBA S.p.A.,

Country ...Italy............................... State .......................... ADP Code No. .........
Address ........ Via Carlo Imbonati 24, 20159 Milan, Italy.

Name (of second applicant, if more than one) .......................................
.................................................. Country ......................... State ...........
Address .................................................

IV    Inventor (see note 3)

(b) A statement on Patents Form No 7/77 ½/will be furnished

| | | | |
|---|---|---|---|
| V | Name of Agent (if any) *(See note 4)* | J. A. KEMP & CO. | ADP CODE NO |

VI    Address for Service (See note 5)    14, South Square
Gray's Inn
LONDON WC1R 5EU

VII    Declaration of Priority (See note 6)
Country                    Filing date                    File number

VIII    The Application claims an earlier date under Section 8(3), 12(6), 15(4), or 37(4) (See note 7)

Earlier application or patent number .................... and filing date .................

V4919*

**IX**  Check List *(To be filled in by applicant or agent)*

**A** The application contains the following number of sheet(s)

1  Request ........ 1 ........ Sheet(s)

2  Description ... 39 ........ Sheet(s)

3  Claim(s) ...... 4 ........ Sheet(s)

4  Drawing(s) ............ Sheet(s)

5  Abstract ............ Sheet(s)

**B** The application as filed is accompanied by:-

1  Priority document ........................................

2  Translation of priority document ...................

3  Request for Search ......................................

4  Statement of Inventorship and Right to Grant ........................................

**X**  It is suggested that Figure No ............. of the drawings (if any) should accompany the abstract when published.

**XI**  Signature *(See note 8)*

J. A. KEMP & CO.    Authorised Agents

**NOTES:**

1.  This form, when completed, should be brought or sent to the Patent Office together with the prescribed fee and two copies of the description of the invention, and of any drawings.

2.  Enter the name and address of each applicant. Names of individuals should be indicated in full and the surname or family name should be underlined. The names of all partners in a firm must be given in full. Bodies corporate should be designated by their corporate name and the country of incorporation and, where appropriate, the state of incorporation within that country should be entered where provided. Full corporate details, eg "a corporation organised and existing under the laws of the State of Delaware, United States of America," trading styles, eg "trading as xyz company", nationality, and former names, eg "formerly [known as] ABC Ltd." are not required and should not be given. Also enter applicant(s) ADP Code No. (if known).

3.  Where the applicant or applicants is/are the sole inventor or the joint inventors, the declaration (a) to that effect at IV should be completed, and the alternative statement (b) deleted. If, however, this is not the case the declaration (a) should be struck out and a statement will then be required to be filed upon Patent Form No 7/77.

4.  If the applicant has appointed an agent to act on his behalf, the agent's name and the address of his place of business should be indicated in the spaces available at V and VI. Also insert agent's ADP Code No. (if known) in the box provided.

5.  An address for service in the United Kingdom to which all documents may be sent must be stated at VI. It is recommended that a telephone number be provided if an agent is not appointed.

6.  The declaration of priority at VII should state the date of the previous filing and the country in which it was made and indicate the file number, if available.

7.  When an application is made by virtue of section 8(3), 12(6), 15(4), or 37(4) the appropriate section should be identified at VIII and the number of the earlier application or any patent granted thereon identified.

8.  Attention is directed to rules 90 and 106 of the Patent Rules 1982.

9.  Attention of applicants is drawn to the desirability of avoiding publication of inventions relating to any article, material or device intended or adapted for use in war (Official Secrets Acts, 1911 and 1920). In addition after an application for a patent has been filed at the Patent Office the comptroller will consider whether publication or communication of the invention should be prohibited or restricted under section 22 of the Act and will inform the applicant if such prohibition is necessary.

10.  Applicants resident in the United Kingdom are also reminded that, under the provisions of section 23 applications may not be filed abroad without written permission or unless an application has been filed not less than six weeks previously in the United Kingdom for a patent for the same invention and no direction prohibiting publication or communication has been given or any such direction has been received.

- 1 -                                    FC 249

Title: Injectable ready-to-use solutions containing an
       antitumor anthracycline glycoside.


The present invention relates to a stable intravenously
injectable ready-to-use solution of an antitumor
5   anthracycline glycoside, e.g. doxorubicin, to a process
for preparing such a solution, and provide the same in a
sealed container, and to a method for treating tumors by
the use of the said ready-to-use solution.
The anthracycline glycoside compounds are a well known
10  class of compounds in the antineoplastic group of agents,
wherein doxorubicin is a typical, and the most widely used,
representative: Doxorubicin. Anticancer Antibiotics, Federi-
co Arcamone, 1981, Publ: Academic Press, New York, N.Y.;
Adriamycin Review, EROTC International Symposium, Brussels,
15  May, 1974, edited by M.Staquet, Publ. Eur. Press Medikon,
Ghent, Belg.;
Results of Adriamycin Therapy, Adriamycin Symposium at
Frankfurt/Main 1974 edited by M.Ghione, J.Fetzer and H.
Maier, publ.: Springer, New York, N.Y.
20  At present, anthracycline glycoside antitumor drugs, in parti-
cular, e.g., doxorubicin, are solely available in the form
of lyophilized preparations, which need to be reconstituted
before administration.

Both the manufacturing and the reconstitution of such
25  preparations expose the involved personnel (workers,
pharmacists, medical personnel, nurses) to risks of con-
tamination which are particularly serious due to the
toxicity of the antitumor substances.

- 2 -

The Martindale Extra Pharmacopoeia 28th edition, page 175
left column, reports, indeed, about adverse effects of
antineaplastic drugs and recommends that "They must be
handled with great care and contact with skin and eyes
5   avoided; they should not be inhaled. Care must be taken
to avoid extravasation since pain and tissue damage may
ensue.".

Similarly, Scand. J. Work Environ Health vol.10 (2), pages 71-
74 (1984), as well as articles on Chemistry Industry, Issue
10  July 4, 1983, page 488, and Drug-Topics-Medical-Economics-Co,
Issue February 7, 1983, page 99 report about severe adverse
effects observed in medical personnel exposed to use of
cytostatic agents, including doxorubicin.

To administer a lyophilized preparation, double handling of
15  the drug is required, the lyophilized cake having to be first
reconstituted and then administered and,moreover,in some cases,
the complete dissolution of the powder may require prolonged
shaking because of solubilization problems.

As the risks connected with the manufacturing and the reconsti-
20  tution of a lyophilized preparate would be highly reduced if
a ready-to-use solution of the drug were available, we have
developed a stable, therapeutically acceptable intravenously
injectable solution of an anthracycline glycoside drug, e.g.
doxorubicin, whose preparation and administration does not
25  require either lyophilization or reconstitution.

- 3 -

According to the present invention, there is provided a
sterile, pyrogen-free, anthracycline glycoside solution which
consists essentially of a physiologically acceptable salt of
an anthracycline glycoside dissolved in a physiologically
5    acceptable solvent therefor, which has not been reconstituted
from a lyophilizate and which has a pH of from 2.5 to 6.5.

Preferably the solution of the invention is provided in
a sealed container.

Preferably the anthracycline glycoside is chosen from
10   the group consisting of doxorubicin, 4'-epi-doxorubicin (i.e.
epirubicin), 4'-desoxy-doxorubicin (i.e. esorubicin),
4'-desoxy-4'-iodo-doxorubicin, daunorubicin and
4-demethoxydaunorubicin (i.e. idarubicin).

A particularly preferred anthracycline glycoside is
15   doxorubicin.

Any physiologically acceptable salt of the anthracycline
glycoside may be used for preparing the solution of the
invention.  Examples of suitable salts may be, for instance,
the salts with mineral inorganic acids such as hydrochloric,
20   hydrobromic, sulfuric, phosphoric, nitric and the like, and
the salts with certain organic acids such as acetic,
succinic, tartaric, ascorbic, citric, glutammic, benzoic,
methanesulfonic, ethanesulfonic and the like.  The salt with
hydrochloric acid is a particularly preferred salt,
25   especially when the anthracycline glycoside is doxorubicin.

Any solvent which is physiologically acceptable and

- 4 -

which is able to dissolve the anthracycline glycoside salt
may be used.  The solution of the invention may also contain
one or more additional components such as a co-solubilizing
agent (which may be the same as a solvent), a tonicity
5    adjustment agent and a preservative.  Examples of solvents,
co-solubilizing agents, tonicity adjustment agents and
preservatives which can be used for the preparation of the
anthracycline glycoside solutions of the invention are
hereunder reported.

10    Suitable solvents and co-solubilizing agents may be, for
instance, water; physiological saline; aliphatic amides, e.g.
N,N-dimethylacetamide, N-hydroxy-2-ethyl-lactamide and the
like; alcohols, e.g. ethanol, benzyl alcohol and the like;
glycols and polyalcohols, e.g. propyleneglycol, glycerin and
15    the like; esters of polyalcohols, e.g. diacetine, triacetine
and the like; polyglycols and polyethers, e.g.
polyethyleneglycol 400, propyleneglycol methylethers and the
like; dioxolanes, e.g. isopropylidenglycerin and the like;
dimethylisosorbide; pyrrolidone derivatives, e.g.
20    2-pyrrolidone, N-methyl-2-pyrrolidone, polyvinylpyrrolidone
(co-solubilizing agent only) and the like; polyoxyethylenated
fatty alcohols, e.g. Brij$^R$ and the like; esters of
polyoxyethylenated fatty acids, e.g. Cremophor$^R$, Myrj$^R$ and
the like; polysorbates, e.g. Tweens$^R$; polyoxyethylene
25    derivatives of polypropyleneglycols, e.g. Pluronics$^R$.

A particularly preferred co-solubilizing agent is
polyvinylpyrrolidone.

- 5 -

Suitable tonicity adjustment agents may be, for instance, physiologically acceptable inorganic chlorides, e.g. sodium chloride, dextrose, lactose, mannitol and the like.

5        Preservatives suitable for physiological administration may be, for instance, esters of para-hydroxybenzoic acid (e.g., methyl, ethyl, propyl and butyl esters, or mixtures of them), chlorocresol and the like.

The above mentioned solvents and co-solubilizing agents, 10  tonicity adjustment agents and preservatives can be used alone or as a mixture of two or more of them.

Examples of preferred solvents are water, ethanol, polyethyleneglycol and dimethylacetamide as well as mixtures in various proportions of these solvents.  Water is a 15  particularly preferred solvent.

To adjust the pH within the range of from 2.5 to about 5.0 a physiologically acceptable acid may be added as desired.  The acid may be any physiologically acceptable acid, e.g., an inorganic mineral acid such as hydrochloric, 20  hydrobromic, sulfuric, phosphoric, nitric and the like, or an organic acid such as acetic, succinic, tartaric, ascorbic, citric, glutammic, benzoic, methanesulphonic, ethanesulfonic and the like, or also an acidic physiologically acceptable buffer solution, e.g., a chloride buffer, an acetate buffer, 25  a phosphate buffer and the like.

For obtaining pH values from about 5 to about 5.5 the

- 6 -

addition of the acid is not, usually, necessary, but only
addition of a physiologically acceptable buffer solution,
e.g., one of those indicated above, may be required, as
desired.

5       For obtaining pH values from about 5.5 to 6.5 the
addition of a physiologically acceptable alkalinizing agent,
such as sodium hydroxide, a mono, di- or triethanolamine or
the like, or a buffer solution such as a phosphate buffer, a
TRIS buffer or the like is required.

10      The preferred range of pH for the ready-to-use solution
of the invention is from 2.5 to 5.5, in particular from about
3 to about 5.2, a pH of about 3 and a pH of about 5 being
particularly preferred values.

        In the solutions of the invention the concentration of
15  the anthracycline glycoside may vary within broad ranges,
preferably from 0.1 mg/ml to 100 mg/ml, in particular from
0.1 mg/ml to 50 mg/ml, most preferably from 1 mg/ml to 20
mg/ml.

        The preferred ranges of concentration may be slightly
20  different for different anthracycline glycosides. Thus, for
example, preferred concentrations for doxorubicin are from
about 2 mg/ml to about 50 mg/ml, preferably from 2 mg/ml to
20 mg/ml, particularly appropriate values being 2 mg/ml and 5
mg/ml. Similar concentrations are preferred also for

25  4'-epi-doxorubicin, 4'-desoxy-doxorubicin and
4'-desoxy-4'-iodo-doxorubicin. Preferred ranges of
concentration for daunorubicin and 4-demethoxy-daunorubicin

- 7 -

are from 0.1 mg/ml to 50 mg/ml, preferably from 1 mg/ml to 20
mg/ml, concentrations of 1 mg/ml and 5 mg/ml being
particularly appropriate.

Suitable packaging for the anthracycline glycoside
5    solutions may be all approved containers intended for
parenteral use, such as plastic and glass containers,
ready-to-use syringes and the like. Preferably the container
is a sealed glass container, e.g. a vial or an ampoule.

According to a particularly preferred feature of the
10   invention, there is provided a sterile, pyrogen-free,
doxorubicin solution which consists essentially of a
physiologically acceptable salt of doxorubicin dissolved in a
physiologically acceptable solvent therefor, which has not
been reconstituted from a lyophilizate and which has a pH of
15   from 2.5 to 6.5.

In the above indicated preferred feature of the
invention the physiologically acceptable salt of doxorubicin
may be, e.g. the salt with a mineral inorganic acid such as
hydrochloric, hydrobromic, sulfuric, phosphoric, nitric and
20   the like, or the salt with an organic acid such as acetic,
succinic, tartaric, ascorbic, citric, glutammic, benzoic,
methanesulfonic, ethanesulfonic and the like. The
hydrochloride salt is a particularly preferred salt.

For the solution hereabove indicated as a preferred
25   feature of the invention suitable solvents, co-solubilizing
agents, tonicity adjustment agents and preservatives may be

- 8 -

the same as those previously recited in this specification.
Water is a particularly preferred solvent.

Also, the physiologically acceptable acid which may be
added to adjust the pH to from 2.5 to about 5, if desired,
5   and the alkanilizing agent which may be added to adjust the
pH, if desired, to a value from about 5.5 to 6.5 may be one
of those previously specified.  When it is desired to adjust
the pH of the above said preferred solution to a value of
from 2.5 to about 5, hydrochloric acid is an especially
10  preferred acid.  Preferred pH values for the above said
preferred solutions of the invention are from 2.5 to 5.5, in
particular from about 3 to about 5.2, the pH values of 3 and
5 being especially preferred.

Though the concentration of doxorubicin in the above
15  preferred feature may vary within the broad range from 0.1
mg/ml to 100 mg/ml, preferred concentrations are from 2 mg/ml
to 50 mg/ml, most preferably from 2 mg/ml to 20 mg/ml:
examples of especially preferred concentrations of
doxorubicin are 2 mg/ml and 5 mg/ml.

20      The invention also provides a process for producing a
sterile, pyrogen-free anthracycline glycoside solution with a
pH of from 2.5 to 6.5, which process comprises dissolving a
physiologically acceptable salt of the anthracycline
glycoside, which salt is not in the form of a lyophilizate,

- 9 -

in a physiologically acceptable solvent therefor; optionally
adding a physiologically acceptable acid or buffer to adjust
the pH within the said range as desired; and passing the
resulting solution through a sterilising filter.

5        One or more additional components such as
co-solubilizing agents, tonicity adjustment agents and
preservatives, for instance of the kind previously specified,
may be added to the solution prior to passing the solution
through the sterilising filter.

10       With the solutions of the invention it is possible to
obtain compositions having a very high concentration of the
anthracycline glycoside active substance even at 50 mg/ml and
more.  This constitutes a great advantage over the presently
available lyophilized preparates wherein high concentrations
15  of anthracycline glycoside can only be obtained with
difficulty because of solubilization problems encountered in
reconstitution, mainly with saline.  The presence of the
excipient, e.g. lactose, in the lyophilized cake, and its
generally high proportion in respect of the active substance,
20  even up to 5 parts of excipient per part of active substance,
has a negative effect on solubilization so that difficulties
may arise in obtaining dissolution of the lyophilized cake,

- 10 -

especially for concentrations of anthracycline glycoside
higher than 2 mg/ml.

The solutions of the invention are characterized by a
good stability.  Solutions in various solvents and with
5  different pH's and concentrations have been found to be
stable for long periods at temperatures accepted for the
storage of pharmaceutical preparations.  This is illustrated
in the Examples which follow.

Owing to the well known anti-tumor activity of the
10  anthracycline glycoside active drug substance, the
pharmaceutical compositions of the invention are useful for
treating tumors in both human and animal hosts.  Examples of
tumors that can be treated are, for instance, sarcomas,
including osteogenic and soft tissue sarcomas, carcinomas,
15  e.g., breast-, lung-, bladder-, thyroid-, prostate- and
ovarian carcinoma, lymphomas, including Hodgkin and
non-Hodgkin lymphomas, neuroblastoma, Wilms tumor, and
leukemias, including acute lymphoblastic leukemia and acute
myeloblastic leukemia.

- 11 -

Examples of specific tumours that can be treated are Moloney
Sarcoma Virus, Sarcoma 180 Ascites, solid Sarcoma 180, gross
transplantable leukemia, L 1210 leukemia and lymphocytic P 388
leukemia.

Thus, according to the invention there is also provided a method
of inhibiting the growth of a tumour, in particular one of those
indicated above, which comprises administering to a host suffer-
ing from said tumour an  injectable solution according to the
invention containing the active drug substance in an amount
sufficient to inhibit the growth of said tumour.

The injectable solutions of the invention are administered by
rapid intravenous injection or infusion according to a variety
of possible dose schedules. Suitable dose schedule for doxoru-
bicin may be, for example, of 60 to 75 mg of active drug sub-
stance per $m^2$ of body surface given as a single rapid infusion
and repeated at 21 days; an alternative schedule may be of
30 $mg/m^2$ day by intravenous route for 3 days, every 28 days.
Suitable dosages for 4'-epi-doxorubicin and 4'-desoxy-doxoru-
bicin may be, for instance, of 75 to 90 $mg/m^2$ given in a single
infusion to be repeated at 21 days, and similar dosages may be
useful also for 4'-desoxy-4'-iodo-doxorubicin.

Idarubicin, i.e. 4-demethoxy-daunorubicin, may be, e.g., admi-
nistered intravenously at a single dose of 13-15 $mg/m^2$ every
21 days in the treatment of solid tumours, while in the
treatment of leukemias a preferred dose schedule is, e.g.,

- 12 -

of 10-12 mg/m$^2$ day by intravenous route for 3 days, to be
repeated every 15-21 days; similar dosages may be, e.g.,
followed also for daunorubicin.

The following examples illustrate but do not limit in any

5   way the invention.

With reference to the examples, the stability controls on
the ready-to-use solutions were carried out by means of high
performance liquid chromatography (HPLC), at the following
experimental conditions:

10  Liquid chromatograph        : Varian model 5010

    Spectrophotometric detector : Knauer model 8700

    Integrating recorder        : Varian model CDS 401

    Injection valve             : Rheodyne model 7125 fitted with
                                   a 10 mcl sample loop

15  Chromatographic column      : Waters μ-Bondapak C18
                                   (length = 300 mm; inner diameter
                                   = 3.9 mm; average particle size =
                                   10 mcm)

    Column temperature          : ambient (about 22°C $\pm$ 2°C)

20  Mobile phase                : water : acetonitrile (69:31 v/v)
                                   adjusted to pH 2 with phosphoric
                                   acid, filtered (sintered glass
                                   filter, 1 mcm or finer porosity)
                                   and deaerated

25  Mobile phase flow rate      : 1.5 ml/min

    Analytical wavelength       : 254 $\pm$ 1 nm

- 13 -

Integrating recorder sensitivity :    512

Chart speed                    :    1 cm/min

At these conditions, the peak of the anthracycline glycoside showed a retention time of about 6 minutes.

5    The obtained results are reported in the Tables accompanying the examples.

The analytical data were extra- polated following an Arrhenius plot in order to determine the time when the 90% of the initial assay could be expected

10    ($t_{90}$ value).

This procedure of analytical data treatment is well known and widely used and described in the art: see, e.g., Chemical Stability of Pharmaceuticals, Kennet A. Connors, Gordon L. Amidon, Lloyd Kennon, Publ.John Wiley and Sons, New York, N.Y.,

15    1979.

- 14 -

<u>Example 1</u>

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.8 g | (10 mg) |
| Water for injections | | |
| q.s. to | 0.4 l | (5 ml) |

Doxorubicin.HCl (0.80 g) was dissolved in 90 percent of
the amount of water for injections, de-aerated by nitrogen
bubbling.  The pH of the solution was not adjusted.  Further
de-aerated water for injections was then added to bring the
solution to its final volume (0.40 l).

The solution was filtered through an 0.22 μ microporous
membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of $55^{o}C$, $45^{o}C$ and $35^{o}C$
(accelerated stability controls) and at $4^{o}C$ for up to 3 weeks
($55^{o}C$), 4 weeks ($45^{o}C$ and $35^{o}C$) and 12 weeks ($4^{o}C$).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 1:

- 15 -

Table 1

| INITIAL VALUES | | | | | | | |
|----------------|---|---|---|---|---|---|---|
| Concentration:1.994 mg/ml     pH = 5.2 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.992 | 99.9 | 1.917 | 96.1 | 1.768 | 88.7 | 1.493 | 75.0 |
| 2 | | | 1.843 | 92.4 | 1.618 | 81.1 | 1.166 | 58.5 |
| 3 | | | 1.774 | 89.0 | 1.506 | 75.5 | 0.830 | 41.6 |
| 4 | 1.974 | 99.0 | 1.720 | 86.3 | 1.393 | 69.9 | | |
| 8 | | | | | | | | |
| 12 | 1.980 | 99.3 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 815 days

$t_{90}$ at 8°C = 480 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.

- 16 -

Example 2

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.8 g | (10 mg) |
| Hydrochloric acid 0.1N | | |
| 5   q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5 ml) |

Doxorubicin.HCl (0.8 g) was dissolved in 90 percent of
the amount of water for injections, de-aerated by nitrogen
10 bubbling.  The hydrochloric acid was then added dropwise to
adjust the pH of the solution to 3.  Further de-aerated water
for injections was then added to bring the solution to its
final volume (0.4 l).

The solution was filtered through an 0.22 μ microporous
15 membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

20    The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55°C, 45°C and 35°C
(accelerated stability controls) and at 4°C for up to 3 weeks
(55°C), 4 weeks (45°C and 35°C) and 12 weeks (4°C).

The stability data obtained, using high performance
25 liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 2:

- 17 -

Table 2

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration:1.992 mg/ml        pH = 3.0 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| (weeks) | 4° C | | 35°C | | 45°C | | 55° C |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.995 | 100.2 | 1.952 | 98.0 | 1.919 | 96.3 | 1.493 | 75.0 |
| 2 | | | 1.889 | 94.8 | 1.851 | 92.9 | 1.036 | 51.9 |
| 3 | | | 1.876 | 94.2 | 1.565 | 78.6 | 0.730 | 36.7 |
| 4 | 1.979 | 99.4 | 1.808 | 90.8 | 1.393 | 69.9 | | |
| 8 | | | | | | | | |
| 12 | 1.972 | 99.0 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 3970 days

$t_{90}$ at 8°C = 2000 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.

- 18 -

<u>Example 3</u>

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.0 g | (100 mg) |
| Hydrochloric acid 0.1N | | |

5   q.s. to                 pH = 3        (pH = 3)

Water for injections

q.s. to                  0.4 l         (5 ml)

Doxorubicin.HCl (8.0 g) was dissolved in 90 percent of
the amount of water for injections, de-aerated by nitrogen
10  bubbling.  The hydrochloric acid was then added dropwise to
adjust the pH of the solution to 3.  Further de-aerated water
for injections was then added to bring the solution to its
final volume (0.4 l).

The solution was filtered through an 0.22 µ microporous
15  membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

20      The stability of the solutions in the vials was tested.
The vials were stored at temperatures of $55^{o}C$, $45^{o}C$ and $35^{o}C$
(accelerated stability controls) and at $4^{o}C$ for up to 3 weeks
($55^{o}C$), 4 weeks ($45^{o}C$ and $35^{o}C$) and 12 weeks ($4^{o}C$).

The stability data obtained, using high performance
25  liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 3:

- 19 -

Table 3

| INITIAL VALUES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Concentration: 20.06 mg/ml     pH = 2.95 | | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 20.06 | 100.0 | 19.56 | 97.5 | 17.84 | 88.9 | 12.31 | 61.4 |
| 2 | | | 18.87 | 94.1 | 15.61 | 77.8 | 7.09 | 35.3 |
| 3 | | | 18.24 | 90.9 | 13.41 | 66.8 | 3.13 | 15.6 |
| 4 | 19.91 | 99.2 | 17.51 | 87.3 | 11.07 | 55.2 | | |
| 8 | | | | | | | | |
| 12 | 19.80 | 98.7 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 3700 days

$t_{90}$ at 8°C = 1780 days

Similar stability data can be observed for analogous solutions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubicin, as hydrochloride salts, at the same 20 mg/ml concentration.

- 20 -

## Example 4

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Polyvinylpyrrolidone | 20.00 g | (250.0 mg) |
| 5  Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

Doxorubicin.HCl (0.80 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling.  The pH of the solution was not adjusted.
10  Polyvinylpyrrolidone was added and dissolved under stirring and nitrogen bubbling.  Further de-aerated water for injections was then added to bring the solution to its final volume (0.40 l).

The solution was filtered through a 0.22 µ microporous
15  membrane under nitrogen pressure.  Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity.  The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

20     The stability of the solutions in the vials was tested.  The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks (55°C), 4 weeks (45°C and 35°C) and 8 weeks (4°C).

The stability data obtained, using high performance
25  liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 4:

- 21 -

Table 4

| INITIAL VALUES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Concentration:1.986 mg/ml    pH = 4.6 | | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | | |

| TIME | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (weeks) | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.984 | 99.9 | 1.928 | 97.1 | 1.797 | 90.5 | 1.605 | 80.8 |
| 2 | | | 1.847 | 93.0 | 1.616 | 81.4 | 1.293 | 65.1 |
| 3 | | | 1.828 | 92.0 | 1.527 | 76.9 | 1.018 | 51.3 |
| 4 | 1.928 | 97.1 | 1.797 | 90.5 | 1.403 | 70.7 | | |
| 8 | 1.989 | 100.1 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1460 days

$t_{90}$ at 8°C = 835 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.

- 22 -

Example 5

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.800 g | (10.00 mg) |
| N,N-Dimethylacetamide | 0.060 l | (0.75 ml) |
| Propylene glycol | 0.048 l | (0.60 ml) |
| Ethanol | 0.012 l | (0.15 ml) |
| Hydrochloric acid 0.1N q.s. to | pH = 3 | (pH = 3) |
| Water for injections q.s. to | 0.400 l | (5.00 ml) |

Doxorubicin.HCl (0.800 g) was dissolved in 90 percent of
the amount of water for injections, de-aerated by nitrogen
bubbling.  N,N-dimethylacetamide, propylene glycol and
ethanol were subsequently added under stirring and nitrogen

15 bubbling.  The hydrochloric acid was then added dropwise to
adjust the pH of the solution to 3.  Further de-aerated water
for injections was then added to bring the solution to its
final volume (0.400 l).

The solution was filtered through an 0.22 μ microporous

20 membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

25 The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55°C, 45°C and 35°C
(accelerated stability controls) and at 4°C for up to 3 weeks
(55°C), 4 weeks (45°C and 35°C) and 8 weeks (4°C).

The stability data obtained, using high performance

30 liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 5:

- 23 -

Table 5

| INITIAL VALUES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Concentration: 2.000 mg/ml | | | | pH = 3.03 | | | | |
| Relative % Assay: 100.0 | | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | | | 1.892 | 94.6 | 1.735 | 86.7 | 1.495 | 74.7 |
| 2 | 1.993 | 99.7 | 1.927 | 96.4 | 1.624 | 81.2 | 1.212 | 60.6 |
| 3 | | | 1.908 | 95.4 | 1.432 | 71.6 | 1.032 | 51.6 |
| 4 | 2.00 | 100.0 | 1.863 | 93.2 | 1.266 | 63.3 | | |
| 8 | 1.960 | 98.0 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 4360 days

$t_{90}$ at 8°C = 2200 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.

- 24 -

### Example 6

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.8 g | (10.0 mg) |
| Polyvinylpyrrolidone | 20.0 g | (250.0 mg) |

5   Hydrochloric acid 0.1N

| q.s. to | pH = 3 | (pH = 3) |
|---|---|---|
| Water for injections | | |
| q.s. to | 0.4 l | (5.0 ml) |

Doxorubicin.HCl (0.8 g) was dissolved in 90 percent of

10   the amount of water for injections, de-aerated by nitrogen
bubbling.  Polyvinylpyrrolidone was added and dissolved under
stirring and nitrogen bubbling.  The hydrochloric acid was
then added dropwise to adjust the pH of the solution to 3.
Further de-aerated water for injections was then added to

15   bring the solution to its final volume (0.4 l).

The solution was filtered through an 0.22 µ microporous
membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with

20   chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of $55^{\circ}C$, $45^{\circ}C$ and $35^{\circ}C$
(accelerated stability controls) and at $4^{\circ}C$ for up to 3 weeks

25   ($55^{\circ}C$), 4 weeks ($45^{\circ}C$ and $35^{\circ}C$) and 8 weeks ($4^{\circ}C$).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of

- 25 -

Table 6

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration: 1.973 mg/ml | | | | pH = 2.71 | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 2.028 | 102.8 | 1.944 | 98.5 | 1.791 | 90.8 | 1.477 | 74.9 |
| 2 | | | 1.885 | 95.5 | 1.582 | 80.2 | 0.972 | 49.3 |
| 3 | | | 1.840 | 93.2 | 1.402 | 71.0 | 0.632 | 32.0 |
| 4 | 1.913 | 97.0 | 1.853 | 93.9 | 1.273 | 64.5 | | |
| 8 | 1.972 | 99.9 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 5560 days

$t_{90}$ at 8°C = 2670 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.

- 26 -

Example 7

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.00 g | (100.0 mg) |
| N,N-Dimethylacetamide | 0.12 l | (1.5 ml) |

5  Hydrochloric acid 0.1N

q.s. to                     pH = 3          (pH = 3)

Water for injections

q.s. to                     0.40 l          (5.0 ml)

Doxorubicin.HCl (8.00 g) was dissolved in 90 percent of
10  the amount of water for injections, de-aerated by nitrogen
bubbling.  N,N-dimethylacetamide was added under stirring and
nitrogen bubbling.  The hydrochloric acid was then added
dropwise to adjust the pH of the solution to 3.  Further
de-aerated water for injections was then added to bring the
15  solution to its final volume (0.40 l).

The solution was filtered through a 0.22 μ microporous
membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
20  chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of $55^{O}C$, $45^{O}C$ and $35^{O}C$
(accelerated stability controls) and at $4^{O}C$ for up to 3 weeks
25  ($55^{O}C$), 4 weeks ($45^{O}C$ and $35^{O}C$) and 8 weeks ($4^{O}C$).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of

– 27 –

Table 7

| INITIAL VALUES<br>Concentration: 19.32 mg/ml<br>Relative % Assay: 100.0 | | | | | | | | pH = 2.96 |
|---|---|---|---|---|---|---|---|---|

| TIME<br>(weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc.<br>mg/ml | Rel.%<br>Assay | Conc.<br>mg/ml | Rel.%<br>Assay | Conc.<br>mg/ml | Rel.%<br>Assay | Conc.<br>mg/ml | Rel.%<br>Assay |
| 1 | 20.1 | 103.5 | 19.14 | 99.1 | 17.34 | 89.8 | 15.57 | 80.6 |
| 2 | | | 19.20 | 99.4 | 15.77 | 81.6 | 12.94 | 67.0 |
| 3 | | | 18.06 | 93.5 | 14.85 | 76.9 | 11.61 | 60.1 |
| 4 | 20.03 | 103.7 | 17.81 | 92.2 | 13.78 | 71.3 | | |
| 8 | 19.99 | 103.5 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1310 days

$t_{90}$ at 8°C = 770 days

Similar stability data can be observed for analogous solutions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubicin, as hydrochloride salts, at the same 20 mg/ml concentration.

- 28 -

### Example 8

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Ethanol | 0.12 l | (1.5 ml) |

5  Hydrochloric acid 0.1 N

q.s. to                        pH = 3           (pH = 3)

Water for injections

q.s. to                        0.40 l           (5.0 ml)

Doxorubicin.HCl (0.80g) was dissolved in 90 percent of

10  the amount of water for injections, de-aerated by nitrogen

bubbling. Ethanol was added under stirring and nitrogen

bubbling. Hydrochloric acid 0.1 N was then added dropwise to

adjust the pH of the solution to 3. De-aerated water for

injections was finally added to bring the solution to its

15  final volume (0.40 l).

The solution was filtered through a 0.22 μ microporous

membrane under nitrogen pressure. Volumes of 5 ml of the

solution were distributed into type I-colourless glass vials

having 5/7 ml capacity. The vials were then closed with

20  chlorobutyl teflon-faced rubber stoppers and sealed with

aluminium caps.

The stability of the solutions in the vials was tested.

The vials were stored at temperatures of 55°C, 45°C and at

35°C (accelerated stability controls) and at 4°C for up to 3

25  weeks (55°C), 4 weeks (45°C and 35°C) and 12 weeks (4°C).

The stability data obtained, using high performance

liquid chromatography (HPLC) for the determination of

potency, are reported in the following Table 8.

- 29 -

Table 8

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration: 1.979 mg/ml        pH = 3.11 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 2.010 | 101.6 | 1.965 | 99.3 | 1.947 | 98.4 | 1.750 | 88.4 |
| 2 | | | 1.957 | 98.9 | 1.910 | 96.5 | 1.645 | 83.1 |
| 3 | | | 1.895 | 95.8 | 1.737 | 87.8 | 1.356 | 68.5 |
| 4 | 1.927 | 97.3 | 1.818 | 91.9 | 1.678 | 84.8 | | |
| 8 | | | | | | | | |
| 12 | 1.939 | 97.9 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1270 days

$t_{90}$ at 8°C =  780 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 204'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.

- 30 -

<u>Example 9</u>

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.000 g | (100.00 mg) |
| N,N-Dimethylacetamide | 0.060 l | (0.75 ml) |
| Propylene glycol | 0.048 l | (0.60 ml) |
| Ethanol | 0.012 l | (0.15 ml) |
| Hydrochloric acid 0.1N q.s. to | pH = 3 | (pH = 3) |
| Water for injections q.s. to | 0.400 l | (5.00 ml) |

5

10

Doxorubicin.HCl (8.000 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling.  N,N-dimethylacetamide, propylene glycol and ethanol were subsequently added under stirring and nitrogen

15 bubbling.  The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3.  Further de-aerated water for injections was then added to bring the solution to its final volume (0.400 l).

The solution was filtered through a 0.22 μ microporous

20 membrane under nitrogen pressure.  Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity.  The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

25        The stability of the solutions in the vials was tested. The vials were stored at temperatures of $55^{\circ}C$, $45^{\circ}C$ and $35^{\circ}C$ (accelerated stability controls) and at $4^{\circ}C$ for up to 3 weeks ($55^{\circ}C$), 4 weeks ($45^{\circ}C$ and $35^{\circ}C$) and 8 weeks ($4^{\circ}C$).

The stability data obtained, using high performance

30 liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 9:

- 31 -

Table 9

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration:20.07 mg/ml          pH = 2.99 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| (weeks) | 4° | | 35° | | 45° | | 55° |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | | | 19.14 | 95.4 | 17.81 | 88.7 | 14.84 | 73.9 |
| 2 | 19.97 | 99.5 | 19.07 | 95.0 | 16.27 | 81.1 | 12.36 | 61.6 |
| 3 | | | 18.08 | 90.1 | 14.62 | 72.9 | 10.04 | 50.0 |
| 4 | 20.06 | 99.9 | 18.03 | 89.8 | 13.20 | 65.8 | | |
| 8 | 19.69 | 98.1 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 846 days

$t_{90}$ at 8°C = 505 days

Similar stability data can be observed for analogous solutions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubicin, as hydrochloride salts, at the same 20 mg/ml concentration.

– 32 –

Example 10

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.0 g | (100.0 mg) |
| Polyvinylpyrrolidone | 20.0 g | (250.0 mg) |

5   Hydrochloric acid 0.1N

q.s. to                pH = 3        (pH = 3)

Water for injections

q.s. to                0.4 l         (5.0 ml)

Doxorubicin.HCl (8.0 g) was dissolved in 90 percent of

10  the amount of water for injections, de-aerated by nitrogen

bubbling.  Polyvinylpyrrolidone was added and dissolved under

stirring and nitrogen bubbling.  The hydrochloric acid was

then added dropwise to adjust the pH of the solution to 3.

Further de-aerated water for injections was then added to

15  bring the solution to its final volume (0.4 l).

The solution was filtered through a 0.22 μ microporous

membrane under nitrogen pressure.  Volumes of 5 ml of the

solution were distributed into type I-colourless glass vials

having 5/7 ml capacity.  The vials were then closed with

20  chlorobutyl teflon-faced rubber stoppers and sealed with

aluminium caps.

The stability of the solutions in the vials was tested.

The vials were stored at temperatures of $55^{o}C$, $45^{o}C$ and $35^{o}C$

(accelerated stability controls) and at $4^{o}C$ for up to 3 weeks

25  $(55^{o}C)$, 4 weeks $(45^{o}C$ and $35^{o}C)$ and 8 weeks $(4^{o}C)$.

The stability data obtained, using high performance

liquid chromatography (HPLC) for the determination of

potency, are reported in the follilowing Table 10:

- 33 -

**Table 10**

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration:  19.57 mg/ml      pH = 2.62 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 19.54 | 99.9 | 19.11 | 97.6 | 16.88 | 86.2 | 12.48 | 63.8 |
| 2 | | | 18.43 | 94.2 | 14.13 | 72.2 | 6.00 | 30.7 |
| 3 | | | 18.02 | 92.1 | 11.57 | 59.1 | 2.61 | 13.3 |
| 4 | 19.58 | 100.1 | 17.36 | 88.7 | 9.23 | 47.2 | | |
| 8 | 19.34 | 98.8 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 2540 days

$t_{90}$ at 8°C = 1290 days

Similar stability data can be observed for analogous solutions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubicin, as hydrochloride salts, at the same 20 mg/ml concentration.

- 34 -

Example 11

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| N,N-Dimethylacetamide | 0.12 1 | (1.5 ml) |
| Hydrochloric acid 0.1N q.s. to | pH = 3 | (pH = 3) |
| Water for injections q.s. to | 0.40 1 | (5.0 ml) |

5 Hydrochloric acid 0.1N

Doxorubicin.HCl (0.80 g) was dissolved in 90% of the
10 amount of water for injections, de-aerated by nitrogen
bubbling. N,N-Dimethylacetamide was added under stirring and
nitrogen bubbling. Hydrochloric acid 0.1N was then added
dropwise to adjust the pH of the solution to 3. De-aerated
water for injections was finally added to bring the solution
15 to its final volume (0.40 1).

The solution was filtered through a 0.22 μ microporous
membrane under nitrogen pressure. Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity. The vials were then closed with
20 chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of $55^{o}C$, $45^{o}C$ and $35^{o}C$
(accelerated stability controls) and at $4^{o}C$ for up to 3 weeks
25 ($55^{o}C$), 4 weeks ($45^{o}C$ and $35^{o}C$) and 8 weeks ($4^{o}C$).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 11:

- 35 -

Table 11

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration: 1.826 MG?ML    pH = 3.14 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml Rel.% Assay |
| 1 | 1.830 | 100.2 | 1.812 | 99.2 | 1.784 | 97.7 | 1.605  87.9 |
| 2 | 1.818 | 99.6 | 1.781 | 97.5 | 1.554 | 85.1 | 1.292  70.8 |
| 3 | | | 1.743 | 95.4 | 1.409 | 77.2 | 1.018  55.7 |
| 4 | 1.823 | 99.8 | 1.734 | 95.0 | 1.369 | 75.0 | |
| 8 | 1.792 | 98.2 | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 5815 days

$t_{90}$ at 8°C = 2920 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-epi-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.

- 36 -

Example 12

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Propylene glycol | 0.12 l | (1.5 ml) |

5   Hydrochloric acid 0.1N

| q.s. to | pH = 3 | (pH = 3) |
|---|---|---|
| Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

Doxorubicin.HCl (0.80 g) was dissolved in 90% of the
10  amount of water for injections de-aerated by nitrogen
bubbling.  Propylene glycol was added under stirring and
nitrogen bubbling.  Hydrochloric acid 0.1 N was then added
dropwise to adjust the pH of the solution to 3.  De-aerated
water for injections was finally added to bring the solution
15  to its final volume (0.40 l).

The solution was filtered through a 0.22 µ microporous
membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
20  chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55°C, 45°C and 35°C
(accelerated stability controls) and at 4°C for up to 3 weeks
25  (55°C), 4 weeks (45°C and 35°C) and 4 weeks (4°C).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
_____ in the following Table 12:

- 37 -

Table 12

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration: 1.982 mg/ml | | | | pH = 3.11 | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml Rel.% Assay |
| 1 | 1.972 | 99.5 | 1.934 | 97.6 | 1.889 | 95.3 | 1.705  86.0 |
| 2 | | | 1.952 | 98.5 | 1.795 | 90.6 | 1.483  74.8 |
| 3 | | | 1.935 | 97.6 | 1.699 | 85.7 | 1.153  58.2 |
| 4 | 2.056 | 103.7 | 1.788 | 90.2 | 1.460 | 73.7 | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1794 days

$t_{90}$ at 8°C = 1025 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml 5 mg/ml concentration.

- 38 -

Example 13

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Polyethylene glycol 400 | 0.12 l | (1.5 ml) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

5

Doxorubicin.HCl (0.80 g) was dissolved in 90% of the

10 amount of water for injections, de-aerated by nitrogen

bubbling. Polyethylene glycol 400 was added under stirring

and nitrogen bubbling. Hydrochloric acid 0.1 N was then

added dropwise to adjust the pH of the solution to 3.

De-aerated water for injections was finally added to bring

15 the solution to its final volume (0.40 l).

The solution was filtered through a 0.22 μ microporous

membrane under nitrogen pressure. Volumes of 5 ml of the

solution were distributed into type I-colourless glass vials

having 5/7 ml capacity. The vials were then closed with

20 chlorobutyl teflon-faced rubber stoppers and sealed with

aluminium caps.

The stability of the solutions in the vials was tested.

The vials were stored at temperatures of 55$^{\circ}$C, 45$^{\circ}$C and 35$^{\circ}$C

(accelerated stability controls) and at 4$^{\circ}$C for up to 3 weeks

25 (55$^{\circ}$C), 4 weeks (45$^{\circ}$C and 35$^{\circ}$C) and 4 weeks (4$^{\circ}$C).

The stability data obtained, using high performance

liquid chromatography (HPLC) for the determination of

- 39 -

Table 13

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration: 1.907 mg/ml       pH = 3.07 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| (weeks) | 4°C | | 35°C | | 45°C | | 55°C |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.871 | 98.1 | 1.797 | 94.2 | 1.668 | 87.5 | 1.484 | 77.8 |
| 2 | | | 1.710 | 89.7 | 1.608 | 84.3 | 1.237 | 64.9 |
| 3 | | | 1.739 | 91.2 | 1.551 | 81.3 | 1.007 | 52.8 |
| 4 | 1.873 | 98.2 | 1.693 | 88.8 | 1.453 | 76.2 | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1130 days

$t_{90}$ at 8°C =  680 days

    Similar stability data can be observed also for analogous

solutions containing either doxorubicin hydrochloride at 5mg/

ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin,

4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-

daunorubicin, as hydrochloride salts, at both 2 mg/ml and

5 mg/ml concentration.

- 40 -

## CLAIMS

1.    A sterile, pyrogen-free, anthracycline glycoside
solution which consists essentially of a physiologically
acceptable salt of an anthracycline glycoside dissolved in a
5   physiologically acceptable solvent therefor, which has not
been reconstituted from a lyophilizate and which has a pH of
from 2.5 to 6.5.

.2.    A solution according to claim 1 in a sealed container.

3.    A solution according to claim 1 or 2 wherein the
10  anthracycline glycoside is chosen from the group consisting
of doxorubicin, 4'-epi-doxorubicin, 4'-desoxy-doxorubicin,
4'-desoxy-4'-iodo-doxorubicin, daunorubicin and 4-demethoxy-
daunorubicin.

4.    A solution according to claim 3 wherein the
15  anthracycline glycoside is doxorubicin.

5.    A solution according to any one of the preceding claims
wherein the physiologically acceptable salt of the
anthracycline glycoside is the salt with a physiologically
acceptable acid chosen from the group consisting of
20  hydrochloric, hydrobromic, sulfuric, phosphoric, nitric,
acetic, succinic, tartaric, ascorbic, citric, glutammic,
benzoic, methanesulfonic and ethanesulfonic acid.

6.    A solution according to claim 5 wherein the
physiologically acceptable salt of the anthracycline
25  glycoside is the salt with hydrochloric acid.

7.    A solution according to any one of the preceding claims
having a pH of from 2.5 to 5.5

8.    A solution according to claim 7 having pH 3 or pH 5.

9.    A solution according to any one of the preceding claims
30  wherein the physiologically acceptable solvent for the
anthracycline glycoside is chosen from the group consisting
of water, ethanol, polyethyleneglycol, dimethylacetamide and
mixtures thereof.

10.    A solution according to claim 9 wherein the
35  physiologically acceptable solvent is water.

- 41 -

11.  A solution according to any one of the preceding claims wherein the concentration of the anthracycline glycoside is from 0.1 mg/ml to 100 mg/ml.

12.  A solution according to claim 11 wherein the
5    concentration of the anthracycline glycoside is from 0.1 mg/ml to 50 mg/ml.

13.  A solution according to claim 12 wherein the concentration of the anthracycline glycoside is from 1 mg/ml to 20 mg/ml.

10   14.  A sterile, pyrogen-free, doxorubicin solution which consists essentially of a physiologically acceptable salt of doxorubicin dissolved in a physiologically acceptable solvent therefor, which has not been reconstituted from a lyophilizate and which has a pH of from 2.5 to 6.5.

15   15.  A solution according to claim 14 in a sealed container.

16.  A solution according to claim 14 or 15 wherein the physiologically acceptable salt of doxorubicin is the salt with a physiologically acceptable acid chosen from the group consisting of hydrochloric, hydrobromic, sulfuric,
20   phosphoric, nitric, acetic, succinic, tartaric, ascorbic, citric, glutammic, benzoic, methanesulfonic and ethanesulfonic acid.

17.  A solution according to claim 16 wherein the physiologically acceptable salt of doxorubicin is the salt
25   with hydrochloric acid.

18.  A solution according to any one of claims 14 to 17 having a pH of from 2.5 to 5.5.

19.  A solution according to claim 18 having pH 3 or pH 5.

20.  A solution according to any one of claims 14 to 19
30   wherein the physiologically acceptable solvent for doxorubicin is chosen from the group consisting of water, ethanol, polyethyleneglycol, dimethylacetamide and mixtures thereof.

21.  A solution according to claim 20 wherein the
35   physiologically acceptable solvent is water.

- 42 -

22.  A solution according to any one of claims 14 to 21
wherein the concentration of doxorubicin is from 0.1 mg/ml to
100 mg/ml.

23.  A solution according to claim 22 wherein the
5  concentration of doxorubicin is from 2 mg/ml to 50 mg/ml.

24.  A solution according to claim 23 wherein the
concentration of doxorubicin is from 2 mg/ml to 20 mg/ml.

25.  A solution according to claim 24 wherein the
concentration of doxorubicin is 2 mg/ml or 5 mg/ml.

10  26.  A process for producing a sterile, pyrogen-free,
anthracycline glycoside solution with a pH of from 2.5 to
6.5, according to any one of the preceding claims, which
process comprises dissolving a physiologically acceptable
salt of the anthracycline glycoside, which salt is not in the
15  form of a lyophilizate, in a physiologically acceptable
solvent therefor; optionally adding a physiologically
acceptable acid or buffer to adjust the pH within the said
range as desired; and passing the resulting solution through
a sterilising filter.

20  27.  A process according to claim 26 wherein an additional
component selected from co-solubilizing agents, tonicity
adjustment agents and preservatives is added to the solution
prior to passing the solution through a sterilising filter.

28.  A process according to claim 27 wherein the
25  co-solubilizing agent is polyvinylpyrrolidone.

29.  A method of inhibiting the growth of a tumour selected
from sarcomas, carcinomas, lymphomas, neuroblastoma,
leukemias and Wilms tumour, which method comprises
administering to a host suffering from said tumour a sterile,
30  pyrogen-free solution according to any one of claims 1 to 25,
containing the active drug substance in an amount sufficient
to inhibit the growth of said tumour.

30.  A method according to claim 29 wherein the tumour is
selected from the group consisting of Moloney Sarcoma Virus,
35  Sarcoma 180 Ascites, Solid Sarcoma 180, gross transplantable
leukemia, L 1210 leukemia and lymphocitic P 388 leukemia.

# EXHIBIT 11



Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2002 WL 31355255 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

◨
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
FRANCE TELECOM S.A., Telediffusion de France
S.A., and U.S. Philips Corp., Plaintiffs,
v.
NOVELL, INC., Defendant.
No. 102-437-GMS.

Oct. 17, 2002.

MEMORANDUM AND ORDER
SLEET, District J.

I. INTRODUCTION

*1 On May 17, 2002, the plaintiffs, France Telecom
S.A. ("France Telecom"), TéléDiffusion de France
S.A. ("TDF"), and U.S. Philips Corp. ("Philips")
(collectively "the plaintiffs") filed this action alleging
patent infringement of a computer software system
for accreditating message signatures. The defendant,
Novell, Inc. ("Novell"), filed its Answer and
Counterclaim on July 16, 2002 (D.I.7). In its Answer,
the defendant asserts ten affirmative defenses,
including the affirmative defense of "unclean hands."
The plaintiffs move to strike this fourth affirmative
defense (D.I.8), and the defendant subsequently
moved for leave to file an amended Answer (D.I.12).
For the following reasons, the court will deny the
plaintiffs' motion and grant the defendant's motion.

II. DISCUSSION

A. Defendant's Motion for Leave to Amend Its
Answer

The defendant moves to amend its Answer pursuant
to Federal Rule of Civil Procedure 15(a). Rule 15(a)
provides that a party may amend its complaint "by
leave of court ... and leave shall be freely given when
justice so requires." FED. R. CIV. P. 15(a). Leave
should be freely granted unless there is an apparent or
declared reason for denial, e.g., undue delay, bad
faith, or dilatory motive on the part of the movant;
undue prejudice to the opposing party; or futility of
the amendment. See Foman v. Davis, 371 U.S. 178,
182 (1962); see also In re Burlington Coat Factory

Sec. Litig., 114 F.3d 1410, 1434 (3d Cir.1997). Leave
to amend is particularly warranted when pleadings
lack the requisite factual specificity for a particular
cause of action. See District Council 47 v. Bradley,
795 F.2d 310, 316 (3d Cir.1986). Indeed, "[t]he
clearest cases for leave to amend are correction of an
insufficient claim or defense and amplification of
previously alleged claims or defenses." U.S. v.
Teeven, 1992 WL 683682, at *7 (D.Del. Oct. 27,
1992).

The plaintiffs object to Novell's motion to amend its
Answer because, they argue, it is futile, as the
amended Answer would remain subject to a motion
to strike due to redundancy. For the reasons set out in
Part B below, the court finds the two defenses are not
redundant, and therefore the amendment is not futile.

Nor would the amendment prejudice the plaintiffs by
complicating discovery and confusing issues at trial,
as they assert. Indeed, as the plaintiffs imply in their
briefs, the more particularized amended Answer will
benefit the parties by providing notice of the nature
and grounds of the defense and by narrowing
discovery and preparation efforts.[FN1] None of the
other reasons for denial, such as undue delay, bad
faith, or dilatory motive on Novell's part, has been
alleged, and the court finds no evidence of such. The
defendant's motion for leave to amend the Answer is,
therefore, granted.

> FN1. Referring to the defendant's
> unamended Answer, the plaintiffs asserted:
> "The unclean hands defense will prejudice
> plaintiffs if it remains in its present form ....
> The undefined nature of defendant's current
> pleading could permit defendant to change
> the theory of its defense, without putting
> plaintiffs on notice that this has occurred ....
> Defendant could also utilize the broad and
> undefined nature of its 'unclean hands'
> defense to rationalize 'fishing expeditions'
> on matters that would otherwise not properly
> be subject to discovery." Plaintiffs' Opening
> Brief in Support of Plaintiffs' Motion to
> Strike Defendant's Fourth Affirmative
> Defense of Unclean Hands at 7-8. These
> potential problems will be avoided by the
> amended Answer.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31355255 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**B. Plaintiffs' Motion to Strike Defendant's Fourth Affirmative Defense of Unclean Hands**

The plaintiffs move to strike the defendant's fourth affirmative defense of unclean hands pursuant to Federal Rule of Civil Procedure 12(f). Rule 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant ... matter." FED. R. CIV. P. 12(f). Motions to strike affirmative defenses are disfavored. *Proctor & Gamble Co. v. Nabisco Brands, Inc.,* 697 F.Supp. 1360, 1362 (D.Del.1988). When ruling on such a motion, "the [c]ourt must construe all facts in favor of the nonmoving party ... and deny the motion if the defense is sufficient under the law."

*2 In its unamended form, the defendant's fourth affirmative defense reads: "The Complaint and the relief requested therein are barred, in whole or in part, by the doctrine of unclean hands." The plaintiffs contend this articulation is insufficient and redundant. They allege it is insufficient because it provides no notice of the nature of the unclean hands defense and because it does not detail the relationship between the plaintiffs' alleged inequitable conduct and the plaintiffs' claim.[FN2] Even if amended, the plaintiffs object, the defense is redundant, because Novell also asserts the affirmative defense of inequitable conduct. The plaintiffs maintain that these two affirmative defenses share identical elements and standards of proof. If one fails, the plaintiffs contend, so must the other. The court will now address these objections in turn.

> FN2. Although the plaintiffs seem to have withdrawn the insufficiency objections following the defendant's motion for leave to amend the Answer, the court will address the insufficiency objection *vis-a-vis* the amended Answer.

**1. Sufficiency per Rule 8**

Rule 8 of the Federal Rules of Civil Procedure requires a "short and plain" statement of a claim or defense. FED. R. CIV. P. 8(a) and (b). It is well settled that the Federal Rules intend a liberal pleading standard. *See Leatherman v. Tarrant County Narcotic Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993) (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"). Indeed, Rule 8 expressly mandates that "[e]ach averment of a pleading shall be simple,

concise, and direct." FED. R. CIV. P. 8(e).

The defendant's fourth affirmative defense, as amended, comprises six short paragraphs stating the basis for the unclean hands defense, including the context of the alleged misconduct. This context includes the title, author, and publication date of the reference allegedly withheld by the plaintiffs from the Patent and Trademark Office ("PTO"). The amended affirmative defense clearly meets the threshold sufficiency requirements of Rule 8.

**2. Sufficiency Per Rule 9**

Rule 9 of the Federal Rules of Civil Procedure requires that all pleadings of fraud or mistake "shall be stated with particularity." FED. R. CIV. P. 9(b). Such averments, however, remain subject to the liberal pleading requirements of Rule 8. *See In re Westinghouse Sec. Litig.,* 90 F.3d 696, 703 (3d Cir.1996); *see generally* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1281, at 520-21 (1990) (pleading with particularity under Rule 9(b) should be done consistently with the general philosophy of Rule 8); 2A JAMES W. MOORE, MOORE'S FEDERAL PRACTICE P 8.13, at 8-58 (2d ed.1995) (the mandate of Rule 8 applies "even where the Rules command particularity, as in the pleading of fraud under Rule 9(b)") (footnote omitted). In the context of alleged inequitable conduct before the PTO during a patent prosecution, "pleadings that disclose the name of the [allegedly withheld] relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b)." *EMC Corp. v. Storage Tech. Corp.,* 921 F.Supp. 1261, 1263 (D.Del.1996).

*3 To the extent the defendant's fourth affirmative defense involves fraud and is subject to the particularity requirement of Rule 9(b), this requirement also is satisfied by Novell's amendment. As noted above, the amended Answer discloses the title, author, and publication date of the relevant prior art allegedly withheld from the PTO. Novell's amended fourth affirmative defense suffices "to apprise the other party of what is being alleged in a manner sufficient to permit responsive pleadings" as Rule 9 requires. 5 WRIGHT & MILLER § 1296 (1990).

**3. Nexus between the Unclean Hands Defense and Plaintiffs' Claim**

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31355255 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

The defense of unclean hands requires "an immediate and necessary relation" between the plaintiff's alleged misconduct and the equity sought by that party. *See Keystone Driller Co. v. General Excavator Co., 290 U.S. 240 (1933)* ( "[Courts] apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation."). Indeed, in the Third Circuit, this nexus is "the primary principle guiding application of the unclean hands doctrine." *New Valley Corp. v. Corporate Prop. Assocs. 2 & 3, 181 F.3d 517, 525 (3d Cir.1999).*

The plaintiffs object to Novell's unamended fourth affirmative defense because, they argue, it fails to disclose any relationship between the alleged inequitable conduct constituting unclean hands, and the patent infringement claim at issue. The amended fourth affirmative defense, however, makes clear this relationship. Novell alleges the defendants knowingly, and with an intent to deceive, failed to disclose relevant and material prior art to the Patent and Trademark Office. If such conduct constitutes unclean hands, it would render the patent unenforceable, and the present infringement action necessarily would fail. *See generally Keystone Driller Co. v. General Excavator Co., 290 U.S. 240 (1933).* The relationship between the alleged inequitable conduct on the part of the plaintiffs and the equity sought by them has been made sufficiently clear by Novell's amended Answer.

### 4. Redundancy

The plaintiffs object to Novell's fourth affirmative defense of unclean hands as redundant because it is indistinguishable from Novell's third affirmative defense of inequitable conduct. The elements and standards of proof for the two defenses are identical, the plaintiffs contend, in the context of non-disclosure of material prior art to the PTO during the procurement of a patent.

The court is unconvinced that the two defenses are "identical," even in the context of non-disclosure to the PTO. The Federal Circuit has defined inequitable conduct as the "failure to disclose material information, or submission of false material information, with an intent to deceive." *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 872 (Fed.Cir.1988). Unclean hands, however, remains a broader defense less amenable to a particular checklist of elements. The doctrine of unclean hands

*4 necessarily gives wide range to the equity court's use of discretion .... It is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim.

*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co ., 324 U.S. 806, 815 (1945)* (citation omitted). Although the two affirmative defenses in the instant case may well rest on the same facts and may result in identical outcomes, the defenses themselves are not necessarily identical. Particularly at this early stage in the proceedings and given the disfavor with which motions to strike affirmative defenses are received, the court will allow the fourth affirmative defense to remain, to succeed or fail as it may in the remaining litigation.

### III. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The plaintiffs' motion to strike the defendant's fourth affirmative defense of unclean hands (D.I.8) is DENIED.
2. The defendant's motion for leave to amend its Answer (D.I.12) is GRANTED.
3. The defendant shall file its amended Answer within 10 days of the date of this order.

D.Del.,2002.
France Telecom S.A. v. Novell, Inc.
Not Reported in F.Supp.2d, 2002 WL 31355255 (D.Del.)

END OF DOCUMENT

# EXHIBIT 12

**Westlaw.**

Slip Copy                                                                                          Page 1
Slip Copy, 2005 WL 1745457 (S.D.Tex.)
(Cite as: Slip Copy)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
    United States District Court,S.D. Texas, Houston
                            Division.
    WEATHERFORD INTERNATIONAL, INC. and
        Weatherford/Lamb, Inc., Plaintiffs,
                              v.
    CASETECH INTERNATIONAL, INC., Defendant.
                    No. Civ.A.H-03-5383.

                       July 25, 2005.

Stephen H. Cagle, Howrey LLP, Houston, TX, for
Plaintiffs.
Neal Elton Dry, Dry & Tassin LLP, Stanley E.
Rauhut, Attorney at Law, Thomas M. Fulkerson,
Tammy Jayk Cirigliano, Wilson Fulkerson LLP,
Houston, TX, for Defendant.

                 *MEMORANDUM AND ORDER*

ELLISON, J.
**\*1** Weatherford International, Inc. and
Weatherford/Lamb, Inc. (collectively
"Weatherford") have submitted a Motion to Dismiss
CaseTech's Counterclaims (Doc. # 43). For the
following reasons, the Motion is GRANTED IN
PART and DENIED IN PART.

                    I. BACKGROUND

Weatherford sued CaseTech International, Inc.
("CaseTech") for infringing U.S. Patent No.
5,575,333 ("the '333 patent"). CaseTech has filed
several counterclaims. Weatherford moves under
Federal Rule of Civil Procedure 12(b)(6) to dismiss
the counterclaims of inequitable conduct/fraud on the
Patent and Trademark Office ("PTO"),[FN1] fraud on
the court, and unclean hands.

          FN1.   These   phrases   are   used
          interchangeably.

                 II. MOTION TO DISMISS

A district court will dismiss a claim under Rule
12(b)(6) only if it appears certain that the claimant

"can prove no set of facts in support of his claim
which would entitle him to relief." *Cornish v. Corr.
Servs. Corp.*, 402 F.3d 545, 549 (5th Cir.2005).
When considering a Rule 12(b)(6) motion to dismiss,
a court must "accept the complaint's well-pleaded
facts as true and view them in the light most
favorable to the plaintiff." *Johnson v. Johnson*, 385
F.3d 503, 529 (5th Cir.2004).

              III. INEQUITABLE CONDUCT

Federal Rule of Civil Procedure 9(b) states that
claims alleging fraud must be plead with
particularity. Fed.R.Civ.P. 9(b). Inequitable conduct,
while a broader concept than fraud, must also be
plead with particularity. *Ferguson Beauregard/Logic
Controls v. Mega Systems*, 350 F.3d 1327, 1344
(Fed.Cir.2003). *See also Nortel Networks Ltd. v.
Kyocera Wireless Corp.*, 2002 WL 31114077, \*1
(N.D.Tex. Sept.20, 2002) (stating that Rule 9(b)
applies to the inequitable conduct defense). Rule 9(b)
states that "[i]n all averments of fraud or mistake, the
circumstances constituting fraud or mistake shall be
stated with particularity. Malice, intent, knowledge,
and other condition of mind of a person may be
averred generally." Fed.R.Civ.P. 9(b).

"Inequitable      conduct      includes     affirmative
misrepresentation of a material fact, failure to
disclose material information, or submission of
false material information, coupled with intent to deceive."
*Semiconductor Energy Lab. Co. v. Samsung Elecs.
Co.*, 204 F.3d 1368, 1373 (Fed.Cir.2000) (quotation
and citation omitted). When inequitable conduct is
alleged, the requirements of Rule 9(b) are satisfied in
the following way:
To satisfy the particularity requirement of Rule 9(b),
[CaseTech], as the alleged patent infringer, must state
the time, place and nature of the alleged fraudulent
activity; mere conclusory allegations of fraud are
insufficient. Allegations of inequitable conduct must
give [Weatherford], the patent holder, notice of the
particular misconduct alleged so that it can defend
against the charge. [CaseTech] must offer specific
facts that [Weatherford] can either deny or
controvert. However, although [CaseTech] must
plead specific facts, it need not plead evidence to
satisfy Rule 9(b).

**\*2** *Nortel Networks*, 2002 WL 31114077, \*2 (quoting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1745457 (S.D.Tex.)
(Cite as: Slip Copy)

Page 2

*In re Papst Licensing, GMBH Patent Litig.*, 174
F.Supp.2d 446, 448 (E.D.La.2001).

Weatherford moves to dismiss CaseTech's
inequitable conduct counterclaim for failure to state a
claim. *See* Fed.R.Civ.P. 12(b)(6). Weatherford argues
that the claim is based on insufficient and conclusory
allegations, and that CaseTech has not pled facts to
suggest that the complained of actions were material
to the patent examiner's patentability determination
or that such actions were made with the intent to
deceive the examiner.

CaseTech has clearly stated the time, place, and
nature of the alleged fraudulent activity. The claim of
inequitable conduct is based on the allegation that
after prosecution on the merits of the patent
application was closed, Weatherford resubmitted
drawings that were substantively different from the
drawings that served as the basis for the patent
examination. CaseTech alleges that these drawings
included different structural elements, which were
not pointed out to the examiner, and therefore
Weatherford has committed a fraud on the PTO.

CaseTech has met the heightened pleading
requirements of Rule 9(b) in stating its claim of
inequitable conduct. Weatherford has sufficient
notice of the misconduct alleged so that it can defend
against the charge, and in fact, that is what
Weatherford begins to do in its Motion to Dismiss.
Weatherford's additional evidentiary arguments
defending against CaseTech's allegation of
inequitable conduct, however, are not the proper
subject of a motion to dismiss.

### IV. FRAUD ON THE COURT

Weatherford next moves to dismiss CaseTech's
counterclaim of fraud on the court. The Fifth Circuit
has held that fraud on the court involves a high
degree of misconduct:
To establish fraud on the court, it is necessary to
show an unconscionable plan or scheme which is
designed to improperly influence the court in its
discretion. Generally speaking, only the most
egregious misconduct, such as bribery of a judge or
members of a jury, or the fabrication of evidence by a
party in which an attorney is implicated, will
constitute a fraud on the court. Less egregious
misconduct, such as nondisclosure to the court of
facts allegedly pertinent to the matter before it, will
not ordinarily rise to the level of fraud on the court.

*Fierro v. Johnson*, 197 F.3d 147, 154 (5th Cir.1999)
(quoting *First Nat'l Bank of Louisville v. Lustig*, 96
F.3d 1554, 1573 (5th Cir.1996)).

CaseTech's claim of fraud on the court is based solely
on the allegation that Weatherford provided drawings
to the Court that differ from the original drawings
submitted with the patent application. This alleged
conduct does not rise to the level of egregiousness
encompassed by a claim of fraud on the court.
CaseTech's counterclaim of fraud on the court is
therefore DISMISSED.

### V. UNCLEAN HANDS

CaseTech claims that Weatherford has unclean hands
because it committed a fraud on the PTO.
Weatherford argues that this claim should be
dismissed because it is duplicative, and simply an
assertion of the same defense under a different name.
Though the claims rely on the same underlying
conduct, their remedies differ. "[T]he remedies for
litigation misconduct differ from the remedies for
misconduct in acquisition of a property right. While
inequitable conduct before the PTO renders the
patent unenforceable by any party, the unclean hands
doctrine bars only the offending party." *Aptix Corp.
v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1376
(Fed.Cir.2001). CaseTech is not precluded from
asserting both counterclaims.

### VI. CONCLUSION

*3 Weatherford's Motion to Dismiss (Doc. # 43) is
GRANTED IN PART and DENIED IN PART.
CaseTech's counterclaim of fraud on the court is
DISMISSED. CaseTech may proceed with its
counterclaims of inequitable conduct and unclean
hands.

IT IS SO ORDERED.

S.D.Tex.,2005.
Weatherford Intern., Inc. v. Casetech Intern., Inc.
Slip Copy, 2005 WL 1745457 (S.D.Tex.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 734637 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Reply to Casetech International,
Inc.'s Response to Plaintiffs' Notice of
Reexamination (Feb. 27, 2006)
• 2006 WL 734636 (Trial Motion, Memorandum and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1745457 (S.D.Tex.)
(Cite as: Slip Copy)

Affidavit) Defendant Casetech International, Inc.'s Response to Plaintiffs' Notice of Reexamination (Feb. 24, 2006)

• 2006 WL 734635 (Trial Motion, Memorandum and Affidavit) Reply to Defendant's Response to Weatherford's Motion for Stay (Feb. 2, 2006)

• 2006 WL 432639 (Trial Motion, Memorandum and Affidavit) Defendant Casetech International, Inc.'s Response to Plaintiffs' Motion for Stay (Jan. 30, 2006)

• 2005 WL 3660149 (Trial Pleading) First Amended Complaint (Nov. 15, 2005)

• 2005 WL 2873743 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Casetech's Motion for Reconsideration of the Court's August 12, 2005 Claim Construction Order (Sep. 13, 2005)

• 2005 WL 2298366 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Sur-Reply to Defendant's Motion for Consideration of Newly Discovered Evidence in Connection with Markman Issues (Jul. 22, 2005)

• 2005 WL 2298365 (Trial Motion, Memorandum and Affidavit) Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Consideration of Newly Discovered Evidence in Connection with Markman Issues (Jul. 19, 2005)

• 2005 WL 2298364 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendant's Motion for Consideration of Newly Discovered Evidence in Connection with Markman Issues (Jul. 15, 2005)

• 2004 WL 2724577 (Trial Motion, Memorandum and Affidavit) Defendant Casetech's Reply to Weatherford's Markman Brief (Sep. 3, 2004)

• 2003 WL 24199073 (Trial Pleading) Original Complaint (Nov. 25, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13

# REDACTED