# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY,      )
     )
    Plaintiff,      )
     )
    v.      )     C.A. No. 04-833-KAJ
     )
SICOR, INC. and SICOR      )
PHARMACEUTICALS, INC.,      )
     )
    Defendants.      )

## DEFENDANTS' RESPONSES TO
## PHARMACIA & UPJOHN'S FOURTH SET OF INTERROGATORIES
## (INEQUITABLE CONDUCT CONTENTIONS)

Defendants Sicor Inc. and SICOR Pharmaceuticals, Inc. (collectively "Defendants" or

"Sicor"), by and through their undersigned counsel, for their responses to the Fourth Set of

Interrogatories by Plaintiff Pharmacia & Upjohn Company LLC ("Plaintiff" or "Pharmacia"),

state as follows:

## GENERAL OBJECTIONS

The following general objections ("General Objections") apply to all of Plaintiff's

Interrogatories in this Fourth Set of Interrogatories and are incorporated by reference into each

specific response made herein. The assertion of the same, similar, or additional objections or the

provision of partial answers in the individual responses to these Interrogatories does not waive

any of Sicor's General Objections as set forth below:

1.     Defendants object generally to the Interrogatories to the extent that they purport to

impose burdens or obligations beyond those required by the Federal Rules of Civil Procedure

and the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "Local Rules").

2.      Defendants object generally to the Interrogatories to the extent they seek privileged information, including, without limitation, information which was developed for or in anticipation of litigation, or which constitutes the work product of counsel or confidential attorney-client communications.

3.      Defendants object generally to the Interrogatories to the extent that: (a) they are overbroad, vague, ambiguous, indefinite, compound, or cumulative, (b) compliance would be oppressive and unduly burdensome, (c) they are harassing, (d) they seek information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence and exceed the bounds of the legitimate purposes of discovery, (e) they seek information not in Defendants' possession; and/or (f) they seek information that is equally available to Defendants and Plaintiff.

4.      These responses are submitted without waiving in any way, and on the contrary reserving:

> (i)     the right to amend or supplement any and all responses or other information provided herein at any time upon receipt of additional information; and
>
> (ii)    the right to object on any grounds to the use in evidence or other use of these Responses or other information provided herein in this or any other proceeding by these parties or any other parties or non-parties.

5.      Defendants object to the Interrogatories to the extent they purport to require the identification of "all" persons or documents relating to broad categories of various subjects on the ground that such requests are overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. In most cases, it simply is not reasonably possible to search for and identify all such persons and/or documents. Subject to

-2-

Local Rule 26.1 and without waiving the foregoing, or their other general or specific objections, Defendants will identify and locate after a reasonable search such persons or documents sufficient to provide the information sought.

6.    Defendants anticipate that Pharmacia and its agents as well as non-parties (including the inventors of the patent-in-suit) may have information and/or documents and things in their possession, custody and control that relate to the issues raised by Pharmacia's contention interrogatories.  The responses provided to these contention interrogatories at this stage are preliminary, and Defendants expressly reserve the right to supplement each of their responses to each of Pharmacia's contention interrogatories as discovery proceeds.

7.    These General Objections and any future responses are made for the sole purpose of this action.  By providing a response to these Interrogatories, Defendants do not concede that the information provided is discoverable, relevant, or admissible, and reserve the right to challenge further discovery into the subject matter of any of the individual requests.  Defendants also reserve the right to challenge the competency, relevance, materiality, privilege, and/or admissibility into evidence of any documents, information, or material produced in response to these Interrogatories in this or any subsequent proceeding, or at the trial of this or any other action.

8.    Responses provided to specific Interrogatories are subject to, and without waiver of, the General Objections and those specific objections raised with respect to particular Interrogatories.  Accordingly, the provision of substantive responses to any Interrogatory shall not be construed as an admission or used as the basis for a contention that Plaintiff is entitled to any response more specific than that provided.

## SPECIFIC RESPONSES AND OBJECTIONS

INTERROGATORY NO. 20

State in detail all factual and legal bases for Sicor's contentions (pled or unpled) that any individual associated with the filing or prosecution of any patent application underlying the '285 patent violated the Duty of Candor including (but not limited to) the identity of each individual whom Sicor contends violated the Duty of Candor; a description of how each such individual violated the Duty of Candor; the identity of every reference, document, or fact allegedly not disclosed to from the PTO; the identity of every reference, document, or fact allegedly misrepresented to the PTO; the identity of every reference, document, or fact allegedly withheld or effectively withheld from the PTO; a description of how such action(s) or omission(s) violated the Duty of Candor; the identity of all documents relating to Sicor's contentions of any violation of the Duty of Candor; and the identity of all individuals with knowledge of any alleged violation of the Duty of Candor.

RESPONSE TO INTERROGATORY NO. 20

Defendants object to this interrogatory as being ambiguous with respect to the amount of "detail" necessary to comply with this request. Defendants have made a good faith attempt to describe all factual bases of which they are aware at this juncture in the proceedings for their contention that the Duty of Candor was violated with respect to the '285 patent. Defendants further object to the extent this interrogatory seeks their contentions of the "law" of inequitable conduct as opposed to the application of the applicable law to the factual bases for Sicor's contention that any individual associated with the filing or prosecution of any patent application underlying the '285 patent violated the Duty of Candor. Additionally, the legal standards that apply to allegations of inequitable conduct are equally available to Pharmacia as to Defendants. Further, as the law on inequitable conduct (and the Duty of Candor) is constantly evolving, Sicor reserves the right to rely on the state of the law as it evolves throughout the litigation, including but not limited to legal developments occurring after the close of discovery.

Subject to and without waiver of any of the foregoing objections or the General Objections, at this time, Defendants respond as follows:

Defendants' contentions are set forth in their Amended Counterclaim previously filed with the Court. Defendants reaffirm the contentions set forth therein and set forth further explanation of those contentions hereinbelow with the expectation that the following response be read in conjunction with that pleading. Furthermore, to aid in Pharmacia's understanding of Defendants' contentions, Defendants have provided document production numbers for various citations. These document production numbers do not necessarily constitute an exhaustive list of instances of the cited documents. Moreover, other documents that Defendants have not directly cited to in this response may further prove or illustrate the factual contentions made herein.

At all times during the pendency of a patent application, all individuals associated with the filing or prosecution of a patent application have a duty of candor and good faith to meaningfully and truthfully disclose to the U.S. Patent and Trademark Office (hereinafter "U.S. Patent Office") material information of which they are aware (the "Duty of Candor"). Each individual associated with the filing or prosecution of what ultimately became the '285 patent who was aware of material information was required by U.S. Patent Office practice to submit, or cause to submit, such information to the U.S. Patent Office as part of an Information Disclosure Statement ("IDS") as early in prosecution of the '285 patent as it was known. According to 37 C.F.R. Section 1.56(c):

> Individuals associated with the filing or prosecution of a patent application within the meaning of this section are: (1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

During the course of the prosecution of the '285 patent Sicor contends that the "individuals" with a Duty of Candor included at least the named inventors: Gaetano Gatti, Diego Oldani, Giuseppe Bottoni, Carlo Confalonieri, Luciano Gambini, and Roberto De Ponti; and the

patent attorneys of record including, but not limited to: Daniel Boehnen, Richard Kelly, and Emily Miao. To date, Sicor has only been able to depose Messrs De Ponti and Gambini regarding their roles in the invention and prosecution of the '285 patent. Consequently, Sicor's investigation into these issues is continuing.

Even without all of the depositions, it is still clear that each of the above-mentioned individuals knew that they had a Duty of Candor to the U.S. Patent Office. Each named inventor executed a "Declaration, Power of Attorney and Petition," in which they specifically acknowledged, under penalty of perjury (18 U.S.C. §1001) "the duty to disclose information material to the examination of this application in accordance with Section 1.56(a) of Title 37 Code of Federal Regulations." (PU 0014905 - PU 0014907). Surely Mr. Boehnen, Mr. Kelly, and Ms. Miao are well aware of their Duty of Candor. Mr. Boehnen, Mr. Kelly, and Ms. Miao are each registered to practice before the U.S. Patent Office and as such their actions in association with the prosecution of any patent application are governed by the Duty of Candor. Moreover, as members of the Patent Bar, Mr. Boehnen, Mr. Kelly, and Ms. Miao's actions in association with the prosecution of any patent application are also governed by the Cannons of Professional Responsibility, codified at 37 C.F.R. §10.20 *et seq.*, which includes the admonition that "[a] practitioner should avoid even the appearance of professional impropriety."

Sicor also presently contends that other agents and employees of Pharmacia acted in connection with the filing and prosecution of the '285 patent and, thus, had a Duty of Candor to the U.S. Patent Office in association with the '285 patent. In 1995, notwithstanding the expiration of the basic drug patents nearly a decade earlier and only two years after Pharmacia AB acquired Farmitalia's chemotherapy drug franchise (including the '285 patent and the rest of the Gatti patent family), Adriamycin was still one of Pharmacia AB's top ten products. Given the commercial significance of the Gatti patent family and the '285 patent to the highly

profitable continuation of this chemotherapy drug franchise, Sicor believes that other individuals were actively and substantially involved in the prosecution of the '285 patent (and its siblings, parents and counterparts) as well as the assertions of the Gatti patents throughout the world. Sicor's investigation is still continuing in this regard, but at this time, Sicor contends that other agents and employees having a Duty of Candor with respect to the '285 patent include, but are not limited to: Geoffrey Woods (a European patent lawyer at J.A. Kemp & Co. whom according to Pharmacia's recent discovery letters to Court is responsible for coordinating worldwide patent prosecution related to the '285 patent and the Gatti patent family); Vittorino Ferrario (characterized in Pharmacia's privilege log as an attorney in Pharmacia's Documentation and Patent Department in Milan, Italy);  and R. Metelli  (characterized in Pharmacia's privilege log as an attorney in Pharmacia's Documentation and Patent Department in Milan, Italy).  Sicor believes that the depositions of the named inventors and U.S.  prosecuting attorneys Boehnen and Miao will shed light on the specific activities of all of the specifically known individuals as well as the identities of other individuals involved in violating the Duty of Candor to the U.S. Patent Office in association with the '285 patent.

For purposes of the Duty of Candor, information is material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. Section 1.56(b)(1991).  In some cases, a stricter standard of materiality has been cited wherein information is "material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability . . . "

37 C.F.R. Section 1.56(b)(1992).

During the course of the prosecution of the '285 patent, U.S. Patent Office practice and the Duty of Candor dictated that the Applicants should avoid the submission of long lists of references in an IDS, and further that if such a long list of references was submitted, the Applicants submitting the IDS should highlight those references which were known to be of significance, particularly those references that might refute, or were inconsistent with, positions taken by the inventors or assignees, or their attorneys or agents, before the U.S. Patent Office.

The Duty of Candor further required, among other things, that each Applicant disclose to the U.S. Patent Office material information arising from related foreign applications and related litigation, and from communications with competitors or other potential infringers. According to Section 2001.06 of the Manual of Patent Examining Procedure (MPEP)(emphasis added):

> Such individuals may be or become aware of material information from various sources such as, for example, co-workers, trade shows, **communications from or with competitors, potential infringers, or other third parties, related foreign applications** (see MPEP Section 2001.06(a)), prior or copending United States patent applications (see MPEP Section 2001.06(b)), **related litigation** (see MPEP Section 2001.06(c)) and preliminary examination searches.

The Duty of Candor further required that the Applicants avoid dumping reams of information upon the U.S. Patent Office late in the course of the prosecution of the '285 patent, which belated dumping involved burying key references within long lists of documents in hopes of hiding information from the attention of U.S. Patent Office.

Based on discovery to date, Sicor contends that at least Gaetano Gatti, Diego Oldani, Giuseppe Bottoni, Carlo Confalonieri, Luciano Gambini, Roberto De Ponti, Daniel Boehnen, Dr. Carlo Confalonieri, Vittorino Ferrario , Richard Kelly, R. Metelli, Emily Miao, and Geoffrey

- 8 -

Woods each jointly and severally violated their Duty of Candor to the U.S. Patent Office in association with the '285 patent.

Gaetano Gatti, Diego Oldani, Giuseppe Bottoni, Carlo Confalonieri, Luciano Gambini, and Roberto De Ponti jointly and severally violated their Duty of Candor to the U.S. Patent Office in association with the '285 patent by falsely communicating in the '285 patent application that actual stability tests had been conducted prior to the filing of the priority document for the '285 patent application (i.e. the UK '452 patent application) for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml. (Beijnen Deposition, 3/1/2006, 91:19 - 96:7). No stability tests were conducted and no data actually existed at the time of filing for any of the molecules (other than doxorubicin hydrochloride at 1 mg/ml, 2 mg/ml and 20 mg/ml). This is particularly and highly material for idarubicin (i.e. 4-demethoxy-daunorubicin) hydrochloride and epirubicin (i.e. 4'-epi-doxorubicin) hydrochloride, both of which are within the scope of the claims of '285 patent. Consequently, Sicor contends that Gaetano Gatti, Diego Oldani, Giuseppe Bottoni, Carlo Confalonieri, Luciano Gambini, and Roberto De Ponti violated their Duty of Candor to the U.S. Patent Office by, among other things, knowingly misrepresenting that they had in fact conducted actual stability testing on idarubicin and epirubicin molecules, when in fact at the time of filing of the patent application neither the named inventors nor anyone else at Pharmacia had conducted such stability testing. As a result, the inventors were not in actual possession of the full scope of the invention claimed in the '285 patent at the time the patent application was filed. This misrepresentation is highly material to the patentability of the claims of the '285 patent under 35 U.S.C. §112. Given the high materiality of this misrepresentation, Sicor also believes that one or more patent attorneys knew

or should have known of this knowing misrepresentation and, thus, violated their Duty of Candor to the U.S. Patent Office.

Dr. Carlo Confalonieri further violated his Duty of Candor in association with the '285 patent by submitting knowingly false statements to the U.S. Patent Office regarding the prior art Wassermann reference. (PI 1190 - PI 1194). In particular, in a declaration dated May 27, 1991 (and resubmitted to the U.S. Patent Office as an Exhibit to Dr. Confalonieri's December 9, 1992 Declaration (PU 0016632 - PU 0016785)), Dr. Confalonieri falsely stated that Wassermann provided "no information" that would allow one skilled in the art to produce storage stable doxorubicin solutions. (PU 0016638 - PU 0016639). Dr. Confalonieri also falsely stated in that same declaration that "one skilled in the art would not have been lead by the Wassermann reference to have recognized the unique advantages to be achieved by adjusting Adriamycin [doxorubicin] solutions to a pH of from 2.5 to 5.0 with hydrochloric acid" and that "there is nothing in Wassermann which would suggest that solutions would have long term storage stable characteristics...". (PU 0016640 - PU 0016641)

Contrary to Confalonieri's misrepresentations, using the data disclosed in Wassermann and standard chemical kinetics equations that were known in the prior art, disclosed by Wassermann and well known to the named inventors (including Dr. Confalonieri), Wassermann provides all of the information necessary for determining the estimated shelf-life stability of doxorubicin in acidic solution containing hydrochloric acid. (See Expert Report of Douglas S. Clark PhD, pp. 18-20). Dr. Confalonieri knew (or should have known) that the degradation of doxorubicin in acidic solution was described by the kinetic equations disclosed in Wassermann and that the shelf-life (stability) could be readily estimated from the degradation rate of doxorubicin which, in turn, could be routinely calculated. Dr. Confalonieri's knowledge is evidenced by a declaration he prepared and submitted to the Swedish Patent Office on December

14, 1994 in a foreign application related to the '285 patent. In that Swedish Confalonieri Declaration, Dr. Confalonieri stated that "[i]n practice the Kobs value [observed rate of degradation for doxorubicin at acidic pH] is calculated on a scientific calculator," that "[t]his is a routine procedure for those skilled in the art", and that "once Kobs is known, the t90 [shelf-life] is known" and acknowledged that he had been using these standard techniques since before the foreign priority date of the '285 patent. (PU 0028154). Dr. Confalonieri also stated that "[t]he relationship between reaction rates and temperature is well established" by the Arrhenius equation. (PU 0028155). Thus, contrary to the material statements he made in his May 27, 1991 declaration about Wassermann's alleged failure to suggest to one of ordinary skill that Wassermann's solutions would have long term storage stable characteristics, Dr. Confalonieri actually knew that storage stability could be routinely calculated on a scientific calculator from the rate equations, rate constant values and activation energy disclosed in the Wassermann reference for the disclosed doxorubicin degradation reaction. Dr. Confalonieri also had knowledge of the standard prior art chemical equations for estimating shelf-life of the doxorubicin solution disclosed in Wassermann. Dr. Confalonieri's misrepresentation to the U.S. Patent Office of the teachings of Wassermann was highly material. The U.S. Patent Examiner had rejected the claims over the Wassermann reference, which rejection was only removed because of the arguments supported by Dr. Confalonieri's misrepresentations. Given the high materiality of the misrepresentations, Sicor also believes that one or more patent attorneys knew or should have known of these knowing misrepresentations and, thus, violated their Duty of Candor to the U.S. Patent Office.

Dr. Carlo Confalonieri and Mr. Richard Kelly jointly and severally violated their Duty of Candor to the U.S. Patent Office in association with the '285 patent by submitting knowingly false comparative testing data to the U.S. Patent Office regarding the prior art Wassermann

reference. Based on the submission of false comparative data prepared at the direction of at least

Dr. Confalonieri, in an Amendment and Communication signed by Mr. Kelly and submitted to

the U.S. Patent Office on January 6, 1993, (PU 0014992 - PU 0015000), Pharmacia further

misrepresented that Wassermann's teaching of an aqueous doxorubicin solution adjusted to a pH

of 2.13 *with hydrochloric acid* had storage stability inferior to the claimed invention. In

particular, Mr. Kelly compared data in Exhibit C of tab 2 of the Confalonieri Declaration (PU

0015197 - PU 0015201) to support the conclusion that doxorubicin hydrochloride solution which

has its pH adjusted to 2.5 with hydrochloric acid has superior storage stability to doxorubicin

hydrochloride solutions whose pH has been adjusted to 2.0 with hydrochloric acid. (PU 0014997

- PU 0014998). Yet, upon close examination of tab 2 within that Exhibit C the only data set

forth for pH 2.0 and 2.5 were for aqueous solutions of doxorubicin *adjusted with glycine-HCl*, a

physiologically acceptable buffer, not a physiologically acceptable acid (in particular, HCl

(hydrochloric acid)) as argued to the U.S. Patent Office. This false comparative data and the

false conclusions resulting therefrom, which allowed Pharmacia to improperly overcome the

rejection of the claims over the Wassermann prior art, are highly material, particularly given the

distinctions that Pharmacia drew prior to this submission and throughout the patent prosecution

between using unpatentable buffers to adjust the pH of the solution and the allegedly unexpected

properties provided by the claimed invention of using only acids to adjust the pH of an aqueous

doxorubicin solution. Given the high materiality of this violation of the Duty of Candor, Sicor

also believes that additional patent attorneys knew or should have known of these prior false

testing data and misrepresentations, but violated their Duty of Candor to the U.S. Patent Office

by failing to affirmatively bring at least this prior violation of the Duty of Candor to the attention

of the U.S. Patent Office.

Daniel Boehnen, Dr. Carlo Confalonieri, Vittorino Ferrario, Richard Kelly, R. Metelli, Emily Miao, and Geoffrey Woods jointly and severally violated their individual Duties of Candor to the U.S. Patent Office in association with the '285 patent by failing to timely disclose material information associated with the related Australian patent infringement accusation and litigation. In August 1991, Farmitalia sought assurances from Upjohn that its dealings with Delta West would not infringe Australian Patent No. 598,197 (the "Australian '197 Patent") to which Upjohn wrote Farmitalia on February 7, 1992, stating that each of the claims of the Australian '197 Patent was invalid based on a non-exhaustive list of sixteen (16) publications and nine (9) patent publications. (PU 0034802 - PU 0034803). (The Australian '197 Patent also claims its priority from the UK '452 Application and, thus, has the same written description as the '285 patent, making it another related foreign application to the '285 patent). Both Farmitalia and Upjohn are predecessors-in-interest to Pharmacia, becoming part of Pharmacia during the prosecution of the '285 patent. Yet no one involved in the prosecution of the '285 patent disclosed this highly material Upjohn invalidity letter to the U.S. Patent Office during the prosecution of the '285 patent.

Mr. Richard Kelly was clearly aware of the existence of this February 1992 Upjohn invalidity letter. During the prosecution of U.S. Patent No. 5,124,317 (the "'317 patent", which is the parent patent of the '285 patent), Mr. Kelly supervised his associate's attempt to submit to the U.S. Patent Office the Upjohn invalidity letter. Because the submission failed to comply with the U.S. Patent Office rules for late submission of information, the U.S. Patent Office never considered the Upjohn invalidity letter before issuing the '317 patent, yet Mr. Kelly did nothing to withdraw the '317 patent from issuance. (Defendant's Exhibit No. 91 at Richard Kelly's 11/29/05 Deposition). Moreover, no one ever (including but not limited to Mr. Kelly, Mr. Boehnen and Ms. Miao) associated with the prosecution of the '285 patent submitted the

- 13 -

February 1992 Upjohn invalidity letter to the U.S. Patent Office in connection with the prosecution of the '285 patent.

Daniel Boehnen, Dr. Carlo Confalonieri, Vittorino Ferrario, Richard Kelly, R. Metelli, Emily Miao, and Geoffrey Woods jointly and severally violated their individual Duties of Candor to the U.S. Patent Office in association with the '285 patent by burying the U.S. Patent Examiner with an exceedingly long list of prior art references -- two hundred and twenty-eight (228) separate references -- on July 1, 1998 ("Ninth Supplemental Information Disclosure Statement")(PU 0015323 - PU 0015339) including many references at issue in the related Australian litigation, which had been settled almost three years earlier. Moreover, this Ninth Supplemental Information Disclosure Statement was filed after the U.S. Patent Examiner had already given Pharmacia an indication that the claims of the '285 patent application were allowable, knowing full well that at this late stage of the prosecution, and after six years of dealing with the '285 patent application, the U.S. Patent Examiner would give this new information little or no scrutiny. Some of the references cited for the first time that would have been material to the patentability of the claims of the '285 patent, but were buried in the list of two hundred and twenty-eight (228) late-filed references, were: Sv. Aage Schou & V. Gaun Jensen (1959) (PU 0076838 - PU 0076840); J. Windheuser (1963) (SICOR-PNU 006409 - SICOR-PNU 006416); B. Sandell (1967) (PU 0076858 - PU 0076860); K. Ilver (1971) (PU 0076829 - PU 0076834); Lachman (1976 edition) (PU 0011777 - PU 0011809); Mori et al. (1980) (Plaintiff's Exhibit No. 64 at Doug Clark's 11/1/05 deposition). Five of these references (Schou, Windheuser, Sandell, Ilver and Lachman) contradicted Pharmacia's *seriatim* arguments for patentability regarding what one of ordinary skill would have understood regarding, among other things, (a) differences between acids and buffers in solution; (b) prior art solutions not being adjusted with hydrochloric acid (as claimed), but instead adjusted with buffers; and (c)

using a buffer instead of an acid to adjust the pH of a solution above about pH 2. Mori discloses stable solutions of anthracycline glycosides. Hence, in addition to violating their duty to timely submit references and to highlight those references which were known to be of significance, these individuals also violated their duty to correct earlier inconsistent arguments refuted by these late filed references. Contrary to that duty, Mr. Boehnen and Ms. Miao, among others, elected to remain silent about the inconsistencies and buried these five references.

Pharmacia's privilege log produced in this litigation shows that Dr. Confalonieri, Vittorino Ferrario, Richard Kelly and R. Metelli were significantly involved in at least the related Australian litigation. Notwithstanding their knowledge of the related Australian litigation and its significance, and the high materiality of the expert analyses, prior art references and opinions expressed therein, Dr. Confalonieri, Vittorino Ferrario, Richard Kelly and R. Metelli still knowingly failed to disclose to the U.S. Patent Office:

(1) the analyses of two experts in the pharmaceutical field, Dr. William Neil Charman (PU 0011682 - PU 0011717) and Mr. Robert Laurence Weston (PU 0014464 - 0014491), that find and explain in detail that the claims of the Australian '197 Patent are invalid in view of many of the same references set forth in Upjohn's February 1992 invalidity letter, and

(2) at least a half-dozen of the references that were raised during the related Australian litigation.

The Charman and Weston expert reports filed during the related Australian litigation were highly material. For example, paragraphs 80-91 of Dr. Charman's report discuss the method by which Dr. Charman graphed the data (see Exhibit WNC10) provided in Wassermann (1983) (PI 1190 - PI 1193) and two other prior art references (Kaniewska (PU 0063154 - PU

- 15 -

0069162) and Benvenuto (PU 0008943 - PU 0008947), which information would have enabled a person skilled in the art in 1985 to make the anthracycline glycoside solutions of either doxorubicin or idarubicin in a pH range of approximately 2.5 to 5. This aspect of Dr. Charman's withheld report directly contradicts the sworn statements in the Confalonieri Declaration concerning Wassermann ("It is my opinion that Wassermann provides no information which would allow one skilled in the art to produce a storage stable Adriamycin solution.") (PU 0015199). Notwithstanding Dr. Charman's April 1995 report which refuted and is inconsistent with the position statements in the Confalonieri Declaration, Pharmacia's patent lawyers, Daniel Boehnen and Emily Miao, resubmitted that same Confalonieri Declaration on July 12, 1996 (PU 0015155 - PU 0015168; PU 0015197 - PU 0015201), to oppose the U.S. Patent Examiner's argument of unpatentability, without ever providing Dr. Charman's report to the U.S. Patent Examiner.

　　Among the half-dozen references that Dr. Confalonieri, Vittorino Ferrario, Richard Kelly and R. Metelli failed to disclose from the related Australian Litigation to the U.S. Patent Office was the complete copy of portions of Lachman, The Theory and Practice of Industrial Pharmacy (2nd Ed. Lea & Febiger 1976) (PU 0011812 - PU 0011860) produced as exhibit WNC5 to Dr. Charman's expert report (PU 0011695). While Applicants did disclose a number of selected pages from the 3rd Edition (1986) of Lachman, that third edition was not prior art to the '285 patent and, more importantly, the omitted pages taught, among other things, the potentially deleterious effect a buffer could have on the stability of a final drug product and the experimental method whereby one of ordinary skill in the art would identify buffers having such an effect. Another of the material, non-cumulative references that Dr. Confalonieri, Vittorino Ferrario, Richard Kelly and R. Metelli failed to disclose from the related Australian Litigation to the U.S. Patent Office during the prosecution of the '285 patent was U.S. Patent No. 4,310,515. The '515

patent was discussed in Dr. Charman's expert report (PU 0011704). In particular, the '515 patent disclosed an injectable, water-based solution having a pH in the range of 2.3 to 2.7 adjusted and stabilized by the presence of the appropriate amount of hydrochloric acid, not a buffer.

Sicor believes from their late submission of so many of the prior art references underlying the related Australian litigation that Mr. Boehnen and Ms. Miao were aware or should have been aware of the related Australian litigation. Because Sicor has not been allowed to depose Mr. Boehnen or Ms. Miao it does not know when they became aware of the related Australian litigation, but given that the withheld Australian references refuted earlier arguments supported by Mr. Boehnen, these lawyers also violated their duty to correct earlier inconsistent arguments refuted by these expert reports. Contrary to that duty, Mr. Boehnen and Ms. Miao, among others, elected to remain silent.

Finally, Sicor's investigation is still continuing on whether Daniel Boehnen and Emily Miao further violated their individual Duties of Candor to the U.S. Patent Office in association with the '285 patent by intentionally misrepresenting the true scope and teachings of the Janssen reference (PU 0013746 - PU 0013756) at page 4 of an Amendment signed by Mr. Boehnen on or about May 6, 1997 (PU 0015277 - PU 0015281). Sicor believes that the depositions of the named inventors and U.S. prosecuting attorneys Mr. Boehnen and Ms. Miao will shed light on this issue.

INTERROGATORY NO. 21

State in detail all factual and legal bases for Sicor's contentions (pled or unpled) that any individual associated with the filing or prosecution of any patent application underlying the '285 patent intended to violate the Duty of Candor including (but not limited to) the identity of each individual whom Sicor contends intentionally violated the Duty of Candor; a description of how each such individual intended to violate the Duty of Candor; the identity of all evidence of an intent to violate the Duty of Candor; the identity of all documents relating to or concerning any

- 17 -

contention of any intentional violation of the Duty of Candor; and the identity of all individuals with knowledge relating to or concerning any alleged intent to violate the Duty of Candor.

RESPONSE TO INTERROGATORY NO. 21

Defendants object to this interrogatory as being ambiguous with respect to the amount of "detail" necessary to comply with this request. Defendants have made a good faith attempt to describe all factual bases of which they are aware at this juncture in the proceedings for their contention that the Duty of Candor was violated with respect to the '285 patent. Defendants further object to the extent this interrogatory seeks their contentions of the "law" of inequitable conduct as opposed to the application of the applicable law to the factual bases for Sicor's contention that any individual associated with the filing or prosecution of any patent application underlying the '285 patent intentionally violated the Duty of Candor. Additionally, the legal standards that apply to allegations of inequitable conduct are equally available to Pharmacia as to Defendants. Further, as the law on inequitable conduct (and intent to violate the Duty of Candor) is constantly evolving, Sicor reserves the right to rely on the state of the law as it evolves throughout the litigation, including but not limited to legal developments occurring after the close of discovery.

Subject to and without waiver of any of the foregoing objections or the General Objections, at this time, Defendants respond as follows:

The "intent to deceive" required to prove inequitable conduct need not be proven by direct evidence. It can be established based upon the inference created by the totality of circumstances surrounding an applicant's conduct, and is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor. So, while intent cannot be simply presumed from materiality, the degree of materiality of a withheld reference or misstatement may lead to an inference of intent in the absence of a credible good faith explanation.

- 18 -

A credible good faith explanation requires more than a mere denial of any intent to mislead. Moreover, affirmative misrepresentations -- which comprise a significant aspect of the violation of the Duty of Candor in this case -- are typically accorded a relatively high degree of materiality, from which intent may easily be inferred.

Each of the violations of the Duty of Candor set forth in Interrogatory No. 21 involved a significant to very high degree of materiality. Some of the violations further involved affirmative misrepresentations of the existence of experimental data, the conduct of experiments and general teachings in the art. An Examiner would be unable to satisfactorily investigate these aspects of a prosecution and frequently relies upon the candor of patent applicants. Yet, as discussed above, various individuals including Daniel Boehnen, Dr. Carlo Confalonieri, Vittorino Ferrario, Richard Kelly, R. Metelli, Emily Miao, and Geoffrey Woods withheld material information, mischaracterized information and delayed the disclosure of other information. None of these improprieties is particularly surprising in view of the value of Pharmacia's highly profitable chemotherapy drug franchise and its stated motivation to keep that franchise running beyond the expiration date of the basic patents. The high materiality of the violations as well as the totality of the circumstances leads to the clear and convincing conclusion that a plurality of the actors identified above each had an intent to deceive the U.S. Patent Office in order to obtain the '285 patent (and the other U.S. patents in the Gatti family).

## INTERROGATORY NO. 22

State in detail all factual and legal bases for Sicor's contentions (pled or unpled) that the '285 patent is unenforceable including (but not limited to) the identity of each individual whose acts or omissions Sicor contends render the '285 patent unenforceable; a description of each act or omission that Sicor contends renders the '285 patent unenforceable; the identity of all documents relating to any acts or omissions Sicor contends render the '285 patent unenforceable; and the identity of all individuals with knowledge relating to or concerning any alleged acts or omissions Sicor contends render the '285 patent unenforceable.

RESPONSE TO INTERROGATORY NO. 22

Defendants object to this interrogatory as being ambiguous with respect to the amount of "detail" necessary to comply with this request. Defendants have made a good faith attempt to describe all factual bases of which they are aware at this juncture in the proceedings for their contention that the '285 patent is unenforceable. Defendants further object to the extent this interrogatory seeks their contentions of the "law" of inequitable conduct as opposed to the application of the applicable law to the factual bases for Sicor's contention that the '285 patent is unenforceable. Additionally, the legal standards that apply to allegations of inequitable conduct are equally available to Pharmacia as to Defendants. Further, as the law on inequitable conduct (and unenforceability) is constantly evolving, Sicor reserves the right to rely on the state of the law as it evolves throughout the litigation, including but not limited to legal developments occurring after the close of discovery. Sicor further objects to Interrogatory No. 22 as being duplicative of Interrogatory No. 21.

Subject to and without waiver of any of the foregoing objections or the General Objections, at this time, Defendants respond as follows:

The '285 patent is unenforceable as a result of any one of the plurality of intentional violations of the Duty of Candor set forth above. The people with knowledge of the acts described herein include, among others: Daniel Boehnen, Dr. Carlo Confalonieri, Vittorino Ferrario, Richard Kelly, R. Metelli, Emily Miao, and Geoffrey Woods. Sicor has not yet had the opportunity to depose any of these individuals due to the Protective Order Pharmacia sought to protect its lawyers, and due to serious discovery deficiencies in Pharmacia's production that delayed the depositions of the remaining named inventors, including Dr. Confalonieri.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
302-654-1888

*Attorneys for Defendants*

*Of Counsel:*

Reid Ashinoff
David R. Baum
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Dated:  April 11, 2006

168460.1

- 21 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of April, 2006, the attached **DEFENDANTS'**

**RESPONSES TO PHARMACIA & UPJOHN'S FOURTH SET OF INTERROGATORIES**

**(INEQUITABLE CONDUCT CONTENTIONS)** was served upon the below-named counsel

of record at the address and in the manner indicated:

Jack B. Blumenfeld, Esquire                                         HAND DELIVERY
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899

Joshua R. Rich, Esquire                                        VIA ELECTRONIC MAIL
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606

Steven J. Balick

# EXHIBIT 15

# REDACTED

# EXHIBIT 16

# REDACTED

# EXHIBIT 17



10
2-3-93

Docket No: 769-249-0 DIV

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| IN RE APPLICATION OF: | : | |
| GAETANO GATTI, ET AL | : | GROUP ART UNIT:   1803 |
| SERIAL NO:  07/827,742 | : | |
| FILED:    JANUARY 29, 1992 | : | EXAMINER: PESELEV, E. |
| FOR:  INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE | : | |

## DECLARATION OF CARLO CONFALONIERI
## PURSUANT TO 37 C.F.R. 1.132

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

 Now come Carlo Confalonieri, a citizen of Italy, and a resident of Cusano  Milanino (Milan), Italy who declares and states that:

 1.  I am the Carlo Confalonieri who previously submitted declarations pursuant to 37 C.F.R. 1.132 in application Serial Number 07/503,865 executed on December 20, 1990 and May 27, 1991 found at tabs 1 and 2 respectively to this declaration.

 2.  In order to demonstrate that the results illustrated in my declaration found at tab 1, were obtained with other physiologically acceptable acids, I conducted additional comparative testing found at tabs 8 through 10 attached hereto. The procedures employed in conducting these tests were the same as those described in my previous declarations, and in particular

DECLARATION

as set forth in tab 1 hereto.  In addition to testing other
physiologically acceptable acids, stability testing for
epirubicin and idarubicin is also presented in tabs 3 through 8.
As can be seen from these tabs epirubicin shows, under both
accelerated and long term testings, a very similar stability
behaviour as doxorubicin, while idarubicin appears to be even
more stable under both accelerated and long term conditions.

        3.  From these tests it is apparent that the storage
    stability conferred on aqueous solutions of doxorubicin is
    not unique to hydrochloric acid but the stability is also
    conferred by other physiologically acceptable acids.  In all
    instances, the physiologically acceptable acids at pHs between
    2.5 and 5 produced aqueous solutions having superior storage
    stability as compared with the use of phosphate buffers as
    taught by Arcamone.  Indeed, even the use of phosphoric acid
    resulted in superior storage stability when compared with the
    use of phosphate buffers as taught in Arcamone.

        4.  In conducting the storage stability tests, I tested a
wide variety of physiologically acceptable acids which produced
aqueous solutions in which the various anthracyclines were
soluble.  In particular, results obtained with acetic acid as
well as hydrochloric acid are illustrated at tab 8.  Tabs 9 and
10 compare sulfuric acid, phosphoric acid, methanesulphonic acid
and tartaric acid with hydrochloric acid with results at tab 10
also comparing the Beijnen formulation using perchloric acid and

                                    2

the Arcamone phosphate buffers.  As can be seen, all of the
tested physiologically acceptable acids produced results vastly
superior to that for the phosphate buffers.

Furthermore, as evident, e.g., from tab 6, the acetic acid used
as pH controlling agent for idarubicin under accelerated and
long term conditions produced results comparable to those
achieved with hydrochloric acid.

That is, that the results achieved with acetic acid would
demonstrate comparable stability values as for the acids
identified previously.

    5.  Based on these results, it is my conclusion that any
physiologically acceptable acid which yielded solutions in which
the anthracycline of interest was soluble will, at the recited
pHs, result in a storage stable aqueous solution.  I find such
results to be quite surprising since until the time of our
invention, it was considered that pH alone was the determining
factor in establishing storage stability of aqueous solutions as
discussed in my previous declarations found at tabs 1 and 2.
From the results which have been presented, it is apparent that
the nature of the specific acid employed is not critical
(although hydrochloric acid appears to yield the best results)
but, rather, that any physiologically acceptable acid results in
solutions having superior storage stability.

    6.  Prior to the present invention, the conventional wisdom
was that it was impossible to produce anthracycline aqueous
solutions which had long term storage stability.  Further, that
although the prior art had been recognized that pH had an effect
upon storage stability of aqueous solution, the conventional
wisdom in the art was that the pH should be adjusted with a

buffer as taught by Arcamone.  Thus, it was surprising and
unexpected to discover that by adjusting the pH of the aqueous
solution with a physiologically acceptable acid, a solution
having a storage stability as demonstrated at tabs 3 through
10 hereto, would result.   Prior to the present invention
the expectation of those skilled in the art was that the nature
of the pH adjusting medium would have no effect on the stability
of the aqueous solution.  Accordingly, it was extremely
surprising and unexpected to find that contrary to conventional
wisdom, the pH adjusting medium had a significant and beneficial
effect.

　　　I hereby declare that all statements made herein of my own
knowledge are true and that all statements made on information
and belief are believed to be true; and further that these
statements were made with the knowledge that willful false
statements and the like so made are punishable by fine or
imprisonment, or both, under Section 1001 of Title 18 of the
United States Code and that such willful false statements may
jeopardize the validity of the application or any patent issued
thereon.


Carlo Confalonieri                Dated: 9th December, 1992

769-249-0 DIV

# EXHIBIT 18

**REDACTED**

# EXHIBIT 19



769-080-0
60/

w/ Declara ②
1-20-88

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION:                    :

GAETANO GATTI ET AL                   : GROUP ART UNIT: 123

SERIAL NO: 06/878,784                 :

FILED: JUNE 26, 1986                  : EXAMINER: PESELEV

FOR:  INJECTABLE READY-TO-USE         :
      SOLUTIONS CONTAINING AN
      ANTITUMOR ANTHRACYCLINE         :
      GLYCOSIDE

RECEIVED
JAN 19 1988
GROUP 120

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

     Responsive to the Official Action dated June 29,
1987, Applicants respectfully request reconsideration
in light of the following amendments and remarks.

IN THE CLAIMS

     Claim 31, line 9, change "3.1" to —3.14.——

REMARKS

     After the above amendments, Claims 16-17, 20-25
and 29-31 remain active in this application.
Reconsideration is respectfully requested.

     Applicants' U.S. representative wishes to thank
Examiner Peselev for the helpful and courteous
interview which was held in her office on October 27,

S.N. 878,784 File History
Page 146

Pt 875

-2-

1987.  The matters which were discussed at that time are summarized and expanded upon in the remarks which follow.

The claims stand rejected under 35 USC 102(b) as anticipated by or, in the alternative, under 35 USC 103 as obvious over Beijnen et al and Arcamone et al. These rejections are respectfully traversed.

In order for a reference to anticipate a claim, within the meaning of 35 USC 102, all material elements of the claim must be found in one prior art source. In re Marshall (CCPA 1978) 577 F2d 301, 198 USPQ 344; In re Kalm (CCPA 1967) 378 F2d 959, 154 USPQ 10.  There are a number of material elements in present Claim 31, which must be met by either of the two prior art references in order for either one of them to anticipate the claim.

The following are some of the relevant material elements of Claim 31:

"sealed glass container"

"intravenously injectable"

"sterile"

"pyrogen-free"

"said solution has not been reconstituted from a lyophilizate"

"pH is 2.7 - 3.14".

-3-

Further, the claims use partially closed claim language, "consists essentially of" with reference to the materials which may be contained in the solution. Thus, the claims exclude any other materials not recited therein if they would materially affect the solution.

The Examiner will recall that the present invention is directed to an extraordinarily stable doxorubicin or Adriamycin® solution. Both doxorubicin and Adriamycin® refer to an anti-cancer drug. Doxorubicin is the common name of the drug, while Adriamycin® is the trademark under which the drug is sold. The claims require that the solution be contained in a sealed glass container. This is a meaningful limitation, because one of ordinary skill in the art would never go to the trouble of sealing an unstable solution of an anticancer drug in a container. A certain minimum stability is required before one would even think to carry out such action. It should be kept in mind that according to the literature accompanying the commercially sold product (Adriamycin®) which is sold in a solid lyophilized form, a reconstituted solution thereof is stable for 24 hours at room temperature and 48 hours under refrigeration (4-10°C). See Exhibit A, page 3, the sixth paragraph.

-4-

The further limitation that the container be made of glass is also material. In the past, it was thought that glass rendered the Adriamycin® solutions less stable than other types of materials, such as polypropylene and other plastics. For example, the Examiner's attention is directed to the highlighted portions of Exhibits B and C, which show that doxorubicin can be adsorbed on and even partially decomposed on containers made of glass. The discovery in the present invention that glass is compatible with the extremely stable Adriamycin® solutions runs counter to these teachings. Thus, this limitation is also material.

The other material limitations listed above relate to the solution itself. First, the solution must be intravenously injectable. This is a meaningful limitation since it imposes stringent requirements on the nature and quantity of the impurities contained in the solution. For example, as will be discussed in greater detail below, some of the solutions in the prior art references contain materials which would render them non-intravenously injectable.

The solution must also be sterile and pyrogen free. Again, these limitations impose stringent requirements on the types and amounts of impurities which may be contained in the solution in the sealed glass container. Unless one purposefully sterilizes

-5-

the solution and renders it pyrogen free, it cannot be
concluded that such a solution meets these limita-
tions.  In fact, it can be concluded without doubt that
such a solution is not sterile or pyrogen free.

The solutions according to the present invention
are also not reconstituted from a lyophilizate
according to the claims.  In the past, doxorubicin was
sold in the form of a solid which had been
lyophilized.  This can be seen in Exhibit A on page 3,
under the heading "How Supplied".  It was thought that
doxorubicin was too unstable in solution to be storage
stable.  Accordingly, after the doxorubicin was
prepared at the manufacturing plant, it was lyophilized
for storage purposes.  Since it is now recognized
according to the present invention that under certain
conditions a solution of doxorubicin can be rendered
extraordinarily stable, the step of preparing the
solution from a lyophilized powder is no longer
necessary.  It would simply be an unnecessary
expenditure of energy to lyophilize the material first
and then prepare a storage stable solution from it.
However, unless one knew that a particular solution of
doxorubicin were very stable, one would still expect to
have to prepare the solution from a lyophilizate.
Again, it is submitted that this limitation in the
claims is a material limitation.

-6-

Another important material limitation in the present claims is the pH of the solution. Over the relatively narrow range of pH recited in the present claims, 2.7-3.14, it has been unexpectedly found that the doxorubicin solutions exhibit enhanced stability. The pH of greatest stability of doxorubicin has been hotly debated in the literature. Reference 5 of the Information Disclosure Statement filed with the last response (March 13, 1987) (Poochikian et al), discloses that doxorubicin is most stable in 5% Dextrose Injection, USP, which has a pH of 4.5. See Table 2, the left-hand heading.

According to reference 3 of the Information Disclosure Statement (Beijnen et al 1985), the maximum stability of doxorubicin solutions is at about pH 4-5. See page 221 of the reference, the left hand column, the next to the last paragraph.

Reference 10 of the Information Disclosure Statement (Janssen et al) states that the results obtained in that study "indicated that pH 4 and 4°C provide optimum shelf life conditions" of aqueous doxorubicin solutions. See the summary of the paper on page 1, the third sentence. It can be seen based on the above references that the prior art has clearly not appreciated that a pH of 2.7-3.14 is the pH of maximum stability of a doxorubicin solution. Note that two of



-7-

these references are dated in 1985 and one is dated in 1981.

The cited references will now be examined in light of the above material limitations of the present claims to determine whether the references do in fact anticipate the present claims. Arcamone et al is a relatively early study from 1972, reporting on the stability of Adriamycin® hydrochloride at 22°C. The study run in Arcamone et al was an analytical study conducted in a laboratory. The reference states that solutions having a pH of 3-6 have a stability of greater than one month. These solutions contained 2 mg/ml of Adriamycin® hydrochloride, and 0.06 molar phosphate buffer.

First of all, Arcamone et al says nothing about a sealed glass container. Second, there is no indication that the solutions were sterilized or rendered pyrogen free. The Examiner's attention is directed to a Declaration (Declaration A) signed by an expert in the field of injectable pharmaceuticals, William J. Ring, who concludes that the solutions in the Arcamone et al reference do not meet several of the above-described material limitations of Claim 31.

It is also notable that the Arcamone et al reference, which was published in 1972, has definitely not lead to an appreciation that a pH of 2.7-3.14 is an

-8-

unexpectedly good pH range for stability of doxo-
rubicin, as clearly shown by the above-described
references which teach that the maximum stability of
doxorubicin solutions is at a pH of from 4 to 5.  In
fact, the range of pH listed by Arcamone et al, 3-6 is
so broad that it does not lead one of ordinary skill in
the art to an appreciation of any particular narrow
range which would give rise to extraordinary stability
or even that such a range exists.  Previous cases have
held that there can be no anticipation where the
reference disclosure is so broad that the likelihood of
arriving at the claimed composition is highly
unlikely.  Ex parte Garvey (POBA 1939) 41 USPQ 5583;
Ex parte Starr (POBA 1938) 44 USPQ 545.  The narrow pH
range of 0.44 pH units according to the present
invention as compared to the broad range of 3-6, is
believed to be such a situation where anticipation does
not result because of a broad disclosure in the
reference.

In accordance with the above comments, and
Declaration A filed herewith, it is respectfully
submitted that the Arcamone et al reference does not
anticipate the claims of the present invention.

For similarly reasons, it is respectfully
submitted that Beijnen et al does not anticipate the
claims of the present invention.  In the right-hand

-9-

column, page 109 of <u>Beijnen et al</u>, it can be seen that
the solutions were kept in "stoppered polypropylene
test tubes, since unlike glass containers, no
adsorption to polypropylene occurs". Thus, at the
outset, the solutions in <u>Beijnen et al</u> are in plastic
rather than <u>glass</u> containers. Second, the solutions of
<u>Beijnen et al</u>, contain perchloric acid, as indicated by
page 114, the left hand paragraph. Perchloric acid is
<u>not</u> an intravenously injectable material, as one of
ordinary skill in the art would readily appreciate.
Declaration B, signed by Dr. Nagesh Palapu, an expert
in the field of drug formulations, substantiates the
fact that the solutions of <u>Beijnen et al</u> are not
intravenously injectable.

Finally, as discussed above in connection with the
<u>Arcamone et al</u> reference, since the experiments
involved in <u>Beijnen et al</u> are laboratory experiments,
and there is no indication that the solutions were
sterilized or rendered pyrogen free, it can be con-
cluded that these features are <u>not</u> met by the solutions
of <u>Beijnen et al</u>. Since the solutions are not sterile
and are not pyrogen free, then they cannot be intra-
venously injectable either.

In light of these distinctions between the present
claims and <u>Beijnen et al</u>, and in view of Declaration B,
it is respectfully submitted that <u>Beijnen et al</u> does
not anticipate the present claims.

-10-

The claims have also been rejected in the alterna-
tive for obviousness over Beijnen et al or Arcamone et
al. These rejections are also respectfully traversed.

The thrust of the Examiner's rejection is one of
inherency. Clearly, neither of the two references
recognize the extraordinary stability of doxorubicin
solutions under the conditions of the present claims,
including a pH of 2.7-3.14. Based on subsequent
references, as late as 1985, the pH of greatest
stability of doxorubicin has been thought to be between
4 and 5. Furthermore, the stability of doxorubicin has
been thought to be greater in polypropylene or poly-
vinylchloride rather than in glass. For these reasons,
it can be seen that one of ordinary skill in the art
has certainly not found it obvious to prepare a
solution of doxorubicin at a pH of 2.7-3.14, to thereby
achieve greatly enhanced stability.

The Examiner's attention is directed to the
Declaration which was filed with the last amendment.
A portion of this declaration, designated Exhibit D
herein, is filed herewith for the Examiner's con-
venience. It can be seen that there is a trough in the
graph of $k_{obs}$-pH profile, the trough being centered
around 2.7-3.14. This same trough is exhibited whether
the doxorubicin is in sterile water, dextrose or
saline. If one goes to a pH of between 4 and 5,

-11-

previously recognized as the pH of greatest stability
of a doxorubicin solution, the k observed, which is
directly related to the decomposition of doxorubicin,
increases precipitously. For example, in sterile
water, it goes up by a factor of at least 3. It
continues to rise beyond pH 5. One of ordinary skill
in the art could not have predicted, based on the
references, that this narrow pH range would give rise
to such stability. In the absence of this realization,
one of ordinary skill in the art would not have placed
such a doxorubicin solution in a sealed glass container
nor would this person have avoided reconstitution from
lyophilized solid material. How can it be said that it
is obvious to prepare such a solution as in the present
invention when a group of references have stated that
the maximum stability of doxorubicin solutions is
between 4 and 5? Further, if the stability of such
solutions had been previously appreciated, why would
the manufacturer of Adriamycin® still prepare it in
lyophilized form, and state that its stability upon
reconstitution ranges from 24 hours to 48 hours at room
temperature or under refrigeration, respectively? The
extraordinary stability over the very narrow pH range
of the present claims, has simply not been previously
appreciated. Previously, the prior art has taught that
doxorubicin solutions were maximally stable at higher

-12-

pH's than those involved (and claimed) in the present invention. Therefore, it is submitted that the present claimed invention is unobvious over either or both of the cited references.

Applicants are filing herewith a second Information Disclosure Statement making of record a few additional references, which are not believed to be any more relevant than the previously cited references. However, Applicants wish to bring these references to the Examiner's attention to fully satisfy their duty of complete disclosure.

In light of the above amendments and remarks, and the Rule 132 Declarations filed herewith, it is respectfully submitted that this application is now in condition for allowance, and an early notice to that effect is earnestly solicited.

Respectfully submitted,

OBLON, FISHER, SPIVAK,
McCLELLAND & MAIER, P.C.

*Robert R. Cook*

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Robert R. Cook, Ph.D.
Registration No. 31,602

Crystal Square Five - Suite 400
1755 South Jefferson Davis Highway
Arlington, Virginia  22202
(703) 521-5940
60/jmw,mkn

# EXHIBIT 20

# REDACTED