# EXHIBIT 21



**Patent Office**
**Canberra**

I, RONALD MAXWELL MAY, ASSISTANT DIRECTOR PATENT ADMINISTRATION, hereby certify that the annexed is a true copy of the Complete specification of Patent No. 598197 as amended pursuant to the provisions of Section 104 of the Patents Act 1990 on 15 January 1992.

WITNESS my hand this Nineteenth day of October 1993.

RONALD MAXWELL MAY
DELEGATE OF COMMISSIONER OF PATENTS

PU 0011728

AUSTRALIA

# 598197

PATENTS ACT 1952

Form 10

COMPLETE SPECIFICATION

(ORIGINAL)

FOR OFFICE USE

Short Title:

Int. Cl:

Application Number: 58858/86.
Lodged:

Complete Specification-Lodged:
Accepted:
Lapsed:
Published:

Priority:

Related Art:

> This document contains the amendments made under Section 49 and is correct for printing.

---

TO BE COMPLETED BY APPLICANT

Name of Applicant:    Farmitalia Carlo Erba S.R.L.
~~FARMITALIA CARLO ERBA S.P.A.~~

Address of Applicant: VIA CARLO IMBONATI 24
20159 MILAN
ITALY

Actual Inventor:

Address for Service: CLEMENT HACK & CO.,
601 St. Kilda Road,
Melbourne, Victoria 3004,
Australia:

Complete Specification for the invention entitled:
INJECTABLE READY-TO-USE SOLUTIONS CONTAINING
AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

The following statement is a full description of this invention
including the best method of performing it known to me:-

PU 0011729

- 1 -                          <u>FC 249</u>

Title: Injectable ready-to-use solutions containing an
       antitumor anthracycline glycoside.

The present invention relates to a stable intravenously
injectable ready-to-use solution of an antitumor
5   anthracycline glycoside, e.g. doxorubicin, to a process
for preparing such a solution, and provide the same in a
sealed container, and to a method for treating tumors by
the use of the said ready-to-use solution.

The anthracycline glycoside compounds are a well known
10  class of compounds in the antineoplastic group of agents,
wherein doxorubicin is a typical, and the most widely used,
representative: Doxorubicin. Anticancer Antibiotics, Federi-
co Arcamone, 1981, Publ: Academic Press, New York, N.Y.;
Adriamycin Review, EROTC International Symposium, Brussels,
15  May, 1974, edited by M.Staquet, Publ. Eur. Press Medikon,
Ghent, Belg.;
Results of Adriamycin Therapy, Adriamycin Symposium at
Frankfurt/Main 1974 edited by M.Ghione, J.Fetzer and H.
Maier, publ.: Springer, New York, N.Y.

20  At present, anthracycline glycoside antitumor drugs, in parti-
cular, e.g., doxorubicin, are solely available in the form
of lyophilized preparations, which need to be reconstituted
before administration.

Both the manufacturing and the reconstitution of such
25  preparations expose the involved personnel (workers,
pharmacists, medical personnel, nurses) to risks of con-
tamination which are particularly serious due to the
toxicity of the antitumor substances.

PU 0011730

- 2 -

The Martindale Extra Pharmacopoeia 28th edition, page 175
left column, reports, indeed, about adverse effects of
antineoplastic drugs and recommends that "They must be
handled with great care and contact with skin and eyes
avoided; they should not be inhaled. Care must be taken
5      to avoid extravasation since pain and tissue damage may
ensue.".

Similarly, Scand. J. Work Environ Health vol.10 (2), pages 71-
74 (1984), as well as articles on Chemistry Industry, Issue
10     July 4, 1983, page 488, and Drug-Topics-Medical-Economics-Co,
Issue February 7, 1983, page 99 report about severe adverse
effects observed in medical personnel exposed to use of
cytostatic agents, including doxorubicin.

To administer a lyophilized preparation, double handling of
15     the drug is required, the lyophilized cake having to be first
reconstituted and then administered and,moreover,in some cases,
the complete dissolution of the powder may require prolonged
shaking because of solubilization problems.

As the risks connected with the manufacturing and the reconsti-
20     tution of a lyophilized preparate would be highly reduced if
a ready-to-use solution of the drug were available, we have
developed a stable, therapeutically acceptable intravenously
injectable solution of an anthracycline glycoside drug, e.g.
doxorubicin, whose preparation and administration does not
25     require either lyophilization or reconstitution.



- 3 -

According to the present invention, there is
provided a sterile, pyrogen-free, anthracycline glycoside
solution which comprises a physiologically acceptable salt
of an anthracycline glycoside dissolved in a
5    physiologically acceptable aqueous solvent therefor at an
anthracycline glycoside concentration of from 0.1 to 50
mg/ml, which has not been reconstituted from a
lyophilizate, and the pH of which has been adjusted from
2.5 to 5.0 solely with a physiologically acceptable acid.
10   Preferably the solution of the invention is provided in a
sealed container.

Preferably the anthracycline glycoside is chosen
from the group consisting of doxorubicin, 4'-epi-
doxorubicin (i.e. epirubicin), 4'-desoxy-4'-iodo-
15   doxorubicin (i.e. esorubicin), 4'-desoxy-4'-doxorubicin,
daunorubicin and 4-demethoxy-daunorubicin (i.e.
idarubicin).  A particularly preferred anthracycline
glycoside is doxorubicin.

Any physiologically acceptable salt of the
20   anthracycline glycoside may be used for preparing the
solution of the invention.  Examples of suitable salts may
be, for instance, the salts with mineral inorganic acids
such as hydrochloric, hydrobromic, sulphuric, phosphoric,
and the like, and the salts with certain organic acids such
25   as succinic, tartaric, ascorbic, citric, methanesulphonic,
ethanesulphonic and the like.  The salt with hydrochloric
acid is a particularly preferred salt, especially when the
anthracycline glycoside is doxorubicin.

Any aqueous-based solvent which is
30   physiologically acceptable and which is able to dissolve
the anthracycline glycoside salt may be used.  The solution
of the invention may also contain one or more additional
components such as a co-solubilizing agent (which may be
the same as a solvent), a tonicity adjustment agent and a
35   preservative.  Examples of solvents, tonicity adjustment
agents and preservatives which can be used for the
preparation of the anthracycline glycoside solutions of the
invention are hereunder reported.

- 4 -

Suitable solvents and co-solubilizing agents may
be, for instance, water; physiological saline; and mixtures
of water and one or more:-

- aliphatic amides, e.g. N,N-dimethylacetamide, N-
5    hydroxy-2-ethyl-lactamide and the like,
- alcohols, e.g. ethanol, benzyl alcohol and the like
- glycols or polyalcohols, e.g. propyleneglycol, glycerin
and the like,
- esters of a polyalcohol, e.g. diacetine, triacetine and
10   the like,
- polyglycols or polyethers, e.g. polyethyleneglycol 400,
a propyleneglycol methylether and the like,
- dioxolanes, e.g. isopropylideneglycerin and the like,
- dimethylisosorbides, and
15   - pyrrolidone derivatives, e.g. 2-pyrrolidone, N-methyl-
2-pyrrolidone, polyvinylpyrrolidone and the like.

Suitable tonicity adjustment agents may be, for
instance, physiologically acceptable inorganic chlorides,
e.g. sodium chloride; dextrose, lactose, mannitol and the
20   like.

Preservatives suitable for physiological
administration may be, for instance, esters of
parahydroxybenzoic acid (e.g. methyl, ethyl, propyl and
butyl esters, or mixtures of them), chlorocresol and the
25   like.

The above mentioned solvents and co-solubilizing
agents, tonicity adjustment agents and preservatives can be
used alone or as a mixture of two or more of them.

A preferred solution additionally contains not
30   more than 30% of one or more co-solvents selected from the
group consisting of ethanol, polyethyleneglycol and N,N-
dimethylacetamide.  Water is a particularly preferred
solvent.

To adjust the pH within the range of from 2.5 to
35   about 5.0 a physiologically acceptable acid is added.  The
acid may be any physiologically acceptable acid, e.g., an
inorganic mineral acid such as hydrochloric, sulphuric,
phosphoric and the like, or an organic acid such as acetic,
succinic, tartaric, ascorbic, citric, glutamic,

- 5 -

ethanesulphonic, methanesulphonic and the like.

The preferred range of pH for the ready-to-use solution of the invention is from 2.62 to 3.14.  A pH of about 3 is a particularly preferred value.

5      .      In the solutions of the invention the concentration of the anthracycline glycoside varies within the range from 0.1 mg/ml to 50 mg/ml, most preferably from 1 mg/ml to 20 mg/ml.

The preferred ranges of concentration may be
10   slightly different from different anthracycline glycosides. Thus, for example, preferred concentrations for doxorubicin are from about 2 mg/ml to about 50 mg/ml, preferably from 2 mg/ml to 20 mg/ml, particularly appropriate values being 2 mg/ml and 5 mg/ml.  Similar concentrations are preferred
15   also for 4'-epi-doxorubicin, 4'-desoxy-doxorubicin and 4'-desoxy-4'-iodo-doxorubicin.  Preferred ranges of concentration for daunorubicin and 4-demethoxy-daunorubicin are from 0.1 mg/ml to 50 mg/ml, preferably from 1 mg/ml to 20 mg/ml, concentrations of 1 mg/ml and 5 mg/ml being
20   particularly appropriate.

Suitable packaging for the anthracycline glycoside solutions may be all approved containers intended for parenteral use, such as plastic and glass containers, ready-to-use syringes and the like.  Preferably the
25   container is a sealed glass container, e.g. a vial or an ampoule.

According to a particularly preferred embodiment of the invention, there is provided a sterile, pyrogen-free, doxorubicin solution which consists essentially of a
30   physiologically acceptable salt of doxorubicin dissolved in a physiologically acceptable solvent therefor at a doxorubicin concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted from 2.5 to 5.0 solely with a
35   physiologically acceptable acid.

In the above indicated preferred embodiment of the invention the physiologically acceptable salt of doxorubicin may be, e.g. the salt with a mineral inorganic acid such as hydrochloric, hydrobromic, sulphuric,



- 6 -

phosphoric and the like, or the salt with an organic acid
such as succinic, tartaric, ascorbic, citric,
methanesulphonic, ethanesulphonic and the like. The
hydrochloride salt is a particularly preferred salt.

5          For the solution hereabove indicated as a
preferred embodiment of the invention suitable solvents,
co-solubilizing agents, tonicity adjustment agents and
preservatives may be the same as those previously recited
in this specification. Water is a particularly preferred
10    solvent.

Also, the physiologically acceptable acid which
may be added to adjust the pH to from 2.5 to 5 may be one
of those previously specified. Hydrochloric acid is an
especially preferred acid. Preferred pH values for the
15    above said preferred solution of the invention are from
2.62 to 3.14. The pH values of 3 is especially preferred.

Though the concentration of doxorubicin in the
above preferred embodiment may vary within the broad range
from 0.1 mg/ml to 50 mg/ml, preferably from 2 mg/ml to 20
20    mg/ml, examples of especially preferred concentrations of
doxorubicin are 2 mg/ml and 5 mg/ml.

The invention also provides a process for
producing a sterile, pyrogen-free anthracycline glycoside
solution with a pH of from 2.5 to 5.0, which process
25    comprises dissolving the physiologically acceptable salt of
the anthracycline glycoside, which salt is not in the form
of a lyophilizate, in the physiologically acceptable
solvent therefor; adding solely a physiologically
acceptable acid to adjust the pH within the said range as
30    desired; passing the resulting solution through a
sterilising filter; and, optionally, adding an additional
component selected from a co-solubilizing agent, a tonicity
adjustment agent and a preservative, for instance of the
kind previously specified, to the solution prior to passing
35    the solution through the sterilising filter.

With the solutions of the invention it is
possible to obtain compositions having a very high
concentration of the anthracycline glycoside active
substance even at 50 mg/ml ————————————



7
- 7̶ -

and more.  This constitutes a great advantage over the
presently available  lyophilized preparates wherein high
concentrations of anthracycline glycoside can only be
obtained with difficulty because of solubilization problems
5  encountered in reconstitution, mainly with saline.  The
presence of the excipient, e.g. lactose, in the lyophilized
cake, and its generally high proportion in respect of the
active substance, even up to 5 parts of excipient per part
of active substance, has a negative effect on solubilization
10  so that difficulties may arise in obtaining dissolution of
the lyophilized cake,



8
- 10 -

especially for concentrations of anthracycline glycoside
higher than 2 mg/ml.

The solutions of the invention are characterized by a
good stability.  Solutions in various solvents and with
5    different pH's and concentrations have been found to be
stable for long periods at temperatures accepted for the
storage of pharmaceutical preparations.  This is illustrated
in the Examples which follow.

Owing to the well known anti-tumor activity of the
10   anthracycline glycoside active drug substance, the
pharmaceutical compositions of the invention are useful for
treating tumors in both human and animal hosts.  Examples of
tumors that can be treated are, for instance, sarcomas,
including osteogenic and soft tissue sarcomas, carcinomas,
15   e.g., breast-, lung-, bladder-, thyroid-, prostate- and
ovarian carcinoma, lymphomas, including Hodgkin and
non-Hodgkin lymphomas, neuroblastoma, melanoma, myeloma,
Wilms tumor, and leukemias, including acute lymphoblastic
leukemia and acute myeloblastic leukemia.

- 9 -

Examples of specific tumours that can be treated are Moloney Sarcoma Virus, Sarcoma 180 Ascites, solid Sarcoma 180, gross transplantable leukemia, L 1210 leukemia and lymphocytic P 388 leukemia.

Thus, according to the invention there is also provided a method of inhibiting the growth of a tumour, in particular one of those indicated above, which comprises administering to a host suffering from said tumour an injectable solution according to the invention containing the active drug substance in an amount sufficient to inhibit the growth of said tumour.

The injectable solutions of the invention are administered by rapid intravenous injection or infusion according to a variety of possible dose schedules. Suitable dose schedule for doxorubicin may be, for example, of 60 to 75 mg of active drug substance per $m^2$ of body surface given as a single rapid infusion and repeated at 21 days; an alternative schedule may be of 30 mg/$m^2$ day by intravenous route for 3 days, every 25 days. Suitable dosages for 4'-epi-doxorubicin and 4'-desoxy-doxorubicin may be, for instance, of 75 to 90 mg/$m^2$ given in a single infusion to be repeated at 21 days, and similar dosages may be useful also for 4'-desoxy-4'-iodo-doxorubicin.

Idarubicin, i.e. 4-demethoxy-daunorubicin, may be, e.g., administered intravenously at a single dose of 13-15 mg/$m^2$ every 21 days in the treatment of solid tumours, while in the treatment of leukemias a preferred dose schedule is, e.g.,

10
- 12 -

of 10-12 mg/m$^2$ day by intravenous route for 3 days, to be
repeated every 15-21 days; similar dosages may be, e.g.,
followed also for daunorubicin.

The following examples illustrate but do not limit in any

5   way the invention.

With reference to the examples, the stability controls on
the ready-to-use solutions were carried out by means of high
performance liquid chromatography (HPLC), at the following
experimental conditions:

10   Liquid chromatograph          : Varian model 5010
     Spectrophotometric detector : Knauer model 8700
     Integrating recorder         : Varian model CDS 401
     Injection valve              : Rheodyne model 7125 fitted with
                                     a 10 mcl sample loop
15   Chromatographic column        : Waters μ-Bondapak C18
                                     (length = 300 mm; inner diameter
                                     = 3.9 mm; average particle size =
                                     10 mcm)
     Column temperature           : ambient (about 22°C ± 2°C)
20   Mobile phase                 : water : acetonitrile (69:31 v/v)
                                     - adjusted to pH 2 with phosphoric
                                     acid, filtered (sintered glass
                                     filter, 1 mcm or finer porosity)
                                     and deaerated
25   Mobile phase flow rate        : .1.5 ml/min
     Analytical wavelength         : 254 ± 1 nm



- 11 -

Integrating recorder sensitivity : 512

Chart speed                     : 1 cm/min

At these conditions, the peak of the anthracycline glycoside
showed a retention time of about 6 minutes.

5    The obtained results are reported in the Tables accompa-
nying the examples.

The extrapolation of the analytical data in order to determine
the time when the 90% of the initial assay could be expected
($t_{90}$ value) was made following an Arrhenius plot.

10   This procedure of analytical data treatment is well known
and widely used and described in the art: see, e.g., Chemical
Stability of Pharmaceuticals, Kennet A. Connors, Gordon L.
Amidon, Lloyd Kennon, Publ.John Wiley and Sons, New York, N.Y.,
1979.

15   The term "teflon" refers to "Teflon$^{TM}$".



- 12 -

Example 1

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.8 g | (10 mg) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5 ml) |

Doxorubicin.HCl (0.8 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.4 l).

The solution was filtered through a 0.22 μ microporous membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks (55°C), 4 weeks (45°C and 35°C) and 12 weeks (4°C).

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 1:



PU 0011741



13

- 28 -

Table 1

INITIAL VALUES
Concentration:1.992 mg/ml        pH = 3.0
Relative % Assay: 100.0

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.995 | 100.2 | 1.952 | 98.0 | 1.919 | 96.3 | 1.493 | 75.0 |
| 2 | | | 1.889 | 94.8 | 1.851 | 92.9 | 1.036 | 51.9 |
| 3 | | | 1.876 | 94.2 | 1.565 | 78.6 | 0.730 | 36.7 |
| 4 | 1.979 | 99.4 | 1.808 | 90.8 | 1.393 | 63.9 | | |
| 8 | | | | | | | | |
| 12 | 1.972 | 99.0 | | — | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 3970 days

$t_{90}$ at 8°C = 2000 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.



- 14 -

Example 2

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.0 g | (100 mg) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 1 | (5 ml) |

Doxorubicin.HCl (8.0 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.4 1).

The solution was filtered through a 0.22 μ microporous membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks (55°C), 4 weeks (45°C and 35°C) and 12 weeks (4°C).

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 2:



SEC 104

PU 0011743

- 15 -

Table 2

| INITIAL VALUES |
|---|
| Concentration: 20.06 mg/ml          pH = 2.95 |
| Relative % Assay: 100.0 |

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 20.06 | 100.0 | 19.56 | 97.5 | 17.84 | 88.9 | 12.31 | 61.4 |
| 2 | | | 18.87 | 94.1 | 15.61 | 77.8 | 7.09 | 35.3 |
| 3 | | | 18.24 | 90.9 | 13.41 | 66.8 | 3.13 | 15.6 |
| 4 | 19.91 | 99.2 | 17.51 | 87.3 | 11.07 | 55.2 | | |
| 8 | | | | | | | | |
| 12 | 19.80 | 98.7 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 3700 days

$t_{90}$ at 8°C = 1780 days

Similar stability data can be observed for analogous solutions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubicin, as hydrochloride salts, at the same 20 mg/ml concentration.



16
- 18 -

Example 3

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.800 g | (10.00 mg) |
| N,N-Dimethylacetamide | 0.060 l | (0.75 ml) |
| Propylene glycol | 0.048 l | (0.60 ml) |
| Ethanol | 0.012 l | (0.15 ml) |
| Hydrochloric acid 0.1N q.s. to | pH = 3 | (pH = 3) |
| Water for injections q.s. to | 0.400 l | (5.00 ml) |

Doxorubicin.HCl (0.800 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. N,N-dimethylacetamide, propylene glycol and ethanol were subsequently added under stirring and nitrogen bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.400 l).

The solution was filtered through a 0.22 µ microporous membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks (55°C), 4 weeks (45°C and 35°C) and 8 weeks (4°C).

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 3:



17

Table 3

| INITIAL VALUES<br>Concentration: 2.000 mg/ml<br>Relative % Assay: 100.0 | | | | | | | | pH = 3.03 |
|---|---|---|---|---|---|---|---|---|

| TIME<br>(weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc.<br>mg/ml | Rel.%<br>Assay | Conc.<br>mg/ml | Rel.%<br>Assay | Conc.<br>mg/ml | Rel.%<br>Assay | Conc.<br>mg/ml | Rel.%<br>Assay |
| 1 | | | 1.892 | 94.6 | 1.735 | 86.7 | 1.495 | 74.7 |
| 2 | 1.993 | 99.7 | 1.927 | 96.4 | 1.624 | 81.2 | 1.212 | 60.6 |
| 3 | | | 1.908 | 95.4 | 1.432 | 71.6 | 1.032 | 51.6 |
| 4 | 2.00 | 100.0 | 1.863 | 93.2 | 1.266 | 63.3 | | |
| 8 | 1.960 | 98.0 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 4360 days

$t_{90}$ at 8°C = 2200 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.



PU 0011746

- 20 -

Example 4

| Composition | for 80 vials | (for 1 vial) |
| Doxorubicin.HCl | 0.8 g | (10.0 mg) |
| Polyvinylpyrrolidone | 20.0 g | (250.0 mg) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5.0 ml) |

Doxorubicin.HCl (0.8 g) was dissolved in 90 percent of
10 the amount of water for injections, de-aerated by nitrogen
bubbling. Polyvinylpyrrolidone was added and dissolved under
stirring and nitrogen bubbling. The hydrochloric acid was
then added dropwise to adjust the pH of the solution to 3.
Further de-aerated water for injections was then added to
15 bring the solution to its final volume (0.4 l).

The solution was filtered through a 0.22 μ microporous
membrane under nitrogen pressure. Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity. The vials were then closed with
20 chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55°C, 45°C and 35°C
(accelerated stability controls) and at 4°C for up to 3 weeks
25 (55°C), 4 weeks (45°C and 35°C) and 8 weeks (4°C).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 4;

PU 0011747



19
- 21 -

Table 4

| INITIAL VALUES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Concentration: 1.973 mg/ml | | | | pH = 2.71 | | | | |
| Relative % Assay: 100.0 | | | | | | | | |

| TIME | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (weeks) | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 2.028 | 102.8 | 1.944 | 98.5 | 1.791 | 90.8 | 1.477 | 74.9 |
| 2 | | | 1.885 | 95.5 | 1.582 | 80.2 | 0.972 | 49.3 |
| 3 | | | 1.840 | 93.2 | 1.402 | 71.0 | 0.632 | 32.0 |
| 4 | 1.913 | 97.0 | 1.853 | 93.9 | 1.273 | 64.5 | | |
| 8 | 1.972 | 99.9 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 5560 days

$t_{90}$ at 8°C = 2670 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.



- $\frac{20}{22}$ -

Example 5

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.00 g | (100.0 mg) |
| N,N-Dimethylacetamide | 0.12 l | (1.5 ml) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

5

Doxorubicin.HCl (8.00 g) was dissolved in 90 percent of
10 the amount of water for injections, de-aerated by nitrogen
bubbling.  N,N-dimethylacetamide was added under stirring and
nitrogen bubbling.  The hydrochloric acid was then added
dropwise to adjust the pH of the solution to 3.  Further
de-aerated water for injections was then added to bring the
15 solution to its final volume (0.40 l).

The solution was filtered through a 0.22 µ microporous
membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
20 chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55°C, 45°C and 35°C
(accelerated stability controls) and at 4°C for up to 3 weeks
(55°C), 4 weeks (45°C and 35°C) and 8 weeks (4°C).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 5:



PU 0011749

- 21 -

Table 5

| INITIAL VALUES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Concentration: 19.32 mg/ml | | | | pH = 2.96 | | | | |
| Relative % Assay: 100.0 | | | | | | | | |

| TIME | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (weeks) | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 20.1 | 103.5 | 19.14 | 99.1 | 17.34 | 89.8 | 15.57 | 80.6 |
| 2 | | | 19.20 | 99.4 | 15.77 | 81.6 | 12.94 | 67.0 |
| 3 | | | 18.06 | 93.5 | 14.85 | 76.9 | 11.61 | 60.1 |
| 4 | 20.03 | 103.7 | 17.81 | 92.2 | 13.78 | 71.3 | | |
| 8 | 19.99 | 103.5 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1310 days

$t_{90}$ at 8°C = 770 days

Similar stability data can be observed for analogous solutions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubicin, as hydrochloride salts, at the same 20 mg/ml concentration



- 22 -

Example 6

| Composition | for 80 vials | (for 1 vial) |
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Ethanol | 0.12 l | (1.5 ml) |
| Hydrochloric acid 0.1 N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

5

Doxorubicin.HCl (0.80g) was dissolved in 90 percent of
10 the amount of water for injections, de-aerated by nitrogen
bubbling. Ethanol was added under stirring and nitrogen
bubbling. Hydrochloric acid 0.1 N was then added dropwise to
adjust the pH of the solution to 3. De-aerated water for
injections was finally added to bring the solution to its
15 final volume (0.40 l).

The solution was filtered through a 0.22 μ microporous
membrane under nitrogen pressure. Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity. The vials were then closed with
20 chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55°C, 45°C and at
35°C (accelerated stability controls) and at 4°C for up to 3
25 weeks (55°C), 4 weeks (45°C and 35°C) and 12 weeks (4°C).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 6 .





23

Table 6

| INITIAL VALUES | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Concentration: 1.979 mg/ml | | | | pH = 3.11 | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 4°C | | 35°C | | 45°C | | 55°C |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml Rel.% Assay |
| 1 | 2.010 | 101.6 | 1.965 | 99.3 | 1.947 | 98.4 | 1.750   86.4 |
| 2 | | | 1.957 | 98.9 | 1.910 | 96.5 | 1.645   83.1 |
| 3 | | | 1.895 | 95.8 | 1.737 | 87.8 | 1.356   68.5 |
| 4 | 1.927 | 97.3 | 1.818 | 91.9 | 1.678 | 84.8 | |
| 12 | 1.939 | 97.9 | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1270 days

$t_{90}$ at 8°C =  780 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.

SEC 104

- 24 -

Example 7

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.000 g | (100.00 mg) |
| N,N-Dimethylacetamide | 0.060 1 | (0.75 ml) |
| Propylene glycol | 0.048 1 | (0.60 ml) |
| Ethanol | 0.012 1 | (0.15 ml) |
| Hydrochloric acid 0.1N q.s. to | pH = 3 | (pH = 3) |
| Water for injections q.s. to | 0.400 1 | (5.00 ml) |

Doxorubicin.HCl (8.000 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. N,N-dimethylacetamide, propylene glycol and ethanol were subsequently added under stirring and nitrogen bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.400 1).

The solution was filtered through a 0.22 μ microporous membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of $55^{\circ}C$, $45^{\circ}C$ and $35^{\circ}C$ (accelerated stability controls) and at $4^{\circ}C$ for up to 3 weeks ($55^{\circ}C$), 4 weeks ($45^{\circ}C$ and $35^{\circ}C$) and 8 weeks ($4^{\circ}C$).

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 7:



AUSTRALIAN
SEC
104
PATENT OFFICE



25
- 27 -

Table 7

INITIAL VALUES
Concentration:20.07 mg/ml          pH = 2.99
Relative % Assay: 100.0

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4° | | 35° | | 45° | | 55° | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | | | 19.14 | 95.4 | 17.81 | 88.7 | 14.84 | 73.9 |
| 2 | 19.97 | 99.5 | 19.07 | 95.0 | 16.27 | 81.1 | 12.36 | 61.6 |
| 3 | | | 18.08 | 90.1 | 14.62 | 72.9 | 10.04 | 50.0 |
| 4 | 20.06 | 99.9 | 18.03 | 89.8 | 13.20 | 65.8 | | |
| 8 | 19.69 | 98.1 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 846 days

$t_{90}$ at 8°C = 505 days

Similar stability data can be observed for analogous solu-
tions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubi-
cin, as hydrochloride salts, at the same 20 mg/ml concentration.



PU 0011754

- 26 -

Example 8

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.0 g | (100.0 mg) |
| Polyvinylpyrrolidone | 20.0 g | (250.0 mg) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5.0 ml) |

Doxorubicin.HCl (8.0 g) was dissolved in 90 percent of
the amount of water for injections, de-aerated by nitrogen
bubbling. Polyvinylpyrrolidone was added and dissolved under
stirring and nitrogen bubbling. The hydrochloric acid was
then added dropwise to adjust the pH of the solution to 3.
Further de-aerated water for injections was then added to
bring the solution to its final volume (0.4 l).

The solution was filtered through a 0.22 μ microporous
membrane under nitrogen pressure. Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity. The vials were then closed with
chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55°C, 45°C and 35°C
(accelerated stability controls) and at 4°C for up to 3 weeks
(55°C), 4 weeks (45°C and 35°C) and 8 weeks (4°C).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
potency, are reported in the folllowing Table 8:



PU 001175S



- 27 -

Table 8

| INITIAL VALUES | | | |
|---|---|---|---|
| Concentration: 19.57 mg/ml | | pH = 2.62 | |
| Relative % Assay: 100.0 | | | |

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 19.54 | 99.9 | 19.11 | 97.6 | 16.88 | 86.2 | 12.48 | 63.8 |
| 2 | | | 18.43 | 94.2 | 14.13 | 72.2 | 6.00 | 30.7 |
| 3 | | | 18.02 | 92.1 | 11.57 | 59.1 | 2.61 | 13.3 |
| 4 | 19.58 | 100.1 | 17.36 | 88.7 | 9.23 | 47.2 | | |
| 8 | 19.34 | 98.8 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 2540 days

$t_{90}$ at 8°C = 1290 days

Similar stability data can be observed for analogous solutions containing 4'-epi-doxorubicin or 4'-desoxy-doxo-rubicin, as hydrochloride salts, at the same 20 mg/ml concentration.



= 2.99

**E**

| 45° | | 55° | |
|---|---|---|---|
| nc. /ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| .81 | 88.7 | 14.84 | 73.9 |
| .27 | 81.1 | 12.36 | 61.6 |
| .62 | 72.9 | 10.04 | 50.0 |
| 3.20 | 65.8 | | |

o Arrhenius equation:

ed for analogous solu-
or 4'-desoxy-doxorubi-
same 20 mg/ml concentration.

.1s   (for 1 vial)

(100.0 mg)

(250.0 mg)

(pH = 3)

(5.0 ml)

olved in 90 percent of
e-aerated by nitrogen
dded and dissolved under          .nd
hydrochloric acid was
of the solution to 3.
ns was then added to              .n
e (0.4 l).
n a 0.22 μ microporous
lumes of 5 ml of the
-colourless glass vials           s
e then closed with
rs and sealed with

the vials was tested.
of 55°C, 45°C and 35°C            .
t 4°C for up to 3 weeks           C
weeks (4°C).                      ks

g high performance
letermination of

g Table 8:

PU 0011757

29
- 32 -

Table 9

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration: 1.826 mg/ml         pH = 3.14 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.830 | 100.2 | 1.812 | 99.2 | 1.784 | 97.7 | 1.605 | 87.9 |
| 2 | 1.818 | 99.6 | 1.781 | 97.5 | 1.554 | 85.1 | 1.292 | 70.8 |
| 3 | | | 1.743 | 95.4 | 1.409 | 77.2 | 1.018 | 55.7 |
| 4 | 1.823 | 99.8 | 1.734 | 95.0 | 1.369 | 75.0 | | |
| 8 | 1.792 | 98.2 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 5815 days

$t_{90}$ at 8°C = 2920 days

Similar stability data can be observed also for analogous
solutions containing either doxorubicin hydrochloride at
5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-
doxorubicin, 4'-epi-desoxy-4'-iodo-doxorubicin, daunorubicin
or 4-demethoxy-daunorubicin, as hydrochloride salts, at
both 2 mg/ml and 5 mg/ml concentration.



30
- 32 -

Example 10

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Propylene glycol | 0.12 1 | (1.5 ml) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.40 1 | (5.0 ml) |

Doxorubicin.HCl (0.80 g) was dissolved in 90% of the amount of water for injections de-aerated by nitrogen bubbling. Propylene glycol was added under stirring and nitrogen bubbling. Hydrochloric acid 0.1 N was then added dropwise to adjust the pH of the solution to 3. De-aerated water for injections was finally added to bring the solution to its final volume (0.40 1).

The solution was filtered through a 0.22 µ microporous membrane under nitrogen pressure. - Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks (55°C), 4 weeks (45°C and 35°C) and 4 weeks (4°C).

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 10:

PU 0011759

3(
- 3̶6̶ -

Table 10

| INITIAL VALUES |
|---|
| Concentration: 1.982 mg/ml          pH = 3.11 |
| Relative % Assay: 100.0 |

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.972 | 99.5 | 1.934 | 97.6 | 1.889 | 95.3 | 1.705 | 86.0 |
| 2 | | | 1.952 | 98.5 | 1.795 | 90.6 | 1.483 | 74.8 |
| 3 | | | 1.935 | 97.6 | 1.699 | 85.7 | 1.153 | 58.2 |
| 4 | 2.056 | 103.7 | 1.788 | 90.2 | 1.460 | 73.7 | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1794 days

$t_{90}$ at 8°C = 1025 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml 5 mg/ml concentration.



32

Example 11

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Polyethylene glycol 400 | 0.12 l | (1.5 ml) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH ≈ 3 | (pH ≈ 3) |
| Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

5

Doxorubicin.HCl (0.80 g) was dissolved in 90% of the

10 amount of water for injections, de-aerated by nitrogen

bubbling. Polyethylene glycol 400 was added under stirring

and nitrogen bubbling. Hydrochloric acid 0.1 N was then

added dropwise to adjust the pH of the solution to 3.

De-aerated water for injections was finally added to bring

15 the solution to its final volume (0.40 l).

The solution was filtered through a 0.22 μ microporous

membrane under nitrogen pressure. Volumes of 5 ml of the

solution were distributed into type I-colourless glass vials

having 5/7 ml capacity. The vials were then closed with

20 chlorobutyl teflon-faced rubber stoppers and sealed with

aluminium caps.

The stability of the solutions in the vials was tested.

The vials were stored at temperatures of 55°C, 45°C and 35°C

(accelerated stability controls) and at 4°C for up to 3 weeks

25 (55°C), 4 weeks (45°C and 35°C) and 4 weeks (4°C).

The stability data obtained, using high performance

liquid chromatography (HPLC) for the determination of

potency, are reported in the following Table 11:

PU 0011761

33
- 33 -

Table 11

| INITIAL VALUES | | |
| --- | --- | --- |
| Concentration: 1.907 mg/ml | | pH = 3.07 |
| Relative % Assay: 100.0 | | |

| TIME (weeks) | TEMPERATURE | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.871 | 98.1 | 1.797 | 94.2 | 1.668 | 87.5 | 1.484 | 77.8 |
| 2 | | | 1.710 | 89.7 | 1.608 | 84.3 | 1.237 | 64.9 |
| 3 | | | 1.739 | 91.2 | 1.551 | 81.3 | 1.007 | 52.8 |
| 4 | 1.873 | 98.2 | 1.693 | 88.8 | 1.453 | 76.2 | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1130 days

$t_{90}$ at 8°C =  680 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.



PU 0011762

- 34/26 -

Example 12

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.8 g | (10 mg) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5 ml) |

Doxorubicin.HCl (0.8 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.4 l).

The solution was filtered through a 0.22 $\mu$ microporous membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of 4°C and 8°C for up to 6 months.

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 12:



- 35 -

**INITIAL VALUES**
Concentration: 2.039 mg/ml                pH = 3.06
Relative % Assay: 100.0

| TIME (months) | TEMPERATURE | | | |
| --- | --- | --- | --- | --- |
| | 4°C | | 8°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.983 | 97.3 | 1.959 | 96.1 |
| 3 | 1.984 | 97.3 | 1.983 | 97.3 |
| 6 | 2.012 | 98.7 | 2.002 | 98.2 |

At the same conditions, similar stability data can be generally observed also for the other solutions mentioned in the preceding examples.



- 36 -

THE CLAIMS DEFINING THE INVENTION ARE AS FOLLOWS:

1.      A sterile, pyrogen-free, anthracycline glycoside solution which comprises a physiologically acceptable salt of an anthracycline glycoside dissolved in a physiologically acceptable aqueous solvent therefor at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted from 2.5 to 5.0 solely with a physiologically acceptable acid.

2.      A solution according to claim 1 in a sealed container.

3.      A solution according to claim 1 or 2 wherein the anthracycline glycoside is chosen from the group consisting of doxorubicin, 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin and 4-demethoxy-daunorubicin.

4.      A solution according to claim 3 wherein the anthracycline glycoside is doxorubicin.

5.      A solution according to any one of the preceding claims wherein the physiologically acceptable salt of the anthracycline glycoside is the salt with an acid chosen from hydrochloric, hydrobromic, sulphuric, phosphoric, succinic, tartaric, ascorbic, citric, methanesulphonic and ethanesulphonic acids.

6.      A solution according to claim 5 wherein the physiologically acceptable salt of the anthracycline glycoside is the salt with hydrochloric acid.

7.      A solution according to any one of the preceding claims having a pH of from 2.62 to 3.14.

8.      A solution according to any one of claims 1 to 6 having a pH of about 3.

9.      A solution according to any one of the preceding claims, wherein the physiologically acceptable acid is an inorganic mineral acid.

10.      A solution according to claim 9, wherein the acid is hydrochloric, sulphuric, or phosphoric acid.

11.      A solution according to any one of claims 1 to 8, wherein the physiologically acceptable acid is an organic acid.



PU 0011765

- 37 -

12.        A solution according to claim 11, wherein the acid is acetic, succinic, tartaric, ascorbic, citric, glutamic, methanesulphonic or ethanesulphonic acid.

13.        A solution according to any one of the preceding claims wherein the solution additionally contains not more than 30% of one or more co-solvents selected from the group consisting of ethanol, polyethylene glycol and N,N-dimethylacetamide.

14.        A solution according to any one of claims 1 to 12 wherein the physiologically acceptable aqueous solvent is physiological saline.

15.        A solution according to any one of the preceding claims wherein the concentration of the anthracycline glycoside is from 1 mg/ml to 20 mg/ml.

16.        A solution according to claim 15 wherein the anthracycline glycoside is doxorubicin at a concentration of from 2 mg/ml to 20 mg/ml.

17.        A solution according to claim 16 wherein the concentration of doxorubicin is 2 mg/ml or 5 mg/ml.

18.        A solution according to any one of the preceding claims which also contains one or more additional components selected from a cosolubilizing agent, a tonicity adjustment agent and a preservative.

19.        A solution according to claim 18, which contains a tonicity adjustment agent selected from dextrose, lactose and mannitol.

20.        A process for producing a sterile, pyrogen-free, anthracycline glycoside solution with a pH of from 2.5 to 5.0, according to any one of the preceding claims; which process comprises dissolving a physiologically acceptable salt of the anthracycline glycoside, which salt is not in the form of a lyophilizate, in a physiologically acceptable aqueous solvent therefor; adding solely a physiologically acceptable acid to adjust the pH within the said range as desired; passing the resulting solution through a sterilising filter; and, optionally, adding an additional component selected from a cosolubilizing agent, a tonicity adjustment agent and a preservative to the solution prior to passing the solution through the sterilising filter.

PU 0011766

– 38 –

21.     A process according to claim 20, wherein dextrose, lactose or mannitol is added as a tonicity adjustment agent to the solution prior to passing the solution through the sterilising filter.

5    22.     A solution according to claim 1 substantially as hereinbefore described in any one of Examples 1 to 12.

23.     A process according to claim 20 substantially as hereinbefore described in any one of Examples 1 to 12.

24.     A sterile pyrogen-free anthracycline glycoside
10   solution with a pH of from 2.5 to 5.0 which has been prepared by a process as claimed in any one of claims 20, 21 and 23.

25.     A method of inhibiting the growth of a tumour selected from sarcomas, carcinomas, lymphomas,
15   neuroblastoma, melanoma, myeloma, leukemias and Wilms tumour, which method comprises administering to a host suffering from said tumour a sterile pyrogen-free solution according to any one of claims 1 to 19 and 24 containing the anthracycline glycoside in an amount sufficient to
20   inhibit the growth of said tumour.

26.     A method according to claim 25 wherein the tumour is selected from Moloney Sarcoma Virus, Sarcoma 180 Ascites, Solid Sarcoma 180, Gross transplantable leukemia, L 1210 leukemia and lymphocytic P 388 leukemia.

25   DATED this 23rd day of August 1991


FARMITALIA CARLO ERBA S.r.l.
By Their Patent Attorneys:

GRIFFITH HACK & CO
Fellows Institute of Patent
30   Attorneys of Australia



# EXHIBIT 22

# REDACTED

# EXHIBIT 23



**McDonnell Boehnen Hulbert & Berghoff LLP**

300 South Wacker Drive     312 913 0001 phone
Chicago, Illinois 60606-6709   312 913 0002 fax
www.mbhb.com

July 11, 2005

Sent Via Facsimile (212) 768-6800

Reid Ashinoff
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York 10020

Re:    Pharmacia & Upjohn Company LLC v. Sicor Inc. et al.
       U.S. District Court for the District of Delaware (C.A. No. 04-883)

Dear Reid:

We have received your letter of earlier today, July 11, 2005. We believe that there are three major points agreed by the parties, but omitted from your letter, as well as a few things implied by your letter that were not agreed by the parties.

First, neither the production of documents nor testimony of the witnesses constitutes a waiver of any attorney-client privilege or work product protection.

Second, nothing in our agreement calls for a witness to reveal the substance of work done under any agreement, except to the extent that it may be related to this litigation but is also unprivileged and non-work product work.

Third, we expressly do not agree with the reservation of the option to approach the other party or the Court on the second page of your letter.

We are willing to provide the agreements related to Drs. De Ponti and Gambini, provided you agree that such disclosure does not constitute any waiver of privilege and/or work product that may exist. As we told you, there are no written agreements related to Dr. Gatti. Should you be unwilling to accept these conditions, please leave me a voice mail message at (312) 913-2133 immediately.

Please contact us if you have any questions.

Very truly yours,

Joshua R. Rich
312 913 2133
rich@mbhb.com

JRR/rr

# EXHIBIT 24

11/29/04

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY,        )
                                   )
            Plaintiff,             )    C. A. No. 04-833-KAJ
                                   )
        v.                         )
                                   )
SICOR, INC. and SICOR              )
PHARMACEUTICALS, INC.,             )
                                   )
            Defendants.            )

## DEFENDANTS' FIRST REQUEST FOR
## PRODUCTION OF DOCUMENTS BY PLAINTIFF

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 34, Defendants

SICOR, Inc. and Sicor Pharmaceuticals, Inc. (collectively "Sicor") request Plaintiff Pharmacia &

Upjohn Company ("PNU") to produce, for the purpose of inspection and copying by Sicor, the

documents and things described in this request in their possession, custody or control within

thirty (30) days of the service date hereof at the offices of Sicor's attorneys, Sonnenschein Nath

& Rosenthal, LLP, 1221 Avenue of the Americas, New York, NY 10020-1089.

### Instructions and Definitions

A.  In the event that any document requested herein is withheld based on a claim

of privilege, set forth with respect to each document so withheld: (1) the type and nature of the

document, (2) the subject matter of the document, (3) the date of the document, (4) the name and

position of each author of the document; (5) the name and position of each recipient or addressee

of the document or a copy thereof, (6) the present location and custodian of the document, (7) the

grounds for the claim of privilege, and (8) the paragraph number of the request to which the

document is responsive.

B.  With respect to each document requested that has been lost, destroyed or otherwise disposed of since its preparation or receipt, set forth with respect to each such document: (1) the type and nature of the document, (2) the subject matter of the document, (3) the date or approximate date of the document, (4) the name and position of each author; (5) the name and position of each recipient or addressee of the document or a copy thereof, (6) the time when and the circumstances under which the document was lost, destroyed, or otherwise disposed of, including the name of the person who directed that the document be disposed of or destroyed, (7) the name, position and address of the last known custodian of the document or a copy thereof, and (8) the paragraph number of the request to which the document would have been responsive.

C.  Documents shall be produced either (1) in the manner and file in which they are currently being retained, or (2) in separate files organized in accordance with this document request.

D.  No part of a request should be left unanswered because an objection is interposed to another part of the request.

E.  These requests are continuing in nature.  If at any time prior to the trial of this action you obtain additional documents responsive to any of these requests, you shall seasonably serve upon the undersigned amended and supplemental responses.

F.  Except when express reference is made to another paragraph, each paragraph herein should be construed independently and not by reference to any other paragraph herein for purposes of limitation.

G. The singular and masculine form of any noun or pronoun shall embrace, and be read and applied as embracing the plural, the feminine and the neuter, except where context clearly makes it inappropriate.

H. "And" as well as "or" shall be construed either as disjunctive or conjunctive so as to bring within the scope of the Request any documents that might otherwise be construed to be outside the scope of the Request.

I. "Refer" or "relate" means to include, mention, define, explain or pertain to in any way, expressly or impliedly, the matter called for.

J. "Document" or "Documents" shall have the broadest possible meaning pursuant to the Federal Rules of Evidence, including, but not limited to, tangible objects and records and includes, without limitation, correspondence, communications, computer printouts, data on computers or computer diskettes of any nature (e.g., whether hard drive, floppy disks, CD-ROMS or DVDS), including e-mail communications, reports, memoranda (internal and otherwise) and/or records of conversations, audio and video tape recordings, diaries, calendars, scheduling books, notes, notebooks, drafts, contracts, agreements, invoices, checks, deposit slips, and all other tangible or intangible written or printed or otherwise recorded material of whatever kind known to be in your possession, custody or control and of anyone under your control including any or all persons or entities acting on your behalf at your direction.

K. "Communication" means any written, oral or mechanical transmittal of information (in the form of facts, ideas, opinions, thoughts, inquiries or otherwise) including, but not limited to, correspondence, memoranda, notes, telexes, telephone conversations, computerized e-mail, in-person meetings, and any written documents relating to any such communications.

L.  "Person" as used herein means natural persons, as well as corporations, partnerships, joint ventures, and all other forms of organization or association.

M.  "Product" shall include a commercially available product as well as any experimental or developmental predecessor of a commercially available product, any abandoned experimental or developmental composition, and any experimental or developmental future product.

N.  "Sale" or "sold" shall mean the transfer of ownership, possession or control from one person or entity to another with or without monetary consideration and shall include any offer or sale, transfer of ownership, possession or control.

O.  "PNU" shall mean Pharmacia & Upjohn Company and its subsidiaries, affiliates, predecessor companies or controlled companies, including Pfizer, and any of those companies' officers, directors, employees, attorneys, agents, independent contractors or other persons acting or purporting to act on its behalf.

P.  "Sicor" shall mean SICOR, Inc. and Sicor Pharmaceuticals, Inc. and each of their respective subsidiaries, affiliates, predecessor companies or controlled companies, and any of those companies' officers, directors, employees, attorneys, agents, independent contractors or other persons acting or purporting to act on their behalf.

Q.  The "PTO" shall mean the United States Patent and Trademark Office.

R.  The "'285 Patent" shall mean U.S. Patent No. 6,107,285 entitled "Injectible Ready-To-Use Solutions Containing an Antitumor Anthracycline Glycoside."

S.  "Idarubicin" shall mean the chemical idarubicin and any salt or esters of Idarubicin, and all pharmaceutical products containing idarubicin, whether in solid state, in the form of an injectable product, or in any other physical form.

- 4 -

T.  "Anthracycline Glycosides" shall mean the chemicals Epirubicin, Doxorubicin, Idarubicin or Danorubicin, including any salt or esters of such chemicals, and all pharmaceutical products containing such chemicals, whether in solid state, in the form of an injectable product, or in any other physical form.

U.  "Cease and Desist Letter" means and refers to any communication or document sent from PNU or its predecessors-in-interest or its licensees, including Boehringer and its subsidiaries, to any other party alleging any actual or potential infringement, or raising any concern to any third party about potential or possible infringement.

V.  "Including"  means including without limitation.

W.  "Prior Art" includes, by way of example, and without limitation, the subject matter described in 35 U.S.C. §§102 and 103 as measured, for the purpose of this Request of Production, from before the U.S. filing date of the '285 Patent, January 29, 1992.

X.  "Related Patent" means any patent, U.S. or foreign, that relates in any way to the '285 Patent, including but not limited to all patents that claim priority from the patent, or from the patent or patent application the '285 Patents claims priority from, including GB 8519452, all parents, divisionals, reissues, reexaminations, continuations, continuations-in-part, requests for continued examination, continued prosecution applications, or correction certificates, including U.S. patents nos. 5,124,318, 5,124,317 and 4,946,831.

Y.  "Related Patent Application" means any patent application, U.S. or foreign, that relates in any way to the '285 Patent, including all applications for which no patents have issued, and including but not limited to all patent applications that claim priority from the '285 Patent, or from the patent or patent application the '285 Patents claims priority from, including GB 8519452, all parents, divisionals, reissues, reexaminations, continuations, continuations-in-

part, requests for continued examination, continued prosecution applications, or correction certificates.

## Request For Production

1.    All documents that state, summarize or refer to the amount of gross revenues generated by PNU from the sale of any product containing Idarubicin since January 1, 1990.

2.    All documents that state, summarize or refer to the amount of gross revenues generated by PNU from the sale of any product containing any of the Anthracycline Glycosides since January 1, 1990.

3.    All documents that state, summarize or refer to the amount of net profits generated by PNU from the sale of Idarubicin since January 1, 1990.

4.    All documents that state, summarize or refer to the amount of net profits generated by PNU from the sale of any of the Anthracycline Glycosides since January 1, 1990.

5.    All documents that evidence, summarize, analyze, forecast, project or refer to the sales by PNU from the sale of Idarubicin since January 1, 1990.

6.    All documents that evidence, summarize, analyze, forecast, project or refer to the sales by PNU from the sale of any of the Anthracycline Glycosides since January 1, 1990.

7.    All documents that evidence, summarize, analyze, forecast, project or refer to the nature or amount of any costs to manufacture or sell Idarubicin since January 1, 1990, including but not limited to costs of sales and costs of goods sold.

8.    All documents that evidence, summarize, analyze, forecast, project or refer to the nature or amount of any costs to manufacture or sell any of the Anthracycline

Glycosides since January 1, 1990, including but not limited to costs of sales and costs of goods sold.

9.    All documents that are, have been or will be used in the marketing or advertising of Idarubicin since January 1, 1990, including, without limitation, product literature and brochures, strategic marketing plans and marketing budgets.

10.    All documents that are, have been or will be used in the marketing or advertising of any Anthracycline Glycosides since January 1, 1990, including, without limitation, product literature and brochures, strategic marketing plans and marketing budgets.

11.    All documents sufficient to identify all manufactures, distributors, resellers, and sales representatives who are involved in the sale, offer for sale, distribution or marketing of Idarubicin or any other Anthracycline Glycosides since January 1, 1990.

12.    All organizational charts that identify the people who are involved in the marketing and / or  development of any of PNU's oncology products, including ready to use solutions of Idarubicin or any other Anthracycline Glycosides, since January 1, 1990.

13.    All documents that constitute, mention or refer to any consideration, negotiation, license, execution, covenant not to sue, settlement of litigation or legal claims or other agreement concerning any invention or subject matter disclosed, described or claimed in the '285 Patent or any of the Related Patents, including all licenses to manufacture, distribute or resell Idarubicin or any of the other Anthracycline Glycosides to any third party including Bedford Laboratories, Inc., Abbott Laboratories, American Pharmaceutical Partners, Inc. or any of their corporate affiliates, and including any royalties received or due under any such license or other agreement.

14.    All documents provided or made available to any actual or potential shareholder, stock analyst, investment banker, lender or investor that evidence, summarize, analyze, forecast, project or refer to the business of manufacturing, licensing or selling of Idarubicin or any of the other Anthracycline Glycosides, including the projected sales, costs of goods sold, or profitability of such products.

15.    All documents that constitute a business plan, proposal, presentation, or any other form of business or financial planning, that refer or relate to Idarubicin.

16.    All documents that constitute a business plan, proposal, presentation, or any other form of business or financial planning, that refer or relate to any of the Anthracycline Glycosides.

17.    All documents that state, summarize or refer to any costs incurred in developing Idarubicin.

18.    All documents that state, summarize or refer to any costs incurred in developing any of the Anthracycline Glycosides.

19.    All documents that evidence, summarize, analyze, forecast, project or refer to any effect that Sicor's advertising or marketing of Idarubicin have had or will have on PNU's sales or projective sales of Idarubicin.

20.    All documents that evidence, summarize, analyze, forecast, project or refer to any effect that Sicor's advertising or marketing of any Anthracycline Glycosides have had or will have on PNU's sales or projective sales of any Anthracycline Glycosides.

21.    All documents that evidence, summarize, or refer to the market of any Idarubicin product and PNU's share of that market.

22.    All documents that evidence, summarize, or refer to the market of any of the Anthracycline Glycosides products, and PNU's share of that market.

23.    All documents that evidence, summarize, analyze, forecast, project or refer to any market trends in connection with the sale of Idarubicin.

24.    All documents that evidence, summarize, analyze, forecast, project or refer to any market trends in connection with the sale of any of the Anthracycline Glycosides.

25.    All documents that mention or refer or relate to or discuss the utility or advantages of Idarubicin or any invention disclosed, described or claimed in the '285 Patent or any of the Related Patents over alternative products.

26.    All documents that mention, refer to or evidence the royalty rate or rates that would constitute a "reasonable royalty" under 35 U.S.C. § 284, assuming that an infringement of the '285 Patent is found in this case.

27.    All documents that evidence, discuss, analyze or refer to the commercial success or performance of Idarubicin.

28.    All documents that evidence, discuss, analyze or refer to the commercial success or performance of any of the Anthracycline Glycosides.

29.    All documents that evidence, discuss, analyze or refer to the amount PNU would have been willing to accept at any time for a license to practice the '285 Patent.

30.    All documents that constitute, mention or refer to any demand by PNU or any of its licensees, including Boehringer and its subsidiaries, for another entity to cease manufacturing or selling any product that infringed or allegedly infringed the '285 patent or any of the Related Patents.

31.    All documents that constitute, mention or refer to any complaints or other pleadings filed in any court by PNU that allege infringement of the '285 Patent or any of the Related Patents.

32.    All documents that constitute, mention or refer to any settlement agreements including any supply agreements or licenses between PNU and any other entity concerning infringement or alleged infringement of the '285 Patent or any of the Related Patents.

33.    All documents that refer or relate to, or that were used in, the analysis, preparation, filing, prosecution and issuance of the patent applications leading to the '285 Patent or any of the Related Patents.

34.    All documents concerning invention disclosures and/or the first written descriptions for the '285 Patent and any of the Related Patents.

35.    All documents concerning any information used or supplied by the listed inventors of the '285 Patent or any of the Related Patents in connection with the preparation or prosecution of these patents.

36.    All drafts of the patent applications leading to the '285 Patent and/or any of the Related Patents.

37.    All copies (including drafts) of responses to Office Actions, amendments, affidavits, and other communications or submissions of any kind with or to the PTO or other patent office with respect to the '285 Patent and any of the Related Patents.

38.    All Documents that discuss, refer or relate to the '285 Patent, any of the Related Patents and/or any of the Related Patent Applications.

39.     All documents that mention, discuss, or comment upon the identity of the inventors who are, who should be, or should have been, named on each of the '285 Patents and any of the Related Patents.

40.     All documents, including but not limited to organizational charts, that identify all persons involved in research, conception and reduction to practice of the subject matter disclosed and/or claimed in the '285 Parent and any of the Related Patents, and all persons involved in preparation and/or prosecution of the '285 Patent and any of the Related Patents.

41.     All documents relating to or providing support for the date of conception of the '285 Patent.

42.     All documents relating to the first reduction to practice of the invention claimed in the '285 Patent.

43.     All documents relating to the diligence exercised in reducing to practice the invention claimed in the '285 Patent.

44.     All prior patents, publications, references or other Prior Art, and all records or documents concerning any Prior Art or any possible ground of unpatentability and/or invalidity, related to, cited, discussed or considered in connection with the '285 Patent and/or any of the Related Patents.

45.     All documents concerning the citation of any references and/or prior art to the PTO or other patent office, including search reports, including copies of all references actually submitted to the PTO or other patent office.

46.    All Documents relating to Prior Art searches related to the subject matter claimed and/or discussed in the '285 Patent or any of the Related Patents conducted by, or under the instruction of PNU or that PNU is aware of.

47.    All documents concerning any actual, potential or possible Prior Art with respect to the '285 Patent or the Related Patents, including but not limited to any Prior Art patents, publications, disclosures, uses and/or sales.

48.    All documents relating to any assertion by anyone as to the existence of Prior Art for the '285 Patent or any of the Related Patents.

49.    All documents relating to the knowledge or use by others of any and all subject matter disclosed and/or claimed in the '285 Patent prior its filing date.

50.    All documents relating to any disclosures, communications, or presentations to others by PNU of any of the inventions disclosed and/or claimed in the '285 Patent.

51.    All documents concerning any manufacture, production, marketing, sale, offer for sale, importation, consumer testing, or public use of any products relating to the subject matter disclosed and/or claimed in the '285 Patent.

52.    Each and every article, advertisement, press release, news bulletin and/or any other presentation (whether or not accepted for publication or presented, and including any drafts or reprints) concerning Idarubicin, any other Anthracycline Glycosides, or any subject matter disclosed and/or claimed in the '285 Patent and/or the Related Patents.

53.    All documents concerning the first public disclosure, first public use, first advertisement, first offer for sale, and/or first sale of any product relating to the subject matter disclosed and/or claimed in the '285 Patent, including but not limited to disclosures,

advertisements, offers for sale and sales of such products prior to the filing date of the '285 Patent.

54.     All documents relating to any potential, theoretical or actual secondary consideration that PNU believes may be applicable to rebut any showing of non obviousness of the '285 Patent.

55.     All documents relating to any actual secondary consideration for non obviousness of the '285 Patent that PNU intends to rely on in this litigation.

56.     All documents that describe, show or provide support for any alleged satisfaction of a long felt need by the invention claimed by the '285 Patent.

57.     All documents that relate to any alleged failure by others to make, use or implement the invention claimed by the '285 Patent.

58.     All documents relating to any alleged commercial success and/or any commercial failure achieved by the invention claimed by the '285 Patent.

59.     All documents relating to any alleged copying by others of the invention claimed by the '285 Patent.

60.     All documents relating to any alleged unexpected results created by the invention claimed by the '285 Patent.

61.     All documents relating to any alleged unexpected properties of the invention claimed by the '285 Patent.

62.     All documents relating to any alleged skepticism of skilled artisans before the invention claimed by the '285 Patent.

63.     All documents relating to any non-infringing alternatives to the invention claimed by the '285 Patent.

64.    All documents referring or relating to, or constituting any agreements concerning any right, title or interest in the '285 Patent, including without limitation all agreements concerning licensing and/or ownership of the '285 Patent and all documents relating to the negotiations of such agreements.

65.    All documents that either are or that evidence valuation of the '285 Patent and/or the Related Patents.

66.    All documents referring or relating to any agreements between PNU and any other person or entity who presently or at any other time had any ownership interest in the '285 Patent.

67.    All documents referring or relating to all Cease and Desist Letters sent by PNU or its licensees, including Boehringer and its subsidiaries in relation to the '285 Patent or any of the Related Patents, including the investigation leading to such letters, the letters themselves, and any ensuing correspondence between PNU and the recipients.

68.    All documents relating to any communication between PNU or its licensees, including Boehringer and its subsidiaries, and any other person regarding the '285 Patent or any of the Related Patents, including without limitation any reports, statements, or analyses by third parties.

69.    All documents concerning patentability, validity or invalidity, enforceability or unenforceability, infringement or non-infringement, or interpretation of the scope of the claims of the '285 Patent or any of the Related Patents, including any opinion of counsel or other, whether legal or otherwise, any search, investigation, analysis, review or study relating thereto.

70.    All documents relating to any lawsuits, opposition proceedings, interferences, reexaminations, reissue proceedings, nullity proceedings, revocation proceedings, arbitrations, conflicts or disputes regarding the '285 Patent or any of the Related Patents, including all pleadings, evidence, exhibits and depositions.

71.    All documents related to any other past or current proceeding that involved the alleged infringement of the '285 Patent and/or the Related Patents, including without limitation any pleadings, motions, transcripts, reports, exhibits, filings, order and discovery.

72.    Each document request and the response thereto by PNU, including the documents produced from any case involving the '285 Patent or any of the Related Patents.

73.    Each request for admission(s) and the response(s) thereto by PNU during discovery of any lawsuit involving the '285 Patent or any of the Related Patents.

74.    A copy of each PNU declaration, including any and all exhibits, which has been signed by or on behalf of PNU in any case involving the '285 Patent or any of the Related Patents.

75.    All documents relating to any product that PNU believes is covered by the claims of the '285 Patent.

76.    All documents that PNU intends to rely upon or otherwise utilize in establishing a reasonable royalty in this litigation.

77.    All documents relating to any tests or inspections that PNU performed on any Sicor product.

78.    All documents relating to any investigation that PNU performed in relation to filing a complaint against Sicor alleging infringement of the '285 Patent.

79.   All documents relating to the first occasion on which PNU became aware of Sicor's alleged infringement of the '285 Patent.

80.   All documents relating to the decision by PNU to file a complaint against Sicor alleging infringement of the '285 Patent.

81.   All communications and documents relating to communications between PNU and Sicor regarding the '285 Patent, Idarubicin, any of the other Anthracycline Glycosides, or any other oncology product.

82.   Each and every lab notebooks of any entity kept within the possession, custody, and/or control of PNU, containing any information relevant to the claims and/or defenses in this litigation.

83.   Each and every notebook and other record of the work, research, results, or conclusions concerning any subject matter claimed and/or disclosed in the '285 Patent or any of the Related Patents.

84.   All documents evidencing any expert opinion testimony given by any of the listed inventors of the '285 Patent or any of the Related Patents.

85.   All documents relating to or constituting any testing or test data referred to in declarations submitted during prosecution of the '285 Patent or any of the Related Patents, including copies of and documents related to the pilot studies, standard operating procedures, protocol, proposed protocol, the testing methodology and the validation method used for such testing, in particular the testing methodology used for determining stability and pH.

86.   All documents relating to or constituting any testing or test data referred to in the declarations of Carlo Colfalonieri submitted during prosecution of the '285 Patent and any of the Related Patents, including copies of and documents related to the pilot studies, standard

operating procedures, protocol, proposed protocol, the testing methodology and the validation method used for such testing, in particular the testing methodology used for determining stability and pH.

87.    All documents relating to or constituting any testing or test data relating to the subject matter claimed and/or disclosed in the '285 Patent or any of the Related Patents, including copies of and documents related to the pilot studies, standard operating procedures, protocol, proposed protocol, the testing methodology and the validation method used for such testing, in particular the testing methodology used for determining stability and pH.

88.    A copy of each testing data relating to the use of a buffer or an acid to adjust pH levels of any solution containing Idarubicin or any other Anthracycline Glycosides, including copies of and documents related to the pilot studies, standard operating procedures, protocol, proposed protocol, the testing methodology and the validation method used for such testing, in particular the testing methodology used for determining stability and pH.

89.    A copy of each testing data relating to the stability of any solution containing Idarubicin or any other Anthracycline Glycosides, including copies of and documents related to the pilot studies, standard operating procedures, protocol, proposed protocol, the testing methodology and the validation method used for such testing, in particular the testing methodology used for determining stability and pH.

90.    All documents relating to any and all examples in the '285 Patent, including but not limited to notebooks and other records of the work, experiments, research, results, and conclusions concerning the subject matter of such examples.

91.    All documents relating to, including documents relevant to, supporting, and/or contradicting, in whole or in part, any and all statements that are part of the file histories of the '285 Patent or any of the Related Patents.

92.    All communications between the listed inventors of the '285 Patent or any of the Related Patents, or PNU,  and their patent attorney(s) or agent(s) concerning the subject matter described or claimed in the '285 Patent and/or any of the Related Patents, and any bills or invoices for related legal services.

93.    All documents, including drafts, of any communications between or among PNU and any third party and/or any foreign or domestic regulatory agency including the United States Food and Drug Administration (FDA) concerning the properties, stability, pH levels and indications for use of Idarubicin.

94.    All documents, including drafts, of any communications between or among PNU and any third party and/or any foreign or domestic regulatory agency including the United States Food and Drug Administration (FDA) concerning the properties, stability, pH levels and indications for use of any Anthracycline Glycosides.

95.    All documents concerning any application submitted by or on behalf of PNU seeking approval to market Idarubicin, related to the properties, stability, pH levels and indications for use, including documents concerning any such applications to the FDA and any communications with the FDA or any individuals conducting trials or studies in support thereof.

96.    All documents concerning any application submitted by or on behalf of PNU seeking approval to market any Anthracycline Glycosides, related to the properties, stability, pH levels and indications for use, including documents concerning any such

applications to the FDA and any communications with the FDA or any individuals conducting trials or studies in support thereof.

97.    All documents relating to the FDA's notification of approval for PNU's sale or offer for sale of Idarubicin or any other Anthracycline Glycosides.

98.    All documents concerning the structure, composition, properties, and/or characteristics of Idarubicin and any other Anthracycline Glycosides made, used sold, imported, or offered for sale by PNU.

99.    The labels and package inserts of Idarubicin and any other Anthracycline Glycosides made, used sold, imported, or offered for sale by PNU.

100.    All batch records concerning the manufacturing process of Idarubicin as an active pharmaceutical ingredient and any other Anthracycline Glycosides an active pharmaceutical ingredient made, used, sold, imported, or offered for sale by PNU.

101.    All batch records concerning the manufacturing process of Idarubicin as finished dosage and any other Anthracycline Glycosides as finished dosage made, used, sold, imported, or offered for sale by PNU.

102.    All documents concerning the manufacturing capacity of PNU or any other entity manufacturing for PNU of Idarubicin and any other Anthracycline Glycosides made, used, sold, imported, or offered for sale by PNU.

103.    The Drug Master File for Idarubicin as an active pharmaceutical ingredient and any other Anthracycline Glycosides made, used, sold, imported, or offered for sale by PNU.

104.    Twenty samples of Idarubicin and any other Anthracycline Glycosides made, used, sold, imported, or offered for sale by PNU for each of the commercially available dosage forms and sizes.

105.    Articles, abstracts, posters, and any other scientific literature concerning Idarubicin and any other Anthracycline Glycosides made, used, sold, imported, or offered for sale by PNU.

106.    All documents concerning PNU's development of Idarubicin and any other Anthracycline Glycosides .

107.    All documents concerning any pending or issued U.S. or foreign patent application directed to Idarubicin or any other Anthracycline Glycosides or methods of making or using same, filed by or on behalf of PNU or any employee thereof, or assigned to PNU.

108.    All documents supporting, contradicting or relating to PNU's allegations in its Complaint against Sicor for infringement of the '285 Patent.

109.    All documents supporting, contradicting or relating to PNU's claim for damages in its Complaint against Sicor for infringement of the '285 Patent.

110.    All documents supporting, contradicting or relating to PNU's allegations in its Complaint or Amended Complaint against Sicor for willful infringement of the '285 Patent.

111.    All documents relating to or prepared by or for any expert retained by PNU in relation to its complaint against Sicor for infringement of the '285 Patent.

112.    All documents PNU intends to rely on in this litigation.

113.    All documents PNU intends to use as exhibits during depositions and trial in this matter.

114.    All documents identified by PNU in its Initial Disclosure Pursuant to Fed.R.Civ.P.26(a)(1).

115.    All communications between PNU and any of the witnesses identified in Sicor's and PNU's Initial Disclosure Pursuant to Fed.R.Civ.P.26(a)(1).

116.    All documents showing PNU's ownership of and rights in and to, including right to sue for infringement, the '285 Patent.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
302-654-1888

*Attorneys for Defendants*

*Of Counsel:*

Reid Ashinoff
Brian T. Moriarty
David R. Baum
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 768-6700

Dated: November 29, 2004
150555.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of November, 2004, the attached **DEFENDANTS'**

**FIRST REQUEST FOR PRODUCTION OF DOCUMENTS BY PLAINTIFF** was served

upon the below-named counsel of record at the address and in the manner indicated:

Jack B. Blumenfeld, Esquire                                   **HAND DELIVERY**
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899


Joshua R. Rich, Esquire                                       **VIA FEDERAL EXPRESS**
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606


149886.1                                            John G. Day

# EXHIBIT 25



**McDonnell Boehnen Hulbert & Berghoff, LLP**

300 South Wacker Drive    312 913 0001 phone
Chicago, Illinois 60606-6709    312 913 0002 fax
www.mbhb.com

June 21, 2005

Sent Via Facsimile (212) 768-6800

Brian T. Moriarty
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York 10020

Re:    Pharmacia & Upjohn Company LLC v. Sicor et al.
       U.S. District Court for the District of Delaware (C.A. No. 04-883)

Dear Brian:

We write in response to your letter that was dated June 17, 2005, but was not sent until yesterday. In your letter, you inquire as to the status of MBHB's representation of the inventors of the subject matter of the '285 patent. As we have told you, this firm has contacted and represents Drs. Bottoni, De Ponti, Gambini, and Gatti in relation to their testimony in the above-captioned case. As you know, however, representing them does not mean that either we or Pharmacia directs or controls them, which neither we nor Pharmacia does.

We have previously advised you that Dr. De Ponti is willing to appear for a U.S. style deposition conducted in Milan under the Federal Rules of Civil Procedure See Joshua Rich's letter of June 16th, i.e., the letter that Sicor omitted in its June 17th submission to the Court. We now understand that Dr. Gambini will also be willing to appear for a U.S. style deposition conducted in Milan under the Federal Rules of Civil Procedure. Dr. De Ponti is willing to sit for his deposition on Wednesday, July 13th; Dr. Gambini is willing to sit for his deposition on Thursday, July 14th. Please confirm that you wish to proceed with these depositions on these dates, and also confirm the details for the proceedings, including the presence of a translator.

As to Drs. Bottoni and Gatti, we already explained our suggestions for avoiding many of the complications and delays of proceeding under the Hague Convention.

Jun-21-05 10:17am    From-MCDONNELL BOEHNEN HULBERT & BERGHOFF    +13129130002    T-112  P.03/03  F-052

We remain willing to cooperate in expediting the taking of testimony from Drs. Bottoni and Gatti, including the suggestions outlined in Joshua Rich's June 16th letter, notwithstanding Judge Jordan's recent observations on the situation. Please advise if you wish our assistance. If so, we should discuss the options for proceeding as soon as possible.

We have located Dr. Oldani, and have made contact with his assistant, but we have not yet been able to speak with him directly. We will continue trying to reach him directly, and will let you know as soon as we do. If you wish to pursue Hague Convention procedures against him in the meantime, you are free to do so. However, we are optimistic that certain of those formalities can be avoided, and the process be expedited, after we reach him.

As we have told you several times, Dr. Confalonieri has indicated that he will not voluntarily participate in any legal proceeding, such that we are unable to elicit his cooperation. You will need to proceed through formal channels in relation to Dr. Confalonieri.

In addition, you inquired again about the employment status of the inventors. We believe we have told you this several times, but none of the six inventors is currently employed by Pfizer, Pharmacia, Farmitalia, or any other company owned or controlled by Pfizer. We hope this resolves the question to your satisfaction.

Please contact us if you have any questions.

Very truly yours,

Daniel A. Boehnen
312 913 2130
boehnen@mbhb.com

McDonnell Boehnen Hulbert & Berghoff LLP    Brian T. Moriarty    2    June 21, 2005

PAGE 3/3 * RCVD AT 6/21/2005 10:16:15 AM [Central Daylight Time] * SVR:CHI2KRF01/22 * DNIS:4777 * CSID:+13129130002 * DURATION (mm-ss):01-24