# EXHIBIT 1

**REDACTED**

# EXHIBIT 2

**REDACTED**

# EXHIBIT 3

```
<IMS-DOCUMENT>0000950123-95-002396.txt : 19950822
<IMS-HEADER>0000950123-95-002396.hdr.sgml : 19950822
ACCESSION NUMBER:              0000950123-95-002396
CONFORMED SUBMISSION TYPE:     8-K
PUBLIC DOCUMENT COUNT:         5
CONFORMED PERIOD OF REPORT:    19950820
ITEM INFORMATION:              Other events
ITEM INFORMATION:              Financial statements and exhibits
FILED AS OF DATE:              19950821
SROS:                 NYSE

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:            UPJOHN CO
                CENTRAL INDEX KEY:           0000102237
                STANDARD INDUSTRIAL CLASSIFICATION:  PHARMACEUTICAL
PREPARATIONS [2834]
                IRS NUMBER:                  381123360
                STATE OF INCORPORATION:             DE
                FISCAL YEAR END:             1231

        FILING VALUES:
                FORM TYPE:          8-K
                SEC ACT:            1934 Act
                SEC FILE NUMBER:    001-04147
                FILM NUMBER:        95565430

        BUSINESS ADDRESS:
                STREET 1:           7000 PORTAGE RD
                CITY:               KALAMAZOO
                STATE:              MI
                ZIP:                49001
                BUSINESS PHONE:     6163234000
</IMS-HEADER>
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<DESCRIPTION>FORM 8-K
<TEXT>

<PAGE>    1




                    SECURITIES AND EXCHANGE COMMISSION
                          Washington, D.C. 20549


                          -------------------

                                FORM 8-K

                             CURRENT REPORT
                PURSUANT TO SECTION 13 OR 15(d) OF THE
                     SECURITIES EXCHANGE ACT OF 1934

                          -------------------
```

AUGUST 20, 1995
Date of Report (Date of earliest event reported)


THE UPJOHN COMPANY
(Exact name of registrant as specified in its charter)


STATE OF DELAWARE                1-4147                38-1123360
(State or other jurisdiction    (Commission           (IRS Employer
     of incorporation)          File Number)          Identification
No.)


7000 PORTAGE ROAD
KALAMAZOO, MICHIGAN                                        49001
(Address of principal executive offices)              (Zip Code)

(616) 323-4000
(Registrant's telephone number, including area code)


Not Applicable
(Former name or former address, if changed since last report)

<PAGE>    2

ITEMS 1-4.  NOT APPLICABLE.


ITEM 5.   OTHER EVENTS.

        (a)  On August 20, 1995, The Upjohn Company (the "Company"), a
Delaware
corporation, Pharmacia Aktiebolag ("Pharmacia"), a Swedish corporation,
Bushwood, Inc. ("Bushwood"), a Delaware corporation and Bushwood Subsidiary,
Inc. ("Bushwood Sub"), a Delaware corporation and a wholly owned subsidiary
of
Bushwood, entered into a Combination Agreement, dated as of August 20, 1995,
as amended on August 21, 1995 to reflect the change of Bushwood's name to
Pharmacia & Upjohn, Inc. ("Pharmacia & Upjohn") and the change of Bushwood
Sub's name to Pharmacia & Upjohn Subsidiary, Inc. ("Pharmacia & Upjohn Sub"),
(the "Combination Agreement").  Pursuant to the Combination Agreement
Pharmacia
& Upjohn Sub will be merged with and into the Company (the "Merger"), subject
to the affirmative vote of a majority of all of the outstanding voting shares
of the Company and to the completion of an offer (the "Offer") by Pharmacia &
Upjohn for all of the issued and outstanding Class A Common Shares, par value
SEK 25 per share and Class B Common Shares, par value SEK 25 per share of
Pharmacia, and American Depositary Shares, each representing one Class A
Common Share of Pharmacia.


        Pursuant to the Combination Agreement, (i) each outstanding share of
the Company's Common Stock, par value $1 per share, other than shares owned
by
the Company as treasury stock and shares owned by Pharmacia or any subsidiary
of the Company or Pharmacia, will be converted into the right to receive 1.45

- 2 -

shares of Pharmacia & Upjohn Common Stock, par value $.01 per share, (ii) each
outstanding share of the Company's Preferred Stock (other than

dissenting shares and shares owned by the Company as treasury stock, all of
which will be cancelled) will be converted into the right to receive one share
of Pharmacia & Upjohn Preferred Stock.

       The foregoing description is qualified in its entirety by reference to
the Combination Agreement, which is attached hereto as Exhibit 2 and is
incorporated herein by reference.  All capitalized terms used but not defined in
this subsection (a) shall have the meanings ascribed to such terms in the
Combination Agreement.


                                      -3-

<PAGE>    4


       (b)  On August 19, 1995, the Board of Directors of the Company
unanimously adopted an amendment (the "Second Amendment") to the Rights
Agreement, dated as of June 17, 1986, as amended, between the Company and The
Bank of New York, as Rights Agent (the "Rights Agreement").  Pursuant to the
Second Amendment, the definition of Acquiring Person was amended so that none
of Pharmacia, AB Volvo, Forvaltningsaktiebolaget Stattum, Bushwood and
Bushwood Sub or any of their respective subsidiaries are not Acquiring persons
under the Rights Agreement.

       The foregoing summary is qualified in its entirety by reference
to the Second Amendment, a copy of which is attached hereto as Exhibit 4
and is incorporated by reference herein.  Capitalized terms not defined in this
subsection (b) shall have the meanings ascribed to such terms in the Rights
Agreement, as amended, which is incorporated herein by reference.

       (c)  Simultaneously with the execution of the Combination Agreement,
the Company and Pharmacia entered into a co-promotion agreement, dated August
20, 1995 (the "Co-promotion Agreement"), which becomes effective on the earlier
of the completion of the initial product promotion plans or April 1, 1996,
whereby the Company will have the right to co-promote Fragmin, Estring and
Mycobutin in the United States and Canada. Upon a change of control of either
the Company or Pharmacia, either party may terminate the Co-promotion
Agreement.

       The foregoing summary is qualified in its entirety by reference to the
Co-promotion Agreement, a copy of which is attached hereto as Exhibit 10 and
is incorporated herein by reference.  Capitalized terms not defined in this
paragraph (c) shall have the meanings ascribed to such terms in the Co-promotion
Agreement which is incorporated herein by reference.


                                      - 3 -

<PAGE>    8

# ARTICLE I

## THE MERGER

SECTION 1.01.  The Merger.  Provided that this Agreement shall not have been terminated in accordance with Section 10.01, upon the terms and subject to the conditions set forth in this Agreement, and in accordance with Section 251 of the DGCL, at the Effective Time (as defined in Section 1.02) Newco Sub shall be merged with and into Upjohn. As a result of the Merger, the separate corporate existence of Newco Sub shall cease and Upjohn shall be the surviving corporation of the Merger (the "Surviving Corporation").

# EXHIBIT 4

# REGULAR UTILITY

Form PTO-436
(Rev. 8/78)

| SERIAL NUMBER | PATENT DATE | PATENT NUMBER |
|---|---|---|
| 878784 | | |

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 06/878,784 | 06/26/86 | 424  5/4 | 154 | 125 183 | Kesela |

APPLICANTS

GAETANO GATTI, SESTO SAN GIOVA, ITALY; DIEGO OLDANI, ROBECCO SUL NAV,
ITALY; GIUSEPPE BOTTONI, BERGAMO, ITALY; CARLO CONFALONIERI,
CUSANO MILANINO, ITALY; LUCIANO GAMBINI, CORNAREDO, ITALY; RORERTO
DE PONTI, MILAN, ITALY.

**CONTINUING DATA***************

VERIFIED

$$\mathcal{GP}$$

**FOREIGN/PCT APPLICATIONS***********

VERIFIED    GREAT BRITAIN    8519452    08/02/85

$$\mathcal{GP}$$

| Foreign priority claimed | yes | no | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|---|
| 35 USC 119 conditions met. | yes | no | | | | | | | |
| Verified and Acknowledged | | | | IIX | 0 | 30 | 2 | $ 618.00 | 769-060-0 |

OBLON, FISHER, SPIVAK,
MC CLELLAND & MAIER
CRYSTAL SQ. 5, STE. 400
1755 S. JEFF. DAVIS HWY.
ARLINGTON, VA 22202

TITLE

INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR
ANTHRACYCLINE GLYCOSIDE

U.S. DEPT. of COMM.-PAT. & TM Office—PTO-436L (rev. 10-78)

---

## PARTS OF APPLICATION FILED SEPARATELY

### AT ALLOWANCE

| SHEETS DRWGS. | FIGURES DRWGS. | CLAIMS | CLASS | SUBCLASS |
|---|---|---|---|---|
| | | | | |

### PREPARED FOR ISSUE

(Assistant Examiner)    (Docket Clerk)

EXAMINED AND PASSED FOR ISSUE

(Primary Examiner)    (Art Unit)

Estimate of printed pages    Issue fee due (est.)

Drawings    Specs

Notice of allowance and issue fee due (est.)
date mailed    Issue fee due

RETENTION LABEL    PI 730



769-080-0
60/

## IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION:              :

GAETANO GATTI ET AL            :  GROUP ART UNIT:  123

SERIAL NO:  06/878,784         :

FILED:  JUNE 26, 1986          :  EXAMINER:  PESELEV

FOR:  INJECTABLE READY-TO-USE  :
      SOLUTIONS CONTAINING AN
      ANTITUMOR ANTHRACYCLINE   :
      GLYCOSIDE

### AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Responsive to the Official Action dated June 29,
1987, Applicants respectfully request reconsideration
in light of the following amendments and remarks.

### IN THE CLAIMS

Claim 31, line 9, change "3.1" to --3.14.--

### REMARKS

After the above amendments, Claims 16-17, 20-25
and 29-31 remain active in this application.
Reconsideration is respectfully requested.

Applicants' U.S. representative wishes to thank
Examiner Peselev for the helpful and courteous
interview which was held in her office on October 27,

S.N. 878,784 File History
Page 146

PL 875

-2-

1987.  The matters which were discussed at that time
are summarized and expanded upon in the remarks which
follow.

The claims stand rejected under 35 USC 102(b) as
anticipated by or, in the alternative, under 35 USC 103
as obvious over Beijnen et al and Arcamone et al.
These rejections are respectfully traversed.

In order for a reference to anticipate a claim,
within the meaning of 35 USC 102, all material elements
of the claim must be found in one prior art source.
In re Marshall (CCPA 1978) 577 F2d 301, 198 USPQ 344;
In re Kalm (CCPA 1967) 378 F2d 959, 154 USPQ 10.  There
are a number of material elements in present Claim 31,
which must be met by either of the two prior art
references in order for either one of them to
anticipate the claim.

The following are some of the relevant material
elements of Claim 31:

"sealed glass container"

"intravenously injectable"

"sterile"

"pyrogen-free"

"said solution has not been reconstituted from a
lyophilizate"

"pH is 2.7 - 3.14".

-3-

Further, the claims use partially closed claim language, "consists essentially of" with reference to the materials which may be contained in the solution. Thus, the claims exclude any other materials not recited therein if they would materially affect the solution.

The Examiner will recall that the present invention is directed to an extraordinarily stable doxorubicin or Adriamycin® solution. Both doxorubicin and Adriamycin® refer to an anti-cancer drug. Doxorubicin is the common name of the drug, while Adriamycin® is the trademark under which the drug is sold. The claims require that the solution be contained in a sealed glass container. This is a meaningful limitation, because one of ordinary skill in the art would never go to the trouble of sealing an unstable solution of an anticancer drug in a container. A certain minimum stability is required before one would even think to carry out such action. It should be kept in mind that according to the literature accompanying the commercially sold product (Adriamycin®) which is sold in a solid lyophilized form, a reconstituted solution thereof is stable for 24 hours at room temperature and 48 hours under refrigeration (4-10°C). See Exhibit A, page 3, the sixth paragraph.

-4-

The further limitation that the container be made of <u>glass</u> is also material. In the past, it was thought that glass rendered the Adriamycin® solutions <u>less</u> stable than other types of materials, such as polypropylene and other plastics. For example, the Examiner's attention is directed to the highlighted portions of Exhibits B and C, which show that doxorubicin can be adsorbed on and even partially decomposed on containers made of glass. The discovery in the present invention that glass is compatible with the extremely stable Adriamycin® solutions runs counter to these teachings. Thus, this limitation is also material.

The other material limitations listed above relate to the solution itself. First, the solution must be <u>intravenously injectable</u>. This is a meaningful limitation since it imposes stringent requirements on the nature and quantity of the impurities contained in the solution. For example, as will be discussed in greater detail below, some of the solutions in the prior art references contain materials which would render them non-intravenously injectable.

The solution must also be <u>sterile</u> and <u>pyrogen free</u>. Again, these limitations impose stringent requirements on the types and amounts of impurities which may be contained in the solution in the sealed glass container. Unless one purposefully sterilizes

-5-

the solution and renders it pyrogen free, it cannot be
concluded that such a solution meets these limita-
tions. In fact, it can be concluded without doubt that
such a solution is not sterile or pyrogen free.

The solutions according to the present invention
are also not reconstituted from a lyophilizate
according to the claims. In the past, doxorubicin was
sold in the form of a solid which had been
lyophilized. This can be seen in Exhibit A on page 3,
under the heading "How Supplied". It was thought that
doxorubicin was too unstable in solution to be storage
stable. Accordingly, after the doxorubicin was
prepared at the manufacturing plant, it was lyophilized
for storage purposes. Since it is now recognized
according to the present invention that under certain
conditions a solution of doxorubicin can be rendered
extraordinarily stable, the step of preparing the
solution from a lyophilized powder is no longer
necessary. It would simply be an unnecessary
expenditure of energy to lyophilize the material first
and then prepare a storage stable solution from it.
However, unless one knew that a particular solution of
doxorubicin were very stable, one would still expect to
have to prepare the solution from a lyophilizate.
Again, it is submitted that this limitation in the
claims is a material limitation.

-6-

Another important material limitation in the present claims is the pH of the solution. Over the relatively narrow range of pH recited in the present claims, 2.7-3.14, it has been unexpectedly found that the doxorubicin solutions exhibit enhanced stability. The pH of greatest stability of doxorubicin has been hotly debated in the literature. Reference 5 of the Information Disclosure Statement filed with the last response (March 13, 1987) (Poochikian et al), discloses that doxorubicin is most stable in 5% Dextrose Injection, USP, which has a pH of 4.5. See Table 2, the left-hand heading.

According to reference 3 of the Information Disclosure Statement (Beijnen et al 1985), the maximum stability of doxorubicin solutions is at about pH 4-5. See page 221 of the reference, the left hand column, the next to the last paragraph.

Reference 10 of the Information Disclosure Statement (Janssen et al) states that the results obtained in that study "indicated that pH 4 and 4°C provide optimum shelf life conditions" of aqueous doxorubicin solutions. See the summary of the paper on page 1, the third sentence. It can be seen based on the above references that the prior art has clearly not appreciated that a pH of 2.7-3.14 is the pH of maximum stability of a doxorubicin solution. Note that two of

PI 880



–7–

these references are dated in 1985 and one is dated in 1981.

The cited references will now be examined in light of the above material limitations of the present claims to determine whether the references do in fact anticipate the present claims. <u>Arcamone et al</u> is a relatively early study from 1972, reporting on the stability of Adriamycin® hydrochloride at 22°C. The study run in <u>Arcamone et al</u> was an analytical study conducted in a laboratory. The reference states that solutions having a pH of 3-6 have a stability of greater than one month. These solutions contained 2 mg/ml of Adriamycin® hydrochloride, and 0.06 molar phosphate buffer.

First of all, <u>Arcamone et al</u> says nothing about a <u>sealed glass container</u>. Second, there is no indication that the solutions were sterilized or rendered pyrogen free. The Examiner's attention is directed to a Declaration (Declaration A) signed by an expert in the field of injectable pharmaceuticals, William J. Ring, who concludes that the solutions in the <u>Arcamone et al</u> reference do <u>not</u> meet several of the above-described material limitations of Claim 31.

It is also notable that the <u>Arcamone et al</u> reference, which was published in 1972, has definitely not lead to an appreciation that a pH of 2.7-3.14 is an

-8-

unexpectedly good pH range for stability of doxo-
rubicin, as clearly shown by the above-described
references which teach that the maximum stability of
doxorubicin solutions is at a pH of from 4 to 5.  In
fact, the range of pH listed by Arcamone et al, 3-6 is
so broad that it does not lead one of ordinary skill in
the art to an appreciation of any particular narrow
range which would give rise to extraordinary stability
or even that such a range exists.  Previous cases have
held that there can be no anticipation where the
reference disclosure is so broad that the likelihood of
arriving at the claimed composition is highly
unlikely.  Ex parte Garvey (POBA 1939) 41 USPQ 5583;
Ex parte Starr (POBA 1938) 44 USPQ 545.  The narrow pH
range of 0.44 pH units according to the present
invention as compared to the broad range of 3-6, is
believed to be such a situation where anticipation does
not result because of a broad disclosure in the
reference.

In accordance with the above comments, and
Declaration A filed herewith, it is respectfully
submitted that the Arcamone et al reference does not
anticipate the claims of the present invention.

For similarly reasons, it is respectfully
submitted that Beijnen et al does not anticipate the
claims of the present invention.  In the right-hand

column, page 109 of Beijnen et al, it can be seen that the solutions were kept in "stoppered polypropylene test tubes, since unlike glass containers, no adsorption to polypropylene occurs". Thus, at the outset, the solutions in Beijnen et al are in plastic rather than glass containers. Second, the solutions of Beijnen et al, contain perchloric acid, as indicated by page 114, the left hand paragraph. Perchloric acid is not an intravenously injectable material, as one of ordinary skill in the art would readily appreciate. Declaration B, signed by Dr. Nagesh Palapu, an expert in the field of drug formulations, substantiates the fact that the solutions of Beijnen et al are not intravenously injectable.

Finally, as discussed above in connection with the Arcamone et al reference, since the experiments involved in Beijnen et al are laboratory experiments, and there is no indication that the solutions were sterilized or rendered pyrogen free, it can be concluded that these features are not met by the solutions of Beijnen et al. Since the solutions are not sterile and are not pyrogen free, then they cannot be intravenously injectable either.

In light of these distinctions between the present claims and Beijnen et al, and in view of Declaration B, it is respectfully submitted that Beijnen et al does not anticipate the present claims.

-10-

The claims have also been rejected in the alterna-
tive for obviousness over Beijnen et al or Arcamone et
al. These rejections are also respectfully traversed.

The thrust of the Examiner's rejection is one of
inherency. Clearly, neither of the two references
recognize the extraordinary stability of doxorubicin
solutions under the conditions of the present claims,
including a pH of 2.7-3.14. Based on subsequent
references, as late as 1985, the pH of greatest
stability of doxorubicin has been thought to be between
4 and 5. Furthermore, the stability of doxorubicin has
been thought to be greater in polypropylene or poly-
vinylchloride rather than in glass. For these reasons,
it can be seen that one of ordinary skill in the art
has certainly not found it obvious to prepare a
solution of doxorubicin at a pH of 2.7-3.14, to thereby
achieve greatly enhanced stability.

The Examiner's attention is directed to the
Declaration which was filed with the last amendment.
A portion of this declaration, designated Exhibit D
herein, is filed herewith for the Examiner's con-
venience. It can be seen that there is a trough in the
graph of $k_{obs}$-pH profile, the trough being centered
around 2.7-3.14. This same trough is exhibited whether
the doxorubicin is in sterile water, dextrose or
saline. If one goes to a pH of between 4 and 5,

-11-

previously recognized as the pH of greatest stability
of a doxorubicin solution, the k observed, which is
directly related to the decomposition of doxorubicin,
increases precipitously.  For example, in sterile
water, it goes up by a factor of at least 3.  It
continues to rise beyond pH 5.  One of ordinary skill
in the art could not have predicted, based on the
references, that this narrow pH range would give rise
to such stability.  In the absence of this realization,
one of ordinary skill in the art would not have placed
such a doxorubicin solution in a sealed glass container
nor would this person have avoided reconstitution from
lyophilized solid material.  How can it be said that it
is obvious to prepare such a solution as in the present
invention when a group of references have stated that
the maximum stability of doxorubicin solutions is
between 4 and 5?  Further, if the stability of such
solutions had been previously appreciated, why would
the manufacturer of Adriamycin® still prepare it in
lyophilized form, and state that its stability upon
reconstitution ranges from 24 hours to 48 hours at room
temperature or under refrigeration, respectively?  The
extraordinary stability over the very narrow pH range
of the present claims, has simply not been previously
appreciated.  Previously, the prior art has taught that
doxorubicin solutions were maximally stable at higher

-12-

pH's than those involved (and claimed) in the present invention. Therefore, it is submitted that the present claimed invention is unobvious over either or both of the cited references.

Applicants are filing herewith a second Information Disclosure Statement making of record a few additional references, which are not believed to be any more relevant than the previously cited references. However, Applicants wish to bring these references to the Examiner's attention to fully satisfy their duty of complete disclosure.

In light of the above amendments and remarks, and the Rule 132 Declarations filed herewith, it is respectfully submitted that this application is now in condition for allowance, and an early notice to that effect is earnestly solicited.

Respectfully submitted,

OBLON, FISHER, SPIVAK,
McCLELLAND & MAIER, P.C.

Norman F. Oblon
Attorney of Record
Registration No. 24,618

Robert R. Cook, Ph.D.
Registration No. 31,602

Crystal Square Five - Suite 400
1755 South Jefferson Davis Highway
Arlington, Virginia  22202
(703) 521-5940
60/jmw,mkn



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 06/878,784 | 06/26/86 | GATTI | G 767-800 C |

```
OBLON, FISHER, SPIVAK,
MC CLELLAND & MAIER
CRYSTAL SQ. 5, STE. 400
1755 S. JEFF. DAVIS HWY.
ARLINGTON, VA 22202
```

| | EXAMINER |
|---|---|
| | FESELUTZ |
| ART UNIT | PAPER NUMBER |
| 109 | 13 |

DATE MAILED:  04/19/88

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined   ☐ Responsive to communication filed on _____   ☐ This action is made final.

A shortened statutory period for response to this action is set to expire __3__ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.   2. ☐ Notice re Patent Drawing, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.   4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474   6. ☐ _____

**Part II    SUMMARY OF ACTION**

1. ☒ Claims _16-17, 20-25 and 29-31_____ are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims _16-17, 20-25 and 29-31_____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings which are acceptable for examination purposes until such time as allowable subject matter is indicated.

8. ☐ Allowable subject matter having been indicated, formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. These drawings are ☐ acceptable;
   ☐ not acceptable (see explanation).

10. ☐ The ☐ proposed drawing correction and/or the ☐ proposed additional or substitute sheet(s) of drawings, filed on _____
    has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved. ☐ disapproved (see explanation). However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

12. ☐ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☐ been filed in parent application, serial no. _____; filed on _____

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

PI 899

PTOL-326 (Rev. 7-82)                EXAMINER'S ACTION

Serial No. 878,784                    2

Art Unit   123

The following is a quotation of 35 U.S.C. 103 which
forms the basis for all obviousness rejections set forth
in this Office action:

A patent may not be obtained though the inven-
tion is not identically disclosed or described as
set forth in section 102 of this title, if the
differences between the subject matter sought to be
patented and the prior art are such that the sub-
ject matter as a whole would have been obvious at
the time the invention was made to a person having
ordinary skill in the art to which said subject
matter pertains. Patentability shall not be nega-
tived by the manner in which the invention was
made.

Subject matter developed by another person, which
qualifies as prior art only under subsection (f)
and (g) of section 102 of this title, shall not
preclude patentability under this section where the
subject matter and the claimed invention were, at
the time the invention was made, owned by the same
person or subject to an obligation of assignment to
the same person.

This application currently names joint inventors.
In considering patentability of the claims under 35
U.S.C. 103, the examiner presumes that the subject
matter of the various claims was commonly owned at the
time any inventions covered therein were made absent any
evidence to the contrary. Applicant is advised of the
obligation under 37 CFR 1.56 to point out the inventor
and invention dates of each claim that was not commonly
owned at the time a later invention was made in order
for the examiner to consider the applicability of poten-
tial 35 U.S.C. 102(f) or (g) prior art under 35 U.S.C.
103.

Claims 16-17, 20-25 and 29-31 are rejected under 35

U.S.C. 103 as being unpatentable over Bejnen et al or

Arcamone et al in view of Arcamone et al '519 or

Benvenuto et al. Arcamone et al show adriamycin hydroch-

loride solution at pH 3-6. Bejnen et al show adriamycin

solution at a pH 2.7-3.1. Applicants claim a sealed

glass container containing stable intraveneously injec-

table solution of adriamycin at a pH 2.7-3.1. Since a

PI 900

Serial No. 878,784                    3

Art Unit   123


pH range claimed by applicants is within the range shown
by Beijnen et al and Arcamone et al, and since doxorubicin
contained in a sealed glass container is known, as shown
by Benvenuto et al, it would be within the ordinary
skill of the art to place solutions shown by Beijnen et
al or Arcamone et al in a sealed glass container shown
by Benvenuto et al.  Note, that intraveneously injectable
solution of adriamycin is known as shown by Arcamone et
al.  The instant solutions are deemed obvious
therefrom.

Applicant's arguments filed December 23, 1987 have
been fully considered but they are not deemed to be per-
suasive.

Applicants point out that in addition to claiming a
specific pH range, the claims are also limited to
"sealed glass container", "intraveneously injectable",
"sterile," "pyrogen-free" and "said solution not being
reconstituted from a lyophilizate."  However, it is
the Examiner's position that the stability of adriamycin
solution claimed by  applicants is due to a certain pH
range i.e. 2.7-3.14 as was shown by the Declaration sub-
mitted on March 13, 1987.  Since that pH range is within
the pH range shown by the art of record, the adriamycin
solution shown by the art of record (Beijnen et al and
Arcamone et al) would be expected to exhibit the same

Serial No. 878,784                    4

Art Unit    123

stability as the claimed solutions. The Declarations
submitted by applicants on December 23, 1987 have been
considered but are not deemed to be persuasive since
they are seen to present statement of what Arcamone et
al and Bejnen et al teach i.e. that each of the referen-
ces does not teach pyrogen-free intravenously injectable
adriamycin solutions. However, it is well known in the
art how to make adriamycin solutions suitable for intra-
venous administration (see Arcamone et al Patent No.
4,058,519). It is still seen to be within the ordinary
skill of the art to take adriamycin solutions shown by
Bejnen et al or Arcamone et al $^{and}$ to put said solution in
a sealed glass container shown by Benvenuto et al. The
instant composition is deemed obvious therefrom.

The copies of the French patent and Martindale,
listed on PTO-1449 submitted by applicants must be
supplied and their English translations, if the above
references are to be considered by the Examiner.

The Group and/or Art Unit location of your
application in the PTO has changed. To aid in corre-
lating any papers for this application, all further
correspondence regarding this application should be
directed to Group Art Unit 183.

S.N. 878,784 File History
Page 173

PI 902

Serial No. 878,784                              5

Art Unit   123


    Any inquiry concerning this communication should be
directed to Elli Peselev at telephone number
703-557-0664 .


E.P
EPeselev/klc

703/557-3920

3-23-88

Johnnie R. Brown
J. R. BROWN
SUPERVISORY PATENT EXAMINER
ART UNIT 123

# EXHIBIT 5

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.    Sheet 1 of 2
ATTORNEYS AT LAW

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of                                          :

GAETANO GATTI ET AL                                          :

Serial Number:  07/503,856                                   :        Group Art Unit:    183

Filed:   APRIL 3, 1990                                       :        Examiner:   PESELEV

For:    INJECTABLE READY-TO-USE                              :
        SOLUTIONS CONTAINING AN                                       RECEIVED
        ANTITUMOR ANTHRACYCLINE                              :
        GLYCOSIDE                                                     FEB 2 0 1992

                                                                     GROUP 180

INFORMATION DISCLOSURE STATEMENT UNDER 37 C.F.R. §1.97

Honorable Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:


    The Applicants wish to make of record the references listed on the attached PTO-1449. These
references are believed to be the most relevant known to Applicants and/or the Assignee concerning
the invention as claimed in the above-identified application. Copies of the listed references are
attached as are any readily available English translations of pertinent portions of any non-English
language references.


### Statement of Relevancy

(Provide in one or two sentences a brief statement as to
how each citation is relevant to the invention)


    SEE ATTACHED SHEETS


SICOR-PNU 084155

Nothing herein shall constitute an admission concerning the contents of any of the cited references, nor shall the inclusion of a reference herein be considered an admission that the reference constitutes prior art against the invention claimed in the above-identified application. It is recognized that the focus during prosecution and the Examiner's subjective evaluation of the relevance of a particular reference may differ from what the Applicant presently contemplates. Accordingly, it is requested that the Examiner independently review each reference and make his or her own determination regarding the relevance thereof. The attached list of citations is not necessarily a complete list of all information known to the Applicant or Assignee. The list includes only those references which, in the reasonable opinion of Applicant, are relevant to the claimed invention.

Respectfully submitted,

Date: FEBRUARY 24 1992

RICHARD D. KELLY
ATTORNEY OF RECORD
REGISTRATION NO. 27,757

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.
Fourth Floor
1755 Jefferson Davis Highway
Arlington, Virginia 22202
(703) 521-5940

RICHARD T. PETERSON
REGISTRATION NO. 35,320

SICOR-PNU 084156

1/90

| FORM PTO-1449 (REV. 7-80) | | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | | ATTY. DOCKET NO. 769-206-0 DIV | | SERIAL NO. 07/503,856 | Sheet 1 of 3 |
|---|---|---|---|---|---|---|---|

**LIST OF REFERENCES CITED BY APPLICANT**
*(Use several sheets if necessary)*

| APPLICANT GAETANO GATTI ET AL | |
|---|---|
| FILING DATE APRIL 3, 1990 | GROUP 183 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | | | | | | |
| | AB | | | | | | |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

### OTHER REFERENCES *(Including Author, Title, Date, Pertinent Pages, Etc.)*

| | AR | THE AMERICAN JOURNAL OF INTRAVENOUS THERAPY & CLINICAL NUTRITION, PP. 15-18, DANIEL KETCHUM ET AL 8, 15-18 (1981) |
|---|---|---|
| | AS | DORA AND FRITZ, CANCER CHEMOTHERAPY HANDBOOK, ELSEVIER: NEW YORK 1980, PP. 388-401 |
| | AT | CANCER TREATMENT REPORTS, VOL. 65, NO. 1-2, JANUARY/FEBRUARY 1981 PP. 21-27, EDWIN D. SAVLOV ET AL |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

SICOR-PNU 084157

| FORM PTO-1449<br>(REV. 7-80) | | U.S. DEPARTMENT OF COMMERCE<br>PATENT AND TRADEMARK OFFICE | | | ATTY. DOCKET NO.<br>'769-206-0 DIV | SERIAL NO.<br>07/503,856 | | Sheet 2 of 3 |
|---|---|---|---|---|---|---|---|---|

**LIST OF REFERENCES CITED BY APPLICANT**
*(Use several sheets if necessary)*

GAETANO GATTI ET AL

| FILING DATE | GROUP |
|---|---|
| APRIL 3, 1990 | 183 |

## U.S. PATENT DOCUMENTS

| *EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | | | | | | |
| | AB | | | | | | |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

## OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | BR | CANCER TREATMENT REPORTS, VOL. 67, NO. 2, FEBRUARY 1983 PP. 133–142 |
| | | MARC B. GARNICK ET AL |
| | BS | JOURNAL OF PHARMACEUTICAL SCIENCES, PP. 782–785, STAFFAN EKSBORG, |
| | | SEPTEMBER 21, 1977  67 |
| | BT | JOURNAL OF PHARMACEUTICAL SCIENCES, VOL. 73, NO. 6, JUNE 1984, PP. 766–770, |
| | | MILENA MENOZZI ET AL |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

SICOR-PNU 084158

| FORM PTO-1449<br>(REV. 7-80) | | U.S. DEPARTMENT OF COMMERCE<br>PATENT AND TRADEMARK OFFICE | | ATTY. DOCKET NO.<br>769-206-0 DIV | | SERIAL NO.<br>07/503,856 | | Sheet 3 of 3 |
|---|---|---|---|---|---|---|---|---|
| **LIST OF REFERENCES CITED BY APPLICANT**<br>*(Use several sheets if necessary)* | | | | APPLICANT<br>GAETANO GATTI ET AL | | | | |
| | | | | FILING DATE<br>APRIL 3, 1990 | | GROUP<br>183 | | |

### U.S. PATENT DOCUMENTS

| *EXAMINER<br>INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE<br>IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | | | | | | |
| | AB | | | | | | |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | YES | NO |
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

### OTHER REFERENCES *(Including Author, Title, Date, Pertinent Pages, Etc.)*

| | CR | TRISSEL,<br>HANDBOOK OF INJECTABLE DRUGS, PP. 143, 144, 171 AND 172 |
|---|---|---|
| | AS | |
| | AT | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not
in conformance and not considered. Include copy of this form with next communication to applicant.

SICOR-PNU 084159                    USCOMM-DC 80-3905

18

American Journal of Intravenous Therapy and Clinical
Nutrition: (1981), Vol. 8, no. 4, Pages 15-18
(Ketchum et al)

Ketchum et al report the results of studies into the
stability of reconstituted doxorubicin formulations.  The
solutions studied by Ketchum et al are therefore the opposite
of those of the present invention, which must not have been
reconstituted from a lyophilizate.

The second paragraph on page 15 of Ketchum et al explains
that doxorubicin.HCl is commercially available in vials and
must be reconstituted before use.  The reconstituted solution
contains doxorubicin.HCl at a concentration of 2 mg/ml.  The
pH of the reconstituted solution is said to be from 3.8 to
6.5.

In the experiments reported by Ketchum et al, 10 mg of
doxorubicin.HCl was initially reconstituted with 5 ml of 0.9%
sodium chloride solution (page 15 last line and page 16 line
1).  However, the reconstituted doxorubicin solution was
subsequently diluted to obtain a standard solution containing
0.01 mg/ml (10 mcg/ml) of doxorubicin.  Solutions containing
0.009 to 0.001 mg/ml (9 mcg/ml to 1 mcg/ml) were then
prepared.

The stability of the diluted solutions containing 0.01 to
0.001 mg/ml of doxorubicin was analyzed by Ketchum et al.  In
the "Conclusion" section on page 18, it is stated that a
reconstituted solution of doxorubicin.HCl remains stable for
at least 7 days.  Nowhere, however, is there any appreciation
that solutions possessing long-term stability at the normal

SICOR-PNU 084160

-2-

storage temperatures of from 4° to 8°C can be obtained by
adjusting the pH of the solution to from 2.5 to 5.0 solely by
means of a physiologically acceptable acid.

9.    Dora and Fritz Cancer Chemotherapy Handbook:
      Elsevier: New York, 1980, Pages 388-401.
      (Doxorubicin)

      This is a general review article.  The first few lines on
page 390 state that, after reconstitution, doxorubicin
solutions at a pH of 3-7 retained potency for 48 hours under
refrigeration and 24 hours at room temperature.  Those periods
are manufacturers' standard storage conditions.  We assume
that they have merely been taken from a product leaflet for
lyophilized forms of doxorubicin.  There is no suggestion of
the solutions of the present invention anywhere in this
reference.

12.   Cancer Treatment Reports (1983), 6, 133-142 (Garnick
      et al)

      Garnick et al report a preclinical development, phase I
trial, and clinical pharmacology studies of long-term infusion
of doxorubicin (ADR) by an Infusaid pump.  According to the
first paragraph of the section "Doxorubicin-Infusaid
Compatibility Studies" at the top of the second column on page
134, doxorubicin was provided in sterile saline solution.
This was continuously maintained at 37°C in contact with the

SICOR-PNU 084161

-3-

Infusaid bellows to determine the long-term stability of such formulations. The doxorubicin in solution decomposed less than 4% over 7 days but decomposition was becoming pronounced after day 9. In order to study the levels of doxorubicin and its metabolites in patients, heparinized plasma and urine samples were adjusted to pH 8.5 as indicated in the second column on page 136. There is no suggestion in Garnick et al of the ready-to-use solutions of the invention which have not been reconstituted from a lyophilizate and whose pH has been adjusted to from 2.5 to 3.5 solely by means of a physiologically acceptable acid.

13.  Cancer Treatment Report (1981) 65, 21-27 (Savlov et al)

     This reference reports a comparative study into the use of cycloleucine or doxorubicin in the treatment of advanced sarcomas. Nothing is said about how the doxorubicin was formulated. Dosage data for doxorubicin is however stated at the bottom of the first column on page 22. In all probability, the doxorubicin formulations have been reconstituted from lyophilized material as that was the only material available at the time. There is no suggestion in Savlov et al of the solutions of the invention.

15.  Journal of Pharmaceutical Sciences (1978) 67, 782-785 (Eksborg)

SICOR-PNU 084162

-4-

Eksborg describes an investigation into the self-association of daunorubicin (I) and doxorubicin (II). Absorption spectra and distribution ratios to an organic phase were studied. The optimum conditions for extraction of daunorubicin and doxorubicin into an organic phase were calculated.

For the purpose of photometric measurements, stock solutions of drug in distilled water were diluted with pH 9.1-10.5 carbonate buffers, 10-1 M phosphoric acid or 10-2 M sodium hydroxide: see the first column on page 782. The second column on page 782 explains that, in partition experiments, the concentration of components in the organic phase was determined after re-extraction to 0.1 M $H_3PO_4$.

Note that the solutions of Eksborg would not have been sterile or pyrogen-free as required in the present invention. Eksborg was not preparing solutions for administration to a patient. He was not, therefore, concerned with ensuring that the strict demands of purity required for pharmaceutical formulations were met.

Absorption spectra at various pHs are shown in Figures 1 and 3. These do not fall within the critical pH range of from 2.5 to 5.0 according to the present invention. In the partition experiments reported on page 784, it seems that a buffer was used as the aqueous phase: see Table I and line 12 above the formula in the first column on page 784. Although page 784 mentions pH values within the range from 4.3-5.78

SICOR-PNU 084163

-5-

(Table I) and 4.3-6.2 (top of second column), there is no
suggestion that these pH values were achieved by addition
solely of an acid.  Even where an acid would have been added
as, for example, in the reextraction of the organic phase to
0.1 M $H_3PO_4$, the resulting solutions would not have been
sterile and pyrogen-free as already mentioned. This reference
therefore neither discloses nor suggests the solutions of the
present invention.

16.   Journal of Pharmaceutical Sciences (1984) 73, 766-770
         (Menozzi et al)

      This paper is a further study into the dimerization of
doxorubicin, daunorubicin and other anthracycline glycosides.
As explained immediately above Figure 1 on page 766,
dimerization constants were determined in three aqueous buffer
systems.  These were phosphate and Tris buffer solutions at pH
7.0 as noted in the "Chemicals" section at the bottom of the
second column on page 766.  There is no disclosure or
suggestion of solutions according to the present invention.

17.   Handbook on Injectable Drugs, Lawrence A. Trissel,
         Third Edition, 1983

      The Handbook of Injectable Drugs deals with
daunorubicin.HCl on pages 143 and 144 and doxorubicin.HCl on
pages 171 and 172.  In each case, only lyophilized material is
described.  The pH ranges relate to reconstituted solutions of

SICOR-PNU 084164

-6-

the lyophilized materials.  There is no disclosure or
suggestion of the material of the invention.

SICOR-PNU 084165

# EXHIBIT 6

769-249-0 DIV
769-206-0 DIV

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF:          :

GAETANO GATTI, ET AL.          :   EXAMINER:  PESELEV

SERIAL NO:  07/827,742         :

FILED:  JANUARY 29, 1992       :   GROUP ART UNIT:  1803

FOR:  INJECTABLE READY-TO-USE  :
      SOLUTIONS CONTAINING
      AN ANTITUMOR             :
      ANTHRACYCLINE GLYCOSIDE

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C.  20231

SIR:

    Responsive to the Official Action mailed November 15,

1993, Applicants submit the following remarks.

IN THE CLAIMS

31. (Three times amended)  A physiologically acceptable

solution of anthracycline glycoside selected from the

consisting of idarubicin hydrochloride, doxorubicin

hydrochloride and epirubicin hydrochloride dissolved in a

physiologically acceptable aqueous solvent, having a pH

adjusted to from 2.5 to 5.0 with a physiologically acceptable

acid selected from the group consisting of hydrochloric acid,

sulfuric acid, phosphoric acid, methane sulfonic acid,

tartaric acid, the concentration of said anthracycline

glycoside being from 0.1 to 100mg/ml, wherein said solution is

contained in a sealed container and has not been reconstituted

from a lyophilizate.

PU 0016223

-2-

Cancel claim 32.

<u>REMARKS</u>

Claims 31, 33-38, 40, and 42 appear in this application.
Claim 31 has been amended to distinguish Applicants' solutions
from prior art solutions which are reconstituted from
lyophilizates.  Basis for the amendment to Claim 31 is found
in canceled Claim 32.  The claims stand rejected under 35 USC
103 as obvious over Japanese Patent no. 60-92212 in
combination with Baurain et al. (U.S. Patent No. 4,296,105)
and Arcamone et al.

    According to the Examiner,

        The Japanese patent discloses adjusting
    the pH of doxorubicin HCl-containing solution to 2.3
    with sulfuric acid. . .
        Baurain et al disclose adjusting the pH of
    doxorubicin HCl-containing solution to 4.0 with
    sulfuric acid. . .

    Japanese application 60-92212 and Baurain et al. (U.S.
Patent 4,296,105) are both directed to anthracycline solutions
which are freeze-dried to form a lyophilizate, which is later
reconstituted in water immediately prior to use.  The
recitation of a sealed container in Claim 31 distinguishes
Applicants' invention from the Japanese application and other
prior art references which involve lyophilizates.  A sealed
container effectively precludes lyophilization, since to
lyophilize an unlyophilized solution would necessarily involve
removal of water from the container and destruction of the
seal.

    The adjustment of the pH to 2.3 in the Japanese
application is directed to improving the poor <u>rate of</u>

PU 0016224

-3-

solvation of doxorubicin salts, which arises from their
facility at forming relatively slow-dissolving gels when first
placed in solution. The stability characteristics of these
solutions is neither mentioned nor claimed. Consequently,
Japanese application 60-92212 contains no teaching of long-
term storage stable solutions of anthracycline glycosides, and
does not suggest the storage-stable solutions achieved by
Applicants.

As with the Japanese application, Baurain et al. does not
teach stable solutions of doxorubicin or other anthracyclines.
Instead, it is directed toward new derivatives of doxorubicin.
The sulfuric acid treatment of the Baurain et al. solution is
merely a step lasting ten minutes in the overall preparation
of the doxorubicin derivatives claimed (Col. 3, lines 33-38).
Consequently it does not teach or suggest Applicants' long-
term storage stable solutions. The recitation of a sealed
container, together with the requirement that the solution has
not been reconstituted from a lyophilizate, effectively
distinguishes Baurain et al.

The study conducted by Arcamone et al. was directed to
ascertaining the stereochemical properties of adriamycin, not
to achieving a new solution achieving long-term storage
stability for such compounds. Arcamone et al. used a
phosphate buffer, a known technique which does not suggest the
use of acids as practiced by Applicants. Arcamone et al.
simply prepared several solutions of adriamycin with the well-
known phosphate buffers and recorded the "stability."

PU 0016225

-4-

Moreover, the Arcamone et al. claim of achieving a
stability of ">1 month" at pH ranges of 3 - 6 is vague, since
the actual time over which the compound remained stable is not
given, nor is there established any methodology by which
stability is determined.  Consequently, Applicants disagree
with the Examiner's assertion that

> the instant claims [] encompass solutions which have
> the same stability as the prior art solutions and
> are therefore not patentable therefrom.

More to the point, neither Arcamone et al. nor any other
reference teaches or suggests that strong acids may be
substituted for phosphate or other buffers to obtain even
equal storage stabilities.  In fact, as demonstrated by
Applicants, their anthracycline solutions provide superior
storage stabilities to the Arcamone buffer solutions.

Prior to Applicants' development of storage stable
anthracycline solutions, the practice of reconstituting such
solutions from lyophilized powders was common in the prior
art.  The toxicity of these powders posed significant health
risks to health care workers from accidental exposure during
handling and reconstitution.  By dramatically increasing the
storage stability of anthracycline glycosides in solution over
the prior art, Applicants' invention allows medical personnel
to handle these compounds in sealed glass containers,
substantially reducing the risk of accidental exposure.

In view of the above amendments and remarks, it is
respectfully submitted that this application is now in

PU 0016226

-5-

condition for allowance.  Early notice to this effect is respectfully requested.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Richard D. Kelly
Registration No. 27,757

Crystal Square Five - Fourth Floor
1755 South Jefferson Davis Highway
Arlington, VA   22202
(703) 413-3000
RDK/TLS