# EXHIBIT 7



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/827,742 | 01/29/92 | GATTI | | 8    762-242-0-DI |

EXAMINER
PEGELEV,E

ART UNIT     PAPER NUMBER
1803

OBLON, SPIVAK, MC CLELLAND, MAIER AND
NEUSTADT
FOURTH FLOOR
1755 JEFFERSON DAVIS HWY.
ARLINGTON, VA 22202

16N1/0926

DATE MAILED: Remailed
49/28/94
1-30-96

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined   ☒ Responsive to communication filed on 5-12-94   ☒ This action is made final.

A shortened statutory period for response to this action is set to expire   3   month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☒ Notice of Art Cited by Applicant, PTO-1449.
3. ☐ Information on How to Effect Drawing Changes, PTO-1474.

2. ☐ Notice of Draftsman's Patent Drawing Review, PTO-948.
4. ☐ Notice of Informal Patent Application, PTO-152.
6. ☐

**Part II   SUMMARY OF ACTION**

1. ☒ Claims 31, 33-38, 40 and 42 are pending in the application.

Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims 31, 33-38, 40 and 42 are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice of Draftsman's Patent Drawing Review, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☒ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. 01/303,856; filed on 4-3-90.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

EXAMINER'S ACTION

PTOL-326 (Rev. 2-93)

PU 0015075

Serial No. 827742                                    -2-

Art Unit   1803

The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. § 103, the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 C.F.R. § 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of potential 35 U.S.C. § 102(f) or (g) prior art under 35 U.S.C. § 103.

Claims 31, 32-38, 40-42 and 44 are rejected under 35 U.S.C.

§ 103 as being unpatentable over the Japanese patent no. 60-92212

in combination with Baurain et al (U.S. Patent no. 4,296,105) and

Arcamone et al.

The Japanese patent discloses adjusting the pH of

doxorubicin HCl-containing solution to 2.3 with hydrochloric acid

(see page 9).

Baurain et al disclose adjusting the pH of doxorubicin HCl-

PU 0015076

Serial No. 827742                    -3-
Art Unit   1803

containing solution to 4.0 with sulfuric acid (see column 3).

Arcamone et al disclose a solution of doxorubicin having the
pH in the range of 3-6.

Therefore, a person having ordinary skill in the art at the
time the instant invention was made would have been motivated to
adjust the pH of anthracycline glycoside- containing solution to
2.5 with hydrochloric acid because such a person would have
expected the pH of 2.3 and the pH of 2.5 to produce the same
results. Further, a person having ordinary skill in the art
would have been motivated to adjust the pH of anthracycline
glycoside-containing solution to a higher pH such as pH 4 as
disclosed by Baurain et al or higher as disclosed by Arcamone et
al with other physiologically acceptable acid, such as sulfuric
acid, as disclosed by Baurain et al, because such a person would
have expected the resulting solutions to have similar
stabilities.

Applicant's arguments filed May 12, 1994 have been fully
considered but they are not deemed to be persuasive.

Applicants contend that the Japanese application and Baurain
et al. are both directed to anthracycline solutions which form a
lyophilizate, which is later reconstituted in water. Same
argument has not been found persuasive because a lyophilizate
which is reconstituted in water is not been to be patentably
distinct from an unlyophilized solution. Further, the purpose

PU 0015077

Serial No. #27742                              -4-
Art Unit  1803

for which the doxorubicin solution was adjusted to pH of 2.3 as
disclosed by the Japanese patent is immaterial and the stability
of the formed solution is an inherent property of said solution.
Also, the stability of solution disclosed by Baurain et al is an
inherent property of said solutions even if said solutions
represented merely a step lasting ten minutes in the preparation
of doxorubicin derivatives.   Applicant have not presented
any evidence in verified form showing that the claimed
compositions have a significantly better stability than the
compositions disclosed by the Japanese patent and Baurain et al.
Note that the Arcamone et al reference was used only to show
the adjustment of the pH of doxorubicin solutions to 3-6.  The
substitution of phosphate buffer disclosed by Arcamone et al with
hydrochloric acid disclosed by the Japanese patent or sulfuric
acid disclosed by Baurain et al. would have been prima facie
obvious to a person having ordinary skill in the art at the time
of the instant invention.

      Claims 31, 32-38, 40, 42 and 44 are rejected under the
judicially created doctrine of obviousness-type double patenting
as being unpatentable over claims 1-6 of U.S. Patent No.
4,946,831.  Although the conflicting claims are not identical,
they are not patentably distinct from each other because the
compositions claimed in the patent no. 4,946,831 are encompassed
by the instant claims.

PU 0015078

Serial No. 927742                              -5-

Art Unit   1803

The obviousness-type double patenting rejection is a
judicially established doctrine based upon public policy and is
primarily intended to prevent prolongation of the patent term by
prohibiting claims in a second patent not patentably distinct
from claims in a first patent. In re Vogel, 164 USPQ 619 (CCPA
1970). A timely filed terminal disclaimer in compliance with 37
C.F.R. § 1.321(b) would overcome an actual or provisional
rejection on this ground provided the conflicting application or
patent is shown to be commonly owned with this application. See
37 C.F.R. § 1.78(d).

The English translation of the Bohne et al reference has not

been received.

THIS ACTION IS MADE FINAL. Applicant is reminded of the

extension of time policy as set forth in 37 C.F.R. § 1.136(a).

A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS FINAL
ACTION IS SET TO EXPIRE THREE MONTHS FROM THE DATE OF THIS
ACTION.  IN THE EVENT A FIRST RESPONSE IS FILED WITHIN TWO MONTHS
OF THE MAILING DATE OF THIS FINAL ACTION AND THE ADVISORY ACTION
IS NOT MAILED UNTIL AFTER THE END OF THE THREE-MONTH SHORTENED
STATUTORY PERIOD, THEN THE SHORTENED STATUTORY PERIOD WILL EXPIRE
ON THE DATE THE ADVISORY ACTION IS MAILED, AND ANY EXTENSION FEE
PURSUANT TO 37 C.F.R. § 1.136(a) WILL BE CALCULATED FROM THE
MAILING DATE OF THE ADVISORY ACTION.  IN NO EVENT WILL THE
STATUTORY PERIOD FOR RESPONSE EXPIRE LATER THAN SIX MONTHS FROM
THE DATE OF THIS FINAL ACTION.

Any inquiry concerning this communication or earlier
communications from the examiner should be directed to Bill
Peselev whose telephone number is (703) 308-4616.

Any inquiry of a general nature or relating to the status of
this application should be directed to the Group receptionist
whose telephone number is (703) 308-0196.

JOHN W. ROLLINS
PRIMARY EXAMINER
ART UNIT 18C

WP
Peselev/tf
September 15, 1994

PU 0015079

# EXHIBIT 8

BOX AF

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

IN RE APPLICATION OF GAETANO GATTI, et al.          :

SERIAL NO.: 07/827,742          :          EXAMINER PESELEV

FILED:  JANUARY 29, 1992          :          GROUP ART UNIT: 1803

FOR:  INJECTABLE READY-TO-USE SOLUTIONS          :
        CONTAINING AN ANTITUMOR
        ANTHRACYCLINE GLYCOSIDE          :          **RECEIVED**

                                                              JUL 1 2 1996

              AMENDMENT UNDER 37 C.F.R. § 1.116          **GROUP 1800**

ASSISTANT COMMISSIONER OF PATENTS & TRADEMARKS
BOX AF
WASHINGTON, D.C. 20231

SIR:

          Responsive to the final Official Action mailed January 30, 1996, Applicants state:

                              IN THE CLAIMS

          Please amend independent Claims 31, 42, and 44 as follows:

31.     (Four times amended)     A physiologically acceptable solution of anthracycline

glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin

hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous

solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected

from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic

acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to

100mg/ml, wherein said solution is contained in a sealed container [and has not been

reconstituted from a lyophilizate].

                                        1

PU 0015155

42.   (Amended)   A sealed container containing a stable, intravenously injectable, sterile, pyrogen-free doxorubicin solution which consists essentially of doxorubicin hydrochloride dissolved in a physiologically acceptable solvent therefore, [wherein the solution has not been reconstituted from a lyophilizate,] wherein said solution has a pH adjusted to 2.71 to 3.14 with a physiologically acceptable acid and has a concentration of doxorubicin of from 0.1 to 100 mg/ml.

44.   (Twice Amended)   A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, and tartaric acid, the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, [wherein said solution has not been reconstituted from a lyophilizate].

Please cancel Claim 40, and add the following claims 45-47:

45.   The anthracycline glycoside solution of Claim 71, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

46.   The container of Claim 42, wherein said doxorubicin solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids.

47.   The anthracycline glycoside solution of Claim 44, wherein said solution exhibits storage stability as a result of said pH being adjusted to the said pH range using said acids. --

2

PU 0015156

**REMARKS**

Introduction

Claims 31, 33-38, 42, and 44 remain in this application. Prior Claim 40 has been canceled, and new claims 45-47 are submitted. Applicants had previously paid for Claims 31-42, so no new fee is required. None of these changes raise any substantial new issue, and they place the application in condition for allowance. Reconsideration of this application, as amended, is respectfully requested.

The Claims of this application were previously drafted in a way that distinguished Applicants' solutions from certain prior art products which are reconstituted from lyophilizate powder in vials by medical personnel at the time of drug administration. The comments of the Examiner in the last Office Action indicated that whether the solution was reconstituted from lyophilizate is immaterial because patentability must reflect the inherent properties of the claimed solution and the prior art. Consistent with the Examiner's comments, Claims 31, 42, and 44 are now amended (by deleting the lyophilizate limitation) to show that the important and *claimed* properties of the present invention do arise from the inherent properties of the solution, regardless of whether the solution is prepared from lyophilizate in vials.

Along those same lines, the novel property of the claimed solution relates to its capacity for long term storage stability. As explained more fully herein, this long term storage stability of the present invention permits it to be pre-packaged and sold as a ready-to-use solution product, rather than to be reconstituted from lyophilizate in vials by medical personnel in conventional manner. This novel property of the present invention was completely unrecognized by the prior art and provides the basis for satisfying a long felt need and achieving commercial success. Also

3

PU 0015157

importantly for patentability, these aspects of the invention establish a motivation to achieve something new and different, a factor which is necessary for a finding of obviousness under §103, but was completely lacking from the prior art

### Double Patenting Rejection

The Examiner has rejected all of the claims on the grounds obviousness-type double patenting over U.S. Pat. No. 4,946,831. Applicants note that, in the Office Action mailed 11/15/93, the Examiner indicated that the terminal disclaimer, although re-submitted by applicants, has not been found in the file. Applicants acknowledge that they will file a new terminal disclaimer to obviate the double patenting rejection. Applicants request that this be held in abeyance until agreement on patentable subject matter has been reached.

### Obviousness Rejection

The Examiner has also rejected all of the claims under 35 U.S.C. §103 as being unpatentable over the Japanese patent no. 60-92212 in combination with Baurain et al. (U.S. Pat. No. 4,296,105) and Arcomone et al. Applicants respectfully request reconsideration of this rejection and allowance of the pending claims.

Before discussing the rejection in detail, it is important to note that the entire thrust and purpose of the present invention is to achieve technology enabling the long term storage of doxorubicin in solution, preferably in a pharmaceutically acceptable solution. There is no question but that none of the prior art cited by the last Office Action are even remotely directed toward achieving a long term storage stable solution of doxorubicin. JP 60-92212 is directed toward the discovery of formulations of doxorubicin salts that "are capable of being completely

4

PU 0015158

dissolved [from reconstitute] in saline solutions within a very short span of time." *See* the first full paragraph on p. 3 of the reference. Baurain is directed to the discovery of N-leucyl-doxorubicin and its salts, as a new active ingredient. Arcomone is directed to a generalized explanation of the structural and physiochemical properties of doxorubicin, including solubility, spectroscopic characteristics, stability, and analytical methods for determining same. However, as will be detailed below, to the extent that Arcomone discussed stability, the references expressly teaches *away from the present invention, i.e.,* by teaching that doxorubicin has a stability in solution of only a few hours when pH is adjusted with HCL and only a few weeks when pH is adjusted to the range of 3-6 (using a something other than an acid to adjust the pH.) The bottom line is that, to the extent JP 60-92212, or Baurain, or Arcomone have any similarity to the claimed invention beyond merely dealing with doxorubicin , the similarities result from pure happenstance, and have nothing to do with the goals and objectives of the present invention.

The last Office Action implicitly acknowledges that all of the elements of the claimed invention were *not* found in a single prior art reference. That is, by virtue of rejecting the claims under Section 103, rather than Section 102, the Office Action acknowledges that the subject matter of the present invention claims is different from the prior art.

In particular, the Office Action relies upon the teaching of a single example in JP 60-92212 that discloses adjusting the pH to a level of 2.3, and the Office Action acknowledges that this pH of 2.3 is below the pH range of 2.5-5.0 that is taught and claimed in the present invention. However, the Office Action holds that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results."

As to Baurain and Arcomone, the Office Action fails to acknowledge how or why these references differ from the present invention. Apparently, however, the Office Action relies upon

5

these references only to disclose the existence of doxorubicin solutions at pH higher than 2.3. Thus, Baurain discloses a doxorubicin salt solution at pH of 4.0, and Arcomone discloses a doxorubicin salt solution at pH of 3-6. The Office Action holds that, "a person of ordinary skill in the art would have been motivated to adjust the pH of anthracyline glycoside-containing solution to higher pH such as pH 4 disclosed by Baurain et al. or higher as disclosed by Arcomone et al with other physiologically acceptable acid, as disclosed by Baurain et al., because such a person would have expected the resulting solutions to have similar stabilities."

Applicants respectfully submit that there are at least four (4) fundamental problems with the rejection in the last Office Action.

- There is no basis on this record for the motivation holding, *i.e.*, for holding that a person of ordinary skill would have been motivated to increase the pH of JP 60-92212 to the higher levels of Baurain and/or Arcomone. Rather, the only motivation for such combination arises via hindsight reliance on the teaching of the present invention.

- Assuming *arguendo* that a person of ordinary skill was motivated to combine the references in order to achieve a "similar stability" (as suggested in the Office Action), the question is similar to what? The only teaching *vis a vis* "stability" to be found anywhere in the present references is a teaching that doxorubicin solution is *not* stable as per the invention. *See* Arcomone, p.21.

- By ignoring the other differences between the claimed subject matter and the prior art, the Office Action does a disservice to the claimed invention. Assuming *arguendo* that a solution was made by following a combination of the references, the resulting combination does not fall within the pending claims.

6

PU 0015160

- Scientific test data comparing the stability of the claimed subject matter to the stability of the solution of JP 60-92212, shows that stability of the claimed invention (pH 2.5-5.0) is unexpectedly higher than the stability of the JP 60-92212 solution (pH 2.3).

For at least these reasons, Applicants respectfully request that the present rejection be withdrawn and the claims be allowed. Once Applicants thereafter submit an appropriate terminal disclaimer, the claims should be passed to issue.


## Lack of Motivation for Combination

As previously noted, there is absolutely nothing in any of the cited references that refers to a possible improvement in the long term storage stability of doxorubicin solutions. These references are oblivious to the problem, much less the solution. More likely, the authors of these references merely accepted the general belief (prior to the invention) that doxorubicin could not be prepared into long term storage stable solutions, and, thus, the authors never explored nor considered the possibility. In any event, none of the references — alone or in combination — provide any motivation for a person skilled in the art to pursue, adapt, modify, or combine any of the references toward any common goal, much less the goal of achieving a long term storage stable solution of doxorubicin hydrochloride.

To the contrary, JP 60-92212 fails to provide any teaching or suggestion that varying pH may have any effect (either negative or positive) on the doxorubicin solution. The same is true of Bauzain. Although Arcomone discloses several examples with differing pH, the examples vary several parameters at the same time, such that it is impossible to draw any conclusion on how to achieve a long term storage stable solution of doxorubicin.

7

PU 0015161

## The References Teach a *LACK* of Stability

The Office Action suggests that a person of ordinary skill would be motivated to combine the references to achieve "similar stability." It is only fair to ask, what does the Examiner mean by achieving similar stability? If the intention is achieve similar stability to the claimed invention, then Applicants respectfully submit that proves that the Examiner was relying upon hindsight reason to combine the references. If the intention was to achieve similar stability to the most stable prior art solution, then Applicants respectfully submit that references expressly taught that such resulting solution was *not* long term storage stable.

As previously noted, neither JP 60-92212 nor Bosanin even mention storage stability of the solution. Rather, both of those references focus on products which are lyophilized, presumably because it was recognized that they were *not* stable. The only reference that provides any express teaching as to storage stability is the Arcamone reference, and this reference expressly teaches that the only way to achieve long term storage stability for doxorubicin is via lyophilization, because the solutions are *not* stable.

> "Adriamycin [doxorubicin] hydrochloride is stable in the solid state . . . . The stability of aqueous solutions of adriamycin varies with pH and the buffer concentration (Table 2 and Fig. 12) as established on the basis of spectrophotometric and chromatographic analysis."

*See* p. 21 of Arcamone. Table 2 indicates that doxorubicin in solution with HCL is stable for less than 20 hours. HCL is the only acid discussed vis a vis stability. Table 2 further indicates that doxorubicin in solution can be stable for more than a month at pH 3-6 when a phosphate buffer is used. Fig. 12 provides more specific information on the use of phosphate buffers with doxorubicin solutions; specifically, Fig. 12 indicates that a 90% stability of doxorubicin in phosphate buffered solution will expire in about 10 days. In sum, these references — considered alone or in combination — teach away from, not toward, the present invention.

8

PU 0015162

## The Hypothetical Combination Is Different Than The Claimed Invention

Assuming *arguendo* that a person of ordinary skill were motivated to combine the cited references, the resulting combination would be different than the claimed subject matter. The Banzain reference differs from the pending invention in several respects, most notably in that Banzain adds L-leucine carboxyanhydride to the pH 10.2 solution. Although Banzain teaches that the pH of the solution is thereafter reduced to pH 4, the purpose and result of doing so is to convert the doxorubicin hydrochloride to N-(L-leucyl) doxorubicin. Thus, assuming a person were to combine JP 60-92212 and Banzain, the result would be a solution of N-(L-leucyl) doxorubicin at pH 4, rather than the present claimed invention. There is no basis to conclude that the resulting combination would comprise doxorubicin hydrochloride solution at the requisite doxorubicin concentration level and the requisite pH level.

Similarly, Arcamone teaches that doxorubicin solutions may be adjusted to a pH of 3-6 using a phosphate buffer solution, or to a pH of 1-2 using HCl. Arcamone presents these as alternatives, and fails to teach or suggest in any way that the acid (rather than the buffer) should be used when adjusting pH to 3-6. (Note: Arcamone teaches at Table 2 that HCL used to adjust the doxorubicin solution will achieve a stability of *less than 20 hours*. Thus, Arcamone teaches away from using HCl to adjust pH for long term storage stability.) Assuming a person were to combine JP 60-92212 and Arcamone, the result would be solution of doxorubicin hydrochloride in which the pH was adjusted by phosphate buffer, rather than HCL as required by the pending claims. There is no basis to conclude the combination of JP 60-92212 and Arcamone would comprise doxorubicin hydrochloride solution at the requisite pH level.

9

PU 0015163

Scientific Evidence Establishes An Unexpected Stability Difference

It is important to recognize that the claimed subject matter is based upon using particular acids to adjust the pH of the solution to a particular pH range. Applicants have demonstrated time and again in comparative data in this application that the resulting solution exhibits surprisingly better long term storage stability than solutions having a pH outside the recited pH range or using a buffer other than the claimed acids to adjust the pH.

Lest there be any doubt on this point, Applicants are submitting herewith yet another declaration still further addressing the issue of stability. *See* Declaration of Carlo Confalonieri, filed herewith. Applicants have prepared four different solutions. The first solution involves following the procedure of example 6 of the JP 60-92212 patent except modified as to the amount of the material made. The pH of the solution was 2.3 as taught in JP 60-92212. This first solution also contained the mannitol excipient of example 6 of JP 60-92212. Two other solutions not containing the mannitol excipient of the Japanese patent were also prepared having a pH of 2.3, one having a concentration of 2mg/ml and one having 5mg/ml concentration. A fourth solution prepared in accordance with the present invention has a pH of 2.5 and a concentration of 2 mg/ml. As can be seen from the enclosed declaration of Dr. Confalonieri, the solution prepared according to the present invention, having a pH of 2.5, exhibited superior stability as compared with each of the solutions having a pH of 2.3. Indeed, the solution having the mannitol excipient taught in the Japanese patent resulted in a composition which had a worse stability than the corresponding composition not containing the excipient. *See* the results of 35°C. (Note: The one and four week stability of the 2.3 pH solution not containing the excipient was superior to the 2.3 pH solution containing the excipient at 45°C, thus demonstrating that the Japanese patent could not have been concerned with long-term storage

10

PU 0015164

stability.) More importantly, the solution having a pH of 2.5 according to the present invention exhibited significantly better stability than each solution having a pH of 2.3 at all temperatures.

These results conclusively demonstrate that solutions having pH 2.5, adjusted by HCL, achieve unexpected and nonobvious results in storage stability *vis a vis* solutions having a pH 2.3. Perhaps more important, these results directly contradict and disprove that a doxorubicin solution having a pH of 2.3 has the same stability as a doxorubicin solution having a pH of 2.5.

The last Office Action held that a person of ordinary skill in the art "would have expected the pH of 2.3 and the pH of 2.5 to produce the same results." Accepting *arguendo* the statement in the last Office Action as to what a person of ordinary skill in the art would have expected, the evidence submitted herewith proves that expectation is incorrect. Thus, the basic assumption of the rejection in the last Office Action is incorrect. That error, without more, warrants reconsideration and reversal of the rejection.

**Secondary Evidence of NonObviousness
Also Provides Strong Evidence of Patentability**

The evidence presented above as to the differences, results, and motivations of the claimed invention *vis a vis* the prior art fully establishes the patentability of the present invention. Above and beyond that evidence, however, the additional available evidence as to secondary considerations of non-obviousness further confirms the patentability of the claimed invention. The examiner should keep in mind the fact that the present invention is not a paper patent but is one which has found commercial success and has solved a long felt need. If it was so obvious to adopt the technique of the present application, it certainly would have been done much earlier given the problem which has been solved.

11

PU 0015165

In *Stratoflex, Inc. v. Aeroquip Corp.* 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed. Cir. 1983), the Federal Circuit Court of Appeals said:

> [E]vidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness. *In re Sernaker*, 702 F.2d 989, 217 USPQ 1 (Fed. Cir. 1983) citing *In re Fielder and Underwood*, 471 F.2d 640, 176 USPQ 300 (CCPA 1983), *see In re Mageli et al.*, 470 F.2d 1380, 1384, 176 USPQ 305, 307 (CCPA 1973) . . . . Indeed, *evidence of secondary considerations may often be the most probative and cogent evidence in the record.* (Emphasis in original.)

After reviewing a decision which failed to give due consideration to evidence of the secondary considerations of non-obviousness, the Federal Circuit Court of Appeals reversed, noting that such evidence is not relegated to second-class status, and whether to consider such evidence is *not* discretionary:

> That approach was error. All evidence bearing on the issue of obviousness, as with any other issue raised in the conduct of the judicial process, must be considered and evaluated *before* the required legal conclusion is reached.

*W.L. Gore & Associates, Inc. V. Garlock, Inc.*, 721 F.2d 1540, 1555, 220 USPQ 303, 314 (Fed. Cir. 1983) (emphasis in original). *See also Minnesota Min. and Mfg. V. Johnson & Johnson*, 976 F.2d 1559, 1573 (Fed. Cir. 1992) ("Objective evidence such as commercial success, failure of others, long-felt need, and unexpected results must be considered before a conclusion on obviousness is reached."); *and see Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725 (Fed. Cir. 1990).

"The rationale for giving weight to the so-called secondary considerations is that they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). As the United States Supreme Court has stated:

> These legal inferences or subtests do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of

12

PU 0015166

judicial treatment than are the highly technical facts often present in patent litigation.

*Graham v. John Deere Co.*, 383 U.S. 1, 35-36, 86 S.Ct. 684, 702-03, 15 L.Ed.2d 545, (1966);

As to evidence of long felt need and/or failure of others, Judge Learned hand has stated, ". . . the length of time the art, though needing the invention, went without it" is one of the best non-technical considerations for determining whether a patented invention is unobvious. *Safety Car Heating & Lighting co. v. General Electric Co.*, 155 F.2d 937, 939 (2d. Cir. 1946). *See also Pandit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1099 (Fed. Cir. 1985), *vacated*, 475 U.S. 809 (1986), *on remand*, 810 F.2d 1561 (Fed. Cir. 1987), *cert. den.*, 481 U.S. 1052 (1987), *later proceeding*, 836 F.2d 1329 (Fed. Cir. 1987). The evidence of long felt need and failure of others in this case is particularly enlightening in this case.

What applicants have surprisingly discovered is that the combination of pH and the pH adjusting means has allowed them to produce a storage stable solution of these anthracyclines. As the examiner is aware, anthracyclines have demonstrated significant value in the treatment of various cancerous tumors. while the anthracyclines have the benefit of tending to destroy cancerous tumors, they also have the detriment of serious side effects, including the destruction of heart muscle. These destructive capabilities are exhibited not only when the drug is injected, but also when the drug becomes ingested such as by inhalation, contact with the skin and the like. These latter exposures are significant to the health care personnel. Prior to the present invention, it was necessary for the health care personnel to dissolve the dry, lyophilized anthracyclines before administering same to the patient. This step of dissolving the lyophilized dry anthracycline created the possibility of direct exposure of the medical personnel to the anthracycline. Over time, such continued exposures could have significant adverse consequences. Thus, the present invention satisfies a long felt need.

13

PU 0015167

Applicant has previously submitted numerous affidavits in support of commercial success and the long felt need solved by this invention. In particular, Declarations of William J. Dana, and Mary Horstman, and Debra Holton-Smith were previously filed in related case S.N. 06/878,784. For the convenience of the Examiner, copies of these declarations are enclosed and submitted now for consideration in this case.

Conclusion

In view of the foregoing amendment and remarks, it is respectfully submitted that this application is in condition for allowance. Early notice to this effect is respectfully requested.

Respectfully submitted,

June 28, 1996

Daniel A. Boehnen, Reg. No. 28,399
Emily Miao, Ph.D., Reg. No. 35,285
BANNER & ALLEGRETTI, LTD.
Suite 3000
10 South Wacker Drive
Chicago, Illinois 60606
312-715-1000

14

PU 0015168

# EXHIBIT 9



**Patent Office
Canberra**

I, RONALD MAXWELL MAY, ASSISTANT DIRECTOR PATENT ADMINISTRATION, hereby certify that the annexed is a true copy of the Complete specification of Patent No. 598197 as amended pursuant to the provisions of Section 104 of the Patents Act 1990 on 15 January 1992.

WITNESS my hand this Nineteenth day of October 1993.

RONALD MAXWELL MAY
DELEGATE OF COMMISSIONER OF PATENTS

PU 0011728

AUSTRALIA

# 598197

PATENTS ACT 1952

Form 10

COMPLETE SPECIFICATION

(ORIGINAL)

FOR OFFICE USE

Short Title:

Int. Cl:

Application Number: 58858/86.
           Lodged:

Complete Specification-Lodged:
              Accepted:
               Lapsed:
            Published:

Priority:

Related Art:

> This document contains the
> amendments made under
> Section 49 and is correct for
> printing.

---

TO BE COMPLETED BY APPLICANT

Name of Applicant:     Farmitalia Carlo Erba S.R.L.
                       ~~FARMITALIA CARLO ERBA S.P.A.~~

Address of Applicant:  VIA CARLO IMBONATI 24
                       20159 MILAN
                       ITALY

Actual Inventor:

Address for Service:   CLEMENT HACK & CO.,
                       601 St. Kilda Road,
                       Melbourne, Victoria 3004,
                       Australia:

Complete Specification for the invention entitled:
       INJECTABLE READY-TO-USE SOLUTIONS CONTAINING
          AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

The following statement is a full description of this invention
including the best method of performing it known to me:-

- 19 -                          FC 249

Title: Injectable ready-to-use solutions containing an
       antitumor anthracycline glycoside.


The present invention relates to a stable intravenously
injectable ready-to-use solution of an antitumor
5   anthracycline glycoside, e.g. doxorubicin, to a process
for preparing such a solution, and provide the same in a
sealed container, and to a method for treating tumors by
the use of the said ready-to-use solution.

The anthracycline glycoside compounds are a well known
10  class of compounds in the antineoplastic group of agents,
wherein doxorubicin is a typical, and the most widely used,
representative: Doxorubicin. Anticancer Antibiotics, Federi-
co Arcamone, 1981, Publ: Academic Press, New York, N.Y.;
Adriamycin Review, EROTC International Symposium, Brussels,
15  May, 1974, edited by M.Staquet, Publ. Eur. Press Medikon,
Ghent, Belg.;
Results of Adriamycin Therapy, Adriamycin Symposium at
Frankfurt/Main 1974 edited by M.Ghione, J.Fetzer and H.
Maier, publ.: Springer, New York, N.Y.
20  At present, anthracycline glycoside antitumor drugs, in parti-
cular, e.g., doxorubicin, are solely available in the form
of lyophilized preparations, which need to be reconstituted
before administration.

Both the manufacturing and the reconstitution of such
25  preparations expose the involved personnel (workers,
pharmacists, medical personnel, nurses) to risks of con-
tamination which are particularly serious due to the
toxicity of the antitumor substances.

- 2 -

The Martindale Extra Pharmacopoeia 28th edition, page 175
left column, reports, indeed, about adverse effects of
antineoplastic drugs and recommends that "They must be
handled with great care and contact with skin and eyes

5   avoided; they should not be inhaled. Care must be taken
to avoid extravasation since pain and tissue damage may
ensue.".

Similarly, Scand. J. Work Environ Health vol.10 (2), pages 71-
74 (1984), as well as articles on Chemistry Industry, Issue

10  July 4, 1983, page 488, and Drug-Topics-Medical-Economics-Co.
Issue February 7, 1983, page 99 report about severe adverse
effects observed in medical personnel exposed to use of
cytostatic agents, including doxorubicin.

To administer a lyophilized preparation, double handling of

15  the drug is required, the lyophilized cake having to be first
reconstituted and then administered and,moreover,in some cases,
the complete dissolution of the powder may require prolonged
shaking because of solubilization problems.

As the risks connected with the manufacturing and the reconsti-

20  tution of a lyophilized preparate would be highly reduced if
a ready-to-use solution of the drug were available, we have
developed a stable, therapeutically acceptable intravenously
injectable solution of an anthracycline glycoside drug, e.g.
doxorubicin, whose preparation and administration does not

25  require either lyophilization or reconstitution.



- 3 -

According to the present invention, there is provided a sterile, pyrogen-free, anthracycline glycoside solution which comprises a physiologically acceptable salt of an anthracycline glycoside dissolved in a
5  physiologically acceptable aqueous solvent therefor at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate, and the pH of which has been adjusted from 2.5 to 5.0 solely with a physiologically acceptable acid.
10 Preferably the solution of the invention is provided in a sealed container.

Preferably the anthracycline glycoside is chosen from the group consisting of doxorubicin, 4'-epi-doxorubicin (i.e. epirubicin), 4'-desoxy-4'-iodo-
15 doxorubicin (i.e. esorubicin), 4'-desoxy-4'-doxorubicin, daunorubicin and 4-demethoxy-daunorubicin (i.e. idarubicin). A particularly preferred anthracycline glycoside is doxorubicin.

Any physiologically acceptable salt of the
20 anthracycline glycoside may be used for preparing the solution of the invention. Examples of suitable salts may be, for instance, the salts with mineral inorganic acids such as hydrochloric, hydrobromic, sulphuric, phosphoric, and the like, and the salts with certain organic acids such
25 as succinic, tartaric, ascorbic, citric, methanesulphonic, ethanesulphonic and the like. The salt with hydrochloric acid is a particularly preferred salt, especially when the anthracycline glycoside is doxorubicin.

Any aqueous-based solvent which is
30 physiologically acceptable and which is able to dissolve the anthracycline glycoside salt may be used. The solution of the invention may also contain one or more additional components such as a co-solubilizing agent (which may be the same as a solvent), a tonicity adjustment agent and a
35 preservative. Examples of solvents, tonicity adjustment agents and preservatives which can be used for the preparation of the anthracycline glycoside solutions of the invention are hereunder reported.

- 4 -

Suitable solvents and co-solubilizing agents may be, for instance, water; physiological saline; and mixtures of water and one or more:-

- aliphatic amides, e.g. N,N-dimethylacetamide, N-
5    hydroxy-2-ethyl-lactamide and the like,

- alcohols, e.g. ethanol, benzyl alcohol and the like

- glycols or polyalcohols, e.g. propyleneglycol, glycerin and the like,

- esters of a polyalcohol, e.g. diacetine, triacetine and
10    the like,

- polyglycols or polyethers, e.g. polyethyleneglycol 400, a propyleneglycol methylether and the like,

- dioxolanes, e.g. isopropylideneglycerin and the like,

- dimethylisosorbides, and
15    - pyrrolidone derivatives, e.g. 2-pyrrolidone, N-methyl-2-pyrrolidone, polyvinylpyrrolidone and the like.

Suitable tonicity adjustment agents may be, for instance, physiologically acceptable inorganic chlorides, e.g. sodium chloride; dextrose, lactose, mannitol and the
20    like.

Preservatives suitable for physiological administration may be, for instance, esters of parahydroxybenzoic acid (e.g. methyl, ethyl, propyl and butyl esters, or mixtures of them), chlorocresol and the
25    like.

The above mentioned solvents and co-solubilizing agents, tonicity adjustment agents and preservatives can be used alone or as a mixture of two or more of them.

A preferred solution additionally contains not
30    more than 30% of one or more co-solvents selected from the group consisting of ethanol, polyethyleneglycol and N,N-dimethylacetamide. Water is a particularly preferred solvent.

To adjust the pH within the range of from 2.5 to
35    about 5.0 a physiologically acceptable acid is added. The acid may be any physiologically acceptable acid, e.g., an inorganic mineral acid such as hydrochloric, sulphuric, phosphoric and the like, or an organic acid such as acetic, succinic, tartaric, ascorbic, citric, glutamic,

- 5 -

ethanesulphonic, methanesulphonic and the like.

The preferred range of pH for the ready-to-use solution of the invention is from 2.62 to 3.14.  A pH of about 3 is a particularly preferred value.

5          In the solutions of the invention the concentration of the anthracycline glycoside varies within the range from 0.1 mg/ml to 50 mg/ml, most preferably from 1 mg/ml to 20 mg/ml.

The preferred ranges of concentration may be
10    slightly different from different anthracycline glycosides. Thus, for example, preferred concentrations for doxorubicin are from about 2 mg/ml to about 50 mg/ml, preferably from 2 mg/ml to 20 mg/ml, particularly appropriate values being 2 mg/ml and 5 mg/ml.  Similar concentrations are preferred
15    also for 4'-epi-doxorubicin, 4'-desoxy-doxorubicin and 4'-desoxy-4'-iodo-doxorubicin.  Preferred ranges of concentration for daunorubicin and 4-demethoxy-daunorubicin are from 0.1 mg/ml to 50 mg/ml, preferably from 1 mg/ml to 20 mg/ml, concentrations of 1 mg/ml and 5 mg/ml being
20    particularly appropriate.

Suitable packaging for the anthracycline glycoside solutions may be all approved containers intended for parenteral use, such as plastic and glass containers, ready-to-use syringes and the like.  Preferably the
25    container is a sealed glass container, e.g. a vial or an ampoule.

According to a particularly preferred embodiment of the invention, there is provided a sterile, pyrogen-free, doxorubicin solution which consists essentially of a
30    physiologically acceptable salt of doxorubicin dissolved in a physiologically acceptable solvent therefor at a doxorubicin concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted from 2.5 to 5.0 solely with a
35    physiologically acceptable acid.

In the above indicated preferred embodiment of the invention the physiologically acceptable salt of doxorubicin may be, e.g. the salt with a mineral inorganic acid such as hydrochloric, hydrobromic, sulphuric,



PU 0011734

- 6 -

phosphoric and the like, or the salt with an organic acid such as succinic, tartaric, ascorbic, citric, methanesulphonic, ethanesulphonic and the like. The hydrochloride salt is a particularly preferred salt.

5    For the solution hereabove indicated as a preferred embodiment of the invention suitable solvents, co-solubilizing agents, tonicity adjustment agents and preservatives may be the same as those previously recited in this specification. Water is a particularly preferred

10   solvent.

Also, the physiologically acceptable acid which may be added to adjust the pH to from 2.5 to 5 may be one of those previously specified. Hydrochloric acid is an especially preferred acid. Preferred pH values for the

15   above said preferred solution of the invention are from 2.62 to 3.14. The pH values of 3 is especially preferred.

Though the concentration of doxorubicin in the above preferred embodiment may vary within the broad range from 0.1 mg/ml to 50 mg/ml, preferably from 2 mg/ml to 20

20   mg/ml, examples of especially preferred concentrations of doxorubicin are 2 mg/ml and 5 mg/ml.

The invention also provides a process for producing a sterile, pyrogen-free anthracycline glycoside solution with a pH of from 2.5 to 5.0, which process

25   comprises dissolving the physiologically acceptable salt of the anthracycline glycoside, which salt is not in the form of a lyophilizate, in the physiologically acceptable solvent therefor; adding solely a physiologically acceptable acid to adjust the pH within the said range as

30   desired; passing the resulting solution through a sterilising filter; and, optionally, adding an additional component selected from a co-solubilizing agent, a tonicity adjustment agent and a preservative, for instance of the kind previously specified, to the solution prior to passing

35   the solution through the sterilising filter.

With the solutions of the invention it is possible to obtain compositions having a very high concentration of the anthracycline glycoside active substance even at 50 mg/ml ————————————



7
- 7 -

and more.  This constitutes a great advantage over the
presently available  lyophilized preparates wherein high
concéntrations of anthracycline glycoside can only be
obtained with difficulty because of solubilization problems
5  encountered in reconstitution, mainly with saline.  The
presence of the excipient, e.g. lactose, in the lyophilized
cake, and its generally high proportion in respect of the
active substance, even up to 5 parts of excipient per part
of active substance, has a negative effect on solubilization
10 so that difficulties may arise in obtaining dissolution of
the lyophilized cake,



8
- 10 -

especially for concentrations of anthracycline glycoside
higher than 2 mg/ml.

The solutions of the invention are characterized by a
good stability.  Solutions in various solvents and with
5   different pH's and concentrations have been found to be
stable for long periods at temperatures accepted for the
storage of pharmaceutical preparations.  This is illustrated
in the Examples which follow.

Owing to the well known anti-tumor activity of the
10  anthracycline glycoside active drug substance, the
pharmaceutical compositions of the invention are useful for
treating tumors in both human and animal hosts.  Examples of
tumors that can be treated are, for instance, sarcomas,
including osteogenic and soft tissue sarcomas, carcinomas,
15  e.g., breast-, lung-, bladder-, thyroid-, prostate- and
ovarian carcinoma, lymphomas, including Hodgkin and
non-Hodgkin lymphomas, neuroblastoma, melanoma, myeloma,
Wilms tumor, and leukemias, including acute lymphoblastic
leukemia and acute myeloblastic leukemia.

- 9 -

Examples of specific tumours that can be treated are Moloney
Sarcoma Virus, Sarcoma 180 Ascites, solid Sarcoma 180, gross
transplantable leukemia, L 1210 leukemia and lymphocytic P 388
leukemia.

Thus, according to the invention there is also provided a method
of inhibiting the growth of a tumour, in particular one of those
indicated above, which comprises administering to a host suffer-
ing from said tumour an injectable solution according to the
invention containing the active drug substance in an amount
sufficient to inhibit the growth of said tumour.

The injectable solutions of the invention are administered by
rapid intravenous injection or infusion according to a variety
of possible dose schedules. Suitable dose schedule for doxoru-
bicin may be, for example, of 60 to 75 mg of active drug sub-
stance per $m^2$ of body surface given as a single rapid infusion
and repeated at 21 days; an alternative schedule may be of
30 mg/$m^2$ day by intravenous route for 3 days, every 28 days.
Suitable dosages for 4'-epi-doxorubicin and 4'-desoxy-doxoru-
bicin may be, for instance, of 75 to 90 mg/$m^2$ given in a single
infusion to be repeated at 21 days, and similar dosages may be
useful also for 4'-desoxy-4'-iodo-doxorubicin.

Idarubicin, i.e. 4-demethoxy-daunorubicin, may be, e.g., admi-
nistered intravenously at a single dose of 13-15 mg/$m^2$ every
21 days in the treatment of solid tumours, while in the
treatment of leukemias a preferred dose schedule is, e.g.,

PU 0011738

- 12 -

of 10-12 mg/m$^2$ day by intravenous route for 3 days, to be repeated every 15-21 days; similar dosages may be, e.g., followed also for daunorubicin.

The following examples illustrate but do not limit in any
5   way the invention.

With reference to the examples, the stability controls on the ready-to-use solutions were carried out by means of high performance liquid chromatography (HPLC), at the following experimental conditions:

10   Liquid chromatograph          :  Varian model 5010
     Spectrophotometric detector :  Knauer model 8700
     Integrating recorder         :  Varian model CDS 401
     Injection valve              :  Rheodyne model 7125 fitted with
                                     a 10 mcl sample loop
15   Chromatographic column        :  Waters μ-Bondapak C18
                                     (length = 300 mm; inner diameter
                                     = 3.9 mm; average particle size =
                                     10 mcm)
     Column temperature           :  ambient (about 22°C ± 2°C)
20   Mobile phase                  :  water : acetonitrile (69:31 v/v)
                                     adjusted to pH 2 with phosphoric
                                     acid, filtered (sintered glass
                                     filter, 1 mcm or finer porosity)
                                     and deaerated
25   Mobile phase flow rate        :  1.5 ml/min
     Analytical wavelength         :  254 ± 1 nm



- 18 -

Integrating recorder sensitivity : 512
Chart speed                 : 1 cm/min

At these conditions, the peak of the anthracycline glycoside
showed a retention time of about 6 minutes.

5   The obtained results are reported in the Tables accompa-
nying the examples.

The extrapolation of the analytical data in order to determine
the time when the 90% of the initial assay could be expected
($t_{90}$ value) was made following an Arrhenius plot.

10  This procedure of analytical data treatment is well known
and widely used and described in the art: see, e.g., Chemical
Stability of Pharmaceuticals, Kennet A. Connors, Gordon L.
Amidon, Lloyd Kennon, Publ.John Wiley and Sons, New York, N.Y.,
1979.

15  The term "teflon" refers to "Teflon$^{TM}$".



12
- 14 -

Example 1

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.8 g | (10 mg) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5 ml) |

Doxorubicin.HCl (0.8 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.4 l).

The solution was filtered through a 0.22 μ microporous membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks (55°C), 4 weeks (45°C and 35°C) and 12 weeks (4°C).

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 1:



PU 0011741



13
- 13 -

Table 1

| INITIAL VALUES |
| :-- |
| Concentration: 1.992 mg/ml          pH = 3.0 |
| Relative % Assay: 100.0 |

| TIME | TEMPERATURE | | | | | | | |
| :-- | :-- | :-- | :-- | :-- | :-- | :-- | :-- | :-- |
| (weeks) | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.995 | 100.2 | 1.952 | 98.0 | 1.919 | 96.3 | 1.493 | 75.0 |
| 2 | | | 1.889 | 94.8 | 1.851 | 92.9 | 1.036 | 51.9 |
| 3 | | | 1.876 | 94.2 | 1.565 | 78.6 | 0.730 | 36.7 |
| 4 | 1.979 | 99.4 | 1.808 | 90.8 | 1.393 | 69.9 | | |
| 8 | | | | | | | | |
| 12 | 1.972 | 99.0 | — | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 3970 days

$t_{90}$ at 8°C = 2000 days

Similar stability data can be observed also for analogous solu-
tions containing either doxorubicin hydrochloride at 5 mg/ml con-
centration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-de-
soxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubi-
cin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentra-
tion.



PU 0011742

- 14 -

Example 2

| Composition | for 80 vials | (for 1 vial) |
| Doxorubicin.HCl | 8.0 g | (100 mg) |
| Hydrochloric acid 0.1N | | |
| 5    q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5 ml) |

Doxorubicin.HCl (8.0 g) was dissolved in 90 percent of
the amount of water for injections, de-aerated by nitrogen

10   bubbling.  The hydrochloric acid was then added dropwise to
adjust the pH of the solution to 3.  Further de-aerated water
for injections was then added to bring the solution to its
final volume (0.4 l).

The solution was filtered through a  0.22 μ microporous

15   membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

20   The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55°C, 45°C and 35°C
(accelerated stability controls) and at 4°C for up to 3 weeks
(55°C), 4 weeks (45°C and 35°C) and 12 weeks (4°C).

The stability data obtained, using high performance

25   liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 2:



PU 0011743

- 15 -

Table 2

| INITIAL VALUES |
| --- |
| Concentration: 20.06 mg/ml          pH = 2.95 |
| Relative % Assay: 100.0 |

| TIME | TEMPERATURE | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| (weeks) | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 20.06 | 100.0 | 19.56 | 97.5 | 17.84 | 88.9 | 12.31 | 61.4 |
| 2 | | | 18.87 | 94.1 | 15.61 | 77.8 | 7.09 | 35.3 |
| 3 | | | 18.24 | 90.9 | 13.41 | 66.8 | 3.13 | 15.6 |
| 4 | 19.91 | 99.2 | 17.51 | 87.3 | 11.07 | 55.2 | | |
| 8 | | | | | | | | |
| 12 | 19.80 | 98.7 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 3700 days

$t_{90}$ at 8°C = 1780 days

Similar stability data can be observed for analogous solu-
tions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubi-
cin, as hydrochloride salts, at the same 20 mg/ml concentration.



16
- 18 -

Example 3

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.800 g | (10.00 mg) |
| N,N-Dimethylacetamide | 0.060 l | (0.75 ml) |
| Propylene glycol | 0.048 l | (0.60 ml) |
| Ethanol | 0.012 l | (0.15 ml) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.400 l | (5.00 ml) |

5

10

Doxorubicin.HCl (0.800 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. N,N-dimethylacetamide, propylene glycol and ethanol were subsequently added under stirring and nitrogen

15 bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.400 l).

The solution was filtered through a 0.22 μ microporous

20 membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

25 The stability of the solutions in the vials was tested. The vials were stored at temperatures of $55^{\circ}C$, $45^{\circ}C$ and $35^{\circ}C$ (accelerated stability controls) and at $4^{\circ}C$ for up to 3 weeks ($55^{\circ}C$), 4 weeks ($45^{\circ}C$ and $35^{\circ}C$) and 8 weeks ($4^{\circ}C$).

The stability data obtained, using high performance

30 liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 3:



- 17 -

Table 3

| INITIAL VALUES | | | | | | | |
|----------------|--|--|--|--|--|--|--|
| Concentration:2.000 mg/ml | | | pH = 3.03 | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME | TEMPERATURE | | | | | | |
|------|-------------|--|--|--|--|--|--|
| (weeks) | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | | | 1.892 | 94.6 | 1.735 | 86.7 | 1.495 | 74.7 |
| 2 | 1.993 | 99.7 | 1.927 | 96.4 | 1.624 | 81.2 | 1.212 | 60.6 |
| 3 | | | 1.906 | 95.4 | 1.432 | 71.6 | 1.032 | 51.6 |
| 4 | 2.00 | 100.0 | 1.863 | 93.2 | 1.266 | 63.3 | | |
| 8 | 1.960 | 98.0 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 4360 days

$t_{90}$ at 8°C = 2200 days

Similar stability data can be observed also for analogous solu-
tions containing either doxorubicin hydrochloride at 5 mg/ml con-
centration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-de-
soxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubi-
cin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentra-
tion.



PU 0011746

18
- 20 -

Example 4

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.8 g | (10.0 mg) |
| Polyvinylpyrrolidone | 20.0 g | (250.0 mg) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5.0 ml) |

Doxorubicin.HCl (0.8 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. Polyvinylpyrrolidone was added and dissolved under stirring and nitrogen bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.4 l).

The solution was filtered through a 0.22 μ microporous membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks (55°C), 4 weeks (45°C and 35°C) and 8 weeks (4°C).

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 4;

PU 0011747



19
- 21 -

Table 4

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration: 1.973 mg/ml     pH = 2.71 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| (weeks) | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 2.028 | 102.8 | 1.944 | 98.5 | 1.791 | 90.8 | 1.477 | 74.9 |
| 2 | | | 1.885 | 95.5 | 1.582 | 80.2 | 0.972 | 49.3 |
| 3 | | | 1.840 | 93.2 | 1.402 | 71.0 | 0.632 | 32.0 |
| 4 | 1.913 | 97.0 | 1.853 | 93.9 | 1.273 | 64.5 | | |
| 8 | 1.972 | 99.9 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 5560 days

$t_{90}$ at 8°C = 2670 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.



- $\frac{20}{22}$ -

Example 5

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.00 g | (100.0 mg) |
| N,N-Dimethylacetamide | 0.12 l | (1.5 ml) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

Doxorubicin.HCl (8.00 g) was dissolved in 90 percent of
10  the amount of water for injections, de-aerated by nitrogen
bubbling.  N,N-dimethylacetamide was added under stirring and
nitrogen bubbling.  The hydrochloric acid was then added
dropwise to adjust the pH of the solution to 3.  Further
de-aerated water for injections was then added to bring the
15  solution to its final volume (0.40 l).

The solution was filtered through a 0.22 μ microporous
membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
20  chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of $55^{\circ}C$, $45^{\circ}C$ and $35^{\circ}C$
(accelerated stability controls) and at $4^{\circ}C$ for up to 3 weeks
25  ($55^{\circ}C$), 4 weeks ($45^{\circ}C$ and $35^{\circ}C$) and 8 weeks ($4^{\circ}C$).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 5:



21
- 23 -

Table 5

| INITIAL VALUES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Concentration:19.32 mg/ml    pH = 2.96 | | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | | |

| TIME | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (weeks) | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 20.1 | 103.5 | 19.14 | 99.1 | 17.34 | 89.8 | 15.57 | 80.6 |
| 2 | | | 19.20 | 99.4 | 15.77 | 81.6 | 12.94 | 67.0 |
| 3 | | | 18.06 | 93.5 | 14.85 | 76.9 | 11.61 | 60.1 |
| 4 | 20.03 | 103.7 | 17.81 | 92.2 | 13.78 | 71.3 | | |
| 8 | 19.99 | 103.5 | | | | | | |

| $t_{90}$ (days) extrapolated according to Arrhenius equation: |
|---|
| $t_{90}$ at 4°C =1310  days |
| $t_{90}$ at 8°C = 770  days |

Similar stability data can be observed for analogous solu-
tions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubi-
cin, as hydrochloride salts, at the same 20 mg/ml concentration



- 22 -

Example 6

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Ethanol | 0.12 l | (1.5 ml) |
| 5  Hydrochloric acid 0.1 N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

Doxorubicin.HCl (0.80g) was dissolved in 90 percent of
10  the amount of water for injections, de-aerated by nitrogen
bubbling.  Ethanol was added under stirring and nitrogen
bubbling.  Hydrochloric acid 0.1 N was then added dropwise to
adjust the pH of the solution to 3.  De-aerated water for
injections was finally added to bring the solution to its
15  final volume (0.40 l).

The solution was filtered through a 0.22 µ microporous
membrane under nitrogen pressure.  Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity.  The vials were then closed with
20  chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55$^{\circ}$C, 45$^{\circ}$C and at
35$^{\circ}$C (accelerated stability controls) and at 4$^{\circ}$C for up to 3
25  weeks (55$^{\circ}$C), 4 weeks (45$^{\circ}$C and 35$^{\circ}$C) and 12 weeks (4$^{\circ}$C).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 6 .





23

Table 6

**INITIAL VALUES**

Concentration: 1.979 mg/ml          pH = 3.11

Relative % Assay: 100.0

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 2.010 | 101.6 | 1.965 | 99.3 | 1.947 | 98.4 | 1.750 | 86.4 |
| 2 | | | 1.957 | 98.9 | 1.910 | 96.5 | 1.645 | 83.1 |
| 3 | | | 1.895 | 95.8 | 1.737 | 87.8 | 1.356 | 68.5 |
| 4 | 1.927 | 97.3 | 1.818 | 91.9 | 1.678 | 84.8 | | |
| 12 | 1.939 | 97.9 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1270 days

$t_{90}$ at 8°C = 780 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 204'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.

- 24 -

Example 7

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.000 g | (100.00 mg) |
| N,N-Dimethylacetamide | 0.060 1 | (0.75 ml) |
| Propylene glycol | 0.048 1 | (0.60 ml) |
| Ethanol | 0.012 1 | (0.15 ml) |
| Hydrochloric acid 0.1N q.s. to | pH = 3 | (pH = 3) |
| Water for injections q.s. to | 0.400 1 | (5.00 ml) |

5

10

Doxorubicin.HCl (8.000 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. N,N-dimethylacetamide, propylene glycol and ethanol were subsequently added under stirring and nitrogen

15 bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.400 1).

The solution was filtered through a 0.22 µ microporous

20 membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

25 The stability of the solutions in the vials was tested. The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks (55°C), 4 weeks (45°C and 35°C) and 8 weeks (4°C).

The stability data obtained, using high performance

30 liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 7:



AUSTRALIAN SEC 104 PATENT OFFICE

PU 0011753



15
- 27 -

Table 7

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration: 20.07 mg/ml | | | | pH = 2.99 | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4° | | 35° | | 45° | | 55° |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | | | 19.14 | 95.4 | 17.81 | 88.7 | 14.84 | 73.9 |
| 2 | 19.97 | 99.5 | 19.07 | 95.0 | 16.27 | 81.1 | 12.36 | 61.6 |
| 3 | | | 18.08 | 90.1 | 14.62 | 72.9 | 10.04 | 50.0 |
| 4 | 20.06 | 99.9 | 18.03 | 89.8 | 13.20 | 65.8 | | |
| 8 | 19.69 | 98.1 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 846 days

$t_{90}$ at 8°C = 505 days

Similar stability data can be observed for analogous solutions containing 4'-epi-doxorubicin or 4'-desoxy-doxorubicin, as hydrochloride salts, at the same 20 mg/ml concentration.



- 26 -

Example 8

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 8.0 g | (100.0 mg) |
| Polyvinylpyrrolidone | 20.0 g | (250.0 mg) |
| 5  Hydrochloric acid 0.1N | | |
| .q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5.0 ml) |

10 Doxorubicin.HCl (8.0 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen bubbling. Polyvinylpyrrolidone was added and dissolved under stirring and nitrogen bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to

15 bring the solution to its final volume (0.4 l).

The solution was filtered through a 0.22 μ microporous membrane under nitrogen pressure. Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with

20 chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks (55°C), 4 weeks (45°C and 35°C) and 8 weeks (4°C).

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the folllowing Table 8:





- $\frac{27}{28}$ -

Table 8

| INITIAL VALUES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentration: 19.57 mg/ml      pH = 2.62 | | | | | | | |
| Relative % Assay: 100.0 | | | | | | | |

| TIME (weeks) | TEMPERATURE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 19.54 | 99.9 | 19.11 | 97.6 | 16.88 | 86.2 | 12.48 | 63.8 |
| 2 | | | 18.43 | 94.2 | 14.13 | 72.2 | 6.00 | 30.7 |
| 3 | | | 18.02 | 92.1 | 11.57 | 59.1 | 2.61 | 13.3 |
| 4 | 19.58 | 100.1 | 17.36 | 88.7 | 9.23 | 47.2 | | |
| 8 | 19.34 | 98.8 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 2540 days

$t_{90}$ at 8°C = 1290 days

Similar stability data can be observed for analogous solutions containing 4'-epi-doxorubicin or 4'-desoxy-doxo-rubicin, as hydrochloride salts, at the same 20 mg/ml concentration.



AUSTRALIAN
SEC
104
PATENT OFFICE

≈ 2.99

| | | | |
|---|---|---|---|
| **E** | | | |
| **45°** | | **55°** | |
| nc. /ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| .81 | 88.7 | 14.84 | 73.9 |
| .27 | 81.1 | 12.36 | 61.6 |
| .62 | 72.9 | 10.04 | 50.0 |
| .20 | 65.8 | | |

o Arrhenius equation :

ed for analogous solu-

or 4'-desoxy-doxorubi-

same 20 mg/ml concentration.

.ls    (for 1 vial)

        (100.0 mg)

        (250.0 mg)

        (pH ≈ 3)

        (5.0 ml)

olved in 90 percent of

e-aerated by nitrogen

dded and dissolved under

hydrochloric acid was

of the solution to 3.

ns was then added to

e (0.4 l).

n a 0.22 μ microporous

lumes of 5 ml of the

-colourless glass vials

re then closed with

ers and sealed with

the vials was tested.

of $55^{\circ}C$, $45^{\circ}C$ and $35^{\circ}C$

it $4^{\circ}C$ for up to 3 weeks

weeks ($4^{\circ}C$).

g high performance

letermination of

g Table 8:

.nd

n

s

C

ks

29

Table 9

| INITIAL VALUES | | |
| --- | --- | --- |
| Concentration: 1.826 mg/ml | | pH = 3.14 |
| Relative % Assay: 100.0 | | |

| TIME (weeks) | TEMPERATURE | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.830 | 100.2 | 1.812 | 99.2 | 1.784 | 97.7 | 1.605 | 87.9 |
| 2 | 1.818 | 99.6 | 1.781 | 97.5 | 1.554 | 85.1 | 1.292 | 70.8 |
| 3 | | | 1.743 | 95.4 | 1.409 | 77.2 | 1.018 | 55.7 |
| 4 | 1.823 | 99.8 | 1.734 | 95.0 | 1.369 | 75.0 | | |
| 8 | 1.792 | 98.2 | | | | | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 5815 days

$t_{90}$ at 8°C = 2920 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-epi-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.



PU 0011758

30
- ¥ -

Example 10

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Propylene glycol | 0.12 l | (1.5 ml) |
| 5    Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

10    Doxorubicin.HCl (0.80 g) was dissolved in 90% of the amount of water for injections de-aerated by nitrogen bubbling.  Propylene glycol was added under stirring and nitrogen bubbling.  Hydrochloric acid 0.1 N was then added dropwise to adjust the pH of the solution to 3.  De-aerated water for injections was finally added to bring the solution 15    to its final volume (0.40 l).

The solution was filtered through a 0.22 µ microporous membrane under nitrogen pressure.- Volumes of 5 ml of the solution were distributed into type I-colourless glass vials having 5/7 ml capacity.  The vials were then closed with 20    chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

The stability of the solutions in the vials was tested. The vials were stored at temperatures of 55°C, 45°C and 35°C (accelerated stability controls) and at 4°C for up to 3 weeks 25    (55°C), 4 weeks (45°C and 35°C) and 4 weeks (4°C).

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency, are reported in the following Table 10:

PU 0011759

31
- 30 -

Table 10

INITIAL VALUES
Concentration: 1.982 mg/ml          pH = 3.11
Relative % Assay: 100.0

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.972 | 99.5 | 1.934 | 97.6 | 1.889 | 95.3 | 1.705 | 86.0 |
| 2 | | | 1.952 | 98.5 | 1.795 | 90.6 | 1.483 | 74.8 |
| 3 | | | 1.935 | 97.6 | 1.699 | 85.7 | 1.153 | 58.2 |
| 4 | 2.056 | 103.7 | 1.788 | 90.2 | 1.460 | 73.7 | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1794 days

$t_{90}$ at 8°C = 1025 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5 mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml 5 mg/ml concentration.



32

## Example 11

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.80 g | (10.0 mg) |
| Polyethylene glycol 400 | 0.12 l | (1.5 ml) |
| 5 Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.40 l | (5.0 ml) |

Doxorubicin.HCl (0.80 g) was dissolved in 90% of the
10 amount of water for injections, de-aerated by nitrogen
bubbling. Polyethylene glycol 400 was added under stirring
and nitrogen bubbling. Hydrochloric acid 0.1 N was then
added dropwise to adjust the pH of the solution to 3.
De-aerated water for injections was finally added to bring
15 the solution to its final volume (0.40 l).

The solution was filtered through a 0.22 μ microporous
membrane under nitrogen pressure. Volumes of 5 ml of the
solution were distributed into type I-colourless glass vials
having 5/7 ml capacity. The vials were then closed with
20 chlorobutyl teflon-faced rubber stoppers and sealed with
aluminium caps.

The stability of the solutions in the vials was tested.
The vials were stored at temperatures of 55°C, 45°C and 35°C
(accelerated stability controls) and at 4°C for up to 3 weeks
25 (55°C), 4 weeks (45°C and 35°C) and 4 weeks (4°C).

The stability data obtained, using high performance
liquid chromatography (HPLC) for the determination of
potency, are reported in the following Table 11:

33
- 33 -

Table 11

INITIAL VALUES
Concentration: 1.907 mg/ml          pH = 3.07
Relative % Assay: 100.0

| TIME (weeks) | TEMPERATURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4°C | | 35°C | | 45°C | | 55°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.871 | 98.1 | 1.797 | 94.2 | 1.668 | 87.5 | 1.484 | 77.6 |
| 2 | | | 1.710 | 89.7 | 1.608 | 84.3 | 1.237 | 64.9 |
| 3 | | | 1.739 | 91.2 | 1.551 | 81.3 | 1.007 | 52.8 |
| 4 | 1.873 | 98.2 | 1.693 | 88.8 | 1.453 | 76.2 | | |

$t_{90}$ (days) extrapolated according to Arrhenius equation:

$t_{90}$ at 4°C = 1130 days

$t_{90}$ at 8°C =  680 days

Similar stability data can be observed also for analogous solutions containing either doxorubicin hydrochloride at 5mg/ml concentration, or 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin or 4-demethoxy-daunorubicin, as hydrochloride salts, at both 2 mg/ml and 5 mg/ml concentration.



PU 0011762

34
- 26 -

Example 12

| Composition | for 80 vials | (for 1 vial) |
|---|---|---|
| Doxorubicin.HCl | 0.8 g | (10 mg) |
| Hydrochloric acid 0.1N | | |
| q.s. to | pH = 3 | (pH = 3) |
| Water for injections | | |
| q.s. to | 0.4 l | (5 ml) |

5

Doxorubicin.HCl (0.8 g) was dissolved in 90 percent of the amount of water for injections, de-aerated by nitrogen

10 bubbling. The hydrochloric acid was then added dropwise to adjust the pH of the solution to 3. Further de-aerated water for injections was then added to bring the solution to its final volume (0.4 l).

The solution was filtered through a 0.22 $\mu$ microporous membrane under nitrogen pressure. Volumes of 5 ml of the

15 solution were distributed into type I-colourless glass vials having 5/7 ml capacity. The vials were then closed with chlorobutyl teflon-faced rubber stoppers and sealed with aluminium caps.

20 The stability of the solutions in the vials was tested. The vials were stored at temperatures of 4°C and 8°C for up to 6 months.

The stability data obtained, using high performance liquid chromatography (HPLC) for the determination of potency,

25 are reported in the following Table 12:



35
- 35 -

INITIAL VALUES
Concentration: 2.039 mg/ml                pH = 3.06
Relative % Assay: 100.0

| TIME (months) | TEMPERATURE | | | |
|---|---|---|---|---|
| | 4°C | | 8°C | |
| | Conc. mg/ml | Rel.% Assay | Conc. mg/ml | Rel.% Assay |
| 1 | 1.983 | 97.3 | 1.959 | 96.1 |
| 3 | 1.984 | 97.3 | 1.983 | 97.3 |
| 6 | 2.012 | 98.7 | 2.002 | 98.2 |

At the same conditions, similar stability data can be generally observed also for the other solutions mentioned in the preceding examples.



- 36 -

THE CLAIMS DEFINING THE INVENTION ARE AS FOLLOWS:

1.      A sterile, pyrogen-free, anthracycline glycoside solution which comprises a physiologically acceptable salt of an anthracycline glycoside dissolved in a physiologically acceptable aqueous solvent therefor at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted from 2.5 to 5.0 solely with a physiologically acceptable acid.

2.      A solution according to claim 1 in a sealed container.

3.      A solution according to claim 1 or 2 wherein the anthracycline glycoside is chosen from the group consisting of doxorubicin, 4'-epi-doxorubicin, 4'-desoxy-doxorubicin, 4'-desoxy-4'-iodo-doxorubicin, daunorubicin and 4-demethoxy-daunorubicin.

4.      A solution according to claim 3 wherein the anthracycline glycoside is doxorubicin.

5.      A solution according to any one of the preceding claims wherein the physiologically acceptable salt of the anthracycline glycoside is the salt with an acid chosen from hydrochloric, hydrobromic, sulphuric, phosphoric, succinic, tartaric, ascorbic, citric, methanesulphonic and ethanesulphonic acids.

6.      A solution according to claim 5 wherein the physiologically acceptable salt of the anthracycline glycoside is the salt with hydrochloric acid.

7.      A solution according to any one of the preceding claims having a pH of from 2.62 to 3.14.

8.      A solution according to any one of claims 1 to 6 having a pH of about 3.

9.      A solution according to any one of the preceding claims, wherein the physiologically acceptable acid is an inorganic mineral acid.

10.      A solution according to claim 9, wherein the acid is hydrochloric, sulphuric, or phosphoric acid.

11.      A solution according to any one of claims 1 to 8, wherein the physiologically acceptable acid is an organic acid.



- 37 -

12.    A solution according to claim 11, wherein the acid is acetic, succinic, tartaric, ascorbic, citric, glutamic, methanesulphonic or ethanesulphonic acid.

13.    A solution according to any one of the preceding claims wherein the solution additionally contains not more than 30% of one or more co-solvents selected from the group consisting of ethanol, polyethylene glycol and N,N-dimethylacetamide.

14.    A solution according to any one of claims 1 to 12 wherein the physiologically acceptable aqueous solvent is physiological saline.

15.    A solution according to any one of the preceding claims wherein the concentration of the anthracycline glycoside is from 1 mg/ml to 20 mg/ml.

16.    A solution according to claim 15 wherein the anthracycline glycoside is doxorubicin at a concentration of from 2 mg/ml to 20 mg/ml.

17.    A solution according to claim 16 wherein the concentration of doxorubicin is 2 mg/ml or 5 mg/ml.

18.    A solution according to any one of the preceding claims which also contains one or more additional components selected from a cosolubilizing agent, a tonicity adjustment agent and a preservative.

19.    A solution according to claim 18, which contains a tonicity adjustment agent selected from dextrose, lactose and mannitol.

20.    A process for producing a sterile, pyrogen-free, anthracycline glycoside solution with a pH of from 2.5 to 5.0, according to any one of the preceding claims; which process comprises dissolving a physiologically acceptable salt of the anthracycline glycoside, which salt is not in the form of a lyophilizate, in a physiologically acceptable aqueous solvent therefor; adding solely a physiologically acceptable acid to adjust the pH within the said range as desired; passing the resulting solution through a sterilising filter; and, optionally, adding an additional component selected from a cosolubilizing agent, a tonicity adjustment agent and a preservative to the solution prior to passing the solution through the sterilising filter.



- 38 -

21.     A process according to claim 20, wherein
dextrose, lactose or mannitol is added as a tonicity
adjustment agent to the solution prior to passing the
solution through the sterilising filter.

5    22.     A solution according to claim 1 substantially as
hereinbefore described in any one of Examples 1 to 12.

23.     A process according to claim 20 substantially as
hereinbefore described in any one of Examples 1 to 12.

24.     A sterile pyrogen-free anthracycline glycoside
10   solution with a pH of from 2.5 to 5.0 which has been
prepared by a process as claimed in any one of claims 20,
21 and 23.

25.     A method of inhibiting the growth of a tumour
selected from sarcomas, carcinomas, lymphomas,
15   neuroblastoma, melanoma, myeloma, leukemias and Wilms
tumour, which method comprises administering to a host
suffering from said tumour a sterile pyrogen-free solution
according to any one of claims 1 to 19 and 24 containing
the anthracycline glycoside in an amount sufficient to
20   inhibit the growth of said tumour.

26.     A method according to claim 25 wherein the tumour
is selected from Moloney Sarcoma Virus, Sarcoma 180
Ascites, Solid Sarcoma 180, Gross transplantable leukemia,
L 1210 leukemia and lymphocytic P 388 leukemia.

25   DATED this 23rd day of August 1991


FARMITALIA CARLO ERBA S.r.l.
By Their Patent Attorneys:

GRIFFITH HACK & CO
Fellows Institute of Patent
30      Attorneys of Australia



# EXHIBIT 10

Westlaw.

Not Reported in F.Supp.2d                                                              Page 1
Not Reported in F.Supp.2d, 2002 WL 32350023 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Hassan H. SHERIF
v.
ASTRAZENECA, et al.
No. Civ.A. 00-3285.

May 9, 2002.

Ralph J. Kelly, Abrahams, Loewenstein & Bushman,
Philadelphia, PA, Plaintiff.
Paul M. Secunda, Morgan, Lewis & Bockius,
Philadelphia, PA, for Defendant.

MEMORANDUM AND ORDER
RUETER, Magistrate J.
*1 Presently before the court is defendants' motion in
limine regarding the testimony of James Lodigiani, a
witness to be called by plaintiff. Mr. Lodigiani is
expected to recount statements made to him by three
individuals, Messrs. Matthew Emmens and Michael
Herman and Ms. Nancy Wysenski. After oral
argument on May 7, and 8, 2002, and evidence
received on May 8, 2002, the motion is GRANTED
IN PART and DENIED IN PART.

*Corporate Structure of Defendant AstraZeneca.* The
corporate structure of defendant AstraZeneca and the
positions held by the three individuals within the
corporate structure are relevant to the court's
consideration of the issues now presented.

*Astra Merck.* On January 20, 1997, Mr. Emmens
became Acting Chief Executive Officer of an entity
known as Astra Merck, Inc. On April 7, 1997, Mr.
Emmens became the CEO and President of Astra
Merck. As of 1997, Mr. Herman was one of two
National Sales Directors of Astra Merck. As of
February, 1997, Ms. Wysenski became the Vice
President of Sales of Astra Merck. Ms. Wysenski
held this position until she resigned on June 12, 1998.
(McKinney Aff.)

*Astra Pharmaceuticals.* Effective July 1, 1998, Astra
AB of Sweden completed the restructuring of Astra
Merck, Inc., its joint venture with Merck & Co., and
combined the business operations of Astra Merck
with Astra USA, Inc. to form Astra Pharmaceuticals

L.P. After Astra Merck became Astra
Pharmaceuticals, Mr. Emmens assumed the position
of Executive Vice President of Sales and Marketing,
and Mr. Herman continued in his position as National
Sales Director. Mr. Emmens left his employment at
Astra Pharmaceuticals on June 1, 1999. *Id.* Ms.
Wysenski never worked for Astra Pharmaceuticals.

*AstraZeneca.* Effective June 1, 1999, as a result of a
merger between Astra AB of Sweden and Zeneca
Group PLC of England, Astra Pharmaceuticals
became AstraZeneca, L.P. The United States business
operations of Zeneca Group and Astra
Pharmaceuticals were consolidated in AstraZeneca.
As of a date in 1999 and currently, Mr. Herman is the
Executive Director for Strategic Projects for
AstraZeneca. Neither Mr. Emmens nor Ms. Wysenski
ever worked for AstraZeneca. *Id.*

Counsel for defendants acknowledged during
preliminary oral argument on May 7, 2002, that the
transformations of the companies from Astra Merck
to Astra Pharmaceuticals to AstraZeneca were a
function of mergers and consolidations with the final
entity, AstraZeneca, for the most part, continuing the
operations and work force of the predecessor
companies. Counsel stated that the mergers resulted
in consolidation of work forces with some significant
changes at the highest levels of management,
although counsel did not identify any changes to the
company's employment practices. Likewise, counsel
for defendants admitted that AstraZeneca accepts
responsibility for the discriminatory acts of its
predecessor companies, and has not raised the issue
of successor liability as a defense in the present
action.

*2 *Argument.* Plaintiff seeks to admit the statements
of Emmens, Herman and Wysenski to show the
corporate culture within which employment decisions
were made by the decision makers of defendant.
Previously, the court found that the statements of
Messrs. Emmens and Herman were relevant and
admissible, but did not determine whether they were
inadmissible hearsay. *Sherif v. AstraZeneca,* 2002
WL 511501 (E.D.Pa. April 3, 2002). Counsel for
plaintiff contends that the statements of these three
individuals are admissible as admissions by party-
opponents under Fed.R.Evid. 801(d)(2)(A).[FN1] Under
this rule, an out-of-court declaration is admissible
against a party opponent if the declarant was an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 2
Not Reported in F.Supp.2d, 2002 WL 32350023 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

employee of the party, he made the statement while so employed and it concerned a matter within the declarant's employment. The Advisory Committee Notes state that "[n]o guarantee to trustworthiness is required in the case of an admission." Fed.R.Evid. 801(d)(2). It has generally been stated that "admissions pass the gauntlet of the hearsay rule, which requires that extra-judicial assertions be excluded if there was no opportunity for the opponent to cross-examine because it is the opponent's own declaration, and 'he does not need to cross-examine himself." ' 2 John W. Strong, McCormick on Evidence § 254 at 136 (5ᵗʰ ed.1999). Moreover, the party "now as opponent has the full opportunity to put himself on the stand and explain his former assertion." Id. (quotation omitted). The Third Circuit Court of Appeals has held that even the death of the declarant does not render such statements inadmissible but impacts on the weight of the evidence rather than its admissibility. Savarese v. Agriss, 883 F.2d 1194, 1201 (3d Cir.1989).

> FN1. Plaintiff also contends that these statements are admissible under the catch-all provision set forth in Fed.R.Evid. 807.

Counsel for defendants specifically opposes admission of these statements on the grounds that at the time the declarants made the statements, they were not employees of AstraZeneca, but of its predecessor companies, and only AstraZeneca, not these prior entities, is a named party to this action. Consequently, defendants contend that these declarations are not admissions against "a party-opponent." Fed.R.Evid. 801(d)(2)(A).

*Statements by Messrs. Emmens and Herman in 1997.* Mr. Lodigiani is expected to testify that during the time period of February to April, 1997, Messrs. Emmens and Herman made statements to Mr. Lodigiani about their opinions as to the corporate culture at Astra Merck regarding diversity in employment decisions and the reason(s) Mr. Lodigiani was passed over for a promotion at Astra Merck. At the time those statements were made, Mr. Emmens was CEO and President of Astra Merck and Mr. Herman was one of two National Sales Directors for Astra Merck. At the time plaintiff was demoted and suspended in November and December, 1998, Mr. Emmens was the Executive Vice President of Marketing and Sales for Astra Pharmaceuticals and Mr. Herman continued in his position as National Sales Director.

*3 On May 24, 1999, plaintiff was fired from his employment with Astra Pharmaceuticals. Sherif v. AstraZeneca, 2001 WL 527807, at *1 (E.D.Pa. May 16, 2001). At the time of his firing, Mr. Emmens was Executive Vice President of Marketing and Sales of Astra Pharmaceuticals and Mr. Herman was the National Sales Director for Astra Pharmaceuticals. According to the testimony of Chester Yuan, one of the named defendants in this case, Mr. Herman was involved in the decision to terminate plaintiff.

The statements made by Messrs. Emmens and Herman are admissible under Fed.R.Evid. 801(d)(2)(A). Both Mr. Emmens and Mr. Herman were in management/ supervisory positions for the predecessors to AstraZeneca at the time they made the relevant statements to Mr. Lodigiani and both remained in such positions at the time plaintiff was suspended, demoted and terminated. At the time this lawsuit was filed, the name of their employer changed but the company and its management remained essentially the same. It does not appear that the companies' employment practices changed with each merger. To decline to accept these statements as admissions against a party-opponent solely because AstraZeneca is the only named party would elevate form over substance. The companies are essentially the same; only the name has changed. Consequently, Emmens' and Herman's admissions as to the corporate culture in which employment decisions were being made are admissible against defendant AstraZeneca.

*Statements by Ms. Wysenski.* Ms. Wysenski's alleged statements, however, are a different matter. Ms. Wysenski's statements do not reflect her opinion as to the corporate culture with respect to decision making but, rather, merely reflect her opinion as to Mr. Lodigiani's qualifications for the position to which he was not promoted. In his deposition, Mr. Lodigiani stated that Ms. Wysenski said, "This position should have been yours, not mine." (Lodigiani Dep. at 30.) Unlike Mr. Emmens, the record does not show that Ms. Wysenski made corporate hiring policies for AstraZeneca or its predecessors or, like Mr. Herman, that she had anything to do with plaintiff's demotion or termination. According to this court's previous ruling, Ms. Wysenski's statements are not relevant. See Sherif v. AstraZeneca, 2002 WL 511501 (E.D.Pa. April 3, 2002).

For the reasons set forth above, the court will permit plaintiff to introduce into evidence through Mr. Lodigiani the statements of Messrs. Emmens and Herman. The plaintiff shall not be permitted to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 32350023 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

introduce into evidence through Mr. Lodigiani the
statements of Ms. Wysenski.

E.D.Pa.,2002.
Sherif v. AstraZeneca
Not Reported in F.Supp.2d, 2002 WL 32350023
(E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:00CV03285 (Docket) (Jun. 28, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.