EXHIBIT 8

1    saying you want a discovery cutoff extension or is that

2    coming from one side only?

3            MR. ASHINOFF:  Your Honor, Mr. Boehnen will have

4    to speak for the other side, but we've had some discussions

5    and I thought we were very far along on the parameters of an

6    agreed request for the extension.  I tried to confirm that

7    this morning with Mr. Boehnen in a letter, but I can't speak

8    for Mr. Boehnen.

9            THE COURT:  Well, give me your best under-

10   standing, Mr. Ashinoff, and then I'll hear from Mr. Boehnen.

11           MR. ASHINOFF:  My best understanding, Your

12   Honor, is that we had basically, without shaking hands,

13   over the phone, resolved the various points relating to a

14   discovery extension which would extend to December 2 the

15   time to finish up and take depositions subject to further

16   rulings of the Court on issues such as inequitable conduct,

17   that will open those up, and that we had also resolved

18   Mr. Boehnen's concern that written discovery not been open

19   ended, and I had both told Mr. Boehnen we're not sitting

20   here with any nefarious plan of launching some major

21   blunderbuss of additional discovery and I iterated in a

22   letter to him the three areas of additional follow-up

23   discovery that he and I had discussed yesterday as being

24   within the purview of what would be permissible between now

25   and December 2.  And my understanding was that we were close

1   to an agreement on the extension through December 2 pursuant

2   to the terms of the letter that I sent him.  I didn't send

3   it to the Court because I really hadn't heard back from him

4   literally until four minutes before the call in an e-mail

5   that said he still had some issues, but I'm not sure

6   fundamentally that we differ.

7          With respect to the discovery we need, Your

8   Honor, I think we've laid out the fact that the document

9   production has been delayed.  I'm not saying that to cast

10  any criticism, I'm just stating the fact that the documents

11  that have been coming from Pharmacia have extended over a

12  long period, including and up to the latest batch last

13  Monday, and we're doing what we can.  We're trying to get

14  witnesses scheduled.  We had served 30(b)(6) notices for

15  witnesses in mid September.  And the date I got offers for

16  one of the witnesses was November 2 and that's going to

17  lead to other discovery.

18         I don't want to go -- there is more I would

19  like to say if Mr. Boehnen is going to oppose this.  If not,

20  though, I don't need to take the Court's time on it.

21         THE COURT:  All right.  Mr. Boehnen, what is

22  your position?

23         MR. BOEHNEN:  And, Your Honor, I'll try not to

24  belabor points either other than to say that Pharmacia has

25  been very diligent in providing information.  We feel as

1    though we're still needing to drag information out of Sicor.

2            THE COURT:  I'm just looking for your position,

3    Mr. Boehnen, about whether you agree there is a discovery

4    cutoff.  I understand each side has got its feelings about

5    the other and I'm really don't want to go there now.

6            MR. BOEHNEN:  Okay.

7            THE COURT:  Just take me to the bottom line.

8            MR. BOEHNEN:  Yes, Your Honor.  The two concerns

9    that I have, and I've tried to explain them consistently to

10   Mr. Ashinoff, is that any extension of discovery -- first of

11   all, we don't think it's necessary.  We could do it with

12   cooperation but we're willing to not oppose an extension but

13   for two considerations:

14           Number one.  We believe that any extension of

15   discovery should be limited to cleaning up matters that

16   are continuing and should not be used as an opportunity to

17   initiate new discovery requests.  That's how we've already

18   gotten into the situation that we're in right now.

19           Number two.  If there is an extension, we're

20   concerned about the trickle-down effect that may have on

21   subsequent events such as the dispositive motion date now

22   set for December 5th.  And if that is extended, we're very

23   concerned that it could impact the January 19th hearing

24   date the Court has set.  And we do not want any extension

25   that would impact or extend that January 19th hearing date.

1          THE COURT:  Well, by definition, it's going to

2    effect both those dates because a one month extension puts

3    us one day before the dispositive motion filing deadline

4    and even with the platoons of attorneys I'm sure you folks

5    have working this case, that is a bit much to ask.  So this

6    would, perforce, move that back and in all likelihood be

7    moving back to some extent that January 19th date because

8    I'm going to -- look, unless you folks are prepared to

9    say hey, we've just got one or two issues and that's it,

10   something that I find hard to believe given the character of

11   the discovery battle and the multi-continent character of

12   the fight you all have had, I'm going to need some time to

13   do what I'm sure you both would like me to do and that is

14   be reasonably prepared when I sit down to talk with you.  So

15   take it as a given that that would have to shift and shift

16   some.  Are you saying in light of that, you're opposed to

17   any extension?

18          MR. BOEHNEN:  Well, there certainly are other

19   options, Your Honor.  Well, could I extend just, say, up

20   until the Tuesday before Thanksgiving.  That would be a two

21   or three week extension.  That would I think then not --

22   then we would not need to extend the dispositive motion

23   date.

24          THE COURT:  Mr. Ashinoff, what is your response?

25          MR. ASHINOFF:  Your Honor, that simply won't

1    work; and now, without too much detail, I do need to get

2    into what has been going on in discovery.

3         We asked, we served a 30(b)(6) notice in August,

4    with depositions in September.  The first witness we got

5    testified under oath that he really knew nothing about what

6    Pharmacia was doing before Pfizer bought it, in essence.

7    And when we pressed it, Mr. Boehnen said, "well, we'll have

8    another witness but the other witness can't come until

9    November" and he is not guaranteeing what that witness will

10   know.  And what Mr. Boehnen said is, "I do not promise you

11   that he will be able to give you detailed information about

12   what happened inside Pharmacia prior to the merger, nor do

13   I ever promise you that we're going to have a witness that

14   will be able to do that.  But we're trying to respond to

15   your questions and certainly you are not as sufficiently an

16   important a player on this that we ever tried to misuse or

17   waste your time."

18        Your Honor, the fact is we're getting witnesses

19   who are supposed to be educated.  That is the obligation of

20   a 30(b)(6) and who were being put up for deposition know

21   nothing.  So now we have to figure out who is going to

22   know something.  I said to Mr. Boehnen in one of the

23   conversations last week or early this week, "I'd like to

24   know who the right people are to depose and talk to.  Would

25   you tell me who does know because you are Pharmacia?"  And

1    he said, "Well, I'll inquire and see what I can find out."

2         We don't even have the right names of the people

3    to talk to yet, Your Honor.  We don't have the inventors in

4    the chair.  Now, we're talking about the inventors, if the

5    Italian referee can get them in the chair, for the week of

6    November 7th through 10th.  We've agreed with Mr. Boehnen

7    that we would take the European experts that he has seen

8    since to designate the week in Milan the same week we take

9    the inventors, assuming we can get the inventors, but we

10   are very transcontinental in this case.  We have a witness

11   in Australia we need who we believe has knowledge that the

12   plant that would have been used to produce this drug to meet

13   the need, had we not allegedly infringed, that the plant

14   basically was basically shut down by the FDA.  We served

15   document requests about that.  We asked for the witness.

16   They don't want to bring us the witness here and we don't

17   have the documents yet.

18        We're doing what we can do, Your Honor, but we

19   need more time.  And it's not because we're not trying.  We

20   served some additional notices of deposition.  I agreed to

21   get on the phone with Mr. Boehnen and with Mr. Sigale who is

22   home with pneumonia but is trying to work from home and is

23   the one who is handling the scientific aspects of the case.

24        I said I would sit down with Mr. Boehnen at

25   some point next week.  And from Mr. Sigale's and my point

1    of view, we can do it Thursday morning and go over with

2    Mr. Boehnen a list of the people we need and ask them to

3    cooperate in scheduling them, but a lot of these people

4    are former employees.  We found out just this week one of

5    them is in Canada and we need to implement the Hague

6    Convention to get that witness.

7            We're in a situation where the plaintiff started

8    the lawsuit but doesn't have witnesses with knowledge of

9    what we need to hear about and the documents.  And we're not

10   faulting them, the documents have not been coming in with

11   regularity.  Their letters to the Court now indicate they

12   are now collecting foreign patent information that we asked

13   for back in late 2004.

14           So again, without ascribing fault, the parties

15   simply are not ready to cut off discovery now and we now

16   need to find former Pharmacia employees with no real help

17   from the plaintiff here, find them, subpoena them, serve

18   Hague Convention requests and get them.

19           THE COURT:  All right.  Mr. Boehnen, I'll give

20   you a chance.  We've morphed into a discussion of how the

21   discovery has gone generally.  I'll give you your chance to

22   fire back.

23           MR. BOEHNEN:  Your Honor, I will try to hit only

24   the highlights, but then please understand I'm keeping it

25   very brief.

1              As to the witness, the 30(b)(6) witness whom

2      Mr. Ashinoff complains as not being offered until

3      November 2nd, we originally offered that witness on October

4      17th or 18th.  They said that wasn't acceptable.  We offered

5      him on October 5th, 6th or 7th or October 12th or 13th.

6      They said that wasn't acceptable.  Then finally they said

7      the only other day is November 2nd in the schedule and they

8      said, fine, we'll take that date.

9              As to the inventors, the Italian commissioner

10     offered the inventors for deposition in Milan the week of

11     October 24th or the week of November 7th.  We said we would

12     like to do it, we would prefer to do it the week of October

13     24th.  Sicor said November 7th, it really needed to be that.

14     Would everybody please go along with that?  And we agreed to

15     that.

16             The documents that they have requested are

17     documents that pertain to files that are not related to

18     these patents.  They've never requested them in the past.

19     We've explained this in your letter.  We said for the first

20     time, you've said now you want these files.  Even though you

21     did not previous request them in a Rule 34 request, we'll go

22     ahead and get them for you but don't blame us because you

23     didn't previously request them.

24             The fact of the matter is, and we've told this

25     to Sicor, for months, many months, none of the people that

1    were referred to as Pharmacia Legacy, the historic company,

2    are there so there is not anybody in the company who knows

3    what was historically done at the Legacy Company in relation

4    to Ita Rubesome (phonetic).  We simply do not have the

5    information they have.  We have given them all of the

6    documents that we have pertaining to Ita Rubesome from the

7    Legacy Company.  They've had those for months.  It isn't a

8    recent event; many months.  We can give you specific dates,

9    if you wish.

10        If they ask us, all we can do is go back to

11   those documents that we have already given to them, try to

12   identify people and track them down.  That is exactly what

13   they're now in the process of doing.  But they're doing it

14   now not because we haven't told them this is the situation

15   all along, it's that they have wanted to continually try to

16   blame us and put us in the position where we're responsible

17   for the fact that there is nobody in the company who knows

18   it.  Well, we aren't responsible for that.  That is a fact

19   of life and they need to deal with it as part of their

20   lawsuit.

21        THE COURT:  Well, I guess they would say as part

22   of "your" lawsuit, but that's neither here nor there.  I

23   take your points, Mr. Boehnen, as well as the things that

24   Mr. Ashinoff has said and here is going to be the upshot of

25   it.  I'm going to give you some more time, both sides.  And

1    I don't do this because I want to, because I don't.  This

2    trial date is going to stay, the pretrial date is going to

3    stay, and I'm going to end up taking some of my decision

4    time because you guys can't get on the same page but this

5    is the last time that is happening.

6            I'll go ahead and bump this discovery cutoff

7    to the 4th of December.  I'll give you the month you are

8    looking for Mr. Ashinoff.  And that means we're going to

9    have to bump the dispositive motion deadline.  We'll take

10    that back into January, since I think it's impractical,

11    given the holidays, to do it earlier than that.

12            Give me just a moment to put my hand on a

13    calendar here.

14            (Pause.)

15            MR. BOEHNEN:  Your Honor, may I make a comment?

16            THE COURT:  Yes.

17            MR. BOEHNEN:  When Mr. Ashinoff and I were

18    discussing moving back the summary judgment motion, we had

19    talked about moving the filing of those motions only one

20    week, to December 12th.

21            THE COURT:  Great.  Hey, if you can both live

22    with that.

23            MR. ASHINOFF:  Your Honor, that's something I

24    actually had asked Mr. Boehnen for a longer extension.  What

25    we did discuss and what I do recall us agreeing on is that

1    we don't need to move the claim construction submission.  So

2    we can get those filed but we will need the extra time on

3    the dispositive motions given the nature of the discovery

4    we're going to be going through, so we would appreciate a

5    January filing date.

6              THE COURT:  Put your claim construction stuff

7    in by the 12th then and go ahead and give me your case

8    dispositives by the 9th.

9              MR. ASHINOFF:  You're saying December 12th on

10   the claim conjunction and January 9th on the dispositive; is

11   that what you are saying?

12             THE COURT:  That's what I'm saying.

13             MR. ASHINOFF:  Okay.  Okay.

14             THE COURT:  That will give me 10 days.  We'll go

15   ahead and hold the January 19th date.  I won't bump that.

16             MR. BOEHNEN:  Your Honor, I think claim

17   construction has two dates.  There is an initial submission

18   and then an opposition.

19             THE COURT:  That won't work.  Hold on just a

20   moment, actually.  I think I'm going to have to bump that

21   19th.  Hold on.

22             (Pause.)

23             THE COURT:  If you submit by the 9th --

24             MR. ASHINOFF:  There is going to need to be

25   responding and reply papers on the dispositive, Your Honor.

1          THE COURT:  Right you are.  That's what I'm

2    looking at.

3          (Pause.)

4          THE COURT:  Okay.  Your briefing on the 9th

5    means that the answer will be due the 23rd and reply on the

6    30th of January.  I will look on my calendar and see if I

7    can't get you a date some time early in February for us to

8    get together and discuss this.  And I'll ask somebody in my

9    staff to help me with that while we continue our discussion.

10         All right.  Now, I have read your papers and I

11   have looked at your attachments and so I don't need anybody

12   to repeat the statements that are made in there, but let's

13   look at each one of these final things together.

14         I break it down this way.  And this is based on

15   the way the letters broke it down.  We have a question about

16   the location of expert witness depositions, we have an issue

17   with respect to the deposition of Mr. Winters and we have

18   an issue with respect to whether certain information is to

19   be extracted by contention interrogatories or 30(b)(6)

20   depositions.  Those are the three things that we still have

21   out there to deal with.

22         MR. ASHINOFF:  Your Honor?

23         THE COURT:  Yes.

24         MR. ASHINOFF:  Your Honor, if I may.  I think I

25   can give short shrift to two of the three but, frankly, the

1   areas that we're most concerned about we also feel we need

2   to deal with.  And I would appreciate if Mr. Sigale, my

3   partner, can address those and add, not repeat, what is in

4   the papers, but expand and respond to what your adversaries

5   said about the patent documents and the lab notebooks and

6   the foreign patent materials.  Mr. Sigale will not repeat

7   what is in the papers but Ms. Noreika's letter raises issues

8   that we really don't believe to be factually accurate and we

9   want to address those.  We need those lab notebooks and the

10  foreign patent materials, Your Honor.

11          THE COURT:  All right.  Well, let me interrupt

12  you, Mr. Ashinoff.  You say that you can shorten things up

13  on two of them.  Any shortening you can do, do it now.

14          MR. ASHINOFF:  Okay.  On the issue of the

15  foreign expert.  On the assumption that the inventors will

16  actually get put in the chair in Milan, the week of November

17  7th, Mr. Sigale who is on the phone will stay in Milan over

18  weekend and take the, Mr. Beijnen and Mr. Arcamone.  If

19  Mr. Boehnen will bring them to Milan early the following

20  week, the Monday-Tuesday, Mr. Boehnen and I agreed on this

21  subject to my checking with Mr. Sigale.  Mr. Sigale now has

22  pneumonia, Your Honor, and I wish he didn't and so does he,

23  but he can't travel before early November.  That is why we

24  couldn't take the October date.  He is the guy who knows the

25  area.  He is the member of the team.

1          THE COURT:  Okay.

2          MR. ASHINOFF:  But we will take the foreign

3     expert in Milan the week after we take the inventors and

4     solve that problem.

5          THE COURT:  All right.  And Mr. Boehnen, that is

6     what you had proposed and that is satisfactory to you, I

7     understand; correct?

8          MR. BOEHNEN:  Yes, Your Honor.

9          THE COURT:  Done.

10         MR. BOEHNEN:  We are still checking with our

11    experts but we believe that will work.

12         THE COURT:  Well, let's put it this way.

13    They're your experts, so make it work.  All right?

14         MR. BOEHNEN:  Yes, sir.

15         THE COURT:  Make it work.

16         MR. BOEHNEN:  Yes.

17         MR. ASHINOFF:  Your Honor, with respect to the

18    Australian deposition, what we proposed is the following:

19    We believe this is an important issue in the case and an

20    important issue.  To test that out, we're prepared to do an

21    hour on the telephone to ascertain whether in fact this is

22    the man with the knowledge we need from Pharmacia.  If he

23    is, we would like to continue it live and we will pay his

24    expenses for hotel room and a coach plane to come here.

25         THE COURT:  Mr. Boehnen?

1    MR. BOEHNEN:  Well, Your Honor, it seems like a

2    reasonable way to proceed.

3         THE COURT:  Okay.  Then we'll leave that at that

4    and hopefully you folks will work it out.  We won't need to

5    talk about it again.

6         All right.  Now let's --

7         MR. ASHINOFF:  Your Honor, the issue, what is

8    left is our deposition notice on secondary considerations

9    which Mr. Sigale is prepared to address and also our request

10   for the foreign patent information and the lab notebooks

11   also within his purview, if it pleases the Court.

12        THE COURT:  Yes, that's fine.  Go ahead,

13   Mr. Sigale.

14        MR. SIGALE:  Thank you, Your Honor.  With

15   respect to the foreign prosecution, I would rather not

16   quibble about it as long as Pharmacia is prepared to produce

17   those, and Ms. Noreika's letter seems to indicate --

18        THE COURT:  They say they will.

19        MR. SIGALE:  -- that they're doing it so I'm not

20   going to address that.

21        THE COURT:  Good.

22        MR. SIGALE:  But we believe they were requested

23   previously.

24        THE COURT:  Whatever.  It's coming to you now.

25        MR. SIGALE:  Okay.  Thank you, Your Honor.  With

1    respect to Dr. Confalonieri's lab notebooks, I think

2    Pharmacia's response misses the point.  If they intend to

3    rely upon Dr. Confalonieri's data, which is what they seem

4    to be contending in their interrogatory responses, we're

5    entitled to see all of Dr. Confalonieri's data.  He

6    submitted data to Patent Offices around the world and in

7    other litigations and magically some of the data that we

8    believe would be helpful to our defense has not been

9    produced but data that is helpful in their case has been.

10   And I've asked about what kind of search was undertaken.

11   I'm not satisfied that a sufficient search was done,

12   especially given the significance of this data.

13              THE COURT:  And the relief you want is what,

14   Mr. Sigale?

15              MR. SIGALE:  Well, I want to know what they've

16   done to search for this.  I'd like them to redouble their

17   efforts and confirm for me that they've checked with the

18   prior prosecution counsel, Oblon Spivack, that they checked

19   with the coordinating counsel and that they've checked the

20   files of the various companies.  It just is beyond belief

21   that lab notebooks that were used to support statements made

22   under penalty of perjury to the U.S. Patent Office and other

23   Patent Offices are not available.

24              THE COURT:  All right.  Who is speaking to this

25   from the other side?

1          MR. BOEHNEN:  Dan Boehnen, Your Honor.

2          First of all, it's not at all unusual that

3    foreign companies in the 1980s, that they did not have the

4    kind of lab notebooks that were used in the U.S. companies.

5    The rest of the world is not a first-to-invent situation.

6    There is not interference practice in the rest of the world.

7    Scientists have not and the rest of the world have not

8    been trained on lab notebooks, the way U.S. attorneys work.

9          Having said that, the fact is that we have made

10   a worldwide search on more than one occasion on all of the

11   lab notebooks.  We would very much like to collect all of

12   the lab notebooks.  We have collected all of the pages that

13   were there.  Mr. Sigale suggests that these were used in

14   Patent Offices and litigations around the world.  Well, they

15   have everything and are getting everything from those Patent

16   Offices in lawsuits around the world.  I would note anything

17   in the Patent Offices around the world is a public record

18   document so they've had an opportunity to get that for a

19   long time.

20         THE COURT:  Well, let's stick with -- hold on.

21   Let's stick with lab notebooks.  And I just need a real

22   precise answer to this.  I hear Mr. Sigale -- am I saying

23   your name right?  Is it see-gal (phonetic)?

24         MR. SIGALE:  That's fine, Your Honor.

25         THE COURT:  I hear him saying that he wants a

1    representation from you folks that you have checked with the

2    folks he just named, an affirmation that in fact you have

3    inquired of and heard from these people that there are no

4    lab notebooks belonging to this inventor. And that's all

5    I'm hearing he is asking for. Are you telling me you got an

6    issue with that?

7              MR. BOEHNEN: To me, Your Honor, no, sir. And I

8    understand, just to restate it, I believe he is referring to

9    the Oblon firm, Jake Wood, which is JA Kemp & Co. in the

10   U.K, and --

11             MR. SIGALE: And the Nerviano Consulting firm

12   (phonetic) where many of these inventors found gainful

13   employment.

14             MR. BOEHNEN: -- the people in the Nerviano

15   Medical Sciences Facility as well as Pfizer itself.

16             THE COURT: Right. Okay.

17             MR. BOEHNEN: No, not a problem. We'll be happy

18   to do that.

19             THE COURT: Done.

20             MR. SIGALE: If I might, I'd prefer to have the

21   notebooks.

22             THE COURT: Well, I'm sure everybody would

23   prefer the notebooks were there because then we wouldn't be

24   having this fight at all. So obviously if the notebooks are

25   there, they'll be produced, but if they're not, you will get

34

1   an affirmation of what was done to look for them with these

2   other folks, right?

3               MR. BOEHNEN:  Yes, sir.

4               MR. ASHINOFF:  Your Honor, just to go back half

5   a step.  On the foreign patent material that Mr. Boehnen,

6   Ms. Noreika say is now being collected, given that we plan

7   to try to go abroad and take the inventors on November 7th,

8   can we get some date not too late in October when that

9   material will be produced to us so we have the time to

10  assimilate it before we take the inventors?

11              THE COURT:  Mr. Boehnen.

12              MR. BOEHNEN:  We have already begun making every

13  effort to get that to them as soon as possible.  Let's see.

14  We can start a rolling production to them by the end of next

15  week and I think we hope to have it to them by the end of

16  October.

17              THE COURT:  All right.  End of October it is.

18  And a rolling production is a good idea.

19              MR. ASHINOFF:  Thank you.

20              THE COURT:  Okay.  Then we had the dispute about

21  the 30(b)(6) categories.

22              MR. ASHINOFF:  And I'm going to let Mr. Sigale

23  address that, Your Honor.

24              MR. SIGALE:  Your Honor, we propounded a number

25  of categories in a 30(b)(6) notice that asks for the factual

1   contentions underlying legal contentions I need to

2   understand and I thought this was an efficient way to do it.

3   For instance, if we take category number six.  We asked for

4   the facts concerning Pharmacia's allegation that licensing

5   and adoption of the ready-to-use formula is evidence that

6   the patent satisfied the obviousness requirement.

7               I need to know what facts those are.  That is

8   not a contention request.  It is what licensing are you

9   talking about?  What adoption are you talking about?  What

10  are the circumstances about that licensing?  And I thought

11  this was an efficient way to get that.  I can go through a

12  couple other categories but I can assure you I'm not looking

13  for legal contentions, that is a waste of time.  A lay

14  witness is not going to be able to give that to me, but

15  facts they certainly can.

16              THE COURT:  All right.  Mr. Boehnen, is this

17  yours again?

18              MS. NOREIKA:  Your Honor, this is Maryellen

19  Noreika.  I'll respond to this issue.

20              THE COURT:  Okay.

21              MS. NOREIKA:  Sicor, there doesn't seem to be

22  any disagreement that depositions are not the appropriate

23  means by which to obtain contentions.  Instead, they're

24  saying, well, we're just seeking facts.  But as the topic

25  that Mr. Sigale just read indicates, these are seeking

1  contentions:  All facts regarding Pharmacia's allegations

2  regarding copying, commercial success, failure of others.

3  There is a topic asking for the data Pharmacia contends

4  shows secondary considerations and the conclusions a person

5  skilled in the art would draw from that data.  There is a

6  topic asking for a witness to testify about Pharmacia's

7  response to a contention interrogatory on secondary

8  considerations.

9            THE COURT:  Okay.

10            MS. NOREIKA:  I mean the wording of these

11  topics.

12            THE COURT:  I think I have your position.  I

13  have other folks who need my attention at 4:00 o'clock so

14  let me tell you, having read this, what my impression is.

15            I think there is some good force to the argument

16  being made by Pharmacia that the inserting of the word

17  "facts" doesn't make this less of an effort to get at what

18  is essentially the legal position of the party, although you

19  may get the benefit as well of saying, well, these are the

20  pieces of specific evidence.

21            So in the first instance, and on an expedited

22  basis, not a 30-day turnaround, if you want the chance to

23  answer these as contention interrogatories, I'm going to

24  direct that you accept them as such and you answer them

25  forthwith.  You know, the sort of thing that you get a

37

1    couple of weeks to respond to.

2            And then if you folks on the Sicor side want to

3    do some follow-up deposition discovery, targeted at

4    inquiring about specific facts that are revealed in the

5    context of these interrogatory responses, you're free to

6    do that.

7            I take the point that Pharmacia is making here,

8    which is it's so broadly worded, it can't help but really be

9    a circumstance where somebody is asked to know every fact

10   pertaining to every contention and that's a little bit much

11   to put on a deponent.

12           So that is the resolution to that.  You want to

13   treat them as contention interrogatory attorneys.  Done.

14   Answer them in two weeks.

15           And then if you have some follow-up and more

16   targeted and specific 30(b)(6) effort you want to make,

17   Sicor, you follow up on it that way.

18           MR. ASHINOFF:  Thank you, Your Honor.

19           THE COURT:  Now, let me tell you one last thing.

20   And this is for you, Mr. Ashinoff, in the discussions that

21   you are going to be having with your client, to the extent

22   again that this is helpful.

23           And again, we're treading here carefully and

24   I'm very careful when we talk about the attorney-client

25   privilege.  I want to assure you I have not made lightly

1    the decision I made about how to approach the bifurcation

2    request.  To the extent it's helpful in your discussing

3    with your client my understanding of the Knorr opinion, I

4    view Knorr-Bremse as saying no adverse inference can be

5    drawn from either failing to get an opinion or declining to

6    produce it; that you are entitled to get your opinion and

7    to stay silent about it.

8            Viewing it that way, I have never yet heard

9    anybody make a reasoned argument to me why it could be

10   put before a jury after the Knorr-Bremse opinion that an

11   opinion was received but not tendered.  And in the absence

12   of that, I'm inclined to think there probably isn't a

13   reasoned argument.  That the only reason for putting it

14   in front of a jury would be so they draw an adverse

15   inference, which with what Knorr-Bremse says could not

16   happen.

17           So I give that to you as my best reading of

18   Knorr, in the absence of people having really been able to

19   put it forth, but I think it only fair, since people are

20   trying to grope around and make a decision, that they grope

21   a little less blindly.  I hope that is helpful to you.

22           MR. ASHINOFF:  It is, Your Honor.  And it

23   actually comports with literally a 100-year old doctrine

24   in federal law in other appellate courts to the extent of

25   saying that to force somebody to assert the privilege in

1    front of a jury is reversible error and that comports with

2    what Your Honor is saying.

3              THE COURT:  Okay.  Well, I thank you for your

4    time today.  I hope it has been helpful in getting some

5    things worked out.  Let me tell you real quickly what I'm

6    looking for as a date in February because this is going to

7    appear in a revised scheduling order that we'll put out.

8    I'm going to see you folks for argument on February 3rd

9    instead of January 19th.  That's a Friday.  All right?

10             MR. BOEHNEN:  Your Honor, one quick point for

11   Pharmacia.

12             THE COURT:  Yes.

13             MR. BOEHNEN:  Can we have a new date when our

14   briefs in opposition to bifurcation will be due?  I would

15   suggest two weeks after they produced papers to us if they

16   chose to rely upon them.

17             THE COURT:  Mr. Ashinoff, you're fine with that,

18   I assume.

19             MR. ASHINOFF:  Yes, as long as Mr. Boehnen

20   doesn't in the interim try to put my witness in the chair

21   and force us to go through all kinds of contortions about

22   privilege.

23             THE COURT:  Well, I'm sure everybody wants to be

24   efficient here, or at least I would like to think so.

25             Mr. Boehnen, you take that point, I'm sure.

1              MR. BOEHNEN:  Yes, sir.

2              MR. ASHINOFF:  Your Honor, one last comment on

3     what Your Honor last said, and I apologize for this.

4              This law firm has an annual weekend once a year

5     where it gathers its partners and their spouses and et

6     cetera and it happens to be February 1st through 4th of

7     2006.

8              THE COURT:  Okay.  That is enough said.  I will

9     not trample on a firm tradition.  If it's the 1st through

10    the 4th, then I'm shifting you guys to the next day I can

11    give you.  And I think it's, yes, the next day I can give

12    you is the 9th and that's when I will set you down.  We'll

13    do this at 10:00 a.m. on February 9th.

14             Can you do that, Mr. Boehnen?

15             MR. BOEHNEN:  Yes, sir.

16             THE COURT:  Okay.

17             MR. ASHINOFF:  Thank you very much, Your Honor.

18             MR. SIGALE:  Your Honor, I'm sorry.  This is

19    Mr. Sigale.  We left open the claim construction dates.  You

20    were suggesting December 12th for the opening brief.  The

21    opposition brief would be due?

22             THE COURT:  It will follow the ordinary course:

23    Two weeks for answer, one week for reply.

24             MR. SIGALE:  Right, which would be the 26th of

25    December; and inasmuch as I don't observe Christmas, I would

41

1    hate to do it to the people that do.

2             THE COURT:  I'll tell you what, guys.  You talk

3    with each other about how best to do that.  In fact, based

4    on the dates we're giving you, I'm giving it to you to come

5    up with an agreed form of order to submit back to me.  And

6    then if you need to adjust a date in there like that, be

7    reasonable with each other and give it back to me; all

8    right?

9             MR. SIGALE:  Thank you, Your Honor.

10            THE COURT:  All right.  Thanks for your time.

11   Good-bye.

12            (The attorneys respond, "Thank you, Your

13   Honor.")

14            (Telephone conference ends at 3:57 p.m.)

15

16

17

18

19

20

21

22

23

24

25

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY LLC,    )
                                    )
                 Plaintiff,         )
                                    )
          v.                        )      C.A. No. 04-833-KAJ
                                    )
SICOR INC. and                      )
SICOR PHARMACEUTICALS, INC.,        )
                                    )
                 Defendants.        )

## PHARMACIA & UPJOHN'S THIRD SET OF INTERROGATORIES

Plaintiff Pharmacia & Upjohn Company, LLC propounds the following Interrogatories to Defendants Sicor Inc. and Sicor Pharmaceuticals, Inc. pursuant to Rules 26 and 33, Fed. R. Civ. P. The written responses to these Interrogatories shall be served upon Plaintiff's counsel within thirty (30) days of the receipt hereof. Further, any documents and things produced in response to these Interrogatories shall be produced for inspection and copying at the offices of McDonnell Boehnen Hulbert & Berghoff LLP, 300 S. Wacker Dr., Chicago, Illinois 60606, within thirty (30) days of the receipt of these Interrogatories.

## DEFINITIONS

For purposes of responding to these requests for production of documents, the following definitions shall apply:

1.    The terms "Plaintiff" and "Pharmacia" shall mean Plaintiff Pharmacia & Upjohn Company, LLC, and other company names under which Pharmacia & Upjohn Company LLC is doing and has done business; their predecessors, parents, subsidiaries, divisions, directors, officers, employees, agents, distributors, jobbers, salespersons, interns, sales representatives, and attorneys; and each person acting or purporting to act on its or their behalf or under its or their control.

2.     The terms "Defendants," "Sicor," and "you" shall mean, and "your" shall relate to, Defendants Sicor Inc. and Sicor Pharmaceuticals, Inc., both collectively and independently (whichever calls for broader production of documents and things), and any other company name under which Sicor is doing or has done business; their predecessors, parents, subsidiaries, divisions, licensees, franchisees, assigns or other related business entities; their directors, officers, employees, agents, distributors, jobbers, salespersons, sales representatives, interns, and attorneys; and each person acting or purporting to act on its or their behalf or under its or their control.

3.     The terms "person" and "persons" shall mean natural persons (including those employed by Defendants) and all other legally cognizable entities, including (without limitation) governmental entities, agencies, officers, departments, or affiliates of any other governmental entity; and commercial entities, corporations, foundations, partnerships, proprietorships, associations, and other non-governmental organizations.

4.     The term "date" shall means the exact day, month and year, if ascertainable, or, if not, Defendants' closest approximation (including by description of the date in relation to other events).

5.     The terms "documents" and "things" shall have the broadest scope permissible under the Federal Rules of Civil Procedure and shall include (without limitation) the originals (or, absent any original, a copy) of any writings or other tangible things, however produced or reproduced, including books, accounting and financial records of any nature whatsoever, agreements, communications, correspondence, e-mail, telegrams, cables, telexes, telecopy or fax transmission messages, memoranda, video, audio or other electromagnetic recordings, studies, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, diaries, letters, forecasts, statistical statements, graphs, laboratory or engineering reports and records, notebooks, charts, plans, sketches, drawings, information bearing photographic products of any

2

nature whatsoever, photo-records, microfilms, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, reports and/or summaries of interviews, reports and/or summaries of investigations, opinions or reports of consultants, patent appraisals, patent searches, opinions of counsel, records, reports or summaries of negotiations, sales literature of any nature whatsoever, brochures, catalogues, catalogue sheets, pamphlets, periodicals, advertisements, circulars or trade letters, press releases, publicity releases, new product releases, reprints, drafts of any documents, working papers, indices, original or preliminary notes, computer printouts and other data compilations from which information can be obtained or translated, if necessary, by Defendants through detection devices into reasonably usable form. Any copy of a "document" as described above containing thereon or attached thereto any alteration, notes, comments or other mark, indicia, or material not included in the original or copy referred to in the preceding sentence shall be deemed a separate "document" within the foregoing definition. The terms "documents" and "things" shall also mean tangibles object other than "documents" as described above, and shall include objects of every kind and nature such as, but not limited to, prototypes, models and specimens. The terms "document" and "things" shall refer to any of the above-identified objects in any tangible form, including electrical versions maintained in a magnetic or optical storage medium.

  6. The term "communication" shall mean any transmission of information from one person or entity to another, including (without limitation) by personal meeting, telephone, facsimile, radio, telegraph, electronic mail, teleconference, writing, or other means.

  7. The terms "relating" and "concerning" shall be interpreted as broadly as possible so as to encompass the liberal scope of discovery set forth in Rule 26(b) of Fed. R. Civ. P.

8.     The terms "identify," "identification," "describe," and "description" shall mean to provide a complete identification of the document, thing, or person to the fullest extent known or ascertainable by Defendants, whether or not the information is in the possession, custody, or control of Defendants and whether or not the information is alleged to be protected by any privilege or work product protection, and includes without limitation a request for the following information:

(a)     with respect to a natural person, his or her name, home and work addresses, home and work telephone numbers, present place of employment (or if unknown, the last known), date(s) of commencement and termination of employment, job title, and description of his or her duties and responsibilities;

(b)     with respect to a person other than a natural person, the full name, state of incorporation or registration, address of its principal place of business, telephone number of its principal place of business, and the identity of each natural person who acted on behalf of such entity with respect to the subject matter of the Request;

(c)     with respect to a document, the type of document (e.g., letter, e-mail, facsimile, contract, calendar pad, report); the number of pages of which the document consists, a description of the document's contents; an identification of each natural person who prepared the document; an identification of each natural person for whom it was prepared; each natural person who signed it; an identification of each natural person to whom it was delivered, mailed, or otherwise received; an identification of each natural person to whom a copy was sent or who otherwise received a copy; the date of writing, creation, and publication; identifying number(s), letter(s) or combination thereof, if any; the significance or meaning of such number(s), letter(s) or combination thereof; and present location and identity of the custodian of that document.  Documents to be identified shall include

4

documents currently in your possession, custody or control; documents you know to have

once existed but that no longer exist; and other documents of which you have knowledge or

information but that are not currently in your possession, custody, or control;

(d)      with respect to oral communications, the manner in which the communications were

made (telephone, conversation, etc.); the identity of each natural person who participated in

or witnessed the communication; the subject matter and content of the communication; and

the date of the communication;

(e)      with respect to a patent or patent application, the country or jurisdiction in which it

was filed, number, named inventor(s), filing date, issue date (if a patent), and all related or

foreign counterpart applications and patents; and

(f)      with respect to films, photographs, tapes, computer media, and other things

susceptible to chemical, biological, mechanical, or electrical reproduction, all identifying

information including their character, subject matters, authors, and dates.

9.      The terms "and," "or," and "and/or" shall be construed disjunctively or conjunctively

as necessary to bring within the scope of these Interrogatories all responses which otherwise might

be construed to be outside its scope.

10.      The terms "describe" and "state" shall mean to set forth fully and unambiguously

every fact relevant to the subject of the Interrogatory of which you have knowledge or information.

11.      Any word written in the singular herein shall be construed as plural or *vice versa* as

necessary to bring within the scope of these Interrogatories all responses which otherwise might be

construed to be outside its scope.

12.      "The '285 patent" shall mean U.S. Patent No. 6,107,285.

13.    The term "prior art" includes by way of example and without limitation, any subject matter that you assert may be encompassed by 35 U.S.C. § 102 and/or 35 U.S.C. § 103.

14.    No Interrogatory or subpart hereof shall be construed as a limitation on any other Interrogatory or subpart hereof.

15.    The term "Idarubicin Hydrochloride Injection Product" shall mean any ready-to-use idarubicin hydrochloride solution for intravenous injection manufactured and sold by Sicor.

16.    The term "1972 Arcamone *et al.* reference" shall mean "Structure and Physiochemical Properties of Adriamycin (Doxorubicin)" published in the International Symposium on Adrimycin, p. 9-22 (1972).

17.    The term "1979 Hoffman *et al.* reference" shall mean "Stability of Refrigerated and Frozen Solutions of Doxorubicin Hydrochloride" published in the American Journal of Hospital Pharmacy, vol. 36, p. 1536-38 (1979).

18.    The term "1985 Janssen *et al.* reference" shall mean "Doxorubicin decomposition on storage. Effect of pH, type of buffer and liposome encapsulation" published in the International Journal of Pharmaceutics, vol. 23, p. 1-11 (1985).

19.    The term "1981 Ketchum *et al.* reference" shall mean "Cost Benefit and Stability Study of Doxorubicin Following Reconstitution" published in the American Journal of Intravenous Therapy & Clinical Nutrition, vol. 8, p. 15-18 (1981).

20.    The term "April 1980 Mori *et al.* reference" shall mean "Studies on the Stability of Aclacinomycin Hydrochloride. I. Stability of Solution of Aclacinomycin Hydrochloride" published in The Japanese Journal of Antibiotics, vol. XXXIII, p. 466-71 (1980).

21.    The term "May 1980 Mori *et al.* reference" shall mean "Physicochemical Properties and Stability of Aclacinomycin A Hydrochloride" published in The Japanese Journal of Antibiotics, vol. XXXIII, p. 618-22 (1980).

22.    The term "1981 Poochikian *et al.* reference" shall mean "Stability of anthracycline antitumor agents in four infusion fluids" published in the American Journal of Hospital Pharmacy, vol. 38, p. 483-86 (1981).

23.    The term "1980 Vigevani & Williamson reference" shall mean "Doxorubicin" published in Analytical Profiles of Drug Substances, vol. 9, p. 245-75 (1980).

24.    The term "1983 Wassermann & Bundgaard reference" shall mean "Kinetics of the acid-catalyzed hydrolysis of doxorubicin" published in the International Journal of Pharmaceutics, vol. 14, p. 73-78 (1983).

25.    Other terms shall be given the same meaning that Sicor believes they should be given in the context of the claims of the '285 patent.

## INSTRUCTIONS

1.    If you produce responsive documents pursuant to Federal Rule of Civil Procedure 33(d), the original and each non-identical copy of each document or other tangible thing requested herein which is in your possession, custody or control (including all copies in the possession, custody, or control of any entity defined as being "you") is to be produced, including company, department, and personal files. If the original or copy is not in your possession, custody or control, a full, clear, legible copy thereof is to be produced.

2.    If any portion of any Interrogatory refers or relates to information of which Defendants were once aware but is no longer within Defendants' knowledge, Defendants are

7

requested to identify the name, telephone number, and address of the person last known by Defendants to have knowledge of such information.

3. Each Interrogatory shall be responded to fully unless it is in good faith objected to, in which event every reason for your objection shall be stated in detail. If an objection pertains to only a portion of an Interrogatory, or a word, phrase, or clause contained within it, you are required to state your objection to that portion only and to respond to the remainder of the Interrogatory, using your best efforts to do so.

4. If you produce responsive documents pursuant to Federal Rule of Civil Procedure 33(d), each document and thing produced is to be (i) identified in your written response hereto to correspond with the categories of the Request in response to which it is being produced or (ii) produced as it is kept in the usual course of business, including all file folders, binders, notebooks and other devices by which each such document or thing is organized or separated.

5. If you or your counsel assert that any information identified in response to an Interrogatory is privileged or otherwise protected from discovery (e.g., by work product immunity), set forth in your response hereto with respect to all information for which a claim of privilege is made such that the document or thing is not produced in full:

a. The place, approximate date, and manner of recording, creating or otherwise preparing any document or thing;

b. The name and organizational position, if any, of each sender of any document or thing;

c. The name and organizational position, if any, of each recipient and/or custodian of any document or thing;

d.    The name and organizational position, if any, of each person (other than stenographic or clerical assistants) participating in the preparation or creation of any document or thing;

e.    The name and organizational position, if any, of each person to whom the contents of the information or any portion thereof have heretofore been communicated by copy, exhibition, reading or summarization;

f.    A statement of the basis on which privilege is claimed with respect to the information and including a statement of sufficient relevant facts and circumstances that will explain the basis of the claim of privilege and will permit the adjudication of the propriety of the claim of privilege;

g.    The name of each person, other than Defendants' attorneys of record, having knowledge of the factual basis asserted for the privilege claim;

h.    The number of the Interrogatory to which the document or thing is responsive;

i.    The identity and organization position, if any, of each person supplying the author of your response hereto with the information requested in subsections (a) through (g) above;

j.    The type of any document or thing withheld (e.g., letter, memorandum, etc.);

k.    The subject matter of any document, communication, or other information;

l.    The location(s) where, if at all, information has been redacted on any document or thing thus produced;

m.    The location of any document, communication, thing or other information withheld; and

n.    In the case of a document, the length of the document in number of pages.

9

7.    The Interrogatories seek all information you know as of the date of service hereof, unless otherwise stated in a particular Interrogatory. Pursuant to Federal Rule of Civil Procedure 26(e), these Interrogatories are deemed to be continuing so that with respect to any Interrogatory, or part thereof, as to which you, after answering, acquire additional documents or things or knowledge or information, you shall seasonably serve supplemental responses and/or make a supplemental production of documents and things, in no case later than thirty (30) days after acquiring such additional documents or things or knowledge or information.

## INTERROGATORIES

**INTERROGATORY NO. 11**

With regard to the 1985 Janssen *et al.* reference, (i) identify with specificity each and every limitation of the asserted claims that is allegedly taught in the reference, and (ii) for each such limitation, identify with specificity how and where the reference teaches such limitation.

**RESPONSE:**

**INTERROGATORY NO. 12**

With regard to the 1983 Wassermann & Bundgaard reference, (i) identify with specificity each and every limitation of the asserted claims that is allegedly taught in the art reference, and (ii) for each such limitation, identify with specificity how and where the reference teaches such limitation.

**RESPONSE:**

10

**INTERROGATORY NO. 13**

With regard to the April 1980 Mori *et al.* reference, (i) identify with specificity each and every limitation of the asserted claims that is allegedly taught in the reference, and (ii) for each such limitation, identify with specificity how and where the reference teaches such limitation.

**RESPONSE:**

**INTERROGATORY NO. 14**

With regard to the May 1980 Mori *et al.* reference, (i) identify with specificity each and every limitation of the asserted claims that is allegedly taught in the reference, and (ii) for each such limitation, identify with specificity how and where the reference teaches such limitation.

**RESPONSE:**

**INTERROGATORY NO. 15**

With regard to the 1972 Arcamone *et al.* reference, (i) identify with specificity each and every limitation of the asserted claims that is allegedly taught in the reference, and (ii) for each such limitation, identify with specificity how and where the reference teaches such limitation.

**RESPONSE:**

**INTERROGATORY NO. 16**

With regard to the 1979 Hoffman *et al.* reference, (i) identify with specificity each and every limitation of the asserted claims that is allegedly taught in the reference, and (ii) for each such limitation, identify with specificity how and where the reference teaches such limitation.

**RESPONSE:**

**INTERROGATORY NO. 17**

With regard to the 1981 Ketchum *et al.* reference, (i) identify with specificity each and every limitation of the asserted claims that is allegedly taught in the reference, and (ii) for each such limitation, identify with specificity how and where the reference teaches such limitation.

**RESPONSE:**

**INTERROGATORY NO. 18**

With regard to the 1981 Poochikian *et al.* reference, (i) identify with specificity each and every limitation of the asserted claims that is allegedly taught in the reference, and (ii) for each such limitation, identify with specificity how and where the reference teaches such limitation.

**RESPONSE:**

**INTERROGATORY NO. 19**

With regard to the 1980 Vigevani & Williamson reference, (i) identify with specificity each and every limitation of the asserted claims that is allegedly taught in the reference, and (ii) for each such limitation, identify with specificity how and where the reference teaches such limitation.

**RESPONSE:**

MORRIS, NICHOLS, ARSHT & TUNNELL

_____

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
  *Attorneys for Plaintiff*
  *Pharmacia & Upjohn Company, LLC*

OF COUNSEL:

Daniel A. Boehnen
Joshua R. Rich
Lara V. Fleishman
MCDONNELL BOEHNEN HULBERT
 & BERGHOFF LLP
300 S. Wacker Drive
Chicago, IL  60606
(312) 913-0001

October 5, 2005