# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY LLC,   )
                                  )
                    Plaintiff,    )
                                  )
        v.                        )        C.A. No. 04-833-KAJ
                                  )
SICOR INC. and SICOR              )        **REDACTED VERSION**
PHARMACEUTICALS, INC.,            )
                                  )
                    Defendants.   )

## PROPOSED FINAL PRETRIAL ORDER
## VOLUME IV OF V

MORRIS NICHOLS ARSHT & TUNNELL LLP          ASHBY & GEDDES

Jack B. Blumenfeld (#1014)                  Steven J. Balick (#2114)
Maryellen Noreika (#3208)                   John G. Day (#2403)
1201 N. Market Street                       222 Delaware Avenue, 17th Floor
P.O. Box 1347                               P.O. Box 1150
Wilmington, DE  19899                       Wilmington, DE  19899
(302) 658-9200                              (302) 654-1888
  Attorneys for Plaintiff                     Attorneys for Defendants

Original Filing Date:  September 22, 2006

Redacted Filing Date:  October 4, 2006

EXHIBIT 10

EXHIBIT A

# REDACTED

A

REDACTED

B

Il magistrato è volato a Pescara, una folla commossa l'attendeva davanti all'ospedale

# Di Pietro al capezzale della madre

A 79 anni, colpita da ictus mentre lavorava nell'orto: è in coma
Applausi al giudice addolorato, il figliolo prediletto di Zi' Anna

PESCARA — [illegible]

Anna Sciolla Palma, madre di Di Pietro

## Appalti e mazzette a Monza Estradato in Italia Politano

CHIASSO — [illegible]

## L'inchiesta diventa una canzone Bobby Solo incide «Mani pulite»

ROMA — [illegible]

LE SIGARETTE

## Ancora file davanti alle tabaccherie Minacce a Roma, un corteo a Napoli

ROMA — [illegible]

SERVIZI SEGRETI

## Cesis: trasferito Fulci l'uomo di Andreotti

ROMA — [illegible]

M. A. Calabrò

LE RIVELAZIONI DI COSSUTTA / Parlano intellettuali e amici dell'editore morto a causa di una bomba venti anni fa a Segrate

# Feltrinelli, fu davvero un complotto?

La Cederna: Giangiacomo temeva di essere ucciso. Bocca: ricostruzione sbagliata

[illegible caption] Giorgio Bocca e Camilla Cederna

[illegible]

Dario Fertilio

LA SENTENZA

## Condannata la società che rubò il segreto dell'«anticancro»

MILANO — [illegible]

M. Bra.

EXHIBIT 126

Da sinistra: il traliccio di Segrate con ai piedi il corpo di Feltrinelli ucciso dall'esplosione (Foto Dotti e Dossier)

## Condannata la società che rubò il segreto dell'«anticancro»

### LA SENTENZA

MILANO — Si chiude con quattro condanne il più grosso caso di spionaggio industriale degli ultimi anni, quello sul furto...

M. Bra.

Dario Ferri

C

# *RIERE DELLA SERA*

MERCOLEDÌ 19 APRILE 1989 - L. 1.000

## a fusione fredda italiana

### Cento an piccole e semplici
### Ecco l'energia del futuro

Festa con brevetto all'Enea - Azzardato parlarne di applicazioni della scoperta - Le novità

#### Ma non sogniamo ad occhi aperti

di UGO AMALDI

---

Il miliardario saudita arrestato in Svizzera rischia l'estradizione negli USA

# Kashoggi in manette per Marcos

### E' accusato di ricettazione e concorso in frode con l'ex dittatore

Avrebbe venduto 11 tele sottratte dall'ex presidente filippino al museo di Manila - Contestato anche l'acquisto fittizio di 4 appartamenti a Manhattan - Una vita da 250 mila dollari al giorno



Legge sull'adozione
Lotti prü vendita
la storia di Serena

---

Clamorosa dichiarazione di Carlo D'Alessio 5 anni dopo scagiona l'ex fotomodella ora in semilibertà

## «Terry Broome non ha ucciso mio figlio»

### Fu uno dei suoi amici, secondo il padre, a sparare i colpi mortali

#### Il garante chiede nuove regole



---

## I nuovi giacobini tra verdi e femministe

---

### Pechino
### Gli studenti assediano
### la Città proibita

---

Giallo a Milano per un furto di collute che può fruttare centinaia di miliardi

## Qualcuno ha rubato il farmaco anticancro



**REPLAY**

Oggi Replay: raddoppia

In palio
20 milioni

---

Dopo la tragedia di Sheffield i superstiti del quartiere intoneranno un disco per beneficenza

## Tornano i Beatles, ma Liverpool non c'è più

## Eni-Petromin
## Le tangenti furono legittime

Gaddo a pagina 3

CONTINUA A PAGINA 2

Oliva a pagina 15

A pagina 2

## Psi: bloccare subito
## le ingiustizie
## dei ticket sanitari

---

# Giallo a Milano per un furto di colture che può fruttare centinaia di miliardi

# Qualcuno ha rubato il farmaco anticancro

MILANO — La Procura della Repubblica di Milano...

Brandolina a pagina 8

---

# Pechino
## Gli studenti assediano
## la Città proibita

PECHINO — Gli studenti cinesi tornano all'attacco e Pechino, nella notte, si è sfiorato lo scontro con le forze dell'ordine...

Farace a pagina 4

---

**REPLAY**

Ogni Replay raddoppia

In palio
20 milioni

Corre a pagina 5

---

# Dopo la tragedia di Sheffield
# Tornano i Beat

di ORESTE DEL BUONO

D



CRONACHE ITALIANE

All'annuncio del successo della prova, i ministri Battaglia e Ruberti, il presidente dell'Enea, centinaia di fisici e studiosi

# Grande festa per il trionfo della fusione

Il titolare del dicastero della Ricerca: «I fatti dimostrano che ho fatto bene a incoraggiare i nostri esperti» - Colombo: «In teoria si può immaginare che da tutto questo nascano macchine per la produzione di energia semplici, piccole e decentrate»

### A New York è sceso il prezzo del palladio. In URSS l'anno risalire la scoperta al 1926

---

Lo scienziato spiega che l'esperimento è riuscito creando uno squilibrio con le variazioni di temperatura

## Scaramuzzi: «Ho vissuto una settimana di passione»



Porto di Genova
Forse la Cgil
non firma l'accordo

---

Sottratti dai laboratori ceppi di coltura, sequestrate in Olanda 120 mila fiale con etichette false

# Il giallo del farmaco anticancro rubato

Denuncia della Farmitalia, la Procura dopo due anni incrimina nove persone

---

La guerra tra fans, poi ciondoli: hanno voluto il boato ai vincitori il «Pizza» di Napoli

## Premio a domicilio perché i vincitori non si amano

### Il tempo

NUVOLOSITÀ
VARIABILE



COLLIRIO
ALFA



EXHIBIT

PDX-128

Sottratti dai laboratori ceppi di coltura, sequestrate in Olanda 120 mila fiale con etichette false

# Il giallo del farmaco anticancro rubato

## Denuncia della Farmitalia, la Procura dopo due anni incrimina nove persone

MILANO – Finiscono etichette contraffatte, mio... ...

Michele Brambilla

## i vincitori non si amano

nominarsi per ritirare il «Pontano» di Napoli

### Il tempo



VARIABILE

NUVOLOSITÀ

E

Pharmacia Trial Exhibit List

| PTX | Dep. Exhibit | Description | Bates No. | Notes | Objections |
|-----|--------------|-------------|-----------|-------|------------|
| 130 | PDX 126A | Translation of newspaper article in the Corriere della Sera, the main Italian daily newspaper entitled Condamnata la societa che rubo il segreto dell' <<anticancro>> | | | |
| 131 | PDX 127 | Newspaper article in the Corriere della Sera, the main Italian daily newspaper entitled Qualcuno ha rubato il farmaco anticancro. | | | |
| 132 | PDX 127A | Translation of newspaper article in the Corriere della Sera, the main Italian daily newspaper entitled Qualcuno ha rubato il farmaco anticancro. | | | |
| 133 | PDX 128 | Newspaper article in the Corriere della Sera, the main Italian daily newspaper entitled Il giallo del farmaco anticancro rubato. | | | |
| 134 | PDX 128A | Translation of newspaper article in the Corriere della Sera, the main Italian daily newspaper entitled Il giallo del farmaco anticancro rubato. | | | |
| 135 | PDX 129 | Handwritten notes regarding idarubicin. | SICOR-PNU 026355 | "For Limited Purposes Only" | |
| 136 | PDX 130 | Redacted facsimile regarding idarubicin hydrochloride - European patent situation. | SICOR-PNU 029331 - 029337 | "For Limited Purposes Only" | |
| 137 | PDX 131 | Redacted memorandum regarding idarubicin. | SICOR-PNU 077258 | "For Limited Purposes Only" | |
| 138 | PDX 132 | Memorandum regarding Doxorubicin Hydrochloride Injection, USP. | SICOR-PNU 056432 - 056433 | "For Limited Purposes Only" | |
| 139 | PDX 133 | Facsimile concerning idarubicin. | SICOR-PNU 028844 | "For Limited Purposes Only" | |
| 140 | PDX 134 | Sicor lab notebook number 61 regarding idarubicin | SICOR-PNU 054197 - 054209 | "For Limited Purposes Only" | |
| 141 | PDX 135 | Sicor lab notebook number 39 regarding idarubicin. | SICOR-PNU 054172 - 054196 | "For Limited Purposes Only" | |
| 142 | DDX 006 | Letter regarding doxorubicin and Epirubicin. | PU 0011162 - 0011165 | | |
| 143 | DDX 007 | Letter regarding telefax dated 7/3/85 to G. Tabusso regarding Adriamycin R.T.U. Solution | PU 0011160 - 0011161 | | |

9

EXHIBIT B

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE EVIDENCE AND ARGUMENT RELATING TO DECISIONS MADE BY FOREIGN TRIBUNALS

Defendants Sicor Inc. and SICOR Pharmaceuticals, Inc. ("Sicor") respectfully submit this Memorandum of Law in support of their motion *in limine* to preclude evidence and argument regarding judicial and/or administrative decisions made by foreign patent tribunals. Such decisions are not only hearsay (not subject to any exception to the hearsay rule), they are also irrelevant and unfairly prejudicial to Sicor.

The only jury issues in this case are: 1) whether U.S. Patent No. 6,107,285, which covers a ready-to-use formulation of certain anthracycline glycosides (the "'285 Patent"), is valid; and 2) if so, whether Sicor willfully infringed the '285 Patent. Notwithstanding the narrow issues remaining in this case, Sicor anticipates that Pharmacia will improperly attempt to introduce evidence and argument relating to judicial decisions made in the courts of Great Britain and Australia and Canada, which found that Mayne Pharma Pty Ltd. and Mayne Pharmca (Canada) Inc. – a generic pharmaceutical manufacturer – had infringed Australian, British and Canadian patents that are related to the '285 patent and part of the same patent family (the "foreign judicial decisions").[1] Pursuant to well-settled authority from the United States Court of Appeals for the Federal Circuit and district courts around the country (including in the District of Delaware), foreign judicial decisions are hearsay and are also entirely irrelevant to the adjudication of a patent dispute in a United States court.

In addition, even if the foreign judicial decisions were somehow relevant (or could overcome their hearsay status), their presentation to the jury would significantly prejudice Sicor's ability to present its case without the jury giving undue and undeserved weight to judicial opinions based on the laws of foreign jurisdictions. It has long been "notoriously well known" that patent laws vary from country to country. *See In re Dulberg*, 472 F.2d 1394, 1398

---

[1] The British decision is attached hereto as Exhibit A, the Australian decision is attached as Exhibit B and the Canadian decision is attached as Exhibit C.

(C.C.P.A. 1973). Permitting the jury in this case to factor into its verdict judicial opinions from the Royal Courts of Justice in London and the Federal Court of Australia and the Federal Court of Canada, notwithstanding that United States law is quite different from the laws applied in those courts, would be manifestly unfair and prejudicial to Sicor.

## ARGUMENTS AND AUTHORITIES

Judicial opinions and factual findings are hearsay and routinely excluded from evidence pursuant to Fed. R. Evid. 801. Simply put, "[i]t is an out of court written statement by a judge now offered to prove the truth of the matter asserted ...[and] [i]t is therefore inadmissible unless it falls within one of the hearsay exceptions." *Herrick v. Garvey*, 298 F.3d 1184, 1191-92 (10th Cir. 2002). *See also Int'l Land Acquisitions, Inc. v. Fausto*, 39 Fed. Appx. 751, 756 (3d Cir. 2002) ("[T]he [judicial] opinion is an out of court statement offered for the truth of the matter asserted. The state court judge was not there to testify as to his recollection of Fausto's actions in his courtroom. This out of court statement thus constitutes hearsay."); *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993) (state court judge's order constituted inadmissible hearsay). Moreover, judicial decisions do not fall into any of the hearsay exceptions set forth in Fed. R. Evid. 803 or 804. The only exception that could even arguably apply to the foreign judicial decisions is for "public records." *See* Fed. R. Evid. 803(8). But, it is now well settled that the public records exception would not apply here. The U.S. Court of Appeals for the Tenth Circuit addressed this precise issue in *Herrick*, and held:

> Rule 803(8) was not intended to allow the admission of findings of
> fact by courts. Rule 803(8) is limited to investigations: "A judge
> in a civil trial is not an investigator, rather a judge.

*Herrick*, 298 F.3d at 1192 (quoting *Nipper*, 7 F.3d at 417); *see also Int'l Land Acquisitions, Inc.*, 39 Fed. Appx. at 756-57 (holding that Rule 803(8) does not permit the admission of judicial opinions and summarizing federal case law on the subject).

- 2 -

In any event, evidence and argument relating to the foreign judicial decisions is irrelevant. Fed. R. Evid. 401 defines "relevant evidence" as follows:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

The foreign judicial decisions are neither consequential nor probative. They merely set forth claim construction and infringement determinations made under the laws of countries other than the United States. As Judge Farnan observed in *Allen v. Howmedica Leibinger, Inc.*, 197 F. Supp. 2d 101, 110 (D. Del. 2002) (emphasis added): "The Federal Circuit . . . has specifically rejected as '*specious*' the argument that a United States court should adopt the conclusion of a foreign tribunal." *See also Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 907 (Fed. Cir. 1986) ("As a final effort to prove obviousness of the [patent-in-suit], [the alleged infringer] urges this court to adopt the conclusion of a German tribunal holding the [a counterpart to the patent-in-suit] obvious. *This argument is specious. The patent laws of the United States are the laws governing a determination* of obviousness/nonobviousness of a United States patent in a federal court.") (emphasis added); *Heidelberger Druckmaschinen AG v. Hantscho Commercial Products, Inc.*, 21 F.3d 1068, 1072 n.2 (Fed. Cir. 1994) ("We take notice of the fact that the theories and laws of patentability vary from country to country, as do examination practices.").

In asserting its claim construction position to this Court, Pharmacia ignored this line of cases and relied upon the foreign judicial decisions in urging this Court to adopt its proposed construction of the term "anthracycline glycoside." Sicor anticipates that Pharmacia will attempt to do the same before the jury with respect to Sicor's position that the '285 Patent is invalid for (1) obviousness and (2) lack of written description pursuant to 35 U.S.C. § 112, and in an attempt to persuade the jury that Sicor willfully infringed the '285 Patent. The federal

- 3 -

evidentiary rules, however, prohibit Pharmacia from doing so on relevance grounds. *See In re*

*Dulberg*, 472 F.2d 1394, 1398 (C.C.P.A. 1973) (emphasis added), which holds:

> We need not even consider the actions taken in foreign countries
> with regard to patentability of this application under our law. The
> granting of a patent on an "invention" in a foreign country *has no*
> *relevance* to the determination of whether the same "invention"
> would be obvious within the ambit of § 103 since *it is notoriously*
> *well known that the standards of patentability vary from country to*
> *country.*

Even if the foreign judicial decisions were marginally relevant, they should be excluded

from evidence pursuant to Fed. R. Evid. 403, which provides:

> Although relevant, evidence may be excluded if its probative value
> is substantially outweighed by the danger of unfair prejudice,
> confusion of the issues, or misleading the jury, or by
> considerations of undue delay, waste of time, or needless
> presentation of cumulative evidence.

Sicor anticipates that Pharmacia will attempt to play to the jury's understandable, but improper,

predisposition for crediting British, Australian and Canadian judicial determinations

notwithstanding that they are based on laws entirely different than those at issue here. Sicor does

not have the burden of proving to the jury that the foreign judicial decisions were incorrect under

United States law, and no such burden should be placed upon it. However, introduction of the

foreign judicial decisions will do just that, and manifestly prejudice Sicor in so doing. *See*

*Herrick*, 298 F.3d at 1192 ("Juries are likely to give disproportionate weight to [judicial findings

of fact] because of the imprimatur that has been stamped upon them by the judicial system.").

## CONCLUSION

For the foregoing reasons, Sicor respectfully requests that evidence and argument

concerning the foreign judicial decisions be precluded at trial.

17535267

- 4 -

A



Neutral Citation Number: [2005] EWCA Civ 137

Case No: A3/2004/2433

IN THE SUPREME COURT OF JUDICATURE
COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE HIGH COURT OF JUSTICE
CHANCERY DIVISION (PATENTS COURT)
Mr Roger Wyand QC
HC-04-CO1628

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 17/02/2005

Before :

THE PRESIDENT
THE RT HON LORD JUSTICE JACOB
and
THE RT HON LORD JUSTICE HOOPER
- - - - - - - - - - - - - - - - - - - -
Between :

(1) Mayne Pharma Pty Ltd
(2) Mayne Pharma plc

- and -

Pharmacia Italia SPA

Respond-
Ents/
Claimants
Appellant/
Defendant

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

Colin Birss  (instructed by Taylor Wessing) for the Claimants
Richard Miller QC (instructed by Clifford Chance) for the Defendant

Hearing date : 9 February 2005
- - - - - - - - - - - - - - - - - - - -

## Judgment Approved by the court for handing down (subject to editorial corrections)

PLAINTIFF'S
TRIAL EXHIBIT

**795**

04 CV 833

PU 0034827

CONFIDENTIAL

**Lord Justice Jacob:**

1.    This is a patentee's appeal in a case rightly subjected to the streamlined procedure. The litigation began on 17th May 2004 when the respondents ("Mayne") commenced proceedings for a declaration of non-infringement of Pharmacia's UK patent No. 2,178,311.  A counterclaim for infringement followed.   The only issue was whether Mayne's product falls within claim 1 of the Patent. The case was heard before Mr Roger Wyand QC, sitting as a Deputy Judge.  He gave judgment, holding non-infringement, on 1st November 2004 and granted permission to appeal.   So the case has gone from start to determination on appeal in less than 9 months.

*What the dispute is about*

2.    Mayne wish to sell an injectable solution of an anti-cancer drug called epirubicin (an anthracycline glycoside) hydrochloride.   They say it does not fall within any of the claims of the patent. Pharmacia say it does.  It is agreed that the whole question turns on claim 1.  This reads:

> "An    injectable,    ready-to-use,    sterile,    pyrogen-free, anthracycline glycoside solution which consists essentially of a physiologically acceptable salt of an anthracycline glycoside dissolved in a physiologically acceptable aqueous solvent therefor at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted to from 2.5 to 5.0 solely with a physiologically acceptable acid, the said acid being selected from hydrochloric, sulfuric, phosphoric, acetic,   succinic,   tartaric,   ascorbic,   citric,   glutamic, methanesulphonic or ethanesulphonic acid."

3.    "Lyophilization" (US spelling) means freeze-drying.  What Mayne do is described, it is agreed accurately, by the Deputy Judge as follows:

> "Mayne purchase epirubicin hydrochloride which has been subjected to a bulk lyophilization process.  Mayne takes this lyophilizate, dissolve it in water, add […].  The resulting solution is […] and is then filled into vials […]."

4.    So lyophilization of the epirubicin hydrochloride forms part of the history of Mayne's product, but it is not the immediate precursor to its production – it is an "upstream" process.  Is the final product nonetheless covered by the claim?  This turns on its meaning, particularly the words *solution ... which has not been reconstituted from a lyophilizate*. It is conceded that the Mayne process fulfils the remainder of the claim, pH adjustment with appropriate acid.

*The Principles of Construction*                                    PU 0034828

5.    To decide upon that meaning one must construe the claim in context.  I summarised the principles in paragraph 41 of my judgment in *Technip SA's Patent* [2004] RPC 919.   The House of Lords in *Kirin-Amgen* [2004] UKHL 46, through Lord Hoffmann's speech, has approved those principles (save for one minor matter) and

CONFIDENTIAL

provided a much fuller justification for them than did I. As a practical working guide, it will generally be sufficient to use my summary as approved. I repeat it here, but stripped down to bare essentials:

"(a)    The first, overarching principle, is that contained in Art 69 itself.

(b)    Art 69 says that the extent of protection is determined *by the terms of the claims*. It goes on to say that the description and drawings shall be used to interpret the claims. In short the claims are to be construed in context.

(c)    It follows that the claims are to be construed purposively – the inventor's purpose being ascertained from the description and drawings.

(d)    It further follows that the claims must not be construed as if they stood alone – the drawings and description only being used to resolve any ambiguity. Purpose is vital to the construction of claims.

(f)    Nonetheless purpose is not the be-all and end-all. One is still at the end of the day concerned with the meaning of the language used. Hence the other extreme of the Protocol – a mere guideline – is also ruled out by Art 69 itself. It is the terms of the claims which delineate the patentee's territory.

(g)    It follows that if the patentee has included what is obviously a deliberate limitation in his claims, it must have a meaning. One cannot disregard obviously intentional elements.

(h)    It also follows that where a patentee has used a word or phrase which, acontextually, might have a particular meaning (narrow or wide) it does not necessarily have that meaning in context.

(i)    It further follows that there is no general "doctrine of equivalents".

(j)    On the other hand purposive construction can lead to the conclusion that a technically trivial or minor difference between an element of a claim and the corresponding element of the alleged infringement nonetheless falls within the meaning of the element when read purposively. This is not because there is a doctrine of equivalents: it is because that is the fair way to read the claim in context.

(k)    Finally purposive construction leads one to eschew what Lord Diplock in *Catnic* called (at p.243):

PU 0034829

**CONFIDENTIAL**

"the kind of meticulous verbal analysis which lawyers are
too often tempted by their training to indulge.""

*The Skilled Man and Common General Knowledge*

6.      In this case it is agreed that the "Protocol questions" do not assist.    What matters is
the meaning of the claim read in context.    Since the claim is assumed to be read by
the person skilled in the art, it is sensible to begin by summarising his relevant
background knowledge - the common general knowledge.    I accept here, as Mr Birss,
for Mayne, contended, that the relevant notional skilled man would be a
pharmaceutical manufacturer, not merely a hospital pharmacist.    Such a man (or team)
would have knowledge not only of how the end product was to be used but also how
to make it.

7.      In particular he would know that:

i)      The active ingredient to be used for the invention (anthracycline glycosides)
were anti-tumour agents having widespread actual use;

ii)     The agents were very toxic so that any risk of medical staff or manufacturing
staff coming into accidental contact with them was serious;

iii)    The existing products on the market were vials containing a "cake" consisting
of a mixture of the active ingredient with an excipient such as lactose;

iv)     The vials were used by injecting solvent through the rubber stopper to dissolve
the cake.  Shaking was necessary.  Once the solid material had been dissolved
there could be a bit of adjustment to get the solution toward isotonicity;

v)      The cake within the vials consisted of a lyophilized product.  They were made
this way: the appropriate amount of a solution containing the active ingredient
and the excipient or bulking agent was placed in the open vials.  These were
placed in lyophilizing conditions.  Broadly (the details do not matter) this
consisted of freezing followed by low pressure to evaporate the ice;

vi)     The resulting product was, to use Mr Birss's word, "fluffy" – it had a low-bulk
density.  So there is more risk involved in handling this than handling
crystalline material.  The latter, being denser, is less apt to fly about;

vii)    The reason for using the solid product in the vials, rather than simply having a
solution was because solutions did not have very good stability – the product
would deteriorate.

*The specification of the patent*

8.      With that, I can turn to the specification.  Its title is "Injectable ready-to-use solutions
containing an antitumor anthracycline glycoside."    The opening general words say
this:

"The present invention relates to a stable intravenously
injectable ready-to-use solution of an antitumor anthracycline
glycoside, e.g. doxorubicin, to a process for preparing such a

PU 0034830

**CONFIDENTIAL**

solution, and provide the same in a sealed container, and to a
method for treating tumors by the use of the said ready-to-use
solution."

9.    Next it acknowledges that the anthracycline glycoside compounds are well known and
used as anti-tumor agents.    It then sets out the nature of the existing products on the
market:

"At present, anthracycline glycoside antitumor drugs, in
particular, e.g., doxorubicon, are solely available in the form of
lyophilized preparations, which need to be reconstituted before
administration."

10.    After summarising two references which discuss the dangers to medical personnel
from this type of agent in general, the patent says this:

"To administer a lyophilized preparation, double handling of
the drug is required, the lyophilized cake having to be first
reconstituted and then administered and, moreover, in some
cases, the complete dissolution of the powder may require
prolonged shaking because of solubilization problems."

11.    It then states the problem to be solved by the invention:

"As the risks connected with the manufacturing and the
reconstitution of a lyophilized preparate would be highly
reduced if a ready-to-use solution of the drug were available,
we have developed a stable, therapeutically acceptable
intravenously injectable solution of an anthracycline glycoside
drug, e.g. doxorubicin, whose preparation and administration
does not require either lyophilization or reconstitution."

12.    Next it sets out what the invention is in the so-called consistory clause.  It is repeated
in claim 1 so I need not set it out again.  There then follows a second consistory
clause, which corresponds to independent claim 31:

"A process for producing a solution according to any one of the
preceding claims; which process comprises dissolving the
physiologically acceptable salt of the anthracycline glycoside,
which salt is not in the form of a lyophilizate, in the
physiologically acceptable aqueous solvent therefor;  adding
solely the physiologically acceptable acid to adjust the pH
within the said range as desired;    optionally, adding an
additional component selected from a co-solublizing agent, a
tonicity adjustment agent and a preservative to the solution;
and then passing the resulting solution through a sterilising
filter."

13.    There then follows detail about how the solution is made.  None of the detail matters
for present purposes save this:  that the description of the detailed variants of the
process at no point mentions the use of lyophilized product.    All the 12 examples

start with the words "Doxorubicin.HCl was dissolved ..." without explicitly saying whether it was lyophilized or not.

14.    The last passage I need mention is a general statement on p. 9 about an advantage of the invention:

> "With the solutions of the invention it is possible to obtain compositions having a very high concentration of the anthracycline glycoside active substance even at 50 mg/ml. This constitutes a great advantage over the presently available lyophilized preparates wherein high concentrations of anthracycline glycoside can only be obtained with difficulty because of solubilization problems encountered in reconstitution, mainly with saline. The presence of the excipient, e.g. lactose, in the lyophilized cake, and its generally high proportion in respect of the active substance, even up to 5 parts of excipient per part of active substance, has a negative effect on solubilization so that difficulties may arise in obtaining dissolution of the lyophilized cake, especially for concentrations of anthracycline glycoside higher than 2 mg/ml."

*The detailed arguments on construction*

15.    Mr Richard Miller QC for the patentees contended that the patent was essentially about formulation of the ready-to-use solution. It was this formulation step which had not to involve lyophilization and its reconstitution on the ward. The starting materials for the formulation were not part of the invention. He submitted in detail that:

i)    The heart of the invention was, as its title said, an injectable ready-to-use solution.

ii)    The passage about "the manufacturing and the reconstitution" is of "such preparations", i.e. the vials on the market. It is saying that the making and use of these each involves exposing people to risk. The workers at risk are those who operate the lyophilizing machines containing the vials. The medical workers at risk are those who have to inject solution into the vials to reconstitute (dissolve) the solid material within them.

iii)    The passage about administration ("To administer a lyophilized preparation ..") is clearly only about the formulated product. The "lyophilized preparation" is that contained in such a product.

iv)    The passage about "The risks connected with the manufacturing and the reconstitution of a lyophilized preparate ..." is likewise about the final product. What it is saying is that if final product were a ready-to-use stable solution the risks would be reduced. The risks being talked about are those concerned with the manufacture of the vials containing lyophilized preparations and their use.

PU 0034832

CONFIDENTIAL

v)   The passage on p. 9 about the great advantage of the invention is by comparison with the "presently available lyophilized preparates" i.e. those on the market now.   It is saying you can get high concentration of the active ingredient and avoid the solubilisation problems of the prior art.   That has nothing to do with the nature of the original raw material active ingredient.

vi)   So the essential teaching of the patent is not concerned with the nature of that basic raw material.   It is about how you make a stable, ready-to-use solution from such a material.

vii)   The fact that claim 31 is more limited than claim 1 (as it is) makes no difference.  Claim 31 is, Mr Miller accepts, not infringed.  This is because it is specifically limited to a process which starts with a raw material ("salt") which "is not in the form of a lyophilizate".  Mr Miller says that by contrast in claim 1 it is "the solution which has not been reconstituted from a lyophilizate".  There is a shift from the unlyophilized starting material of claim 31 to the unlyophilized material used to make the ready-to-use solution.

16.   Mr Birss submits that his case is crucially dependent upon whether the Deputy Judge was right in his paragraph 36:

"36.   On a fair reading of the claims and in the context of the specification and such evidence of common general knowledge as is before me I find that the skilled addressee would form the view that the patentee regarded lyophilization as not just an unnecessary but as an undesirable process step in the production of the injectable solution and intended to exclude a solution made by the use of such a step, even if it were to be followed by other steps, such as the adjustment of pH and sterilising by filtration."

17.   Putting it another way, he submitted that the whole teaching of the patent is about the complete avoidance of lyophilization.  You do not need lyophilization at any stage.  And it is that which is to be avoided if you are to avoid danger to workers during any part of the manufacture.   As he put it "you can throw away the lyophilizing machine."

18.   He drew a homely analogy – with instant coffee.  If you want a cup of real coffee (i.e. coffee which has not been reconstituted from a lyophilizate) containing milk and sugar you will not be satisfied with a cup of instant coffee where the milk and sugar has been added after the reconstitution.

19.   Mr Birss further relied upon the process aspect of the invention – claim 31.  First he pointed out that if the examples were truly indifferent as to whether the starting material was lyophilized or not, then none of them would be examples of the process of the invention.  So it was implicit that the starting material was not lyophilized.  Second he submitted that claim 31 tracks claim 1 and in particular both claims use the word "lyophilizate".  If Mr Miller were right then the word would have a different meaning in each claim which was improbable.

*The Deputy Judge's conclusions*

PU 0034833

**CONFIDENTIAL**

20.     I have already quoted the most crucial paragraph of his judgment. But I should mention some other points too. First there is the way he dealt with claim 31. He said this:

> "28.     Pharmacia counters by saying that claim 31 is effectively dependent on claim 1 and is therefore narrower than claim 1 and should be construed in such a way. This is not strictly correct. Claim 31 is a process claim whereas claim 1 is a product claim. Whilst it is correct that the process of claim 31 may not be the only process that will produce a product within claim 1 this does not mean that it must necessarily be construed as a subset of the processes that can produce such a product. There may be other processes: there may not. It is neutral."

21.     I think that is right. In general in a patent with product and process claims one may perhaps expect the process to produce the product, but there is no necessary corollary that the product must be made only by the process. All depends on the language used in context.

22.     In the preceding paragraph the Judge said this:

> "27.     Mayne submit that their product is made by the process of claim 31 except that the salt of the anthracycline glycoside which they dissolve is in the form of a lyophilizate. Thus, they do not infringe claim 31, as is acknowledged by Pharmacia. They point out that the examples being silent as to how the API is produced, it must be assumed that the API is not a lyophilizate otherwise there is no example of the process claimed. Thus, they say, the skilled addressee would understand the phrase in claim 1 "which has not been reconstituted from a lyophilizate" as excluding a solution which has been made by the process of claim 31 but with the starting material, the API, being a lyophilizate."

23.     Mr Birss submitted that the Judge's comment about the claim 31 argument being "neutral" did not apply to this paragraph. I think he is right. On the other hand the Judge here does no more than record Mr Birss' argument about the examples. He never found it necessary to take the argument specifically into account, though he may have done in his crucial paragraph 36.

24.     Next I should mention the Judge's paragraphs 33 and 34:

> "I have two problems with Pharmacia's approach to construction of the disputed phrase. The first is that even if the patent does not teach achieving stability by adjusting the pH the claim also refers to an anthracycline glycoside concentration of from 0.1 to 50 mg/ml. The passage set out above from page 9 line 11 of the patent explains that this is an advantage over "the presently available lyophilized preparates". I have heard no evidence as to how the skilled addressee would regard this passage but on its face it seems to be teaching away from the use of lyophilizates.

PU 0034834

**CONFIDENTIAL**

The second problem is more fundamental. If one concludes that the skilled addressee does not regard the disputed phrase as necessarily excluding **any** lyophilization/reconstitution step, where does he/she draw the line? The suggestion by Pharmacia is that the skilled addressee would understand the phrase to mean that lyophilization was not used on the final product but could have been used on a precursor. This, says Pharmacia, would only exclude precisely what was done before in the hospital pharmacy."

25.   I do not agree with either of these points. As Mr Miller pointed out the passage on p.9 is by way of contrast with the existing product – "the teaching away from lyophilizates" relates only to lyophilizates in the final product.

26.   Nor do I see any real problem about where the line is drawn. Mr Miller put it this way: "only if the step of reconstitution produces a ready-to-use solution is there no infringement." Mr Birss suggested there was a problem here: suppose you reconstituted and then diluted the solution or added saline for isotonicity – as you sometimes did with the prior art. Would that mean no infringement? I see no problem. The product is either ready-to-use or it is not. If it is, then if the immediately prior step was reconstitution, there is no infringement – otherwise there is.

27.   Finally the Judge thought there was support from a linguistic analysis of the claim. I do not go into the detail of this – Mr Birss did not seek to support it as such. His support for the Judge, as I have already said, rested essentially on paragraph 36.

*My opinion*

28.   I have come to the conclusion that Mr Miller is right, essentially for the reasons he advanced. I need elaborate only a little. I think the skilled man would see the real point of the teaching in the description as being the provision of a stable, ready-to-use solution. Such a desirable substance was not previously available. The patent teaches him how to make it. He can make it without having to lyophilize the material in the vials. He knows he will have to start his formulation with active ingredient raw material. But he would not regard the nature of that as part of the formulation process. The patent teaches him how to do away with a previously essential lyophilization.

29.   When he comes to read claim 1, knowing that its purpose in law is to set out the monopoly, he sees that it is the "ready-to-use solution" which must not "have been reconstituted from a lyophilizate." With the understanding of the purpose and teaching of the description he would read it as meaning that the solution itself has not been made by reconstitution – it is avoidance of that which fulfils the purpose of doing away with the previously essential step. If he considered the nature of the starting raw material, lyophilized or not, he would see it made no real difference – just that starting with lyophilizate would introduce an unnecessary complication.

30.   I think this construction is that which is consistent with the inventor's purpose as disclosed in his specification – the manufacture of a ready-to-use solution which does not involve the previously essential lyophilization stage.

**PU 0034835**

**CONFIDENTIAL**

31.    As to Mr Birss's coffee example, like many analogies it is beguilingly misleading –
there is no true analogy because coffee in its raw material form can never be
lyophilized.   Nor do I think it matters whether the examples are read as starting with
unlyophilized material – whether they do or not is not what matters because they are
essentially about producing the stable solution.

32.    Accordingly I would allow the appeal.    I would not want to part from this case
without paying tribute to the high quality of the argument on both sides.    Sadly,
however, I must also record the fact that I was most disappointed to see the quite
extraordinary number of files of paper produced, quite unnecessarily, for this appeal.
We were only referred to two pages not included in the one main file.  They were
obviously not wanted on voyage or to put it more formally not "relevant to
proceedings in the Court of Appeal" within the meaning of para. 15.1(1) of the
Practice Direction to Part 52 of the CPR.  No doubt this will be taken into account on
assessment of costs.

**Lord Justice Hooper:**

33.    I agree.

**Dame Elizabeth Butler-Sloss P:**

34.    I also agree.

PU 0034836


CONFIDENTIAL

B

PLAINTIFF'S
TRIAL EXHIBIT
**796**
04 CV 833

# FEDERAL COURT OF AUSTRALIA

## Pharmacia Italia S.P.A v Mayne Pharma Pty Ltd [2005] FCA 1066

**INTELLECTUAL PROPERTY** – patents – claim for infringement – clarity of expression used in a claim – exclusionary integer – principles of construction – whether permissible to qualify a claim by reference to the body of specification – whether substance of invention taken.

*Patents Act 1990* (Cth), ss 40(2)(b), 117, 120

*Assidoman Multipack (formerly Multipack Wraparound Systems) v Mead Corporation* [1995] RPC 321 cited

*Attorney-General v Prince Ernest Augustus of Hanover* [1957] AC 436 cited

*Catnic Components Ltd v Hill & Smith Ltd (No. 1)* [1982] RPC 183 discussed

*Clark v Adie* (1875) LR 10 Ch. App. 667 cited

*Commonwealth Industrial Gases Ltd v MWA Holdings Pty Ltd* (1990) 180 CLR 160 followed

*Décor Corporation Pty Ltd v Dart Industries Inc* (1998) 13 IPR 385 applied

*Electric & Musical Industries Ltd v Lissen Pty Ltd* (1936) 54 RPC 23 cited

*Flexible Steel Lacing Co v Beltreco Ltd* (2000) 49 IPR 331 cited

*General Tire & Rubber Co. v Firestone Tyre & Rubber Co Ltd (No. 1)* [1972] RPC 457 cited

*Improver Corp v Remington Consumer Products Ltd* [1990] FSR 181 cited

*Interlego AG v Toltoys Pty Ltd* (1973) 130 CLR 461 cited

*Kimberly-Clark Australia Pty Limited v Arico Trading International Pty Limited and Others* (2001) 207 CLR 1 applied

*Kirin-Amgen Inc v Hoescht Marion Roussel Ltd* [2005] 1 All ER 667 cited

*Leonardis v Sartas No. 1 Pty Ltd* (1996) 67 FCR 126 cited

*Marconi v Mullard* (1923) 40 RPC 159 cited

*Martin Engineering Co v Trison Holdings Pty Ltd* (1989) 14 IPR 330 cited

*Mayne Pharma Pty Ltd and Mayne Pharma plc v Pharmacia Italia SPA* [2005] EWCA Civ 137 considered

*Minerals Separation North American Corp v Noranda Mines* (1952) 69 RPC 81 cited

*Minnesota Mining and Manufacturing Co v Beiersdorf (Australia) Ltd* [1979-1980] 144 CLR 253 cited

*Nesbit Evans Group Australia Pty Ltd v Impro Ltd and Anor* (1997) 39 IPR 56 cited

*Nicaro Holdings Pty Ltd v Martin Engineering Co* (1990) 91 ALR 513 cited

*Olin Corporation v Super Cartridge Co Pty Ltd and Anor* (1977) 51 ALJR 525 applied

*Populin v H.B. Nominees Pty Ltd* (1982) 41 ALR 471 applied

*Radiation Ltd v Galliers & Klaerr Pty Ltd* (1938) 60 CLR 36 applied

*Rehm Pty Ltd v Websters Security Systems (International) Pty Ltd and Ors* (1988) 81 ALR 79 cited

*Root Quality Pty Ltd and Anor v Root Control Technologies Pty Ltd and Others* (2000) 177 ALR 231 cited

*Walker v Alemite Corp* (1933) 49 CLR 643 applied

*Welch Perrin and Company Proprietary Limited v Worrel* (1961-1962) 106 CLR 588 followed

- 2 -

GS Banker and CT Rhodes, *Modern Pharmaceutics* (1979)
*Dictionary of Pharmacy, Pharmaceutical Products Press,* 2004

PHARMACIA ITALIA S.P.A and PFIZER (PERTH) PTY LIMITED v MAYNE
PHARMA PTY LTD and F H FAULDING & CO LTD and FAULDING
HEALTHCARE PTY LTD

VID 439 OF 2003

CRENNAN J
5 AUGUST 2005
MELBOURNE

GENERAL DISTRIBUTION

IN THE FEDERAL COURT OF AUSTRALIA

VICTORIA DISTRICT REGISTRY

V439 OF 2003

BETWEEN:         PHARMACIA ITALIA S.P.A
                 FIRST APPLICANT

                 PFIZER (PERTH) PTY LIMITED
                 SECOND APPLICANT

AND:             MAYNE PHARMA PTY LTD
                 FIRST RESPONDENT

                 F H FAULDING & CO LTD
                 SECOND RESPONDENT

                 FAULDING HEALTHCARE PTY LTD
                 THIRD RESPONDENT

JUDGE:           CRENNAN J
DATE OF ORDER:   5 AUGUST 2005
WHERE MADE:      MELBOURNE

THE COURT ORDERS THAT:

1.   The parties to prepare short minutes of final orders on liability in accordance with
     these reasons and include any other orders or directions as appropriate for the further
     disposition of the matter.

Note:   Settlement and entry of orders is dealt with in Order 36 of the Federal Court Rules.

GENERAL DISTRIBUTION

IN THE FEDERAL COURT OF AUSTRALIA

VICTORIA DISTRICT REGISTRY

V439 OF 2003

BETWEEN:        PHARMACIA ITALIA S.P.A
                FIRST APPLICANT

                PFIZER (PERTH) PTY LIMITED
                SECOND APPLICANT

AND:            MAYNE PHARMA PTY LTD
                FIRST RESPONDENT

                F H FAULDING & CO LTD
                SECOND RESPONDENT

                FAULDING HEALTHCARE PTY LTD
                THIRD RESPONDENT

JUDGE:          CRENNAN J
DATE:           5 AUGUST 205
PLACE:          MELBOURNE

REASONS FOR JUDGMENT

INTRODUCTION

1        This proceeding concerns the alleged infringement of Australian Patent No. 598197, entitled 'Injectable ready-to-use solutions containing an antitumor anthracycline glycoside' ('Patent') within s 117 of the *Patents Act 1990* (Cth) (the '*Patents Act*'). The first applicant, Pharmacia Italia S.p.A, a company incorporated in Italy, is the registered proprietor of the Patent; the second applicant, Pfizer (Perth) Pty Limited, a company incorporated in Australia, is a manufacturer of pharmaceuticals (together, 'the applicants'). Since 23 July 2003 the second applicant has been the exclusive licensee in Australia of the invention described in the Patent in relation to epirubicin hydrochloride.

2        The first respondent, Mayne Pharma Pty Ltd is a manufacturer, distributor and exporter of pharmaceutical products. The second and third respondents are F H Faulding & Co Ltd, and Faulding Healthcare Pty Ltd respectively. The three respondent companies form

- 2 -

part of the Mayne Pharma group of companies, all of which are incorporated in Australia (together, 'the respondents'). The applicants allege that the respondents have infringed certain claims of the Patent by 'manufacturing, selling, using and keeping a ready –to-use antitumor anthracycline glycoside solution as claimed in the Patent' (the 'respondents' product') and have made application to this court under s 120 of the *Patents Act*.

3        It is noted that on 23 July 2003 an order by consent was made in the following terms:

> 'The decisions of the questions of law and issues of fact in respect of the validity (if put in issue by way of Cross-claim) and liability for infringement of Australian Letters Patent 598197 be made separately from and before any other question in the proceeding.'

Accordingly, the only question to be resolved by the Court, at this stage, is whether the respondents have infringed certain claims of the Patent by making and selling epirubicin hydrochloride in injectable ready-to-use solutions.

4        The primary issue of infringement is whether the respondents' product has been 'reconstituted from a lyophilizate' as that phrase is used in Claim 1 of the Patent, which states that the invented pharmaceutical product 'has not been reconstituted from a lyophilizate'. A secondary issue is whether the specific occasions on which the respondents used sodium hydroxide, in addition to hydrochloric acid, to adjust the pH of the solution avoid infringement, when Claim 1 of the Patent refers to the pH being adjusted '**solely** with a physiologically acceptable acid' (emphasis added).

5        The invention, the subject of the Patent relates to:

(a) a pharmaceutical product, being a stable intravenously injectable ready-to-use solution of an antitumor anthracycline glycoside, e.g. doxorubicin;

(b) a process for preparing such a solution, [providing] the same in a sealed container; and

(c) a method for treating tumours by the use of the ready-to-use solution.

6        The priority date of the Patent is 2 August 1985. Anthracycline glycosides are anticancer drugs which were well known at the priority date. It appears that at that time they were commercially available solely in the form of lyophilized preparations (in a solid form) that needed to be reconstituted into an injectable form (a liquid) before administration to a patient.

7          Lyophilization is a process which is colloquially described as 'freeze-drying' whereby the temperature of the subject material is lowered to freeze it. A vacuum is drawn then the temperature is raised such that the frozen solvent (usually water) sublimates directly from a solid to a gas. Accordingly, a 'lyophilizate' is the dried or solid form of a product which was formerly in a liquid form and has undergone lyophilization.

8          Anthracycline glycosides cannot be administered to a patient in their lyophilized solid form yet they are unstable in aqueous solution and degrade, resulting in both a loss of pharmaceutical activity and the precipitation of solid particles, which prevents them from being administered intravenously.   Because of the problems related to instability, anthracycline glycosides were not manufactured in the form of ready-to-use solutions before the priority date. As mentioned above, they were only marketed in the form of a lyophilized solid in a vial, which was required to be reconstituted into a liquid form before the product could be injected into a patient.

9          In the body of the Patent specification it is noted that the manufacturing and reconstitution of such preparations expose the personnel involved to risks of contamination which are particularly serious because of the toxicity of the antitumour substances. The complete specification states:

          *'To administer a lyophilized preparation, double-handling of the drug is required, the lyophilized cake having to be first reconstituted and then administered and, moreover, in some cases, the complete dissolution of the powder may require prolonged shaking because of solubilization problems.'* (p2)

10         The complete specification indicates that the invention is targeted at circumventing the problems of handling cytotoxic material safely:

          *'As the risks connected with the manufacturing and the reconstitution of a lyophilized preparate would be highly reduced if a ready-to-use solution of the drug were available, we have developed a stable, therapeutically acceptable intravenously injectable solution of an anthracycline glycoside drug, e.g. doxorubicin, whose preparation and administration does not require either lyophilization or reconstitution.'* (p2)

### THE COMPLETE PATENT SPECIFICATION

11         The entitlement of the complete specification is set out in paragraph 1 above. The body of the Patent specification describes the product, process and method of treatment

- 4 -

which are defined in the claims thus:

> 'The present invention relates to a stable intravenously injectable ready-to-use solution of an antitumour anthracycline glycoside, e.g. doxorubicin, to a process for preparing such a solution, and provide the same in a sealed container, and to a method for treating tumours by the use of the said ready-to-use solution.'

12      Then follows a description of relevant prior art and the problems which the invention seeks to overcome as set out in paragraphs 9 and 10 above.

13      The complete specification then sets out the consistory clause for the product, which underlines Claim 1, as follows:

> 'According to the present invention, there is provided a sterile, pyrogen-free, anthracycline glycoside solution which comprise a physiologically acceptable salt of an anthracycline glycoside dissolved in a physiologically acceptable aqueous solvent therefor at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate, and the pH of which has been adjusted from 2.5 to 5.0 solely with a physiologically acceptable acid. Preferably the solution of the invention is provided in a sealed container.'

14      The language of the consistory clause for the product is then reflected in a preferred embodiment as follows:

> 'According to a particularly preferred embodiment of the invention, there is provided a sterile, pyrogen-free, doxorubicin solution which consists essentially of a physiologically acceptable salt of doxorubicin dissolved in a physiologically acceptable solvent therefor at a doxorubicin concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted from 2.5 to 5.0 solely with a physiologically acceptable acid.'

15      The complete specification then sets out the consistory clause for the process as follows:

> 'The invention also provides a process for producing a sterile, pyrogen-free anthracycline glycoside solution with a pH of from 2.5 to 5.0, which process comprises dissolving the physiologically acceptable salt of the anthracycline glycoside, which salt is not in the form of a lyophilizate, in the physiologically acceptable solvent therefor; adding solely a physiologically acceptable acid to adjust the pH within the said range as desired; passing the resulting solution through a sterilising filter and, optionally, adding an additional component selected from a co-solubilizing agent, a tonicity adjustment agent and a preservative, for instance of the kind previously specified, to the solution prior to passing the solution through the sterilising filter.'

- 5 -

16          The complete specification then proceeds:

> 'With the solutions of the invention it is possible to obtain compositions
> having a very high concentration of the anthracycline glycoside active
> substance even at 50 mg/ml and more. This constitutes a great advantage
> over the presently available lyophilized preparates wherein high
> concentrations of anthracycline glycoside can only be obtained with difficulty
> because of solubilization problems encountered in reconstitution, mainly with
> saline. The presence of the excipient, e.g. lactose in the lyophilized cake, and
> its generally high proportion in respect of the active substance, even up to 5
> parts of excipient per part of active substance, has a negative effect on
> solubilization so that difficulties may arise in obtaining dissolution of the
> lyophilized cake.'

17          Then the complete specification sets out the consistory clause for the method as
follows:

> '... according to the invention there is also provided a method of inhibiting
> the growth of a tumour, in particular one of those indicated above, which
> comprises administering to a host suffering from said tumour an injectable
> solution according to the invention containing the active drug substance in an
> amount sufficient to inhibit the growth of said tumour. The injectable
> solutions of the invention are administered by rapid intravenous injection or
> infusion according to a variety of possible dose schedules.'

18          Further, in terms of preferred embodiments, the complete specification then provides
12 examples which 'illustrate but do not limit in any way the invention' and they include the
dissolution of doxorubicin, and the adjustment of the solution's pH, followed by the filtration
and containment of the solution in sealed vials. The stability of the 12 solutions is then
described over various periods of time.

19          The invention is the subject of 26 claims. The pharmaceutical product (solution)
claims are claims 1 to 19 and 22. The process claims are claims 20, 21, 23 and 24 and the
claims relating to a method of treatment using the product are claims 25 and 26.

20          The applicants allege the respondents have infringed:

(a)     product claims 1 to 3, 5 to 10, 14 and 15; and

(b)     method claims 25 and 26.

21          Claim 1 is the only independent claim relating to a solution of the invention and the
only claim that refers to the invention as a solution 'which has not been reconstituted from a

- 6 -

lyophilizate' and 'the pH of which has been adjusted from 2.5 to 5.0 solely with a physiologically acceptable acid.'

22      The parties are agreed that resolution of the construction of Claim 1, in respect of those parts emphasised below, will resolve the controversy between them. Claim 1 is now set out with numbers (1) to (6) interpolated to identify its six integers:

'1.    (1)    A sterile,

       (2)    pyrogen-free

       (3)    anthracycline glycoside solution

       (4)    which comprises

              (i) a physiologically acceptable salt of an anthracycline glycoside

              (ii) dissolved

                   (a)  in a physiologically acceptable aqueous solvent therefor

                   (b)  at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml,

       (5)    which has not been reconstituted from a lyophilizate

       (6)    and the pH of which

              (i)  has been adjusted from 2.5 to 5.0

              (ii) solely with a physiologically acceptable acid.'

23      It is also necessary to set out Claim 20, the process claim, relied on by the respondents as an aid to construing Claim 1:

'20.   A process for producing a sterile, pyrogen-free, anthracycline glycoside solution with a pH of from 2.5 to 5.0, according to any one of the preceding claims; which process comprises dissolving a physiologically acceptable salt of the anthracycline glycoside, which salt is not in the form of a lyophilizate, in a physiologically acceptable aqueous solvent therefore; adding solely a physiologically acceptable acid to adjust the pH within the said range as desired; passing the resulting solution through a sterilising filter; and, optionally, adding an additional component selected from a cosolubilizing agent, a tonicity adjustment agent and a preservative to the solution prior to passing the solution through the sterilising filter.'

24      The invention is for a new combination. Accordingly, to establish infringement, the applicants must demonstrate that the respondents have taken 'each and every one of the essential integers': *Populin v H.B. Nominees Pty Ltd* (1982) 41 ALR 471 at 475. The respondents have admitted their product has the features of the new combination in Claim 1

- 7 -

except those covered by integer (5) and the emphasised part of integer (6)(ii).

25        Each of the respondents is involved in one of the manufacture, distribution or sale of
the respondents' product. In a written outline of submissions, the respondents' product is
described as:

> '. . . a sterile, pyrogen-free anthracycline glycoside solution which comprises
> a physiologically acceptable salt of an anthracycline glycoside dissolved in a
> physiologically acceptable aqueous solvent therefor at an anthracycline
> glycoside concentration of from 0.1 to 50 mg/ml. The pH of the solution has
> been adjusted to a figure within the range of 2.5 to 5.0.'

26        The respondents assert that their product does not infringe the Patent because, at an
early stage in the manufacturing process, the dissolution of bulk lyophilizate takes place, and
that therefore their solution has been 'reconstituted from a lyophilizate', a feature of
production which it asserts is expressly excluded by Claim 1 of the Patent. It can be noted in
this context that the applicant conceded that the bulk powder used in the manufacture of the
respondents' product is a lyophilizate.

27        The applicants assert that the Patent is to be construed such that the words 'which has
not been reconstituted from a lyophilizate' in Claim 1 are limited to mean the process that
takes place just prior to administration of the solution to a patient. They submit that the
expression means (and thereby excludes from the monopoly claimed) solutions made up
shortly before administration to a patient, which were known at the priority date and does not
mean the dissolution of the lyophilizate in the respondents' method of manufacture.
Therefore, it is submitted, the respondents' product is within the scope of Claim 1.

28        Thus the two questions to be resolved by the court are whether (i) the respondents'
product has been 'reconstituted from a lyophilizate' as the phrase is used in Claim 1 and (ii)
the pH of the respondents' product has been adjusted solely with a physiologically acceptable
acid.

29        The claims in a complete specification define the invention: s 40(2)(b) of the *Patents
Act*. They mark out the monopoly operating to disclaim what is not specifically and
definitely claimed: *Walker v Alemite Corp* (1933) 49 CLR 643 at 656. This is to ensure that
the public and specifically a manufacturer will not have difficulty being satisfied that a claim
is not infringed: *General Tire & Rubber Co. v Firestone Tyre & Rubber Co Ltd (No. 1)*

- 8 -

[1972] RPC 457 at 515 (*'General Tire & Rubber Co.'*). There are no special rules for the interpretation of patent specifications: *Décor Corporation Pty Ltd v Dart Industries Inc* (1998) 13 IPR 385 at 391 (per Lockhart J) (*'Décor'*). The approach to be taken is discussed by the High Court in *Kimberly-Clark Australia Pty Limited v Arico Trading International Pty Limited and Others* (2001) 207 CLR 1 at [24] (*'Kimberly-Clark'*):

> *'It is well settled that the complete specification is not to be read in the abstract; here it is to be construed in the light of the common general knowledge and the art before 2 July 1984, the priority date; the court is to place itself "in the position of some person acquainted with the surrounding circumstances as to the state of [the] art and manufacture at the time".'*

30    The parties were substantially in agreement that the skilled addressee for the purposes of this case was a 'team' as is appropriate with highly developed technology: *General Tire & Rubber Co.* at 485. The team included not only a pharmacist working in a hospital but also persons involved in the manufacture of cytotoxic drugs for hospital pharmacists, as at the priority date 2 April 1985.

31    Speaking broadly, it was contended for the applicants that the word 'reconstituted' as it occurs in the phrase 'has not been reconstituted from a lyophilizate' in Claim 1 was a term of art. It was conceded that the word had an ordinary English meaning in pharmaceutical science but it was contended that it also had a specialist meaning in pharmaceutical science. Thus the word 'reconstitution' was capable of having more than one meaning. It was submitted that ambiguity or lack of clarity could be dispelled by resort to the body of the specification.

32    Alternatively, if 'reconstituted' as used in Claim 1 is not a term of art, it was contended that the complete specification, ie. the context showed the expression was used in a special and narrow sense. Either way the exclusionary integer would indicate to the skilled addressee that the invention did not cover known prior art.

33    It was contended for the respondents that the word 'reconstituted' as used in Claim 1 is not a term of art. Next, it was submitted it was a word of ordinary English meaning, which as a matter of principle precluded resort to the body of the specification to qualify Claim 1. Further, the express terms of Claim 1 were relied on as not limiting the phrase in contention, to solutions in a vial or to injectable solutions. It was submitted that the applicants' attempts to construe the exclusionary integer narrowly should fail.

- 9 -

34.    Numerous experts gave evidence about the meaning of the term 'reconstituted' which is unexceptional given the terms of the dispute: *Minnesota Mining and Manufacturing Co v Beiersdorf (Australia) Ltd* [1979-1980] 144 CLR 253 at 270 ('*Minnesota Mining*'); *Leonardis v Sartas No. 1 Pty Ltd* (1996) 35 IPR 23 at 36.

35    The applicants' experts did not dispute the fact that 'reconstitution' has a usual, or as they put it, general meaning, perhaps best exemplified by the relevant entry in the 1982 *Supplement to the Oxford English Dictionary*:

> '*reconstituted, that has been constituted or formed anew; applied spec. to food which has been dehydrated and subsequently made ready for use by adding liquid.*'

36    It was also conceded by the applicants that the word 'reconstituted' was used in the pharmaceutical sciences with a usual but narrower meaning of describing the step of putting lyophilized material into solution. This is exemplified in an entry after the priority date in the *Dictionary of Pharmacy, Pharmaceutical Products Press, 2004*:

> '*reconstitution   process of adding a solvent or suspending liquid (usually purified water) to a previously prepared spray-dried or freeze-dried drug formulation intended to be used in a short period of time (usually within two weeks) after the addition (generally refrigerated following reconstitution); example: reconstitution of an antibiotic suspension*'

37    Professor Stella, an American Professor of Pharmaceutical Chemistry, gave evidence on behalf of the applicants that as at the priority date, in 1985, all anthracycline glycosides were supplied for use as lyophilizates prepared in a particular way to produce an intravenously injectable solution.

38    Dr Williams, a specialist pharmacist in manufacturing from Westmead Teaching Hospital in New South Wales, gave evidence on behalf of the applicants of his experience also as at the relevant date. He gave evidence that anthracycline glycosides were provided to pharmacists in single dose sealed vials:

> '. . . *which had to be prepared by the pharmacist for administration to the patient by a reconstitution. A reconstitution was carried out as part of the general dispensing process in response to receipt of a prescription. The doses were reconstituted immediately prior to the administration to a patient, either on the day of administration or no more than one day before administration.*'

- 10 -

He also gave evidence he performed many such reconstitutions and trained many others in the procedure:

> 'Pharmacists used the term "reconstitution" to describe the act of adding a sterile diluent to a sterile solid drug in a vial (or, rarely, in an ampoule) to dissolve or suspend the drug in order to prepare an injection, installation or irrigation, and a product which is reconstituted has been prepared in this way.
>
> In the specific context of reconstituting cytotoxic drugs for intravenous injection, other important aspects of a reconstitution include the fact the resulting product must be fully dissolved and that the reconstituted solution must be free of pyrogens.
>
> Reconstitution technique is an important element of pharmacy training and practice. Hospital pharmacists, in particular, may perform reconstitutions many times a day; larger hospitals including Westmead have dedicated reconstitution units including cytotoxic reconstitution units, as I have mentioned. Accordingly, reconstitution is a well known procedure and the term "reconstituted" is well understood by pharmacists.'

He did not accept that 'reconstitution' was a synonym for 'dissolution' in the context of hospital pharmacy practice.

39      The applicants also relied on the evidence of Dr Marshall, a Consulting Pharmaceutical Scientist from South Australia who gave the following evidence:

> 'I have been asked . . . to consider what term or expression would be used by pharmaceutical formulation chemists to describe the step where a lyophilizate is put into solution as part of a manufacturing process. The words I would use are "dissolve" or "dissolution". The words "dissolve" and "dissolution" are in my experience frequently used both orally and in writing (such as in operating manuals or manufacturing instructions) in describing processes involving putting solid pharmaceutical compounds into solution. I cannot recall (before or after 1985) seeing the words "reconstitute" or "reconstitution" used in a technical document (of which I have seen hundreds) relating to the process of dissolving pharmaceutical compounds in the manufacturing of pharmaceuticals or formulations of such pharmaceuticals.
>
> The word "reconstitution" is, however, used in the pharmaceutical industry in relation to finished product powders, whether lyophilized or not, which are dissolved or suspended before administration to a patient . . .'

40      Dr Marshall referred to the text Modern Pharmaceutics by Gilbert S. Banker and Christopher T. Rhodes (1979) which states:

> 'Several ophthalmic drugs are prepared as sterile powders for reconstitution

- 11 -

> *by the pharmacist before dispensing to the patient... The sterile powder is usually manufactured by lyophilization and is packaged separately from the diluent, and a sterile dropper assembly is provided. In powder form these drugs have a much longer shelf life than that of their solution forms. The pharmacist should use only the diluent provided with the product since it has been developed to maintain the optimum potency and preservation of the reconstituted solution. The pharmacists should use great care in performing the reconstitution to prevent microbial contamination of the sterile product and dropper. Each product has an expiration date for the reconstituted solution which should be explained to the patient along with the proper storage conditions and method of usage.'*

41        Professor Peter Stewart, Head of the Department of Pharmaceutics, Victorian College of Pharmacy, upon whom the applicants also rely, echoed the evidence of Dr Marshall as follows:

> *'Reconstitution has a particular meaning in the context of pharmacy. It refers to the following fundamental steps taken shortly before administration of the drug to the patient.*
> > *(a) Taking a solid form of an active pharmaceutical compound (plus any excipients).*
> > *(b) Adding a solvent to the solid to make an acceptable delivery system.*
> *The delivery system produced by reconstitution is referred to as "reconstituted".'*

Dr Stewart also gave evidence that:

> *'For injectable delivery systems reconstitution is usually a matter of hours before administration.'*

42        Dr Richard Oppenheim, a chemist with some 30 years experience in the area of 'human pharmaceuticals', was at the relevant time a member of the Pharmaceutics faculty of the Victorian College of Pharmacy in Melbourne. He gave clear evidence on behalf of the respondents that:

> *'The term "reconstitution" refers to the process of adding a suitable and appropriate liquid or liquid system to a solid that has previously been associated with that liquid or some other liquid system, to form a solution, dispersion or suspension suitable for its intended use. If a solid has undergone the process of reconstitution by the addition of a suitable liquid or liquid system, the resultant solution, dispersion or suspension is said to have been "reconstituted".'*

He also gave evidence of an instance of doxorubicin being available as bulk lyophilizate for research purposes only, as at the priority date. In this respect, his knowledge and experience differed from that of the other experts.

- 12 -

43        Dr Kenneth Brown, Consultant Pharmaceutical Scientist in Pharmaceutics, from New South Wales, provided a similar assessment as follows:

> *'The process of reconstitution does not necessarily involve bringing the solution back to exactly the same form as the previous solution. The practical essence of reconstitution is the re-association of the lyophilizate with solvent.*
>
> *In the pharmaceutical sciences "reconstitution" includes the reconstitution of a lyophilized product by a pharmacist immediately prior to administration. However, this is not the only meaning of the term. "Reconstitution" is a broad and non-specific term which applies at any time a lyophilizate is redissolved into a solvent or passes into solution.'*

44        The respondents' experts did not disagree that 'reconstitution' has a meaning, in the pharmaceutical sciences, of 'reconstitution of a lyophilized product prior to administration to a patient'. However, they did not accept that reconstitution in that pharmacy context can only occur shortly before administration to a patient. When cross-examined about the references to 'lyophilized cake' and the reconstitution of 'a lyophilized preparate' which occur in the passages extracted respectively in paragraphs 9 and 10 above describing the prior art, Dr Oppenheim agreed these reference were to material in a vial, that is, they were references to the drug as it was available in a hospital environment. Dr Brown also agreed that the reference to 'lyophilizate preparate' extracted in paragraph 10 above is a reference to the product available in the hospital environment.

45        I now turn to consider submissions in more detail. Mr Caine, of senior counsel, appearing for the applicants conceded that the term 'reconstituted' has a general meaning in the context of pharmaceutical sciences to describe the step of putting lyophilized material into solution. However, he submitted that 'reconstituted' was used also as a term of art in the context of cytotoxic drugs which meant the process of preparing a liquid dosage form of a cytotoxic drug before administration to a patient. He submitted that the essence of the invention is a reformulation of a known drug in a ready-to-use solution which was something that had never before been achieved. I agree with that description of the essence of the invention. He then submitted the context of the specification makes it clear that the phrase in contention in Claim 1 was a disclaimer in respect of the prior art. It was a reference to the lyophilised preparation, known at the priority date, which needed to be made up before administration.

46        It was further submitted that the process undertaken by the respondents is one in which a manufacturer produces a lyophilized material, in bulk, and supplies it to one of the Mayne entities, which then takes that freeze-dried, raw material and makes it into a ready-to-use solution. The applicants assert that the bulk lyophilization from the supplier entity is different from the prior art disclaimed and dealt with by the inventors in the Patent specification. Mr Caine's submissions are that the reconstitution referred to in the complete specification is reconstitution which involves a lyophilized cake in a vial; and that it is this specific reconstitution which is carved out from the definition of the monopoly of Claim 1.

47        The applicants submit that the complete specification refers to the dangers involved in the systems, as they were in 1985, being risks to the staff who had to reconstitute the lyophilized preparations shortly before administration because the preparations were unstable in solution over a longer period of time. This was the problem sought to be overcome through the invention of the ready-to-use solution. The invention did not involve the problematic process of reconstitution just prior to administration. Therefore, the applicants submit that the act of reconstitution just prior to administration is that which is sought to be disclaimed in Claim 1 through use of the phrase 'which has not been reconstituted from a lyophilizate.'

48        Mr Macaw, of senior counsel for the respondents, submitted that the words 'reconstituted from a lyophilizate' as occurring in Claim 1 bear an ordinary meaning and no special sense for them exists in the pharmaceutical industry, which would confine the meaning to a subset of their usual or ordinary meaning. It was contended that the meaning of the exclusionary integer of the claim including the word 'reconstituted' is plain and unambiguous, and in accordance with well-settled principle, the meaning of the exclusionary integer could not be qualified by resort to the body of the specification.

49        It was next submitted that even if resort were had to the body of the specification to clarify the expression in contention, such resort supports the ordinary meaning. Reliance was placed on the inventor's failure in the body of the specification to expressly state that 'lyophilized preparates' referred to in the body of the specification (about which Drs Brown and Oppenheim were cross-examined) were confined to what was known as at the priority date. Reliance was also placed on the fact that Claim 1 was not confined to a solution in a sealed container, as occurs in dependent Claim 2, and also placed on the fact that there was a