EXHIBIT 11



Neutral Citation Number: [2005] EWCA Civ  137

Case No: A3/2004/2433

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION (PATENTS COURT)**
**Mr Roger Wyand QC**
**HC-04-CO1628**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 17/02/2005

Before :

**THE PRESIDENT**
**THE RT HON LORD JUSTICE JACOB**
and
**THE RT HON LORD JUSTICE HOOPER**

- - - - - - - - - - - - - - - - - - - -

Between :

|  |  |
|---|---|
| (1)  **Mayne Pharma Pty Ltd** | **Respond-** |
| (2)  **Mayne Pharma plc** | **Ents/** |
|  | **Claimants** |
| **- and -** | **Appellant/** |
| **Pharmacia Italia SPA** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

Colin Birss  (instructed by Taylor Wessing) for the Claimants
Richard Miller QC (instructed by Clifford Chance) for the Defendant

Hearing date : 9 February 2005
- - - - - - - - - - - - - - - - - - - -

# Judgment Approved by the court
# for handing down
# (subject to editorial corrections)

**Lord Justice Jacob:**

1.    This is a patentee's appeal in a case rightly subjected to the streamlined procedure. The litigation began on 17th May 2004 when the respondents ("Mayne") commenced proceedings for a declaration of non-infringement of Pharmacia's UK patent No. 2,178,311. A counterclaim for infringement followed. The only issue was whether Mayne's product falls within claim 1 of the Patent. The case was heard before Mr Roger Wyand QC, sitting as a Deputy Judge. He gave judgment, holding non-infringement, on 1st November 2004 and granted permission to appeal. So the case has gone from start to determination on appeal in less than 9 months.

*What the dispute is about*

2.    Mayne wish to sell an injectable solution of an anti-cancer drug called epirubicin (an anthracycline glycoside) hydrochloride. They say it does not fall within any of the claims of the patent. Pharmacia say it does. It is agreed that the whole question turns on claim 1. This reads:

> "An injectable, ready-to-use, sterile, pyrogen-free, anthracycline glycoside solution which consists essentially of a physiologically acceptable salt of an anthracycline glycoside dissolved in a physiologically acceptable aqueous solvent therefor at an anthracycline glycoside concentration of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted to from 2.5 to 5.0 solely with a physiologically acceptable acid, the said acid being selected from hydrochloric, sulfuric, phosphoric, acetic, succinic, tartaric, ascorbic, citric, glutamic, methanesulphonic or ethanesulphonic acid."

3.    "Lyophilization" (US spelling) means freeze-drying. What Mayne do is described, it is agreed accurately, by the Deputy Judge as follows:

> "Mayne purchase epirubicin hydrochloride which has been subjected to a bulk lyophilization process. Mayne takes this lyophilizate, dissolve it in water, add [...]. The resulting solution is [...] and is then filled into vials [...]."

4.    So lyophilization of the epirubicin hydrochloride forms part of the history of Mayne's product, but it is not the immediate precursor to its production – it is an "upstream" process. Is the final product nonetheless covered by the claim? This turns on its meaning, particularly the words *solution ... which has not been reconstituted from a lyophilizate.* It is conceded that the Mayne process fulfils the remainder of the claim, pH adjustment with appropriate acid.

*The Principles of Construction*

5.    To decide upon that meaning one must construe the claim in context. I summarised the principles in paragraph 41 of my judgment in *Technip SA's Patent* [2004] RPC 919. The House of Lords in *Kirin-Amgen* [2004] UKHL 46, through Lord Hoffmann's speech, has approved those principles (save for one minor matter) and provided a much fuller justification for them than did I. As a practical working guide,

it will generally be sufficient to use my summary as approved.   I repeat it here, but stripped down to bare essentials:

"(a)       The first, overarching principle, is that contained in Art 69 itself.

(b)       Art 69 says that the extent of protection is determined *by the terms of the claims*.  It goes on to say that the description and drawings shall be used to interpret the claims.   In short the claims are to be construed in context.

(c)       It follows that the claims are to be construed purposively – the inventor's purpose being ascertained from the description and drawings.

(d)       It further follows that the claims must not be construed as if they stood alone – the drawings and description only being used to resolve any ambiguity.   Purpose is vital to the construction of claims.

(f)       Nonetheless purpose is not the be-all and end-all.   One is still at the end of the day concerned with the meaning of the language used.   Hence the other extreme of the Protocol – a mere guideline – is also ruled out by Art 69 itself.   It is the terms of the claims which delineate the patentee's territory.

(g)       It follows that if the patentee has included what is obviously a deliberate limitation in his claims, it must have a meaning.      One cannot disregard obviously intentional elements.

(h)       It also follows that where a patentee has used a word or phrase which, <u>acontextually</u>, might have a particular meaning (narrow or wide) it does not necessarily have that meaning in context.

(i)       It further follows that there is no general "doctrine of equivalents".

(j)       On the other hand purposive construction can lead to the conclusion that a technically trivial or minor difference between an element of a claim and the corresponding element of the alleged infringement nonetheless falls within the meaning of the element when read purposively.   This is not because there is a doctrine of equivalents: it is because that is the fair way to read the claim in context.

(k)       Finally purposive construction leads one to eschew what Lord Diplock in *Catnic* called (at p.243):

"the kind of meticulous verbal analysis which lawyers are too often tempted by their training to indulge.""

*The Skilled Man and Common General Knowledge*

6.　　In this case it is agreed that the "Protocol questions" do not assist.　What matters is the meaning of the claim read in context.　Since the claim is assumed to be read by the person skilled in the art, it is sensible to begin by summarising his relevant background knowledge - the common general knowledge.　I accept here, as Mr Birss, for Mayne, contended, that the relevant notional skilled man would be a pharmaceutical manufacturer, not merely a hospital pharmacist.　Such a man (or team) would have knowledge not only of how the end product was to be used but also how to make it.

7.　　In particular he would know that:

    i)　　The active ingredient to be used for the invention (anthracycline glycosides) were anti-tumour agents having widespread actual use;

    ii)　　The agents were very toxic so that any risk of medical staff or manufacturing staff coming into accidental contact with them was serious;

    iii)　　The existing products on the market were vials containing a "cake" consisting of a mixture of the active ingredient with an excipient such as lactose;

    iv)　　The vials were used by injecting solvent through the rubber stopper to dissolve the cake.　Shaking was necessary.　Once the solid material had been dissolved there could be a bit of adjustment to get the solution toward isotonicity;

    v)　　The cake within the vials consisted of a lyophilized product.　They were made this way: the appropriate amount of a solution containing the active ingredient and the excipient or bulking agent was placed in the open vials.　These were placed in lyophilizing conditions.　Broadly (the details do not matter) this consisted of freezing followed by low pressure to evaporate the ice;

    vi)　　The resulting product was, to use Mr Birss's word, "fluffy" – it had a low-bulk density. So there is more risk involved in handling this than handling crystalline material.　The latter, being denser, is less apt to fly about;

    vii)　　The reason for using the solid product in the vials, rather than simply having a solution was because solutions did not have very good stability – the product would deteriorate.

*The specification of the patent*

8.　　With that, I can turn to the specification.　Its title is "Injectable ready-to-use solutions containing an antitumor anthracycline glycoside."　The opening general words say this:

> "The present invention relates to a stable intravenously injectable ready-to-use solution of an antitumor anthracycline glycoside, e.g. doxorubicin, to a process for preparing such a solution, and provide the same in a sealed container, and to a method for treating tumors by the use of the said ready-to-use solution."

9.      Next it acknowledges that the anthracycline glycoside compounds are well known and used as anti-tumor agents.   It then sets out the nature of the existing products on the market:

>       "At present, anthracycline glycoside antitumor drugs, in particular, e.g., doxorubicon, are solely available in the form of lyophilized preparations, which need to be reconstituted before administration."

10.     After summarising two references which discuss the dangers to medical personnel from this type of agent in general, the patent says this:

>       "To administer a lyophilized preparation, double handling of the drug is required, the lyophilized cake having to be first reconstituted and then administered and, moreover, in some cases, the complete dissolution of the powder may require prolonged shaking because of solubilization problems."

11.     It then states the problem to be solved by the invention:

>       "As the risks connected with the manufacturing and the reconstitution of a lyophilized preparate would be highly reduced if a ready-to-use solution of the drug were available, we have developed a stable, therapeutically acceptable intravenously injectable solution of an anthracycline glycoside drug, e.g. doxorubicin, whose preparation and administration does not require either lyophilization or reconstitution."

12.     Next it sets out what the invention is in the so-called consistory clause.  It is repeated in claim 1 so I need not set it out again.  There then follows a second consistory clause, which corresponds to independent claim 31:

>       "A process for producing a solution according to any one of the preceding claims; which process comprises dissolving the physiologically acceptable salt of the anthracycline glycoside, which salt is not in the form of a lyophilizate, in the physiologically acceptable aqueous solvent therefor;  adding solely the physiologically acceptable acid to adjust the pH within the said range as desired;   optionally, adding an additional component selected from a co-solublizing agent, a tonicity adjustment agent and a preservative to the solution; and then passing the resulting solution through a sterilising filter."

13.     There then follows detail about how the solution is made.  None of the detail matters for present purposes save this:  that the description of the detailed variants of the process at no point mentions the use of lyophilized product.   All the 12 examples start with the words "Doxorubicin.HCl was dissolved …" without explicitly saying whether it was lyophilized or not.

14.     The last passage I need mention is a general statement on p. 9 about an advantage of the invention:

> "With the solutions of the invention it is possible to obtain compositions having a very high concentration of the anthracycline glycoside active substance even at 50 mg/ml. This constitutes a great advantage over the presently available lyophilized preparates wherein high concentrations of anthracycline glycoside can only be obtained with difficulty because of solubilization problems encountered in reconstitution, mainly with saline.  The presence of the excipient, e.g. lactose, in the lyophilized cake, and its generally high proportion in respect of the active substance, even up to 5 parts of excipient per part of active substance, has a negative effect on solubilization so that difficulties may arise in obtaining dissolution of the lyophilized cake, especially for concentrations of anthracycline glycoside higher than 2 mg/ml."

*The detailed arguments on construction*

15.     Mr Richard Miller QC for the patentees contended that the patent was essentially about formulation of the ready-to-use solution.   It was this formulation step which had not to involve lyophilization and its reconstitution on the ward.   The starting materials for the formulation were not part of the invention.   He submitted in detail that:

i)      The heart of the invention was, as its title said, an injectable ready-to-use solution.

ii)     The passage about "the manufacturing and the reconstitution" is of "such preparations", i.e. the vials on the market.  It is saying that the making and use of these each involves exposing people to risk.  The workers at risk are those who operate the lyophilizing machines containing the vials.   The medical workers at risk are those who have to inject solution into the vials to reconstitute (dissolve) the solid material within them.

iii)    The passage about administration ("To administer a lyophilized preparation ..") is clearly only about the formulated product.   The "lyophilized preparation" is that contained in such a product.

iv)     The passage about "The risks connected with the manufacturing and the reconstitution of a lyophilized preparate ..." is likewise about the final product.   What it is saying is that if final product were a ready-to-use stable solution the risks would be reduced.   The risks being talked about are those concerned with the manufacture of the vials containing lyophilized preparations and their use.

v)      The passage on p. 9 about the great advantage of the invention is by comparison with the "presently available lyophilized preparates" i.e. those on the market now.   It is saying you can get high concentration of the active

ingredient and avoid the solubilisation problems of the prior art.   That has nothing to do with the nature of the original raw material active ingredient.

vi)     So the essential teaching of the patent is not concerned with the nature of that basic raw material.   It is about how you make a stable, ready-to-use solution from such a material.

vii)    The fact that claim 31 is more limited than claim 1 (as it is) makes no difference.  Claim 31 is, Mr Miller accepts, not infringed.  This is because it is specifically limited to a process which starts with a raw material ("salt") which "is not in the form of a lyophilizate".  Mr Miller says that by contrast in claim 1 it is "the solution which has not been reconstituted from a lyophilizate".  There is a shift from the unlyophilized starting material of claim 31 to the unlyophilized material used to make the ready-to-use solution.

16.    Mr Birss submits that his case is crucially dependent upon whether the Deputy Judge was right in his paragraph 36:

> "36.     On a fair reading of the claims and in the context of the specification and such evidence of common general knowledge as is before me I find that the skilled addressee would form the view that the patentee regarded lyophilization as not just an unnecessary but as an undesirable process step in the production of the injectable solution and intended to exclude a solution made by the use of such a step, even if it were to be followed by other steps, such as the adjustment of pH and sterilising by filtration."

17.    Putting it another way, he submitted that the whole teaching of the patent is about the complete avoidance of lyophilization.  You do not need lyophilization at any stage.  And it is that which is to be avoided if you are to avoid danger to workers during any part of the manufacture.    As he put it "you can throw away the lyophilizing machine."

18.    He drew a homely analogy – with instant coffee.  If you want a cup of real coffee (i.e. coffee which has not been reconstituted from a lyophilizate) containing milk and sugar you will not be satisfied with a cup of instant coffee where the milk and sugar has been added after the reconstitution.

19.    Mr Birss further relied upon the process aspect of the invention – claim 31.  First he pointed out that if the examples were truly indifferent as to whether the starting material was lyophilized or not, then none of them would be examples of the process of the invention.  So it was implicit that the starting material was not lyophilized.  Second he submitted that claim 31 tracks claim 1 and in particular both claims use the word "lyophilizate".  If Mr Miller were right then the word would have a different meaning in each claim which was improbable.

*The Deputy Judge's conclusions*

20.     I have already quoted the most crucial paragraph of his judgment.  But I should
        mention some other points too.   First there is the way he dealt with claim 31.   He
        said this:

> "28.     Pharmacia counters by saying that claim 31 is
> effectively dependent on claim 1 and is therefore narrower than
> claim 1 and should be construed in such a way.  This is not
> strictly correct.  Claim 31 is a process claim whereas claim 1 is
> a product claim.  Whilst it is correct that the process of claim
> 31 may not be the only process that will produce a product
> within claim 1 this does not mean that it must necessarily be
> construed as a subset of the processes that can produce such a
> product.  There may be other processes:  there may not.  It is
> neutral."

21.     I think that is right.  In general in a patent with product and process claims one may
        perhaps expect the process to produce the product, but there is no necessary corollary
        that the product must be made only by the process.  All depends on the language used
        in context.

22.     In the preceding paragraph the Judge said this:

> "27.     Mayne submit that their product is made by the
> process of claim 31 except that the salt of the anthracycline
> glycoside which they dissolve is in the form of a lyophilizate.
> Thus, they do not infringe claim 31, as is acknowledged by
> Pharmacia.  They point out that the examples being silent as to
> how the API is produced, it must be assumed that the API is
> not a lyophilizate otherwise there is no example of the process
> claimed.     Thus, they say, the skilled addressee would
> understand the phrase in claim 1 "which has not been
> reconstituted from a lyophilizate" as excluding a solution which
> has been made by the process of claim 31 but with the starting
> material, the API, being a lyophilizate."

23.     Mr Birss submitted that the Judge's comment about the claim 31 argument being
        "neutral" did not apply to this paragraph.  I think he is right.  On the other hand the
        Judge here does no more than record Mr Birss' argument about the examples.  He
        never found it necessary to take the argument specifically into account, though he
        may have done in his crucial paragraph 36.

24.     Next I should mention the Judge's paragraphs 33 and 34:

> "I have two problems with Pharmacia's approach to construction of the disputed
> phrase.  The first is that even if the patent does not teach achieving stability by
> adjusting the pH the claim also refers to an anthracycline glycoside concentration
> of from 0.1 to 50 mg/ml.  The passage set out above from page 9 line 11 of the
> patent explains that this is an advantage over "the presently available lyophilized
> preparates".  I have heard no evidence as to how the skilled addressee would
> regard this passage but on its face it seems to be teaching away from the use of
> lyophilizates.

> The second problem is more fundamental. If one concludes that the skilled addressee does not regard the disputed phrase as necessarily excluding **any** lyophilization/reconstitution step, where does he/she draw the line? The suggestion by Pharmacia is that the skilled addressee would understand the phrase to mean that lyophilization was not used on the final product but could have been used on a precursor. This, says Pharmacia, would only exclude precisely what was done before in the hospital pharmacy."

25.    I do not agree with either of these points. As Mr Miller pointed out the passage on p.9 is by way of contrast with the existing product – "the teaching away from lyophilizates" relates only to lyophilizates in the final product.

26.    Nor do I see any real problem about where the line is drawn. Mr Miller put it this way: "only if the step of reconstitution produces a ready-to-use solution is there no infringement." Mr Birss suggested there was a problem here: suppose you reconstituted and then diluted the solution or added saline for isotonicity – as you sometimes did with the prior art. Would that mean no infringement? I see no problem. The product is either ready-to-use or it is not. If it is, then if the immediately prior step was reconstitution, there is no infringement – otherwise there is.

27.    Finally the Judge thought there was support from a linguistic analysis of the claim. I do not go into the detail of this – Mr Birss did not seek to support it as such. His support for the Judge, as I have already said, rested essentially on paragraph 36.

*My opinion*

28.    I have come to the conclusion that Mr Miller is right, essentially for the reasons he advanced. I need elaborate only a little. I think the skilled man would see the real point of the teaching in the description as being the provision of a stable, ready-to-use solution. Such a desirable substance was not previously available. The patent teaches him how to make it. He can make it without having to lyophilize the material in the vials. He knows he will have to start his formulation with active ingredient raw material. But he would not regard the nature of that as part of the formulation process. The patent teaches him how to do away with a previously essential lyophilization.

29.    When he comes to read claim 1, knowing that its purpose in law is to set out the monopoly, he sees that it is the "ready-to-use solution" which must not "have been reconstituted from a lyophilizate." With the understanding of the purpose and teaching of the description he would read it as meaning that the solution itself has not been made by reconstitution – it is avoidance of that which fulfils the purpose of doing away with the previously essential step. If he considered the nature of the starting raw material, lyophilized or not, he would see it made no real difference – just that starting with lyophilizate would introduce an unnecessary complication.

30.    I think this construction is that which is consistent with the inventor's purpose as disclosed in his specification – the manufacture of a ready-to-use solution which does not involve the previously essential lyophilization stage.

31.     As to Mr Birss's coffee example, like many analogies it is beguilingly misleading –
        there is no true analogy because coffee in its raw material form can never be
        lyophilized.   Nor do I think it matters whether the examples are read as starting with
        unlyophilized material – whether they do or not is not what matters because they are
        essentially about producing the stable solution.

32.     Accordingly I would allow the appeal.   I would not want to part from this case
        without paying tribute to the high quality of the argument on both sides.     Sadly,
        however, I must also record the fact that I was most disappointed to see the quite
        extraordinary number of files of paper produced, quite unnecessarily, for this appeal.
        We were only referred to two pages not included in the one main file.   They were
        obviously not wanted on voyage or to put it more formally not "relevant to
        proceedings in the Court of Appeal" within the meaning of para. 15.1(1) of the
        Practice Direction to Part 52 of the CPR.   No doubt this will be taken into account on
        assessment of costs.

**Lord Justice Hooper:**

33.     I agree.

**Dame Elizabeth Butler-Sloss P:**

34.     I also agree.

4



*Federal Court of Canada*                                    *Cour fédérale du Canada*

FACSIMILE TRANSMITTAL FORM                  FORMULAIRE D'ACHEMINEMENT PAR
                                                             TÉLÉCOPIEUR

TO                                                           DESTINATAIRE

Name: _Sheila Block_                                         Nom: _Susan Beaulzen_

Title: _____                                       Titre: _____

Organization: _Torys_                                        Organisme: _____

Location: _____                                    Endroit: _____

Facsimile No.: _416-865-7380_                                Télécopieur: _613-235-2508_


FROM                                                         EXPÉDITEUR

Name: _Stuart Shepherd_                                      Nom: _____

Office: _Federal Court_                                      Bureau: _____

Telephone No.: _416-954-5052_                                Téléphone: _____

Facsimile No.: _____                               Télécopieur: _____

Date: _December 20,05_                                       Date: _____

Time: _____                                        Heure: _____


TOTAL NUMBER OF PAGES: _____                               NOMBRE DE PAGES: _____
(including this cover page)                                  (incluant le présent formulaire)


COMMENTS                                                     REMARQUES

_Please find attached the Order and Reasons for Order_

_of the Court on file T-1142-04_


N.B.: If you do not receive all pages being          N.B.: S'il manque des pages, prière de
transmitted, please call us at above                       communiquer avec l'expéditeur au
number.                                                    numéro susmentionné.



CANADA

Federal Court                                                        Cour fédérale

Date: 20051220

Docket: T-1142-04

Toronto, Ontario, December 20, 2005

PRESENT:    THE HONOURABLE MR. JUSTICE ROGER T. HUGHES

BETWEEN:

PFIZER CANADA INC. and PHARMACIA ITALIA S.p.A.

Applicants

and

THE MINISTER OF HEALTH
and MAYNE PHARMA (CANADA) INC.

Respondents

ORDER

UPON APPLICATION made to this Court and heard on the 12th and 13th days of

December, 2005, for an Order to prohibit the Minister of Health to issue a Notice of Compliance to

the Respondent Mayne Pharma (Canada) Inc. in respect of an application therefore by said

Respondent in respect of a certain drug containing epirubicin;

AND UPON reviewing the Record herein and hearing submissions of Counsel for the

Applicant and the Respondent Mayne, The Minister taking no active part in these proceedings;

AND **FOR** the Reasons delivered herewith;

**THIS COURT ORDERS that**

1.    The Minister of Health is prohibited from issuing a Notice of Compliance to Mayne

Pharma (Canada) Inc. in respect of Epirubicin Hydrochloride Injection Ph. Eur. Having

a strength per dosage unit of 2 mg/ml until the expiry of Canadian Letters Patent on

October 22, 2008 or earlier if said patent is held to be invalid by an unappealable

judgment of a competent Canadian Court; and

2.    Counsel shall provide written submissions as to costs within ten (10) working days from

the date hereof following which a further Order as to costs will be made.

"Roger T. Hughes"

JUDGE



CANADA

Federal Court                                    Cour fédérale

Date: 20051220

Docket: T-1142-04

Citation: 2005 FC 1725

BETWEEN:

PFIZER CANADA INC. and PHARMACIA ITALIA S.p.A.

Applicants

and

THE MINISTER OF HEALTH
and MAYNE PHARMA (CANADA) INC.

Respondents

REASONS FOR ORDER

HUGHES J.

[1]     This is an application made under the provisions of the *Patented Medicines (Notice of Compliance) Regulations* SOR/93-133 as amended (the NOC Regulations).  The Applicants Pfizer Canada Inc. and Pharmacia Italia S.p.A. (Pfizer) seek to the prohibit the Minister of Health (Minister) from issuing a Notice of Compliance under the Food and Drug Regulations to Mayne Pharma (Canada) Inc. (Mayne) in respect of its proposed injectable ready-to-use Epirubicin Hydrochloride solution in a strength of 2mg/ml (Mayne Product) until the expiry of Canadian Patent 1,291,037 ('037 Patent).  Pfizer also seeks a declaration that Mayne did not serve a proper notice of allegation as required by the NOC Regulations, costs and other relief.

[2]    The '037 patent was issued and granted by the Canadian Patent Office on October 22, 1991 from an application filed in Canada on June 27, 1986. As such the '037 Patent falls to be considered under the "*old*" provisions of the *Patent Act*, R.C.S. 1989, c.P.4 as they pertain to patents granted in respect of applications filed in Canada before October 1, 1989. This patent is concerned with injectable solutions used to treat tumours. It contains 116 claims which can be divided into three categories 1) product claims directed to ready-to-use solutions; 2) process claims directed to the making of such solutions; and 3) use claims directed to the use of such solutions. Of the product claims, claims 1 (and dependent claims 2-11), 12 (and dependent claims 13-22), 60 (and dependent claims 61-68), 69 (and dependent claims 70-88) and 98 (and dependent claims 99-105 and 115) are at issue. Of the use claims, claims 47 and 59 are at issue. By reason of the nature of the NOC Regulations, no process claims are at issue.

[3]    The Applicants Pfizer are "*first parties*" as defined by the NOC Regulations. There is no dispute that the '037 patent has been properly listed in accordance with those Regulations.

[4]    The Respondent Mayne is a "*second party*" as defined in the NOC Regulations. Mayne has, in its letter of allegation, stated that it is seeking a Notice of Compliance under the Food and Drug Regulations from the Minister for Epirubicin Hydrochloride Injection Ph. Eur. having a strength per dosage unit of 2 mg/ml (Mayne Product). Mayne alleges that no claim of the '037 patent will be infringed by the Mayne Product, the process for its manufacture and its route of administration for use. The letter of allegation states as follows:

3.  *The Mayne Product that is subject of the abbreviated new drug submission which has been filed and is pending with the Minister of Health, is formulated as a ready to use injectable solution in a single dose, sealed vial (10 mg/5ml, 50 mg/ml, 200 mg/ml). The Mayne Product comprises the following ingredients: the active pharmaceutical ingredient (API) Epirubicin Hydrochloride [which has been reconstituted from lyophilized Epirubicin Hydrochloride (Ph. Eur.) manufactured and supplied to Mayne by a third party]; Water for Injection (Ph. Eur.); Sodium Chloride (Ph. Eur.); and Hydrochloric Acid (Ph. Eur.) [for pH adjustment within the range 2.5 to 4.0, if necessary]. Nitrogen (Ph. Eur) is present to deoxygenate the Water for Injection and to provide an inert headspace within the vial.*

4.  *The Mayne Product will be manufactured by Mayne's Australian parent (Mayne Pharma Pty.) using the following process:*

    (a)  *65% of the required volume of Water for Injection (Ph. Eur) is added to a mixing vessel and purged with Nitrogen (Ph. Eur) fro 15 minutes. [Solution A]*

    (b)  *A slurry of Epirubicin Hydrochloride is prepared by reconstituting lyophilized Epirubicin Hydrochloride (Ph. Eur) with Water for Injection (Ph. Eur) to form a slurry. The slurry is added to the Solution A described above while stirring. The solution is mixed for 30 minutes.*

    (c)  *10% of the required volume of Water for Injection (Ph. Eur) is added to a second mixing vessel and purged with Nitrogen (Ph. Eur) for 15 minutes. Sodium chloride (Ph. Eur) is added to the Water for Injection (Ph. Eur) while stirring. The solution is mixed for 10 minutes [Solution B] Potency of the solution may be checked and the addition of Water forInjection may be adjusted, as necessary.*

    (d)  *Solution B is added to Solution A and stirred for 10 minutes. The pH of the resultant bulk solution is checked and adjusted, if necessary, to a target range of 2.8 to 3.0 with Hydrochloric Acid, (Ph. Eur).*

    (e)  *Thereafter, the volume of the bulk solution is progressively adjusted to 100% of the volume necessary for an epirubicin hydrochloride drug concentration of 2 mg/ml with addition of Water for Injection (Ph. Eur). The pH of the solution is checked and, if necessary, the pH of the solution is adjusted to the target range of 2.8 to 3.0 with Hydrochloric Acid (Ph. Eur).*

    (f)  *The solution is then passed through a sterilizing filter, and aseptically dispensed into sterile, glass vials under a nitrogen atmosphere. The vials are then stoppered and sealed.*

5.  *The route of administration for the Mayne Product is intravenous.*

[5]  Pfizer does not dispute the accuracy of these representations.

Page: 4

[6]    The only issue in these proceedings is that of infringement, validity of the '037 patent is not

challenged.  The issue of infringement turns on a question of construction of the claims and in

particular, to what does the phrase "*not reconstituted from a lyophilizate*" refer in construing the

claims.  In this regard it is sufficient, for illustration, to refer to claim 1, a broad product claim, and

claim 47 a broad use claim.

> 1.   *An injectable, ready-to-use, sterile, pyrogen-free, anthracycline glycoside solution*
>      *which consists essentially of a physiologically acceptable salt of an anthracycline*
>      *glycoside dissolved in a physiologically acceptable aqueous solvent therefore at an*
>      *anthracycline glycoside concentration of from 0.1 to 50 mg/ml, which has not been*
>      *reconstituted from a lyophilizate and the pH of which has been adjusted to from 2.5*
>      *to 5.0 solely with a physiologically acceptable acid.*
>
>                              ***
>
> 47.  *Use of an injectable, ready-to-use, sterile pyrogen-free solution as defined in claim*
>      *1 to inhibit the growth of a tumour selected from sarcomas, carcinomas,*
>      *lymphomas, neuroblastoms, melanoma, mycloma, leukemias and wilms tumour.*

[7]    The other claims at issue differ in detail, which detail is not material to the issue before this

Court.  I accept those differences as enumerated in the Beijnen affidavit filed herein at paragraphs

29 to 33 and 35.

> 29.  *Claim 12 claims the same solution as in claim 1, except that the pH of the solution is*
>
>      *adjusted with a physiologically acceptable acid selected from a group that includes*
>
>      *hydrochloric acid.*
>
>                              ***
>
> 30.  *Claim 60 claims a solution which is the same as the solution in claim 1, except that it is*
>
>      *storage stable and has a narrower pH range.*
>
>                              ***

31. Claim 69 claims a solution which is the same as the solution in claim 12, except that it is storage stable and has a narrower pH range.

***

32. Claim 98 claims a solution which is the same as the solution in claim 69, except that the pH of the solution has been adjusted from 2.5 to 3.5 solely with a glycine buffer.

33. There are also various dependent solution claims, which include the following:

(a) an anthracycline glycoside salt solution in a sealed container (claims 2, 13, 61, 70 and 99);

(b) a solution of an epirubicin salt (claims 3, 14, 62, 71 and 100);

(c) a solution of an epirubicin salt in a sealed container (claims 63, 72 and 101);

(d) a solution of epirubicin hydrochloride (claims 4, 15, 64 and 73);

(e) an anthracycline glycoside salt solution having a pH of from 2.62 to 3.14 (claims 5 and 16), or from 2.6 to 3.5 (claims 65 and 74) or of about 3 (claims 6, 17 and 102); and

(f) a solution in which the concentrations of the anthracycline glycoside is from 1 mg/ml to 20 mg/ml (claims 9, 20, 68, 77 and 105).

***

35. Claims 47 and 59 of the '037 Patent are the use claims. They cover the use of the solutions described in solution claims 1 and 12. The use claims read as follows:

Use of an injectable, ready-to-use, sterile, pyrogen-free solution as defined in claim (1 or 12, in claims 47 and 59

*respectively) to inhibit the growth of a tumour selected from*

*sarcomas,    carcinomas,    lymphomas,    neuroblastoma,*

*melanoma, myeloma, leukaemias and Wilms tumour.*

[8]     The process claims are not at issue in these proceedings.  The NOC Regulations do not

extend to processes.  However claim 36, the broadest of the process claims, should be noted.  It

reads:

> 36.    *A process for producing an injectable, ready-to-use, sterile,*
> *pyrogen-free, anthracycline glycoside solution which consists essentially*
> *of a physiologically acceptable salt of an anthracycline glycoside*
> *dissolved in a physiologically acceptable  aqueous solvent therefore,*
> *which has not been reconstituted from a lyophilizate and which has a pH*
> *of from 2.5 to 5.0, which process comprises dissolving the said*
> *physiologically acceptable salt, which salt is not in the form of a*
> *lyophilizate, in the said solvent at an anthracycline glycoside*
> *concentration of from 0.1 to 50 mg/ml; adding solely a physiologically*
> *acceptable acid to adjust the pH to from 2.5 to 5.0 as desired and*
> *passing the resulting solution through a sterilising filter.*

[9]     The other process claims are directed to narrowing parameters similar to the solution claims.

[10]    The issue in this proceeding is one of construction of the claims.  The answer as to

infringement will be apparent once the claims are construed.  Construction is a matter for the Court

alone, to be done before consideration is given to issues of infringement or validity, it is not to be

"*results oriented*", one and the same interpretation applies to validity and infringement issues

(*Whirlpool Corp.* v. *Camco Inc*, [2000]  2 S.C.R. 1067 at paras. 43 and 49(a) and (b)).  Onus does

not come into play at the construction stage of a patent proceeding.

[11]    For the purposes of the construction issue in this proceeding the claims can be divested of their more technical terms and presented more simply. One of the more technical terms is that of lyophilization which, in everyday terms can be expressed as freeze drying. A benefit of such freeze drying is that it enhances the shelf life of the product. A detriment is that it must be reconstituted, by mixing with a suitable solvent, before use.

### Solution Claims:

*An injectable, ready-to-use solution which consists essentially of a salt of the active ingredient dissolved in an acceptable solvent at a given range of concentration, which has not been reconstituted from a lyophilizate and the pH of which has been adjusted to a certain range solely with an acceptable acid*

### Use claims:

*Use of an injectable, ready-to-use solution to inhibit the growth of certain tumours.*

### Process Claims (not at issue in this NOC proceeding):

*A process for producing an injectable, ready-to-use solution as described in the solution claims, comprising dissolving the salt, which salt is not in the form of a lyophilizate in the solvent to a certain concentration; adding solely an acceptable acid to adjust the pH to a certain range and filtering.*

[12]    Pfizer argues that the words *"not reconstituted from a lyophilizate"* in the solution claims and, by implication in the use claims, refer to the final product as it is presented to the medical professional for administration to a patent. Mayne on the other hand argues that those words refer to the salt of the active ingredient anthracycline glycoside. Given Pfizer's construction the Mayne Product and its use, would infringe the claim at issue; given Mayne's construction, they would not.

[13]    The Court is aware that these issues have already been litigated by the parties or entities related to them, in the United Kingdom and Australia. Those decisions can be located at:

> **UK** – *Mayne Pharma Pty Ltd.* v. *Pharma Italia SpA*, [2004] EWHC 2458 (Ch.) a decision dated 1 November 2004, by Wyand Q.C. a Deputy Judge which was reversed by the Court of Appeal in [2005] EWCA Civ 317, on February 1, 2005, judgment for that Court given by Jacob L.J. Leave to appeal in the House of Lords was refused.

> **Australia** – *Pharmacia Italia SpA* v. *Mayne Pharma Pty Ltd*, [2005] F.C.A. 1078 and [2005] F.C.A. 1675. Decisions of the Federal Court of Australia. No appeal has been taken from these decisions, and, I am informed, none is now possible.

[14]    These decisions are not binding upon this Court.

[15]    This case rests simply on the question of claim construction. For that purpose I propose to examine, briefly, the history of claim construction in Canada and the United Kingdom. Then I will address the principals to be applied in construing a claim as instructed by the Supreme Court of Canada in *Whirlpool* (*Whirlpool Corp.* v. *Camco Inc.* [2000] 2 S.C.R. 1067) and *Free World* (*Free World Trust* v. *Electro Santé Inc.* [2000] 2 S.C.R. 1024). Then I propose to construe the claims at issue.

## The History of Claim Construction

[16]    In the earliest of days in patent history, a patent did not contain claims as we know them. A patent may have ended with a phrase such as "*A device substantially as described herein*". A good summary was given by Blanco White in "*Patents for Inventions*", 4th ed, London, Stevens & Sons 1979 at paragraph 1-305:

> *Origin and growth of claims*
>     *In such circumstances there was not room for the modern system of patent claims. The patentee quite often did, during the nineteenth century, end his specification with an indication of the features of his invention he considered new and important ("and what I claim is the levers x and y, co-operating with the wheel b and rod c," or something like that)-much as the proprietor of a design today makes a statement of the features of novelty claimed for his design. It was not until the 1883 Act that the inclusion of claims was compulsory, and it was not until the transfer of the key jurisdiction in patent actions from the jury of a court of common law to the Court of Chancery and the Chancery Division had resulted in the growth of rules for determining how to construe a principle of operation out of the description of a machine that we find claims in the modern sense growing up. For the essence of modern claim is that the patentee no longer leaves it to the jury to determine the scope of his invention, but tries to set this out for himself in his claims. By now it is a commonplace that this is precisely what claims are for, but it was not a commonplace seventy years ago; it was not even clear law that claims had that effect, until the famous decisions in Nobel v. Anderson in 1894 made it so. Nor until the second decade of the present century was it clear that a patentee who wished to cover the principle of operation of his machine, and not only the details of its construction, must say so in his claims and not just leave it to the jury. Thus it is hardly necessary to go back more than fifty years in the Reports of Patent Cases to find the distinction between the invention claimed and the preferred embodiment of it described in detail in the specification, which is so fundamental to present-day ideas, either not drawn at all or drawn only in vague and ambiguous terms. Since a judicial decision does not lose its authority by becoming obsolete-rather it gains in sanctity-the law is still bedevilled by authoritative judgments delivered before the days of claims.*

[17]     The bedevilling of the law by the ghosts of these earlier, pre-claim, cases is evident in the cri

de coeur of Lord Loreburn in *Natural Colour Kinematograph Co. Ltd.* v. *Bioschemes Ltd*, (1915) 32

R.P.C. 256 (H.L.) at page 266 where he speaks of counsel shaping and re-shaping a claim with

references to the specification and other evidence:

> *I wish to add that, quite apart from these grounds, I think this Patent is bad from ambiguity in the Specification. There seems to be some danger of the well known rule of law against ambiguity being in practice invaded. Some of those who draft Specifications and Claims are apt to treat this industry as a trial of skill, in which the object is to make the Claim very wide upon one interpretation of it, in order to prevent as many people as possible from competing with the patentee's business and then to rely upon carefully prepared sentences in the Specification which, it is hoped, will be just enough to limit the Claim within safe dimensions if it is attacked in Court. This leads to litigation as to the construction of Specifications, which could generally be avoided if at the outset a sincere attempt were made to state exactly what was meant in plain language. The fear of a costly law suit is apt to deter any but wealthy competitors from contesting a Patent. This is all wrong. It is an abuse which a Court can prevent, whether a charge of ambiguity is or is not raised on the Pleadings, because it affects the public by practically enlarging the monopoly, and does so by a kind of pressure which is very objectionable. It is the duty of patentee to state clearly and distinctly, either in direct words or by clear and distinct reference, the nature and limits of what he claims. If he uses language which, when fairly read, is avoidably obscure or ambiguous, the Patent is invalid, whether the defect be due to design, or to carelessness or to want of skill. Where the invention is difficult to explain, due allowance will, of course, be made for any resulting difficulty in the language. But nothing can excuse the use of ambiguous language when simple language can easily be employed, and the only safe way is for the patentee to do his best to be clear and intelligible. It is necessary to emphasize this warning. To my mind, this is a very plain case of offence against the rule to which I have referred. I cannot see what purpose there could have been using the roundabout language here employed, which has provoked so much argumentative subtlety and taken up so much time, unless the object was to hold in reserve a variety of constructions for use if the Patent should be called in question, and in the meantime to frighten off those who might be disposed to challenge the Patent.*

[18]     The same sentiment was expressed by the United States Supreme Court in the 'nose of wax"

case, *White* v. *Dunbar*, 119 US 47 (1886) per Bradley J. at pp 51-52 as cited by the Supreme Court

of Canada in the *Whirlpool* case, supra, at paragraph 51:

> *Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express... . The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.*

## a) In Canada

[19]    As matters developed in Canada, the Court would not, typically, first attempt to construe a

claim, rather, it would go first to either validity or infringement and apply what was described as a

"*literal*" reading of the claim. If the claim survived validity on a "*literal*" reading, then

infringement would be considered "*literally*" and if there was no such infringement, then a second

look at the claims on the basis of the "*substance*" was taken, as infringement was considered either

literally or in substance.  A good example of this practice in *Kramer* v. *Lawn Furniture Inc.* (1974),

13 C.P.R. (2nd) 231 a decision of Addy J. of the Federal Court.  At pages 235 and 236 he found the

patent to be valid without any discussion as to how the claim was to be construed.  He then turned to

infringement at page 237 and gave a classic statement as to claim interpretation:

> The claims should be interpreted by reading them and applying common vocabulary of the art to
> the wording of the claim. They should be interpreted as if read by a person who is possessed of
> all the technical knowledge required to fully understand the terms used and the principles
> involved. The specifications and drawings should be read as a whole to provide background to
> assist in the interpretation of the claim or to supply the vocabulary necessary for the
> interpretation of the claim but should not be used to vary or enlarge the claims, except in so far
> as the vocabulary, as supplied by the specifications, reasonably and fairly provides for such a
> variation or enlargement. As has been often stated, the patentee may act as his own
> lexicographer.

[20]    Having given that statement, he said at page 238:

> In the light of these general principles, the text of the claims of the plaintiffs' two patents must be
> examined to see, first, if there has been a literal infringement of the patents as expressed in the
> claims and, if not, then whether there has nevertheless been a true infringement of the substance
> of the inventions.

[21]    He then examined infringement on a "*literal*" interpretation of the claims and, finding none,

embarked on a consideration of the "*substance*" of the claim.  At page 239 he said:

> Although there is no literal infringement, the Court must also determine whether the variations
> are minor ones and whether the alleged infringer has in fact taken the substance of the invention,
> refer Omark Industries (1960) Ltd. v. Gouger Saw Chain Co. et al., supra; whether the object
> under attack is but a colourable imitation of the invention, refer Fox's Canadian Law and
> Practice Relating to Letters Patent for Inventions, 4th ed. (1972), at pp. 364-9 and whether the
> defendant has in effect taken what has been described in the cases as the pith and marrow of the
> patent or invention.

[22]    The "*two step*" approach respecting infringement was conflated to one by the Federal Court of Appeal in the *Mobil Oil* case (*Mobil Oil Corp.* v. *Hercules Canada Inc* (1995), 63 C.P.R. (3rd) 473) where Marceau J. for the Court said at page 488:

> The established law in Canada, as stated long ago by Thorson P. in McPhar Engineering Co. v. Sharpe Instruments Ltd. (1960), 35 C.P.R. 105, [1956-60] Ex. C.R. 447, 21 Fox Pat. C. 1 (Ex. Ct.), is "that if a person takes the substance of an invention he is guilty of infringement and it does not matter whether be omits a feature that is not essential to it or substitutes an equivalent for it". That being the case, I do not appreciate the utility of the traditional twofold test and even its relevance. No doubt a textual infringement will simplify the problem as it will put an immediate end to the inquiry. But it seems to me that the exercise may be useless in cases like this one where the distinction between textual and substantial infringement may be difficult to draw.

[23]    As an "*outlier*" to the main stream of thought, there are a few cases, notable of which is *Schweyer Electric and Mfg Co.* v. *New York Central Railroad Co.* [1935] S.C.R. 665 where the Supreme Court took claims directed to electrically operated railroad signal devices without reference to whether or not alternating current was to be used and, by reading the specification found that the claims "*inevitably*" meant alternating current. Per Duff C.J. for the Court at 669:

> In construing these claims they must be read with reference to the earlier part of the specification and, so reading them, it seems to me the conclusion is inevitable -- I am convinced this is not putting it too strongly -- that, as regards the devices in the apparatus on the vehicle which respond to the "caution" and "danger" signals, these claims do not contemplate a system which could be effectively worked without the use of alternating current circuits. In that view, since the respondents employ direct current circuits alone, no infringement is established.

## b)  In the United Kingdom

[24]    Claim construction has come to its current state in the United Kingdom in two cases. The first, *Catnic* (*Catnic Components Limited* v. *Hill and South Limited* [1982] R.P.C. 183 with the House of Lords decision starting at 239) was reviewed by the Supreme Court of Canada in *Whirlpool* supra. The second is more recent and after *Whirlpool*. It is *Kirin-Amgen Inc.* v. *Hoechst Marion Roussel Ltd.* a 2004 decision of the House of Lords reported, in Canada, at 331 N.R.1.

[25]    *Catnic* was a breakthrough in that it did away with the two part approach – textual then pith

and marrow – and replaced it with one criteria *"purposive construction."* It should be noted,

however, that this was done in the context of an infringement analysis only and, rather than being

directed to the claim alone, the House of Lords speaks of an *"invention"* and a *"patent*

*specification".* Lord Diplock at pages 242 and 243 says:

> *My Lords, in their closely reasoned written cases in this House and in the oral argument, both*
> *parties to this appeal have tended to treat "textual infringement" and infringement of the "pith*
> *and marrow" of an invention as if they were separate causes of action, the existence of the*
> *former to be determined as a matter of construction only and of the latter upon some broader*
> *principle of colourable evasion. There is, in my view, no such dichotomy; there is but a single*
> *cause of action and to treat it otherwise, particularly in cases like that which is the subject of the*
> *instant appeal, is liable to lead to confusion.*

***

> *My Lords, a patent specification is a unilateral statement by the patentee, in words of his own*
> *choosing, addressed to those likely to have a practical interest in the subject matter of his*
> *invention (i.e. "skilled in the art"), by which he informs them what he claims to be the essential*
> *features of the new product or process for which the letters patent grant him a monopoly. It is*
> *those novel features only that he claims to be essential that constitute the so-called "pith and*
> *marrow" of the claim. A patent specification should be given a purposive construction rather*
> *than a purely literal one derived from applying to it the kind of meticulous, verbal analysis in*
> *which lawyers are too often tempted by their training to indulge. The question in each case is:*
> *whether persons with practical knowledge and experience of the kind of work in which the*
> *invention was intended to be used, would understand that strict compliance with a particular*
> *descriptive word or phrase appearing in a claim was intended by the patentee to be an essential*
> *requirement of the invention so that any variant would fall outside the monopoly claimed, even*
> *though it could have no material effect upon the way the invention worked.*

[26]    By the time the *Kirin- Amgen* decision was made by the House of Lords, the United

Kingdom had adhered to the European protocol respecting patents and article 69 of the protocol

became important. It reads:

*Article 69*

*Extent of protection*

> *(1)  The extent of the protection conferred by a European patent to a European patent application*
> *shall be determined by the terms of the claims. Nevertheless, the description and drawings shall*
> *be used to interpret the claims.*

> (2) For the period up to grant of the European patent, the extent of the protection conferred by the
> European patent application shall be determined by the latest filed claims contained in the
> publication under Article 93. However, the European patent as granted or as amended in
> opposition proceedings shall determine retroactively the protection conferred by the European
> patent application, insofar as such protection is not thereby extended.

[27]    This article, it should be noted, does not differ materially from what has become standard

Canadian practice namely, reading the claims in the context of the whole of the specification, a

point which the Supreme Court of Canada makes at paragraph 50 of the *Whirlpool* decision.

[28]    In *Kirin- Amgen*, Lord Hoffman, with whom the other Lords agreed, gave a *tour de force* as

to patent construction which bears repeating here.  In brief, he said as to construction that is

*objective*, it is concerned with what a reasonable person, here the reasonable person skilled in the art

to which the patent pertains, would have understood the author (inventor) to mean.  The question is

not what the inventor might have intended but rather what the addressee understands.  Lord

Hoffman said at paragraphs 32 to 35:

> 32. *Construction, whether of a patent or any other document, is of course not directly concerned
> with what the author meant to say. There is no window into the mind of the patentee or the author
> of any other document. Construction is objective in the sense that it is concerned with what a
> reasonable person to whom the utterance was addressed would have understood the author to be
> using the words to mean. Notice, however, that it is not, as is sometimes said, "the meaning of the
> words the author used", but rather what the notional addressee would have understood the
> author to mean by using those words. The meaning of words is a matter of convention, governed
> by rules, which can be found in dictionaries and grammars. What the author would have been
> understood to mean by using those words is not simply a matter of rules. It is highly sensitive to
> the context of and background to the particular utterance. It depends not only upon the words the
> author has chosen but also upon the identity of the audience he is taken to have been addressing
> and the knowledge and assumptions which one attributes to that audience.*

> \*\*\*

> 33. *In the case of a patent specification, the notional addressee is the person skilled in the
> art. He (or, I say once and for all, she) comes to a reading of the specification with common
> general knowledge of the art. And he reads the specification on the assumption that its
> purpose is to both to describe and to demarcate an invention - a practical idea which the
> patentee has had for a new product or process - and not to be a textbook in mathematics or
> chemistry or a shopping list of chemicals or hardware. It is this insight which lies at the heart
> of "purposive construction". If Lord Diplock did not invent the expression, he certainly gave it
> wide currency in the law. But there is, I think, a tendency to regard it as a vague description
> of some kind of divination which mysteriously penetrates beneath the language of the*

specification. Lord Diplock was in my opinion being much more specific and his intention was to point out that a person may be taken to mean something different when he uses words for one purpose from what he would be taken to mean if he was using them for another. The example in the Catnic case was the difference between what a person would reasonably be taken to mean by using the word "vertical" in a mathematical theorem and by using it in a claimed definition of a lintel for use in the building trade. The only point on which I would question the otherwise admirable summary of the law on infringement in the judgment of Jacob LJ in Rockwater Ltd v Technip France SA (unreported) [2004] EWCA Civ 381, at paragraph 41, is when he says in sub-paragraph (e) that to be "fair to the patentee" one must use "the widest purpose consistent with his teaching". This, as it seems to me, is to confuse the purpose of the utterance with what it would be understood to mean. The purpose of a patent specification, as I have said, is no more nor less than to communicate the idea of an invention. An appreciation of that purpose is part of the material which one uses to ascertain the meaning. But purpose and meaning are different. If, when speaking of the widest purpose, Jacob LJ meant the widest meaning, I would respectfully disagree. There is no presumption about the width of the claims. A patent may, for one reason or another, claim less than it teaches or enables.

34. "Purposive construction" does not mean that one is extending or going beyond the definition of the technical matter for which the patentee seeks protection in the claims. The question is always what the person skilled in the art would have understood the patentee to be using the language of the claim to mean. And for this purpose, the language he has chosen is usually of critical importance. The conventions of word meaning and syntax enable us to express our meanings with great accuracy and subtlety and the skilled man will ordinarily assume that the patentee has chosen his language accordingly. As a number of judges have pointed out, the specification is a unilateral document in words of the patentee's own choosing. Furthermore, the words will usually have been chosen upon skilled advice. The specification is not a document inter rusticos for which broad allowances must be made. On the other hand, it must be recognised that the patentee is trying to describe something which, at any rate in his opinion, is new; which has not existed before and of which there may be no generally accepted definition. There will be occasions upon which it will be obvious to the skilled man that the patentee must in some respect have departed from conventional use of language or included in his description of the invention some element which he did not mean to be essential. But one would not expect that to happen very often.

35. One of the reasons why it will be unusual for the notional skilled man to conclude, after construing the claim purposively in the context of the specification and drawings, that the patentee must nevertheless have meant something different from what it appears to have meant, is that there are necessarily gaps in our knowledge of the background which led him to express himself in that particular way. The courts of the United Kingdom, the Netherlands and Germany certainly discourage, if they do not actually prohibit, use of the patent office file in aid of construction. There are good reasons: the meaning of the patent should not change according to whether or not the person skilled in the art has access to the file and in any case life is too short for the limited assistance which it can provide. It is however frequently impossible to know without access, not merely to the file but to the private thoughts of the patentee and his advisors as well, what the reason was for some apparently inexplicable limitation in the extent of the monopoly claimed. One possible explanation is that it does not represent what the patentee really meant to say. But another is that he did mean it, for reasons of his own; such as wanting to avoid arguments with the examiners over enablement or prior art and have his patent granted as soon as possible. This feature of the practical life of a patent agent reduces the scope for a conclusion that the patentee could not have meant what the words appear to be saying. It has been suggested that in the absence of any explanation for a restriction in the extent of protection claimed, it should be presumed that there was some good reason between the patentee and the patent office. I do not think that it is sensible to have presumptions about what people must be taken to have meant but a

*conclusion that they have departed from conventional usage obviously needs some rational basis.*

## The Principles of Whirlpool and Free World

[29]   The Supreme Court of Canada in *Whirlpool* and *Free World* supra, gave landmark decisions respecting Canadian patent law.  While preceding *Kirin- Amgen* by almost four years, these decisions are remarkably in agreement.  In its decisions the Supreme Court endorsed the *"purposive construction"* approach and did away with the *"two tiered"* approach (*Free World* paras 45-50, *Whirlpool* paras 42-50).  The Court expressly rejected a *"grammatical"* or *"meticulous verbal analysis"* approach (*Whirlpool* paragraphs 48 and 53).

[30]   These two cases, together with *Kirin-Amgen* provide instruction as to the construction of a claim in a *"purposive"* manner.

## Statutory Basis in Canada

[31]   Section 34(2) of the *Patent Act* R.S.C. 1985, c.P.4 requires that a patent specification and with a claim or claims which *"distinctly and in explicit terms"* set out the scope of the monopoly claimed.  As the Supreme Court in *Whirlpool* said at paragraph 42:

> 42    The content of a patent specification is regulated by s. 34 of the Patent Act. The first part is a "disclosure" in which the patentee must describe the [page1089] invention "with sufficiently complete and accurate details as will enable a workman, skilled in the art to which the invention relates, to construct or use that invention when the period of the monopoly has expired": Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd., [1981] 1 S.C.R. 504, at p. 517. The disclosure is the quid provided by the inventor in exchange for the quo of a 17-year (now 20-year) monopoly on the exploitation of the invention. The monopoly is enforceable by an array of statutory and equitable remedies and it is therefore important for the public to know what is prohibited and where they may safely go while the patent is still in existence. The public notice function is performed by the claims that conclude the specification and must state "distinctly and in explicit terms the things or combinations that the applicant regards as new and in which he claims an exclusive property or privilege" (s. 34(2))". An inventor is not obliged to claim a monopoly on everything new, ingenious and useful disclosed in the specification. The usual rule is that what is not claimed is considered disclaimed.

## The Questions to be Addressed in Construing a Claim

[32]    When construing the claims, therefore, the following questions may be addressed:

      1.    Who construes the claims?

      2.    When are the claims construed?

      3.    As of what date is the claim to be construed?

      4.    What are the criteria for construction?

      5.    What resources may be used for purposes of construction?

      6.    Through whose eyes is construction to be made?

      7.    What is to be made of the resulting construction?

## 1) Who Construes the Claim

[33]    The Court construes the claim (*Whirlpool* at paragraphs 43 and 45).

[34]    It is not the function of an expert witness to construe the claim. As the Supreme Court said at paragraph 57 of *Whirlpool*:

> *"The role of the expert was not to interpret the patent claims but to put the trial judge in the position of being able to do so in a knowledgeable way."*

## 2) When are the Claims Construed

[35]    The claims are construed by the Court at the outset of its decision before considering issues of validity or infringement. It is not to be a *"results oriented"* exercise, rather, it is to be carried out without an eye either to the alleged infringement or the prior art. (*Whirlpool* paragraphs 43 and 49(a)).

### 3) As of What Date are the Claims to be Construed

[36]    The claims are to be construed as of the date of the patent was issued and granted in the case

of an "*old*" *Act* patent, that is, one that was applied for in Canada before October 1, 1989.  In respect

of a "*new*" *Act* patent, that is, one for which an application was filed in Canada after October 1,

1989, the date upon which the claim is to be construed is the publication date. (*Whirlpool* paragraph

42, *Free World* paragraph 44).

### 4)  What are the Criteria for Construction

[37]    In this regard consideration must be given to the words of the Supreme Court in *Whirlpool*

at paragraph 45:

> "*The key to purposive construction is therefore the identification by the court, with the assistance of the skilled reader, of the particular words or phrases in the claims that describe what the inventor considered to be the "essential" elements of his invention.*"

[38]    In Free World in paragraph 51 the Supreme Court says:

> "*The words chosen by the inventor will be read in the sense the inventor is presumed to have intended.*"

[39]    These words do not mean that the Court is to embark upon a *subjective* examination of what

was in the mind of the inventor, rather, the Court is to embark upon an *objective* exercise as to what

a skilled reader would have understood the inventor to mean.  As Lord Hoffman said at paragraph

32 of *Kirin- Amgen*:

> "*Construction is objective in the sense that it is concerned with what a reasonable person to whom the utterance was addressed would have understood the author to be using the words to mean (emphasis added).*"

## 5)  What Resources May be Used for Construction

[40]    A claim is to be read in the context of the rest of the specification.  As the Supreme Court

said in *Whirlpool* at paragraph 48:

> 48    ... In *Catnic*, as in the earlier case law, the scope of the monopoly remains a function of the
> written claims but, as before, flexibility and fairness is achieved by differentiating the essential
> features ("the pith and marrow") from the unessential, based on a knowledgeable reading of the
> whole specification through the eyes of the skilled addressee rather than on the basis of "the kind
> of meticulous verbal analysis in which lawyers are too often tempted by their training to indulge"
> (*Catnic, supra, p. 243).*

at paragraph 49(f):

> 49(f)    While the appellants express concern that "purposive construction" may open the door
> to extrinsic evidence of intent, as is the case with certain types of extrinsic evidence in the
> United States, neither *Catnic, supra,* nor *O'Hara, supra,* goes outside the four corners of the
> specification, and both properly limit themselves to the words of the claims interpreted in the
> context of the specification as a whole.

and at paragraph 52:

> 52    I have already given my reasons for concluding that to the extent the appellants are
> arguing for a simple "dictionary" approach to construction of the '803 claims, it must be
> rejected. In *Western Electric Co. v. Baldwin International Radio of Canada, [1934] S.C.R.
> 570,* the Court cited earlier authority dealing with the word "conduit" as used in a patent
> claim. Duff C.J. at p. 572 accepted the proposition that "[y]ou are not to look into the
> dictionary to see what 'conduit' means, but you are to look at the specification in order to see
> the sense in which the patentees have used it". In *Consolboard, supra,* as mentioned, Dickson
> J. considered that the whole of the specification (including the disclosure and the claims)
> should be looked at "to ascertain the nature of the invention" (p. 520). To the same effect is
> the statement of Taschereau J. in *Metalliflex Ltd. v. Rodi & Wienenberger Aktiengesellschaft,
> [1961] S.C.R. 117,* at p. 122:
>
>> The claims, of course, must be construed with reference to the entire
>> specifications, and the latter may therefore be considered in order to assist
>> in apprehending and construing a claim, but the patentee may not be
>> allowed to expand his monopoly specifically expressed in the claims "by
>> borrowing this or that gloss from other parts of the specifications".
>
> More recently, *Hayhurst, supra,* at p. 190, cautioned that "[t]erms must be read in context,
> and it is therefore unsafe in many instances to conclude that a term is plain and unambiguous
> without a careful review of the specification". In my view, it was perfectly permissible for the
> trial judge to look at the rest of the specification, including the drawing, to understand what
> was meant by the word "vane" in the claims, but not to enlarge or contract the scope of the
> claim as written and thus understood.

[41]    The Court may be assisted by expert witnesses in order to understand the context of the invention described and the particular meaning of terms used in the patent. The expert, however, is not to displace the Court in the role of the person who is to interpret the claims. In *Whirlpool* at paragraph 45 the Supreme Court stated:

> 45    The key to purposive construction is therefore the identification <u>by the court</u>, with the assistance of the skilled reader, of the particular words or phrases in the claims that describe what the inventor considered to be the "essential" elements of his invention. This is no different, I think, than the approach adopted roughly 40 years earlier by Duff C.J. in J. K. Smit & Sons, Inc. v. McClintock, <u>[1940] S.C.R. 279</u>. The patent in that case related to a method of setting diamonds in devices such as rotary drill bits for earth boring. Duff C.J., citing the earlier jurisprudence, put the focus on the inventor's own identification of the "essential" parts of his invention, at p. 285:
>
>> Obviously, the invention, as described by the inventor himself, involves the use of air suction to hold the diamonds in place while the molten metal is being introduced into the mold. There can be no doubt, in my mind, that as the inventor puts it, that is an essential part of his process. That part of his process is clearly not taken by the appellants. Adapting the language of Lord Romer, it is not the province of the court to guess what is and is not of the essence of the invention of the respondent. The patentee has clearly indicated that the use of air suction at that stage of the process is an essential, if not the essential, part of the invention described in the specification. [Emphasis added.]

and at paragraph 57:

> 57    The third and most important obstacle to the appellants' dictionary approach is that it was not in fact consistent with the testimony of their own expert. The parties called three experts. The role of the expert was not to interpret the patent claims but to put the trial judge in the position of being able to do so in a knowledgeable way.

## 6) **Through Whose Eyes is Construction to be Made**

[42]    A patent is addressed to the "*ordinary person skilled in the art*" to which it pertains.

[43]    In *Whirlpool* the Supreme Court said at paragraph 53:

> "However, the patent specification is not addressed to grammarians, etymologists or to the public generally, but to skilled individuals sufficiently versed in the art to which the patent relates to enable them on a technical level to appreciate the nature and description of the invention."

and at paragraph 53 the Court affirms that it is the *"ordinary"* worker skilled in the field who is to

be regarded as the criterion:

> 53    *A second difficulty with the appellants' dictionary approach is that it urges the Court to look at the words through the eyes of a grammarian or etymologist [page1099] rather than through the eyes and with the common knowledge of a worker of ordinary skill in the field to which the patent relates. An etymologist or grammarian might agree with the appellants that a vane of any type is still a vane. However, the patent specification is not addressed to grammarians, etymologists or to the public generally, <u>but to skilled individuals sufficiently versed in the art to which the patent relates</u> to enable them on a technical level to appreciate the nature and description of the invention: H. G. Fox, The Canadian Law and Practice Relating to Letters Patent for Inventions (4th ed. 1969), at p. 185. <u>The court</u> writes Dr. Fox, at p. 203, <u>must place itself</u>*
>
> > *<u>in the position of some person acquainted with the surrounding circumstances as to the state of the art and the manufacture at the time, and making itself acquainted with the technical meaning in that art or manufacture that any particular word or words may have.</u>*
>
> *See also D. Vaver, Intellectual Property Law (1997), at p. 140. Knowledge of purpose is one of the important attributes the skilled worker brings to the exercise, as was made clear in Burton Parsons Chemicals, Inc. v. Hewlett-Packard (Canada) Ltd., [1976] 1 S.C.R. 555, a case that concerned the validity of a chemical patent. The invention was a type of conductive cream to be smeared on bits of the human body for the purpose of making electro-cardiograms and the like. The mixture was of no fixed composition. The essential invention was "to combine a highly ionizable salt with an aqueous emulsion" (p. 564). It was put in evidence that hundreds, if not thousands, of substances would fit the description, including some that would be toxic or irritating to the skin. A toxic "conductive cream" would not be a useful therapeutic tool, and it was alleged on that account that the patent lacked utility and was invalid. These objections were swept away by Pigeon J. who held that the notional skilled workman would understand perfectly well the purpose of the combination and could therefore be expected to apply the [page1100] teaching of the patent by sensibly choosing components suitable for that purpose (p. 563):*
>
> > *While the construction of a patent is for the Court, like that of any other legal document, it is however to be done on the basis that the addressee is a man skilled in the art and the knowledge such a man is expected to possess is to be taken into consideration. To such a man it must be obvious that a cream for use with skin contact electrodes is not to be made up with ingredients that are toxic or irritating, or are apt to stain or discolour the skin.*
>
> *Burton Parsons is a pre-Catnic instance of purposive construction where, as in Catnic itself, the skilled addressee made sense and purpose of the words used in the claim by deploying <u>the common knowledge of someone in that position</u>. It is through the eyes of such a person, not an etymologist or academic grammarian, that the terms of the specification, including the claims, must be read (Emphasis added).*

The same was stated by the Supreme Court at paragraph 44 of *Free World*:

44    The courts have traditionally protected a patentee from the effects of excessive literalism. The patent is not addressed to an ordinary member of the public, but to a worker skilled in the art described by Dr. Fox as

> a hypothetical person possessing the ordinary skill and knowledge of the particular art to which the invention relates, and a mind willing to understand a specification that is addressed to him. This hypothetical person has sometimes been equated with the "reasonable man" used as a standard in negligence cases. He is assumed to be a man who is going to try to achieve success and not one who is looking for difficulties or seeking failure.

(Fox, supra, at p. 184)

It is the "common knowledge" shared by competent "ordinary workers" that is brought to bear on the interpretation: Fox, supra, at p. 204; Terrell on the Law of Patents (15th ed. 2000), at p. 125; I. Goldsmith, Patents of Invention (1981), at p. 116 (Emphasis added).

[44]    An "ordinary" worker was discussed by the Supreme Court at paragraphs 70 and 71 of *Whirlpool*. To encapsulate what was said, an "ordinary" worker is one who operates on the basis of common knowledge in the trade, possessing "ordinary skills" and not possessed with any special "in house" knowledge. At paragraph 74 the Court said:

> "While the hypothetical "ordinary worker" is deemed to be uninventive as part of his fictional personality, he or she is thought to be reasonably diligent in keeping up with advances in the field to which the patent relates. The "common knowledge" of skilled workers undergoes continuous evolution and growth."

## 7) What is to be Made of the Resulting Construction

[45]    Purposive construction may be capable of expanding or limiting the literal text of the claim (*Whirlpool* paragraph 49(h)).

[46]    It may be that the result is a "self inflicted" wound as stated in *Free World* paragraph 51:

> 51    This point is addressed more particularly in Whirlpool Corp. v. Camco Inc., [2000] 2 S.C.R. 1067, 2000 SCC 67 and Whirlpool Corp. v. Maytag Corp., [2000] 2 S.C.R. 1116, 2000 SCC 68, released concurrently. The involvement in claims construction of the skilled addressee holds out to the patentee the comfort that the claims will be read in light of the knowledge provided to the court by expert evidence on the technical meaning of the terms and concepts used in the claims. The words chosen by the inventor will be read in the sense the inventor is presumed to have intended, and in a way that is sympathetic to accomplishment of the inventor's purpose expressed or implicit in the text of the claims. However, if the inventor

> *has misspoken or otherwise created an unnecessary or troublesome limitation in the claims, it is a self-inflicted wound. The public is [page1054] entitled to rely on the words used provided the words used are interpreted fairly and knowledgeably.*

[47]    The public is entitled to a construction which, in the words used in paragraph 50 of *Free World* by the Supreme Court is *"in the interest of fairness both to the patentee and the public."*

[48]    Once a claim is construed, the Court may proceed to examine the issues of validity and infringement on the basis of that construction.

## Throwing Up One's Hands - Ambiguity

[49]    There is a temptation, particularly in hotly contested cases, to throw up one's hands and say that the claim is not capable of any construction, or any one construction. That is, it is ambiguous, therefore, invalid. The Supreme Court of Canada in *Pioneer Hi Bred* v. *Commissioner of Patents*, [1989] 1 S.C.R. 1623 has said at pages 1637 and 1638 :

> *In summary, the Patent Act requires that the applicant file a specification including disclosure and claims (Consolboard Inc., supra, at p. 520). Canadian courts have stated in a number of cases the test to be applied in determining whether [page1638] disclosure is complete. The applicant must disclose everything that is essential for the invention to function properly. To be complete, it must meet two conditions: it must describe the invention and define the way it is produced or built*
>
> ***
>
> *The applicant must define the nature of the invention and describe how it is put into operation. A failure to meet the first condition would invalidate the application for ambiguity, while a failure to meet the second invalidates it for insufficiency. The description must be such as to enable a person skilled in the art or the field of the invention to produce it using only the instructions contained in the disclosure*
>
> ***
>
> *and once the monopoly period is over, to use the invention as successfully as the inventor could at the time of his application.*

Page: 24

[50]    Section 36(2) requires that a patent end with claims that *"clearly and distinctly"* describe the

invention.

[51]    The last time a Canadian court held a claim to be ambiguous, hence invalid, was in

addressing one of many patents at issue in *Xerox of Canada Ltd.* v. *IBM Canada Ltd.* (1977), 33

C.P.R. (2nd) 24 at pages 82-83.  In retrospect today's Court may simply have held the claim not to

be infringed.  Prior to that one must go back to the early 1930's where the Supreme Court of Canada

in *Complex Ore Reduction Co.* v. *Electrolytic Zinc Process Co.* [1930] S.C.R. 462 held a patent to

be invalid for ambiguity.  At pages 475 and 476 Rinfret J. said:

> To sum up our views, on this branch of the case, we think the specification is insufficient. It
> fails to comply with the conditions of clarity and distinctness required by section 13 of the Act
> and does not state in precise and unambiguous terms in what the alleged invention
> consists. If the descriptive part of the specification be construed as suggested by counsel for
> the French Company, the claims were not made to conform with it and they are inadequate
> for that purpose. We can find in the patent no other subject-matter patentable in law. The
> utility or the beneficial effect of manganese or of certain proportions of manganese are not
> what French
>
>> claimed as new and for the use of which he claimed an exclusive property
>> and privilege.
>
> At least, he did not clearly and distinctly do so. In the words of Fletcher Moulton L.J., the
> claim is
>
>> a separate part of the specification primarily designed for delimitation.
>
> British United Shoe Machinery Company Limited v. A. Fussel & Sons, Limited [(1908) 25
> R.P.C. 631 at p. 650.]. The delimitation must be clearly marked out. 'And, in conclusion, we
> will quote the following passage from Lord Halsbury's speech in The British Ore
> Concentration Syndicate Limited v. Minerals Separation Limited [(1909) 27 R.P.C. 33, at p.
> 47.].
>
>> The statute requires it (the specification) to be a distinct statement of what is the
>> invention. In construing a specification one has to remember that it is a document not
>> only assuring a monopoly to the patentee, which but for the statute would be contrary
>> to the common law, but so (also?) prohibiting any one, other than the patentee, doing
>> what he would be free to do, but for the right which is granted, subject to the
>> condition, among other things, that the patentee states distinctly what his invention
>> is. If he designedly makes it ambiguous, in my judgment the patent would
>> undoubtedly be bad on that ground; but even if negligently and unskilfully he fails to
>> make distinct what his invention is, I am of opinion that the condition is not fulfilled,

*reconstituted from a lyophilizate and the pH of which has been adjusted to a certain range solely with an acceptable acid.*

[55]    The issue for resolution is to what does the phrase *"which has not been reconstituted from a lyophizate"* refer?  Does it refer to the *"ready-to-use solution"* or to the *"acceptable salt."*

[56]    I will refer to the rules of construction set out previously.

## 1.  Who constitutes the claim?

[57]    This Court construes the claims.  Statements made by the experts, such as Beijnen at paragraph 59 and Cunningham at paragraph 24 are to be given no weight when it comes to construction.

## 2.  When are the claims to be construed?

[58]    The claims are to be construed now, before considering infringement.  Validity is not at issue in these proceedings.

## 3.  As of what date is the patent to be construed?

[59]    This is an *"old" Act* patent.  It is to be construed as of the date that it was issued and granted - October 22, 1991.

## 4.  What are the criteria for construction?

[60]    The claim is to be read in the context of the specification, against the background of the state of the art as set out as it existed as of the date upon which the claims is to be construed.

*and the consequence would be that the patent would be bad."*

[52]    As a practical matter, Canadian courts have resisted holding claims to be incapable of

meaning. The modern approach is exemplified by Mosley J. in *Letourneau* v. *Clearbrook Iron*

*Works Ltd.*, September 26, 2005, 2005 F.C. 1229 at paragraphs 37 and 38:

> *[37]      A claim is not invalid simply because it is not a model of concision and lucidity.*
> *Very few patent claims are. Claims are drafted to be understood by people with practical*
> *knowledge and experience in the specific field of the invention: Risi Stone Ltd.supra, at 20. If*
> *a term can be interpreted using grammatical rules and common sense, it cannot be*
> *ambiguous: Mobil Oil Corp. v. Hercules Canada Inc. (1995), 63 C.P.R (3d) 473 at 484, 188*
> *N.R. 382 (F.C.A.).*
>
> *[38]      The Court must give a purposive construction to a claim without being too astute*
> *or technical. If there is more than one construction that can be reasonably reached, the Court*
> *must favour the construction which upholds the patent. Where the language of the*
> *specification, upon a reasonable view of it, can be read so as to afford the inventor protection*
> *for that which he has actually in good faith invented, the court, as a rule, will endeavour to*
> *give effect to that construction: Lubrizol Corp. v. Imperial Oil Ltd. (1992), 45 CPR (3d) 449,*
> *98 D.L.R. (4th) 1 (F.C.A.); Western Electric Co. Inc. and Northern Electric Co. v. Baldwin*
> *International Radio of Canada Ltd., [1934] S.C.R. 570, [1934] 4 D.L.R. 129; Unilever PLC.*
> *v. Proctor & Gamble Inc., [1995] F.C.J. No. 1005 at para 23, 61 C.P.R. (3d) 499 (F.C.A.).*

[53]    In short, ambiguity is truly a last resort, rarely, if ever, to be used.

## Construction of the Claim(s) at Issue

[54]    The parties are agreed that claim 1 typifies all claims for the purposes of construction. To

re-iterate, it reads:

> *An injectable, ready-to-use, sterile, pyrogen-free, anthracycline glycoside solution which consists*
> *essentially of a physiologically acceptable salt of an anthracycline glycoside dissolved in a*
> *physiologically acceptable aqueous solvent therefore at an anthracycline glycoside concentration*
> *of from 0.1 to 50 mg/ml, which has not been reconstituted from a lyophilizate and the pH of*
> *which has been adjusted to from 2.5 to 5.0 solely with a physiologically acceptable acid.*

Or, with most of the technical terms removed:

> *An injectable, ready-to-use solution which consists essentially of a salt of the active ingredient*
> *dissolved in an acceptable solvent at a given range of  concentration, which has not been*

## 5. What resources may be used for construction

[61]    The evidence of the experts may be used as background against which the description contained in the specification is to be read in arriving at a purposive construction of the claims.

## 6. Through Whose eyes is construction to be made?

[62]    Through the eyes of an ordinary person skilled in the art. Certainly Beijnen meets this criteria. Cunningham is more of a generalist, however his comments are useful. Murgatroyd speaks only to the chemistry of lyophilization and to that limited extent, his comments are useful.

## Therefore – Construing the Claim

[63]    As to the state of this art, the evidence of the expert offered by Pfizer, Beijnen, and those offered by Mayne, Cunningham and Murgatroyd, were, by and large, not in conflict. Beijnen was more experienced in the particular field and offers greater assistance when it comes to what the background was that existed as of the relevant time, October 1991. The evidence as to the background is:

1.    Lyophilization, in layman's terms freeze-drying, was a common technique applied to a variety of substances including certain medicines in order that they may be stored for a period of time and remain stable. (Beijnen paragraphs 15 and 16, Cunningham paragraph 19, Murgatroyd paragraphs 14 and 15).

2.      A "*lyophilizate*" is the product of lyophilization (Beijnen paragraph 15, Cunningham paragraph 27).

3.      With respect to the chemical at issue anthracycline glycocide and, in particular doxorubicin, it was commercially available as a salt only in a lyophilized form (Beijnen paragraphs 14 and 17 and Beijnen cross examination page 72 line 22 to page 73 line 7, Exhibit 2).

4.      Anthracycline glycocides and in particular doxorubicin were extremely toxic. Exposure to humans whether during manufacture or in preparation for administration to a patient could be very harmful (Beijnen paragraphs 19 to 24, Cunningham paragraphs 37 to 39, Cunningham cross examination page 90 line 21 to page 97 line 11).

5.      Anthracycline glycocides were useful in the treatment of certain cancers (Beijnen paragraph 12).

6.      In the medical use context anthracycline glycocides and in particular doxorubicin were presented to a nurse or, other person administering the drug to a patient, in the form of a lyophilized material mixed with excipients such as lactose, contained in a sealed vial. The stopper of the vial would be punctured and a solvent such as water introduced. The vial was shaken until the material went into solution. A second puncture was made through the stopper into the vial and the solution was administered to a patient. Care

needed to be taken by the nurse or other such person, to avoid exposure to the material

in the vial (Beijnen paragraph 20).

[64]    Against this background, the specification of the '037 may be read.  The background of the

invention is set out at pages 1 and 2 which can be abridged as follows:

> *The present invention related to a stable intravenously injectable ready-to-use solution of an antitumor anthracycline glycoside, e.g. doxorubicin, to a process for preparing such a solution, and provide the same in a sealed container and to a method for treating tumors by the use of the said ready-to-use solution.*

> *The anthracycline glycoside compounds are a well known class of compounds in the antineoplastic group of agents, wherein doxorubicin is a typical, and the most widely used, representative.*

***

> *At present, anthracycline glycoside antitumor drugs, in particular, e.g. doxorubicin, are solely available in the form of lyophilized preparations, which need to be reconstituted before administration.*

> *Both the manufacturing and the reconstitution of such preparations expose the involved personnel (workers, pharmacists, medical personnel, nurses) to risks of contamination which are particularly serious due to the toxicity of the antitumor substances.*

> *The Martindale Extra Pharmacopoeia 28th edition, page 175 left column, reports, indeed, about adverse effects of antineoplastic drugs and recommends that "They must be handled with great care and contact with skin and eyes avoided, they should not be inhaled.  Care must be taken to avoid extranvasation since pain and tissue damage may ensue."*

***

> *Similarly, report about severe adverse effects observed in medical personnel exposed to use of cytostatic agents, including doxorubicin.*

> *To administer a lyophilized preparation, double handling of the drug is required, the lyophilized cake having to be first reconstituted and then administered and, moreover, in some cases, the complete dissolution of the powder may require prolonged shaking because of solubilization problems.*

> *As the risks connected with the manufacturing and the reconstitution of a lyophilized preparate would be highly reduced if a ready-to-use solution of the drug were available, we have developed a stable, therapeutically acceptable intravenously injectable solution of an anthracycline glycoside drug, e.g. doxorubicin, whose preparation and administration does not require either lyophilization or reconstitution.*

[65]    The invention is stated at pages 3 to 9 starting with a statement which is simply a recitation of what is contained in claim 1 followed by a number of examples and choices which are set out for each of the ingredients and parameters.  Other ingredients if desired are indicated.

[66]    The resulting advantage is set out at page 9.

> With the solutions of the invention it is possible to obtain compositions having a very high concentration of the anthracycline glycoside active substance even at 50 mg/ml.  This constitutes a great advantage over the presently available lyophilized preparate wherein high concentrations of anthracycline glycoside can only be obtained with difficulty because of solubilization problems encountered in reconstitution, mainly with saline.  The presence of the excipient, e.g. lactose, in the lyophilized cake, and its generally high proportion in respect of the active substance, even up to 5 parts of excipient per part of active substance, has a negative effect on solubilization so that difficulties may arise in obtaining dissolution of the lyophilized cake.

[67]    A process for making such solutions is described at page 8 in which, after stating that the solution to be made is as set out in claim 1, it says:

> "... which process comprises dissolving the said physrotologically (SP) acceptable salt, which salt is not in the form of a lyophilizate, in the said solvent..."

[68]    This process description, says Mayne, means that the phrase in claim 1 "which has not been reconstituted from a lyophilizate" is directed to the salt, not the solution.  Pfizer says that this statement in the process is directed to the avoidance of undue exposure during the manufacture stage and that the process as described is only one of several processes that could be used.

[69]    Mayne further argues, after scouring the description for all uses of lyophilizate or lyophilized cake or lyophilized preparation or lyophilized preparate or freeze-dried preparate, that the word lyophilizate meant only the salt.  Pfizer says that lyophilizate means anything that contains lyophilized active ingredient.

[70]    These exercises engaged in by counsel for Pfizer and Mayne are precisely the exercises that the Supreme Court says one is to avoid. One avoids a *"grammatical"* or *"etymological"* approach. One looks at the claim in light of the specification against the background in September 1991 as it would be understood by an ordinary person skilled in the art.

[71]    An ordinary person skilled in the art would understand that the invention was to deliver to the public something that it did not have before namely, a ready-to-use, stable preparation of the medicine in a form that did not require reconstitution from a powder, by the nurse of other person administering the drug. In this context the phrase *"which has not been reconstituted from a lyophilizate"* can only refer to the solution and not one of its ingredients, the salt.

## 7. What is the result?

[72]    In the result, Pfizer's construction of the claims is the correct one. On that construction the Mayne product is an infringement of at least claim 1.

[73]    Therefore, Mayne's allegation as to non-infringement is not justified and the Minister will be prohibited from issuing to Mayne a Notice of Compliance in respect of its application at issue here.

## Adequacy of the Notice of Allegation

[74]    Pfizer, in its Notice of Application, alleged that Mayne's Notice of Allegation was inadequate. Very little was made of this at the hearing and the point, except for a small querulous

point made in reply, was abandoned by Pfizer.  Certainly no evidence was led by Pfizer to the effect that they were puzzled or misled.

[75]     Such a plea has become somewhat commonplace in these NOC proceedings and should only be made where truly it is justified.

[76]     Where experienced parties with experienced Counsel proceed in such matters without a proper demonstration to the Court as to true inadequacy of the Notice of Allegation, such a plea should not stand (*Aventis Pharma Inc.* v. *Apotex Inc.*, 2005 F.C. 1283 at paras. 98-108; *Aventis Pharma Inc.* v. *Apotex Inc.*, 2005 F.C. 1504 at paras 48-50).

[77]     Here the plea of inadequacy has not been made out and should be dismissed with a cost penalty to dissuade such pleading by others in the future.  I propose, at this time, a modest one-quarter deduction from costs otherwise allowed.

**Costs**

[78]     Counsel have asked that I reserve as to the matter of costs until after this judgment has been released and considered by them.  I propose therefore, that counsel shall have ten (10) working days from release of this judgement to provide written submissions as to costs.  Those submissions are to be guided by the following considerations:

1.     Pfizer was successful and, in the normal course, would be entitled to its costs;

2.   Pfizer's costs should be reduced by one-quarter as previously indicated;

3.   The proceedings were, as almost all NOC proceedings, hard fought and requiring of good skills. They were not, however, exceptional and the high end of Column III may be appropriate;

4.   The expert Beijnen should be allowed his fees and disbursements. However, the Court is concerned with escalating expert fees in general and suggest that such fees should not exceed those allowed for lead counsel in preparing for and arguing the case;

5.   Pfizer had three counsel gowned, Mayne had one. The Pfizer case could have been argued by one counsel only.

6.   Cross-examinations were conducted overseas. Modest, not extravagant, disbursements should be allowed.

**In Conclusion**

[79]   An order will go in the following terms:

1.   The Minister of Health is prohibited from issuing a Notice of Compliance to Mayne Pharma (Canada) Inc. in respect of Epirubicin Hydrochloride Injection Ph. Eur. Having a strength per dosage unit of 2 mg/ml until the expiry of Canadian Letters Patent on

Page: 34

October 22, 2008 or earlier if said patent is held to be invalid by an unappealable

judgment of a competent Canadian Court; and

2.    Counsel shall provide written submissions as to costs within ten (10) working days from

the date hereof following which a further Order as to costs will be made.

"Roger T. Hughes"

_____

JUDGE

Toronto, Ontario
December 20, 2005

FEDERAL COURT

NAMES OF COUNSEL AND SOLICITORS OF RECORD

DOCKET:                  T-1142-04

STYLE OF CAUSE:          PFIZER CANADA INC. and
                         PHARMACIA ITALIA S.p.A.
                                              Applicants

                         and

                         THE MINISTER OF HEALTH
                         and MAYNE PHARMA (CANADA) INC.
                                              Respondents

PLACE OF HEARING:        TORONTO, ONTARIO

DATE OF HEARING:         DECEMBER 12 & 13, 2005

REASONS FOR ORDER:       HUGHES J.

DATED:                   DECEMBER 20, 2005

APPEARANCES:

Sheila Block
Kameleh Nicola
Cynthia L. Tape          FOR APPLICANTS

Susan D. Beaubien        FOR RESPONDENTS

SOLICITORS OF RECORD:

Torys LLP
Toronto, Ontario         FOR APPLICANTS

Susan D. Beaubien
Barrister & Solicitor
Ottawa, Ontario          FOR RESPONDENTS