# EXHIBIT 11

2. Syringes and I.V. sets with Luer-Lock fittings should be used whenever possible.

3. Special care must be taken in priming I.V. sets. The distal tip cover must be removed before priming. Priming should be performed into a sterile, alcohol dampened gauze sponge, which then is disposed of appropriately.

**Disposal Procedures**

1. Place contaminated materials in a leakproof, puncture proof container appropriately marked as hazardous waste.

2. Cytotoxic drug waste should be transported according to institutional procedures for contaminated material.

3. There is insufficient information to recommend any single preferred method for disposal of cytotoxic drug waste.

   3.1 One method for disposal of hazardous waste is by incineration at a temperature considered sufficient by the Environmental Protection Agency (EPA) to destroy organic compounds. Incineration should be done in an EPA permitted hazardous waste incinerator.

   3.2 Another method of disposal is by burial at an EPA permitted hazardous waste site.

   3.3 A licensed hazardous waste disposal company may be consulted for information concerning available disposal methods in the local area.

**Personnel Policy Recommendations**

1. All personnel working with cytotoxic agents must receive special training.

2. Access to the compounding area must be limited to only necessary authorized personnel.

3. The personnel working with these agents should be observed regularly by supervisory personnel to insure compliance with procedures.

4. Acute exposure episodes must be documented. The employee must be referred for professional medical examination.

**Monitoring Procedures**

1. Procedures to monitor the equipment and operating techniques of the personnel should be performed on a regular basis and documented. Specific methods of monitoring should be developed to meet the complexities of the function.

2. It is recommended that personnel involved in the preparation of cytotoxic agents on a full-time basis be given periodic health examinations in accordance with institutional policy.

**Supplement I**
*Special Techniques and Precautions for Use In the Class II Biological Safety Cabinet*

1. All equipment needed to complete the procedure in the Class II Biological Safety Cabinet should be placed into the cabinet before beginning and the view screen should

be placed at the recommended operating position. A wait of at least two to three minutes before beginning work to allow the unit time to purge itself of airborne contaminants is recommended.

2. The proper procedures for use in the Biological Safety Cabinet are not the same as those used in the horizontal laminar hood. In many cases, they seem contradictory, although in theory they are not. This is because of the nature of the airflow pattern in the Biological Safety Cabinet. Clean air descends through the work zone from the top of the cabinet toward the work surface. As it descends, the air is split, with some leaving though the rear perforation and some leaving through the front perforation. The region where the airflow splits is known as the "smoke split" because smoke introduced into this area appears to split into two directions.

3. It is recommended that the smoke slit be determined and marked on each hood after it is purchased even if the manufacturer states its location. This can be easily done by using an incense stick to generate smoke and moving it gently from front to rear laterally along the work surface of the cabinet near the center.

4. Routinely used large equipment should be placed in the cabinet in its normal position when the determination of the smoke split is made. The equipment should then be placed in the same position every time the cabinet is used.

5. Personnel should refrain from applying any face powder, eye make-up, rouge, fingernail polish, hairspray or other cosmetics in the work area. These cosmetics may provide a source of prolonged exposure if contaminated.

6. Eating, drinking, chewing of gum, storage of food or smoking in, around, or near the Biological Safety Cabinet should be prohibited. Each of these are sources of ingestion if they are accidentally contaminated by the cytotoxic agent or other hazardous products.

7. Sterile products should be arranged in the cabinet so as to minimize the possibility of contamination. This may mean locating them in the immediate vicinity of the smoke split. If appropriate, due to quantity or configuration, the sterile items should be kept only in the center and nonsterile items on either side.

8. For additional operator protection, it is recommended that the area behind the smoke split be used whenever possible since the airflow direction in the area is away from the operator, lessening the chance of accidental exposure.

9. The least efficient area of the cabinet in terms of product and personnel contamination is within three inches of the sides near the front opening. Therefore, you should not work within three inches of the sides of the cabinet.

10. Periodic evaluation of the smoke split should be performed on a routine basis. A constantly changing smoke split location may be indicative of problems with the operation of the cabinet.

11. Entry into and exit from the cabinet should be in a direct manner perpendicular to the face of the cabinet.

Rapid movements of the hands in the cabinet and later-
ally through the protective air barrier should be avoided.

## Supplement II
### Special Procedures for Acute Exposure or Spills

1.0  Acute Exposure

1.1  Overtly contaminated gloves or outer garments should
be removed and replaced immediately after an exposure.

1.2  Hands should be washed after removing gloves. Gloves
are not a substitute for handwashing.

1.3  In case of skin contact with a cytotoxic drug product,
the affected area should be washed thoroughly with
soap and water as soon as possible. Refer to professional
medical attention as soon as possible.

1.4  For eye exposure, flush affected eye with copious
amounts of water. Refer to professional medical atten-
tion immediately.

2.0  Spills

2.1  All personnel involved in the cleanup of a spill should
wear protective clothing (e.g., gloves, gowns, etc.). All
clothes and other materials used in the process should be
treated or disposed of properly.

2.2  Double gloving should be used in the cleaning up of
spills.

9 July 1984; Accepted 26 February 1985

B-18

Am. Ind. Hyg. Assoc. J (46)    June, 1985

5



Fig. 2—Electron photomicrograph of part of hepatocyte during acute non-A, non-B hepatitis (week 8) transmitted by inoculum I.

"Tubule" bounded by a single membrane (S), a longitudinal section through tubule (L), and a tangential section across tubule (T) are identified by arrows. The tubules often appear to contain ribosome-like particles. (×37 800.)

date eleven chimpanzees experimentally infected with human non-A, non-B hepatitis in our laboratory have developed characteristic increases in serum-alanine-aminotransferase (A.L.T.), with peak values of from 86 to 397 I.U./ml between weeks 6 and 17. Light microscopy of weekly liver-biopsy sections showed acidophilic changes, focal necrosis, and lymphocytic infiltration of sinusoids temporally associated with increased A.L.T.[1]

Thin sections of weekly liver samples from five of these chimpanzees (three infected with inoculum I, one with II, and one with III) revealed on electronmicroscopy,[2] a characteristic abnormal derangement of the endoplasmic reticulum (ER) in four of the chimpanzees, taking the form of "tubules" present throughout the cytoplasm of hepatocytes (figs 1 and 2) during the period when A.L.T. was raised. The hepatocytes in liver-biopsy sections of the chimpanzee infected with inoculum III did not show this change during acute non-A, non-B hepatitis despite the examination of eight weekly liver samples. This alteration in the ER configuration in many, but not all, hepatocytes in given liver-biopsy sections generally corresponded to the timing of histopathological changes seen by light microscopy.

The ER abnormality (figs 1 and 2) resembles the approximation or reduplication of the membranes of two ER vesicles or tubules. Such changes were not seen by electronmicroscopy during the examination of weekly liver-biopsy samples from chimpanzees with either hepatitis A or B but are not unlike a

variation of the "undulating tubules" described by Ghadially[3] in a large variety of tissues and cultured cell lines derived from normal and pathological tissues. The failure to detect this ER alteration in the one chimpanzee infected with inoculum III may be due to our inability to detect it or to the existence of unique characteristics of this inoculum.

The diameter of the "tubules" formed by the ER alteration ranged from approximately 190 nm for those bounded by a single membrane to 206 nm for those bounded by a double membrane (figs 1 and 2); the longest was 740 nm when viewed in longitudinal section. No consistent virus particles were associated with this ER derangement, as judged by standard thin-section electronmicroscopy, although ribosome-like particles were distributed along the inner surface of the "tubule" in some cases (fig. 2). Whether the ER membranes contain antigens or particles specific for an agent of non-A, non-B hepatitis remains to be determined by further electronmicroscopic studies or immune electronmicroscopy with specific antisera.

Hepatitis Branch,
Division of Blood and Blood Products,
Bureau of Biologics,                                    D. JACKSON
Food and Drug Administration,                           E. TABOR
Bethesda, Maryland 20014, U.S.A.                        R. J. GERETY

## MUTAGENICITY IN URINE OF NURSES HANDLING CYTOSTATIC DRUGS

SIR,—Anti-cancer drugs are known to be cancer-causing agents also, but we know of no studies of the possible occupational hazards in handling such drugs in oncological units. We have used a very sensitive screening procedure to look for mutagenic activity in the urine of patients on chemotherapy and of nurses administering these drugs.

The mutagenicity of urine concentrates, prepared by the XAD-2 method,[4] was investigated with the bacterial fluctuation test[5] with tryptophan-dependent *Escherichia coli* strain WP2 uvrA or histidine auxotroph strains of *Salmonella typhimurium*, TA 98 and TA 100 as indicator organisms.[6] 'Aroclor 1254' induced rat liver supernatant (S-9 mix) was used for metabolic activation.

Urine was collected from cancer patients on chemotherapy and from psychologists and office clerks not occupationally exposed to chemicals (controls). The urine samples of patients were collected on the morning after a 4 or 5 days treatment period. The usual combination of drugs used included cyclophosphamide and vincristine. Sometimes combinations of doxorubicin, vincristine, bleomycin, dacarbazine, and lomustine (C.C.N.U.) were also used. Urine samples from nurses were collected on Thursday afternoons. Additional samples from nurses were also gathered on Monday morning after a free weekend. All the subjects were non-smokers having normal dietary habits.

The urine sample (100 ml, filtered through a Whatman no. 1 paper) was loaded on a XAD-2 resin (1·5 ml) column, the flow-rate being 2-3 ml/min. The remaining urine was removed from the column with air suction. The absorbent was taken out from the column and washed with 5 ml of sterile distilled water by gentle stirring for 1 min to remove the residual histidine. After this the resin was washed twice with 5 ml acetone, with vigorous shaking for 1 min. The two acetone fractions were combined and evaporated at 60°C under a continuous flow of nitrogen. The residue was dissolved in 200 µl of dimethylsulphoxide (nurses and controls) or in 500 µl of dimethylsulphoxide (patients), because of toxicity problems in the test. For assay, a 100 µl sample of urine concentrate was used.

All the patients receiving cytostatic drugs exhibited mutagenicity in their urine. The mutagenic activity of the cytostatic drug cyclophosphamide is well documented. Cyclophosphamide is an indirect mutagen—i.e., it has to be metabolically

2. Barker, L. F., Chisari, F. V., McGrath, P. P., Dalgard, D. W., Kirschstein, R. L., Almeida, J. D., Edgington, T. S., Sharp, D. G., Peterson, M. R. *J. infect. Dis.* 1973, 127, 648.

3. Ghadially, F. N. Ultrastructural Pathology of the Cell; p. 209. London, 1975.
4. Yamasaki, E., Ames, B. N. *Proc. natn. Acad. Sci. U.S.A.* 1977, 74, 3555.
5. Green, M. H. L., Bridges, B. A., Rogers, A. M., Horspool, G., Muriel, W. J., Bridges, J. W., Fry, J. R. *Mutat. Res.* 1977, 48, 287.
6. Ames, B. N., McCann, J., Yamasaki, E. *ibid.* 1975, 35, 347.



**Relative revertant frequencies.**

$R_t/R_s$=revertants in test *vs.* spontaneous revertants in solvent control, in fluctuation test with *E. coli* WP2 uvrA (open) and *S. typhimurium* TA 100 (shade) on concentrated urine samples from cytostatic patients (values extrapolated −2·5 to fit same volume of urine), nurses, and controls.

activated to form mutagenic metabolites. The role of a single chemical in a combination of chemotherapeutic drugs is difficult to evaluate. However, doxorubicin and nitrosoureas have been found to be mutagenic in the salmonella/microsome test.[4,5]

Most of the nurses exhibited mutagenicity in their urine concentrates (see figure). Both strains TA 100 and WP2 revealed increased amounts of revertant tubes in the fluctuation test. The mutagenicity was less striking after a duty-free weekend. Slight mutagenic activity could be detected with the *E.coli* WP2 uvrA strain in Monday morning urines.

The mutagenicity was significantly higher in the urines of patients than in those of nurses. The amount of urine in the test sample was smaller for the patients than for the nurses. No mutagenic activity was detected in the urine of non-smoking controls. The differences of means of revertant frequencies are significant between controls and nurses (p<0.001). The Monday and Thursday samples of nurses are statistically significant in the *t*-test at 0·01>p>0·001.

The carcinogenic risk of anti-cancer drugs has not been previously discussed from an occupational standpoint. Several reports suggest an increased frequency of subsequent precancerous lesions or cancer in patients on anti-cancer drugs.[6] Patients on cyclophosphamide may be at risk of urinary-tract cancers,[1] a risk possibly related to the excretion of mutagenic urinary metabolites of cyclophosphamide. This is why we think that the finding of mutagenic activity in urine concentrates not only of patients on cytostatic drugs but also among personnel handling these drugs warrants special consideration. Further studies to characterise the relation between occupational exposure and mutagenicity in urine are needed.

Department of Industrial
Hygiene and Toxicology
Institute of Occupational Health,
SF-00290 Helsinki 29, Finland;
and Department of Radiotherapy
and Oncology,
University Central Hospital,
Helsinki

KAI FALCK
PENTTI GRÖHN
MARJA SORSA
HARRI VAINIO
ERKKI HEINONEN
LARS R. HOLSTI

4. Seino, Y., Nagao, M., Yahagi, T., Hoshu, A., Kawachi, T., Sugimura, T. *Cancer Res.* 1978, **38**, 2148.
5. Benedict, W. F., Baker, M. S., Haroun, L., Choo, E., Ames, B. N. *ibid.* 1977, **37**, 2209.
6. Harris, C. C. *Cancer*, 1976, **37**, 1014.
7. Wall, R. L., Clausen, K. P. *New Engl. J. Med.* 1975, **293**, 271.

## Medicine and the Law

### Negligent Failure to Terminate Pregnancy

IN April, 1972, the defendant doctor agreed with the plaintiff that he would perform a legal abortion to terminate her pregnancy by means of dilatation-and-curettage. By this method he failed to terminate her 7-week pregnancy, and in December, 1972, she gave birth by cæsarian section to a healthy son. She brought an action for breach of contract against the doctor, claiming that he had performed the operation negligently and subsequently failed to carry out the necessary investigations, further procedures, and treatment.

Mr Justice WATKINS said that the plaintiff went to the clinic in April, 1972, and the operation was performed by the doctor under a general anæsthetic. That evening the doctor assured her that all was well and she could go home. She was unaware of the doctor's operation notes which read, "aspiration D. & c., no evidence of fetal parts, hydatidiform mole", a potentially dangerous situation for the plaintiff. The doctor turned his back upon a situation that obviously demanded immediate and urgent attention. The plaintiff consulted her general practitioner in early June. A pregnancy test proved positive. She took various steps, but was dissuaded by the receptionist at the clinic from returning to see the defendant doctor. In August, 1972, the defendant doctor offered to perform a second operation which involved greater risk to the plaintiff, and she refused it. He told her that the D & c. he had performed had failed because she had a double uterus, which she believed. In 1974 the plaintiff was informed that she might have a cause of action against the doctor, which was confirmed by a consultant's report of October, 1975, so the claim was not statute-barred. Bearing in mind the age of the fetus, the power of the aspirator, and the simplicity of the operation, the doctor had botched the operation. In all probability he had perforated the tissues surrounding the uterus or passages outside the uterus. Neither the catheter nor the curette had entered the uterus. He seized upon a speculative and dangerous explanation of his failure to aspirate the fetus. Such a matter should have been placed before a consultant without delay. The doctor had much experience in carrying out D. & c. operations. He failed to terminate the plaintiff's pregnancy when her uterus was free of defect. In operating upon her he failed to exercise reasonable skill and care. In addition to his breach of duty in performing the operation in the circumstances he owed her a continuing duty of care as though the relationship of doctor and patient continued to exist between them. The doctor's counsel conceded that he should have done more for the care and welfare of the plaintiff, and should have arranged a histological examination of the aspirated material. If the doctor had seen the plaintiff two or three weeks after the D. & c. she would have undergone another operation, but he did nothing. The plaintiff's subsequent determination to keep the child was not the effective cause of the continuation of her pregnancy. The sole and effective cause was the doctor's breach of contract. A sum of £14 500 for loss of earnings was awarded, £3 500 for diminution of her prospects of marriage, and £750 for pain and other mental suffering, including anxiety, distress, and other mental suffering. Judgment for the plaintiff in the sum of £18 750 with interest and costs.

*Scuriaga v. Powell. Queen's Bench Division:* Watkins J. May 18, 1979. Counsel and solicitors: Margaret Puxon (Ward Bowie), Roderick Adams (Hempsons).

SUSAN DENNY
Barrister-at-law

EXHIBIT D

**PHARMACIA'S OPPOSITION TO SICOR'S MOTION IN LIMINE #4:**
**ATTORNEY TESTIMONY AND ATTORNEY-PREPARED DOCUMENTS**

Sicor's fourth motion *in limine* seeks to preclude a variety of evidence altogether or from the liability and willfulness phases of this litigation, even though that evidence is directly related to issues in suit. But it was Sicor that put the evidence at issue in the case. Although Sicor was repeatedly given the opportunity to avoid producing all of this evidence under claim of privilege, and avoid its consideration by the jury altogether, Sicor made the strategic decision to produce it. Sicor obtained bifurcation on the basis of the prejudice of the documents that will be used during the willfulness phase; it cannot be heard now to cry prejudice from those highly relevant documents. Sicor cannot now run from that decision by claiming its irrelevance or jury prejudice.

I.      **Sicor Made the Opinion Letter Relevant to the**
        **Liability Phase by Having Its Liability Expert Review It**

Sicor argues that Pharmacia should not be permitted to use in the liability phase the opinion that Sicor will use to defend itself in the willfulness phase. If Sicor had acted in the normal way, it would be correct – the opinion letter would be relevant only to willfulness. But Sicor did not act in the normal way, it chose to give the opinion to its liability phase expert and have him consider it. Ex. 1, p. 260-61. By doing so, Sicor made the opinion relevant to the liability phase and its motion in limine should be denied.

Sicor's liability-phase expert, Douglas Clark, testified at length about the opinion letter and his agreements and disagreements with the opinions expressed therein; his testimony on the opinion letter calls his credibility into question with regard to both obviousness and written description. With regard to obviousness, Dr. Clark went so far as to suggest that the claim construction of the term "anthracycline glycoside" identified

in the opinion letter was "not reasonable" for a person having ordinary skill in the art to adopt. Ex. 1, p. 150-51 ("It's not impossible.  I don't think it would be a reasonable conclusion for one of ordinary skill in the art to make.").  With regard to the opinion letter's discussion of the written description requirement, Dr. Clark indicated he was not qualified to render an opinion on that issue:

> Q.   Could you turn to Page 61 of the opinion and under the Roman VII, it says in the first paragraph: "We are of the opinion that all 13 claims of the 285 patent are invalid for lack of written description under 35 USC Section 112, first paragraph, because the issued claims are not limited to solutions not reconstituted from a lyophilizate and are broader than what one of ordinary would recognize as the invention described in the specification."
>       Do you see that?
>
> A.   I do.
>
> Q.   Do you believe that statement with regard to the issued claims are not limited to solutions not reconstituted from a lyophilizate is incorrect?
>
> MR. SIGALE:   Objection.   Calls for a legal conclusion.   Objection.  Vague.
>
> A.   Yes.  I interpreted this when I looked at it as a legal interpretation.  I didn't consider it much beyond that.
>
> Q.   So in your mind, it wouldn't be what one of ordinary skill in the art would have read the claims as requiring?
>
> A.   No, not necessarily.  To me this says that the claims of the parent are invalid.  ***This is a legal interpretation which I'm not qualified to make*** because the issued claims are not limited to solutions not reconstituted from a lyophilizate and are broader than what one of ordinary would recognize as inventions described in the specification.

*Id.* at 264-65 (emphasis added).

Sicor was not required to have Dr. Clark review the opinion letter, it chose to do so in an unsuccessful attempt to bolster his shaky testimony.  That is, far from respecting the "sanctity of the attorney-client privilege," Sicor chose to use privileged materials

2

opportunistically.  None of the cases Sicor cites in its motion involve such a situation, and nothing could justify preventing Pharmacia from using a document that Sicor itself put at issue for the liability phase.  Sicor has repeatedly attempted to manipulate the attorney-client privilege and select the scope of its waiver in order to use the privilege as both a sword and a shield.  Exs. __, __.  It cannot do so under the law, *In re Echostar Comms. Corp.*, 448 F.3d 1294, 1300 (Fed. Cir. 2006),[1] and this Court should once again step in and prevent its efforts.  Sicor's Fourth Motion in limine should be denied with regard to the opinion letter.

## II.    Sicor's Attorney Testimony is Relevant to Secondary Considerations of Nonobviousness

The second category of evidence that Sicor is trying to preclude (again, from the validity phase of the litigation) is evidence of Sicor's copying of Pharmacia's formulation after its failed attempts to design around the '285 patent.  Such copying is an important secondary consideration indicative of nonobviousness.  *See Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed. Cir.), *cert. denied*, 477 U.S. 905 (1986); *see also Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566 (Fed. Cir.), *cert. denied*, 481 U.S. 1052 (1987).  Such evidence is not only relevant and admissible, it *must* be considered.  As noted by the Federal Circuit, "It is jurisprudentially inappropriate to disregard any relevant evidence on any issue in any case, patent cases included.  Thus evidence arising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness."  *Stratoflex, Inc. v.*

---

[1] "The client can waive the attorney-client privilege when, for instance, it uses the advice to establish a defense.  However, selective waiver of the privilege may lead to the inequitable result that the waiving party could waive its privilege for favorable advice while asserting its privilege on unfavorable advice.  In such a case, the party uses the attorney-client privilege as both a sword and a shield."  448 F.3d at 1300.

3

*Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983) (emphasis added).

The evidence Sicor seeks to exclude demonstrates that: (1) Sicor initially considered avoiding copying by developing a non-infringing alternative formulation; (2) it was unable to do so; and (3) Sicor ultimately abandoned attempts to develop a non-infringing alternative and copied Pharmacia's formulation. Copying in this setting, where Sicor had specifically considered designing around (*i.e.*, not copying), but was unable to do so is a particularly relevant secondary consideration.[2] As such, this evidence of Sicor's inability to avoid copying goes to the heart of the obviousness inquiry and must be considered by the jury.

Notably, all of the evidence on this copying and abandoned design-around effort was initially withheld by Sicor under claim of privilege. Sicor made the conscious choice to rely on an advice of counsel defense, thus making these documents available. Had Sicor been truly concerned about the use of these documents, it had the opportunity to forebear reliance on advice of counsel.

**III.    Documents Should Not be Redacted in the Willfulness Phase**

The third category of evidence that Sicor seeks to preclude (this time altogether, in all phases of the trial) are the various statements by Wes Fach to Sicor's chief executive officer in PTX 113, including the statement that the jury "may well rely on a non-scientific (even irrational) basis." In fact, each of these statements is highly relevant to the issue of willful infringement, and the totality of circumstances test. To determine willfulness, the jury "must examine the totality of the circumstances of the case."

---

[2] "Failure of others" is another oft-cited secondary consideration. *See*, *e.g.*, *Panduit*, 810 F.2d at 1566 (Fed. Cir.). Here, the failure of others is that of Sicor itself, which tried, and failed, to design a non-infringing alternative. Instead Sicor chose to copy Pharmacia's formulation.

*Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics Inc.,* 976 F.2d 1559, 1582 (Fed. Cir. 1992).   And once again, it is Sicor that made the choice to rely on the advice of counsel defense.[3]   In short, Sicor cannot argue with a straight face that this memo – including each of the statements in the section of PTX 113 that it now seeks to redact – was not part of the "totality of circumstances" that Sicor's CEO faced in making the decision to press ahead with the infringing product.

For these reasons, therefore, Sicor's motion to preclude this evidence and argument should be denied.

---

[3] As the Court may recall, Sicor first attempted to use the attorney-client privilege as both a sword and a shield by refusing to produce anything more than its opinion of counsel. Thwarted in that attempt, and after making the strategic decision to produce the materials in question even after a warning by this Court, Sicor now tries to raise a different shield -- that statements in this memo should be redacted because of their "inflammatory" nature -- while still trying to rely on the advice of counsel. Sicor cannot have it both ways. Having chosen to rely on advice of counsel, it cannot now redact some of that advice regarding the very same validity issues that were addressed by its opinion.

1

REDACTED

2

# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

October 24, 2005

The Honorable Kent A. Jordan                    VIA ELECTRONIC FILING
United States District Court
844 King Street
Wilmington, DE  19801

      Re:    *Pharmacia & Upjohn Company v. Sicor Inc. and Sicor Pharmaceuticals Inc.*
              C.A. No. 04-833-KAJ

Dear Judge Jordan:

      We, along with Sonnenschein Nath & Rosenthal LLP, represent defendants Sicor Inc. and Sicor Pharmaceuticals, Inc. (collectively, "Sicor") in the above-referenced patent dispute.  In accordance with Your Honor's instruction during the October 11, 2005 telephonic hearing (the "October 11 Hearing"), we write to advise the Court that Sicor has decided to assert an advice of counsel defense to Pharmacia & Upjohn LLC's willful infringement allegation.  Having made that decision, Sicor recognizes that it must waive the attorney-client privilege with respect to the legal opinion upon which it relied in deciding to launch its idarubicin hydrochloride injection in the Summer of 2002.  Thus, Sicor will produce to Pharmacia today the February 28, 2001 opinion of the Brobeck Phleger & Harrison firm and the supporting declaration of Dr. Waldemar Priebe, which was obtained by the Brobeck firm during its opinion work, and the other exhibits attached thereto (collectively, the "Brobeck Opinion").  The Brobeck Opinion states that "we have reached the firm conclusion that all of the claims of the '285 patent are invalid."

      Sicor understands the scope of its privilege waiver to be limited to the actual advice provided to its CEO at the time, Mr. Marvin Samson, and considered by Mr. Samson in making the product launch decision in the Summer of 2002.  Mr. Samson became the CEO of Sicor in September 2001.  Mr. Samson is prepared to testify at deposition and at trial that in deciding to launch the idarubicin hydrochloride injection in 2002, the only information he recalls receiving or reviewing with respect to patent issues were: (1) conversations with Sicor's general counsel, Mr. Wesley N. Fach, sometime in 2002 prior to the September 2002 product launch, to the effect that the company had received an invalidity opinion from outside counsel; and (2) portions of the Brobeck Opinion itself.

      During the October 11 Hearing, the Court stated that the privilege waiver would extend only to communications with the decision maker with respect to the patent at issue:

            I also typically do not view attorney work product as being within
            that scope of waiver.

Honorable Kent A. Jordan
October 24, 2005
Page 2

***

*I'm not telling you that everything you sent over to me is going to
the other side.* What I'm telling you is you need to make an
election about whether you want to invoke the [advice of counsel
defense]. If you do, you are going to have to give up *information
that was communicated to the client* associated with the opinion
that you want to rely on.

(Ex. A: October 11 Hearing Transcript at 14:7 – 15:2) (emphasis added).

Both Mr. Samson and Mr. Fach, Sicor's general counsel, are prepared to testify that no
privileged documents other than the Brobeck Opinion itself were presented to or reviewed by
Mr. Samson in connection with the 2002 launch decision. The three documents that were
attached as Exhibits A through C to Sicor's *in camera* submission (Bates Nos. SICOR-PNU
026342-43, 026347 and 029305-07) – which were dated between August 2000 and March 2001
– were created well before Mr. Samson became Sicor's CEO, and well over a year before Mr.
Samson made the product launch decision. They are thus irrelevant – the decision maker did not
read or rely on them in making his launch decision. For that reason alone, they should not have
to be produced by Sicor. In addition, this Court has recognized that those documents "raise[]
some significant issues in terms of potential prejudice. . . ." (Ex. A at 8:16-18). This too
militates against their disclosure.

Moreover, the documents constitute attorney work product – they set forth the mental
impressions of Mr. Fach with respect to anticipated litigation. Indeed, by the time Mr. Fach
prepared these documents, Pharmacia had already threatened to commence litigation if Sicor
launched its idarubicin hydrochloride injection. This is classic work product that, as this Court
observed during the October 11 Hearing, is not within the scope of Sicor's waiver of the
attorney-client privilege based upon its assertion of an advice of counsel defense. The
documents thus should not be produced for this reason as well.

The potential prejudice resulting from the waiver of privilege and the presentation to both
plaintiff's counsel and the jury of the documents attached as Exhibits A through C to Sicor's *in
camera* submission formed the primary basis for Sicor's bifurcation motion. For the reasons set
forth in Sicor's *in camera* submission and herein, Sicor believes that these documents should not
be produced to plaintiff's counsel, as their prejudicial effect far outweighs their probative value.
To the extent this Court believes it appropriate for Sicor to make a formal record of the matters
set forth in this letter, Sicor is prepared to do so. Mr. Samson and Mr. Fach are prepared to sit
for deposition, and Mr. Samson's deposition has already been scheduled with plaintiff's counsel.

Honorable Kent A. Jordan
October 24, 2005
Page 3


       We appreciate the time and attention that the Court has devoted to this issue.


                      Respectfully,

                      */s/ Steven J. Balick*

                      Steven J. Balick

SJB/dmf


cc:    Maryellen Noreika, Esquire (by hand)
       Daniel A. Boehnen, Esquire (via electronic mail)
       Reid L. Ashinoff, Esquire (via electronic mail)

# EXHIBIT A

1

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4    PHARMACIA & UPJOHN COMPANY,        :   CIVIL ACTION
                                         :
 5                                       :
                   Plaintiff and         :
 6                 Counter-defendant,    :
                                         :
 7    v.                                 :
                                         :
 8    SICOR INC., and SICOR              :
      PHARMACEUTICALS INC.,              :
 9                                       :
                   Defendants and        :   NO. 04-833 (KAJ)
10                 Counter-Claimants.        - - -

11                         Wilmington, Delaware
12                 Tuesday, October 11, 2005 at 3:00 p.m.
                         TELEPHONE CONFERENCE
13                              - - -

14    BEFORE:       HONORABLE KENT A. JORDAN, U.S.D.C.J.

15                              - - -

16    APPEARANCES:

17
                   MORRIS NICHOLS ARSHT & TUNNELL
18                 BY:  MARYELLEN NORIEKA, ESQ.

19                     and

20                 McDONNELL BOEHNEN HULBERT & BERGHOFF, LLP
                   BY:  DANIEL A. BOEHNEN, ESQ.,
21                      JOSHUA R. RICH, ESQ., and
                        GRANTLAND G. DRUTCHAS, ESQ.
22                      (Chicago, Illinois)

23                         Counsel for Pharmacia & Upjohn
                           Company
24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

```
 1   APPEARANCES: (Continued)

 2

 3              ASHBY & GEDDES
               BY:  JOHN G. DAY, ESQ.
 4
                    and
 5
               SONNENSCHEIN NATH & ROSENTHAL, LLP
 6             BY:  REID L. ASHINOFF, ESQ. and
                    DAVID R. BAUM, ESQ.
 7                  (New York, New York)

 8                  and

 9             SONNENSCHEIN NATH & ROSENTHAL, LLP
               BY:  JORDAN A. SIGALE, ESQ.
10                  (Chicago, Illinois)

11                       Counsel for Sicor Inc. and Sicor
                         Pharmaceuticals Inc.
12

13

14                       - oOo -

15                   P R O C E E D I N G S

16             (REPORTER'S NOTE:  The following telephone

17   conference was held in chambers, beginning at 3:00 p.m.)

18             THE COURT:  Hi, this is Judge Jordan.  Who do I

19   have on the line?

20             MS. NOREIKA:  Good afternoon, Your Honor.  It's

21   Maryellen Noreika from Morris Nichols for plaintiff

22   Pharmacia; and I have with me, Dan Boehnen and Joshua Rich

23   of the McDonnell Boehnen firm in Chicago.

24             MR. BOEHNEN:  Also with us in Chicago is Grant

25   Drutchas.
```

1            MS. NOREIKA:  Oh.  I apologize, Grant.

2            THE COURT:  All right.  Who do I have on for

3    Sicor?

4            MR. DAY:  Good afternoon, Your Honor.  On behalf

5    of Sicor, you have John Day from Ashby & Geddes as local

6    counsel; and from the Sonnenschein firm in New York, Reid

7    Ashinoff and David Baum; and from Sonnenschein's office in

8    Chicago, Jordan Sigale.

9            THE COURT:  All right.

10           MR. ASHINOFF:  Good afternoon, Your Honor.

11           THE COURT:  Good afternoon.  Well, by my count,

12   this is the fifth time we're getting together in this case

13   because we have discovery issues.  So this is not a good

14   record, ladies and gentlemen, but we're going to plow

15   through what we've got here.

16           Before we start, however, I have a question

17   for the folks at Sicor, and that is, I got the in camera

18   submission that you sent over.  Did you send a version,

19   redacted, if you thought necessary, of your legal argument

20   to the opposing counsel?

21           MR. ASHINOFF:  Your Honor, what we served on

22   the opposing counsel is a motion that we filed and a

23   privilege log that listed the privilege material that the

24   Court got.  What we served in camera on the Court was the

25   short discussion of the substance of the privileged material

1    and the actual privileged material.  We did not serve copies

2    of the discussion and description of the privilege material

3    or the actual material on our adversary.

4              THE COURT:  All right.  I need to have you

5    identify yourself for the record.

6              MR. ASHINOFF:  It's Reid Ashinoff.  I'm sorry,

7    Your Honor.

8              THE COURT:  All right.  Mr. Ashinoff, that's not

9    going to cut it.  I'm going to quote to you what I said in

10   our last teleconference on the 19th of September.  Page 24

11   of the transcript:

12             "You can certainly submit your documents in

13   camera and your legal arguments ought to be submitted so

14   that the other side can respond to them."

15             Later on the same page:

16             "In short, you give me the documents but you

17   give your arguments to the attorney side, too, so they can

18   respond unless it's something genuinely extraordinary that

19   you think will get past me; all right?"

20             And what I was trying to communicate there and

21   what I will reemphasize is I'm not going to let you give me

22   legal argument without an opportunity for them to respond to

23   legal argument.

24             MR. ASHINOFF:  Your Honor, I don't think we cite

25   any law at all in the material we submitted in camera.  What

1   we submitted in camera basically highlights certain lines

2   in the privileged text and points those out to the Court,

3   amongst the entirety of the text, points those lines out and

4   makes the factual points that we think those would prejudice

5   us.  All the legal argument is in the publicly filed motion

6   and the cases are in the publicly filed motion, as the Court

7   directed.

8           THE COURT:  All right.  On the other side, do

9   you have the documents with legal argument in it?

10          MR. BOEHNEN:  Your Honor, we have the document

11  that was titled their memorandum in law in support of the

12  motion.  Of course, we have nothing that contains any kind

13  of description even generic or otherwise of the documents

14  that are submitted in camera.

15          THE COURT:  Well --

16          MR. ASHINOFF:  Your Honor, they have a privilege

17  log that identifies each of the in camera documents.

18          THE COURT:  Yes.  Here is the problem I'm

19  having.  Well, let me ask you.  Again, I know I'm picking

20  this out instead of dealing in the first instance with the

21  stuff you guys teed up but this is important to get taken

22  care of so I'm taking the time while we're on the phone to

23  do it.

24          What did you have in mind, Mr. Ashinoff?  Say

25  you had the result you wanted, which was a bifurcation of

1    willfulness and, you know, that I agreed with you and to

2    throw my own language back at myself, I said "you'd need a

3    whale of a showing" and you've done it.  What did you have

4    in mind for how this was to be bifurcated?

5              MR. ASHINOFF:  Your Honor, what we had in

6    mind and what we suggested in the legal memo was that the

7    documents and the issue of willfulness would not be produced

8    now so we wouldn't have to produce privileged material and

9    we'll go to trial on the underlying liability issues, to the

10   extent that Sicor is successful at the end of the case.

11             To the extent it's Pharmacia is successful

12   and it does not resolve, what we contemplated was there is

13   only going to be about a very small handful of privileged

14   documents, as Your Honor can now see, and only two or three

15   witnesses at most who would really talk to them and we

16   contemplated bringing those witnesses to Delaware after the

17   first stage of the trial, have the same jury take a week

18   off or even four days for the expedited discovery of the

19   willfulness evidence.  We would then have -- obviously, we'd

20   be forced to waive.  If we were going to waive, we would put

21   the witnesses up in Delaware on an expedited basis for the

22   plaintiff and you would rebring the jury back four or five

23   days later and try willfulness.  That is the procedure we

24   contemplated.  We didn't contemplate a need to have a second

25   separate jury and we didn't contemplate any inordinate

1    delay; and obviously recognizing the Court's desire for

2    efficiency, we contemplated bringing the witnesses to be

3    deposed in Delaware for the convenience of plaintiff and

4    the Court.

5         THE COURT:  All right.  Based on what you have

6    been able to read, who on the Pharmacia side, if anybody,

7    wants to speak up and respond to that?

8         MR. BOEHNEN:  Your Honor, this is Dan Boehnen.

9         I would note that, first of all, the idea of

10   three or four days or a week I think would not be at all

11   fair, would put us at a great disadvantage.  We're envision-

12   ing the situation where the jury has found that the patents

13   are valid and infringed and we're now going into a damage

14   phase and one of the issues is going to be whether the

15   infringement is willful.  Well, I not only need time to take

16   discovery of the information that has been withheld based on

17   grounds of privilege but I need time to now go back over not

18   only the prior trial transcripts but all of the previous

19   discovery so as to connect the dots back up to the broader

20   picture.  That isn't going to be done in a matter of two or

21   three or four days.

22        THE COURT:  All right.

23        MR. BOEHNEN:  Second of all, we have lots of

24   document requests, interrogatories, depositions that we

25   wanted to take now that do not go to privileged subject

8

1   matter but do go to the willfulness issue.  And at this

2   point, Sicor has refused to provide those, too, until this

3   whole issue was resolved.

4                THE COURT:  Well, we're going to resolve it

5   in part right now, and here is how.  And I say that in

6   part for this reason:  We're not bifurcating discovery here

7   so anything that has to do with willfulness and isn't

8   privileged you give up right now, Mr. Ashinoff, and do it

9   post haste.  Get moving on it.

10               Second, I agree with the plaintiff here that

11  saying "well, I've give you three four days in between"

12  doesn't cut it.  If you want to rely on an advice of counsel

13  defense, you are going to waive your privilege and you are

14  going to do that now, although it does not mean that it's

15  going to be tried with the liability phase.

16               I've taken a look at what you sent over.  I

17  agree it raises some significant issues in terms of potent-

18  ial prejudice and so I am not deciding the bifurcation issue

19  today.  And that, all by itself, is I think a step forward

20  for the folks on the Sicor side because it is out of our

21  custom and practice or at least mine to think about doing

22  this, but you have raised enough of an issue that I'm

23  prepared to hear what the other side says, but it's going

24  to be something that the other side says based on an

25  understanding of exactly the character of the information

1  you believe so prejudicial that it must be kept from the

2  jury in the liability phase.

3          So you make your decision in your election.  If

4  you want to rely on this advice of counsel defense, you've

5  waived your privilege and you start producing even the

6  privilege material now, because I want to hear from the

7  other side what their response is to your argument that

8  there are aspects of this privilege material which are

9  of such prejudicial effect that it would taint a jury in

10 considering liability.

11         Now, Mr. Ashinoff, having heard that ruling, do

12 you want or need additional time to decide whether to rely

13 on an advice of counsel defense?

14         MR. ASHINOFF:  Absolutely, Your Honor.  I need

15 to be able to advise the senior decision makers at my client

16 and sit down with them at some point and get them obviously

17 in the near term to make a decision.

18         There is one aspect of what the Court is

19 suggesting that I just heard that maybe I should have heard

20 in the prior comments but didn't.  To the extent the Court

21 is suggesting that we need to make a decision on waiver and

22 produce privileged materials before the Court makes a

23 decision on bifurcation, that procedure is not something

24 we're familiar with.

25         We tried to follow the Federal Circuit authority

1    with the in camera submission and the Circuit authorities

2    and the other decisions that have found that bifurcation has

3    been appropriate, having not ordered the production of the

4    privileged material at this phase. And if that is what the

5    Court is suggesting, respectfully, that is quite a departure

6    from the standard practice in the various Circuits on this

7    issue, if we haven't in fact been able to raise. And we

8    greatly respect the Court's attention to the issue but in

9    fact we're prejudiced, the very handing over that material

10   to the other side is a manifestation of that prejudice and

11   harm.

12              THE COURT:  I understand I think pretty clearly

13   the arguments on both sides, and what I'm telling you is if

14   you want the benefit of a bifurcation here, it's going to be

15   a benefit you get in the context of appropriate respect for

16   what I deem to be the plaintiff's needs and the imposition

17   which it is on a jury to have to deal with this in a

18   bifurcated fashion.

19              So there is no prejudice in front of a jury if

20   you produce now and I say there is bifurcation.  The

21   prejudice, which is real and it don't think insignificant,

22   I grant you; that turning over attorney-client privileged

23   material is, in and of itself, a significant step; but you

24   can't have it the way you want it is what I'm telling you.

25   You can't say, okay, we think we're going to rely on advice

1   of counsel but we're keeping all of the information in our

2   hip pocket and we'll give you three-four days to figure out

3   how it fits in. And, by the way, do your depositions and

4   review the documents in that time and we'll have the jury

5   on ice while that is happening and then we'll bring them

6   back and then we'll talk to them about it. That will not

7   do.

8           So since it will not do, what I'm telling you

9   is you need to go back, talk to your clients, think about

10  whether you want to rely on this advice of counsel defense.

11  If you do and you are successful in persuading me that this

12  information shouldn't go in front of the jury because it's

13  so important, it won't. And the jury will never hear a word

14  about it. The only people that will know about it are going

15  to be your opponents. And that is not an insignificant

16  thing but it doesn't mean the jury is going to hear about

17  it in the liability phase.

18          So you will suffer some effect from your

19  decision, but you don't get to put the other side and the

20  jury, as I said, in the kind of box that the proposal you're

21  making contemplates. It's I don't think practical or fair,

22  given the demands of the litigation in this court and the

23  lawful and appropriate concerns that the plaintiff has.

24          So that's the procedure I'm telling you that I

25  want you to follow here. Decide what you want to do. In

1    effect, I'm giving you an opportunity to still make the case

2    that there is bifurcation.  And I'm suggesting to you that I

3    think you've made a decent argument based on what I've seen,

4    but I'm not going to allow you to have the procedure you're

5    looking for.

6         MR. ASHINOFF:  Your Honor, in light of what the

7    Court is saying, what I would like to do is basically get to

8    sit down with the senior decision makers at my client.  I

9    will tell the Court that this decision is going to be made

10   at the highest levels of the company, both legal and

11   business, so I'm going to need to gather them together.

12        I guess I would have a transcript of the Court's

13   comments within the next day or so.  There is a Jewish

14   holiday coming up.  I'd like to see if I can get them

15   together with me next week and get back to the Court, if I

16   can, later next week, subject to the holidays which I know

17   many of these clients observe, and we also do, this week.

18        THE COURT:  Yes, that's fine.  When do you think

19   I might hear from you next week, Mr. Ashinoff?

20        MR. ASHINOFF:  I would like to aim at advising

21   the Court and our adversaries by the end of next week.  And

22   the only condition, and I can't speak to it, I literally

23   don't know where the senior people of the company are in the

24   next week and, obviously, the first call I make after this

25   one will be to my client.  I just don't know the schedule of

1    the general counsel and the senior executives who will have

2    to make the decision.

3                THE COURT:  All right.  I will look for some

4    word from you.  We'll set this for a week from Friday at

5    the outside, okay?  That gives you a week and-a-half to

6    coordinate with people; and if you think you need more time,

7    let me know.  I understand it's a big decision.

8                MR. ASHINOFF:  Your Honor, could I have just a

9    week from Monday, just knowing what the ensuing week looks

10   like?

11               THE COURT:  Yes, done.

12               MR. ASHINOFF:  Thank you.

13               THE COURT:  And if you would be so good as

14   to make sure that this decision, without going into the

15   obviously any attorney-client discussions, is couched in a

16   way that you can advise me on the record, not in camera,

17   with a copy to the other side of your decision, I'd

18   appreciate that.

19               MR. ASHINOFF:  I understand that, Your Honor.

20   And just to pick up on your last point.  I would understand

21   that if we do waive privilege with respect to the decision

22   to launch the product, that waiver does not extend to

23   current litigation discussions between counsel and business

24   people making this judgments now about waiver.  I mean that

25   is a separate event.

1          THE COURT:  It is.  And let me dilate for

2    just a moment on that because to the extent it's helpful to

3    you in talking with your clients, I do not typically view

4    post-litigation decision making as within the scope of

5    waiver, so things that are being done now, decisions that

6    are being done now are not within that scope of waiver.  And

7    I also typically do not view attorney work product as being

8    within that scope of waiver.  If it hasn't been communicated

9    to between the attorney and the client, I typically do not

10   view that as within the scope of waiver.  I don't know if

11   that is of assistance to you or not, but to the extent it

12   is, there you go.

13          MR. ASHINOFF:  Your Honor, I appreciate that.  I

14   guess -- and I don't want to prolong this because there are

15   other matters that we need the Court's help on, but to the

16   extent that some of what is in the privilege materials is

17   in fact work product and we end up making a waiver decision

18   now, do we have the ability to redact the aspects of these

19   documents that we view as work product as opposed to advice,

20   per se?

21          THE COURT:  Yes, that is what I'm telling you.

22   I'm not telling you that everything you sent over to me is

23   going to the other side.  What I'm telling you is you need

24   to make an election about whether you want to invoke the

25   privilege.  If you do, you are going to have to give up

1   information that was communicated to the client associated

2   with the opinion that you want to rely on.  Okay?

3          MR. ASHINOFF:  That's fine for now, Your Honor.

4   And when we get back to you, if there is further issues,

5   we'll try to ask for help then.

6          THE COURT:  All right.

7          MR. ASHINOFF:  Thank you.

8          THE COURT:  Thanks.  Now, again, sorry for

9   taking that at the top of the hour but it's important to me

10  that this stuff get resolved and get resolved timely because

11  one of the issues that you want to deal with and you want

12  to deal with as part of this teleconference and that I will

13  again take out of the order you gave me is the discovery

14  cutoff.  I mean I'm acutely aware that we're within less

15  than a month of the discovery cutoff in this case and you

16  guys are still, you've got some cat-and-dog fighting going

17  on here.  So that's why I said, and I'll reemphasize, we

18  don't have a bifurcation of discovery going on here.  If you

19  are going to rely -- whether you are going to rely on advice

20  of counsel or not, your nonprivileged information associated

21  with willfulness, give it up.  That needs to happen.

22         Now, let's talk for a minute about the discovery

23  cutoff.  And I understand this is going to be informed by

24  the discussion we're going to have on some of these issues.

25  But I just want to get this clear up front.  Are both sides

1    saying you want a discovery cutoff extension or is that

2    coming from one side only?

3              MR. ASHINOFF:  Your Honor, Mr. Boehnen will have

4    to speak for the other side, but we've had some discussions

5    and I thought we were very far along on the parameters of an

6    agreed request for the extension.  I tried to confirm that

7    this morning with Mr. Boehnen in a letter, but I can't speak

8    for Mr. Boehnen.

9              THE COURT:  Well, give me your best under-

10   standing, Mr. Ashinoff, and then I'll hear from Mr. Boehnen.

11             MR. ASHINOFF:  My best understanding, Your

12   Honor, is that we had basically, without shaking hands,

13   over the phone, resolved the various points relating to a

14   discovery extension which would extend to December 2 the

15   time to finish up and take depositions subject to further

16   rulings of the Court on issues such as inequitable conduct,

17   that will open those up, and that we had also resolved

18   Mr. Boehnen's concern that written discovery not been open

19   ended, and I had both told Mr. Boehnen we're not sitting

20   here with any nefarious plan of launching some major

21   blunderbuss of additional discovery and I iterated in a

22   letter to him the three areas of additional follow-up

23   discovery that he and I had discussed yesterday as being

24   within the purview of what would be permissible between now

25   and December 2.  And my understanding was that we were close

1    to an agreement on the extension through December 2 pursuant

2    to the terms of the letter that I sent him.  I didn't send

3    it to the Court because I really hadn't heard back from him

4    literally until four minutes before the call in an e-mail

5    that said he still had some issues, but I'm not sure

6    fundamentally that we differ.

7             With respect to the discovery we need, Your

8    Honor, I think we've laid out the fact that the document

9    production has been delayed.  I'm not saying that to cast

10   any criticism, I'm just stating the fact that the documents

11   that have been coming from Pharmacia have extended over a

12   long period, including and up to the latest batch last

13   Monday, and we're doing what we can.  We're trying to get

14   witnesses scheduled.  We had served 30(b)(6) notices for

15   witnesses in mid September.  And the date I got offers for

16   one of the witnesses was November 2 and that's going to

17   lead to other discovery.

18            I don't want to go -- there is more I would

19   like to say if Mr. Boehnen is going to oppose this.  If not,

20   though, I don't need to take the Court's time on it.

21            THE COURT:  All right.  Mr. Boehnen, what is

22   your position?

23            MR. BOEHNEN:  And, Your Honor, I'll try not to

24   belabor points either other than to say that Pharmacia has

25   been very diligent in providing information.  We feel as

1    though we're still needing to drag information out of Sicor.

2              THE COURT:  I'm just looking for your position,

3    Mr. Boehnen, about whether you agree there is a discovery

4    cutoff.  I understand each side has got its feelings about

5    the other and I'm really don't want to go there now.

6              MR. BOEHNEN:  Okay.

7              THE COURT:  Just take me to the bottom line.

8              MR. BOEHNEN:  Yes, Your Honor.  The two concerns

9    that I have, and I've tried to explain them consistently to

10   Mr. Ashinoff, is that any extension of discovery -- first of

11   all, we don't think it's necessary.  We could do it with

12   cooperation but we're willing to not oppose an extension but

13   for two considerations:

14             Number one.  We believe that any extension of

15   discovery should be limited to cleaning up matters that

16   are continuing and should not be used as an opportunity to

17   initiate new discovery requests.  That's how we've already

18   gotten into the situation that we're in right now.

19             Number two.  If there is an extension, we're

20   concerned about the trickle-down effect that may have on

21   subsequent events such as the dispositive motion date now

22   set for December 5th.  And if that is extended, we're very

23   concerned that it could impact the January 19th hearing

24   date the Court has set.  And we do not want any extension

25   that would impact or extend that January 19th hearing date.

1          THE COURT:  Well, by definition, it's going to

2     effect both those dates because a one month extension puts

3     us one day before the dispositive motion filing deadline

4     and even with the platoons of attorneys I'm sure you folks

5     have working this case, that is a bit much to ask.  So this

6     would, perforce, move that back and in all likelihood be

7     moving back to some extent that January 19th date because

8     I'm going to -- look, unless you folks are prepared to

9     say hey, we've just got one or two issues and that's it,

10    something that I find hard to believe given the character of

11    the discovery battle and the multi-continent character of

12    the fight you all have had, I'm going to need some time to

13    do what I'm sure you both would like me to do and that is

14    be reasonably prepared when I sit down to talk with you.  So

15    take it as a given that that would have to shift and shift

16    some.  Are you saying in light of that, you're opposed to

17    any extension?

18          MR. BOEHNEN:  Well, there certainly are other

19    options, Your Honor.  Well, could I extend just, say, up

20    until the Tuesday before Thanksgiving.  That would be a two

21    or three week extension.  That would I think then not --

22    then we would not need to extend the dispositive motion

23    date.

24          THE COURT:  Mr. Ashinoff, what is your response?

25          MR. ASHINOFF:  Your Honor, that simply won't

1    work; and now, without too much detail, I do need to get

2    into what has been going on in discovery.

3              We asked, we served a 30(b)(6) notice in August,

4    with depositions in September.  The first witness we got

5    testified under oath that he really knew nothing about what

6    Pharmacia was doing before Pfizer bought it, in essence.

7    And when we pressed it, Mr. Boehnen said, "well, we'll have

8    another witness but the other witness can't come until

9    November" and he is not guaranteeing what that witness will

10   know.  And what Mr. Boehnen said is, "I do not promise you

11   that he will be able to give you detailed information about

12   what happened inside Pharmacia prior to the merger, nor do

13   I ever promise you that we're going to have a witness that

14   will be able to do that.  But we're trying to respond to

15   your questions and certainly you are not as sufficiently an

16   important a player on this that we ever tried to misuse or

17   waste your time."

18             Your Honor, the fact is we're getting witnesses

19   who are supposed to be educated.  That is the obligation of

20   a 30(b)(6) and who were being put up for deposition know

21   nothing.  So now we have to figure out who is going to

22   know something.  I said to Mr. Boehnen in one of the

23   conversations last week or early this week, "I'd like to

24   know who the right people are to depose and talk to.  Would

25   you tell me who does know because you are Pharmacia?"  And

1    he said, "Well, I'll inquire and see what I can find out."

2            We don't even have the right names of the people

3    to talk to yet, Your Honor.  We don't have the inventors in

4    the chair.  Now, we're talking about the inventors, if the

5    Italian referee can get them in the chair, for the week of

6    November 7th through 10th.  We've agreed with Mr. Boehnen

7    that we would take the European experts that he has seen

8    since to designate the week in Milan the same week we take

9    the inventors, assuming we can get the inventors, but we

10   are very transcontinental in this case.  We have a witness

11   in Australia we need who we believe has knowledge that the

12   plant that would have been used to produce this drug to meet

13   the need, had we not allegedly infringed, that the plant

14   basically was basically shut down by the FDA.  We served

15   document requests about that.  We asked for the witness.

16   They don't want to bring us the witness here and we don't

17   have the documents yet.

18            We're doing what we can do, Your Honor, but we

19   need more time.  And it's not because we're not trying.  We

20   served some additional notices of deposition.  I agreed to

21   get on the phone with Mr. Boehnen and with Mr. Sigale who is

22   home with pneumonia but is trying to work from home and is

23   the one who is handling the scientific aspects of the case.

24            I said I would sit down with Mr. Boehnen at

25   some point next week.  And from Mr. Sigale's and my point

1    of view, we can do it Thursday morning and go over with

2    Mr. Boehnen a list of the people we need and ask them to

3    cooperate in scheduling them, but a lot of these people

4    are former employees.  We found out just this week one of

5    them is in Canada and we need to implement the Hague

6    Convention to get that witness.

7                We're in a situation where the plaintiff started

8    the lawsuit but doesn't have witnesses with knowledge of

9    what we need to hear about and the documents.  And we're not

10   faulting them, the documents have not been coming in with

11   regularity.  Their letters to the Court now indicate they

12   are now collecting foreign patent information that we asked

13   for back in late 2004.

14               So again, without ascribing fault, the parties

15   simply are not ready to cut off discovery now and we now

16   need to find former Pharmacia employees with no real help

17   from the plaintiff here, find them, subpoena them, serve

18   Hague Convention requests and get them.

19               THE COURT:  All right.  Mr. Boehnen, I'll give

20   you a chance.  We've morphed into a discussion of how the

21   discovery has gone generally.  I'll give you your chance to

22   fire back.

23               MR. BOEHNEN:  Your Honor, I will try to hit only

24   the highlights, but then please understand I'm keeping it

25   very brief.

1              As to the witness, the 30(b)(6) witness whom

2    Mr. Ashinoff complains as not being offered until

3    November 2nd, we originally offered that witness on October

4    17th or 18th.  They said that wasn't acceptable.  We offered

5    him on October 5th, 6th or 7th or October 12th or 13th.

6    They said that wasn't acceptable.  Then finally they said

7    the only other day is November 2nd in the schedule and they

8    said, fine, we'll take that date.

9              As to the inventors, the Italian commissioner

10   offered the inventors for deposition in Milan the week of

11   October 24th or the week of November 7th.  We said we would

12   like to do it, we would prefer to do it the week of October

13   24th.  Sicor said November 7th, it really needed to be that.

14   Would everybody please go along with that?  And we agreed to

15   that.

16             The documents that they have requested are

17   documents that pertain to files that are not related to

18   these patents.  They've never requested them in the past.

19   We've explained this in your letter.  We said for the first

20   time, you've said now you want these files.  Even though you

21   did not previous request them in a Rule 34 request, we'll go

22   ahead and get them for you but don't blame us because you

23   didn't previously request them.

24             The fact of the matter is, and we've told this

25   to Sicor, for months, many months, none of the people that

1   were referred to as Pharmacia Legacy, the historic company,

2   are there so there is not anybody in the company who knows

3   what was historically done at the Legacy Company in relation

4   to Ita Rubesome (phonetic). We simply do not have the

5   information they have. We have given them all of the

6   documents that we have pertaining to Ita Rubesome from the

7   Legacy Company. They've had those for months. It isn't a

8   recent event; many months. We can give you specific dates,

9   if you wish.

10          If they ask us, all we can do is go back to

11  those documents that we have already given to them, try to

12  identify people and track them down. That is exactly what

13  they're now in the process of doing. But they're doing it

14  now not because we haven't told them this is the situation

15  all along, it's that they have wanted to continually try to

16  blame us and put us in the position where we're responsible

17  for the fact that there is nobody in the company who knows

18  it. Well, we aren't responsible for that. That is a fact

19  of life and they need to deal with it as part of their

20  lawsuit.

21          THE COURT: Well, I guess they would say as part

22  of "your" lawsuit, but that's neither here nor there. I

23  take your points, Mr. Boehnen, as well as the things that

24  Mr. Ashinoff has said and here is going to be the upshot of

25  it. I'm going to give you some more time, both sides. And

1   I don't do this because I want to, because I don't.  This

2   trial date is going to stay, the pretrial date is going to

3   stay, and I'm going to end up taking some of my decision

4   time because you guys can't get on the same page but this

5   is the last time that is happening.

6          I'll go ahead and bump this discovery cutoff

7   to the 4th of December.  I'll give you the month you are

8   looking for Mr. Ashinoff.  And that means we're going to

9   have to bump the dispositive motion deadline.  We'll take

10  that back into January, since I think it's impractical,

11  given the holidays, to do it earlier than that.

12         Give me just a moment to put my hand on a

13  calendar here.

14         (Pause.)

15         MR. BOEHNEN:  Your Honor, may I make a comment?

16         THE COURT:  Yes.

17         MR. BOEHNEN:  When Mr. Ashinoff and I were

18  discussing moving back the summary judgment motion, we had

19  talked about moving the filing of those motions only one

20  week, to December 12th.

21         THE COURT:  Great.  Hey, if you can both live

22  with that.

23         MR. ASHINOFF:  Your Honor, that's something I

24  actually had asked Mr. Boehnen for a longer extension.  What

25  we did discuss and what I do recall us agreeing on is that

1    we don't need to move the claim construction submission.   So

2    we can get those filed but we will need the extra time on

3    the dispositive motions given the nature of the discovery

4    we're going to be going through, so we would appreciate a

5    January filing date.

6              THE COURT:  Put your claim construction stuff

7    in by the 12th then and go ahead and give me your case

8    dispositives by the 9th.

9              MR. ASHINOFF:  You're saying December 12th on

10   the claim conjunction and January 9th on the dispositive; is

11   that what you are saying?

12             THE COURT:  That's what I'm saying.

13             MR. ASHINOFF:  Okay.  Okay.

14             THE COURT:  That will give me 10 days.  We'll go

15   ahead and hold the January 19th date.  I won't bump that.

16             MR. BOEHNEN:  Your Honor, I think claim

17   construction has two dates.  There is an initial submission

18   and then an opposition.

19             THE COURT:  That won't work.  Hold on just a

20   moment, actually.  I think I'm going to have to bump that

21   19th.  Hold on.

22             (Pause.)

23             THE COURT:  If you submit by the 9th --

24             MR. ASHINOFF:  There is going to need to be

25   responding and reply papers on the dispositive, Your Honor.

1          THE COURT:  Right you are.  That's what I'm

2    looking at.

3          (Pause.)

4          THE COURT:  Okay.  Your briefing on the 9th

5    means that the answer will be due the 23rd and reply on the

6    30th of January.  I will look on my calendar and see if I

7    can't get you a date some time early in February for us to

8    get together and discuss this.  And I'll ask somebody in my

9    staff to help me with that while we continue our discussion.

10          All right.  Now, I have read your papers and I

11    have looked at your attachments and so I don't need anybody

12    to repeat the statements that are made in there, but let's

13    look at each one of these final things together.

14          I break it down this way.  And this is based on

15    the way the letters broke it down.  We have a question about

16    the location of expert witness depositions, we have an issue

17    with respect to the deposition of Mr. Winters and we have

18    an issue with respect to whether certain information is to

19    be extracted by contention interrogatories or 30(b)(6)

20    depositions.  Those are the three things that we still have

21    out there to deal with.

22          MR. ASHINOFF:  Your Honor?

23          THE COURT:  Yes.

24          MR. ASHINOFF:  Your Honor, if I may.  I think I

25    can give short shrift to two of the three but, frankly, the

1    areas that we're most concerned about we also feel we need

2    to deal with.  And I would appreciate if Mr. Sigale, my

3    partner, can address those and add, not repeat, what is in

4    the papers, but expand and respond to what your adversaries

5    said about the patent documents and the lab notebooks and

6    the foreign patent materials.  Mr. Sigale will not repeat

7    what is in the papers but Ms. Noreika's letter raises issues

8    that we really don't believe to be factually accurate and we

9    want to address those.  We need those lab notebooks and the

10   foreign patent materials, Your Honor.

11          THE COURT:  All right.  Well, let me interrupt

12   you, Mr. Ashinoff.  You say that you can shorten things up

13   on two of them.  Any shortening you can do, do it now.

14          MR. ASHINOFF:  Okay.  On the issue of the

15   foreign expert.  On the assumption that the inventors will

16   actually get put in the chair in Milan, the week of November

17   7th, Mr. Sigale who is on the phone will stay in Milan over

18   weekend and take the, Mr. Beijnen and Mr. Arcamone.  If

19   Mr. Boehnen will bring them to Milan early the following

20   week, the Monday-Tuesday, Mr. Boehnen and I agreed on this

21   subject to my checking with Mr. Sigale.  Mr. Sigale now has

22   pneumonia, Your Honor, and I wish he didn't and so does he,

23   but he can't travel before early November.  That is why we

24   couldn't take the October date.  He is the guy who knows the

25   area.  He is the member of the team.

```
1                THE COURT:  Okay.

2                MR. ASHINOFF:  But we will take the foreign

3    expert in Milan the week after we take the inventors and

4    solve that problem.

5                THE COURT:  All right.  And Mr. Boehnen, that is

6    what you had proposed and that is satisfactory to you, I

7    understand; correct?

8                MR. BOEHNEN:  Yes, Your Honor.

9                THE COURT:  Done.

10               MR. BOEHNEN:  We are still checking with our

11   experts but we believe that will work.

12               THE COURT:  Well, let's put it this way.

13   They're your experts, so make it work.  All right?

14               MR. BOEHNEN:  Yes, sir.

15               THE COURT:  Make it work.

16               MR. BOEHNEN:  Yes.

17               MR. ASHINOFF:  Your Honor, with respect to the

18   Australian deposition, what we proposed is the following:

19   We believe this is an important issue in the case and an

20   important issue.  To test that out, we're prepared to do an

21   hour on the telephone to ascertain whether in fact this is

22   the man with the knowledge we need from Pharmacia.  If he

23   is, we would like to continue it live and we will pay his

24   expenses for hotel room and a coach plane to come here.

25               THE COURT:  Mr. Boehnen?
```

1              MR. BOEHNEN:  Well, Your Honor, it seems like a

2       reasonable way to proceed.

3              THE COURT:  Okay.  Then we'll leave that at that

4       and hopefully you folks will work it out.  We won't need to

5       talk about it again.

6              All right.  Now let's --

7              MR. ASHINOFF:  Your Honor, the issue, what is

8       left is our deposition notice on secondary considerations

9       which Mr. Sigale is prepared to address and also our request

10      for the foreign patent information and the lab notebooks

11      also within his purview, if it pleases the Court.

12             THE COURT:  Yes, that's fine.  Go ahead,

13      Mr. Sigale.

14             MR. SIGALE:  Thank you, Your Honor.  With

15      respect to the foreign prosecution, I would rather not

16      quibble about it as long as Pharmacia is prepared to produce

17      those, and Ms. Noreika's letter seems to indicate --

18             THE COURT:  They say they will.

19             MR. SIGALE:  -- that they're doing it so I'm not

20      going to address that.

21             THE COURT:  Good.

22             MR. SIGALE:  But we believe they were requested

23      previously.

24             THE COURT:  Whatever.  It's coming to you now.

25             MR. SIGALE:  Okay.  Thank you, Your Honor.  With

1    respect to Dr. Confalonieri's lab notebooks, I think

2    Pharmacia's response misses the point.  If they intend to

3    rely upon Dr. Confalonieri's data, which is what they seem

4    to be contending in their interrogatory responses, we're

5    entitled to see all of Dr. Confalonieri's data.  He

6    submitted data to Patent Offices around the world and in

7    other litigations and magically some of the data that we

8    believe would be helpful to our defense has not been

9    produced but data that is helpful in their case has been.

10   And I've asked about what kind of search was undertaken.

11   I'm not satisfied that a sufficient search was done,

12   especially given the significance of this data.

13        THE COURT:  And the relief you want is what,

14   Mr. Sigale?

15        MR. SIGALE:  Well, I want to know what they've

16   done to search for this.  I'd like them to redouble their

17   efforts and confirm for me that they've checked with the

18   prior prosecution counsel, Oblon Spivack, that they checked

19   with the coordinating counsel and that they've checked the

20   files of the various companies.  It just is beyond belief

21   that lab notebooks that were used to support statements made

22   under penalty of perjury to the U.S. Patent Office and other

23   Patent Offices are not available.

24        THE COURT:  All right.  Who is speaking to this

25   from the other side?

1             MR. BOEHNEN:  Dan Boehnen, Your Honor.

2             First of all, it's not at all unusual that

3    foreign companies in the 1980s, that they did not have the

4    kind of lab notebooks that were used in the U.S. companies.

5    The rest of the world is not a first-to-invent situation.

6    There is not interference practice in the rest of the world.

7    Scientists have not and the rest of the world have not

8    been trained on lab notebooks, the way U.S. attorneys work.

9             Having said that, the fact is that we have made

10    a worldwide search on more than one occasion on all of the

11    lab notebooks.  We would very much like to collect all of

12    the lab notebooks.  We have collected all of the pages that

13    were there.  Mr. Sigale suggests that these were used in

14    Patent Offices and litigations around the world.  Well, they

15    have everything and are getting everything from those Patent

16    Offices in lawsuits around the world.  I would note anything

17    in the Patent Offices around the world is a public record

18    document so they've had an opportunity to get that for a

19    long time.

20             THE COURT:  Well, let's stick with -- hold on.

21    Let's stick with lab notebooks.  And I just need a real

22    precise answer to this.  I hear Mr. Sigale -- am I saying

23    your name right?  Is it see-gal (phonetic)?

24             MR. SIGALE:  That's fine, Your Honor.

25             THE COURT:  I hear him saying that he wants a

1   representation from you folks that you have checked with the

2   folks he just named, an affirmation that in fact you have

3   inquired of and heard from these people that there are no

4   lab notebooks belonging to this inventor. And that's all

5   I'm hearing he is asking for. Are you telling me you got an

6   issue with that?

7                MR. BOEHNEN: To me, Your Honor, no, sir. And I

8   understand, just to restate it, I believe he is referring to

9   the Oblon firm, Jake Wood, which is JA Kemp & Co. in the

10  U.K, and --

11               MR. SIGALE: And the Nerviano Consulting firm

12  (phonetic) where many of these inventors found gainful

13  employment.

14               MR. BOEHNEN: -- the people in the Nerviano

15  Medical Sciences Facility as well as Pfizer itself.

16               THE COURT: Right. Okay.

17               MR. BOEHNEN: No, not a problem. We'll be happy

18  to do that.

19               THE COURT: Done.

20               MR. SIGALE: If I might, I'd prefer to have the

21  notebooks.

22               THE COURT: Well, I'm sure everybody would

23  prefer the notebooks were there because then we wouldn't be

24  having this fight at all. So obviously if the notebooks are

25  there, they'll be produced, but if they're not, you will get

1   an affirmation of what was done to look for them with these

2   other folks, right?

3           MR. BOEHNEN:  Yes, sir.

4           MR. ASHINOFF:  Your Honor, just to go back half

5   a step.  On the foreign patent material that Mr. Boehnen,

6   Ms. Noreika say is now being collected, given that we plan

7   to try to go abroad and take the inventors on November 7th,

8   can we get some date not too late in October when that

9   material will be produced to us so we have the time to

10  assimilate it before we take the inventors?

11          THE COURT:  Mr. Boehnen.

12          MR. BOEHNEN:  We have already begun making every

13  effort to get that to them as soon as possible.  Let's see.

14  We can start a rolling production to them by the end of next

15  week and I think we hope to have it to them by the end of

16  October.

17          THE COURT:  All right.  End of October it is.

18  And a rolling production is a good idea.

19          MR. ASHINOFF:  Thank you.

20          THE COURT:  Okay.  Then we had the dispute about

21  the 30(b)(6) categories.

22          MR. ASHINOFF:  And I'm going to let Mr. Sigale

23  address that, Your Honor.

24          MR. SIGALE:  Your Honor, we propounded a number

25  of categories in a 30(b)(6) notice that asks for the factual

1    contentions underlying legal contentions I need to

2    understand and I thought this was an efficient way to do it.

3    For instance, if we take category number six.  We asked for

4    the facts concerning Pharmacia's allegation that licensing

5    and adoption of the ready-to-use formula is evidence that

6    the patent satisfied the obviousness requirement.

7              I need to know what facts those are.  That is

8    not a contention request.  It is what licensing are you

9    talking about?  What adoption are you talking about?  What

10   are the circumstances about that licensing?  And I thought

11   this was an efficient way to get that.  I can go through a

12   couple other categories but I can assure you I'm not looking

13   for legal contentions, that is a waste of time.  A lay

14   witness is not going to be able to give that to me, but

15   facts they certainly can.

16             THE COURT:  All right.  Mr. Boehnen, is this

17   yours again?

18             MS. NOREIKA:  Your Honor, this is Maryellen

19   Noreika.  I'll respond to this issue.

20             THE COURT:  Okay.

21             MS. NOREIKA:  Sicor, there doesn't seem to be

22   any disagreement that depositions are not the appropriate

23   means by which to obtain contentions.  Instead, they're

24   saying, well, we're just seeking facts.  But as the topic

25   that Mr. Sigale just read indicates, these are seeking

1  contentions:  All facts regarding Pharmacia's allegations

2  regarding copying, commercial success, failure of others.

3  There is a topic asking for the data Pharmacia contends

4  shows secondary considerations and the conclusions a person

5  skilled in the art would draw from that data.  There is a

6  topic asking for a witness to testify about Pharmacia's

7  response to a contention interrogatory on secondary

8  considerations.

9         THE COURT:  Okay.

10         MS. NOREIKA:  I mean the wording of these

11  topics.

12         THE COURT:  I think I have your position.  I

13  have other folks who need my attention at 4:00 o'clock so

14  let me tell you, having read this, what my impression is.

15         I think there is some good force to the argument

16  being made by Pharmacia that the inserting of the word

17  "facts" doesn't make this less of an effort to get at what

18  is essentially the legal position of the party, although you

19  may get the benefit as well of saying, well, these are the

20  pieces of specific evidence.

21         So in the first instance, and on an expedited

22  basis, not a 30-day turnaround, if you want the chance to

23  answer these as contention interrogatories, I'm going to

24  direct that you accept them as such and you answer them

25  forthwith.  You know, the sort of thing that you get a

1    couple of weeks to respond to.

2            And then if you folks on the Sicor side want to

3    do some follow-up deposition discovery, targeted at

4    inquiring about specific facts that are revealed in the

5    context of these interrogatory responses, you're free to

6    do that.

7            I take the point that Pharmacia is making here,

8    which is it's so broadly worded, it can't help but really be

9    a circumstance where somebody is asked to know every fact

10   pertaining to every contention and that's a little bit much

11   to put on a deponent.

12           So that is the resolution to that.  You want to

13   treat them as contention interrogatory attorneys.  Done.

14   Answer them in two weeks.

15           And then if you have some follow-up and more

16   targeted and specific 30(b)(6) effort you want to make,

17   Sicor, you follow up on it that way.

18           MR. ASHINOFF:  Thank you, Your Honor.

19           THE COURT:  Now, let me tell you one last thing.

20   And this is for you, Mr. Ashinoff, in the discussions that

21   you are going to be having with your client, to the extent

22   again that this is helpful.

23           And again, we're treading here carefully and

24   I'm very careful when we talk about the attorney-client

25   privilege.  I want to assure you I have not made lightly

1    the decision I made about how to approach the bifurcation

2    request.  To the extent it's helpful in your discussing

3    with your client my understanding of the Knorr opinion, I

4    view Knorr-Bremse as saying no adverse inference can be

5    drawn from either failing to get an opinion or declining to

6    produce it; that you are entitled to get your opinion and

7    to stay silent about it.

8           Viewing it that way, I have never yet heard

9    anybody make a reasoned argument to me why it could be

10   put before a jury after the Knorr-Bremse opinion that an

11   opinion was received but not tendered.  And in the absence

12   of that, I'm inclined to think there probably isn't a

13   reasoned argument.  That the only reason for putting it

14   in front of a jury would be so they draw an adverse

15   inference, which with what Knorr-Bremse says could not

16   happen.

17          So I give that to you as my best reading of

18   Knorr, in the absence of people having really been able to

19   put it forth, but I think it only fair, since people are

20   trying to grope around and make a decision, that they grope

21   a little less blindly.  I hope that is helpful to you.

22          MR. ASHINOFF:  It is, Your Honor.  And it

23   actually comports with literally a 100-year old doctrine

24   in federal law in other appellate courts to the extent of

25   saying that to force somebody to assert the privilege in

1    front of a jury is reversible error and that comports with

2    what Your Honor is saying.

3              THE COURT:  Okay.  Well, I thank you for your

4    time today.  I hope it has been helpful in getting some

5    things worked out.  Let me tell you real quickly what I'm

6    looking for as a date in February because this is going to

7    appear in a revised scheduling order that we'll put out.

8    I'm going to see you folks for argument on February 3rd

9    instead of January 19th.  That's a Friday.  All right?

10             MR. BOEHNEN:  Your Honor, one quick point for

11   Pharmacia.

12             THE COURT:  Yes.

13             MR. BOEHNEN:  Can we have a new date when our

14   briefs in opposition to bifurcation will be due?  I would

15   suggest two weeks after they produced papers to us if they

16   chose to rely upon them.

17             THE COURT:  Mr. Ashinoff, you're fine with that,

18   I assume.

19             MR. ASHINOFF:  Yes, as long as Mr. Boehnen

20   doesn't in the interim try to put my witness in the chair

21   and force us to go through all kinds of contortions about

22   privilege.

23             THE COURT:  Well, I'm sure everybody wants to be

24   efficient here, or at least I would like to think so.

25             Mr. Boehnen, you take that point, I'm sure.

1          MR. BOEHNEN:  Yes, sir.

2          MR. ASHINOFF:  Your Honor, one last comment on

3    what Your Honor last said, and I apologize for this.

4          This law firm has an annual weekend once a year

5    where it gathers its partners and their spouses and et

6    cetera and it happens to be February 1st through 4th of

7    2006.

8          THE COURT:  Okay.  That is enough said.  I will

9    not trample on a firm tradition.  If it's the 1st through

10   the 4th, then I'm shifting you guys to the next day I can

11   give you.  And I think it's, yes, the next day I can give

12   you is the 9th and that's when I will set you down.  We'll

13   do this at 10:00 a.m. on February 9th.

14         Can you do that, Mr. Boehnen?

15         MR. BOEHNEN:  Yes, sir.

16         THE COURT:  Okay.

17         MR. ASHINOFF:  Thank you very much, Your Honor.

18         MR. SIGALE:  Your Honor, I'm sorry.  This is

19   Mr. Sigale.  We left open the claim construction dates.  You

20   were suggesting December 12th for the opening brief.  The

21   opposition brief would be due?

22         THE COURT:  It will follow the ordinary course:

23   Two weeks for answer, one week for reply.

24         MR. SIGALE:  Right, which would be the 26th of

25   December; and inasmuch as I don't observe Christmas, I would

41

1    hate to do it to the people that do.

2              THE COURT:  I'll tell you what, guys.  You talk

3    with each other about how best to do that.  In fact, based

4    on the dates we're giving you, I'm giving it to you to come

5    up with an agreed form of order to submit back to me.  And

6    then if you need to adjust a date in there like that, be

7    reasonable with each other and give it back to me; all

8    right?

9              MR. SIGALE:  Thank you, Your Honor.

10             THE COURT:  All right.  Thanks for your time.

11   Good-bye.

12             (The attorneys respond, "Thank you, Your

13   Honor.")

14             (Telephone conference ends at 3:57 p.m.)

15

16

17

18

19

20

21

22

23

24

25

3

SHEET 1

1

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                            - - -

4    PHARMACIA & UPJOHN COMPANY,              :   CIVIL ACTION
                                              :
5                                             :
             Plaintiff and                    :
6            Counter-defendant,               :
                                              :
7    v.                                       :
                                              :
8    SICOR INC., and SICOR                    :
     PHARMACEUTICALS INC.,                    :
9                                             :
             Defendants and                   :   NO. 04-833 (KAJ)
10           Counter-Claimants.               :
                                - - -
11
                         Wilmington, Delaware
12             Thursday, March 30, 2006 at 10:30 a.m.
                     TELEPHONE CONFERENCE
13
                            - - -
14
     BEFORE:       HONORABLE KENT A. JORDAN, U.S.D.C.J.
15
                            - - -
16   APPEARANCES:

17

             MORRIS NICHOLS ARSHT & TUNNELL
18           BY:  JAMES W. PARRETT, ESQ.

19               and

20   McDONNELL BOEHNEN HULBERT & BERGHOFF, LLP
             BY:  JOSHUA R. RICH, ESQ., and
21               JEFFREY A. STECK, ESQ.
                 (Chicago, Illinois)
22
                    Counsel for Pharmacia & Upjohn
23                  Company

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter

SHEET 2

**2**

1   APPEARANCES: (Continued)

2

3           ASHBY & GEDDES
4           BY:  JOHN G. DAY, ESQ.
                and
5
      SONNENSCHEIN NATH & ROSENTHAL, LLP
6           BY:  REID L. ASHINOFF, ESQ., and
                 MICHAEL S. GUGIG, ESQ.
7           (New York, New York)

8                Counsel for SICOR Inc. and SICOR
9                Pharmaceuticals Inc.

10

11

12

13

14

15                - oOo -

16             P R O C E E D I N G S

17           (REPORTER'S NOTE:  The following telephone

18    conference was held in chambers, beginning at 10:30 a.m.)

19           THE COURT:  Hi, this is Judge Jordan.  Who do I

20    have on the line?

21           MR. PARRETT:  Good morning.  It's James Parrett

22    and I have on the line with me Joshua Rich and Jeff Stack.

23           MR. RICH:  On behalf of Pharmacia, Your Honor.

24           MR. PARRETT:  Yes.  Thank you.

25           THE COURT:  All right.

**3**

1           MR. DAY:  Good morning, Your Honor.  On behalf

2    of the defendants, you have John Day from Ashby & Geddes,

3    locally; Raid Ashinoff and Mike Gugig at the Sonnenschein

4    firm in New York.

5           MR. ASHINOFF:  Good morning, Your Honor.

6           THE COURT:  Good morning.

7           We've got several things to take up here today.

8    I'm going to deal with your two motions to compel.  We're

9    going to deal with the letters that I received over the last

10   couple weeks with respect to the contested Exhibit 106 the

11   defense wants to rely on.  I'm also going to talk to you

12   about the motion to bifurcate.  And we're going to start

13   with the motions to compel.  I'm sorry.  There is one other

14   thing on the agenda we need to deal with and that is the

15   scheduling of the Markman hearing.

16           So Pharmacia was the first to the table with the

17   motion to compel.  I'll give the floor to you.  Mr. Rich,

18   are you the one speaking on behalf of Pharmacia?

19           MR. RICH:  Yes, I am, Your Honor.  And thank you

20   very much.

21           Your Honor, this is a pretty straightforward

22   situation.  What has occurred generally is that SICOR has

23   argued that Marvin Samson, its Chief Executive Officer,

24   relied only upon the executive summary of the opinion of

25   counsel; that they received an oral advice, a very brief

**4**

1    oral advice from Wesley Fach, SICOR's general counsel.  And

2    they're perfectly entitled to make that argument but by the

3    same token, Your Honor, we're entitled to make the argument

4    that the other information in his possession that he

5    contends he didn't rely upon and the other information

6    that was available to him, the information that informed

7    Mr. Fach's conversations with him, that would undermine his

8    opinions, his reliance, are important, are relevant and,

9    as part of the totality of the circumstances, render his

10   reliance, if any, inappropriate.

11           THE COURT:  Well, let me ask Mr. Ashinoff a

12   question or two on this front.

13           And I assume you are speaking on this point for

14   SICOR; am I right, Mr. Ashinoff?

15           MR. ASHINOFF:  Yes, Your Honor.

16           THE COURT:  If I understand the argument you are

17   making, it's that you get to decide what the scope of the

18   privilege is by saying what Mr. Samson considered.  That's

19   your view of the appropriate contours of what you can keep

20   and what you have to reveal; is that correct?

21           MR. ASHINOFF:  Not exactly, Your Honor.

22           THE COURT:  Then straighten me out.

23           MR. ASHINOFF:  We make a distinction between

24   attorney-client privilege and attorney work product.

25           THE COURT:  Well, let's just deal with privilege

**5**

1    here, attorney-client privilege.  Am I right about your

2    position with respect to attorney-client privilege?

3           MR. ASHINOFF:  No.  With privilege, Your Honor,

4    we have waived of the privilege.  And we've produced what

5    Mr. Samson received.

6           THE COURT:  Okay.  And that's my question to

7    you.  When you say you produced what Mr. Samson received,

8    your view of the world is that Mr. Samson is the one who

9    decided to launch a product and so it's what he saw and only

10   what he saw that gets revealed; is that it?

11           MR. ASHINOFF:  It's what was provided to him and

12   to the company.  It's a little broader than the way you just

13   said it, Your Honor.  But I mean, for example, if they got

14   the opinion letter that we produced, and let's say they also

15   got another letter that said, by the way, everything in that

16   opinion letter is wrong, and he didn't see that, I wouldn't

17   be holding that back.  It seems to me once I have waived

18   privilege, I have to waive it with respect to everything

19   the company got from their outside patent opinion counsel

20   Brobeck.  So, no, I'm not making quite the delineation that

21   you're suggesting, Your Honor.

22           THE COURT:  Well, let me ask you then to

23   expressly rebut what I read in the opening brief from

24   Pharmacia.  They say that your position with them has been

25   that you've refused to produce documents based on the

6

1  assertion that if they were provided to SICOR officers and
2  employees other than Mr. Samson, they're not matters that
3  you have to reveal as within the scope of the waiver. Is
4  that just an inaccurate statement by them?
5          MR. ASHINOFF: Yes. We produced whatever
6  Brobeck gave to the company that's relevant. So, yes, that
7  is an inaccurate statement of our position.
8          THE COURT: And that you have taken the position
9  that if it wasn't produced to Mr. Samson during the summer
10 2002, it wasn't within the scope of waiver. Is that also
11 inaccurate or is that an accurate statement of your
12 position?
13         MR. ASHINOFF: I'm sorry?
14         THE COURT: They also assert that you have
15 refused to produce documents that were provided to
16 Mr. Samson at times other than the summer of 2002. Is that
17 also an inaccurate statement of your position?
18         MR. ASHINOFF: No, that's not inaccurate, but it
19 is happenstance because what was produced to the company and
20 provided by Brobeck and what was given to Mr. Samson we have
21 produced. What was produced by Brobeck and provided to the
22 company generally about the validity of the patent we have
23 produced. We're not withholding that.
24         The distinction that we've made is fundamentally
25 a work product distinction in terms of a dialogue that the

7

1  in-house counsel had with in-house people about his work
2  product impressions and about litigation issues.
3          THE COURT: So when you say --
4          MR. ASHINOFF: That's the line we're drawing.
5          THE COURT: And the line you are drawing is if
6  the person is in-house, that is, this is a fellow employee
7  of SICOR along with Mr. Samson but he had it not with
8  Mr. Samson, that is that work product and therefore not
9  reviewable; is that right?
10         MR. ASHINOFF: No, Your Honor. I don't believe
11 we withheld any communications from the Brobeck firm to the
12 company.
13         THE COURT: You're missing my point.
14         MR. ASHINOFF: I'm sorry.
15         THE COURT: Your position is if it's not
16 Brobeck, it's work product. In other words --
17         MR. ASHINOFF: No.
18         THE COURT: -- any discussions within SICOR
19 that SICOR employees might have had with their own in-house
20 lawyers, that is work product?
21         MR. ASHINOFF: No, sir.
22         THE COURT: Okay.
23         MR. ASHINOFF: No. And we're prepared to offer
24 Mr. Fach as the deponent who has waived privilege with
25 respect to the advice he gave in-house to Mr. Samson about

8

1  the validity or invalidity of the patent. We are not
2  withholding that at all.
3          THE COURT: Well, maybe we're not on the same
4  page because I'm not limiting this to discussions with
5  Mr. Samson. I'm talking about in-house lawyers at SICOR
6  talking to other SICOR employees about the validity or
7  invalidity of the patent or anything else remotely related
8  to the opinions of counsel.
9          MR. ASHINOFF: We've waived with respect to
10 that, Your Honor. We're not planning to withhold or limit
11 that questioning. Anything that Mr. Samson said to people
12 in-house about the validity of the patent we have waived on,
13 that is of the attorney-client privilege waiver, as distinct
14 from what Mr. Fach may have said to people about the
15 likelihood of what may happen in the litigation.
16         THE COURT: Okay. Might have said to who? Mr.
17 Fach might have said to who, sir?
18         MR. ASHINOFF: Well, I think what they'll find
19 when they take Mr. Fach's deposition is he really didn't
20 have many conversations with many people about this. And if
21 he had them, they can hear it.
22         THE COURT: Yes. Well --
23         MR. ASHINOFF: We never asserted that that
24 is privileged. That we have waived with respect to the
25 subject matter of the validity of the patent, including any

9

1  conversations Mr. Fach has with anybody in-house about the
2  validity of the patent. I don't have any intention of
3  withholding that from them, and that's not the position
4  we took in our papers.
5          THE COURT: All right. Well, Mr. Rich,
6  Mr. Ashinoff is just telling you guys you are dead wrong in
7  characterizing the arguments they've made in withholding
8  information. So do you want to take that up?
9          MR. RICH: Absolutely, Your Honor. I wish I
10 could square his arguments with the information provided in
11 the privilege log. And I think, first of all, this is a
12 newly announced position to us. Second of all, I think if
13 you look at the documents that SICOR provided to Your Honor
14 in relation to the waiver of privilege issue, way back in
15 2005, they provided three exhibits, Exhibits A, B and C,
16 that they continue to withhold that were authored by Wes
17 Fach, who is in-house counsel. And they're communications,
18 two of the three are communications to Marvin Samson, the
19 person who allegedly relied upon the opinion of counsel.
20 The third is to someone else at SICOR, Frank Becker. It's
21 just not anything that can be squared with their privilege
22 log or their descriptions of documents.
23         THE COURT: Let's ask Mr. Ashinoff about that.
24         MR. ASHINOFF: Your Honor, those documents
25 are exactly what I was thinking about. And Your Honor has

SHEET 4

10

1  seen them. Those documents go beyond any issue about the
2  validity of the patent and talk about -- and I don't want
3  to waive my privilege as to what they talk about. My work
4  product privilege, that is. Those documents contain
5  protected work product, and that's why we --
6       THE COURT: How do you think that a
7  communication from Mr. Fach to Mr. Samson is not outside the
8  scope or how is it you think that is outside the scope?
9  You have really got me puzzled, Mr. Ashinoff. And I'm not
10 trying to be obtuse. Do your best to explain to me how,
11 when you've got a lawyer telling Mr. Samson this is what we
12 think about the position we've got with respect to that
13 patent, that that is not waived as a result of your wanting
14 to rely on advice of counsel in this matter?
15      MR. ASHINOFF: I can do that. And, Your Honor,
16 I would refer to our papers and I will do it now very
17 simply. If Mr. Fach says to Mr. Samson we've got an
18 invalidity opinion from Brobeck and the opinion is -- and
19 let's do it hypothetically so this conversation isn't a
20 waiver. Let's say hypothetically he says this opinion is
21 strong or this opinion is weak here and strong there. All
22 of that is waived.
23      Let's say hypothetically Mr. Fach goes on and
24 says to him, you know, it's nice you have the opinion but in
25 a litigation, anything could happen and this or that, and

11

1  this is my view of what might happen in the litigation, and
2  this is my view of what a judge might think or a jury might
3  think. That is protected work product, and that is our
4  position. And that is the delineation we've made in our
5  papers.
6       MR. RICH: Your Honor, this is Joshua Rich
7  again. If I might take this from the hypothetical to the
8  practical to show that is not the line that has been drawn,
9  in terms of the redaction of documents at least.
10      If I could refer Your Honor to the page five of
11 the opening brief. I'm not going to quote the language
12 because it certainly is confidential and we have been
13 accused of misconduct by merely citing the language that was
14 produced to us in this motion, but clearly at least part of
15 what has been redacted have been comments on the opinion
16 itself, not merely comments relating to validity but the
17 import of the opinion itself which would undermine reliance
18 upon the opinion.
19      THE COURT: All right.
20      MR. ASHINOFF: Your Honor, I think the best way
21 to do this; and as Your Honor said, this is best done on the
22 written record because of the importance and complexity; is
23 the Court looks at the in camera submissions we made, which
24 I know the Court at some point has -- although this stuff
25 gets old fast, but the reality is Your Honor has the key

12

1  documents that we believe are work product and we submitted
2  them with this short piece to the Court and the Court has
3  reviewed. So I believe that the distinction we're making is
4  both legitimate, recognized in the law and reality based.
5       THE COURT: And I have read them, Mr. Ashinoff.
6  If you're assuming we're having this discussion without my
7  having reviewed them, you're inaccurate in that assumption.
8       MR. ASHINOFF: No, I'm not, sir.
9       THE COURT: Okay.
10      MR. ASHINOFF: It's just it's hard for me to
11 encapsulate where Mr. Rich talks about the documents and
12 this without having a specific document in front of us. I
13 worry about the generalities of his assertion.
14      THE COURT: Well, here is the bottom line on
15 this. You've drawn it too narrowly, and indeed your effort
16 to withhold these documents that are attached is overruled.
17      I disagree with you, Mr. Ashinoff. And, in
18 fact, I don't think anything that I said previously could
19 fairly be read in the manner that you folks have attempted
20 to read it, and it appears to be from your papers, which are
21 somewhat at odds with what you are saying on the phone here
22 today, that it's really only what the Brobeck people may
23 have said that is within the waiver. There are things in
24 these memoranda which are explicitly, and in some instances
25 implicitly, in a way that cannot be mistaken, commenting

13

1  on opinions of counsel related to the positions that your
2  client intends to take. And if you want to waive privilege
3  and say, oh, we are, in good faith reliance on these
4  opinions, you are waiving all of this, and you can't keep
5  this in your back pocket, and you've got to give it up.
6  You have to. Now, that's after looking at it and
7  considering what it says, you've got to give it up.
8       Now, I'm not going to go through your document
9  and look and see if there is anything else in here that
10 might possibly be of a character that is redactable for some
11 reason. But I can tell you the stuff you highlighted for me
12 I view as going to and affecting directly the quality of the
13 reliance on the opinion of counsel.
14      So I'm granting the motion to compel to the
15 extent you were reading it in any fashion that made a
16 distinction between outside or inside counsel in regards to
17 whether one could or couldn't rely on the opinions that were
18 being given. You know, that just doesn't wash. You want a
19 jury to hear and believe that your client was not willful in
20 the steps that it took because it relied in good faith on
21 information provided by counsel. And you can sure do that.
22 The law allows you to do that. What it doesn't allow you to
23 do is say that all this other stuff that the client knew
24 about, because its lawyers, whether inside or outside, were
25 telling them about things affecting the quality of that

SHEET 5

14

1  advice, are things that you don't have to give up. You do.
2      Now, looking at the language in these exhibits,
3  it's pretty obvious to me why you've made the motion you've
4  made to bifurcate. And we might as well take that up right
5  now, too.
6      I'm granting the relief that SICOR has asked
7  for on bifurcation as to the presentation of this at trial.
8  And this is a first for me and is complicating how we're
9  going to have to handle this trial because I agree with the
10 defendants here that the language in these memos is of an
11 extraordinarily prejudicial nature and may result in a jury
12 making unfounded steps towards liability if it's presented
13 to them prematurely.
14     But I am not, I reiterate, bifurcating
15 discovery. If you want to move forward on a willfulness
16 defense in this case, you will give them this stuff and
17 you've give it to them now. Are we all squared away on
18 bifurcation?
19     MR. ASHINOFF: Your Honor, I have a lingering
20 issue here, if I may for a moment.
21     THE COURT: Sure.
22     MR. ASHINOFF: To the extent Mr. Rich has
23 characterized what I was trying to do is separate the
24 outside advice from the inside advice, I again state that
25 was not what I was attempting to do. Nor was I planning

15

1  not to have the in-house counsel testify about the patent
2  opinion or what he thought about the patent opinion. And
3  I was not going to withhold that. And that is a
4  mischaracterization of our position.
5      However, I do believe, Your Honor, that some
6  of what the in-house counsel had to say when it relates to
7  litigation as opposed to the validity of the opinion. Let
8  me give a hypothetical, just to make my point.
9      Hypothetically, if the in-house counsel said,
10 you know, I think this is a very strong invalidity opinion
11 and I think Brobeck are the brightest lawyers in the world
12 and I think that they're right, but even so I think you have
13 only a 40 percent chance of winning the litigation because
14 the jury is never going to believe this, that latter part of
15 that is protected work product. And as the memo has both
16 pieces, I believe we should be entitled to redact the
17 protected work product.
18     THE COURT: Well, let's stop because I
19 understand your hypothetical and I'm just telling you I
20 disagree with you. If it's communicated to the client, it's
21 an attorney-client issue. It's no longer a work product
22 issue, somehow separated. It is now a communication to the
23 client, which goes to the question of the wisdom or the
24 propriety or the strength of the opinion that is being
25 rendered.

16

1      Now, your hypothetical is, on the one hand, the
2  guy says "this is a brilliant opinion;" on the other hand,
3  he says "but I wouldn't rely on it" or "I think you've got
4  problems with it" or "this is your risk." Look, that is too
5  fine a distinction to make. You are trying to slice the
6  salami so thin, it's just absolutely transparent and it
7  won't work.
8      So I have read your submissions. I heard
9  your arguments. I looked at what you have submitted. I
10 understand why it's troubling to you. I'm telling you my
11 reading of it is this is information communicated to the
12 client that bears on the reliability, the wisdom, the sense
13 of going forward in the face of the opinion you got. And
14 if you want to do that, you can do it. But you are waiving
15 it.
16     Now, that's the decision. It's informed. It's
17 my best effort. If it's wrong, you guys don't have a lot
18 of relief here except seeking mandamus, I guess, but I don't
19 think you are going to get anywhere with that. So you ought
20 to just say, okay, we gave it our best shot. Let's move on.
21     MR. ASHINOFF: I understand, Your Honor. And
22 in fact, the bifurcation relief obviously deals with the
23 greatest part of the practical problem that it presented
24 for us.
25     THE COURT: And I'm agreeing with you. You do

17

1  have a practical problem, and I'm helping you resolve it.
2  Now you guys are going to have to help me resolve how do we
3  address the practical realities of that when it comes to
4  dealing with the jury, but that's a discussion for another
5  day. And I expect you folks to be talking about that in
6  good faith and with a higher degree of cooperation than has
7  been evidenced in this case to date.
8      You know, it could be that there has been a
9  great deal of cooperation that I don't see because the only
10 thing that bubbles up, of course, are the problems. So I
11 don't mean to imply it's been nothing but nails and biting
12 the whole time because you guys could have been getting
13 along better than the numerous disputes would indicate.
14 But this is a point on which I really do need solid,
15 professional, thoughtful attorneys thinking with me about
16 how we're going to manage it at trial. And we'll deal
17 with that another day. But you all need to start thinking
18 about it and talking about it now, please.
19     MR. ASHINOFF: Yes, sir.
20     THE COURT: That handles Pharmacia's motion to
21 compel, or gives you guidance which ought to resolve it. Am
22 I right about that, Mr. Rich?
23     MR. RICH: I hope so.
24     THE COURT: I hope so, too.
25     Mr. Ashinoff, I trust it does; correct?

United States District Court - Honorable Kent A. Jordan

SHEET 6

18

1      MR. ASHINOFF: We will accept the rulings and
2  we will go through all the documents and put them in piles
3  based on the rulings. And I suspect most of them are going
4  over, if not all of them.
5      THE COURT: Now let's turn to SICOR's motion
6  against Pharmacia.
7      And, Mr. Ashinoff, I'll give you the first crack
8  at this one. This is yours.
9      MR. ASHINOFF: Your Honor, I'm going to allow
10  my partner, Mr. Michael Gugig to address this.
11      THE COURT: That's fine. How do you say your
12  name?
13      MR. GUGIG: It's Gugig, Your Honor. G-U-G-I-G.
14  Mike is the first name.
15      THE COURT: All right. Go ahead, Mr. Gugig.
16      MR. GUGIG: Thank you, Your Honor. Very
17  briefly, I know you have been through the papers and seen
18  what happened here. We had an extraordinarily difficult
19  time in terms of the privilege log that we received in the
20  first instance, receiving it piecemeal and ultimately having
21  it end up with 14,000 or so entries. We cut those down as
22  best we could.
23      And I won't go through all the history except
24  to say that during the briefing process of this motion, we
25  continued to talk with the other side, we continued to try

19

1  to narrow the issues and, in fact, were successful in doing
2  that, bringing this to some 1,600 or 1,800 documents in
3  total down from an initial, I think it was 6,000.
4      The problem is that Pharmacia's privilege log
5  has really been a moving target since Day One. During the
6  course of the briefing, Pharmacia revised its privilege
7  log to such an extent as to make wholesale changes that
8  are impossible to square with what was originally on the
9  privilege log. And I point Your Honor to page four of our
10  reply brief which just gives three short examples of three
11  documents where the descriptions of the documents, the
12  dates of the documents, the authors, the recipients, the
13  bases of the privilege, everything has changed entirely,
14  100 percent. We did the best that we could to cut down
15  and make cuts based on sort of overarching categories. The
16  problem with this kind of moving target privilege log is
17  that we can't pin it down ultimately and figure out what
18  it is that needs to be challenged. And I do think that is
19  terribly prejudicial to us.
20      Having said that, on the specific issues that
21  we challenged, there was back and forth. If you note on
22  their privilege log, they designate both attorneys and
23  patent agents with the denomination of ATTY, presumably
24  standing for attorney. We asked Pharmacia on several
25  occasions to identify who are the attorneys and who are the

20

1  patent agents.
2      A November 2005 letter is the only time they
3  attempted to distinguish between those two categories of
4  individuals. And we took them at their word. Whatever it
5  said on that letter, we just accepted that these folks were
6  attorneys. So the problem is continuing on their log, on
7  the contested documents that are still at issue, there are
8  thousands, I think 1,600-or-so log entries that do not have
9  anybody on that list as either an author or a recipient.
10  And we have been refused in our attempts to distinguish
11  between patent agent and attorneys.
12      Now, Pharmacia says in its opposition brief that
13  British counsel was supervising all of the patent agents
14  worldwide in their patent prosecution efforts but there is
15  no affidavit saying that.
16      THE COURT: Yes. Well, why don't we just get
17  that handled right now.
18      Mr. Rich.
19      MR. RICH: Yes, Your Honor.
20      THE COURT: I did notice that there on page two
21  of the reply brief from SICOR, they throw that charge at you
22  and Mr. Gugig has just repeated it here now. What is your
23  response to that, that you are asking the Court, on attorney
24  argument, without a basis in fact, to uphold attorney-client
25  privilege?

21

1      MR. RICH: Your Honor, it's interesting because
2  that sort of argument would undermine any privilege log
3  whatsoever. I can tell you as an Officer of the Court, as
4  someone who has been through these documents, as someone who
5  has talked to the client and talked to Jeffrey Wood. I
6  can name the specific individual at JA Kemp & Co. who was
7  supervising worldwide prosecution, that that was his role.
8      THE COURT: All right. Now, let me ask this
9  question of Mr. Gugig. Is it purely a formality at this
10  point to get an affidavit from Mr. Wood? Because if that is
11  your point that, gee, they weren't really supervising, if I
12  have Mr. Rich saying they were, Mr. Wood said he was, does
13  that resolve it?
14      MR. GUGIG: I don't think it does, Your Honor.
15  I do think there are issues with the extent of Mr. Wood's
16  purported supervision of these folks. If we had an
17  affidavit from Mr. Wood, presumably we would be entitled
18  to take his deposition to delve further into those
19  relationships.
20      With respect with Mr. Rich, it has never been my
21  understanding that a lawyer can say I promise as an Officer
22  of the Court that these factual assertions in this case are
23  true and have the Court take them with the source of
24  evidence. So I think the answer to the question, Your
25  Honor, is no.

SHEET 7

**22**

1　　　THE COURT: And you think that if Mr. Wood
2　were to step forward with an affidavit saying it was my
3　responsibility to take the point worldwide for the
4　prosecution of intellectual property rights, acquisition of
5　patent rights, and I had folks working under my direction
6　in several countries to do that, that then you would need a
7　deposition of this guy?
8　　　MR. GUGIG: It's possible we would. We
9　might not need it. But I have to say, Your Honor, it is
10　significant to us that in opposition to our motion,
11　Pharmacia was able to submit affidavits from attorneys in,
12　I think, eight or nine or ten foreign countries; but with
13　respect to the one lawyer who they say was supervising
14　worldwide patent prosecution and using that as the basis to
15　assert a privilege over people that they have not identified
16　in terms of status, whether patent agent or attorney or not,
17　I think speaks volumes, and it is suspicious, and I suspect
18　that I would ultimately want to take a deposition.
19　　　THE COURT: And did it --
20　　　MR. GUGIG: I am not taking that position now.
21　　　MR. ASHINOFF: Your Honor?
22　　　THE COURT: And did anybody have a problem with
23　the notion that the discovery was cut off in this case? Did
24　we extend it or am I correct that it has passed?
25　　　MR. ASHINOFF: Your Honor, with respect to the

**23**

1　discovery cutoff, the problem we have is there were a number
2　of depositions on both sides that could not be taken until
3　these rulings are made and additional documents, if any, are
4　exchanged. So there are about seven or eight depositions,
5　including a number in Italy, that could not occur until
6　these rulings and, ultimately, any further exchange of
7　material. So while the discovery cutoff has come and
8　gone, both sides have been in agreement and under the
9　understanding that obviously none of those depositions
10　could go forward.
11　　　THE COURT: Well, we'll talk about that in a
12　minute.
13　　　Mr. Rich.
14　　　MR. RICH: Your Honor, if I could disabuse some
15　of the suspicion that Mr. Gugig has. I think this is a
16　"fool me once, shame on you; fool me twice, shame on me"
17　situation in two ways.
18　　　First, we clearly expressed to them. And I
19　can say I discussed it at some length with Mr. Gugig and
20　Mr. Ashinoff's partner, Jordan Sigale about what the papers
21　would include. And there was no complaining, no concern,
22　nothing expressed in terms of need to show that -- he was
23　very accepting that Mr. Wood would be someone who was
24　directing this. That was not hidden at all during this
25　process. At no point did SICOR complain or suggest that

**24**

1　they didn't believe that.
2　　　However, in discussing a briefing schedule, it
3　was discussed expressly that the parties would be submitting
4　declarations to prove foreign law. And that arose in part
5　out of something that SICOR filed with regard to the letters
6　rogatory, in the reply memorandum on the letters rogatory.
7　SICOR argued that Pharmacia's submissions in opposition was
8　insufficient because there weren't declarations to establish
9　foreign law. And so we had both talked about timing needed
10　to obtain these declarations.
11　　　THE COURT: Well, here is the short of it. You
12　know what? If they think that they need something in the
13　way of an affidavit from Mr. Wood, produce it. And then if
14　they have something they want to act on it, maybe I'll hear
15　them.
16　　　I will say this. Most of this feels like a
17　sideshow to me. The vast majority of this particular
18　dispute we're talking about sounds like lawyers just kind of
19　picking at each other on stuff that could easily be resolved
20　and indeed most of it sounds like it has been resolved.
21　　　To the extent I need to go through here and make
22　rulings, I guess I will. I'll say that the assertion that
23　there is no attorney listed as an author or recipient looks
24　like it's coming down to, in some instances, a dispute about
25　whether people were identified in the privilege log had also

**25**

1　been formerly or previously identified by Pharmacia. And
2　the answer to that is I don't care whether they figured it
3　out early or they figured it out late. If these are people
4　who are attorneys and they're on the log, it's good enough.
5　　　If it comes down to a question of whether
6　somebody has to identify the litigation, I hear Pharmacia
7　saying they did it. Now, Mr. Gugig, did they not do it? I
8　mean they may not have done it when you wanted them to, but
9　is it done now?
10　　　MR. GUGIG: Not in all cases, Your Honor, and
11　one of the exhibits to our reply brief lists it. And I will
12　find that for you in a moment.
13　　　THE COURT: Okay. While you are looking for it,
14　Mr. Rich, you say you did it, they say you didn't. I mean
15　this is not a complicated issue. Either you did or you
16　didn't.
17　　　MR. RICH: Your Honor, I think again this is one
18　of those form over substance issues. I think I can allay
19　some of the concerns they stated as not being work product
20　documents that talk about the drafting of a license
21　agreement. Well, the drafting of a license agreement was
22　in settlement of litigation.
23　　　THE COURT: Well, hold on. I don't want to
24　get taken off the point here. You say there is no law out
25　there that says we have to identify the litigation it was in

**26**

1 anticipation of; and you also make a point, a pretty telling
2 one, that they didn't do it either until the day before they
3 submitted their motion in this regard. And I guess I'd have
4 to agree with you, that that makes their complaining sound a
5 little hollow.
6 But if there is a challenge and you want to
7 challenge them on the point and you want to challenge them
8 on the point, I guess you guys have made this bed together
9 and I'll have you lie in it. I won't have you saying that
10 is attorney work product without saying what it was with
11 regard to. You will need to say. I mean if you really
12 were settling litigation, you can say there was anticipated
13 litigation, it never materialized but it was between these
14 parties. Just tell them. Get it done.
15 MR. RICH: Fair enough, Your Honor. I actually
16 was assuming my first argument wouldn't succeed. I truly
17 believe that you don't need to identify specific litigation
18 and we did not argue that SICOR was required to. We did
19 tell them that they were arguing something in their motion
20 that was inconsistent with their privilege log.
21 THE COURT: Yes.
22 MR. RICH: But I think this is one of those
23 things where the parties sitting down and talking, I think
24 if we go through on a document-by-document basis, there is
25 no question, given our brief review of all the documents

**27**

1 after we received their motion.
2 THE COURT: Now, there is a question also about
3 whether documents were filed in a public forum. Obviously,
4 if that really happened, I'd read your papers as agreeing,
5 yes, of course, we can't claim privilege for something we
6 filed but that you are saying the premise is wrong.
7 So, Mr. Gugig, what is the foundation for your
8 assertion that, oh, yes, they're claiming privilege as to
9 stuff they actually filed with public bodies in the face of
10 they're saying that is just not so?
11 MR. GUGIG: The only thing I can say, Your
12 Honor, is that the descriptions we are challenging make it
13 reasonable for us to believe that this was a publicly filed
14 document. There are documents included in, and I believe
15 we're only talking about 28-or-27 documents at this point,
16 that are of concern on this point. One of them was just
17 described as form, and the recipient, the Patent Office
18 indicates to me it was filed. Other things are verbatim
19 translations of Office Actions. It seems to me that is
20 public domain. That is not privilege material.
21 THE COURT: All right. Well, Mr. Rich, maybe
22 you've got some work to do on your privilege log. If the
23 aim of SICOR here was to say their privilege log was poorly
24 done, therefore, strip them of all privileges, I'm just not
25 going there. We got enough to do in this case without

**28**

1 having this turn into a fight over the quality of privilege
2 logs.
3 So I hope I have given enough guidance and
4 input here for you folks to work this out without having
5 to deal with your issues again on your privilege logs. If
6 we do have to deal with them, I guess we do. But I would
7 really, really strongly suggest that nobody bring me any-
8 thing in this regard unless you have gone to the Nth degree
9 to get things worked out. Because we're at the end of
10 the game now and it's time to be getting ready for case
11 dispositive motions and for a trial after that if the case
12 doesn't go away on case dispositive motions.
13 MR. GUGIG: Your Honor, it's Mike Gugig. May I
14 just interject one comment? And I just want to clarify
15 something that you said early on in making these rulings.
16 I am not clear whether you have instructed
17 Pharmacia to distinguish between patent agent and patent
18 attorneys. On their privilege log now they do use the
19 designation "attorney" to signify or to denominate both
20 statuses. The one request I would make is that they
21 distinguish between those statuses and tell us if somebody
22 is actually an attorney or if somebody is a patent agent.
23 THE COURT: Mr. Rich?
24 MR. RICH: Your Honor, like sitting down and
25 speaking with Mr. Gugig about all the other concerns he has,

**29**

1 I have no problem with that. I'll ruin the next week-or-so
2 for Mr. Steck sitting here with me and he can go through the
3 log and identify who is an attorney and who is an agent; and
4 I think if that is what resolves the concern, I don't think
5 that is a problem at all.
6 THE COURT: All right. It sounds like you are
7 on the same page.
8 MR. RICH: With the one caveat, of course, there
9 are countries where there are not -- they don't fall within
10 these strict distinctions and attorneys don't prosecute and
11 agents -- you know, there are different terms for roles and
12 they're not one or the other.
13 THE COURT: Well, give them the best that you
14 can. And then I'm in earnest about saying there is enough
15 to fight about here so that mounting discovery disputes and
16 thinking that if you can only get your hands on that one
17 obscure document the whole case will shift, I just don't
18 think that is really productive at this point. So fight
19 your fights, get it done, but I'd prefer not to hear from
20 you with discovery disputes since we're at a stage of the
21 case where we're all supposed to be focusing on other
22 things.
23 Now, I said we would speak in a moment about
24 how you are going to deal with other matters. If you've
25 got some production to do or some revising to do of

privilege logs on both sides and remaining depositions, what was your plan for getting that done? Recognizing, as Mr. Ashinoff has already put on the record, that there was a limited amount that you could do until we spoke, all of us, together, had you thought about how you would proceed to get these things done now?

MR. ASHINOFF: Your Honor, speaking from our point of view and contemplating this, I would like to think that will not take more thank a couple of weeks for Mr. Rich and Mr. Gugig to either work everything out or ask to tee up a brief phone call if they can't on whatever remains there.

We then need to get the Italian depositions scheduled with the Special Referee. I think realistically that April 28th date for dispositive motions and claim construction briefs needs to have some relief because of this and because frankly both on claim construction we need the inventors and on the inequitable conduct counterclaim, which the Court recently amended and allowed in, we need the inventors. And we talked about having to take the inventors before you let us take the prosecuting attorneys.

THE COURT: All right.

MR. ASHINOFF: We need, at the minimum, I think, in all honesty, a month to six weeks relief from the claim construction filing dates and summary judgments filing dates to get the privilege documents issues worked out, the



documents reviewed, the depositions scheduled and taken and the briefs and claim construction positions written.

THE COURT: Mr. Rich.

MR. RICH: Your Honor, I would suggest that the issues are severable in that the Federal Circuit has made it quite clear that inventor testimony is irrelevant to the question of claim construction. And I think all the other issues that really would be potentially resolved on summary judgment can be resolved according to the current schedule, other than, of course, inequitable conduct. I think there is a strong likelihood that inequitable conduct would be narrowed, if not disappear entirely by summary judgment. But, of course, filing a summary judgment motion before SICOR has any opportunity to take discovery relevant to it would be unfair.

THE COURT: Well --

MR. RICH: I would suggest two separate tracks, maintaining essentially the same track for Markman and other summary judgment issues.

THE COURT: No. Let me just cut you off. That is not happening.

MR. RICH: Okay, Your Honor.

THE COURT: I'm going to give four weeks of an extension. That's it. And I would not suggest you folks wait around to start scheduling. I heard Mr. Ashinoff's



run-down include, well, we'll let these guys work stuff out and then we'll schedule this. No, you start your scheduling now and start working stuff out now.

MR. ASHINOFF: That was our intention, Your Honor. If I was heard to say we're going to wait to start scheduling, that I misspoke. Certainly, that wasn't my thought. We've got to schedule these things way in advance.

THE COURT: Right. And with all due respect to the other things you guys have to do, no doubt everybody is very busy, that should begin immediately. So why don't you folks go ahead and start working that angle.

I will ask you to provide to me a stipulation and order that moves the case dispositive date four weeks. Let me give you a date certain here.

(Pause.)

THE COURT: May 30th is the date. Tuesday, May 30th is the date that I'll expect your case dispositives and Markman brief, opening briefs to come in. And then you need to be aware that the briefing on this is going to -- you know, there are just not going to be any extensions on briefing; okay? Get your material in because now we're cutting into my decision time and I want to give your motions the due consideration that I know you folks want me to give them. So I'll look forward to getting that stip from you folks; all right?



MR. RICH: Your Honor?

THE COURT: Yes.

MR. RICH: If I could just ask a practical question. How long would you like between the filing and the reply in support of the motions for summary judgment and the Markman hearing and summary judgment argument?

THE COURT: Well, we're going to have to come up with that date for you. Having moved these things back, I think it's fair to say that I'm going to want to have the hearing with you guys some time in the very end of June or in early July. I'm not going to want more than about four weeks to elapse. And I'll have to have you folks communicate with Ms. Stein in my office so that we can peg that date. But don't let that hold up your coming up with a stip -- okay? -- on the other dates.

MR. ASHINOFF: Okay, Your Honor. And we'll communicate with Ms. Stein what you said about dates that work for everybody?

THE COURT: Yes.

MR. ASHINOFF: And for the Court?

THE COURT: Yes, for the summary judgment argument and Markman discussion.

MR. ASHINOFF: Yes, sir.

THE COURT: And you should be planning and pegging. I'm giving you sort of the very end of May here.