IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PHARMACIA & UPJOHN COMPANY, LLC, | ) ) ) | **REDACTED PUBLIC VERSION** |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 04-833-KAJ |
| SICOR INC. and SICOR PHARMACEUTICALS, INC., | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' NOTICE
OF ITS INTENT TO SUBMIT EVIDENCE TO THE JURY IN SUPPORT OF ITS
OBVIOUSNESS DEFENSE THAT THE PATENT AND TRADEMARK OFFICE ACTED
ON INACCURATE AND UNRELIABLE INFORMATION ABOUT PRIOR ART**

ASHBY & GEDDES
Steven J. Balick (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Defendants*

*Of Counsel:*

Reid L. Ashinoff
Michael S. Gugig
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Jordan A. Sigale
SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
Chicago, Illinois 60606
(312) 876-8000

Dated: November 9, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY, LLC,

Plaintiff,

v.

SICOR INC. and SICOR PHARMACEUTICALS, INC.,

Defendants.

C.A. No. 04-833-KAJ

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' NOTICE OF ITS INTENT TO SUBMIT EVIDENCE TO THE JURY IN SUPPORT OF ITS OBVIOUSNESS DEFENSE THAT THE PATENT AND TRADEMARK OFFICE ACTED ON INACCURATE AND UNRELIABLE INFORMATION ABOUT PRIOR ART**

As part of its defense that the '285 patent is invalid as obvious, defendants Sicor Inc. and SICOR Pharmaceuticals, Inc. (collectively, "Sicor") respectfully provide notice to the Court and Pharmacia & Upjohn Company, LLC ("Pharmacia") that they intend to present evidence to the jury that the Patent and Trademark Office ("PTO") acted upon inaccurate and unreliable information from Pharmacia in determining non-obviousness of the claims of the '285 patent, specifically with respect to the conventional wisdom on the use of buffers to adjust pH and the disclosures made in the Wassermann and Janssen prior art references. Sicor makes this submission pursuant to the Court's directive at the October 27, 2006 final pretrial conference.

**PRELIMINARY STATEMENT**

At the October 17, 2006 final pretrial conference, the Court informed Sicor that "where there might be some overlap" between evidence of inequitable conduct and the invalidity case evidence, the Court wanted a "heads up on it so that to the extent things have to be in front of the jury they can be." (D.I. 304, Ex. A at 4:9-12). Heeding the Court's instruction, Sicor promptly alerted the Court during the reconvened final pretrial conference on October 27 that discrete

pieces of evidence relevant to Sicor's inequitable conduct defense were also directly relevant to Sicor's defense that the '285 patent is invalid as obvious.

As a preliminary matter, Sicor does not seek to present evidence to the jury from its entire inequitable conduct defense. Sicor intends to introduce only the small subset of its inequitable conduct evidence that directly overlaps with Sicor's obviousness defense; in total, Sicor seeks to present to the jury only three of the twelve issues of fact listed in the final pretrial order as also underpinning Sicor's inequitable conduct defense. (See D.I. 288 at Ex. 1 pp 4-6, Ex. B at 4-6). In this regard, Sicor's obviousness evidence is narrowly tailored to demonstrate that the PTO had inaccurate and unreliable information regarding the determinations that the claims were not obvious over the Wassermann and Janssen references. Further, Sicor will not present evidence nor argue before the jury issues concerning any intent to deceive or materiality. Simply put, Sicor merely intends to provide the jurors with all of the available evidence related to the PTO determination that the '285 patent was not obvious over Wassermann and/or Janssen, including evidence that the PTO's action was based upon inaccurate and unreliable information.

## ARGUMENT AND AUTHORITIES

### I. A PARTY MAY INTRODUCE EVIDENCE THAT THE PTO BASED A DETERMINATION OF NON-OBVIOUSNESS ON INACCURATE AND UNRELIABLE INFORMATION ABOUT PRIOR ART

To determine whether a patent is invalid as obvious, the jury can, and should, consider specific evidence that the PTO was not fully aware of the scope and content of prior art presented to it. Such evidence is particularly important in this case because Pharmacia is arguing that Sicor has an "especially difficult" burden to demonstrate invalidity based on prior art references (Wassermann and Janssen) that were before the PTO during the prosecution of the '285 patent. (*See* Ex. C, Pharmacia's Proposed Jury Instruction 2.2 ("the challenger's burden [of clear and convincing evidence] is especially difficult when the prior art references of arguments

at issue in a case were before the Patent Office Examiner during the prosecution of the application")). Without presenting evidence that the PTO had inaccurate and unreliable information about that prior art, Sicor will be unfairly hindered in its ability to overcome the allegedly stronger presumption of validity due to the PTO's determination.

Courts acknowledge that the nature of proceedings before the PTO can be relevant to determine the substantive validity of a patent. *See, e.g., Lyle/Carlstrom Assoc., Inc. v. Manhattan Store Interiors, Inc.*, 635 F.Supp. 1371, 1382 (E.D.N.Y. 1986) (*citing Kahn v. Dynamics Corp. of Amer.*, 508 F.2d 939, 942 (2d Cir. 1974)). In particular, courts hold that the fact finder "should attach less weight to the PTO's determination of validity or even ignore it entirely if there is evidence that the PTO . . . was misled about the scope and content of prior art" relevant to its decision. *Lyle/Carlstrom*, 635 F.Supp. at 1382-83; *see also Revlon, Inc. v. Carson Prods. Co.*, 602 F.Supp. 1071, 1082 (S.D.N.Y. 1985) (PTO's determination of validity is weakened where "the PTO was given incorrect data, or deceived as to the significance of correct data") (citations omitted); *Ansul Co. v. Uniroyal Inc.*, 301 F.Supp. 273, 280-81 (S.D.N.Y. 1969) (same), *modified on other grounds*, 448 F.2d 872 (2d Cir. 1971).

*Syntex LLC v. Apotex, Inc.*, 407 F.3d 1371, 1379, 1383 (Fed. Cir. 2005) is on point. In *Syntex*, the patent holder for an anti-inflammatory eye drop solution sued a generic manufacturer for infringement. The issue on appeal was whether the use of a particular chemical agent was an obvious alteration of similar formulations taught in the prior art. Reversing the district court's determination of non-obviousness, the Federal Circuit held that, *inter alia*, the district court erroneously "failed to appreciate . . . the prosecution history of the relevant patents," including the patent holder's submission of a declaration and test data that omitted key data that was previously submitted to another examiner as part of a rejected parent application. *Id.* at 1379. While the patent holder's actions did not rise to the level of inequitable conduct, the Federal

Circuit found that the prosecution history "cast[ed] doubt on the final examiner's conclusion" of non-obviousness, and remanded to "review the file history as part of its assessment of whether the invention claimed by the claims in suit are nonobvious." *Id.* at 1379, 1383.

Here, as in *Syntex*, the PTO ultimately reversed its prior determinations that the claimed invention was obvious over both the Wassermann and Janssen references based upon Pharmacia's submission of inaccurate and unreliable statements and testing data. To determine whether the '285 patent is invalid as obvious, the jury should be able to consider evidence of those inaccurate and unreliable statements.

## II. EVIDENCE THAT SICOR SEEKS TO PRESENT TO THE JURY

The record in this case shows that the PTO did not have accurate and reliable information concerning the conventional wisdom regarding the use of buffers to adjust pH and the disclosures of two key prior art references, the Wasserman and Janssen articles. To demonstrate that the PTO's determination of non-obviousness should be afforded less weight, Sicor should be able to present that evidence of Pharmacia's inaccurate and unreliable statements to the jury. The specific evidence is set forth below.

### A. Conventional Wisdom on the Use of Buffers to Adjust pH

The record in this case demonstrates that the PTO received inaccurate and unreliable information concerning the conventional wisdom on the use of buffers to adjust pH levels. In a declaration that was submitted to the PTO on December 9, 1992, one of the '285 patent's named inventors, Dr. Carlo Confalonieri, represented that the conventional wisdom in the art was that the pH should be adjusted with a buffer:

> Prior to the present invention, the conventional wisdom was that it was impossible to produce anthracycline aqueous solutions which had long term storage stability. Further, that although the prior art had been recognized that pH had an effect upon storage stability of aqueous solution [sic], *the conventional wisdom in the art was that the pH should be adjusted with a buffer* as taught by Arcamone.

(Ex. D at 3-4 ¶ 6) (emphasis added). In sworn testimony, however, another named inventor -- Dr. Gaetano Gatti -- confirmed that conventional wisdom was that it was actually *incorrect* to use buffers in this way. At his deposition, Dr. Gatti testified that

**REDACTED**

In addition, Pharmacia submitted to the PTO only a partial copy of Lachman, The Theory and Practice of Industrial Pharmacy (2nd Ed. Lea & Febiger 1976), and then only belatedly in the group of 229 references filed with the PTO after a favorable indication of allowability. In the pages that Pharmacia did not submit to the PTO, Lachman taught the potentially deleterious effect a buffer could have on the stability of a final drug product, and discussed the experimental method whereby one of ordinary skill in the art would identify buffers having such an effect. *See* Ex. F, Lachman at 41 ("Although [buffer] salts tend to maintain the pH of [pharmaceutical liquids] at a constant level, they can also catalyze the degradation ... [t]he rate of reaction can be influenced by the ionic strength of the solution in accordance with the following equation....."). Moreover, the Wassermann reference taught that ionic strength has a negative effect on doxorubicin stability.

Thus, Dr. Confalonieri's 1992 declaration was inaccurate and unreliable; the sworn testimony of the other inventor and omitted Lachman reference provides a more accurate description of the conventional wisdom in the prior art concerning the use of buffers to adjust pH, but the PTO never received that information. The jury should consider that evidence

because it allowed Pharmacia to overcome the PTO's rejection of the claims as obvious over both Wassermann and Janssen.

### B. The Wassermann Reference

The record in this case also shows that the PTO received inaccurate and unreliable information concerning the Wasserman reference itself. In an Amendment dated January 6, 1993 (Exhibit G), Pharmacia's attorney Richard Kelly represented that the claimed invention (a doxorubicin solution with a pH adjusted to 2.5 - 5 with hydrochloric acid) demonstrated superior storage stability than the doxorubicin solution taught in Wassermann (a doxorubicin solution with a pH adjusted to 2.1 with hydrochloric acid). Mr. Kelly's conclusion was based on data originally set forth in a March 10, 1987 declaration by Dr. Confalonieri (Ex. H at 5-6).[1]

Mr. Kelly's comparative data and conclusions were wrong because the actual data in the 1987 declaration by Dr. Confalonieri concerned experiments where aqueous solutions of doxorubicin were adjusted with a *buffer* (glycine-HCl) and not an *acid*. (Ex. H at Table 2). Indeed, Dr. Gatti confirmed at his deposition that the experiments referenced in the Confalonieri Declaration used a glycine *buffer*, and not hydrochloric acid. (Ex. E at 116:5-14; 117:1-4)

**REDACTED**

---

1 Dr. Confalonieri's declaration dated March 10, 1987 (Ex. H) was submitted to the PTO four times: (1) in 1987; (2) as Exhibit C to Dr. Confalonieri's declaration dated December 20, 1990; (3) as an exhibit to Tab 2 of Dr. Confalonieri's declaration dated December 9, 1992 (Ex. D herein). Dr. Confalonieri also referenced the experimental results to overcome obviousness rejections based on Wassermann in his May 27, 1991 declaration to the PTO. (Ex. J at 2-5).

The jury should be permitted to consider the evidence of Mr. Kelly's and Dr. Confalonieri's inaccurate submission because it allowed Pharmacia to overcome the Patent Office's rejection of the claims as obvious over Wasserman.

### C. The Janssen Reference

The record in this case also shows that the PTO considered inaccurate information about the scope and content of the Janssen prior art. In response to an Office Action dated January 20, 1992 (Attached as Exhibit K), Pharmacia's patent lawyer submitted the following statement: "Janssen does not teach or suggest a concentration of anthracycline glycoside ranging from 0.1 to 100 mg/ml in pharmaceutically acceptable solution or otherwise." (Ex. K at 4). That statement is not accurate. As Pharmacia's own technical expert, Dr. Jacob H. Beijnen, testified at deposition, Janssen *does* teach part of the claimed solution concentration. (Ex. L at 223:25 - 224:1-6,

**REDACTED**

The jury should be given the evidence that Pharmacia's inaccurate description of Janssen allowed Pharmacia to overcome the PTO's rejection of the claims as obvious over Janssen.

## CONCLUSION

For the reasons set forth above, Sicor should be able to present evidence to the jury as part of its obviousness defense that the PTO acted upon inaccurate and unreliable information about the scope and content of the prior art. Sicor's ability to present that evidence is particularly important because Pharmacia argues that Sicor has a higher burden to overcome the PTO's determination of non-obviousness because the Wassermann reference and Janssen reference were already considered by the PTO. Sicor should be able to counter Pharmacia's position by providing the jury with evidence that the PTO's determination was made erroneously and based on inaccurate and unreliable information.

ASHBY & GEDDES

/s/ *John G. Day*

Steven J. Balick (I.D. # 2114)
Tiffany Geyer Lydon (I.D. #3950)
John G. Day (I.D. # 2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888

*Attorneys for Defendants*

*Of Counsel:*

Reid L. Ashinoff
Michael S. Gugig
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700
Jordan A. Sigale
SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
Chicago, Illinois 60606
(312) 876-8000

Dated: November 2, 2006
174801.1

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

PHARMACIA & UPJOHN COMPANY, : CIVIL ACTION

Plaintiff and Counter-defendant,

v.

SICOR INC., and SICOR PHARMACEUTICALS INC.,

Defendants and Counter-Claimants. : NO. 04-833 (KAJ)

- - -

Wilmington, Delaware
Tuesday, October 17, 2006 at 2:00 p.m.
PRETRIAL CONFERENCE - PART I

- - -

BEFORE: HONORABLE KENT A. JORDAN, U.S.D.C.J.

- - -

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL
BY: MARYELLEN NOREIKA, ESQ.

and

McDONNELL BOEHNEN HULBERT & BERGHOFF, LLP
BY: DANIEL A. BOEHNEN, ESQ., and
JOSHUA R. RICH, ESQ., and
GRANTLAND G. DRUTCHAS, ESQ.
(Chicago, Illinois)

Counsel for Pharmacia & Upjohn Company

Brian P. Gaffigan
Registered Merit Reporter

APPEARANCES: (Continued)

ASHBY & GEDDES
BY: JOHN G. DAY, ESQ.

and

SONNENSCHEIN NATH & ROSENTHAL, LLP
BY: REID L. ASHINOFF, ESQ., and
MICHAEL S. GUGIG, ESQ.
(New York, New York)

and

SONNENSCHEIN NATH & ROSENTHAL, LLP
BY: JORDAN A. SIGALE, ESQ.
(Chicago, Illinois)

Counsel for Sicor Inc. and Sicor Pharmaceuticals Inc.

- oOo -

PROCEEDINGS

(REPORTER'S NOTE: The following Pretrial Conference was held in open court, beginning at 2:00 p.m.)

THE COURT: Good afternoon. Please be seated.

MR. ASHINOFF: Good afternoon, Your Honor.

THE COURT: All right. Why don't we get started with some introductions.

MS. NOREIKA: Your Honor, Maryellen Noreika for Morris Nichols for the plaintiff. With me at counsel table is Dan Boehnen, his partner Grant Drutchas and Josh Rich, all from the McDonnell Boehnen firm in Chicago.

THE COURT: All right. Thank you.

MR. DAY: Good afternoon, Your Honor. For Sicor, John Day from Ashby & Geddes. With me today, Reid Ashinoff, Jordan Sigale, Mike Gugig from the Sonnenschein firm. Jordan is from Chicago, Mike and Reid are from New York.

(The attorneys respond, "Good afternoon, Your Honor.")

THE COURT: All right. I have a number of things to take care of at this pretrial conference. Frankly, we're not getting to them all so if we have to come back, we have to come back, but hopefully that won't be necessary.

First, let's just go over some general logistical information. I will be in soliloquy mode for a bit here. First, I'll ask you to go back and ask you to re-read the trial management order. A lot of information, as the name suggests, relevant to how I'm going to deal with you folks in front of the jury is in there and it's important for you to know what I'll expect you to know.

Second, as everybody understands at this point, the only liability issue we're dealing with is the invalidity contention. Then, of course, there is damages to be dealt with if the patent is found to be valid. Then we'll have willfulness and damages. Otherwise, there is a

whole bunch of equitable defenses.

I'm sure you thought about this already but I want to emphasize it here. I'm going to take the evidence as to the inequitable conduct and other equitable defenses separate and apart from the jury. Do not endeavor to put in front of the jury, in any form or fashion, evidence that goes to those defenses and is not otherwise specifically applicable to one of the issues that has to be before the jury. And in those cases where there might be some overlap, I'll absolutely expect you to give me a heads up on it so that to the extent things have to be in front of the jury, they can be. Now, you already pinned yourself down on some of this stuff in your motions in limine and we'll be dealing with those today. But to the extent there is any open question about that, I would like that to be clearly understood.

You should plan your trial days in a fashion that will have you prepared to put that evidence on before me, that is, those things that go to the equitable defenses before me at 4:30. In other words, at the conclusion of the trial day in front of the jury, if you have evidence to put on, I'll hear you at 4:30 and we'll run that from 4:30 to 5:30 each day but, of course, that time counts against your overall time in the trial. And that's not some extra time you are getting. It's a timed trial. The number of hours

were set in the order and the time that you use, whether the jury is in the box or not, is going to count against your time.

Okay. Are there any questions about any of that on the plaintiff's side, Ms. Noreika or Mr. Boehnen?

MR. BOEHNEN: No, Your Honor.

THE COURT: All right. Mr. Day or Mr. Ashinoff?

MR. ASHINOFF: No, Your Honor.

THE COURT: Okay. Good enough. Now, as you know, and your local counsel has probably already advised you of this, we'll have nine jurors. All will deliberate, no alternates, but that does give us the freedom to have three and still have a jury of six combined parties with their deliberations.

I use the silent struck method of picking a jury, which means nobody is going to need to say from counsel table anything in factoring the actual seating of the jury.

During voir dire, I will be conducting the vast majority of that, although I will give, within bounds of reason, each side an opportunity to ask a follow-up question due to something I asked at sidebar to jurors who are subject to individual questioning. I'm confident neither side will give me any reason to be concerned about how those questions are used.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACIA & UPJOHN COMPANY LLC, )
Plaintiff, )
v. ) C.A. No. 04-833-KAJ
SICOR INC. and SICOR PHARMACEUTICALS, INC., ) **FILED UNDER SEAL**
Defendants. )

**PROPOSED FINAL PRETRIAL ORDER**
**VOLUME I OF V**

MORRIS NICHOLS ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
Attorneys for Plaintiff

ASHBY & GEDDES

Steven J. Balick (#2114)
John G. Day (#2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
Attorneys for Defendants

# EXHIBIT 1

AGREED TO ISSUES OF FACT AND LAW

I. Whether Sicor can demonstrate by clear and convincing evidence that the '285 patent fails to disclose sufficient written description to support the scope of claim 9, which requires the following general proofs:

A. the Scope of claim 9, as determined by the Court and

B. the understanding of a person of ordinary skill in the art of the scope of the invention as disclosed in the written description of the invention as set forth in the operative patent application.

II. Whether Sicor can demonstrate by clear and convincing evidence that the '285 patent fails to disclose sufficient written description to support the scope of claim 13, which requires the following general proofs:

A. the Scope of claim 13, as determined by the Court; and

B. the understanding of a person of ordinary skill in the art of the scope of the invention as disclosed in the written description of the invention as set forth in the operative patent application.

III. Whether Sicor can demonstrate by clear and convincing evidence that claim 9 of the '285 patent would have been obvious to one of ordinary skill in the art at the time the invention was made over the Janssen and Wassermann references taken alone or in combination with one another, which includes the following general proofs:

A. the scope and content of the prior art;

B. the differences between the Janssen and Wassermann references taken alone or in combination with one another and claim 9 of the '285 patent;

C.    the level of one of ordinary skill in the art at the time the invention of the '285 patent; and

D.    objective evidence of non-obviousness (to the extent that evidence has a nexus with the claimed invention).[1]

1.    Commercial success of embodiments of the claimed invention, including those sold by Pharmacia, Sicor, Pharmachemie, and Gensia;

2.    Unexpected results provided by the claimed invention, including storage stability;

3.    Unexpected properties of the claimed invention;

4.    Long-felt, but unmet, need for the claimed invention;

5.    Skepticism of those in the art;

6.    Teaching away from the claimed invention by those in the art;

7.    Copying of the claimed invention, including by Sicor, Pharmachemie, and Gensia;

8.    Inability of Sicor to design around the claimed invention;

9.    Lack of non-infringing alternatives;

10.    Industry recognition of the importance of the claimed invention; and

11.    Licensing of the claimed invention.

IV.    Whether Sicor can demonstrate by clear and convincing evidence that claim 13 of the '285 patent would have been obvious to one of ordinary skill in the art at the time the invention was made over the Janssen and Wassermann references taken alone or in

---

[1]    Sicor does not concede that all of these proposed types of secondary considerations are recognized in the law.

combination with one another, in further view of Kaplan[2], which includes the following general proofs:

A. the scope and content of the prior art;

B. the differences between the Janssen and Wassermann references taken alone or in combination with one another, in further view of Kaplan, and claim 13 of the '285 patent;

C. the level of one of ordinary skill in the art at the time the invention of the '285 patent; and

D. objective evidence of non-obviousness.

1. Commercial success of embodiments of the claimed invention, including those sold by Pharmacia and Sicor;
2. Unexpected results provided by the claimed invention, including storage stability;
3. Unexpected properties of the claimed invention;
4. Long-felt, but unmet, need for the claimed invention;
5. Skepticism of those in the art;
6. Teaching away from the claimed invention by those in the art;
7. Copying of the claimed invention, including by and Sicor;
8. Inability of Sicor to design around the claimed invention;
9. Lack of non-infringing alternatives.

---

2 Pharmacia has moved *in limine* to exclude consideration of the Kaplan reference, as it was not identified in Sicor's answers to interrogatories or expert witness statement as a potentially invalidating reference.

V. Whether Sicor can demonstrate by clear and convincing evidence that the '285 patent is unenforceable due to inequitable conduct, which requires the following general proofs:[3]

A. either an affirmative misrepresentation or an omission of material information, as detailed below; and

1. Misrepresentations

a) in the '285 patent specification that for concentrations over 2 mg/ml it would be difficult (if not impossible) to dissolve lyophilized forms of anthracycline glycosides;

b) in the '285 patent specification that actual stability tests had been conducted before filing on other anthracycline glycosides (e.g. idarubicin and epirubicin) and concentrations greater than 2 mg/ml.

c) during prosecution including declarations that Wasserman provided "no information" that would allow one skilled in the art to produce storage stable doxorubicin solutions when Dr. Confalonieri had demonstrable knowledge that the rate constant values and activation energy disclosed in Wassermann directly applied to the already well-known rate equations for estimating shelf-life of aqueous doxorubicin solutions.

d) during prosecution and in declarations regarding the purported prior use of buffers rather than acids to adjust the pH of an

---

3 Pharmacia does not agree that Sicor properly identified all of the issues it seeks to introduce in relation to its inequitable conduct defense.

anthracycline glycoside solution because those in the art did not previously recognize the deleterious effects of buffers on anthracycline glycosides.

e) through the submission and reliance on false comparative testing of the claimed invention to a solution purported to be close to the Wassermann solution, but -- in fact -- was not.

2. Failure to disclose

a) that the subject matter of the '285 patent was publicly available before the critical date in reconstituted Adriamycin®.

b) that it was known to Pharmacia before 1983 that anthracycline glycosides were more stable at an acidic pH than at an alkaline one from their manufacturing experience with doxorubicin and the falsity of contradictory statements that one of the novel aspects of the invention is that it teaches that anthracycline glycosides are stable in the claimed pH range.

c) material information from the Australian and Canadian patent infringement litigations on related foreign patents including expert reports, Upjohn's invalidity position, and prior art (e.g. complete version of Lachman and U.S. Patent No. 4,310,515)

3. Burying the Patent Examiner with two hundred and twenty-eight (228) separate references after allowance (including some of the highly material references at issue in the Australian litigation, which had been settled almost three years earlier) and not noting for the PTO that five of those

228 references (Schou, Windheuser, Sandell, Ilver and the incomplete version of Lachman) contradicted Pharmacia's *seriatim* arguments regarding what one of ordinary skill would have understood.

B.   an intent to deceive through the misrepresentation or omission, as detailed below.

1.   The inventors were demonstrably aware that stability testing had not been done;

2.   Dr. Gatti was demonstrably aware of the truth of lyophilizate solubility;

3.   Dr. Confalonieri was aware of the true facts about knowledge vis a vis Wassermann;

4.   One or more of Dr. Confalonieri, Richard Kelly, Emily Miao, Daniel Boehnen, Geoffrey Woods, Vittorino Ferrario, and R. Metelli had a known obligation to the USPTO and were aware or should have been aware that the comparative testing did not properly reflect the disclosure of Wassermann given the high materiality of the reference, the testing and the declaration to allowance of the patent.

5.   One or more of Dr. Confalonieri, Richard Kelly, Emily Miao, Daniel Boehnen, Geoffrey Woods, Vittorino Ferrario, and R. Metelli had a known obligation to the USPTO and were aware of the Canadian and Australian litigation, yet withheld material information while submitting other less material information;

6.   Moreover, the high materiality of most (if not all) of these misrepresentations and omissions leads to an inference of an intent to mislead.

VI.    Whether Sicor can demonstrate that Pharmacia's actions before the Patent Office and in this litigation result in a finding of unclean hands, as detailed below.[4]

    A.    Inequitable conduct set forth above.

    B.    Pharmacia informed Sicor through its predecessor-in-interest that it believed the Australian counterpart to the '285 patent to be invalid, and that the way Sicor manufactures its allegedly infringing product would not infringe any of the worldwide Gatti patents, even if they were valid.

    C.    Litigation misconduct, including

        1.    Contrary to Italian law, Pharmacia's counsel prepared at least one witness for his deposition and attempted to prepare at least one other.

        2.    During Dr. Bottoni's deposition, Sicor also first learned that Dr. Bottoni had executed and was acting pursuant to a consulting agreement with Pharmacia's counsel, McDonnell Boehnen Hulbert & Berghoff, LLP ("MBHB"), which was about one year *before* the deposition took place and which was never produced.

        3.    Pharmacia misrepresented to the Court that "none of [the inventors] are Pharmacia's employees or agents."

        4.    Pharmacia's counsel misrepresented to Sicor's counsel on June 21, 2005 (after the Bottoni agreement) that neither Pharmacia nor counsel could direct or control their appearance for deposition.

---

[4] Pharmacia has moved *in limine* to exclude consideration of any evidence of unclean hands, as no such evidence was identified in Sicor's answers to interrogatories or otherwise in discovery.

5.     During his testimony, Dr. Bottoni suggested that the agreement's geographic limitation on where his deposition could take place was suggested to him by Pharmacia's counsel, and that there was nothing other than the agreement that would have prevented him from traveling to the United States for the deposition.

VII.    If the '285 patent is not found invalid or unenforceable, the quantum of damages to which Pharmacia is entitled, including:

    A.    But for Sicor's infringement, Pharmacia would have made additional sales of the claimed invention (proofs conforming to the traditional four *Panduit* factors);

    B.    To the extent that lost profits are not proven, the reasonable royalty for the use made of the invention by Sicor (based on the *Georgia-Pacific* factors), together with interest and costs as fixed by the Court.

VIII.    Whether a permanent injunction should be issued in view of the four-factor test for injunctive relief reiterated by the United States Supreme Court in *eBay v. Mercexchange LLC*.

IX.    If the '285 patent is not found invalid or unenforceable, whether Pharmacia can demonstrate by clear and convincing evidence that Sicor's actions, including those enumerated below, in infringing the '285 constitute willful infringement.

    A.    Sicor's deliberate copying of the ideas of Pharmacia in formulating its infringing product, including by rejecting alternative formulations;

    B.    Sicor's failure, upon knowing of Pharmacia patent protection, to investigate the scope of the patent and form a good-faith belief that it was invalid or not infringed, including by not relying reasonably on competent advice of counsel;

C. Sicor's behavior as a party to this litigation, including its vexatious litigation conduct;

D. Sicor's size and financial condition;

E. The lack of closeness of this case;

F. The duration of Sicor's misconduct;

G. Sicor's lack of remedial action;

H. Sicor's motivation for harm;

I. Sicor's attempts to conceal its misconduct, including by failing to disclose its pending ANDA and intentionally and willfully refusing to respond to Pharmacia's cease and desist letters;

J. Sicor's pattern of stealing and copying Pharmacia's (and its predecessor-in-interest's) intellectual property, including trade secrets and patents relating to anthracycline glycosides.

X. If the '285 patent is not found invalid or unenforceable, whether Pharmacia can demonstrate by clear and convincing evidence that Sicor's actions both with respect to willful infringement and in this litigation, including those enumerated below, make this an exceptional case.

A. Sicor's deliberate copying of the ideas of Pharmacia in formulating its infringing product, including by rejecting alternative formulations;

B. Sicor's failure, upon knowing of Pharmacia patent protection, to investigate the scope of the patent and form a good-faith belief that it was invalid or not infringed, including by not relying reasonably on competent advice of counsel;

C.     Sicor's behavior as a party to this litigation, including its vexatious litigation conduct;

D.     Sicor's size and financial condition;

E.     The lack of closeness of this case;

F.     The duration of Sicor's misconduct;

G.     Sicor's lack of remedial action;

H.     Sicor's motivation for harm;

I.     Sicor's attempts to conceal its misconduct, including by failing to disclose its pending ANDA and intentionally and willfully refusing to respond to Pharmacia's cease and desist letters;

J.     Sicor's pattern of stealing and copying Pharmacia's (and its predecessor-in-interest's) intellectual property, including trade secrets and patents relating to anthracycline glycosides.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PHARMACIA & UPJOHN COMPANY, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SICOR INC. and SICOR PHARMACEUTICALS, INC.,<br><br>Defendants. | ) | C.A. No. 04-833-KAJ |

**JOINT PROPOSED PRELIMINARY JURY INSTRUCTIONS**
**RE: VALIDITY ISSUES**

Pursuant to D. Del. L.R. 51.1 (a), Pharmacia & Upjohn Company, LLC submit the attached Joint Proposed Jury Instructions, in triplicate, relating to validity issues (what the parties have termed phase I). The parties have reached agreement with respect to Proposed Instruction Nos. 1.1-1.9, 2.4 and 3.1-3.3. With respect to the other proposed instructions, the agreed upon language, if any, and additional proposals by one or both parties is indicated. These instructions are also being submitted on disk in WordPerfect format.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

*/s/ Maryellen Noreika*

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 N. Market Street, P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
*Attorneys for Plaintiff*
*Pharmacia & Upjohn Company LLC*

Daniel A. Boehnen
Joshua R. Rich
McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 S. Wacker Drive
Chicago, Illinois 60606
(312) 913-0001

October 12, 2006

## 2.2 ARGUMENTS CONSIDERED BY PTO (PHARMACIA ONLY)

The law presumes, in the absence of clear and convincing evidence to the contrary, that the Patent Office acted correctly in issuing the patent.

Therefore, the challenger's burden is especially difficult when the prior art references of arguments at issue in a case were before the Patent Office Examiner during prosecution of the application.

Source:

*Cryovac v. Pechiney*, § 5.2; *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999). See also *Glaxo Group Ltd. v. Apotex Inc.*, 376 F3d 1339 (Fed. Cir. 2004)( (burden especially difficult when the prior art was before the PTO examiner during prosecution); *Intervet Am., Inc. v. KeeVet Labs., Inc.*, 887 F.2d 1050, 1054, (Fed. Cir. 1989). (presumption that the Examiner did his duty); *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990) (burden especially difficult when the prior art was before the PTO examiner during prosecution).

# EXHIBIT D

Docket No.: 769-249-0 DIV

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:

GAETANO GATTI, ET AL

SERIAL NO: 07/827,742

FILED: JANUARY 29, 1992

FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

GROUP ART UNIT: 1803

EXAMINER: PESELEV, E.

DECLARATION OF CARLO CONFALONIERI PURSUANT TO 37 C.F.R. 1.132

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Now come Carlo Confalonieri, a citizen of Italy, and a resident of Cusano Milanino (Milan), Italy who declares and states that:

1. I am the Carlo Confalonieri who previously submitted declarations pursuant to 37 C.F.R. 1.132 in application Serial Number 07/503,865 executed on December 20, 1990 and May 27, 1991 found at tabs 1 and 2 respectively to this declaration.

2. In order to demonstrate that the results illustrated in my declaration found at tab 1, were obtained with other physiologically acceptable acids, I conducted additional comparative testing found at tabs 8 through 10 attached hereto. The procedures employed in conducting these tests were the same as those described in my previous declarations, and in particular

DEFENDANTS' TRIAL EXHIBIT NO. 142

EXHIBIT
142
03/01/06

as set forth in tab 1 hereto. In addition to testing other physiologically acceptable acids, stability testing for epirubicin and idarubicin is also presented in tabs 3 through 8. As can be seen from these tabs epirubicin shows, under both accelerated and long term testings, a very similar stability behaviour as doxorubicin, while idarubicin appears to be even more stable under both accelerated and long term conditions.

3. From these tests it is apparent that the storage stability conferred on aqueous solutions of doxorubicin is not unique to hydrochloric acid but the stability is also conferred by other physiologically acceptable acids. In all instances, the physiologically acceptable acids at pHs between 2.5 and 5 produced aqueous solutions having superior storage stability as compared with the use of phosphate buffers as taught by Arcamone. Indeed, even the use of phosphoric acid resulted in superior storage stability when compared with the use of phosphate buffers as taught in Arcamone.

4. In conducting the storage stability tests, I tested a wide variety of physiologically acceptable acids which produced aqueous solutions in which the various anthracyclines were soluble. In particular, results obtained with acetic acid as well as hydrochloric acid are illustrated at tab 8. Tabs 9 and 10 compare sulfuric acid, phosphoric acid, methanesulphonic acid and tartaric acid with hydrochloric acid with results at tab 10 also comparing the Beijnen formulation using perchloric acid and

the Arcamone phosphate buffers. As can be seen, all of the tested physiologically acceptable acids produced results vastly superior to that for the phosphate buffers.

Furthermore, as evident, e.g., from tab 6, the acetic acid used as pH controlling agent for idarubicin under accelerated and long term conditions produced results comparable to those achieved with hydrochloric acid.

That is, that the results achieved with acetic acid would demonstrate comparable stability values as for the acids identified previously.

5. Based on these results, it is my conclusion that any physiologically acceptable acid which yielded solutions in which the anthracycline of interest was soluble will, at the recited pHs, result in a storage stable aqueous solution. I find such results to be quite surprising since until the time of our invention, it was considered that pH alone was the determining factor in establishing storage stability of aqueous solutions as discussed in my previous declarations found at tabs 1 and 2. From the results which have been presented, it is apparent that the nature of the specific acid employed is not critical (although hydrochloric acid appears to yield the best results) but, rather, that any physiologically acceptable acid results in solutions having superior storage stability.

6. Prior to the present invention, the conventional wisdom was that it was impossible to produce anthracycline aqueous solutions which had long term storage stability. Further, that although the prior art had been recognized that pH had an effect upon storage stability of aqueous solution, the conventional wisdom in the art was that the pH should be adjusted with a

buffer as taught by Arcamone. Thus, it was surprising and unexpected to discover that by adjusting the pH of the aqueous solution with a physiologically acceptable acid,a solution having a storage stability as demonstrated at tabs 3 through 10 hereto, would result. Prior to the present invention the expectation of those skilled in the art was that the nature of the pH adjusting medium would have no effect on the stability of the aqueous solution. Accordingly, it was extremely surprising and unexpected to find that contrary to conventional wisdom, the pH adjusting medium had a significant and beneficial effect.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Carlo Confalonieri
Carlo Confalonieri

Dated: 9th December, 1992

# EXHIBIT E

REDACTED

# EXHIBIT F

# The Theory and Practice of Industrial Pharmacy

SECOND EDITION

LEON LACHMAN, PH.D.
*Vice President of Development and Control Division, Endo Laboratories Incorporated, Subsidiary of E. I. du Pont de Nemours and Company (Inc.), Garden City, New York*

HERBERT A. LIEBERMAN, PH.D.
*Vice President, Research and Development, Personal Products Division, Warner-Lambert Company, Morris Plains, New Jersey*

JOSEPH L. KANIG, PH.D.
*President, Joseph L. Kanig Associates, Inc. Pharmaceutical Consultants, Westbury, New York; Formerly Dean, College of Pharmaceutical Sciences, Columbia University, New York, New York*

LEA & FEBIGER PHILADELPHIA
1976

PU 0011812

# Contents

1. Preformulation 1
ELIE C. SHAMI
JOHN R. DUDZINSKI
RUSSELL J. LANTZ, JR.

2. Kinetic Principles and Stability Testing 32
LEON LACHMAN
PATRICK DELUCA

3. Biopharmaceutics 78
MILO GIBALDI

4. Theories of Dispersion Techniques 141
E. N. HIESTAND
WILLIAM I. HIGUCHI
N. F. H. HO

5. Pharmaceutical Suspensions 162
LLOYD KENNON
GUNTHER K. STORZ

6. Emulsions 184
MARTIN M. RIEGER

7. Semisolids 215
BERNARD IDSON
JACK LAZARUS

8. Suppositories 245
JOACHIM ANSCHEL
HERBERT A. LIEBERMAN

9. Pharmaceutical Aerosols 270
JOHN J. SCIARRA

10. Compaction and Compression 296
EDWARD SHOTTON
JOHN A. HERSEY
PAUL E. WRAY

11. Tablets 321
WILLIAM C. GUNSEL
JOSEPH L. KANIG

12. Tablet Coating 359
JOHN B. ELLIS
ELLIOTT B. PRILLIG
ANTON H. AMANN

13. Capsules
Part I. Hard Capsules 389
VAN B. HOSTETLER
JEAN Q. BELLARD

Part II. Soft Gelatin Capsules 404
J. PEARSON STANLEY

Part III. Microencapsulation 420
JOSEPH A. BAKEN
JERROLD L. ANDERSON

14. Sustained Action Dosage Forms 439
MANFORD ROBINSON

15. Milling 466
EUGENE L. PARROTT



CHAPTER 2

# KINETIC PRINCIPLES AND STABILITY TESTING

LEON LACHMAN AND PATRICK DE LUCA

Although the pharmaceutical industry has long been aware of the importance of stability testing in product development, it has only been within approximately the last fifteen years that major strides have been made in this area. During this period, the empirical approach to stability testing, for the most part, has been replaced by scientific considerations employing certain basic physical-chemical principles.

Several sections of the Federal Food and Drug and Cosmetic Act relate to stability of pharmaceutical products. Section 505 (b) (4) concerns itself with preservation of the characteristics of the new drug and is the basis for requiring stability data in the new drug application. Section 501 (a) (2) (B) concerns itself with drug adulteration. A drug is considered adulterated if it does not meet the quality and purity characteristics that it is represented to possess. Section 505 (h) states that a drug shall be deemed to be misbranded if found by the Health Education and Welfare Agency to be liable to deterioration unless packaged in such form and manner and its label bears a statement of such precautions as necessary for the protection of the public health.

Of the three sections we have mentioned, the one that pertains most directly to stability testing of drugs is Section 505 (b) (4). The FDA Regulation dealing with this Section is 314.1 (8) (p) under New Drug Applications, and requires "a complete description of and data derived from studies of the stability of the drug, including information showing the suitability of the analytical method used." It further states that stability data should be submitted for the new substance, for the finished dosage form in the container in which it is to be marketed, and, if it is reconstituted at the time of dispensing, for the solution so prepared. It requires that an expiration date appear on the label to preserve the identity, strength, quality and purity of the drug until it is used. In fact it states, "if no expiration date is proposed, the applicant must justify its absence."

Further, the current Good Manufacturing Practices regulations of the FDA act, as published in the Federal Register of January 15, 1971, provide specific information as to the stability of pharmaceutical products and their expiration dating.[1] Thus the Commissioner of the FDA concludes that "the interests of consumers must be served by the establishment of valid expiration dates for all drug products. To allow time for the or-

PU 0011814

derly accumulation of data to support such dating, sections 133.13 and 133.14 have been changed to set forth basic guidelines for stability for all drugs, which studies will be used to establish expiration dates. No drug container-closure system is indefinitely stable, and the manufacturer or packer of a drug product is responsible for determining the stability characteristics for each of the products." It should be noted that the Commissioner indicates that valid expiration dates must be established for all drug products and provides for a reasonable time to acquire data for such dating.

The application of certain physicochemical principles in the performance of stability studies has proved to be of considerable advantage in the development of stable dosage forms. Only through this approach is it possible to accurately and adequately make use of data obtained from exaggerated storage conditions for the purposes of predicting the stability at normal shelf storage for extended periods of time. It is extremely important that the pharmaceutical manufacturer accurately predict the shelf stability of a new product from accelerated storage data, because of the considerable economic advantage gained in marketing a new product as soon as possible after formulation. A sound stability testing program is possible only if personnel are skilled in employing these principles and if appropriate equipment is available.

## THEORETICAL CONSIDERATIONS

Degradative reactions in pharmaceutical formulations take place at definite rates and are chemical in nature. They are dependent on conditions, such as concentration of reactants, temperature, pH, radiation, and catalysts. An effective and efficient study of these reactions requires the application of chemical kinetic principles.

### Order of Reaction

In many cases, by stating the order of the reaction, the manner in which the rate of a reaction varies with the concentration of the reactants can be defined. For the most part, the degradation of pharmaceuticals can be treated as zero-order, first-order, or pseudo first-order reactions, even though many of the pharmaceutical compounds degrade by complicated mechanisms. Consequently, the lower-order reaction types will be treated in depth here, and only minor consideration will be given to higher-order reactions.

**Zero-Order Reaction.** When the reaction rate is independent of the concentration of the reacting substance, it is dependent on the zero power of the reactant and, therefore, is considered to be of the zero-order reaction. In this type of reaction the limiting factor is something other than concentration, such as solubility or absorption of light in certain photochemical reactions. When solubility is the factor, only that amount of drug that is in solution undergoes degradation. This can be depicted as follows:

$$A\,(\text{solid}) \rightleftharpoons A\,(\text{sol.}) \longrightarrow B \qquad (1)$$

As drug is consumed in the degradation reaction, more drug goes into solution until all solid A has reacted. Until this occurs, the degradation reaction is not dependent on the total concentration of drug, but only on the portion that is in solution, resulting in a zero-order reaction.

The rate of decomposition of the drug can be described mathematically as follows:

$$\text{Rate of concentration decrease} = \frac{-dC_a}{dt} = k \qquad (2)$$

Where $C_a$ = concentration of reacting material A

$k$ = proportionality factor = reaction rate

$t$ = time

Since $C_a$ is a constant, $x$, the amount of A reacting is identified as

$$\frac{dx}{dt} = k \qquad (3)$$

Integration of equation (3) yields:

$$x = kt + \text{constant} \quad (4)$$

If the data from a stability study followed a zero-order reaction, a plot of x versus t, as shown in Figure 2-1, results in straight line plots with the slope equal to k. The value k would indicate the amount of drug that is degrading per unit time and the intercept of the line at time zero is equal to the constant in Equation 4.

Carrett and Carper.[3] in their study of the color stability of a liquid multisulfa preparation, showed that the color loss at 500 mμ followed zero-order kinetics. The graph in Figure 2-2 presents their data at several elevated temperatures. The straight line plots show that the degradation is behaving according to zero-order kinetics, and the slopes of their lines represent the rate of degradation at the particular temperatures.

**First-Order Reaction.** When the reaction rate is dependent on the first power of concentration of a single reactant (rate = $kC_a$). It is considered to be first-order. In this type of reaction, a substance decomposes directly into one or more products (A = products). The rate of reaction is directly proportional to the concentration of the reacting substance and can be expressed mathematically in the following form:

Rate of concentration decrease

$$= -\frac{dC_a}{dt} = kC_a \quad (5)$$

FIG. 2-1. A representative zero order plot of the amount of drug reacting vs. time.

FIG. 2-2. Plot of optical absorbance of extracted color against time at 40, 50, 60 and 70°C at 500 mμ. (From Garrett, E. R., and Carper, R. F.: J. Am. Pharm. Assoc. Sci. Ed., 44:515, 1955.)

Integrating Equation 5 in the form

$$-\frac{dC_a}{C_a} = k\,dt \quad (6)$$

We obtain

$$-\ln C_a = kt + i \quad (7)$$

where i is the constant of integration Converting from the natural logarithm (ln) yields

$$-\log C_a = \frac{k}{2.303}t + \text{constant} \quad (8)$$

Using the above equation for a first-order reaction, a straight-line is produced when the logarithm of the concentration $C_a$ is plotted against time, as shown in Figure 2-3. The velocity or reaction rate constant, k, can be calculated by multiplying the slope of the line by 2.303. The higher the temperature, the greater is the k value, as evidenced by the steepness of the slopes.

Integration of Equation 5 between the

PU 0011816



**FIG. 2-3.** Representative degradation curves for a material deteriorating according to first-order kinetics.

limits $C_1$ and $C_2$ and $t_1$ and $t_2$ results in the following:

$$-\int_{C_1}^{C_2} \frac{dC}{C} = k \int_{t_1}^{t_2} dt \qquad (9)$$

$$-(\ln C_2 - \ln C_1) = k(t_2 - t_1) \qquad (10)$$

$$k = \frac{1}{t_2 - t_1} \ln \frac{C_1}{C_2} = \frac{2.303}{t_2 - t_1} \log \frac{C_1}{C_2} \qquad (11)$$

This equation permits the calculation of the rate of decomposition of a substance between any time interval $(t_2 - t_1)$ if the concentration of drug at these two times is known.

Where $t_1$ is the time at beginning of the reaction $t_o$ at concentration $C_o$ and $t_2$ any time $t$ at concentration $C$, then Equation 11 can be expressed as follows:

$$k = \frac{2.303}{t} \log \frac{C_o}{C} \qquad (12)$$

Use of this expression permits the calculation of the rate of reaction k, by determining the concentration of drug remaining at any time t. Equation 11 or 12 can be used to ascertain whether the reaction is following first-order kinetics by determining k at several time intervals and noticing whether the values are essentially constant. Equation 12 is also written as follows:

$$k = \frac{2.303}{t} \log \frac{a}{(a - x)} \qquad (13)$$

Where $a = C_o$, $x$ = amount reacting in time t, and $(a - x)$ the amount remaining after time t.

The constant k is called the reaction velocity constant or, more frequently, the specific reaction rate. For a first-order reaction, it is a number that expresses the fraction of the material reacting in a unit of time and may be expressed in reciprocal seconds, minutes, or hours. For example, when k has a value of 0.001 $sec.^{-1}$, the material is decomposing at a rate of 0.1% per second.

The time necessary for a fraction of the material to degrade can readily be calculated. The half-life, $t_{1/2}$, of a drug is the time required for 50% of the drug to degrade and can be calculated as follows:

$$t_{1/2} = \frac{2.303}{k} \log \frac{C_o}{C} = \frac{2.303}{k} \log \frac{100}{50}$$

$$= \frac{2.303}{k} \log 2 = \frac{0.693}{k} \qquad (14)$$

$$\text{therefore } t_{1/2} = \frac{0.693}{k} \qquad (15)$$

In the pharmaceutical field, the time required for 10% of the drug to degrade is an important value to know, since it represents a reasonable limit of degradation of active ingredients. The $t_{90\%}$ value can be calculated as follows:

$$t_{90\%} = \frac{2.303}{k} \log \frac{100}{90} = \frac{0.104}{k}$$

$$t_{90\%} = \frac{0.104}{k} \qquad (16)$$

or

$$t_{90\%} = 0.152\, t_{1/2} \qquad (17)$$

It is important to note here that the $t_{1/2}$ or $t_{90\%}$ is concentration independent. In other words, it will take the same time to reduce the concentration of drug from 0.1 moles to 0.05 moles as it would to go from 0.001 moles to 0.0005 moles.

FIG. 2-4. Approximate interrelationship between rate constant, k, and the time elapsing until 10% or 50% decomposition. (From Schou, S. A.: Pharm. Acta Helv., 34:309, 1959.)

As a result of the foregoing discussion, it is obvious that knowledge of the specific rate constant, k, permits an estimation of the amount of drug that will degrade within a given time. The graph in Figure 2-4 indicates the approximate interrelationship between k and the time elapsing until 10 or 50% of the drug is decomposed.

**Pseudo First-Order Reactions.** If a reaction rate is dependent on the concentration of two reactant species (rate = $k C_a C_b$ or $k = C_a C_a$ or $k C_a^2$), it would be of a second order. A pseudo first-order reaction can be defined as a second-order or bimolecular reaction which is made to behave like a first-order reaction. This is found in the case in which one reacting material is present in great excess or maintained at a constant concentration as compared to the other substance. Under such circumstances, the reaction rate is determined by one reactant even though two are present, since the second reactant does not exhibit a significant change in concentration during the degradation reaction. An example of such a situation is the hydrolysis of an ester catalyzed by hydroxyl ion. If the hydroxyl ion concentration is high as compared to the concentration of the ester, the reaction will behave as a first-order reaction and can easily be followed by assay for residual ester. A similar approach, and one more frequently employed, is to keep the pH constant through the use of appropriate buffers. Illustrating such an approach is the study of the hydrolysis of the ester methyl-DL-α-phenyl-2-piperidylacetate at several pH levels and at 80°C. Semi-logarithmic plots of residual concentration of ester vs. time results in straight line curves in accordance with the equation for first-order kinetics, as shown in Figure 2-5.

## Influence of pH on Degradation

The magnitude of the rate of hydrolytic reactions catalyzed by hydrogen and hydroxyl ions can vary considerably with pH. Hydrogen ion catalysis predominates at the lower pH range, whereas hydroxyl ion catalysis operates at the higher pH range. At the intermediate pH range, the rate can be pH independent or catalyzed by both hydrogen and hydroxyl ions. The rate constants in this pH range are, however, generally less than those at higher or lower pH values. To determine the influence of pH on the degradation reaction, the decomposition is meas-

FIG. 2-5. Typical pseudo first-order rate plots for the hydrolysis of methyl DL-α-phenyl-2-piperidylacetate at 80° at several pH levels. (From Siegel, S., et al.: J. Am. Pharm. Assoc. Sci. Ed., 48:431, 1959.)

PU 0011818

ured at several hydrogen ion concentrations. The pH of optimum stability can be determined by the plotting of the logarithm of the rate constant vs. pH as illustrated by the pH profile in Figure 2-6. The point of inflection of such a plot represents the pH of optimum stability. Knowledge of this point is extremely useful in the development of a stable dosage form, provided the pH is within safe physiological limits. Studies of this type can be performed at elevated temperatures so that data can be obtained in as short a time as possible. The shift of this point of inflection caused by temperature elevation generally is not of sufficient magnitude to seriously affect the conclusions drawn from such data. The plot in Figure 2-7 gives an actual example in which the point of inflection for methyl-DL-α-phenyl-2-piperidylacetate served as a guide in the development of a stable injectable solution.

FIG. 2-6. pH inflection plot of maximum stability.

## Influence of Temperature on Degradation

In order for the rate constants or velocity of degradation to be of use in the formulation of pharmaceutical products, it is necessary to evaluate the temperature dependency of the reaction. This permits the prediction of the stability of the product at ordinary shelf temperature from data obtained under exaggerated conditions of testing. According to rule-of-thumb methods, the rate of reaction was said to double for each 10° rise in temperature. Although this rule may serve as a fairly accurate estimate for certain preparations, it is not generally applicable. Therefore, to assign an overall factor for the influence of temperature on the acceleration of reactions is foolhardy. Some deterioration reactions are not measurably influenced over a 10° temperature range, while others undergo rapid degradative changes. The recommended procedure is to set up a planned schedule of accelerated tests for each formulation in order to ascertain the temperature dependency of the chemical changes in the product undergoing evaluation.

The most satisfactory method for expressing the influence of temperature on reaction velocity is the quantitative relation proposed

FIG. 2-7. pH dependency of the hydrolysis of methyl DL-α-phenyl-2-piperidylacetate at 80°. (From Siegel, S., et al.: J. Am. Pharm. Assoc. Sci. Ed., 48:431, 1959.)

by Arrhenius.

$$k = Se^{-Ha}/RT \qquad (18)$$

Where k = specific rate of degradation
R = gas constant (1.987 calories degree$^{-1}$ mole$^{-1}$)
T = absolute temperature
S = frequency factor

The constant of integration in the Arrhenius equation has been designated as the frequency factor. This value is a measure of the frequency of collisions which can be expected between the reacting molecules for a given reaction. Logarithmically, it may be expressed as follows:

$$\ln k = -\frac{\Delta Ha}{RT} + \ln S \qquad (19)$$

Converting to $\log_{10}$

$$\log k = -\frac{\Delta Ha}{2.303\,R}\cdot\frac{1}{T} + \log S \qquad (20)$$

where log S can be considered as a constant.

From Equation 20, a plot of log k vs. $\frac{1}{T}$ yields a slope equal to $-\frac{\Delta Ha}{2.303R}$ from which the value for the heat of activation can be calculated. The heat of activation ($\Delta Ha$) represents the energy the reacting molecules must acquire in order to undergo reaction. The higher the value for the heat of activation, the more the stability is temperature-dependent. The graph in Figure 2-8 represents a plot of k values obtained at several elevated temperatures. Since the plot is linear, the prediction of stability at shelf temperature is possible by extrapolating the curve to the lower temperatures and reading off the k value for the lower temperature. Once the k value is obtained, it can be used to estimate the time for $t_{90\%}$ degradation with the aid of Equation 16.

In the event the data available is more limited, for example, where the rate constants at two elevated temperatures or at one temperature and the heat of activation are

FIG. 2-8. Temperature dependency of degradation rates.

known, it is still possible to obtain an estimate of the rate constant at a lower temperature by treating Equation 19 to give Equation 22.

Using the differential form of Equation 19,

$$\frac{d \ln k}{dt} = \frac{\Delta Ha}{RT^2} \qquad (21)$$

Upon integration between the limits $k_1$ and $k_2$ and $T_1$ and $T_2$ the following equation results:

$$\log \frac{k_2}{k_1} = \frac{\Delta Ha}{2.303\,R}\left(\frac{T_2 - T_1}{T_2 \cdot T_1}\right) \qquad (22)$$

The utility of the temperature dependency relationship is dependent on the controlling mechanisms of degradation. Preparations that degrade through solvolytic processes, e.g., reactions in solution, generally have heats of activation in the range of 10 to 30 Kcal. mole. Here, considerable advantage may be taken of the significant increases in rate of reaction that result with temperature

elevation. On the other hand, if diffusion or photolysis are the rate determining steps of the reaction, the heat of activation is only of the magnitude of 2 to 3 Kcal./mole, and little advantage is gained by accelerated temperature studies in prediction, since the temperature effect on rate is small. For reactions such as pyrolysis of polyhydroxylic materials, in which the heat of activation can be of the magnitude of 50 to 70 Kcal./mole, the rate of degradation, which may be great at elevated temperatures, may not be of any practical significance at the temperatures of marketing and storage of the pharmaceutical preparation.

**Simplified Techniques for Stability Prediction.** Simplified graphic techniques have been employed to predict the breakdown that may occur over prolonged periods of storage at normal shelf conditions. Free and Blythe describe such a technique for liquid products where the decomposition behaves according to the general kinetic laws.[3,4] For example, the plots in Figure 2-9 show that the degradation is following a first-order reaction. The time for the loss lines at the several temperatures to reach 90% of the theoretical potency is noted by arrows on the curve. These time values at different temperatures are plotted in Figure 2-10, and the time for 10% loss of potency at room temperature can be obtained from the resulting straight line by extrapolation to 25°C. If the extrapolated data in Figure 2-10 shows that the time to reach 90% potency at room temperature is too rapid to provide an adequate shelf life for the product, it is possible to determine the overage required for the product in order to maintain at least 90% potency for a prescribed time. This is accomplished by drawing the loss line representative of the 90% potency value at room temperature, as shown in Figure 2-11. Then a line is drawn parallel to this from the desired shelf life back to "0" days. The example shown in Figure 2-11 indicates that by the use of a 10% overage, the product will now take about twice as long to fall below 90% of labeled claim during shelf storage.




FIG. 2-10. Plot of $t_{90\%}$ values vs. absolute temperature⁻¹. (From Blythe, R. H.: Product Formulation and Stability Prediction. Presented at the Production Section of the Canadian Pharm. Mfrs. Assoc., April, 1957.)




FIG. 2-9. $t_{90\%}$ values at several temperatures. (From Blythe, R. H.: Product Formulation and Stability Prediction. Presented at the Production Section of the Canadian Pharm. Mfrs. Assoc., April, 1957.)

Kennon describes the construction of certain kinetic paths which can be used for purposes of comparison during formulation development work.[5] Using standard kinetic equations, he calculated the paths that reac-

PU 0011821




FIG. 2-11. Plot of average and normal loss curves. (From Blythe, R. H.: Product Formulation and Stability Prediction. Presented at the Production Section of the Canadian Pharm. Mfgrs. Assoc., April, 1957.)

FIG. 2-12. Two-year shelf-life goal reference decomposition. (From Kennon, L.: J. Pharm. Sci. 53:815, 1964. Reproduced with permission of the copyright owner.)

tions would follow if a 10% potency loss in two years at room temperatures is permitted. By choosing activation energies of 10 and 20 kcal./mole, both of which are conservatively low, and plotting the time in months which a formulation would take to drop to 90% potency versus 1/T, one arrives at Figure 2-12. Table 2-1 presents the data used in Figure 2-12.

Using the graph or table if the potency of the formulation is found to remain above 90% of its original concentration after storage at the various temperatures for certain periods of time, there is good assurance that the formulation will meet the requirement of a two-year shelf life. Thus if the assays are over the 90% of original concentration at the minimum times shown (indicated by the 20 Kcal./mole line on the graph) at the respective temperatures, in all probability, the assays will be over 90% after two years at room temperature; if the assays remain over 90% at the maximum times shown (indicated by the 10 Kcal./mole line on the graph), it is a certainty (kinetically speaking) that a potency of over 90% will be maintained after two years at room temperature.

It is evident from the above discussion that considerable information can be gained on the stability characteristics of a drug through the use of certain physicochemical principles. Since most pharmaceutical preparations are complex, the degradation reaction may be complicated by possible interaction of the several ingredients in the formulation. It becomes impractical and is generally unnecessary to perform thorough basic kinetic studies on the final formulation in order to obtain an estimate of the shelf life of the product. Instead, it usually is sufficient to follow the degradation or some property of the degradation as a function of time at several elevated temperatures, using the kinetic expressions presented, and then to extrapolate the data to ambient conditions to obtain an estimate of the shelf life of the prod-

**TABLE 2-1.** *Maximum and Minimum Time at Which Potency Must Be at Least 90% of Label Claim at the Temperature Indicated in Order to Predict a Shelf-Life of Two Years at Room Temperature.*

| Temperature | Maximum | Minimum |
|---|---|---|
| 37° | 12 months | 6.4 months |
| 45° | 8.3 months | 2.9 months |
| 60° | 4.1 months | 3 weeks |
| 85° | 6 weeks | 2.5 days |

uct. This will be demonstrated with practical examples in the section of this chapter dealing with the chemical and physical testing of pharmaceutical dosage forms.

Consequently, discussions of kinetic expressions pertaining to complex mechanisms, general acid-base reactions, and the influence of ionic strength will not be treated in depth, but will be briefly presented in a general manner to provide the reader with an awareness of the additional factors that can contribute to the stability of a drug.

## General Acid-Base Catalysis of Degradation

Buffer salts are commonly used in the formulation of pharmaceutical liquids to regulate the pH of the solution. Although these salts tend to maintain the pH of the solution at a constant level, they can also catalyze the degradation. Therefore, it is necessary to evaluate the effect of buffer concentration on the stability of the preparation in addition to the effect of hydrogen and hydroxyl ion concentrations. Common buffer salts such as acetate, phosphate, and borate have been found to have catalytic effects on the degradation rate of drugs in solution. As an example, Figure 2-13 illustrates that monohydrogen phosphate ion catalyzes the rate of hydrolysis of phenethicillin.

To determine whether a particular formulation is catalyzed by the buffer system employed, the ionic strength is kept constant and the concentration of buffer altered while the ratio of the buffer salts is kept constant to maintain the pH. If the degradation reaction is found to be influenced by the different concentrations of buffer, then the reaction is considered to be general acid and base catalyzed. In such a case, the concentration of the buffer ratio should be kept as low as possible to diminish this catalytic effect.

FIG. 2-13. Plot showing catalytic effect of $HPO_4^{=}$ ion on rate of hydrolysis of phenethicillin at 35°. (From Schwartz, M. A., et al.: J. Pharm. Sci., 51:523, 1962.)

FIG. 2-14. Dependence of reaction rates on ionic strength.

## Influence of Ionic Strength on Degradation

The rate of reaction can be influenced by the ionic strength of the solution in accordance with the following equation:

$$\log k = \log k_o + 1.02 Z_A Z_B \sqrt{u} \quad (23)$$

where $Z_A + Z_B$ are the charges carried by the reacting species in solution, u, the ionic strength, k, the rate constant of degradation, and $k_o$, the rate constant at infinite dilution. The ionic strength ($u = \frac{1}{2}\Sigma c_i z_i^2$) is defined as half the sum of the terms obtained by multiplying the concentration of each of the ionic species present in the solution by the square of its valence. By plotting the logarithm of the reaction rates vs. the square root of the ionic strength, as illustrated in Figure 2-14, it can be determined whether an in-

crease in ionic strength increases, reduces, or has no effect on the degradation rate.

The concentration of salt employed in a liquid pharmaceutical formulation can increase or decrease the degradation rate of the drug in solution or have no effect. When the drug is positively charged and is undergoing hydrogen ion catalysis, an increase in ionic strength caused by the addition of a salt, such as sodium chloride, causes an increase in the rate of degradation as shown in curve (1), Figure 2-14. A decrease in the rate of degradation results if the positively charged drug is undergoing hydroxyl ion catalysis and the ionic strength is increased by addition of a salt as shown in curve (3), Figure 2-14. If the drug undergoing degradation is a neutral molecule, changes in ionic strength by the addition of a salt would have no effect on the rate of gradation as shown in curve (2), Figure 2-14.

The graph in Figure 2-15 shows the influence of increasing the ionic strength on the degradation rate of a positively charged drug; namely, methyl-DL-α-phenyl-2-piperidylacetate undergoing hydronium ion catalyzed degradation.

A negative salt effect on the degradation rate is illustrated in Figure 2-16, in which a positively charged ester is being reacted with the negatively charged hydroxyl ion.

For concentrated solutions, Equation 23 must be expanded to include interactions between ionic species.

FIG. 2-15. Influence of ionic strength on the velocity of hydronium ion-catalyzed reaction. (From Siegel, S., et al.: J. Am. Pharm. Assoc. Sci. Ed. 48:431, 1959.)

FIG. 2-16. Influence of ionic strength on the velocity of the hydroxyl ion-catalyzed reaction. (From Siegel, S., et al.: J. Am. Pharm. Assoc. Sci. Ed. 48:431, 1959.)

## Complex Reactions

Although most degradative reactions occurring in pharmaceutical systems can be treated by the simple zero, first-order, and pseudo first-order kinetics, as previously discussed, there are certain pharmaceutical formulations which exhibit more complicated reactions. These have opposing, consecutive, and side reactions along with the main reaction. In most instances, the extent of the simultaneous reactions is small in comparison with the main reaction and can be neglected. These more complicated reactions, several of which will now be briefly described, include opposing or reverse reactions, consecutive reactions, and side or competing reactions.

1. OPPOSING REACTIONS. The simplest case of a reversible reaction is that in which both reactions are of the first order, as illustrated by the following:

$$A \underset{k'}{\overset{k}{\rightleftharpoons}} B \qquad (24)$$

A somewhat more complicated reversible reaction is one in which the forward reaction is of a first-order type and the reverse reaction of a second-order type as demonstrated by the following:

$$A \underset{k'}{\overset{k}{\rightleftharpoons}} B + C \qquad (25)$$

Where the forward and reverse reactions are both of the second-order type, the reaction takes on the following form:

$$A + B \underset{k'}{\overset{k}{\rightleftharpoons}} C + D \qquad (26)$$

Reversible reactions of the above type are quite common, but usually the reverse reaction is ignored because the concentration is not significantly affected. An example of this is

$$CH_3COOH + C_2H_5OH \rightleftharpoons CH_3COOC_2H_5 + H_2O$$

Initially, the reverse reaction can be ignored, but as the reaction proceeds and the concentration of water and ethyl acetate increases, both reactions influence Equation 26.

Since this has been our first example of a second-order reaction, a brief discussion of this type of reaction will be given. For Equation 26, the rate of reaction will be proportional to the concentration of the two reacting substances A and B for the forward reaction and C and D for the reverse reaction. Working with the forward reaction, and if a and b represent the initial concentration of the two reacting substances, and if x denotes the moles of A and B in each liter reacting in the interval of time t, then the velocity of the reaction is expressed by the equation:

$$\frac{dx}{dt} = k(a - x)(b - x) \qquad (27)$$

Where A and B are present in equal concentrations, a = b

$$\frac{dx}{dt} = k(a - x)^2 \qquad (28)$$

Integrating Equation 28 yields

$$\frac{1}{k}\frac{dx}{(a - x)^2} = dt$$

$$\frac{1}{k}\frac{1}{(a - x)} = t + \text{constant}$$

$$\text{when } t = 0, \text{const.} = \frac{1}{ka} \text{ (since at } t = 0, x = 0)$$

$$k = \frac{1}{t} \cdot \frac{x}{a(a - x)} \qquad (29)$$

The half-life or time for 50% degradation ($t_{1/2}$) to take place is as follows:

Since x = 1/2a at the half-life, substituting into Equation 29 results in the following equation:

$$t_{1/2} = \frac{1}{ka} \qquad (30)$$

Integrating Equation 27, in which concentrations of A and B are not equal, the following equation results:

$$kt = \frac{1}{a - b} \cdot \ln \frac{b(a - x)}{a(b - x)}$$

or

$$k = \frac{2.303}{t(a - b)} \cdot \log \frac{b(a - x)}{a(b - x)} \qquad (31)$$

In such a reaction, plotting the $\log \frac{b(a - x)}{a(b - x)}$ vs. time (t), a straight line is obtained, and k is then obtained by multiplying the slope of the line by $2.303/(a - b)$.

2. CONSECUTIVE REACTIONS. When the stages of a consecutive reaction occur at rates of about the same magnitude, each stage must be considered in the kinetics of the overall reaction. The simplest case is one in which both consecutive processes are of the first order, as illustrated by the following equation:

$$A \xrightarrow{k_1} B \xrightarrow{k_2} C \qquad (32)$$

In the consecutive reaction, if $k_2$ is considerably greater than $k_1$, B can be considered an unstable intermediate and the rate determining step for the overall reaction would be the conversion of A to B. The overall reaction could then be treated by first-order kinetics.

3. SIDE REACTIONS. In some processes, the reacting substance can be removed by two

PU 0011825

or more reactions occurring simultaneously, as depicted by the following equation:

$$A \begin{cases} \xrightarrow{k_1} B \\ \xrightarrow{k_2} C \end{cases} \quad (33)$$

Side or competing reactions are generally more common to organic chemistry. The organic chemist routinely deals with the production of several compounds from two reactants. However, through the proper manipulation of conditions (e.g., pressure, temperature, concentration) the desired product will predominate. An example of a competing reaction is the nitration of bromobenzene to produce ortho, meta, and para nitrobenzene as follows:

Br-benzene + $3HNO_3$ → ortho-$NO_2$ bromobenzene, meta-$NO_2$ bromobenzene, para-$NO_2$ bromobenzene + $3H_2O$

## DEGRADATIVE PATHWAYS

Although the decomposition of active ingredients in pharmaceutical dosage forms can occur through several pathways, i.e., hydrolysis, oxidation-reduction, racemization, decarboxylation, ring cleavage, and photolysis, those most frequently encountered are hydrolysis and oxidation-reduction. Consequently, this section will treat these two important degradation processes in depth and only briefly review the others.

### Hydrolysis

Many pharmaceuticals contain ester or amide functional groups which undergo hydrolysis in solution. Examples of drugs that tend to degrade by hydrolytic cleavage of an ester or amide linkage are anesthetics, antibiotics, vitamins, and barbiturates.

**Ester Hydrolysis.** The hydrolysis of an ester into a mixture of an acid and alcohol essentially involves the rupture of a covalent linkage between a carbon atom and an oxygen atom. Although some of these hydrolyses can be effected in pure water, in the majority of cases the presence of a catalyst is needed to promote the reaction. These catalysts are invariably substances of a polar nature, such as mineral acids, alkalies, or certain enzymes, all of which are capable of supplying hydrogen or hydroxyl ions to the reaction mixture. The alkaline hydrolysis of an ester does not differ essentially from an acid-catalyzed hydrolysis, except that it is irreversible and, therefore, quantitative because the resultant acid is at once neutralized. On the other hand, the acid-catalyzed hydrolysis of esters is reversible and may be made essentially complete in either direction by an excess of water or alcohol.

Of the numerous schemes presented to represent the hydrolysis of esters by either alkali or acid, the one given by Walters is perhaps the clearest to visualize.[4]

For both the alkali- and acid-catalyzed hydrolysis, it is evident that the ester is cleaved at the acyl-oxygen linkage, that is, between the carbonyl carbon (C) and the oxygen of $C_2H_5(O - C_2H_5)$. This type of cleavage takes place for most ester hydrolytic reactions.

In practice, the general scheme employed to denote ester hydrolysis is as follows:

$$R^1{-}\overset{O}{\overset{\|}{C}}{-}OR + H^+ + OH^- \longrightarrow R^1{-}\overset{O}{\overset{\|}{C}}{-}OH + HOR$$

ester → acid + alcohol

*Alkali Catalyzed*

*Acid Catalyzed*

rate determining addition of ionic catalyst

Combination of ion with water gives this unstable intermediate, which immediately breaks down to acid or salt and alcohol.

This holds true for either acid- or alkaline-catalyzed reactions.

The general form of the kinetic equation to express acid- or base-catalyzed hydrolysis are as follows:

$$\frac{d\,(\text{ester})}{dt} = -k\,(\text{ester})(H^+)$$

$$\frac{d\,(\text{ester})}{dt} = -k\,(\text{ester})(OH^-)$$

These equations denote second-order reactions, but in studying degradation reactions of this type, it is possible to treat them as pseudo first-order reactions. This is done by keeping the $OH^-$ or $H^+$ at a considerably higher concentration than the ester concentration or by maintaining the $H^+$ or $OH^-$ concentrations essentially constant through the use of buffers. This would cause the above equation to reduce to

$$\frac{d\,(\text{ester})}{dt} = -k\,(\text{ester})$$

which represents a kinetic expression for a first-order reaction. Whenever possible, first-order kinetic expressions have been employed in the study of the degradation of drugs by ester hydrolysis, but at times second-order kinetic expressions have been employed.

A number of reports in the literature deal with detailed kinetic studies of the hydrolysis of pharmaceutical ingredients containing an ester group in the molecule. Probably one of the earliest and most thorough studies was performed on aspirin by Edwards.[7] He studied the degradation of aspirin in various buffer solutions and treated the overall reaction as pseudo first-order.

TABLE 2-2. *Aspirin Hydrolysis at Varying pH at 17°C*

| pH | k (days$^{-1}$) | pH | k (days$^{-1}$) |
|---|---|---|---|
| 0.53 | 0.578 | 6.0 | 0.130 |
| 1.33 | 0.0835 | 6.98 | 0.10 |
| 1.80 | 0.045 | 8.00 | 0.13 |
| 2.48 | 0.0267 | 9.46 | 0.321 |
| 2.99 | 0.0343 | 10.3 | 1.97 |
| 4.04 | 0.086 | 11.39 | 13.7 |
| 5.03 | 0.130 | 12.77 | 530 |

The data in Table 2-2 represent a summary of the rates of degradation over a wide pH.

From a plot of the log k vs. pH as presented in Figure 2-17, Edwards was able to postulate a reaction mechanism and determine the influence of pH on the degradation. For example, it becomes readily evident from the plot in Figure 2-17 that the pH of optimum stability is at 2.4, from a pH of about 5 to 7 the degradation reaction was essentially pH independent, and at a pH of above 10, the stability of aspirin was found to decrease rapidly with increase in pH. At the area where the degradation is pH independent there are several reactions going on, each causing an effect of its own resulting in a cancellation of the effect of $H^+$ and $OH^-$, giving a uniform rate over this pH range.

FIG. 2-17. Overall velocity constant for aspirin hydrolysis at 17°C as a function of pH. (From Edwards, L. J.: Trans. Farad Soc., 46:723, 1950.)

Although it was sufficient to use pseudo first-order kinetics to define and study the degradation of aspirin, the hydrolysis of aspirin proceeds through a complex mechanism over the pH range studied, consisting of six different degradative pathways as shown on opposite page.

Other pharmaceutical materials that have been reported to degrade through ester hydrolysis are procaine, atropine, and methyl p-aminobenzoate.

The aforementioned examples of pharmaceutical materials exhibiting degradation through ester hydrolysis are only a few of the ones that have been reported within the last 15 years. However, they should be adequate to illustrate the importance of chemical kinetic studies in evaluating the degradation pathways and overall stability of pharmaceutical compounds containing an ester group in the molecule.

As a result of the realization that a considerable number of drugs degrade through ester hydrolysis, methods to enhance the stability of pharmaceuticals undergoing this type of degradation have been under study. The factors to be considered are:

1. *pH.* If physiologically permissible, the solution of the drug should be formulated as close as possible to its pH of optimum stability. In the event the hydrolytic degradation of the drug is general acid- and base-catalyzed, that is, the degradation is catalyzed by the acid and basic species of the buffer salt in addition to $H^+$ and $OH^-$, the buffer concentration should be kept at a minimum.

2. *Type of Solvent.* Partial or full replacement of water with a solvent of lower dielectric constant generally causes a considerable decrease in the velocity of ester hydrolysis.[9-11] Examples of these nonaqueous solvents are ethanol, glycols, glucose, and mannitol solutions and substituted amides.

3. *Complexation.* The hydrolytic rates

$$CH_3COOC_6H_4COOH + H_3O^+ \xrightarrow{k_1} HOC_6H_4COOH + CH_3COOH + H^+ \quad \text{(at low pH)}$$

$$CH_3COOC_6H_4COOH + H_2O \xrightarrow{k_2} HOC_6H_4COOH + CH_3COOH \quad \text{(uncatalyzed)}$$

$$CH_3COOC_6H_4COOH + OH^- \xrightarrow{k_3} \left.\begin{matrix} HOC_6H_4COOH + CH_3COO^- \\ HOC_6H_4COO^- + CH_3COOH \end{matrix}\right\} \quad \text{(pH independent)}$$

$$CH_3COOC_6H_4COO^- + H_3O^+ \xrightarrow{k_4} HOC_6H_4COOH + CH_3COOH$$

$$CH_3COOC_6H_4COO^- + H_2O \xrightarrow{k_5} \left.\begin{matrix} HOC_6H_4COOH + CH_3COO^- \\ HOC_6H_4COO^- + CH_3COOH \end{matrix}\right\} \quad \text{(uncatalyzed)}$$

$$CH_3COOC_6H_4COO^- + OH^- \xrightarrow{k_6} HOC_6H_4COO^- + CH_3COO^- \quad \text{(at high pH)}$$

may be influenced in two ways by complex formation, namely, steric or polar. Obviously, the attachment of a large caffeine molecule, for example, on a benzocaine molecule, can greatly affect the frequency and ease of encounter of the ester with various catalytic species ($H^+$, $OH^-$) through steric hindrance. The reaction also may be affected by the electronic influence of the complexing agent, which can alter the affinity of the ester carbonyl ion for the catalytic species. In general, the steric effect would be expected to decrease the hydrolytic rate, whereas the electronic effect may increase or decrease the reaction velocity.

Caffeine

Benzocaine

In recent years, the literature has contained several reports on the influence of complexing agents in retarding the hydrolytic deterioration of esters.[19-22] It has been shown by Higuchi and Lachman,[19] Lachman et al.,[20] and Lachman and Higuchi[21] that caffeine complexes with local anesthetics, such as benzocaine, procaine, and tetracaine, to cause a reduction of the velocity of their hydrolytic degradation. These investigators showed that the complexed fraction of the ester undergoes essentially no degradation.

Consequently if it were possible to complex the total amount of drug in solution, it might be possible to completely stabilize it. Because of the limited solubility of caffeine, it has not been possible to accomplish this in the studies employing the hydrochloride salts of the local anesthetics. Guttman has reported that the velocity of the base-catalyzed decomposition of riboflavin was decreased by the presence of caffeine in solution.[22] It was found that the vitamin in its complexed form with caffeine possessed negligible reactivity toward alkaline hydrolysis.

4. *Surfactants.* Using benzocaine as an example, Riegelman studied the effect of surfactants on the rate of hydrolysis of esters.[24] He found that nonionic, cationic, and anionic surfactants stabilize the drug against base catalysis as evidenced by the data in Table 2-3.

**TABLE 2-3.** *Influence of Surfactant on Benzocaine Degradation at 30 C Using 0.04N NaOH*

| Half-Life $(t_{1/2})$ in Minutes | Nonionic (%) | Cationic (%) | Anionic (%) |
|---|---|---|---|
| 64 | 0 | 0 | 0 |
| 188 | 1.33 | | |
| 324 | 3.3 | | |
| 57 | | 0.067 | |
| 423 | | 1.34 | |
| 650 | | 2.46 | |
| 430 | | | 1 |
| 1130 | | | 3 |

PU 0011829

A 5% sodium lauryl sulfate solution (anionic) caused an 18-fold increase in the half-life of benzocaine. The association of benzocaine close to the anionic head group of the surfactant made a definite barrier to the approach of the hydroxyl group into the micelle and attack on the ester linkage. When 2.46% cetyl trimethyl ammonium bromide in solution (cationic) is used, a 10-fold increase in the half-life of benzocaine results. This effect is rather interesting but can possibly be explained by the fact that although the negatively charged hydroxyl ion is attracted by the cationic group, it apparently cannot penetrate beyond this polar head into the deeper confines of the micelle wherein the benzocaine appears to be held. When a nonionic surfactant at 3.3% concentration is used, only about a 4- to 5-fold increase in half-life was obtained for benzocaine, indicating that the nonionic surfactant is a less effective stabilizer than the anionic or cationic ones. Because of the relatively high degree of hydration at the surface of the nonionic surfactant micelle, it would appear that considerable hydrolytic attack could take place within the micelle, as well as in the aqueous phase. However, this explanation of micelle protection against hydrolytic degradation of pharmaceutical compounds warrants further exploration.

5. *Modification of Chemical Structure.* A number of reports in the literature show that certain substituents added to the alkyl or acyl chain of aliphatic or aromatic esters or to the benzene ring of aromatic esters cause a decrease in the hydrolytic rate.[25-30] This may be attributed to a steric and/or polar effect of the substituent group. For example, by increasing the length of, or by branching, the acyl or alkyl chain, the rate of hydrolysis of the ester usually decreases due to steric hindrance. However, if an electrophilic or nucleophilic group is introduced into the acyl or alkyl side chain of aliphatic or aromatic esters or on the benzene ring of aromatic esters, the rate of hydrolysis can be increased or decreased by the electronic effect of these groups.[31,32] For example, alkaline hydrolysis of aromatic esters is promoted by the presence of electrophilic groups on the benzene ring (halogen or $NO_2$), which attract electrons away from the reaction site (ester groups). The hydrolysis is retarded, on the other hand, by nucleophilic groups ($CH_3$, $OCH_3$ and $NH_2$) which cause electrons to move toward the point of reaction.[31] The reverse effect would be found in the case of hydrogen ion catalyzed hydrolysis of aromatic esters.

In general, base-catalyzed hydrolytic reactions are more affected by polar effects of substituents than is acid-catalyzed hydrolysis. On the other hand, the steric retardation of acid-catalyzed hydrolysis caused by substituents is greater than for base-catalyzed hydrolysis. However, the total effect produced by substituents in alkaline hydrolysis is considerably greater than the effect produced in acid ester hydrolysis.[33] This is probably accounted for by the fact that, in alkaline ester hydrolysis, both polar and stearic effects of the substituents are contributing, whereas in acid ester hydrolysis, the polar effect is almost negligible.

In pharmaceutical practice, it is generally not possible to employ substituents on the drug molecule for improving stability against

*Nonionic*

Drug located at periphery of micelle.

*Anionic*

The free negative charges repel incoming $OH^-$ ions.

*Cationic*

Presence of + ends attracts $OH^-$ at low concentration. At higher concentration, the attached $OH^-$ shields the drug from $OH^-$.

hydrolytic cleavage of the ester group, because in most cases, these substituents also have an effect on the physiological activity of the drug molecule.

*6. Salts and Esters.* Another technique that is sometimes employed to increase the stability of pharmaceuticals undergoing degradation through ester hydrolysis is to reduce their solubility by forming less soluble salts or esters of the drug.[34-36] Generally, it is only the fraction of the drug that is in solution that undergoes hydrolytic degradation. Garrett, in his study with acyl-salicylates, found that a compound that shows rapid hydrolysis in solution may be made to exhibit better stability than a more stable analog by reducing its solubility.[34]

Transient derivatives are nontoxic additions to drug molecules, such as hydrolyzable esters, that remain intact long enough to improve the drug bioavailability and then cleave to allow the parent compound to exert its recognized biological activity. A transient derivative is a more soluble and or stable form of the parent compound and permits better absorption for improved and more reproducible bioavailability. In this case the drug modification undergoes biotransformation or hydrolysis at physiological pH to yield the active form of the drug.

Monoesters of the antibiotics lincomycin and Clindamycin have been prepared to render soluble and stable compounds suitable for injection. At pH 7.4 the antibiotics undergo bio-modification to yield the active undissociated forms.

Monoesters of lincomycin with faster rates of hydrolysis were found to have greater in vivo antibacterial activity.[37,38]

Lincomycin, R groups = OH

Substitution of a hexanoate group, $-O-\overset{O}{\overset{\|}{C}}-C_5H_{11}$, in the 2 position gives rise to hydrolysis rates at pH 7.4 in intestinal fluid, which are significantly greater than hexanoate substitution in the 3, 4, or 7 positions. The difference in enzymatic hydrolysis rates is attributed to the different steric and electronic environments of the four hydroxyl groups. Steric hindrance at the 2 position was also demonstrated by the observation that (3,3-dimethyl) butyrate hydrolyzed much more slowly than the hexanoate ester.

The phosphate esters of Clindamycin undergo biomodification to release the active undissociated form. The inactive compound, Clindamycin phosphate, on treatment with dephosphorylating enzymes affords the active compound Clindamycin.[39] Figure 2-18 shows the percentage of hydrolysis of Clindamycin phosphate esters in various enzymatic systems. The 3-phosphate ester was found to hydrolyze much more slowly and much less extensively than the 2-phosphate ester. An in vivo study in rats revealed lower blood levels for the 3-phosphate and is probably related to the rate and degree of hydrolysis.

**Amide Hydrolysis.** Pharmaceutical compounds containing an amide group can undergo hydrolysis in a manner similar to that of an ester type compound. Instead of the acid and alcohol that form as a result of ester hydrolysis, hydrolytic cleavage of an amide results in the formation of an acid and an amine.

$$\underset{\text{amide}}{R-\overset{O}{\overset{\|}{C}}-\overset{H}{\overset{|}{N}}-R'} + H_2O \longrightarrow \underset{\text{acid}}{R-\overset{O}{\overset{\|}{C}}-OH} + \underset{\text{amine}}{H_2N-R'}$$

Because of the relatively greater stability of amides as compared to structurally similar esters, there is considerably less information in the literature on quantitative chemical kinetic studies pertaining to the hydrolytic

FIG. 3-18. Percent hydrolysis of clindamycin phosphate esters in enzyme systems.
1. Clindamycin —2—$PO_4$ in alkaline phosphatase.
2. Clindamycin —2—$PO_4$ in rat liver homogenate.
3. Clindamycin —2—$PO_4$ in human plasma
4. Clindamycin —3—$PO_4$ in alkaline phosphatase.
5. Clindamycin —3—$PO_4$ in rat liver homogenate.
6. Clindamycin —3—$PO_4$ in human plasma. (From Brodasky, T. F., and Lewis, C. J.: Antibiot. 25:230, 1972.)

stability of such compounds. Pharmaceuticals such as niacinamide, phenethicillin, barbiturates, and chloramphenicol have been reported to degrade by amide hydrolysis.

In a report on the stability of salicylamide and some N-substituted derivatives, Kosky postulated both basic and acid hydrolysis as mechanisms for degradation.[40] The basic hydrolysis proceeded as follows:

$$R\text{—}\overset{O}{\overset{\|}{C}}\text{—}NHR' + OH^- \xrightleftharpoons{\text{slow}} R\text{—}\underset{OH}{\overset{O^-}{C}}\text{—}NHR' \xrightarrow{\text{fast}} R\text{—}\overset{O}{\overset{\|}{C}}\text{—}OH + R'NH^- \xrightarrow{\text{fast}} RC(=O)\text{—}O^- + R'NH_2$$

The rate-determining step in the hydroxide ion catalyzed reaction is the nucleophilic attack by the hydroxide ion.

The acid hydrolysis was as follows:

$$RC(=O)\text{—}NHR' + H_3O^+ \xrightarrow{\text{fast}} RC(=O)\text{—}NH_2R' + H_2O \xrightleftharpoons{\text{slow}} \left[R\text{—}\underset{\underset{H\ \ H}{O}}{\overset{O}{C}}\text{—}NH_2R\right]^+ \xrightarrow{\text{fast}} RC(=O)\text{—}OH_2^+ + R'NH_2 \xrightarrow{\text{fast}} RC(=O)\text{—}OH + R'NH_3^+$$

The mechanism for acid hydrolysis of amides requires that substituents should exert only weak polar effects, but when suitably situated, they should exert strong steric effects. The effect of alkyl and aminoalkyl substituents on the amide nitrogen in retarding the rate of acid hydrolysis of salicylamide appears to be primarily due to steric hindrance.

As seen in Figure 2-19 in the acid medium, salicylanilide was more stable than salicylamide, which in turn was more stable than benzamide. Aminoalkyl substituents on the nitrogen increased the stability of benzamide. Salicylamide was more stable in basic than acidic medium, probably due to the protection afforded by the negative charges on the phenolate ion. The N-alkyl and N-amino alkylsalicylamides were highly resistant to acid and base hydrolysis. This appeared to be due to combined steric hindrance by the hydroxyl group in the ortho position and the alkyl and aminoalkyl group on the nitrogen.

FIG. 2-19. Pseudo first-order plot of the hydrolysis of amides in 1.0 N perchloric acid at 90°. Key: 1. benzamide; 2. salicylamide; 3. N-(2-diethylaminoethyl) benzamide; 4. salicylanilide; 5. N-(2-diethylaminoethyl salicyl-amide hydrochloride; 6. N-(2-dimethylaminoethyl)-salicylamide hydrochloride; 7. N-(2-diisopropylaminoethyl)-salicylamide hydrochloride; 8. N-isopentylsalicylamide; 9. N-propylsalicylamide. (From Koshy, K. T.: J. Pharmaceut. Sci., 58:560, 1969.)

The methods available for retarding deterioration through amide hydrolysis are similar to those presented under ester hydrolysis.

It was indicated in the discussion of ester hydrolysis that the replacement of all or part of the water with solvent of lower dielectric constant would generally increase the stability of the pharmaceutical preparation toward hydrolysis. Contrary to this generalization, Marcus and Taraszka found that aqueous solutions of chloramphenicol containing up to 50% propylene glycol had no effect on improving the stability of this antibiotic over that obtained with solutions of the antibiotic in water.[41] In fact, a slight increase in the rate of reaction was observed. Consequently, as illustrated by this study, it is unwise to make a blanket assumption that replacement of all or part of the water in a pharmaceutical preparation will enhance the stability of an active ingredient. Instead, each situation must be individually evaluated with due consideration given to the mechanism of degradation. An instance in which the use of propylene glycol was found to retard amide hydrolysis is in a report by Bodin and Taub,[42] who show that the stability of pentobarbital in solution is effectively enhanced by the use of a propylene glycol solvent system.

**Ring Alteration.** A hydrolytic reaction can proceed as a result of ring cleavage with subsequent attack by hydrogen or hydroxyl ion. Examples of drugs that have been reported to undergo hydrolysis by this mechanism include hydrochlorothiazide, pilocarpine, and reserpine. Quite often equilibrium kinetics is associated with such mechanisms.

Mollica et al. reported that the hydrolysis of hydrochlorothiazide involved reversible kinetics in which the rate of forward reaction was influenced by pH, but the equilibrium constant was independent of pH.[44] The hydrolytic reaction was reported to proceed by ring opening to form an imine which undergoes attack by water or hydroxide ion

PU 0011833

$H_2NO_2S$ … NH … N–H … Cl ⇌ (I)

$SO_2NH_2$, $NH_2$ + HCHO (II)

to yield a carbinolamine intermediate which further decomposes to formaldehyde and 4-amino-6-chloro-m-benzenedisulfonamide as shown by the following scheme:

$$I \rightleftharpoons R - N = CH_2 \rightleftharpoons R - NH - CH_2OH \rightleftharpoons II + HCHO$$

The observed pH profile for hydrochlorothiazide, illustrated in Figure 2-20, is relatively complex and cannot be explained by ionization of reactants, but lends itself to Schiff base formation and hydrolysis.

FIG. 2-20. pH-Rate profile of the hydrolysis of hydrochlorothiazide at 60°C. (From Mollica, J. A., Rehm, C. R., and Smith, J. B.: J. Pharm. Sci., 58:635, 1969. Reproduced with permission of the copyright owner.)

The hydrolysis of pilocarpine in aqueous solution has been reported to involve a cyclic equilibrium process which is catalyzed by hydrogen ion and hydroxyl ion.[44] Although uncertainty exists as to whether both the hydrogen ion and hydroxide ion catalysis are equilibrium processes, the concentration of pilocarpate and pilocarpic acid are influenced by pH. One of the schemes postulated for the cyclic mechanism is as follows:

Pilocarpine ⇌ $H^- +$ Pilocarpate ; Pilocarpine ⇌ Pilocarpic A

Pilocarpine is relatively stable in solutions of acidic pH. $k_H = 1.35 \times 10^{-1}$ liters mole hr. As the pH increases, pilocarpine progressively becomes unstable. $k_{OH} = 7.56 \times 10^{2}$ liters mole hr. Phosphate and carbonate buffers catalyze the degradation, whereas borate does not. The addition of methylcellulose improves the stability slightly.

## Oxidation-Reduction

The oxidative decomposition of pharmaceutical compounds is responsible for the instability of a considerable number of pharmaceutical preparations. For example, steroids, vitamins, antibiotics, and epinephrine undergo oxidative degradation. These reactions are mediated either by free radicals or by molecular oxygen. Because of the complexity of oxidative processes and their sensitivity to trace metal and other impurities it is difficult to reproduce them and to establish mechanisms for the reactions. Consequently, a good number of reports dealing

PU 0011834

with oxidation-reduction reactions are qualitative in nature rather than quantitative.

A substance is said to be oxidized if electrons are removed from it. Thus a substance is oxidized when it gains electronegative atoms or radicals or loses electropositive atoms or radicals. Oxidation often involves the addition of oxygen or the removal of hydrogen. The simplest type of oxidation is, therefore, the elimination of an electron as in the process

$$Fe^{++} \longrightarrow Fe^{+++} + e^-$$

where the ferrous ion is oxidized to the ferric ion.

The most common form of oxidative decomposition occurring in pharmaceutical preparations is autoxidation, which involves a free radical chain process. In general, autoxidation may be defined as the reaction of any material with molecular oxygen. Free radicals are produced by reactions involving homolytic bond fission of a covalent bond, so that each atom or group involved retains one of the electrons of the original covalent bond. This may be depicted as follows:

$$A{:}B \longrightarrow A\cdot + B\cdot$$
$$CH_3{:}CH_3 \longrightarrow 2CH_3\cdot$$

These radicals are highly unsaturated and readily take electrons from other substances causing oxidation. The autoxidation of an organic substance RH by a free radical chain process can be simply described as follows:

*Initiation:*

$$RH \xrightarrow[\text{light, heat}]{\text{activation}} R\cdot + (\dot{H})$$

*Propagation:*

$$R\cdot + O_2 \longrightarrow RO_2\cdot$$
$$RO_2\cdot + RH \longrightarrow ROOH + R\cdot$$

*Hydroperoxide Decomposition:*

$$ROOH \longrightarrow RO\cdot + \cdot OH$$

*Termination:*

$$RO_2\cdot + X \longrightarrow \text{inactive products}$$
$$RO_2\cdot + RO_2\cdot \longrightarrow \text{inactive products}$$

The initiation of this reaction can be produced by the thermal decomposition of substances naturally present or added to the reaction mixture or possibly by light. As shown above, termination of the reaction may take place by combining two $RO_2\cdot$ radicals or by X, a free radical inhibitor. In the latter case, X generally converts the peroxy radical $RO_2\cdot$ to a hydroperoxide and becomes a resonance stabilized radical incapable of continuing the chain. Generally free radicals can best be terminated by a free radical inhibitor (e.g., sodium metabisulfite, thiourea, cysteine hydrochloride), since otherwise the product of recombination of radicals could contain sufficient energy to redissociate the molecule. In autoxidative reactions, only a small amount of oxygen is needed to initiate the reaction and thereafter oxygen concentration is relatively unimportant.

Heavy metals, particularly those possessing two or more valency states, with a suitable oxidation-reduction potential between them (copper, iron, cobalt, and nickel) generally catalyze oxidative deteriorations. These metals reduce the length of the induction period (the time which no measurable oxidation occurs) and increase the maximum rate of oxidation. They can affect the rates of chain initiation, propagation and termination, as well as the rate of hydroperoxide decomposition. In each case, their major function is to increase the rate of formation of free radicals.

Many oxidations are catalyzed by hydrogen and hydroxyl ions. This can partly be ascribed to the fact that the redox potential for many reactions depends on pH. This is particularly true for pharmaceutical compounds falling under the classification of weak acids. The system quinone hydroquinone may be taken as a classic example to illustrate this point.

$$\text{quinone} + 2H^+ + 2e \rightleftharpoons \text{hydroquinone}$$

The oxidation potential may be expressed by the following simplified version of the Nernst equation:

$$E = Eo + \frac{0.06}{2} \log \frac{C_{H^+}{}^2 \cdot C_{quinone}}{C_{hydroquinone}}$$

Where Eo is the so-called standard potential, E the actual potential, two, equals the number of electrons taking place in change from the ox-form to the red-form and 0.06 is a calculated approximate constant.[45] It can be seen from this equation that an increase in the concentration of hydrogen ions causes an increase in the value of E. This means that the red-form of the system is less readily oxidized when the pH is low. Since pharmaceuticals that undergo deterioration through oxidation are generally in the red-form, minimum decomposition is usually found in the pH range of 3 to 4.

Although the oxygen concentration is of importance in the autoxidation process, its significance is not generally adequately considered. When studying the rate of the reaction for an oxidation at different temperatures, it is necessary to consider both the direct effect of the temperature and the effect of temperature on the oxygen content (concentration of oxygen) of the liquid. For example, the transfer of a preparation from storage at 15°C to 5°C, with a temperature coefficient of 2 for a 10°C change, will cause the rate to be reduced to half its initial magnitude owing to the direct temperature dependence of the reaction. Simultaneously, the concentration of oxygen will increase by about 25%, usually resulting in an increased rate of oxidation.

Examples of pharmaceuticals undergoing oxidative degradation are prednisolone, morphine, epinephrine, and isoamyl nitrite.

For the most part, oxidative degradations of pharmaceutical compounds follow first-order or second-order kinetic expressions. Guttman and Meister studied the base-catalyzed degradation of prednisolone and found that the degradation exhibited a first-order dependency on steroid concentration.[46] The rate at which prednisolone disappeared from aqueous solutions was found to increase with an increase in hydroxyl ion concentration under both aerobic and anaerobic conditions. However, the reaction mixture exposed to air showed more rapid degradation of prednisolone (Table 2-4).

For example, at a hydroxide ion concentration of 0.01N, the rate constant for the overall degradation obtained under anaerobic conditions was approximately ⅔ the value of that obtained when no precautions were taken to exclude air from the system.

A report of a very interesting study showed that trace metal impurities in buffer salts caused an accelerated decomposition of prednisolone which was first thought to be due to buffer concentration.[47] By studying the oxidative degradation with and without 0.1% disodium salt of ethylenediamine tetraacetic acid at different buffer concentrations, it was found that the solutions not containing any chelating agent degraded more rapidly as the buffer concentration increased, while the buffered solutions containing chelating agent showed that the rate of degradation was independent of the concentration of the buffer. This is clearly shown by the graphs in Figure 2-21.

These investigators also studied the influence of pH on the stability of prednisolone in borate buffer with and without chelating agent. The chelating agent was found to have little effect on the degradation rate up to a pH of 8; but at higher pH, the disappearance of prednisolone occurred more rapidly from systems which were not protected by chelating agents. Using a phosphate buffer system, it was found that the solutions containing the chelating agent showed enhanced stability, beginning at pH 5 over the solutions without chelating agent. In addition, the pH de-

**TABLE 2-4.** *Rate Constants for the Base Catalyzed Degradation of Prednisolone at 35°C in the Absence and Presence of Air*

| *Normality of NaOH* | *ka (Anaerobic) Hr⁻¹* | *ka (Aerobic) Hr⁻¹* |
|---|---|---|
| 0.01 | 0.0311 | [illegible] |
| 0.02 | 0.0501 | [illegible] |
| 0.03 | [illegible] | [illegible] |
| 0.04 | 0.103 | [illegible] |
| 0.05 | 0.130 | 0.110 |



FIG. 2-21. The effect of buffer concentration on the rate of prednisolone degradation in the presence and absence of sequestrene $Na_2$ at 30°, pH 10, and ionic strength 0.2. Key: O, no EDTA; ●, 0.1% EDTA. (From Oesterling, T. O., and Guttman, D. E.: J. Pharm. Sci., 53:1189, 1964.)

pendency from 5 to 8 was only very small for the system containing chelating agent, but considerable for the system without it. It is interesting to note that the influence of pH on the metal catalyzed reaction in phosphate buffer was somewhat different from the borate buffer.

Rancidity, which can affect nearly all oils and fats, is a widely known term covering many typical off-flavors formed by the autoxidation of unsaturated fatty acids present in an oil or fat. These off-flavors have a more or less distinct odor and are due to the volatile compounds that are formed upon oxidation of the oils and fats. These volatile compounds are generally short-chain monomers which are formed by cleavage of the nonvolatile hydroperoxide primary oxidation product. The free radical mechanism shown here depicts the oxidation of oils and fats which take place in the presence of atmospheric oxygen, light, and trace amounts of catalysts.

Determination of iodine numbers can be employed as an indication whether oxidation has taken place across the double bond.

The stability of pharmaceutical com-

$$R'{-}CH_2{-}CH{=}CH{-}R'' + O_2 \longrightarrow R'{-}\dot{C}H{-}CH{=}R'' + HO_2\cdot$$

$$R'{-}\dot{C}H{-}CH{=}CH{-}R'' + O_2 \longrightarrow R'{-}CH(O{-}O\cdot){-}CH{=}CH{-}R''$$

$$R'{-}CH(O{-}O\cdot){-}CH{=}CH{-}R'' + R'{-}CH_2{-}CH{=}CH{-}R'' \longrightarrow$$

$$R'{-}CH(O{-}OH){-}CH{=}CH{-}R'' + R'{-}\dot{C}H{-}CH{=}CH{-}R''$$

$$2R'{-}CH(O{-}OH){-}CH{=}CH{-}R'' \longrightarrow R'{-}CH_2{-}CHO + R''{-}CH{=}CH\cdot + \cdot OH$$

hydroperoxide — nonvolatile

+

$$R''{-}CH{=}CH{-}CHO + R'{-}CH_2\cdot + \cdot OH$$

volatile

or

$$2R'{-}C(H)(O\cdot){-}CH{=}CH{-}R'' + 2\cdot OH$$

PU 0011837

pounds undergoing oxidative degradation can be increased by several approaches.

**Oxygen Content.** Since, in many cases, oxidative degradation of a drug will take place in aqueous solution, it is helpful to keep the oxygen content of these solutions at a minimum. In a study to determine the oxygen content of water prepared and treated by different techniques, it was found that water in equilibrium with atmospheric oxygen contains 5.75 ml. per liter of oxygen at 25°C, 9.14 ml. per liter of oxygen at 4°C, and all free oxygen is expelled from water at 100°C.[46] Freshly distilled water collected directly from the distillation apparatus and stored at 4°C in closed containers contains ¼ to ½ the oxygen content of water saturated with oxygen from the atmosphere. Boiling and cooling this freshly distilled water to 20°C results in an increase in the oxygen content of the water almost two-fold. However, if the water is cooled in an atmosphere essentially free from atmospheric oxygen, there is no increase in oxygen content. In order to obtain water that contains a minimum amount of free oxygen, water after it is first boiled is carbon dioxide or nitrogen gas purged. The oxygen content of water treated with carbon dioxide is reduced to 0.45 ml. per liter at 20°C.

Since most oxidative degradations of pharmaceutical compounds are probably autoxidative in nature, involving chain reactions that only require a very small amount of oxygen for initiating the reaction, reduction of oxygen concentration alone is not sufficient in many cases to completely prevent the degradation from occurring. The traces of oxygen left may be sufficient to start a chain reaction. Consequently, it is necessary to add agents, such as antioxidants and chelating agent, to obtain full protection against oxidative degradation.

**Antioxidants.** Antioxidants are added to pharmaceutical formulations as redox systems possessing higher oxidative potentials than the drug which they are designed to protect or as chain inhibitors of radical induced decomposition. The effect of antioxidants is generally to break up the chains formed during the propagation process by providing a hydrogen atom or an electron to the free radical and receiving the excess energy possessed by the activated molecule.

Although the selection of an antioxidant can be made on sound theoretical grounds based on the difference in redox potential between the drug and antioxidant, electrometric measurements only rarely predict the efficiency of antioxidants in complex pharmaceutical systems. The effectiveness of an antioxidant or the comparative value of various antioxidants for a particular pharmaceutical preparation is best accomplished by subjecting the pharmaceutical system with the antioxidant to standard oxidative conditions and periodically assaying the formulation for both drug and antioxidant. Although this method may require maximum effort, it yields the most useful information. It should be remembered that, because of the complexity of free radical oxidative processes and their sensitivity to trace amounts of impurities, attempts to compare the effectiveness of antioxidants among different pharmaceutical systems are of limited validity.

Some of the more common antioxidant materials used in pharmaceutical systems are listed in Tables 2-5 and 2-6.

**TABLE 2-5.** *Antioxidants Commonly Used for Aqueous Systems*

| | |
|---|---|
| Sodium sulfite | Isoascorbic acid |
| Sodium metabisulfite | Thioglycerol |
| Sodium bisulfite | Thiosorbitol |
| Sodium thiosulfate | Thiourea |
| Sodium formaldehyde sulfoxylate | Thioglycolic acid |
| Acetone sodium metabisulfite | Cysteine hydrochloride |
| Ascorbic acid | |

**TABLE 2-6.** *Antioxidants Commonly Used for Oil Systems*

| | |
|---|---|
| Ascorbyl palmitate | Butylated hydroxy anisole |
| Hydroquinone | α-tocopherol |
| Propyl gallate | Phenyl-α-napthylamine |
| Nordihydroguaiaretic acid | Lecithin |
| Butylated hydroxy toluene | |

The effectiveness of these antioxidants can depend on the concentration used and whether they are used singularly or in combination.

Although sodium metabisulfite has been used extensively in the past and is still used to a considerable extent as an effective antioxidant, recent reports have indicated that the antioxidant activity of this substance is inhibited by a number of compounds; it really undergoes degradation itself; and it potentiates the degradation of epinephrine.[19-22]

The effectiveness of bisulfite as an antioxidant in typical pharmaceutical systems depends on the ease with which this compound is oxidized in comparison with the drug it is to protect. Substances that inhibit bisulfite oxidation may exert important effects on the overall stability of the product by decreasing the antioxidant effect of bisulfite. It has been postulated that the mechanism by which these substances inhibit sulfite activity is through the formation of coordination compounds between inhibitor and bisulfite. Typical substances that can inhibit the oxidation of bisulfite are mannitol, phenols, inorganic anions, aldehydes, ketones, and alkaloids.

It has been shown that bisulfite reacts with epinephrine to form a colorless, inactive epinephrine sulfonate, thus pointing out the need for caution in the use of bisulfite in formulations without performing adequate studies to determine its effect on active ingredients.[21] These investigators showed that a substantial breakdown of epinephrine takes place in the presence of bisulfite as depicted in Figure 2-22. Higuchi and Schroeter reported that the degradation of chloramphenicol induced by bisulfite appears to be considerably more complex than that found with epinephrine.[22] Loss of optical activity was found to occur at a much faster rate in the presence of bisulfite.

FIG. 2-22. Per cent epinephrine remaining in 0.1% (0.0055 molar) solutions containing 0.1% sodium bisulfite (0.0096 molar) buffered at pH 4.0 with 0.1 molar acetate or citrate. The solutions were stored in sealed, evacuated ampuls at 80°. (From Schroeter, L. C., Higuchi, T., and Schuler, E. E.: J. Am. Pharm. Assoc. Sci. Ed., 47:724, 1958.)

Riegelman and Fisher, in their study to stabilize epinephrine against sulfite-catalyzed degradation, found that when boric acid was added to the solution, a marked stabilization of epinephrine took place.[23] They postulated that this stabilizing effect of boric acid was due to chelate formation between boric acid and the catechol grouping of epinephrine.

The epinephrine is able to form a one-to-one chelate through its dihydroxy structure (see below).

In the presence of boric acid, the rate of sulfite attack is reduced as the hydrogen ion concentration decreases. The half-life for epinephrine under the reaction conditions at pH 8.0 in the absence of boric acid was found to be 195 hours, whereas in the pres-

$H_3BO_3$ + HO–(catechol ring)–C(HO)(H)–$CH_2$–NH–$CH_3$ ⇌

HO–B(O,O-ring)–C(HO)(H)–$CH_2$–NH–$CH_3$ + $H^+$ + $2H_2O$

PU 0011839

ence of boric acid, the half-life was found to be 267 hours. At pH 7.5, however, the half-life of epinephrine was found to be 74 hours in the absence and 1,270 hours in the presence of boric acid. It was postulated that epinephrine is increasingly chelated by the boric acid molecules as the pH is made more alkaline, and that the chelated epinephrine is far less susceptible to sulfite attack than free epinephrine.

The effectiveness of antioxidants can be enhanced through the use of synergists such as chelating agents.

**Chelating Agents.** Chelating agents tend to form complexes with the trace amounts of heavy metal ions inactivating their catalytic activity in the oxidation of medicaments. Examples of some chelating agents are ethylenediamine tetraacetic acid derivatives and salts, dihydroxyethyl glycine, citric acid, and tartaric acid.

**pH.** It is also desirable to buffer solutions containing ingredients that are readily oxidizable to a pH in the acid range. This causes an increase of the oxidation potential of the system with a concurrent increase in stability when oxidations are catalyzed by hydrogen or hydroxyl ions. However, the pH of optimum stability in the acid range must be determined experimentally for each drug.

**Solvents.** Solvents other than water may have a catalyzing effect on oxidation reactions when used in combination with water or alone. For example, aldehyde, ethers, and ketones may influence free radical reactions significantly.

## Photolysis

Consideration of the decomposition of pharmaceutical compounds resulting from the absorption of radiant energy in the form of light has become more important in recent years because of the complex chemical structure of many new drugs. Degradative reactions, such as oxidation-reduction, ring rearrangement, or modification and polymerization, can be brought about by exposure to light at particular wave lengths. According to the equation, $E = 2.859 \times 10^5 / \lambda$ Kcal. per mole, the energy absorbed per mole is greater the shorter the wave length (λ) of light. Consequently, the radiations absorbed from the ultraviolet and violet portions of the light spectrum are more active in initiating chemical reactions than from the other longer wave length portions of the spectrum.

In a large number of systems that are photolyzed, free radicals are products that undergo subsequent reactions. If the molecules absorbing the radiation take part themselves in the main reaction, the reaction is said to be a photochemical one. Where the absorbing molecules do not themselves participate directly in the reaction, but pass on their energy to other molecules that do, the absorbing substance is said to be a photosensitizer.

The kinetics of photochemical reactions is more complicated than the kinetics of thermal reactions because more variables are involved. The intensity and wave length of light and the size and shape of the container may greatly affect the rate of reaction. A photochemical reaction may be accompanied by a thermal reaction, identical to the photochemical reaction, or opposite to it, or entirely different in character. A photochemical reaction may produce a catalyst which then causes a thermal reaction to proceed at a measurable rate. Sometimes an induction period is necessary while a sufficient quantity of catalyst is being accumulated to make the reaction proceed with a measurable velocity. A thermal reaction, once started, may continue after the illumination is stopped, giving an after effect. The energy available in a photochemical reaction is much greater than in a thermal reaction, and this fact often changes the character of the reaction.

As a result of the complexity of photolytic reactions, investigations in this area of pharmaceutical stability have been, for the most part, qualitative in nature. It is only within recent years that photodegradative studies have been performed on a quantitative basis. In photodegradative reactions, second-order, first-order, and zero-order reactions are possible.

Felmeister and Discher studied the photodecomposition of chlorpromazine hydrochloride at 253.5 mμ and derived the mechanism for the free radical-mediated deterioration of chlorpromazine.[53] The ultraviolet ir-

radiation of chlorpromazine causes the degradation to proceed through a semiquinone free radical intermediate. The semiquinone free radical disproportionates in aqueous media in both the absence and the presence of dissolved oxygen, though the loss of free radical is slightly faster in the presence of oxygen. The loss in concentration of chlorpromazine versus photons of light per liter absorbed showed that degradation was following zero-order kinetics.

Hamlin et al. studied the photolytic degradation of alcoholic solutions of hydrocortisone, prednisolone, and methylprednisolone exposed to ordinary fluorescent lighting.[34] The plots in Figure 2-23 show that the degradation follows first-order kinetics and that prednisolone and methylprednisolone show about the same rate of degradation, whereas hydrocortisone degrades about ⅓ the rate of the other two steroids. Hence, the two double bonds present in prednisolone and methylprednisolone make these steroids more susceptible to light-catalyzed degradation than the one double bond in the A ring of hydrocortisone.

FIG. 2-23. First-order plots of the photolytic degradation of steroids when exposed to laboratory fluorescent lighting. Hydrocortisone: X, INH assay; O, U. V. assay. Prednisolone: Δ, INH assay; □, U. V. assay. Methylprednisolone: ●, INH. (From Hamlin, W. E., Chulski, T., Johnson, R. H., and Wagner, J. G.: J. Am. Pharm. Assoc. Sci. Ed., 49:253, 1960.)

## Racemization

In such a reaction, an optically active substance loses its optical activity without changing its chemical composition. This reaction can be important to the stability of pharmaceutical formulations, since the biological effect of the dextro form can be considerably less than that of the levo form. For example, levo-adrenaline is 15 to 20 times more active than dextro-adrenaline. Solutions of levo-adrenaline form a racemic mixture of equal parts of levo-, and dextro-adrenaline with a pharmacologic activity just over half that of the pure levo compound.

The kinetics of racemization may be studied in a manner similar to hydrolytic reactions. By determining the rate constant, temperature dependency of the reaction, and dependence of the reaction on pH, it is possible to establish the optimal conditions for storage of the preparation. Racemization reactions, in general, undergo degradation in accordance with first-order kinetic principles. The racemization of a compound appears to depend on the functional group bound to the asymmetric carbon atom; aromatic groups tend to accelerate the racemization process.

## CHEMICAL AND PHYSICAL STABILITY TESTING OF PHARMACEUTICAL DOSAGE FORMS

**Chemical Stability.** The information presented thus far has illustrated that it is possible, through the use of chemical kinetic principles, to accurately study the degradation of an active drug in solution, as well as determine the mechanism responsible for the degradation. A more complicated situation arises when we attempt to study the stability of one or more drugs in a liquid pharmaceutical dosage form. Because of the multiplicity of ingredients in most pharmaceutical formulations, there exists the possibility of interactions taking place, as well as each ingredient having different degradative characteristics. The ideal situation would be to study the degradation pattern of each ingredient in the mixture individually. This is, of course, difficult, time consuming, and expensive to accomplish. Fortunately, it is not necessary for

Case 1:04-cv-00833-KAJ Document 324 Filed 11/09/2006 Page 67 of 126

purposes of stability prediction to determine the mechanisms of degradation. Generally, it is possible to evaluate the stability of any component of a pharmaceutical preparation by determining some property of the degradation as a function of time. If this function can be linearized in accordance with chemical kinetic reaction orders, the temperature dependency of the degradation can be obtained. Information of this type, obtained from exaggerated test conditions of short duration, permits the determination of the chemical stability of an active ingredient or ingredients, colorants, and antimicrobial preservatives for extended shelf storage.

The color stability of a multisulfonamide preparation was determined in this fashion. By the use of colorimetric measurements of samples subjected to thermally accelerated degradation, it was possible to predict the color stability of the preparation at room temperature, with data obtained in about 25 days.[6]

The arithmetic plots in Figure 2-2 presenting the change in absorbance at 500 mμ vs. time are linear, indicating that color loss is following a zero-order reaction. The slopes of these lines were obtained and are indicative of the rate of change of color with time. These rate constants are summarized in Table 2-7.

From the data in this table, Arrhenius plots were made and are shown in Figure 2-24. The linear nature of the curve indicates its utility in predicting the rates of color loss at lower temperatures. The rate constants at the lower temperatures obtained from this plot are summarized in Table 2-8.

These rate constants can then be used to determine the time when the color has reached an undesirable level. For example,

FIG. 2-24. Plot of the logarithm of the rate of decrease in absorbance of extracted color per hour against the reciprocal of the absolute temperature (T) as obtained at 500 mμ. (From Garrett, E. R., and Carper, R. F.: J. Am. Pharm. Assoc. Sci. Ed., 44:515, 1955.)

to predict the time for the absorbance to fall to 0.225 (At) from a zero time value of 0.470 (Ao) the zero-order kinetic equation At = Ao − kt is used. At 20°C, the rate constant (k) from Table 2-8 is $1.15 \times 10^5$ (absorbance decrease hour). Rearranging the above equation to find the time the absorbance will reach 0.225 at 30°C

$$t_{90} = \frac{-At + Ao}{k} = \frac{-0.225 + 0.470}{1.15 \times 10^{-5}}$$
$$= 31.304 \text{ hours} = 887 \text{ days}$$

The predicted times for 20°, 25°, and 30°C are summarized in Table 2-9.

The thermal degradation of ascorbic acid, vitamin $B_{12}$, folic acid, vitamin A, d-pantothenyl alcohol, and thiamine hydrochloride in a liquid multivitamin preparation was studied by use of either zero-order or first

TABLE 2-7. *Rates of Decrease of Absorbance of Prepared Extract at 500 mμ per Hour (k)*

| °C | (k) |
|---|---|
| 40 | 0.00011 |
| 50 | 0.00028 |
| 60 | 0.00082 |
| 70 | 0.00196 |

TABLE 2-8. *k Values Determined from Arrhenius Expression*

| °C | k, Absorbance dec. hr. |
|---|---|
| 20 | 0.0000115 |
| 25 | 0.0000209 |
| 30 | 0.0000363 |

PU 0011842

TABLE 2-9. *Duration of Color (Corresponding to Estimated Point of Rejection of Absorbance of Extract, A = 0.225)*

| °Centigrade | Time |
|---|---|
| 20° | 887 days (ca. 2½ yrs.) |
| 25° | 488 days (ca. 1⅓ yrs.) |
| 30° | 281 days (ca. ¾ yr.) |

order treatment of the data. It was possible to predict the stability of the vitamin components maintained at room temperature from the data obtained from samples stored under accelerated test conditions.

The stability of ascorbic acid in a liquid o/w multivitamin emulsion containing sodium fluoride and vitamins A, $B_6$, D, and C as active ingredients was studied under accelerated storage conditions to predict its shelf life. With zero- and first-order kinetic treatment of the data it was possible to determine the pH of optimum stability, as well as the concentration of ascorbic acid to provide for a shelf life of two years for the product. It was possible to make this estimation from 30 days of accelerated temperature study. The predicted stability was subsequently corroborated by room temperature data.[55]

Swintosky et al. used chemical kinetics to predict the shelf life of oral penicillin G procaine suspensions from elevated temperature storage conditions.[34] The degradation of penicillin in saturated procaine penicillin solutions was found to follow a first-order reaction. Using information obtained from the Arrhenius plot of the stability data at several elevated temperatures and the solubility of penicillin at these temperatures, the authors were able to prepare aqueous suspensions of procaine penicillin of a predictable shelf life which would be far in excess of that observed in solution, since only that fraction of the penicillin in solution undergoes degradation.

It has been shown that vitamin A acetate and palmitate encased in gelatin, acacia, and like substances, when tabletted into conventional uncoated tablets and/or chewable tablets, follow a pseudo first-order degradation scheme.[56] An Arrhenius plot of the data obtained at several elevated temperatures for vitamin A palmetate is shown in Figure 2-25. This linear plot of the logarithm of the pseudo first-order rate constants obtained at elevated temperatures vs. absolute temperature permits an estimation of the rate constants at room temperature (25°C), and thus an estimation of the shelf life of the vitamin in the tablet. If the rate constant is placed into Equation 18, the $t_{10\%}$ at 25°C is obtained. The relative stabilities of several vitamin A derivatives in the solid state are demonstrated by the zero-order plots of their degradation in Figure 2-26.[57] It was postulated that the degradation occurs almost exclusively in a liquid film at the surface of the crystal. The relative amount of material in the liquid state may be expected in these instances to determine, in some large manner, the rate of degradation. The fraction of material in the liquid state is related to the melting point of the pure crystalline solid by the following equation

$$\ln x_1 = -\frac{Lf}{R}\left(\frac{1}{T} - \frac{1}{Tm}\right)$$

where $x_1$ is the mole fraction of solvent (the liquid phase), Lf is the molar heat of fusion, R, the gas constant, and Tm the melting point

FIG. 2-25. Rate constants (k = week⁻¹) for pseudo first-order rate constants of vitamin A palmitate beadlets in dry-slugged, mannitol-base, multivitamin chewable tablet. Log k is plotted against reciprocal absolute temperature. (From Carstensen, J. T.: J. Pharm. Sci. 51:100, 1964.)

FIG. 2-28. Solid state degradation of vitamin A compounds at 50°. ▲ Vitamin A benzahydrazone, m.p. 181–182°; ■ vitamin A succinate triphenylguanidine salt, m.p. 141–140.5°; ●, vitamin A 3,4,5-trimethoxybenzoate, m.p. 85–88°; △ vitamin A nicotinate, m.p. 93–94°; □ vitamin A phthalimido-N-acetate, m.p. 111–112°; ○ vitamin A acetate, m.p. 57–58°. (From Guillory, J. K., and Higuchi, T.: J. Pharm. Sci. 51:100, 1962.)

of the pure solid. It is evident from the plots in Figure 2-28 that in a series of vitamin A derivatives, the compound having the highest melting point will generally be the most stable, all other factors being equal. Consequently, the use of chemical alteration to provide derivatives having high melting points, and hence greater stability, should prove a useful tool to the pharmaceutical formulator of solid dosage forms where drug degradation poses a serious problem.

The influence of active constituents and tablet diluents on the stability of phenylephrine hydrochloride in a solid state were studied in accordance with chemical kinetic principles. For the most part, phenylephrine hydrochloride was found to degrade in accordance with zero-order kinetics. Through such studies, it was possible to scientifically develop multi-ingredient tablet formulations containing phenylephrine hydrochloride at optimal stability.

**Statistical Techniques in Predicting Thermal Stability.** In the last few years, it has become standard procedure to use statistics in determining the validity of the Arrhenius treatment of data.

Statistical aspects of the Arrhenius treatment of kinetic data and the prediction of stability have been covered by Carstensen and Su.[58] The authors demonstrated that when decomposition is less than 10%, which is the case for many drugs of intermediate stability and certainly those for which a New Drug Application (NDA) is being considered, zero-order and first-order degradation are practically indistinguishable, and statistical methods are greatly facilitated by the use of zero-order kinetics. Of importance is the necessity to employ at least four points to obtain reasonable accuracy in applying the Arrhenius treatment and making an extrapolation. The degree of accuracy can be calculated, and Garrett has shown there is a substantial difference between three points and more than three points.[59] Additionally, the "longer" the extrapolation, the larger the scatter of points. For example, Carstensen demonstrated that if only the data shown in Table 2-10 at the three highest temperatures were used to predict stability at 25°C, using least squares for plotting, then

$$\log k_{25°C} = [0.0353 - 7] \pm 1.6740,$$

which corresponds to

$$k_{25°C} \text{ of } 2.30 \times 10^{-9} \text{ to } 5.12 \times 10^{-6}$$

The interval is of several orders of magnitude, and at the higher rate constant (the least stable) the drug remaining after two years would be calculated to be 81.6%.

However, if all the data in Table 2-10 are employed, then:

$$\log k_{25°C} = [0.2257 - 7] \pm 0.2937$$

which corresponds to

$$k_{25°C} \text{ of } 8.51 \times 10^{-8} \text{ to } 3.30 \times 10^{-7}$$

TABLE 2-10. *Rate Constants of Degradation of Diazepam Injection*

| t°C | 1000/T | $10^5 k_1$ ($hrs^{-1}$) | $y = 5 + \log k_1$ |
|---|---|---|---|
| 121 | 2.54 | 178 | 2.2455 |
| 110 | 2.61 | 84.3 | 1.9258 |
| 100 | 2.68 | 33.1 | 1.5198 |
| 85 | 2.81 | 10.0 | 1.0000 |
| 70 | 2.92 | 2.15 | 0.3324 |

The interval is much narrower, and at the higher rate constant, the drug remaining after two years would be calculated to be 98.7%.

If an Arrhenius plot of the data at the three highest temperatures listed in Table 2-10 is constructed and 95% confidence lines are included, the graph shown in Figure 2-27 results. The dotted lines represent the high and low limits around the extrapolated solid line. The further away the actual experimental points are from the extrapolation the greater the variation. This emphasizes the inaccuracy which results from attempts to extrapolate over too wide a temperature range.

Both Garrett[60] and McLeod et al.[61] used statistical procedures to determine the degree of confidence to be held in the predicted stability of a pharmaceutical preparation; the data they used were based on accelerated storage tests. In all cases, the predicted potency was found to agree very closely with the potency determined for samples stored at the temperature for as long as a year. The estimates were found to be well within the limits of error of prediction and the 95% confidence limits of a single assay.

To facilitate data processing and statistical treatment of stability information, computer programs have been developed and are commercially available.* Digital and analog computer programs have been employed to simulate drug decomposition induced during linear nonisothermal stability studies.[62,63]

*EDP Technology Inc., 1532 Third Street, Santa Monica, Calif. 90401 The Upjohn Company, Kalamazoo, Michigan.

FIG. 2-27. Arrhenius plot of degradation of diazepam in ampul solution with high and low limits. (From Carstensen, J. T., and Su, K. S. W.: Bull. Parenteral Drug Assn., 25:287, 1971.)

**Physical Stability.** Although there are a considerable number of reports in the literature concerned with chemical stability testing of active ingredients in pharmaceutical dosage forms, there is a conspicuous scarcity of reports dealing with physical stability testing. From both pharmaceutical and therapeutic standpoints, physical changes in the dosage form upon storage can be as serious as chemical instability of the active ingredients, sometimes more so. Examples of physical changes that can take place are crystal growth, change in crystal form, increase or decrease in dissolution rate and disintegration times, cracking of emulsions, caking of suspension, color fading, color development, and sediment or swirl development in solutions. Crystal growth in a suspension can result in a change in the rate of absorption and possibly in ineffective therapeutic levels. Crystal growth in an ointment or cream can cause skin irritation as well as poorer absorption. A change in crystal form of a steroid in suspension can result in the formation of a therapeutically inactive form of the drug.

TABLETS. There have been several studies concerned with the influence of temperature and light on the color stability of tablets. In one investigation, the effect of temperature on the rate of darkening of tablet dosage forms was investigated, and it was found that the darkening was following either zero- or first-order kinetics, depending on the drug and tablet formulation.[44] For example, for tablet of drug A, which darkened in accordance with first-order kinetics, the Arrhenius plot is given in Figure 2-28 and the data in Table 2-11.

The linearity of the Arrhenius plot permits

FIG. 2-28. Logarithm of apparent rate constants k of drug A, taken from Table 2-11 plotted as a function of reciprocal absolute temperature. (From Carstensen, J. T., Johnson, J. L., Valentine, W., and Vance, J. J.: J. Pharm. Sci., 53:1050, 1964.)

extrapolation to 25°C from the elevated temperatures. With this information, it was possible to estimate the extent of darkening at room temperature at extended storage periods. Everhard and Goodhart,[43] using certain relationships developed by Kubelka,[44] quantitated the relationship of light-catalyzed fading of colored tablets as a function of time and light intensity. Since fading is proportional to the product of time, L and intensity of the light, I, these investigators proceeded to plot $\theta_t$ vs. the product of time and intensity (Fig. 2-29). The value for $\theta_t$ is gotten from the equation $(1 - R_t)^2/2R_t$ where $R_t$ is the measured reflectance of the tablet. The consistency of the slopes (k values) at the three different concentrations shows that the fading of the dye at the surface of the tablet is first order. By using the product of time and intensity, each intensity condition was found to be on the same straight line

TABLE 2-11. *Drug A*

| Temp., t°C. | $10^3/T$ (°K$^{-1}$) | Mo. Stored | x-Value % | Log x | Log x − $x_o$* | 100 k (Mo.$^{-1}$) |
|---|---|---|---|---|---|---|
| 5 | — | 21 | 34.78 | 1.54133 | — | — |
| 55 | 3.05 | 1 | 35.06 | 1.54481 | 0.00348 | 3.48 ± 0.7 |
| 45 | 3.145 | 3 | 35.06 | 1.54481 | 0.00348 | 1.15 ± 0.23 |
| 37 | 3.225 | 11 | 35.07 | 1.54494 | 0.00361 | 0.62 ± 0.12 |
| 25 | 3.355 | 16 | 34.88 | 1.54258 | 0.00125 | 0.08 ± 0.04 |

*5° value used for reference.

PU 0011846



FIG. 2-29. Plots of $\theta_t$ vs. the product of time and intensity. ●, 11 footcandles; ▲, 30 footcandles; ■, 80 footcandles; ▼, 635 footcandles. Top line, 0.06% dye; middle line, 0.03%; bottom line, 0.015% dye. (From Everhard, M. E., and Goodhardt, F. W.: J. Pharm. Sci., 52:281, 1963.)

for any given concentration. The general first-order equation for the straight line plots in Figure 2-29 is

$$\ln \theta_t = -ktI + \ln \theta_t'$$

where $\theta_t$ (Kubelka-Munk function of the tablet) is the $\theta$ calculated at time, t, and $\theta_t'$ is the $\theta_t$ at t = o. By determining the times at which objectionable fading took place under high light intensity, it is possible from these time-intensity values to calculate the time for objectionable fading at lower intensities encountered under normal shelf storage conditions, using the above equation (Table 2-12).

If the dissolution rate of the active ingredient from the tablet or the tablet disintegration time were to increase under extended shelf storage of the tablet formulation, the therapeutic effectiveness of the tablet medication can be seriously affected. In general, a decrease in therapeutic efficacy would take place because the active ingredient would be less readily available for absorption.

The effect of storage of phenobarbital and phenacetin tablets on the rates of dissolution have been studied for three tablet formulations.[47] Tablets prepared with gelatin or polyethylene glycol 6,000 as granulating agents changed little during storage. Whereas, tablets prepared with carboxymethylcellulose underwent a significant increase in dissolution rate.

It is unwise and dangerous to assume that a tablet formulation exhibiting good drug absorption will remain so throughout its shelf life. This can be illustrated by the curves in Figure 2-30, in which the blood levels are plotted for an aged tablet and for one newly prepared. It is evident that aging of this tablet formulation results in a considerable change in drug availability.

FIG. 2-30. Decrease in blood levels when an aged tablet (------) was administered orally to human beings rather than a fresh tablet (———).

TABLE 2-12. *Time Required For Objectionable Fading at Low Light Intensities as Calculated From Accelerated Light Conditions*

| Concentration of Dye % w/w | Hours at 540 fc | Calcd. Hours at 30 fc | Calcd. Hours at 10 fc |
|---|---|---|---|
| 0.060 | 17 | [illegible] | [illegible] |
| 0.030 | 7 | 75 | [illegible] |
| 0.015 | 2 | 31 | [illegible] |

fc = footcandles

DISPERSE SYSTEMS. The physical stability of an emulsion or suspension can be influenced by factors affecting the chemical stability of the emulsifier, suspending agent, antioxidant, microbiological preservative, and active substance, as well as the physical characteristics of the disperse system.

It is an established fact that the degree of stability of an emulsion may be measured by the variation of the distribution of sizes of the dispersed droplets with time. An emulsion approaching the unstable state is characterized by the appearance of large globules as the result of coalescence and aggregation of small globules.

Lloyd has employed the relationship between reflectance of colored emulsions and the surface average diameter of their disperse phase to evaluate different emulsion stabilizers and study the kinetics of emulsion coalescence.[47] Oil-in-water emulsions containing 50 volume % dispersed phase and different starches, starch derivatives, water-soluble gums, and surfactants were used. The oil phase was colored with the red dye, Scarlet B. Reflectance of the emulsions was determined at 450 mμ and the surface average particle diameters of the internal phase was determined by microscope. Upon plotting surface average particle diameter on logarithmic paper, a linear relationship exists as shown in Figure 2-31.

The relationship between % reflectance (R) and surface average particle diameter (D) was expressed as follows:

$$\text{Log } R = -k \log D + \log c$$

or alternatively as

$$R = \frac{c}{D^k}$$

where k and c are constants characteristic of the emulsion. Surface average particle diameter was shown to be inversely related to specific interfacial area (A) of a given emulsion as follows:

$$D = \frac{6f}{A}$$

FIG. 2-31. Reflectance of various emulsion systems versus surface-average particle diameter. (From Lloyd, N. E.: J. Colloid Sci., 14:441, 1959.)

where f is the volume fraction of the dispersed phase. Thus, the reflectance is proportional to the specific interfacial area of the emulsion raised to k power.

$$R = c'A^k$$

where

$$c' = \frac{c}{(6f)^k}$$

Based on the data in Figure 2-31, emulsion stability was evaluated by determining the change in average particle diameter with time through reflectance measurements of the sample at designated time intervals. The data from this study are summarized in the semi-log plot Figure 2-32. The portions of the curves during the periods of active coalescence approximate straight lines. Since specific interfacial area simulates a concentration factor (interfacial areas per unit volume of oil), the coalescence behavior of the emulsion system in Figure 2-32 simulates a first-order reaction and can be used to estimate the physical stability of an emulsion at extended storage periods.

FIG. 2-32. Stability of paraffin oil emulsions containing various starches and starch derivatives. (From Lloyd, N. E.: J. Colloid Sci., 14:441, 1959.)

Van den Tempel measured the rate of coagulation of o/w emulsions according to the following simplified equation:

$$\frac{1}{n} - \frac{1}{n_0} = at$$

where $n$ = number of particles in a unit volume at time t, $n_0$ = number of particles at time $t_0$, and a = rate of decrease of particle concentration.[69] Plotting $\frac{1}{n}$ vs. time results in a linear relationship (Fig. 2-33). The data plotted in this figure show the rate of decrease of particle concentration (coagulation) in an emulsion stabilized with dioctyl sodium sulfosuccinate.

While it is undoubtedly fundamental to study emulsion stability on the basis of size frequency analysis, the practical commercial aspect of stability is the observation of creaming and/or separation of water and oil in an emulsion. Factors involved in this observation are vibration, head space of gas, temperature, globule size, density of the phases, viscosity of the external phase, gelling, and other changes in the emulsifying agent with aging.

A scheme for expressing separation changes quantitatively will now be presented.[70] The separation of oil or water of quantity, dV, in time, t, is dependent on time and the amount of emulsion still emulsified $(1 - V)$, as well as the height at which the emulsified globule must travel to reach the separation layer and make the separated portion of the phase clear. This height is proportional to V in a cylindrical vessel. However, the sedimentation velocity is not proportional to the height, but to a power of this, which can theoretically be between 0 and 1 and is usually 0.5. Errors of ± 3% were reported to accompany this method of evaluation. The equation for sedimentation was reported as:

$$\frac{dV}{dt} = k(1 - V)V^{1/2}$$

FIG. 2-33. Decrease of particle concentration in emulsions with time. (From Van den Tempel, M.: Rec. Trav. Chim., 72:433, 1953.)

Integration of the equation gives

$$kt = \log \frac{1 + \sqrt{V}}{1 - \sqrt{V}}$$

By determining the half-life, the time for half the volume to separate, it is possible to readily compare a series of emulsions.

To study demulsification of oil-in-water and water-in-oil emulsions, the internal phase was colored and the volumes of separated internal phase measured colorimetrically at different times.[71] A graphic evaluation of the rate of internal phase separation revealed that the relationship of the % separated to time is exponential (Fig. 2-34). The straight lines obtained by this log-log plot indicate the following equation to apply

$$x = ky^{a}$$
$$\log x = \log k + a \log y$$

FIG. 2-34. Plots showing the rates of demulsification of several emulsions systems. (From Menczel, E., Rabinowitz, M., and Madjar, A.: Am. J. Pharm., 132:315, 1960.)

where y is the % separated internal phase, x is time, and k and a are constants that differ from one emulsion system to another.

Whatever the rate of separation of the internal phase, the demulsification is first nonapparent and then becomes apparent. It was assumed that the rate of demulsification was equal at both the nonapparent and apparent stages (negative and positive y axis of Figure 2-34) for emulsions consisting of considerable volumes of internal phase dispersion, the separation of 1% internal phase (ln = 0) renders the demulsification perceptible. A perceptible demulsification axis (P.D.A.) was suggested which is actually the demarcation point between apparent and nonapparent demulsification: the less the rate of demulsification, the more time it will take to reach the P.D.A. If the slope of the internal phase separation is drawn upward and extended into the nonapparent stage, the interception points (k) with the perceptible axis of demulsification indicate the degree of emulsion stability. When the same exponential time units are used for the x axis, as well as the P.D.A., the higher the value for k, the more stable the emulsion.

The ultracentrifuge has been suggested as a means to measure o/w emulsion stability.[72] By determining the emulsion clearing or separation at different centrifugal speeds and plotting the logarithm of this data vs. time, the straight line plots shown in Figure 2-35 are obtained. A bad emulsion was found to separate oil almost instantly following a first-order rate of separation. A good emulsion exhibited an induction period during which no detectable oil separation took place, followed by an accelerated rate of oil separation as depicted in Figure 2-36.

The viscosity aging characteristics of suspensions and suspending agents were studied by Levy.[73] The viscosity degradation curve for sodium alginate XR-C is shown in Figure 2-37, and it appears to follow a first-order degradation. For sodium alginate, the effect of concentration on stability was found to be negligible in the concentration range studied. However, in the case of sodium carboxymethylcellulose, there was a pronounced effect of concentration on the viscosity stability as shown in Figure 2-38.





FIG. 2-35. Examples of clearing of oil water emulsion from i.v. emulsion at various centrifugal speeds. Plots of the logarithm of the distance of the emulsion-water boundary from the center of the rotor against the time of ultracentrifugation in seconds at 30°. The symbols and corresponding r.p.m. are: —○—, 13,590; —●—, 15230; --○-- 20,410; —◑—, 34,830; —●— 35,600. (From Garrett, E. R.: J. Pharm. Sci., 51:35, 1962.)

FIG. 2-37. The viscosity stability of sodium alginate XR-C at several concentrations. (From Levy, G.: J. Pharm. Sci., 50:429, 1961.)

increase in polymer concentration results in a decrease in the rate of viscosity change.

The plots in Figure 2-39 compare the stability of sodium carboxymethylcellulose of various average molecular weights by plotting viscosity half-lives vs. initial apparent viscosity. The vertical line in the figure serves to compare the viscosity half-lives of the three polymer types at a given apparent viscosity. It was indicated that if a comparison of solutions of equal concentration rather than equal viscosity were done, a distorted picture of their relative stabilities would be given to the formulator.

FIG. 2-36. Increase of oil coalescence as a function of time for "bad," curve A, and "good," curves B, C, D, oil-water emulsions. The symbols and ultracentrifugal r.p.m. at 30° are: ○, 39,780; ◑, 52,840; ●, 47,660. (From Garrett, E. R.: J. Pharm. Sci., 51:35, 1962.)

FIG. 2-38. The decrease in the apparent viscosity of several concentrations of sodium carboxymethylcellulose (M. W. 73,000) as a function of time. (From Levy, G.: J. Pharm. Sci., 50:429, 1961.)





FIG. 2-38. The viscosity half-life ($V_{1/2}$) of sodium carboxymethylcellulose solutions at 49° as a function of the initial apparent viscosity. (From Levy, G.: J. Pharm. Sci. 50:429, 1961.)

None of the several methods described for evaluating the physical stability of disperse systems considered the temperature dependency of the parameters employed. For accurate utilization of the data from exaggerated temperature storage, the relationship of the change in these parameters at the different temperatures must be determined. It is realized, however, that for emulsions and suspensions it may not be possible to exaggerate the temperatures to the extent done for solutions. In disperse systems, the physical properties at temperatures above a certain point could be completely different from that which would exist at normal temperatures of storage. For example, in formulations exhibiting thixotropic properties, a rise in temperatures above a certain value would cause a change in the properties of the preparation into a gel structure. In this physical form, the preparation would exhibit parameters which could not be extrapolated to parameters as they would exist in the normal system. However, it is felt that through the use of elevated temperatures, but not as high as employed for chemical reactions, valid temperature dependency data could be obtained which would be useful in the estimation of the physical stability of a product at normal storage conditions.

## INFLUENCE OF PACKAGING COMPONENTS ON DOSAGE FORM STABILITY

Faulty packaging of pharmaceutical dosage forms can invalidate the most stable formulation. Consequently, it is essential that the choice of container materials for any particular product be made only after a thorough evaluation of the influence of these materials on the stability of the product and the effectiveness of the container in protecting the product during extended storage under varying environmental conditions of temperature, humidity, and light.

The materials most commonly employed as container components for pharmaceutical preparations include glass, metal, plastic, and rubber.

**Glass.** Of these four materials, glass has been the container of choice for pharmaceutical dosage forms because of its resistance to decomposition by atmospheric conditions or by solid and liquid contents of different chemical composition. Furthermore, by varying the chemical composition of glass, it is possible to adjust the chemical behavior and radiation properties of the glass.

Although glass exhibits many advantages over other packaging materials, it has two principal faults: namely, the release of alkali and of insoluble flakes to liquids stored in the container. The U.S.P. XIX acknowledges that alkali ions can be released for each of four types of glass in the Compendium as shown by the data in Table 2-13.

By decreasing the soda content in the glass or replacing the sodium oxide with other oxides, it has been possible to overcome the undesirable property of glass releasing alkali cations into solution. This is exemplified by the borosilicate glass in Table 2-13, as compared to the general purpose soda-lime glass.

Several approaches have been used to increase the resistance of glass to alkali release by surface treatment. One method consists of treating the surface of soda-lime glass to produce a fire-polished skin of silica which

PU 0011852

TABLE 2-13. *Glass Types and Test Limits*

| Type | General Description | Type of Test | Limits: Size (ml.) | Limits: ml. of 0.02 N Acid |
|---|---|---|---|---|
| I. | Highly resistant borosilicate glass | Powdered glass | All | 1.0 |
| II. | Treated soda-lime glass | Water attack | 100 or less | 0.7 |
| | | | over 100 | 0.2 |
| III. | Soda-lime glass | Powdered glass | All | 8.5 |
| IV. | General purpose soda-lime glass | Powdered glass | All | 15.0 |

is more resistant than the inner layers of glass. This surface-treated glass is represented by Type II glass in Table 2-13.

Another approach is to treat the surface of the glass with sulfur dioxide in the presence of water vapor and heat.[74] This causes the surface alkali to react with the sulfur dioxide and the glass becomes more resistant, as shown by the data in Table 2-14, for five-hour extractions performed with boiling water for treated and untreated glass. The suggested reason for the greater resistivity of this glass is that a layer of positively charged hydrogen ion glass forms, causing the development of a compacted layer on drying and the expulsion of water. The diffusion of sodium through such a layer is greatly retarded; hence, the extraction by water would be considerably reduced.

In recent years a number of drugs have been developed which are of high potency and, consequently, of low dosage. The stability of these drugs can readily be affected by the release of soluble alkali from glass containers. As a safety factor, whenever the dosage form is a liquid, the solution should be buffered in order to eliminate any effect due to possible change in pH if some alkali were released from the glass.

TABLE 2-14. *Extraction of Alkali*

| Glass Treatment | Extraction as mg. $Na_2O$ |
|---|---|
| Annealed in absence of $SO_2$ | 2.8 |
| Annealed in presence of $SO_2$ | 0.9 |

Insoluble flakes have been found to sometimes appear in solutions stored in glass containers. The type of glass employed plays a major role in whether or not flake formation takes place. For example, flake formation may occur in non-borosilicate glass immediately after autoclaving, whereas in borosilicate glass, it will occur at temperatures a good deal higher than normally used for autoclaving. Flakes are particularly likely to occur with phosphate, citrate, tartrate, and alkaline solutions. Pre-treatment of the containers with dilute acid solution was found to delay flake formation.

Many pharmaceutical preparations exhibit physical or chemical changes due to the radiant energy of light. Light radiations can cause color development or color fading and potentiate an oxidation-reduction reaction, resulting in drug degradation, rancidity of oil formulations, and flavor and odor loss. Products exhibiting physical and chemical changes resulting from the effects of radiant energy can, in most instances, be adequately protected by the use of special glass containers. Flint glass, which is the most widely used multi-purpose container material, has the disadvantage of being transparent to light rays above 300 mμ. As a result, amber glass, which has the property of shutting out certain portions of the light spectrum, has been used extensively by the pharmaceutical industry. The transmission curves for flint and amber glass shown in Figure 2-40 shows that although flint glass transmits significantly from 300 mμ, amber glass does not begin to transmit to any appreciable extent

Case 1:04-cv-00833-KAJ Document 324 Filed 11/09/2006 Page 79 of 126

FIG. 2-40. Transmission curves for typical flint and amber glass.

**TABLE 2-16.** *Chemical Assay for Residual Antihistamine from Solutions Stored in Clear and Amber Glass Ampuls*

| Time (Weeks) | Assay (%) | |
|---|---|---|
| | Clear Glass | Amber Glass |
| 0 | 100 | 100 |
| 4 | 83 | 98 |
| 8 | 64 | 98 |

until 470 mμ. Since it is known that the photochemical activity of the light radiations drops off with increasing wave length, it would be expected that the amber container would afford a product better protection against light than the flint glass. This is illustrated by the following examples.

The data in Table 2-15 show the protective effect of amber glass on the fading of dyes from the surfaces of tablets stored in flint and amber glass bottles.

The results in Table 2-16 summarize the stabilizing properties of amber glass on the photochemical degradation of an antihistamine injectable solution exposed to exaggerated illumination. The solutions stored in clear glass ampuls show a 36% loss of antihistamine concentration, while those in amber glass show essentially no loss in drug concentration.

The protective effect of amber glass on the darkening of sulfonamide tablets exposed to exaggerated lighting is shown in Table 2-17, where reflectance data are given for the surface of the sulfonamide tablets. It is evident that the tablets darken with storage, since the reflectance values decrease substantially when the tablets are exposed to light in an open dish. Visual observation of these tablets indicated that they had taken on a yellow-tan color. However, for the tablets stored in amber bottles, no significant change in reflectance took place, and visual observation showed no apparent darkening.

**Plastics.** Although glass has many desirable properties, recent years have seen the use of more and more containers having all or part of their structure composed of plastic for the storage of pharmaceutical preparations. It should be realized that the term plastic denotes a considerable group of high molecular weight polymers, each of different physical and chemical properties. These include polyethylene, polypropylene, polystyrene, polyvinylchloride, and several others. Any particular plastic may be available in different densities or modified by certain additives which affect its chemical and physical properties. Only through studying the stability of the plastic container with the product for which it is to be used is it possible to be certain that the plastic has no effect

**TABLE 2-15.** *The Amount of Dye (%) Faded per Day When Irradiated Under Exaggerated Intensity*

| Glass Sample | F.D. & C. Blue #1 | D. & C. Yellow #10 |
|---|---|---|
| Flint | 12.9 | 38.1 |
| Amber | 4.6 | 6.2 |

**TABLE 2-17.** *Influence of Light on the Photosensitivity of a Sulfonamide Tablet Formulation*

| Time (Weeks) | % Reflectance at 491 mμ | |
|---|---|---|
| | Open Dish | Amber Bottle |
| 0 | 52.8 | 52.6 |
| 2 | 41.3 | 52.3 |
| 4 | 35.6 | 53.6 |
| 6 | 31.7 | 53.8 |
| 8 | 28.9 | 52.9 |
| 10 | 25.4 | — |
| 12 | 23.8 | 51.5 |

PU 0011854

on the preparation and that the preparation or one of its ingredients has no effect on the plastic.

A chief disadvantage of plastic containers, as compared to glass, is the problem of permeation in two directions, namely, from the solution in the container through the plastic into the ambient environment and from the ambient environment through the plastic into the preparation. In addition, materials can be leached from the plastic container into the liquid preparation, materials from the preparation can be adsorbed or absorbed onto and into the plastic container, and in certain instances, the contents of the container can chemically or physically react with the plastic components of the containers, causing container deformation. The degree of permeation, leaching, sorption, diffusion, and chemical reactivity varies considerably from one plastic material to another.

The stability of a product packaged in a plastic container can be affected in several ways owing to container permeability. The chemical, as well as the physical, stability of tablet dosage form can be influenced considerably due to penetration of water vapor from the atmosphere into the container. Penicillin tablets were found to degrade in polystyrene containers due to permeation of water vapor.[75] Oxygen and carbon dioxide in air can permeate through plastic containers, catalyzing the degradation of drugs that are prone to oxidation or hydrolysis. A tetracycline suspension was found to change in color and taste owing to permeation of air through the walls of a polyethylene container.[76]

Plastic containers, when used for emulsion preparations, must be thoroughly evaluated for physical and chemical changes of the emulsion, as well as for physical changes in the container. It has been reported that certain materials in an emulsion have a tendency to migrate toward the polyethylene wall, causing either a change in the emulsion or a collapse in the container.[77] Since polyethylene has a tendency to elastic recovery, air is continuously drawn into the plastic container, increasing the chance of oxidation and drying out of the preparation. In the case of an emulsion, the air can cause the emulsion to break down owing to dehydration or oxidation of the oil phase. This phenomenon of package "breathing" is a major cause of product deterioration during storage in plastic containers. It can also be responsible for the loss of flavor and perfume ingredients from products packaged in plastic containers.

The property of plastics to sorb materials from solution can cause loss of drug, antibacterial agent, or other materials from solution. The curves in Figure 2-41 show the degree of binding of several commonly used antibacterial preservatives when solutions of these preservatives are in contact with the nylon barrel of a disposable syringe.[78] After one week's storage at 30°C, in nearly all instances, over 60% of the preservative is bound. When these same preservatives were evaluated with polyethylene and polystyrene barrels, essentially no binding was found. This clearly illustrates the importance of selecting the correct plastic material for a particular use.

FIG. 2-41. Binding of antibacterial preservatives by nylon as a function of time. (From Marcus, E., et al.: J. Am. Pharm. Assoc. Sci. Ed., 48:457, 1959.)

Case 1:04-cv-00833-KAJ Document 324 Filed 11/09/2006 Page 81 of 126

Stability tests performed on Vioform Lotion packaged in plastic containers showed that the Vioform was being sorbed by the container. Lining of the container with an epoxy resin eliminated this problem. This is illustrated by the data summarized in Table 2-18, which presents reflectance data of the inside wall of the lined and unlined container. A decrease in the reflectance of the container wall is indicative of Vioform sorption by the plastic since a yellow surface reflects less light than a white surface. This is further substantiated by the increase in reflectance of the lotion with storage, indicating that the lotion is becoming lighter because of the loss in Vioform content.

Although the epoxy lining was effective in eliminating the problem with Vioform lotion, it was not effective in preventing the sorption of the antibacterial agent, phenyl mercuric acetate, from solution as illustrated by the data in Table 2-19.

It is evident from the results presented in Tables 2-18 and 2-19 that linings are not always effective and must be evaluated separately for each product. The ineffectiveness of the lining could be attributed to sorption of the lining itself by the preservative or to the presence of imperfections, such as pinholes in the lining, which permit penetration of the lining to the plastic.

**Metals.** In addition to glass and plastic, certain metals are also employed as containers for pharmaceutical products. Disperse systems, having a consistency of a soft paste, gel, cream, or ointment, can be conveniently packaged into collapsible tubes. Metals commonly used for such tubes are tin, plastic coated tin, tin coated lead, aluminum, and coated aluminum. Tubes constructed of a single material can readily be tested for stability with a product. Tubes having coatings present additional problems, since it must be established that the coating material is sufficiently inert for the preparation, as well as whether the coating completely covers the underlying material. In addition, the coating must be evaluated for ease of cracking and solvent resistance.

Tin and tin-coated tubes are generally employed because of their unreactive properties, although it has been reported that tin tubes can be corroded by chlorides or acid conditions. Vinyl and cellulose lacquers are applied to tin to increase their utility.

Coated and uncoated aluminum tubes are being used, but are not always satisfactory. It has been reported that aluminum reacts with fatty alcohol emulsions to form a white encrustation.[39] Such tubes were also found to be unstable for mercury-containing compounds. It has been stated that uncoated aluminum tubes are deleteriously affected when used for preparations outside the pH range of 6.5 to 8.0.[40] The application of an epoxy lining to the internal surfaces of aluminum tubes was found to make them more resistant to attack.

Whether the container is made of glass, plastic, or metal, it still requires a closure to effectively contain the contents. In addition to forming an effective seal on the container, the closure should not react chemically or physically with the container contents to sorb material from the contents or leach material to the contents.

**TABLE 2-18.** *Sorption of Vioform by the Plastic Container from the Lotion When Stored at 40°C.*

| | Reflectance in % | | | |
|---|---|---|---|---|
| | Unlined Container | | Lined Container | |
| Time (Weeks) | Lotion | Container | Lotion | Container |
| 0 | 60.0 | 55.0 | 63.0 | 54.5 |
| 1 | 60.0 | 48.0 | 61.5 | 53.0 |
| 2 | 61.0 | 49.5 | 63.0 | 53.0 |
| 3 | 63.0 | 50.0 | 61.5 | 54.0 |
| 4 | — | 49.0 | 63.0 | 53.0 |

TABLE 2-19. *Loss of Phenylmercuric Acetate from Solution Stored in Lined and Unlined Polyethylene Bottles*

| Time (Weeks) | % Preservative Lost | | | |
|---|---|---|---|---|
| | Unlined Container | | Epoxy Lined Container | |
| | 25°C | 40°C | 25°C | 40°C |
| 0 | 0 | 0 | 0 | 0 |
| 1 | 10.0 | 29.3 | 12.4 | 24.6 |
| 2 | 11.5 | 38.5 | — | 27.0 |
| 3 | 20.0 | 35.8 | 15.4 | 37.7 |
| 4 | 30.0 | 46.2 | 23.9 | 43.9 |
| 8 | 33.2 | 57.7 | 27.7 | 58.5 |
| 12 | 33.7 | 70.0 | 33.2 | 68.8 |

**Rubber.** Rubber of varying composition is used in pharmaceuticals and biologicals as stoppers, cap liners, and parts of dropper assemblies. A major use of the rubber stopper is that of a closure for multiple-dose vial solutions for injections. The problems that can be encountered by having rubber stoppers in contact with the liquid in the vial are the sorption of active ingredient, antibacterial preservative, or other materials into the rubber, and the extraction of one or more components of the rubber into the vial solution.

The data in Table 2-20 illustrate the influence of various rubber closures on the loss of the antimicrobial preservative chlorobutanol from vial solutions. It is evident from these data that the closures have a marked deleterious effect on preservative concentration at all temperatures. At 60°C, after 12 weeks' storage, the vials stoppered with neoprene closures and stored in an inverted position show only 8.5% residual concentration of chlorobutanol, whereas the ampuls under the same condition of storage contain 72.4%.

The curves in Figure 2-42 show that extractives from the natural rubber closures used to stopper vials containing water for injection were leached into the water when the vials were autoclaved. It is evident from the absorption spectra of the extractives in the vial solutions that even normal autoclaving at 115°C, 10 psi for 30 minutes causes appreciable extractive to enter the water for injection. Subsequent storage of these vials at room temperature for the shelf life of the

TABLE 2-20. *Influence of Various Closures on Residual Concentration of Chlorobutanol in Vial Solutions after Storage*

| Temp. (°C) | Storage Time (wk.) | Ampul Control (%) | Stopper Composition | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Natural Rubber | | Neoprene Polymer | | Butyl Polymer | |
| | | | Upright (%) | Inverted (%) | Upright (%) | Inverted (%) | Upright (%) | Inverted (%) |
| 25 | 12 | 100 | 81.00 | 78.7 | 87.3 | 81.0 | 68.1 | 63.8 |
| 40 | 2 | 100 | 76.6 | 63.8 | 81.7 | 59.6 | 68.1 | 61.7 |
| — | 12 | 97.9 | 74.5 | 57.5 | 53.2 | 46.8 | 68.0 | 66.0 |
| 50 | 2 | 97.9 | 59.6 | 57.5 | 57.5 | 46.8 | 60.0 | 61.7 |
| — | 12 | 91.5 | 57.5 | 42.5 | 46.8 | 38.3 | 59.6 | 57.5 |
| 60 | 2 | 95.8 | 57.5 | 53.2 | 51.0 | 46.8 | 51.0 | 48.9 |
| — | 12 | 72.4 | 57.5 | 42.5 | 29.8 | 8.5 | 46.8 | 46.8 |



FIG. 2-42. Leaching of extractives from rubber stoppers on multiple dose vial solutions.

pharmaceuticals, which at present is an average of three years, would no doubt cause further leaching of extractives in solution.

If an epoxy lining is applied to rubber stoppers, a considerable reduction results in the amount of extractive leached from the stopper by the water for injection in the vials, but there is essentially no effect on the sorption of preservative from solution. However, the use of Teflon coated rubber stoppers essentially completely prevents sorption and leaching of the rubber stopper.

The presence of rubber closure extractives in the vial solutions could interfere with the chemical analysis of the active ingredient, affect the toxicity or pyrogenicity of the injectable preparation, interact with the drug or preservative to cause inactivation or loss of stability, and cause physical instability to the preparation owing to the presence of particulate matter in the solution.

## REFERENCES

1. Federal Register, 36:601, January 15, 1971.
2. Garrett, E. R., and Carper, R. F.: J. Pharm. Sci., 44:515, 1955.
3. Free, S. M.: Considerations in Sampling for Stability. Presented before the A.D.M.A., November, 1955.
4. Blythe, R. H.: Product Formulation and Stability Prediction. Presented at the Production Section of the Canadian Pharm. Mfg. Ass., April, 1957.
5. Kennon, L.: J. Pharm. Sci., 53:815, 1964.
6. Walters, W. A.: Physical Aspects of Organic Chemistry. 4th ed., E. Van Nostrand Co., Inc., New York, 1950, p. 332.
7. Edwards, L. J.: Trans Farad-Soc., 46:723, 1950.
8. Blakey, W., McCombie, H., and Scarborough, H. A.: J. Chem. Soc., 2863, 1926.
9. Timm, E. W., and Hinshelwood, C. N.: J. Chem. Soc., 862, 1938.
10. Tommila, E.: Suomen Kemistilehti, 15B:9, 1942.
11. Gerstuth, F. G.: J. Am. Pharm. Assoc., 20:568, 1931.
12. Schultz, R. F.: J. Am Chem. Soc., 61:1443, 1939.
13. Selvinova, A. S., and Syrkin, Y. K.: Compt. rend. Acad. Sci., 23:45, 1939.
14. Vavon, G., and Decass, J.: J. Bull. Soc. Chim., 10:325, 1943.
15. Stinson, V. R.: J. Chem. Soc., 2673, 1955.
16. Stinson, V. R.: Nature, 175:47, 1955.
17. Tommila, E., and Hella, A.: Ann. Acad. Sci. Fennicae, A23, 1954.
18. Bowles, W. H.: J. Pharm. Sci., 57:1057, 1968.
19. Higuchi, T., and Lachman, L.: J. Am. Pharm. Assoc. Sci. Ed., 44:532, 1955.
20. Lachman, L., Ravin, L. J., and Higuchi, T.: J. Am. Pharm. Assoc. Sci. Ed., 45:290, 1956.
21. Lachman, L., and Higuchi, T.: J. Am. Pharm. Assoc. Sci. Ed., 46:32, 1957.
22. Lachman, L., Guttman, D., and Higuchi, T.: J. Am. Pharm. Assoc. Sci. Ed., 46:36, 1957.
23. Guttman, D. E.: J. Pharm. Sci., 51:1162, 1962.
24. Riegelman, S.: J. Pharm. Sci., 49:339, 1960.
25. Smith, L., and Olsson, H.: Z. physik. chem., 102:26, 1922.
26. Olsson, H.: Z. physik. chem., 129:243, 1927.
27. Paloma, M. H., and Juvala, A.: Chem. Ber., 81B:1770, 1928.
28. Evans, D. P., and Davies, G.: J. Chem. Soc., 339, 1940.
29. Salmi, E. J., and Lemin, R.: Suomen Kemistilehti, 20B:43, 1947.
30. Newman, M. S.: J. Am. Chem. Soc., 72:4783, 1950.
31. Tommila, E.: Ann. Acad. Sci. Fennicae, A57:3, 1941.
32. Ingold, C. K.: Structure and Mechanisms in Organic Chemistry. Cornell University Press, Ithaca, 1953, p. 752.
33. Hammett, L. P.: J. Am. Chem. Soc., 74:213, 1952.
34. Swintosky, J. V., Rosen, E., Robinson, T. J., Chamberlain, R. E., and Guarini, J. R.: J. Am. Pharm. Assoc. Sci. Ed., 45:37, 1956.

35. Blaug, S. M., and Wesolowski, J. W.: J. Pharm. Sci., 48:691 1959.
36. Garrett, E. R.: J. Am. Pharm. Assoc. Sci. Ed., 46:584, 1957.
37. Siniuda, A. A., Morozowich, W., Lewis, C., and MacKellar, F. A.: J. Pharm. Sci., 58:1389, 1969.
38. Taraszka, M. J.: J. Pharm. Sci., 60:1414, 1971.
39. Brodasky, T. F., and Lewis, C.: J. Antibiot., 25:230, 1972.
40. Kosky, K. T.: J. Pharm. Sci., 58:560, 1969.
41. Marcus, A. D., and Taraszka, A. J.: J. Am. Pharm. Assoc. Sci. Ed., 48:77, 1959.
42. Bodin, J., and Taub, A.: J. Am. Pharm. Assoc. Sci. Ed., 44:296, 1955.
43. Mollica, J. A., Rehm, C. R., and Smith, J. B.: J. Pharm. Sci., 58:635, 1969.
44. Chung, P. H., Chin, T. F., and Lach, J. L.: J. Pharm. Sci., 59:1300, 1970.
45. Glasstone, S.: Textbook of Physical Chemistry. D. Van Nostrand Co., Inc., New York, 2nd ed., 1954, p. 947.
46. Guttman, D. E., and Meister, P. D.: J. Am. Pharm. Assoc. Sci. Ed., 47:773, 1958.
47. Oesterling, T. O., and Guttman, D. E.: J. Pharm. Sci., 53:1189, 1964.
48. Schou, S. A., and Gredsted, A.: Dansk. Tids. Farm., 25:161, 1951.
49. Schroeter, L. C.: J. Pharm. Sci., 52:564, 1963.
50. Higuchi, T., and Schroeter, L. C.: J. Am. Pharm. Assoc. Sci. Ed., 48:535, 1959.
51. Schroeter, L. C., Higuchi, T., and Schuler, E. E.: J. Am. Pharm. Assoc. Sci. Ed., 47:734, 1958.
52. Riegelman, S., and Fisher, E. Z.: J. Pharm. Sci., 51:206, 1962.
53. Felmeister, A., and Dischler, C. A.: J. Pharm. Sci., 53:756, 1964.
54. Hamlin, W. E., Chulski, T., Johnson, R. H., and Wagner, J. G.: J. Am. Pharm. Assoc. Sci. Ed., 49:253, 1960.
55. Tingstad, J. E., MacDonald, L. H., and Meister, P. D.: J. Pharm. Sci., 52:343, 1963.
56. Carstensen, J. T.: J. Pharm. Sci., 53:839, 1964.
57. Guillory, J. K., and Higuchi, T.: J. Pharm. Sci., 51:100, 1962.
58. Carstensen, J. T., and Su, K. S. W.: Bull. Parenteral Drug Assn., 25:287, 1971.
59. Garrett, E. R.: J. Pharm. Sci., 51:811, 1962.
60. Garrett, E. R.: J. Pharm. Assoc. Sci. Ed., 45:171, 1956.
61. McLeod, H. A., Pelletier, O., and Campbell, J. A.: Canad. Pharm. J. Sci. Ed., 55:173, 1958.
62. Zoglio, M. A., Windheuser, J. J., Vatti, R., Maulding, H. W., Kornblum, S. S., Jacobs, A., and Hamot, H.: J. Pharm. Sci., 57:2080, 1968.
63. Kay, A. I., and Simon, T. H.: J. Pharm. Sci., 60:205, 1971.
64. Carstensen, J. T., Johnson, J. B., Valentine, W., and Vance, J. J.: J. Pharm. Sci., 53:1050, 1964.
65. Everhard, M. E., and Goodhart, F. W.: J. Pharm. Sci., 52:281, 1963.
66. Kubelka, P.: J. Opt. Soc. Am., 38:448, 1948.
67. Solvang, S., and Finholt, P.: Medd. Norsk. Farm. Selsk., 31:101, 1969.
68. Lloyd, N. E.: J. Colloid Sci., 14:441, 1959.
69. Van den Tempel, M.: Rec Trav. Chim., 72:433, 1953.
70. Lederer, E. L.: Kolloid Z., 71:61, 1935.
71. Menczel, E., Rabinovitz, M., and Madjor, A.: Am. J. Pharm., 132:315, 1960.
72. Garrett, E. R.: J. Pharm. Sci., 51:35, 1962.
73. Levy, G.: J. Pharm. Sci., 50:429, 1961.
74. Dimbley, V.: J. Pharm. and Pharmacol. 5:969, 1953.
75. Bull, A. W.: J. Pharm. and Pharmacol. 7:806, 1956.
76. Wight, C. S., Tomlinson, J. A., and Kirmeier, S.: Drug & Cosmetic Ind., 72:768, 1953.
77. Chen, J. L., Cyr, G. N. and Langlykke, A. F.: Drug & Cosmetic Ind., 81:586, 1957.
78. Marcus, E., Kimm, H. K., and Autian, J.: J. Am. Pharm. Assoc. Sci. Ed., 48:457, 1959.
79. Boardman, L. H.: J. Pharm. and Pharmacol. 1:934, 1949.
80. Stephenson, D.: J. Pharm. and Pharmacol. 5:999, 1953.

# EXHIBIT G

$840 - 117 9R 1803 18 2-3-93

769-249-0 DIV

MAIL ROOM JAN 6 1993

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF: :

GAETANO GATTI, ET AL : GROUP: 1803

SERIAL NUMBER: 07/827,742 : EXAMINER: PESELEV, Z.

FILED: JANUARY 29, 1992 :

FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

PETITION FOR EXTENSION OF TIME
UNDER 37 CFR 1.136

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

It is hereby requested that a THREE month extension of time for responding to Office Action dated July 6, 1992 be granted to January 6, 1993.

The required fee of $ 840.00 is enclosed herewith by check and any further charges may be made against the Attorney of Record's Deposit Account No. 15-0030. A duplicate copy of this sheet is enclosed.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.

Richard D. Kelly
Attorney of Record
Registration No. 27,757

Fourth Floor
1755 Jefferson Davis Highway
Arlington, Virginia 22202
(703) 521-5940

01/27/93 07827742 1 117 840.00 CK

DEFENDANTS' TRIAL EXHIBIT NO. 278

#774-102

JAN 2 1993

9
C

2-3-93

Docket No: 769-249-0 DIV

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF: :

GAETANO GATTI, ET AL : GROUP ART UNIT: 1803

SERIAL NO: 07/827,742 : EXAMINER: PESELEV, E.

FILED: JANUARY 29, 1992 :

FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE :

AMENDMENT

HONORABLE COMMISSIONER OF PATENTS AND TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Responsive to the Official Action mailed July 6, please amend the above-identified application as follows:

IN THE SPECIFICATION

Amend the Specification by inserting after "January 25, 1990", --now United States Patent 5,124,317--.

IN THE CLAIMS

Please amend Claim 31 to read as follows:

Sub 9t. C1

31. A physiologically acceptable solution of anthracycline glycoside selected from the group consisting of idarubicin hydrocholoride doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable aqueous solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methane sulfonic acid, ethanesulfonic acid, tartaric acid, acetic

170 MP 01/22/93 07827742 1 102 76.00 CK

PU 0014993

C1 acid, succinic acid, ascorbic acid, citric acid, and glutamic acid and the concentration of said anthracycline glycoside being from 0.1 to 100mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

Amend Claim 33, line 3 by amending "dimethylacetamide" to read --N.N.-dimethylacetamide--.

Please amend Claim 40, line 1 by inserting before "comprising" the term --further--.

Please amend Claim 42, line 6, by replacing "2.71 to 3.14" with --2.5 to 5.0--.

Cancel Claims 39 and 41.

Please add the following new claims:

C2 43. A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride and doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 5.0 with a physiologically acceptable acid and the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

44. A physiologically acceptable aqueous solution of anthracycline glycoside selected from the group consisting of idarubicin hydrochloride, doxorubicin hydrochloride and epirubicin hydrochloride dissolved in a physiologically acceptable solvent, having a pH adjusted to from 2.5 to 5.0 with

a physiologically acceptable acid selected from the group consisting of hydrochloric acid, sulfuric acid, phosphoric acid, methanesulfonic acid, tartaric acid and acetic acid and the concentration of said anthracycline glycoside being from 0.1 to 100 mg/ml, wherein said solution has not been reconstituted from a lyophilizate.

C2

REMARKS

Claims 31, 33, 40 and 42 have been amended, Claims 39 and 41 have been cancelled from this application and Claims 43 and 44 have been added to the application. Accordingly, Claims 31-38, 40, and 42-44 appear in this application. Reconsideration is respectfully requested.

Applicants' counsel wishes to thank Examiner Peselev for the most useful and helpful interview held in her office on July 22, 1992 concerning this application and related application Serial No. 07/827,938. As reflected on the Examiner Interview Summary Record, applicants are submitting herewith a declaration making of record all of the comparative data which was shown to the Examiner during the interview. The remarks which follow reflect the arguments presented at the interview.

Applicants are the first to develop storage stable anthracycline solutions. Prior to the development of applicants invention, anthracyclines were sold and distributed as lyophilized powders. It was necessary for the medical personnel to dissolved the lyophilized powder in an aqueous solution prior

to administration to the patient. This exposed the medical personnel to significant health risks since anthracyclines have potent side effects which, with long term exposure, can be fatal. Applicants' invention for the first time allowed the pharmaceutical manufacturer to provide the medical personnel with anthracyclines in aqueous solutions thereby substantially reducing the risk of accidental exposure of the medical personnel to the anthracyclines.

Prior to applicants invention, aqueous solutions were considered to have short term storage stability only. No practical method existed which allowed the pharmaceutical manufacturer to offer to the medical community aqueous solutions of anthracyclines which were ready for use until the present invention.

The Examiner has rejected Claims 31-42 under 35 U.S.C. 103 as being unpatentable of Beijnen, Arcamone or Bosaquent in combination with Benvenuto and Arcamone ('579) Wasserman, Patelli or Mori. These rejections are respectfully traversed.

As the Examiner is aware from the prosecution of the parent applications, both of which have now matured into United States Patents, none of the references which have been cited by the Examiner disclose any aqueous solutions of anthracyclines which are storage stable to the degree that applicants have achieved. The primary references all teach the desirability of preparing anthracycline solutions having acid pHs from lyophilized

anthracyclines.' Arcamone and Bosaquant specifically used conventional pH adjusting agents, buffers. It is the use of buffers which is the conventional technique for adjusting pH in the medical field. Beijnen does disclose the use of perchloric acid to adjust very dilute concentrations of doxorubicin in aqueous solutions. Beijnen's objective was to determine the rate constant of doxorubicin decomposition at various pHs. This can be appreciated from the fact that perchloric acid is not physiologically acceptable and from the extremely dilute concentrations employed in Beijnen. As noted in the declaration found at tab 1 to Dr. Confalonieri's most recent declaration, it was impossible to produce stable aqueous solutions of doxorubicin whose pH had been adjusted with perchloric acid having a concentration greater than 0.1 mg/ml, the minimum concentration required in the present claims.

Accordingly, none of the primary references would suggest to anyone skilled in the art that the use of an acid to adjust the pH of aqueous solutions of doxorubicin would offer unexpected results as compared with the use of buffers, the conventional approach.

Wasserman teaches adjusting an aqueous doxorubicin solution to a pH of 2.1 with hydrochloric acid. However, at this low pH the solution has inferior storage stability as compared with a pH of 2.5. Further discussion of Wasserman is to be found in Dr.

Confalonieri's May 27, 1991 declaration, found at tab 2 to his present declaration.

The remaining secondary references are cited for the concept of sterile anthracycline solution and the use of glass containers to contain the solutions. Applicants' invention does not lie in the preparation of sterile solutions nor in the use of glass containers, but rather, in the preparation of storage stable anthracycline aqueous solutions whose stability far exceed any which was achieved prior to the present invention.

Attached hereto is a declaration by Dr. Confalonieri who has previously provided declarations in each of the parent applications. Dr. Confalonieri has established that the unexpected results previously demonstrated when the pH of the aqueous solution was adjusted with hydrochloric acid is also obtained with other physiologically acceptable acids. The present claims are not limited to any specific acid other than the requirement that it be physiologically acceptable and that the solution contain at least from 0.1 mg/ml of anthracycline.

Applicants have amended Claim 31 to recite the physiologically acceptable acids presented in Claim 41 which are described on the page 10 of the present Specification as well as to specify that the solution is aqueous. In addition, applicants have added Claim 44 which identifies the physiologically acceptable acids as being selected from a group of acids which have been specifically tested by Dr. Confalonieri. Newly

presented Claim 43 is identical to originally presented Claim 31 except for the limitation that the solutions is "aqueous". It is respectfully submitted that each of these claims is fully supported by the disclosure as filed and is allowable over the prior art of record.

During the prosecution of the parent application, Serial No. 471,005, now United States Patent 5,124,318, applicants submitted extensive Information Disclosure Statements to the Examiner. Copies of these statements are enclosed. However, it is not believed that the prior art which was cited is anymore relevant than the prior art which has been cited by the Examiner in this Office Action.

The Examiner has also rejected the claims on the basis of double patenting over applicants issued United States Patent 4,946,831. This rejection is now moot in view of the submission of the enclosed terminal disclaimer.

The Examiner also entered rejections under 35 U.S.C. 112 which are believed to be overcome by the present amendments and are, therefore, moot.

In view of the above amendments and remarks, it is respectfully submitted that this application is now in condition

for allowance. Early notice to this effect is respectfully requested.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.

Richard D. Kelly
Registration No. 27,757

1755 Jefferson Davis Highway
Fourth Floor
Arlington, Virginia 22202
(703) 521-5940

MAIL ROOM
JUL 3 ... TRADEMARK OFFICE

DOCKET NO. 9-249-0 DIV

IN RE APPLICATION OF: GAETANO GATTI, ET AL

SERIAL NO.: 07/827,742

FILED: JANUARY 29, 1992

FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

THE COMMISSIONER OF PATENTS AND TRADEMARKS
WASHINGTON, D.C. 20231

Sir:

Transmitted herewith is an amendment in the above-identified application.

☐ No additional fee is required.

☐ Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been established by a verified statement previously submitted.

☐ Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been established by a verified statement submitted herewith.

☒ Additional documents filed herewith: TERMINAL DISCLAIMER
PETITION FOR EXTENSION OF TIME
INFORMATION DISCLOSURE STATEMENT WITH REFERENCES, RULE 132 DEC

The fee has been calculated as shown below.

| | (Col. 1) CLAIMS REMAINING AFTER | | (Col. 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Col. 3) PRESENT EXTRA | SMALL ENTITY RATE | SMALL ENTITY ADDITIONAL FEE | OTHER THAN A SMALL ENTITY RATE | OTHER THAN A SMALL ENTITY ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| TOTAL | * 12 | MINUS | ** 20 | = 0 | $11 = | $ | $22 = | $ |
| INDEP | * 4 | MINUS | *** 3 | = 1 | $37 = | $ | $74 = | $ 74.00 |
| ☐ | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +$115+ | $ | +$230+ | $ |
| | | | | | TOTAL | $ | TOTAL | $ 74.00 |

X A check in the amount of $ 916.00 is attached.

XX Please charge any additional fees for the papers being filed herewith and for which no check is enclosed herewith, or credit any overpayment to deposit Account No. 15-0030. A duplicate copy of this sheet is enclosed.

XX If these papers are not considered timely filed by the Patent and Trademark Office, then a petition is hereby made under 37 C.F.R. §1.136, and any additional fees required under 37 C.F.R. §1.136 for any necessary extension of time may be charged to deposit Account No. 15-0030. A duplicate copy of this sheet is enclosed.

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Richard D. Kelly
Attorney of Record
Registration No. 27,757

Fourth Floor
1755 Jefferson Davis Highway
Arlington, Virginia 22202
(703) 413-3000

*If the entry in Column 2 is less than the entry in Column 1 write "0" in Column 3.
**If the "Highest Number Previously paid for" IN THIS SPACE is less than 20 write "20" in this space.
***If the "Highest Number Previously paid for" IN THIS SPACE is less than 3 write "3" in this space.

7/92

# EXHIBIT H

769-080-0
75/

IN THE UNITED STATES PATENT & TRADEMARK OFFICE

| | | |
|---|---|---|
| IN RE APPLICATION OF | : | GROUP ART UNIT: 123 |
| GAETANO GATTI ET AL | : | |
| SERIAL NO: 878,784 | : | |
| FILED: JUNE 26, 1986 | : | EXAMINER: PESELEV |
| FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE | : : | |

DECLARATION UNDER RULE 1.132 DECLARATION II

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

NOW COMES Carlo Confalonieri, a citizen of Italy, and a resident of Cusano Milanino/(Milan), Italy, who declares and says that:

1. I am an employee of Farmitalia Carlo Erba S.p.A. since 1964, and an expert in the chemistry of anthracyclins, and have worked in the field of pharmaceutical analysis for at least ten years.

2. I graduated from the University of Milan, with a degree in Pharmacy in the year of 1976.

3. I supervised the following experiments:

4. The following experiments were carried out under accelerated temperature conditions on 5.0 ml of 2 mg/ml doxorubicin·HCl solutions in a container-closure system consisting of: glass type I, 8 ml top capacity vial; teflon-faced chlorobutyl rubber bung; aluminum seal.

pH-stability profile at 55°C of doxorubicin·HCl solutions in sterile water, 5% dextrose, 0.9% saline

2 mg/ml doxorubicin·HCl solutions were prepared in the following I=0.05 buffers: a) glycine·HCl pH 2.0, 2.5 and 3.0; b) formate pH 3.5; c) acetate pH 4.0, 5.0 and 5.5.

5.0 ml of each solution in glass vials were stored at 55°C and analyzed at prefixed times (up to 120 hours) for doxorubicin·HCl assay and pH.

Tables 1, 2 and 3 attached hereto give the doxorubicin·HCl residual concentration and percent stability at 55°C, at different pH's and times of storage for sterile water, 5% dextrose and 0.9% saline solutions, respectively.

The doxorubicin·HCl assays are the mean of three independent determinations performed by the USP HPLC method (USP XXI). At each pH value, the pseudo-first order rate constants ($K_{obs}$) for the degradation were calculated by linear regression analysis of the natural logarithm of the residual concentration of

doxorubicin·HCl ($|Dx|_t$) versus time as depicted by the following equation:

$$\ln |Dx|_t = \ln |Dx| - K_{obs} \cdot t$$

J. Thuro Carstens, Theory of Pharmaceutical Systems, Volume 1/ General Principles, page 172, Academic Press, New York and London 1972

Kenneth A. Connors, Gordon L. Amidon, Lloyd Kennon, Chemical Stability of Pharmaceuticals, chapter 2, John Wiley and Sons, New York 1979

Arthur Osol, Remington's Pharmaceutical Sciences, 16th Edition, chapter 18, Mack Publishing Company, Easton, Pennsylvania 1980

Valentino J. Stella, Chemical and Physical Bases Determining the Instability and Incompatibility of Formulated Injectable Drugs, Journal of Parenteral Sciences & Technology, July-August 1986, page 142

Tables 4, 5 and 6 attached hereto give the observed rate constants ($K_{obs}$) for the degradation kinetics of doxorubicin·HCl at 55°C and at different pH's for sterile water, 5% dextrose and 0.9% saline solutions, respectively.

Figures A, B and C attached hereto show the $K_{obs}$-pH profile for the doxorubicin·HCl degradation at 55°C in the above mentioned media. The data in Tables 1-6 and the Figures A-C evidence that the 2 mg/ml doxorubicin·HCl solutions show at 55°C the maximum stability in the pH range about 3.0-3.5 (± 0.2, e.g., 2.8, 3.2 and 3.3, 3.7) for all the three media tested.

5. I declare further that all statements made of my own knowledge are true and all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of this application or any patent issuing thereon.

6. Further declarant saith not.

March 10, 1987
Date

Carlo Confalonieri
Signature

75/mkn

Table 1 - Accelerated (55°C) stability data of 2 mg/ml doxorubicin.HCl solutions in sterile water at various pHs

| Buffers | Tests | Time (hours) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 0 | 8 | 16 | 24 | 48 | 72 | 120 |
| pH 2.0 glycine-HCl | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.022 | 1.862 | 1.666 | 1.554 | 1.145 | 0.801 | |
| | . % stability | 100.0 | 91.6 | 82.4 | 76.9 | 56.6 | 39.6 | |
| | pH | 2.00 | 2.01 | 2.02 | 2.01 | 2.01 | 2.02 | |
| pH 2.5 glycine-HCl | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 1.982 | 1.926 | 1.836 | 1.718 | 1.567 | 1.000 | |
| | . % stability | 100.0 | 96.7 | 92.1 | 86.2 | 78.2 | 50.2 | |
| | pH | 2.51 | 2.50 | 2.50 | 2.52 | 2.51 | 2.52 | |
| pH 3.0 glycine-HCl | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.003 | 1.956 | 1.861 | 1.831 | 1.696 | 1.525 | 1.256 |
| | . % stability | 100.0 | 97.6 | 93.0 | 91.4 | 84.7 | 76.1 | [illegible] |
| | pH | 3.00 | 3.01 | 3.02 | 3.02 | 3.01 | 3.02 | 3.00 |
| pH 3.5 formate | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.035 | 1.950 | 1.887 | 1.840 | 1.680 | 1.539 | 1.241 |
| | . % stability | 100.0 | 95.6 | 92.7 | 90.4 | 82.6 | 75.6 | 61.0 |
| | pH | 3.51 | 3.51 | 3.51 | 3.51 | 3.52 | 3.52 | 3.51 |
| pH 4.0 acetate | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.012 | 1.788 | 1.661 | 1.541 | 1.167 | | |
| | . % stability | 100.0 | 88.8 | 82.7 | 76.6 | 57.4 | | |
| | pH | 4.00 | 4.00 | 4.04 | 4.02 | 4.02 | | |
| pH 5.0 acetate | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.019 | 1.821 | 1.688 | 1.512 | 1.060 | | |
| | . % stability | 100.0 | 90.3 | 83.6 | 74.9 | 52.5 | | |
| | pH | 5.03 | 5.05 | 5.04 | 5.04 | 5.06 | | |
| pH 5.5 acetate | Doxorubicin.HCl assay | | | | | | | |
| | . mg/ml | 2.047 | 1.808 | 1.427 | 1.228 | 0.903 | | |
| | . % stability | 100.0 | 88.3 | 69.7 | 60.0 | 44.1 | | |
| | pH | 5.50 | 5.53 | 5.53 | 5.54 | 5.54 | | |

Table 2 - Accelerated (55°C) stability data of 2 mg/ml doxorubicin.HCl solutions in 5% dextrose at various pHs

| Buffers | Tests | Time (hours) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 0 | 8 | 16 | 24 | 32 | 48 | 72 | 96 | 120 |
| pH 2.0 glycine-HCl | Doxorubicin.HCl assay | | | | | | | | | |
| | - mg/ml | 1.993 | 1.851 | 1.682 | 1.513 | 1.361 | 1.078 | 0.765 | | |
| | - % stabiliy | 100.0 | 92.8 | 84.4 | 75.9 | 68.2 | 54.1 | 38.4 | | |
| | pH | 2.14 | 2.13 | 2.14 | 2.15 | 2.18 | 2.21 | 2.16 | | |
| pH 2.5 glycine-HCl | Doxorubicin.HCl assay | | | | | | | | | |
| | - mg/ml | 1.967 | 1.897 | 1.822 | 1.700 | 1.681 | 1.499 | 1.305 | | |
| | - % stability | 100.0 | 96.4 | 92.6 | 86.5 | 85.5 | 76.2 | 66.3 | | |
| | pH | 2.56 | 2.56 | 2.56 | 2.56 | 2.60 | 2.56 | 2.61 | | |
| pH 3.0 glycine-HCl | Doxorubicin.HCl assay | | | | | | | | | |
| | - mg/ml | 1.975 | | 1.906 | 1.832 | | 1.645 | 1.508 | 1.344 | 1.208 |
| | - % stability | 100.0 | | 96.6 | 92.7 | | 83.3 | 76.4 | 68.0 | 61.1 |
| | pH | 3.04 | | 3.05 | 3.06 | | 3.08 | 3.08 | 3.13 | 3.10 |
| pH 3.5 formate | Doxorubicin.HCl assay | | | | | | | | | |
| | - mg/ml | 1.985 | | 1.897 | 1.850 | | 1.622 | 1.334 | 1.222 | |
| | - % stability | 100.0 | | 96.7 | 93.7 | | 81.6 | 68.0 | 61.6 | |
| | pH | 3.58 | | 3.50 | 3.60 | | 3.63 | 3.60 | 3.63 | |
| pH 4.0 acetate | Doxorubicin.HCl assay | | | | | | | | | |
| | - mg/ml | 2.003 | 1.913 | 1.716 | 1.665 | 1.487 | 1.332 | 1.081 | | |
| | - % stability | 100.0 | 95.5 | 85.6 | 83.1 | 74.2 | 66.5 | 53.9 | | |
| | pH | 4.10 | 4.10 | 4.12 | 4.11 | 4.14 | 4.15 | 4.12 | | |
| pH 5.0 acetate | Doxorubicin.HCl assay | | | | | | | | | |
| | - mg/ml | 2.012 | 1.906 | 1.872 | 1.608 | 1.416 | 1.163 | | | |
| | - % stability | 100.0 | 94.7 | 83.2 | 79.9 | 70.4 | 57.8 | | | |
| | pH | 5.04 | 5.04 | 5.05 | 5.05 | 5.07 | 5.04 | | | |
| pH 5.5 acetate | Doxorubicin.HCl assay | | | | | | | | | |
| | - mg/ml | 1.991 | 1.841 | 1.470 | 1.246 | 1.081 | | | | |
| | - % stability | 100.0 | 88.5 | 73.8 | 62.6 | 54.0 | | | | |
| | pH | 5.56 | 5.54 | 5.46 | 5.50 | 5.48 | | | | |

Table 2 - Accelerated (55°C) stability data of 2 mg/ml doxorubicin.HCl solutions in 0.9% saline at various pHs

| Buffers | Tests | Time (hours) 0 | 4 | 8 | 18 | 24 | 36 | 48 | 72 | 96 | 120 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Doxorubicin.HCl assay | | | | | | | | | | |
| pH 2.0 | . mg/ml | 1.998 | | 1.857 | 1.560 | 1.307 | 1.221 | 0.931 | 0.701 | | |
| glycine-HCl | . % stability | 100.0 | | 92.9 | 78.1 | 65.9 | 61.6 | 46.6 | 35.1 | | |
| | pH | 2.16 | | 2.16 | 2.16 | 2.16 | 2.22 | 2.20 | 2.19 | | |
| | Doxorubicin.HCl assay | | | | | | | | | | |
| pH 2.5 | . mg/ml | 1.946 | | 1.875 | 1.670 | 1.602 | 1.368 | 1.132 | | | |
| glycine-HCl | . % stability | 100.0 | | 96.3 | 85.8 | 82.3 | 70.3 | 58.1 | | | |
| | pH | 2.50 | | 2.50 | 2.50 | 2.58 | 2.62 | 2.62 | | | |
| | Doxorubicin.HCl assay | | | | | | | | | | |
| pH 3.0 | . mg/ml | 1.994 | | | 1.818 | 1.771 | | 1.571 | 1.375 | 1.206 | 1.003 |
| glycine-HCl | . % stability | 100.0 | | | 91.2 | 88.8 | | 78.8 | 68.9 | 60.4 | 50.3 |
| | pH | 3.04 | | | 3.07 | 3.07 | | 3.08 | 3.13 | 3.14 | 3.12 |
| | Doxorubicin.HCl assay | | | | | | | | | | |
| pH 3.5 | . mg/ml | 1.997 | | | 1.824 | 1.742 | | 1.543 | 1.323 | 1.176 | 0.918 |
| formate | . % stability | 100.0 | | | 91.4 | 87.2 | | 77.3 | 66.2 | 58.9 | 46.0 |
| | pH | 3.58 | | | 3.56 | 3.56 | | 3.64 | 3.61 | 3.64 | 3.63 |
| | Doxorubicin.HCl assay | | | | | | | | | | |
| pH 4.0 | . mg/ml | 1.972 | 1.803 | 1.828 | 1.653 | 1.584 | | | | | |
| acetate | . % stability | 100.0 | 91.4 | 92.7 | 83.8 | 80.4 | | | | | |
| | pH | 4.10 | 4.10 | 4.10 | 4.10 | 4.11 | | | | | |
| | Doxorubicin.HCl assay | | | | | | | | | | |
| pH 5.0 | . mg/ml | 1.970 | | 1.732 | 1.464 | 1.442 | 1.278 | | | | |
| acetate | . % stability | 100.0 | | 87.9 | 74.3 | 72.8 | 64.6 | | | | |
| | pH | 5.04 | | 5.06 | 5.04 | 5.08 | 5.05 | | | | |
| | Doxorubicin.HCl assay | | | | | | | | | | |
| pH 5.5 | . mg/ml | 2.021 | | 1.847 | 1.546 | 1.330 | | | | | |
| acetate | . % stability | 100.0 | | 91.3 | 76.5 | 65.7 | | | | | |
| | pH | 5.50 | | 5.54 | 5.53 | 5.53 | | | | | |

Table 4 – $K_{obs}$ values (1/days) for the degradation of doxorubicin.HCl 2 mg/ml solutions in sterile water at various pHs at 55°C

| Buffer | pH | $K_{obs} \times 10^3$ | 95% confidence limits |
|---|---|---|---|
| Glycine-HCl (I = 0.05) | 2.0 | 309.5 | ± 12.7 |
| Glycine-HCl (I = 0.05) | 2.5 | 136.3 | ± 0.6 |
| Glycine-HCl (I = 0.05) | 3.0 | 93.1 | ± 4.6 |
| Formate (I = 0.05) | 3.5 | 96.7 | ± 4.4 |
| Acetate (I = 0.05) | 4.0 | 269.8 | ± 18.7 |
| Acetate (I = 0.05) | 5.0 | 322.6 | ± 19.2 |
| Acetate (I = 0.05) | 5.5 | 415.4 | ± 45.7 |

Table 5 - $K_{obs}$ values (1/days) for the degradation of doxorubicin.HCl 2 mg/ml solutions in 5% dextrose at various pHs at 55°C

| Buffer | pH | $K_{obs} \times 10^3$ | 95% confidence limits |
|---|---|---|---|
| Glycine-HCl (I = 0.05) | 2.0 | 323.8 | ± 17.2 |
| Glycine-HCl (I = 0.05) | 2.5 | 138.7 | ± 9.9 |
| Glycine-HCl (I = 0.05) | 3.0 | 100.5 | ± 5.9 |
| Formate (I = 0.05) | 3.5 | 132.0 | ± 20.7 |
| Acetate (I = 0.05) | 4.0 | 209.7 | ± 12.7 |
| Acetate (I = 0.05) | 5.0 | 273.1 | ± 27.7 |
| Acetate (I = 0.05) | 5.5 | 453.7 | ± 59.2 |

Table 6 – $K_{obs}$ values (1/days) for the degradation of doxorubicin.HCl 2 mg/ml solutions in 0.9% saline at various pHs at 55°C

| Buffer | pH | $K_{obs}$ x $10^3$ | 95% confidence limit |
|---|---|---|---|
| Glycine-HCl (I = 0.05) | 2.0 | 362.4 | ± 19.4 |
| Glycine-HCl (I = 0.05) | 2.5 | 276.5 | ± 30.2 |
| Glycine-HCl (I = 0.05) | 3.0 | 133.2 | ± 8.0 |
| Formate (I = 0.05) | 3.5 | 148.1 | ± 11.1 |
| Acetate (I = 0.05) | 4.0 | 215.7 | ± 35.4 |
| Acetate (I = 0.05) | 5.0 | 301.2 | ± 60.1 |
| Acetate (I = 0.05) | 5.5 | 430.3 | ± 59.9 |

K obs - pH PROFILE AT 55^C

Figure A – $K_{obs}$ – pH profile for doxorubicin.HCl degradation at 55°C in sterile water



Figure 8 – $K_{obs}$ – pH profile for doxorubicin.HCl degradation at 55°C in 5% dextrose

K obs – pH PROFILE AT 55^C

K obs E+3 (1/days)

500
450
400
350
300
250
200
150
100
50

1.5 2.5 3.5 4.5 5.5

pH

Figure C – $K_{obs}$ – pH profile for doxorubicin.HCl degradation at 55°C in 0.9% saline

# EXHIBIT I

# REDACTED

# EXHIBIT J

769-086-0 FWC

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| IN RE APPLICATION OF: | : | |
| GAETANO GATTI ET AL | : | GROUP ART UNIT: 183 |
| SERIAL NO. 07/503,856 | : | EXAMINER: PESELEV |
| FILED: APRIL 3, 1990 | : | |
| FOR: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE | : | |

DECLARATION PURSUANT TO 37 C.F.R. 1.132

HONORABLE COMMISSIONER OF PATENTS & TRADEMARKS
WASHINGTON, D.C. 20231

SIR:

Now comes Carlo Confalonieri, a citizen of Italy, and a resident of Cusano Milanino (Milan), Italy, who declares and states that:

1. I am an employee of Farmitalia Carlo Erba, S.r.l. since 1964 and I am an expert in the chemistry of anthracyclines.

2. I graduated from the University of Milan, with a degree in Pharmacy in 1976.

3. That I supervised the accelerated stability test originally presented in my March 10,1987 declaration filed in Serial No. 878,784, a copy of which is Exhibit C to my December 20, 1990 Declaration filed in Serial No. 07/503,856.

The complete details of the experiments which were conducted are found on pages 2 and 3 of Exhibit C.

4. In Table 1, pH's of from 2 to 3.0 were compared at 55°C for stability wherein the pH was adjusted with HCl. As can be seen, the composition wherein the pH was 2.5 had superior stability as compared with the same solution at a pH of 2.0. The superiority of stability is particularly apparent beginning at about 16 hours and continuing thereafter. In Table 2, further comparisons of solutions having a pH from 2.0 to 3.0 and adjusted with HCl are reported. The actual pH for the solution having a reported pH of 2.0 is, as set forth in the table, variable over the time of the test beginning at 2.14 and varying from a low of 2.13 to a high of 2.21. Similarly, the solution with a recorded pH of 2.5 varied somewhat over the test period and ranged from an initial pH of 2.56 to a high of 2.61.

5. I am also familiar with the Wassermann reference, Exhibit F, hereto. The Wassermann reference is reporting on the decomposition of Adriamycin under acidic conditions at a pH of about 2. In the experiments, Wassermann reports a pH of 2.13. The composition of Wassermann differs from the composition which is the subject of the above-identified application in that the concentration of Adriamycin in the solution is only about 1/80th of the minimum of concentration specified in the present claims and, (2) the pH is lower than the minimum specified in the claim of 2.5. It is my opinion that Wassermann was not concerned with long term storage stability but, rather, was solely concerned with the kinetics of Adriamycin decomposition under acidic conditions as are found in the gastric system and in liquid

chromatography using acidic mobile phases. It is my opinion that Wassermann provides no information which would allow one skilled in the art to produce a storage stable Adriamycin solution. My opinion is confirmed by the Beijnen article, Exhibit G hereto. On the first page of the article (page 109) Beijnen describes the Wassermann article thusly:

> Furthermore, as explained by Wassermann and Bundgaard, data with respect to the acid catalyzed hydrolysis of anthracyclines are of importance in relation to gastric degradation and liquid chromatography using acidic mobile phases.

6. The test results reported on Table 2 further confirm my opinion that Wassermann was unconcerned with long term storage stability. As can be seen, when a pH is adjusted to 2.14 the storage stability of the solution for the first 8 hours 55°C is comparatively good, approximately 92.8% of the anthracycline remains in an active form. This is in agreement with Wassermann's statement that under the conditions of HPLC, degradation will not be a factor and, that in the gastric system of a patient having normal retention times, the anthracyclines will survive largely intact. However, as can be seen from Table 2 long term stability of the solution at a pH of 2.14 (approximately) is not good. After 16 hours at 55°C, only 84.4% of the doxorubicin remains in active form as compared with 92.6% of the doxorubicin having a pH of about 2.5 (2.56). As the time is extended the 72 hours, the difference in stability of the two solutions becomes even more apparent. It is my opinion that the

tests reported in Table 2 demonstrate that the Wassermann solution would not be considered a long term storage stable product.

7. Based on the extensive experimentations which I have carried out and my experience with the experiments reported on Tables 1-3, the difference between a pH of 2.5 and a pH of 2.56 will not have a significant effect on the overall stability of the doxorubicin solutions as can be seen from Table 1, at a pH of 2.51, the doxorubicin solution had approximately the same stability as that reported for a pH of 2.56 in Table 2. Accordingly, it is my opinion that the test results presented in Table 2 are a fair comparison of a solution having pH of 2.5 versus a solution having a pH of 2.14 wherein the pH was achieved by adjustment with hydrochloric acid.

8. In conclusion, it is my opinion that one skilled in the art would not have been lead by the Wassermann reference to have recognized the unique advantages to be achieved by adjusting Adriamycin solutions to a pH of from 2.5 to 5.0 with hydrochloric acid. There is nothing in Wassermann which would suggest that such solutions would have long term storage stable characteristics such as those which are the subject of the claims of the above-identified application. Based upon the experience of those skilled in the art, when one was preparing the solution of Adriamycin for use in chemotherapy, any adjustment of pH above about 2 would have been performed with a buffer and not with hydrochloric acid. Thus, it is my opinion that it was quite

surprising and unexpected to find that the use of hydrochloric acid to adjust the pH of an Adriamycin solution to from 2.5 to 5.0 resulted in a storage stable solution.

9. The undersigned declares further that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

10. Further deponent saith not.

Date: 27th May, 1991

Carlo Confalonieri
Carlo Confalonieri

PU 0016641

# EXHIBIT K

MAIL ROOM MAY 8 1997 PAT. & TRADEMARK OFC.

AMENDMENT

#41/H
[signature]
6/10/97

CERTIFICATE OF MAILING

I hereby certify that this paper and every paper referred to therein as being enclosed is being deposited with the U.S. Postal Service as first class mail, postage prepaid, in an envelope addressed to: Commissioner of Patents & Trademarks, Washington, DC 20231, on May 06, 1997 (Date of Deposit)

5/6/97 [signature]
Date Name

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No. 96,926)

In re Application of:

Gaetano Gatti et al.

Serial No.: 07/827,742

Filed: January 29, 1992

For: INJECTABLE READY-TO-USE SOLUTIONS CONTAINING AN ANTITUMOR ANTHRACYCLINE GLYCOSIDE

Examiner: R. Penelev

Art Unit: 1211

## AMENDMENT

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

This is in response to the Office Action mailed December 6, 1996. A Petition for an extension of time (two months) and requisite fee are attached herewith. Please amend this application as shown below.

### IN THE CLAIMS

Please add the following new dependent claims as shown below. A clean copy of the entire set of pending claims, after amendment, is attached as Appendix A.

37. (Amended) The solution of claim 31 wherein the concentration of doxorubicin is about 2 mg/ml.

38. (Amended) The solution of claim 31 wherein the concentration of doxorubicin is about 5 mg/ml.

-- 48. The solution of claim 31 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

49. The solution of claim 48 wherein the physiologically acceptable acid is hydrochloric acid.

50. The solution of claim 49 wherein the anthracycline glycoside is idarubicin hydrochloride.

51. The solution of claim 44 wherein the concentration of anthracycline glycoside is about 1 mg/ml.

52. The solution of claim 51 wherein the physiologically acceptable acid is hydrochloric acid.

53. The solution of claim 52 wherein the anthracycline glycoside is idarubicin hydrochloride. --

REMARKS

Reconsideration of this application, as amended, is respectfully requested.

Claims 31, 33-38, 40, 42 and 44-47 were pending in this application. New dependent claims 48-53 were added to further specify other embodiments of the invention. Claims 31, 33-38, 40, 42, and 44-53 are now pending in this application.

Support for the new dependent claims can be found in the application as originally filed. For instance, the subject matter of new claims 49 and 52 can be found on page 3, lines 23 and 24; new claims 48 and 51 can be found on page 6, lines 17 and 18; and new claims 47 and 53 can be found on page 3, line 13. Support for the amendment of claims 37 and 38 can be found on page 6, lines 14-24, in the specification. Accordingly, no new matter has been introduced into the application as a result of the above amendment.

Turning to the Office Action, claims 31, 33-38, 40 and 42 stand rejected under 35 U.S.C. 103 as being unpatentable over Janssen et al., International J. Pharmaceutics, Vol. 23 (1985), pp. 1-11 ("Janssen"). These claims also stand rejected under 35 U.S.C. 103 as being unpatentable over Kaniewska (Chem. Abstracts, Vol. 88, 1978, Abst. No. 197526x) ("Kaniewska I") or Kaniewska (Pharmacia Polska, Vol. 9, pp. 539-542) ("Kaniewska II") in combination with Janssen. Applicants respectfully traverse these rejections.

The Federal Circuit has reiterated the manner in which obviousness rejections are to be reviewed. Where claimed subject matter has been rejected as obvious in view of a combination of prior art references, "a proper analysis under § 103 requires, inter alia, consideration of two factors: (1) whether the prior art would have suggested to those of ordinary skill in the art that they should make the claimed composition or device, or carry out the claimed process; and (2) whether the prior art would also have revealed that in so making or carrying out, those of ordinary skill would have a reasonable expectation of success." In re Vaeck, 947 F.2d 488, 493, 20 U.S.P.Q.2d 1438, 1442 (Fed. Cir. 1991), cited In re Dow Chemical Co., 837 F.2d 469, 473, 5 U.S.P.Q.2d 1529, 1531 (Fed. Cir. 1988). As the Federal Circuit emphasized by succinctly summarizing: "Both the suggestion and the reasonable expectation of success must be founded in the prior art, not in the Applicants' disclosure." Id. In the present case, neither Janssen, Kaniewska I, nor Kaniewska II provide any suggestion for the combination of references. Moreover, neither Janssen, Kaniewska I nor Kaniewska II, alone or in combination with each other, teach an expectation of success for doing what the Applicants have done, *i.e.* achieving a storage stable solution of anthracycline glycosides in a pharmaceutically accepted solution.

Janssen merely relates to a doxorubicin-HCl salt dissolved in Tris or phosphate buffer or cell culture medium for determination of decomposition kinetics in the presence or absence of liposomes. While Janssen teaches that doxorubicin decomposition rates can be modulated by buffer choice and temperature, Janssen does not teach or suggest that any of the disclosed buffers are "pharmaceutically acceptable solutions" as recited in the present claims. Moreover, Janssen does not suggest that its result can be achieved irrespective of the manner of adjusting the pH, *i.e.*, irrespective of using buffer. The reader knows only that the buffer used therein achieved the results disclosed. There is nothing in Janssen that implies the need for a storage stable physiologically acceptable solution of anthracycline glycoside. There is also nothing in Janssen that suggest the same result could be obtained by pH adjustment of a physiologically acceptable aqueous solvent medium with the use of a physiologically acceptable acid. Moreover, as the Examiner had acknowledged on page 2 of the prior Office Action, Janssen does not teach or suggest a concentration of anthracycline glycoside ranging from 0.1 to 100 mg/ml in pharmaceutically acceptable solution or otherwise.

Like Janssen, Kaniewska I is mainly concerned with decomposition kinetics, and merely states that adriamycin-HCl in buffered solutions followed first order kinetics at increasing pH of the medium. While Kaniewska describes measurement of a decomposition rate constant at pH 2.6, Kaniewska does not teach or suggest any "pharmaceutically acceptable solution." Indeed, Kaniewska I is completely silent with respect to the chemical identity of the solution, other than the fact that it is buffered. Like Janssen, Kaniewska I fails to suggest that the results are achieved without use of a buffer, *i.e.*, irrespective of how pH is adjusted. While Kaniewska I does disclose determination of a rate constant at pH 2.6 as the Examiner noted on page 2 of the Action, this determination is not a disclosure of a pharmaceutically acceptable solution having the recited pH range as presently claimed.

Finally, Kaniewska II merely concerns decomposition kinetics of adriamycin hydrochloride in solid form and in a 2% solution of "Britton-Robinson" buffer at various pH values. As shown in the attached article by Britton and Robinson (J. Chem. Soc., 458, 1456 (1931)), the Britton-Robinson buffer merely refers to an aqueous solution of sodium hydroxide, acetic acid, phosphoric acid and boric acid. Acetic acid is replaceable with phenylacetic acid and in one version, a barbituric drug substance, veronal, was also included. Britton-Robinson buffers are not considered pharmaceutically acceptable and cannot be used for pharmaceutical preparations due to the presence of physiologically unacceptable substances such as boric acid.

Accordingly, a person of ordinary skill in the art would not be motivated by Janssen's teachings concerning non-physiologically acceptable phosphate or TRIS buffer or cell growth

medium containing doxorubicin, or Kaniewska I's teachings concerning unknown buffered solutions for decomposition kinetic studies, or Kaniewska's adriamycin solutions in Britton-Robinson buffers for decomposition kinetic studies to make and use the presently claimed physiologically acceptable solution with any reasonable expectation of success. There is no teaching in the cited references that the results are achieved irrespective of what is used to adjust the pH level, and the teaching of the cited references was not achieved in a physiologically accepted solution. As a threshold matter, obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination. In re Geiger, 815 F.2d 686 (Fed. Cir. 1987); In re Fine, 837 F.2d 1071 (Fed. Cir. 1988). Withdrawal of the § 103 rejection based on Janssen, Kaniewska I and II, alone or in combination with each other, is in order and is respectfully requested.

These references merely illustrate that, prior to the present invention, scientists were searching for an answer to a long-term storage stable solution of anthracycline glycosides in a pharmaceutically acceptable solution. These references do not teach the solution. Rather, they confirm the long-standing need of the problem. Indeed, Janssen et al. expressly acknowledged that they had not solved the problem: "In our laboratory, work is in progress to address the problem related to the chemical stability of DXR [*i.e.*, doxorubicin] in a systematic way." Janssen et al., p. 10.

In view of the above amendment and discussion, Applicants respectfully submit that claims 31, 33-38, 40, 42, and 44-53 are allowable and that a Notice of Allowance should be issued in this case. The Applicants urge the Examiner to contact the Applicants' undersigned representative if the Examiner believes that this would expedite prosecution of this application.

Respectfully submitted,

Dated: May 6, 1997

Daniel A. Boehnen
Registration No. 28,399

McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Chicago, Illinois 60606
Phone: (312) 913-0001
Facsimile: (312) 913-0002

# EXHIBIT L

# REDACTED

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of November, 2006, the attached **REDACTED PUBLIC VERSION OF MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' NOTICE OF ITS INTENT TO SUBMIT EVIDENCE TO THE JURY IN SUPPORT OF ITS OBVIOUSNESS DEFENSE THAT THE PATENT AND TRADEMARK OFFICE ACTED ON INACCURATE AND UNRELIABLE INFORMATION ABOUT PRIOR ART** was served upon the below-named counsel of record at the address and in the manner indicated:

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19801

HAND DELIVERY

Joshua R. Rich, Esquire
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606

VIA FEDERAL EXPRESS

/s/ *John G. Day*

John G. Day